**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

KELLI DENISE GOODE, Individually,
and also as the Personal Representative of
Troy Charlton Goode, Deceased, and as
Mother, Natural Guardian, and Next
Friend of R.G., a Minor, and also
on behalf of all similarly situated persons.

                                        **PLAINTIFF**

**vs.**           **Civil Action Number:**    **2:16-cv-02029-SHM-cgc**

THE CITY OF SOUTHAVEN           **JURY DEMAND**
TODD BAGGETT Individually, JEREMY
BOND, TYLER PRICE,
Individually, JOEL RICH Individually,
JASON SCALLORN Individually, STACIE
J. GRAHAM a/k/a WITTE Individually,
MIKE MUELLER Individually, WILLIAM
PAINTER, JR. Individually, BRUCE K.
SEBRING Individually, JOSEPH SPENCE,
Individually, RICHARD A.
WEATHERFORD, Individually, JOHN
DOES 1-10, BAPTIST MEMORIAL
HOSPITAL-DESOTO, a Mississippi
Corporation, SOUTHEASTERN EMERGENCY
PHYSICIANS, INC., A Tennessee Corporation,
LEMUEL DONJA OLIVER, M.D.,
and SUN LIFE ASSURANCE COMPANY OF
CANADA,

                                          **DEFENDANTS**

---

**PLAINTIFF'S FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS**
**AND STATE LAW AND AS A CLASS ACTION FOR INJUNCTIVE RELIEF AND**
**DAMAGES**
**(Jury Trial Demanded)**

---

Plaintiff, acting by and through her undersigned attorneys, brings this Complaint against

Defendants alleging for her causes of action as follows:

1

## I. INTRODUCTION

1.     This Complaint seeks damages and injunctive relief based upon the untimely death of Troy Charleton Goode, a beloved husband, father, brother, and son, as well as an extremely accomplished chemical engineer.  Troy died on July 18, 2015, at Baptist Memorial Hospital in Southaven, Mississippi.

2.     Troy had been arrested for public drunkenness and/or disorderly conduct, was unarmed, was not engaged in the commission of any crime, posed no threat to any person and yet Southaven police officers attacked him with a police dog, shocked him in the back with a "taser" gun, jumped on and straddled his back while he was in a prone (face-down) position, hogtied him and placed him prone, and strapped him to a stretcher in a five point restraint which proximately resulted in death.  Troy remained hogtied for more than an hour.

3.     At the time of his death, Troy was hogtied to a hospital bed and under the supervision of two Southaven Police officers.  Shockingly, no medical personnel were present.  Just prior to Troy's death, numerous City of Southaven employees at the hospital heard Troy's cries for help and saw him struggle to breathe.  They did not help him.  Instead, they laughed.

4.     As detailed below, hogtying is well-known to be deadly.   Police training manuals (including those used by the State of Mississippi), Memphis Police Department, EMS standard operating procedures, Department of Justice recommendations, medical literature, and hospital regulations all warn about the risk of injury or death created by hogtying.  Despite this, Troy remained hogtied by police, fire, EMS, and hospital personnel.  Troy's death is not a simple case of negligence.  Instead, it reflects a systemic failure and willful violation of civil rights by the governmental Defendants named herein and those acting in concert with the governmental entities.

5.     The death of Troy Charlton Goode was caused by an unnecessary and excessive use of force which resulted in injuries, damages, and losses being suffered and sustained by Troy, Kelli, and R.G.

6.     As a result of the excessive force used by Defendants, further detailed below, Kelli Goode is now a 31-year-old widow.  R.G. is now fatherless.

## II. JURISDICTION

(Federal question jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. §1132(e))

7.     This Complaint seeks damages pursuant to Title 42 U.S.C. §§ 1983 and 1988 for the violation of the civil and constitutional rights of Troy Charlton Goode (deceased, and hereinafter "Troy"), and for the violation of the civil and constitutional rights of the Plaintiff, Kelli Denise Goode ("Kelli" or "Plaintiff"), and for violations of the law of the State of Tennessee and the State of Mississippi, arising from the wrongful death of Troy, who was arrested and placed in a five point restraint commonly known as "hog tying," and died in Southaven, Desoto County, Mississippi, as a direct and proximate result of the unlawful and excessive restraints, as well as for life insurance benefits due under an ERISA employee benefit plan.  Jurisdiction is founded upon Title 28 U.S.C. §§ 1331 and 1343 and Title 29 U.S.C. §1132(e). This Court has supplemental jurisdiction over the state law claims presented herein pursuant to 28 U.S.C. §1367.

## II. VENUE

8.     A substantial part of the events and omissions giving rise to this civil action occurred in Memphis, Shelby County, Tennessee; therefore, pursuant to 28 U.S.C. §1391(b)(2) and 28

U.S.C. §123(c)(2), the proper venue for this action is in the Western Division of the United States District Court of the Western District of Tennessee. Venue for the ERISA claims is proper within this District pursuant to 29 U.S.C. 1132(e)(2).

### III. JURY TRIAL DEMANDED

9.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial of this action as is her right pursuant to Amendment VII to the Constitution of the United States of America.

### IV. PARTIES

10.    The estate of Troy Charlton Goode (deceased) is being represented by his surviving wife, Kelli Denise Goode, who brings this action not only on behalf of the estate but as well as herself and the minor son of the marriage, R.G.

11.    The City of Southaven is a public entity which is a political subdivision created and existing by virtue of the laws of the state of Mississippi that is located within Desoto County, Mississippi and which may be served with process of this Court by serving same upon Darren Musselwhite, Mayor of the City of Southaven at 8710 Northwest Dr., Southaven, MS 38671. Defendant City of Southaven operates and manages the Southaven Police Department and Southaven Fire Department.

12.    Defendant Todd Baggett was, at all times relevant hereto, a police officer employed by the City of Southaven with the Southaven Police Department and was acting within the scope and course of his employment as a police officer for the City of Southaven. Upon information and belief, Defendant Todd Baggett is an adult resident citizen of Desoto County, Mississippi,

who may be served with process of this Court who may be served with process of this Court at his place of employment, to wit: Southaven Police Department, 8691 Northwest Dr, Southaven, MS 38671. Defendant Todd Baggett is being sued in his individual and official capacities. At all times material to this civil action, Defendant Todd Baggett was an agent, employee, and/or servant of the City of Southaven, and was acting within the scope and course of his employment and duties with the City of Southaven.

13.     Defendant Jeremy Bond was, at all times relevant hereto, a police officer employed by the City of Southaven with the Southaven Police Department and was acting within the scope and course of his employment as a police officer for the City of Southaven. Upon information and belief, Defendant Jeremy Bond is an adult resident citizen of Desoto County, Mississippi, who may be served with process of this Court at his place of employment, to wit: Southaven Police Department, 8691 Northwest Dr, Southaven, MS 38671. Defendant Jeremy Bond is being sued in his individual and official capacities. At all times material to this civil action, Defendant Jeremy Bond was an agent, employee, and/or servant of the City of Southaven, and was acting within the scope and course of his employment and duties with the City of Southaven.

14.     Defendant Tyler Price was, at all times relevant hereto, a police officer employed by the City of Southaven with the Southaven Police Department and was acting within the scope and course of his employment as a police officer for the City of Southaven. Upon information and belief, Defendant Tyler Price is an adult resident citizen of Desoto County, Mississippi, who may be served with process of this Court at his place of employment, to wit: Southaven Police Department, 8691 Northwest Dr, Southaven, MS 38671. Defendant Tyler Price is being sued in his individual and official capacities. At all times material to this civil action, Defendant Tyler

5

Price was an agent, employee, and/or servant of the City of Southaven, and was acting within the scope and course of his employment and duties with the City of Southaven.

15.     Defendant Joel Rich was, at all times relevant hereto, a police officer employed by the City of Southaven with the Southaven Police Department and was acting within the scope and course of his employment as a police officer for the City of Southaven. Upon information and belief, Defendant Joel Rich is an adult resident citizen of Desoto County, Mississippi, who may be served with process of this Court at his place of employment, to wit: Southaven Police Department, 8691 Northwest Dr, Southaven, MS 38671.  Defendant Joel Rich is being sued in his individual and official capacities.  At all times material to this civil action, Defendant Joel Rich was an agent, employee, and/or servant of the City of Southaven, and was acting within the scope and course of his employment and duties with the City of Southaven.

16.     Defendant Jason Scallorn was, at all times relevant hereto, a police officer employed by the City of Southaven with the Southaven Police Department and was acting within the scope and course of his employment as a police officer for the City of Southaven.  Upon information and belief, Defendant Jason Scallorn is an adult resident citizen of Desoto County, Mississippi, who may be served with process of this Court at his place of employment, to wit: Southaven Police Department, 8691 Northwest Dr, Southaven, MS 38671.  Defendant Jason Scallorn is being sued in his individual and official capacities.  At all times material to this civil action, Defendant Jason Scallorn was an agent, employee, and/or servant of the City of Southaven, and was acting within the scope and course of his employment and duties with the City of Southaven.

17.     Defendant Stacie J. Graham a/k/a Witte was, at all times relevant hereto, an EMS medic employed by the City of Southaven with the Southaven Fire Department and was acting within the scope and course of her employment as an EMS medic for Southaven. Upon information and

belief, Defendant Stacie J. Graham is an adult resident citizen of Desoto County, Mississippi, who may be served with process of this Court at her place of employment, to wit: Southaven Fire Department at 8710 Northwest Dr, Southaven, MS 38671. Defendant Stacie J. Graham is being sued in her individual and official capacities. At all times material to this civil action, Defendant Stacie J. Graham was an agent, employee, and/or servant of the City of Southaven and was acting within the scope and course of her employment and duties with the City of Southaven.

18.     Defendant Mike Mueller was, at all times relevant hereto, a fire fighter employed by the City of Southaven with the Southaven Fire Department and was acting within the scope and course of his employment as Lieutenant and/or fire fighter for Southaven Fire Department. Upon information and belief, Defendant Mike Mueller is an adult resident citizen of Sesoto County, Mississippi, who may be served with process of this Court at his place of employment, to wit: Southaven Fire Department at 8710 Northwest Dr, Southaven, MS 38671. Defendant Mike Mueller is being sued in his individual and official capacities. At all times material to this civil action, Defendant Mike Mueller was an agent, employee, and/or servant of the City of Southaven and was acting within the scope and course of his employment and duties with the City of Southaven.

19.     Defendant William Painter, Jr. was, at all times relevant hereto, a fire fighter employed by the City of Southaven with the Southaven Fire Department and was acting within the scope and course of his employment as a fire fighter for Southaven Fire Department. Upon information and belief, Defendant William Painter, Jr. is an adult resident citizen of Desoto County, Mississippi, who may be served with process of this Court at his place of employment, to wit: Southaven Fire Department at 8710 Northwest Dr, Southaven, MS 38671. Defendant William Painter, Jr. is being sued in his individual and official capacities. At all times material to this

7

civil action, Defendant William Painter, Jr. was an agent, employee, and/or servant of the City of Southaven and was acting within the scope and course of his employment and duties with the City of Southaven.

20.    Defendant Bruce K. Sebring was, at all times relevant hereto, a fire fighter employed by the City of Southaven with the Southaven Fire Department and was acting within the scope and course of his employment as a fire fighter for the City of Southaven. Upon information and belief, Defendant Bruce K. Sebring is an adult resident citizen of Desoto County, Mississippi, who may be served with process of this Court at his place of employment, to wit: Southaven Fire Department at 8710 Northwest Dr, Southaven, MS 38671.  Defendant Bruce K. Sebring is being sued in his individual and official capacities.  At all times material to this civil action, Defendant Bruce K. Sebring was an agent, employee, and/or servant of the City of Southaven, and was acting within the scope and course of his employment and duties with the City of Southaven.

21.    Defendant Joseph Spence was, at all times relevant hereto, a fire fighter employed by the City of Southaven with the Southaven Fire Department and was acting within the scope and course of his employment as a fire fighter for the City of Southaven. Upon information and belief, Defendant Joseph Spence is an adult resident citizen of Desoto County, Mississippi, who may be served with process of this Court at his place of employment, to wit: Southaven Fire Department at 8710 Northwest Dr, Southaven, MS 38671.  Defendant Joseph Spence is being sued in his individual and official capacities.  At all times material to this civil action, Defendant Joseph Spence was an agent, employee, and/or servant of the City of Southaven and was acting within the scope and course of his employment and duties with the City of Southaven.

22.    Defendant Richard A. Weatherford was, at all times relevant hereto, a fire fighter employed by the City of Southaven with the Southaven Fire Department and was acting within

the scope and course of his employment as an engine driver and/or fire fighter for the City of Southaven. Upon information and belief, Defendant Richard A. Weatherford is an adult resident citizen of Shelby County, Tennessee, who may be served with process of this Court at his place of employment, to wit: Southaven Fire Department at 8710 Northwest Dr, Southaven, MS 38671. Defendant Richard A. Weatherford is being sued in his individual and official capacities. At all times material to this civil action, Defendant Richard Weatherford was an agent, employee, and/or servant of the City of Southaven and was acting within the scope and course of his employment and duties with the City of Southaven.

23.     Defendant Southeastern Emergency Physicians, Inc. (hereinafter "Southeastern") is a corporation existing by virtue of the law of the State of Tennessee whose agent for service of process is The Prentice-Hall Corporation System, Inc., 2908 Poston Ave., Nashville, TN 37203. Defendant Southeastern is a contract provider of physician services to hospitals for emergency room duties. Upon information and belief, Defendant Southeastern pursuant to contract provided the services of Dr. Lemuel Oliver to Baptist Memorial Hospital Desoto at times material hereto.

24.     Defendant Lemuel Donja Oliver, M.D. (hereinafter "Oliver") is a physician licensed to practice medicine in the State of Mississippi. Oliver is an adult resident of Lee County, Mississippi, who may be served with process of this Court at 3848 Big Oaks Blvd., Saltillo, MS 38866. Upon information and belief, Defendant Oliver has continuous and systematic contacts with Tennessee, including through ownership of property and multiple businesses in Shelby County, Tennessee. At times material, Defendant Oliver was charged with the responsibility of providing medical care to Decedent. Defendant Oliver acted in concert with other Defendants herein to deprive Decedent of civil rights guaranteed and protected by the Constitution and laws of the United States and State of Mississippi. At all times material hereto, Defendant Oliver was

an agent or employee of Defendants Baptist and Southeastern. Defendants Lemuel Donja Oliver, M.D., Southeastern, and Baptist Memorial Hospital-Desoto are hereinafter referred to as the "Hospital Defendants."

25.     The true names and identities of certain Defendants are presently unknown to the Plaintiff.  These Defendants are referred to in this Complaint as Defendants John Does 1-5.  The Plaintiff alleges that each of the Defendants John Does 1-5 were employed by the City of Southaven with the Southaven Police Department or Fire Department at the time of conduct alleged herein and were responsible for the promulgation of the conduct alleged herein.  Plaintiff will seek to amend this Complaint as soon as the true names and identifies of Defendants John Does 1-5 have been ascertained.

26.     The true names and identities of certain other Defendants are presently unknown to the Plaintiff.  These Defendants are referred to as John Does 6-10.  The Plaintiff alleges that each of the Defendants John Does 6-10 was/were a supervisor employed by the City of Southaven with the Southaven Police Department or the Southaven Fire Department at the time of the conduct alleged in this Complaint and was/were individually responsible for the training, supervision, and discipline of Defendants Baggett, Bond, Rich, Scallorn, Graham, Mueller, Painter Jr., Sebring, Spence and Weatherford.  The Plaintiff asserts that the failure to properly train, supervise and/or discipline officers named herein or to be named herein was/were a cause and fact of the injuries alleged.  The Plaintiff will seek to amend this Compliant as soon as the true names and identifies of Defendants John Does 6-10 have been ascertained.

27.     Defendant City of Southaven, as the entity which operates and manages the Southaven Police Department and the Southaven Fire Department, was responsible for the training and supervision of all police and fire officers and other agents, employees, and/or servants of the

Southaven Police Department and the Southaven Fire Department, and was also responsible for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts alleged herein occurred.

28.     Defendants Baggett, Bond, Rich, Scallorn, Graham, Mueller, Painter Jr., Sebring, Spence, Weatherford and John Does 1-10, to the extent they engaged in any acts or omissions alleged herein, engaged in such acts or omissions under color of state law.

29.     Defendant Baptist Memorial Hospital-Desoto, Inc. ("Baptist") is a Mississippi non-profit corporation which may be served through its Administrator and CEO, James Russell Huffman, at 7601 Southcrest Parkway, Southaven, MS 38671.  Baptist operates a hospital in Desoto County, Mississippi, and at times material hereto acted in concert with the Defendants herein who were acting under color of state law to deprive Decedent of civil rights guaranteed and protected by the Constitution and laws of the United States and of the state of Mississippi.  Baptist's parent organization, Baptist Memorial Health Care Corporation, is a Tennessee Corporation which promulgates practices and procedures for Defendant Baptist.  Upon information and belief, Defendant Baptist has frequent, significant, and systematic contacts with Tennessee, including through multiple contracts with other Defendants in this case, a heavy reliance on Tennessee patients and resources, the routine treatment of patients and collection activities on patients who reside in Tennessee, transaction of business in Tennessee, and through risk management, regulatory, legal, and business activities it conducts through its parent corporation in Tennessee.

30.     The Plaintiff is informed and believes and thereupon alleges that at all times mentioned in this Complaint, the above-named Defendants, and each of them, were the agents, employees, servants, joint ventures, partners and/or co-conspirators of the other Defendants named in this

Complaint, and that at all times each of the Defendants was/were acting within the course and scope of said relationship with Defendants.

31.     Defendant Sun Life Assurance Company of Canada (hereinafter "Sun Life"), is an insurance company authorized to transact the business of insurance in this state, and may be served with process through the Commissioner of the Tennessee Department of Commerce and Insurance, 500 James Robertson Parkway, Suite 660, Nashville, Tennessee 37243-1204.   Sun Life was hired by NexAir, Troy's employer, as NexAir's insurance carrier for benefits provided under the company's ERISA benefits plan.


## V. EXHAUSTION OF PRE-LAWSUIT PROCEDURES

32.     Some of the claims brought herein are brought pursuant to the law of the State of Mississippi, and an action at law brought pursuant to the provisions of the Mississippi Tort Claims Act (codified at Miss. Code Ann. §11-46-1, et seq.) may not be brought unless a notice of claim has been filed pursuant to the requirements of Miss. Code Ann. §1-46-11.  The Plaintiff herein, acting by and through the undersigned attorneys, has filed the necessary notice required by Miss. Code Ann. §11-46-11; therefore, this action may now be properly brought against the Defendants (to-wit:  the City of Southaven, Baggett, Bond, Rich, Scallorn, Graham, Mueller, Painter Jr., Sebring, Spence, Weatherford, and John Does 1 through 10).

33.     Similarly, some claims are brought pursuant to provisions of the law of the State of Mississippi, and an action at law brought alleging medical malpractice in the State of Mississippi may not be brought unless a notice of claim has been filed pursuant to the requirements of Miss. Code Ann. § 15-1-36(15).  The Plaintiff herein, acting by and through the undersigned attorneys,

has sent the notice required by Miss. Code Ann. § 15-1-36(15); therefore, this action may now be properly brought against the Defendants.

## VI. FACTUAL ALLEGATIONS

A.    **Introductory Facts**

34.    The initial incident which gives rise to this civil action occurred at approximately 7:45 p.m. and continued for approximately 1.5 hours on Saturday, July 18, 2015, at or near 3451 Goodman Rd. within the municipal corporation limits of the City of Southaven, Mississippi. Additional incidents occurred in Shelby County, Tennessee and in Southaven, Mississippi with effects intended to result and in fact resulting in harm to Plaintiff in Shelby County, Tennessee.

35.    At all times relevant hereto, Defendants Baggett, Bond, Rich and Scallorn (the "Police Defendants") were agents, employees, and/or servants of the City of Southaven and were acting within the course and scope of their employment and duties as police officers for the City of Southaven.

36.    At all times relevant hereto, Defendants Graham, Mueller, Painter Jr., Sebring, Spence and Weatherford (the "Fire/EMS Defendants") were agents, employees, and/or servants of the City of Southaven, working in the Southaven Fire Department and were acting within the course and scope of their employment and duties as firefighters, emergency medical technicians, and/or paramedics for the City of Southaven.

37.    At all times relevant hereto, John Does 1 through 10 were agents, employees, and/or servants of the Southaven Police Department or Southaven Fire Department and were acting within the course and scope of their employment and duties as police officers or firefighters, emergency medical technicians, and/or paramedics with the City of Southaven.

38.     At approximately 7:45 p.m. a call was made to the Southaven Police Department by an unidentified person who erroneously believed that she was witnessing a domestic disturbance between the Troy and Kelli.  In fact, Troy and Kelli had driven to Southaven in order to attend a rock concert.  Before the concert commenced, Troy came under the influence and commenced to exhibit fear and paranoia.  Kelli got Troy into their car, left the concert venue, and began to drive back to Memphis where they reside.  Shortly after leaving the concert venue, Troy told Kelli that he could not stay within the confines of the vehicle and opened the door and exited into a parking lot on Goodman road.  Upon information and belief, it was this conduct which lead the unknown caller to contact the Southaven Police Department.

39.     Troy was six foot and one inch (6'1") in height and weighed approximately one hundred fifty (150) pounds.  He was often described by his family and friends as a "bean pole."

40.     Troy was unarmed and posed no threat to the public or law enforcement officers.

41.     Troy was an honors graduate of Christian Brothers University in Memphis in the field of chemical engineering.  He worked as an engineer for NexAir, one of the largest distributors of atmospheric gases and welding supplies in the United States.  His intellectual functioning level was quite high.


**B. Southaven Police Response**

42.     The Southaven Police Department quickly arrived on the scene.  Upon information and belief, the first police car to arrive was driven by Defendant Baggett who commenced a discussion with Kelli.

43.     Defendant Baggett questioned Kelli, who assured him that Troy was not acting violently toward her.

14

44.    In fact, Kelli never informed any of the Defendants that Troy had acted or was acting aggressively.

45.    Instead, Kelli informed Defendant Baggett that Troy was not acting like himself after taking LSD and becoming frightened.

46.    Shortly after Defendant Baggett's first interactions with Plaintiff, Defendant Scallorn arrived. Defendant Scallorn's unit was a K-9 unit.

47.    When Defendant Scallorn got out of his patrol car, Troy held up his hands and stated, "Okay, I'll go."

48.    Troy approached the K-9 unit patrol car and opened the door in an attempt to voluntarily submit to police authority and enter the patrol car to be taken into custody.

49.    When Troy opened the door to the patrol car the police dog, a Belgian Malinois named "Weasel", got out of the vehicle but was not aggressive.

50.    Defendant Scallorn grabbed the police dog by the collar, restraining it and preventing it from attacking Troy.

51.    Troy, who was an animal lover, began to talk in friendly terms to the dog.

52.    At that point in time, one or more of the Defendants willfully, intentionally, wantonly, and with reckless disregard for Decedent's well-being commanded the police dog to attack Troy.

53.    Defendant Scallorn intentionally released the police dog to allow it to attack Troy.

54.    Prior to being attacked by the police dog, Troy had not physically attacked any officer or any member of the public.

55.    Prior to being attacked by the police dog, Troy had not verbally threatened any officer or any member of the public with violence.

56.    Prior to being attacked by the police dog, Troy's hands were in the air.

57.     Prior to being attacked by the police dog, Troy was not attempting to flee the scene or otherwise resist arrest.

58.     At the time Troy was attacked by the police dog, he was not in commission of any violent crime or any felony.

59.     At the time Troy was attacked by the police dog, he was unarmed.

60.     Upon command by one or more of the Police Defendants, the police dog attacked Troy forcing him to the ground.  A number of bite wounds and lacerations were inflicted to Troy's left arm.

61.     When Troy attempted to get up after being attacked by the dog, Defendant Scallorn without provocation, drew his "taser" gun from its holster and willfully, intentionally, wantonly, with reckless disregard for Decedent's well-being, shot Troy in the back.

62.     Prior to being shot with a "taser" gun, Troy had not physically attacked any officer or any member of the public.

63.     Prior to being shot with a "taser" gun, Troy had not verbally threatened any officer or member of the public with violence.

64.     Upon being struck with the electrode probes fired from the taser gun, Troy fell to the ground and was completely incapacitated.

65.     Defendants Baggett and Rich began handcuffing Troy behind his back. Despite Troy's incapacity, one of the Police Defendants jumped upon Troy's back with that Defendant's full weight and began sitting on Troy's back while straddling the back of his chest.

66.     Defendant Bond placed leg shackles on Troy and Troy was shackled with his hands and feet connected in a four point bind known as "hog tying."

67.     The Police Defendants kept Troy in a prone position with his hands and feet hogtied behind him and with the weight of one or more officers on his back while determining what course of action to take.

68.     One or more of the Police Defendants called for an ambulance to transport Troy to the hospital to treat bleeding caused by the dog bites and to remove the probes attached to his body from the "taser" gun.

69.     Kelli informed the Police Defendants and Fire/EMS Defendants that Troy had a history of asthma and provided them Troy's rescue inhaler.

70.     While hogtied, Troy began complaining that he was unable to breathe properly.

71.     Despite Troy's complaints, the Police Defendants kept Troy in a prone, hogtied position.


**C.  Facts Regarding Hogtying**

72.     The "hogtie" (also written as "hog-tie" and used as a verb) is a maximal restraint technique in which a person's hands are bound behind their back, their feet are shackled, and the hands and feet are then connected to one another.

73.     According to a May 1996 article in the FBI Law Enforcement Bulletin, the hogtie position is a "physically incapacitating position" which "makes it difficult for subjects to breathe and ***can cause them to die.***"  (Emphasis added).

74.     The FBI Law Enforcement Bulletin warning about hogtying further states that "[i]nterference with proper breathing produces an oxygen deficiency (known as hypoxia) in the blood, which disturbs the body's chemistry and creates the conditions for a fatal rhythm disturbance in the heart."

75.     The National Law Enforcement Technology Center, an office within the United States Department of Justice, published an article in June 1995 which "presents information relevant to positional asphyxia—i.e. death as a result of body position that interferes with one's ability to breathe."

76.     According to the Department of Justice article, police officers should "**avoid the use of maximally prone restraint techniques (e.g. hogtying).**" (emphasis added)

77.     NYPD Guidelines to Preventing Deaths in Custody quoted in the Department of Justice, National Law Enforcement Technology Center article cited above include the following:

a.  "As soon as the subject is handcuffed, *get him off his stomach*.  Turn him on his side or place him in a seated position." (emphasis in the original)

b.  "Never tie the handcuffs to a leg or ankle restraint."

c.  "Do not lay the person on his stomach during transport to a station house or hospital. Instead, place him in a seated position."

78.     Training materials from the Mississippi Law Enforcement Officers Training Academy (the "Academy") identify "positional asphyxia" as a danger of police restraint procedures.

79.     The Academy trains officers that, "[w]hen a violator has been arrested, and handcuffed in a face-down position, Officers must get the suspect up to at least a 'seated' position as soon as possible."

80.     The Academy identifies prone restraint as a lethal technique:  "[p]eople who remain on their stomachs for varying periods of time *will suffocate* themselves due to their own body weight." (Emphasis added).

81.     Defendants Bond, Price, Rich, and Scallorn were each trained that positional asphyxia is a danger of police restraint procedures and that handcuffed suspects "who remain on their stomachs for varying periods of time will suffocate themselves due to their own body weight."

82.    At the latest, since 1992 medical authority has been published on the decrease in respiratory function caused by the hogtied position particularly when the subject is in a prone position.

83.    A 1997 study by Roeggla, et al., found hogtied subjects experienced a 39% decrease in Forced Vital Capacity, 41% decrease in Forced Expiratory Volume, a 21% decrease in heart rate, a 32.3% decrease in systolic blood pressure and a 26.1% decrease in diastolic blood pressure. The study opined that "in the case of the hobble restraint, the upright position is mandatory to prevent a possibly fatal outcome."

84.    A 2005 study by Meredith, et al, found that 3 of 8 subjects with a preexisting respiratory condition were unable to tolerate prone restraint positions due to a clinical deterioration in symptoms.

85.    A 2008 review of the effects of prone positioning during anesthesia by Edgcombe, et al, noted the numerous changes in physiology of patients placed in a prone position, including decreased cardiac index, obstruction of the inferior vena cava, changes in respiratory physiology, decreases in respiratory compliance and increased peak airway pressure (where the position used is inferior in terms of allowing abdominal and chest wall movement). The authors noted that a number of medical complications can arise, even in controlled settings, where a patient is placed in a prone position for an extended period of time.

86.    A 2012 study by Barnett, et al, found multiple statistically significant physiological impacts of prone restraint positions. Forced vital capacity, expiratory volume, heart rate, and oxygen saturation were measured. The researchers found that the use of prone restraint positions such as the hogtie restricted respiratory function and that the risk increased as pressure on the anterior chest wall increased.

87.     A 2010 study by Ho, et al, found that the diameter of the inferior vena cava significantly decreased in size when a subject was placed prone and further significantly decreased in size when weight was added to the subject's back.  The researchers posited that the IVC compression may contribute to deaths occurring during police restraint.

88.     A 2013 study by Chan, et al (who has admitted his studies may be biased due to conflicts of interest in favor of police), confirmed that IVC compression occurs during prone restraint with weight.  The study also found statistically significant decreases in stroke volume and cardiac index during prone restraint.

89.     A 2012 literature review by Barnett, et al, studied the existing medical literature on restraint related asphyxia.  Based on all medical literature searched, the researchers found that prone restraint position has the ability to impede life-maintaining physiological function.

90.     The prone hogtied position to which Troy was subjected is very dangerous since it impairs breathing by inhibiting movement of the chest wall, diaphragm and accessory muscles of respiration and which results in hypoxia.

91.     Use of the hogtie restraint on an individual who is intoxicated is deadly force, due to the increased probability that the individual will be unable to breathe and will suffocate themselves due to positional asphyxia.

92.     Use of a hogtie restraint on an individual who remains prone for an extended period of time is deadly force, due to the probability that a person will be unable to breathe and will suffocate themselves due to positional asphyxia.

93.     Use of a hogtie restraint with additional straps across the head, neck, or body is deadly force, due to the probability that a person with additional straps across their body will be unable to breathe and will suffer from positional asphyxia.

94.     Use of a hogtie restraint on an individual who complains of trouble breathing is deadly force, due to the probability that the person is unable to properly obtain sufficient oxygen to prevent cardiac arrhythmia and, ultimately, cardiac arrest.

95.     Use of a hogtie restraint on an individual with a known respiratory condition (such as asthma) is deadly force, due to the probability that the person will experience difficulty breathing in a constrained position and will ultimately suffocate.

**D.  Southaven Fire Department Responds**

96.     At approximately 7:57 p.m., a City of Southaven Fire Department ambulance arrived on the scene.  In the ambulance were Defendants Spence and Graham a/k/a Witte.  Defendant Spence is an Emergency Medical Technician and Defendant Graham is a paramedic.

97.     Also involved in the Southaven Fire Department response were Defendants Mueller, Painter, Sebring, and Weatherford.

98.     A wheeled stretcher was removed from the ambulance, and the Defendants on the scene picked Troy up by his shackles and placed him face down on the stretcher, still hogtied.

99.     Troy's head and body were then strapped down to the stretcher using "straps x5", meaning that five straps were placed across Troy's body and head.

100.    As a result of the straps, Troy's torso was subjected to a large amount of pressure due to the opposing forces-the hogtying pulling Troy's limbs backwards while the head and body straps were forcing Troy's torso downward in the opposite direction.

101.    While in this five point restraint, Troy was crying out and struggling to raise his torso as if unable to breathe.

102.    Nevertheless, neither the Fire/EMS Defendants nor the Police Defendants did anything to alleviate the dangerous constricted posture in which Troy had been placed.

103.    Troy was transported by ambulance to Defendant Baptist Memorial Hospital-Desoto ("Baptist").  In the ambulance during the transfer were Police Defendants Baggett and Rich and Fire/EMS Defendants Spence and Graham.

104.    While in the ambulance, Troy remained in the custody of the Police Defendants.

105.    Upon information and belief, Southaven Fire Department ambulances, including the ambulance used to transport Troy, are equipped with video cameras.

106.    The Fire/EMS Defendants did not turn on the camera to videotape their treatment and transport of Troy.

107.    While in the ambulance, Troy remained hogtied, prone, and strapped to the stretcher.

108.    In spite of Troy's distress caused by inability to breathe properly, the Defendants transporting Troy did not activate the ambulance's emergency lights or sirens in order to expedite Troy's trip to the hospital.

109.    Instead, the ambulance sat in the parking lot for several minutes with Troy struggling to breathe.

110.    The ambulance ride from the scene of Troy's arrest to Baptist was only 4.4 miles.

111.    Troy was strapped to the stretcher not later than 8:08 PM and did not arrive at Defendant Baptist until 8:28PM, 20 minutes later.

112.    At 8:20 PM, Troy's pulse rate was 164, systolic blood pressure was 126, and diastolic blood pressure was 91.

113.    At 8:25 PM, Troy's pulse rate had risen to 186, systolic blood pressure had risen slightly to 128, and diastolic blood pressure had dropped to 61.

114. By the time Troy reached the emergency department of Defendant Baptist, he was experiencing supraventricular tachycardia, his oxygen saturation was low, and his respiratory rate was elevated, all of which strongly signaled that Troy was slowly suffocating.

**E. Mississippi EMS Standard Operating Procedures**

115. The Standard Operating Procedures for Emergency Medical Personnel in the State of Mississippi (the "SOPs") forbid transporting a patient who is hogtied.

116. The SOPs provide for each of the following:

a. "Use the minimum amount of force and restraint necessary to safely accomplish patient care and transportation with regard to the patient's dignity. Avoid unnecessary force."

b. "Have one person talk to and reassure the patient throughout the restraining procedure."

c. "After restraint, the patient should be placed in a *supine* position." (emphasis added).

d. "Restrain all 4 extremities *with patient supine* on stretcher." (emphasis added).

e. "Use soft restraints to prevent the patient from injuring him or herself or others."

f. "Do not place restraints in a manner that may interfere with evaluation and treatment of the patient or in any way that may compromise patient's respiratory effort."

g. "After the individual is controlled, he/she shall be restrained to the stretcher or other transport device *in the supine positon*." (emphasis added)

h. "**DO NOT** restrain patient in a hobbled, hog-tied, or prone position." (Emphasis in the original).

i. "Padded or leather wrist or ankle straps are appropriate. Handcuffs and plastic ties are not considered soft restraints."

j.  "Never apply restraints near the patient's neck or apply restraints or pressure in a fashion that restricts the patient's respiratory effort."

117.  The SOPs warn that "[t]here is a risk of serious complications or death if patient continues to struggle violently against restraints."

118.  By the time Troy was in the ambulance and attached to a heart monitor, he was experiencing supraventricular tachycardia (SVT).

119.  The SOPs outline a standard procedure for treating SVT.

120.  For a patient in SVT, the SOPs call for an emergency medical technician to provide airway maintenance.

121.  The SOPs call for a patient in SVT to be administered 100% oxygen.

122.  The SOPs call for a patient in SVT to be monitored by pulse oximetry.

123.  The SOPS call for a patient in SVT to be monitored by a 12 Lead EKG.

124.  The Fire/EMS Defendants, in concert with the Police Defendants, took no action to maintain Troy's airway by releasing him from the hogtied position that was restricting his respiration.

125.  The Fire/EMS Defendants, in concert with the Police Defendants, did not provide Troy 100% oxygen necessitated by his medical condition.

126.  The Fire/EMS Defendants, in concert with the Police Defendants, did not monitor Troy by pulse oximetry or a 12 Lead EKG.

127.  The SOPs outline a standard procedure for treating a patient in respiratory distress such as that caused by asthma or COPD.

128.  The Fire/EMS Defendants and Police Defendants were aware that Troy had a medical history of asthma.

24

129.    The SOPs call for a patient in respiratory distress to be monitored by pulse oximetry, capnography, and a 12 Lead EKG, and to be given oxygen and airway maintenance.

130.    The Fire/EMS Defendants, in concert with the Police Defendants, did not monitor Troy by pulse oximetry, capnography, or a 12 Lead EKG.

131.    The Fire/EMS Defendants, in concert with the Police Defendants, took no action to maintain Troy's airway by releasing him from the hogtied position that was restricting his respiration and did not provide Troy supplemental oxygen.

132.    The SOPs outline a standard procedure for treating a patient who had been shocked with a Taser.

133.    The SOPs call for a patient who has been shocked with a Taser to be given oxygen and airway maintenance and monitored by pulse oximetry and a 12 Lead EKG.

134.    The Fire/EMS Defendants, in concert with the Police Defendants, took no action to maintain Troy's airway or monitor Troy by pulse oximetry or a 12 Lead EKG.

135.    The Fire/EMS Defendants, in concert with the Police Defendants, violated SOP # 107 governing handling of a patient suffering from supraventricular tachycardia, SOP # 311 concerning respiratory distress and SOP # 612 addressing care of a patient who has been shocked by a Taser gun.


**F. Actions by Baptist Memorial Hospital-Desoto and Continued Conduct by Southaven Police and Fire/EMS Personnel**

136.    Defendants Baggett, Rich, Spence and Graham transported Troy out of the ambulance and into the Emergency Department of Defendant Baptist Memorial Hospital-Desoto.

137.    Troy arrived at the Emergency Department still prone, strapped down and hogtied.

25

138.    In the Emergency Department, Troy was assessed by employees or agents of Defendant Baptist, as well as by Defendant Lemuel Oliver acting in his capacity as an agent or employee of Defendants Baptist and Southeastern.

139.    Prior to or upon his arrival at the hospital, the Fire/EMS Defendants informed Baptist of Troy's vital signs and that Troy was experiencing supraventricular tachycardia.

140.    Upon arrival at the hospital, Troy's oxygen saturation was noted to be 90%. His supraventricular tachycardia had not been resolved.

141.    Troy's vital signs indicated a serious, life-threatening cardiopulmonary event.

142.    The employees and agents of Defendant Baptist informed Defendant Oliver of Troy's supraventricular tachycardia, as reported to them by the Fire/EMS Defendants.

143.    The employees and agents of Defendant Baptist informed Defendant Oliver of Troy's low oxygen saturation, high systolic blood pressure, low diastolic blood pressure, tachycardia, tachypnea, and that he was in a hogtied, prone position.

144.    In spite of Troy's vital signs, the Hospital Defendants did not perform an EKG or even apply a heart rate monitor.

145.    In spite of his vital signs, the Hospital Defendants did not supply Troy with a supplemental source of oxygen.

146.    In spite of his vital signs, the Hospital Defendants did not order the Southaven Police and Fire personnel to remove the straps holding Troy to the stretcher or to remove the shackles and handcuffs keeping Troy in a hogtied position.

147.    In fact, upon information and belief, the Hospital Defendants refused to treat Troy unless he remained in a prone, hogtied position, restrained by law enforcement handcuffs and restraint devices.

26

148.    Troy continued crying out and struggling against his restraints while in the Emergency Department in a desperate attempt to obtain the oxygen he needed to survive.

149.    Troy remained in the custody of the Police Defendants while in the Baptist Emergency Department.

150.    Defendant Oliver, based on the use of restraint and seclusion on Troy, ordered continuous 1:1 monitoring for Troy by a trained medical professional.

151.    Despite the written medical orders, the Hospital Defendants left Troy alone in an emergency department room with Defendants Baggett and Rich.

152.    After Defendants Baggett and Rich were alone with Troy for approximately 15 minutes, Defendant Rich called a nurse to report that Troy was no longer breathing.

153.    Only after Troy had stopped breathing did Defendant Rich release Troy from the hogtied position in which he had been restrained.

154.    Despite resuscitation attempts by the Hospital Defendants, Troy was pronounced dead approximately 25 minutes later at 9:44 p.m.

155.    Troy's body underwent extensive post-mortem examination to determine his cause of death.

156.    Toxicology reports performed on Troy found no toxic substance in an amount sufficient to cause Troy's death.

157.    Stated another way, Troy did not die due to an overdose or poisoning of any substance.

158.    Troy died as a result of positional asphyxiation.  The hogtied, prone, strapped position in which Defendants kept Troy resulted in a drop of blood oxygen levels in his body, causing a cardiac arrhythmia and finally cardiac arrest and death.

159.    Upon information and belief, various members of the Police Defendants and/or Fire/EMS Defendants filtered in and out of the room while Troy struggled to breathe.

160.    Upon information and belief, these Defendants were laughing at Troy's desperate struggle to breathe just minutes prior to his death.

## G. Facts Regarding Appropriate Restraints by Hospitals

161.    Handcuffs, ankle shackles, hobble devices, or other chain-type restraint devices are not safe, appropriate health care restraint interventions for use by hospital staff to restrain patients.

162.    The use of handcuffs, ankle shackles, hobble devices, or other chain-type restraint devices by hospital personnel violates the Patients' Rights provisions of the Conditions of Participation for Medicaid and Medicare Hospitals, 42 C.F.R. §482.13(e) (see interpretive comments A-0154).

163.    Baptist is accredited by the Joint Commission, an independent, not-for-profit organization that establishes quality and performance standards for member hospitals.

164.    The Joint Commission Standards require documentation of the use of restraint, including documentation of orders for use, results of patient monitoring, reassessment, and unanticipated changes in the patient's condition.

165.    Under federal healthcare regulations, hospital personnel may only use restraints upon the written order of a physician or other licensed practitioner and the order must specify the duration and circumstances under which restraints may be used.  See 42 C.F.R. §482.13(e)(4)-(5).

166.    No written order for restraints was made by any physician or other licensed practitioner for Troy's care.

167.    Joint Commission Standards also require that trained hospital staff continually monitor patients who are simultaneously restrained and secluded.    See Joint Commission Standard PC.03.05.13.

168.    Troy Goode was restrained and secluded when he stopped breathing.

169.    Troy Goode was not being monitored by any trained hospital staff when he stopped breathing.


**H.  Defendants Conspire to Threaten Kelli and Nikki Goode with Arrest if They Visit Troy**

170.    Plaintiff Kelli Goode was Troy's high school sweetheart.  She later became his fiancée, and then his wife and mother of their young son.  As his wife and best friend, Kelli was Troy's medical decision-maker with authority to visit him in the hospital and make any decisions regarding his care when he was unable to do so.

171.    When Troy was arrested, Kelli requested to accompany him to the hospital in the Southaven Fire Department ambulance.

172.    One or more of the Police Defendants and/or Fire/EMS Defendants threatened Kelli with arrest if she attempted to accompany Troy to the hospital.

173.    Kelli, out of concern for her husband, told Defendants that she intended to drive to the hospital on her own and stay with her husband.

174.    One or more of the Police Defendants and/or Fire/EMS Defendants threatened Kelli with arrest and further threatened to inflate criminal charges against Troy if Kelli proceeded to the premises of Defendant Baptist Memorial Hospital-Desoto.

175.    One or more of the Police Defendants and/or Fire/EMS Defendants ordered Kelli to cross the Mississippi/Tennessee state line and return to her home or face arrest and the inflation of criminal charges against her husband.

176.    When Kelli left the scene where Troy had been arrested, one or more of the Police Defendants followed her in a marked police car until she turned away from the hospital and toward the Mississippi/Tennessee state line.

177.    Kelli, having been threatened by the police with arrest and the inflation of any criminal charges against her husband, obeyed police orders by crossing the Mississippi/Tennessee state line and returning to her in-law's home.

178.    Kelli and her mother-in-law began desperately attempting to obtain information about Troy's whereabouts and condition.  They made multiple telephone calls to Defendant Baptist Memorial Hospital-Desoto seeking information.

179.    At approximately 9:00 p.m., Kelli and her mother-in-law finally were able to reach a nurse working for Baptist who informed them that Troy was in "stable condition" and reassured them that he would be fine.

180.    In reality, this statement was false.  Troy was suffering a cardiac arrhythmia, tachycardia, hypoxia, tachypnea, low diastolic blood pressure, and high systolic blood pressure.

181.    At the time the nurse informed Kelli that Troy was stable, he was in fact suffering a serious, life-threatening cardiopulmonary event.

182.    While on the phone with the nurse, Nikki Goode, Troy's mother, stated that she and Kelli planned to visit Troy to make sure he was okay.

183.    In response, the nurse handed the phone to another individual who, upon information and belief, was one of the Police Defendants.  That individual then threatened Nikki and Kelli with arrest if they entered Mississippi to come to the hospital.

184.    Due to the unlawful threats against them, Kelli and Nikki Goode remained at their house while Troy fought for his life.

185.    Kelli was deprived of her last opportunity to see her husband alive, speak with him, or comfort him as he died.  Troy was deprived of the emotional support and presence of his medical decision-maker, as well as the opportunity to say any last words to his son, wife, or mother.


**I.  Southaven Officials Respond to Troy's Death**

186.    Upon information and belief, Defendant City of Southaven conducted an inquiry into the circumstances surrounding the death of Troy.

187.    Subsequent to the investigation into the circumstances of death, Mayor Musselwhite of the Defendant City of Southaven announced that the officers involved had acted properly and in accordance with their training as Southaven police offers.

188.    Mayor Darren Musselwhite of the Defendant City of Southaven blamed Troy for his own death, stating that, "Mr. Goode made some bad decisions that night that heavily influenced his death."

189.    Mayor Darren Musselwhite stated that, "this man died from a heart problem likely caused by his decision to use dangerous and illegal drugs."

190.    Musselwhite's claim that Troy died due to drug use was simply false and medically unfounded.

191.    Musselwhite further stated, "The Southaven Police did not cause nor contribute to his death."

192.    Musselwhite further stated, "The facts also show that [Troy] violent behavior mandated that he be restrained for the public safety of our other citizens, as well as himself"

193.    Troy had not acted violently toward any person nor had he made any threats of violence toward any person prior to being attacked by a police dog and tased in the back.

194.    Musselwhite claimed that Troy's arrest "was done by a legal "4-point restraint" tactic."

195.    Musselwhite's claim that Southaven Police used a legal method of restraint was false.

196.    Musselwhite's statement that the police acted properly and used legal tactics is a ratification of the conduct of the Police Defendants.

197.    Musselwhite then claimed that the Southaven Police Department had no involvement beyond the initial arrest:  "The facts further show that our Police released him on the scene to our Emergency Medical Services personnel and he was continuously monitored by medical professionals from this time until released to medical professionals at the hospital."

198.    Musselwhite's claim that Southaven Police released Troy on the scene to Southaven Fire/EMS personnel was false.

199.    Musselwhite's claim that Troy was continuously monitored by medical professionals was false.

200.    Musselwhite also stated that, "[a]ny suggestion that our Police threatened or denied any person's right to view or film the incident is false; however, our EMS personnel did comply with all HIPAA and privacy laws which may have given this appearance on the scene."

201.    HIPAA privacy laws do not restrict public recording of an arrest, emergency medical treatment, or transport which occurs in a public place.

202. Musselwhite later stated that he is, "informed" and "educated" on "every issue that occurs in this City."

203. Musselwhite stated in an e-mail about Troy that, "I cannot debate details with you at this point I must tell you that I must defend the integrity of the City and our Police Department."

204. Mayor Musselwhite's statements served as an official ratification of the conduct of the Police and Fire/EMS Defendants.

205. On July 20, 2015, Southaven Police Lieutenant Mark Little made an official statement to the media on behalf of the City of Southaven Police Department, in which he talked about the force used on Troy. In that statement, Lieutenant Little said, "It's nothing illegal. It's called restraining. We're just basically keeping him from kicking and hurting someone."

206. Lieutenant Little's official statement to the media serves as a ratification of the conduct of the Police Defendants.

207. On November 18, 2015, the City of Southaven released an official statement regarding Troy's death.

208. In that statement, the City of Southaven stated as follows: "The men and women of the City of Southaven EMS and Police were faced with a difficult situation and handled Mr. Goode's arrest in a manner that officers and emergency personnel deemed appropriate and necessary for the safety of Mr. Goode and all persons involved. The City is aware of potential litigation regarding this matter and will put forth a vigorous defense for all its first responders involving all the facts in this matter."

209. The official statement by the City of Southaven serves as a ratification of the conduct of the Police Defendants and the Fire/EMS Defendants.

**J. Troy's Cause of Death**

210.     Upon information and belief, on November 30, 2015, an unknown individual leaked to the press a document that purported to be the final autopsy result of Troy Goode performed by the Mississippi State Medical Examiner.

211.     In that document, Troy's cause of death was listed as "complications of LSD toxicity."

212.     At the time of his death, Troy had 1.0 ng/mL of LSD in his system.

213.     The average recreational dose of LSD causes blood concentrations of 4-6 ng/mL.

214.     Troy had a blood concentration of LSD less than one quarter what would be expected had he taken a usual recreational dose.

215.     Death due to the pharmacological effects of LSD is exceedingly rare and, in fact, may never have occurred in the history of mankind.

216.     According to a 2008 article by, *inter alia*, a researcher at Harvard Medical School, "there have been no documented human deaths from an LSD overdose." *See* Passie T., et al., *The Pharmacology of Lysergic Acid Diethylamide: A Review, in* CNS Neuroscience and Therapeutics. 2008 Winter; 14(4): 295-314.

217.     Estimates of lethal doses of LSD are higher than 100,000 ug orally.

218.     A dose of 100,000 ug would require ingestion of more than 200 units of street blotter.

219.     Ingestion of "4-5 hits of LSD," which police reports claim Troy took, is inconsistent with a toxic overdose.

220.     There have been 0 reported deaths in medical literature due to the pharmacological effects of LSD at the usual psychedelic dose.

221.     There is no evidence in scientific literature that a blood concentration of 1.0 ng/mL of LSD is toxic, or would be consistent with the size of LSD overdose that might result in death.

222.    A blood concentration of 1.0 ng/mL of LSD is inconsistent with a toxic overdose.

223.    LSD did not cause Troy Goode's death.

224.    Sun Life, as insurance carrier for the NexAir Employee Group Benefits Plan, provides Life Insurance and Accidental Death & Dismemberment Insurance benefits for NexAir employees.

225.    Sun Life is a claims administrator for the Plan.    Sun Life exercises authority in adjudicating a participant's claim for benefits, including communicating with the participant, evaluating the claim, making the determination whether to grant or deny benefits under the Plan, and adjudicating any appeals from the initial determination.

226.    Kelli was Troy's beneficiary under the Sun Life policy.

227.    A claim for life insurance benefits was sent on July 20, 2015 and received by Sun Life on or about August 7, 2015.

228.    Pursuant to Department of Labor regulations, Sun Life must render a decision on a Life Insurance benefits claim within 90 days of the claim being filed, unless the insurer requests a 90 day extension.

229.    The original 90 day period for a determination ended November 5, 2015 at the latest. Assuming Sun Life properly obtained an extension, the period for a determination ended February 3, 2016.

230.    To date, Sun Life has not rendered a determination as required by federal law.


**K.  Concluding Factual Allegations**

231.    Failure to provide appropriate medical care to an arrested individual "may actually produce physical torture or a lingering death."  *See Estelle v. Gamble*, 429 US 97 (1976).

232.    Troy required medical attention for his supraventricular tachycardia during the time he was in the ambulance until his death.

233.    None of the Defendants provided Troy medical treatment for supraventricular tachycardia until he suffered full respiratory arrest.

234.    Troy remained hogtied and prone in the ambulance and hospital despite his need for medical care.

235.    The hogtie restraint with additional straps across the head, neck or body that restrict respiration is considered torture under international law.

236.    Under federal law, torture is any act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering upon another person within his custody or physical control.  See 18 U.S.C. §2340(1).

237.    The Italian mafia uses the hogtie restraint with or without additional ligatures attached to the head or neck as a method of torture and execution.

238.    Terrorist organizations in Turkey utilize the hogtie or "hogball" restraint as a method of torture and execution of political opponents and civilians.

239.    Defendants, acting in concert with one another, tortured Troy Goode to death.


## VII. CLAIMS FOR RELIEF

## COUNT I:  FIRST CLAIM FOR RELIEF

### Civil Conspiracy

(*Against Defendants City of Southaven, the Hospital Defendants, the Police Defendants, the Fire/EMS Defendants, and John Does 1-10*)

240.    Plaintiff re-alleges all preceding paragraphs of this Complaint as if set forth verbatim herein.

241.    On the date of Troy's death, the Defendants, acting in concert with one another, entered into an agreement, expressly or by implication, through their participation in or condoning of the use of excessive force, use of deadly force, and other actions complained of herein, to engage in conduct that was wrongful, intentional, willful, wanton, and designed to violate the civil and constitutional rights of rights of Troy Charlton Goode and of the Plaintiff including, but not limited to, the right to procedural and substantive due process of law, the right to be free from the excessive use of force, the right to be free from the unnecessary and unauthorized use of deadly force, and the right to freely travel.

242.    The Defendants' agreement to engage in or allow persons under their supervision and control to engage in such conduct was illegal and amounted to a civil conspiracy to cause harm to and violate the civil and constitutional rights of Troy and the Plaintiff.

243.    Defendants agreed, both explicitly and tacitly, to use unlawful and deadly force against Troy by keeping him prone and hogtied with his head and chest strapped down to a stretcher throughout his arrest, detention, and stay at the hospital.

244.    Defendants agreed, both expressly and tacitly, to use unlawful and deadly force against Troy by keeping him hogtied with his head and chest strapped down to a stretcher despite the fact that Troy's position prevented appropriate medical treatment and interfered with attempts to maintain a patent airway and perform tests of Troy's physical condition that were clearly indicated by his symptoms.

245.    Upon information and belief, the Fire/EMS Defendants explicitly agreed to use unlawful force against Troy by permitting the Police Defendants to maintain Troy in a hogtied position strapped to a stretcher while Troy was under their care, despite standard operating procedures that clearly forbid the practice of transporting a patient in the hogtied position.

246.    The Hospital Defendants expressly or by implication agreed to permit the Police Defendants to maintain Troy in a hogtied position strapped to a stretcher while Troy was under their care despite his condition necessitating removal of those restraints and agreed to permit the Police Defendants to be alone in a hospital room with Troy despite medical orders which would forbid such an occurrence.

247.    Mayor Musselwhite stated in an e-mail that the Hospital Defendants explicitly agreed to permit the Police Defendants to maintain Troy in a hogtied position, stating that "medical personnel at the hospital refused to treat [Troy] unless his arms and legs were restrained" in the hogtied position.

248.    Defendants entered into an agreement, explicitly or by implication, to violate Kelli's constitutional rights by restricting her freedom to travel and visit her husband in the hospital through the use of threats of arrest or punishment against Kelli and Troy.

249.    The Hospital Defendants explicitly agreed to allow such threats be made and assisted the Police Defendants in making them through, *inter alia*, informing the Police Defendants that Troy's family was calling and permitting the Police Defendants to speak to Troy's family using equipment owned by the Hospital Defendants, all while knowing that such threats violated Troy and Kelli's constitutional rights, federal regulations, and hospital policies.

250.    Each of the Defendants agreed to commit unlawful acts and to assist other Defendants in committing unlawful acts in violation of Troy and Kelli's constitutional rights as more fully laid out in the preceding paragraphs of this Complaint.

251.    As a direct and proximate consequence of the conduct of the Defendants as aforesaid, both known and unknown, the Defendants are liable to the Plaintiff for the civil conspiracy to engage in conduct they knew or reasonable should have known was against the law and public

policy of the United States of America when the same manifested itself against the interests of Troy and the Plaintiff.

252.    At all times pertinent to this civil action, the Defendants acted with wanton and willful reckless disregard for the safety and well-being of Troy Charlton Goode and of the Plaintiff. Therefore, the Plaintiff is entitled to a money judgment against the Defendants who engaged in or contributed to or otherwise facilitated through their acts of omission or commission this civil conspiracy.

253.    As a result of the conspiracy between the Defendants, each Defendant is jointly and severally liable for the actions of each other Defendant.

## COUNT II: SECOND CLAIM FOR RELIEF

### Excessive Force/Unreasonable Seizure
### (42 U.S.C. Section 1983)

(*Against Defendants City of Southaven, the Hospital Defendants, the Police Defendants, the Fire/EMS Defendants, and John Does 1-10*)

254.    Plaintiff re-alleges all preceding paragraphs of this Complaint as if set forth verbatim herein.

255.    The acts and omissions of Defendants alleged herein, including, but not limited, to the use of excessive force and the use of deadly force upon Troy, caused his untimely and unnecessary death, and violated the civil and constitutional right of Troy to be free from excessive force and unreasonable seizure as defined by the Fourth and Fourteenth Amendments to the Constitution of the United States.

256.    The Police Defendants used excessive force in each of the following ways:

a. Intentionally and maliciously instructing a police dog to attack Troy while Troy was unarmed, nonviolent, not fleeing, with his hands over his head, having committed (at most) a nonviolent misdemeanor.

b. Intentionally and maliciously releasing a police dog so that it could attack Troy while Troy was unarmed, nonviolent, not fleeing, with his hands over his head, having committed (at most) a nonviolent misdemeanor.

c. Intentionally and maliciously firing a taser gun at Troy's back while Troy was unarmed, nonviolent, not fleeing, and bleeding from multiple dog bites, having committed (at most) a nonviolent misdemeanor.

d. Sitting on Troy's back while Troy was facedown, having been previously incapacitated by a taser gun.

e. Hogtying Troy face down despite the knowledge that Troy was intoxicated and at risk for positional asphyxia and sudden death due to the use of that technique.

f. Applying 5 straps across Troy's head and back while Troy was hogtied, face-down on a stretcher, despite the knowledge that such a position exacerbated the already high risk of positional asphyxiation.

g. Maintaining Troy in a face-down, hogtied position during his detention, EMS transport, and at the hospital despite the knowledge that such a position carries the risk for positional asphyxia and sudden death, particularly for an intoxicated individual.

h. Maintaining Troy in a face-down, hogtied position when he began to complain about difficulty breathing.

i. Maintaining Troy in a face-down, hogtied position when Troy began to show clear signs of hypoxia, including low oxygen saturation, tachycardia and tachypnea.

40

j.  Maintaining Troy in a face-down, hogtied position when Troy began experiencing supraventricular tachycardia which ultimately led to a more serious cardiac arrhythmia and his death.

257.   The uses of force detailed in the preceding paragraph were each excessive force when considered individually.

258.   The uses of force detailed above, when considered collectively, constitute an excessive use of force.

259.   The Fire/EMS Defendants, in concert with the Police Defendants, used excessive force in restraining Troy as detailed in subparagraphs f-j, above.

260.   The Hospital Defendants, in concert with the Fire/EMS and Police Defendants, used excessive force in restraining Troy as detailed in subparagraphs g-j, above.

261.   As a direct and proximate result of the acts and omissions by the Defendants, Troy suffered unreasonable interference with his personal liberty, pain, suffering and death, and the conduct also resulted in the Plaintiff suffering injuries, damages, and losses as alleged in this Complaint.

262.   The acts and omissions of the Defendants were malicious, reckless, wanton, and/or accomplished with a conscious disregard of the rights of Troy and Plaintiff, and, as a result, Plaintiff is entitled to an award of exemplary and punitive damages according to proof.

## COUNT III:  THIRD CLAIM FOR RELIEF

### Substantive Due Process – Loss of Family Relationships
### (42 U.S.C. Section 1983)

*(Against City of Southaven, the Hospital Defendants, the Police Defendants, the Fire/EMS Defendants, and John Does 1-10)*

263.    Plaintiff re-alleges all preceding paragraphs of this Complaint as if set forth verbatim herein.

264.    The acts and omissions of the Defendants alleged in this Complaint, including but not limited to the use of excessive and deadly force upon Troy, caused the untimely and wrongful death of Troy and deprived the Plaintiff of her interest in her family relationship with her husband in violation of her substantive due process rights as defined by the Fourteenth Amendment to the Constitution of the United States.

265.    The acts and omissions of the Defendants alleged herein deprived R.G., a minor child, of his interest in his family relationship with his father, Troy Charlton Goode, in violation of his substantive due process rights as defined by the Fourteenth Amendment to the Constitution of the United States.

266.    The acts and/or omissions detailed above were the direct and proximate cause of injury to the Plaintiff as alleged herein.

267.    As a direct and proximate result of the acts and omissions of the Defendants, Plaintiff has been compelled to retain counsel to represent her in this matter and the Plaintiff is entitled to an award of attorneys' fees in this matter pursuant to 42 U.S.C. Section 1988.

268.    The acts and omissions of the Defendants were malicious, reckless, wanton and/or accomplished with a conscious disregard of the Plaintiff's rights thereby entitling the Plaintiff to an award of exemplary and punitive damages according to proof.

## COUNT IV: FOURTH CLAIM FOR RELIEF

### Deliberate Indifference to Medical Necessity
### (42 U.S.C. Section 1983)

*(Against City of Southaven, the Hospital Defendants, the Police Defendants, the Fire/EMS Defendants, and John Does 1-10)*

269.    Plaintiff re-alleges all preceding paragraphs of this Complaint as if set forth verbatim herein.

270.    Upon arrest by the Southaven Police Department, Troy was a pretrial detainee.

271.    The Fifth and Fourteenth Amendments to the United States Constitution require that a pretrial detainee not be punished prior to an adjudication of guilt in accordance with the due process of law.

272.    Defendants agreed, both expressly and tacitly, to act in concert with deliberate indifference to Troy's serious medical needs.

273.    Upon arrest or shortly thereafter, Troy began experiencing difficulty breathing, tachycardia, and a cardiac arrhythmia.

274.    Upon Troy's arrest or shortly thereafter, Kelli informed the Police Defendants and the Fire/EMS Defendants that Troy had asthma and provided these Defendants Troy's inhaler.

275.    The Police Defendants acted with deliberate indifference to Troy's medical condition in each of the following ways:

   a.  Maintaining Troy in a prone, hogtied, dangerously constricted position for an extended period of time despite knowing that such a position may ultimately be fatal;

   b.  Failing to perform basic first aid to Troy by, *inter alia*, maintaining his airway after arrest and during transport;

   c.  Performing a routine, non-emergent transport of Troy to the hospital;

d. Maintaining Troy in a prone, hogtied position during and after the transport to the hospital despite Troy showing signs of hypoxia, including low oxygen saturation, tachycardia, tachypnea, and difficulty breathing; and,

e. Failing to monitor Troy's breathing when Troy was alone with these Defendants in a room in the Baptist Emergency Department, despite knowing that Troy was experiencing a cardiac arrhythmia and having difficulty breathing.

276. The Fire/EMS Defendants acted with deliberate indifference to Troy's medical condition in each of the following ways:

a. Maintaining Troy in a prone, hogtied, dangerously constricted position for an extended period of time despite knowing that such a position will ultimately be fatal;

b. Violating Southaven EMS SOPs as detailed above;

c. Performing a routine, non-emergent transport of Troy to the hospital despite affirmative knowledge that Troy was experiencing a cardiac arrhythmia;

d. Maintaining Troy in a prone, hogtied position during and after the transport to the hospital despite Troy showing signs of hypoxia, including low oxygen saturation, tachycardia, tachypnea, and difficulty breathing;

e. Failing to perform appropriate heart monitoring and/or pulse oximetry;

f. Failing to maintain Troy's airway;

g. Failing to provide Troy supplemental oxygen;

h. Failing to use appropriate medical restraints;

i. Failing to treat Troy for supraventricular tachycardia despite actual knowledge of Troy's condition; and,

j. Failing to comply with the Advanced Cardiac Life Support protocol.

277.    The Hospital Defendants, in concert with the Fire/EMS and Police Defendants, acted with deliberate indifference to Troy's medical needs in each of the following ways:

a.  Maintaining Troy in a prone, hogtied, dangerously constricted position for an extended period of time despite knowing that such a position will ultimately be fatal;

b.  Maintaining Troy in a prone, hogtied position during and after the transport to the hospital despite Troy showing signs of hypoxia, including low oxygen saturation, tachycardia, tachypnea, and difficulty breathing;

c.  Failing to perform appropriate heart monitoring and/or pulse oximetry;

d.  Failing to maintain Troy's airway;

e.  Failing to provide Troy supplemental oxygen;

f.  Failing to use appropriate medical restraints;

g.  Failing to treat Troy for supraventricular tachycardia despite actual knowledge of Troy's condition; and,

h.  Failing to comply with the Advanced Cardiac Life Support protocol.

278.    Defendants' deliberate indifference to Troy's known and apparent medical needs caused his condition to deteriorate rapidly, ultimately causing a cardiac arrhythmia which became fatal.

279.    Defendants' deliberate indifference to Troy's known and apparent medical needs was a violation of Troy's civil rights as secured by the Fifth and Fourteenth Amendments of the United States Constitution.  Defendants are liable in damages pursuant to 42 U.S.C. §1983.

## COUNT V: FIFTH CLAIM FOR RELIEF

### Unconstitutional Practices/De Facto Policy
### (42 U.S.C. Section 1983)

*(Against Defendants City of Southaven and John Does 6 through 10)*

280.    Plaintiff re-alleges all preceding paragraphs of this Complaint as if set forth verbatim herein.

281.    The acts and omissions of the Defendants were the direct and proximate result of the customs, practices, and/or de facto policies of Defendants John Does 6 through 10 and the City of Southaven.

282.    Such customs, practices, or de facto policies include but are not limited to an ongoing pattern of being deliberatively indifferent to the excessive use of force and the use of deadly force against persons such as Troy.

283.    The customs, practices, and/or de facto policies of these Defendants were a direct and proximate cause of the Plaintiff's injuries and the death of Troy, in that said customs, practices, and/or de facto policies were being followed by the police officers, firefighters, and paramedics whose actions give rise to this civil action.

284.    Upon information and belief, City of Southaven policies and procedures or de facto policies permit its police officers to use the level of force used on Troy, including the use of police dogs, tasers, prone hogtie restraints, transfer in the prone and hogtied position while strapped to a stretcher, and the other uses of force detailed in this Complaint.

285.    Upon information and belief, City of Southaven and Southaven Fire Department policies and procedures or de facto policies permit its employees to use the methods of restraint used on Troy, including transportation in a prone, hogtied position.

286.     Defendants failed to promulgate appropriate policies or procedures or take other measures to prevent deaths due to excessive force, use of deadly force, and indifference to known medical necessity.

287.     As a direct and proximate result of the customs, practices, and/or de facto policies of Defendants, Troy and the Plaintiff suffered injuries and damages as detailed in this Complaint.


## COUNT VI: SIXTH CLAIM FOR RELIEF

### Supervisory Liability and Ratification
### (42 U.S.C. Section 1983)

(*Against Defendants City of Southaven and John Does 6-10*)

288.     Plaintiff re-alleges all preceding paragraphs of this Complaint as if set forth verbatim herein.

289.     Defendants City of Southaven and Defendants John Does 6-10 expressly and tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein, and knew that such conduct was unjustified and would result in violations of constitutional rights.

290.     The customs, policies, and/or practices of the said Defendants were a direct and proximate cause of the Plaintiff' injuries and the death of the decedent, Troy Charlton Goode, in that the said Defendants failed to adequately train and supervise their employees and/or agents to prevent the occurrence of the constitutional violations occurring in this incident. The said Defendants also failed to promulgate appropriate policies or procedures or take other measures to prevent this incident.

291.     As a direct and proximate result of the aforementioned customs, policies and/or practices of the said Defendant, the decedent, Troy Charlton Goode, and the Plaintiff suffered injuries and damages as alleged herein.

## COUNT VII: SEVENTH CLAIM FOR RELIEF

### Supervisory Liability – Failure to Train
### (42 U.S.C. Section 1983)

*(Against Defendants City of Southaven and John Does 6-10)*

292.    Plaintiff re-alleges all preceding paragraphs of this Complaint as if set forth verbatim herein.

293.    Defendants City of Southaven and Defendant John Does 6 through 10 failed to provide adequate training and/or supervision to its police officers regarding the appropriate response to reports of disturbances, treatment and control of individuals such as Troy, use of force, and use of deadly force. The Defendants have the non-delegable duty and responsibility to formulate, oversee, and implement official policies, practices, customs, and procedures to be carried out by its police officers, emergency medical technicians, paramedics, and other personnel.

294.    As a direct and proximate consequence of the failure on the part of Defendants to properly develop, implement, and otherwise devise a policy of adequate training and/or supervision for its police officers, Troy and the Plaintiff were deprived of civil and constitutional rights, privileges, and immunities. Properly trained and supervised police officers, emergency medical technicians, paramedics, and other personnel would have known not to engage in the acts which resulted in the death of Troy and which resulted in the deprivation of the civil and constitutional rights of Troy and of the Plaintiff.

295.    The failure of Defendants to provide adequate and proper training and supervision relating to disturbance calls such as occurred in this case and to provide adequate and proper training and supervision relating treatment and control of individuals such as Troy, the use of force and the use of deadly force is so grossly negligent that in amounted to deliberate indifference and disregard for the civil and constitutional rights of Troy and of the Plaintiff. As a

48

result of the failure to act, train, and/or supervise its police officers, Defendants are liable in damages for the excessive use of force committed against Troy, pursuant to 42 U.S.C. §1983.

## COUNT VIII: EIGHTH CLAIM FOR RELIEF

### Injunctive Relief – Class Action
### (42 U.S.C. Section 1983)

*(Against Defendants City of Southaven, the Police Defendants, the Fire/EMS Defendants and Defendants John Does 6-10)*

296.    Plaintiff re-alleges all preceding paragraphs of this Complaint as if set forth verbatim herein.

297.    Plaintiff brings this Count as a Class Action pursuant to Rule 23(a) and (b)(2) or, in the alternative, (b)(1) or (b)(3) of the Federal Rules of Civil Procedure on behalf of the following defined Classes:

> A.  All persons who were hogtied in a prone position by the Southaven Police Department or transported in a hogtied, hobbled, or prone position by the Southaven Fire Department from January 13, 2013 to present.

> B.  All present and future individuals who have been or will be hogtied in a prone position or transported in a hogtied, hobbled, or prone position by the Southaven Police Department or Southaven Fire Department.

298.    Plaintiff seeks money damages on behalf of Class A and declaratory and injunctive relief on behalf of Class B.

299.    **Numerosity**.  The requirements of Rule 23(a)(1) are satisfied in that there are too many Class Members for joinder of all of them to be practicable.  Upon information and belief, the City of Southaven, through the Southaven Police Department and Southaven Fire Department

has policies, customs, or routine practices by which its employees hogtie individuals prone and transport those individuals in that position.

300. **Commonality**. The claims of the Class Members raise numerous common issues of fact and law, thereby satisfying the requirements of Rule 23(a)(2). Every issue concerning liability is common to all Class Members because all issues concern the actions of Defendants with respect to the use of the hogtie procedure during arrest and transport. These issues are common in that, when answered as to one class member, a significant number of Class Members will be affected. As to liability and relief, the counts set forth in this Class action claim raise the following common issues of fact and law, among others:

a. Is the use of the hogtie restraint an objectively unreasonable use of force when the hogtied individual remains in a prone position?

b. Is the use of the hogtie restraint an objectively unreasonable use of force when applied to an intoxicated individual?

c. Do Southaven Police Department training protocols and routine practices improperly allow individuals to be hogtied and placed prone for transport?

d. Is the EMS transport of a hogtied, hobbled, or prone patient an objectively unreasonable use of force due to the likelihood that an individual will be injured or killed during transport?

e. Do Southaven Fire Department training protocols and routine practices improperly allow individuals to transported hogtied, hobbled, or in a prone position?

301. **Typicality.** The claims of the named Plaintiff are typical of the absent Class Members because they have a common source and rest upon the same legal and remedial theories, thereby satisfying the requirements of Rule 23(a)(3). For example, the named Plaintiff and the proposed

class all suffered injury as a result of a restraint technique explicitly approved by the highest executive officer of the City of Southaven. The actions of the Police Defendants and Fire/EMS Defendants have been ratified as appropriate conduct pursuant to the policies of the City of Southaven, through the Southaven Police Department and Southaven Fire Department, and it is likely that use of the same restraint techniques will continue for the future Class Members. The nature of the inquiry to the named and unnamed Plaintiffs is the same – the Defendants' use of a dangerous, potentially lethal, degrading form of restraint during arrest and transportation of individuals suspected to have committed crimes or in need of medical attention.

302. **Adequacy of Representation.** The requirements of Rule 23(a)(4) are satisfied in that Plaintiff has a sufficient stake in the litigation vigorously to prosecute her claims on behalf of the Class Members and Plaintiff's interests are aligned with those of the proposed class. There are no defenses of a unique nature that may be asserted against Plaintiff individually, as distinguished from the other members of the Class, and the relief sought in this Count is common to the Class. Plaintiff does not have any interest that is in conflict with or is antagonistic to the interests of the members of the Class, and has no conflict with any other member of the Class. Plaintiff has selected counsel who are skilled in class action litigation and are well-qualified to carry out their duties as class counsel, having been appointed Class Counsel in other class actions.

303. **Declaratory and Equitable Relief**. The requirements of Rule 23(b)(2) are satisfied in that the Defendants' actions affected and will affect the class members in a similar manner, making appropriate final declaratory and injunctive relief with respect to the Class as a whole. For example, among other forms of equitable relief, Plaintiff seeks with respect to the Class as a whole a judicial declaration that the Defendants used objectively unreasonable force by

maintaining suspects in a prone hogtied position and transporting patients in a hogtied, hobbled, or prone position and that they be enjoined from using this method of restraint in the future.

304. **Predominance and Superiority**. Alternatively, all of the requirements for Rule 23(b)(3) are satisfied because the common factual and legal issues identified above are sufficiently cohesive to warrant adjudication by representation. In particular, the Plaintiff and the Class Members have suffered a common cause of injury, namely the Defendants' use of a dangerous, potentially lethal, degrading form of restraint during arrest and transportation of individuals suspected to have committed crimes or in need of medical attention. The Class Members' legal claims arise exclusively under federal law and, therefore, do not involve the application of other states' laws which may have varying degrees of liability and proof. Class action treatment is also superior to other available methods for the fair and efficient adjudication of this controversy, because individual litigation of the claims of all Class Members is economically unfeasible and procedurally impracticable. The likelihood of individual Class Members prosecuting separate claims is remote and, even if every Class Member could afford individual litigation, the court system would be unduly burdened by individual litigation in such cases. Additionally, individual litigation would also present the potential for varying, inconsistent or contradictory judgment while magnifying the delay and expense to all parties and to the court system, thus resulting in multiple trials of the same legal issue and creating the possibility of repetitious litigation. As a result, the desirability to concentrate litigation in this forum is significantly present. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance of a class action. Relief concerning Plaintiff's rights under the laws herein alleged and with respect to the Class would be proper.

305. At all times pertinent to this civil action, the Police Defendants acted pursuant to the policies, regulations, and decisions officially adopted or promulgated by those persons whose acts may fairly be said to present the official policy of, or were pursuant to, a governmental custom, usage or practice of Defendant City of Southaven.

306. At all times pertinent to this civil action, the Fire/EMS Defendants acted pursuant to the policies, regulations, and decisions officially adopted or promulgated by those persons whose acts may fairly be said to present the official policy of, or were pursuant to, a governmental custom, usage or practice of Defendant City of Southaven.

307. The policies, regulations, customs, usage, or practice of Defendant City of Southaven, through the Southaven Police Department and Southaven Fire Department, authorize the methods of restraint used against decedent Troy Charlton Goode during his arrest, detention, and transport.

308. Defendant City of Southaven, through the Southaven Police Department and Southaven Fire Department, has engaged and continues to engage in a pattern or practice of using potentially lethal hogtie restraints, wherein individuals are maintained in a hogtied, prone position during law enforcement or emergency services transport.

309. The City of Southaven has tolerated the misconduct of individual officers and firemen through its acts or omissions and has ratified the use of lethal hogtie restraints against unarmed, nonviolent suspects.

310. The City of Southaven has engaged in and continues to engage in a pattern or practice of conduct that deprives citizens and visitors in Southaven rights, privileges, or immunities secured or protected by the Constitution (including the Fourth and Fourteenth Amendments) or the laws of the United States, in violation of 42 U.S.C. 1983.

311.    In the absence of intervention by this Court, Defendants City of Southaven through the Southaven Police Department and Southaven Fire Department, will continue to use hogtie restraints against suspects and patients in their custody.

## COUNT IX:  NINTH CLAIM FOR RELIEF

### Invasion of Privacy by the Malicious Release of Expunged Records
### in Violation of T.C.A. § 40-32-101

*(Against Defendant John Doe #1)*

312.    Plaintiff re-alleges all preceding paragraphs of this Complaint as if set forth verbatim herein.

313.    Under Tennessee state law expunged records are destroyed, with an exception for various records, "that are maintained as confidential records for law enforcement purposes and are not open for inspection by members of the public." *See* T.C.A. § 40-32-101(b)(1).

314.    On January 22, 2009, pursuant to an order of the Honorable Karen Massey, Judge for Division 11 of the General Sessions Court of Shelby County, Tennessee, various records regarding Troy were expunged.

315.    Following his initial confrontation with the Police Defendants, the Police Defendants requested Troy's expunged records, purportedly for law enforcement purposes.

316.    Following Troy's death, John Doe #1, who is believed to be one of the Police Defendants or another member of the Southaven Police Department, released the expunged records to reporters working with the Commercial Appeal, a newspaper in Memphis, Tennessee.

317.    This release of expunged records was done intentionally and maliciously, for the purpose of damaging Troy's reputation and convincing the public that his death was justified.

54

318.    The release of expunged records other than to law enforcement agencies for law enforcement purposes is a Class A misdemeanor under Tennessee state law.

319.    A reasonable person would realize that the release of private, confidential, expunged records to the public is offensive to a person of ordinary sensibilities.  Such an intrusion goes beyond the limits of decency and violates Tennessee state law.

320.    As a result of the unwarranted, unreasonable intrusion into and publicity given to Troy's private, confidential records, Plaintiff has suffered harm to Plaintiff's reputation, interest in privacy, mental anguish, and other damages.

### COUNT X: TENTH CLAIM FOR RELIEF

**Wrongful Death of Troy Charlton Goode Due to
Acts of Reckless Disregard Committed by Defendants
(MISS. CODE ANN. §§11-7-13 and 11-46-9)**

*(Against City of Southaven, the Hospital Defendants, the Police Defendants, the Fire/EMS Defendants, and John Does 1-10)*

321.    Plaintiff re-alleges all preceding paragraphs of this Complaint as if set forth verbatim herein.

322.    The acts and/or omissions of the Defendants alleged herein and detailed below caused the wrongful death of Troy Charlton Goode and were the direct and proximate cause, or were a proximate contributing cause, of Plaintiff's injuries entitling Plaintiff to recover damages pursuant to Miss. Code Ann. §11-7-13 and Miss. Code Ann. §11-46-9.

323.    The Police Defendants, who were police officers acting within the course and scope of their employment as agents, employees, and/or servants of the City of Southaven, acted in reckless disregard of the safety and well-being of Troy by commanding a police dog to attack

Troy and shooting Troy with a taser gun at a time when Troy was unarmed, not posing any threat of violence, fleeing, or actively resisting arrest.

324. The Police Defendants, who were police officers acting within the course and scope of their employment as agents, employees, and/or servants of the City of Southaven, acted in reckless disregard of the safety and well-being of Troy by using lethal force against Troy as detailed in this Complaint.

325. The Fire/EMS Defendants, who were emergency medical technicians, paramedics, or other personnel acting with the course and scope of their employment as an agent, employee, and/or servant of the City of Southaven, acted in reckless disregard of the safety and well-being of Troy by willfully violating their own written Standard Operating Procedures and acting in concert with the Police Defendants to maintain Troy in a hogtied, prone position despite knowing the dangers of that position, and by acting in concert with the Police Defendants to refuse to provide the interventions clearly indicated by Troy's vital signs and condition.

326. The Hospital Defendants, who were doctors and medical personnel acting within the course and scope of their employment as agents, employees, and/or servants of Baptist Memorial Hospital-Desoto, acted in reckless disregard of the safety and well-being of Troy Charlton Goode by willfully failing to appropriately treat Troy and acting in concert with the Police and Fire/EMS Defendants to maintain Troy in a hogtied, prone position despite knowing the dangers of that position, and by acting in concert with the Police and Fire/EMS Defendants to refuse to provide the interventions clearly indicated by Troy's vital signs and conditions.

327. The acts of the Defendants are the proximate cause, or are a proximate contributing cause, of the death of Troy Charlton Goode and are the proximate cause, or are a proximate contributing cause, of the injuries, damages, and losses suffered and sustained by Troy and which

have been suffered and sustained by the Plaintiff; therefore, the Defendants are liable to the Plaintiff for the Plaintiff's injuries, damages, and losses.

## COUNT XI: ELEVENTH CLAIM FOR RELIEF

### Intentional and Negligent Infliction of Emotional Distress

*(Against City of Southaven, the Police Defendants, the Fire/EMS Defendants, the Hospital Defendants, and John Does 1-10)*

328.    Plaintiff re-alleges all preceding paragraphs of this Complaint as if set forth verbatim herein.

329.    The Defendants' conduct as previously described in this Complaint was designed not only to inflict illegal acts causing suffering upon Troy, but also to inflict emotional distress and mental anguish upon Troy and upon the Plaintiff, and the manner, method, and design of the Defendants' conduct caused Troy and the Plaintiff to endure emotional distress and mental anguish, and also caused the Plaintiff to endure emotional distress and mental anguish because she was present when Defendants commanded a police dog to attack Troy, shot a taser gun at a completely helpless and incapacitated Troy in the back, hogtied him and placed him face down on a stretcher, and denied Plaintiff the right to visit Troy in the hospital.  The Plaintiff endured emotional distress and mental anguish at the time of the events leading to the death of Troy and since these events, and will continue to endure emotional distress and mental anguish in the future.

330.    As a direct and proximate consequence of the outrageous conducted of the Defendants, they are liable to the Plaintiff for the negligent and intentional infliction of emotional distress and mental anguish upon Troy and upon the Plaintiff.  At all times pertinent to this civil action, the Defendants acted with wanton and willful reckless disregard for the safety and well-being of Troy.    Therefore, the Plaintiff is entitled to a money judgment against the Defendants who

engaged in or contributed to or otherwise facilitated through their acts of omission or commission such outrageous conduct.

## COUNT XII: TWELVETH CLAIM FOR RELIEF

### The Common Law Tort of Outrage

*(Against City of Southaven, the Hospital Defendants, the Police Defendants, the Fire/EMS Defendants, and John Does 1-10)*

331.  Plaintiff re-alleges all preceding paragraphs of this Complaint as if set forth verbatim herein.

332.  The Defendants' overall conduct at all times pertinent to this civil action was so outrageous that it shocks the moral and legal conscience of the community.  This outrageous conduct resulted in the untimely and unnecessary death of Troy, who was attacked by a police dog, shot in the back with a taser gun and then hogtied in the prone position at a time when he was completely helpless, and left in that position until he suffocated and died, and the manner, method, and design of the Defendants' conduct amounted to a cold, callous, and premeditated abuse of legal authority.

333.  As a direct and proximate consequence of the conduct of the aforementioned Defendants, both known and unknown, the Defendants are liable to the Plaintiff for such outrageous conduct as the same resulted in the untimely and unnecessary death of Troy.  At all times pertinent to this civil action the Defendants acted with wanton and willful reckless disregard for the safety and well-being of Troy. Therefore, the Plaintiff is entitled to a money judgment against the Defendants who engaged in or contributed to or otherwise facilitated through their acts of omission or commission such outrageous conduct.

## COUNT XIII: THIRTEENTH CLAIM FOR RELIEF

### Violation of Plaintiff's Right to Interstate Travel
### and Hospital Visitation

*(Against City of Southaven, the Hospital Defendants, the Police Defendants, the Fire/EMS Defendants, and John Does 1-10)*

334. Plaintiff re-alleges all preceding paragraphs of this Complaint as if set forth verbatim herein.

335. Kelli and Troy had a constitutional right to travel freely from one state to another.

336. Kelli and Troy had a constitutional right to be treated as welcome visitors rather than unfriendly aliens when traveling outside of their home state of Tennessee.

337. Defendants, acting individually and in concert with one another, and acting within the course and scope of their employment and under the color of law, deprived Kelli of her right to travel freely between the states of Tennessee and Mississippi for the purpose of visiting her husband in the hospital.

338. The Police Defendants and/or the Fire/EMS Defendants, acting under the color of law, made unlawful threats against Kelli and Troy and unlawfully ordered Kelli to return to the State of Tennessee, all for the purpose of preventing her from visiting her husband in the hospital.

339. Defendants, acting individually and in concert with one another, and acting within the course and scope of their employment and under the color of law, made unlawful threats to Kelli while she was in Shelby County, Tennessee for the purpose of preventing her from traveling to Mississippi to be with her husband.

340. Upon information and belief, Baptist has enacted Patient Bill of Rights which permits patients in their facility to have visitors and, in the event of incapacity, to have a guardian or other representative present to make decisions regarding the patient's care.

341.    Baptist is an accredited member of the Joint Commission, a not-for-profit organization that evaluates and accredits hospitals in the United States.  As a result of Baptist obtaining such accreditation, Baptist must abide by the Joint Commission standards.

342.    Joint Commission standards include, but are not limited to, the following:

a.    The hospital allows a family member, friend, or other individual to be present with the patient for emotional support during the course of stay.

b.    When a patient is unable to make decisions about his or her care, treatment, and services, the hospital involves a surrogate decision-maker in these decisions.

c.    The hospital involves the patient's family in care, treatment, and services decisions to the extent permitted by the patient or surrogate decision-maker, in accordance with law and regulation.

343.    Under federal law, Baptist must "ensure that all visitors enjoy full and equal visitation privileges consistent with patient preferences."

344.    The Hospital Defendants, Fire/EMS Defendants, and Police Defendants acted in concert to prevent Plaintiff from visiting her husband in the hospital by, *inter alia*, threatening her with arrest unless she crossed the Mississippi/Tennessee state line to return to her home, following her to ensure she was driving toward the Mississippi/Tennessee state line instead of toward the hospital, using communications directed into the state of Tennessee to falsely inform Plaintiff and her mother-in-law that Troy's condition was "stable" when he was, in fact, mere minutes from death, and using communications directed into the state of Tennessee to threaten her and her mother-in-law with arrest and the inflation of charges against Troy if they entered the state of Mississippi and came to Baptist Memorial Hospital-Desoto.

345.    Defendants, acting individually and in concert with one another, and acting within the course and scope of their employment and under the color of law, deprived Troy and Kelli of their right to hospital visitation as established by federal regulation and Baptist hospital policies.

346.    As a direct and proximate result of the aforementioned actions of Defendants, the decedent, Troy Charlton Goode, and the Plaintiff suffered injuries and damages as alleged herein.

## COUNT XIV: FOURTEENTH CLAIM FOR RELIEF

### Medical Malpractice

*(Against the Hospital Defendants and Fire/EMS Defendants)*

347.    Plaintiff re-alleges all preceding paragraphs of this Complaint as if set forth verbatim herein.

348.    The Hospital Defendants and the Fire/EMS Defendants, jointly and severally, and each individually, had a duty to recognize the severity of Troy's medical conditions, stabilize him, and initiate proper treatment and care.

349.    The ACLS protocols developed by the American Heart Association express the standard of care prevailing in Southaven, Mississippi for doctors, nurses, paramedics, emergency medical technicians, and other healthcare professionals for treating cardiac emergencies.

350.    Under the ACLS protocols, an adult with supraventricular tachycardia would be classified as an "adult tachycardia with a pulse."

351.    Under the ACLS algorithm for adult tachycardia with a pulse, a healthcare provider must work to identify and treat the underlying cause of the tachycardia.

352.    Under the ACLS algorithm, a healthcare provider should identify and treat the underlying cause in the following ways:

    a.   Maintain patent airway; assist breathing as necessary

    b.   Provide oxygen if patient is hypoxemic (<94% oxygen saturation)

    c.   Use a cardiac monitor to identify rhythm, monitor blood pressure and oximetry

353.   Under the ACLS algorithm, a healthcare provider should utilize synchronized cardioversion if a patient presents with a persistent tachyarrhythmia causing hypotension, acutely altered mental status, signs of shock, ischemic chest discomfort, or acute heart failure.

354.   The Hospital Defendants and Fire/EMS Defendants failed to meet the standard of care prevailing in Southaven, MS and similar communities by, *inter alia*:

    a.   Failing to perform appropriate heart monitoring and/or pulse oximetry;

    b.   Failing to maintain Troy's airway;

    c.   Failing to provide Troy supplemental oxygen;

    d.   Failing to use appropriate medical restraints;

    e.   Failing to appropriate monitor Troy's condition as required by written medical orders;

    f.   Permitting non-medical personnel exclusive custody and control over Troy;

    g.   Failing to treat Troy for supraventricular tachycardia despite actual and constructive knowledge of Troy's condition;

    h.   Failure to treat Troy's respiratory distress despite actual and constructive knowledge of that condition;

    i.   Maintaining Troy in a supine, dangerously constricted position under five-point restraints in violation of their own protocols, policies, and/or standard operating procedures; and,

    j.   Falsely informing Plaintiff and her mother-in-law that Troy's condition was "stable" when he was, in fact, mere minutes from death, and using or conspiring to use communications directed into the state of Tennessee to threaten Kelli and her mother-in-

law with arrest and the inflation of charges against Troy if they entered the state of Mississippi and came to Baptist Memorial Hospital-Desoto, thereby depriving Troy of his medical decision-maker and emotional support.

355. These Defendants' failures to meet the applicable standard of care was the direct and proximate cause of Plaintiff's injuries as set forth herein.

## COUNT XV: FIFTEENTH CLAIM FOR RELIEF

## ERISA INDIVIDUAL BENEFITS CLAIM
## (29 U.S.C. 1132(a)(1)(B))

*(Against Defendant Sun Life)*

356. Plaintiff re-alleges all preceding paragraphs of this Complaint as if set forth verbatim herein.

357. Under ERISA, venue is proper in "the district where the plan is administered, where the breach took place, or where defendant resides or may be found." 29 U.S.C. 1132(e)(2). As a result, this district is the proper venue for this ERISA claim.

358. Plaintiff was a beneficiary of the NexAir Employee Group Benefits Plan and Sun Life insurance policy, which is administered in Shelby County, Tennessee.

359. Under the terms of the NexAir Employee Group Benefits Plan and the Sun Life insurance policy, Defendant Sun Life agreed to provide Life Insurance and Accidental Death and Dismemberment Insurance benefits to Plaintiff in the event of Troy's accidental death.

360. Plaintiff is entitled to benefits under the terms of the Plan and the Sun Life insurance policy.

361.    A claim for life insurance benefits was filed on behalf of Plaintiff on July 20, 2015 and received by Sun Life on or about August 7, 2015.  To date, Sun Life has not provided those benefits or a determination regarding that claim.

362.    Pursuant to federal law and regulations, in the case of the failure of a plan to establish or follow claims procedures consistent with minimum regulatory standards, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under ERISA section 502(a).  See 29 C.F.R. 2560.503-1(l).

363.    Sun Life did not provide a determination within the 90 days (or 180 days with an extension) permitted under federal regulations.  See 29 C.F.R. 2560.503-1(f)(1).

364.    Sun Life owed Plaintiff duties as a fiduciary of the ERISA Plan, including the duty of loyalty.

365.    Sun Life has breached its fiduciary duties to Plaintiff, including the duty of loyalty.

366.    As a result of Sun Life's refusal to provide contractual life benefits, Plaintiff has suffered and will continue to suffer damagers under the Plan, plus interest and other damages, for a total amount to be determined.

## VIII:  DAMAGES

367.    Plaintiff re-alleges all preceding paragraphs of this Complaint as if set forth verbatim herein.

368.    As a proximate consequence of the above described acts of the Defendants, Troy was wrongfully deprived of his life and his civil and constitutional rights, and the Plaintiff was also

deprived of her civil and constitutional rights, and the Plaintiff has suffered injuries, damages, and losses, including (but not limited to) the following:

a. Troy's pain and suffering, loss of the joy of life, and other losses caused by the injuries he sustained when he was attacked by a police dog, shot in the back with a taser gun, hogtied in the prone position with weight on his back, strapped to a stretcher in the hogtied position, and maintained in that position for an excessive and ultimately lethal period of time;

b. Troy's deprivation of his life and his civil and constitutional rights secured by the United States Constitution;

c. Medical, hospital, doctor, and funeral expenses;

d. Troy's lost wages, loss of income, and loss of wage earning capacity;

e. Loss of the love, society, companionship, affection, and loss of the normal parent-child relationship, which existed between Troy and his son R.G.;

f. Loss of the love, consortium, companionship, affection, and loss of the normal spousal relationship which existed between Troy and Plaintiff.

g. Loss of the aid, services, and physical assistance provided by Troy for Plaintiff and for his son R.G.;

h. Exemplary or punitive damages; and,

i. Other injuries, damages, and losses suffered and sustained by the Plaintiff which may be shown upon the trial of this action.

## IX. REQUEST FOR RELIEF

369. WHEREFORE, PREMISES CONSIDERED, the Plaintiff demands judgment against the Defendants:

a. A monetary judgment in favor of the Plaintiff and against the Defendants for actual or compensatory and presumed damages sustained by the Plaintiff, pursuant to 42 U.S.C. §1983, for violations of the civil and constitutional rights of Troy and the Plaintiff arising

out of the death of Troy Charlton Goode and the facts and violations of duties as described in this Complaint, for which the Defendants should be held liable and responsible in an amount to be determined by a jury that is in excess of the sum of Seventy-five Thousand Dollars ($75,000.00);

b. Punitive damages in an amount determined by a jury;

c. A judgment in favor of the Plaintiff and against the Defendants under the pendent state law claims for the wrongful death of Troy, medical malpractice, invasion of privacy, the tort of outrage, and negligent and intentional infliction of emotional distress, and for injuries, damages, and losses suffered and sustained by the Plaintiff as a result of the wrongful death of Troy Charlton Goode in an amount to be determined by a jury in excess of Seventy-five Thousand Dollars ($75,000.00);

d. A judgment in favor of the Plaintiff class and against the Defendants for damages and for a permanent injunction against the use of the prone hogtie restraint on individuals in custody of the Southaven Police Department or who are being transported by Southaven Fire/EMS personnel for purposes of medical treatment;

e. A judgment in favor of the Plaintiff and against the Defendants for the Plaintiff' reasonable attorneys' fees pursuant to 42 U.S.C. §1988, plus all costs of this action and all of the Plaintiff's related litigation costs, litigation fees, and litigation expenses, as well as pre-judgment and post-judgment interest as allowed by law;

f. A judgment in favor of Plaintiff and against Defendant Sun Life in the amount equal to the Life Insurance and Accidental Death & Dismemberment benefits to which Plaintiff is entitled, reasonable attorneys' fees pursuant to 29 U.S.C. 1132(g), plus all costs of this

action and all of Plaintiff's related litigation costs, fees, and expenses, as well as pre-judgment and post-judgment interest as allowed by law;

g. A judgment in favor of the Plaintiff and against the Defendants for such other relief, either general or specific, which the Court may deem appropriate in law or equity and for which the Plaintiff duly prays.

RESPECTFULLY SUBMITTED, this the 21st day of March, 2016.

/s/ Tim Edwards
/s/ Kevin McCormack
Tim Edwards, (TN BPR# 5353)
Kevin M. McCormack, (TN BPR# 29295)
Ballin, Ballin & Fishman, P.C.
200 Jefferson Ave., Suite 1250
Memphis, TN 38103
Office (901) 525-6278
Fax (901) 525-6294
tedwards@bbfpc.com
kmccormack@bbfpc.com

ATTORNEYS FOR PLAINTIFF

<u>CERTIFICATE OF CONSULTATION</u>

Tim Edwards, attorney for the Plaintiff, states that pursuant to §11-1-58 of the Mississippi Code of 1972, as amended, he has reviewed the facts of the case and has consulted with at least one (1) expert qualified pursuant to the Mississippi Rules of Civil Procedure and the Mississippi Rules of Evidence who is qualified to give expert testimony as to the standard of care or negligence and who he believes to be knowledgeable in the relevant issues involved in this case. Tim Edwards further states that he has concluded on the basis of said review and consultation that there is a reasonable basis for the commencement of this civil action.

<u>/s/ Tim Edwards</u>
Tim Edwards, (TN BPR# 5353)