**In the Matter Of:**

*KELLI DENISE GOODE vs*

*CITY OF SOUTHAVEN*

*2:16-cv-02029-SHM-cgc*



*JASON SCALLORN*

*November 30, 2016*



REPORTING
CORPORATION

*1st in Reporting, 1st in Service, 1st in Technology*

We Bridge the State and Cover the Nation!

www.alphareporting.com

800-556-8974

Jason Scallorn - November 30, 2016

```
 1            IN THE UNITED STATES DISTRICT CIRCUIT
             FOR THE WESTERN DISTRICT OF TENNESSEE
 2                      WESTERN DIVISION

 3     ──────────────────────────────────────────────

       KELLI DENISE GOODE,          )
 4     Invidually, and also as      )
       the Personal                 )
 5     Representative of TROY        )
       CHARLTON GOODE, Deceased,    )
 6     and as Mother, Natural       )
       Guardian, and Next Friend    )
 7     of R.G., a Minor, and also)
       on behalf of all similarly)
 8     situated persons,            )
                                    )
 9                                  )
            Plaintiffs,             )
10                                  )
       VS.                          )NO. 2:16-cv-02029-SHM-cgc
11                                  )
                                    )
12                                  )
       THE CITY OF SOUTHAVEN,       )
13     et al.,                      )
                                    )
14                                  )
            Defendants.             )
15     ──────────────────────────────────────────────

16
                   VIDEOTAPED DEPOSITION
17
                            OF
18
                     JASON SCALLORN
19
                   NOVEMBER 30, 2016
20

21

22

23            ALPHA REPORTING CORPORATION
                   236 Adams Avenue
24                 Memphis, TN 38103
                    901-523-8974
25               www.alphareporting.com
```

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

2

1    The videotaped deposition of JASON

2 SCALLORN is taken on this, the 30th day of November,

3 2016, on behalf of the Defendants, pursuant to

4 notice and consent of counsel, beginning at

5 approximately 9:30 a.m., in the offices of Ballin,

6 Ballin & Fishman, 200 Jefferson Avenue, Suite 250,

7 Memphis, Tennessee.

8    This deposition is taken pursuant to the

9 terms and provisions of the Federal Rules of Civil

10 Procedure.

11    All forms and formalities are waived.

12 Objections are [reserved|not reserved], except as to

13 form of the question, to be disposed of at or before

14 the hearing.

15    The signature of the witness is waived.

16

17

18

19

20

21

22

23

24

25

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

```
                                                                    3
1                    A P P E A R A N C E S

2    FOR THE PLAINTIFFS:

3                       KEVIN McCORMACK, ESQ.
                        Ballin, Ballin & Fishman, PC
4                       200 Jefferson Avenue, Suite 1250
                        Memphis, Tennessee 38103
5                       (901) 525-6278

6
     FOR THE DEFENDANTS:
7
                        DAVID WALKER UPCHURCH, ESQ.
8                       dupchurch@upchurchpa.com
                        JOHN MARK McINTOSH, ESQ.
9                       jmcintosh@upchurchpa.com
                        Upchurch & Upchurch, P.A.
10                      141 S. Commerce Street, Suite B
                        Tupelo, Mississippi 38804
11                      (662) 260-6958

12                      MARTY PHILLIPS, ESQ.
                        Rainey, Kizer, Reviere & Bell, PLLC
13                      50 North Front Street, Suite 610
                        Memphis, Tennessee 38103
14                      (901) 333-8101

15                      JAMES RIC GASS, ESQ.
                        gass@gwmlaw.com
16                      Gass, Weber & Mullins, LLC
                        309 N. Water Street, Suite 700
17                      Milwaukee, WI 53202
                        (414) 223-3300
18
                        LOYS A. "TREY" JORDAN, III, ESQ.
19                      McDonald Kuhn, PLLC
                        5400 Poplar Avenue, Suite 330
20                      Memphis, Tennessee 38119
                        (901) 526-0606
21
                        BERKLEY N. HUSKISON, ESQ.
22                      Mitchell, McNutt & Sams, PA
                        215 Fifth Street North
23                      Columbus, Mississippi 39701
                        (662) 328-8035
24

25   ALSO PRESENT:    JASON ELY, VIDEOGRAPHER
```

**Alpha Reporting Corporation**

Exhibit "B" page 4 of 173

Jason Scallorn - November 30, 2016

4

```
1                    I N D E X

2

3                EXAMINATION INDEX

4
    JASON SCALLORN
5        BY MR. McCORMACK . . . . . . . . . . . . . . . 7
         BY MR. GASS . . . . . . . . . . . . . . . . 90
6        BY MR. UPCHURCH . . . . . . . . . . . . . . 94
         BY MR. JORDAN . . . . . . . . . . . . . . .112
7        BY MR. HUSKISON . . . . . . . . . . . . . .140
         FURTHER BY MR. GASS . . . . . . . . . . . .144
8        FURTHER BY MR. McCORMACK . . . . . . . . . .148

9

                   EXHIBIT INDEX
10
                                              MAR
11   Exhibit
     EXHIBIT NO. 1    Polygraph examination -
12                    CONFIDENTIAL              12

13   EXHIBIT NO. 2    Photograph               24

14   EXHIBIT NO. 3    Google Earth map         35

15   EXHIBIT NO. 3    Google Earth map         24

16   EXHIBIT NO. 4    Requests for admissions  35

17   EXHIBIT NO. 5    Supplemental Incident Report  58

18   EXHIBIT NO. 6    Memo dated July 19, 2015  59

19   EXHIBIT NO. 7    Photograph               77

20   EXHIBIT NO. 8    Photograph - ID Only     78

21   EXHIBIT NO. 9    Photograph               79

22   EXHIBIT NO. 10 Arrests procedures         87

23

24

25   COURT REPORTER'S CERTIFICATE             154
```

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

5

1           VIDEOGRAPHER:  Today is November 30th,

2 2016 and the time is approximately 9:34.  The case

3 number is 2:16-CV-02029-SHM-CGC, filed in the United

4 States District Court for the Western Division of

5 Tennessee.  It's entitled Kelli Denise Goode versus

6 The City of Southaven, et al.

7           Will counsel please identify themselves

8 for the record.

9           MR. HUSKISON:  I'm Berk Huskison and I

10 represent Southaven, City of Southaven and the

11 individual Southaven defendants, one of which is

12 Jason Scallorn, being deposed today.

13           MR. McCORMACK:  Kevin McCormack for the

14 plaintiffs.

15           MR. GASS:  Ric Gass for Dr. Oliver.

16           MR. PHILLIPS:  Marty Phillips for

17 Dr. Oliver.

18           MR. JORDAN:  Trey Jordan for Southeastern

19 Emergency Physicians.

20           MR. UPCHURCH:  David Upchurch on behalf of

21 Baptist Memorial Hospital-DeSoto, Inc.

22           MR. McINTOSH:  John Mark McIntosh on

23 behalf of Baptist Memorial Hospital-DeSoto, Inc.

24           VIDEOGRAPHER:  Will the court reporter

25 please swear in the witness.

**Alpha Reporting Corporation**

6

```
 1                    JASON SCALLORN,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4                     EXAMINATION
 5   BY MR. McCORMACK:
 6        Q.   You are Jason Scallorn?
 7        A.   Yes, sir.
 8        Q.   Have you ever given a deposition before?
 9        A.   Yes, sir.
10        Q.   About how long ago was that?
11        A.   Couple years ago.
12        Q.   Just so that we're all on the same page,
13   I'm going to go over some ground rules, if that's
14   all right with you.  First of all, we've got a court
15   reporter here who's trying to take down every word
16   we say.  In order to keep the record clear, what I'm
17   going to ask you to do is let me finish a question
18   before you answer; is that fair?
19        A.   Yes, sir.
20        Q.   And likewise, if you're answering a
21   question, I'll try to let you finish before I start
22   on my next question; is that fair to you?
23        A.   Yes, sir.
24        Q.   And the reason we're doing that is so that
25   we don't have the record being, interjections one
```

**Jason Scallorn - November 30, 2016**

1  after the other, after the other.  Another thing I'm
2  going to ask you to do, instead of saying uh-huh,
3  uh-uh, if you could answer yes or no, so that the
4  court reporter can write down yes or no; is that
5  fair?
6      A.   Yes, sir.
7      Q.   I'm going to ask a lot of questions of you
8  today.  Some of my questions might not come out very
9  well because I'm sitting here and talking to you,
10  and some things that make sense to me might not make
11  sense to you.  So I'm going to ask you, if you don't
12  understand a question of mine, will you ask me to
13  rephrase it?
14      A.   Yes, sir.
15      Q.   If you do answer, I'm going to assume that
16  you understood the question since you could have
17  asked me to rephrase it; is that fair?
18      A.   Yes, sir.
19      Q.   This is not a marathon.  This is not
20  something where you have to worry about sitting in
21  that chair the whole time.  If you need a break,
22  we're fine to take a break.  All that I'm going to
23  ask is that you finish the question that's pending
24  at that point and then we're fine to take a break
25  whenever you need; is that fair?

Jason Scallorn - November 30, 2016

8

1    A.    Okay.

2    Q.    All right.  Could you state your name and

3 spell your last for the record?

4    A.    Jason Murray Scallorn, S-C-A-L-L-O-R-N.

5    Q.    Where do you currently reside, sir?

6    A.    5646 Pine Tree Loop East in Southaven,

7 Mississippi.

8    Q.    And you are currently an employee of the

9 City of Southaven, correct?

10    A.    Yes, sir.

11    Q.    Working for the Southaven Police

12 Department, right?

13    A.    Yes, sir.

14    Q.    I want to ask you some questions about the

15 ethics of being a police officer.  I'm going to ask

16 you whether you agree or disagree with these.

17         Do you agree that as a police officer you

18 should keep your private life unsullied as an

19 example for all?

20    A.    Yes, sir.

21    Q.    Do you agree as a police officer that you

22 are supposed to be honest in thought and deed, both

23 in your personal and official life?

24    A.    Yes, sir.

25    Q.    Do you agree that as a police officer you

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

9

1    are supposed to be exemplary in obeying the laws of
2    the land and regulations of your department?
3         A.    Yes, sir.
4         Q.    Do you agree that you are supposed to
5    enforce the law courteously and appropriately
6    without fear or favor, malice or ill will; never
7    employ unnecessary force or violence?
8         A.    Yes, sir.
9         Q.    Do you agree that the public demands that
10   the integrity of its law enforcement officers be
11   above reproach?
12        A.    Yes, sir.
13        Q.    Do you agree that dishonesty of a single
14   officer may impair public confidence and cast
15   suspicion and disrespect upon the entire department?
16        A.    Yes, sir.
17        Q.    Do you agree that you are expected to
18   scrupulously avoid any conduct which might
19   compromise your integrity or the integrity of your
20   department or fellow officers?
21        A.    Yes, sir.
22        Q.    Do you agree that you are expected to act
23   courteously towards members of the public and give
24   fair and courteous treatment to everyone?
25        A.    Yes, sir.

**Alpha Reporting Corporation**

Exhibit "B" page 10 of 173

**Jason Scallorn - November 30, 2016**

10

1   Q.   Do you agree that discourtesy or

2   disrespect shown towards any citizen is

3   indefensible?

4   A.   Yes, sir.

5   Q.   Do you agree that excessive or unwarranted

6   force or brutality should not be tolerated under any

7   circumstances?

8   A.   Yes, sir.

9   Q.   With regards to your professional life in

10  the past, Mr. Scallorn, you have lied about

11  misconduct to avoid getting in trouble, haven't you?

12  A.   Yes, sir.

13  Q.   I want to talk a little bit about what

14  Southaven knew about your history of lying to avoid

15  misconduct when they hired you.

16       Now, before you became an employee of the

17  Southaven Police Department, you went through a

18  polygraph examination, right?

19  A.   Yes, sir.

20  Q.   And that's commonly known as a lie

21  detector?

22  A.   Yes, sir.

23  Q.   When you went through that lie detector

24  test, that was one of the conditions of your

25  employment, wasn't it?

**Alpha Reporting Corporation**

Exhibit "B" page 11 of 173

**Jason Scallorn - November 30, 2016**

1    A.    Yes, sir.

2    Q.    And that was a condition of your

3  employment because there were some irregularities in

4  your background, right?

5    A.    Everybody has to do a polygraph.

6    Q.    So that's standard for every single

7  officer?

8    A.    Yes, sir.

9    Q.    I'm going to pass you a document.

10        (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

11  WAS PASSED TO THE WITNESS.)

12        MR. McCORMACK:   Handing copies out to the

13  other attorneys here.

14        MR. GASS:   Have we agreed to do sequential

15  numbering of all exhibits starting from Kelli's

16  depo?

17        MR. McCORMACK:   I don't think we have, and

18  I'm not sure what number we ended on, so that would

19  be hard for us to do at this point.

20        Go ahead and mark this as Exhibit 1.   If

21  you'll hand it to the court reporter there,

22  Mr. Scallorn.

23        (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

24  WAS MARKED AS EXHIBIT NO. 1 TO THE TESTIMONY OF THE

25  WITNESS, AND IS ATTACHED HERETO.)

**Alpha Reporting Corporation**

Exhibit "B" page 12 of 173

12

1          MR. GASS:  Does anybody have any objection
2    to eventually doing sequential renumbering?
3          MR. McCORMACK:  I would have no problem
4    with that.
5          MR. GASS:  Okay.  Great.
6    BY MR. McCORMACK:
7      Q.   Mr. Scallorn, this is the polygraph report
8    for the polygraph test that you took, right?
9      A.   Yes, sir.
10          MR. HUSKISON:  Let me make just a point
11    for the record.  The questions in the report that he
12    is asking questions to Mr. Scallorn about is part of
13    what we've all agreed is confidential in this case.
14    I just want to make that point for the record.
15    BY MR. McCORMACK:
16      Q.   In this polygraph examination, this lie
17    detector test, you were asked how many times you've
18    been reprimanded by your employer for misconduct,
19    right?
20      A.   Yes, sir.
21      Q.   And you told the Southaven Police
22    Department that you'd been reprimanded for visiting
23    your girlfriend's house while on duty?
24      A.   Yes, sir.
25      Q.   You were also asked how many times you

Jason Scallorn - November 30, 2016

13

1  should have been reprimanded but weren't, right?

2      A.    Yes, sir.

3      Q.    And you advised that there were quite a

4  few of those times?

5      A.    Yes, sir.

6      Q.    A lot of the time for sleeping on duty?

7      A.    Once.

8      Q.    You've had a few times for sleeping on

9  duty?

10     A.    I recall one time.

11     Q.    When you gave the statement to the

12 Southaven Police Department, you said it was a few

13 times?

14     A.    Yes, sir.

15     Q.    You also advised them that you should have

16 been disciplined for being outside of the city in a

17 patrol car or over at your girlfriend's watching

18 television?

19     A.    Yes, sir.

20     Q.    And that's when you would have been on

21 duty?

22     A.    Yes, sir.

23     Q.    You were asked if you had lied to get out

24 of trouble for that, right?

25     A.    Yes, sir.

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

14

1    Q.    And you told them that you had told your
2  captain you weren't at your girlfriend's house when
3  you were?
4    A.    Right.
5    Q.    And that's when you were on duty?
6    A.    Yes, sir.
7    Q.    You would go over about every other Sunday
8  and watch football, as opposed to doing your job
9  when you were on duty, right?
10    A.    Yes, sir.
11    Q.    You were also asked how many times you've
12  committed an act while on duty that might have
13  resulted in a charge of conduct unbecoming an
14  officer, right?
15    A.    Yes, sir.
16    Q.    You advised that you had had oral sex on
17  two occasions with two female dispatchers?
18    A.    It was one.  So yes.
19    Q.    With one female dispatcher on two
20  occasions?
21    A.    Yes, sir.
22    Q.    While in your patrol car?
23    A.    Yes, sir.
24    Q.    While on duty?
25    A.    Not in the patrol car, at her apartment.

Alpha Reporting Corporation

Exhibit "B" page 15 of 173

Jason Scallorn - November 30, 2016

15

1    Q.    While on duty?

2    A.    Yes, sir.

3    Q.    You were also asked about your drug usage,

4    right?

5    A.    Yes, sir.

6    Q.    And you advised them that you had smoked

7    marijuana not more than 60 times, right?

8    A.    Yes, sir.

9    Q.    You also advised them that you had

10   committed the crime of driving while intoxicated,

11   right?

12   A.    Yes, sir.

13   Q.    And you had done that three or four times?

14   A.    Yes, sir.

15   Q.    Now, after you finished this lie detector

16   test, Southaven Police Department still hired you,

17   right?

18   A.    Yes, sir.

19   Q.    Did they require you to go through any

20   disciplinary action upon being hired?

21   A.    No, sir.

22   Q.    Did they put you on probationary period?

23   A.    Yes, sir.

24   Q.    Was that probationary period for a

25   disciplinary reason for these answers in this

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

16

1  polygraph report?

2      A.   No, sir.

3      Q.   Did they require you to go through any

4  extra training based on the things that we just

5  talked about in this polygraph report?

6      A.   No, sir.

7      Q.   All right.

8           MR. HUSKISON:  I note for the record,

9  also, that this report, the polygraph, is dated, I

10  believe it's August 19, 2010.  Exhibit 1.

11 BY MR. McCORMACK:

12     Q.   All right.  Now, you're currently a K-9

13 officer with the Southaven Police Department, right?

14     A.   I was until a month ago.  I'm now a patrol

15 shift supervisor.

16     Q.   So you've gotten a promotion since then?

17     A.   Yes, sir.

18     Q.   All right.  When did you become a K-9

19 officer?

20     A.   December of 2014.

21     Q.   Did you have to have extra training to

22 become a K-9 officer?

23     A.   Yes, sir.

24     Q.   Did you have to learn the policies and

25 procedures for a K-9 officer before you obtained

**Alpha Reporting Corporation**

17

1    that position?

2         A.    Yes, sir.

3         Q.    Did that come with a pay raise, by the

4    way?

5         A.    No, sir.  I -- excuse me, we get a, what's

6    called a stipend because we house the dog.  It's $20

7    a paycheck, but it's not a promotion raise, per se.

8         Q.    All right.  Based on your familiarity with

9    the K-9 policies and procedures, under what

10   circumstances are you allowed to order a police dog

11   to attack a suspect?

12        A.    Noncompliance, trying to flee from a

13   crime.

14        Q.    Any crime?

15        A.    Yes, sir.

16        Q.    And any noncompliance?

17        A.    Within reason.

18        Q.    Well, what does that mean, within reason?

19        A.    Verbal noncompliance.  We can use the dog

20   as we could any -- anything else in the use of force

21   to gain compliance.

22        Q.    So you believe that it's appropriate to

23   use that any time that you could have used physical

24   force on a suspect?

25        A.    So says the policy.

18

1     Q.   I want talk to you a little bit about the

2   dog.  What's the name of your K-9 partner?

3     A.    Wessel.

4     Q.    Wessel.  I think we had it down as Weasel.

5     A.    Well, we -- we call him Weasel.  His name

6   is Wessel, we call him Weasel.

7     Q.    If I accidentally called him Weasel, I

8   don't mean any offense by that.

9     A.    No, sir, that's what I call him.

10     Q.    So Wessel has had to go through a lot of

11   training to become a K-9 officer, right?

12     A.    Yes, sir.

13     Q.    He actually had to go through a lot of

14   obedience training?

15     A.    Yes, sir.

16     Q.    I want you tell us a little bit about the

17   obedience training.  What sorts of scenarios do you

18   run a police dog through to get them ready to be

19   obedient to the officer handling him?

20     A.    The obedience, it starts off with your

21   basic, making the dog follow you around.  When I say

22   on lead, that means with a leash.  Have the dog

23   follow you on lead, not trying to pull away, not

24   trying to fight.  Take the leash off, try to get the

25   same result with you.  We'll start introducing

**19**

1  certain things into the obedience. We'll drop toys,

2  we'll drop bite sleeves. And the thing is to make

3  him be focused on me, and be obedient to me and not

4  what's going on around him.

5      Q.   Do you use any live distractions, people,

6  trying to distract him?

7      A.   Not with Weasel. We -- we've tried in the

8  past, but sometimes he does well with it, sometimes

9  he doesn't.

10     Q.   Now, you've actually have -- used live

11  decoys on him a number of times, haven't you?

12     A.   Yes, sir.

13     Q.   Have there ever been any times that you

14  reported that he was failing in his obedience

15  training?

16     A.   No, sir.

17     Q.   Have there ever been any times that you

18  were of the opinion that you couldn't keep him

19  obedient to you in a work situation?

20     A.   No, sir.

21     Q.   As a general rule, part of the reason you

22  go through obedience training is so that he doesn't

23  bite random people, right?

24     A.   Yes, sir.

25     Q.   And you train him as best you can so that

**Jason Scallorn - November 30, 2016**

20

1  he wouldn't bite unless he's commanded, right?

2       A.    That's the goal.

3       Q.    All right.  Sir, what is your height and

4  weight, as we sit here today?

5       A.    Six foot, about 225.

6       Q.    Was it about the same on July 18th, 2015?

7       A.    No, sir, I've put on some weight.  I was

8  probably around 200 pounds then.

9       Q.    So about six feet and 200 pounds?

10      A.    Yes, sir.

11      Q.    It's around the holidays, it's easy to put

12  on the weight.

13      A.    Yes, sir, and not doing K-9 training

14  anymore, kind of find something else to supplement

15  that.

16      Q.    I want to talk to you about the -- what

17  happened on July 18th, 2015.  Do you remember that

18  day?

19      A.    Yes, sir.

20      Q.    Is there anything that will keep you from

21  accurately remembering what happened on that day?

22      A.    No, sir.

23      Q.    All right.  Well, let's start off, when

24  did you start your shift that day?

25      A.    I believe it was at 7:00 p.m.

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

21

```
1    Q.   7:00 p.m.  And how long was your shift?
2    A.   Ten hours.
3    Q.   So it would have ended at, what is that,
4  5:00 a.m.?
5    A.   Yes, sir.
6    Q.   So where were you stationed when you
7  started your shift?
8    A.   As a K-9 officer you -- I live in the
9  City, so I would just get in service from my
10 residence, call and notify dispatch that I was in
11 service and start answering calls or doing what I
12 needed to do.
13   Q.   All right.  At some point you were called
14 to the scene where Troy Goode was having an
15 incident, right?
16   A.   Yes, sir.
17   Q.   Where were you before you got that call?
18   A.   I was on Getwell at Central Parkway, by
19 DeSoto Central High School.
20   Q.   When you got that call, did you
21 immediately proceed to the scene?
22   A.   Yes, sir.
23   Q.   I'm going to hand you a picture that might
24 make this a little bit easier to describe where you
25 were and what happened.
```

**Alpha Reporting Corporation**

Exhibit "B" page 22 of 173

Jason Scallorn - November 30, 2016

22

1          (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
2    WAS PASSED TO THE WITNESS.)
3    BY MR. McCORMACK:
4          Q.    Is this a fair and accurate depiction of
5    the location where, sort of an overhead view of
6    where Troy Goode was arrested on July 18th?
7          A.    Yes, sir.
8          Q.    Are you able to identify all of the roads
9    there?
10          A.    Yes, sir, Goodman Road is right here.
11          Q.    All right.  Do me a favor and mark with
12    this Sharpie that I'm handing you, the direction
13    that you were traveling when you were responding to
14    that call.
15          A.    (Witness complies).  That would be east.
16          Q.    And you've marked that with a black arrow?
17          A.    Yes.
18          Q.    Pointing down on, what road is that?
19          A.    Goodman Road.
20          Q.    So you headed south on Goodman Road,
21    right?
22          A.    East.
23          Q.    Sorry, east on Goodman Road?
24          A.    Yes, sir.
25          Q.    Where did you go when you headed east on

**Alpha Reporting Corporation**

Exhibit "B" page 23 of 173

23

1  Goodman Road?

2  A.  While I was heading east and Goodman

3  Road -- do you want me to draw it or just...

4  Q.  Let's -- where did you end up stopping on

5  Goodman Road?

6  A.  In front of the shopping center right here

7  where the incident took place, where the Rancho

8  Grande Mexican Restaurant is.  I pulled over on the

9  shoulder of Goodman Road in front of it.

10  Q.  So on the right shoulder of the road?

11  A.  Yes, sir.

12  Q.  All right.

13  MR. McCORMACK:  Let's go ahead and mark

14  that as Exhibit 2.  If you can hand that to the

15  court reporter.

16  (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

17  WAS MARKED AS EXHIBIT NO. 2 TO THE TESTIMONY OF THE

18  WITNESS AND IS ATTACHED HERETO.)

19  BY MR. McCORMACK:

20  Q.  I have a slightly enlarged version of that

21  here.

22  (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

23  WAS PASSED TO THE WITNESS.)

24  A.  Thank you.

25  BY MR. McCORMACK:

Jason Scallorn - November 30, 2016

24

1    Q.   Sir, is that a fair and accurate depiction
2  of the area where you pulled up your vehicle?
3    A.   Yes, sir.
4    Q.   All right.  If you could, draw for me a
5  rectangle where you stopped your vehicle.
6    A.   (Witness complies).
7    Q.   All right.  And you've just drawn a --
8         MR. JORDAN:  Can he hold that up one more
9  time?
10 BY MR. McCORMACK:
11   Q.   -- black rectangle where you had pulled
12 over your car?  Could you mark with an X where you
13 saw Mr. Goode when you pulled up?
14   A.   (Witness complies).
15   Q.   And you've marked an X just about even
16 with your car.
17   A.   Yes, sir.
18   Q.   Is that fair to say?
19   A.   Yes, sir.
20   Q.   Were there any other officers on the scene
21 when you arrived?
22   A.   Officer Todd Baggett was --
23   Q.   Did Todd Baggett have a vehicle there?
24   A.   Yes, sir.
25   Q.   If you could, mark where his car is with

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

25

1  another rectangle and we'll write a TG or TB by

2  that.

3      A.    I don't recall exactly where it was in the

4  parking lot.

5      Q.    It was somewhere in the parking lot up

6  here?

7      A.    It was somewhere in the parking lot, yes,

8  sir.

9      Q.    And you don't remember if it was stopped

10  in the driveway here or if it had pulled all the way

11  in?

12      A.    He was in the parking lot, I just don't

13  recall where.

14      Q.    Right.  So you don't know if it was

15  stopped in the driveway or --

16      A.    No, sir.

17      Q.    -- pulled all the way in?

18      A.    I don't recall.

19      Q.    All right.  Where was Todd himself when

20  you arrived?

21      A.    Standing in the parking lot talking to

22  Ms. Goode.

23      Q.    If you could mark with a TB where Todd

24  Baggett was.

25      A.    This is approximate, but it was somewhere

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

26

1    on that front row, I believe.

2        Q.    All right.  So that would be, he was to

3    the east of Mr. Goode?

4        A.    Yes.

5        Q.    I guess east and south?

6        A.    Yes, sir.

7        Q.    All right.  Were there any other officers

8    on the scene when you arrived?

9        A.    Not at this time.

10       Q.    All right.  When you first arrived on the

11   scene, what did you do?

12       A.    I arrived on the scene.  I exited my

13   vehicle and I walked around to the back of it behind

14   the Tahoe.

15       Q.    All right.  So you walked around in front

16   of your car to the back?

17       A.    Yes.

18       Q.    All right.  When you got to the back of

19   your car, if I understand correctly, your testimony

20   is that Mr. Goode started walking towards the car,

21   right?

22       A.    In an erratic manner.  He was kind of

23   zigzagging towards it.

24       Q.    And you walked up to the car, right?

25       A.    Yes, sir.

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

27

1    Q.   And you started giving him verbal
2  commands, right?
3    A.   At first I was just trying to have a
4  conversation with him and he wouldn't respond.  As
5  he kept getting closer, I started giving him orders
6  and he still wouldn't respond.
7    Q.   When he got to the car, did he make any
8  statements to you?
9    A.   Yes, sir.
10    Q.   What did he say?
11    A.   It was something about, I'm not worried
12  about that dog, or I'm not worried; something along
13  those lines.  It was kind of unintelligible, but he
14  said something definitely about the dog, like he
15  wasn't concerned about the dog, I'm not worried
16  about -- something.
17    Q.   All right.  And at that point, he reached
18  for the door handle, right?
19    A.   Yes, sir.
20    Q.   And he opened the car door?
21    A.   Yes, sir, he did.
22    Q.   And then Wessel got out of the car, right?
23    A.   Yes, sir.
24    Q.   Now, Wessel didn't immediately bite him,
25  did he?

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

28

1    A.    Where I was standing, Mr. Goode was right
2  there.  And I was beside -- I was trying to get
3  Mr. Goode to come to me.  And when he opened the
4  door, I heard my dog chomp.  I can't say for certain
5  if he got a shirt, if he nipped him, I can't say for
6  certain, I didn't see that, but I heard a chomp.
7    Q.    Well, if he did get him, where would he
8  have bitten him?
9    A.    It would have been some -- somewhere on
10 the front.
11   Q.    Somewhere on the front of his body?
12   A.    It could have been arms, body.  He could
13 have grabbed his shirt or something, I don't know.
14   Q.    All right.  Did you hear Mr. Goode scream
15 at that point as though he had been bitten?
16   A.    He made a noise but it didn't sound like a
17 scream.
18   Q.    Did you have any reason to believe at that
19 point that Mr. Goode had been bitten?
20   A.    I didn't know at that point.
21   Q.    All right.  Now, after the dog got down
22 out of the car, you got control of him, right?
23   A.    Yes, sir.
24   Q.    Did you have him by the collar?
25   A.    Yes, sir, I had him by his choke collar.

**Alpha Reporting Corporation**

Exhibit "B" page 29 of 173

**Jason Scallorn - November 30, 2016**

29

```
1      Q.   So you had him by the choke collar, so you
2  had good control of him?
3      A.   Yes, sir.
4      Q.   At this point, Mr. Goode was still by your
5  car, right?
6      A.   At this point when he had opened the door,
7  he had come around this way, back towards the road.
8  I had came around and got Weasel.  And somehow
9  Mr. Goode ended up behind my Tahoe right there, and
10 I was standing there with Weasel trying to give him
11 orders.
12     Q.   So Mr. Goode got past you?
13     A.   Yes.
14     Q.   Did he walk around you?
15     A.   I don't recall, but I believe so.  At that
16 moment in time, I was just trying to get to my dog
17 because I didn't want him tearing off across the
18 parking lot.
19     Q.   He would have had to have been close to
20 you if you were grabbing the dog, right?
21     A.   Yes.
22     Q.   Would you say he was within two or three
23 feet?
24     A.   About -- I don't -- approximately.
25     Q.   All right.  Now --
```

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

30

1    A.    He was far enough away that I couldn't
2    grab him.
3        Q.    Did you try to grab him?
4        A.    I tried to grab his arm when I went by,
5    but I couldn't.
6        Q.    So you grabbed the dog instead?
7        A.    Yes.
8        Q.    Now, after Mr. Goode had gotten by you,
9    you began giving him commands to stop where he was,
10   right?
11       A.    And to lay down on the ground.
12       Q.    When he didn't comply, you then ordered
13   your dog to attack him?
14       A.    I was walking up to the Tahoe and I kept
15   saying, get on the ground, get on the ground.
16   Because at this time I did not want him running into
17   Goodman Road, traffic was so bad.  I didn't want him
18   causing wrecks.  My goal was to keep him out of
19   Goodman Road.  It was 7 o'clock on a Friday
20   afternoon.
21           There was a Widespread Panic concert,
22   there were people everywhere, and all I could think
23   about was keeping him out of Goodman Road.
24       Q.    That wasn't quite my question.
25       A.    Yes, sir, but I was telling him to get on

**Jason Scallorn - November 30, 2016**

31

1  the ground.  And when he refused, I said get on the

2  ground or I'm going to use my dog.  At that time, he

3  laughed at me and he took off running west in the

4  grass.

5      Q.  My question was, you commanded your dog to

6  attack him, didn't you?

7      A.  Not initially, not right there.

8      Q.  You didn't command your dog to attack

9  Mr. Goode?

10      A.  Not at that point, not until he took off

11  running.

12      Q.  I understand your testimony, but my

13  question to you is, did you command your dog to

14  attack Mr. Goode?

15      A.  Not that I recall.

16      Q.  You never made that command?

17      A.  No, sir.

18      Q.  You did release your dog to go attack him,

19  right?

20      A.  Yes, sir.

21      Q.  Now, we already talked about your

22  obedience training.  Do you have a command that you

23  give your dog to have him apprehend a suspect?

24      A.  Yes, sir.

25      Q.  What's that command?

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

32

1    A.    Stellin.

2    Q.    Stellin?

3    A.    Stellin.

4    Q.    And you didn't give that command that day?

5    A.    When he took off running I did, but not

6    when he was standing behind the Tahoe.

7    Q.    So that's a yes, you did give the command,

8    stellin?

9    A.    Yes.

10   Q.    Attack?

11   A.    Yes.

12         COURT REPORTER:  I'm sorry, stellin?

13         THE WITNESS:  S-T-E-L-L-I-N.

14   BY MR. McCORMACK:

15   Q.    Sir, I'm handing you what's been filed by

16   your attorney in this case.

17         (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

18   WAS PASSED TO THE WITNESS.)

19   BY MR. McCORMACK:

20   Q.    These are not filed, it has been sent to

21   us.  These are responses to a set of requests for

22   admissions.  Have you seen these before?

23   A.    No, sir, I have not.

24   Q.    Well, I'll tell you, I don't think it's in

25   dispute.  These have been prepared by your

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

33

1  attorneys.  If you could look at Request No. 7 for

2  me.  Do you see that?

3      A.   Yes.

4      Q.   And in that, we asked whether or not

5  someone in the Department of the City of Southaven

6  had ordered a dog to attack Mr. Goode, do you see

7  that?

8      A.   Yes, sir.

9      Q.   And that was denied, right?

10     A.   I don't understand the question.

11     Q.   Well, it says denied right there, doesn't

12  it?

13     A.   Yes, sir, it does.

14     Q.   So that's not true, you did command your

15  dog to attack Mr. Goode, right?

16     A.   Yes, sir, I did.

17     Q.   All right.

18          MR. McCORMACK:  Let's go ahead and mark

19  those as Exhibit 3 to the deposition.

20          MR. PHILLIPS:  Do we need to --

21          MR. JORDAN:  Since he's already gone on

22  it, you want to make that 3?

23          MR. McCORMACK:  Yeah, let's go ahead and

24  make that 3 and we'll make the RFOs 4.

25          THE WITNESS:  Take this off and put it on

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

1    that one?
2            MR. McCORMACK:  Yeah, if you can.
3    Sometimes they stick on pretty good.
4    (WHEREUPON, THERE WAS DISCUSSION OFF THE RECORD.)
5            THE WITNESS:  3 on this one, sir?
6            MR. McCORMACK:  Yes, and that will be 4.
7            THE WITNESS:  Yes, sir.
8            (WHEREUPON, THE ABOVE-MENTIONED DOCUMENTS
9    WERE MARKED AS EXHIBIT NOS. 3 AND 4 TO THE TESTIMONY
10   OF THE WITNESS AND IS ATTACHED HERETO.)
11   BY MR. McCORMACK:
12       Q.   Do you know on July 18th, how tall was
13   Mr. Goode?
14       A.   I recall he was about my height, that I
15   recall; maybe a little taller or around my height.
16       Q.   Do you have any idea how much he weighed
17   on that day?
18       A.   No, sir.
19       Q.   Based on you looking at him, would it
20   surprise you if I told you he weighed about 150
21   pounds?
22       A.   He was thin, he was skinny.  I -- it
23   wouldn't surprise me.
24       Q.   Didn't look like a big guy, did he?
25       A.   No, sir.

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

35

```
 1        Q.    Now, when you were there on the side of
 2   the road and you said you had gotten out and gotten
 3   control of your dog, Wessel, were any other officers
 4   on the scene at that point?
 5        A.    Todd Baggett.
 6        Q.    Other than Todd Baggett, no one else had
 7   arrived yet?
 8        A.    If they had, I don't recall.
 9        Q.    All right.  You don't recall seeing
10   Officer Rich arrive?
11        A.    No, sir.  I know he was there, but I don't
12   recall seeing him arrive.
13        Q.    You don't recall seeing Officer Bond
14   arrive?
15        A.    No, sir.
16        Q.    Okay.  After the dog had attacked
17   Mr. Goode, it knocked him to the ground, right?
18        A.    No, sir.
19        Q.    It did not knock him to the ground?
20        A.    No, sir.
21        Q.    Well, if it didn't knock him to the ground
22   how did he end up on the ground?
23        A.    He tripped.
24        Q.    He tripped.  Was that while the dog was
25   trying to apprehend?
```

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

36

1    A.    No, sir.

2    Q.    So it's your testimony that the dog was

3  still attacking him and, I'm sorry, did you recall

4  the dog?

5    A.    No, sir.

6    Q.    You didn't.  So the dog just kept

7  attacking him?

8    A.    After I sent Wessel to apprehend

9  Mr. Goode, I recall Wessel making an apprehension on

10  his arm.  At that time, Mr. Goode punched Wessel,

11  Wessel released from the bite, he fell down, and

12  that's when I started chasing on foot.  Wessel came

13  back beside me, but he would never re-engage.  He

14  just stayed beside me.

15    Q.    So your testimony is that Wessel engaged,

16  Mr. Goode was still standing?

17    A.    Yes.

18    Q.    Mr. Goode, according to you, attacked the

19  dog, punched the dog?

20    A.    Yes, sir.

21    Q.    The dog stopped trying to bite him?

22    A.    Yes.

23    Q.    And then Mr. Goode fell?

24    A.    Yes, sir.

25    Q.    So it's your testimony that the dog didn't

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

37

```
 1   take him down, the dog just --
 2        A.   No, sir, the dog didn't take him down.
 3        Q.   All right.  Now, after you got back
 4   control of Wessel, you continued trying to give
 5   commands, right?
 6        A.   Yes, sir.
 7        Q.   Mr. Goode still wasn't responding to your
 8   commands, was he?
 9        A.   After Mr. Goode had fell, I grabbed
10   Wessel, backed away.  And at that time, that's when
11   I first saw Joel, Officer Rich.  Officer Rich,
12   Officer Baggett and Officer Bond.  That's when they
13   came and tried to take Mr. Goode into custody.
14        Q.   If you could, you still got Exhibit 3
15   there?
16        A.   Yes, sir.
17        Q.   Do you still have that marker?
18        A.   Yes, sir.
19        Q.   If you could mark for me with a TG where
20   Mr. Goode was at the time that he tripped.
21        A.   This is approximate, but it's -- I'm
22   sorry, sir.
23             MR. JORDAN:   You using another X on that?
24             THE WITNESS:   TG.
25   BY MR. McCORMACK:
```

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

38

```
1       Q.   All right.  And if you could, were you in
2  about the same position next to your cruiser?
3       A.   When he tripped?
4       Q.   Yes.
5       A.   No, sir.  When he tripped I was behind
6  him.  I was running after him, behind him.
7       Q.   And by behind him, you mean that you were
8  on the, I guess that would be the western side --
9       A.   Yes, sir.
10      Q.   -- of Goodman Road?
11      A.   Yes, sir.
12      Q.   All right.  If you could, mark with a JS
13 where you were when he tripped.
14      A.   (Witness complies).  Approximately about
15 10 yards behind him.
16      Q.   Okay.  Now we have that cruiser there.
17 Was Todd Baggett still in the same location?
18      A.   Yes.
19      Q.   Where was Officer Rich?
20      A.   I don't know where he came from, just when
21 Mr. Goode did trip and fall, I came around with my
22 dog, told him to stay on the ground.  And as soon as
23 I came around, that's where Officer Rich, Officer
24 Baggett and Officer Bond attempted to take him into
25 custody.
```

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

39

1     Q.   All right.  Were they in the parking lot

2  when they started to approach Mr. Goode?

3     A.   Yes, sir.

4     Q.   So they were on the south side?

5     A.   That I recall, yes, sir.

6     Q.   Okay.  Mr. Goode didn't have a weapon on

7  him, did he?

8     A.   No, sir.

9     Q.   Before the first time that the dog

10  apprehended him, he wasn't attacking anyone, was he?

11     A.   No, sir.

12     Q.   It was daylight?

13     A.   Yes, sir.

14     Q.   Clear visibility?

15     A.   Yes, sir.

16     Q.   You were able to see him clearly?

17     A.   Yes, sir.

18     Q.   When Wessel first apprehended Mr. Goode,

19  which arm was that on, do you remember?

20     A.   He was running west from me, so it would

21  be his -- I believe it would be his left arm.

22     Q.   On his left arm.  And what angle did the

23  dog apprehend him from?

24     A.   He came up from -- when you run your arms

25  move like that.  Came up from under, somewhere like

**Alpha Reporting Corporation**

Exhibit "B" page 40 of 173

Jason Scallorn - November 30, 2016

40

1   that.

2       Q.   All right.

3       A.   I can't tell you if it was directly under,

4   or if it came like that, but it was somewhere in

5   that area.

6       Q.   When he bit Mr. Goode, did he hang on or

7   did he release the bite immediately?

8       A.   He hung on for a second, until Mr. Goode

9   hit him.

10      Q.   Okay.  Now, you said again, that Mr. Goode

11  at this point, you were behind him, right?

12      A.   Yes, sir.

13      Q.   And he has gotten back up?

14      A.   Yes, sir.  Well, he never fell.  He kept

15  running.  After he hit the dog, Wessel released.

16  That's when he turned and kept running.

17      Q.   So he didn't fall at this point?

18      A.   No, sir.

19      Q.   So I was mistaken there, he didn't trip

20  until after --

21      A.   Yes, sir.

22      Q.   -- sometime later.  All right.

23           But at this point you were behind him,

24  right?

25      A.   Yes, sir.

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

41

1    Q.    And you had three other officers on the

2  scene?

3    A.    Yes, sir.

4    Q.    And which direction did you say that

5  Mr. Goode was running?

6    A.    After --

7    Q.    After the dog had bit him?

8    A.    He had turned and was running back east.

9    Q.    So he had started running east?

10    A.    Yes.

11    Q.    According to you.  Okay.  And just to be

12  clear, you didn't see where the other cruisers were

13  from the officers who had arrived, either Officer

14  Rich on Bond?

15    A.    No, sir, I don't recall where there were.

16    Q.    All right.  Did you see any cars in this

17  sort of driveway area, coming into the parking lot?

18    A.    I don't recall.

19    Q.    All right.  Now, when Mr. Goode continued

20  not responding to your commands, you then deployed

21  your taser, right?

22    A.    Yes, sir.

23    Q.    And you did that in order to try to knock

24  him down, get him to the ground and get control of

25  him?

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

42

```
 1     A.    Yes, sir.
 2     Q.    Were there any other police officers who
 3   had pulled their taser or aimed it at Mr. Goode?
 4     A.    I didn't -- I don't recall seeing any.
 5     Q.    Now you did fire your taser, right?
 6     A.    Yes, sir.
 7     Q.    And according to you, only one dart
 8   connected, right?
 9     A.    Yes, sir.
10     Q.    And it's your testimony that Mr. Goode
11   wasn't shocked by the taser, right?
12     A.    Yes, sir.
13     Q.    He just tripped?
14     A.    Yes, sir.
15     Q.    And that was at the same time that you hit
16   him with the taser?
17     A.    He tripped in the wires because I almost
18   tripped in them, too.
19     Q.    Now, you were hitting him from behind,
20   right?
21     A.    Yes, sir.
22     Q.    And it's your testimony that he tripped in
23   the wires while running?
24     A.    Yes, sir.
25     Q.    Mr. Goode fell face first, right?
```

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

43

1    A.    Yes, sir.

2    Q.    If, in fact, he had been shocked by the

3  taser, he would have also fallen face first, right?

4    A.    I assume.

5    Q.    And if, in fact, he had been shocked by

6  the taser, there would be marks on his clothes

7  showing that he had been hit by that taser, right?

8    A.    Yes, sir.

9    Q.    Do you know what happened to Mr. Goode's

10  clothes after all this was over?

11    A.    No, sir, I don't.

12    Q.    All right.  Now, after Mr. Goode fell to

13  the ground, you went over to handcuff him, right?

14    A.    No, sir, I did not.

15    Q.    You did not.  Who did go to handcuff him?

16    A.    I don't recall who -- it would have either

17  been Officer Rich or Officer Baggett, I don't recall

18  which one it was.

19    Q.    They also applied shackles to his legs,

20  didn't they?

21    A.    Yes, sir.

22    Q.    Are you issued shackles as part of your

23  standard equipment?

24    A.    Some people are, some people aren't.

25    Q.    What determines who is and who isn't?

Jason Scallorn - November 30, 2016

44

1      A.   We have some in the equipment room, and

2  sometimes you can check a pair out.  I've had a pair

3  I bought several years ago I've just had forever.

4      Q.   You bought them personally?

5      A.   Yes, sir.

6      Q.   Were those used on Mr. Goode?

7      A.   Yes, sir.

8      Q.   The ones that you bought?

9      A.   Yes, sir.

10      Q.   What kind of shackles are those?

11      A.   It's like a big set of handcuffs, except

12  it has about a 15-inch chain in the middle.  And the

13  cuff part on the end is way oversized to accommodate

14  ankles and stuff like that.

15      Q.   Made out of steel?

16      A.   Yes, sir.

17      Q.   Where did you buy those?

18      A.   I believe it was at Shapiro's on Summer

19  Avenue when they were in business several years ago.

20      Q.   Do you remember what brand name or

21  manufacturer those are?

22      A.   No, sir, I -- I -- it's either going to be

23  Smith & Wesson or Peerless, but I can't recall which

24  one.

25      Q.   There's Smith & Wesson or, what was the

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

45

1   other name?

2       A.    Peerless.

3       Q.    Is that Peerless, like P-E-E-R?

4       A.    Yes, sir.

5       Q.    After the police officers who were

6   restraining Mr. -- well, let's take that a little

7   more slowly.  Mr. Goode is on the ground after

8   having tripped?

9       A.    Yes, sir.

10      Q.    All right.  And two officers approached

11  him, or was it more than two?

12      A.    Three.

13      Q.    Three officers.

14      A.    No, at this time it was three, and I do

15  recall that Officer Price had arrived, I do recall

16  that now.

17      Q.    All right.

18      A.    Officer Price had arrived.  He hadn't made

19  it to Mr. Goode yet, but Officer Bond, Officer Rich

20  and Officer Baggett were dealing with Mr. Goode at

21  this point.

22      Q.    And three of them went over and got

23  control of him?

24      A.    Yes, sir.

25      Q.    Now, you had your taser, so were you

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

46

1  having to deal with the cords for that?

2      A.   Well, as soon as he went to the ground and

3  the two officers came to take control of him, I

4  still had my dog.  So what I did was I walked back

5  to my Tahoe, put my dog in there, took the cartridge

6  off.  Walked back up to them.  And at that time

7  Officer Bond is holding his legs as he's kicking,

8  and he says, I need some shackles.

9      Q.   When was Officer Bond said I need some

10 shackles, you gave him your shackles?

11     A.   I went back to my truck, got my shackles,

12 came back and gave them to Officer Bond.

13     Q.   When you gave the shackles to Officer

14 Bond, he -- well, again, I want to take this a

15 little more slowly.

16          When Mr. Goode was on the ground, and the

17 three officers, that would have been Rich, Bond and

18 Baggett were approaching him, did they manage to get

19 control of his arms?

20     A.   Eventually.

21     Q.   Did they have to put any pressure on his

22 back --

23     A.   Yes, sir.

24     Q.   -- to keep him down?

25     A.   Yes, sir.

**Alpha Reporting Corporation**

Exhibit "B" page 47 of 173

Jason Scallorn - November 30, 2016

47

1   Q.   And he was face down, right?

2   A.   Yes, sir.

3   Q.   And how did they put pressure on his back?

4   A.   I don't recall.  I know they -- I know I

5   saw at one time, at this time Officer Price had got

6   over there and he was putting a hand on his back to

7   hold him.

8   Q.   All right.  Did you see any of those

9   officers put their knee on his back to keep him in

10  control?

11  A.   No, sir, I did not.

12  Q.   You didn't see any of them put their knee

13  on his back?

14  A.   No, sir.

15  Q.   All right.  So they had the hand on his

16  back and they were getting control of his arms,

17  right?

18  A.   (Witness nods head affirmatively.)

19  Q.   Did they manage to get him in handcuffs

20  before they applied the shackles?

21  A.   Yes, sir.

22  Q.   So once he was handcuffed, there were

23  still three officers controlling him, right?

24  A.   Yes, sir.

25  Q.   And they asked you for your pair of

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

48

1    shackles?

2        A.    Yes, sir.

3        Q.    You went to your truck and got the

4    shackles?

5        A.    Yes, sir.

6        Q.    And then you went over and handed them to

7    Officer Bond?

8        A.    Yes, sir.

9        Q.    And Officer Bond applied them to his legs,

10   right?

11       A.    Yes, sir.

12       Q.    And he looped them so that his legs -- the

13   shackles were attached to the handcuffs, right?

14       A.    Yes, sir.  I didn't actually see that,

15   because at the time I dropped -- when I gave him the

16   shackles, I turned and went back into the parking

17   lot.

18       Q.    At any point did you see that his hands

19   and his legs were connected?

20       A.    Yes, sir.

21       Q.    It's commonly called the hogtie position,

22   right?

23       A.    We call it the four point restraint.

24       Q.    It's also called the maximal restraint,

25   prone maximal restraint, right?

**Alpha Reporting Corporation**

Exhibit "B" page 49 of 173

**Jason Scallorn - November 30, 2016**

49

1    A.    Yes, sir.

2    Q.    Is it okay if I call it the hogtie

3    restraint?

4    A.    Yes, sir.

5    Q.    Now, when Mr. Goode was hogtied, he was

6    still face down, right?

7    A.    I believe so.

8    Q.    When he was hogtied, did you turn him on

9    his side so that he could breathe?

10   A.    I wasn't over there.

11   Q.    Did you see any other officer turn him on

12   his side so that he could breathe?

13   A.    I believe they did turn him on his side.

14   I believe Officer Price did.

15   Q.    Did you see that personally?

16   A.    When I was talking to Ms. Goode in the

17   parking lot, I remember looking over and I remember

18   seeing the back of his feet, which would indicate he

19   was laying on his side.

20   Q.    All right.  So you believe that you did

21   see him turned on his side?

22   A.    Yes, sir.

23   Q.    And how long was he turned on his side?

24   A.    I don't know.

25   Q.    Who turned him on his side?

**Alpha Reporting Corporation**

Exhibit "B" page 50 of 173

Jason Scallorn - November 30, 2016

50

1      A.   I believe it was Officer Price, but I
2   can't be sure.
3      Q.   Now, when he was turned on his side, did
4   anyone go to check his breathing?
5      A.   I don't know.
6      Q.   You didn't do it, did you?
7      A.   No, sir.
8      Q.   All right.  Did you assist in placing
9   Mr. Goode in the ambulance?
10      A.   No, sir.
11      Q.   Did you see how he was placed in the
12   ambulance?
13      A.   When I looked over he was already on -- he
14   was already on the gurney and they were wheeling him
15   over to the ambulance.
16      Q.   When you say when you looked over, you
17   weren't involved in anything, you weren't over there
18   with him?
19      A.   No, sir.
20      Q.   The other officers, at that point?
21      A.   No, sir.
22      Q.   What were you doing while the other
23   officers were attempting to place Mr. Goode on the
24   gurney?
25      A.   At that time, Lieutenant Tim Wood, who's

Jason Scallorn - November 30, 2016

51

1   the shift supervisor, had arrived on scene, and I
2   was speaking with him and Ms. Goode.
3       Q.   All right.  Did you talk to anyone at the
4   scene, including but not limited to Ms. Goode, about
5   what was happening?
6       A.   Ms. Goode.
7       Q.   Just Ms. Goode?
8       A.   Yes.
9       Q.   Did you talk to any other eyewitnesses at
10  the scene?
11      A.   I don't recall speaking to anybody else.
12      Q.   All right.  What do you remember Ms. Goode
13  telling you?
14      A.   I remember, to the best of my
15  recollection, when I walked up there and I spoke
16  with her, I said what is wrong with him.  And she
17  said I am sorry he made you do that.  I said what is
18  he taking, we need to know.  And she said, he look
19  LSD.
20      Q.   She wasn't trying to conceal the fact that
21  he had taken LSD from you?
22      A.   No, sir.
23      Q.   Did she also tell you that he had asthma?
24      A.   No, sir.
25      Q.   Are you aware that he had asthma?

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

52

1     A.    No, sir.

2     Q.    Did any other officer tell you, this guy's

3   got asthma, we need to be careful with him?

4     A.    No, sir.

5     Q.    Did you talk to any of the paramedics on

6   the scene?

7     A.    No, sir.

8     Q.    Have you given any statements to the

9   Mississippi Bureau of Investigation related to this

10  matter?

11    A.    No, sir.

12    Q.    How about to the FBI?

13    A.    No, sir.

14    Q.    U.S. Attorney's Office?

15    A.    No, sir.

16    Q.    Have you given any statements to anyone

17  other than your attorney about this case?

18    A.    No, sir.

19    Q.    You haven't given any statements to your

20  own -- to your Lieutenant?

21    A.    Well, my Lieutenant got a copy of the memo

22  I wrote to Lieutenant Little.

23    Q.    You haven't spoken to the police chief

24  about it?

25    A.    He just -- he called me and told me that

**Alpha Reporting Corporation**

Exhibit "B" page 53 of 173

Jason Scallorn - November 30, 2016

53

1   we had been cleared by the Department of Justice.

2       Q.    You didn't talk to anyone else in the

3   department, any of the other officers who were

4   there?

5       A.    We talked about it, just after the scene,

6   but after that we just went back to work.

7       Q.    All right.  I want to talk to you a little

8   bit about the technology that you use there at the

9   police department.  You have a computer that you

10  use, right?

11      A.    Yes, sir.

12      Q.    As you type up reports on it?

13      A.    Uh-huh (affirmative response).

14      Q.    You also have an email address there,

15  don't you?

16      A.    Yes, sir.

17      Q.    Do you receive emails at that email

18  address?

19      A.    Yes, sir.

20      Q.    What is that email address?

21      A.    Jscallorn@southaven.org.

22      Q.    Did you send or receive any emails about

23  this case?

24      A.    I don't recall.  Chief may have emailed

25  something about when you guys were asking for

Alpha Reporting Corporation

**Jason Scallorn - November 30, 2016**

54

1  information and stuff.  We get those emails to

2  supply documentation or whatever you needed, but

3  that's about all I remember.

4      Q.   Do you remember getting an email about

5  this case from your police chief?

6      A.   Yes, sir, but I don't recall -- remember

7  what it said.

8      Q.   All right.  When you prepare a report on

9  that computer, do you email it to someone?

10     A.   No, sir.

11     Q.   What happens to that report?

12     A.   It's not emailed, per se.  It's -- when

13 you get through with the report, it's sent to a

14 supervisor for them to -- to review it and to

15 approve it.  But it's not an email, per se.  It's

16 kind of a closed thing.

17     Q.   And what about the memos, are those the

18 same way as a closed -- closed system?

19     A.   No, sir, the memos are done on a Word

20 document and they're printed out and given to

21 whoever they need to be given to.

22     Q.   It's a Word document, you say?

23     A.   Yes, sir.

24     Q.   Do you have to have a unique login to get

25 into the computer though?

**Alpha Reporting Corporation**

Exhibit "B" page 55 of 173

Jason Scallorn - November 30, 2016

55

1    A.    Yes, sir.

2    Q.    And that's one that's just unique to you,

3    nobody else can use it?

4    A.    Well, not for -- not for memos and stuff.

5    We basically have a desktop where it's like

6    community folders, but if you want to get into the

7    reporting system, it's -- you have to login to that.

8    Q.    All right.  I'm handing you what has been

9    produced to us as your Incident Supplement Report.

10            (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

11   WAS PASSED TO THE WITNESS.)

12   BY MR. McCORMACK:

13   Q.    Is this a fair and accurate copy of the

14   Incident Supplement Report you prepared about this

15   case?

16   A.    Yes, sir.

17   Q.    Let's talk about why you prepare an

18   incident report or an Incident Supplement Report.

19   You prepare it for a couple of reasons:  No. 1 is

20   you want to make sure that all of the events are

21   accurately recorded, right?

22   A.    Yes, sir.

23   Q.    You want to make sure that it's accurately

24   recorded because No. 1, it tracks what activities

25   you took, right?

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

56

1    A.    Yes, sir.

2    Q.    No. 2, it could be used for part of a

3  criminal prosecution, right?

4    A.    Yes, sir.

5    Q.    And No. 3, it could be used as part of a

6  civil lawsuit like this one?

7    A.    Yes, sir.

8    Q.    And you know that before you prepare these

9  reports, right?

10    A.    Yes, sir.

11    Q.    And this report was prepared the day after

12  Troy Goode had passed away, right?

13    A.    Yes, sir.

14    Q.    So when you wrote this, you already knew

15  that Mr. Goode was dead?

16    A.    Yes, sir.

17    Q.    And, of course, because you knew that

18  Mr. Goode was dead, and because you knew you wanted

19  to be as accurate as possible, you included all

20  information that you could remember that you thought

21  was relevant in that report, didn't you?

22    A.    Yes, sir.

23        MR. MCCORMACK:  All right.  Let's go ahead

24  and mark that as Exhibit 5.

25        MR. HUSKISON:  Which one do we want to

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

1  mark?  Do we want to mark the Supplemental Incident

2  Report?

3          MR. McCORMACK:  Yes.

4          MR. HUSKISON:  And you're looking at a

5  memo, too.  You want -- we marking it as well?

6          MR. McCORMACK:  Yeah, that's next.

7          MR. HUSKISON:  Okay.

8          (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

9  WAS MARKED AS EXHIBIT NO. 5 TO THE TESTIMONY OF THE

10  WITNESS AND IS ATTACHED HERETO.)

11  BY MR. McCORMACK:

12      Q.    I'm handing you a memo.

13      A.    Yes, sir.

14      Q.    Looks like it was prepared by you, going

15  to Lieutenant Little, also on the 19th.

16          (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

17  WAS PASSED TO THE WITNESS.)

18  BY MR. McCORMACK:

19      Q.    That would also be the day after Troy

20  Goode had died?

21      A.    Yes, sir.

22      Q.    And you prepared this memo in order to

23  expand on your incident report, right?

24      A.    Yes, sir.

25      Q.    Did you include all information that you

**Jason Scallorn - November 30, 2016**

58

1    thought was relevant to the case, right?

2        A.    Yes, sir.

3        Q.    You did include everything that you

4    thought was relevant?

5        A.    Yes, sir.

6        Q.    As we sit here today, is there anything

7    that you want to revise about that memorandum?

8        A.    Not that I recall.

9        Q.    All right.  And I might have already asked

10   this, but this is a true and accurate copy of that

11   memo, right?

12       A.    Yes, sir.

13           MR. MCCORMACK:  Let's go ahead and mark

14   that as Exhibit 6.

15           (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

16   WAS MARKED AS EXHIBIT NO. 6 TO THE TESTIMONY OF THE

17   WITNESS AND IS ATTACHED HERETO.)

18   BY MR. McCORMACK:

19       Q.    You didn't have a warrant for Mr. Goode's

20   arrest, did you?

21       A.    No, sir.

22       Q.    You arrested him on a misdemeanor charge,

23   right?

24       A.    Yes, sir.

25       Q.    What was that misdemeanor charge you

**Alpha Reporting Corporation**

Exhibit "B" page 59 of 173

Jason Scallorn - November 30, 2016

59

1    arrested him for?

2        A.    It was going to be public intoxication and

3    disorderly conduct, failure to obey.

4        Q.    Those are all misdemeanors, right?

5        A.    Yes, sir.

6        Q.    Mr. Goode was not armed?

7        A.    No, sir.

8        Q.    I want to talk to you a little bit about

9    the policies and procedures of the Southaven Police

10   Department.  You're familiar with the K-9 policies

11   you've already said, right?

12       A.    Yes, sir.

13       Q.    The K-9 policies state that a K-9 officer

14   should not have a history of disciplinary actions

15   against him, right?

16       A.    Yes, sir.

17       Q.    We had already gone through what Southaven

18   knew when you became a K-9 officer, right?

19       A.    Yes, sir.

20       Q.    They knew about a history of misconduct?

21       A.    Yes, sir.

22       Q.    They still allowed you to become a K-9

23   officer, right?

24       A.    Yes, sir.

25       Q.    According to Southaven Police Department

**Alpha Reporting Corporation**

Exhibit "B" page 60 of 173

60

1  policy, to the best of your understanding, are you

2  allowed to hogtie a suspect?

3      A.    If you have to, to gain control you can

4  use a four point restraint.

5      Q.    And that includes keeping them face down

6  with their hands and their legs bound to each other,

7  right?

8      A.    Yes, sir.

9      Q.    According to Southaven policy, are you

10 allowed to transport that person in that position?

11     A.    I don't know.

12     Q.    You don't know whether or not your

13 policies allow a person to be transported in a

14 hogtied position?

15     A.    No, sir.  I personally would not, but I

16 don't know what the policy says, per se, about

17 transporting somebody that's in a four point

18 restraint.

19     Q.    Why would you not transport somebody --

20         MR. GASS:  Can I just ask, you used you

21 and transport, and then there's the police

22 department and then there's the EMS, the ambulance.

23 And I don't know if you're meaning to include both

24 of them together in the you.

25 BY MR. MCCORMACK:

**Jason Scallorn - November 30, 2016**

61

```
 1      Q.   Well, let me clarify that for you.  When
 2   I'm talking about these questions, I'm talking about
 3   the police department policies.  Is that clear to
 4   you?
 5      A.   Yes, sir.
 6      Q.   Now, the police department policies,
 7   you're not sure whether or not they allow a police
 8   officer to transport a suspect in the hogtied
 9   position?
10      A.   Correct.
11      Q.   And you said that you wouldn't do it?
12      A.   No, sir.
13      Q.   Why wouldn't you do it?
14      A.   In the back of a police car, there's no
15   way to monitor them if they are like that.
16      Q.   So what would you be afraid of?
17      A.   That they could possibly die.
18      Q.   You received training from the Mississippi
19   Law Enforcement Officers Training Academy, didn't
20   you?
21      A.   Yes, sir.
22      Q.   Did Ron Crew teach any of your courses?
23      A.   Yes, sir.
24      Q.   Do you believe that he is a competent
25   instructor?
```

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

62

1     A.    He was then.  I haven't spoken to him

2  since 2000.

3     Q.    Speaking about your experiences with him,

4  was he competent?

5     A.    From what I recall, yes, sir.

6     Q.    Did he seem knowledgeable?

7     A.    From what I recall, yes, sir.

8     Q.    Seemed to know what he was talking about?

9     A.    Yes, sir.

10     Q.    Did you use any of the materials he had

11  written in your courses?

12     A.    Not that I recall.

13     Q.    Did you use a -- the cover here, a manual,

14  Mechanics of Arrest and Control?  Do you recall

15  that?

16     A.    No, sir.

17     Q.    Would you agree with me that if a person

18  is put in a hogtie position, you must get them on

19  their side as quickly as possible, or else they will

20  die?

21          MR. UPCHURCH:  Object to the form.

22     A.    Not necessarily.

23  BY MR. McCORMACK:

24     Q.    Were you trained that if you hogtie

25  someone, you must get them on their side or else

**Alpha Reporting Corporation**

63

1    they could die?

2        A.    No, sir.

3        Q.    You were not trained about that?

4        A.    (Witness nods head negatively.)

5        Q.    When the City of Southaven -- well, the

6    shackles you used weren't issued by the City of

7    Southaven, were they?

8        A.    No.

9        Q.    Did you advise the City that you were

10   using your own equipment?

11       A.    I've always carried them.

12       Q.    Has anyone ever raised an issue about you

13   carrying those shackles?

14       A.    No, sir.

15       Q.    Did you receive any discipline for

16   carrying those shackles?

17       A.    No, sir.

18       Q.    Even after this event, did you receive any

19   discipline for using your own equipment?

20       A.    No, sir.

21       Q.    Have you ever advised anyone before today

22   that those are your equipment rather than the City's

23   equipment?

24       A.    It's common knowledge, a lot of guys carry

25   them.  We carry our own handcuffs, too.

**Jason Scallorn - November 30, 2016**

64

```
1      Q.    You pay for your own handcuffs?
2      A.    Uh-huh (affirmative response).
3      Q.    I want to talk to you a little bit about
4  your work history.  Other than the Southaven Police
5  Department, what other police departments have you
6  worked with?
7      A.    The DeSoto County Sheriff's Department and
8  the Hernando Police Department.
9      Q.    Have you worked with any police department
10  outside the State of Mississippi?
11      A.    No, sir.
12      Q.    Have you ever been trained by any police
13  department outside the State of Mississippi?
14      A.    Yes, sir.
15      Q.    Which other police departments have you
16  received training from?
17      A.    A lot of times we'll do classes, and it
18  will be what we call an import class, we'll bring
19  instructors from different places.  I remember West
20  Monroe, Louisiana was one of them.  I can't recall,
21  I mean, over the years what agencies they worked at.
22          I remember the West Monroe because my
23  family is from Monroe, Louisiana, so that resonated
24  with me, I remember that.  But the rest of them,
25  people come from out of town to train us, but I
```

**Alpha Reporting Corporation**

65

1  don't recall where they're from.

2      Q.    Fair enough.  Other than the discipline

3  that we talked about -- well, where had you

4  committed those acts of misconduct that we talked

5  about from that polygraph report?

6      A.    Where at?

7      Q.    Were they with one department or were they

8  with multiple?

9      A.    Just Hernando.

10     Q.    Just Hernando.  Other than the discipline

11 that we already talked about in Hernando, have you

12 ever received any other disciplinary actions against

13 you?

14     A.    No, sir.

15     Q.    Have you ever committed any acts that

16 should have caused there to be discipline against

17 you?

18     A.    No, sir.

19     Q.    With the City of Southaven, have you ever

20 committed any acts that you believe should cause

21 discipline against you?

22     A.    No, sir.

23     Q.    Have you been disciplined at all for your

24 actions in relation to Mr. Goode?

25     A.    No, sir.

Jason Scallorn - November 30, 2016

66

1    Q.    Are you aware of anyone who's been
2  disciplined as a result of Mr. Goode's death?
3    A.    Excuse me.  No, sir.
4    Q.    And I think I already know the answer to
5  this, but I probably should ask it anyway.
6          Are you aware of any officers between
7  their interactions with Troy Goode violated any of
8  the Southaven Police Department's policies and
9  procedures?
10    A.    No, sir.
11    Q.    And that's including in their
12  transportation of him, that's including everything
13  all through the time that he was alive?
14    A.    Yes, sir.
15    Q.    All right.  Did you ever go to Baptist
16  Memorial Hospital-DeSoto when Troy Goode was there?
17    A.    Yes, sir, I did.
18    Q.    How many times?
19    A.    Twice.
20    Q.    All right.  Let's talk about that first
21  one.  Why did you go there?
22    A.    First time was, it's customary after we
23  have a K-9 apprehension to go to the hospital to
24  photograph the apprehension.  And usually then a
25  patrolman will stay with him.  We'll leave and go to

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

67

1    the police department and start our paperwork.
2        Q.    Now, you say it's customary to photograph
3    the wounds.  What do you use to photograph them?
4        A.    A City camera.
5        Q.    Once you photograph them, is that a
6    digital camera?
7        A.    Yes, sir.
8        Q.    So then you have to upload them to a
9    computer?
10       A.    Yes, sir.
11       Q.    Did you take any pictures in this case?
12       A.    No, sir, I couldn't.
13       Q.    When you got to the hospital, was
14   Mr. Goode in a room or was he still in the emergency
15   area?
16       A.    He was in a room.
17       Q.    He was in a room?  Were there any other
18   officers in the room with him?
19       A.    Officer Baggett.
20       Q.    Other than Officer Baggett, were there any
21   other officers that you saw there at the hospital?
22       A.    No, sir.
23       Q.    You didn't see Officer Bond there?
24       A.    No, sir.
25       Q.    Did you talk to Officer Baggett about what

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

68

1    had happened?

2         A.    I briefly spoke with him, I don't recall

3    what it was about.  We couldn't talk.  Mr. Goode was

4    creating such a disturbance.  He was yelling that --

5    I did want to pull Officer Baggett out of the room

6    to speak with him, but there's no way I could have

7    spoke with him in the room because of the

8    disturbance he was creating.

9              So at that time Lieutenant Wood showed up.

10   He instructed me to leave from there and go to the

11   police department and start my paperwork and Officer

12   Baggett to stay.

13        Q.    Did you talk to -- how long did you talk

14   to Officer -- I'm sorry, Lieutenant Wood?

15        A.    Just a -- it's basically, you know, what

16   are you doing here.  I was going to come document

17   the apprehension, but I can't.  He said okay, clear

18   it and go to the station and start on your

19   paperwork.

20        Q.    Then you went back to station, right?

21        A.    Yes, sir.

22        Q.    Started on your paperwork?

23        A.    Yes, sir.

24        Q.    About what time did you go to the hospital

25   that first time?

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

69

1    A.    It was before it got dark, and it was
2  summertime, but it was right as the sun -- I think
3  the sun was going down.  I hate to speculate but
4  maybe around between 7:50 and 8:20, somewhere around
5  there.
6      Q.    And then you drove back to the police
7  department?
8      A.    Yes, sir.
9      Q.    And you started doing some paperwork
10 there?
11     A.    Yes, sir.
12     Q.    About how long after you got back -- about
13 how long did it take you to get to the police
14 department?
15     A.    From the hospital?
16     Q.    Yes.
17     A.    Maybe 10 minutes.
18     Q.    All right.  How long were you doing
19 paperwork before you received a call to go back to
20 the hospital?
21     A.    It was a while, maybe an hour and a half,
22 two hours.
23     Q.    What prompted you to go back to the
24 hospital?
25     A.    I was doing the paperwork and at that

**Alpha Reporting Corporation**

70

1 time, Lieutenant Wood had walked up to me and told
2 me that Mr. Goode had coded.  And I said, yes, sir.
3 And he went to the hospital.  And I said, well, I'll
4 meet you up there.

5     Q.   Why did you go to the hospital?

6     A.   Don't know.  I mean, I wanted to go up
7 there and just help as much as I could, I guess.

8     Q.   You had been involved in the arrest of
9 Mr. Goode, right?

10     A.   Yes, sir.

11     Q.   You heard that he had coded and you
12 decided independently that you would go up there,
13 right?

14     A.   Yes, sir.

15     Q.   You weren't ordered to go?

16     A.   Well, Lieutenant Wood said, are you going.
17 I said, yes, sir, I'll meet you up there.  And he
18 said, okay, come on.

19     Q.   So was that an order for you to go?

20     A.   I don't know.

21     Q.   But you independently felt that it was
22 important that you go to the hospital, right?

23     A.   Yes, sir.

24     Q.   When you arrived at the hospital, who was
25 there, which officers?

**Jason Scallorn - November 30, 2016**

71

1    A.   Officer Baggett, Lieutenant Wood.  I don't
2  -- I don't know if there was anybody -- I don't
3  recall.
4    Q.   You recall Officer Baggett and Lieutenant
5  Wood?
6    A.   Yes, sir.
7    Q.   Did you speak with them?
8    A.   Just, I walked up and I asked Officer
9  Baggett, I said, what happened.  He said he was in
10 the emergency room with him when he coded, then they
11 started working him.
12   Q.   When you had gone to the hospital either
13 time, were you able to see Mr. Goode?
14   A.   The first time I was.
15   Q.   Was he still laying face down?
16   A.   Yes, sir.
17   Q.   Were his hands and legs still restrained
18 in the hogtied position?
19   A.   Four point restraint, yes, sir.
20   Q.   Were there any other straps on him at that
21 point?
22   A.   Not that I recall.
23   Q.   Was he hooked up to any kind of monitors
24 that you could see?
25   A.   I don't -- I don't recall.  There were

**Jason Scallorn - November 30, 2016**

72

```
 1   monitors in the room, I don't know if he was hooked
 2   up to them.
 3       Q.   Did you speak to any nurses or doctors at
 4   the hospital?
 5       A.   No, sir.
 6       Q.   When you were at the hospital, did you
 7   hear any of the officers standing outside of
 8   Mr. Goode's room laughing?
 9       A.   No, sir.
10       Q.   So if that did happen it wasn't when you
11   were there?
12       A.   No, sir.
13       Q.   All right.  After Mr. Goode had passed
14   away, were you able to ever go in and see what
15   condition he was in?
16       A.   I stuck my head in the door, but at that
17   time Lieutenant Little, the supervisor I wrote the
18   memo to, had arrived on scene with Detective, I
19   believe it was Rosenberg, and they were
20   photographing.  I stuck my head in the door for a
21   second but I didn't go in.
22       Q.   So you weren't able to see any of the
23   injuries to Mr. Goode?
24       A.   No, sir.
25       Q.   As we sit here today, have you seen any
```

**Jason Scallorn - November 30, 2016**

1  photographs of his injuries?

2      A.   I saw pictures of the bite that Lieutenant

3  Little and Detective Rosenberg took, but that's all

4  I saw.

5      Q.   And that would be a bite on his left arm?

6      A.   Yes, sir.

7      Q.   Did you see any other bite wounds on him?

8      A.   No, sir.

9      Q.   So when we were talking earlier about how

10 you weren't sure whether or not your dog had managed

11 to bite him when he was first getting out of the

12 car, you didn't see any bite wounds on his body that

13 would indicate that he did manage to bite him?

14     A.   No, sir.

15     Q.   And by bite, that would be, that your dog

16 managed to bite Mr. Goode?

17     A.   No, sir.

18     Q.   How many pictures did you see?

19     A.   I don't recall, just a couple.

20     Q.   How did you receive those?  Were they

21 given to you or were you just shown them?

22     A.   I believe Detective Rosenberg showed them

23 to me.  No, no, he emailed them to me because I had

24 to give them to the K-9 lieutenant to put in the

25 file.  Excuse me on that.

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

1    Q.    They were emailed to your --

2    A.    Yes.

3    Q.    -- work email address?

4    A.    Yes.

5    Q.    And you said that was Detective Rosen who

6    emailed them to you?

7    A.    Rosenberg.

8    Q.    Rosenberg.  Did Detective Rosenberg email

9    you anything other than the pictures for the K-9

10   file?

11   A.    No, sir.

12   Q.    Now this K-9 file that you just mentioned,

13   is that kept at the police department?

14   A.    Yes, sir.

15   Q.    Does that contain all the information

16   about the K-9 apprehension of Mr. Goode on July

17   18th?

18   A.    Same stuff as right here, just with

19   pictures.

20        MR. McCORMACK:  All right.  I need a

21   couple of minutes to gather together the rest of

22   what I'm going to do.  Mind if we take about five

23   minutes?

24        VIDEOGRAPHER:  Going off the record.  The

25   time is 10:38.

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

75

1          (A BRIEF BREAK WAS TAKEN FROM 10:38 A.M.
2     UNTIL 10:52 A.M.)
3          VIDEOGRAPHER:  Going back on the record.
4     The time is 10:52.
5     BY MR. McCORMACK:
6          Q.   Before the break we had talked a little
7     bit about pictures that you had seen that were shown
8     to you by a detective with the Southaven Police
9     Department.  I'm going to show you some pictures and
10    see if these are the ones that you remember.
11         (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
12    WAS PASSED TO THE WITNESS.)
13    BY MR. McCORMACK:
14         Q.   Do you remember seeing this picture, sir?
15         A.   Yes, sir.
16         MR. McCORMACK:  Pass some copies around to
17    everyone.
18    BY MR. McCORMACK:
19         Q.   And this is a picture of Mr. Goode's left
20    arm?
21         A.   Yes, sir.
22         Q.   And looks like there's a, what looks to be
23    a bite wound there on his forearm.
24         A.   Yes, sir.
25         Q.   Is that right?  And to your understanding,

**Jason Scallorn - November 30, 2016**

76

```
 1   is that where your dog bit --
 2        A.   Yes, sir.
 3        Q.   -- Mr. Goode?  All right.
 4             MR. McCORMACK:  Let's go ahead and mark
 5   that as Exhibit 7.
 6             (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
 7   WAS MARKED AS EXHIBIT NO. 7 TO THE TESTIMONY OF THE
 8   WITNESS AND IS ATTACHED HERETO.)
 9             THE WITNESS:  On the picture, is there a
10   certain place you want me to put it?
11             MR. McCORMACK:  If you could put it in the
12   bottom corner.
13             THE WITNESS:  Okay.
14   BY MR. McCORMACK:
15        Q.   Handing you another picture.
16             (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
17   WAS PASSED TO THE WITNESS.)
18   BY MR. McCORMACK:
19        Q.   Do you recall seeing this picture?
20        A.   No, sir.
21        Q.   Do you recall seeing any pictures of
22   Mr. Goode's wrist?
23        A.   No, sir.
24        Q.   All right.
25             MR. GASS:  Can we still make a record of
```

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

```
1  --
2           MR. McCORMACK:  Yeah.
3           MR. PHILLIPS:  For ID, maybe.
4           MR. McCORMACK:  We'll mark that one as
5  Exhibit 8.
6           (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
7  WAS MARKED FOR IDENTIFICATION ONLY AS EXHIBIT NO. 8
8  TO THE TESTIMONY OF THE WITNESS AND IS ATTACHED
9  HERETO.)
10          MR. JORDAN:  Did he say Exhibit A?
11          MR. McCORMACK:  8.
12  BY MR. McCORMACK:
13     Q.   I'm handing you another picture.
14          (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
15  WAS PASSED TO THE WITNESS.)
16  BY MR. McCORMACK:
17     Q.   Is this the picture that you saw?
18     A.   No, sir.
19     Q.   In this picture you can see on the left
20  arm that bite wound, right?
21     A.   Yes, sir.
22     Q.   And do you see any bite wounds on the
23  right arm there?
24     A.   No, sir.
25     Q.   And none other than that one on his left
```

**Alpha Reporting Corporation**

1  forearm, right?

2      A.    Yes, sir.

3          MR. McCORMACK:   Mark that as Exhibit 9.

4          (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

5  WAS MARKED AS EXHIBIT NO. 9 TO THE TESTIMONY OF THE

6  WITNESS AND IS ATTACHED HERETO.)

7  BY MR. McCORMACK:

8      Q.    Just for clarification, Exhibit 9,

9  that's -- when you saw Mr. Goode in the hospital, he

10  wasn't in this position, was he?

11         MR. HUSKISON:   Which time?

12  BY MR. McCORMACK:

13     Q.    When you saw Mr. Goode, when you went to

14  the hospital, before he had passed away?

15     A.    No, sir.

16     Q.    He wasn't in that position?

17     A.    No, sir.

18     Q.    He was face down?

19     A.    Yes, sir.

20     Q.    Not face up.  Okay.

21         Who is Carla Scallorn?

22     A.    My wife.

23     Q.    Current wife?

24     A.    Yes.

25     Q.    Did you talk to Ms. Scallorn at all about

**Alpha Reporting Corporation**

Exhibit "B" page 79 of 173

Jason Scallorn - November 30, 2016

79

1  what happened to Mr. Goode?

2     A.    I -- she's a police officer's wife.  She

3  knows what happened but I didn't elaborate with her.

4     Q.    Are you aware of any comments that she has

5  made about the case?

6     A.    No.

7     Q.    You're not aware of her making any posts

8  on Facebook about the case?

9     A.    No, sir.

10     Q.    Do you have a Facebook account?

11     A.    Yes, sir.

12     Q.    Do you have a YouTube account?

13     A.    Yes, sir.

14     Q.    Have you made any comments on Facebook

15  about this case?

16     A.    No.

17     Q.    Any on YouTube?

18     A.    No.

19     Q.    What is your Facebook -- your name is just

20  under Jason Scallorn?

21     A.    (Witness nods head affirmatively.)

22     Q.    And you still have access to that account?

23     A.    Uh-huh (affirmative response).

24     Q.    You would have no problem getting

25  materials from that account if they were requested

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

80

1  of you?

2      A.    No problem.

3      Q.    Same thing with your YouTube account?

4      A.    Yes, sir.

5      Q.    Have you made any edits to your Facebook

6  page to sort of clean it up since you knew you were

7  a defendant in this case?

8      A.    Not necessarily.

9      Q.    When you say not necessarily, what do you

10 mean?

11     A.    I don't understand what you mean, clean it

12 up.

13     Q.    Have you removed any information that you

14 thought might look bad?

15     A.    No, sir.

16     Q.    Have you removed any information that you

17 thought might look bad from your YouTube account?

18     A.    No, sir.

19     Q.    Your YouTube account, you use that to look

20 at a lot of videos of people shooting guns, right?

21     A.    Yes.

22     Q.    Different kinds of guns, different tests

23 on guns?

24     A.    Yes, sir.

25     Q.    You didn't change anything on your YouTube

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

81

```
1    page in order to keep it from being used as evidence
2    in this case?
3         A.   No, sir.
4         Q.   Have you made any changes on your YouTube
5    page since being named as a defendant in this case?
6         A.   Not that I recall.
7         Q.   Do you have any other social media
8    accounts?
9         A.   Instagram.
10        Q.   Instagram.  Do you have any pictures on
11   Instagram that are related to this case?
12        A.   No, sir.
13        Q.   Are you able to comment on Instagram?
14        A.   I believe so.
15        Q.   You haven't made any comments on Instagram
16   related to this case?
17        A.   No, sir.
18        Q.   And just like with the other accounts, you
19   still have access to that, and if anything was
20   requested of it, you would still be able to get
21   that, right?
22        A.   Yes, sir.
23             MR. HUSKISON:  Subject to objection by
24   Counsel.
25             MR. McCORMACK:  I'm sure there would be
```

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

82

1    one.

2    BY MR. McCORMACK:

3        Q.    I want to talk to you a little bit about

4    your training.  We've gone through this a few times.

5    I'm going to try not to repeat any areas.  This

6    might make it easier on some of my colleagues here.

7              You're not trained as a doctor, right?

8        A.    No, sir.

9        Q.    Are you trained as a cardiologist?

10       A.    No, sir.

11       Q.    Not trained as a nurse of any type?

12       A.    No, sir.

13       Q.    Don't have any training in emergency

14   medicine as it's practiced in an emergency room?

15       A.    No, sir.

16       Q.    I'm assuming you have some training in

17   first aid, right?

18       A.    Very basic.

19       Q.    But you wouldn't claim to be an expert on

20   any medical issues that a person may or may not

21   have --

22       A.    No, sir.

23       Q.    -- would you?  Do you have any training on

24   the use of shackles?

25       A.    No, sir.

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

83

1    Q.   Did the City of Southaven provide you with

2  any training on how to properly restrain a person?

3    A.   No, sir.

4    Q.   Are you aware of any policies or

5  procedures on how to properly restrain someone in

6  use at the Southaven Police Department?

7    A.   No, sir.

8    Q.   You said earlier that using the hogtie

9  restraint is something that you're allowed to do in

10  Southaven.  Are you aware of any policy or procedure

11  that allows you to use that restraint?

12    A.   No, sir.

13    Q.   I'm going to hand you a copy of the arrest

14  procedures for the Southaven Police Department.

15        (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

16  WAS PASSED TO THE WITNESS.)

17    A.   Yes, sir.

18  BY MR. McCORMACK:

19    Q.   You have seen this document before, right?

20    A.   Yes, sir.

21    Q.   This is a fair and accurate copy of

22  Section 6 of the Southaven policies and

23  procedures -- Southaven Police Department Policies

24  and Procedures?

25    A.   Yes, sir.

**Alpha Reporting Corporation**

Exhibit "B" page 84 of 173

Jason Scallorn - November 30, 2016

84

1     Q.   If you could flip with me to Page 69,

2  Handcuffing.  You were given this before you became

3  a police officer at the City of Southaven, right?

4     A.   Yes, sir.

5     Q.   And you were supposed to familiarize

6  yourself with it?

7     A.   Yes, sir.

8     Q.   And you're supposed to follow these

9  procedures?

10     A.   Yes, sir.

11     Q.   If you'll look with me at Section E, it

12  discusses approved positions for handcuffing a

13  suspect, right?

14     A.   Yes, sir.

15     Q.   Section F gives you additional points to

16  consider when handcuffs are utilized, right?

17     A.   Yes, sir.

18     Q.   And in Section F, there are actually

19  recommendations for what to do if you need to get

20  additional control beyond the handcuffs on the

21  suspect, right?

22     A.   Yes, sir.

23     Q.   Specifically in Section 6, you're advised

24  that you should -- that handcuffs can be placed

25  through the belt to prevent the hands from being

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

85

1  looped under the body and brought to the front?

2      A.    Yes, sir.

3      Q.    That would be the arrestee's belt, right?

4      A.    Yes.

5      Q.    Where in this document does it say

6  anything about using shackles on a suspect?

7      A.    It doesn't.

8      Q.    It doesn't.  Have you ever heard of anyone

9  being disciplined by the Southaven Police Department

10 for using shackles?

11     A.    No, sir.

12     Q.    Is it fair to say that -- well, actually,

13 let me ask it this way.  How many times have you

14 used shackles on a suspect?

15     A.    A couple.  I don't recall exactly how many

16 times, not a lot, just a couple.

17     Q.    Have you ever witnessed other officers

18 using shackles on a suspect?

19     A.    Yes, sir, a couple times.

20     Q.    Would it be fair to say that there is a --

21 an unspoken policy that you're allowed to use

22 shackles on a suspect?

23           MR. HUSKISON:  Object to the form.

24     A.    It's not unspoken.  It's a way that --

25 it's kind of a last-ditch resort when there's --

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

86

1  people fighting and kicking and there's no way to

2  safely control them, we have to do that.

3      Q.    Have any of your supervisors ever advised

4  you that you're allowed to use shackles to control a

5  suspect?

6      A.    Yes, sir.

7      Q.    Who has advised you of that?

8      A.    Nobody in particular, it's just, it's an

9  accepted method.

10     Q.    Within the Southaven Police Department?

11     A.    Yes, sir.

12     Q.    Have you ever received any training on --

13         MR. MCCORMACK:  Well, before we move on,

14  let's mark that as Exhibit 10.  Thank you.

15         (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

16  WAS MARKED AS EXHIBIT NO. 10 TO THE TESTIMONY OF THE

17  WITNESS AND IS ATTACHED HERETO.)

18  BY MR. McCORMACK:

19     Q.    Have you ever received any training on the

20  dangers of the hogtie restraint?

21     A.    No, sir.

22     Q.    That wasn't a part of your training at the

23  Law Enforcement Officers Training Academy?

24     A.    If it was, I don't remember it.

25     Q.    Did you receive any training from the City

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

87

1  of Southaven Police Department on the use of the

2  hogtie restraint?

3      A.    No, sir.

4      Q.    Have you received any training from the

5  Southaven Police Department on the risk of

6  positional asphyxia from the hogtie restraint?

7      A.    No, sir.

8      Q.    Have you been advised by anyone within the

9  Southaven Police Department that there is a risk of

10  positional asphyxia?

11      A.    No, sir.

12      Q.    And that would be when using the hogtie

13  restraint?

14      A.    Yes, sir.

15      Q.    Have you received any training about the

16  dangers that could be caused to a suspect with

17  respiratory illnesses when placed in the hogtie

18  restraint?

19      A.    No, sir.

20      Q.    Have you received any training on the

21  dangers that could be caused to an intoxicated

22  person if they're placed in the hogtie restraint?

23      A.    No, sir.

24      Q.    Have you received any training about how

25  to speak to a jury?

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

88

```
1       A.    In the academy, just basic courtroom
2   testimony that I vaguely remember, that's about it.
3       Q.    Have you ever received any training on how
4   to avoid civil liability as a police officer?
5       A.    No, sir.
6       Q.    That wasn't part of your course at the
7   training academy?
8       A.    I don't -- if it was, I don't recall it.
9       Q.    Before you came in for your deposition
10  today, what, if anything, did you do to prepare?
11      A.    I had a meeting yesterday at the Southaven
12  Police Department with our attorney.
13      Q.    Other than conversations with your
14  attorney, did you talk to anyone else about your
15  deposition here today?
16      A.    No, sir.
17      Q.    Did you tell your wife you were coming in
18  for a deposition?
19      A.    Yes, sir.
20      Q.    Did you tell your chief that you were
21  coming in for the deposition?
22      A.    He's the one that emailed me and told me
23  the date.
24      Q.    So did you have a conversation with him
25  about that?
```

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

89

```
 1      A.   No, sir, just email.

 2      Q.   Did you review any materials to prepare?

 3      A.   Just what, yesterday, just what you guys

 4  have shown me today.

 5      Q.   Were there any other materials that you

 6  looked at to prepare for this deposition other than

 7  materials that are already exhibits to your

 8  deposition?

 9      A.   No, sir.

10           MR. MCCORMACK:  All right.  Mr. Scallorn,

11  that's all I've got for you, for right now.  I'm

12  going to pass it along to the other attorneys in the

13  case.

14           THE WITNESS:  Yes, sir.

15           MR. GASS:  I've only got just one

16  question, or one topic.

17                    EXAMINATION

18  BY MR. GASS:

19      Q.   You're within the vicinity of Mr. Goode

20  out there in front of the Rancho Grande Restaurant?

21      A.   Yes, sir.

22      Q.   Are you with him in the transport to the

23  hospital?

24      A.   No, sir.

25      Q.   Are you with him at any time in the
```

90

1    emergency room entrance area?

2        A.    No, sir.

3        Q.    Are you ever with him in the emergency

4    department examination area?

5        A.    Briefly.

6        Q.    And were you ever with him in any private

7    room, a decontamination room or a room designated

8    Room 9?

9        A.    The decon room was the room I was

10   momentarily in with him.

11       Q.    And that's before his death?

12       A.    Yes, sir.

13       Q.    So there's two periods of time where you

14   were with him?

15       A.    (Witness nods head affirmatively.)

16       Q.    Out there on the grassy area parking lot

17   in front of the restaurant, and for the brief time

18   in the decontamination room?

19       A.    Yes, sir.

20       Q.    Is it accurate to say that during all of

21   the times that you were with him, in those two

22   locations, you heard him yelling and screaming?

23       A.    Yes, sir.

24       Q.    Would it be accurate to say that if either

25   his position he was in, or his asthma was causing

**Jason Scallorn - November 30, 2016**

1   him any breathing problems at all, it would have

2   been impossible for him to be yelling and screaming

3   in the way you heard it?

4          MR. McCORMACK:   Object to the form.

5      A.   Yes, sir.

6   BY MR. GASS:

7      Q.   And so that the jury gets a real feel, was

8   this soft yelling and screaming or loud?

9      A.   Extremely loud.  When I parked at the back

10   of the emergency room before I came in, I could hear

11   him screaming from the doors that you roll the

12   gurneys into, I could hear him screaming clearly

13   from there.

14     Q.   And how far away would you have been at

15   that time?

16     A.   It's on the other side of the ER, maybe 30

17   yards, 40 yards.

18     Q.   And how many doors in between you and

19   where he was at that time?

20     A.   Three.  The two entrance doors to the ER,

21   then a room -- the door to the decon room would have

22   been three doors.

23     Q.   Do you think you could get your voice up

24   to the screaming decibels that you heard him at both

25   of those locations?

**Alpha Reporting Corporation**

1          MR. McCORMACK:  Object to the form.

2      A.    I doubt it, I don't know.

3  BY MR. GASS:

4      Q.    Would it be louder than you think you can

5  scream?

6      A.    Yes, sir.

7      Q.    Could you scream as loud as you can for us

8  on this video?

9          MR. McCORMACK:  Object to the form.

10 BY MR. GASS:

11     Q.    Go ahead.

12     A.    (Witness screams.)

13     Q.    And he was screaming louder than that?

14     A.    Yes, sir.

15     Q.    For you to do that just now, did you have

16 to take kind of a deep breath to do that?

17     A.    Yes, sir.

18     Q.    Did you ever see any indication in the two

19 areas where you observed Mr. Goode, that he ever had

20 trouble breathing?

21     A.    No, sir.

22     Q.    Did he ever express anything, I'm having

23 trouble breathing?

24     A.    No, sir.

25     Q.    The reports indicate that he was saying

Jason Scallorn - November 30, 2016

93

1   things that didn't make sense.

2          MR. McCORMACK:   Object to the form of the

3   question.

4      A.   Yes, sir.

5   BY MR. GASS:

6      Q.   Did you hear that?

7      A.   I never actually heard him verbalize any

8   words.  He was just making -- making sounds.

9      Q.   There are reports that say he was saying,

10  I don't know how to explode.  Did you hear him say

11  that?

12         MR. McCORMACK:   Object to the form of the

13  question.

14     A.   I did not hear him say that.

15         MR. GASS:   That's all I have.  Thank you.

16         THE WITNESS:   Yes, sir.

17         MR. UPCHURCH:   Can I borrow that mic?

18  I'll come down here.

19                    EXAMINATION

20  BY MR. UPCHURCH:

21     Q.   Mr. Scallorn, my name is David Upchurch.

22  I introduced myself to you immediately prior to your

23  deposition.  Our firm, by way of reminder,

24  represents the hospital, Baptist Memorial

25  Hospital-DeSoto, Inc. in this matter.

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

94

1          I want follow-up with a few questions that
2     were asked by Mr. Gass.  I don't want to in any way
3     be repetitive, but I want to explore with you the
4     two opportunities that you had to interact with
5     Mr. Goode.
6          I first want to make sure that we have an
7     accurate understanding of your interactions with him
8     and with his wife off of Goodman Road.  And to do
9     that, let's look again, please sir, at Exhibit 3.
10          (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
11     WAS PASSED TO THE WITNESS.)
12          A.   Yes, sir.
13     BY MR. UPCHURCH:
14          Q.   And I'll put that back in front of you.
15     And as a guide to our discussions, I want to look at
16     your Incident Supplement Report, which is marked as
17     Exhibit 5.  You're welcome to view that.
18          (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
19     WAS PASSED TO THE WITNESS.)
20     BY MR. UPCHURCH:
21          Q.   And a copy of the memorandum that you
22     authored, which is exhibited to your deposition as
23     Exhibit 6.
24          (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
25     WAS PASSED TO THE WITNESS.)

**Alpha Reporting Corporation**

95

1    BY MR. UPCHURCH:

2        Q.    Again, I'll place those in front of you

3    just by way of reference, if you need them.

4            Do I understand from your prior testimony

5    that you were notified of Mr. Goode and this

6    incident by your dispatch?

7        A.    Yes, sir.

8        Q.    If you look at Exhibit 5, which is your

9    supplemental report, the first sentence of the

10   second paragraph I think addresses that call from

11   dispatch.  Looking at that by way of reminder, what

12   were you informed by dispatch that Mr. Goode was

13   doing at the time?

14           MR. McCORMACK:  Object to the form of the

15   question.

16       A.    To the best of my recollection, it was a

17   9-1-1 call about a physical disturbance between a

18   male and a female.  The male was acting irrational,

19   running through businesses, running from her, acting

20   irrational.

21   BY MR. UPCHURCH:

22       Q.    And did you not report in your

23   supplemental report in the second paragraph that he

24   was running from the scene, west on Goodman Road?

25       A.    Yes, sir.

Jason Scallorn - November 30, 2016

96

1    Q.   All right, sir.  Now, you then, as you
2  arrived on scene on Goodman Road, you report, and I
3  want to ask you, did you see Mr. Goode running
4  around in the lawn of the restaurant?
5    A.   Yes, sir.
6    Q.   Now, taking this -- I'm not sure that that
7  red pen will show up.
8         MR. McCORMACK:  I might have a fine tip
9  here.  That might make it easier to draw on there.
10        (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
11  WAS PASSED TO THE WITNESS.)
12        THE WITNESS:  Yes, sir.
13        MR. UPCHURCH:  Thank you.
14  BY MR. UPCHURCH:
15    Q.   Could you identify maybe from the rooftop
16  standpoint on Exhibit 3 where the Mexican restaurant
17  that we've been discussing is located?
18    A.   Yes, sir, it's going to be approximately
19  right here.  Right here is a Lenny's.  Then right
20  here is the Mexican restaurant.
21    Q.   All right, sir.  Would you write Lenny's
22  above where that restaurant would be?
23    A.   (Witness complies).
24    Q.   And then the name of the Mexican
25  restaurant is?

**Alpha Reporting Corporation**

Exhibit "B" page 97 of 173

Jason Scallorn - November 30, 2016

97

1    A.    Rancho Grande.

2    Q.    Rancho Grande.  If you'll write that.

3          Now, could you identify for us on Exhibit

4  3, when you were driving up, or arriving at the

5  scene, where Mr. Goode was and what he was doing?

6    A.    He was in this area where this X is.  He

7  was running back and forth like that.

8    Q.    All right, sir.  Was he running back and

9  forth parallel to the road at that time?

10   A.    Yes, sir.

11   Q.    All right.  So if we look at the X on

12 Exhibit 3, he was running -- what direction does

13 Goodman Road run?

14   A.    This is a -- this is east towards Olive

15 Branch.

16   Q.    All right, sir.

17   A.    And that is back west towards Southaven.

18   Q.    All right.  Could you put an E on the east

19 side of that, and then a west on the west side.  So

20 he was running east and west, back on -- parallel

21 with Goodman Road?

22   A.    Yes, sir.

23   Q.    When you arrived, did you note where his

24 wife, Ms. Kelli Goode was?

25   A.    At first I didn't see her, but she was up

98

1  here talking with Officer Baggett.

2      Q.   All right.  So she was in the area of the

3  parking lot where you've marked Exhibit 3 as TB?

4      A.   Yes, sir.

5      Q.   Looking at your memo, which is marked as

6  Exhibit 6, on the third paragraph there, you

7  indicate that you were advised that there was a

8  white male wearing a white shirt and khaki shorts.

9           Do you recall Mr. Goode, in fact, wearing

10 khaki shorts and a white shirt when you arrived?  Do

11 you have any recollection of that?

12     A.   I have no recollection of what he was

13 wearing.

14     Q.   All right, sir.  But in your memo, that's

15 the best recollection that you have, of information

16 you received from dispatch?

17     A.   Yes, sir.

18     Q.   All right, sir.  When you say in your

19 incident report in the second paragraph that this

20 gentleman was running around in the front lawn, can

21 you describe that with greater particularity for us?

22 Was he -- was he sprinting, was he pacing, was he --

23 how do you describe it?

24     A.   It was a little bit of everything.  For

25 the brief time I saw it, it would be a sprint, then

Jason Scallorn - November 30, 2016

1    it would be a jog.  Then he would -- I remember -- I

2    remember him like skipping, hopping and skipping one

3    time; just irrational.

4        Q.   All right, sir.  As we look at your

5    supplement report, you indicate that Mr. Goode came

6    towards you and you've told Mr. McCormack that?

7        A.   Uh-huh (affirmative response).

8        Q.   Correct?  And at that time, you gave

9    Mr. Goode a loud verbal command to stop walking

10   towards you?

11       A.   Yes, sir.

12       Q.   Why did you give that command?

13       A.   I didn't want him to get to me.  If I

14   could make him lay down on the ground and be

15   compliant, then it would have been over with.

16       Q.   All right, sir.  And that gets to my

17   question.  Did Mr. Goode comply with your demand for

18   him to one, stop coming towards you?

19       A.   No, sir.

20       Q.   Did he comply with your command for him to

21   get on the ground?

22       A.   No, sir.

23       Q.   Did he, in fact, disobey both of those

24   commands?

25       A.   Yes, sir.

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

100

1    Q.   Now, looking at the third paragraph of

2   your supplemental report, this is after you get

3   control of your K-9 partner, did you then give

4   Mr. Goode another verbal command to lay down on the

5   ground?

6    A.   Yes, sir.

7    Q.   Why did you give that command?

8    A.   Still trying to get control of him, still

9   trying to get him to comply.

10    Q.   You remark in your memo that at times

11   the -- Mr. Goode was getting dangerously close to

12   Goodman Road.  Did you have concerns at your

13   involvement with Mr. Goode on Goodman Road that he

14   presented a danger to himself in terms of going into

15   traffic on Goodman Road?

16         MR. McCORMACK:  Object to the form of the

17   question.

18    A.   Yes, sir, absolutely.

19         MR. UPCHURCH:  Pardon?

20         MR. McCORMACK:  Objection to the form.

21   BY MR. UPCHURCH:

22    Q.   Did you form the opinion as one of the

23   police officers on the scene, that Mr. Goode

24   presented a danger to the public, in terms of the

25   traffic going back and forth on Goodman Road?

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

1          MR. McCORMACK:  Object to the form.

2      A.   Yes, sir.

3  BY MR. UPCHURCH:

4      Q.   Did you form an opinion as the on-site

5  police officer that Mr. Goode was presented a

6  potential danger to the people that would have been

7  in the parking lot area on Goodman Road?

8          MR. McCORMACK:  Object to the form.

9      A.   Yes, sir.

10  BY MR. UPCHURCH:

11     Q.   Did you, after having control of your K-9,

12  give Mr. Goode a verbal command to lay down on the

13  ground?

14     A.   Yes, sir.

15     Q.   Did he, in fact, obey that command?

16     A.   No, sir.

17     Q.   He, in fact, disobeyed that command,

18  didn't he?

19     A.   Yes, sir.

20     Q.   You state in your report that you released

21  your K-9 partner in attempt to apprehend Mr. Goode

22  who was running into traffic -- to keep him from

23  running into traffic on Goodman Road.

24          If we look at Exhibit E, at the time you

25  released your K-9 partner, where was Mr. Goode

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

102

1  running?

2        MR. McCORMACK:  Object to the form of the

3  question.

4      A.    Directly west from behind my truck, on the

5  edge of the road.

6  BY MR. UPCHURCH:

7      Q.    All right, sir.  So if we look at Exhibit

8  3, we go to the rear of your vehicle.  Put an R at

9  the rear of that vehicle, please sir.

10     A.    Yes, sir.  (Witness complies).

11     Q.    Okay.  Maybe circle that R just to give

12  us a prominent display of that.  And the F is in the

13  front, and so he was at the -- near the rear of your

14  vehicle running west, parallel with Goodman Road?

15     A.    (Witness nods head affirmatively.)

16     Q.    Again, can you describe his running, was

17  he just walking away from you, was he running, how

18  do you describe his pace?

19     A.    When he left from behind my truck and

20  began running, that, I would say he was sprinting

21  then.

22     Q.    All right, sir.  Away from you?

23     A.    Yes, sir.

24     Q.    And disobeying a verbal command that you

25  had given?

Jason Scallorn - November 30, 2016

103

1    A.    Yes, sir.

2    Q.    Now, again, looking at your Supplemental

3 Incident Report and trying to understand the

4 timeline events, your dog -- K-9 partner apprehended

5 him.  Mr. Goode strikes the dog, gets free from the

6 dog.  And then as I understand it, he starts running

7 east?

8    A.    (Witness nods head affirmatively.)

9    Q.    Is that correct?

10    A.    Yes, sir.  Well, my K-9 partner made the

11 apprehension approximately in this area.

12    Q.    All right.  I want you, could you just,

13 maybe using this black marker, it may show up

14 better.  Could you draw a circle where the K-9

15 apprehension occurred?

16    A.    (Witness complies).

17    Q.    All right.  And that's the circle that's

18 in front of your initials, JS?

19    A.    Yes.

20    Q.    Let's put apprehend there, or

21 apprehension.

22    A.    Write apprehension?

23    Q.    Yeah.

24         MR. HUSKISON:  Like for K-9.

25         MR. UPCHURCH:  K-9 apprehension, that's

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

104

1   better.

2           MR. McCORMACK:   How about just K-9?

3           MR. UPCHURCH:   How about just K-9?

4       A.   K-9?

5   BY MR. UPCHURCH:

6       Q.   K-9.  That will work.  All right.  Now,

7   sir, if you could, from that area of the K-9

8   apprehension, if you could show us where Mr. Goode

9   went after he struck your partner.

10      A.   At that time, when he struck Weasel, he

11  turned right here and started heading back east.

12      Q.   All right, sir.  Now, again, when he

13  turned and started heading back east, what was his

14  pace, was he running from you, sprinting from you,

15  how do you describe his?

16      A.   He was running.

17      Q.   All right, sir.  And at the point that you

18  dislodged your taser, where would Mr. Goode have

19  been?

20      A.   He was about 15 feet in front of me.

21      Q.   Had he reached your vehicle?

22      A.   No, sir.

23      Q.   All right.  So he was still on the east

24  side of your -- on the west side of your vehicle?

25      A.   Yes.  Or about parallel with it, just that

Jason Scallorn - November 30, 2016

105

1    area.

2        Q.    All right, sir.  And you've described the

3    events after the attempted tasing occurred and I

4    don't want to rehash those.  But I want to ask this

5    to make sure our understanding is accurate.  Your

6    fellow police officers attempted to apprehend

7    Mr. Goode after he fell following the attempted

8    tasing?

9        A.    Yes, sir.

10       Q.    Do I understand correctly that those

11   officers were able to restrain Mr. Goode's arms by

12   use of handcuffs?

13       A.    Eventually.  He was fighting for a while.

14       Q.    All right.  That's what I want to -- to

15   ask you.

16             Did Mr. Goode, in fact, resist the

17   attempts to apprehend him -- apprehend him from your

18   fellow officers?

19       A.    Yes, sir.

20       Q.    Were they ultimately able to secure his

21   arms and handcuffs behind his back?

22       A.    After -- after a struggle, they were.

23       Q.    All right, sir.  How many officers did it

24   take to struggle with Mr. Goode to ultimately get

25   his hands handcuffed behind his back?

Alpha Reporting Corporation

Jason Scallorn - November 30, 2016

106

1    A.   That I recall, I believe it was three.

2    Q.   All right, sir.  Are you describing for us

3  Mr. Scallorn, that Mr. Goode was resisting with such

4  force and in such a way that it took three of your

5  colleagues to restrain him in handcuffs?

6         MR. McCORMACK:  Object to the form.

7    A.   Yes -- yes, sir.

8  BY MR. UPCHURCH:

9    Q.   All right, sir.  That's your testimony, is

10 it not?

11   A.   Yes, sir.

12        MR. McCORMACK:  Object to the form.

13 BY MR. UPCHURCH:

14   Q.   Now, you've told Mr. McCormack that leg

15 restraints were also used.  My question is, why?

16   A.    Mr. Goode continued to kick, continued to

17 flail.  When they originally handcuffed him behind

18 his back, he started rolling over.  I guess you

19 would, for lack of a better term, like an alligator

20 roll, and started kicking and flailing and...

21   Q.   All right, sir.  Was he still screaming

22 out as well at this time?

23   A.   Yes, sir.

24   Q.   So we've got a subject who took three of

25 your colleagues to place handcuffs on.  He's

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

107

1 screaming, yelling, rolling, and kicking to such an

2 extent, am I correct, that your colleagues requested

3 leg restraints to try to get him appropriately

4 apprehended?

5       MR. McCORMACK:  Object to the form of the

6 question.

7     A.  Yes, sir.

8 BY MR. UPCHURCH:

9     Q.  Look with me, please, sir, at Exhibit 6,

10 marked for your deposition.  Looking on Page 14,

11 that first paragraph ends with:  Due to the

12 subject's condition.  Do you see that?

13     A.  On the first paragraph?

14     Q.  Yes, sir, ending about right there.

15     A.  Yes, sir.

16     Q.  All right.  If you go up about six lines

17 from there, you write, quote:  They were then able

18 to cuff the subject; however, he was still fighting

19 and being uncooperative.

20       That's what you just described for me and

21 the need for leg restraints, correct?

22     A.  Yes.

23       MR. McCORMACK:  Object to the form.

24 BY MR. UPCHURCH:

25     Q.  When you were on Goodman Road, on scene,

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

108

1    responding to the dispatch that you had received

2    regarding Mr. Goode, did Mr. Goode ever obey a

3    verbal command that you or any other officer gave

4    him?

5        A.   No, sir.

6        Q.   Did Mr. Goode continue to be uncooperative

7    until he was restrained in the four point restraint?

8        A.   Yes, sir.

9        Q.   Now, the next paragraph addresses your

10   communication with Ms. Goode, his wife.

11       A.   Yes, sir.

12       Q.   And I don't think that you were asked many

13   questions about that.

14           The communication that you and Ms. Kelli

15   Goode had occurred where, if we're looking at

16   Exhibit 3?

17       A.   Approximately where TB is.

18       Q.   All right.  Looking at your report,

19   Exhibit 6, did Ms. Goode indicate to you, as

20   referenced on the third line of that report, that

21   Mr. Goode was, quote, out of his mind right now,

22   closed quote?

23           MR. McCORMACK:  Object to the form of the

24   question.

25       A.   Yes, sir.

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

1  BY MR. UPCHURCH:

2      Q.   Did you agree with that statement based

3  upon your observation of Mr. Goode?

4      A.   Yes, sir.

5      Q.   Did Ms. Goode indicate to you that he was,

6  quote, out of his mind, closed quote, due to

7  ingestion of illegal drugs?

8      A.   Yes, sir, she told me he had taken LSD.

9      Q.   All right, sir.  Continuing to look at

10  your report, did Ms. Goode, in fact, apologize to

11  you for Mr. Goode's behavior?

12      A.   Yes, sir, she did.

13      Q.   Did she, in fact, indicate to you that she

14  understood the actions that the police officers had

15  to take with Mr. Goode because of his behavior?

16      A.   She was upset, but she understood.

17      Q.   All right, sir.  Looking at the next

18  paragraph that you write, which takes us to -- well,

19  before I transition there, do you have an estimate

20  or a recollection, Mr. Scallorn, of the time that

21  elapsed between your arrival on Goodman Road when

22  you responded to the dispatch, and when Mr. Goode

23  was placed in the EMS for transport to the hospital?

24      A.   Sir, I don't want to speculate on time.  I

25  can tell you it wasn't long, but I don't want to

**Alpha Reporting Corporation**

110

1  speculate on time.

2      Q.   All right, sir.  Watching your watch

3  wasn't a priority?

4      A.   No, sir, I was busy.

5      Q.   Mr. Gass has asked you about your

6  recollections of seeing Mr. Goode in the

7  decontamination room, and I won't re-plow that

8  testimony.  But you do mention in this paragraph

9  that Mr. Goode was, quote, thrashing around, closed

10 quote.

11         Was that based upon your observation of

12 him in the decontamination room?

13         MR. McCORMACK:  Object to the form.

14     A.   For the brief time I was in there, yes,

15 sir.

16 BY MR. UPCHURCH:

17     Q.   All right, sir.  Can you describe for us

18 what you mean by thrashing around, can you help us

19 understand that observation?

20     A.   He was on a gurney in the four point

21 restraint.  And he had thrashed and created such a

22 disturbance he had almost fallen off the gurney and

23 had to be pulled back on the gurney.  And he was

24 making unintelligible noises, rambling, screaming;

25 couldn't stay in there.

**Jason Scallorn - November 30, 2016**

111

1    Q.   All right, sir.  You go on to state in the

2  next sentence that the subject was still in a much

3  heightened state of impairment and was still being

4  very aggressive.  What do you mean by very

5  aggressive?

6    A.   Just yelling and screaming.  I remember --

7  I don't remember who the medical personnel were, but

8  people were saying, hey, Troy, trying to get his

9  attention.  He would laugh, he would cry, he would

10 scream, he would spit, just -- all at the same time.

11   Q.   All right, sir.  When you were on scene

12 out at Goodman Road, do you ever recall Mr. Goode

13 calmly putting his hands up and saying I'll go or

14 I'll do whatever you all want me to do?

15   A.   No, sir.

16   Q.   That wasn't his behavior, was it?

17   A.   Not at all.

18   Q.   Thank you.  That's all I have for you.

19              EXAMINATION

20 BY MR. JORDAN:

21   Q.   Officer, my name is Trey Jordan, I have a

22 few questions.

23   A.   Yes, sir.

24   Q.   Again, these are going to be some

25 sequencing questions.

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

112

1        MR. JORDAN:  Let me get my microphone,
2 hold on one second.
3 BY MR. JORDAN:
4    Q.   When you arrived on the scene, do you
5 recall when you first noticed Ms. Goode, Kelli
6 Goode?
7    A.   I don't recall when I first noticed her.
8 I -- when I looked up, when I was looking at
9 Mr. Goode, like I'm looking at you, over the
10 shoulder I could see Officer Baggett talking to
11 somebody.  I later found out that was Ms. Goode.
12    Q.   Was she attempting to, when you arrived
13 and first made contact with Mr. Goode, was she
14 within, let's say, 25 feet of him, was she close to
15 him?
16    A.   Maybe 25 yards, not feet.
17    Q.   25 yards.  Was she attempting to engage in
18 any kind of communication with him that you could
19 see, swinging, hey, come back from Goodman Road?
20    A.   Not that I saw.
21    Q.   Just for the jurors, so they can
22 understand Goodman Road, describe that road for me.
23 Is it a two-lane road where you might have a car
24 going by every two or three minutes?
25    A.   No, sir, it's a state highway.  It's a

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

113

1   four-lane divided by a turning lane, east and west.

2   It's the main corridor through DeSoto County.  The

3   time of day that that was there, that road is

4   congested.  We work tons of wrecks every day on that

5   road.  It's a dangerous road.

6         This time it was on a Friday.  It was

7   especially congested, because in proximity to where

8   the Snowden Grove Amphitheater was, the concert that

9   Mr. Goode was attending, Goodman Road is the only

10   way to get in to it, so it was extremely congested.

11     Q.  So Goodman Road is the main access to

12   venue where this concert was occurring?

13     A.  Yes, sir.

14     Q.  It is one of the major thoroughfares

15   through the county, correct?

16     A.  Yes, sir.

17     Q.  Is it -- in the area where you first made

18   contact with Mr. Goode, is there a pedestrian

19   crosswalk there, is there a place where -- is there

20   something that would let vehicles to know to slow

21   down if someone ran into the road?

22     A.  No, sir.

23     Q.  Is this an area where it's controlled by a

24   traffic light in the proximity where you made an

25   encounter with him?

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

114

1    A.   There's not a traffic light, I'd say,
2  within three-quarters of a mile either direction.
3    Q.   So the traffic is moving at this point?
4    A.   Yes, sir.
5    Q.   Can you tell me what the posted speed
6  limit is on that road?
7    A.   55 at that point.
8    Q.   55-mile-an-hour-road, major road, and this
9  is the one, the major thoroughfare in the county?
10   A.   Yes, sir.
11        MR. McCORMACK:   Object to the form.
12 BY MR. JORDAN:
13   Q.   Have you ever worked any kind of -- let me
14 back up and ask:  When you arrived at the scene, how
15 close, when you first observed Mr. Goode, was he to
16 the road?  How close was he to entering that
17 roadway?
18   A.   15, 20 yards.
19   Q.   15 or 20 yards.  And he was noncompliant
20 with your commands, correct?
21   A.   Yes, sir.
22        MR. McCORMACK:   Object to the form.
23 BY MR. JORDAN:
24   Q.   You said he was zigzagging when you first
25 noticed his manner of walk?

Jason Scallorn - November 30, 2016

115

1    A.    Yes, sir.

2    Q.    In fact, you described earlier, I think,

3  that as he came toward you, when you first

4  encountered him or came towards your vehicle, he did

5  it kind of in a zigzagging manner; is that correct?

6    A.    Yes, sir.

7    Q.    When you first arrived and encountered

8  him, was this encounter before you had any

9  communication with Ms. Goode?

10    A.    Yes, sir.

11    Q.    Because she later told you that he had

12  taken acid, correct?

13    A.    Yes, sir.

14    Q.    But upon your first encounter, you didn't

15  know if you had a person who was under the influence

16  of alcohol, correct?

17    A.    Yes, sir.

18    Q.    Didn't know if he simply had a mental

19  incapacitation, correct?

20    A.    Yes, sir.

21    Q.    Didn't know if he was on heroine?

22    A.    Correct.

23    Q.    Didn't know if he was on crystal meth?

24    A.    Correct.

25    Q.    You had no idea who you were encountering

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

116

1  at that time, correct?

2      A.    No idea.

3      Q.    You just knew you had a person coming

4  toward you, noncompliant, who you had been

5  dispatched on a 9-1-1 call, correct?

6          MR. McCORMACK:  Object to the form.

7      A.    Yes, sir.

8  BY MR. JORDAN:

9      Q.    I want to make sure, and I want to break

10  down my question.  You went there on a 9-1-1 call,

11  correct?

12      A.    Yes, sir.

13      Q.    To your knowledge, that is why you were

14  dispatched?

15      A.    Yes, sir.

16      Q.    And, again, the nature of the 9-1-1 call

17  you got from dispatch described the event you were

18  responding to as what?

19      A.    A white male in a physical disturbance

20  with his wife, acting erratically, running in and

21  out of businesses in the area, running through the

22  parking lot.

23      Q.    So when you arrive at the scene, you had

24  at least -- whether it's true or not, you have been

25  advised by dispatch that there has been an

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

117

1  altercation where a male has potentially assaulted a

2  female, correct?

3        MR. McCORMACK:  Object to the form of the

4  question.

5    A.  Yes, sir.

6  BY MR. JORDAN:

7    Q.  An altercation, that's what you were

8  advised of?

9    A.  Yes, sir.

10    Q.  All right.  So you are now on scene.  You

11  are being approached by a person who is

12  non-compliant, correct?

13    A.  Yes, sir.

14    Q.  Who at least you have been advised has

15  potentially attacked a female, correct?

16        MR. McCORMACK:  Object to the form.

17    A.  Yes, sir.

18  BY MR. JORDAN:

19    Q.  All right.  So you get there.  And he, you

20  said you see him about 15 yards from Goodman Road,

21  correct?

22    A.  Yes, sir.

23    Q.  And he approaches you in a zigzag manner.

24  Do you recall, and you may have said this already,

25  but I want to make sure I understand.  What was

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

118

1   your -- you first tried to engage him with just
2   conversation, correct?
3       A.   Yes, sir.
4       Q.   And is that to try to de-escalate the
5   situation?
6       A.   It's to -- it's an attempt to de-escalate
7   to see if I can get his attention on me, then, you
8   know, whatever he wants to do with me, that's fine.
9   If he can focus on me, he's not running out in the
10  road, he's not assaulting somebody else.  If he
11  wants to come to me and talk, we can talk.  If he
12  wants to come to me and, whatever, but it's me and
13  not the citizens.
14      Q.   Because your goal is to not only protect
15  the citizens --
16      A.   Right.
17      Q.   -- but protect him?
18      A.   Yes.
19      Q.   You told him, come here.  Come to me, come
20  away from the road.  Come see me, right?
21      A.   Yes, sir.
22      Q.   That's what your thought was when you
23  arrived?
24      A.   Yes, sir.
25      Q.   So now he's coming towards you.  And

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

1  instead of continuing towards you then, what does he
2  do?
3      A.   He kept coming, and I -- I was verbally
4  escalating when he wasn't complying.  And when he
5  got close to my truck, I said, lay down on the
6  ground, I have a dog, don't come any closer.  At
7  this point I started getting nervous.  It's not
8  natural to walk up like that.
9      Q.   And when you say you get nervous, as
10 someone comes closer and closer to you, that limits
11 what your options are; is that accurate?
12     A.   If you tell -- yes, sir.  If you tell
13 somebody, hey, you mind if I speak with you, sir,
14 and they walk over to you and you have a consensual
15 conversation, that's one thing.  But when you're
16 giving commands to somebody to stop, and they're
17 being defiant and coming at you and staring at you,
18 that makes you nervous.
19     Q.   Because as a suspect or an individual gets
20 closer to you, then at that point you have to worry
21 about things like knives, him actually grabbing you,
22 correct?
23         MR. McCORMACK:  Object to the form.
24     A.   Yes, sir.
25 BY MR. JORDAN:

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

1    Q.   Is that a yes?  Tell me this:  Do officers

2  get killed with their own firearms?

3         MR. McCORMACK:  Object to the form of the

4  question.

5  BY MR. JORDAN:

6    Q.   When they get taken away from officers?

7    A.   Absolutely.

8    Q.   And is that one of the reasons why you

9  want to keep people basically away from your space?

10   A.   Yes, sir.

11   Q.   Because if somebody gets in a physical

12 altercation with you, from your experience as a

13 patrol officer, I think you said you're now a

14 supervising patrol office, correct?

15   A.   Yes, sir.

16   Q.   Is that one of the things that officers

17 are fearful of, somebody gets too close is that they

18 actually get in a physical altercation and have

19 their own gun taken?

20   A.   We teach officers, there's the thing we

21 call the reactionary gap, and it's called that

22 because you can only react at a certain point.  You

23 let somebody get too close in, things go bad.

24   Q.   And, in fact, when someone gets closer in

25 to you, does that start limiting your ability to do

**Jason Scallorn - November 30, 2016**

121

1   anything other than go to a quicker escalation of

2   lethal force?

3       A.   Yes, sir.

4       Q.   Whereas, if somebody is further away from

5   you, you might have the option to taser, the dog,

6   you have -- the further away from you, the more

7   options you have; is that accurate?

8       A.   Yes, sir.

9       Q.   So now he comes up, and then he diverts

10  from you and decides to let the dog out, correct?

11      A.   Yes, sir.

12           MR. McCORMACK:   Object to the form.

13  BY MR. JORDAN:

14      Q.   Did you instruct him to let the dog out?

15      A.   No, sir.

16      Q.   Did he say anything to give you any

17  warning that he was going to let the dog out?

18      A.   No, sir.

19      Q.   So the dog gets out.   Now, where are you

20  positioned with regard to the vehicle when he opens

21  the door?

22      A.   My vehicle is a Tahoe.   The hatchback on

23  the Tahoe, I'm standing on that side facing him.

24  Like, if this is the back of my vehicle, and you're

25  Mr. Goode, I'm standing like, my Tahoe's right here.

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

122

1    Q.    And are you using the vehicle at that
2  point to shield you?
3    A.    I'm using it more to shield him.
4    Q.    Okay.  And so when he opens the door, do
5  you have a view that's obscured, relative to seeing
6  the direct action between him and the dog?
7    A.    Yes, sir.
8    Q.    What obscured your view?
9    A.    Well, he opened -- like, I'm standing at
10 the back of the Tahoe and the door is right here.
11 When he opened the door, he was kind of leaned in,
12 and when he opened the door, I leaned over and
13 looked, and I heard a chomp, but I couldn't see
14 nothing.
15   Q.    And when you heard the chomp, that's the
16 dog, you think -- you heard the dog's jaws clamp
17 shut, but it could have been on his shirt, we don't
18 know what he chomped on?
19   A.    Yes, sir.
20   Q.    So then the dog gets out of the vehicle?
21   A.    Yes, sir.
22   Q.    From the time you first encountered him
23 and I mean, laid eyes on him, until the time that he
24 opened the door for the dog to get out, and I know
25 you -- I'm not asking you to speculate, but can you

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

123

1    give me a range of time that might have elapsed?

2        A.    30, 45 seconds.

3        Q.    So from the time you're on scene, first

4    see him, to the time he's opening the door to let

5    your dog out, 30 to 45 seconds?

6        A.    Yes, sir.

7        Q.    So the dog gets out.  And then, again,

8    tell me what's the next event happened?

9        A.    When he opened the door, and the dog came

10   out, I left from behind the Tahoe to go get my dog

11   because I didn't want -- I had to get him.  I got

12   him.  Well, at that time, Mr. Goode came and stood

13   where I was standing at the Tahoe, at the place

14   where I was trying to keep him from getting to, and

15   I started giving him orders to lay down on the

16   ground.

17       Q.    And you've got the dog by the collar at

18   this time?

19       A.    Yes, sir.

20       Q.    And you don't have your lead out?

21       A.    No, sir.

22       Q.    You've just got the collar.  Because he

23   let the dog out.  You weren't planning on him being

24   out at that time?

25       A.    I didn't plan on letting him out.

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

124

1     Q.   So now -- are you yelling at him at this

2 point?

3     A.   Yes.

4     Q.   Are you screaming commands?

5     A.   I'm not screaming, per se, but I am giving

6 very loud, very clear, dominating commands.  I am

7 telling him, you will lay down on the ground.  You

8 will comply.

9     Q.   Now, at this point, has Ms. Goode come up

10 to you and said, hey, look, my husband's on acid or

11 anything like that, or is she still away from you?

12     A.   I hadn't spoken to her at this point.

13     Q.   Had you even heard her say anything at

14 this point?

15     A.   No, sir.

16     Q.   Do you hear her screaming at her husband

17 at this point?

18     A.   No, sir.

19     Q.   Do you see her coming anywhere, let's say

20 within 10 feet?

21     A.   No, sir.

22     Q.   All right.  So you're now yelling for him

23 to get on the ground.  Does he comply?

24     A.   No, sir.

25     Q.   What happens then?

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

125

1    A.   He laughed at me.  And then he took off

2  running west down Goodman Road on the shoulder of

3  the road.

4    Q.   And this is where I think you said, at

5  this point you make the decision to release the dog?

6    A.   Yes, sir.

7    Q.   Now, I want talk about -- I want to make

8  sure I understand the difference between an

9  apprehension and an attack, okay?  You -- police

10  dogs are used to apprehend people, correct?

11    A.   Yes, sir.

12    Q.   The police dogs aren't used to -- the

13  word, I think, attack has been used.  But the dogs

14  are meant to stop a fleeing suspect, for example,

15  correct?

16        MR. McCORMACK:  Object to the form.

17    A.   Yes, sir, they're made to apprehend.

18  BY MR. JORDAN:

19    Q.   And when they apprehend someone, that can

20  be by grabbing a piece of clothing and pulling them

21  down.  It may actually, I think Mr. Goode had a bite

22  on his arm, but it may be a matter of biting his arm

23  as well, correct?

24    A.   Yes.

25        MR. McCORMACK:  Object to the form.

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

126

BY MR. JORDAN:

Q.   But the purpose of the dog, in this case,
is to stop the suspect from fleeing, correct?

A.   Yes, sir.

Q.   Now at this point, were you concerned for
Mr. Goode's welfare?

A.   Absolutely.

Q.   Because where was he, again, at this point
in proximity to Goodman Road?

A.   Maybe five yards.

Q.   Okay.  So now since your encounter, he's
moved from 15 yards from Goodman Road, now he's 5
yards from Goodman Road?

A.   Yes, sir.

Q.   And this is a person who's not obeying
your commands?

A.   Correct.

     MR. McCORMACK:  Object to the form.

BY MR. JORDAN:

Q.   Well, was he obeying your commands at this
point?

A.   No, sir.

Q.   So the dog -- when the dog finally was
able to reach him and engage with him, how far away
were you from Mr. Goode at that point?

**Jason Scallorn - November 30, 2016**

127

1   A.   I'd say 25 yards.

2   Q.   And he's running, so the dog was able to

3   catch up to him?

4   A.   Yes, sir.

5   Q.   I assume the dog is faster than you, me,

6   and Mr. Goode?

7   A.   He's fast.

8   Q.   All right.  Now, so that the jury

9   understands about the training of these dogs, these

10  dogs when they're trained, it is not infrequent,

11  would you agree, that when they encounter a suspect,

12  that the suspect will often hit the dog, kick the

13  dog, I mean, these dogs get some rough treatment,

14  correct?

15  A.   Yes, sir.

16  Q.   Now, just so that I can understand, you

17  have been with this dog -- you have been, and it's

18  Wessel, I know everybody's calling him Weasel, but

19  it's Wessel, correct?

20  A.   Yes, sir.

21  Q.   What kind of dog is Wessel?

22  A.   A Belgian Malinois.

23  Q.   And that's one of the dogs, along with

24  German Shepherds, that's one of the dogs standardly

25  used by police departments, correct?

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

128

1    A.    That's correct.

2    Q.    Had you seen Wessel previously hit, you

3  know, had been kicked by suspects before that he was

4  trying to help apprehend?

5    A.    I had made a couple of apprehensions prior

6  to that date.  I remember one of them did hit him.

7  But it was more of a slap and not a hit.

8    Q.    And did he remain engaged?

9    A.    Yes, sir.

10    Q.    Because that's what I want to ask you.

11  Mr. Goode hit this trained police dog hard enough

12  that the dog disengaged, correct?

13    A.    Yes, sir.

14        MR. McCORMACK:  Object to the form.

15  BY MR. JORDAN:

16    Q.    Well, when he was hit, did he -- when

17  Mr. Goode hit this dog, did the dog disengage?

18        MR. McCORMACK:  Object to the form.

19    A.    Yes, sir, he did.

20  BY MR. JORDAN:

21    Q.    Where did the dog get hit, in the head?

22    A.    In the nose, the snout.

23    Q.    Now, typically, even when a police dog is

24  trained, K-9 unit disengages, it's brief, and the

25  dog will usually re-engage, correct?

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

129

1    A.    Yes, sir.

2    Q.    For the dog to remain disengaged, the blow

3 that dog would have had to have received would have

4 been a substantial blow, correct?

5         MR. McCORMACK:    Object to the form.

6    A.    Yes, sir.

7 BY MR. JORDAN:

8    Q.    Because those dogs, in their training, are

9 trained to re-engage, even after they let off from

10 the initial contact with the fleeing suspect,

11 correct?

12    A.    When I got -- when I got up to Weasel, we

13 have a saying, it's go find daddy.  Like when they

14 come out of the car, go find, you know, Wessel came

15 to me and would not leave my side.

16    Q.    So basically this dog that's trained to be

17 there to help you, was looking to you for help?

18    A.    Yes, sir.

19    Q.    And he would not, he would not even -- he

20 came and stayed by you?

21    A.    Yes, sir.

22    Q.    And he would not again approach Mr. Goode;

23 is that accurate?

24    A.    Yes, sir, I could tell my dog was hurt.

25    Q.    So now we have a K-9 that's been -- is it

Alpha Reporting Corporation

**Jason Scallorn - November 30, 2016**

130

1   fair to say that after he had been struck in the

2   nose area by Mr. Goode, that your K-9 at that point

3   was incapacitated?

4        A.   Yes, sir.

5             MR. McCORMACK:   Object to the form.

6   BY MR. JORDAN:

7        Q.   Do you view him to be a partner with you,

8   able to help continue with the effort to apprehend

9   Mr. Goode after Mr. Goode had struck the dog?

10       A.   My dog is never a hindrance to me, but at

11  that moment in time, he became a hindrance because

12  now I'm worried about Mr. Goode.  I'm worried about

13  my dog, and a lot is going on at one time.  So the

14  dog became a hindrance at that point.

15       Q.   Is a dog, is a police dog actually

16  considered to be equipment, or what do you consider

17  a police dog?

18       A.   City Hall will tell you it's a piece of

19  equipment.  My family will tell you it's a member of

20  our family.

21       Q.   So this dog, after the blow, was rendered

22  ineffective to assist you in helping subdue

23  Mr. Goode; is that accurate?

24            MR. McCORMACK:   Object to the form of the

25  question.

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

131

```
 1      A.    Yes.
 2  BY MR. JORDAN:
 3      Q.    So now you have a dog that's incapacitated
 4  and Mr. Goode, is he still fleeing down Goodman?
 5      A.    Yes, sir.
 6      Q.    And at this point you decided to deploy
 7  the taser?
 8      A.    Yes, sir.
 9      Q.    And the taser, when you -- let's explain a
10  little bit so I can understand and the jury can too.
11  A taser is a nonlethal option for an officer; is
12  that accurate?
13      A.    Yes, sir.
14      Q.    And it's deployed by firing two barbs that
15  have lead wires on them, correct?
16      A.    Yes, sir.
17      Q.    And for the weapon, the item, the object
18  to be effective, both barbs have to make contact, go
19  through the clothing and actually hit the skin,
20  correct?
21      A.    Yes, sir.
22      Q.    If one barb does not do that, then a
23  charge cannot be delivered by the taser, correct?
24      A.    That's correct.
25      Q.    In this case when you fired, do you
```

**Alpha Reporting Corporation**

Exhibit "B" page 132 of 173

Jason Scallorn - November 30, 2016

132

1   believe that one or both barbs failed to engage?

2       A.   I saw one fly off to the right.  And

3   that's the one that I got caught up in my leg.

4       Q.   And so that we can be clear then, this

5   isn't a situation where you might fire a taser at

6   somebody and one goes through the shirt but the

7   other, like, hits a backpack or something.  You

8   actually saw one of the prongs and the trail wire go

9   off and not even make contact with any part of

10  Mr. Goode, correct?

11      A.   Yes, sir.

12      Q.   And at that point, is the taser able to

13  deliver a charge?

14      A.   No, sir.

15      Q.   All right.  Now you talk about the wires,

16  these are the wires that's unspooled from the taser,

17  correct?

18      A.   Yes, sir.

19      Q.   And you say you actually got tangled up in

20  one?

21      A.   Yes, sir.

22      Q.   And did Mr. Goode get tangled up, you

23  think?

24      A.   Yes, sir.

25      Q.   And is that what you believe caused him to

Alpha Reporting Corporation

Jason Scallorn - November 30, 2016

133

1  trip?

2      A.    Yes, sir.

3      Q.    So now he's tripped and he's on the

4  ground?

5      A.    Yes, sir.

6      Q.    At this point, have you had any contact

7  with Ms. Goode?

8      A.    No, sir.

9      Q.    Is she up in this area?

10     A.    I didn't see her.

11     Q.    Is she telling you what her husband is on,

12  or that he's on any kind of drugs at this point?

13     A.    I didn't see her.

14     Q.    When he is on the ground, is that when the

15  other officers actually come into his proximity?

16     A.    Yes, sir.  As soon as he tripped and he

17  hit the ground, because I'm running, but it's --

18  best I can because I have Wessel with me.  I don't

19  have my leash yet, so I'm trying to run with this

20  Malinois, hanging onto his collar.  And we came

21  around.  Like, Mr. Goode fell, and we came around.

22  At that time, the officers came and they started to

23  struggle with him.

24     Q.    And you never had any part of trying to

25  handcuff him, correct?

Jason Scallorn - November 30, 2016

134

1     A.    No, sir.

2     Q.    You, at that point when he was on the

3   ground trying to be cuffed, you took Wessel back to

4   your vehicle?

5     A.    Yes, sir.

6     Q.    And then you actually had to return a

7   second time to your vehicle to get the leg

8   restraints, correct?

9     A.    Yes, sir.  I took Wessel back to my

10  vehicle, just briefly, just made sure his nose

11  wasn't bleeding.  Shut the door, ran back up to the

12  scene, and that's when Officer Bond said I need some

13  shackles.  So I ran back to my truck, got the

14  shackles and came back, gave them to him.

15    Q.    And the entirety of the time that -- let

16  me ask you, from your observations, at any time that

17  the other officers were attempting to cuff

18  Mr. Goode, was he ever compliant?

19    A.    No, sir.

20    Q.    Did he ever say, I give up, I surrender?

21    A.    No, sir.

22    Q.    At any time you ever encountered

23  Mr. Goode, did he ever put his hands up and say, I

24  submit, or give any indication or say anything that

25  would indicate that he was agreeing to be taken into

1  custody?

2       MR. McCORMACK:  Object to the form of the

3  question.  You may answer.

4     A.    Not at all, no, sir.

5  BY MR. JORDAN:

6     Q.    At what -- how long after you arrived at

7  the scene -- let me give you a range of time.  How

8  long after you arrived at the scene, did you have

9  initial communication with Ms. Goode?

10    A.    Like I say, I don't want to speculate on

11 time, but it was -- after I gave Officer Bond the

12 shackles, that's when I went up and began to speak

13 with her.

14    Q.    Was he -- was he still on the ground when

15 you initiated the contact with her?

16    A.    Yes.

17    Q.    When he told you -- did she say that he

18 was on acid, on LSD, do you remember what she said

19 specifically?  Same thing, but I'm asking how she

20 described it.

21    A.    He had taken LSD at the Widespread Panic

22 concert at the Snowden Grove Amphitheater.

23    Q.    Did she tell you how much he had taken?

24    A.    I don't recall.  She said a few hits, I

25 don't know what that --

Jason Scallorn - November 30, 2016

1    Q.   Did she tell you what kind of acid he had

2 taken, the method of delivery, being on blotter

3 paper, liquid acid, on his skin, on his tongue, any

4 idea?

5    A.   No, sir.

6    Q.   Would that information had been helpful to

7 you to know the amount of acid he consumed?  Would

8 you have wanted to know that?

9    A.   It would have been nice to know.

10    Q.   Is that something that would have -- that

11 you would have included in your report if she had

12 told you how much specifically he had taken?

13    A.   Yes, sir.

14    Q.   Or the type that he had taken?

15    A.   Yes, sir.

16    Q.   I think you were asked this earlier, but I

17 want to make sure.  Did she ever indicate that he

18 had any health problems at all?

19    A.   No, sir.

20    Q.   Any issue with asthma?

21    A.   No, sir.

22    Q.   You were asked multiple questions about --

23 when we started today by Counsel who thoroughly went

24 over the obligations, duties and responsibilities of

25 police officers.  Do you remember those?

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

137

1    A.   Yes, sir.

2    Q.   As a police officer, do you have an

3 obligation and responsibility to protect the general

4 public from a suspect?

5    A.   Yes, sir, I do.

6    Q.   When the suspect is resisting arrest, do

7 you have an obligation to protect the general public

8 from the suspect that might be a danger to others?

9    A.   Absolutely.

10    Q.   Is that what handcuffs -- or is that one

11 reason you have handcuffs, to protect you the

12 officer, the suspect and the general public?

13    A.   Yes, sir.

14    Q.   Are handcuffs -- I think your policy says

15 that, but for someone who's under arrest, they are

16 by policy supposed to be cuffed, correct?

17    A.   Yes, sir.

18    Q.   If Mr. Goode had not been trying to kick

19 at the officers, physically use his feet to harm

20 himself or the officers, would he have been put in

21 leg restraints?

22         MR. McCORMACK:   Object to the form of the

23 question.

24    A.   A four point restraint is the last tool we

25 have in the toolbox.  That's the last-ditch effort.

**Alpha Reporting Corporation**

Exhibit "B" page 138 of 173

Jason Scallorn - November 30, 2016

138

1    BY MR. JORDAN:

2        Q.    Last-ditch effort for what?

3        A.    To gain compliance and restrain them from

4    hurting themselves or other people.

5        Q.    Have you been kicked before?

6        A.    Absolutely.

7        Q.    Have you been kicked by a handcuffed

8    suspect before?

9        A.    Yes, sir.

10       Q.    How many times has that happened to you?

11       A.    It's not regular, it goes in spurts.  But

12   I can tell you, when you work a night shift and you

13   deal with intoxicated people, you deal with people

14   who are high on drugs, angry people.  I've been

15   kicked, I've been spit on, I've been head-butted,

16   all this by handcuffed people.

17       Q.    When you went to the hospital and

18   encountered, I think you said the room is called the

19   detox room; is that correct?

20       A.    Decon is how it was referred to me.

21       Q.    Decon room.  At that point, had Mr. Goode

22   given any indication that he was going to be any

23   more compliant than the first time you encountered

24   him?

25       A.    No, sir.

Alpha Reporting Corporation

Exhibit "B" page 139 of 173

Jason Scallorn - November 30, 2016

139

1    Q.   Those are my questions.  Have you

2  understood my questions I've asked you?

3    A.   Yes, sir.

4        MR. JORDAN:  I have no further questions.

5        MR. HUSKISON:  Is that everybody?  I'm

6  going to follow-up just a few.  And this is Berk

7  Huskison who represents Southaven.

8                       EXAMINATION

9  BY MR. HUSKISON:

10    Q.   You mentioned the command that you give

11  your dog.  What is the word you used?

12    A.   It's dutch, it's stellin.

13    Q.   Okay.  And you spelled that earlier for

14  her?

15    A.   Yes, sir.

16    Q.   What does that command, what does it mean?

17    A.   The command, the way we train the dogs is

18  through association.  And when the dog is in

19  training, when he's taught to apprehend the decoy in

20  the bite suit, you give him the command over and

21  over again as stellin, so when the dog hears

22  stellin, he associates, hey, I'm supposed to go

23  apprehend this.

24    Q.   So basically it's telling the dog to

25  apprehend?

**Alpha Reporting Corporation**

140

```
1    A.    Yes, sir.
2    Q.    Now, Mr. McCormack asked you some
3  questions about responses to requests for
4  admissions.  And I think some of the questions you
5  talked about, did -- did you command the dog to
6  physically attack?  I think in some of them you said
7  did you command the dog to attack; physical use
8  sometime, attack use sometime.
9          When you commanded the dog to go
10 apprehend, what were you telling the dog to do?
11   A.    Stellin, go apprehend.
12   Q.    And you at no time intended for the dog to
13 physically harm Mr. Goode, did you?
14         MR. McCORMACK:  Object to the form of the
15 question.
16   A.    An apprehension is based on the suspect's
17 act, much like a use of force is based on the
18 actions of a suspect.  If Mr. Goode would have
19 stopped and complied, he would not have been
20 apprehended by the K-9.
21 BY MR. HUSKISON:
22   Q.    Okay.  Now, Mr. McCormack asked you a
23 little bit about your training.
24   A.    Yes, sir.
25   Q.    To be a police officer, what is the
```

**Jason Scallorn - November 30, 2016**

141

1  initial training that you go through?

2      A.   Now it's 12 weeks at the Mississippi Law

3  Enforcement Officers Academy in Jackson.

4      Q.   And when you went through, do you remember

5  when that was?

6      A.   2000.

7      Q.   2000?  How long was that training then?

8      A.   Ten weeks.

9      Q.   When you're at that training, do you do

10  things like go over, at least study how to arrest

11  people and how to handle situations?

12      A.   Yes, sir.

13      Q.   That's part of what you're trained to do,

14  isn't it?

15      A.   Yes, sir.

16      Q.   Now, as part of your ongoing training,

17  what are officers required to do, anything yearly?

18      A.   The State has requirement for an

19  in-service, if you will, type training.  We have to

20  accrue so many hours of continuing education each

21  year.

22      Q.   And had you done that?

23      A.   Yes, sir.

24      Q.   Up until the date of this incident?

25      A.   Yes, sir.

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

142

```
 1      Q.   Have you done that since?
 2      A.   Yes, sir.
 3      Q.   Met your minimum requirements?
 4      A.   Yes, sir.
 5      Q.   Now, the other aspect, had you had any
 6 specific training on the use of a taser?
 7      A.   Yes, sir.
 8      Q.   Okay.  And had you had any specific
 9 training on having -- having a dog?
10      A.   Yes, sir.
11      Q.   Okay.  And how much training -- what kind
12 of training do you get on K-9s?
13      A.   You start off with a basic class, which is
14 400 hours.  It's about three months long.
15      Q.   Okay.
16      A.   Then after that, our training group, in
17 DeSoto County we train with the DeSoto County
18 Sheriff's Department, the Horn Lake Police
19 department.  Some of these guys have master trainers
20 who have gone and got these certifications and every
21 Wednesday we train from 8 to 12 hours on K-9.
22      Q.   And that's what you had been doing?
23      A.   Yes, sir.
24           MR. HUSKISON:  That's all the questions I
25 have.
```

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

143

 1          MR. McCORMACK:  I have some follow-up on
 2  that.
 3          MR. GASS:  Yeah, I have some more, but do
 4  you want us -- do you want me to go first or do you
 5  want to go first?
 6          MR. McCORMACK:  You can go two first if
 7  you'd like.  I have no problem with that.
 8          MR. HUSKISON:  Let's get a mic over,
 9  though.
10                  FURTHER EXAMINATION
11  BY MR. GASS:
12     Q.   Officer, I would like to go, first, to
13  that Mr. Goode went over to the car or the truck and
14  opened the door.
15     A.   Yes, sir.
16     Q.   Okay.  Tell me if I'm exaggerating or not.
17          Your worst fear of what Mr. Goode could
18  have done out there that day in a totally additional
19  dimension of danger, beyond running around in a
20  parking lot or on the grass, or even running out
21  onto the street, would it be an exaggeration to say
22  that the worse risk would be that if he got into a
23  car and got behind the wheel and then took off in
24  his condition?
25          MR. McCORMACK:  Object to the form of the

**Jason Scallorn - November 30, 2016**

144

1   question.

2       A.    Without a doubt, that's worse case

3   scenario.

4   BY MR. GASS:

5       Q.    And did you hear or learn of anything --

6   strike that.

7             And if he got into a car, let's say with

8   his wife, and she was driving, and he was just a

9   passenger in the condition that you saw him in, was

10  that a danger?

11      A.    Absolutely.

12            MR. McCORMACK:  Object to the form.

13  BY MR. GASS:

14      Q.    Did you ever hear that before they

15  actually got into the parking lot and got out of the

16  car, that as they were driving down Goodman, that

17  they were weaving in and off the road, driving

18  erratically?

19            MR. McCORMACK:  Object to the form of the

20  question.

21      A.    I haven't heard that.

22  BY MR. GASS:

23      Q.    Would it surprise you at all?

24      A.    No, sir.

25      Q.    Seeing his condition and if he was just a

**Alpha Reporting Corporation**

Exhibit "B" page 145 of 173

**Jason Scallorn - November 30, 2016**

145

1　passenger, it would not surprise you if while she

2　was driving him from the -- the --

3　　　A.　　Arena.

4　　　Q.　　-- the arena over to this area, that that

5　would have occurred?

6　　　　　MR. McCORMACK:　Object to the form.

7　　　A.　　That wouldn't surprise me.

8　BY MR. GASS:

9　　　Q.　　Now another risk, there were people that

10　were pulling into that parking lot while this was

11　going on, right?

12　　　A.　　Yes, sir.

13　　　Q.　　She was following him around, correct?

14　　　A.　　Yes, sir.

15　　　Q.　　They were focused on -- she was focused on

16　him and not on the traffic?

17　　　A.　　Yes, sir.

18　　　Q.　　Did they run a risk of being hit by cars?

19　　　A.　　I believe so.

20　　　Q.　　And if he got out onto the road, that

21　55-mile-an-hour four-lane road, he would run a risk

22　of being injured.　Do I have that right?

23　　　　　MR. McCORMACK:　Object to the form.

24　　　A.　　Absolutely.

25　BY MR. GASS:

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

146

1    Q.   But beyond that, if somebody tried to
2 avoid a guy out there out of his mind, to use her
3 words, and a motorist tried to avoid him, what other
4 risks then are there?
5    A.   You had the risk of --
6         MR. McCORMACK:  Object to the form of the
7 question.
8    A.   -- other people, innocent people being
9 injured in a motor vehicle accident.
10 BY MR. GASS:
11   Q.   The scenario where there's trucks, right?
12   A.   Yes, sir.
13   Q.   Big trucks, right?
14   A.   Yes, sir.
15   Q.   A big 18-wheeler hitting a small
16 Volkswagon with a family with a couple of kids in
17 it?
18        MR. McCORMACK:  Object to the form of the
19 question.
20 BY MR. GASS:
21   Q.   Would that be a worse case scenario --
22        MR. McCORMACK:  Object to the form.
23 BY MR. GASS:
24   Q.   -- caused by a guy out of his mind, out
25 running down that road?

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

147

1     A.    Yes, sir.

2           MR. McCORMACK:   Again, objection to the

3     form of that.

4     BY MR. GASS:

5     Q.    I understand there's some possibility that

6     he was throwing things at her, or she was throwing

7     things at him.  Did you see anything like that?

8     A.    No, sir.

9     Q.    Hear anything like that?

10    A.    No, sir.

11          MR. GASS:  Thank you, Officer.

12          THE WITNESS:  Yes, sir.

13                  FURTHER EXAMINATION

14    BY MR. McCORMACK:

15    Q.    All right.  Officer Scallorn, you've been

16    asked a lot of questions about your dog by a few of

17    the other attorneys here.  I want to talk to you a

18    little bit more about that.  How big is Wessel?

19    A.    He's -- he fluctuates.  Summer weight is

20    usually around 70; winter weight is around 75.

21    Q.    It's a big dog?

22    A.    Yes, sir.

23    Q.    And again, we've talked about his

24    training.  He's well-trained about how to make an

25    apprehension, right?

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

148

1    A.   Yes, sir.

2    Q.   He does it forcefully, doesn't he?

3    A.   No.

4    Q.   He does it in such a manner as to actually

5  apprehend a suspect?

6    A.   Yes, sir.

7    Q.   And we've already talked about the

8  obedience training he received at some length,

9  right?

10    A.   Yes, sir.

11    Q.   Once he returned to you, and you got back

12  control of him after he bit Troy Goode, did you ever

13  give him another command to attack?

14    A.   No, sir.

15    Q.   You mentioned earlier, you said you didn't

16  plan to let the dog out.  When you arrived on the

17  scene your back door was locked, wasn't it?

18    A.   Yes, sir.

19    Q.   You had to unlock it for the dog to get

20  out, right?

21    A.   Yes, sir.

22    Q.   So in the 30 seconds or so that -- you

23  said 30 to 45 seconds between the time you arrived

24  and that door was opened, right?

25    A.   Uh-huh (affirmative response).

**Alpha Reporting Corporation**

Exhibit "B" page 149 of 173

Jason Scallorn - November 30, 2016

149

1    Q.   So in those 30 to 45 seconds, you unlocked
2    that door, correct?
3         A.   Yes, sir.
4         Q.   You were asked a couple of questions about
5    Mr. Goode's ability to breathe.  You're not a
6    doctor, are you?
7         A.   No, sir.
8         Q.   You don't know about lung capacity, do
9    you?
10        A.   No, sir.
11        Q.   You don't know about a person's ability to
12   continue screaming when their oxygen levels have
13   plummeted?
14        A.   No, sir.
15        Q.   You don't know about the possibly
16   manifestations of asphyxia in a person who's slowly
17   suffocating, do you?
18        A.   No, sir.
19        Q.   Are you aware that asphyxia can cause
20   hallucinations?
21        A.   No, sir.
22        Q.   Have you received any training that one of
23   the reasons a person might be erratic is that
24   they're suffering from a lack of oxygen?
25        A.   No, sir.

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

150

1    Q.    Have you received any training about
2  causes, other than drugs, of someone acting erratic?
3    A.    No, sir.
4    Q.    You have received training -- you were
5  asked some questions about night shift and dealing
6  with erratic suspects.  Have you received training
7  on dealing with erratic suspects?
8    A.    No more than what you get at the academy.
9    Q.    So you did receive some training at the
10 academy about how to handle someone who's acting
11 erratically?
12   A.    Yes, sir.
13   Q.    Were there any special instructions that
14 you were given for handling the night shift that
15 night?
16   A.    No, sir.
17   Q.    Nothing having to do with the concert,
18 things to look out for?
19   A.    No, sir.
20   Q.    You were asked a few questions, I believe
21 by Mr. Huskison, about the annual training that you
22 did.  In any of that annual training, have you ever
23 been advised that hogtying a suspect can cause
24 problems?
25   A.    No, sir.

**Alpha Reporting Corporation**

151

1    Q.   In any of your annual training, have you

2  ever been advised about dangers of something called

3  positional asphyxia?

4    A.   No, sir.

5    Q.   In any of that training have you ever been

6  advised of any -- strike that.

7         You were asked a number of questions about

8  verbal commands and about the use of force in

9  relation to verbal commands.  I want to talk to you

10  a little bit more that about.

11         Does disobeying a verbal command allow you

12  under Southaven policy to use deadly force?

13    A.   No.

14    Q.   Are you able to use deadly force on

15  someone who has committed a misdemeanor who is

16  attempting to flee?

17    A.   No, sir.

18    Q.   You understand that that's Southaven

19  policy, right?

20    A.   Yes, sir.

21    Q.   Once a person is under control, once you

22  have them in a state where they're not going to

23  cause any harm to themselves or others, are you able

24  to use deadly force on them?

25    A.   No, sir.

Jason Scallorn - November 30, 2016

152

1    Q.   If a person had used deadly force on a

2  suspect after they had been subdued, that would be

3  excessive, wouldn't it?

4    A.   Yes, sir.

5    Q.   Have you ever been advised by anyone, that

6  use of a hogtie restraint is deadly force if the

7  person remains face down?

8    A.   No, sir.

9    Q.   You've been never trained about that?

10    A.   No, sir.

11    Q.   Would it surprise you that the Mississippi

12  Law Enforcement Officers Training Academy trains

13  people that it is deadly force?

14        MR. HUSKISON:  Object to the form; if you

15  know.

16    A.   I wasn't trained that way.

17  BY MR. McCORMACK:

18    Q.   Would that surprise you, based on the

19  training you received from Southaven?

20    A.   I don't know.

21    Q.   You don't know if it would surprise you

22  that you haven't been trained that someone can die

23  from a procedure that Southaven uses?

24        MR. HUSKISON:  His answer is that he has

25  not been trained on that.  I think that's his answer

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

153

1  to the question.
2  BY MR. McCORMACK:
3      Q.   My question is, would it surprise you?
4          MR. HUSKISON:  Object to the form.  I
5  don't see how it matters whether it would surprise
6  him or not.
7      A.   No, sir.
8  BY MR. McCORMACK:
9      Q.   Wouldn't surprise you?
10     A.   No.
11         MR. MCCORMACK:  All right.  That's all
12  I've got.  Anybody else?
13         VIDEOGRAPHER:  This concludes the
14  videotaped deposition.  The time is 12:08.
15      (THE DEPOSITION CONCLUDED AT 12:08 P.M.)
16
17
18
19
20
21
22
23
24
25

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

154

```
 1                C E R T I F I C A T E

 2    STATE OF TENNESSEE      )
                              )
 3    COUNTY OF SHELBY        )

 4
             I, SHERI ALLEN, LCR #492, Licensed Court
 5    Reporter, in and for the State of Tennessee, do
      hereby certify that the above deposition was
 6    reported by me, and the transcript is a TRUE and
      accurate record to the best of my knowledge, skills,
 7    and ability.

 8           I further certify that I am not related to
      nor an employee of counsel or any of the parties to
 9    the action, nor am I in any way financially
      interested in the outcome of this case.

10
             I further certify that I am duly licensed by
11    the Tennessee Board of Court Reporting as a Licensed
      Court Reporter as evidenced by the LCR number and
12    expiration date following my name below.

13           I further certify that this transcript is
      the work product of this court reporting agency and
14    any unauthorized reproduction and/or transfer of it
      will be in violation of Tennessee Code Annotated
15    39-14-104, Theft of Services.

16

17                          _____
                            Sheri Allen, LCR #492
18                          Expiration Date 6-30-2018
                            ALPHA REPORTING CORPORATION
19                          236 Adams Avenue
                            Memphis, Tennessee 38103
20

21

22

23

24
```

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

### Exhibits

**Exhibit 1** 4:11 11:20, 24 16:10

**Exhibit 2** 4:13 23:14, 17

**Exhibit 3** 4:14,15 33:19 37:14 94:9 96:16 97:3,4,12 98:3 102:7,8 108:16

**Exhibit 4** 4:16

**Exhibit 5** 4:17 56:24 57:9 94:17 95:8

**Exhibit 6** 4:18 58:14, 16 94:23 98:6 107:9 108:19

**Exhibit 7** 4:19 76:5,7

**Exhibit 8** 4:20 77:5,7

**Exhibit 9** 4:21 78:3,5,8

**Exhibit 10** 4:22 86:14, 16

### $

**$20** 17:6

### 1

**1** 11:20,24 16:10 55:19, 24

**10** 38:15 69:17 86:14, 16 124:20

**10:38** 74:25 75:1

**10:52** 75:2,4

**12** 141:2 142:21

**12:08** 153:14,15

**14** 107:10

**15** 104:20 114:18,19 117:20 126:12

**15-inch** 44:12

**150** 34:20

**18-wheeler** 146:15

**18th** 20:6,17 22:6 34:12 74:17

**19** 16:10

**19th** 57:15

### 2

**2** 23:14,17 56:2

**20** 114:18,19

**200** 20:8,9

**2000** 62:2 141:6,7

**2010** 16:10

**2014** 16:20

**2015** 20:6,17

**2016** 5:2

**225** 20:5

**25** 112:14,16,17 127:1

**2:16-CV-02029-SHM-CGC** 5:3

### 3

**3** 33:19,22,24 34:5,9 37:14 56:5 94:9 96:16 97:4,12 98:3 102:8 108:16

**30** 91:16 123:2,5 148:22,23 149:1

**30th** 5:1

### 4

**4** 33:24 34:6,9

**40** 91:17

**400** 142:14

**45** 123:2,5 148:23 149:1

### 5

**5** 56:24 57:9 94:17 95:8 126:12

**55** 114:7

**55-mile-an-hour** 145:21

**55-mile-an-hour-road** 114:8

**5646** 8:6

**5:00** 21:4

### 6

**6** 58:14,16 83:22 84:23 94:23 98:6 107:9 108:19

**60** 15:7

**69** 84:1

### 7

**7** 30:19 33:1 76:5,7

**70** 147:20

**75** 147:20

**7:00** 20:25 21:1

**7:50** 69:4

### 8

**8** 77:5,7,11 142:21

**8:20** 69:4

### 9

**9** 78:3,5,8 90:8

**9-1-1** 95:17 116:5,10, 16

**9:34** 5:2

### A

**a.m.** 21:4 75:1,2

**ability** 120:25 149:5,11

**ABOVE-MENTIONED** 11:10,23 22:1 23:16,22 32:17 34:8 55:10 57:8,

16 58:15 75:11 76:6,16 77:6,14 78:4 83:15 86:15 94:10,18,24 96:10

**absolutely** 100:18 120:7 126:7 137:9 138:6 144:11 145:24

**academy** 61:19 86:23 88:1,7 141:3 150:8,10 152:12

**accepted** 86:9

**access** 79:22 81:19 113:11

**accident** 146:9

**accidentally** 18:7

**accommodate** 44:13

**account** 79:10,12,22, 25 80:3,17,19

**accounts** 81:8,18

**accrue** 141:20

**accurate** 22:4 24:1 55:13 56:19 58:10 83:21 90:20,24 94:7 105:5 119:11 121:7 129:23 130:23 131:12

**accurately** 20:21 55:21,23

**acid** 115:12 124:10 135:18 136:1,3,7

**act** 9:22 14:12 140:17

**acting** 95:18,19 116:20 150:2,10

**action** 15:20 122:6

**actions** 59:14 65:12,24 109:14 140:18

**activities** 55:24

**acts** 65:4,15,20

**additional** 84:15,20 143:18

**address** 53:14,18,20 74:3

**addresses** 95:10 108:9

**Jason Scallorn - November 30, 2016**

admissions 32:22 140:4

advise 63:9

advised 13:3,15 14:16 15:6,9 63:21 84:23 86:3,7 87:8 98:7 116:25 117:8,14 150:23 151:2,6 152:5

affirmative 53:13 64:2 79:23 99:7 148:25

affirmatively 47:18 79:21 90:15 102:15 103:8

afraid 61:16

afternoon 30:20

agencies 64:21

aggressive 111:4,5

agree 8:16,17,21,25 9:4,9,13,17,22 10:1,5 62:17 109:2 127:11

agreed 11:14 12:13

agreeing 134:25

ahead 11:20 23:13 33:18,23 56:23 58:13 76:4 92:11

aid 82:17

aimed 42:3

alcohol 115:16

alive 66:13

alligator 106:19

allowed 17:10 59:22 60:2,10 83:9 85:21 86:4

altercation 117:1,7 120:12,18

ambulance 50:9,12,15 60:22

amount 136:7

Amphitheater 113:8 135:22

angle 39:22

angry 138:14

ankles 44:14

annual 150:21,22 151:1

answering 6:20 21:11

answers 15:25

anymore 20:14

apartment 14:25

apologize 109:10

applied 43:19 47:20 48:9

apprehend 31:23 35:25 36:8 39:23 101:21 103:20 105:6, 17 125:10,17,19 128:4 130:8 139:19,23,25 140:10,11 148:5

apprehended 39:10, 18 103:4 107:4 140:20

apprehension 36:9 66:23,24 68:17 74:16 103:11,15,21,22,25 104:8 125:9 140:16 147:25

apprehensions 128:5

approach 39:2 129:22

approached 45:10 117:11

approaches 117:23

approaching 46:18

appropriately 9:5 107:3

approve 54:15

approved 84:12

approximate 25:25 37:21

approximately 5:2 29:24 38:14 96:18 103:11 108:17

area 24:2 40:5 41:17 67:15 90:1,4,16 97:6 98:2 101:7 103:11 104:7 105:1 113:17,23 116:21 130:2 133:9 145:4

areas 82:5 92:19

arena 145:3,4

arm 30:4 36:10 39:19, 21,22 73:5 75:20 77:20,23 125:22

armed 59:6

arms 28:12 39:24 46:19 47:16 105:11,21

arrest 58:20 62:14 70:8 83:13 137:6,15 141:10

arrested 22:6 58:22 59:1

arrestee's 85:3

arrival 109:21

arrive 35:10,12,14 116:23

arrived 24:21 25:20 26:8,10,12 35:7 41:13 45:15,18 51:1 70:24 72:18 96:2 97:23 98:10 112:4,12 114:14 115:7 118:23 135:6,8 148:16, 23

arriving 97:4

arrow 22:16

aspect 142:5

asphyxia 87:6,10 149:16,19 151:3

assaulted 117:1

assaulting 118:10

assist 50:8 130:22

associates 139:22

association 139:18

assume 7:15 43:4 127:5

assuming 82:16

asthma 51:23,25 52:3 90:25 136:20

attached 11:25 23:18 34:10 48:13 57:10 58:17 76:8 77:8 78:6 86:17

attack 17:11 30:13 31:6,8,14,18 32:10 33:6,15 125:9,13 140:6,7,8 148:13

attacked 35:16 36:18 117:15

attacking 36:3,7 39:10

attempt 101:21 118:6

attempted 38:24 105:3,6,7

attempting 50:23 112:12,17 134:17 151:16

attempts 105:17

attending 113:9

attention 111:9 118:7

attorney 32:16 52:17 88:12,14

Attorney's 52:14

attorneys 11:13 33:1 89:12 147:17

August 16:10

authored 94:22

Avenue 44:19

avoid 9:18 10:11,14 88:4 146:2,3

aware 51:25 66:1,6 79:4,7 83:4,10 149:19

- - - - - - - - - - - - - - -

**B**

- - - - - - - - - - - - - - -

back 26:13,16,18 29:7 36:13 37:3 40:13 41:8 46:4,6,11,12,22 47:3,6, 9,13,16 48:16 49:18 53:6 61:14 68:20 69:6, 12,19,23 75:3 91:9 94:14 97:7,8,17,20 100:25 104:11,13 105:21,25 106:18 110:23 112:19 114:14 121:24 122:10 134:3,9, 11,13,14 148:11,17

backed 37:10

**Jason Scallorn - November 30, 2016**

background 11:4

backpack 132:7

bad 30:17 80:14,17 120:23

Baggett 24:22,23 25:24 35:5,6 37:12 38:17,24 43:17 45:20 46:18 67:19,20,25 68:5,12 71:1,4,9 98:1 112:10

Baptist 5:21,23 66:15 93:24

barb 131:22

barbs 131:14,18 132:1

based 16:4 17:8 34:19 109:2 110:11 140:16, 17 152:18

basic 18:21 82:18 88:1 142:13

basically 55:5 68:15 120:9 129:16 139:24

began 30:9 102:20 135:12

behalf 5:20,23

behavior 109:11,15 111:16

Belgian 127:22

belt 84:25 85:3

Berk 5:9 139:6

big 34:24 44:11 146:13, 15 147:18,21

bit 10:13 18:1,16 21:24 40:6 41:7 53:8 59:8 64:3 75:7 76:1 82:3 98:24 131:10 140:23 147:18 148:12 151:10

bite 19:2,23 20:1 27:24 36:11,21 40:7 73:2,5,7, 11,12,13,15,16 75:23 77:20,22 125:21 139:20

biting 125:22

bitten 28:8,15,19

black 22:16 24:11 103:13

bleeding 134:11

blotter 136:2

blow 129:2,4 130:21

body 28:11,12 73:12 85:1

Bond 35:13 37:12 38:24 41:14 45:19 46:7,9,12,14,17 48:7,9 67:23 134:12 135:11

borrow 93:17

bottom 76:12

bought 44:3,4,8

bound 60:6

Branch 97:15

brand 44:20

break 7:21,22,24 75:1, 6 116:9

breath 92:16

breathe 49:9,12 149:5

breathing 50:4 91:1 92:20,23

briefly 68:2 90:5 134:10

bring 64:18

brought 85:1

brutality 10:6

Bureau 52:9

business 44:19

businesses 95:19 116:21

busy 110:4

buy 44:17

**C**

call 18:5,6,9 21:10,17, 20 22:14 48:23 49:2 64:18 69:19 95:10,17 116:5,10,16 120:21

called 17:6 18:7 21:13 48:21,24 52:25 120:21 138:18 151:2

calling 127:18

calls 21:11

calmly 111:13

camera 67:4,6

capacity 149:8

captain 14:2

car 13:17 14:22,25 24:12,16,25 26:16,19, 20,24 27:7,20,22 28:22 29:5 61:14 73:12 112:23 129:14 143:13, 23 144:7,16

cardiologist 82:9

careful 52:3

Carla 78:21

carried 63:11

carry 63:24,25

carrying 63:13,16

cars 41:16 145:18

cartridge 46:5

case 5:2 12:13 32:16 52:17 53:23 54:5 55:15 58:1 67:11 79:5,8,15 80:7 81:2,5,11,16 89:13 126:2 131:25 144:2 146:21

cast 9:14

catch 127:3

caught 132:3

caused 65:16 87:16,21 132:25 146:24

causing 30:18 90:25

center 23:6

Central 21:18,19

certifications 142:20

chain 44:12

chair 7:21

change 80:25

charge 14:13 58:22,25 131:23 132:13

chasing 36:12

check 44:2 50:4

chief 52:23 53:24 54:5 88:20

choke 28:25 29:1

chomp 28:4,6 122:13, 15

chomped 122:18

circle 102:11 103:14, 17

circumstances 10:7 17:10

citizen 10:2

citizens 118:13,15

city 5:6,10 8:9 13:16 21:9 33:5 63:5,6,9 65:19 67:4 83:1 84:3 86:25 130:18

City's 63:22

civil 56:6 88:4

claim 82:19

clamp 122:16

clarification 78:8

clarify 61:1

class 64:18 142:13

classes 64:17

clean 80:6,11

clear 6:16 39:14 41:12 61:3 68:17 124:6 132:4

cleared 53:1

close 29:19 100:11 112:14 114:15,16 119:5 120:17,23

closed 54:16,18 108:22 109:6 110:9

closer 27:5 119:6,10, 20 120:24

**Jason Scallorn - November 30, 2016**

clothes 43:6,10

clothing 125:20 131:19

coded 70:2,11 71:10

collar 28:24,25 29:1 123:17,22 133:20

colleagues 82:6 106:5,25 107:2

command 31:8,13,16, 22,25 32:4,7 33:14 99:9,12,20 100:4,7 101:12,15,17 102:24 108:3 139:10,16,17,20 140:5,7 148:13 151:11

commanded 20:1 31:5 140:9

commands 27:2 30:9 37:5,8 41:20 99:24 114:20 119:16 124:4,6 126:16,20 151:8,9

comment 81:13

comments 79:4,14 81:15

committed 14:12 15:10 65:4,15,20 151:15

common 63:24

commonly 10:20 48:21

communication 108:10,14 112:18 115:9 135:9

community 55:6

competent 61:24 62:4

compliance 17:21 138:3

compliant 99:15 134:18 138:23

complied 140:19

complies 22:15 24:6, 14 38:14 96:23 102:10 103:16

comply 30:12 99:17,20 100:9 124:8,23

complying 119:4

compromise 9:19

computer 53:9 54:9, 25 67:9

conceal 51:20

concerned 27:15 126:5

concerns 100:12

concert 30:21 113:8, 12 135:22 150:17

CONCLUDED 153:15

concludes 153:13

condition 11:2 72:15 107:12 143:24 144:9, 25

conditions 10:24

conduct 9:18 14:13 59:3

confidence 9:14

confidential 12:13

congested 113:4,7,10

connected 42:8 48:19

consensual 119:14

considered 130:16

consumed 136:7

contact 112:13 113:18 129:10 131:18 132:9 133:6 135:15

continue 108:6 130:8 149:12

continued 37:4 41:19 106:16

continuing 109:9 119:1 141:20

control 28:22 29:2 35:3 37:4 41:24 45:23 46:3,19 47:10,16 60:3 62:14 84:20 86:2,4 100:3,8 101:11 148:12 151:21

controlled 113:23

controlling 47:23

conversation 27:4 88:24 118:2 119:15

conversations 88:13

copies 11:12 75:16

copy 52:21 55:13 58:10 83:13,21 94:21

cords 46:1

corner 76:12

correct 8:9 61:10 99:8 103:9 107:2,21 113:15 114:20 115:5,12,16,19, 22,24 116:1,5,11 117:2,12,15,21 118:2 119:22 120:14 121:10 125:10,15,23 126:3,17 127:14,19,25 128:1,12, 25 129:4,11 131:15,20, 23,24 132:10,17 133:25 134:8 137:16 138:19 145:13 149:2

correctly 26:19 105:10

corridor 113:2

counsel 5:7 81:24 136:23

county 64:7 113:2,15 114:9 142:17

couple 6:11 55:19 73:19 74:21 85:15,16, 19 128:5 146:16 149:4

courses 61:22 62:11

court 5:4,24 6:14 7:4 11:21 23:15 32:12

courteous 9:24

courteously 9:5,23

courtroom 88:1

cover 62:13

created 110:21

creating 68:4,8

Crew 61:22

crime 15:10 17:13,14

criminal 56:3

crosswalk 113:19

cruiser 38:2,16

cruisers 41:12

cry 111:9

crystal 115:23

cuff 44:13 107:18 134:17

cuffed 134:3 137:16

Current 78:23

custody 37:13 38:25 135:1

customary 66:22 67:2

## D

daddy 129:13

danger 100:14,24 101:6 137:8 143:19 144:10

dangerous 113:5

dangerously 100:11

dangers 86:20 87:16, 21 151:2

dark 69:1

dart 42:7

date 88:23 128:6 141:24

dated 16:9

David 5:20 93:21

day 20:18,21,24 32:4 34:17 56:11 57:19 113:3,4 143:18

daylight 39:12

de-escalate 118:4,6

dead 56:15,18

deadly 151:12,14,24 152:1,6,13

deal 46:1 138:13

dealing 45:20 150:5,7

death 66:2 90:11

**Jason Scallorn - November 30, 2016**

December 16:20

decibels 91:24

decided 70:12 131:6

decides 121:10

decision 125:5

decon 90:9 91:21 138:20,21

decontamination 90:7,18 110:7,12

decoy 139:19

decoys 19:11

deed 8:22

deep 92:16

defendant 80:7 81:5

defendants 5:11

defiant 119:17

deliver 132:13

delivered 131:23

delivery 136:2

demand 99:17

demands 9:9

denied 33:9,11

Denise 5:5

department 8:12 9:2, 15,20 10:17 12:22 13:12 15:16 16:13 33:5 53:1,3,9 59:10,25 60:22 61:3,6 64:5,7,8, 9,13 65:7 67:1 68:11 69:7,14 74:13 75:9 83:6,14,23 85:9 86:10 87:1,5,9 88:12 90:4 142:18,19

Department's 66:8

departments 64:5,15 127:25

depiction 22:4 24:1

deploy 131:6

deployed 41:20 131:14

depo 11:16

deposed 5:12

deposition 6:8 33:19 88:9,15,18,21 89:6,8 93:23 94:22 107:10 153:14,15

describe 21:24 98:21, 23 102:16,18 104:15 110:17 112:22

describing 106:2

designated 90:7

desktop 55:5

Desoto 21:19 64:7 113:2 142:17

detective 72:18 73:3, 22 74:5,8 75:8

detector 10:21,23 12:17 15:15

determines 43:25

detox 138:19

die 61:17 62:20 63:1 152:22

died 57:20

difference 125:8

digital 67:6

dimension 143:19

direct 122:6

direction 22:12 41:4 97:12 114:2

directly 40:3 102:4

disagree 8:16

disciplinary 15:20,25 59:14 65:12

discipline 63:15,19 65:2,10,16,21

disciplined 13:16 65:23 66:2 85:9

discourtesy 10:1

discusses 84:12

discussing 96:17

DISCUSSION 34:4

discussions 94:15

disengage 128:17

disengaged 128:12 129:2

disengages 128:24

dishonesty 9:13

dislodged 104:18

disobey 99:23

disobeyed 101:17

disobeying 102:24 151:11

disorderly 59:3

dispatch 21:10 95:6, 11,12 98:16 108:1 109:22 116:17,25

dispatched 116:5,14

dispatcher 14:19

dispatchers 14:17

display 102:12

dispute 32:25

disrespect 9:15 10:2

distract 19:6

distractions 19:5

District 5:4

disturbance 68:4,8 95:17 110:22 116:19

diverts 121:9

divided 113:1

Division 5:4

doctor 82:7 149:6

doctors 72:3

document 11:9,10,23 22:1 23:16,22 32:17 54:20,22 55:10 57:8,16 58:15 68:16 75:11 76:6,16 77:6,14 78:4 83:15,19 85:5 86:15 94:10,18,24 96:10

documentation 54:2

DOCUMENTS 34:8

dog 17:6,10,19 18:2, 18,21,22 27:12,14,15 28:4,21 29:16,20 30:6, 13 31:2,5,8,13,18,23 33:6,15 35:3,16,24 36:2,4,6,19,21,25 37:1, 2 38:22 39:9,23 40:15 41:7 46:4,5 73:10,15 76:1 103:4,5,6 119:6 121:5,10,14,17,19 122:6,16,20,24 123:5, 7,9,10,17,23 125:5 126:2,23 127:2,5,12, 13,17,21 128:11,12,17, 21,23,25 129:2,3,16,24 130:9,10,13,14,15,17, 21 131:3 139:11,18,21, 24 140:5,7,9,10,12 142:9 147:16,21 148:16,19

dog's 122:16

dogs 125:10,12,13 127:9,10,13,23,24 129:8 139:17

dominating 124:6

door 27:18,20 28:4 29:6 72:16,20 91:21 121:21 122:4,10,11,12, 24 123:4,9 134:11 143:14 148:17,24 149:2

doors 91:11,18,20,22

doubt 92:2 144:2

draw 23:3 24:4 96:9 103:14

drawn 24:7

driveway 25:10,15 41:17

driving 15:10 97:4 144:8,16,17 145:2

drop 19:1,2

dropped 48:15

drove 69:6

drug 15:3

drugs 109:7 133:12

**Alpha Reporting Corporation**

Exhibit "B" page 160 of 173

**Jason Scallorn - November 30, 2016**

138:14 150:2

**due** 107:11 109:6

**duly** 6:2

**dutch** 139:12

**duties** 136:24

**duty** 12:23 13:6,9,21
14:5,9,12,24 15:1

**E**

**earlier** 73:9 83:8 115:2
136:16 139:13 148:15

**easier** 21:24 82:6 96:9

**east** 8:6 22:15,22,23,25
23:2 26:3,5 41:8,9
97:14,18,20 103:7
104:11,13,23 113:1

**easy** 20:11

**edge** 102:5

**edits** 80:5

**education** 141:20

**effective** 131:18

**effort** 130:8 137:25
138:2

**elaborate** 79:3

**elapsed** 109:21 123:1

**email** 53:14,17,20
54:4,9,15 74:3,8 89:1

**emailed** 53:24 54:12
73:23 74:1,6 88:22

**emails** 53:17,22 54:1

**emergency** 5:19 67:14
71:10 82:13,14 90:1,3
91:10

**employ** 9:7

**employee** 8:8 10:16

**employer** 12:18

**employment** 10:25
11:3

**EMS** 60:22 109:23

**encounter** 113:25
115:8,14 126:11
127:11

**encountered** 115:4,7
122:22 134:22 138:18,
23

**encountering** 115:25

**end** 23:4 35:22 44:13

**ended** 11:18 21:3 29:9

**ending** 107:14

**ends** 107:11

**enforce** 9:5

**enforcement** 9:10
61:19 86:23 141:3
152:12

**engage** 112:17 118:1
126:24 132:1

**engaged** 36:15 128:8

**enlarged** 23:20

**entering** 114:16

**entire** 9:15

**entirety** 134:15

**entitled** 5:5

**entrance** 90:1 91:20

**equipment** 43:23 44:1
63:10,19,22,23 130:16,
19

**ER** 91:16,20

**erratic** 26:22 149:23
150:2,6,7

**erratically** 116:20
144:18 150:11

**escalating** 119:4

**escalation** 121:1

**estimate** 109:19

**et al** 5:6

**ethics** 8:15

**event** 63:18 116:17
123:8

**events** 55:20 103:4
105:3

**eventually** 12:2 46:20
105:13

**everybody's** 127:18

**evidence** 81:1

**exaggerating** 143:16

**exaggeration** 143:21

**examination** 6:4
10:18 12:16 89:17 90:4
93:19 111:19 139:8
143:10 147:13

**examined** 6:2

**excessive** 10:5 152:3

**excuse** 17:5 66:3
73:25

**exemplary** 9:1

**Exhibit** 11:20,24 16:10
23:14,17 33:19 34:9
37:14 56:24 57:9
58:14,16 76:5,7 77:5,7,
10 78:3,5,8 86:14,16
94:9,17,23 95:8 96:16
97:3,12 98:3,6 101:24
102:7 107:9 108:16,19

**exhibited** 94:22

**exhibits** 11:15 89:7

**exited** 26:12

**expand** 57:23

**expected** 9:17,22

**experience** 120:12

**experiences** 62:3

**expert** 82:19

**explain** 131:9

**explode** 93:10

**explore** 94:3

**express** 92:22

**extent** 107:2

**extra** 16:4,21

**extremely** 91:9 113:10

**eyes** 122:23

**eyewitnesses** 51:9

**F**

**face** 42:25 43:3 47:1
49:6 60:5 71:15 78:18,
20 152:7

**Facebook** 79:8,10,14,
19 80:5

**facing** 121:23

**fact** 43:2,5 51:20 98:9
99:23 101:15,17
105:16 109:10,13
115:2 120:24

**failed** 132:1

**failing** 19:14

**failure** 59:3

**fair** 6:18,22 7:5,17,25
9:24 22:4 24:1,18
55:13 65:2 83:21
85:12,20 130:1

**fall** 38:21 40:17

**fallen** 43:3 110:22

**familiar** 59:10

**familiarity** 17:8

**familiarize** 84:5

**family** 64:23 130:19,20
146:16

**fast** 127:7

**faster** 127:5

**favor** 9:6 22:11

**FBI** 52:12

**fear** 9:6 143:17

**fearful** 120:17

**feel** 91:7

**feet** 20:9 29:23 49:18
104:20 112:14,16
124:20 137:19

**fell** 36:11,23 37:9 40:14
42:25 43:12 105:7
133:21

**fellow** 9:20 105:6,18

**Jason Scallorn - November 30, 2016**

felt 70:21

female 14:17,19 95:18
117:2,15

fight 18:24

fighting 86:1 105:13
107:18

file 73:25 74:10,12

filed 5:3 32:15,20

finally 126:23

find 20:14 129:13,14

fine 7:22,24 96:8 118:8

finish 6:17,21 7:23

finished 15:15

fire 42:5 132:5

firearms 120:2

fired 131:25

firing 131:14

firm 93:23

flail 106:17

flailing 106:20

flee 17:12 151:16

fleeing 125:14 126:3
129:10 131:4

flip 84:1

fluctuates 147:19

fly 132:2

focus 118:9

focused 19:3 145:15

folders 55:6

follow 18:21,23 84:8

follow-up 94:1 139:6
143:1

foot 20:5 36:12

football 14:8

force 9:7 10:6 17:20,24
106:4 121:2 140:17
151:8,12,14,24 152:1,
6,13

forcefully 148:2

forearm 75:23 78:1

forever 44:3

form 62:21 85:23 91:4
92:1,9 93:2,12 95:14
100:16,20,22 101:1,4,8
102:2 106:6,12 107:5,
23 108:23 110:13
114:11,22 116:6 117:3,
16 119:23 120:3
121:12 125:16,25
126:18 128:14,18
129:5 130:5,24 135:2
137:22 140:14 143:25
144:12,19 145:6,23
146:6,18,22 147:3
152:14 153:4

found 112:11

four-lane 113:1 145:21

free 103:5

Friday 30:19 113:6

front 23:6,9 26:1,15
28:10,11 85:1 89:20
90:17 94:14 95:2 98:20
102:13 103:18 104:20

---

**G**

gain 17:21 60:3 138:3

gap 120:21

Gass 5:15 11:14 12:1,5
60:20 76:25 89:15,18
91:6 92:3,10 93:5,15
94:2 110:5 143:3,11
144:4,13,22 145:8,25
146:10,20,23 147:4,11

gather 74:21

gave 13:11 46:10,12,13
48:15 99:8 108:3
134:14 135:11

general 19:21 137:3,7,
12

gentleman 98:20

German 127:24

Getwell 21:18

girlfriend's 12:23
13:17 14:2

give 9:23 29:10 31:23
32:4,7 37:4 73:24
99:12 100:3,7 101:12
102:11 121:16 123:1
134:20,24 135:7
139:10,20 148:13

giving 27:1,5 30:9
119:16 123:15 124:5

goal 20:2 30:18 118:14

good 29:2 34:3

Goode 5:5 21:14 22:6
24:13 25:22 26:3,20
28:1,3,14,19 29:4,9,12
30:8 31:9,14 33:6,15
34:13 35:17 36:9,10,
16,18,23 37:7,9,13,20
38:21 39:2,6,18 40:6,8,
10 41:5,19 42:3,10,25
43:12 44:6 45:7,19,20
46:16 49:5,16 50:9,23
51:2,4,6,7,12 56:12,15,
18 57:20 59:6 65:24
66:7,16 67:14 68:3
70:2,9 71:13 72:13,23
73:16 74:16 76:3 78:9,
13 79:1 89:19 92:19
94:5 95:5,12 96:3 97:5,
24 98:9 99:5,9,17
100:4,11,13,23 101:5,
12,21,25 103:5 104:8,
18 105:7,16,24 106:3,
16 108:2,6,10,15,19,21
109:3,5,10,15,22
110:6,9 111:12 112:5,
6,9,11,13 113:9,18
114:15 115:9 121:25
123:12 124:9 125:21
126:25 127:6 128:11,
17 129:22 130:2,9,12,
23 131:4 132:10,22
133:7,21 134:18,23
135:9 137:18 138:21
140:13,18 143:13,17
148:12

Goode's 43:9 58:19
66:2 72:8 75:19 76:22
105:11 109:11 126:6
149:5

Goodman 22:10,19,

20,23 23:1,2,5,9 30:17,
19,23 38:10 94:8 95:24
96:2 97:13,21 100:12,
13,15,25 101:7,23
102:14 107:25 109:21
111:12 112:19,22
113:9,11 117:20 125:2
126:9,12,13 131:4
144:16

grab 30:2,3,4

grabbed 28:13 30:6
37:9

grabbing 29:20 119:21
125:20

Grande 23:8 89:20
97:1,2

grass 31:4 143:20

grassy 90:16

Great 12:5

greater 98:21

ground 6:13 30:11,15
31:1,2 35:17,19,21,22
38:22 41:24 43:13 45:7
46:2,16 99:14,21 100:5
101:13 119:6 123:16
124:7,23 133:4,14,17
134:3 135:14

group 142:16

Grove 113:8 135:22

guess 26:5 38:8 70:7
106:18

guide 94:15

gun 120:19

guns 80:20,22,23

gurney 50:14,24
110:20,22,23

gurneys 91:12

guy 34:24 146:2,24

guy's 52:2

guys 53:25 63:24 89:3
142:19

Jason Scallorn - November 30, 2016

## H

half 69:21

Hall 130:18

hallucinations 149:20

hand 11:21 21:23 23:14 47:6,15 83:13

handcuff 43:13,15 133:25

handcuffed 47:22 105:25 106:17 138:7, 16

handcuffing 84:2,12

handcuffs 44:11 47:19 48:13 63:25 64:1 84:16,20,24 105:12,21 106:5,25 137:10,11,14

handed 48:6

handing 11:12 22:12 32:15 55:8 57:12 76:15 77:13

handle 27:18 141:11 150:10

handling 18:19 150:14

hands 48:18 60:6 71:17 84:25 105:25 111:13 134:23

hang 40:6

hanging 133:20

happen 72:10

happened 20:17,21 21:25 43:9 68:1 71:9 79:1,3 123:8 138:10

happening 51:5

hard 11:19 128:11

harm 137:19 140:13 151:23

hatchback 121:22

hate 69:3

head 47:18 63:4 72:16, 20 79:21 90:15 102:15 103:8 128:21

head-butted 138:15

headed 22:20,25

heading 23:2 104:11, 13

health 136:18

hear 28:14 72:7 91:10, 12 93:6,10,14 124:16 144:5,14 147:9

heard 28:4,6 70:11 85:8 90:22 91:3,24 93:7 122:13,15,16 124:13 144:21

hears 139:21

height 20:3 34:14,15

heightened 111:3

helpful 136:6

helping 130:22

HERETO 11:25 23:18 34:10 57:10 58:17 76:8 77:9 78:6 86:17

Hernando 64:8 65:9, 10,11

heroine 115:21

hey 111:8 112:19 119:13 124:10 139:22

high 21:19 138:14

highway 112:25

hindrance 130:10,11, 14

hired 10:15 15:16,20

history 10:14 59:14,20 64:4

hit 40:9,15 42:15 43:7 127:12 128:2,6,7,11, 16,17,21 131:19 133:17 145:18

hits 132:7 135:24

hitting 42:19 146:15

hogtie 48:21 49:2 60:2 62:18,24 83:8 86:20 87:2,6,12,17,22 152:6

hogtied 49:5,8 60:14

61:8 71:18

hogtying 150:23

hold 24:8 47:7 112:2

holding 46:7

holidays 20:11

honest 8:22

hooked 71:23 72:1

hopping 99:2

Horn 142:18

hospital 66:23 67:13, 21 68:24 69:15,20,24 70:3,5,22,24 71:12 72:4,6 78:9,14 89:23 93:24 109:23 138:17

Hospital-desoto 5:21,23 66:16 93:25

hour 69:21

hours 21:2 69:22 141:20 142:14,21

house 12:23 14:2 17:6

hung 40:8

hurt 129:24

hurting 138:4

husband 124:16 133:11

husband's 124:10

Huskison 5:9 12:10 16:8 56:25 57:4,7 78:11 81:23 85:23 103:24 139:5,7,9 140:21 142:24 143:8 150:21 152:14,24 153:4

## I

ID 77:3

idea 34:16 115:25 116:2 136:4

IDENTIFICATION 77:7

identify 5:7 22:8 96:15

97:3

ill 9:6

illegal 109:7

illnesses 87:17

immediately 21:21 27:24 40:7 93:22

impair 9:14

impairment 111:3

import 64:18

important 70:22

impossible 91:2

in-service 141:19

incapacitated 130:3 131:3

incapacitation 115:19

incident 21:15 23:7 55:9,14,18 57:1,23 94:16 95:6 98:19 103:3 141:24

include 57:25 58:3 60:23

included 56:19 136:11

includes 60:5

including 51:4 66:11, 12

indefensible 10:3

independently 70:12, 21

indication 92:18 134:24 138:22

individual 5:11 119:19

ineffective 130:22

influence 115:15

information 54:1 56:20 57:25 74:15 80:13,16 98:15 136:6

informed 95:12

infrequent 127:10

ingestion 109:7

initial 129:10 135:9

Alpha Reporting Corporation

## Jason Scallorn - November 30, 2016

141:1

**initially** 31:7

**initials** 103:18

**initiated** 135:15

**injured** 145:22 146:9

**injuries** 72:23 73:1

**innocent** 146:8

**Instagram** 81:9,10,11, 13,15

**instruct** 121:14

**instructed** 68:10

**instructions** 150:13

**instructor** 61:25

**instructors** 64:19

**integrity** 9:10,19

**intended** 140:12

**interact** 94:4

**interactions** 66:7 94:7

**interjections** 6:25

**intoxicated** 15:10 87:21 138:13

**intoxication** 59:2

**introduced** 93:22

**introducing** 18:25

**Investigation** 52:9

**involved** 50:17 70:8

**involvement** 100:13

**irrational** 95:18,20 99:3

**irregularities** 11:3

**issue** 63:12 136:20

**issued** 43:22 63:6

**issues** 82:20

**item** 131:17

---

**J**

**Jackson** 141:3

**Jason** 5:12 6:1,6 8:4 79:20

**jaws** 122:16

**job** 14:8

**Joel** 37:11

**jog** 99:1

**John** 5:22

**Jordan** 5:18 24:8 33:21 37:23 77:10 111:20,21 112:1,3 114:12,23 116:8 117:6, 18 119:25 120:5 121:13 125:18 126:1, 19 128:15,20 129:7 130:6 131:2 135:5 138:1 139:4

**JS** 38:12 103:18

**Jscallorn@ southaven.org.** 53:21

**July** 20:6,17 22:6 34:12 74:16

**jurors** 112:21

**jury** 87:25 91:7 127:8 131:10

**Justice** 53:1

---

**K**

**K-9** 16:12,18,22,25 17:9 18:2,11 20:13 21:8 59:10,13,18,22 66:23 73:24 74:9,12,16 100:3 101:11,21,25 103:4,10,14,24,25 104:2,3,4,6,7 128:24 129:25 130:2 140:20 142:21

**K-9S** 142:12

**keeping** 30:23 60:5

**Kelli** 5:5 97:24 108:14 112:5

**Kelli's** 11:15

**Kevin** 5:13

**khaki** 98:8,10

**kick** 106:16 127:12 137:18

**kicked** 128:3 138:5,7, 15

**kicking** 46:7 86:1 106:20 107:1

**kids** 146:16

**killed** 120:2

**kind** 20:14 26:22 27:13 44:10 54:16 71:23 85:25 92:16 112:18 114:13 115:5 122:11 127:21 133:12 136:1 142:11

**kinds** 80:22

**knee** 47:9,12

**knew** 10:14 56:14,17, 18 59:18,20 80:6 116:3

**knives** 119:21

**knock** 35:19,21 41:23

**knocked** 35:17

**knowledge** 63:24 116:13

**knowledgeable** 62:6

---

**L**

**lack** 106:19 149:24

**laid** 122:23

**Lake** 142:18

**land** 9:2

**lane** 113:1

**last-ditch** 85:25 137:25 138:2

**laugh** 111:9

**laughed** 31:3 125:1

**laughing** 72:8

**law** 9:5,10 61:19 86:23 141:2 152:12

**lawn** 96:4 98:20

**laws** 9:1

**lawsuit** 56:6

**lay** 30:11 99:14 100:4 101:12 119:5 123:15 124:7

**laying** 49:19 71:15

**lead** 18:22,23 123:20 131:15

**leaned** 122:11,12

**learn** 16:24 144:5

**leash** 18:22,24 133:19

**leave** 66:25 68:10 129:15

**left** 39:21,22 73:5 75:19 77:19,25 102:19 123:10

**leg** 106:14 107:3,21 132:3 134:7 137:21

**legs** 43:19 46:7 48:9, 12,19 60:6 71:17

**length** 148:8

**Lenny's** 96:19,21

**lethal** 121:2

**letting** 123:25

**levels** 149:12

**liability** 88:4

**lie** 10:20,23 12:16 15:15

**lied** 10:10 13:23

**lieutenant** 50:25 52:20,21,22 57:15 68:9,14 70:1,16 71:1,4 72:17 73:2,24

**life** 8:18,23 10:9

**light** 113:24 114:1

**likewise** 6:20

**limit** 114:6

**limited** 51:4

**limiting** 120:25

**limits** 119:10

**lines** 27:13 107:16

Jason Scallorn - November 30, 2016

liquid 136:3

live 19:5,10 21:8

located 96:17

location 22:5 38:17

locations 90:22 91:25

locked 148:17

login 54:24 55:7

long 6:10 21:1 49:23 68:13 69:12,13,18 109:25 135:6,8 141:7 142:14

looked 50:13,16 89:6 112:8 122:13

Loop 8:6

looped 48:12 85:1

lot 7:7 13:6 18:10,13 25:4,5,7,12,21 29:18 39:1 41:17 48:17 49:17 63:24 64:17 80:20 85:16 90:16 98:3 101:7 116:22 130:13 143:20 144:15 145:10 147:16

loud 91:8,9 92:7 99:9 124:6

louder 92:4,13

Louisiana 64:20,23

LSD 51:19,21 109:8 135:18,21

lung 149:8

lying 10:14

**M**

made 28:16 31:16 44:15 45:18 51:17 79:5,14 80:5 81:4,15 103:10 112:13 113:17, 24 125:17 128:5 134:10

main 113:2,11

major 113:14 114:8,9

make 7:10 12:10,14 19:2 21:24 27:7 33:22,

24 55:20,23 76:25 82:6 93:1 94:6 96:9 99:14 105:5 116:9 117:25 125:5,7 131:18 132:9 136:17 147:24

makes 119:18

making 18:21 36:9 79:7 93:8 110:24

male 95:18 98:8 116:19 117:1

malice 9:6

Malinois 127:22 133:20

manage 46:18 47:19 73:13

managed 73:10,16

manifestations 149:16

manner 26:22 114:25 115:5 117:23 148:4

manual 62:13

manufacturer 44:21

marathon 7:19

marijuana 15:7

mark 5:22 11:20 22:11 23:13 24:12,25 25:23 33:18 37:19 38:12 56:24 57:1 58:13 76:4 77:4 78:3 86:14

marked 11:24 22:16 23:17 24:15 34:9 57:9 58:16 76:7 77:7 78:5 86:16 94:16 98:3,5 107:10

marker 37:17 103:13

marking 57:5

marks 43:6

Marty 5:16

master 142:19

materials 62:10 79:25 89:2,5,7

matter 52:10 93:25 125:22

matters 153:5

maximal 48:24,25

Mccormack 5:13 6:5 11:12,17 12:3,6,15 16:11 22:3 23:13,19,25 24:10 32:14,19 33:18, 23 34:2,6,11 37:25 55:12 56:23 57:3,6,11, 18 58:13,18 60:25 62:23 74:20 75:5,13, 16,18 76:4,11,14,18 77:2,4,11,12,16 78:3,7, 12 81:25 82:2 83:18 86:13,18 89:10 91:4 92:1,9 93:2,12 95:14 96:8 99:6 100:16,20 101:1,8 102:2 104:2 106:6,12,14 107:5,23 108:23 110:13 114:11, 22 116:6 117:3,16 119:23 120:3 121:12 125:16,25 126:18 128:14,18 129:5 130:5, 24 135:2 137:22 140:2, 14,22 143:1,6,25 144:12,19 145:6,23 146:6,18,22 147:2,14 152:17 153:2,8,11

Mcintosh 5:22

meaning 60:23

means 18:22

meant 125:14

Mechanics 62:14

media 81:7

medical 82:20 111:7

medicine 82:14

meet 70:4,17

meeting 88:11

member 130:19

members 9:23

memo 52:21 57:5,12, 22 58:11 72:18 98:5,14 100:10

memorandum 58:7 94:21

Memorial 5:21,23 66:16 93:24

memos 54:17,19 55:4

mental 115:18

mention 110:8

mentioned 74:12 139:10 148:15

Met 142:3

meth 115:23

method 86:9 136:2

Mexican 23:8 96:16, 20,24

mic 93:17 143:8

microphone 112:1

middle 44:12

mile 114:2

mind 74:22 108:21 109:6 119:13 146:2,24

mine 7:12

minimum 142:3

minutes 69:17 74:21, 23 112:24

misconduct 10:11,15 12:18 59:20 65:4

misdemeanor 58:22, 25 151:15

misdemeanors 59:4

Mississippi 8:7 52:9 61:18 64:10,13 141:2 152:11

mistaken 40:19

moment 29:16 130:11

momentarily 90:10

monitor 61:15

monitors 71:23 72:1

Monroe 64:20,22,23

month 16:14

months 142:14

motor 146:9

**Jason Scallorn - November 30, 2016**

motorist 146:3

move 39:25 86:13

moved 126:12

moving 114:3

multiple 65:8 136:22

Murray 8:4

**N**

named 81:5

natural 119:8

nature 116:16

necessarily 62:22
80:8,9

needed 21:12 54:2

negatively 63:4

nervous 119:7,9,18

nice 136:9

night 138:12 150:5,14,
15

nipped 28:5

nods 47:18 63:4 79:21
90:15 102:15 103:8

noise 28:16

noises 110:24

non-compliant
117:12

noncompliance
17:12,16,19

noncompliant 114:19
116:4

nonlethal 131:11

NOS 34:9

nose 128:22 130:2
134:10

note 16:8 97:23

noticed 112:5,7
114:25

notified 95:5

notify 21:10

November 5:1

number 5:3 11:18
19:11 151:7

numbering 11:15

nurse 82:11

nurses 72:3

**O**

obedience 18:14,17,
20 19:1,14,22 31:22
148:8

obedient 18:19 19:3,
19

obey 59:3 101:15
108:2

obeying 9:1 126:15,20

object 62:21 85:23
91:4 92:1,9 93:2,12
95:14 100:16 101:1,8
102:2 106:6,12 107:5,
23 108:23 110:13
114:11,22 116:6 117:3,
16 119:23 120:3
121:12 125:16,25
126:18 128:14,18
129:5 130:5,24 131:17
135:2 137:22 140:14
143:25 144:12,19
145:6,23 146:6,18,22
152:14 153:4

objection 12:1 81:23
100:20 147:2

obligation 137:3,7

obligations 136:24

obscured 122:5,8

observation 109:3
110:11,19

observations 134:16

observed 92:19
114:15

obtained 16:25

occasions 14:17,20

occurred 103:15 105:3
108:15 145:5

occurring 113:12

offense 18:8

office 52:14 120:14

officer 8:15,17,21,25
9:14 11:7 14:14 16:13,
19,22,25 18:11,19 21:8
24:22 35:10,13 37:11,
12 38:19,23,24 41:13
43:17 45:15,18,19,20
46:7,9,12,13 47:5 48:7,
9 49:11,14 50:1 52:2
59:13,18,23 61:8
67:19,20,23,25 68:5,
11,14 71:1,4,8 84:3
88:4 98:1 101:5 108:3
111:21 112:10 120:13
131:11 134:12 135:11
137:2,12 140:25
143:12 147:11,15

officer's 79:2

officers 9:10,20 24:20
26:7 35:3 41:1,13 42:2
45:5,10,13 46:3,17
47:9,23 50:20,23 53:3
61:19 66:6 67:18,21
70:25 72:7 85:17 86:23
100:23 105:6,11,18,23
109:14 120:1,6,16,20
133:15,22 134:17
136:25 137:19,20
141:3,17 152:12

official 8:23

Olive 97:14

Oliver 5:15,17

on-site 101:4

ongoing 141:16

opened 27:20 28:3
29:6 122:9,11,12,24
123:9 143:14 148:24

opening 123:4

opens 121:20 122:4

opinion 19:18 100:22
101:4

opportunities 94:4

opposed 14:8

option 121:5 131:11

options 119:11 121:7

oral 14:16

order 6:16 17:10 41:23
57:22 70:19 81:1

ordered 30:12 33:6
70:15

orders 27:5 29:11
123:15

originally 106:17

overhead 22:5

oversized 44:13

oxygen 149:12,24

**P**

P-E-E-R 45:3

p.m. 20:25 21:1 153:15

pace 102:18 104:14

pacing 98:22

pair 44:2 47:25

Panic 30:21 135:21

paper 136:3

paperwork 67:1
68:11,19,22 69:9,19,25

paragraph 95:10,23
98:6,19 100:1 107:11,
13 108:9 109:18 110:8

parallel 97:9,20 102:14
104:25

paramedics 52:5

Pardon 100:19

parked 91:9

parking 25:4,5,7,12,21
29:18 39:1 41:17 48:16
49:17 90:16 98:3 101:7
116:22 143:20 144:15
145:10

Parkway 21:18

**Jason Scallorn - November 30, 2016**

part 12:12 19:21 43:22 44:13 56:2,5 86:22 88:6 132:9 133:24 141:13,16

particularity 98:21

partner 18:2 100:3 101:21,25 103:4,10 104:9 130:7

pass 11:9 75:16 89:12

passed 11:11 22:2 23:23 32:18 55:11 56:12 57:17 72:13 75:12 76:17 77:15 78:14 83:16 94:11,19, 25 96:11

passenger 144:9 145:1

past 10:10 19:8 29:12

patrol 13:17 14:22,25 16:14 120:13,14

patrolman 66:25

pay 17:3 64:1

paycheck 17:7

pedestrian 113:18

Peerless 44:23 45:2,3

pen 96:7

pending 7:23

people 19:5,23 30:22 43:24 64:25 80:20 86:1 101:6 111:8 120:9 125:10 138:4,13,14,16 141:11 145:9 146:8 152:13

period 15:22,24

periods 90:13

person 60:10,13 62:17 82:20 83:2 87:22 115:15 116:3 117:11 126:15 149:16,23 151:21 152:1,7

person's 149:11

personal 8:23

personally 44:4 49:15 60:15

personnel 111:7

Phillips 5:16 33:20 77:3

photograph 66:24 67:2,3,5

photographing 72:20

photographs 73:1

physical 17:23 95:17 116:19 120:11,18 140:7

physically 137:19 140:6,13

Physicians 5:19

picture 21:23 75:14,19 76:9,15,19 77:13,17,19

pictures 67:11 73:2,18 74:9,19 75:7,9 76:21 81:10

piece 125:20 130:18

Pine 8:6

place 23:7 50:23 76:10 95:2 106:25 113:19 123:13

places 64:19

placing 50:8

plaintiffs 5:14

plan 123:25 148:16

planning 123:23

plummeted 149:13

point 7:24 11:19 12:10, 14 21:13 27:17 28:15, 19,20 29:4,6 31:10 35:4 40:11,17,23 45:21 48:18,23 50:20 60:4,17 71:19,21 104:17 108:7 110:20 114:3,7 119:7, 20 120:22 122:2 124:2, 9,12,14,17 125:5 126:5,8,21,25 130:2,14 131:6 132:12 133:6,12 134:2 137:24 138:21

Pointing 22:18

points 84:15

police 8:11,15,17,21, 25 10:17 12:21 13:12 15:16 16:13 17:10 18:18 42:2 45:5 52:23 53:9 54:5 59:9,25 60:21 61:3,6,7,14 64:4, 5,8,9,12,15 66:8 67:1 68:11 69:6,13 74:13 75:8 79:2 83:6,14,23 84:3 85:9 86:10 87:1,5, 9 88:4,12 100:23 101:5 105:6 109:14 125:9,12 127:25 128:11,23 130:15,17 136:25 137:2 140:25 142:18

policies 16:24 17:9 59:9,10,13 60:13 61:3, 6 66:8 83:4,22,23

policy 17:25 60:1,9,16 83:10 85:21 137:14,16 151:12,19

polygraph 10:18 11:5 12:7,8,16 16:1,5,9 65:5

position 17:1 38:2 48:21 60:10,14 61:9 62:18 71:18 78:10,16 90:25

positional 87:6,10 151:3

positioned 121:20

positions 84:12

possibility 147:5

possibly 61:17 149:15

posted 114:5

posts 79:7

potential 101:6

potentially 117:1,15

pounds 20:8,9 34:21

practiced 82:14

prepare 54:8 55:17,19 56:8 88:10 89:2,6

prepared 32:25 55:14 56:11 57:14,22

presented 100:14,24 101:5

pressure 46:21 47:3

pretty 34:3

prevent 84:25

previously 128:2

Price 45:15,18 47:5 49:14 50:1

printed 54:20

prior 93:22 95:4 128:5

priority 110:3

private 8:18 90:6

probationary 15:22, 24

problem 12:3 79:24 80:2 143:7

problems 91:1 136:18 150:24

procedure 83:10 152:23

procedures 16:25 17:9 59:9 66:9 83:5,14, 23,24 84:9

proceed 21:21

produced 55:9

professional 10:9

prominent 102:12

promotion 16:16 17:7

prompted 69:23

prone 48:25

prongs 132:8

properly 83:2,5

prosecution 56:3

protect 118:14,17 137:3,7,11

provide 83:1

proximity 113:7,24 126:9 133:15

public 9:9,14,23 59:2 100:24 137:4,7,12

pull 18:23 68:5

**Jason Scallorn - November 30, 2016**

**pulled** 23:8 24:2,11,13 25:10,17 42:3 110:23

**pulling** 125:20 145:10

**punched** 36:10,19

**purpose** 126:2

**put** 15:22 20:7,11 33:25 46:5,21 47:3,9, 12 62:18 73:24 76:10, 11 94:10 97:18 102:8 103:20 134:23 137:20

**putting** 47:6 111:13

**Q**

**question** 6:17,21,22 7:12,16,23 30:24 31:5, 13 33:10 89:16 93:3,13 95:15 99:17 100:17 102:3 106:15 107:6 108:24 116:10 117:4 120:4 130:25 135:3 137:23 140:15 144:1, 20 146:7,19 153:1,3

**questions** 7:7,8 8:14 12:11,12 61:2 94:1 108:13 111:22,25 136:22 139:1,2,4 140:3,4 142:24 147:16 149:4 150:5,20 151:7

**quicker** 121:1

**quickly** 62:19

**quote** 107:17 108:21, 22 109:6 110:9,10

**R**

**raise** 17:3,7

**raised** 63:12

**rambling** 110:24

**ran** 113:21 134:11,13

**Rancho** 23:7 89:20 97:1,2

**random** 19:23

**range** 123:1 135:7

**re-engage** 36:13 128:25 129:9

**re-plow** 110:7

**reach** 126:24

**reached** 27:17 104:21

**react** 120:22

**reactionary** 120:21

**ready** 18:18

**real** 91:7

**rear** 102:8,9,13

**reason** 6:24 15:25 17:17,18 19:21 28:18 137:11

**reasons** 55:19 120:8 149:23

**recall** 13:10 25:3,13,18 29:15 31:15 34:14,15 35:8,9,12,13 36:3,9 39:5 41:15,18 42:4 43:16,17 44:23 45:15 47:4 51:11 53:24 54:6 58:8 62:5,7,12,14 64:20 65:1 68:2 71:3,4, 22,25 73:19 76:19,21 81:6 85:15 88:8 98:9 106:1 111:12 112:5,7 117:24 135:24

**receive** 53:17,22 63:15,18 73:20 86:25 150:9

**received** 61:18 64:16 65:12 69:19 86:12,19 87:4,15,20,24 88:3 98:16 108:1 129:3 148:8 149:22 150:1,4,6 152:19

**recollection** 51:15 95:16 98:11,12,15 109:20

**recollections** 110:6

**recommendations** 84:19

**record** 5:8 6:16,25 8:3 12:11,14 16:8 34:4 74:24 75:3 76:25

**recorded** 55:21,24

**rectangle** 24:5,11 25:1

**red** 96:7

**reference** 95:3

**referenced** 108:20

**referred** 138:20

**refused** 31:1

**regard** 121:20

**regular** 138:11

**regulations** 9:2

**rehash** 105:4

**related** 52:9 81:11,16

**relation** 65:24 151:9

**relative** 122:5

**release** 31:18 40:7 125:5

**released** 36:11 40:15 101:20,25

**relevant** 56:21 58:1,4

**remain** 128:8 129:2

**remains** 152:7

**remark** 100:10

**remember** 20:17 25:9 39:19 44:20 49:17 51:12,14 54:3,4,6 56:20 64:19,22,24 75:10,14 86:24 88:2 99:1,2 111:6,7 128:6 135:18 136:25 141:4

**remembering** 20:21

**reminder** 93:23 95:11

**removed** 80:13,16

**rendered** 130:21

**renumbering** 12:2

**repeat** 82:5

**repetitive** 94:3

**rephrase** 7:13,17

**report** 12:7,11 16:1,5,9 54:8,11,13 55:9,14,18 56:11,21 57:2,23 65:5

94:16 95:9,22,23 96:2 98:19 99:5 100:2 101:20 103:3 108:18, 20 109:10 136:11

**reported** 19:14

**reporter** 5:24 6:15 7:4 11:21 23:15 32:12

**reporting** 55:7

**reports** 53:12 56:9 92:25 93:9

**represent** 5:10

**represents** 93:24 139:7

**reprimanded** 12:18, 22 13:1

**reproach** 9:11

**Request** 33:1

**requested** 79:25 81:20 107:2

**requests** 32:21 140:3

**require** 15:19 16:3

**required** 141:17

**requirement** 141:18

**requirements** 142:3

**reside** 8:5

**residence** 21:10

**resist** 105:16

**resisting** 106:3 137:6

**resonated** 64:23

**resort** 85:25

**respiratory** 87:17

**respond** 27:4,6

**responded** 109:22

**responding** 22:13 37:7 41:20 108:1 116:18

**response** 53:13 64:2 79:23 99:7 148:25

**responses** 32:21 140:3

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

responsibilities
136:24

responsibility 137:3

rest 64:24 74:21

restaurant 23:8 89:20
90:17 96:4,16,20,22,25

restrain 83:2,5 105:11
106:5 138:3

restrained 71:17
108:7

restraining 45:6

restraint 48:23,24,25
49:3 60:4,18 71:19
83:9,11 86:20 87:2,6,
13,18,22 108:7 110:21
137:24 152:6

restraints 106:15
107:3,21 134:8 137:21

result 18:25 66:2

resulted 14:13

return 134:6

returned 148:11

review 54:14 89:2

revise 58:7

RFOS 33:24

Ric 5:15

Rich 35:10 37:11
38:19,23 41:14 43:17
45:19 46:17

risk 87:5,9 143:22
145:9,18,21 146:5

risks 146:4

road 22:10,18,19,20,23
23:1,3,5,9,10 29:7
30:17,19,23 35:2 38:10
94:8 95:24 96:2 97:9,
13,21 100:12,13,15,25
101:7,23 102:5,14
107:25 109:21 111:12
112:19,22,23 113:3,5,
9,11,21 114:6,8,16
117:20 118:10,20
125:2,3 126:9,12,13
144:17 145:20,21

146:25

roads 22:8

roadway 114:17

roll 91:11 106:20

rolling 106:18 107:1

Ron 61:22

rooftop 96:15

room 44:1 67:14,16,17,
18 68:5,7 71:10 72:1,8
82:14 90:1,7,8,9,18
91:10,21 110:7,12
138:18,19,21

Rosen 74:5

Rosenberg 72:19
73:3,22 74:7,8

rough 127:13

row 26:1

rule 19:21

rules 6:13

run 18:18 39:24 97:13
133:19 145:18,21

running 30:16 31:3,11
32:5 38:6 39:20 40:15,
16 41:5,8,9 42:23
95:19,24 96:3 97:7,8,
12,20 98:20 101:22,23
102:1,14,16,17,20
103:6 104:14,16
116:20,21 118:9 125:2
127:2 133:17 143:19,
20 146:25

## S

S-C-A-L-L-O-R-N 8:4

S-T-E-L-L-I-N 32:13

safely 86:2

Scallorn 5:12 6:1,6 8:4
10:10 11:22 12:7,12
78:21,25 79:20 89:10
93:21 106:3 109:20
147:15

scenario 144:3
146:11,21

scenarios 18:17

scene 21:14,21 24:20
26:8,11,12 35:4 41:2
51:1,4,10 52:6 53:5
72:18 95:24 96:2 97:5
100:23 107:25 111:11
112:4 114:14 116:23
117:10 123:3 134:12
135:7,8 148:17

School 21:19

scream 28:14,17 92:5,
7 111:10

screaming 90:22 91:2,
8,11,12,24 92:13
106:21 107:1 110:24
111:6 124:4,5,16
149:12

screams 92:12

scrupulously 9:18

seconds 123:2,5
148:22,23 149:1

Section 83:22 84:11,
15,18,23

secure 105:20

send 53:22

sense 7:10,11 93:1

sentence 95:9 111:2

sequencing 111:25

sequential 11:14 12:2

service 21:9,11

set 32:21 44:11

sex 14:16

shackles 43:19,22
44:10 46:8,10,11,13
47:20 48:1,4,13,16
63:6,13,16 82:24 85:6,
10,14,18,22 86:4
134:13,14 135:12

Shapiro's 44:18

Sharpie 22:12

Shepherds 127:24

Sheriff's 64:7 142:18

shield 122:2,3

shift 16:15 20:24 21:1,
7 51:1 138:12 150:5,14

shirt 28:5,13 98:8,10
122:17 132:6

shocked 42:11 43:2,5

shooting 80:20

shopping 23:6

shorts 98:8,10

shoulder 23:9,10
112:10 125:2

show 75:9 96:7 103:13
104:8

showed 68:9 73:22

showing 43:7

shown 10:2 73:21 75:7
89:4

shut 122:17 134:11

side 35:1 38:8 39:4
49:9,12,13,19,21,23,25
50:3 62:19,25 91:16
97:19 104:24 121:23
129:15

simply 115:18

single 9:13 11:6

sir 6:7,9,19,23 7:6,14,
18 8:5,10,13,20,24 9:3,
8,12,16,21,25 10:4,8,
12,19,22 11:1,8 12:9,
20,24 13:2,5,14,19,22,
25 14:6,10,15,21,23
15:2,5,8,12,14,18,21,
23 16:2,6,17,23 17:2,5,
15 18:9,12,15 19:12,
16,20,24 20:3,7,10,13,
19,22 21:5,16,22 22:7,
10,24 23:11 24:1,3,17,
19,24 25:8,16 26:6,25
27:9,19,21,23 28:23,25
29:3 30:25 31:17,20,24
32:15,23 33:8,13,16
34:5,7,18,25 35:11,15,
18,20 36:1,5,20,24
37:2,6,16,18,22 38:5,9,
11 39:3,5,8,11,13,15,
17 40:12,14,18,21,25

**Jason Scallorn - November 30, 2016**

41:3,15,22 42:1,6,9,12, 14,21,24 43:1,8,11,14, 21 44:5,7,9,16,22 45:4, 9,24 46:23,25 47:2,11, 14,21,24 48:2,5,8,11, 14,20 49:1,4,22 50:7, 10,19,21 51:22,24 52:1,4,7,11,13,15,18 53:11,16,19 54:6,10, 19,23 55:1,16,22 56:1, 4,7,10,13,16,22 57:13, 21,24 58:2,5,12,21,24 59:5,7,12,16,19,21,24 60:8,15 61:5,12,21,23 62:5,7,9,16 63:2,14,17, 20 64:11,14 65:14,18, 22,25 66:3,10,14,17 67:7,10,12,22,24 68:21,23 69:8,11 70:2, 10,14,17,23 71:6,16,19 72:5,9,12,24 73:6,8,14, 17 74:11,14 75:14,15, 21,24 76:2,20,23 77:18,21,24 78:2,15, 17,19 79:9,11,13 80:4, 15,18,24 81:3,12,17,22 82:8,10,12,15,22,25 83:3,7,12,17,20,25 84:4,7,10,14,17,22 85:2,11,19 86:6,11,21 87:3,7,11,14,19,23 88:5,16,19 89:1,9,14, 21,24 90:2,12,19,23 91:5 92:6,14,17,21,24 93:4,16 94:9,12 95:7, 25 96:1,5,12,18,21 97:8,10,16,22 98:4,14, 17,18 99:4,11,16,19, 22,25 100:6,18 101:2, 9,14,16,19 102:7,9,10, 22,23 103:1,10 104:7, 12,17,22 105:2,9,19,23 106:2,7,9,11,21,23 107:7,9,14,15 108:5,8, 11,25 109:4,8,9,12,17, 24 110:2,4,15,17 111:1,11,15,23 112:25 113:13,16,22 114:4,10, 21 115:1,6,10,13,17,20 116:7,12,15 117:5,9, 13,17,22 118:3,21,24 119:12,13,24 120:10, 15 121:3,8,11,15,18 122:7,19,21 123:6,19, 21 124:15,18,21,24

125:6,11,17 126:4,14, 22 127:4,15,20 128:9, 13,19 129:1,6,18,21,24 130:4 131:5,8,13,16,21 132:11,14,18,21,24 133:2,5,8,16 134:1,5,9, 19,21 135:4 136:5,13, 15,19,21 137:1,5,13,17 138:9,25 139:3,15 140:1,24 141:12,15,23, 25 142:2,4,7,10,23 143:15 144:24 145:12, 14,17 146:12,14 147:1, 8,10,12,22 148:1,6,10, 14,18,21 149:3,7,10, 14,18,21,25 150:3,12, 16,19,25 151:4,17,20, 25 152:4,8,10 153:7

**sit** 20:4 58:6 72:25

**sitting** 7:9,20

**situation** 19:19 118:5 132:5

**situations** 141:11

**skin** 131:19 136:3

**skinny** 34:22

**skipping** 99:2

**slap** 128:7

**sleeping** 13:6,8

**sleeves** 19:2

**slightly** 23:20

**slow** 113:20

**slowly** 45:7 46:15 149:16

**small** 146:15

**Smith** 44:23,25

**smoked** 15:6

**snout** 128:22

**Snowden** 113:8 135:22

**social** 81:7

**soft** 91:8

**sort** 22:5 41:17 80:6

**sorts** 18:17

**sound** 28:16

**sounds** 93:8

**south** 22:20 26:5 39:4

**Southaven** 5:6,10,11 8:6,9,11 10:14,17 12:21 13:12 15:16 16:13 33:5 59:9,17,25 60:9 63:5,7 64:4 65:19 66:8 75:8 83:1,6,10,14, 22,23 84:3 85:9 86:10 87:1,5,9 88:11 97:17 139:7 151:12,18 152:19,23

**Southeastern** 5:18

**space** 120:9

**speak** 68:6 71:7 72:3 87:25 119:13 135:12

**speaking** 51:2,11 62:3

**special** 150:13

**specific** 142:6,8

**specifically** 84:23 135:19 136:12

**speculate** 69:3 109:24 110:1 122:25 135:10

**speed** 114:5

**spell** 8:3

**spelled** 139:13

**spit** 111:10 138:15

**spoke** 51:15 68:2,7

**spoken** 52:23 62:1 124:12

**sprint** 98:25

**sprinting** 98:22 102:20 104:14

**spurts** 138:11

**standard** 11:6 43:23

**standardly** 127:24

**standing** 25:21 28:1 29:10 32:6 36:16 72:7 121:23,25 122:9 123:13

**standpoint** 96:16

**staring** 119:17

**start** 6:21 18:25 20:23, 24 21:11 67:1 68:11,18 120:25 142:13

**started** 21:7 26:20 27:1,5 36:12 39:2 41:9 68:22 69:9 71:11 104:11,13 106:18,20 119:7 123:15 133:22 136:23

**starting** 11:15

**starts** 18:20 103:6

**state** 8:2 59:13 64:10, 13 101:20 111:1,3 112:25 141:18 151:22

**statement** 13:11 109:2

**statements** 27:8 52:8, 16,19

**States** 5:4

**station** 68:18,20

**stationed** 21:6

**stay** 38:22 66:25 68:12 110:25

**stayed** 36:14 129:20

**steel** 44:15

**stellin** 32:1,2,3,8,12 139:12,21,22 140:11

**stick** 34:3

**stipend** 17:6

**stood** 123:12

**stop** 30:9 99:9,18 119:16 125:14 126:3

**stopped** 24:5 25:9,15 36:21 140:19

**stopping** 23:4

**straps** 71:20

**street** 143:21

**strike** 144:6 151:6

**strikes** 103:5

**struck** 104:9,10 130:1, 9

**Jason Scallorn - November 30, 2016**

struggle 105:22,24
133:23

stuck 72:16,20

study 141:10

stuff 44:14 54:1 55:4
74:18

subdue 130:22

subdued 152:2

subject 81:23 106:24
107:18 111:2

subject's 107:12

submit 134:24

substantial 129:4

suffering 149:24

suffocating 149:17

suit 139:20

Summer 44:18 147:19

summertime 69:2

sun 69:2,3

Sunday 14:7

supervising 120:14

supervisor 16:15 51:1
54:14 72:17

supervisors 86:3

supplement 20:14
55:9,14,18 94:16 99:5

supplemental 57:1
95:9,23 100:2 103:2

supply 54:2

supposed 8:22 9:1,4
84:5,8 137:16 139:22

surprise 34:20,23
144:23 145:1,7 152:11,
18,21 153:3,5,9

surrender 134:20

suspect 17:11,24
31:23 60:2 61:8 84:13,
21 85:6,14,18,22 86:5
87:16 119:19 125:14
126:3 127:11,12
129:10 137:4,6,8,12

138:8 140:18 148:5
150:23 152:2

suspect's 140:16

suspects 128:3 150:6,
7

suspicion 9:15

swear 5:25

swinging 112:19

sworn 6:2

system 54:18 55:7

––––––––– T –––––––––

Tahoe 26:14 29:9
30:14 32:6 46:5
121:22,23 122:10
123:10,13

Tahoe's 121:25

takes 109:18

taking 51:18 96:6

talk 10:13 18:1 20:16
51:3,9 52:5 53:2,7
55:17 59:8 64:3 66:20
67:25 68:3,13 78:25
82:3 88:14 118:11
125:7 132:15 147:17
151:9

talked 16:5 31:21 53:5
65:3,4,11 75:6 140:5
147:23 148:7

talking 7:9 25:21 49:16
61:2 62:8 73:9 98:1
112:10

tall 34:12

taller 34:15

tangled 132:19,22

taser 41:21 42:3,5,11,
16 43:3,6,7 45:25
104:18 121:5 131:7,9,
11,23 132:5,12,16
142:6

tasing 105:3,8

taught 139:19

TB 25:1,23 98:3 108:17

teach 61:22 120:20

tearing 29:17

technology 53:8

television 13:18

telling 30:25 51:13
124:7 133:11 139:24
140:10

Ten 21:2 141:8

Tennessee 5:5

term 106:19

terms 100:14,24

test 10:24 12:8,17
15:16

testified 6:3

testimony 11:24 23:17
26:19 31:12 34:9 36:2,
15,25 42:10,22 57:9
58:16 76:7 77:8 78:5
86:16 88:2 95:4 106:9
110:8

tests 80:22

TG 25:1 37:19,24

thin 34:22

thing 7:1 19:2 54:16
80:3 119:15 120:20
135:19

things 7:10 16:4 19:1
93:1 119:21 120:16,23
141:10 147:6,7 150:18

thoroughfare 114:9

thoroughfares 113:14

thought 8:22 56:20
58:1,4 80:14,17 118:22

thrashed 110:21

thrashing 110:9,18

three-quarters 114:2

throwing 147:6

Tim 50:25

time 5:2 7:21 13:6,10
17:23 24:9 26:9 29:16

30:16 31:2 36:10
37:10,20 39:9 42:15
45:14 46:6 47:5 48:15
50:25 66:13,22 68:9,
24,25 70:1 71:13,14
72:17 74:25 75:4 78:11
89:25 90:13,17 91:15,
19 95:13 97:9 98:25
99:3,8 101:24 104:10
106:22 109:20,24
110:1,14 111:10 113:3,
6 116:1 122:22,23
123:1,3,4,12,18,24
130:11,13 133:22
134:7,15,16,22 135:7,
11 138:23 140:12
148:23 153:14

timeline 103:4

times 12:17,25 13:4,8,
13 14:11 15:7,13
19:11,13,17 64:17
66:18 82:4 85:13,16,19
90:21 100:10 138:10

tip 96:8

today 5:1,12 7:8 20:4
58:6 63:21 72:25
88:10,15 89:4 136:23

Todd 24:22,23 25:19,
23 35:5,6 38:17

told 12:21 14:1 34:20
38:22 52:25 70:1 88:22
99:6 106:14 109:8
115:11 118:19 135:17
136:12

tolerated 10:6

tongue 136:3

tons 113:4

tool 137:24

toolbox 137:25

topic 89:16

totally 143:18

town 64:25

toys 19:1

tracks 55:24

traffic 30:17 100:15,25
101:22,23 113:24

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

114:1,3 145:16

**trail** 132:8

**train** 19:25 64:25 139:17 142:17,21

**trained** 62:24 63:3 64:12 82:7,9,11 127:10 128:11,24 129:9,16 141:13 152:9,16,22,25

**trainers** 142:19

**training** 16:4,21 18:11, 14,17 19:15,22 20:13 31:22 61:18,19 64:16 82:4,13,16,23 83:2 86:12,19,22,23,25 87:4,15,20,24 88:3,7 127:9 129:8 139:19 140:23 141:1,7,9,16,19 142:6,9,11,12,16 147:24 148:8 149:22 150:1,4,6,9,21,22 151:1,5 152:12,19

**trains** 152:12

**transition** 109:19

**transport** 60:10,19,21 61:8 89:22 109:23

**transportation** 66:12

**transported** 60:13

**transporting** 60:17

**traveling** 22:13

**treatment** 9:24 127:13

**Tree** 8:6

**Trey** 5:18 111:21

**trip** 38:21 40:19 133:1

**tripped** 35:23,24 37:20 38:3,5,13 42:13,17,18, 22 45:8 133:3,16

**trouble** 10:11 13:24 92:20,23

**Troy** 21:14 22:6 56:12 57:19 66:7,16 111:8 148:12

**truck** 46:11 48:3 102:4, 19 119:5 134:13 143:13

**trucks** 146:11,13

**true** 33:14 58:10 116:24

**turn** 49:8,11,13

**turned** 40:16 41:8 48:16 49:21,23,25 50:3 104:11,13

**turning** 113:1

**two-lane** 112:23

**type** 53:12 82:11 136:14 141:19

**typically** 128:23

**U**

**U.S.** 52:14

**uh-huh** 7:2 53:13 64:2 79:23 99:7 148:25

**uh-uh** 7:3

**ultimately** 105:20,24

**unbecoming** 14:13

**uncooperative** 107:19 108:6

**understand** 7:12 26:19 31:12 33:10 80:11 95:4 103:3,6 105:10 110:19 112:22 117:25 125:8 127:16 131:10 147:5 151:18

**understanding** 60:1 75:25 94:7 105:5

**understands** 127:9

**understood** 7:16 109:14,16 139:2

**unintelligible** 27:13 110:24

**unique** 54:24 55:2

**unit** 128:24

**United** 5:3

**unlock** 148:19

**unlocked** 149:1

**unnecessary** 9:7

**unspoken** 85:21,24

**unspooled** 132:16

**unsullied** 8:18

**unwarranted** 10:5

**Upchurch** 5:20 62:21 93:17,20,21 94:13,20 95:1,21 96:13,14 100:19,21 101:3,10 102:6 103:25 104:3,5 106:8,13 107:8,24 109:1 110:16

**upload** 67:8

**upset** 109:16

**usage** 15:3

**utilized** 84:16

**V**

**vaguely** 88:2

**vehicle** 24:2,5,23 26:13 102:8,9,14 104:21,24 115:4 121:20,22,24 122:1,20 134:4,7,10 146:9

**vehicles** 113:20

**venue** 113:12

**verbal** 17:19 27:1 99:9 100:4 101:12 102:24 108:3 151:8,9,11

**verbalize** 93:7

**verbally** 119:3

**version** 23:20

**versus** 5:5

**vicinity** 89:19

**video** 92:8

**videos** 80:20

**view** 22:5 94:17 122:5, 8 130:7

**violated** 66:7

**violence** 9:7

**visibility** 39:14

**visiting** 12:22

**voice** 91:23

**Volkswagon** 146:16

**W**

**walk** 29:14 114:25 119:8,14

**walked** 26:13,15,24 46:4,6 51:15 70:1 71:8

**walking** 26:20 30:14 99:9 102:17

**wanted** 56:18 70:6 136:8

**warning** 121:17

**warrant** 58:19

**watch** 14:8 110:2

**watching** 13:17 110:2

**weapon** 39:6 131:17

**wearing** 98:8,9,13

**Weasel** 18:4,5,6,7 19:7 29:8,10 104:10 127:18 129:12

**weaving** 144:17

**Wednesday** 142:21

**weeks** 141:2,8

**weighed** 34:16,20

**weight** 20:4,7,12 147:19,20

**welfare** 126:6

**well-trained** 147:24

**Wessel** 18:3,4,6,10 27:22,24 35:3 36:8,9, 10,11,12,15 37:4,10 39:18 40:15 127:18,19, 21 128:2 129:14 133:18 134:3,9 147:18

**Wesson** 44:23,25

**west** 31:3 39:20 64:19, 22 95:24 97:17,19,20 102:4,14 104:24 113:1

## Jason Scallorn - November 30, 2016

125:2

**western** 5:4 38:8

**wheel** 143:23

**wheeling** 50:14

**white** 98:8,10 116:19

**Widespread** 30:21
135:21

**wife** 78:22,23 79:2
88:17 94:8 97:24
108:10 116:20 144:8

**winter** 147:20

**wire** 132:8

**wires** 42:17,23 131:15
132:15,16

**witnessed** 85:17

**Wood** 50:25 68:9,14
70:1,16 71:1,5

**word** 6:15 54:19,22
125:13 139:11

**words** 93:8 146:3

**work** 19:19 53:6 64:4
74:3 104:6 113:4
138:12

**worked** 64:6,9,21
114:13

**working** 8:11 71:11

**worried** 27:11,12,15
130:12

**worry** 7:20 119:20

**worse** 143:22 144:2
146:21

**worst** 143:17

**wound** 75:23 77:20

**wounds** 67:3 73:7,12
77:22

**wrecks** 30:18 113:4

**wrist** 76:22

**write** 7:4 25:1 96:21
97:2 103:22 107:17
109:18

**written** 62:11

**wrong** 51:16

**wrote** 52:22 56:14
72:17

### Y

**yards** 38:15 91:17
112:16,17 114:18,19
117:20 126:10,12,13
127:1

**year** 141:21

**yearly** 141:17

**years** 6:11 44:3,19
64:21

**yelling** 68:4 90:22
91:2,8 107:1 111:6
124:1,22

**yesterday** 88:11 89:3

**Youtube** 79:12,17
80:3,17,19,25 81:4

### Z

**zigzag** 117:23

**zigzagging** 26:23
114:24 115:5