IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

---

KELLI DENISE GOODE, Individually, and also as the Personal Representative of Troy Charlton Goode, Deceased, and as Mother, Natural Guardian, and Next Friend of R.G., a Minor, and also on Behalf of all Similarly Situated Persons,

Plaintiffs,

VS.

Civil Action No. 3:17-cv-060-DMB-RP

THE CITY OF SOUTHAVEN, TODD BAGGETT, Individually, JEREMY BOND, Individually, TYLER PRICE, Individually, JOEL RICH, Individually, JASON SCALLORN, Individually, STACIE J. GRAHAM a/k/a WITTE, Individually, MIKE MUELLER, Individually, WILLIAM PAINTER, JR., Individually, BRUCE K. SEBRING, Individually, JOSEPH SPENCE, Individually, RICHARD A. WEATHERFORD, Individually, JOHN DOES 1-10, BAPTIST MEMORIAL HOSPITAL - DeSOTO, A Mississippi Corporation, SOUTHEASTERN EMERGENCY PHYSICIANS, INC., A Tennessee Corporation, and LEMUEL DONJA OLIVER, M.D.,

Defendants.

---

COPY

DEPOSITION OF MARK W. FOWLER, J.D, M.D.

October 20, 2017

---

AMY THOMAS EPSTEIN, RPR, LCR/CCR(TN), CSR(MS)
Riverside Reporting Service
434 Jason Drive
Memphis, Tennessee 38120
(901) 767-4025

The Deposition of MARK W. FOWLER, J.D, M.D. taken October 20, 2017, beginning at approximately 9:00 o'clock a.m., in the offices of Ballin, Ballin & Fishman, Suite 1250, 200 Jefferson Avenue, Memphis, Tennessee, pursuant to Notice to the parties, for any and all purposes allowed under the Federal Rules of Civil Procedure on behalf of the Defendant, Baptist in the above-styled cause.

All forms and formalities, excluding the signature of the witness, are waived. Objections, except as to the form of the question, are reserved, to be presented and disposed of at or before the hearing. Objections as to the form of the question must be made at the taking of the deposition.

A P P E A R A N C E S

For the Plaintiff:

KEVIN M. McCORMACK, ESQ.
Ballin, Ballin & Fishman
Suite 1250
200 Jefferson Avenue
Memphis Tennessee 38103

JAMES F. GARRETT, ESQ. (Via Telephone)
Eastland and Garrett
P.O. Box 3059
Oxford Mississippi 38655

For the Southaven Defendants:

L. BRADLEY DILLARD, ESQ.
Mitchell, McNutt & Sams
P.O. Box 7120
Tupelo Mississippi 38802

For the Defendant, Baptist:

DAVID W. UPCHURCH, ESQ.
JOHN MARK McINTOSH, ESQ.
Upchurch & Upchurch
P.O. Drawer 2529
Tupelo Mississippi 38803

For the Defendant, Southeastern:

MATTHEW R. MACAW, ESQ.
McDonald Kuhn
Suite 330
5400 Poplar Avenue
Memphis Tennessee 38119

A P P E A R A N C E S (Continued)

For the Defendant, Dr. Oliver:

MARTY R. PHILLIPS, ESQ.
Rainey, Kizer, Reviere & Bell
P.O. Box 1147
Jackson Tennessee 38302-1147

JAMES R. GASS, ESQ.
Gass Weber Mullins
Suite 300
241 North Broadway
Milwaukee Wisconsin 53202

# I N D E X


| | PAGE |
|---|---|
| DIRECT EXAMINATION BY MR. UPCHURCH | 6 |
| CROSS EXAMINATION BY MR. MACAW | 166 |
| CROSS EXAMINATION BY MR. DILLARD | 167 |
| CROSS EXAMINATION BY MR. PHILLIPS | 177 |
| CROSS EXAMINATION BY MR. McCORMACK | 198 |
| REDIRECT EXAMINATION BY MR. UPCHURCH | 213 |


# E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | third renotice of deposition | 6 |
| 2 | C.V | 27 |
| 3 | List of Documents or Material Reviewed in Preparation for Deposition | 39 |
| 4 | case list | 42 |
| 5 | 42 CFR 482.13 and the interpretive guideline | 124 |
| 6 | Emergency Medicine Patient Safety Foundation document | 151 |
| 7 | soft restraint instructions (TO BE SUPPLIED) | 193 |
| 8 | depositions reviewed with color markings | 213 |

MARK W. FOWLER, J.D, M.D.

after having duly affirmed, was deposed and testified as follows:

(Whereupon, Exhibit 1 was marked as an exhibit to the deposition of the witness and can be found among the deposition exhibits attached hereto.)

THE WITNESS: I affirm the obligation to speak the truth.

DIRECT EXAMINATION

BY MR. UPCHURCH:

Q. Dr. Fowler, good morning. My name is David Upchurch. We met just prior to your deposition today. In preparation for your deposition I know that you have had experience in this arena before, so I'll dispense with the customary instructions except to say if you don't understand a question that I ask, would you please let me know that?

A. Good morning. Yes, sir, I will.

Q. All right, sir. My second statement to you by way of introduction will be that if you need to look at any of the materials that you have that you've brought with you in response to any question that I have, you know and understand, do you not, that you

are free to do that at any time?

A. Yes, sir.

Q. This is not intended to be a marathon session, although I do think it will take us some time to go through your opinions today. So if you need a break at any time, would you please let me know that? And we'll take a break at your convenience.

A. Yes, sir, I will.

Q. State your full name.

A. My full name is Mark W. Fowler.

Q. You live where?

A. My home address is 4175 Clifford Rives, R-I-V-E-S, Road, Union City, Tennessee 38261. May I add my mailing address is P.O. Box 2022, Union City, Tennessee 38281?

Q. Your date of birth?

A. 8-13-1957.

Q. Dr. Fowler, I have premarked as Exhibit 1 to your deposition a copy of the third renotice of deposition which schedules your deposition here today, although we've altered the time by one hour. Let me hand you that notice of deposition.

Have you seen that notice of deposition prior to today?

A. Yes, sir, I have.
Q. You know that that notice requests you to bring certain items to the deposition with you, and I want to go through those items. Item number one asked you to bring the entire consist of your litigation file. Did you do that?
A. Yes, sir.
Q. Is that the folders that you have in front of you?
A. Yes, sir, it is.
Q. The information that we have that was provided in the two expert reports that you have authored indicate that you have reviewed the following materials, and I want you to confirm whether or not you have received and reviewed these materials. One would be the medical records of Baptist-DeSoto Hospital for Mr. Goode's July 18, 2015 admission.
A. Yes, I have reviewed that, yes.
Q. Item number two, the deposition of Stacie Graham.
A. Yes, sir.
Q. The deposition of Ms. Graham, did you receive the transcript or exhibits or both?
A. Just the transcript.

Q. Same question, number three, the deposition of Dr. Oliver?
A. I received the transcript.
Q. And reviewed?
A. Yes.
Q. Without exhibits?
A. Yes.
Q. Four, deposition of Jeffrey Baker. Reviewed?
A. Yes.
Q. Without exhibits?
A. Without exhibits, yes.
Q. Next item, deposition of Paul Flock. Received and reviewed?
A. Yes, without exhibits.
Q. The next item identified in your expert report is a factual narrative. Could you identify for us what factual narrative you received from counsel for Mrs. Goode?
A. The precise answer to that question is as follows. While I have probably received one, it does not strike me presently that I received it in writing, probably orally from Mr. McCormack and Mr. Edwards. If there is such a document, I'd like to see it.

Q. Do you have in front of you your initial report that was dated January 13, 2017?
A. I do not. May I see that, please?
Q. (Counsel complies with request.).
A. Thank you, sir.
MR. GASS: Dr. Fowler, you're a little on the soft spoken side.
THE WITNESS: Yes, sir.
MR. GASS: And I'm not hard of hearing, but I'm having a little difficulty. Would you keep your voice up? I appreciate it.
THE WITNESS: Not a problem, sir, will do it.
All right, Mr. Upchurch. Go ahead.
BY MR. UPCHURCH:
Q. Look with me, please, sir, at the first paragraph, the last sentence. It states: I have also been provided by counsel for Mrs. Goode a factual narrative compiled from various depositions taken for case preparation.
Did you, in fact, receive, as you indicate in your report, a factual narrative?

A. The fact -- the sentence you refer to does not refer to a written factual narrative, and so in response to your question it is not a document that comes immediately to mind; but I have received verbal reports from Mr. Edwards and Mr. McCormack.
Q. Can you identify for us within the verbal reports that you received what various depositions were reported to you on other than the depositions that you have told me you have received and reviewed without exhibits?
A. Would you bear with me just a second while I review the materials that I have?
You have asked me about various materials that I have received. I will supplement my response as follows. I have the Southaven Fire Department transport record of the ambulance.
Q. Yes, sir. I hadn't asked you that yet. I'll do that. The question that's pending is about the factual narrative.
A. As I have indicated, the factual narrative would have been in oral form insofar as I remember. I do not specifically remember a written summary.
Q. All right, sir. Do you remember -- can

you identify for us any of the depositions or the deposition testimony that was reported to you in oral form by counsel for Mrs. Goode?

A. Do I remember that summary? Yes, uh-huh (affirmative).

Q. All right, sir. Tell me the depositions, that is, the deponents, for whom you received an oral summary.

A. Mr. Todd Baggett, Mr. Jeffrey Wayne Baker, Mr. Paul Eric Flock, I did not receive one for Creseana Gist but I have the deposition in front of me, Stacie Graham, and Dr. Oliver. I have the videotaped deposition of Matthew Price, I don't recall specifically that being detailed for me, and the videotaped deposition of Joel Rich and the videotaped deposition of Jason Scallorn and the videotaped deposition of Janet Tidwell as well as the deposition of Mrs. Goode; and the oral presentation would have been a relatively short narrative setting the stage for my evaluation of these materials.

Q. All right, sir. You identify in your initial report that you have reviewed Baptist-DeSoto's responses to requests for admissions dated January 19, 2017. Is that accurate?

A. I have reviewed them. I have not reviewed them recently.

Q. All right, sir. You indicate that you've reviewed the expert report of Michael LaRochelle, D.O. Did you review that report?

A. Would you say that name again, please?

Q. Yes, sir. Michael LaRochelle, ER physician who has been identified on behalf of Southaven defendants.

A. I have reviewed that report, yes, sir.

Q. All right. Expert report of Allen Jones, M.D.?

A. I have reviewed that report, but not recently, yes.

Q. Expert report of Michael Revelle, M.D.?

A. Yes, I have reviewed that report.

Q. Expert report of Frederick Carlton, M.D.?

A. Yes.

Q. Expert report of Michael Stodard, M.D.?

A. Yes.

Q. Do you know any of the doctors that I just listed, Drs. LaRochelle, Jones, Revelle, Carlton, or Stodard? Do you know any of them personally?

A. Yes, sir, I do.

Q. Which ones?
A. Revelle.
Q. How do you know Dr. Revelle?
A. Dr. -- actually his name is pronounced Revelle, but Dr. Revelle and I attended undergraduate prescience requisites for medical school and medical school together.
Q. Do you know any of those physicians that I named by reputation?
A. I do not.
Q. Other than Dr. Revelle?
A. No, sir, I do not.
Q. You identified that you reviewed a copy of 42 CFR 482.13. Did you review that?
A. Yes.
Q. You identified a photograph of Midazolam or Versed?
A. Yes.
Q. That is a photograph of what?
A. It's a vial of medicine.
Q. And who provided you with that photograph?
A. Probably Mr. Edwards.
Q. And what is the significance of that vial

of Versed?
A. It's a vial of Versed. Versed is in the benzodiazepine class and used for sedation.
Q. You identified that you reviewed a postmortem photograph of Mr. Goode.
A. Yes.
Q. Do you have that in your file?
A. I don't think so, no. I don't think so.
Q. Could you look?
A. (Witness complies with request.)
If you have a copy, I'll be glad to reference that. I have, as you can see, several hundred pages here. I have seen the photograph that you're referring to, but whether or not I can identify it in a reasonable period of time is up in the air.
Q. Let me say, there have been multiple photographs of Mr. Goode produced, and so I was -- my interest in whether -- is whether you can identify the particular photograph that you received.
A. That's going to take me some time to do. If we want to move through the deposition and talk about any photographs that you want to produce, that will be fine.
Q. Yes, sir. My question is do you have it

in your file?
A. I don't think I have it in my file.
Q. All right, sir. You indicated that you reviewed Baptist discovery pages 52 through 60. Did you review that discovery in preparation for your opinion?
A. I don't have a present recollection of that, no.
Q. There is a document identified Emergency Patient Safety Foundation's Restraint and Seclusion Safety Briefing. Did you review that document in preparation for your reports?
A. Yes, I did.
Q. Is that a document that you obtained on your own, or was that provided to you?
A. Provided by plaintiff's counsel.
Q. You indicated that you planned to review the deposition of the corporate representative of Baptist Hospital DeSoto. That representative was Brady Simpson. Did you receive and review Mr. Simpson's deposition?
A. I don't have a present recollection of seeing that.
Q. Now, earlier in our discussion you

identified some additional deposition transcripts that you have received, and I believe if my notes are accurate those included the deposition of Todd Baggett?
A. Yes, sir.
Q. Included the deposition of Ms. Creseana Gist?
A. Yes.
Q. Included the deposition of Mr. Price?
A. Yes.
Q. Included the deposition of Joel Rich?
A. Yes.
Q. Included the deposition of Mr. Scallorn?
A. Yes.
Q. Included the deposition of Janet Tidwell?
A. Yes.
Q. And the deposition of Mrs. Goode?
A. Yes.
Q. Again, those transcripts were provided to you without exhibits?
A. Yes.
Q. Those seven additional deposition transcripts that you've identified for us, were those received after your supplemental report was authored,

which report was dated I believe February 26, 2017?

A. I can't speak to that. As you know, the deposition -- my deposition was set some time ago. The only deposition I remember receiving subsequent to the initial report was that of Creseana Gist.

Q. All right, sir. In your supplemental report you identify the additional records that you had reviewed --

A. (Interposing.) May I see that, please?

Q. Yes, sir. Don't interrupt my question, please, sir.

A. I understand; but bear in mind -- wait a minute. Bear in mind you're asking me about a document without producing the document in front of me, and I don't want to get tangled up on he said/she said without the document in front of me so that I can review the document preparatory to answering the question.

Q. This isn't a he said/she said question.

A. Yes, it is. So, again --

Q. (Interposing.) Do you have your supplemental report in your file?

A. Let me look.

Q. All right, sir.

A. If you have it, let me refer to the one you have.
Q. I want to know if you have it in your file.
A. Well, as I indicated to you, Mr. Upchurch, and as you can see, the file is several hundred pages. So it will take me a few minutes to work through the file.
All right. You're referring to a supplemental report dated July 26, 2017; is that correct?
Q. Yes, sir. I may have misspoke about the date. I couldn't read the --
A. (Interposing.) And this is the problem that we're getting into. I want to see the document before I answer any questions about it, please, sir.
Q. You have it in front of you; do you not?
A. I'm asking you. The supplemental report that I have is dated July 26, '17. If you have a document other than that, let me see it before I answer questions about it.
Q. We're looking at the same document.
A. All right, sir.
Q. If you'll look at -- in the first

paragraph you'll see about four lines down you say that you have been provided with and considered the following materials, that is, the following materials since the issuance of your initial report.

A. Uh-huh (affirmative). Sorry, yes, sir.

Q. Would it -- would it be logical to presume that if you had had the additional seven deposition transcripts that you've identified for us at the time that you authored your supplemental report that you would have delineated those for us?

A. Would you repeat that question, please?

Q. Yes, sir. That is, the seven additional depositions that you identified for us are not included in your original report, and they're not included in your supplemental report.

A. All right. Just a second. Referring now to the report of Mark W. Fowler, J.D., M.D., which is dated 1-13-2017, will you pull that document out, please, sir?

Q. I'm not here to respond to your questions.

A. I'm not here to respond to trick questions, Mr. Upchurch.

Q. No trick --

A. (Interposing.) Let me --
Q. (Interposing.) Listen.
A. Let me complete my response.
Q. No, sir. There is no trick questions.
A. Yes, sir, there is.
Q. We're looking at reports that you have in front of you, and I'm just trying to understand what you've reviewed and when you've reviewed it. That's not a trick question.
A. Well, let me --
Q. (Interposing.) No, sir.
A. We can finish the deposition now if you want to, but I'm going to respond to what you're inquiring about.
Q. I'm going to let you respond.
A. Okay. Let's move along then.
Q. You're not going to interrupt me.
A. All right, sir. Let's move along.
Q. And I'm going to express my question, and I'll certainly extend the same courtesy to you to answer.
A. Please repeat your question.
Q. All right, sir. Look at your initial report.

A. I'm looking at it.

MR. McCORMACK: David, do you mean the initial or the supplemental?

MR. UPCHURCH: The initial.

MR. McCORMACK: All right.

MR. UPCHURCH: I want to respond to Mr. Fowler's concerns -- Dr. Fowler's concerns, pardon me.

MR. McCORMACK: Thank you.

BY MR. UPCHURCH:

Q. In that report you delineate -- you identify four depositions that you had received and reviewed, those being of Ms. Graham, Dr. Oliver, Mr. Baker, and Mr. Flock, correct?

A. That is correct, yes.

Q. All right, sir. Now, if we look over at your supplemental report, again looking at the first paragraph, there are no additional deposition transcripts identified, correct?

A. Correct.

Q. So my question to you is does it appear to you that you received the seven additional transcripts that you've identified for us today after execution of your supplemental report?

A. I presume that is reasonable to conclude. The precise timing of when I got all these reports and so forth and so on is a little bit difficult to pin down. Sometimes they come -- I don't know the particular dates of the depositions, but they are furnished to me some time after they're taken; and in that continuity of back and forth, reports are submitted as requested by Mr. Edwards. He provides me with additional depositions, and I review them. The precise timing of who did what when would be difficult to pin down.

Q. Well, certainly you've mentioned your legal degree prior to our deposition. You would understand that in preparing these reports, you are obligated to list for us the materials that you've reviewed. You understand that; do you not?

A. Well, to the extent that they have some bearing on my opinion, I suppose that would be correct, yes.

Q. Now, I think that we have gone over all of the materials that are identified in your two reports. Plus you've identified seven additional transcripts that you've reviewed. Are there other materials in your file that you have reviewed in

connection with your medical legal review of this case?

A. I would say that we have had an extensive discussion of the materials that I have reviewed, and to the best of my knowledge that discussion is now complete as I have indicated to you previously with respect to what I reviewed in determining and in forming the basis of my opinion in this case.

Q. I think you were mentioning to me early on that you received EMS records in addition to the hospital records?

A. I did, in fact, say that, yes, sir.

Q. How many pages of EMS records did you receive?

A. Let's see.

Five pages of EMS records.

Q. Are those numbered in any fashion?

A. Yes, sir, they are. They appear to be numbered by the generation of the records themselves. They do not have Bates numbers on them if that's what you're asking.

Q. All right, sir. Have we now discussed the entirety, Dr. Fowler, of the records or materials that you have reviewed in connection with the opinions

that you plan to express in this case?
A. To the best of my knowledge we have, yes, sir.
Q. Do I understand correctly, then, that you have not reviewed any policies or procedures from Baptist-DeSoto Hospital?
A. I knew this was coming. Yes, I have reviewed many records, Mr. Upchurch. I cannot specifically name the scores of records individually that I have reviewed, but I will be glad to answer any questions that you have to the extent that you have a record that you want me to discuss. Okay? Do I remember each one? I do not.
I'm doing the best I can; and I, frankly, have never been through a deposition where I had to be cross-examined about how many records I reviewed. So I'm glad to answer your questions to the best of my knowledge. Do I remember specific Baptist policy record? I do not remember specifically, no, sir.
Q. Thank you, Dr. Fowler. Do you have any Baptist policies and procedures in the litigation file that you've brought with you in response to the notice of deposition?
A. Not to my knowledge.

Q. Can you identify for us by name or title any policy or procedure that you've reviewed from Baptist Hospital in connection with your review of this case?
A. Not to my knowledge, no.
Q. Can you identify any correspondence that you've received from plaintiff's counsel that would have attached or provided you with any copy of a Baptist-DeSoto policy or procedure that's been produced in this case?
A. Not to my knowledge.
Q. Item number two asks you to bring with you a copy of your C.V. Did you do that?
A. Yes, sir. That's previously been furnished to you.
Q. Let me show you what we've been provided, Dr. Fowler. It may be easier and more expeditious if you could review it and just confirm whether or not that is an up-to-date copy of your C.V., please, sir.
A. Bear with me just a second. You asked me to find it in my file, and I found it. Okay?
Q. No, sir. My question was did you have it.
A. Do I have it in the file? I have it in

the file, yes, sir.
Q. All right. If you would hand that to me, please?
A. (Witness complies with request.)
Q. This would be a current up-to-date copy of your C.V.?
A. Yes, sir.
Q. We'll mark that as Exhibit 2 to your deposition.

(Whereupon, Exhibit 2 was marked as an exhibit to the deposition of the witness and can be found among the deposition exhibits attached hereto.)

MR. PHILLIPS: Is the notice number one?

MR. McCORMACK: Yes.

MR. PHILLIPS: Thank you.

BY MR. UPCHURCH:
Q. Let me hand that back to you. I understand from the review of your C.V. that you would have graduated U.T. Martin in 1980 undergraduate?
A. That's correct.
Q. You had the good fortune of being a Rotary Scholar it appears and studying in England?

A. That's correct.
Q. Would that have been in the year following your graduation from U.T. Martin in 1980?
A. That's correct.
Q. You then went to U.T. Knoxville College of Law obtaining a J.D. in 1984?
A. That's correct.
Q. As far as education goes, you then obtained an M.D. from the U.T. College of Medicine in 1999?
A. That's correct.
Q. It appears that you completed an accelerated residency in family medicine in 2001?
A. Yes, sir.
Q. And where was that residency training completed?
A. Covington, Tennessee.
Q. Through which hospitals?
A. Baptist Hospital, Baptist Memorial Hospital of Tipton County.
Q. An accelerated residency is performed in how many years?
A. Three.
Q. What does an accelerated residency mean?

A. It combines the fourth year of medical school -- traditionally the fourth year of medical school has three years -- three months in which you can go on vacation, you can look for jobs, you can take time off. They collapse the fourth year of medical school and the first year, also known as the intern year, into one year.

Q. Have you ever entered or completed residency training in the field of emergency medicine?

A. No, sir.

Q. You are board certified in what field or fields?

A. Family medicine.

Q. Have you ever been board certified in the field of emergency medicine?

A. Mr. Upchurch, I'm board certified in family medicine only.

Q. All right, sir. Are you Board eligible within the field of emergency medicine?

A. Mr. Upchurch, I'm board certified in family medicine only. I have not attempted training in emergency room medicine, no, sir.

Q. Does the fact that you have not had training -- residency training in emergency medicine,

does that render one uneligible to sit for the emergency medicine boards?

A. I have no idea. It's not a question with which I am concerned.

Q. Your C.V. indicates -- a review of your C.V. indicates that you practiced law it appears from 1984 through 1994?

A. That's correct.

Q. Where was your law practice located?

A. West Tennessee.

Q. Where was your physical office located, what county?

A. Union City, Tennessee; Obion County, Tennessee.

Q. Based upon my review of your C.V. you were engaged in the practice of emergency medicine from 2000 to 2001 at Baptist Hospital in Tipton?

A. Yes.

Q. Why did you leave there in July of 2001?

A. To return to Union City to join the clinic in Union City.

Q. That would have been a family practice clinic?

A. Yes.

Q. It appears you also served as a part-time ER physician from 2001 to 2005 in Union City?
A. Yes.
Q. What was the name of that hospital? Is it Baptist-Union City?
A. Baptist Memorial Hospital Union City.
Q. All right, sir. Then there appears to be a hiatus of two years before you returned to full-time ER work in 2007 through 2009 again at Union City; is that accurate?
A. Yes.
Q. It appears that you had a short stint at Humboldt General Hospital from November 2007 to January 2008 as an ER physician?
A. Yes.
Q. And then you worked from '09 to April of 2013 as an ER physician at Baptist-Tipton?
A. Yes.
Q. From April '09, which is when your C.V. indicates that you began staffing the ED at Baptist-Tipton, through April 2013 were you employed on a full-time basis?
A. Repeat the question, please.
Q. Yes, sir. Were you working as a

full-time emergency medicine physician or Emergency Department physician from April '09 through April 2013?

A. Yes, sir.

Q. Who was your employer at that time?

A. Probably TeamHealth Physicians.

Q. Have you practiced -- have you staffed an Emergency Department since April of 2013?

A. No, sir.

Q. Where do you hold a medical license, what states?

A. Tennessee.

Q. Have you ever held a license in any other state?

A. No, sir.

Q. Has your medical license ever been adversely impacted upon in any way?

A. No, sir.

Q. Have you had privileges to staff an Emergency Department since April of 2013?

A. I don't recall. I don't think -- never been revoked. I may have terminated my employment, but without revocation of the privileges.

Q. And why did you terminate your employment

at Baptist-Tipton in April of 2013?
A. Wanted to explore other opportunities.
Q. Do you currently have admitting privileges at any hospital?
A. No, sir.
Q. When was the last approximate time that you had admitting privileges at any hospital?
A. I don't recall.
Q. More than five years ago?
A. I don't recall.
Q. Last year?
A. I don't recall means I don't recall, Mr. Upchurch.
Q. You don't know if you had admitting privileges this year?
A. I don't have them now, no, sir.
Q. All right, sir. Are you on the inactive staff of any hospital?
A. Not that I know of.
Q. When you did have hospital privileges, had you ever had those privileges suspended or adversely impacted upon in any way?
A. No, sir.
Q. During your work at the Baptist

facilities that we've referenced, the Emergency Department work that you did, do you recall if you served on any committees within the Baptist System for the hospitals at which you worked?

A. Do I recall that? Yes, I do.

Q. All right, sir. Can you identify for us if you served on any committees and what committees those were?

A. I served on the Executive Committee at Union City, was Chairman of the Ethics Committee.

Q. In looking at the professional associations that are identified on your C.V., have you ever been a member of any college, association, academy, or other organization that focuses on or is dedicated to the practice of emergency medicine?

A. No, sir.

Q. When you were engaged in the practice of Emergency Department medicine, did you subscribe to any emergency medicine publications or journals?

A. Yes.

Q. Identify those for us, please, sir.

A. Audio Digest Clinical Emergency Summaries.

Q. Who produces those?

A. I don't know.
Q. Have you taken those publications or items since leaving ER work in April of 2013?
A. Off and on, yes.
Q. Are those -- is the Audio Digest separate from the clinical summaries? Tell me what that is.
A. Audio Digest is an entity that produces written and audio materials governing selected topics in emergency medicine.
Q. And how does one obtain those?
A. You subscribe to it.
Q. Do you currently have a subscription?
A. No, sir.
Q. Have you had a subscription since April of 2013?
A. Yes.
Q. When would you have last had a subscription?
A. I don't know.
Q. Do you keep a list of the CME that you attend?
A. Yes.
Q. In Tennessee does one have to turn that CME into a particular board or entity on a yearly

basis?

A. The American Academy keeps track of that.

Q. American Academy of?

A. Family Physicians.

Q. Is there a local office of that that you turn those hours into, or is that the national association?

A. The national academy keeps track of that. The Tennessee Academy in Nashville or Brentwood keeps track of it as well.

Q. Since leaving the practice of emergency medicine in April of 2013 have you attended any CME courses that specifically relate to emergency medicine?

A. Yes.

Q. Are there any textbooks in the field of emergency medicine that you would identify for us as authoritative or generally reliable in your opinion?

A. Yes. Tintinalli's Emergency Medicine, which is an emergency medicine board review book, and Current Medical Diagnosis and Treatment of Emergency Medicine, Current Medical Diagnosis and Treatment of Medical Conditions, the Harriet Lane Handbook, ACLS Provider's Course Handbook, various and sundry

reference works that relate to pharmacology, and that sort of thing.

Q. Item number three asks you to bring with you a copy of all billing records that you have generated for your work in this case. Do you have that with you?

A. No, sir, I don't I have one letter. I think I've only submitted one letter to Mr. Edwards regarding billing matters.

Q. Can you estimate for us, please, sir, the time that you have spent in reviewing and preparing your opinions in this case?

A. Probably thirty hours total.

Q. Item number four requested you to bring a copy of any notes that you may have made in connection with your formulation of opinions in this case. Do you have any such notes?

A. I do not.

Q. You did not make any notes, be they written or computer generated?

A. No, sir. No.

Q. Would it be accurate to state, then, that the only memorialization of your opinions in this case would be the two expert reports that you prepared and

submitted?
A. No, no. I have it memorized. I understand the case.
Q. My question to you was -- I believe was is there any other memorialization of your opinions other than those two reports?
A. You mean written memorialization?
Q. Yes, sir.
A. No, sir.
Q. Item number five requested you to bring copies of any texts, treatises, or articles that you have reviewed or relied upon or plan to rely upon at the trial of this case to support your opinions.
A. Uh-huh (affirmative).
Q. Are there any such texts, treatises, or articles responsive to that area of inquiry?
A. Yes. I have a list of documents reviewed recently in preparation for this deposition. As I said, there is scores of documents that I have looked at, but in response to your question I have looked at Emergency Medicine Seventh Edition Tintinalli, page 136 and following published by McGraw Hill in 2011. I've also looked at the ACLS Provider Manual 2001, the section on Unstable Tachycardia published by

the American Heart Association. It's case eight, page 157. However -- and I intended to bring them, but I had left them at the condo; but I would add that both of these documents are in the public domain.

Q. All right, sir. If you could hand me that sheet that you're looking at, please, sir?

A. (Witness complies with request.)

MR. UPCHURCH: We'll mark the list. It's a document entitled List of Documents or Material Reviewed in Preparation for My Deposition. We'll mark that as Exhibit 3 to Dr. Fowler's deposition.

(Whereupon, Exhibit 3 was marked as an exhibit to the deposition of the witness and can be found among the deposition exhibits attached hereto.)

BY MR. UPCHURCH:

Q. Where is your condo?

A. It's on the South Bluff.

Q. Can you identify for us the subject matter on page 136 and following in Tintinalli's that you reviewed?

A. Yes, sir. Supraventricular tachycardias,

their assessment and treatment.

Q. Did you identify -- did you review Tintinalli's text after the preparation of your supplemental expert report?

A. Almost certainly I would have reviewed Tintinalli's text in anticipation of submitting both the original and the subsequent reports. Please understand, this is an ongoing process, and I'll go back and forth and back and forth. The deposition will be set, rescheduled, and I'll go back to make sure my memory is fresh on what I'm trying to explain.

Q. Same question with respect to the ACLS Provider Manual. Do you recall if you reviewed that before or after submission of your supplemental expert report?

A. I certainly -- both. The answer is both. I reviewed it before and after.

Q. Do you plan to rely at the trial of this case on Tintinalli's text as a basis for the opinions that you express in this case?

A. In part, yes.

Q. Same question for the ACLS Provider Manual?

A. In part, yes.

Q. Same question for the Restraint and Seclusion Patient Safety Briefing article?
A. In part, yes.
Q. As we speak about publications, there are two publications, as I recall, identified on your C.V. I don't believe, but let me ask. Neither of these addresses any issues that are pertinent to your review of this case, do they?
A. That is correct.
Q. Item number six requested you to bring with you any exhibits that you would plan to use as a summary or in support of your anticipated trial opinions. Do you have any exhibits that would be responsive to that inquiry as of today?
A. That would be the preliminary and supplemental report previously submitted as well as my C.V. I suppose.
Q. All right, sir. Item number seven asks you to bring a list of cases that you -- that had been reviewed by you in the past five years.
A. (Indicating.)
Q. And that's included, is it not, on the final page of your C.V.?
A. I think I added this case on that list

which I've just handed to you.

Q. All right, sir. We'll mark this list as Exhibit 4 to your deposition.

(Whereupon, Exhibit 4 was marked as an exhibit to the deposition of the witness and can be found among the deposition exhibits attached hereto.)

MR. UPCHURCH: The list is entitled List of Cases in Which I Have Testified as an Expert.

BY MR. UPCHURCH:

Q. The Russell versus McNairy Hospital case, you were retained as an expert on behalf of the plaintiff in that case?

A. Yes, sir.

Q. And that was a case that you were retained by Mr. Edwards or Mr. McCormack or their firm?

A. That's correct.

Q. Did that case go to trial?

A. No, sir, settled, as I understand, for the policy limits.

Q. The first six cases that you've identified there, are all of those in Tennessee

courts? There is a Marshall County, Mississippi, and I didn't know --

A. (Interposing.) Yes -- no, they're all Tennessee cases, yes, sir.

Q. All right, sir. In each of those six cases that are listed prior to the Goode case, could you identify for us, please, sir, whether you testified on behalf of the plaintiff or defendant in each of those cases?

A. Certainly. In State versus Chris Clarke I testified as a physician for the State of Tennessee as to the -- wait a minute. In Chris Clarke? In Chris Clarke I testified on behalf of the defendant relative to some toxicology issues.

What's the next case?

Q. Reid, R-E-I-D, versus American Ordnance.

A. All right. In that case I testified on behalf of the plaintiff relative to the cause of injuries that were incurred in a workman's compensation case dealing with preparation -- handling of machinery.

Q. The third case is the Zimmerle versus Bills case?

A. In that case I testified on behalf of the

insured decedent who -- and the issue was whether or not he died as a result of pre-existing medical conditions or another situation, which would have allowed him to enjoy the double indemnity under the accidental death clause.

Q. Smith versus Union City?

A. Union City Manor Nursing Home?

Q. Yes, sir.

A. In that case I testified on behalf of the plaintiff relative to the mishandling of orthopedic instructions as to weightbearing post hip replacement.

Q. Hawks versus ABF Engineering?

A. In that case I testified on behalf of the plaintiff relative to a heart attack that occurred at work.

Q. The testimony that you have identified, was that at deposition or trial or both?

A. Let's see. Chris Clarke went to trial. Reid went to trial. Zimmerle was settled for the policy limits. The other one, the McNairy County case settled. What was the last one?

Q. Smith and Hawks were the other two.

A. They went to trial.

Q. And you testified at trial?

A. Yes, sir. Smith? Did you say Smith?
Q. Yes, sir, Smith and Hawks I think were the last two.
A. Smith was settled -- no, wait a minute Smith went to arbitration. Smith went to arbitration. So we had Judge Riley. I don't know if you want to call that a trial, but it was a hearing. And then the last one was Hawks? Hawks went to trial.
Q. Your initial report that you have in front of you was dated January 13, 2017. Who initially contacted you about review of this case?
A. Mr. Edwards.
Q. Do you recall the approximate time period in which that initial request came?
A. I do not.
Q. Do you recall how it was initiated; e-mail, phone, or otherwise?
A. I do not.
Q. Do you know personally any of the health care providers who were involved in Mr. Goode's care on July 18, 2015?
A. No, sir.
Q. Have you communicated with anyone who is presently employed or affiliated with a Baptist

Hospital in Tennessee or Mississippi concerning this case?
A. No, sir.
Q. Have you personally communicated in any fashion with the plaintiff, Mrs. Goode?
A. No, sir.
Q. Have you had any communication of any kind with anyone who claims to have been an eye witness to the events giving rise to this litigation?
A. No, sir.
Q. Have you reviewed any news reports, be that print or video, that in any way arise out of or relate to this litigation?
A. I have a vague recollection of seeing a brief clip which was from a news program. The details were insignificant. I don't remember much about it.
Q. Did you see that on your own, or had that been -- was that provided to you by counsel?
A. I think I -- I think I looked it up on the Internet to be perfectly honest with you.
Q. Do you recall what the video depicted?
A. Depicted a man on a gurney next to an ambulance, and that's about all.
Q. Let's look, Dr. Fowler, at your initial

exert report, if you'll get that out, make sure we're looking at the same document.

Do you have that in front of you?

A. I do; but for the purposes of clarity I'd like to see the document that you purport is my initial report.

Q. Doctor, what I'm looking at is titled Report of Mark W. Fowler, J.D., M.D.; and it contains four pages that ends with your signature and a date under your signature. Is that what you have in front of you?

A. I have a document that would meet those descriptions, yes. However, I want to -- if you're going to ask me questions, I want to answer questions from the document that you have.

Q. I'm not showing you my document.

A. Okay. Then I won't answer questions.

Q. All right, sir. That's up to you and your counsel. My document has my notes, my comments on them, and so I'm not going to --

A. (Interposing.) Well, since we're being technical about things, I don't want to look at one document when you're holding something else.

Q. I think that I handed you a copy of your

initial report.
A. Is that (indicating) it?
Q. That's it. That's what I provided you.
A. And this represents a copy of what you have in your file minus your markings and notes; is that correct?
Q. That represents a copy of what was provided to us by Mrs. Goode's counsel in this litigation.
A. Very good.
Q. If you'll turn to page three, you have listed your opinions there. They are misnumbered, but certainly we can overcome that deficit; but I want to discuss those opinions with you. You understand that my purpose is to ask you questions about your opinions so I know the opinions that you will express when this case goes to trial next year?
A. Understood.
Q. You understand, do you not, that LSD is an illegal drug in Mississippi?
A. I do not know personally whether LSD is or is not illegal in Mississippi.
Q. Is it illegal in Tennessee?
A. It is.

Q. Do you know whether or not LSD is a schedule one drug?
A. I believe that the federal government has listed it as a schedule one drug, yes.
Q. And what does that mean?
A. Has no medical indication -- there is no medical indication for using LSD, and it has a high propensity to cause addiction.
Q. Does the definition of a schedule one drug also include the fact that that drug carries severe safety concerns?
A. Yes.
Q. Have you in your experience as a physician had the occasion to treat a patient who you knew or who it was reported to you had ingested LSD?
A. Probably so. I have treated hundreds, if not thousands, of patients, many of whom were in a psychotic or agitated state, and I either suspected or had reported to me that they were on LSD.
Q. Do you consider yourself an expert on LSD?
A. Not per se, no, sir.
Q. Do you understand that some of the sequelae from ingestion of LSD can include anxiety?

A. Yes, I understand that.
Q. Panic?
A. Yes.
Q. Paranoia?
A. Yes.
Q. Delirium?
A. Yes.
Q. Confusion?
A. Yes.
Q. Hallucinations?
A. Yes.
Q. Claustrophobia?
A. Yes.
Q. Do you know how many hits of acid or LSD Mr. Goode ingested in this case?
A. I do not know personally. There are varying reports from three to four or five.
Q. Do you have any information as to the manner in which Mr. Goode ingested LSD?
A. Not personally. From the records it appears that it was dropped into his hand and he licked it off his palm, but I -- that's all I know about that.
Q. Do you have any information as to how

Mr. Goode obtained the LSD?
A. I think he purchased it at the concert or obtained it from his friends, so-called.
Q. In your initial report on page three you use the term floridly psychotic?
A. Would you refer to where that is? Where are you reading that from?
Q. If you'll look on page three in the first paragraph about four lines up from the bottom of that paragraph it begins: An individual who is floridly psychotic.
A. Yes, sir. I see that reference. What was your question, please?
Q. Are you of the opinion that Mr. Goode was floridly psychotic secondary to his ingestion of LSD?
A. May we assume from here on out in the deposition that to the extent that I render an opinion regarding medical facts that is to a reasonable degree of medical certainty so I don't have to say that ten thousand times?
Q. Certainly accept that.
A. Very good. To that extent, then, I would preface my remarks as saying I have an opinion to a reasonable degree of medical certainty that as a

result of the ingestion of LSD Mr. Goode, am I pronouncing that correctly, was floridly psychotic.

Q. Is it your opinion that Mr. Goode's behavior arising out his florid psychosis led to his encounter with the police on the afternoon of July 18, 2015?

A. Yes.

Q. Other experts identified on behalf of Mr. -- of Mrs. Goode have rendered the opinion that they -- that he thought Mr. Goode was on a, quote, bad trip, closed quote, from his LSD ingestion. Do you agree with that?

A. Yes.

Q. Do you agree that Mr. Goode's behavior associated with his bad trip is what led to his arrest on the afternoon of July 18, 2015?

A. Yes.

Q. Do you understand from your review of the materials in this case that on at least two prior occasions, that is, prior to July of 2015, Mr. Goode had ingested LSD, had an encounter with police, and ended up being hospitalized?

A. I am familiar with the notion that he may have had ingestion of LSD on prior occasions. The

sequelae of that use on those prior occasions I do not distinctly remember this morning.

Q. Assume that to be true --

A. (Interposing.) All right, sir.

Q. (Continuing.)-- for purposes of this question. Assume that on two prior occasions prior to July 2015 he ingested LSD, had bad trips, had encounters with the police, and wound up being hospitalized. If we assume that to be true, would you as a medical professional have counseled Mr. Goode against future consumption of LSD?

A. Absolutely.

Q. Do you find -- assuming for purposes of this question that what I represented to you about the two prior bad trips ending up in hospitalization to be true --

A. (Interposing.) Yes, sir.

Q. (Continuing.)-- if we make that assumption, do you find that Mr. Goode's decision to ingest LSD on July 18, 2015 was reckless?

A. It was stupid.

MR. McCORMACK: Object to the form.

THE WITNESS: I'm sorry.

MR. McCORMACK: You can answer the question.

THE WITNESS: It was inappropriate. Reckless, probably, yes.

BY MR. UPCHURCH:

Q. You know from your review of the records, Dr. Fowler, that Mr. Goode was admitted to the Baptist-DeSoto Emergency Department around 8:28 p.m., correct?

A. That is correct.

Q. He was noted to be highly agitated and combative. Do you find that his documented agitation and combativeness were secondary to his florid psychosis?

A. There may be other factors playing a role at this point in time.

Q. Well, let's see if we can answer the first question, then we'll move on to those other factors. Do you agree that his florid psychosis contributed to his highly agitated and combative state?

A. Yes, sir.

Q. What other factors are you referring to that you believe may have likewise contributed to his

agitation and combativeness?

A. At this point in time there is a question about hypoxia. He has a pulse oximetry reading of ninety percent, which is low, which generated an alarm in somebody's system. I think it was the Baptist System. In addition to that, he has documentation that would sustain a finding of supraventricular tachycardia.

At the point in time that he arrived at the hospital, no one knows for sure what cardiac rhythm he is in; and cardiac dysrhythmias in and of themselves can cause alarm, confusion, fear, apprehension, and panic.

Q. Further on in the ED notes, specifically timed at 8:56, Mr. Goode was documented to be violently thrashing and screaming illogically and screaming curses. Do you again relate that behavior at least in part to his florid psychosis?

A. In part, yes.

Q. He was noted to be disoriented with illogical speak and delusional. Do you relate those findings at least in part to his florid psychosis?

A. Yes.

Q. At 9:01 p.m. Mr. Goode was documented to

be angry, agitated, combative, uncooperative, screaming loudly and illegibly, dangerously agitated, uncooperative. Do you attribute those findings as documented in the medical records at least in part to his florid psychosis secondary to LSD usage?

A. In part, yes.

Q. The other parts that you referred to with respect to the first question that I asked you in this line of questions where you referenced his hypoxia and you made reference to a cardiac dysrhythmia, do you attribute those to findings or opinions to a -- as a cause of that behavior as well?

A. I'm sorry, repeat your question, please.

Q. In my original question I asked you about the patient's agitation and combativeness. You said you attributed that to his florid psychosis, plus his hypoxia and a potential cardiac dysrhythmia, correct?

A. There is no potential cardiac dysrhythmia here. There is pristine documentation of cardiac dysrhythmia as obtained by Ms. Graham. He was in cardiac dysrhythmia. The cardiac dysrhythmia, as I opined in a minute ago, can contribute to alarm, confusion, panic.

Q. All right, sir. Let's talk about the

SVT. How do you define SVT as you use it in your reports?
A. SVT is a supraventricular tachycardia. It is a tachycardia, which implies a heart rate greater than one hundred, arising other than in the sinus node. It is a pathological and potentially lethal arrhythmia.
Q. Would you agree, Dr. Fowler, that SVT is an umbrella term that describes tachycardias that involve tissues above the bundle of His?
A. It also includes wide complex tachycardias, but the answer to your question is yes.
Q. Would you expect a patient who is admitted to the Emergency Department who is agitated, combative, violently thrashing about, screaming illogically, screaming curses, uncooperative -- would you expect that patient to have an elevated heart rate?
A. Yes.
Q. Would you expect that patient to have an elevated respiration rate?
A. Yes.
Q. Identify for us, please, sir, the types of SVT that are diagnosable.

A. Well, for ACLS purposes, which is the purpose that I'm addressing here in the emergency room, you have narrow complex and you have wide complex SVTs. They are treated differently. The narrow complex SVTs, as I indicated a minute ago, are supraventricular tachycardias arising below the sinus node and above the bundle of His and are potentially tachydysrhythmias, okay? This is complicated by a subset of Wolff-Parkinson-White dysrhythmias, of which there are three types. You have to be aware of whether or not your patient is in a Wolff-Parkinson-White dysrhythmia as you work down the algorithm of treatments.

And then there are wide complex tachyarrhythmias. So you have multiple sets of supraventricular tachyarrhythmias, wide complex, narrow complex; and they're treated differently depending on what you're facing.

Q. Identify the wide complex for me.

A. The wide complex SVTs are not at issue in this case.

Q. Yes, sir. Identify the types for me, though.

A. I'm not familiar with specific wide

complex tachycardias in this case.
Q. Okay.
A. Pardon me. There are no documented wide complex tachycardias in this case.
Q. But can you identify for us any types of wide complex tachycardia?
A. Well, V-fib is a wide complex tachycardia. Ventricular fibrillation is a wide complex tachycardia. Torsade de Pointe is a wide complex tachycardia.
Q. Are those supraventricular tachycardias?
A. No. You asked me about wide complex tachycardias.
Q. You have reviewed the rhythm strip from the EMS transport; have you not?
A. Yes, sir.
Q. Get that out in front of you, if you would, please, sir.
A. All right, sir.
Q. When you were practicing medicine in an Emergency Department setting, you would have certainly reviewed and interpreted rhythm and EKG strips; would you not?
A. Yes, sir.

Q. Do you identify P-waves on this rhythm strip?

A. There are no P-waves on this rhythm strip.

Q. How do you classify this rhythm strip?

A. This is a supraventricular tachycardia, narrow complex type.

Q. Do you find this rhythm strip to show the patient in sinus rhythm?

A. I do not.

Q. And why not? What's -- what would -- are P-waves an indicator of sinus rhythm?

A. P-waves are the definitive criteria for a sinus rhythm.

Q. And it's your opinion that there are no P-waves reflective on this rhythm strip?

A. That is correct, yes.

Q. Would it -- do you believe or are you of the opinion that a twelve lead EKG is required to diagnose a particular type of SVT?

A. A particular type would reference, for example, the three different manifestations of Wolff-Parkinson-White, for which you need a twelve lead EKG; but for the purposes of addressing a person

in the emergency room with this rhythm, you're thinking about, talking about supraventricular tachycardia, and you do not need a twelve lead EKG for that.

Q. All right. What is this rhythm? Identify the type of SVT that you believe this rhythm demonstrates.

A. I have answered that question.

Q. Answer it again.

A. Supraventricular tachycardia, narrow complex.

Q. Is narrow complex a -- you do realize that there are types of SVT that are delineated in the literature; do you not?

A. Yes. I recognize that, and I've answered to that extent.

Q. Do you find this to be an atrial tachycardia?

A. This is a supraventricular tachycardia.

Q. Can you answer my question? Do you find this to be an atrial tachycardia?

A. This is not an atrial tachycardia.

Q. All right, sir.

A. No, sir.

Q. Do you find it to be a macroreentrant tachycardia?
A. It is an AV nodal reentrant tachycardia.
Q. And what from this rhythm strip gives you the basis to render an opinion that it's an AV nodal reentrant tachycardia?
A. Because it's a narrow complex tachycardia, which means that the impulse, electrical impulse initiating the cardiac contraction is narrow, signaling an impulse to both ventricles at the same time, which is what produces a narrow complex QRS signal. So this arises above the junction where the signal splits to the different tachycardias. That's why it's a narrow complex.
It is by definition fast. This one looks to be a hundred sixty to a hundred eighty, and therefore it is a supraventricular, arising above the ventricles, narrow complex QRS signal, less than one hundred twenty milliseconds, tachycardia.
Q. Are you familiar, Dr. Fowler, with the term physiologic sinus tachycardia?
A. Yes.
Q. What is that?
A. Physiologic sinus tachycardia is a normal

tachycardia with a rhythm -- pardon me, with a rate greater than one hundred beats per minute arising in the sinus node usually as a consequence of stress or exertion or in some cases a pathological condition such as pain, but it is a normal heart rhythm. A person in physiologic sinus tachycardia has a fast heart rate, a fast but normal heart rate.

Q. Are you of the opinion that a component of Mr. Goode's elevated heart rate was related to his florid psychosis?

A. Yes.

Q. Is it your opinion that electrocardioversion should have been carried out for Mr. Goode upon his admission to the ED based upon a -- based upon the EMS rhythm strip that we've looked at?

A. That is not the ACLS protocol, and that's not how you approach this.

Q. All right, sir. Is it your opinion that antiarrhythmic drugs should have been administered Mr. Goode -- to Mr. Goode because of the SVT that you opine is evident from this rhythm strip?

A. That is not the ACLS protocol, and that's not how you approach this problem.

Q. All right, sir. In your practice when

you worked in the medical -- in the Emergency Department, would you have wanted to obtain a twelve lead EKG before you would definitively diagnose and treat an SVT?

A. Not prior to definitive diagnosis. All you need and is frequently found on defibrillators is one lead, the rhythm lead. What should have happened and what I would have done in this case was to obtain any kind of a rhythm strip, whether through the defibrillator or through twelve lead if possible, to determine what rhythm I was dealing with at the particular time he landed in my emergency room.

You don't treat a rhythm outside the hospital. You treat the rhythm at hand, not based on what somebody else says or did. You've got to determine what rhythm you are dealing with. That was not done in this case.

Q. Let me ask you, the opinions that are listed on page -- that begin on page three of your initial report --

A. (Interposing.) Uh-huh (affirmative).

Q. (Continuing.)-- are those opinions directed -- or, is each of those opinions directed to both the hospital nursing staff and to Dr. Oliver, or

are there some of those opinions that are directed to one but not both?

A. Well, the way I approach that is this. Dr. Oliver is the captain of the ship. He's got responsibility for supervising the nurses, and the nurses have certain responsibilities independent of Dr. Oliver's responsibility.

You want me to break this down as to each of the opinions?

Q. Yes, sir, I want you to identify for me which of these opinions are directed to Baptist nursing personnel.

A. Let's begin there. Number one, failed to properly -- promptly assess and treat a supraventricular tachycardia. The record in this case indisputably establishes that Stacie Graham, the EMT, had placed monitors and had identified a supraventricular tachycardia and that she communicated her suspicions to Mr. Jeffrey Baker, who was a nurse employed by Baptist Memorial Hospital.

Mr. Baker failed to take any steps to determine a rhythm. He didn't apparently look at her rhythm strip. He apparently didn't attach any leads and attempt to obtain his own rhythm strip. So that

falls on the nurses per se, but it falls as well on Dr. Oliver. The ball was dropped and the standard of care was violated or not met by failing to take information that they had and confirm or verify that information.

Number next --

Q. (Interposing.) Hold on. Let's stop there.

A. Go ahead.

Q. Do you find that Mr. Goode upon his admission to Baptist Hospital at around 8:28 was timely triaged?

A. Timely triaged? He was triaged within a few minutes, I think roomed within eight to ten minutes. The answer to that question is no.

Q. Tell me why not.

A. Well, he was triaged, but he was not effectively triaged.

Q. That wasn't my question. My question was was he timely triaged from the point of his admission to the point where he was taken I believe you'll recall to the decontamination room where the triage was carried out. Do you find that to be timely?

A. No, sir, because in my opinion timely

implies effective. If you don't do an effective triage, it ain't timely, regardless of whether it's done in milliseconds or ten minutes.

Q. All right. So it's not timely.

A. Not timely.

Q. All right, sir. Now, identify for us as we look at that first opinion there how you contend that nursing personnel failed to promptly -- promptly assess this SVT.

A. Okay. Mr. Baker, the nurse, I think his name is Jeffrey Baker, was acting apparently as a triage nurse and received the call from Ms. Graham and was on notice that she had what she thought was a supraventricular tachycardia; and it was incumbent upon him to embrace that notion, to report it to Dr. Oliver as soon as possible, and to begin the process of confirming the supraventricular tachycardia. He failed to do that.

Q. All right, sir. And my question more specific is how do you contend that Mr. Baker failed in his assessment? That is, what do you contend the standard of care required him to do with the knowledge that you say that he had about the report of the SVT?

A. Conceptualize that he has a possible --

that he has a patient with a possible SVT, prepare the ACLS cart, and to determine the cardiac rhythm as soon as possible.

Q. And how do you opine that the cardiac rhythm should have been determined?

A. How do I opine that? No opinion to it. You put leads on the patient. You hook the leads up to an ECG machine.

Q. All right, sir. Has it been your experience that one can -- that one can obtain a meaningful twelve lead EKG on a patient who is screaming, yelling, and violently thrashing, as documented, on a gurney?

A. That is difficult, yes; but, again, as I indicated a minute ago, Ms. Graham had a three lead EKG, which is all you need to at least begin the evaluation; and hers is pristine. Hers is not affected by artifact whatsoever, not the rhythm strip that I'm seeing.

So if she can do that, my understanding and assumption would be anybody else who was committed to making a difference as opposed to making excuses could have done the same thing.

Q. Is it your opinion that Mr. Baker was

committed to making excuses?

A. It is indeed.

Q. What's the basis for that opinion?

A. Because he has a report that a person has SVT. He does absolutely nothing about it other than make excuses, and by that I mean this. Throughout the course of this record Baptist talks about how violent this man was and how out of control he was, and not one Baptist employee has a scratch, not one Baptist employee has a mark, not one Baptist employee mentions a damaged piece of equipment, not one Baptist employee indicates anything other than he was flopping around.

That's making excuses. If you're an emergency room physician or a nurse, you engage. Have you ever heard the phrase nobody dies on my watch? That implies that you get in and you get your hands dirty and you engage. Everybody in this case raised their hands, oh, oh, so violent, I'm afraid, I'm afraid; and they didn't do anything for him, and they let the man die in restraints by himself with a police officer. You think that meets the standard of care?

Q. Doctor, do you think it was appropriate for a floridly psychotic patient such as Mr. Goode to remain restrained in some fashion --

A. (Interposing.) In some fashion, certainly.
Q. Let me finish my question. Throughout his ED course until he could be appropriately calmed and sedated?
A. Should he have remained in restraints during the course of his hospitalization? As long as he was psychotic, yes; but not in this manner.
Q. We'll get to that opinion and discuss it. You've told me that Mr. Baker should have attempted to obtain a cardiac rhythm by twelve lead EKG or otherwise. You say in your opinion number one that there was a failure to treat an SVT.
A. Correct.
Q. Does that portion of your opinion -- is that directed at nursing personnel or elsewhere?
A. Yes, it is directed at both.
Q. All right. Certainly you understand as counsel for the hospital, my interest is in the nursing personnel. Identify for me your opinions, please, sir, as to how nursing personnel, in particular Mr. Baker at the time of triage, Mr. Flock later on, failed to treat an SVT.
A. The ACLS training supposes that a team

leader, who can be a nurse, can do a diagnosis -- do an assessment, diagnose, and treat whether or not a physician is present; and I will allow for the fact that it was very busy that night, and I will allow for the fact that the doctor or whatever doctors were on duty may not have been or could not have been in attendance to treat this particular patient.

There is nothing in the ACLS protocols or licensing protocols that I'm aware of that prevents the nurses from attaching the leads, making the diagnosis, and screaming across the room, Dr. Oliver, we have an SVT, what do you want us to do. Nothing prevents them from doing that, but they didn't do it.

Q. Is that what you are -- when you say that the nurses failed to treat, are you -- is that your opinion, that is, that they should have communicated or yelled out to Dr. Oliver to get instructions for treatment?

A. Again, they should have applied -- they should have taken the knowledge that they had, we have a potential cardiac dysrhythmia, we should act on that, we should attach leads, we should medicate the patient, we should get a determination as to where we are in connection with this particular patient and try

to do something about it.

Q. You mentioned medicate the patient. Is it your opinion that the nursing staff should have medicated Mr. Goode without physician order?

A. I think -- I think in the context of this particular environment, giving credit to the complexity of the case and giving credit to the busyness of the ER, the sequence of events should have been a dialogue back and forth between the nurses regarding this patient to immediately administer Ativan, to immediately administer oxygen, to immediately administer and check the patency of the I.V. line, and to prepare to administer Ativan and/or Haldol. That should have been automatic. That should have been rolling in process once he hit the door.

Q. Is it your opinion that nursing personnel I think my question was should have administered those medications in the absence of physician order?

A. I think they should put the oxygen on, yes. Should have put the leads on, yes. They should have prepared for the Ativan, yes. This was not a mystery. This is --

Q. (Interposing.) Prepared for the Ativan?

A. Prepared for the administration of

Ativan.

Q. Meaning what?

A. Meaning getting the vial out, meaning cleaning the top with alcohol, meaning preparing a syringe, meaning preparing to attach the syringe to the I.V. line and push the Ativan. All of those things should have been done in preparation to confirmation of Dr. Oliver's order.

Q. That gets to my question. Is it your opinion that nursing personnel should have pushed Ativan, as you just said, in the absence of physician order?

A. Not in the absence of his order, no, but they should have been prepared to do so immediately; and I say that because this is a collaborative effort. Okay? When it's this busy and this chaotic, nurses ought to have enough gumption to begin the process of preparing what they know is coming.

Nobody indicated this was a complete mystery about how they were going to treat him. Everybody knows what the protocol for this is, and they should have been initiating the protocol promptly. This was a crisis, and they let it go.

Q. Have we explored or have you expressed

all of the opinions that you hold with respect to that first opinion, that is, failed to promptly assess and treat an SVT?

A. Yes. Again, to reiterate, they were on notice that there was a problem. They had a duty to conceptualize how to handle the problem. They had a duty to prepare to diagnose the problem. They had a duty to communicate to Dr. Oliver the existence of a potential problem, all of which they failed to do.

Q. Number two addresses that communication piece. Have you expressed the opinions that relate to number two in terms of communicating to Dr. Oliver?

A. Yes, I have.

Q. Let's look at that third opinion. It is directed in part to nursing personnel as well?

A. Yes, sir.

Q. In your supplemental report that you have before you, in the second paragraph there, Doctor, about four lines down you make reference to a marginally low blood oxygenation. Is that the way that you describe an $O_2$ sat of ninety percent, as marginally low?

A. Marginally low, yes, sir.

Q. You indicate in your third opinion there

that this reading, which would have suggested a cause, paren, cardiac dysrhythmia, closed paren, warranting treatment, explain that opinion, please, sir, as to how this $O_2$ sat of ninety would have suggested a cardiac dysrhythmia.

A. Certainly. The pulse oximeter we're speaking of as described in the depositions is a small device roughly the size or about half the size of this binder clip (indicating), roughly an inch long and roughly three quarters of an inch wide. It has light sensitive sensors in it. You apply it to the finger or a toe, in this particular case I think you can -- it was applied to a finger; and it measures the light differential emitted by pulsations in the finger.

In other words, it's measuring the return of a laser tied to a specific frequency which relates the oxygen saturation. The more saturated the blood with oxygen, the higher the reading. When the blood is less saturated, it has a slightly different photographic element and produces a lower figure.

When you see a patient hollering, screaming, and carrying on, physically agitated, you would expect, and in this case they confirm, an elevated respiratory rate. As a consequence of that

you would expect to see an oxygenation saturation in the high nineties, ninety-five, ninety-six, ninety-seven. They had ninety percent.

The most common cause of a hypoxic figure is a pulse mismatch, which clues you into the fact that the pulse is not being recorded appropriately by the sensor. In that posture you know that there is a pulse mismatch. So you look at the pulse oximeter, and I would hypothesize that the pulse oximeter is not giving you a rate of a hundred sixty to a hundred eighty, which ought to clue you to the fact that if you're looking at a pulse of 76 and you're seeing a man floridly psychotic, the pulse oximeter is not giving you a reliable reading.

So you put your fingers on the man's wrist to determine roughly the rate; and once you've done that, you begin to realize that you're dealing with a tachyarrhythmia; and if you've got any sense at all, you remember that the EMT called in an SVT and you begin to work the protocol. That was not done in this case.

Q. The heart rate at triage was what? Do you recall? The records I believe show 164.

A. Bear with me. I'm looking through. I

see on the document I'm about to describe for you, the header of which is Baptist OneCare and Epic Transformation, ED Provider Notes by Lemuel Oliver, M.D., at 7-18-2015, a physical exam blood pressure 122 over 64, pulse zero, respiration 24. Certainly they didn't know what the pulse was at that point in time.

Q. My question dealt with triage, Dr. Fowler.

A. I'm looking for that.

Q. Are your records Bates stamped at the bottom right?

A. No, sir, they are not.

Q. Let me hand you what's the timeline that's found in these records. If you'll look at 2033 hours, I think you'll see the --

A. (Interposing.) If I can describe this document for further reference in the future if needed, this is a patient care timeline, again, this appears to be generated by Baptist OneCare which is in the header, patient care timeline 7-18-2015 2028 to 7-18-15 2144, referring to the time in military time. A set of vital signs was taken at 2033. The heart rate was identified at 164; pulse ox, which is delineated as $SpO_2$, ninety percent. That is correct,

that's what this document says. Is this your Bates 38? Is that what that is?

Q. Doctor, are you of the opinion that the pulse ox did not accurately record the heart rate at 164 at triage?

A. I don't know where that -- where that number came from. I do not know where that number came from, whether they counted it or how they got that -- through the blood pressure machine or how they got it; but you recognize that the Dinamap, which takes the blood pressure, will also produce a pulse. So I cannot speak to how they got that heart rate.

Q. Has it been your experience when you worked in the Emergency Department that obtaining an $O_2$ saturation level through a pulse ox can be impacted by patient movement?

A. If he's moving his hand, if he's moving the particular area where it's attached, yes.

Q. Would you expect that given the description of Mr. Goode being yelling and screaming and thrashing about on the stretcher that his $O_2$ sat obtained at triage would have been impacted by that movement?

A. I would expect they would secure the hand

by the wrist and try to get an accurate measurement.

Q. Yes, sir. Can you answer my question?

A. Repeat your question.

Q. Would you expect that given the movement of Mr. Goode that was noted at the time of triage that that movement would impact the ability to obtain the $O_2$ sat?

A. Only if you're indifferent enough not to secure the hand or try to obtain a meaningful reading.

Q. All right, sir.

A. And, again, if you're going to make excuses, it is true, a hand flopping around won't give you a good reading. If you're going to make a difference, you grab the hand and you figure it out and you apply yourself.

Q. And you think Mr. Baker was indifferent here?

A. I do indeed.

Q. All right, sir.

A. I think the whole team was indifferent.

Q. Would you agree, Dr. Fowler, that the health care providers who were assessing and evaluating Mr. Goode at triage and thereafter would be in the best position to assess the reliability of

the $O_2$ sat reading of ninety percent?
A. They would be in the best position to assess the $O_2$ reading. They didn't do it, but they would be in the best position.
Q. Do you find any evidence based upon your review of the record that Mr. Goode had an obstructed airway at any time during his triage or thereafter?
A. No; but you recognize hypoxia is not related just to the movement of air alone. Hypoxia can be caused by other things, which were also left undiagnosed.
Q. Do you find any evidence based upon your review of the record that Mr. Goode was in respiratory distress at the time of triage or thereafter in the Emergency Department?
A. As manifested by the inability to move air in and out and speak and yell, he was not in respiratory distress in that fashion; but there are other manifestations of respiratory distress.
Q. Do you find based upon your review of the record that there was any evidence that Mr. Goode was experiencing a circulatory collapse or compromise?
A. He might have. He had tachyarrhythmia and he had tachydyspnea, which means that he's

respirating fast, his heartbeat is fast, his level of $SpO_2$ is anomalous, there is a potential for saddle embolus or pulmonary embolism, which they completely blew off.

Q. Are you in a position, Dr. Fowler, to express an opinion to the Court and jury at the trial of this case that Mr. Goode was experiencing circulatory collapse at the time of his triage?

A. No, but what I am in a position --

Q. (Interposing.) I'm sorry, I didn't hear you.

A. The answer is no. What I am in a position to say is they failed to consider all potential differential diagnoses.

Q. In your response to the prior three questions you mention that there was -- for example, when we were talking about respiratory distress, you said that there were other causes --

A. (Witness nods head affirmatively.)

Q. (Continuing.)-- for respiratory distress. What were you referring to?

A. A pulmonary embolism obstructs blood flow to those areas of the lungs responsible for the exchange of carbon dioxide and oxygen. If you have a

pulmonary embolism or particularly a saddle embolus, what happens is you can move air just fine, but you can't oxygenate; and as a consequence of that you die. You have low oxygen and hypercarbia, or an excess of carbon dioxide, and you die.

You have to consider that in this type of presentation. You have to be aggressive. You have try to make a difference and not make excuses.

Q. And you do know from your review of this case that there is no evidence to suggest that Mr. Goode had a saddle embolus, embolus of any kind?

A. Well, lamentably, Dr. Oliver canceled all of the laboratories that were ordered when the patient died. So nobody is going to know.

Q. Well, Doctor, have you reviewed the autopsy report?

A. I don't think the autopsy report has been furnished to me.

Q. Has anyone ever indicated to you that there was any finding on any autopsy report or subsequent forensic analysis that suggested an embolus of any kind?

A. No.

Q. You would not be in a position to testify

to the Court and jury when this case goes to trial that more likely than not Mr. Goode had an embolus, would you?

A. We -- this line of questioning arises from the fact that the assessment of the hypoxia was incomplete. Okay. So the overall direction that I intend to suggest here is this. They failed to consider all differential diagnosis, because they were not engaged adequately in the case.

Q. Can you answer my question?

A. Repeat your question.

Q. The question was whether or not you can express an opinion to a reasonable degree of medical probability that Mr. Goode had an embolus, saddle or otherwise.

A. I do not intend to testify as to the cause of death.

MR. PHILLIPS: Is this a good time for a short break?

THE WITNESS: As far as I'm concerned, certainly.

MR. UPCHURCH: Certainly.

MR. PHILLIPS: That's two of us.

MR. UPCHURCH: Certainly.

MR. PHILLIPS: Thank you.

(Whereupon, a break was taken.)

BY MR. UPCHURCH:

Q. All right. Doctor, you ready to continue?

A. Yes, sir, uh-huh (affirmative).

Q. Dr. Fowler, we're back on the record after a brief recess. We were looking on page three of your initial report, your third opinion there. We were in the process of discussing that, and I think that we had gotten to the point where I was asking you how in your opinion Baptist nursing personnel looking at number three failed to effectively and thoroughly troubleshoot a low oxygen saturation.

Tell me what you will testify at trial as to how nursing personnel failed in that regard.

A. Yes, sir. As I indicated previously, the pulse oximeter, as I understand it, that was used in this case is a fingertip appliance characteristically applied to the index finger of either hand. It takes a measurement based on the relative oxygenation of the blood, hemoglobin in the blood, and returns a finding.

When you see a finding such as in this

case of ninety percent in an individual who does not otherwise appear to have respiratory issues, such as pneumonia or acute exacerbation of asthma or COPD, the question is is my pulse oximeter giving me a good reading; and the first step is to determine if there is a pulse mismatch.

If there is a pulse mismatch, that is to say your palpated pulse is different from the pulse reading on the pulse oximeter, you cannot rely on the $SpO_2$ value, it is not appropriate; but, additionally, there are multiple other clues to think about, and one of them is this in terms of making a thorough evaluation. You cannot -- in medicine when a patient presents, you cannot immediately, as they do in television, jump to the diagnosis.

The diagnosis has to be evaluated and eliminated by a process of scientific endeavor. Therefore, you would say to yourself if I have a pulse mismatch, do I potentially have something that's interfering with ventilation, ventilation being the exchange of carbon dioxide and oxygen, at the capillary air interface. My comment then would, therefore, be I would have added a D-dimer in the presence of tachycardia and tachypnea, fast breathing,

fast heart rate, in an incoherent patient to eliminate that possibility.

It turns out there doesn't appear to be much evidence if any evidence for a pulmonary embolism, but they did not effectively troubleshoot this issue.

Q. All right, sir. Certainly it would not be within the scope of nursing practice to order a D-dimer?

A. Oh, of course it would, absolutely it would. This is a collaborative approach; and in the presence of a busy emergency room in a complicated patient, I would expect the nurses to make recommendations. If I said let's do CBC, blood cell count comprehensive panel, and the nurse were to say to me, well, you have tachyarrhythmia and you have dyspnea, you want a D-dimer, I would certainly say that's a good idea, put that in.

Q. Yes, sir. I appreciate the benefit of that response. My question, though, was that it is outside the scope of nursing, is it not, to make an order for a D-dimer?

A. No.

Q. A nurse can write an order and have an

order for a D-dimer carried out in this situation?

A. Under the conditions, the unique conditions of a busy emergency room, a complicated incoherent patient, if a nurse put that order in, I would not object to it nor would I say to her you're beyond the scope of your practice. It is a collaborative effort.

Q. All right, sir. So we've got an opinion now that an ER nurse can order a D-dimer test for a patient to determine whether or not that patient has a -- has a likelihood of an embolus. Is it your opinion, Doctor, in this case that the standard of care required Baptist nursing personnel to order without physician input a D-dimer for this patient?

MR. McCORMACK: Object to the form.

You can answer.

BY THE WITNESS:

A. I think it's incumbent upon them to approach this problem with a view towards solving it and not with a view towards saying, well, gee, that's not within the scope of my practice or this patient is too violent or this patient is too -- thrashing around too much, I can't do anything. That attitude of

helplessness in the emergency room is inappropriate. Again, it's a collaborative approach, and they failed to do that.

BY MR. UPCHURCH:

Q. Yes, sir, and I appreciate all of that very much; but it doesn't answer my question.

A. Okay. Technically, then, a nurse cannot order a lab test on a patient.

Q. Thank you, Doctor. Let's go back to the pulse mismatch testimony. Do you have any factual basis to suggest that the pulse of 164 obtained at triage was inaccurate?

A. Do I -- no, I do not have any basis to determine that it's inaccurate. I don't have any basis to determine what machine reported that. Either the Dinamap or the pulse oximeter can report that.

Q. Yes, sir. I didn't ask you about the machine. I asked you about the accuracy of the number.

MR. McCORMACK: Object to the form.

BY MR. UPCHURCH:

Q. You are not in a position to testify at trial, are you, that in your opinion to a reasonable

degree of medical probability there was, in fact, a pulse mismatch at the time of triage, are you?
A. They didn't effectively troubleshoot that, so, no, I can't.
Q. It's your opinion, then, that nursing personnel should have obtained a manual pulse by palpating the pulse to confirm the 164?
A. Certainly would have been good.
Q. My question was did the standard of care require it --
A. (Interposing.) Yes, sir, it does.
Q. (Continuing.)-- of the nursing personnel?
A. It does.
Q. And tell me what a pulse mismatch is. That is, you get a 164, let's say, from a pulse oximeter and you get a ninety from your palpable pulse. Is that a pulse mismatch?
A. That is, yes.
Q. And what is the significance of that medically?
A. Medically the significance of that is in that particular scenario that your pulse oximeter reading is not necessarily accurate.
Q. Looking at statement number three, you

say failed to effectively and troubleshoot a low oxygen saturation reading. And we've discussed that; have we not?

A. We have.

Q. And then it goes on to say, which would have suggested a cause, paren, cardiac dysrhythmia, closed paren, warranting treatment. When you say "which", what are you referring to?

A. The oxygen saturation mismatch; and, again, generally speaking how this works --

Q. (Interposing.) Hold on. Let me interrupt you.

A. Go ahead.

Q. When you say oxygen saturation mismatch, you're referring to the oxygen saturation number plus this potential for a pulse mismatch?

A. Yes.

Q. And how does the combination of the $O_2$ sat of ninety with the potential of a pulse mismatch suggest a cardiac dysrhythmia?

A. That's easy. Characteristically if the pulse ox is low and the pulse ox gives you a pulse of 86 and you palpate the wrist and you can appreciate that it's faster than that, your next step will be to

determine what is the pulse as best I can.

And the next step logically is this is greater than a hundred, which is easily done, and therefore I need a cardiac monitor. Oh, and, by the way, I have a report that he was in supraventricular tachycardia, perhaps I should think about that as well.

Q. In your initial report -- I'm looking under the heading EMS Transport and Care.

A. What page is that on?

Q. It's on page one, sorry --

A. (Interposing.) Okay. That's all right.

Q. (Continuing.)-- of your initial report. It's the last paragraph on page one.

A. Okay. I mean, in the process of shuffling all these papers around, I've lost track of page one; but go ahead and pose your question. Let me see if I can answer it while I look.

Q. You reference the fact that in transport Mr. Goode's blood pressure dropped from 126 over 91 to 128 over 61, and then you state, and I'm quoting, this is important because a change of this magnitude may herald the onset of compromised cardiac output.

A. Yes, sir, I'm familiar with that

language.

Q. All right, sir. When you reference a change of this magnitude, are you referring to the change in the diastolic values?

A. Yes.

Q. And how in your opinion does the change of these diastolic values herald the onset of compromised cardiac output?

A. That's a good question. Let me explain as follows. During the course of cardiac cycle, systole is the process of atrial and ventricular contraction generally speaking. Diastole is the process of the heart relaxing and a period of time when it's, quote-unquote, at rest, meaning not contracting.

The heart pumps blood, but the heart obtains no oxygenation and no nutrition in the form of glucose from the blood it pumps. It only obtains oxygenation and glucose from the blood coursing through the cardiac arteries, left anterior descending, the circumflex arteries, and so forth and so on. So it is in diastole that the heart is being perfused itself.

Now in this particular situation two

things happen. First, the pulse jumps from 160 to 180. In effect, this reduces the time the heart spends in diastole and the time the heart muscle can be perfused; but, in addition, the perfusion pressure has gone down thirty milliliters of mercury, and that lowered measure means less effective perfusion of the heart muscle; and that is a potential problem with tachydysrhythmias. Diastole is not long enough to allow complete perfusion and can lead to cardiac collapse.

Q. I asked plaintiff's cardiology expert, a gentleman by the name of Dr. Parikh --

A. (Interposing.) Uh-huh (affirmative).

Q. (Continuing.)-- if he could assess the level of cardiac output for Mr. Goode, and he told me that he could not based upon the information that he had available. Can you?

A. No.

MR. McCORMACK: Object to the form.

THE WITNESS: Sorry, excuse me. No.

BY MR. UPCHURCH:

Q. You cannot assess his cardiac output

during EMS transport, during triage, or throughout his ED stay, can you?

A. At the point he died his cardiac output was zero.

Q. Point well taken. Prior to his arrest can you assess his cardiac output?

A. No, sir.

Q. Have you -- do you know Dr. Parikh?

A. No, sir, I don't.

Q. Not reviewed his deposition?

A. Not to my memory, no, sir.

Q. Have you had any verbal report on his deposition?

A. Not to my knowledge, no, sir -- I mean, pardon me, I don't remember if I have.

Q. Would it surprise you to learn that Dr. Parikh testified that Mr. Goode was experiencing physiologic sinus tachycardia upon his admission to the Emergency Department?

MR. McCORMACK: Object to the form.

THE WITNESS: If he opined that, that -- I would say that that's his opinion.

BY MR. UPCHURCH:

Q. He's wrong?

A. I would have to look at his testimony in context of everything that was going on.

Q. Everything that was going on was me asking him that question, and he said based upon his review of the record -- and certainly this is my recollection of his testimony, was that based upon the information available to him he agreed that this gentleman was in sinus rhythm and that he was having physiologic sinus tachycardia.

You would disagree with that?

MR. McCORMACK: Object to the form of that question.

THE WITNESS: I would disagree with that, yes.

BY MR. UPCHURCH:

Q. All right. Would you defer to a cardiologist, he's an interventional cardiologist practicing in Texas, to make that assessment?

A. No, sir, I would not; and I would like to explain why. When I was practicing emergency room medicine, I came in one night at 6:00 o'clock to replace a cardiac fellow, an individual who completed

his internal medicine residency training and who was in training to become a cardiologist; and he pointed to room one and said that patient has gastroenteritis, I'm about to let her go.

I walked in the room. At this point in time the CBC, comprehensive panel, x-rays had all been completed. I walked in the room, and I said to myself this woman is not having gastroenteritis, she's having a massive heart attack. She was, in fact, having a massive heart attack, and it was completely missed by a gentleman in cardiac training. I saved her life.

She was flown out within thirty minutes after we successfully decided that she was, in fact, having a cardiac event based on a significantly elevated troponin. No doctor is infallible, and I would not necessarily defer to anyone on that particular point.

Q. Let's look at your fourth opinion on page three. It's actually misnumbered, a second number two, but we'll refer to it as number four, okay?

A. Thank you, and please accept my apologies for that.

Q. Again, as you say, we all make inadvertent mistakes from time to time. Is this

fourth opinion directed at least in part to Baptist nursing personnel?

A. In that -- if I may read it so we're in proper context, failed to promptly assess and effectively treat a patient in a psychotic rage leaving him hog-tied in the prone position for over forty minutes after arrival, yes, that applies both to the nurse and to the physician.

Q. If you'll look on page two of your report, the next to the last paragraph begins Mr. Baker recorded.

A. Yes.

Q. And you state that, quote, he did not record facial contusions and abrasions which were clearly evident postmortem, period, closed quote. Do you have any factual basis, Dr. Fowler, to render an opinion as to when in time Mr. Goode sustained the facial contusions and abrasions that were noted postmortem?

A. This would not necessarily be to a reasonable degree of medical certainty, but by report from the police officers Mr. Goode fell and/or collapsed, shortly after an unsuccessful taser attempt he collapsed to the ground. My assumption or my

hypothesis would be that that was when he sustained this injury.

And the observation here is, again, a part of the total picture that the assessment was not complete. In other words, he's got this head wound. Where did this come from? What do you know about this? What do we know about this? How shall we react to this?

Q. Do you have any factual basis to suggest, Dr. Fowler, that Mr. Goode experienced some head or intracranial injury as a result of the events that gave rise to his ED admission?

A. I'm sorry. Would you repeat that one more time?

Q. Yes, sir. Do you have any factual basis to suggest or to testify that Mr. Goode experienced a head injury, in particular an intracranial injury, as a result of the events that gave rise to his hospital admission?

A. As a result of the total picture of events, I would opine as follows. There is no evidence whatsoever that Officer Baggett, who was alone with Mr. Goode in the holding room, struck him. I, therefore, think we can conclude that Mr. Baggett

did not strike him. That would imply that the head injury was sustained most likely in the fall and may have been no more significant than a concussion, but a concussion would be within the realm of possibility and would be a factor contributing to panic and confusion and disorderly behavior.

Q. Is there any report of Mr. Goode experiencing a loss of consciousness prior to arrival in the ED?

A. Prior to arrival, no.

Q. You say that these facial contusions warrant a full assessment. Do you have any opinion as to whether or not -- well, does that statement or opinion relate to nursing assessment?

A. Yes.

Q. And what do you contend was required of nursing with respect to these facial contusions that you believe were present upon triage?

A. It's a fairly straightforward assessment. You take a penlight, and you shine it in the patient's eyes to determine if there is -- the pupils are equal, round, reactive to light, whether or not the eyes move in conjunction. That's a very simple assessment to do and can be done reasonably easy. You also take an

otoscope and look at patient's ears, nose, and throat to determine whether or not you see the leakage of cerebrospinal fluid or blood.

Q. When you worked, staffed Emergency Departments both on a full-time and part-time basis, did you have an occasion to have a patient brought into the ED in forensic restraints?

A. Yes, many times.

Q. Did you ever have a patient who was brought in in forensic restraints restrained in the manner that Mr. Goode was restrained?

A. Never heard of such and have never seen such.

Q. Was it your experience in working with the Baptist facilities in Tennessee that when a patient was brought in in forensic or police restraints that police officers or law enforcement personnel were required to stay with that patient at all times throughout the admission?

A. Yes.

Q. Do you agree that based upon the description of Mr. Goode as he was admitted to the ED and your characterization of him as being floridly psychotic -- do you agree that in that condition

Mr. Goode presented a danger to himself?
A. To himself?
Q. Yes, sir.
A. Yes.
Q. Do you agree that he presented a danger to -- a potential danger to the health care providers who were caring for him at Baptist?
A. A minimal potential danger; and, again, again, not one person has testified to so much as a mark, a scratch, a bruise, or a blow delivered to them by Mr. Goode with the exception of the dog that bit him. There is no damage to equipment. There is no anything that would suggest that he intended to hurt other people. Was he goofy? Yes. Was he a threat to others? Minimally.
Q. All right, sir. You have had the occasion as an ED physician to treat patients who are highly agitated because of drug issues?
A. Yes, sir.
Q. In those situations was it important to you to protect your safety as well as the safety of nursing personnel who were working with you?
A. Certainly.
Q. Do you agree, Dr. Fowler, that the

Emergency Department personnel who were interacting with Mr. Goode on July 18, 2015 were in the best position to evaluate whether it was appropriate to request removal or repositioning of his forensic restraints?

A. In theory they were in the best position, but their conclusion was inaccurate. There are mechanisms of solving this problem if you really want to solve it.

Q. Given what you know about Mr. Goode's condition upon presentation, would it be reasonable in your opinion to have maintained him in forensic restraints until such time as sedative medications or chemical restraints effectively calmed him?

A. Would you repeat that question, please?

Q. Yes, sir. Given your understanding of Mr. Goode's condition and behavior at presentation to the ED, is it reasonable in your opinion to have maintained him in the forensic restraints until such time as sedative medications or chemical restraints could have effectively sedated him?

A. I understand the question. Absolutely, unequivocally unacceptable the way that they handled this man once he reached the hospital.

Q. Is it your opinion that at the time of triage he should have been taken out of forensic restraints?
A. He should have been -- had his position adjusted. You can then apply hospital soft restraints and reapply in the supine position on his back the forensic restraints if you need them; but a minimal effort was made to establish some sort of therapeutic bond with this patient, to relieve his distress, which is manifested -- which was no doubt exacerbated by his being in the hog-tie position. Simply relieving him of that may have gained you some therapeutic ground; not done in this case.
Q. Yes, sir. My question is is it your opinion that the patient should have been removed from his forensic restraints and repositioned at the time of triage?
A. The answer to that question is he should have been repositioned, yes. Forensic restraints could have been reapplied, yes.
Q. I know they could have been, but certainly you understand that's not the inquiry that I'm making. My question to you is did the standard of care in your opinion require that he be -- that the

forensic restraints be removed and the patient repositioned in triage?

A. Well, that's a half question, and it begs the question, and that is this. What are you going to do once you've done that? And, again, in complete and candid response to your question, if he had been repositioned, the forensic restraints would have been applied, which is a datum that you're not indicating in your question.

So, yes, it would be have been reasonable to reposition him. Yes, it would have been reasonable to reapply the forensic restraints; but your question as posed does not deal with the reapplication of forensic restraints, and that is my comment.

Q. It's your position, then, that the standard of care required repositioning of the patient to the supine position in triage?

A. Absolutely, unequivocally.

Q. Have you ever had the experience of applying soft wrist restraints to a patient in the ED setting?

A. Yes, sir.

Q. Have you had any experience with patients extricating themselves from soft wrist restraints?

A. I have seen them break one time.
Q. Tell me about that. How did the patient break them?
A. I want to say it was an arm restraint, and I want to say that the manner in which he was tied left the arm restraint requiring only a single strand of strap which broke loose from the soft cuff. The strand or the strap is fairly long. It should have been looped around the bed rails a couple of times. That would have prevented that. Other than that I've not seen them fail.
Q. But the patient by patient force split the strap from the actual wrist restraint?
A. That is correct.
Q. Broke it?
A. If you want to say so, sure. We'll say it malfunctioned.
Q. Would you agree that the health care providers attending to Mr. Goode were in the best position to assess whether transition to health care restraints, that is, the soft restraints, were indicated?
A. I would agree that they were in the best position to make that decision, but I disagree with

the decision they arrived at.

Q. Is it your opinion that in triage Mr. Goode should have been transitioned to the supine position, that forensic restraints should have been used to secure him in that fashion, and that after the forensic restraints were reapplied soft restraints then applied?

A. You could do it either way. You can do it one limb at a time; and bear in mind, when I answer your question that the forensic restraints should be removed, quote-unquote, in triage, I'm implying a continuum of action that begins with the doctor saying let's change these out, get you soft restraints, and let's get going.

That was not done. They left the man in the hog-tie position for forty some odd minutes.

Q. Tell us how you would envision the repositioning in the triage area taking place.

A. This is very simple, very common sense. There are at least two male nurses. There is one male doctor. I assume they're all in reasonably good physical condition. There are at least two female nurses. There may be other male employees, particularly a security guard and there was at least

one policeman.

It's inconceivable to me that with that much help they could not secure one appendage at a time, applied the soft restraints, moved to the next appendage, adjust the body, apply the soft restraints, apply the forensic restraints if they had wanted to. I've done it many times with just two female nurses and myself. Do you want to engage, do you want to make a difference, or do you want to make excuses?

Q. And it's your opinion that each of the health care providers that you just identified chose to make excuses?

A. That's correct.

Q. Have you had the occasion to administer chemical restraints in the Emergency Department setting?

A. As defined by the use of medicines to induce a state of relaxation, yes.

Q. Is there a difference between medications used to sedate a patient or to cause relaxation and chemical restraints?

A. Surely there is, absolutely. They're paralytics. Paralytics are used in surgery, but only in a controlled environment. Paralytics are not

indicated in the context of this particular problem.

Q. Yes, sir. Maybe I didn't ask a good question. Let me try again. Well, give me an example of the medications that you would typically use in the ED setting to sedate a patient such as Mr. Goode.

A. Versed, Ativan, Valium are all injectable. Morphine can induce somnolence. If I had it, I might administer gas, although I don't ordinarily do that; but you could. So there are multiple ways, and we'll categorize those as anxiolytics; the benzodiazepines and narcotics, morphine, Dilaudid, Demerol, that sort of thing.

Q. Are those the same medications that you would use for chemical restraints?

A. Well, to the extent that I've already commented if you want to restrain a person during surgery, you give them paralytics so they don't flop around during surgery. That would be a, quote, chemical restraint, but you would not necessarily do that in the emergency room unless you were about to intubate somebody.

Q. All right, sir. Have you ever issued an order in the Emergency Department for a chemical restraint?

A. As defined above, meaning anxiolytics, Versed, Ativan, Valium, yes.

Q. Have you ever actually written the order as a chemical restraint order?

A. No, sir, not -- I don't -- that's -- that sounds like a lawyer's term to me. We're going to sedate the patient, give zero point two milligrams of whatever for sedation, patient sedation. I don't use the terminology chemical restraint.

Q. All right. And I take it from your -- our dialogue you don't consider it a chemical restraint in the ED setting as opposed to you consider it more a sedative medication?

A. Well, we are simply using two phrases to describe the same phenomenon.

Q. Okay. The medications that you listed that you give for sedative purposes did not include Haldol. Have you used Haldol in your experience for that purpose?

A. Well, we have to be precise here. Haldol would not be a sedative per se. It's an antipsychotic.

Q. All right.

A. And, therefore, hopefully reduces or

eliminates or minimizes the psychotic manifestations of the patient's behavior.

Q. With that distinction have you had the occasion in your Emergency Department practice to order a sedative plus an antipsychotic such as Haldol to calm a patient such as Mr. Goode?

A. Yes, I have.

Q. Have you ordered that Haldol via both I.M. routes and I.V. routes?

A. I don't recall that particular data point.

Q. At what point does the patient become chemically restrained?

MR. McCORMACK: Object to the form of the question.

THE WITNESS: Define chemically restrained.

BY MR. UPCHURCH:

Q. Well, you told me there was no -- that we were just playing verbal semantics with that versus sedation. So I'm -- I'm accepting you as you define those two terms to be interchangeable, and my question to you is at what point do you consider the patient restrained via the Ativan or the Haldol or other

agents that you might use to achieve that effect?

MR. McCORMACK: Object to the form.

BY THE WITNESS:

A. Well, I think we're talking about multiple different concepts here and multiple different issues. For the purpose of addressing what I suspect is coming as a subsequent question, when you start the administration of these medications, they are at that point chemically restrained. Whether or not they are sedated is a different question.

And the reason I address the question in that manner is that once you start this process, you have to have a medical personnel in there supervising the patient. That's not what happened here. They gave him Haldol, they gave him Ativan, and they walked away. Unbelievable. A gross departure from the standard of care.

BY MR. UPCHURCH:

Q. Well, let's go back to your statement. I want to make sure that we are operating on -- or, understanding each other with respect to your definition of the terms that you're using. Do I understand you to say that upon administration of

Ativan or other sedatives or antipsychotics such as Haldol -- that upon administration of those medicines a patient is considered chemically restrained?

A. You have initiated the process of chemical restraints requiring medical supervision. Okay. Now, that's different from are they sedated, can you work with them? They are two different questions in my mind.

Q. Because the process of sedation may take time in terms of multiple dosages of medications to achieve the level of sedation that one is desiring to achieve?

A. Correct, but you don't administer these medications and walk out of the room, not under these circumstances.

Q. All right, sir. We will talk about that opinion. Let's look, Doctor, at your fifth opinion. Again, it's identified as the second number three on page three.

A. Yes, sir, I see it.

Q. Have we discussed the opinions that -- discussed already the opinions that you hold with respect to repositioning the patient to the supine position?

A. Yes; and in summary I feel it's incumbent upon the nursing staff when they are encountering a patient prone in the hog-tie position to begin the process of adjusting the restraints to put him in the supine position with or without forensic restraints as indicated on the particular situation.

Q. Now, the last phrase of that fifth opinion says despite the hospital protocol requiring the least restrictive restraint. What hospital protocol are you referring to?

A. This relates back to a question we discussed earlier. I don't have a distinct memory of this, but I am under the impression that hospital protocol -- and I think I got this from the nurse risk manager person. The hospital protocol and the other documents that we've referred to require the least restrictive restraints to maintain the patient's safety and the safety of others attending to him.

The supine position in my opinion would have relieved his distress and/or protected him by relieving the stress on the accessory muscles of respiration and other physiologic phenomenon that ultimately contributed to his demise. You cannot, do not, must not leave a patient in the hog-tied position

prone. Never seen it, never heard of it, to my knowledge it is not accepted practice anywhere in the United States.

Q. Do you agree that in Mr. Goode's psychotic -- florid psychotic state, as you have described, that he was likely to resist any restraints that he was placed in irrespective of the position?

A. Certainly.

Q. Let's look at your sixth opinion, Doctor, which is numbered four on page three. Quote, failed to post a trained medical staff member in the room to observe the patient, period, closed quote. At what point do you contend that a trained medical staff member was required to be posted with Mr. Goode?

A. Well, certainly at the beginning when they administered the chemical restraints as you have defined. When they administered Ativan and Haldol, at that point and from thereafter he should have been attended to by a medically trained personnel and attended to with an EKG monitor or cardiac monitor and a pulse oximetry and someone who could watch for decompensation.

But in addition to that he's also restrained; and I understand the hospital's position

to be, well, we don't have to monitor because he wasn't in hospital restraints, he was in law enforcement restraints, which is absolute nonsense. The man was restrained. He died restrained. He died restrained in an inappropriate position; and he was in restraints not for legal purposes, that is, we wish to prevent you from escaping, but for medical purposes, that is, you are flailing about so that you pose a risk to yourself.

So in that sense he should have been attended one on one from the time he was -- from the time he was roomed. He was restrained.

Q. From the time he was roomed?

A. Yes.

Q. What does that mean? Does that mean in triage or when he actually made it to the treatment room nine?

A. Well, he would have been attended to one on one in triage; and as they moved him to the room where he was ultimately isolated and where he died, he should have been attended to by medical personnel.

Q. When you say trained medical staff in that opinion, what are you referring to?

A. At least a nurse, and not the janitor who

has had one hour of seclusion training, not appropriate.

Q. And is the -- did you say janitor?

A. Yes.

Q. Is it your opinion that the one on one monitoring was required -- well, let me ask you. What is the basis of your opinion that one on one monitoring was required by a trained medical staff member in room nine but prior to the administration of the Ativan and Haldol?

A. He was in restraints. I think the CFR requires that. I think the recommendations in that document previously discussed on patient safety recommends that. I'm pretty sure the hospital policy requires that.

Q. Well, that's why I asked you at the outset about the hospital policies, and you told me you don't recall reviewing any of those. You did say, though, that you had reviewed the CFR. Do you have that in your materials?

A. No, sir.

MR. McCORMACK: Object to the form of that question.

THE WITNESS: I don't think I

have the CFR with me.

BY MR. UPCHURCH:

Q. You identified the CFR in I believe it was your supplemental report, and you identified a particular section of that.

A. Uh-huh (affirmative).

Q. It was 42 CFR 482.13. Let me hand you a copy of what I believe is that section. It's been marked BMH Discovery 135 through 142.

A. Go ahead.

Q. And I'll also hand you, Doctor, just for sake of completeness the interpretive guidelines for that particular section. Those interpretive guidelines are mentioned in that report that you told me you reviewed earlier. Let me hand that to Mr. McCormack, and then he can hand that to you.

A. All right, sir. I have the documents referred to. Thank you.

Q. All right, sir. Based upon your review of the records was there ever a time in the Emergency Department that Mr. Goode was left alone, that was -- that is, without someone being personally present with him?

A. My understanding is he was never left

alone.

Q. All right, sir. In light of that fact do you agree that Mr. Goode was not in, quote, seclusion, closed quote, as defined by this CFR section?

MR. McCORMACK: Object to the form.

THE WITNESS: I've not read the definition of seclusion, if you want -- let me see if I can find that.

BY MR. UPCHURCH:

Q. I can direct you to that. It's on page 137.

A. Sure. Let me read it. Seclusion is involuntary confinement of a patient alone in a room or area from which the patient is physically prevented from leaving. Seclusion may only be used for the management of violent or self-destructive behavior.

In that particular posture he was not secluded.

Q. All right, sir. Back on page 136, and I know you're familiar with this, but the definition of restraint is given; is it not?

A. Yes, sir.

Q. Now, if you look at the interpretive

guidelines and if you look at the third page in, Doctor, it's on what's Bates stamped as 145.

A. Okay, bear with me. I don't know that -- oh, here it is. Okay, Bates 145.

Q. Yes, sir. We're looking at the interpretive guidelines for this same section that we've been looking at from the code. That is 42 CFR 482.13, correct?

A. Yes, sir.

Q. Would you turn over to page 149, please, sir?

A. (Witness complies with request.) All right, sir.

Q. I'm looking at the bottom paragraph that begins the use of handcuffs.

A. At the very bottom, yes, sir.

Q. Yes, sir. That says: The use of handcuffs, manacles, shackles, or other chain type restraint devices or other restrictive devices applied by nonhospital employed or contracted law enforcement officials for custody, detention, and public safety reasons are not governed by this rule.

A. Yes, I see that.

MR. McCORMACK: Object to the

form.

THE WITNESS: And I also see, if you will, the next sentence which says, quote, the use of such devices are considered law enforcement restraint devices and would not be considered safe, appropriate health care restraint interventions for use by hospital staff to restrain patients.

BY MR. UPCHURCH:

Q. Certainly you would agree with that, that in your experience in the ED you would not even have available to you the type of forensic restraints that were used?

A. I don't have handcuffs and leg shackles, no.

Q. Right. I mean, that's -- that's not a health care restraint?

A. No, sir, it's not.

MR. McCORMACK: Object to the form.

BY MR. UPCHURCH:

Q. That's not -- that's not a restraint that an ED physician or nurse would be trained in how to

apply?
A. No.
Q. That is, shackles and handcuffs?
A. That's correct.
Q. All right. Do you agree that under this interpretation of CFR 482.13 that forensic restraints are not governed by that section?
MR. McCORMACK: Object to the form. Are you asking him for a legal opinion?
MR. UPCHURCH: No, sir. I'm just asking him to -- based upon his review of the sentences that we've read if he agrees with the plain statement that this section doesn't apply to forensic restraints.
BY MR. UPCHURCH:
Q. I'm not asking you a legal opinion.
MR. McCORMACK: I'm going to object. This is -- to the form of the question in that it's calling for a legal opinion based on reading and interpreting law.
THE WITNESS: I'm not sure I

understand your question. Would you repose the question, please?

BY MR. UPCHURCH:

Q. Do you agree based upon the sentences that we've just read on page 149 with the express language of the interpretive guidelines that CFR -- 42 CFR Section 482.13 does not apply to forensic or police restraints?

MR. McCORMACK: Same objection.

THE WITNESS: Well, they're describing police restraints.

BY MR. UPCHURCH:

Q. Yes, sir.

A. So there is some application there somewhere.

Q. Well, let me read it to you again. It says: The use of handcuffs, manacles, shackles, other chain type restraint devices or other restrictive devices applied by nonhospital employed or contracted law enforcement officials for custody, detention, and public safety reasons are not governed by this rule.

Do you have any basis to dispute that sentence?

MR. McCORMACK: Object to the

form of the question.

THE WITNESS: The rule talks about the use of forensic restraints. Whether or not it governs or doesn't govern, I can't opine on that.

BY MR. UPCHURCH:

Q. Well, do you agree that the restrictive devices that Mr. Goode came into the hospital with were applied by nonhospital personnel?

A. Yes.

Q. Do you agree that they were applied by law enforcement?

A. I agree.

Q. Do you agree that they were applied for custody, detention, or public safety reasons by law enforcement personnel?

A. I agree with that as well.

Q. All right, sir.

MR. UPCHURCH: We'll attach 42 CFR 482.13 and the interpretive guideline, if I might see those, Doctor, as the next collective exhibit to the doctor's deposition.

(Whereupon, Exhibit 5 was

marked as an exhibit to the deposition of the witness and can be found among the deposition exhibits attached hereto.)

BY MR. UPCHURCH:

Q. Am I correct from our earlier discussion that you cannot direct me to any hospital policy that you rely upon to support your opinion that a trained medical staff member was required to be posted with Mr. Goode in his room?

A. Well, inasmuch as I don't have access to the Baptist policies, my response to that question is somewhere the notion that an individual in restraints must be attended to by hospital employee has arisen, and I think it was in connection with the deposition; but, in any event, to argue that this man was appropriately attended to in the light and posture of the assertion of Baptist that he was fine and healthy when he got here and died unexpectedly stretches, defies credulity.

The man was in restraints. He was in the joint custody of the Police Department and the hospital, and they left him in the hog-tied prone position, which is not approved by any standard or organization or body for the appropriate restraint of

a hospital patient. Now, somewhere in all of that mix somebody is responsible.

The hospital is responsible for not alleviating his suffering, not attending to him and putting him in an accepted position. They didn't do that, and I am confident that Baptist has a policy that speaks to this very thing. I don't have it.

Q. And that gets to my very question. You don't have it, and having not reviewed it you would not under your oath testify that Baptist has breached a policy that you've not reviewed, would you?

MR. McCORMACK: Object to the form.

BY THE WITNESS:

A. Oh, yes, I would. I would absolutely testify that it is my belief that if they don't have a policy, they're supposed to; and it's also my belief that they violated the policy by leaving him in this prone position and by not monitoring him even though he is restrained.

Let's get to the heart of it. Baptist is debating metaphorically how many angels can dance on the head of a pin when in reality any juror is going to understand the man was in restraints, the man was

not attended to by medical personnel, and the man died not because he was beaten to death by the police or as a result of what the police did, but by medical neglect.

It is the thing which he was entitled to be protected from, and Baptist did not lift a finger to do much of significance to protect him or save his life. That he was intoxicated by LSD, however inappropriate and unwise that may have been, did not give him a slip that says don't treat. That's what they did. They left him to die.

BY MR. UPCHURCH:

Q. Yes, sir. So you're going to opine about -- at trial about policies you've never seen?

A. No, sir. By the time trial arrives, I will have reviewed the policy, because I'm confident that Mr. McCormack and Mr. Edwards will furnish me that policy for further review at the time of trial; and if you have to redepose me, so be it.

Q. Well, let me say I'll reserve that right now to do that.

A. Understood.

Q. I will tell you those policies have been produced long since.

A. Uh-huh (affirmative).

Q. And I understand from your testimony that you've not reviewed those.

A. That I remember. Now, let's not beat this about. If you want me to review and opine them, furnish them. I'll be glad to. We can take a quick recess, shouldn't take me but a couple of minutes, and I'll be glad to render an opinion.

Q. Doctor, is it your opinion that each time -- on each occasion that a sedating medication such as Ativan and an antipsychotic medication such as Haldol are administered to a patient for calming purposes that that patient is required by the standard of care to have one on one continuous monitoring from a trained medical personnel?

A. Yes, it is.

Q. So when I subpoena your charts from Baptist and you've ordered a sedating medication such as Ativan and administered an antipsychotic such as Haldol, I will find, then, that your patients were being continuously one on one monitored by medically trained personnel?

MR. McCORMACK: Object to the form.

You can answer.

THE WITNESS: The answer to that question -- I don't know the answer to that question. Okay? Because in the particular environments where I've worked, I could see directly into the room; and that would be more than sufficient.

BY MR. UPCHURCH:

Q. Would it be your habit to have written an order for one on one continuous observations of patients when you felt they needed it?

A. In the particular situation I'm confident that the Baptist nurses where I have worked would produce a form for me to sign, which form is allowed by the CFR and which form would identify all the different requirements pertinent to chemical or physical restraints.

Q. Does that form to your recollection include an order for one on one monitoring and observation?

A. I don't remember the form per se.

Q. Let's look, Doctor, at opinion number seven. It's actually not numbered on page three. It

begins with as a direct and proximate result of these failures.

If my note of your earlier testimony is accurate, you said that you do not intend to testify as to cause of death at trial. Is that correct?

A. I have not been retained to opine on that issue, that's correct.

Q. With respect to your initial report, are there any opinions that you hold with respect to hospital nursing personnel, Doctor, that we've -- that we've not discussed?

A. Would you repeat the question, please?

Q. Yes, sir. With respect to the opinions delineated on page three of your initial report, are there any opinions that you hold with respect to Baptist nursing personnel that we've not discussed?

A. Let me summarize them.

Q. No, sir.

A. Well, I'm trying to think.

Q. I want an answer to my question, and then you can certainly answer.

A. Then let me think out loud in response to your question. We have spoken about the failure to effectively communicate with a suspected

supraventricular tachycardia which was communicated by the EMT to Nurse Baker. We have discussed the failure to apply a cardiac monitor insofar as it relates to that issue. We have discussed the failure to effectively troubleshoot the mismatch between the pulse oximetry and the clinical presentation.

We have discussed the failure to apply one on one medical supervision. We have discussed failure to remove the patient from the hog-tie position. We have not or have obliquely discussed not putting oxygen on him, which was not attempted. We have not noted the fact that notwithstanding Baptist employees' terrible fear of this harmful person that Ms. Graham was able to get vital signs, that Ms. Graham was able to place an I.V., that Ms. Graham was able to get a pulse oximetry, and that Ms. Graham was able to get an EKG reading.

It astounds me that Baptist is going to take the position that this violent man who never broke a thing, who never put a scratch on anybody was so violent that he couldn't be treated. It astounds me that Baptist given their motto of teaching, preaching, and healing takes the position that forensic restraints which were applied to keep the man

from falling off the gurney were not restraints that have any application to them insofar as it relates to one on one monitoring.

It astounds me at the lack of indifference that was manifested toward this patient, a de minimis effort to help him. Okay. I know what they did. You know what they did. They snickered at him, they laughed at him, they made fun of him, and they put him back in the room for their own convenience and they refused to engage. This is abysmal care, abysmal.

Q. Do you have any factual basis to suggest that the health care providers snickered or laughed at Mr. Goode?

A. I have seen hints of that in the Complaint and elsewhere.

Q. Do you consider your review of a Complaint a factual basis to render an opinion?

A. I consider -- the federal rules define a Complaint as a brief statement of the facts supporting the claim for liability.

Q. Not my question, Doctor. Can you answer my question?

A. Yes. I consider the -- certainly you're

not telling me that Mr. Edwards would produce something that was entirely false in a Complaint which he signs as a member of the Court. You're not suggesting that; and so, therefore, I opine and imply or infer from that that if Mr. Edwards put in the Complaint they snickered and laughed at him that such a thing took place.

Q. All right, sir. That's reliable enough evidence for you to render an opinion at trial on?

A. Yes, sir.

Q. All right, sir. Any other factual basis other than your heartfelt reliance on Mr. Edwards as a basis for your statement that health care providers simply laughed and snickered at this gentleman?

MR. McCORMACK: Object to the form.

THE WITNESS: No.

BY MR. UPCHURCH:

Q. You stated in your initial report -- and I'm looking on page one, Doctor, if you want to look at it.

A. Go ahead.

Q. I'm looking under the heading the EMS Transport and Care. The second sentence under that

paragraph states: A credible body of peer reviewed literature supports the proposition that holding someone in the prone position interferes with the diaphragm and the voluntary muscles of respiration, which may compromise respiratory effectiveness. This is of particular significance -- of particular importance, pardon me, in a psychotic patient who may decompensate unexpectedly, requiring urgent intervention.

Identify for us, please, sir, the credible body of peer reviewed literature that you reviewed in connection with that statement.

A. There is a book -- there is at least one textbook I reviewed called Sudden Unexpected Death Syndrome and others. I cannot produce those citations this afternoon, but I will certainly do so.

Q. Who authored the Sudden Unexpected Death Syndrome --

A. (Interposing.) I don't recall.

Q. (Continuing.)-- text?

A. I don't recall. I mean, I have it, I have the book, but I don't recall who did that.

Q. Was it Dr. Wecht?

A. Cyril Wecht? No, sir, I don't think it

was; but it may have been. As I say, I just don't recall.

Q. All right, sir. Based upon your statement, are psychotic patients -- are they at an increased risk of decompensating unexpectedly?

A. Sure, depending on the basis for the psychosis. Hypoxia can produce psychosis. Hypercarbia can produce psychosis. Drug intoxication can induce psychosis. Other things can induce altered mental status, not necessarily psychosis, that contribute to sudden collapse.

Q. Are you of the opinion that Mr. Goode experienced hypoxic psychosis with an $O_2$ sat of ninety percent?

A. I do not have enough factual information to answer that question. However, at this time I would like to segue to a point that we have discussed and which I've been turning over in my mind with your permission. We have discussed at length the presence or existence of Baptist policies as it relates to observation one on one for a patient in restraint. I have found now the reference which I have been remembering, and that is this, if you'll permit me.

Q. Identify the deposition --

A. (Interposing.) Certainly.
Q. (Continuing.)-- that you're referring to, please, sir.
A. I'll be glad to. This is the deposition of Dr. Lemuel Donja Oliver taken December 14th, 2016. Donja is spelled D-O-N-J-A. This is on page 80 of the deposition. The question by Mr. Edwards posed at line four by Mr. Edwards: Quote, and then will you turn over to page 29, please, under monitoring and observation? It says if the patient is being restrained utilizing the violent, comma, slash, self-destructive criteria, comma, the following is required; one, an assigned staff member who is skilled and trained accomplishes monitoring through continuous in-person, face-to-face observation.
It is that upon which I rely in opining that the hospital and its employees deviated from the standard of care by not providing one on one observation.
Q. And that was at least in part a basis for the opinions that you've expressed earlier?
A. Yes, sir, that's correct.
Q. Do you recognize excited delirium syndrome as a valid diagnosis?

A. I do.
Q. Have you in your medical career assigned that diagnosis to a patient?
A. I have not.
Q. Have you had a patient whom you treated who subsequently died who was identified at autopsy as having excited delirium syndrome?
A. I don't think that there are autopsy findings that support sudden unexpected death syndrome; but the answer to your question is no, I have not to my knowledge.
Q. What do you understand to be the typical characteristics associated with excited delirium syndrome?
A. The typical characteristics are associated almost hand in glove with this case. As manifested by an individual who encounters law enforcement, usually in a state of rage or psychosis, the individual is placed in confinement as defined by restraints, typically in the hog-tie position, and left there for an extended period of time, as a result of which he experiences cardiorespiratory collapse and dies.
I also understand based upon my reading

that it is commonly understood phenomena by law enforcement that you're not supposed to do this. It is commonly understood by EMT personnel you're not supposed to transport in this manner and may -- and apparently not understood by Baptist Southaven, that you're not supposed to leave an individual in this position for an extended period of time.

Q. Let's look, Doctor, at your supplemental report which I believe you have in front of you as well.

A. All right, sir. I have that.

Q. Tell me what the handwriting is that you have on the legal sheet that's attached to that report that you have.

A. This refers to a conference with Mr. Edwards on March 27, 2017 regarding the citation to the American Journal of Emergency Medicine, Volume 19, Number 3, Factors Associated With Sudden Death in Individuals Undergoing Restraint.

MR. McCORMACK: Hold on. Is -- Dr. Fowler, is that a note that you made of a conversation regarding mental impressions?

THE WITNESS: Yes.

MR. McCORMACK: I'm going to object to that being read into the record.

MR. UPCHURCH: I'd say for the record that Dr. Fowler has that in front of him. It is the materials that he brought with him. I am entitled to ask him about that and to see that information.

MR. McCORMACK: Are you taking the position that you're entitled to see work product information merely because he brought it to the deposition today?

MR. UPCHURCH: My position is, as stated, Dr. Fowler was asked to bring with him the documents that he reviewed and notes that he made in preparation for this -- his opinions and for this deposition. He brought to the deposition the folder that he has in front of him.

Those notes were contained in that folder, and my position is that in light of that being brought as responsive to the notice that I'm entitled to see

that information.

MR. McCORMACK: I will note for the record that you requested he bring his entire litigation file, and that has not been reviewed for privilege for work product.

I'm going to instruct you not to read that onto the record.

THE WITNESS: Sure. I would also comment for the record's sake that this document was prepared in March and has nothing to do with the preparation of my deposition here today.

MR. GASS: I would ask that a copy of whatever this document is that has the marginalia on it that's at issue at this point -- that a copy of it be made, placed in some sort of a sealed envelope so that if it becomes the subject of a motion ultimately that we have preserved it.

MR. McCORMACK: I'm happy to make sure it's preserved.

MR. GASS: In that fashion?

MR. McCORMACK: I'm happy to make a copy of it so we have a copy preserved.

MR. GASS: Thank you.

BY MR. UPCHURCH:

Q. Doctor, do you have your supplemental report in front of you?

A. Yes, sir, I do.

Q. At the time of your initial review of this case you were aware, were you not, that Ativan and Haldol were administered to Mr. Goode?

A. Yes.

Q. In your initial report you made no criticisms of the administration of Ativan and Haldol other than your opinion that the amount of Ativan was insufficient?

A. That's correct.

Q. Is it your opinion that the dose of Ativan as ordered, which I believe was two milligrams I.M., was an insufficient sedative for Mr. Goode given the condition in which he presented?

A. Yes. It wasn't administered I.M. It was administered I.V.; but, nevertheless, yes.

Q. Thank you. What do you contend the

dosage of Ativan should have been to effect sedation of Mr. Goode in his floridly psychotic state?

A. Well, the answer to that question depends on the clinical response.

Q. I'll amend my question to state a starting dose then.

A. Starting dose would be two.

Q. So you find the dose to be appropriate?

A. It's an appropriate start.

Q. All right. And you would know from your experience in the ED that you would start with two milligrams Ativan, five milligrams of Haldol? Is that an appropriate starting dose?

A. Yes.

Q. And then you would monitor for the effects of those medications on the patient, and the physician would make a determination as to whether additional dosages need to be administered?

A. Monitor at the bedside by myself or a nurse, not the Southaven Police Department.

Q. Okay. You made no criticisms in your initial report of monitoring with respect to the Ativan and Haldol, did you?

A. To the extent that I did not or to the

extent that you believe that I did not, my criticism as manifested in the deposition today is you don't start these medicines under these conditions without monitoring.

Q. Yes, sir. My question was -- if you disagree with it, you can tell me. But in your initial report you made no criticism of the monitoring associated with the giving of Ativan and Haldol, did you?

A. Again, I do not criticize the decision to give Ativan and Haldol per se, no.

Q. You made no criticism in your initial report of the monitoring with respect to Ativan and Haldol, did you?

A. The initial report will speak for itself. However, to the extent that we have added an additional consideration, that consideration being that he should have been monitored, the answer is he should have been monitored once this process was started.

Q. After you submitted your initial report, were you requested to render additional opinions regarding the monitoring of Ativan and Haldol?

A. I don't recall that I was asked at that

particular point, no, sir.

Q. How did you come to form this opinion about monitoring after the issuance of your initial report?

MR. McCORMACK: Object to the form.

You can answer.

BY THE WITNESS:

A. In this particular situation there are thousands of questions you could ask me that wouldn't be included in the initial report. The administration of Ativan and Haldol per se was not inappropriate. It is the failure to monitor an individual in a precarious medical condition that is important and is at issue at this point in time. The failure to monitor contributed to the -- his untimely demise.

BY MR. UPCHURCH:

Q. How long after the Ativan was administered would you expect from your clinical experience for it to have an effect clinically on the patient?

A. That can vary. I myself have had Ativan and the onset of action within three, four, five minutes. I have seen individuals completely

refractory to Ativan in the sense that they did not elicit the expected clinical response. It varies across individuals.

Q. Same question with respect to your experience in administering Haldol I.V. How long would you expect after administration to it have -- typically to have an effect clinically on the patient?

A. Within a few minutes; three, four, five minutes.

Q. In your supplemental report, I'm looking at the second paragraph, Doctor, the second sentence you say: It is further my opinion that Mr. Goode should have been continuously monitored with ECG and pulse oximetry from the time of admission since he was in a hog-tie restraint with findings of SVT and marginally low blood oxygenation coupled with his pre-existing diagnosis of asthma.

Have we discussed your opinions in that regard previously?

A. Yes.

Q. I think the only new component is reference to a pre-existing diagnosis of asthma. Do you have any factual basis to suggest, Dr. Fowler, that Mr. Goode was experiencing an asthma attack at

any time during his ED admission?

A. There is no factual basis in my opinion to support an asthma attack or event in this particular situation.

(Whereupon, Mr. Gass left the deposition.)

BY MR. UPCHURCH:

Q. Mr. Flock testified that the patient's movement prevented him from applying and his behavior prevented him from applying twelve lead EKG to the patient. You would say that that was a refusal to engage on his part?

MR. McCORMACK: Object to the form.

BY THE WITNESS:

A. I would say two things. The hospital attempts to stand on the notion that twelve lead EKG is required to determine the rhythm. That is not the case. You can do this with very simple monitors. It's done all the time in ambulances. It's done all the time with Zoll, Z-O-L-L, monitors where we're running a code.

I don't need a twelve lead EKG to run a code. I often just use one lead, the rhythm lead,

which is number two. In that particular posture they made no attempt to relieve the patient's distress by putting him in the supine position. That would likely have helped some.

You cannot apply twelve lead EKG leads to the chest when it's closely apposition to the bed, nor can you do it necessarily when they're thrashing around; but they made no meaningful attempt to relieve that. Now, this man could have been restrained in the prone position and twelve lead EKG applied if they'd wanted to. They didn't want to.

BY MR. UPCHURCH:

Q. You state in the next sentence in your report, page one, that he should have had one on one continuous observation. Have we discussed your opinions, Dr. Fowler, with respect to the need in your opinion for continuous one on one observation?

A. Yes. Again, to summarize, you don't know if the individual is going to sustain an adverse event to the medications, such as tardive dyskinesia, which is associated with the administration of Haldol that warrants immediate medical attention.

So any time you're restrained because you're violent or self-destructive in this manner, you

have to have one on one and you have to have one on one once you begin the process of administering sedation. You don't know whether in this particular case two milligrams is much too much for Mr. Goode just because of the way he is and all of a sudden he stops breathing, which would warrant an immediate intervention; but you don't walk away from this man in this condition having administered these drugs under these circumstances. You just don't do it.

Q. You go on to state in your report, I'm looking at page one still, beginning with the sentence certainly after administration of chemical restraints, and you go on to repeat an opinion about monitoring the patient. My only question to you is, Doctor, have we discussed all of the opinions that you have with respect to monitoring Mr. Goode upon administration of the Ativan and Haldol?

A. Yes, sir.

Q. You reference the CFR section that we've marked as Exhibit 5 to your deposition in support of this opinion. Could you identify for us, please, sir, the portion of that CFR section that you are relying on? And I'll hand you back that exhibit.

A. Thank you, sir. Beginning with the

page 136: A restraint is any manual method, physical or mechanical device, material, equipment that immobilizes or reduces the ability of a patient to move his or her arms, legs, body, or head freely. That's the definition of a restraint.

On page 137: A drug or medication when it is used as restriction to manage the patient's behavior or restrict the patient's freedom of movement and is not a standard of treatment or dosage for the patient's condition.

In this particular situation the medication was administered to limit the patient's movement or restrict his freedom of movement and manage his behavior.

Restraint or seclusion may only be used when less restrictive interventions have been determined to be ineffective to protect the patient, staff member, or others.

On page 140, paragraph small Roman six: Monitoring the physical and psychological well-being of the patient who is restrained or secluded, including but not limited to respiratory and circulatory status, skin integrity, vital signs, and any special requirements specified by hospital policy

associated with a one hour face-to-face evaluation.

Number -- page 141, standard death reporting requirements: Hospitals must report deaths associated with the use of seclusion or restraints, each death that occurs while a patient is in restraint or seclusion is the basis.

Now, this requires a liberal reading. Baptist has argued via deposition that he was in forensic restraints, as though somehow or another this is a magical category that exempts them or excuses them from their monitoring responsibilities. Not so. The fact that they were applied by the Police Department for the purpose of maintaining this individual's relative immobility and to restrict his movement makes them just as applicable to regulation of the -- as would the soft restraints.

So Baptist is attempting to argue how many angels can dance on the head of a pin. That's a totally ridiculous argument. The man was restrained, period. As a result of the restraints he should have had one to one medical monitoring. He didn't get it. Period. He died. Period. And that is a plain and simple reading and understanding of these requirements.

Q. Are there any additional publications that you rely on in addition to the CFR for one on one monitoring of Mr. Goode in this clinical setting?
A. We have mentioned obliquely by reference to Dr. Oliver's deposition --
Q. (Interposing.) Yes, sir.
A. (Continuing.)-- the requirement that in Baptist Hospital protocol that he be restrained. Bear with me just a second.
With respect to your question now I'm referring to a document called Emergency Medicine Patient Safety Foundation previously indicated on my list of documents that discusses patient restraints. This language is by and large consistent with the language of the Code of Federal Regulations which you would expect, but it also says and I quote: Patients must be assessed and monitored at regular intervals, and I will not finish that sentence, the purpose of which is to monitor to determine the effect of chemical restraints to make sure the patient doesn't experience circulatory interference as a result of the restraints which would cut off circulation to his appendage, and an assessment is done to determine why he's violent or destructive.

Q. What page are you reading from, Doctor?
A. On this page I'm referring to, Emergency Medicine Patient Safety Foundation, it is not a numbered page. Bear with me.
The reference to assessment is on page seven. The reference to continuous monitoring is: Any patient who is in restraint, although it says and seclusion, must be continuously monitored on a one and one basis. Restraints and seclusion can only be used for patients who are violent and self-destructive.
Q. All right, sir. If I could see that, please, we'll attach that as the next numbered exhibit, which I believe is Exhibit 6 to your deposition.
A. We can mark it, but I want a copy to refer back to later on.
Q. Yes, sir. You're certainly entitled to that, Doctor.
(Whereupon, Exhibit 6 was marked as an exhibit to the deposition of the witness and can be found among the deposition exhibits attached hereto.)
MR. PHILLIPS: Would you give me the title? Just read the title --

well, no, that's fine. Pass it down, and I won't interrupt your questioning.

Do you need this right now, Doctor?

THE WITNESS: Not this instant, no, sir.

MR. PHILLIPS: If you need it, I'll give it right back.

THE WITNESS: No, no, no problem.

MR. McCORMACK: At a break do you want to make a copy of that and we can use the copy as an exhibit?

MR. UPCHURCH: Whatever is easiest, yes. That makes sense.

MR. PHILLIPS: Do you want to do that now?

MR. McCORMACK: I'll just do it at the next break.

MR. PHILLIPS: Do you want to break now, David?

(Off the record discussion.)

(Whereupon, a break was taken.)

BY MR. UPCHURCH:

Q. Doctor, we're back on the record after a brief recess. We were discussing the opinions in your supplemental report, and I think we had reached the bottom of page one, which begins in addition hospital protocol; and that sentence goes on to speak of one on one monitoring of the patient.
And we've discussed, have we not, the opinions that you hold in that regard and the basis for those opinions?
A. Yes, sir, we have.
Q. In the next paragraph you state that I also expect to review the deposition of the corporate representative. I believe I asked you that at the outset of this deposition. The corporate representative was a gentleman by the name of Brady Simpson. Am I right that you've not received his transcript of that deposition?
A. That is correct. When I -- I was thinking Ms. Tidwell, a nurse, was the corporate representative in her capacity as risk manager; but I have not reviewed that, and there is another document -- deposition of an eye witness that I have not seen.
Q. What eye witness are you referring to? Do you know his or her name?

A. I don't, no.
Q. Have you reviewed, Doctor, the expert report of Dr. Wecht, forensic pathologist who has been retained by the plaintiff who renders opinions on cause of death? Have you reviewed his report?
A. Yes.
Q. Have you reviewed the report of Dr. Arnold, if I'm pronouncing his name correctly, a forensic pathologist who testified yesterday by deposition?
A. Not that I recall.
Q. Do you have any understanding -- strike that.
You have told us that you were not retained to render an opinion on cause of death?
A. Yes, sir.
Q. Do you have any understanding, Doctor, as to the plaintiff's position, Mrs. Goode's position with respect to the cause of death of Mr. Goode?
A. The issues of cause of death are outside my purview.
Q. All right, sir. In light of that fact, that the issues of cause of death are outside of your purview, do I understand correctly, then, that the

testimony that you will offer at the trial of this case will be confined to the issues of duty?
A. Uh-huh (affirmative).
Q. And breach of duty?
A. Pardon me. The answer to your question is yes. I will opine as to the requisite standard of care on the part of the emergency personnel.
Q. Will not address issues of causation or cause of death, correct?
A. That is correct.
Q. How long have you been doing medical legal work?
(Whereupon, Mr. McIntosh left the deposition.)
THE WITNESS: Four or five years.
BY MR. UPCHURCH:
Q. Approximate number of cases that you've reviewed?
A. Reviewed? Probably twenty or less.
Q. Can you give us a percentage breakdown on behalf of patient/plaintiff versus defendant?
A. Predominantly plaintiff. The defense industry, insurance industry likes to hire what I

would describe as high powered experts with all these credentials that I don't have.

Q. Speaking of that, I presume you may be referring to academic credentials. Have you held any teaching or academic positions within the field of medicine?

A. No, sir.

Q. Your typical charge for record review, deposition review?

A. $1500.

Q. And do you just do that on a flat fee basis for review of records?

A. Yes, sir.

Q. Then if you -- do you exhaust, say, that retainer? Do you bill in $1500 increments thereafter?

A. No, sir. The $1500 buys you complete review of the records, buys you back and forth telephone calls. It buys you a written report. Then beyond that, depending on the circumstances, it's an hourly fee of $250.

Q. Do you have a recollection of the amount that you have billed in terms of dollars for your review of this particular case?

A. Total probably is close to two thousand.

Q. Your charge for deposition testimony is what?
A. $1500.
Q. And I believe we have remitted payment to you --
A. (Interposing.) Yes, sir.
Q. (Continuing.)-- for that --
A. (Interposing.) Yes.
Q. (Continuing.)-- when we had this deposition scheduled months ago?
A. That's correct, yes.
Q. What is your charge for trial, attending trial?
A. The same, $250 an hour.
Q. Portal to portal?
A. Yes, sir.
Q. Just a little bit about you background-wise, Doctor. Are you a native of Tennessee?
A. Yes.
Q. Ever lived in North Mississippi or in the Mississippi Delta?
A. No, sir.
Q. Do you have any relatives in, let's say,

North Mississippi where this case is venued, which is in Lafayette County?
A. No, sir, I do not.
Q. Do you have any business associations that bring you into contact with North Mississippi?
A. No, sir.
Q. Speaking of your present business activities, there appear to be quite a few on your C.V. Do you continue to be the corporate medical director of Interstate Blood Banks?
A. Yes, sir.
Q. Can you tell us what that position is and what you do?
A. Interstate Blood Bank has twenty-three or four plasma collection centers across the Eastern United States. We have ten whole blood collection centers mostly across the Eastern United States, one in Temple, Texas. The industry is extensively regulated by the Code of Federal Regulations as well as customers and by the European Health Authority.
In connection with collection of plasma and whole blood, I set medical standards for who can and can't donate. This results in the preparation of a booklet which the staff of these centers use to

determine donor suitability or donor eligibility.

In addition, I have to answer the unanticipated questions that arise in connection with a donor, for example, who as a child had an atrial septal defect that was surgically repaired, can they donate as opposed to the donor with status post CABG eight months ago, can he donate. So I do those kinds of policies.

In addition to that I'm the Director of Regulatory Affairs, which requires me to address audit complaints, interact with the FDA, and interpret and apply FDA regulations as it relates to the collection of plasma and whole blood.

Q. Do you continue to serve as the Medical Director For Advanced Rehab, Dash, Chiropractic?

A. Yes, sir.

Q. What do you do in that role?

A. In that capacity I supervise and review the charts of the nurse practitioners or physician assistants who are physically seeing patients in Jackson, Tennessee.

Q. You don't render any personal medical care or treatment to those patients?

A. Personally no, but I'm always available

by telephone to answer questions.

Q. Do you -- okay. You've told me you continue to be the Director of Regulatory Affairs for the Interstate Blood Bank?

A. Yes, sir.

Q. Do you continue to serve as Medical Director For Urgent Team?

A. Yes, sir.

Q. Urgent Team is an urgent care clinic located in Dyersburg, Tennessee?

A. Yes, sir. That's correct.

Q. Tell me what you -- your role is as medical director.

A. In addition to reviewing charts electronically, I also am called upon to fill in for practitioners when they are unable to attend the clinic. So I've done that fairly extensively here in the months of August and September, because we had a provider who was sick.

Q. All right, sir. So that is direct patient care at least from time to time in that role?

A. Yes, sir.

Q. Same question with respect to Medical Directorship of Urgent 45 in Jackson, Tennessee. Do

you continue to serve in that capacity?
A. Yes, sir.
Q. Do you see patients in that capacity?
A. No, sir; but Urgent 45 and Advanced Rehab are actually the same entity or related entities. They're in the same building.
Q. All right, sir. Do you continue to serve as Medical Director for Avalon Hospice in Dyersburg?
A. Yes, sir, I do.
Q. Describe your role for that entity, please.
A. The Avalon Hospice Service provides hospice care or end of life care for individuals characteristically with advanced COPD, CHF, and cancer. We review their plan of care on a biweekly basis or every other week basis, and also I supply and adjust narcotics for their pain control.
Q. Do you round on those particular patients?
A. No, sir, I do not.
Q. Do you continue to serve as Medical Director for the Terrell Clinic?
A. Yes, sir.
Q. What is the Terrell Clinic?

A. Terrell Clinic is a family medicine clinic in Union City, Tennessee. In addition to being the Medical Director, I also have hands on care of patients two days a week.

Q. Do you continue to serve as Medical Director for Urgent Care in Union City, Tennessee? Is that a separate entity?

A. That's a separate entity. Union City Urgent Care, yes, I'm the Medical Director there as well.

Q. In that capacity do you see patients?

A. No, sir.

Q. Do you continue to serve as Medical Director of Bloom Medical Spa?

A. Yes, sir, I do.

Q. Tell me what Bloom Medical Spa is.

A. It's an aesthetic spa. They do other things. They do colon cleansing, they do lasering, they do microneedling for aesthetic purposes for women primarily. That's pretty much what Bloom Medical Spa is.

Q. So you don't render any medical services there?

A. No, sir.

Q. The last entity that I have listed on what I'm looking at is Medical Director of Tyson Foods?

A. Yes, sir.

Q. What is your job responsibility in that role?

A. In that connection Tyson will send over a patient often for pre-employment physical or often for follow-up for workers' compensation injuries, and so I provide direct patient care in that capacity.

Q. And where do you render those services?

A. At Terrell Clinic in Union City. You have not asked, but I would offer that I also provide direct patient care at the Waters Nursing Home in Union City, Tennessee.

Q. Spell Waters.

A. W-A-T-E-R-S.

Q. How long have you rounded on patients in that facility?

A. Ever since I returned to Union City, so 2001, 2002, something like that.

Q. So the entities at which you render direct medical care would be Waters Nursing Home, the Terrell Clinic, and Urgent Team?

A. Yes, sir.
Q. Are there any other positions of employment that you currently hold that I've not asked you about?
A. Well, apart from the obvious medical legal consulting, no.
Q. And do you do that consulting under a separate business entity or name?
A. No, sir, just as a sole proprietor really.
Q. Do you advertise in any way your services as a medical legal expert?
A. No, sir, I do not.
Q. Have you ever done that?
A. No, sir. It's all word-of-mouth.
Q. Doctor, I will tender you to others who I presume will have questions for you. I'd like to review your file with the document that we've discussed removed and reserve the right to ask you questions about that; but for sake of time, I'll tender you.
But before doing that I know we've been discussing this matter for some number of hours now, but have we discussed, Dr. Fowler, each of the

standard of care opinions -- which you've said you're going to confine your testimony to. Have we discussed each of the standard of care opinions that you plan to offer at the trial of this case against Baptist Hospital, in particular nursing personnel?
A. Yes, sir.
Q. And have we discussed the basis for those opinions?
A. Yes, sir.
Q. All right, sir. With that I'll tender you to others; and unless you need it in response to questions by counsel, I'll review the consist of your legal file.
MR. McCORMACK: David, I have not had a chance to review the file yet. There might be some other documents that are responsive to the request but that are privileged.
Would you like me to go ahead and review those before we go through them?
MR. UPCHURCH: Why don't we for efficiency sake let these other lawyers examine Dr. Fowler and maybe we can do

that at the next break?

MR. McCORMACK: That makes sense.

CROSS EXAMINATION

BY MR. MACAW:

Q. Dr. Fowler, my name is Mat Macaw, and I represent Southeastern Emergency Physicians, LLC. My question relates to your testimony that April of 2009 through April 2013 you were working for the ER at Baptist-Tipton; is that right?

A. That's correct, yes.

Q. All right. You had said during your testimony that you were employed by TeamHealth. Do you recall that?

A. Yes.

Q. Can you explain for me the relationship between yourself and TeamHealth and Baptist-Tipton?

A. I was an independent contractor for TeamHealth, also known as Emergency Coverage Corporation, and I was an independent contractor and not an employee of the hospital.

Q. Okay. And would that be true for also Baptist-Union City and the ER in Humboldt and then also the I guess previous employment at Baptist-Union

City from '01 to '05?

A. Yes, sir, with the exception that at Humboldt I was an employee of West Tennessee Regional or -- the entity that owns Jackson General and so forth and so on.

Q. Those are all the questions I have for you. I'll tender the witness. Thank you.

A. Thank you, sir.

CROSS EXAMINATION

BY MR. DILLARD:

Q. Dr. Fowler, my name is Brad Dillard. I'm one of the lawyers representing the Southaven defendants in this case.

A. Yes, sir.

Q. First of all, I know in your report you made some -- or, rendered some opinions concerning the EMS transport and the care. I want to focus on that. Before I do, though, what is your education, training, and experience, if any, as an EMT?

A. As an EMT?

Q. Yes, sir.

A. None.

Q. Have you ever been licensed or certified by any state or governmental body as an EMT?

A. No, sir.

Q. Have you ever transported patients in an ambulance from an accident scene, say, to a hospital ER?

A. No, sir.

Q. What is the basis, then, of your familiarity with the standard of care that would be applicable to an EMT such as Stacie Graham that would allow you to render opinions as you have in your report?

A. As a licensed emergency -- as a licensed physician and as a former emergency room physician and/or as a physician practicing independently, from time to time I utilize ambulances services; and I know that there are certain things that they are required to do, assess the patient, take a brief history, take vital signs, begin the process of documentation, begin the process of securing the patient for transport.

In that capacity from time to time I have observed EMTs violate the standard of care by, for example, ineffective chest compressions or failure to obtain an I.V. when I.V. should have been obtained. So the basis of my expertise would be interaction over several years with EMTs in connection with handling

patients.
Q. In conjunction with preparing your report and rendering the opinions you have in this case, have you reviewed any of the policies and procedures of the Southaven EMT Department or EMS personnel?
A. Not that I recall.
Q. Have you reviewed any rules or regulations of the State of Mississippi that might be applicable to EMS personnel such as Ms. Graham?
A. Not that I recall.
Q. In looking at your report -- I'm on page one just under the heading the EMS Transport and Care.
A. Uh-huh (affirmative).
Q. Do you have that report?
MR. McCORMACK: The original report?
BY MR. DILLARD:
Q. The original report, that's correct.
A. Yes, sir, I see. Yes, sir, I do.
Q. Now, in that -- end of the first full paragraph under the heading the EMS Transport and Care, you state that unfortunately Mr. Goode was left in this hog-tied position until he suffered cardiorespiratory collapse. And to be sure I

understand, by that phrase cardiorespiratory collapse, do you essentially mean death?

A. Yes, sir.

Q. And that did not --

A. (Interposing.) Not essentially, but literally death, yes.

Q. I want to be sure we're on the same page. Would you agree that cardiorespiratory collapse or death did not occur during the course of Mr. Goode's ambulance ride with Stacie Graham?

A. May I address your question and go a step further, please?

Q. Sure, if you'd just answer yes or no, and then explain however you'd like to.

A. Yes, sir. The answer to your question is Ms. Graham and the Southaven Fire Department or EMT service were no longer involved once Baptist Hospital employees and staff took over. Mr. Goode died several minutes, almost maybe an hour after Ms. Graham had left the scene.

Q. Would you accept the point of transition of care from EMS personnel to a hospital ER to be at the triage point?

A. Yes, sir.

Q. And if at triage a patient is accepted by the ER, then there is care transition at that point?
A. Absolutely.
Q. Would you expect as an individual who has practiced emergency medicine for a police officer to render any type of medical care in an ER setting?
A. In the ER setting?
Q. Yes, sir.
A. No, sir. Well, okay. In fairness, running an extended code, if the police officer had training in basic life support, I might ask him to do a rotation for chest compressions, because chest compressions wear people out; but apart from that, no, sir.
Q. And I probably worded that too broadly then. Let me narrow it down to this particular case and Officer Baggett, who was present in the Baptist ER.
A. Right.
Q. Would you have expected Officer Baggett to provide any type of medical care to Troy Goode while a patient in the Baptist ER?
A. I would expect Officer Baggett to do exactly what he did, which is to report an obvious

change in condition. The answer -- the precise answer to your question is no, I would not have expected him to do anything other than that.

Q. Looking back at your report on the second paragraph of that same heading, under that same heading, the EMS Transport and Care, you talk about Ms. Graham, the EMT, that she testified she was unable to get a reading on Mr. Goode's oxygen saturation because Mr. Goode was thrashing about so violently that she could not keep a pulse oximeter on his finger.

And you say this seems unlikely. What reason do you have to doubt Ms. Graham's testimony as to the manner in which Mr. Goode was thrashing or moving around?

A. I do not have any reason to believe that Ms. Graham did anything other than her dead level best under the circumstances with one exception, and that one exception pertains to leaving this gentleman in the hog-tied position.

Q. And as far as the things Ms. Graham was able to do, she was able to apply a three lead EKG to Mr. Goode?

A. Absolutely she was.

Q. She was able to start an --
A. (Interposing.) Don't let me -- pardon me for interrupting. Not only did she do that, she obtained a pristine reading. It was an excellent reading, free of artifact.
Q. Which was communicated to the Baptist ER?
A. According to her deposition as well as the deposition of Mr. Baker, that is correct.
Q. And as an ER physician would you find that to be important, that such a finding be reported to you prior to the patient's arrival?
A. Absolutely.
Q. She was able to insert an I.V. line during the course of the brief ambulance ride from the scene to Baptist Hospital?
A. Yes, sir; and not only was the I.V. line in place, it was patent and operable.
Q. You've reviewed all of the -- all the Baptist medical records I assume, correct?
A. As far as I know, yes.
Q. Yes. Have you also reviewed all of the records that would relate to the ambulance run from the scene to Baptist Hospital?
A. As far as I know, yes.

Q. Having reviewed those records, would you have any reason to opine that Ms. Graham intentionally withheld any medical care to Mr. Goode?

A. Ms. Graham, in response to your question --

Q. (Interposing.) Yes, sir.

A. (Continuing.)-- did the very best she could under difficult circumstances; and, again, the only fault that I have with the ambulance service per se is leaving the gentleman in the hog-tied position.

Q. At the top of the next page, page two, you discuss the chemical restraint issue. You state that Ms. Graham at the end of that did not utilize a chemical or see the need to do so apparently. Again, I believe her testimony if you read her deposition was that the -- that Mr. Goode's skin color was good, there was no airway compromise, she did not feel that a chemical sedative was required.

Did you read her deposition?

A. I did, yes.

Q. Okay. And also as further explanation of that do you recall her testimony that this was a brief ambulance ride and also she was unsure about the

potential adverse interactions between Versed and this illegal drug that Mr. Goode had consumed?

A. Correct.

Q. Would that be a legitimate concern?

A. Absolutely it would.

Q. Okay.

A. And let me say again for clarification that this is an ongoing process; and, you know, obviously you try to think of what they are going to ask me, what are they going to talk about, and I must say that in light of my rereading her deposition I am inclined to think that her decision not to use chemical restraints was appropriate given the relatively short four mile trip, four minutes, five minutes from the position of confinement, if you will, or arrest, if you prefer, to the hospital.

Q. Let me ask you this question. It may short circuit the rest of the questions I was going to ask you. I think you said a moment ago the only criticism that you're going to have of Ms. Graham at this point is transporting Mr. Goode in the prone position?

A. That's correct.

Q. Okay. Now, there are three areas of

opinions at the top of page two where you've listed some potential criticism concerning supraventricular tachycardia, oxygen, and failure to turn. That -- would that number three, the third, then, criticism, failed to turn the patient to the supine position for transport, would that now be the only criticism you would have?

A. That is correct; and, again, this is an evolving process.

Q. Yes, sir.

A. And your understanding changes as you read the different depositions and you see who said what, who did what. So to that extent, again, the only criticism I have of Ms. Graham is that she failed to put the individual in the supine position.

Q. And, for clarification, Ms. Graham would have been the only EMT in the back of the ambulance during the course of Mr. Goode's transport to Baptist ER?

A. Yes. I understand she was accompanied by a police officer; but as to being the only EMT personnel, that's correct.

Q. Thank you, Doctor.

A. Yes, sir.

CROSS EXAMINATION

BY MR. PHILLIPS:

Q. Are you okay with me staying here, or would you like me to come closer?

A. You make yourself comfortable, Marty.

Q. Okay. I'm comfortable right here. So if you need me to relocate, I will.

During the course of responding to Mr. Upchurch's questions you have provided some comments about Dr. Oliver?

A. Yes, sir.

Q. And obviously as the lawyer for Dr. Oliver here, I want to be sure I understand what opinions you hold about Dr. Oliver. Have you elucidated those opinions already in the course of the deposition?

A. Yes, sir, I have.

Q. Is there any opinion listed on page three of your initial report that is under the category Baptist-DeSoto and Dr. Oliver that would not apply to Dr. Oliver but would only apply to the hospital?

A. The finding number two, original two or first two, if you will, failure to properly communicate effectively thereby allowing a

supraventricular tachycardia to go untreated applies to Mr. Baker's failure to communicate that to Dr. Oliver, okay?

Q. So that then would not apply as criticism to Dr. Oliver?

A. That's correct.

Q. Okay. Any others that would not apply to Dr. Oliver?

A. Apply only to Dr. Oliver or exclude Dr. Oliver?

Q. That would exclude Dr. Oliver.

A. No, sir. I think the others all apply jointly to the various Baptist employees and Dr. Oliver as well.

Q. I understand from your response earlier, Dr. Fowler, that you yourself have given Haldol and Ativan to patients similar to Mr. Goode?

A. That's correct, yes, sir.

Q. How many times would you estimate you've done that?

A. A handful; more than three, less than ten.

Q. Okay. In each circumstance where you have ordered the administration of Haldol and Ativan,

has there been one to one monitoring by a medical person following administration of the drug?
A. Let me be very clear on that. In those cases -- most of which would have occurred in Covington, because I was there the longest. In those cases the trauma room one is directly across from the doctor's station. Whether or not there was a nurse per se bodily in that room the whole time, I cannot say; but I could see the whole time, and we would have cardiac monitors and pulse oximetry on that patient.
So whether or not there was a body of a medical trained personnel in the room I probably could not aver one way or the other. However, I would point out that the regulations applicable to this do allow for video audio monitoring.
Q. So there is a type of monitoring that would be satisfactory that would not require the physical presence of a medical person in the room?
A. That's correct.
Q. In Exhibit 6 to which you made reference earlier -- and feel free to retrieve the document from the court reporter.
A. I have it here.
Q. Do you note the organization that

publishes this document?

A. This is the Emergency Medicine Patient Safety Foundation. I do not know of them further than that.

Q. I understand the title from the document, but I just wondered if you knew anything about the organization or who is part of it.

A. No, sir I don't.

Q. How these things get published.

A. No, sir, I don't. My guess, I could guess, is that these are a group of individuals, some of whom were probably academicians who spend time reviewing records generated in connection with litigation and in connection with CMS findings and generate standards applicable to the country as a whole for the purpose of limiting loss -- limiting injury and death.

Q. Prior to reading Exhibit 6 for this case, do you recall having read any publication by the Emergency Medicine Patient Safety Foundation?

A. No, sir, I do not.

Q. Is this a peer reviewed document?

A. I couldn't tell you that.

Q. The pages are not numbered, but I have

counted them; and if you would count with me to page eight?
A. Yes, sir. I think I have that now.
Q. Would you locate, please, the third bullet point from the top?
A. Yes.
Q. Does it state patients must be assessed and monitored at regular intervals usually not exceeding a few hours?
A. It does, in fact, say that.
Q. Does it further state intervals are based on patient's need, condition, and type of restraint used?
A. Yes, it does.
Q. Does it further say CMS and TJC do not specify time frame for assessment?
A. It does say that. The precise context of what we're talking about is not immediately apparent to me, so I'd have to go back and rereview the document to see what the context is; but you are correct it says as you read, yes.
Q. And then does the last sentence of that particular bullet point conclude TJC used to specify two hour assessments for nonbehavioral health patients

and every fifteen minutes for behavioral health patients?
A. Yes.
Q. Was Dr. Oliver's order for Haldol five milligrams and Ativan two milligrams within the standard of care?
A. Initially, yes. That's the first -- that's one of many first steps, yes.
Q. I understand that that was ordered in this particular case as a starting dose?
A. That's correct.
Q. So to be sure I understand your opinion, his order for the starting dose of five milligrams of Haldol, two milligrams of Ativan, those orders were within the standard of care?
A. Yes.
Q. Was it also within the standard of care for those two drugs, Haldol and Ativan, to be administered I.V.?
A. Yes, although initially he ordered one of them I.M.; but you could administer both of them I.M. and I.V.
Q. It is not considered an off-label use of these drugs to be given in the manner that they were

given to Mr. Goode; am I right?
A. That is correct.
Q. Did you discern from reading Dr. Oliver's deposition and from reviewing the medical records that his plan was to try to calm the patient as the first step before proceeding with further evaluation and assessment?
A. I think, to be fair, that Dr. Oliver encountered the patient originally and assumed or decided that he could not continue his assessment until the patient was calm.
Q. Is it a reasonable consideration to try to take steps to calm a patient before proceeding with evaluation and treatment?
A. It can be, but this is not necessarily sequential; and so I often envision -- well, let me backtrack a minute. This is an ongoing multifaceted process in which you ought to be doing multiple things at the same time. Among other things critically important to me a preliminary first step would be to try to get him out of the prone position, because that in and of itself is so potentially distressing to patients.
Q. And working as an emergency room

physician, obviously one's clinical judgment becomes important --
A. (Interposing.) Yes.
Q. (Continuing.)-- in what one does in the care of a patient, right?
A. That's correct.
Q. In making the assessment about whether to try to calm the patient before trying to reposition the patient involves consideration of clinical judgment, doesn't it?
A. It does.
Q. Can there be differences of opinion among competent and reasonable emergency physicians as to what the standard of care requires in terms of treating a particular patient in a particular circumstance?
A. Certainly there can.
Q. You mentioned that you knew Dr. Michael Revelle earlier?
A. Yes.
Q. In fact, he was a classmate of yours?
A. That's right. That's correct.
Q. Do you have a high regard for his integrity and competency as an emergency room

physician?
A. To be perfectly honest with you, I'm sure Mike is a man of great integrity; but to further elaborate, I don't know much, if anything, about his technical competency.
Q. Just because you've not had an opportunity to observe it?
A. That's correct, yes.
Q. Were the Haldol and Ativan given in this case given in standard initial doses?
A. Yes.
Q. Were they considered standard treatment or medications for a patient such as Mr. Goode?
A. Yes.
Q. Was Dr. Oliver in a difficult position in this case in your opinion?
A. Yes, absolutely.
Q. Would you tell me why you believe that to be true?
A. Well, first of all, according to his deposition and/or that of the nurses there were seven or eight ambulances that arrived at the same time. That's a complicating factor.
Q. One beyond the doctor's control?

A. That's right, yes; and it's manageable, but it's manageable in the sense that you have to be hyperalert and hyperdedicated and you have to make painful decisions. All right. It was a difficult situation in the sense that all of a sudden you have this loud boisterous person and now people are coming out of their rooms to look at that; and that puts the emergency room physician in a difficult situation, because those people are likely to complain about a loud and boisterous patient over which he has no control.

He has a complicated patient thrashing about, and that complicates it, okay, all of which are givens and all of which -- for which I would accord him some modicum of respect or courtesy. However, it's his failure to completely engage that troubles me; and by that I mean had this been in my emergency room and I would opine that the standard of care would be you go to the bedside and you remain at the bedside until you've had a detailed assessment; and once you've had a detailed assessment of this person, you begin to form a therapeutic alliance if possible; and it probably was not possible in this case.

You begin to alleviate the patient's

suffering to the extent that you can, and that, again, would have been getting him out of that hog-tied position.

So my -- fault in my opinions regarding Dr. Oliver pertain to not pressing harder to get him out of that hog-tied position, relieve his discomfort as a therapeutic trial to see if that affects the patient's behavior; and oftentimes in my experience it has. Just changing the restraints makes a huge difference.

Q. I thought I understood you to say that you'd never seen a patient in a hog-tied position?

A. I've never seen a patient in a hog-tied position, that's correct; but I have seen patients restrained with handcuffs and restrained with leg irons, and I come up to them and say if you behave, we'll take these off and you can sit up or if you behave, we can change your position and make you a little bit more comfortable; and that often works. It doesn't always work, but it often works; but because of the inherent danger of the hog-tied position, that should have been a very early priority.

Q. According to your review of the materials did you see that Dr. Oliver first saw this patient

about 9:00 p.m.?

A. I am under the impression that there was a brief encounter earlier than that. I may be mistaken, but I was under the impression that there was a brief encounter earlier than that.

Q. All right. Would you please look at page three of your initial report, sir?

A. (Witness complies with request.) Yes.

Q. In that first paragraph you make reference to Dr. Oliver's testimony, and it says in particular Dr. Oliver has testified that he arrived at the treatment room to perform an examination of Mr. Goode at approximately 9:00 p.m.

A. Okay.

Q. And then you note that his charting did not occur until 9:08 p.m., right?

A. Right.

Q. Did you conclude that he went in first to evaluate the patient at around 9:00 p.m.?

A. Yes.

Q. And so then continuing with the timeline you have set forth, you note that the administration of the Haldol took place at about 9:15?

A. That is correct.

Q. So within fifteen minutes of when Dr. Oliver first saw the patient, he has given an order for a medicine to try to help calm him down and that medicine has actually been given?
A. That's correct, although the patient, to be honest, arrived at 2026, which would have been 8:26.
Q. Yes, sir. There is a difference, though, in the time that the patient arrives in the emergency room and the time that a physician goes to evaluate and treat that patient, though, right?
A. That's potentially true, yes.
Q. And then the code in this case was called at about 9:22 p.m., right?
A. Code being -- the particular phrase you have used indicates the end of the code. A code is called when it's ended, but the code was announced about approximately 9:22.
Q. And you're right, my question was inartfully described. The code was initiated --
A. (Interposing.) Correct.
Q. (Continuing.)-- at about 9:22 p.m.?
A. That's correct.
Q. So that's twenty-two minutes after

Dr. Oliver saw this patient?
A. Right.
Q. Did you see any reflection in the medical record before the code was initiated that this patient was described by any medical provider as having any difficulty breathing?
A. The record is replete with notations that the individual was moving air, ventilating effectively. There is a difference between ventilation and respiration, but he was moving air effectively, yes.
Q. So that is to say the record does not reflect respiratory distress before the code was initiated?
A. That's correct, yes.
Q. Did you notice any evidence in the medical record that you reviewed of any sort of discoloration of the patient before the code was initiated?
A. No, sir. There is no notation of that in the record.
Q. There has been a fair amount of discussion about this $O_2$ saturation level in the case?
A. Uh-huh (affirmative).

Q. Is it your opinion that the patient was hypoxic or the patient may have been hypoxic?
A. Frankly, I don't put a great deal of stock in the pulse oximeter as I understand it.
Q. Tell me why.
A. And the reason is a pulse oximetry of ninety percent under these circumstances does not suggest an accurate pulse oximetry, okay, but what it suggests is a mismatch between the likely pulse from the pulse oximeter and the actual pulse, which throws off and makes irrelevant the pulse oximetry meaning.
Q. May I be sure I understand the point --
A. (Interposing.) Sure.
Q. (Continuing.)-- that you just made?
A. Sure.
Q. When you as a physician evaluate these materials and you see this $O_2$ saturation rate of ninety percent recorded, you conclude that it is likely inaccurate; am I correct?
A. On the basis of this record only.
Q. Yes.
A. Yes, I conclude it is inaccurate and warrants further investigation.
Q. If a provider were to use soft restraints

that were available in the hospital, would the provider need to use those restraints consistent with the instructions that accompany those restraints?

A. No. Let me elaborate on that. I've read the instructions.

Q. For the soft restraints?

A. For the soft restraints that were presumably used in this case, and early on they say do not attach them to the bed rails; and in my experience they are uniformly attached to the bed rails. Sometimes they're attached in a different spot on the bed, which, as you can imagine, a hospital bed, it has, oh, I don't know what you'd call it, a rail around the edge of the bed, and you can tie them there too; but most nurses, most doctors tie them to the bed rails themselves even in derogation of the instructions.

Q. In the file materials that you have brought with you today, do you have the soft restraint instructions that you say you've reviewed?

A. No, sir, I do not.

Q. Where did you review those?

A. They were sent to me electronically by Mr. Edwards' office.

Q. Do you still have them in electronic form?
A. Yes, sir, I do.
Q. Would you be able to provide that some time after today --
A. (Interposing.) Sure.
Q. (Continuing.)-- to Mr. McCormack?
A. Sure.
Q. And I would like to mark that as the next late filed exhibit to your deposition --
A. (Interposing.) Sure.
Q. (Continuing.)-- with your cooperation and approval.
A. Sure.

(Whereupon, Exhibit 7 was designated to marked as an exhibit to the deposition of the witness when provided at a later date.)

BY MR. PHILLIPS:
Q. Having read those instructions, you recognize that using soft restraints on Mr. Goode would have been in violation of instructions that accompany the restraints, right?
A. Well, that presupposes that they would

tie them to the rails, the bed rails, the collapsible rails that go up and down. So inasmuch as they did not do that, I could not presuppose that they would have done so in violation of the package instruction.

Q. But when you were responding to Mr. Upchurch's questions, isn't that what you said should have been done with regard to restraining him, restraining him to the bed rails?

A. Yes.

Q. So that, in fact, would have been in violation of the instructions that accompany the restraints?

A. Yes, but of no --

Q. (Interposing.) Had that been done?

A. Yes, had that been done; but of no practical consequence.

Q. Is there also a contraindication for the soft restraints in using them for patients who are highly aggressive or agitated? Do you remember reading that?

A. I don't recall reading that.

Q. Well, if that's true, would that be another circumstance where the instructions would differ from how you're purporting that those soft

restraints be used?
A. I think that's a judgment call.
Q. Wouldn't it be a --
A. (Interposing.) You don't -- for obvious reasons, you don't use restraints on a person who is calm.
Q. Right.
A. Okay? So the only time you need restraints is when the person is either so deranged they're about to get out of the bed or so potentially violent that they need to be prevented from thrashing about and falling out of the bed.
Q. Certainly based upon the characterizations of those who saw Mr. Goode in the emergency room, he was highly aggressive or agitated while in the Emergency Department?
A. Yes, that's correct.
Q. There was a lot of discussion in your exchanges with Mr. Upchurch about SVC, supraventricular tachycardia?
A. SVT, yes.
Q. Do you remember that?
A. Yes.
Q. Assume for purposes of my question that

this patient, Mr. Goode, had physiologic sinus tachycardia. If that were true, would it change any of the opinions you hold in this case?

A. If he was in physiologic sinus tachycardia, the algorithm under ACLS calls for the administration of Adenosine. It also calls for carotid sinus massage, which probably would have been bypassed. It also calls for imitating the mammalian diving response by the application of a cold rag to the face. Neither of those three mechanisms would have made any practical difference in sinus tachycardia. Adenosine is metabolized within seconds.

Okay. So to the extent that he was in sinus tachycardia as posed by your question, the remainder of my opinions would apply to the failure to put him in the supine position, the failure to apply ECG monitoring. The ECG monitoring becomes critical, because some time prior to his demise he was in a cardiac dysrhythmia almost certainly; and the ECG monitoring would have alerted them to that more quickly.

So it changes my opinion just a little bit, but the ultimate outcome might have been prevented if he had been on ECG monitoring and on

oxygen and in the supine position.
Q. Have you reviewed any of the medical literature that suggests that the prone maximal restraint position is physiologically neutral?
A. It's physiologically neutral?
Q. Yes, sir.
A. Yes. There is an old study, and I think it's several decades old, it's a flawed study, but they attempted to reproduce the effects -- or, they attempted to study the effects of being hog-tied in the prone position in connection with -- they were actually looking at excited delirium syndrome; and that study was flawed because it showed no effect, and the flaws in that study -- and I don't remember the title or the authors, but the flaws in that study were this. The individuals they were assessing were not in psychiatric distress.
Q. You mentioned earlier Tintinalli's text as one on which you would rely, right?
A. Yes, yes.
Q. Do you also acknowledge Rosen's text as a reliable authority?
A. I do not acknowledge it for the sole reason that I've never seen one; and it may or may not

be, and I would not necessarily dissent from the opinion that it's reliable. I've just never used it.

Q. You've never used Rosen's text on emergency medicine?

A. That's correct.

Q. Have you told me about the opinions that you have with regard to Dr. Oliver and the bases for them?

A. Yes, sir, I have.

Q. Thank you, sir.

A. Yes, sir.

CROSS EXAMINATION

BY MR. McCORMACK:

Q. Dr. Fowler, as you know, my name is Kevin McCormack. I represent the plaintiff in this case. I want to follow up on some of the things you've been asked here today.

Just as an initial matter, we're looking at an event that occurred in July 2015 in Mississippi. Are you aware of that?

A. Yes, sir, I am.

Q. Are you familiar with the standard of care applicable to emergency medicine in Mississippi on that date?

A. Yes, I am.

Q. And that's through your work and through your experience and your long educational background?

A. Yes, sir, that's correct.

Q. You were asked whether there could be a difference of opinion between ER physicians about when to reposition a patient versus when to use a sedative. In your opinion can there be a difference of opinion between ER physicians as to whether or not to use cardiac monitoring after injecting Haldol and Ativan?

A. I would say there wouldn't be a reasonable difference of opinion. You don't -- in this particular situation there is the suggestion, the legitimate suggestion that he's in supraventricular tachycardia, mishandled by the hospital exclusively. That warrants -- would have warranted the application of cardiac monitors. So that was a breach of the standard of care.

Assuming, therefore, then that he was in sinus -- physiologic sinus tachycardia, the EKG monitor would have alerted you to his cardiac decompensation before it was clinically manifested as witnessed by the police officer. So that would not be something upon which reasonable emergency room

physicians would disagree.

Q. In your opinion can there be a reasonable disagreement between ER physicians as to whether or not a patient should be hog-tied in an emergency room?

A. No reasonable emergency room physician would ever allow the patient to remain in the hog-tied position given the resources and the personnel in Southaven at Baptist-DeSoto at the time; but, moreover, I don't think any reasonable physician anywhere in the country would allow a patient to remain hog-tied for any length of time until he could put the patient in a supine position and restrain him in soft restraints and/or forensic restraints if needed.

Q. You were asked about your own personal experience in giving patients Haldol and Ativan, and you said in many cases you were able to visually see them.

A. That's correct.

Q. You also said that those patients were on monitors?

A. Yes; but, moreover, I wish to add most of the time I'm standing at the bedside when it happens, because Haldol is notorious for causing tardive

dyskinesia; and tardive dyskinesia is uncomfortable and unpleasant and needs to be treated as well.

So I'm usually standing at the bedside in the midst of a crisis like this.

Q. And I believe that Mr. Phillips asked you if there is -- there is an alternative to having a trained medical person in the room, referring to video audio monitoring?

A. Sure. You could put a camera on them, have a microphone in there; but if you don't also have them on ECG and pulse oximetry monitoring, your monitoring is ineffective.

Q. Was the video audio monitoring with ECG and pulse oximetry performed on Mr. Goode?

A. No, not to my knowledge.

Q. So in the absence of that, would a trained medical person be required to be in the room?

A. Yes.

Q. I believe Mr. Upchurch asked you whether this -- whether an opinion about failing to monitor Mr. Goode was a new opinion in your supplemental report. Was that included under point four in your original report, failed to post a trained medical staff member in the room to observe the patient?

A. The initial report does have under, quote, number four failure to post a trained medical staff member in the room to observe the patient.
Q. You mentioned one time that you saw a soft restraint break or malfunction I believe was the term that you used?
A. Yes.
Q. Have you ever seen that happen when the soft restraint is properly applied with it wrapped around the bed rail?
A. Well, again, the package instructions say don't put them around the bed rail. That's where most nurses put them. You can also put them and are probably supposed to put them -- imagine this is the surface of the bed, the surface of this table, and there is a rail that sticks out; and you can apply it to that rail, which is a firm fixed rail.
The bed rails that are collapsible are often used inappropriately, but it's of no clinical significance; and I do not remember to which this one was attached when it failed.
Q. And I might have been -- might have misstated that. Let me ask it more broadly. Have you ever seen a properly applied soft restraint fail?

A. Yes, once.

Q. And that was the time you've already mentioned to us where it was not wrapped around enough times?

A. That's correct, yes.

Q. All right. We've already talked a lot about the pulse oximetry reading. If you have a pulse oximetry reading that you believe is inappropriate or that it doesn't match up with the clinical presentation that you're seeing, what's the proper course of action for an emergency room physician?

A. Well, you know, you walk it through, you check to see if there is a pulse mismatch. If you don't find a pulse mismatch, then you would next have to consider whether there is a respiration problem, which as previously defined means that even though he's moving air in and out, there is a problem with exchange of carbon dioxide and $O_2$, at which point you would consider an arterial blood gas.

Q. If there is no pulse mismatch between what you get from the $O_2$ probe and what you find when you double check that reading, double check the pulse, are you able to simply disregard that $O_2$ reading?

A. It's one data point, and what people who

don't deal with instruments all the time don't always appreciate is instruments are not always one hundred percent reliable; and by that I mean in the simplest form this. I have a thermometer, it's a decorative thermometer at my house. It has been and remains stuck at eighty degrees. In December it ain't eighty degrees. In August it ain't eighty degrees; but occasionally the thermometer is correct.

So in deciding whether or not I should believe this or that instrument or this or that lab value, I would make a correlation with a clinical assessment; and in this particular assessment if the pulse oximetry is wrong, I would continue to assess; but I would probably also put oxygen on him. It's not going to hurt him, and it may, in fact, help if there is a true hypoxic situation until I can measure the A-a gradient, the arterial-alveolar gradient, which is what you look at if you're concerned about an oxygen hypoxic problem.

Q. You mentioned that there was an eye witness statement that you have not seen. Have you seen any statements from any eye witness unaffiliated with any of the defendants who was in the ER on the night that Troy Goode died?

A. Not to my knowledge, no.
Q. All right. Hypothetically I want you to assume that a -- that an eye witness saw Mr. Goode with a red face and moaning. Would that be a sign of respiratory distress?
MR. PHILLIPS: I'll object as beyond the disclosures.
MR. DILLARD: Same objection.
MR. MACAW: Same objection.
MR. UPCHURCH: Join.
THE WITNESS: All right. Would you repeat the question, please?
BY MR. McCORMACK:
Q. Sure. I want you to assume that an eye witness saw Mr. Goode with a red face and moaning. Would that be a sign of respiratory distress?
MR. DILLARD: Same objection.
THE WITNESS: It could be a sign of respiratory distress. It may also be a sign of cardiac distress.
BY MR. McCORMACK:
Q. Well, I want to ask you a little bit since there were objections. What are signs of cardiac distress?

A. When you have backward failure, and backward failure means that the heart is not pumping fast enough to propel the blood forward, you see this in congestive heart failure, you have jugular venous distention, you have a flushed facies. It is often described that individuals having a heart attack with backward failure will experience this vascular congestion in the head. So that is a marker for backward failure in cardiac collapse.

Q. Are there any other signs that a person might be able -- that a layman might be able to observe?

A. Well, yes, but they are so obvious and overt. For example, collapse, altered mental status, power, diaphoresis where they are pale and gray and sweaty would also be manifestations of cardiac collapse. Now, whether or not a lay person would know the significance of that is a different question; and so, therefore, it usually falls to complete collapse before the lay person can say, wait a minute, something is wrong here.

Q. In your opinion did Troy Goode simply -- simply stop breathing and die, or was this an ongoing condition? Does that question make sense to you?

A. Sure.

MR. UPCHURCH: Object to the form to the extent that it's outside the scope of this witness' testimony.

BY THE WITNESS:

A. In this particular posture assuming for the sake of argument cardiac collapse based on my prior opinions that he was in supraventricular tachycardia and that as a sequelae of that he went into cardiac collapse, his activity level would diminish. The hollering and screaming would diminish. Then you might see signs of gasping respirations or altered respirations or a death rattle. There might be multiple manifestations to a trained observer that would herald the onset of imminent death. The lay person might not necessarily appreciate that, particularly if he wasn't paying attention; and Officer Baggett testified repeatedly he wasn't paying a great deal of attention to Troy.

BY MR. McCORMACK:

Q. Given that there would have been some signs that Mr. Goode was beginning to have problems, is it your opinion -- or, do you have any opinion as to what effect a trained medical observer would have

had on this case?
A. I don't know how long --
MR. UPCHURCH: (Interposing.) Object to the form.
BY THE WITNESS:
A. (Continuing.)-- he was in a meaningful cardiac dysrhythmia, but the instant the cardiac dysrhythmia occurs and your -- if your EKG monitoring is attached, you begin to get alarms; and the alarms would initiate the sequence in which the ACLS code could be initiated, and sometimes minutes are critical.
Once you get into ventricular fibrillation, you're in bad trouble; and it's difficult to convert V-fib. So that's a terminal fatal rhythm. The presence of the cardiac monitor would herald the onset of a nonperfusing rhythm that would allow you to intervene sooner.
BY MR. McCORMACK:
Q. I believe you said earlier that you thought that this was a gross violation of the standard of care. Was that on the part of the hospital or of Dr. Oliver or of both?
A. Of both.

Q. And why is that?
A. Well, there is a gross unwillingness to engage with assessing the patient, diagnosing the patient, and treating the patient and alleviating the patient's distress. He was in the hospital emergency room at 2026, he expired at 2144, and until the code was called and he was already effectively dying, he remained in the hog-tied position, which is widely understood and known to be a dangerous position which can lead to the very thing that happened to him.
He had an unassessed, untreated supraventricular tachycardia, which is known to decompensate to a fatal dysrhythmia. That was not addressed. He was placed in a room without a trained medical observer who might have been attuned to the subtle signs of the onset of cardiac decompensation and responded more promptly, and let me elaborate on that last point.
I'll never forget when I was a resident in a room in LeBonheur with a nurse and a respiratory therapist looking at a child who was obviously sick; and as I observed this child, it occurred to me the child was in desperate situation; and so I called the code, but neither the nurse nor the respiratory

therapist agreed with that decision.

There are subtle signs that you can become attuned to once you've done this that herald the onset of collapse. A policeman would not necessarily know what those are. So that's why you need a trained medical observer.

Q. Have you personally ever treated an agitated patient who was large and aggressive?

A. Yes.

Q. Have you ever dealt with a patient who outweighed you?

A. Yes.

Q. Who was agitated?

A. Yes.

Q. Is it common for an emergency room physician and for emergency room staff to have to consider that a patient might come in in an agitated state?

A. I think that's an assumption that one makes when you go into emergency medicine. Certainly it's in the popular literature, popular media that emergency room patients can be violent. So you have to be prepared to accept that and be prepared to deal with that, and there are mechanisms for dealing with

it.

Q. Is it appropriate if a patient is agitated to simply disregard them?

A. No.

Q. Is it appropriate if a patient is agitated to decide that that patient deserves less than the standard of care?

A. No. No reasonable physician would take such a position.

Q. If a patient is -- has taken a hallucinogenic drug such as LSD, is it appropriate to simply disregard them?

A. No, nor is it appropriate, for example, if someone was involved in a bank robbery to put him off in seclusion just because he's a suspect in a bank robbery and has killed twelve people. He's still your patient.

Q. All right. Dr. Fowler, there might be some follow-up questions, but that's all I have for you.

A. Thank you, sir.

MR. UPCHURCH: I don't have any additional questions. I would like to review the consist of his file if you

might look at those at a break, and then I may or may not have any additional questions.

MR. McCORMACK: All right.

(Whereupon, a break was taken.)

MR. UPCHURCH: At the recess Mr. McCormack has reviewed Dr. Fowler's litigation file and produced that file for inspection to defense counsel with the exception of two items that Mr. McCormack will describe on the record.

From the consist of Dr. Fowler's file we'll attach as composite Exhibit 8 deposition transcripts from Dr. Fowler's file. Those are the deposition transcripts of Paul Eric Flock, R.N.; Lemuel Donja Oliver, M.D.; Jeffrey Wayne Baker, R.N.; Janet Tidwell, R.N.; and Denise Goode.

MR. McCORMACK: Kelli Denise Goode.

MR. UPCHURCH: I'm sorry, Kelli Denise Goode. We would request that

color copies of these exhibits be made. There is both highlight on these exhibits as well as handwritten entries by Dr. Fowler that we would like to make sure is a part of the exhibit.

(Whereupon, Exhibit 8 was marked as an exhibit to the deposition of the witness and can be found among the deposition exhibits attached hereto.)

REDIRECT EXAMINATION

BY MR. UPCHURCH:

Q. Dr. Fowler, looking at the deposition of Mr. Flock, could you read your handwriting on the cover page for us for the record?

A. All right, sir. Beginning on the first page is number one, three lead issue; number two, failure to order one to one observation; number three, failure to observe post sedation.

Q. All right, sir. If you'll flip over, there were -- there is one other marking in red pen. If you could, read that for us, please, sir.

A. Oh, I see. Quote, much less time, end quote.

Q. That's on page forty-two?

A. Yes, sir.

Q. All right. Now, I'm handing you the deposition of Dr. Oliver that appears to have just one handwritten entry on the inside cover. Would you please read that into the record for us?

A. Quote, not aware the patient was in SVT, some delay in seeing the patient. Number next -- well, next, minimal effort to address psychosis, failed to change the restraints. The next one says failed to get a report, presumably from the ambulance; number next, failed to monitor; and, next, three lead issue.

Q. All right, sir. Next I'm handing you the deposition of Mr. Baker. There appears to be just one handwritten entry on the back side of page one. If you would, read that into the record.

A. A recognized restraint should have been changed; next, twelve lead versus three lead issue; number next, given that Ms. Graham is capable, who disregarded her assessment of SVT.

Q. All right, sir.

MR. UPCHURCH: Mr. McCormack, would you identify for purposes of the record the two documents that have been

held out based upon a claim of privilege from Dr. Fowler's file?

MR. McCORMACK: Certainly. I'll identify them by title. They're both single pages. One has a single line on the back. They're both handwritten notes. The first one appears to say conference with Tim Edwards 3-27-17; second one, conference, Tim Edwards, 10-11-17.

MR. UPCHURCH: The plaintiff is objecting to the production of those records on what grounds, please, sir?

MR. McCORMACK: Based on work product.

MR. UPCHURCH: All right, sir. For the basis previously stated, the hospital will recess Dr. Fowler's deposition.

MR. PHILLIPS: I think it goes without saying, but we're also reserving the right to reconvene should that be necessary based on the subsequent production and ruling by the Court.

MR. McCORMACK: Sure.

THE WITNESS: No problem.

MR. MACAW: Same for us.

THE WITNESS: Just, if you will, give me whatever adequate lead time, because patient schedules depend on my being there and so forth. So I'll be glad to work with you and be flexible, but just a little bit of notice would be appreciated.

MR. PHILLIPS: For?

THE WITNESS: If you need to redepose me.

MR. PHILLIPS: Okay.

(Whereupon, the deposition was adjourned to be reconvened if needed at a later date.)

ERRATA SHEET

I, the undersigned, MARK W. FOWLER, J.D, M.D., do hereby certify that I have read the foregoing deposition and that, to the best of my knowledge, said deposition is true and accurate with the exception of the following corrections listed below:

| PAGE | LINE | CHANGE |
| --- | --- | --- |
| 141 | 16 | So, we have an individual with multiple anomalous vital signs: 1) Tachycardic; 2) Tachypneic; 3.) anomalous Oxygen Saturation 4) Falling Diastolic Blood Pressure 5) Tachy dysrhythmias, 6) and, she is an anomalous history. Monitoring is essential to discover and address clinical deterioration, before it leads to patient demise |

12/4/2017
Date

MARK W. FOWLER, J.D, M.D.

STATE OF ~~Ohio~~ Tennessee )
COUNTY OF Obion )

Sworn to and subscribed before me on this the 4th day of December, 2017.

Danza W. Leo
Notary Public

My Commission Expires: 01/19/2021

DANZA W. LEO STATE OF TENNESSEE NOTARY PUBLIC OBION COUNTY

AMY THOMAS EPSTEIN, RPR, CCR, LCR
Riverside Reporting Service

C E R T I F I C A T E

STATE OF TENNESSEE )
COUNTY OF SHELBY )

I, AMY THOMAS EPSTEIN, RPR, LCR/CCR(TN), CSR(MS), a Notary Public duly commissioned and qualified in and for the State of Tennessee, do hereby certify that pursuant to Notice to counsel, there came before me on October 20, 2017, at approximately 9:00 o'clock a.m., in the offices of Ballin, Ballin & Fishman, Suite 1250, 200 Jefferson Avenue, Memphis, Tennessee, the following described person, to-wit, MARK W. FOWLER, J.D, M.D., who was by me duly sworn to testify to the truth and nothing but the truth of his knowledge and concerning the matter in controversy in this cause;

That he was therefore carefully examined upon his oath, and his examination reduced to writing under my supervision;

That the deposition is a true record of the testimony given by the witness; and that the reading and signing of the deposition by said witness was expressly waived.

I further certify that I am neither attorney nor counsel for, nor related to or employed by

any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notary seal this 31st day of October, 2017.

AMY THOMAS EPSTEIN, RPR, LCR/CCR(TN), CSR(MS)
Registered Professional Reporter
Tennessee LCR NO. 255, Expires June 30, 2018
Mississippi CSR NO. 1840 Expires August 19, 2018

NOTARY PUBLIC AT LARGE
MY COMMISSION EXPIRES: April 10, 2021