```
1              IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF MISSISSIPPI
2                       OXFORD DIVISION

3    KELLI DENISE GOODE,              )
     Individually, and also as       )
4    the Personal                    )
     Representative of Troy          )
5    Charlton Goode, Deceased,       )
     and as Mother, Natural          )
6    Guardian, and Next Friend       )
     of R.G., a Minor, and also      )
7    on behalf of all similarly      )
     situated persons,               )
8                                    )
                    Plaintiffs,      ) CIVIL ACTION
9                                    )
     VS.                             ) NO.: 3:17-cv-060-DMB-RP
10                                   )
     THE CITY OF SOUTHAVEN,          )
11   TODD BAGGETT,                   )
     Individually, JEREMY BOND,      )
12   Individually, TYLER PRICE,      )
     Individually, JOEL RICH,        )
13   Individually, JASON             )
     SCALLORN, Individually,         )
14   STACIE J. GRAHAM a/k/a          )
     WITTE, Individually, MIKE       )
15   MUELLER, Individually,          )
     WILLIAM PAINTER, JR.,           )
16   Individually, BRUCE K.          )
     SEBRING, Individually,          )
17   JOSEPH SPENCE,                  )
     Individually, RICHARD A.        )
18   WEATHERFORD, Individually,      )
     JOHN DOES 1-10, BAPTIST         )
19   MEMORIAL HOSPITAL -             )
     DESOTO, a Mississippi           )
20   Corporation, SOUTHEASTERN       )
     EMERGENCY PHYSICIANS,           )
21   INC., A Tennessee               )
     Corporation, and LEMUEL         )
22   DONJA OLIVER, M.D.,             )
                                     )
23                  Defendants.      )

24

25
```

1    * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

2                        ORAL DEPOSITION OF

3                        PARIN PARIKH, M.D.

4                       SEPTEMBER 19, 2017

5    * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

6         ORAL DEPOSITION OF PARIN PARIKH, M.D., produced as a

7    witness at the instance of the Defendants, and duly

8    sworn, was taken in the above-styled and numbered cause

9    on September 19, 2017, from 1:10 p.m. to 4:48 p.m.,

10   before Lisa C. Hundt, CSR, RPR, CLR in and for the State

11   of Texas, reported by machine shorthand, at the offices

12   of Lexitas, located at 1201 Elm Street, Suite 5220,

13   Dallas, Texas, in accordance with the Federal Rules of

14   Civil Procedure and the provisions stated on the record

15   or attached hereto.

```
 1                    A P P E A R A N C E S

 2    FOR THE PLAINTIFFS:

 3         Mr. Kevin M. McCormack
           BALLIN, BALLIN & FISHMAN
 4         200 Jefferson Avenue
           Suite 1250
 5         Memphis, Tennessee 38103
           901.525.6278
 6         901.525.6294 (Fax)

 7         And

 8         Mr. James F. Garrett (via telephone)
           EASTLAND AND GARRETT
 9         103 N. Lamar Boulevard
           Suite 204
10         Oxford, Mississippi 38655
           877.217.3492
11
      FOR THE DEFENDANT LEMUEL DONJA OLIVER:
12
           Mr. Marty R. Phillips
13         RAINEY, KIZER, REVIERE & BELL
           50 North Front Street
14         Suite 610
           Memphis, Tennessee 38103
15         901.333.8181
           901.577.1416 (Fax)
16         mphillips@raineykizer.com

17         And

18         Mr. James R. Gass (via telephone)
           GASS, WEBER, MULLINS
19         241 North Broadway
           Suite 300
20         Milwaukee, Wisconsin 53202
           414.223.3300
21         414.224.6116 (Fax)

22

23

24

25
```

Exhibit "F" page 3 of 166

Parin Parikh, M.D.      4

```
1   FOR THE DEFENDANT THE CITY OF SOUTHAVEN, TODD BAGGETT,
    Individually, JEREMY BOND, Individually, TYLER PRICE,
2   Individually, JOEL RICH, Individually, JASON SCALLORN,
    Individually, STACIE J. GRAHAM a/k/a WITTE,
3   Individually, MIKE MUELLER, Individually, WILLIAM
    PAINTER, JR., Individually, BRUCE K. SEBRING,
4   Individually, and RICHARD WEATHERFORD:

5        Mr. L. Bradley Dillard (via telephone)
         MITCHELL, MCNUTT & SAMS
6        105 S. Front Street
         Tupelo, Mississippi 38804
7        662.842.3871
         662.842.8450 (Fax)
8

9   FOR THE DEFENDANT BAPTIST MEMORIAL HOSPITAL - DESOTO,
    INC.:
10
         Mr. David W. Upchurch
11       UPCHURCH & UPCHURCH
         141 S. Commerce Street
12       Suite B
         Tupelo, Mississippi 38804
13       662.260.6950
         662.269.3713 (Fax)
14
    FOR DEFENDANT SOUTHEASTERN EMERGENCY PHYSICIANS, INC.:
15
         Mr. Loys A. "Trey" Jordan, III (via telephone)
16       MCDONALD KUHN
         5400 Poplar Avenue
17       Suite 330
         Memphis, Tennessee 38119
18       901.526.0606

19

20

21

22

23

24

25
```

Exhibit "F" page 4 of 166

1                          INDEX

2                                                      PAGE

3    Appearances......................................    3

4    Exhibits.........................................    5

5    Stipulations.....................................    6

6    PARIN PARIKH, M.D.

7          Examination by Mr. Phillips................    7

8          Examination by Mr. Upchurch................  100

9          Examination by Mr. Dillard.................  119

10         Examination by Mr. McCormack...............  128

11    Corrections Page................................  165

12    Reporter's Certificate..........................  167

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                              EXHIBITS

2     NO.   DESCRIPTION                                   PAGE

3     Ex. 1    Medical Literature Dr. Parikh Reviewed...... 73

4     Ex. 2    Dr. Vilkey's Report........................ 73

5     Ex. 3    Statement of Facts......................... 74

6     Ex. 4    Notice of Deposition....................... 85

7     Ex. 5    Emails Pertaining to the Articles.......... 90

8     Ex. 6    Dr. Parikh's Bills......................... 90

9     Ex. 7    Email Communications....................... 99

10    ***REPORTER'S NOTE:   Exhibits 3, 5, 6, and 7 were
      retained by counsel.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit "F" page 6 of 166

```
 1                    P R O C E E D I N G S

 2                     PARIN PARIKH,

 3    having been first duly sworn, testified as follows:

 4                      EXAMINATION

 5    BY MR. PHILLIPS:

 6        Q.   Tell us your name, please.

 7        A.   Parin Parikh.

 8        Q.   Dr. Parikh, I'm Marty Phillips, we met a few

 9    moments ago.  And in this case, I, along with Ric Gass,

10    represent Dr. Oliver.  You have been identified as an

11    expert on behalf of the plaintiff as somebody who may be

12    called upon to give testimony at the trial of the case.

13    Do you understand that?

14        A.   Yes.

15        Q.   We're here today to take your deposition about

16    the opinions you have in this case.  You understand

17    that?

18        A.   Yes, sir.

19        Q.   Okay.  You've had an opportunity, I trust, in

20    preparation for today to review whatever materials you

21    needed to review to prepare?

22        A.   Yes.

23        Q.   And you have had an opportunity to meet with

24    counsel who retained you in preparation for the

25    deposition?
```

1      A.    Yes, sir.

2      Q.    When did you last do so?

3      A.    Meet with counsel?

4      Q.    Yes.

5      A.    Just prior to this.

6      Q.    Today?

7      A.    This morning, yes.

8      Q.    Okay.  Is there any reason that you feel

9   unprepared to go forward and discuss this case with us

10  in this setting today?

11     A.    Other than this being my first one, no, I

12  think I'm ready to go.

13     Q.    Okay.  By saying this is your first one, do

14  you mean it is your first deposition?

15     A.    Yes.

16     Q.    It's your first deposition in any kind of a

17  case?

18     A.    Yes, sir.

19     Q.    All right.  Well, I appreciate you telling me

20  that.  Let me mention a few things that might facilitate

21  the process.  I'll start by telling you that if I don't

22  ask a bad question today, it will be the first time

23  ever.  So if I ask you a question that you don't

24  understand, don't answer it.  Stop me and tell me you

25  don't understand the question so I can try to repeat it

1    or rephrase it.  All right?

2         A.    Okay.

3         Q.    It is important that we understand each other

4    and I need your help to be sure that occurs, all right?

5         A.    Yes.

6         Q.    Also, it's not uncommon at all in the course

7    of conversation for us to communicate by saying "uh-huh"

8    or "huh-uh" or by shaking or nodding our heads.

9         A.    Right.

10        Q.    Please don't do that because we want our

11   record to be clear.  We don't want to be arguing about

12   "uh-huh" or "huh-uh" later on.  And if I prompt you for

13   a "yes" or a "no" answer, it'll be just to try be to

14   sure our record is clear, okay?

15        A.    Yes, sir.

16        Q.    Sometimes in depositions people are eager to

17   answer.  They think they know what the question is, so

18   they start to answer before it's been fully asked.  And

19   you might guess right about the question or you might

20   guess wrong about what it is.  So if you would please

21   wait until the question has been completed, I'll do my

22   best to wait until your answer's been completed before I

23   start the next question, all right?

24        A.    Got it.

25        Q.    All right.  Your area of specialty is

1    cardiology; is that right?

2          A.    Yes, sir.

3          Q.    And is that your area of practice?

4          A.    Yes.

5          Q.    Is that your only area of practice?

6          A.    That is my main area of practice, only area of

7    practice.

8          Q.    Which one, main or only?

9          A.    Only -- I mean, so let me just clarify.

10   Interventional cardiology and cardiovascular medicine.

11         Q.    Okay.  Both of those would be encompassed

12   within the field of cardiology?

13         A.    Yes.

14         Q.    Okay.  In this case, and when I read your

15   report and your supplemental report, I noticed several

16   times that you refer to your field of cardiology or

17   cardiovascular medicine, words to that effect.

18         A.    Yes.

19         Q.    So the opinions that you hold in this case are

20   going to be given from the vantage point of one with

21   that specialty?

22         A.    Yes.

23         Q.    You're not claiming expertise in any other

24   area of medicine besides cardiology, are you?

25         A.    No, sir.

1        Q.    And do you think that it is important for an

2    expert to limit his opinions to his area of expertise

3    and practice?

4        A.    Yes.

5        Q.    And in this case, you intend to limit your

6    opinions to the field of cardiology?

7        A.    Yes.

8        Q.    You don't consider yourself an expert in

9    emergency room medicine, do you?

10       A.    No, not all emergency room cases.

11       Q.    What kind of training does one have to undergo

12   in order to be an emergency room physician?

13       A.    Generally, we have four years of undergraduate

14   degree and then four years of medical school, and then

15   one specializes in emergency room.  Generally, that's --

16   I believe it's a three- or four-year residency.  I think

17   it varies depending on where and what your training is.

18       Q.    You have not done a residency in emergency

19   medicine, have you?

20       A.    No, although I served as a resident.  Part of

21   our training in medical school and in residency is

22   serving as either a medical student or a resident in the

23   emergency room.  So there's some exposure.

24       Q.    Sure, but there are exposure to many areas of

25   medicine in medical school?

1      A.   Yes.

2      Q.   And one chooses a field or specialty after

3  medical school, right?

4      A.   Yes.

5      Q.   You're not board-certified in emergency

6  medicine, are you?

7      A.   No, sir.

8      Q.   In order to be qualified to take the board

9  certification exam, what does one have to have?

10     A.   Well, to be frank, I'm not quite sure about

11  the specifics of emergency room medicine.

12     Q.   Okay.  Fair enough.

13          Whatever those qualifications might be,

14  would it be true that you wouldn't be qualified to sit

15  for the board certification exam in emergency medicine?

16     A.   That would be correct.  I would not be

17  qualified.

18     Q.   You don't regularly go to continuing medical

19  education courses directed to emergency room physicians,

20  do you?

21     A.   No, sir.

22     Q.   You don't regularly read or receive

23  publications directed to emergency room physicians, do

24  you?

25     A.   No, sir.

Parin Parikh, M.D.                                                    13

1      Q.   Being a cardiologist is, of course, different

2  than being an emergency room physician, correct?

3      A.   Yes.

4      Q.   They see different kinds of patients than you

5  do, they see them in different settings than you do,

6  right?

7      A.   Yes.

8      Q.   As a cardiologist, do you typically treat

9  patients who present with a chief complaint of dog bite?

10     A.   No.

11     Q.   Do you typically treat patients who have a

12 history of taking LSD?

13     A.   Generally, no.

14     Q.   Do you consider yourself an expert in LSD?

15     A.   No.

16     Q.   Do you generally treat patients who are

17 restrained in some manner when they arrive to see you?

18     A.   Not commonly, but I do have exposure to those

19 patients in the hospital or in the emergency room.

20     Q.   Do you typically treat patients who are in

21 police custody?

22     A.   Once again, not commonly, but I have.

23     Q.   When is the last time you have treated a

24 patient who was restrained?

25     A.   I'm going to have difficulty... I know within

Exhibit "F" page 13 of 166

Parin Parikh, M.D.                                                                14

1    this past year I've treated patients that have had

2    restraints on, for example, in the emergency room or

3    intensive care unit.  Probably less than 10 patients.  I

4    can't --

5         Q.   Ever?

6         A.   No; within the past year or so.

7         Q.   Okay.  Were these patients in restraints that

8    were placed after they arrived at the hospital, or were

9    they in forensic restraints when they were brought in

10   for care?

11        A.   One patient was brought in restraints under

12   police custody that I recall in the past year.  The

13   rest, I'm not sure.  They were likely put in restraints

14   afterwards, but I couldn't fully comment on it.

15        Q.   You understand from your review of the

16   materials in this case that Mr. Troy Goode was in

17   restraints when the police brought him to the emergency

18   room, right?

19        A.   Yes.  Yes, sir.

20        Q.   How many times would you estimate that you

21   have seen a patient in that circumstance, brought in by

22   the police for care in forensic restraints?

23        A.   It's rare.

24        Q.   Can you give me an estimate of how many times

25   that has occurred, if ever, in your practice?

1      A.    Maybe about once a year or so.

2      Q.    Are you guessing, or do you know?

3      A.    That's a rough estimate.  It's not an exact

4  number.  But on occasion, we do treat emergent cardiac

5  conditions with those patients who were brought in under

6  police custody.  So I can't give you an exact number,

7  but it's not common.  It is rare, but I do have some

8  exposure to it.  Not a lot.

9      Q.    Have you ever treated a patient like Troy

10  Goode?

11            MR. MCCORMACK:  Object to the form, vague.

12      A.    What's -- yeah.

13      Q.    (BY MR. PHILLIPS)  Well, you understand from

14  the materials his condition when he came in and

15  presented to the emergency department, don't you?

16      A.    I've treated -- so that's not a patient I

17  would necessarily get called on because he doesn't have

18  an acute cardiac complaint at the time of presentation.

19      Q.    Okay.

20      A.    But I have been called on to manage difficult

21  or agitated patients that are believed to have a cardiac

22  condition.  Once again, this is not a common or everyday

23  occurrence in my practice, but sometimes we are -- we

24  need to evaluate those patients in the emergency room.

25      Q.    Do you --

1           MR. MCCORMACK:  Marty, before you go on,

2   occasionally, Dr. Parikh, I will make an objection on

3   the record.  That will be an objection that is not

4   intended to stop the flow of questioning.  It's mostly

5   just to make a record of it.  Unless I instruct you not

6   to answer the question, you should wait for me to finish

7   the objection and then continue answering.

8       Q.   (BY MR. PHILLIPS)  Would emergency room

9   physicians generally see more patients who are brought

10  in in restraints and in custody than you would?

11      A.   Yes.

12      Q.   As between cardiovascular medicine and

13  interventional cardiology, where do you spend most of

14  your time?

15      A.   About 60 to 70 percent of my practice is

16  general cardiovascular medicine.  30 to 40 percent is

17  interventional cardiology.

18      Q.   This case does not involve interventional

19  cardiology, does it?

20      A.   No, sir.

21      Q.   Have you ever published anything that you

22  think is relevant to any issue in this case?

23      A.   I don't believe in terms of relevant to this

24  case, no.

25      Q.   Have you ever done any research that you think

1    is relevant to any issue in this case?

2         A.    No, sir.

3         Q.    Have you ever made any presentations to any

4    groups on any issue that you think is relevant to the

5    case?

6         A.    No.  I do work -- you know, as cardiologists,

7    we do work closely with emergency room physicians on

8    certain committees in our hospital, which I do sit on;

9    for example, how to provide emergent cardiac care in

10   certain patients coming to the emergency room.  The

11   reason I mention it is at these committees, sometimes I

12   do have presentations, case presentations, so...

13        Q.    But none that you can recall that were on

14   issues relevant to this case?

15        A.    No; not in terms of -- no.

16        Q.    Would -- when is the last time that you worked

17   a shift as an emergency room physician?

18        A.    At least, let's see, 2006, 2009 -- eight

19   years.

20        Q.    Does one have to have hospital privileges

21   specifically for working as an emergency room physician?

22        A.    I would assume they do.  At our hospital, they

23   do.

24        Q.    And you don't hold those privileges, do you?

25        A.    In terms of what?

1     Q.    Working as an emergency room physician in a

2  hospital emergency room.

3     A.    No, not working as an emergency room

4  physician.

5     Q.    If on the 1st of October, which is not long

6  away, you decided you wanted to go to a hospital in this

7  area and work as an emergency room physician --

8     A.    Uh-huh.

9     Q.    -- you wouldn't be qualified to do so, would

10  you?

11     A.    I -- you could -- to be honest, there's

12  probably locums positions you could pick up.  And being

13  board-certified in both internal medicine and

14  cardiovascular physician, you could probably pick up

15  some shifts in the ER.  I have not done so.

16     Q.    Okay.  You would first have to get privileges

17  to work as an emergency room physician?

18     A.    You'd have to go through the proper hospital

19  credentialing process, yes.

20     Q.    And without that, you wouldn't be entitled to

21  work in the ED, right?

22     A.    Correct.

23     Q.    You're not an expert in the standard of care

24  required in an emergency room physician, are you?

25     A.    No.

Parin Parikh, M.D.

19

1    Q.   Have you ever treated a patient with symptoms

2    that were consistent with excited delirium?

3    A.   That's -- no, mainly because it's a diagnosis

4    I'm not really familiar with and have come across in my

5    training.

6    Q.   Okay.  Do you consider yourself an expert in

7    excited delirium?

8    A.   No.

9    Q.   So if you have seen patients who've had

10   symptoms with excited delirium, you wouldn't be able to

11   recognize that or recall it at this point?

12   A.   Well, I've never come across excited delirium

13   in my clinical training, so it would be hard to

14   recognize it.  I think it would be hard to recognize,

15   even given the definition of what excited delirium is.

16   Q.   Have you ever treated a patient that you

17   thought had positional asphyxia?

18   A.   No, I don't -- no.

19   Q.   You don't consider yourself an expert in

20   positional asphyxia, do you?

21   A.   No.  I'm not sure who would be an expert in

22   that.

23   Q.   Is your practice an office-based practice or a

24   hospital-based practice or some of both?

25   A.   Both.

1          Q.    Enlighten me, if you would, as to how much in

2      each category.

3          A.    For example, I'm on emergency room call

4      generally once a week and once every fourth to sixth

5      weekend, where we cover emergency room cases, emergency

6      room consults, and cover the hospital cases.  As

7      interventional cardiologists, we serve often as a first

8      line, patients even sometimes bypass the ER if they're

9      thought to be having acute cardiac condition and we're

10     called in.

11               So I do consider myself to have experience

12     with high level of acuity of care and high levels of

13     cardiac acuity in the emergency room and hospital

14     setting, and that's a significant part of my practice.

15               Depending on how that week or month goes,

16     you know, it could be anywhere from 30 to 60 percent of

17     my practice, while the rest is outpatient-based,

18     office-based medicine.

19         Q.    You're aware in this case, aren't you, that

20     Mr. Goode ingested LSD before coming to the emergency

21     department?

22         A.    Yes, sir.

23         Q.    You have read about his behavior --

24         A.    Yes.

25         Q.    -- after ingesting LSD?

1     A.   Yes.

2     Q.   What do you understand his behavior was after

3   he ingested the LSD?

4     A.   He was very agitated and obviously difficult

5   to control.   That's my understanding of his initial

6   behavior.

7     Q.   There has been reference by some to his being

8   in a psychotic rage.

9     A.   Uh-huh.

10    Q.   Do you agree with that?

11    A.   It's hard for me to comment on that.   I

12  think -- just -- I'm not --

13    Q.   Why is that?

14    A.   I guess -- you're -- what -- what do you mean

15  by "psychotic rage"?

16    Q.   That's just a phrase that has used -- been

17  used by others who have reviewed these records, and I

18  wondered if you agreed with that characterization.

19    A.   I mean, I will call him agitated.   I'm not

20  sure how to characterize psychotic rage.

21    Q.   The behavior that is described as being

22  erratic, bizarre, disruptive, whatever term one might

23  use, do you attribute all of that in Mr. Goode to his

24  use of LSD?

25    A.   Perhaps his initial symptoms of those, but as

1    the case progressed, the agitation, erratic behavior,

2    signs of distress could also be signs of other things

3    such as hypoxia.

4         Q.    You said it could be?

5         A.    Yes.

6         Q.    You couldn't make a determination as to

7    whether it actually was, it's just one of the

8    possibilities; is that right?

9         A.    Well, those are common manifestations of

10   hypoxia.

11        Q.    But not everybody who has those manifestations

12   has hypoxia, though, right?

13        A.    Right.

14        Q.    So what other causes could there be besides

15   hypoxia?

16        A.    The agitation and irritation?

17        Q.    Yes.

18        A.    There could be a lot of causes.  Certainly

19   toxin ingestion is high on the list.

20        Q.    Would that include LSD?

21        A.    Yeah, that includes LSD.  Metabolic

22   disarrangements.  For example, severe electrolyte

23   abnormalities can sometimes cause that as well.  The

24   list is probably long.  Hypoxia can definitely cause

25   that.  In my opinion, just the state of being tied up

1    probably makes someone more agitated as well.

2         Q.   Fighting against the restraints and being in

3    that agitative state while restrained?

4         A.   Yes, yes.

5         Q.   Does LSD cause a person's heart rate to

6    increase?

7         A.   Yes.

8         Q.   Did LSD cause Troy Goode's heart rate to

9    increase?

10        A.   I think there are a lot of factors that caused

11   his heart rate to increase.

12        Q.   Did LSD contribute to Mr. Goode's increase in

13   heart --

14        A.   It could have -- yeah, it could have

15   contributed.

16        Q.   Do you think it likely did?

17        A.   I think it was a multitude of factors.  To pin

18   the percentage that was from LSD to other factors such

19   as dehydration, just him having exercised, essentially

20   running around before he was pinned down.  Hypoxia can

21   lead to increased heart rate, so I think it's

22   multifactorial, his tachycardia.

23        Q.   Is dehydration a possibility in Mr. Goode that

24   we're not able to establish?

25        A.   No.  I think that if you look at the clinical

1   scenario, dehydration is -- has to be on your list.

2   He's been outside and it's in July, I believe.  He's

3   been running around.  He is -- has a really high heart

4   rate.  I mean, I think you have to consider it.

5        Q.   As a possibility?

6        A.   Yeah.

7        Q.   Is there any testing that is done to

8   demonstrate dehydration?

9        A.   You could check -- physical exam is one of the

10  things we use, certain signs and symptoms on physical

11  exam and certain laboratory work can help corroborate

12  dehydration.

13       Q.   Do we have any of that lab work in this case?

14       A.   No, I don't believe any lab work was drawn.

15       Q.   There was some drawn, it just wasn't

16  performed.  Is that your understanding?

17       A.   Right, yes.

18       Q.   What advantage does a doctor actually seeing a

19  patient have over someone like you who doesn't have that

20  opportunity and could only look at records?

21       A.   Yeah.  No, there's a -- there's a big

22  advantage in seeing the patient.  It's always very

23  important.

24       Q.   How so?

25       A.   You could have a relatively stable patient

1   that has abnormal vital signs, or you could have a

2   patient with normal vital signs who's actually fairly

3   unstable, and seeing the patient does have value.

4        Q.    You've heard the expression that you -- you

5   don't treat the vital signs, you treat the patient?

6        A.    Yes.

7        Q.    Is that similar to what you're communicating

8   to me?

9        A.    Yeah.

10       Q.    Does LSD cause a patient's blood pressure to

11  go up?

12       A.    Yes, it can.

13       Q.    Does LSD cause heart arrhythmias?

14       A.    It's not a common -- in my experience in

15  cardiovascular medicine, things that cause arrhythmia,

16  LSD is not a common one that comes up.

17       Q.    Even if it's not a common one, is it one that

18  can cause a cardiac arrythmia?

19       A.    It's not well described, actually, and

20  something I've come across in my experience.

21       Q.    Can the behavior that LSD causes a patient to

22  have cause arrythmia?

23       A.    It can cause a fast heart rate, yes.

24       Q.    And can it cause and does it cause stress on

25  the heart, the behavior that LSD induces?

1    A.    It could.

2    Q.    How does behavior generated from LSD stress

3    the heart?

4    A.    I guess what do you mean by -- when you say --

5    what behaviors are you talking about and what -- what do

6    you mean by "stress the heart"?

7    Q.    You've identified some things.  You've read

8    them in the records Mr. Goode is described as screaming

9    and being combative.  I think your word was "agitated."

10   A.    Right.

11   Q.    Do those things stress a person and stress

12   a --

13   A.    Those things can cause increased heart rate

14   and blood pressure, can cause stress on the heart, but

15   there's really no known direct link between LSD and

16   cardiotoxicity.  Like there are very known mechanisms

17   with other toxins, such as cocaine or alcohol.  Those

18   mechanisms aren't really identified with LSD.

19   Q.    There is, however, an indirect link if LSD

20   causes the behavior that stresses the heart, then

21   there's an indirect link between LSD and stress on the

22   heart, right?

23   A.    I guess in those behaviors, could it cause

24   some of the abnormal conditions that we're seeing such

25   as fast heart rate or blood pressure?  I don't know how

1  much direct toxicity it could do to the heart or even

2  indirect.

3      Q.   Well, if -- if LSD caused a patient to fight

4  against restraints --

5      A.   Uh-huh.

6      Q.   -- would that stress the patient's heart?

7      A.   Yes.

8      Q.   Is LSD a stimulant?

9      A.   Yes.

10      Q.   I read in either your -- well, I think it was

11  in both your report and your supplemental report --

12      A.   Uh-huh.

13      Q.   -- that you said that his rhythm strips were

14  suggestive of supraventricular tachycardia?

15      A.   Yeah.

16      Q.   That may not be an exact quote, but that's the

17  phrase that is there suggestive of.  Do you remember

18  reading that -- or writing that?

19      A.   Yes.

20      Q.   Okay.  What do you mean when you say that it

21  is suggestive of?

22      A.   Can I just review my statement real quick?

23      Q.   Of course.

24              (Witness reviewed document.)

25      A.   Suggestive of STV.  So --

1          MR. UPCHURCH:  Page 2, I believe.

2          THE WITNESS:  Yeah, I see that.

3      A.   So some of this is very technical.  I don't

4   mean to be technical, but anybody who has a fast heart

5   rate that is greater than 100, technically, that is a

6   supraventricular tachycardia.

7              So if I put you on a treadmill and your

8   heart rate, as it should, goes up to 140, you have a

9   normal physiologic response and that's sinus tachycardia

10  and that is an SVT.  So the rhythm strip is an SVT.

11             Now, the different types -- there are many

12  different types of SVT.  Some are more physiologic than

13  others and some are more benign, some are more

14  malignant.  Does that help answer your question?

15     Q.   (BY MR. PHILLIPS)  I think so.  Let me see if

16  I understand.  You made that comment that the rhythm

17  strip was suggestive of SVT because of the beats per

18  minute of the heart?

19     A.   Uh-huh.

20     Q.   Yes?

21     A.   Yes.

22     Q.   And that doesn't mean that it's a condition

23  that's harmful to the patient, it just means that he's

24  got a heart rate above a certain threshold?

25     A.   Yes.

1     Q.   Is there any limitation on the kind of rhythm

2  strip that you see in this record in being able to come

3  to a diagnosis of SVT?

4     A.   Yeah.  So the limitations on -- when it's a

5  short strip and it's only one lead, so that -- those are

6  some of the limitations on that.  It does give you a

7  good sense of the -- what the heart rate is doing.  And

8  when you say "SVT," it means it's a supraventricular

9  tachycardia.  It's originating from the top part of the

10  heart as opposed to the bottom part of the heart, which

11  is an important differentiation.

12           So those are some of the limitations of

13  that particular diagnostic technology.

14           And then --

15           THE WITNESS:  Sorry, what was the second

16  part of that question?  Was the -- go back.

17           (Requested portion was read back.)

18     A.   Was -- and being -- so that -- this is where

19  the nomenclature gets a little bit tricky.  That is an

20  SVT, but just pure definition, it's a fast heart rate.

21  It's originating from the top part of the heart.

22           To differentiate what type of SVT --

23  and -- and sometimes clinically when someone just has

24  sinus tachycardia, we don't generally call it an SVT.

25  Technically it falls in that category.  So to

1    differentiate whether that's just sinus tachycardia or a

2    more malignant SVT, you know, it's difficult to say.

3    And then it's limited what you could say about that

4    rhythm strip.

5                I hope that helps answer the question.

6        Q.    So is this rhythm strip consistent with sinus

7    tachycardia?

8        A.    That could be sinus tachycardia, yes.

9        Q.    Is that a benign condition?

10       A.    You know, that is a very elevated heart rate.

11   So whenever you evaluate someone with such an elevated

12   heart rate, you do have to ask yourself why the heart

13   rate is so elevated.  It may not be that benign,

14   because -- I'll use an example that's just easy to use.

15               If you got shot and you have massive blood

16   loss, your heart rate's going to be really high.  That's

17   not benign, because you have massive blood loss causing

18   an increased heart rate.  So when you see such an

19   elevated heart rate, there needs to be further

20   monitoring and evaluation as to why that person's heart

21   rate is so high.

22       Q.    In this case, we know we have a patient who's

23   trashing and combative and agitated.

24       A.    Uh-huh.

25       Q.    That's an explanation for this SVT, isn't it?

1          A.    That is one explanation, but once again, when

2    you have a patient at point A, you still need to make --

3    you still have to monitor an abnormal vital sign like

4    that and see which direction it goes.  Is it getting

5    better?  Is it getting worse?  So --

6          Q.    Would it be fair to say that based upon the

7    data we have in this case, you're not able to reach a

8    conclusion as to whether this particular SVT was benign

9    or not for this particular patient?

10         A.    Yes, I think -- yeah.

11         Q.    My statement was correct?

12         A.    Yes.  You --

13         Q.    Okay.

14         A.    You don't have enough determination.

15         Q.    And since you have defined SVT as merely being

16   a heartbeat or a -- a heart rate above a certain number

17   of beats per minute, that would mean that not all SVT

18   requires medical treatment or electrocardioversion,

19   right?

20         A.    Yeah.  Not all -- not all of it requires

21   specific medication, but I think it does require further

22   monitoring/observation, especially when that elevated

23   heart rate is seen in conjunction with other abnormal

24   vital signs such as decreased oxygen levels, respiratory

25   distress.  A combination of those vital signs should be

1    more closely followed.

2         Q.   And what it might show after they were

3    followed, we don't know, right?  That would be

4    speculative to talk about monitoring that wasn't done,

5    wouldn't it?

6         A.   It's speculative to say what may have happened

7    in this case, but in general, you can see if someone

8    comes in with very abnormal vital signs if they're

9    getting better or if they're getting worse or if they're

10   staying stable.  In this case, clearly, things became

11   much worse fairly quickly.

12        Q.   But we don't know whether they became worse

13   suddenly -- it could have become worse suddenly just

14   before the arrest, right?

15        A.   Well, I think you already saw signs that there

16   were multiple abnormal vital signs before the arrest.

17   So when you use the term "suddenly," I don't quite

18   follow that because it's not like all of a sudden he had

19   very abnormal vital signs and then he got worse.

20             He consistently had very abnormal vital

21   signs.  Every single heart rate was between 160 and 180.

22   That's very abnormal.  The one oxygen saturation we have

23   is 90 percent.  That's not normal.  He was clearly

24   tachypneic.  That's not normal.  So these are all a

25   combination of pretty abnormal vital signs.

Parin Parikh, M.D.

33

```
 1              So when you say he's suddenly got worse, I
 2   don't quite follow that logic.  I see it as more of a
 3   continuum of he wasn't doing well and then declined.
 4        Q.   Can each of those things you mentioned be
 5   explained by a patient who's taken LSD and, as a result,
 6   is combative, agitated, and thrashing?
 7        A.   I think that can play a role, but that doesn't
 8   explain the cardiac arrest.
 9        Q.   No, I was just talking about the vital signs
10   you mentioned.  Could -- couldn't the use of LSD and the
11   behavior resultant from it --
12        A.   Yeah.
13        Q.   -- explain each of the vital signs that you
14   mentioned?
15        A.   I don't see how it would explain his hypoxia.
16        Q.   Do you consider an O2 saturation of 90 to be
17   hypoxic?
18        A.   In a -- there -- how old was this gentleman
19   again?  A young gentleman like this, he shouldn't have
20   an oxygen saturation of 90 percent.  That's not normal.
21        Q.   Well, there's a difference between not normal
22   and hypoxic, isn't there?
23        A.   Yeah.  I would consider that to be significant
24   hypoxia.
25        Q.   Just a single reading like that?
```

1      A.    Something that definitely needs to be followed

2  up on.

3      Q.    Did you consider whether the O2 saturation was

4  accurate?

5      A.    That's -- there is some legitimacy to that.

6  However, when the patient has a cardiac arrest

7  10 minutes after a recorded vital sign of an oxygen

8  saturation of 90 percent, I think your assumption that

9  it was just an abnormal reading is not a very good one.

10      Q.    Have you had experiences where O2 saturations

11  were recorded and done so inaccurately?

12      A.    Absolutely.

13      Q.    And can it be inaccurate when the patient is

14  moving and maybe adjusting around the little device that

15  clips on the end of your finger?

16      A.    There's a lot of reasons to have abnormal

17  readings.

18      Q.    Is that one of them?

19      A.    Yeah.  Patient -- you don't have a good O2

20  probe attached is one -- one reason.

21      Q.    What is an electrophysiologist?

22      A.    It's a cardiologist that specializes in

23  arrhythmias.  Often they also specialize in putting in

24  cardiac devices such as pacemakers and defibrillators.

25      Q.    That is a subspecialty of cardiology?

1     A.   Yeah, yes.

2     Q.   Do you have that subspecialty training?

3     A.   Not -- I'm not a board-certified

4 electrophysiologist, but I have a -- we very commonly

5 deal with electrical abnormalities.

6     Q.   At autopsy, was there any indication of any

7 problem with Mr. Goode's heart?

8     A.   I'd have to look -- no, I don't -- I don't

9 think there was in terms of, you know, a predisposing

10 heart condition or an enlarged heart, no.

11     Q.   At autopsy, was there any indication of any

12 problem with his lungs or lung function?

13     A.   There was a comment on edema, pulmonary edema

14 in the lungs.

15     Q.   Did he have any evidence of chronic

16 obstructive pulmonary disease?

17     A.   No.

18     Q.   Is the pulmonary edema a finding that likely

19 arose near the time of his death or after his death, or

20 can you tell?

21     A.   No.  I mean, it could have been anywhere along

22 his course.  Someone who's going into pulmonary edema

23 will exhibit a lot of these signs of hypoxia, agitation,

24 elevated heart rate.  For example, a patient with -- who

25 comes in with congestive heart failure, they can speak

1    and talk and vocalize just normally, but they're very

2    agitated.  They have -- their heart rate is increased,

3    and they're in pulmonary edema.  So I don't -- I think

4    that the assumption that those findings of pulmonary

5    edema were just at the time of arrest or post arrest

6    aren't correct.

7         Q.    It could be, though, that's one possibility,

8    isn't it?

9         A.    I don't see it as a very likely possibility.

10        Q.    Well, I understand your opinion, but you

11   acknowledge it's a possibility that it could have arisen

12   at or near the time of the arrest?

13        A.    Can I see -- can I look at the review of the

14   ER records of the intubation?

15        Q.    Sure.

16        A.    At the time of his...

17                    (Witness reviewed document.)

18        A.    Sorry, it may take me a minute.

19                    MR. UPCHURCH:  Are you looking for the

20   time, Doctor?

21        A.    Well, I'm looking for when he intubated the

22   patient, what his findings were at that time.

23                    (Sotto voce conversation.)

24        A.    So there's no note in here about his findings

25   on intubation.

```
 1                    (Witness reviewed document.)
 2         A.    Yeah, okay.  So sorry, going back to your
 3    question.  Is there --
 4         Q.    (BY MR. PHILLIPS)  We were talking, I think,
 5    about whether you acknowledge that it was a possibility
 6    that the pulmonary edema could have arisen at or near
 7    the time of the arrest.
 8         A.    I think it's more likely that the possibility
 9    is he was in pulmonary edema or hypoxia before.  It is a
10    possibility.
11         Q.    What was the last part of what you said?
12         A.    It is a possibility.
13         Q.    Okay.  There was no evidence of asthma at
14    autopsy, was there?
15         A.    No.
16         Q.    What does his ability to yell and scream tell
17    us about his respiratory function?
18         A.    So I have read the -- some of the statements
19    that hypothesize that because he's able to yell and
20    scream, that he had no issues with oxygenation.  Just
21    because he's able to vocalize doesn't mean that he can't
22    have compromised oxygen levels in the lungs or blood,
23    and doesn't mean he wasn't in respiratory distress.
24         Q.    Is a patient's ability to yell and scream some
25    evidence of respiratory status and function?
```

1        A.    In certain settings, for example, when someone

2   has a physical obstruction, choking on food, if there is

3   a complete obstruction, there's not going to be air

4   movement and so they probably won't be able to vocalize.

5   But in other settings, just the ability to vocalize or

6   yell or scream doesn't necessarily correlate well with

7   your respiratory status.

8        Q.    But you agree it is an indication of

9   respiratory status?

10       A.    It's not always a good one.

11       Q.    It's something that a clinician seeing a

12  patient would have an opportunity to evaluate, though,

13  right?

14       A.    Yes.

15       Q.    You have given some opinions in your reports

16  in this case on the impact of the prone maximal

17  restraint position, right?

18       A.    Yes, yes.

19       Q.    Are your opinions in this case on that topic

20  based solely on the medical literature that you have

21  reviewed on that topic?

22       A.    Yes.

23       Q.    Before you were retained as an expert in this

24  case, had you ever reviewed the medical literature about

25  the prone maximal restraint position?

1    A.    No, sir.

2    Q.    Before you were retained as an expert in this

3    case, have you ever reviewed the medical literature

4    pertaining to positional asphyxia?

5    A.    No.

6    Q.    The literature that you cite in this case, was

7    it given to you, or did you locate it on your own?

8    A.    I did an independent search.  Some of the

9    articles which I reference in my expert statement I

10   asked to get those articles and Mr. McCormack did

11   provide them for me.  But all the articles I came about

12   were from independent research.

13   Q.    Did you identify literature in your search

14   that disagreed with your conclusion and opinions about

15   the prone maximal restraint position?

16   A.    Yes.

17   Q.    Did you cite the contrary literature in your

18   reports?

19   A.    Well, interesting, some of the same studies

20   that I cite, you know, have been used to say that

21   there's not an effect on cardiac output in the prone

22   maximal or the prone hogtied position.  I've -- if you

23   look at the methodologies in -- in those particular

24   studies that don't necessarily support that the prone

25   hogtie position causes -- does not cause decrease in

1    cardiac output, there's significant flaws in those

2    methodologies.

3        Q.   And I think my question was whether you cited

4    in your reports the literature that disagrees with the

5    conclusion you're reaching in this case --

6        A.   Yeah.

7        Q.   -- or is there literature out there that

8    you're aware of that you didn't cite?

9        A.   Well, there's not a lot of literature on this.

10   It's not a wide body of evidence and most of it I've

11   actually included.  I would say -- so -- sorry.  Can I

12   back up just a little bit?

13            So the studies that I, in particular,

14   looked at with my expertise in cardiovascular medicine

15   were studies that sought particular cardiac studies that

16   imaged the heart or heart and blood vessels in the prone

17   hogtie position.  There's not much data out there.  The

18   four major studies I found, I included in my findings.

19            People do have different interpretations

20   of some of these studies.  Some people cite the same

21   studies and say that it supports their position that the

22   prone hogtie position does not lead to decrease in

23   cardiac output or cause cardiovascular compromise.  I

24   actually look at the same study and say there are signs

25   here that being in the prone hogtie position does lead

Parin Parikh, M.D.                                                            41

1  to cardiovascular compromise.

2                 And specifically, I think that's where my

3  expertise in this area comes in, in interpreting some of

4  these methodologies of these studies and its effect on

5  cardiac output.

6                 So I've actually -- to answer your

7  question, I've included some of those studies that

8  people have cited saying that there's data that supports

9  that the prone hogtie position doesn't cause

10 cardiovascular compromise.  I've actually cited those

11 studies as well, so I've been comprehensive in that.

12      Q.    You acknowledge --

13      A.    Does that help?

14      Q.    Let me see if I understand.

15      A.    Yeah.

16      Q.    You acknowledge that there's medical

17 literature from peer-reviewed sources that concludes

18 that the prone maximal restraint position does not

19 compromise cardiac output?

20      A.    The -- I would disagree with some of those

21 conclusions.

22      Q.    I understand.

23      A.    Yes.

24      Q.    But before we get to whether you agree or

25 not --

Parin Parikh, M.D.                                                                    42

1          A.    Yeah.

2          Q.    -- you acknowledge that there is peer-reviewed

3    medical literature that concludes that the prone maximal

4    restraint position does not compromise cardiac output

5    that exists, doesn't it?

6          A.    I will say that --

7          Q.    Could you answer my question, and then I'll be

8    glad to let you explain.

9          A.    In -- the prone maximal position identifying

10   healthy subjects who have no pre -- no predisposing

11   conditions who are only in the prone hogtie position for

12   less than five minutes at a time, some people have

13   concluded that yes, there is no compromise in

14   cardiovascular output or cardiovascular compromise,

15   that -- that does exist.

16         Q.    And then there are people who interpret the

17   medical literature differently than you do about whether

18   the prone maximal restraint position compromises cardiac

19   output, right?

20         A.    Yes.

21         Q.    So -- so we have two things, we have the

22   literature and what it says, and then we have how one

23   interprets that literature and whether one accepts what

24   it says, right?

25         A.    What do you mean by the first statement, the

1    literature and what it says?

2        Q.   Well, you can read an article --

3        A.   Uh-huh.

4        Q.   -- and see the conclusion that's reached?

5        A.   Yes.

6        Q.   And there are studies that conclude that the

7    prone maximal restraint position does not compromise

8    cardiac output.  That's what the paper says?

9        A.   Okay.

10       Q.   Agree?

11       A.   Can I look at some of those papers?  I mean,

12    could you cite a specific --

13       Q.   Are you aware in general that those exist?

14    We'll talk about some in a moment.

15       A.   Well, I don't know if they draw that

16    conclusion --

17       Q.   Okay.

18       A.   -- that there's no effect on --

19       Q.   Are you aware of experts who reached the

20    conclusion that the prone maximal restraint position

21    does not compromise cardiac output?

22       A.   Yes.

23       Q.   And is that a reasonable view for an expert to

24    take in your view?  Can you understand how an expert

25    could legitimately take that view?

1          A.    I would disagree with that view.  I don't --

2     so I don't know -- I mean, so no, I guess I don't see

3     how they could take that view.

4          Q.    Let me try to make a distinction.

5          A.    I don't --

6          Q.    Sometimes --

7          A.    -- disrespect them, but...

8          Q.    Sometimes one can say here is my opinion and

9     nobody can disagree with this legitimately.  On the

10    other hand, one can sometimes say here's my opinion, but

11    I understand there's a differing viewpoint from mine.

12         A.    Yes.

13         Q.    And is that what we have in this case, you

14    have your opinion, but you recognize that there are

15    experts who hold a differing viewpoint than yours about

16    whether the prone maximal restraint position compromises

17    cardiac output?

18         A.    Yes.

19               MR. MCCORMACK:  Object to the form.

20               You can answer.

21         A.    Do I recognize that they hold different views?

22         Q.    (BY MR. PHILLIPS)  Yes.

23         A.    That there are different views out there?

24         Q.    Yes.

25         A.    Yes, there are different views out there.

Parin Parikh, M.D.

1    Q.   If it were true that the prone maximal

2  restraint position is physiologically neutral, would it

3  impact any of the opinions you hold in this case?

4    A.   If it were physiologically neutral?  Yeah, I

5  think it -- yeah.  I think that there is some compromise

6  in that position, so it would probably affect some of my

7  views.

8    Q.   How would it affect your views if -- if it

9  were true that the prone maximal restraint position were

10  physiologically neutral?

11    A.   It's -- I guess it's a little difficult --

12  it's kind of speculating on some -- I don't know.  It's

13  hard for me to answer that.  If -- how would it change

14  my opinion of the whole case?

15    Q.   Or the conclusion you reach about the prone

16  maximal restraint position in this case?

17    A.   I'm sorry, I'm not following the question.

18    Q.   Okay.  Sometimes lawyers ask what is called a

19  hypothetical question.

20    A.   Okay.

21    Q.   That is to say, assume that a particular

22  premise is true.

23    A.   Okay.

24    Q.   And my premise is the prone maximal restraint

25  position is physiologically neutral.

1      A.    Okay.

2      Q.    If that premise is true, how would it impact

3  your conclusions in this case?

4      A.    Well, I guess, given my conclusion that the

5  prone hogtie position promoted cardiovascular

6  compromise, it would affect that conclusion.  But the

7  other aspect of it is I -- is him being in that position

8  for -- even if it's physiologically neutral, kind of

9  prevented monitoring and observation of some of his

10  vital signs, and so it may not have changed that.

11      Q.    To say that the position prevented monitoring

12  or care is not the same as saying it caused cardiac

13  collapse, though, is it?

14      A.    Those are two different things, yes.

15      Q.    Okay.  Was Mr. Goode less restrained at the

16  hospital than he had been before he got to the hospital?

17      A.    Was he less restrained at the hospital --

18      Q.    Yes.

19      A.    -- compared to when he came in?

20      Q.    Right.

21      A.    I think he had the same level of restraint, to

22  my knowledge.

23      Q.    Do you remember the testimony and discussion

24  about there being additional straps across the stretcher

25  during transport that was removed once he got to the

1   hospital?

2        A.   Okay.  So I'd have to look back and see

3   exactly what it was.

4        Q.   If that's true --

5        A.   Okay.

6        Q.   -- if those facts are true, would that mean

7   that he's less restrained at the hospital than he had

8   been before he got there?

9        A.   So when were those straps added?  Just for

10  transport --

11       Q.   Yes.

12       A.   -- and the EMS and those straps were removed?

13       Q.   Right.

14       A.   The positioning of those straps, I'd have to

15  look back and see exactly.

16       Q.   Well, if there were straps on and then the

17  straps were taken off at the hospital --

18       A.   Uh-huh.

19       Q.   -- is there less restraint at the hospital

20  than before?

21       A.   That -- yeah, that would be less restraint.

22       Q.   Did you review Dr. Vilke's reports in this

23  case?

24       A.   Yes.

25       Q.   And do you recognize him as being someone who

Parin Parikh, M.D.

1   has researched and published in the area of positional

2   asphyxia in pertaining to the prone maximal restraint

3   position?

4        A.   Yeah, yes.

5        Q.   And did you notice in his report that he cited

6   some 22 articles?

7        A.   Yes.

8        Q.   Did you read all those articles?

9        A.   I did not read all those articles.

10       Q.   You only read the ones that you cited in your

11  report.  Would that be right?

12       A.   Well, I actually didn't comment too much on

13  positional asphyxia in my particular expert statement.

14  I commented more on the studies that looked at cardiac

15  studies and cardiac inflow and cardiac output.

16       Q.   But it's -- your comment is cardiac function

17  pertaining to the prone maximal restraint position,

18  though, isn't it?

19       A.   Yes.

20       Q.   Okay.  So let me see if I understand the

21  distinction you're making.  One might talk about the

22  impact, if any, that the prone maximal restraint

23  position has on respiratory status --

24       A.   Uh-huh.

25       Q.   -- distinct from cardiac status?

1    A.    Yes.

2    Q.    And what you're telling is you're not really

3  focusing on the respiratory part, but rather the cardiac

4  part?

5    A.    Yes.

6    Q.    Okay.  You have even cited to an article on

7  which Dr. Vilke is a coauthor, haven't you?

8    A.    Yes.

9    Q.    Do you recognize him as an authority in the

10 field of positional asphyxia?

11               MR. MCCORMACK:  Object to the form.

12               THE WITNESS:  Oh, can I answer?

13               MR. MCCORMACK:  Oh, yeah, you can answer.

14   A.    I guess I don't know enough to say who is an

15 expert or not on positional asphyxia.

16   Q.    (BY MR. PHILLIPS)  He is one of the people who

17 has published multiple articles or been involved in

18 publications of multiple articles on that topic?

19   A.    Yeah.

20   Q.    Okay.  The first article I think that you cite

21 in your report is one with the lead author of Ho, H-O?

22   A.    Yes.

23   Q.    Do you have that article among your materials,

24 Doctor?

25   A.    Yes.

1       Q.    If you look on page 257 of that article --

2       A.    Uh-huh.

3       Q.    -- down in Table 2, do you see the vital sign

4  measurements from this study?

5       A.    Yes.

6       Q.    And there's a distinction made between people

7  standing in Table 2 and people in the prone position,

8  right?

9       A.    Yes.

10      Q.    And those people in the prone position --

11 which is the position we're talking about in this

12 case -- had normal heart rates, didn't they?

13      A.    After just two minutes of the prone position,

14 with also a 10-centimeter opening below them, yes.

15      Q.    They also had normal systolic blood pressure

16 in the prone position, didn't they?

17      A.    With the same methodologies, yes.

18      Q.    And normal diastolic pressure in the prone

19 position?

20      A.    Yes.

21      Q.    So the Ho study does not indicate a change in

22 vital signs as a result of being in the prone position,

23 does it?

24      A.    With its limited methodology, yes.

25      Q.    But it's a study you cited?

1        A.    Yes.

2        Q.    Okay.  If a patient's stroke volume were going

3    down, would you expect the heart rate to go up?

4        A.    Yes.

5        Q.    And the heart rate in these patients didn't go

6    up, did it?

7        A.    No.

8        Q.    And if there were cardiac compromise, you

9    would expect the heart rate to go up to try to

10   compensate for that, wouldn't you?

11       A.    After two minutes, there wasn't sign of change

12   of vital signs or cardiac output.

13       Q.    So this study does not indicate evidence of

14   cardiac compromise from the prone position, does it,

15   based on what's actually in the study?

16       A.    So if you look at one of the markers for

17   inflow into the heart, which is one of the primary

18   methodologies that the study was looking at --

19       Q.    Right.

20       A.    -- you have to wonder why they were looking at

21   the interior vena cava, the IVC, as it's referenced.

22   The reason you would look at the inferior vena cava is

23   that is a good marker of blood flow that goes into the

24   right atrium of the heart or blood flow and pressure

25   into the heart.  So there's a reason they looked at some

1  of these markers, because some of these markers can be

2  signs of compromise.

3           So if you take 25 young, healthy patients

4  who are only in the prone position for two minutes,

5  sure, they didn't have a compromise in their blood

6  pressure or heart rate or stroke volume.  But even just

7  two minutes in the prone position, and despite the fact

8  that they had a cutout underneath them on their belly

9  and lower chest, they still have compromised IVC filling

10  and decreased filling into the heart.

11           So, in my opinion, just a short amount of

12  time, despite the fact that you have these limited

13  methodologies, you see some signs of decreased blood

14  flow into the heart.  So while you can't come to the

15  conclusion that it -- I agree with -- that you can't

16  come to the conclusion that this decreases cardiac

17  output.  I -- I really don't see how you come to the

18  conclusion that a two-minute study in healthy patients

19  who had a little cutout below them to relieve some of

20  the pressure of being in prone position, that you could

21  come to the conclusion that someone who is in the prone

22  hogtie position for an hour and a half would have the

23  same response.

24       Q.   From the article, the Ho article that you

25  cited and rely upon, the authors in that article did not

1  reach the conclusion that the prone position results in

2  cardiac compromise or compromises cardiac output, did

3  they?

4       A.    I'm quoting now, "In our study, we found a

5  significant decrease in the IVC dimensions with position

6  change" [as read].

7             So there's a -- one of the markers of

8  cardiac inflow and flow into the heart they found a

9  significant change in.

10      Q.    What they're describing, though, is a

11  difference in the size of the inferior vena cava?

12      A.    Uh-huh.

13      Q.    They're not reporting on a change in volume as

14  a result of that, right -- or a change in vital signs as

15  a result of that; is that right?

16      A.    At -- at --

17      Q.    Is that right?

18      A.    But you wouldn't expect to see a change of

19  vital signs that quickly.

20      Q.    Was my statement correct?

21      A.    I'm going to have to review the statement.

22      Q.    Okay.  They were reporting -- I'll repeat it

23  for you.  They're reporting a change in the size --

24      A.    Uh-huh.

25      Q.    -- of the inferior vena cava --

1      A.    Yes.

2      Q.    -- but not reporting a change in function or

3   volume as a result of the change in size?

4      A.    So the reason you measure the size --

5      Q.    Can you answer my question before we get into

6   the explanations?

7      A.    Well, I think the question has some false

8   assumptions in terms of when you say they're just

9   measuring the inferior vena cava and not talking about

10  the volume or size.

11     Q.    Let me try it like this, maybe it will be

12  easier for you.  They describe the changes in the size

13  of the inferior vena cava?

14     A.    Yes.

15     Q.    But yet, in those patients who had those size

16  changes, their vital signs, as reported on Table 2, were

17  still within the normal range?

18     A.    Yes.

19     Q.    Okay.  Another study that you cited is -- is

20  it Savaser, S-A-V-A-S-E-R --

21     A.    Yes.

22     Q.    -- the lead author?

23            This article did not look at cardiac

24  filling, did it?

25     A.    It looked at IVC size, which is a measure of

1    cardiac filling.

2        Q.    But there's not a specific conclusion reached

3    as to cardiac filling, is there?

4        A.    No.  It talks about there are changes in the

5    IVC seen on -- there were significant changes in the

6    size of the IVC seen in the prone maximal restraint

7    position with the weights on, I believe.  Let me --

8        Q.    But that, again, has to do with the size of

9    the inferior vena cava?

10       A.    That's a marker of flow into the heart,

11   though; a very good one.

12       Q.    I understand your interpretation of it.  I'm

13   trying to focus on what the study actually says.  It's

14   talking about the size of the inferior vena cava, right?

15       A.    But there's a reason we look at that marker.

16   It's not -- there's a reason we choose that marker to

17   look at on transthoracic echocardiography.  And why we

18   do that measurement very commonly, it's a marker of the

19   filling pressures in the heart.

20       Q.    Does that article conclude on the first page

21   of it under conclusions, in the abstract portion --

22       A.    Uh-huh.

23       Q.    -- "PMR" -- that stands for prone maximal

24   restraint --

25       A.    Uh-huh.

1     Q.     -- "with and without weight force did not

2  result in any change in CO" -- that's cardiac output --

3  "or other evidence of cardiovascular or hemodynamic

4  compromise" [as read].

5               That was the conclusion stated, right?

6     A.     That was their conclusion, yes.

7     Q.     Okay.  Do you agree that this article

8  published in the Journal of Forensic and Legal Medicine

9  in 2013 is a reliable authority?

10    A.     A reliable authority on what?

11    Q.     On the topic it addresses, the effect of the

12  prone maximal restraint position --

13    A.     No; I think --

14    Q.     -- on cardiac output.

15    A.     -- there are significant limitations in the

16  methodology.

17    Q.     Why would you choose to cite an article to

18  support your opinion that you say has severe limitations

19  in its methodology?

20    A.     Because if you take this study -- I believe

21  this is also 25 healthy, male volunteers, okay?  And

22  they were put in these positions for, I believe, only

23  three minutes.

24               (Witness reviewed document.)

25    A.     Yes; subject remained in each position three

1    minutes before measurements were collected.  In between

2    the different positions, they were allowed five minutes

3    of rest, okay?  So the most they were in a prone hogtie

4    position or a prone hogtie position with weights was

5    three minutes at a time.  That's it.

6              Even at three minutes at a time, you start

7    to see differences -- maybe you don't see changes in

8    cardiac output three minutes in, but you start to see

9    changes in stroke volume, which is an important

10   component of cardiac output.  So you see a small

11   decrease in stroke volume between a supine position and

12   a prone maximal restraint position.  That's in the

13   result section in the abstract that you were referring

14   to.

15             This tells me that just a short amount of

16   time with breaks and rest in between, that there's

17   beginning of evidence of cardiac compromise in these

18   patients.  That's why I actually included this.  And it

19   kind of goes back to your original question of, you

20   know, did I ignore other citations?  I actually looked

21   at the studies that came to opposite conclusions and

22   looked at the methodology and think there's significant

23   flaws with them.

24        Q.   Look on page 994 of the Savaser study that

25   we've just been talking about.

1      A.    Uh-huh.

2      Q.    The conclusions are listed on the bottom

3 right.  Do you see that category?

4      A.    Yes.

5      Q.    Would you read the conclusion reached by this

6 study that you cite in your report?

7      A.    "Cardiac output is not significantly affected

8 by PMR as compared with the prone or supine positions"

9 [as read].

10     Q.    With or without --

11     A.    Oh.  "With or without application of 50 or

12 100 pounds of weight force to the back" [as read].

13     Q.    Do you agree with that conclusion that you

14 just read from the Savaser article that you cited?

15     A.    I would qualify the conclusion that cardiac

16 output is not significantly affected by healthy males

17 with no predisposing condition that were only subjected

18 to three minutes of the prone position.

19     Q.    Do you agree with the conclusion as stated on

20 page 994?

21     A.    No, I do not.  I don't.

22     Q.    You do not agree, is that what you said?

23     A.    I mean, you have -- you have to take into

24 account the limit -- the limits of their methodologies.

25 If -- if that conclusion is taking that into account,

1    then I would agree with it.

2         Q.    In your report dated -- this is actually your

3    amended report --

4         A.    Uh-huh.

5         Q.    -- July 31st, 2017, on page 3 --

6         A.    Uh-huh.

7         Q.    -- you cite the Savaser study in that first

8    paragraph on the page.

9         A.    Uh-huh.

10        Q.    And three lines up from the bottom of that

11   paragraph, you make the statement, "There were no

12   changes in cardiac output in this study" [as read].

13        A.    Uh-huh.  But the subjects were under testing

14   conditions for only three minutes.

15        Q.    But you observed in your report that that

16   study didn't show changes in cardiac output with the

17   qualifications --

18        A.    With the methodologies they used, correct,

19   there were no changes in cardiac output.

20        Q.    Which is more important, cardiac output or

21   stroke volume?

22        A.    I mean, they're tied together.  Stroke volume

23   is an important part of cardiac output, but your

24   ultimate measurement is cardiac output.

25        Q.    I think the third study you cite is

1    Dharmavaram.  Is that close to right?

2        A.    Yes, I believe so.

3        Q.    And that is a study published in 2006; is that

4    right?

5        A.    Yes.

6        Q.    This actually is looking at patients in the

7    prone position for spine surgery?

8        A.    Yes.

9        Q.    Different circumstance than we have in this

10   case, right?

11       A.    Yes.

12       Q.    Those patients would have necessarily received

13   general anesthesia?

14       A.    Yes.

15       Q.    Different circumstance from our case, right?

16       A.    As are the first two studies, yes.

17       Q.    And if you look in that particular study,

18   Doctor, I think it's page 1390 --

19       A.    Uh-huh.

20       Q.    -- it sketches out five different positions at

21   the top.

22       A.    You know what?  I have some other version of

23   this.

24              MR. MCCORMACK:  Page numbers might be

25   different, Marty.

Parin Parikh, M.D.                                                    61

 1                    THE WITNESS:   Yeah.

 2          Q.    (BY MR. PHILLIPS)  Let me show you the page

 3     I'm referencing and then you can find it.

 4          A.    Okay.

 5          Q.    Do you see that?

 6          A.    Yes.

 7          Q.    Which of those positions listed is most like

 8     prone maximal restraint position?

 9          A.    Well, there are definitely differences.

10          Q.    Is the prone maximal restraint position listed

11     there at all?

12          A.    No.

13          Q.    And would the last position, the bolster

14     position, be the one most like the prone maximal

15     restraint position?

16          A.    Yeah, the last two, really.  Yes.

17          Q.    May I have that back?

18          A.    Yes.

19          Q.    Is 6.8 liters per minute considered normal

20     cardiac output?

21          A.    Yes.

22          Q.    And if this study reflects in the bolster

23     position 6.8 liters per minute in the prone position,

24     that would be normal cardiac output, wouldn't it -- or

25     in the bolster position, I should say?

1      A.    Yes.

2      Q.    And that, in fact, is what that study says,

3  isn't it?

4      A.    That they had -- that this was their cardiac

5  output?

6      Q.    Yes.

7      A.    Yes.

8      Q.    What is the range for normal cardiac output?

9      A.    4 to 6 liters per minute.

10     Q.    So there could be a change in cardiac output

11  and yet the cardiac output still be within the normal

12  range?

13     A.    Yes.

14     Q.    4.3 would be within the normal range?

15     A.    Yes.

16     Q.    And patients in the Savaser study had a

17  cardiac output of 4.3 liters per minute in the prone

18  position, didn't they?

19     A.    I'd have to look back at the exact number.

20     Q.    Does that sound correct?

21     A.    Yes, yes.

22     Q.    And stroke volume, is it measured in

23  milliliters?

24     A.    Yes.

25     Q.    Is that the same measure as a cc?

1      A.    Yes.

2      Q.    Is there a substantial difference -- or is it

3   clinically significant, I should say, to have the

4   difference in 1 milliliter of stroke volume?

5      A.    Generally, no.

6      Q.    Can there be changes observed in testing like

7   this that does not result in a clinically significant

8   effect?

9      A.    Yes.

10      Q.    So one would have to consider both whether

11   there is a change and then whether that change is a

12   clinically significant one?

13      A.    Yes.

14      Q.    Or has a clinically significant impact, right?

15      A.    Yes.

16      Q.    You cite another study with the lead author

17   being Shimazu?

18      A.    Uh-huh.

19      Q.    Am I close?

20      A.    Yes.

21      Q.    Do you have a copy of that study?

22      A.    I do.

23      Q.    There were three groups of patients in that

24   study, weren't there, identified as group A, group B,

25   and group C?

1    A.    Yes.

2    Q.    In group A, we had patients who had no history

3  of myocardial ischemia or cardiomyopathy, right?

4    A.    Yes.

5    Q.    That is the group to which Troy Goode would

6  belong --

7    A.    Yes.

8    Q.    -- isn't it?

9          He would be a group A patient --

10    A.    Yes.

11    Q.    -- because he has no prior cardiac history?

12    A.    Correct.

13    Q.    And in this particular study, the Shimazu

14  study that you cite in your report, there was no

15  ejection fraction changes in group A in the prone

16  position?

17    A.    But there were changes in heart rate/stroke

18  volume.  You might not really expect to see a change in

19  ejection fraction.

20    Q.    The problems noted were really in the patients

21  with the pre-existing history, weren't -- weren't they?

22    A.    What -- what do you mean by that?  The

23  problem?  What do you mean by "problems"?

24    Q.    The ones who were thought to have some

25  problem -- some cardiac problem relating to positioning

Parin Parikh, M.D.                                                    65

1  were patients with pre-existing conditions?

2       A.   No.   I mean -- and I'm quoting on the article

3  here now under -- on page 303 under prone values, "In

4  all 90 patients, heart rate increase and stroke volume

5  decrease with prone positioning resulting in a decrease

6  in cardiac index" [as read].

7       Q.   Did the rates remain within the normal range

8  even though there was a change in them?

9       A.   They were in the -- in group A, yes.

10      Q.   Okay.   So even though there were changes in

11 group A, they still were within the normal range?

12      A.   Yes.

13      Q.   Okay.   And then I think the Meredith study

14 is --

15      A.   Yes.

16      Q.   -- the last one you cited?

17      A.   Yes.

18      Q.   Do you consider all of these studies that

19 you've cited in your report to be reliable authorities

20 on the topics they address?

21      A.   Yes.

22      Q.   The Meredith study deals with only eight

23 patients?

24      A.   Correct.

25      Q.   And those patients had COPD, chronic

1   obstructive pulmonary disease; is that right?

2       A.   Yes.

3       Q.   Troy Goode didn't have chronic obstructive

4   pulmonary disease, right?

5       A.   No, sir.

6       Q.   And five of the eight patients with chronic

7   obstructive pulmonary disease did not have a problem

8   being in the maximal prone restraint position --

9       A.   Yes.

10      Q.   -- right?

11      A.   Yes.

12      Q.   Three of the eight patients could not tolerate

13  those restraints?

14      A.   Correct.  They couldn't -- correct -- even to

15  finish the study.

16      Q.   And those patients were aged 69, 70, and 67?

17      A.   Yes.

18      Q.   Troy Goode was a young, healthy patient,

19  right?

20      A.   Yes.

21      Q.   Other than these articles which we've just

22  discussed which were cited in your report, have you read

23  any others for your work in this case?

24      A.   Let's take a look.  In -- in doing my search

25  and research on this, I -- yes, I came across other

 1   articles.  But these are the main ones I focused on.

 2        Q.   Your supplemental report says that you

 3   reviewed the deposition of Dr. Wecht?

 4        A.   Yes.

 5        Q.   Did you, in fact, review that deposition?

 6        A.   Yes.

 7        Q.   I didn't see it among your materials.  Do you

 8   not have it here?

 9        A.   I don't have it with me, but I mention it in

10   my supplemental that I reviewed it.

11        Q.   You did?  You did?

12        A.   Yeah.

13        Q.   And did you, likewise, read the exhibits to

14   Dr. Wecht's deposition?

15        A.   I may not have looked at it that closely.

16        Q.   Did you know that there were medical articles

17   attached to his deposition?

18        A.   To be honest, I don't know if I was supplied

19   the medical articles.  I think I was just supplied with

20   a transcript of the deposition.

21        Q.   Did you read Dr. Wecht's testimony about the

22   statements in the articles that were made exhibits to

23   his deposition?

24        A.   I didn't read the whole thing.  Part of the

25   reason in preparation for deposition, as I have not done

1    one before, I really wanted to see what the format and

2    structure was like, so Mr. McCormack -- McCormack and

3    his staff provided that for me.

4         Q.   So you were reading it for style more than

5    substance?

6         A.   In a sense, yeah.

7         Q.   And if those studies focused more on the

8    respiratory argument as opposed to the cardiac argument,

9    you really wouldn't have focussed on that anyway for the

10   reasons you mentioned to me earlier?

11        A.   Right.

12        Q.   So do you intend to express any opinions about

13   whether there is any impact on respiratory function from

14   the prone maximal restraint position, or is that an

15   issue that you're going to say is outside your area of

16   expertise?

17        A.   It would -- the area that I comment on more is

18   more in my area of expertise.

19        Q.   The cardiac area?

20        A.   Yeah.

21        Q.   Okay.

22        A.   There is a close interplay between heart and

23   lung function and cardiopulmonary status, but this is

24   the focus of, I would say, my expert opinion.

25        Q.   The focus being cardiac?

1       A.    Yes.

2       Q.    Not respiratory?

3       A.    Yes.

4       Q.    Are you familiar with the Sloane study from

5   2014 entitled "Evaluation of the ventilatory effects of

6   the prone maximal restraint position (PMR position) on

7   obese human subjects"?

8       A.    I believe I did come across that, but I didn't

9   look closely into it because it focused on obese

10  patients.

11      Q.    And Mr. Goode was not obese?

12      A.    Yes.

13      Q.    If a patient is obese, does that increase that

14  patient's risk of having some cardiac compromise?

15      A.    In the prone position you mean?

16      Q.    Yes.

17      A.    Yes.  In my review of the literature, it seems

18  that that's one of the risk factors that makes you more

19  prone to cardiac compromise.

20      Q.    If this Sloane article concludes with this

21  sentence in the abstract, "In this small study of obese

22  subjects, there were no clinically significant

23  differences in the cardiovascular and respiratory

24  measures comparing seated, prone, and PMR position

25  following exertion" [as read], do you agree that that's

1    what that study concluded?

2         A.   I'd really have to look at the study and the

3    methodologies.

4         Q.   Well, if the study reaches that conclusion, do

5    you agree with the statement?

6         A.   Not -- not necessarily, no.

7         Q.   Do you consider the Forensic Science

8    International a reliable authority?

9         A.   On -- reliable authority on just --

10        Q.   Prone maximal restraint position.

11        A.   I'm not terribly familiar with -- with the --

12   with the journal, actually.  And just along those lines

13   of, you know, do I trust it as a source, you know, I do

14   have more confidence in the echocardiography studies

15   that were done in cardiac journals than a forensic

16   journal.

17        Q.   Did you read any articles in the American

18   Journal of Emergency Medicine?

19        A.   I don't believe so.

20        Q.   Did you read the Krauskopf, K-R-A-U-S-K-O-P-F,

21   study from 2008 that concluded, in part, that there were

22   only minor charges in the cardiac index and output,

23   other cardiovascular parameters were not at all

24   influenced by weight force application?

25        A.   I'd have to look at the article.

1      Q.    You haven't seen that one?

2      A.    No.

3      Q.    Did you look at the Schmidt article from the

4  Journal of Emergency Medicine, 1999?

5      A.    What's the title of the article?

6      Q.    "The effects of positional restraint on heart

7  rate and oxygen saturation."

8      A.    I do believe I came across that article.

9      Q.    The abstract section concludes, "In our study

10 population, the use of hogtie and an alternate maximal

11 restraint method did not result in any clinical

12 restrictions in heart rate or oxygen saturation

13 recoveries" [as read].

14     A.    I do recall that article.  I think I didn't

15 focus on it because it looked more at the oxygen levels.

16 Kind of going back to our comment about cardiovascular

17 with positional asphyxia.

18     Q.    I asked about it because it mentioned heart

19 rate.

20     A.    Yeah.  It did comment on the heart rate, yes.

21     Q.    Do you agree with that conclusion I just read

22 to you?

23     A.    Once again, I'd have to look at the article.

24     Q.    Do you agree that that study concluded as I

25 just read to you?  You want to look at this statement I

1    read and tell me if I read it correctly?

2          A.    I mean, sure, they could have concluded that,

3    if that's the case.

4                      (Witness reviewed document.)

5          A.    Do I agree with you that they concluded that?

6          Q.    Yes.

7          A.    Yes.

8          Q.    And the conclusion, again, is, "In our study

9    population, the use of hogtie and an alternate maximal

10   restraint method did not result in any clinical

11   restrictions in heart rate or oxygen saturation

12   recoveries" [as read].

13                And that certainly is a reputable and

14   reliable journal, isn't it, the Journal of Emergency

15   Medicine?

16         A.    Once again, I'm less familiar with emergency

17   room journals.

18         Q.    It's -- it's outside of the literature you

19   normally --

20         A.    Yes.

21         Q.    -- review?

22               MR. PHILLIPS:  What would you think,

23   Doctor, about taking a short break?  We've been going

24   for awhile.  Would you like to stretch your legs?

25               THE WITNESS:  Sure.  Yeah, that sounds

1    good.

2                    MR. PHILLIPS:  Is that okay with everybody

3    on the phone?

4                    MR. GASS:  That's fine, thank you.

5                    MR. DILLARD:  Yes, thank you.

6                    (Break taken from 2:32 p.m. to 2:44 p.m.)

7         Q.    (BY MR. PHILLIPS)  Doctor, do you have there

8    in your hand a copy of the medical literature that you

9    brought with you today and it's that that you cited in

10   your report and that we've discussed today?

11        A.    Yes, sir.

12        Q.    And is all of the underlining and writing on

13   those articles yours?

14        A.    Yes.

15        Q.    I want to make a copy of those collective

16   Exhibit 1.

17                    (Sotto voce conversation.)

18                    (Exhibit Number 1 was marked.)

19        Q.    And, then, we're going to mark as collective

20   Exhibit 2 a copy of Dr. Vilke's report with your

21   handwriting on it.

22                    (Exhibit Number 2 was marked.)

23        Q.    Is that what we have here?

24        A.    Yes.

25        Q.    Okay.  And then have we identified everything

1    that you made a mark on, Doctor?

2         A.    Yes.

3         Q.    Okay.  I see among the materials that you've

4    reviewed, you also have something called "Statement of

5    Facts"?

6         A.    Yes.

7         Q.    Who prepared this?

8         A.    That was provided to me by Mr. McCormack and

9    his staff.

10        Q.    Did you rely upon this for the opinions you

11   hold in this case?

12        A.    I -- partially; amongst the other reports that

13   I reviewed as well.

14        Q.    All right.  We'll mark a copy of this

15   Statement of Facts as Exhibit 3.

16                   (Exhibit Number 3 was marked.)

17        Q.    And, then, for purposes of identifying the

18   other things that you have with you that you have

19   reviewed, we have your report, your amended report.  We

20   have -- I'm going to call them the fire department

21   records, the EMS records, the Baptist hospital records,

22   the autopsy report, and tox studies.  Did I cover all of

23   it, or is there something more?

24        A.    That's it.

25                   MR. MCCORMACK:  Did you include the police

1  records?

2       Q.   (BY MR. PHILLIPS)  Police records.  There was

3  an incident report in there.  Okay.  Is that everything

4  that you reviewed for your work in this case?  Besides

5  Dr. Wecht's deposition, you told me that today.

6       A.   Yes.

7       Q.   Okay.

8       A.   And there -- as you were going through some

9  articles, I mentioned that I did do a literature search,

10  so there's some articles I may have come across, but not

11  as deeply looked into or relied on.  I don't know if I

12  could list every single one, but...

13       Q.   Other than the articles that we marked as

14  collective Exhibit 1, did you keep anything that popped

15  up on your literature search?

16       A.   No.

17       Q.   Okay.  You also have apparently reviewed

18  Dr. Clair's report and supplemental report?

19       A.   Yes.

20       Q.   Okay.  Do you know Dr. Clair?

21       A.   No, sir.

22       Q.   Do you know of Vanderbilt?

23       A.   Yes.

24       Q.   What is its reputation?

25       A.   It's got a great one.

1    Q.    Did you recognize that Dr. Clair is the

2    executive medical director, chief medical officer of the

3    Vanderbilt Heart and Vascular Institute?

4    A.    Yes.

5    Q.    And you realize that he's a cardiologist with

6    special training in electrophysiology?

7    A.    Yes.  Although I didn't realize he was EP

8    until you just told me.

9    Q.    Other than Dr. Wecht's deposition, did you

10   review any depositions in this case?

11   A.    No, sir.

12   Q.    So you've not reviewed Dr. Oliver's

13   deposition, for instance?

14   A.    No.

15   Q.    Or anybody's deposition that described how

16   Mr. Goode was acting and behaving on the day in

17   question?

18   A.    No, sir.

19   Q.    Do you use the DSM in your practice?

20   A.    No.

21   Q.    What is that?

22   A.    It's a --

23   Q.    What do the letters stand for?

24   A.    The -- it's -- I'd have to look it up even.

25   It's a diagnostic tool used by mainly psychiatrists in

Parin Parikh, M.D.                                                    77

1  terms of psychiatric diagnosis.

2      Q.    You made reference to it in your supplemental

3  report.   Why would you make reference to it if you're

4  not familiar with it and don't generally use it?

5      A.    Just that, you know, the diagnosis of excited

6  delirium, in my opinion, is not a very widely accepted

7  diagnosis.   It's -- it doesn't have a -- no true

8  definition, no clear way of diagnosing it, even on

9  autopsy.   There's not many objective measures used to

10  diagnose it.

11            On a standard list of diagnosis, whether

12  that's ICD-10 or DSM, it's not listed as a diagnosis,

13  just to further support the hypothesis that it's not a

14  widely used or accepted diagnosis.

15      Q.    Do you use the ICD, the International

16  Classification of Diseases, in your practice?

17      A.    Yes.

18      Q.    And is it your position that if something is

19  not listed in the DSM or the ICD, it's not a valid

20  diagnosis?

21      A.    No; no, that's not my point with that.

22      Q.    Do you agree that there are valid diagnoses

23  that aren't listed in those two publications?

24      A.    There can be, yes.

25      Q.    Do you know if positional asphyxia is listed

Exhibit "F" page 77 of 166

Parin Parikh, M.D.                                                       78

1    in either the DSM or the ICD?

2         A.    Asphyxia is listed in ICD-10.

3         Q.    But positional asphyxia is not; did you know

4    that?

5         A.    No.   But mechanical asphyxia is.   Asphyxia by

6    other causes is list, instead, there.

7         Q.    Are you aware that the literature publishes

8    some other codes that are consistent with excited

9    delirium?

10        A.    I'm aware of that statement, yes.

11        Q.    And that's exactly the statement you're making

12   about positional asphyxia.   It's not listed as such, but

13   there are other topics that you think catch it, right?

14        A.    Yeah.   But it's -- asphyxia is still a clear

15   diagnosis.   That's summarized --

16        Q.    But positional asphyxia is a different kind of

17   asphyxia, isn't it?

18        A.    I think it's well described, and whether it's

19   mechanical asphyxia, asphyxia, it's pretty similar

20   diagnosis.

21        Q.    Is there an ICD-9 code for manic excitement?

22        A.    I'm not sure.

23        Q.    Well, assume there is.   Is that something

24   that's broad enough to encompass excited delirium?

25        A.    I -- I don't think I would be able to comment

1    on that really.

2         Q.   Are you familiar with the ICD-9 code for

3    delirium with mixed origin?

4         A.   No.

5         Q.   Are you familiar with the ICD-9 code of

6    delirium drug induced?

7         A.   Come across it.

8         Q.   Are you familiar with the ICD-9 code of

9    delirium induced by drug?

10        A.   I'm unaware of any of those diagnoses causing

11   cardiac arrest.

12        Q.   Are you aware of the ICD-9 code for agitation?

13        A.   Yes.

14        Q.   For delirium?

15        A.   I know -- I -- I would assume that it exists.

16        Q.   For psychomotor excitement?

17        A.   I'm not sure about that, but...

18        Q.   Psychomotor agitation?

19        A.   Same.

20        Q.   Abnormal excitement?

21        A.   Same; I'm not too sure.

22        Q.   Before you were retained as an expert in this

23   case, were you familiar with excited delirium?

24        A.   No, sir.

25        Q.   You first learned about it for your work in

1    this case?

2         A.    Yes.

3         Q.    You have among your materials, I think, a

4    publication on excited delirium?

5         A.    Yes.

6         Q.    And would you locate that, please?  It's part

7    of Exhibit 1, isn't it?

8         A.    Yes.

9         Q.    Is it the American College of Emergency

10   Physicians White Paper Report on Excited Delirium

11   Syndrome?

12        A.    Yes.

13        Q.    Does the American College of Emergency

14   Physicians, based upon your review of that white paper

15   that you hold in your hand, recognize excited delirium

16   syndrome as a valid diagnosis?

17        A.    Yes.

18        Q.    And a valid cause of death?

19        A.    Yes.

20        Q.    And when you made a comment in your report to

21   the effect that at least one professional association

22   has recognized excited delirium as a diagnosis and cause

23   of death, you were referring to the American College of

24   Emergency Physicians in this white paper?

25        A.    Yes.

1     Q.   Do you know that the National Association of

2  Medical Examiners also recognizes excited delirium as a

3  valid diagnosis?

4     A.   Yes.

5     Q.   And cause of death?

6     A.   Yes.

7     Q.   Those are two well-respected organizations,

8  aren't they?

9     A.   Yes.

10    Q.   So you don't dispute that excited delirium

11 exists as a diagnosis reported in the medical

12 literature, do you?  You're holding it in your hand.

13    A.   No.  I just -- I do dispute its link to --

14 some of its proposed links to cardiac arrest.  I --

15 there's no --

16    Q.   But you acknowledge that the medical

17 literature recognizes --

18    A.   Yes.

19    Q.   -- excited delirium as a diagnosis?

20    A.   Yes.

21    Q.   In fact, you read that yourself when you

22 looked at that white paper, didn't you?

23    A.   Yes.

24    Q.   LSD ingestion has been reported to cause

25 excited delirium, hasn't it?

Parin Parikh, M.D.                                                      82

1          A.    According to this report, yes.

2          Q.    And, in fact, that is the report that you

3    have, the white paper from the American College of

4    Emergency Physicians, that report says that LSD has been

5    described as precipitating excited delirium, right?

6          A.    Yes.

7          Q.    And do you accept that conclusion in that

8    white paper that's part of Exhibit 1?

9          A.    I guess that's the conclusion that the paper

10   has come to.

11         Q.    Did you make any attempt to review the white

12   paper from the American College of Emergency Physicians

13   on Excited Delirium Syndrome and apply it to this case

14   and determine what symptoms Troy Goude [pronouncing] had

15   that were consistent with Excited Delirium Syndrome as

16   identified in that paper?

17               MR. MCCORMACK:   Troy Goode.

18               MR. PHILLIPS:   I'm sorry.   Troy Goode, I

19   apologize.

20         A.    Could you help me understand the question?

21   Did I --

22         Q.    (BY MR. PHILLIPS)   Yes.   You recognize that in

23   the White Paper Report on excited delirium, which you

24   hold in your hand that's part of collective Exhibit 1,

25   part of what's described there are certain symptoms

Parin Parikh, M.D.                                                    83

1    consistent with Excited Delirium Syndrome, those that

2    have been reported?

3         A.    Yes.

4         Q.    You're aware of that?

5         A.    Yes.

6         Q.    My question is:  Did you try to take those

7    symptoms that have been reported that are consistent

8    with excited delirium and look and see if Troy Goode's

9    presentation was consistent with those symptoms or not,

10   or is that something that's beyond the scope of what

11   you're doing in the case?

12        A.    I guess I've never actually gone through the

13   exercise of what you said, if I went through each

14   particular symptom and linked it to the symptoms he was

15   having or exhibiting.

16        Q.    Is that something that's beyond the scope of

17   your expertise and beyond the scope of what you intend

18   to comment on in this case?

19        A.    Yes.

20        Q.    In the white paper that you have there, the

21   pages I have are not numbered.  Are yours?

22        A.    They're not.

23              MR. MCCORMACK:  I don't think any of them

24   are.

25        Q.    (BY MR. PHILLIPS)  Okay.  Can you locate

1   Table 4?

2          A.    Yes.

3          Q.    On the right side, you see the heading that

4   said conditions that cause sudden death?

5          A.    Yes.

6          Q.    The first sentence under that heading says,

7   "Sudden unexpected death is the hallmark of fatal

8   excited delirium syndrome" [as read], right?

9          A.    Yes.

10         Q.    Is this the only thing that you have reviewed,

11  that white paper, pertaining to excited delirium?

12         A.    There was one other article that was

13  essentially -- it was almost the same article.  I'm

14  trying to remember the name of that now.

15         Q.    Is this a piece of literature that you sought

16  out as part of your literature search --

17         A.    Yeah.

18         Q.    -- or was it provided to you?

19         A.    No.  I -- I can probably remember what it is

20  now if I look at this.

21         Q.    No; I'm talking about the white paper itself.

22  Is that something that you located yourself and

23  reviewed?

24         A.    Yes.  Once I reviewed Dr. Vilke's statement, I

25  sought this out.

1          Q.    Okay.  Did you find that Dr. Vilke's statement

2     was consistent with the white paper?

3          A.    Yes.

4          Q.    Now, I think you were about to tell me about a

5     possible other article that you reviewed pertaining to

6     excited delirium.  Are you able to --

7          A.    Yes.  It was very similar to this white paper.

8     I thought I had included it in here.

9                    (Witness reviewed document.)

10         A.    It was kind of a summary on excited delirium

11    syndrome and it was almost the same article.

12         Q.    Contained very similar information --

13         A.    Yes.

14         Q.    -- to what's in your white paper?

15         A.    Yes.

16         Q.    I'm going to mark as the next exhibit a copy

17    of the notice for your deposition.

18                    (Exhibit Number 4 was marked.)

19         Q.    The notice asks you, Doctor, to bring certain

20    things with you today and we have identified a lot of

21    material that you brought.  But for completeness, I'll

22    ask you if you have brought anything else with you today

23    in response to the deposition notice other than what

24    we've already identified for the record?

25         A.    I'm sorry, have I brought anything else?

1    Q.    Yeah.  Take a look at this document --

2    A.    Okay.

3    Q.    -- and you'll see that it asks you to bring

4    things with you to the deposition today.

5              (Witness reviewed document.)

6    A.    Okay.

7    Q.    My question to you is whether you have any

8    other materials to furnish me in response to the

9    deposition notice other than those things that we've

10   already identified together?

11   A.    The article that I mentioned that was very

12   similar to this one.

13   Q.    Yes.

14   A.    Yeah.

15   Q.    But you don't have that --

16   A.    I don't have that on me, no.

17   Q.    And you don't have it anywhere else, do you?

18   A.    I'd have to look it up again and -- I don't

19   have a physical copy.

20   Q.    Okay.  You've not reviewed any photographs in

21   this case, have you?

22   A.    No.  A photograph was provided to me by

23   Mr. McCormack and his staff initially.  Mr. Goode being

24   wheeled into the emergency room was on photograph

25   originally that was provided to me.

1    Q.   I didn't see that among your materials.

2    A.   Yeah.

3    Q.   Did you discard the photograph?

4    A.   I never -- I guess I don't have a physical

5    copy of it.

6    Q.   Was it of any significant to any opinion you

7    plan to express?

8    A.   Not particularly.

9    Q.   Have we covered everything that you've

10   reviewed in order to form your opinions in this case?

11   A.   Yes, sir.

12   Q.   Okay.  Your report says that in the last four

13   years, you've not testified as an expert --

14   A.   Correct.

15   Q.   -- right?

16        And -- and your testimony today is you've

17   never testified as an expert during any time period?

18   A.   Yes.

19   Q.   Have you done expert case reviews before this

20   one?

21   A.   You mean for the medical literature or --

22   Q.   Let me clarify.  Mr. McCormack or Mr. Edwards,

23   or somebody from their office, contacted you and asked

24   you to review a case and give opinions?

25   A.   Yes.

1     Q.    That's an example of what I mean by "review."

2  And so my question is:  Have you conducted that kind of

3  review on any occasion, other than pertaining to the

4  Goode matter we're here to discuss today?

5     A.    No, sir.

6     Q.    Have you made any notes about this case other

7  than your markings on collective Exhibit 1?

8     A.    No.  I mean, have I maybe scribbled something

9  on a piece of paper to remind myself what to print?

10  Probably.  But nothing -- I don't think anything

11  substantial.

12     Q.    Have you had any correspondence, including

13  emails with Mr. McCormack, Mr. Edwards, or their office?

14     A.    I -- Mr. McCormack and I have had email

15  correspondence, the majority of them to help schedule

16  timing of deposition, timing of us coordinating phone

17  call, and my request for him -- for some of the articles

18  that are present here --

19     Q.    So there's --

20     A.    -- that have been provided for me.

21     Q.    There's nothing substantive in any of those

22  emails other than your asking him to provide you these

23  articles and he did so?

24     A.    Yes.

25           MR. PHILLIPS:  Do we have copies of those

1    emails pertaining to the article request, Kevin?

2                    MR. MCCORMACK:  I don't have them on me.

3    I'm happy to provide them to you.

4                    MR. PHILLIPS:  Okay.  Thank you.  I would

5    appreciate that.

6         Q.    (BY MR. PHILLIPS)  Have you submitted --

7         A.    Oh, sorry.  One -- and other things included,

8    for example, the expert statements that were provided to

9    me by his office.

10        Q.    Yes.

11        A.    The communications.

12        Q.    Communications regarding your expert reports?

13        A.    Yeah.

14        Q.    Yeah.

15              Have you submitted any bill for your work

16    in this case?

17        A.    Yes.

18        Q.    Do you have those with you?

19        A.    Sorry, I do not have those bills.  I have a

20    summary of our compensation agreement.

21        Q.    All right.  Let's mark as late filed exhibit

22    whatever the next one is the emails pertaining to the

23    articles that you identified.  And let's mark as the

24    next late filed exhibit the bills that you've submitted

25    in this case.

1          MR. MCCORMACK:  What exhibit number are we

2     on?

3          THE REPORTER:  I believe those are going

4     to be 5 and 6.

5          MR. MCCORMACK:  5 and 6.

6          (Exhibit Numbers 5 and 6 were marked.)

7     Q.   (BY MR. PHILLIPS)  You said that you could

8     summarize for me your compensation agreement, I think?

9     A.   Yes.

10    Q.   What is it?

11    A.   It was -- prior to the deposition, any work

12    was $300 per hour, plus expenses.  And then deposition

13    or trial-related expenses plus -- $400 an hour.

14    Q.   Will your bills reflect how much time you

15    actually had spent working on the case before the

16    deposition started today?

17    A.   Not the current bill, no.  Not the one I have,

18    no.

19    Q.   Well, when we look at all of your bills

20    together --

21    A.   Yeah.

22    Q.   -- are they going to reflect the amount of

23    time you spent?

24    A.   Yes.

25    Q.   Okay.  Have you ever advertised your services

1  as an expert?

2       A.   No.

3       Q.   Did you bring a current CV?

4       A.   I did not bring that.

5       Q.   Is it the same one that was provided to us

6  with your report?

7       A.   Yes.

8       Q.   It has not changed --

9       A.   No.

10      Q.   -- since then?

11      A.   No.

12      Q.   You were asked to provide a copy of any facts

13  or data that you were provided from plaintiff's counsel,

14  and we have that statement of facts that we marked.

15      A.   Yes.

16      Q.   Is there anything more?

17      A.   That photograph.

18      Q.   Right.

19      A.   The expert statements, deposition of

20  Dr. Wecht, the articles I requested.

21      Q.   In your report of January 31st, 2017, in the

22  second paragraph, you make a reference to a narrative

23  summary of facts surrounding the case by counsel for

24  Ms. Goode.  Is that the document summary of facts that

25  we already marked?

Exhibit "F" page 91 of 166

1      A.    Yes.

2      Q.    You've received no other factual summary

3  besides that?

4      A.    No, sir.

5      Q.    You were asked to bring text, treatises,

6  articles that you reviewed or relied upon for your

7  opinions, and you've done that and we've already marked

8  those, right?

9      A.    Yes.

10     Q.    Do you know how plaintiff's counsel in this

11  case located you?

12     A.    Yes.

13     Q.    How?

14     A.    Through -- Mr. McCormack and I are

15  acquaintances through a long chain.  Let me try to get

16  it right.  His -- Mr. McCormack's wife's father, his

17  second cousin's -- her husband and my father are old

18  friends.  So we --

19     Q.    Who is a cousin with whom?

20     A.    Mr. McCormack's wife's father is second

21  cousins with my dad's friend's wife.  Yeah.

22     Q.    Okay.  So there's no kinship between your

23  family and Mr. McCormack's in-laws?

24     A.    No.

25     Q.    Did you know Mr. McCormack before you were

1    contacted to review this case?

2         A.    Because of some of the family ties with

3    parents, friends, cousins, we've been at a couple

4    weddings together that we've both been invited to.

5         Q.    Where were the weddings?

6         A.    One was in Hawaii, and there was another one

7    in -- where was the other wedding?

8                   THE WITNESS:  I'd have to remember if you

9    were at the one in Seattle or not.

10        A.    I can't remember.

11        Q.    (BY MR. PHILLIPS)  When was the Hawaii wedding

12   that and you Mr. McCormack attended?

13        A.    That was last fall, November of 2016.

14        Q.    Was that after you were contacted about

15   reviewing this case?

16        A.    That preceded -- that preceded that.

17        Q.    Which preceded?

18        A.    The wedding preceded contact about the case.

19        Q.    How long after the Hawaii wedding in November

20   of 2016 were you contacted about reviewing the Goode

21   case?

22        A.    I think in -- when was the original statement?

23   In January?

24        Q.    In January of 2017.

25        A.    In January.  So either December or January.

1      Q.    How long were you in Hawaii with

2  Mr. McCormack?

3      A.    Well, I was there for a couple weeks.  Our

4  common time together was at the wedding and the wedding

5  reception, so, you know, a couple hours at the wedding,

6  a few hours at the reception.

7      Q.    And when was -- go ahead.

8      A.    It was -- there were a lot of people there.

9      Q.    Did you talk to Mr. McCormack at the Hawaii

10 wedding?

11     A.    Yeah; yes.

12     Q.    Did you know him before then?

13     A.    I knew of him.  I -- frankly, I can't remember

14 the first time we met.  But I knew him as this family

15 friend's husband.

16     Q.    Had you communicated with him at all even

17 socially before the Hawaii encounter?

18     A.    Potentially at another common event, like a

19 wedding, but not directly to -- with each other.

20     Q.    When was the wedding before the Hawaii

21 wedding?

22     A.    I'd -- I'd really have to kind of go back.

23     Q.    Just give me an estimate of the time.

24     A.    Within the past year before that or so.

25     Q.    Okay.  And do you know where that was?

1      A.    No, I don't.  I mean --

2      Q.    What was your contact with Mr. McCormack at

3  the prior wedding?

4      A.    Similar type of thing.  We were both invited

5  to these events.

6      Q.    Other than attending these two weddings, have

7  you had any other contact with Mr. McCormack?

8      A.    Yeah.  Another kind of -- I use the term

9  "family get-together" loosely as there's actually no

10  blood relationship, but there was a get-together and we

11  were both invited to that as well.

12      Q.    When was that?

13      A.    That was earlier this year.

14      Q.    2017?

15      A.    Yes.

16      Q.    Where?

17      A.    That was in Las Vegas.

18      Q.    How long?

19      A.    Two days.

20      Q.    Did the two of you do anything together in

21  Vegas?

22      A.    There were a group of 11 of us that

23  were together.

24      Q.    Are you going to tell me that what happens in

25  Vegas stays in Vegas?

Parin Parikh, M.D.                                                96

```
 1              (Laughter.)

 2        Q.   Did you do any social things together in

 3   Vegas?

 4        A.   We did.

 5        Q.   What?

 6        A.   Oh, we -- there were 10 or 11 of us and we had

 7   rented out a house.  We all stayed together.  I -- you

 8   know, it was the beginning of the NCAA basketball

 9   tournament.  We watched basketball.

10        Q.   Did you watch basketball together?

11        A.   Yeah.  It was pretty tame.

12        Q.   Any other --

13        A.   Played some sports.

14        Q.   Any other trips or gatherings that you and

15   Mr. McCormack have had?

16        A.   No.

17        Q.   Did you communicate with him about this

18   lawsuit at any of these places where you've gathered

19   with him?

20        A.   The initial one, we struck a conversation that

21   I was a cardiologist.

22        Q.   In the Hawaii wedding?

23        A.   At the initial wedding.

24        Q.   The one before Hawaii?

25        A.   No, the one in Hawaii.
```

Exhibit "F" page 96 of 166

Parin Parikh, M.D.                                                97

1      Q.    Okay.

2      A.    That -- that kind of -- I think he

3   recognized that -- you know, asked me about my

4   profession and I was a -- I was a cardiologist.

5              The only communications we had in Las

6   Vegas were to try to -- scheduling issues.  At that

7   point, I believe we were trying to schedule a deposition

8   that was eventually canceled.  But we didn't other than

9   that.

10     Q.    Do you know Mr. Edwards?

11     A.    No.  I mean, other than through communications

12  that I've had with him --

13     Q.    Do you know --

14     A.    -- regarding this case.

15     Q.    -- anybody else in that law firm, the Ballin,

16  Ballin, Fishman firm in Memphis?

17     A.    No, sir.

18     Q.    Have you ever had any professional

19  relationship with Mr. McCormack or Mr. Edwards before

20  this case?

21     A.    No.

22     Q.    When you were first contacted, how were you

23  contacted?

24     A.    Via email -- or was it a phone call?  I really

25  can't remember if it was a phone call or email.  I'd

1    have to look back.

2         Q.    If it was by email, can you search for that

3    and provide those emails to us where you were initially

4    contacted about the case?

5         A.    Yes.

6         Q.    We'll mark those as the next late filed

7    exhibit.

8                    Do you remember what you were told about

9    the case?

10        A.    That there's a case he was potentially

11   interested in me reviewing, and that's when I was

12   provided the summary of facts and --

13        Q.    Is it actually statement of facts?

14        A.    Or sorry, statement of facts.  And the

15   hospital records, the EMS records, the fire report

16   records.  I think that's what I was initially provided,

17   and I was later provided the autopsy reports.

18        Q.    Did he tell you anything about the plaintiff's

19   allegations or theory in the case?

20        A.    The -- what?  I don't even know what theory

21   you're referring to, so...

22        Q.    Well, you understand that the plaintiff has a

23   theory as to what happened in this case and why

24   Mr. Goode died?  Did he explain any of that to you in

25   the initial contact?

1      A.    The initial contact was initially --

2   surrounded this discussion of SVT, actually.  And to

3   help him understand SVT.  That's kind of where it

4   started, actually.

5      Q.    Okay.

6      A.    Which is, I think, why when we made the

7   cardiology connection, that's kind of -- the discussion

8   went on from there.

9      Q.    Okay.  Have you discussed this case with

10  anybody other than Mr. McCormack?

11     A.    What's Tim's last name?

12     Q.    Mr. Edwards?

13     A.    Mr. Edwards.  I think we've had some email

14  communications and email communications with his staff

15  that would be included on...

16     Q.    I didn't mean to do this in piecemeal fashion,

17  but I've wound up doing it.  I would like to have

18  whatever discoverable email communication that has

19  existed between the two of you.

20          MR. PHILLIPS:  Can we just make that part

21  of the last late filed exhibit I marked?

22          MR. MCCORMACK:  You want to make that part

23  of Exhibit 7?

24          MR. PHILLIPS:  Was that the last one?

25          MR. MCCORMACK:  I believe so.

Parin Parikh, M.D.                                                        100

```
 1                    MR. PHILLIPS:  Yeah, just to keep from

 2       having more exhibits.

 3                    MR. MCCORMACK:  Sure.

 4                    MR. PHILLIPS:  And you'll --

 5                    MR. MCCORMACK:  Yeah, we'll -- I'll review

 6       them and --

 7                    MR. PHILLIPS:  Sure.

 8                    MR. MCCORMACK:  -- anything that's

 9       discoverable, we'll send.

10                    MR. PHILLIPS:  Good, thank you.

11            Q.   (BY MR. PHILLIPS)  Do you know any of the

12       other experts in this case, Dr. Parikh?

13            A.   No, sir.

14                    MR. PHILLIPS:  These other lawyers have

15       been waiting most patiently, so I think out of respect

16       for them, I'm going to stop asking questions for now and

17       let them ask questions for awhile.  It will give me a

18       chance to reflect and see if there's anything else I

19       want to ask you.  When they finish, I may have

20       additional questions, but I'm going to let them ask some

21       questions for now.  I appreciate your time very much.

22                    THE WITNESS:  Thank you.

23                         EXAMINATION

24       BY MR. UPCHURCH:

25            Q.   Dr. Parikh, good afternoon.  My name is David
```

1    Upchurch.  We met just prior to your deposition earlier

2    today.

3                    You are a member of the American College

4    of Cardiology, are you not?

5         A.    Yes, sir.

6         Q.    By virtue of your membership in the American

7    College, are you familiar with the American College of

8    Cardiology Code of Ethics that they have?

9         A.    Yes.  Not verbatim, but I'm aware that they

10   exist.

11        Q.    Yes, sir.

12                   Are you generally familiar -- I'll tell

13   you it's Section 6 of -- of that code on expert witness

14   testimony.  Have you reviewed that in connection with

15   your activities in this case?

16        A.    I have -- I have not reviewed that.

17        Q.    6.1 of that says, "A member must be an

18   acknowledged expert having the appropriate education and

19   experience in the specific area in which he or she is

20   testifying.  A member shall not misrepresent his or her

21   education and experience" [as read].

22                   6.2 of that statement says, "Expert

23   witness testimony is considered the practice of medicine

24   and should be provided in an objective manner using

25   medical knowledge to form expert medical opinions that

Parin Parikh, M.D.                                            102

```
 1    are subject to peer review" [as read].

 2                   Do -- do you understand and agree to be --

 3    to follow each of those statements that I've just read

 4    to you?

 5         A.    Yes.

 6         Q.    Now, following up on the first statement, you

 7    have identified your field of expertise as cardiology?

 8         A.    Yes.

 9         Q.    You have told Mr. Phillips that you are not

10    holding yourself out as one having expertise in the

11    field of emergency medicine?

12         A.    Correct.

13         Q.    You would likewise say, would you not,

14    Dr. Parikh, that you are not holding yourself out as an

15    expert in the field of emergency department nursing?

16         A.    Correct.

17         Q.    You have identified for Mr. Phillips the

18    documents that you have reviewed in connection with your

19    opinions that you have given in this case.  This -- this

20    question:  Has there been any document or item or

21    material that you have requested that you have not

22    received?

23         A.    You mean when I requested a certain article

24    or --

25         Q.    I guess what I'm trying to explore with you,
```

Exhibit "F" page 102 of 166

1    has there been any part of this case, any document, any

2    record, any deposition that you wanted to see --

3         A.    Oh, I see, that wasn't --

4         Q.    -- that you've requested that hasn't been

5    provided to you?

6         A.    No.

7         Q.    Look with me, please, sir, on page 1 of your

8    January 31, 2017, report.

9         A.    Okay.  I don't have -- I have my amended

10   report here, but I'd have to look back to see the older

11   report.

12                   MR. MCCORMACK:  Do you have a copy of

13   that?

14        Q.    (BY MR. UPCHURCH)  If you'll look on your

15   amended report --

16        A.    Uh-huh.

17        Q.    -- at the last paragraph which begins, "During

18   the time."

19        A.    Sorry, the last?

20        Q.    It's on the last paragraph on my copy.  It

21   begins -- it's on page 1, last paragraph begins --

22        A.    "During this time," okay.

23        Q.    -- "during this time."  If you'll look at the

24   second sentence, it begins "given" and it states, "Given

25   that the patient had a prior history of asthma" [as

1    read].

2         A.    Uh-huh.

3         Q.    And it goes on.  I want to ask you a question

4    about the reference to the asthma.  Do you find any

5    evidence on your review of the record that Mr. Goode had

6    any activation or exacerbation of his asthma during the

7    events that are at issue in this case?

8         A.    It doesn't appear so.

9         Q.    Certainly don't want to wade back through your

10   discussion with Mr. Phillips on SVT --

11        A.    Sure.

12        Q.    -- but let me see if I have a general

13   understanding of what you have said to him.  And that is

14   that SVT is, in essence, an umbrella term used to

15   describe tachycardias that emanate from a particular

16   area of the heart, true?

17        A.    Yes.

18        Q.    And you told us without going through each

19   particular type of SVT that there are multiple types of

20   SVT, true?

21        A.    Yes.

22        Q.    One of those types, as I understand it, is a

23   physiological sinus tachycardia?

24        A.    Yes.

25        Q.    Would you agree, based upon your review of the

1    records, that the most likely type of SVT that Mr. Goode

2    had was a physiologic sinus tachycardia?

3        A.    Yes.

4        Q.    Define for us what physiologic sinus

5    tachycardia is.

6        A.    It is your normal rhythm.  Sinus rhythm is our

7    normal rhythm.  When that rate is elevated above 100,

8    it's considered sinus tachycardia.  So, essentially, he

9    had a normal rhythm in the sense that there wasn't a

10   malignant arrythmia, but his heart rate was going very

11   fast and was very elevated.

12       Q.    And I think you told Mr. Phillips that one of

13   the physiologic responses that is involved in this case

14   would be the psychological manifestations or effects of

15   the LSD that Mr. Goode ingested, true?

16       A.    Yes.

17       Q.    If you'll look on page 2, please, sir, of your

18   supplemental report, the -- in the middle, there is the

19   heading "hospital care."

20       A.    Yes.

21       Q.    If you'll direct your attention, please, sir,

22   to the second sentence beginning "on initial exam."  It

23   makes reference to facial trauma or contusions.  Do I

24   understand correctly that based upon the materials that

25   you have provided, you've not seen any evidence of

1    facial trauma or contusions?

2         A.   Well, in looking at the ER records on the

3    physical exam or in the history component, there was no

4    mention of those -- the facial trauma or contusions, but

5    those presence -- those findings were present on the

6    autopsy.  Did I physically see them?

7         Q.   Well, my question -- let me see if I can ask a

8    better one.

9         A.   Yeah.

10        Q.   Have you provide -- have you been provided any

11   photographic documentation that evidences any such

12   trauma or abrasions?

13        A.   The photograph I was provided was not a level

14   of detail that I could do a proper physical exam or

15   assessment.

16        Q.   All right, sir.  Could you identify for us how

17   this statement with respect to facial trauma bears upon

18   your opinions with respect to the field of cardiology?

19        A.   In terms -- it -- so when you look at the

20   constellation of how he presented, an elevated heart

21   rate, tachypnea with an elevated respiratory rate, a

22   decreased O2 saturation, whether you're an ER physician,

23   a medicine doctor, a cardiology, you should -- a

24   cardiologist, you should recognize that that is a

25   constellation of very abnormal vital signs and that

1   patient needs a full assessment.

2                And it was difficult to assess this

3   patient.  And partly, I think things weren't properly

4   assessed because of the position he was in.  So it's

5   not -- I guess it's not a specific cardiovascular care,

6   but I don't think you have to have a specific expertise

7   to say that these vital signs should have been monitored

8   and addressed.

9       Q.   All right, sir.  Would I be accurate, though,

10  in understanding the -- the documents and materials that

11  you've reviewed in this case, you would have no factual

12  basis to opine, would you, that facial trauma was

13  present at triage?

14      A.   No.  This -- the fact that there is facial

15  trauma was -- I -- I can't say that, but it was present

16  on autopsy.

17      Q.   And the same answer would hold true for the

18  contusions or leg abrasions or other contusions that are

19  referenced in that sentence.  You would have no factual

20  basis to testify to this court and jury as to when those

21  were present on this gentleman?

22      A.   The -- no, I couldn't comment on the exact

23  time that they occurred.

24      Q.   Nor do you have any factual basis to offer to

25  a court and jury as to how these abrasions or contusions

1    occurred?

2         A.    I mean, some of the contusions -- he had a dog

3    bite.  We know that that was part -- so we have some

4    evidence based on the summary that we provided where

5    these contusions could have come from.  But you're

6    right, me personally, I can't say at exactly which time

7    and what happened and...

8         Q.    All right, sir.  If you'll again, please, sir,

9    look with me on page 2 of your supplemental report under

10   the heading hospital care, looking at the paragraph

11   beginning "in addition."

12        A.    Uh-huh.

13        Q.    That first sentence makes reference to

14   diminished cardiac output.

15        A.    Uh-huh.

16        Q.    Could you define for us, please, sir, what

17   cardiac output is?

18        A.    By the strict definition, generally cardiac

19   output is measured in liters per minute, so the amount

20   of blood that the heart ejects or produces in a period

21   of a minute time.

22        Q.    And a normal range would be what?

23        A.    4 to 6 liters per minute.

24        Q.    How does one measure or quantify one's or

25   one's patient's diminished cardiac output?

1      A.    Man, this could go a while.  Okay.  Let's --

2 let me try to be succinct.  There are a lot of different

3 methods in measuring cardiac output.

4            Sorry, your question -- how do you measure

5 cardiac output in general?  This -- this could be really

6 broad, so help me narrow it down a little bit.

7      Q.    Well -- and I -- I appreciate that.  What I'm

8 trying to get at is, is there an objective measure by

9 one -- by which one can compute a patient's cardiac

10 output so that one can say, Mr. Upchurch, your cardiac

11 output is reduced or low?

12      A.    Okay.  There are a variety of different

13 methods of calculating cardiac output.  It's a term we

14 use in medicine is something called the gold standard.

15 You know, what is the best test to measure cardiac

16 output?

17            The best test is an invasive heart

18 catheterization -- a right heart cath, where you go

19 inside the heart, you measure certain variables, and you

20 calculate a cardiac output.  Now, you can imagine that

21 you're not going to do that on everybody, okay.

22            So the other approaching gold standard is

23 cardiac MRI.  Once again, not very feasible in -- in a

24 lot of patients.  You know, it's a long test.

25            So because the gold standards are

1   difficult and you can't widely apply them, we use

2   different tools to help us assess or get an

3   approximation of cardiac output.  Immediately on bedside

4   evaluation of a patient, things like your blood

5   pressure, heart rate, oxygen saturation, and exam are --

6   can be important markers or surrogates of cardiac

7   output.  If you have really bad cardiac output,

8   generally, you're going to be tachycardia and

9   hypotensive or hypoxic.  So they can be signs of

10  decreased cardiac output.

11            The studies that I comment on specifically

12  use the modality of either transthoracic

13  echocardiography, which is an ultrasound of the heart,

14  or nuclear medicine, which is another mode of taking

15  pictures of the heart with a nuclear camera.  Those --

16  they're not quite as good as the gold standard of a

17  heart catheterization or an MRI measuring cardiac

18  output, but they're very good.

19            So I hope that helps answer your question

20  a little bit.  There's a lot of different ways to

21  measure cardiac output.  Some are immediately available.

22  Some are more complex, invasive procedures.

23       Q.   Thank you for that explanation.  In -- in

24  light of the means that you've just identified to

25  objectively determine a patient's cardiac output, am I

Parin Parikh, M.D.

111

1  right in understanding that, in this case, you cannot

2  state to a reasonable degree of medical certainty or

3  probability what Mr. Goode's cardiac output was in the

4  emergency department within the events that we're

5  talking about?

6      A.   You're right.  I mean, I -- there's no -- I

7  can't give you a certain number of what his cardiac

8  output was, but there was certain gross abnormalities

9  that were -- were crying for attention.  You know, the

10  elevated heart rate, decreased oxygen levels, his

11  respiratory distress.

12      Q.   All right, sir.  Identify for us, please, sir,

13  the respiratory distress to which you refer for

14  Mr. Goode during the subject hospitalization?

15      A.   Yeah.  So his -- his respiratory rate was

16  elevated.  And let's turn to -- do you mind if I turn to

17  the ER records here?

18      Q.   Certainly.

19              (Witness reviewed document.)

20      A.   I mean, on his initial -- repeat the question

21  for me.

22      Q.   Yes, sir.  You identified three items that, I

23  believe your words were calling out or crying out for

24  attention.  And you identify an elevated heart rate,

25  decreased O2, and respiratory distress.  And my question

Parin Parikh, M.D.

112

```
1    was for you to identify, please, sir -- please, sir, the
2    respiratory distress to which you refer.
3         A.    Okay.  Well, I mean, generally, hypoxia and
4    elevated heart -- sorry, not elevated heart rate --
5    elevated respiratory rate and hypoxia are signs of
6    respiratory distress.
7         Q.    This patient's heart -- respiratory rate was
8    what?  Tell me the rate you're referring to.
9         A.    They recorded a rate of 24.
10        Q.    When was that rate recorded?  What -- what do
11   you --
12        A.    I believe on triage.  Those were his triage
13   vital signs.
14        Q.    As I look at the ED notes, Dr. Parikh, the
15   patient came in, he was noted to be highly agitated and
16   combative.  He was documented to be violently thrashing
17   and screaming illogically.  Would you expect a patient
18   who is highly combative, who is highly agitated, who was
19   violently thrashing and screaming illogically to have an
20   elevated respiratory rate?
21        A.    Yeah.  He shouldn't be hypoxic.
22        Q.    You commented about the hypoxia or the O2
23   saturation of 90 percent in your discussion with
24   Mr. Phillips.  And my note reflects that you said he had
25   a decreased O2 sat of 90 percent and arrested 10 minutes
```

Exhibit "F" page 112 of 166

1   later.  Is that your understanding that within

2   10 minutes after the 90 -- 90 percent O2 sat was

3   obtained, that Mr. Goode arrested?

4       A.   Let's see the exact timing.  His...

5               (Witness reviewed document.)

6               MR. DILLARD:  David -- this is Brad

7   Dillard.  Could you repeat that question, please?

8               MR. UPCHURCH:  Yes, sir.  I'll -- I'll

9   attempt to.  Brad, my -- my question was:  My note from

10  Dr. Parikh's testimony in response to Mr. Phillip's

11  questions was that he referenced the decreased O2 sat of

12  90 percent and that the patient arrested 10 minutes

13  later.  And he was correlating the O2 sat to the arrest.

14  And my question was, was it his understanding that --

15  that Mr. Goode arrested within 10 minutes after that 90

16  O2 sat was recorded?

17      A.   It was a longer time period.

18               MR. DILLARD:  Thank you.

19      A.   It was a longer time period than 10 minutes.

20  It was -- the vital signs were taken at 2033 and the

21  code started at 2122.  So it was about 50 minutes.

22      Q.   (BY MR. UPCHURCH)  All right, sir.

23      A.   No subsequent recorded vital signs in those

24  50 minutes.

25      Q.   As we return to -- well, strike that.

Parin Parikh, M.D.                                                    114

```
1              Looking back at the emergency department
2    records, Dr. Parikh, and you'll see these references in
3    the patient care timeline, that timeline begins on
4    page 38 of the records, if -- you'll see that number in
5    the bottom right-hand corner.  I want to be accurate in
6    referring to the descriptions to Mr. Goode.  At 2043 --
7    at 2040 hours, you'll see that he is referred to as
8    highly agitated and combative, correct?
9         A.   Yes.
10        Q.   Page 39, in a note that was timed at
11   2056 hours, you'll see that he was violently thrashing
12   and screaming illogically and screaming curses.  Do you
13   see that?
14        A.   Yes.
15        Q.   You'll see at the bottom part of that note,
16   that he was noted to be delusional due to suspected
17   influence of drugs?
18        A.   I'm sorry, where is that part?
19        Q.   It's at the -- it's very bottom of that 2056
20   note.
21        A.   Okay.
22        Q.   See that?
23        A.   Yes.
24        Q.   At the 2101 note, you'll see that he is
25   described as angry, agitated, combative, aggressive,
```

Exhibit "F" page 114 of 166

1    uncooperative, disoriented, violent, screaming loudly,

2    speaking illegibly -- illegibly, dangerously agitated,

3    uncooperative.

4              My question to you, Dr. Parikh, is:  In

5    looking at those descriptions of Mr. Goode and

6    understanding that that was his behavior as was

7    described by the healthcare providers at the time, do

8    you agree that given that level of agitation,

9    combativeness, thrashing, screaming, yelling, that --

10   that those behaviors would have a deleterious impact on

11   one's ability to obtain a meaningful EKG tracing for

12   this patient?

13        A.   Yes.

14              MR. MCCORMACK:  Object to the form.

15              THE WITNESS:  Sorry.

16              MR. MCCORMACK:  You can answer.

17        Q.   (BY MR. UPCHURCH)  That is, you would not

18   expect, as a board-certified cardiologist, to be able to

19   get a meaningful EKG on a patient who is screaming, who

20   is thrashing around violently with EKG leads on?

21        A.   Agreed.

22        Q.   You would agree that before one could get such

23   a meaningful EKG, be that a 3-lead or a 12-lead EKG,

24   that patient has to be calmed down to an extent that the

25   leads can be appropriately applied, the patient can

1 remain appropriately calm and still so that the EKG can

2 run in a meaningful way?

3   A. Yes.

4   Q. You would have no factual basis, would you,

5 Dr. Parikh, to dispute the testimony of the healthcare

6 providers that Mr. Goode's behavior, as we've just

7 reviewed, prevented them from appropriately applying

8 cardiac leads?

9      MR. MCCORMACK:  Object to the form.

10      You can answer.

11   A. Sorry.  Can you repeat that?

12   Q. (BY MR. UPCHURCH)  Yes, sir.

13   A. I got thrown off.

14   Q. Fair enough.  My question to you is:  You

15 would have no factual basis, would you, to dispute the

16 testimony of the healthcare providers in this case that

17 Mr. Goode's behavior prevented them from applying EKG

18 leads to this patient?

19      MR. MCCORMACK:  Object to the form.

20   A. No.

21   Q. (BY MR. UPCHURCH)  Would you anticipate,

22 Dr. Parikh, given your experience, that you've testified

23 that a patient such as Mr. Goode with his behavior, his

24 agitation, his screaming and yelling, that that could

25 adversely impact a pulse oximeter's ability to get a

1    reliable lead?

2         A.    Yes.  But that doesn't mean an abnormal

3    reading shouldn't be attempted for follow up.

4         Q.    You would have no basis to factually dispute

5    the deposition testimony, although I know you haven't

6    read it, but the deposition of the healthcare providers

7    that Mr. Goode's behavior, his screaming, his thrashing

8    about violently, his combativeness prevented them from

9    securing an O2 monitor on him?

10                   MR. MCCORMACK:  Object to the form.

11        Q.    (BY MR. UPCHURCH)  You would have no basis to

12   factually dispute that, would you?

13                   MR. MCCORMACK:  Same objection.

14                   You can answer.

15        A.    No.

16        Q.    (BY MR. UPCHURCH)  You told Mr. Edwards --

17   Mr. Phillips, pardon me -- when you all were discussing

18   pulmonary edema -- do you remember that discussion?

19        A.    Yes.

20        Q.    My notes reflect that you said that Mr. Goode

21   likely had pulmonary edema before the arrest, before his

22   arrest.  My question to you is:  What is the factual

23   basis that you have for that conclusion?

24        A.    So I think the question was, you know, could

25   it have happened at the time of the arrest or after.  I

1    think it's more likely that he even had pulmonary edema

2    before.  He was hypoxic.  He was agitated.  He was in a

3    position that perhaps compromised his cardiopulmonary

4    status.  He was getting more and more agitated, it seems

5    like, based on some of these descriptions, which hypoxia

6    can cause.  I mean, he had a hypoxic reading.  What

7    other reason would he have to be hypoxic?  And that

8    finding was found on autopsy.

9              So I think it's more likely than not that

10   he could have had pulmonary edema prior to his arrest

11   and, you know, that was compromising his status.

12        Q.   Have you identified every basis that you'll

13   testify to the court and jury as to the -- as to the

14   basis for your opinion regarding pulmonary edema?  Is

15   there any other factor other than the hypoxia, the

16   agitation?

17        A.   And the finding on the autopsy report, yeah.

18        Q.   Describe for us, please, sir, the photograph

19   that you received from Mr. McCormack and Mr. Edwards.

20   What does it depict?

21        A.   It depicts Mr. Goode in the -- in the prone

22   hogtie position on his transfer from the ambulance into

23   the hospital.

24        Q.   Was it a video or a single photograph?

25        A.   It was a photograph, I believe.

Parin Parikh, M.D.                                                                119

1        Q.    Do you know who took the photograph?

2        A.    Not off the top of my head.  That information

3   was provided to me, I believe.  I just don't know it off

4   the top of my head.

5        Q.    All right, sir.

6              MR. UPCHURCH:  I would like to mark as the

7   next numbered exhibit the photograph, if we might, that

8   was provided to Dr. Parikh, together with any

9   nonprivileged email communication regarding that --

10  regarding that photograph.

11             MR. MCCORMACK:  I'm happy to provide it.

12  I think that's part of Exhibit 7 that we've already

13  discussed.

14             MR. UPCHURCH:  Including the photograph?

15             MR. MCCORMACK:  I believe so.  I'll make

16  sure that you get it.

17             MR. UPCHURCH:  Fair enough.

18             Doctor, I believe that's all the questions

19  I have for you, sir.  Thank you.

20             THE WITNESS:  Okay.

21             MR. MCCORMACK:  Trey or Brad?

22             MR. JORDAN:  This is Trey.  On behalf of

23  SEP, I have no questions.

24                     EXAMINATION

25  BY MR. DILLARD:

Parin Parikh, M.D.                                                                 120

```
 1        Q.    Doctor, this is Brad Dillard.  I'm one of the
 2   attorneys representing the Southaven defendants.  Can
 3   you hear me okay?
 4        A.    Yeah.  Let me ask you --
 5        Q.    Okay.
 6        A.    -- if you have questions, I want to take a
 7   quick break and use the restroom, if that's okay.
 8              MR. DILLARD:  Absolutely.  That will be
 9   fine.
10              (Break taken from 3:47 p.m. to 3:54 p.m.)
11        Q.    (BY MR. DILLARD)  Doctor, again, this is Brad
12   Dillard.  I'm one of the attorneys for the Southaven
13   parties.
14              I think early on in your testimony, I made
15   a note that you had some limited experience in working
16   in a hospital ER on cardiac issues.  Is that correct?
17        A.    In a hospital ER on cardiac issues?  I would
18   call it more than limited experience.  I think I'm
19   pretty --
20        Q.    All right.  So maybe my understanding was that
21   there were limited occasions where you had to treat
22   patients who were in either police custody or in
23   restraints.  Would that be more accurate?
24        A.    Yes.
25        Q.    Would it be fair to say in none of those
```

Parin Parikh, M.D.                                                           121

```
 1    occasions where police officers were present did any of

 2    those officers provide medical care to the patient while

 3    in the hospital ER?

 4         A.    That is correct.  That the police officers

 5    didn't provide medical --

 6         Q.    In fact, as a physician, you would not expect

 7    a police officer to provide any medical care to a

 8    patient present in a hospital ER, would you?

 9         A.    Correct.

10         Q.    In regard to the areas you're holding yourself

11    out in as an expert, am I correct you're not holding

12    yourself out as an expert on EMS standard of care

13    issues?

14         A.    I guess in evaluating certain -- there are

15    certain things I think I could comment on, on how to

16    properly evaluate, you know...  In general, no, in terms

17    of all EMS standard of care issues, but there are some

18    areas I feel qualified to comment on.

19         Q.    Which ones are those?

20         A.    For example, if they suspect a patient's

21    having an arrhythmia or an acute cardiac event, we are

22    often in direct contact with -- with the field and with

23    the EMS and supervising them in those patients' care.

24         Q.    You said you're often in contact with the EMS

25    concerning patient care?
```

Parin Parikh, M.D.                                                    122

1      A.    Yes.

2      Q.    And that would be you as in the -- the

3  emergency room, or you as just a cardiologist?  I'm

4  trying to make sure I understand the situation.

5      A.    There are certain -- for certain cardiac

6  emergencies, we have what are called field activations,

7  where we're in direct contact with EMS in the field,

8  whether that's an ambulance crew, whether that's a

9  CareFlight crew.  And I should -- it's not often that we

10 do that, but it is -- it's not rare.  It's something

11 that we commonly deal with.

12     Q.    Looking on page 2 of your report, if you have

13 that in front of you, Doctor, there's a -- this is a

14 supplemental report dated July 31, 2017.  There's a

15 sentence midway down that page right above the heading

16 "hospital care" --

17     A.    Uh-huh.

18     Q.    -- where you state, "In my opinion, the

19 tachycardia was not addressed in any meaningful way,

20 including basic supportive care, such as oxygen and IV

21 hydration" [as read].

22           Would that be the totality of any

23 criticism you might have of the Southaven EMS in regard

24 to Mr. Goode?

25     A.    Yeah.  I would -- you know, some basic

1    measures in terms of follow-up vital signs and basic

2    supportive care were -- didn't seem to be addressed.    I

3    think that's -- that's a good summary.

4         Q.    Okay.  So the point you would make in regard

5    to the EMS care would relate to whether there was oxygen

6    provided en route to the emergency room and whether

7    there was IV hydration during --

8         A.    Yeah.

9         Q.    -- the ambulance ride.  Would that be correct?

10        A.    And -- and the oxygen level measured.

11        Q.    Okay.  Was the oxygen level measured upon

12   admission to the ER?

13        A.    On triage, yes, it was.

14        Q.    Have you had experience with patients who were

15   combative or agitated that made it difficult to

16   administer oxygen or IV hydration?

17        A.    Yes.  I could understand that being the

18   situation.

19        Q.    Was there any medical documentation in this

20   case you're aware of showing that Mr. Goode was, in

21   fact, dehydrated upon admission to the Baptist ER?

22        A.    Well, he had a -- he had an incredibly

23   elevated heart rate.  His blood pressure had dropped a

24   little bit.  Those would be the main signs.  And just

25   his overall clinical presentation.

Parin Parikh, M.D.                                                124

```
 1        Q.    You're not relying on any -- are you -- well,
 2   strike that.
 3               Are you rendering an opinion that
 4   Mr. Goode was, in fact, dehydrated based on the --
 5        A.    I would say more likely than not --
 6               (Multiple people speaking simultaneously.)
 7        Q.    -- heart rate and --
 8               THE REPORTER:  I'm sorry, Mr. Dillard,
 9   could you restate your question?
10               MR. DILLARD:  Sure.
11        Q.    (BY MR. DILLARD)  Doctor, are you -- are you
12   rendering an opinion, then, that Mr. Goode was, in fact,
13   dehydrated based upon the heart rate and blood pressure?
14        A.    I would say more likely than not he was
15   dehydrated.
16        Q.    Going back just a moment to the areas that you
17   are holding yourself out in, am I correct, though, you
18   are not holding yourself out as an expert on any issues
19   pertaining to law enforcement, such as law enforcement
20   policies, procedures, or guidelines?
21        A.    Yeah.  No, I don't claim to be an expert on
22   that at all.
23        Q.    And you would render no opinions at trial
24   concerning the involvement of the Southaven Police
25   Department in regard to the apprehension and detainment
```

1    of Mr. Goode, would you?

2        A.    I -- in -- help me understand the question in

3    terms of do -- do I have a comment on how they

4    apprehended him?

5        Q.    No.  My question -- let me rephrase that.

6               My question is -- to be sure I

7    understand -- you will -- you will offer no criticism at

8    trial of the Southaven Police Department, correct?

9        A.    I -- I guess I don't have a -- in general, I

10   think that the -- the prone hogtied position that he

11   remained in could have been reevaluated.  Does that help

12   answer your question?

13       Q.    I think so.  And in your opinion -- again, to

14   be sure I fully understand all of your opinions in this

15   case -- in your opinion, when would that have been

16   reevaluated?

17       A.    I don't think there's an exact time.  But when

18   he was triaged and had signs of hypoxia and he continued

19   to be agitated and tachycardic, those could have been

20   times for reassessment.

21       Q.    On page 4 of your report, in the paragraph

22   under the heading "Mr. Goode's death," the last sentence

23   of that paragraph states that, "Mr. Goode went into full

24   hemodynamic collapse and cardiac arrest after over an

25   hour and a half" [as read].

1              Do you see that sentence?

2         A.    Yes.

3         Q.    In your report, have you -- have you listed

4    any -- well, strike that.  Let me rephrase it, then.

5              You referenced an hour and a half period.

6    At what point did this hour and a half period begin,

7    in -- in your opinion, as referenced in your report?

8         A.    So if you look at the time of arrest, I

9    believe it was 9:33 or -- let's see...

10             (Witness reviewed document.)

11        A.    Let me confirm that time.

12        Q.    So you're commencing that time period at the

13   point of arrest through the time of death?

14        A.    No.  Let's see, code starts -- sorry, 2122,

15   which is 9:22, he was picked up by EMS, I believe, at

16   8:20.  That's an hour right there.  He was probably in

17   the prone maximal restraint position for some time

18   before that.  So an hour to an hour and a half of being

19   tied up in that position before he coded.

20        Q.    Okay.  And that would be for a total time

21   period [inaudible] --

22             THE REPORTER:  Mr. Dillard, you --

23             MR. DILLARD:  Yes?

24             THE REPORTER:  You cut out.  I got "and

25   that would be a total time period..."  Want to start

1   over?

2          MR. DILLARD:  Okay.  Let me -- let me

3   restart that question.

4     Q.  (BY MR. DILLARD)  Doctor, that would be a

5   total time period beginning on Goodman Road in

6   Southaven, Mississippi, when Mr. Goode was first placed

7   in the prone maximal position, through the ambulance

8   ride to the hospital, through his stay in the ER until

9   he coded; is that correct?

10     A.  Up until the time of his arrest.  It's unclear

11   to me based on the documentation exactly when the prone

12   hogtie position commenced, so that's why I used an hour

13   to an hour and a half.  It was at least -- at least an

14   hour.

15     Q.  You state at the bottom of page 4, "To

16   summarize, it is my opinion that being maintained in the

17   prone position prevented a proper assessment and

18   monitoring of Mr. Goode's medical condition and likely

19   was a substantial factor contributing to reduced cardiac

20   output and eventual hemodynamic collapse" [as read].

21          What are -- I guess to help me understand,

22   are you stating that there is something that could have

23   been done or should have been done that would have

24   prevented this collapse?

25     A.  I think that when you have a constellation of

1   very abnormal vital signs, such as hypoxia, respiratory

2   distress, tachypnea, and elevated heart rate, that there

3   should, in some way, be closer monitoring of that, and

4   observation of that, rather a 50-minute gap and then the

5   patient arrests.

6        Q.   Well, in your opinion, what would have been

7   the latest point in time that some intervention, in your

8   opinion, may have prevented the cardiac arrest and the

9   hemodynamic collapse referenced in your report?

10       A.   I think that's really hard to speculate on.

11       Q.   You have no -- no opinion in that regard?

12       A.   I think it's a speculative question that's

13  kind of hard to answer.

14            MR. DILLARD:   Okay, Doctor, thank you.

15            THE WITNESS:   Thank you.

16            MR. MCCORMACK:   Do we have somebody else

17  on the -- oh, Trey?

18                     EXAMINATION

19  BY MR. MCCORMACK:

20       Q.   All right.  Dr. Parikh, as you know, my name

21  is Kevin McCormack.  I represent Kelli Goode in this

22  case.  I have some questions for you based on what we've

23  heard here today.

24            Just at the outset, would anything about

25  our relationship, that being that my wife's father's

1   second cousin's childhood friend is somehow related to

2   you, would that affect your professional judgment in any

3   way in this case?

4        A.   No.

5        Q.   I want to talk to you a little bit about --

6   you were asked questions about your experience in the

7   emergency room.  Do you treat patients who are in the

8   emergency room at a hospital?

9        A.   Yes.

10       Q.   And can you explain to us how often you do

11  that?

12       A.   I mean, it's very common, several times a

13  week.

14       Q.   Do you ever consult -- have a consult with the

15  doctor in the ER?

16       A.   Yes.

17       Q.   And by that, I mean an ER physician.

18       A.   Yes.

19       Q.   Okay.  So in what role do they come to you

20  when they've got a patient?  What -- what are they

21  looking to you to do?

22       A.   It could be a wide range.  It could be an

23  acute emergent cardiac condition that requires emergent

24  evaluation in the emergency room.  It could be a patient

25  that is getting admitted and perhaps I don't see that

Parin Parikh, M.D.

130

```
 1    patient in the emergency room, but I see them once
 2    they're admitted to the hospital.  It could be a
 3    question that they have and they want to send the
 4    patient out and I see them as an outpatient.  So there's
 5    a wide range of interactions we have with the ED
 6    physicians in the ER.
 7         Q.   Is it fair to say that they come to you when
 8    they need more specialized information about cardiac
 9    issues in the ER?
10         A.   Yes.
11         Q.   So they're essentially seeking your expertise
12    in that area?
13         A.   Yes.
14         Q.   You were asked some questions about hypoxia
15    and about Troy's ability to scream and whether or not
16    that indicated some kind of respiratory compromise.  Do
17    you remember those questions?
18         A.   Yes.
19         Q.   Okay.  Can you describe to us the difference
20    between obstructive and restrictive conditions when
21    we're talking about respiration?
22         A.   Sure.  There could be an obstruction in your
23    airways.  For example, if you choked on a piece of food
24    that's stuck in your airway, that could be an
25    obstructive lesion to -- to airflow.  Restriction is
```

Exhibit "F" page 130 of 166

1   more external factors, like you can't take a deep

2   breath, you can't inspire deeply, whether that's because

3   of physical constraints.

4               Some patients have pathology where they're

5   not able to move their rib muscles or diaphragms.  So

6   that's some of the differences between restrictive and

7   obstructive physiology.

8       Q.   Is it common for you to have to consider

9   restrictive conditions when you're treating a patient

10  who has cardiac condition?

11      A.   Sometimes when patients have, you know,

12  multitude of comorbidities, which they often have in

13  sicker cardiac patients.  They not only have heart

14  conditions, but they have kidney conditions, lung

15  conditions, et cetera.  So what was your question again?

16      Q.   My question was:  Is that something you have

17  to consider when you're evaluating cardiac conditions?

18      A.   Yeah.

19      Q.   Do you deal with that routinely?

20      A.   Pretty commonly.

21      Q.   When you have somebody who is in -- who has a

22  restrictive condition, how can that affect their cardiac

23  health?  A restrictive pulmonary condition, they can't

24  get enough oxygen, how does that affect their cardiac

25  health?

Parin Parikh, M.D.

1    A.    There's a close interplay between the heart

2    and lungs.  So when you're not able to oxygenate

3    properly, that can cause problems particularly on the

4    right side of the heart, increased filling pressures,

5    and that can affect the left side of the heart in terms

6    of your cardiac output and the pressures inside your

7    heart.

8    Q.    So speaking sort of generally -- and I know

9    this is going to be a question where you can go on for a

10   long time, so can you give us sort of an overview -- how

11   does hypoxia affect -- let's start with heart rate?

12   A.    Yeah.  In the acute phases, generally, hypoxia

13   is going to elevate your heart rate, because you want to

14   get more oxygen from the lungs that may or may not be

15   there and try to deliver more oxygen.  So your heart

16   rate is generally going to go up.

17              The hypoxia itself can cause feelings of

18   air hunger and agitation, which itself can drive up

19   adrenalin and drive up your heart rate.

20   Q.    And let's talk about cardiac output, how

21   would -- well, actually, let's start with blood

22   pressure.  How would hypoxia affect blood pressure?

23   A.    Initially, same type of thing.  You may

24   increase your blood pressure as your vascular tone is

25   trying to clamp down.  But if you're hypoxic long enough

Parin Parikh, M.D.

1   and your heart itself isn't getting enough oxygen so it

2   can't maintain cardiac output, it can't fill, it can't

3   pump, then, eventually, you're going to have a decreased

4   heart rate, decreased blood pressure, and even cardiac

5   arrest.

6       Q.   You said initially hypoxia would cause an

7   increased heart rate?

8       A.   Probably.  In a healthy individual, if you

9   suddenly couldn't breathe or you couldn't get enough

10  oxygen, you probably would have an increase in your

11  heart rate.

12      Q.   Would that, at some point, change?

13      A.   Yes, that can.

14      Q.   And why would that happen?

15      A.   If you're not getting enough oxygen to the

16  point where you're not supplying your heart enough

17  oxygen to work, then you're not going to produce cardiac

18  output.

19      Q.   You were asked some questions about EKG

20  findings and how it might be difficult to obtain EKG

21  findings on an agitated individual.

22      A.   Yes.

23      Q.   Do you need EKG findings to begin treatment

24  for cardiac conditions?

25      A.   There's different types of EKGs you can get.

```
 1    You can get just short rhythm strips.  You can get

 2    limited lead EKGs, or you can get 12-lead EKGs.  Certain

 3    conditions you could treat without a 12-lead EKG.

 4    Certain conditions you need a 12-lead EKG.  It's highly

 5    variable.

 6         Q.   You were asked some questions about

 7    supraventricular tachycardia.  Do you need to have a

 8    diagnosis of supraventricular tachycardia in order to

 9    begin treating someone whose heart rate is 180 or above

10    and whose oxygen levels are at 90 percent?

11         A.   Right.  You -- at that point, you don't need a

12    specific diagnosis of what the SVT is.  Now, if you know

13    it, it may help you treat it, especially if it's certain

14    types of more malignant arrhythmias.  But at the

15    minimum, when you see an elevated heart rate and

16    hypoxia, further monitoring -- you know, IV hydration,

17    supplemental oxygen, repeating vital signs -- should be

18    pretty standard in that situation.

19         Q.   And you were asked some questions about this

20    probe.  That's a clip that goes on the finger, right, to

21    measure oxygen?

22         A.   It's -- it comes in a lot of forms and I -- I

23    don't know specifically which form they had in this

24    particular case.  It could be a -- a sticker-type thing.

25    It could be a clip.  Those are the two main forms in
```

Parin Parikh, M.D.                                                    135

```
 1    use.
 2         Q.   If you have a reading on one of those that you
 3    think is inaccurate, do you commonly take another
 4    reading?
 5         A.   Yes.
 6         Q.   Why do you do that?
 7         A.   It also -- it depends on what's going on with
 8    the patient.  You know, if you get a reading of
 9    2 percent and they're talking to you, you get a sense
10    that that's probably an inaccurate reading.  But if you
11    think it's inaccurate and the patient isn't doing well,
12    then you want to make sure to get a follow-up to make
13    sure that it's chalking it up to an inaccurate response,
14    okay?
15              So the constellation of a variety of
16    abnormal vital signs, respiratory distress, hypoxia,
17    elevated heart rate, in that situation, you'd want to
18    follow up to make sure your assumption that it's a --
19    just a false, erroneous oxygen level is, is that, you
20    don't want to assume that unless you actually know it.
21         Q.   You were asked some questions about notes that
22    you made about abrasions and contusions.
23         A.   Uh-huh.
24         Q.   And you noted that those weren't present at
25    triage, according to the medical records, right?
```

1    A.    Well, they weren't -- yeah, they weren't

2  commented on.

3    Q.    And they were on the autopsy?

4    A.    Yes.

5    Q.    Do you have any opinion that -- as to when

6  those were sustained, when those abrasions and

7  contusions were sustained by Mr. Goode?

8    A.    I would -- they were probably sustained along

9  the way of trying to restrain him, whether it was in the

10 field or in the process of restraining him.  He also had

11 an encounter with a -- with a canine as well.  I would

12 assume it's somewhere in that process.

13   Q.    Because they're not noted on triage, you don't

14 know whether or not they were there on triage, do you?

15   A.    Yeah, I --

16   Q.    You obviously weren't there?

17   A.    No; I couldn't comment on that.

18   Q.    All right.  Based on your review of the

19 medical records, is it possible that those were

20 sustained during his stay in the hospital?

21         MR. PHILLIPS:  Objection; calls for

22 speculation.

23   Q.    (BY MR. MCCORMACK)  You can answer.

24         MR. DILLARD:  Join -- join in the

25 objection.

```
 1              MR. JORDAN:  Same objection.  This is Trey
 2    Jordan.
 3              MR. UPCHURCH:  Joined.
 4        A.   The -- they could have happened anywhere along
 5    the course.
 6        Q.   (BY MR. MCCORMACK)  You were asked some
 7    questions about police, and I believe you said that you
 8    don't expect police to provide medical care?
 9        A.   Correct.  I believe the question was
10    specifically in the hospital.
11        Q.   Correct.  You don't expect a police officer,
12    in the hospital, to be the one providing medical care to
13    one of your patients?
14        A.   Right.
15        Q.   If there is a -- a patient you have with a
16    medical condition, you wouldn't tell a police officer to
17    go and monitor it for you, would you?
18        A.   No.
19        Q.   I want to talk to you a little bit about the
20    basics of, sort of, cardiology.  When you're talking
21    about cardiology, we're talking about the heart, right?
22        A.   Yes.
23        Q.   Okay.  And you've already said that the heart
24    and the lungs are closely related, they have a close
25    interplay, right?
```

1          A.    [Nods head.]

2          Q.    Is that accurate?

3          A.    Yes; yes, sorry.

4          Q.    So let's talk about oxygen delivery.  We all

5    know, I think, that the lungs take in oxygen from the

6    air.  How does that air get out into, let's say, your

7    hand or other organs in -- in your body?

8          A.    Yeah.  So the right side of the heart gets

9    deoxygenated blood from the body, goes through the right

10   atrium, right ventricle to the pulmonary arteries, which

11   are the only arteries that carry deoxygenated blood, go

12   to the lungs, get oxygenated, return via the pulmonary

13   veins to the left side of the heart, left atrium, into

14   the left ventricle, and then that is systemically pumped

15   out, delivered via our arteries, capillaries to the rest

16   of our organs to deliver oxygen and other nutrients.

17         Q.    Okay.  Can you describe to us the difference

18   between an artery and a vein?

19         A.    Arteries, for the most part, take blood away

20   from the heart and carry oxygenated blood, with the

21   exception of the pulmonary arteries that carry

22   deoxygenated blood.  Veins return blood flow to the

23   heart.  They're generally deoxygenated, with the

24   exception of the pulmonary veins that have oxygenated

25   blood from the lungs.

Parin Parikh, M.D.                                                           139

1          Q.     Yeah.   So it's fair to say that the -- the

2     veins are what return it to the heart?

3          A.     Yes.

4          Q.     Is that true also with the inferior vena cava,

5     the IVC?

6          A.     Yes.

7          Q.     All right.   In terms of the number of veins

8     that return blood to the heart, how significant is the

9     IVC?

10         A.     That's -- there's two major veins that return

11    blood flow to the heart.   Superior vena cava mainly does

12    a lot of our brain and then some arms, both our arms as

13    well.   And then, really, the rest of the body returns

14    blood flow to the heart via the inferior vena cava.   So

15    one of the two very important veins that return blood

16    flow into the heart.

17         Q.     In terms of volume, which one provides more

18    blood back to the heart?

19         A.     It's really highly variable on -- for example,

20    after you've eaten and you have a lot of blood flow to

21    the stomach, it's going to be much more variable coming

22    from the inferior vena cava.   In general, more oxygen is

23    extracted from the blood that goes to our brain.   So it

24    can be about equal, but sometimes, you know, it can be

25    more superior vena cava.   But it's -- it's an

1    important -- at least, generally, 50 percent -- from the

2    inferior vena cava, but that can go up and down.

3         Q.   In a lot of the studies that you've cited to

4    and that you've discussed today, you discuss the

5    inferior vena cava and its diameter going down.

6         A.   Uh-huh.

7         Q.   Why is that important?

8         A.   So -- so I mentioned earlier that there's a

9    lot of different ways to measure cardiac output.  Some

10    of the ones that we consider to be the gold standard are

11    either very expensive or very invasive.  So, generally,

12    that's not a good way to go in the large majority of

13    patients or in a more urgent evaluation of a patient.

14         So we use different clinical markers, or

15    we use different tests, such as echocardiography, which

16    is generally readily available -- quickly available; can

17    be brought to the patient's bedside.  And one of the

18    markers -- and it's a very good marker that can be used

19    for filling in the heart is looking at the IVC -- IVC

20    size and dimensions, how wide it is and how it responds

21    to respirations, if it collapses or not.

22         And that's a marker of cardiac filling and

23    right atrial pressures, and it's a good marker of that.

24         Q.   When you say "cardiac filling," what is that?

25         A.   Just blood flow returning to the heart.

Parin Parikh, M.D.                                                  141

1      Q.    Okay.  So if you don't have sufficient cardiac

2  filling, presumably, you can't pump blood into the rest

3  of your body, right?

4      A.    Right.  You're not going to have adequate

5  cardiac output.

6      Q.    When you have decreased venous return or

7  cardiac filling, is that the same thing?

8      A.    Decreased venous return, yeah, leads to less

9  cardiac filling.

10     Q.    Okay.  So when you have decreased venous

11 return, how does your body compensate for that?  Let's

12 say that you do have your IVC that's been narrowed,

13 how -- what would your body do in response?

14     A.    So from a cardiac output standpoint -- just to

15 really make it simple, you could look at two variables.

16 Cardiac output is equal to your heart rate times your

17 stroke volume.  So if your volume is going down because

18 of less venous return, less blood flow to the heart,

19 generally, your heart rate's going to go up to keep your

20 cardiac output the same.

21     Q.    And I think you've already discussed the

22 compensatory mechanisms for hypoxia.  That's also

23 increased heart rate as well?

24     A.    Yes.

25     Q.    If you were to take a patient and immediately

Parin Parikh, M.D.                                                    142

1    cut off their inferior vena cava, what sort of effects

2    would that have on -- on their physical health?

3        A.    They would have decreased return blood flow to

4    the heart.  There would also be the issue of where that

5    blood flow would go acutely.  They'd get a lot of

6    swelling or edema, especially if it happened acutely

7    because they haven't developed channels to return that

8    blood flow.

9              So, initially, you would have decreased

10   stroke volume.  You'd probably compensate by increasing

11   your heart rate to try to maintain your cardiac output.

12   But at a certain point, if you're not getting that

13   volume into the heart somehow, you're going to have

14   decreased cardiac output.  And once your compensatory

15   mechanisms can't be sustained, they'll wear out.

16       Q.    And when you have that decreased cardiac

17   output, what effects would that have on a person's

18   health?

19       A.    Decreased blood pressure, you know, congestive

20   heart failure.  In extreme situations, cardiac arrest.

21       Q.    Did you see any signs that Troy Goode had a --

22   that his blood pressure was starting to drop at any

23   point in your review of these documents?

24       A.    There are some signs that his diastolic blood

25   pressure dropped, I think, by about 30 points compared

Parin Parikh, M.D.                                                                 143

1    to the measurements in EMS versus the triage

2    measurement.

3         Q.    That would have been a change that occurred

4    in between about five minutes in two readings, right?

5         A.    Yes.

6         Q.    In that time, what happened to Troy Goode's

7    heart rate?

8         A.    Heart rate seemed to go up from the 1 --

9    mid-160s to the mid-180s.

10        Q.    If you have a patient who has tachycardia at

11   180, a drop in blood pressure, and signs of hypoxia, and

12   those conditions are not treated, they are not addressed

13   in any way, to a reasonable degree of medical certainty,

14   would you expect that patient to suffer negative medical

15   effects from it?

16        A.    Yes.

17        Q.    And what sort of negative effects would you

18   expect to see?

19        A.    Well, if they're not resolved, I mean, if the

20   hypoxia is worsening, what we talked about, you could

21   eventually have cardiac arrest even.  If the -- if

22   respiratory distress isn't involved and they don't have

23   a protected airway -- meaning, you know, they're not

24   able to breathe -- they're going to have respiratory

25   collapse as well.

1           So I think the constellation of those

2    signs, it needs further, at minimum, observation and

3    further evaluation.

4           Q.    What -- when Troy Goode finally had a cardiac

5    arrest after about, I think you said an hour and a half

6    in this hogtied position, what rhythm did he go into?

7           A.    Let me pull the ER records.  I believe that it

8    was PEA arrest, but there's also mention of potential

9    defib that he was shocked out of.  Let me pull that.

10                     (Witness reviewed document.)

11          A.    So I'm just turning to page 40 of the hospital

12   records right now.  Code start, initial rhythm looked

13   like PEA -- pulseless electrical activity, PEA.  Well,

14   here, there's only mention of PEA.  I believe -- so it

15   was definitely PEA arrest.  But I think the ER physician

16   notes -- also made note of defib.  But it looks like

17   mainly it was PEA arrest, which stands for pulseless

18   electrical activity.

19          Q.    What are the common causes of pulseless

20   electrical activity?

21          A.    So the common ones are hypovolemia, acidosis,

22   hypo or hyperchloremia, hypoxia.  Cardiac tamponade can

23   do it.  Problems with the lung, tension pneumothorax.

24   Certain toxins can certainly do it.  Those are some of

25   the -- any kind of -- some kind of trauma can do it.

1    Those are, kind of, the major ones that would lead to

2    PEA arrest.

3        Q.    Based on your review of the medical records,

4    did you see any --

5        A.    Sorry, hypothermia can do it as well.

6        Q.    Did you see any sign that Troy Goode was

7    suffering from hypoxia?

8        A.    Yeah.  I mean, an O2 sat of 90 percent and

9    respiratory distress.

10       Q.    Based on your review of the records, did you

11   have any reason to believe Troy Goode might have had --

12   you mentioned an acidosis?

13       A.    Yes.

14       Q.    That he might have had some kind of acidosis

15   developing, whether respiratory or metabolic?

16       A.    He -- he could have.  You know, we don't have

17   laboratory data, but he could have had acidosis as well.

18       Q.    And you mentioned certain toxins.  Is LSD

19   cardiotoxic?

20       A.    Not directly.

21       Q.    When you say it's not directly cardiotoxic,

22   does that mean that in your practice when you hear that

23   somebody's gone into cardiac arrest, do you even

24   consider that it could be an LSD overdose?

25       A.    No.

Parin Parikh, M.D.

146

1     Q.   That's not something that you commonly

2  experience?

3     A.   No.

4     Q.   Have you ever seen an LSD-related cardiac

5  arrest?

6     A.   No.

7     Q.   With other drugs, does that happen?

8     A.   Yes.  Certain toxins, mainly cocaine, have

9  very well-known mechanisms of action with direct

10  cardiotoxicity, both acute and chronic.

11     Q.   I think that Mr. Phillips went over this with

12  you, but you haven't been provided any witness

13  statements from witnesses in the hospital, have you?

14     A.   No.

15     Q.   If a witness saw that Troy Goode had a red

16  face, that his eyes were bulging out, and that he was

17  moaning and that he was saying the word "breathe," would

18  that be an indication to you that your conclusion that

19  Troy Goode was in respiratory distress is accurate?

20           MR. PHILLIPS:  I'll object.  It's beyond

21  the scope of the disclosure.

22           MR. UPCHURCH:  Join.

23           MR. DILLARD:  Join in the objection.  This

24  is Brad Dillard.

25           MR. JORDAN:  Trey Jordan.  Same objection.

Exhibit "F" page 146 of 166

Parin Parikh, M.D. 147

```
 1          Q.   (BY MR. MCCORMACK)   Would that be -- or would

 2     that account be consistent with your opinion?

 3          A.    Generally moaning, yelling out, incoherency,

 4     that can be signs of severe agitation from hypoxia.

 5          Q.    You mentioned agitation can be a sign of

 6     hypoxia?

 7          A.    Yes.

 8          Q.    Have you witnessed that yourself in your

 9     practice?

10          A.    Yes.

11          Q.    Is it common for people who are hypoxic to

12     become agitated?

13          A.    Yes.

14          Q.    You were asked a question about restraints and

15     whether Mr. Goode was in less restraint when he was in

16     the hospital.  When Mr. Goode was in the hospital, he

17     was subjected to chemical restraints, wasn't he?

18          A.    I believe he was given IV medication, yes.

19          Q.    Okay.  And those medications can be used as

20     chemical restraints?

21          A.    They can.  It's -- I would say -- that's a

22     little bit out of my area, but they have been known to

23     use as chemical restraints.

24          Q.    I want to talk to you a little bit, generally,

25     about medical research.  You reviewed a lot of medical
```

Exhibit "F" page 147 of 166

1  articles in preparing your opinion today.  Are some

2  articles that are published better than others?

3      A.   Definitely.

4      Q.   And when I say "better," they will give you

5  more indication of what's really going on in the

6  condition?

7      A.   They're better quality studies.

8      Q.   You mentioned that there were some problems

9  with methodology in some of the studies that you looked

10 at.  How -- do problems with methodologies affect what

11 you should draw from a -- from reading one of these

12 studies?

13     A.   Yeah.  And -- and this kind of goes back to

14 why it's difficult answering some of the previous

15 questions if I agreed to certain conclusions.  For

16 example, in the Ho and the Savaser studies, healthy

17 subjects, without anything else going on, were subject

18 from anywhere from two to three minutes of prone hogtie

19 position, and then a conclusion was drawn that a prone

20 maximal position doesn't reduce cardiac output.  And

21 those two to three minutes are then suddenly applied to

22 someone who is hypoxic, tachycardiac, and in the prone

23 hogtie position for well over an hour.

24              So your -- your patient has to fit the

25 population that was being studied.  And using some of

1    these studies where patients are in a -- completely

2    healthy patients without any kind of other forces going

3    on in a, kind of, very normal conditions are subjected

4    to two to three minutes and then drawing a conclusion

5    that there's no affect on cardiac output is -- frankly,

6    it's quite out there.  That's why I kind of disagree

7    with some of the interpretations of some of these

8    studies.

9                But if you look at some of these studies

10   and the echocardiography effects on certain markers for

11   cardiac output, you know, we talked about how it's hard

12   to measure cardiac output directly.  But even in those

13   few minutes, certain signs of decreased heart filling

14   and decreased pressures in the heart are present.

15               So, you know, you could look to some of

16   these other studies were actually done in cardiology

17   journals that looked at healthy patients as well, looked

18   at different modalities, including nuclear medicine,

19   which is a different way of looking at it compared to

20   echocardiography.

21               You could look at the surgical studies.

22   Granted, it is a different patient population, but even

23   in patients that are in a prone position during surgery,

24   have IV hydration, that have a protected airway, just

25   being prone for a few minutes changes their stroke

1   volume in cardiac output, okay?  And that's only after a

2   few minutes.

3                So I think you really got to look at that

4   data.  And it's hard to draw conclusions that when you

5   see these changes after a few minutes, that there's, you

6   know, going to be no change in a patient that has been

7   outside on a hot day, bitten by a dog, has been subdued,

8   is agitated for a variety of reasons, has had LSD

9   intoxication, is hypoxic, tachycardic.  To compare that

10  to this patient population is kind of a stretch to come

11  to some of the same conclusions.

12               So you've got to look at methodologies of

13  your studies, who's doing the studies, who's reading the

14  studies.  The -- some of the advantages, I think, of the

15  cardiology studies is you have cardiologists reading

16  these studies that they're board-certified to do.  For

17  example, you can be board-certified in echocardiography.

18  You can be board-certified in reading nuclear studies,

19  which I am both.  And the other thing is those readers

20  were both blinded, meaning --

21       Q.    What does that mean?

22       A.    -- they didn't realize that -- what patient

23  was in, if they were supine, if they were prone, or

24  what were the conditions of the patient.  They were just

25  reading the study and -- and coming out with -- and that

Parin Parikh, M.D.                                                    151

1    was described in the methodology section.  In the

2    methodology section of the -- you know, the forensic and

3    legal medicine journal, there really wasn't a

4    description of who was reading the studies, if it was

5    blinded, okay?  So if the authors or persons reading the

6    studies were a little biased about the results that they

7    wanted, you could introduce bias as well in that method.

8              So, you know, I think there's a lot of

9    interesting methodologies, things to look at here.  And

10   I do think that my expertise in cardiovascular medicine

11   really hits at that.  You know, I could comment on that

12   quite confidently.

13       Q.    You mentioned something about bias.  When

14   you're looking at a study, let's say it's a new drug

15   that comes out, do you have to look at who funded that

16   study?

17       A.    Right.  I mean, if you've got a pharmaceutical

18   company funds a study that their drug is great, you've

19   got to -- you want to make sure you're looking at the

20   study and see what their methodology is, you know, that

21   the patient did great for three weeks, and then the

22   patient should be on the medication for 10 years.  Well,

23   how about some data that extends out to 5 or 10 years

24   before we put them on the medication for that long?

25   So...

1       Q.    Do you have to consider whether the person

2   performing the study has a vested interest in the

3   outcome?

4       A.    You do.   And that's why the -- when you look

5   at the major clinical trials that are considered the

6   highest standard, they are generally -- they're

7   randomized, meaning sometimes the patients themselves

8   don't even know which arm they're in, if they're getting

9   the medication or not.   And the physicians or clinicians

10  evaluating them don't know what they're on.   There's a

11  lot of blinding that goes on.

12              So in some of these observational case

13  studies, that's sometimes not possible to do.   But if

14  you know the condition of the patient, it could

15  introduce some bias.

16      Q.    When you're looking at a study, do you have to

17  consider how large the patient population was that was

18  being studied?

19      A.    Yeah, and you -- the larger patient

20  population, generally the better.

21      Q.    You were asked some questions about that white

22  paper on excited delirium.

23      A.    Uh-huh.

24      Q.    That white paper contains citations to

25  sources, right?

1     A.    Yes.

2     Q.    Do you know where the -- you were asked about

3 a line in there that says that LSD may cause excited

4 delirium. Do you know what that -- which study that was

5 drawn from?

6     A.    Off the top of my head, no. I could...

7     Q.    If a statement is drawn from a case study,

8 does it have the same weight to you as if it comes from

9 a -- a double-blind study?

10     A.    No.

11     Q.    You mentioned already that Troy Goode's heart

12 rate got into the mid-180s. What's a normal heart rate

13 for a 30-year-old male?

14     A.    At rest, a normal heart rate generally should

15 be considered between 60 and 100. Below 60 could be a

16 slow heart rate. Above 100 is generally fast heart

17 rate. Now, certainly when someone is exercising, you

18 can get your heart rate up 140, 150, even 160. That can

19 be considered normal in the proper setting, but the

20 heart rate should come down eventually at rest.

21     Q.    Would 186 be considered a normal heart rate

22 for a 30-year-old male?

23     A.    That's definitely an elevated heart rate.

24     Q.    In -- in a clinical setting if you saw a

25 patient who had a heart rate of 180 -- sorry, 186, would

Parin Parikh, M.D.

154

1   you consider that something that needed follow-up?

2       A.   Yes.

3       Q.   If you saw a patient in the ER who had a heart

4   rate of 186, would you consider that something that

5   needs to be followed up on?

6       A.   Yes.

7       Q.   Does being hogtied in the prone position

8   harm -- let me rephrase that.

9               Does being hogtied in the prone position

10  affect cardiac output?

11      A.   So in the literature that I've looked at, I

12  think that being in the hogtied prone position leads to

13  decreased stroke volume.  And in the nuclear and the TEE

14  studies that were done does cause a decrease in the

15  cardiac index.

16              So, you know, in two out of the four

17  studies here with the two studies coming out of

18  cardiology journals with cardiologists dedicated to

19  reading the echos and nuclear studies, both those

20  studies showed that the prone position caused a decrease

21  in cardiac output.

22      Q.   Can a decrease in cardiac output be harmful to

23  a patient?

24      A.   Yes.

25      Q.   How so?  It's kind of a broad question.

1    A.    I know.  Well, it's just -- it's one of those

2    things that's like so fundamental to me hard --

3    sometimes it's hard to explain.

4                Yeah, but, generally, when you decrease

5    your cardiac output, that means you're delivering less

6    oxygen, less nutrients.  You're clearing less toxins.

7    And that's how you deliver brain and -- and nutrition

8    and oxygen to the brain to your major internal organs.

9                So when you have a drop -- a prolonged

10   drop in cardiac output, your body's going to try to

11   maintain cardiac output as long as it can with

12   compensatory mechanisms, by trying to increase the heart

13   rate, by trying to increase your breathing.  But at a

14   certain point, if you don't have enough oxygen and

15   you're not delivering it, then you can go into, you

16   know, full-blown cardiac arrest.

17   Q.    And is it your opinion that that's exactly

18   what happened with Troy Goode?

19   A.    I think that he had an unstable physiologic

20   condition that was documented by a prolonged time of

21   elevated heart rate, an unknown time, but at least

22   50 minutes from the time the oxygen was measured to when

23   he had cardiac arrest, respiratory distress.  And he had

24   prolonged physiologic instability related to being in

25   the prone hogtied position that led to his cardiac

1    arrest.

2        Q.    And is that opinion to a reasonable degree of

3    medical certainty?

4        A.    Yes.

5        Q.    All right.  I want to ask you a few questions

6    about excited delirium --

7        A.    Sure.

8        Q.    -- to wrap up here.  When was the first time

9    you heard the term "excited delirium"?

10       A.    During, kind of, reviewing this case, and

11   specifically reviewing Dr. Vilke's statement, and then,

12   kind of, doing further investigation based on that.

13       Q.    Do you believe that excited delirium is a

14   recognized medical condition in the field of cardiology?

15       A.    It is not really recognized in any

16   cardiovascular text or any cardiovascular literature of

17   a syndrome of excited delirium causing cardiac arrest,

18   no.

19       Q.    I want to go a little broader.  Was it

20   something that you read about in medical school?

21       A.    You know, in four years of medical school,

22   three years of residency, three years of general

23   fellowship, another year of advanced fellowship and in

24   practice, I've never heard this term or heard its

25   relation to cardiac arrest.

Parin Parikh, M.D.

1    Q.    Do you commonly deal with -- treat patients

2   who have had a cardiac arrest in the emergency room and

3   then are transferred to in-patient care?

4    A.    Yes.

5    Q.    Okay.  What kinds of conditions can cause the

6   person to have cardiac arrest that you then have to see

7   for in-patient care?

8    A.    In general, we end up seeing a lot of the

9   cardiac arrests because it's often related to the heart,

10  or they have some consequences to their heart from

11  cardiac arrest.  But the most common cause of in-patient

12  hospital are respiratory compromise or circulatory

13  compromise.

14            So it's very common I see cardiac arrest

15  patients.  Now, it doesn't happen that often, so I don't

16  see cardiac arrest patients every day, but we're very

17  often involved in their care.

18   Q.    How many patients in your entire medical

19  career have you seen who are in-patients where you

20  had -- where they had had a cardiac arrest due to

21  excited delirium?

22   A.    None.

23   Q.    How many patients have you treated in the

24  emergency department who had cardiac issues due to

25  excited delirium?

1          A.    None.    And I've never heard an emergency room

2    physician mention this diagnosis either.

3          Q.    Have you ever heard any of your fellow

4    cardiologists at any conference discuss this possible

5    theory?

6          A.    No.    The first time I heard a cardiologist

7    mention it was Dr. Clair's report.

8          Q.    You mentioned in your report that you -- that

9    this hypothesis of excited delirium has some -- some

10   issues.    What -- what sorts of issues do you see with

11   this hypothesis of excited delirium?

12         A.    Well, I'll just read from the white paper

13   itself.    Describe some of the -- "At present" -- I'm

14   quoting from the White Paper Report on excited delirium.

15   Quote, "At present, physicians and other medical and

16   nonmedical personnel involved in personal interaction

17   with these patients do not have a definitive diagnostic

18   test for excited delirium syndrome" [as read].

19         Q.    Okay.    Let's stop there.    What does that mean?

20         A.    There's no way to actually test these patients

21   for it, a diagnostic test, laboratory test.    And

22   further, you know, the exact pathophysiology of excited

23   delirium remains unidentified.    So you can't --

24         Q.    Explain to us what that means.

25         A.    You have a syndrome that you -- doesn't have a

1    clear definition of diagnosis clinically, doesn't have a

2    clear pathophysiologic mechanism, can't be defined

3    postmortem on autopsy, can't be defined on laboratory

4    data.  You know, I'll read it here, epidemiology section

5    of the paper.  "The exact incidence of excited delirium

6    syndrome is impossible to determine as there is no

7    current standardized case definition to identify excited

8    delirium syndrome" [as read].

9              So the paper itself says there's no way to

10   recognize this syndrome.  There's been no link that I'm

11   aware from a cardiology standpoint of excited delirium

12   in cardiac arrest.  I'm sure there's some proposed

13   mechanisms; none of them are proven.

14             "The pathophysiology of excited delirium

15   is complex and poorly understood" [as read], another

16   direct quote from -- from the paper.  So I think that

17   speaks to my opinion of excited delirium as a diagnosis.

18        Q.   You've already mentioned that LSD is not

19   cardiotoxic.  If Troy Goode had taken LSD and not been

20   restrained and never had this run-in with the Southaven

21   Police Department or with the medical providers in this

22   case, do you see any reason that that LSD would have led

23   to cardiac arrest?

24             MR. PHILLIPS:  Objection; lack of

25   foundation and beyond the scope of the expert

1    disclosure.

2                    MR. UPCHURCH:  Join the objection.

3                    MR. MCCORMACK:  You can answer.

4                    MR. DILLARD:  This is Brad Dillard.  Join

5    the objection.

6                    MR. JORDAN:  Trey Jordan also joining the

7    objection.

8                    THE WITNESS:  I may also join a little

9    bit.

10                   MR. PHILLIPS:  It's unanimous.

11       A.    I will say that in my experience in

12   cardiology, there's not been known direct LSD toxicity

13   or LSD causing acute heart attacks or LSD causing

14   weakened heart muscle or congestive heart failure.

15                   I guess I don't have enough knowledge on

16   pure pharmacology about LSD to completely comment on it.

17   But from a cardiovascular perspective, it's just

18   something we don't clinically encounter.  It's not

19   something that we're taught about.  It's not -- like we

20   are with some of the other toxins.  So -- what was the

21   exact -- exact question again?  I'm sorry.

22       Q.    (BY MR. MCCORMACK)  It was whether or not you

23   thought that LSD, in the absence of this run-in with the

24   police, should have been a cause of death for Troy

25   Goode?

1       A.   It shouldn't -- it shouldn't cause cardiac

2  arrest.

3       Q.   All right.

4             MR. MCCORMACK:  Marty, I might have one

5  more in here.  Do you want me to look through?  I know

6  you said you had a few more, but I want to try to speed

7  it up rather than --

8             MR. PHILLIPS:  I don't -- I don't think

9  I'm going to have anymore, but I'm ready to wrap it up

10  so I can catch my flight.

11             MR. MCCORMACK:  Well, in that case --

12  David, are you going to have anymore questions?

13             MR. UPCHURCH:  [Shakes head.]

14             MR. MCCORMACK:  How about you, Brad?

15  Brad?

16             MR. DILLARD:  Hello?

17             MR. MCCORMACK:  Brad, do you have anymore

18  questions?

19             MR. DILLARD:  I'm having a hard time

20  hearing some of that.  Did Kevin finish his line of

21  questioning?

22             MR. MCCORMACK:  I did.  I might have one

23  more, but I'm looking at my notes.  I'm trying to speed

24  things up.  So if you want to hop in, I'm happy to let

25  you hop in while I look at --

1          MR. DILLARD:  I'm not going to have any

2     further questions.  Thank you.

3          MR. MCCORMACK:  All right.  Then give me

4     just five minutes to check my notes.  I probably don't

5     have anything more.

6          MR. PHILLIPS:  Why don't you take a minute

7     and a half.

8          THE REPORTER:  Off the record?

9          MR. MCCORMACK:  Off the record.

10          (Off the record for less than one minute.)

11          MR. MCCORMACK:  I have no further

12     questions.

13          MR. DILLARD:  This is Brad.  I would like

14     a copy, please.

15          (Proceedings concluded at 4:49 p.m.)

16

17

18

19

20

21

22

23

24

25



```
 1                    CHANGES AND SIGNATURE

 2    WITNESS NAME: PARIN PARIKH, M.D. DATE: SEPTEMBER 19, 2017

 3    PAGE LINE      CHANGE              REASON

 4    144 line 22         hyperchloremia → hyperkalemia

 5                             (mis-transcribed)
```

Exhibit "F" page 163 of 166

1    I, PARIN PARIKH, M.D., have read the foregoing
deposition and hereby affix my signature that same is
2    true and correct, except as noted above.

3

4    _____

5    PARIN PARIKH, M.D.

6

7

8

9    THE STATE OF  Texas         )

10   COUNTY OF  Rockwall        )

11

12        Before me,  Carlotta Garza         , on

13   this day personally appeared PARIN PARIKH, M.D., known

14   to me (or proved to me under oath or through

15   Texas Driver License        ) (description of identity

16   card or other document)) to be the person whose name is

17   subscribed to the foregoing instrument and acknowledged

18   to me that they executed the same for the purposes and

19   consideration therein expressed.

20        Given under my hand and seal of office this

21   29    day of  November          , 2017.

22

23                              _____

CARLOTTA C GARZA        NOTARY PUBLIC IN AND FOR

24                              THE STATE OF  Texas

COMMISSION EXPIRES: 04 13 2019

25

Exhibit "F" page 164 of 166

```
 1    STATE OF TEXAS      )

 2    COUNTY OF DALLAS    )

 3         I, LISA C. HUNDT, a Certified Shorthand Reporter in

 4    and for the State of Texas, hereby certify that,

 5    pursuant to the agreement hereinbefore set forth, there

 6    came before me on the 19th day of September, A.D, 2017,

 7    at 1:10 p.m., at the office of Lexitas, located at 1201

 8    Elm Street, Suite 5220, in the City of Dallas, State of

 9    Texas, the following named person, to-wit:  PARIN

10    PARIKH, M.D., who was by me duly cautioned and sworn to

11    testify to the truth, the whole truth, and nothing but

12    the truth of his knowledge touching and concerning the

13    matters in controversy in this cause; and that he was

14    thereupon carefully examined upon his oath and his

15    examination reduced to writing under my supervision;

16    that the deposition is a true record of the testimony

17    given by the witness, same to be sworn and subscribed by

18    said witness before any Notary Public, pursuant to the

19    agreement of the parties; and that the amount of time

20    used by each party at the deposition is as follows:

21              Mr. Kevin M. McCormack - 0 hours, 42 minutes,

22              Mr. Marty R. Phillips - 1 hour, 53 minutes,

23              Mr. L. Bradley Dillard - 0 hours, 12 minutes,

24              Mr. David W. Upchurch - 0 hours, 30 minutes,

25              Mr. James F. Garrett - 0 hours, 0 minutes,
```

Exhibit "F" page 165 of 166

Parin Parikh, M.D.                                                                  166

1          Mr. James R. Gass - 0 hours, 0 minutes,

2          Mr. Loys A. "Trey" Jordan - 0 hours, 0 minutes

3       I further certify that I am neither attorney nor

4    counsel for, nor related to or employed by, any of the

5    parties to the action in which this deposition is taken,

6    and further, that I am not a relative or employee of any

7    attorney or counsel employed by the parties hereto, or

8    financially interested in the action.

9       I further certify that before the completion of the

10   deposition, ___X___ the Deponent, and/or _____ the

11   Plaintiff/Defendant, ___X___ did _____ did not request

12   to review the transcript.

13      In witness whereof, I have hereunto set my hand and

14   affixed my seal this 10th day of October, A.D. 2017.

15

16

17

18   _____
     LISA C. HUNDT, CSR, RPR, CLR
19   Texas CSR No. 6533
     Expiration Date:  12/31/18
20
     LEXITAS-DALLAS
21   Firm Registration No. 459
     6500 Greenville Avenue, Suite 445
22   Dallas, Texas 75206
     214.373.4977
23

24

25   Taxable Cost:    $ 1100.85

Exhibit "F" page 166 of 166