1

1 UNITED STATES DISTRICT COURT
 NORTHERN DISTRICT OF MISSISSIPPI
2 OXFORD DIVISION

3 KELLI DENISE GOODE,    )
 Individually, and also as the )
4 Personal Representative of  )
 Troy Charlton Goode, Deceased, )
5 and as Mother, Natural Guardian)
 and as Next Friend of R.G., a )
6 Minor, and also on behalf of )
 all similarly situated persons,)
7        )
     Plaintiffs, )
8        )
  vs.     ) No. 3:17CV60-DMB-RP
9        )
 THE CITY OF SOUTHAVEN, TODD )
10 BAGGETT, Individually,  )
 JEREMY BOND, Individually, )
11 TYLER PRICE, Individually, JOEL)
 RICH, Individually, JASON )
12 SCALLORN, Individually, STACIE )
 J. GRAHAM a/k/a WITTE,  )
13 Individually, MIKE MUELLER, )
 Individually, WILLIAM PAINTER, )
14 JR., Individually, BRUCE K. )
 SEBRING, Individually, JOSEPH )
15 SPENCE, Individually, RICHARD )
 A. WEATHERFORD, Individually, )
16 JOHN DOES 1-10, BAPTIST  )
 MEMORIAL HOSPITAL-DESOTO, a )
17 Mississippi Corporation,  )
 SOUTHEASTERN EMERGENCY  )
18 PHYSICIANS, LLC., a Tennessee )
 Corporation, and LEMUEL DONJA )
19 OLIVER, M.D.,    )
        )
20     Defendants. )
21     - - -
22  DEPOSITION OF ROBERT C. KRAUSE, EMT
23

24

1

2         DATE:              October 11, 2017 at 9:40 a.m.

3         PLACE:             Collins Reporting Service,
                             Inc.
4                            615 Adams Street
                             Toledo, Ohio 43604

5         REPORTER:          Maureen Powers, RPR
                             Notary Public
6

7                                - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

3

```
1    APPEARANCES:
2     On behalf of the Plaintiffs:
3          BALLIN, BALLIN & FISHMAN, P.C.:
           Kevin M. McCormack
4          200 Jefferson Avenue, Suite 1250
           Memphis, Tennessee 38103
5          (901) 525-6278
6          EASTLAND & GARRETT, PLLC:
           James F. Garrett (via telephone)
7          103 N. Lamar Blvd., Suite 204
           Oxford, Mississippi 38655
8          (662) 234-0804
9
      On behalf of the Defendants the City of Southaven,
10    Todd Baggett, Jeremy Bond, Tyler Price, Joel Rich,
      Jason Scallorn, Stacie J. Graham, Mike Mueller,
11    William Painter, Jr., Bruce K. Sebring, Joseph
      Spence and Richard A. Weatherford:
12
           MITCHELL, McNUTT & SAMS, P.A.:
13         L. Bradley Dillard, Sr.
           Post Office Box 7120
14         Tupelo, Mississippi 38802
           (662) 842-3871
15
16    On behalf of the Defendant Lemuel Donja Oliver,
      M.D.:
17
           GASS WEBER MULLINS, LLC:
18         J. Ric Gass (via Skype)
           241 North Broadway, Suite 300
19         Milwaukee, Wisconsin 53202
           (414) 223-3300
20
           RAINEY, KIZER, REVIERE & BELL, P.L.C.:
21         Amanda Waddell (via telephone)
           Raymond James Tower
22         50 N. Front Street, Suite 610
           Memphis, Tennessee 38103
23         (901) 333-8101
24
```

4

```
 1   APPEARANCES (Continued)

 2
       On behalf of the Defendant Baptist Memorial
 3     Hospital - Desoto:

 4         UPCHURCH & UPCHURCH, P.A.:
           John Mark McIntosh (via telephone)
 5         141 S. Commerce Street
           Tupelo, Mississippi 38804
 6         (662) 260-6953

 7
       On behalf of the Defendant Southeastern Emergency
 8     Physicians, LLC:

 9         McDONALD KUHN:
           Matthew R. Macaw (via telephone)
10         5400 Poplar Avenue, Suite 330
           Memphis, Tennessee 38119
11         (901) 526-0606

12
                          - - -
13

14

15

16

17

18

19

20

21

22

23

24
```

5

```
 1                    I N D E X

 2                  EXAMINATION

 3   Witness:  Robert C. Krause, EMT        Page        Line
       Examination by Mr. Dillard..........   7          13
 4     Examination by Mr. McIntosh.........  96          21
       Examination by Ms. Waddell..........  98          12
 5     Examination by Mr. McCormack........  99           7
       Re-Examination by Mr. Dillard....... 121           9
 6     Re-Examination by Mr. McCormack..... 128           3

 7
                        - - -
 8

 9                   EXHIBITS

10   Exhibit Number 1......................   6           1
     Exhibit Number 2......................   6           1
11   Exhibit Number 3......................   6           1
     Exhibit Number 4......................   6           1
12   Exhibit Number 5......................   6           1
     Exhibit Number 6......................   6           1
13   Exhibit Number 7......................   6           1
     Exhibit Number 8......................   6           1
14   Exhibit Number 9......................   6           1
     Exhibit Number 10.....................   6           1
15   Exhibit Number 11..................... 132           5
     Exhibit Number 12..................... 132           5

16

17

18
                        - - -
19

20

21

22

23

24
```

6

```
 1              (Court Reporter marked Exhibit
 2         Numbers 1 - 10.)
 3                   - - -
 4              MR. DILLARD:  We have premarked a
 5         number of exhibits, I'm going to go back
 6         through these to be sure we're all clear on
 7         what they are.
 8              Exhibit 1, notice of deposition.
 9         Exhibit 2 would be the resume and,
10         description of Leading Technologies, LLC
11         and resume of Mr. Krause.  Exhibit 3, list
12         of case testimony over the last four years.
13         Exhibit 4, Mr. Krause's July 31, 2017
14         report.  Exhibit 5, portions of a
15         publication, Emergency Care and
16         Transportation of the Sick and Injured,
17         Tenth Edition.  Exhibit 6, excerpts from an
18         American Heart Association Provider Manual
19         article, Advanced Cardiovascular Life
20         Support.  Exhibit 7, excerpts from
21         publication EMT Prehospital Care, Fourth
22         Edition.  Exhibit 8, the Southaven EMT
23         patient care record and run report.
24         Exhibit 9 would be another copy, I believe,
```

7

```
 1              of Mr. Krause's testimony list along with
 2              CV.  Exhibit 10, portions of an article,
 3              Essentials of Paramedic Care, Second
 4              Edition.
 5                   I'd like to go ahead and make those
 6              exhibits to the deposition at this time.
 7              Having heard no objection, swear him in.
 8                        - - -
 9                   ROBERT C. KRAUSE, EMT,
10   a Witness herein, being first duly sworn to tell the
11   truth, the whole truth, and nothing but the truth,
12   testified and said as follows:
13                        EXAMINATION
14   BY MR. DILLARD:
15       Q.      Could you state your full name, sir?
16       A.      Robert C. Krause, K-r-a-u-s-e.
17       Q.      Mr. Krause, my name is Brad Dillard, we
18   met just a few moments ago.  I'm one of the
19   attorneys representing the City of Southaven,
20   defendants, the City of Southaven, a number of
21   police officers, and then EMT Stacie Graham.
22                   I'm here today to ask you some questions
23   about a report that you submitted to the plaintiff's
24   counsel dated July 31, 2017.
```

8

1          If at any time I ask you a question that
2    is not clear or if you don't understand me, would
3    you agree to stop me, let me know so that I can
4    repeat that or rephrase it for you?
5          A.      Yes, sir.
6          Q.      And having seen your case list, you
7    obviously have testified either in a deposition or
8    trial a number of times, correct?
9          A.      Yes, sir.
10         Q.      You're familiar with the process?
11         A.      Yes, sir.
12         Q.      If we can just have an agreement then
13   that if you'll let me finish my question, I'll do my
14   best to let you finish your answer, and then our
15   nice court reporter won't be mad at either one of
16   us.
17         A.      Yes, sir.
18         Q.      Would you just give me the benefit of
19   your educational background and your work history?
20         A.      Yes, sir.  Do you want my full
21   educational background or do you want academic
22   degrees, training?
23         Q.      Academic degrees, training, then sort of
24   bring me up through your work history.

9

1       A.      Okay.  In the academic degree area, I

2   have an Associate's degree in fire science, I have a

3   Bachelor's degree from the University of Cincinnati

4   in fire and safety engineering.  I have a Master's

5   degree from Bellevue University in security

6   management, which is homeland security types of

7   issues, and I'm currently completing my Doctorate

8   in organizational leadership at Bowling Green State

9   University.

10          I've been a certified paramedic since

11  1981.  I have maintained that licensure the entire

12  time without interruption.  My training includes,

13  may I look at that CV, and I'll just, I'll itemize

14  this for you.

15      Q.      I'm going to hand those to you.

16      A.      Thank you.  Academic-wise, and I can put

17  all of this on the record if you want me to, all of

18  these on there.

19      Q.      No, no.  We can look at that.  I just

20  want sort of a broad overview of your work history

21  and your educational background.

22      A.      That's my educational background in

23  paramedicine.  I'm an EMS instructor, I teach EMT

24  programs in the state of Ohio.  I'm also a fire

 1    instructor, I teach firefighting techniques as well

 2    in the state, throughout the United States and

 3    Canada.

 4              I have been working in the field since

 5    1981, since 1993 I've been here in Toledo.  My

 6    current position is battalion chief with the City of

 7    Toledo.

 8         Q.    Do you still serve actively as an EMT?

 9         A.    Oh, yes, sir.  I'm an active supervisor.

10    I'm on the line, I respond to incidents.  I'm very

11    active in my battalion.

12         Q.    In your battalion, your fire battalion?

13         A.    That's how it's called, it's a

14    geographic area.  There's three battalions in the

15    city.  Mine is the center city and east side and

16    some of the north end, but it's the geographical

17    area that I supervise, there are 18 fire stations in

18    the city, six of which fall under my battalion, and

19    I respond routinely with those crews throughout the

20    battalion to a variety of incidents.

21         Q.    Okay.  Those don't involve

22    transportation of patients with an ambulance?

23         A.    They do.  Absolutely.

24         Q.    You're personally involved in

1  transporting patients in an ambulance?

2      A.      Well, it depends on the case, but most

3  of the time I do not get in the back of the

4  ambulance.  I mean, I'm at the scene and we have

5  medic units there which transport the patients.  But

6  I am there as they're being put in or taken out as

7  the scene unfolds, I'm involved.

8      Q.      With your battalion, then, are you

9  typically responding to a fire or some other type of

10  emergency like that?

11      A.      Well, I have some administrative duties

12  which deal with staffing, potentially discipline,

13  but my focus on a daily basis is operational things

14  that are occurring within my battalion, which is

15  responding to fires, car accidents, medical

16  emergencies, drug overdoses, shootings, those types

17  of incidents.

18      Q.      I'm just trying to be sure I understand

19  your current position then.  You would oversee the

20  firemen who are on the scene as part of your job

21  duties?

22      A.      Yes, sir.

23      Q.      And then would you separately have EMTs

24  who would respond, say, to an auto accident with an

12

1  ambulance?

2      A.      Yes.  But they are all within the fire

3  division.  We're all in the same organization.  So

4  your example of an accident, we will arrive with

5  Toledo firefighters on a fire engine, or two,

6  depending on the significance of the incident, and

7  also the Lucas County paramedic units contain Toledo

8  firefighters, as well as the Toledo medic units,

9  which are BLS rigs, if push came to shove, could

10  operate on an advanced level.  Those are all filled

11  with Toledo firefighters.

12      Q.      So if you respond to our hypothetical

13  car accident, you're there with the firemen and also

14  the EMTs are on the scene, are you over the EMTs and

15  the firemen and you're dictating what happens at the

16  scene?

17      A.      Yes, sir.

18      Q.      When is the last occasion you would have

19  personally been involved in transporting the patient

20  where you got in the back of the ambulance and went

21  with him to the hospital?

22      A.      It would have to be within the last

23  year.  Most of the time we'll put more than enough

24  people in the back of the ambulance to make sure,

13

1　and I would say, boy, even closer than that because

2　we had an obstetrical incident that required a lot

3　of attention within the last five months in which I

4　was in the ambulance.

5　　　　Q.　　　Just, say, in the last year then,

6　because you mentioned that time period, in the last

7　year, how many occasions would you have had to

8　actually be in the back of an ambulance with a

9　patient during transportation to a hospital?

10　　　　A.　　　No more than two.

11　　　　Q.　　　Now, the documents you looked at that

12　you have in front of you as part of Exhibit 9, is

13　that your personal resume?

14　　　　A.　　　Yes.　The conference at the very top

15　didn't happen in 2917.　It's a little bit too much

16　in the future, but it was in 2017.　But the Clare

17　Firefighters Association was 2017.　That's the most

18　current, yes.

19　　　　Q.　　　Thank you.

20　　　　A.　　　You're welcome.

21　　　　Q.　　　This resume then would list all of your

22　education, training, work history, certificates,

23　licenses, everything pertinent to your professional

24　operation, correct?

1    A.    Yes, sir.

2    Q.    Then the separate document that we have

3  marked as Exhibit 2 references Leading Technologies,

4  LLC?

5    A.    Yes, sir.

6    Q.    How is that document different from your

7  personal CV we just talked about?

8    A.    Well, this is not something I generated.

9  This document is generated by the company Leading

10 Technologies.  That's not me.  I would imagine that

11 they, at some point early on, cut and pasted this to

12 put it into their website.  I don't oversee that.

13         And I'm sure, just by looking here, they

14 changed the format a little bit.  But in basics,

15 this is a summation of information.  But this is

16 something that they generate and I have no control

17 over.

18    Q.    Who is or what is Leading Technologies,

19 LLC?

20    A.    This is run by a gentleman named Bob

21 Yano, Y-a-n-o, and he is a, well, clearinghouse.  He

22 has experts that, when attorneys need an expert in a

23 certain area, they call him, he researches his

24 database, if there's someone applicable, and then

15

```
 1   provides that information to the attorneys.
 2        Q.      Would you be one of the experts then
 3   that would be in the Leading Technologies database?
 4        A.      Yes, sir.
 5        Q.      Is that a service that you have to pay
 6   for?
 7        A.      No, sir.
 8        Q.      How is Leading Technologies compensated
 9   if you're retained in a case?
10        A.      I believe the attorneys pay him.  I'm
11   not familiar with that financial arrangement.  It
12   doesn't involve me.
13        Q.      When you're retained through Leading
14   Technologies, do you personally execute a contract
15   or have a direct agreement with the attorney
16   retaining you?
17        A.      No, sir.  It goes right through Yano and
18   Leading.
19        Q.      So your billing would go to Leading
20   Technologies who would then bill the attorney hiring
21   you?
22        A.      Yes, sir.
23        Q.      And the document itself, again, I
24   believe you said, is sort of a summation of the
```

1   other document that we looked at, your resume,

2   correct?

3        A.      Yes.  I don't know how complete he is or

4   if he makes any edits to it.  That information is

5   not available to me.

6        Q.      How long have you been affiliated with

7   Leading Technologies, LLC?

8        A.      I think I've helped Bob over the last

9   couple of years, two years, three years maybe.

10       Q.      Do you know Bob on a personal basis?

11       A.      I wouldn't know him if he walked in this

12  room, sir.

13       Q.      How did you come to be affiliated with

14  this company?

15       A.      He called me.  I would imagine early on

16  he was mining for experts, and asked if I would be

17  interested in being in his group, I said, sure.

18       Q.      No cost to you?

19       A.      No cost to me.

20       Q.      Do you advertise for your services

21  anywhere else, or are you affiliated with any other

22  companies like Leading Technologies?

23       A.      Not that I'm aware of.  I used to

24  advertise, but I just, I don't anymore.  There is no

1    need to.

2        Q.      Do you have any type of company that you

3    set up that you perform your expert services

4    through?

5        A.      Yes.

6        Q.      What is that?

7        A.      The name of the company is Emergency

8    Services Consultants.

9        Q.      Is that a corporation?

10       A.      Ltd., yes, sir.

11       Q.      Formed under the laws of the State of

12   Ohio?

13       A.      State of Ohio, yes, sir.

14       Q.      When did you form this company?

15       A.      Geez, that's got to be within the last

16   10 years.  I'd have to go look at the certificate on

17   the wall, but within the last 10 years.

18       Q.      Was that strictly for your expert work?

19       A.      Yes.  And, well, it was, it started out

20   as teaching, I was doing more teaching than I was

21   doing anything else.  And then there happened to be

22   an attorney in one of the classrooms that I was

23   doing some teaching for, and he asked me if I knew

24   what an expert was.  I had a basic idea, yeah,

1  you're good at what you do, but I didn't know the

2  witness thing.  And he retained me in a case, he

3  asked me for some things, I gave them to him and he

4  said, this is what this is.

5      Q.      Does Emergency Services Consulting have

6  any other employees?

7      A.      On occasion, one.

8      Q.      Who would that be?

9      A.      My wife.  She's a law enforcement

10  expert.  She's a police captain for the last 34

11  years.  She handles law enforcement issues, a

12  variety of things.

13      Q.      So she'll act as an expert witness in

14  those areas?

15      A.      Yes, if she's asked.

16      Q.      As far as a percentage basis of your

17  total annual income, how much of that would be

18  generated through your expert work versus your work

19  as a battalion leader or other services you might

20  provide?

21      A.      About 20 percent.

22      Q.      Has that been consistent over the last

23  three to four, five years?

24      A.      Yes, sir.

19

1    Q.    How much time on average would you spend

2 in a given month performing expert work such as

3 this, giving a deposition, reviewing material,

4 generating reports, things like that?

5    A.    Well, it certainly depends on the

6 caseload, but you're asking number of hours?

7    Q.    Just on average on a monthly basis.

8    A.    Maybe 30 hours maybe.  There have been

9 months where it's been a little higher, but

10 certainly months where it's been lower.

11    Q.    Has your, any certification or licensure

12 you've had for basically EMT-related services ever

13 been suspended or revoked, modified, any sort of

14 limitations like that placed on it?

15    A.    No, sir.

16    Q.    Ever been subject to discipline by your

17 governing body?

18    A.    No, sir.

19    Q.    Who would be the governing body in Ohio

20 that would monitor EMTs?

21    A.    It would be the State of Ohio,

22 Department of Public Safety, the EMS Bureau.

23    Q.    Does that EMS Bureau, do they have their

24 own set of protocols and guidelines for EMTs?

20

```
 1      A.      To function under, as in medical

 2 protocols?

 3      Q.      Yes.

 4      A.      No, sir.

 5      Q.      The reason I'm asking, in your report,

 6 we'll get there in a moment, you referenced some

 7 protocols in Mississippi.

 8      A.      Yes, sir.

 9      Q.      I want to know if Ohio has similar

10 protocols to those.

11      A.      Most of the jurisdictions all have their

12 own, I don't know of a blanket Ohio protocol that

13 says, this is what you'll do.  I've functioned under

14 the Lucas County protocols for the last 26 years, so

15 I'm not aware of any blanket Ohio protocols.

16      Q.      Have you ever been licensed as an EMT in

17 any state other than Ohio?

18      A.      Yes.

19      Q.      What would those be?

20      A.      Michigan.  Pennsylvania.

21      Q.      Are those still active certifications?

22      A.      No, sir.

23      Q.      When did those lapse?

24      A.      Well, Michigan was probably the late
```

21

```
 1   '80s, because I just simply didn't want work there,

 2   and Philadelphia, well, Pennsylvania would have

 3   lapsed in, maybe the very first part of 1990, 1991,

 4   somewhere in there, after I left Philadelphia.

 5        Q.      You allowed those to lapse voluntarily?

 6        A.      Yes, sir.

 7        Q.      Going back to the protocols for a

 8   moment, prior to becoming involved in this case, had

 9   you ever had an occasion to review any protocols for

10   EMTs in the state of Mississippi?

11        A.      No, sir.

12        Q.      Do the Lucas County protocols that you

13   operate under, are they similar to or different from

14   the Mississippi protocols you reviewed for this

15   case?

16        A.      Similar.

17        Q.      Is there a national or standardized set

18   of protocols for EMTs?

19        A.      Well, there's a standard of care, and

20   the standard of care is generated by the educational

21   materials, the governing bodies such as the American

22   Heart Association.  Certainly medical practices that

23   are throughout the country have become standardized.

24   There's a standardized curriculum, which is the
```

22

1    Department of Transportation emergency medical

2    technician paramedic curriculum, and that means that

3    the paramedics in Boston, Massachusetts are being

4    trained the very same way they are in San Diego,

5    California.  So it is the national standard.

6              What is then typical is localities

7    develop and base their own protocols off of the

8    national standards.  For example, in California,

9    each county has some very slight differences in

10   their protocols, but they, at least, all meet the

11   minimum.

12             So, you know, County A might have a

13   little bit more than County B, but they all hit the

14   very minimum of the standard of care.

15   Q.      What is the minimum of the standard of

16   care?  How is that established?

17   A.      Well, it's established by that standard

18   of care that I mentioned, by the current texts that

19   are out there, by the research that is being done,

20   by the States who say that we would adhere to these

21   types of standards and use these methods for our

22   protocol development.

23   Q.      Would you agree that essentially the

24   standard of care is what a reasonably prudent EMT

1    would do under the same or similar circumstances?

2        A.      Well, that's close, but there has to be

3    what is the basic standards.  Now, for Mississippi,

4    they've established that, these are what the

5    paramedics shall function within.  They've made it

6    very clear in their opening parts of the document.

7              So they've made it clear that if you're

8    working in the Mississippi, you'll function under

9    these guidelines.

10       Q.      And is it your position that the

11   Mississippi guidelines give no discretion to deviate

12   from any of the protocols at all under any

13   circumstances?

14       A.      Well, discretion is, this is the

15   guidelines that they have set.  Now, they also talk

16   about if you have to switch protocols, you may have

17   to do that.  In other words, if I start treating you

18   for chest pain, but then as I begin to evaluate you

19   and develop my differential diagnosis, I also

20   determine you have COPD.  Then I'm allowed to start

21   blending some of those, and which I have to then

22   document why I did it.  There's very little

23   discretion, I mean, these are what you're being told

24   to do.

1    Q.    Well, the protocols, I'm kind of using

2  your example, you're treating the patient, you

3  recognize there may be a different problem that

4  exists, would it be important then for the EMT to be

5  able to put eyes on the patient, to assess the

6  patient, to interact with the patient to make that

7  determination as to what problem or scenario is

8  developing?

9    A.    Well, absolutely.  I mean, you can't

10 make a diagnosis, we couldn't, as you and I sit in

11 this room today, we couldn't make a diagnosis on a

12 patient who's back in the kitchen.  I mean, we have

13 to have eyes on the patient, we have to be able to

14 interact with the patient at some level, and then

15 make decisions on what we see, what our vital signs

16 tell us, or don't tell us, then respond

17 appropriately within our protocols to manage that

18 patient.

19    Q.    So the EMTs' implementation of the

20 protocols you talked about would be in large part

21 based on their assessment of the scene, assessment

22 of the patient, and just an overall determination of

23 what the appropriate care would be?

24    A.    Yes.

1  Q.      I'm going to look at your list of
2  testimony, do you have a copy of that?
3  A.      No, sir, I don't.
4  Q.      Let me hand you one that's been marked,
5  actually I think we have two copies that are marked.
6  I want to be sure they're the same.
7  A.      Yes, sir.
8  Q.      The first one is Exhibit 3, that's a
9  copy we were provided along with your report.  Then
10 there's another copy that is marked as part of
11 Exhibit 9.
12 A.      Yes, sir.  I sent multiple, I wanted to
13 make sure that these were available to you, so I
14 sent them here to the reporting agency so that we
15 had these, that we weren't, where the hell are they,
16 kind of thing.
17 Q.      Are those two the same document or any
18 changes to the one you sent?
19 A.      These are the same.  There's 3, or one
20 in 9, whatever.
21 Q.      Exhibit 3 and Exhibit 9, are they both
22 same document?
23 A.      Yes, sir.
24 Q.      They would list all of your depositions

1    or trial testimony over the last four-year period?

2        A.      Yes, sir.

3        Q.      Have you ever testified in the state of

4    Mississippi?

5        A.      No, sir.

6        Q.      Has any court, to your knowledge, ever

7    disqualified you as an expert for any reason?

8        A.      Absolutely not.  No, sir.

9        Q.      Are you aware of any, what's called a

10   Daubert challenge?

11       A.      Yes, sir.

12       Q.      Have you ever been challenged on that

13   basis, either due to your qualifications or the

14   content of your opinions?

15       A.      Yes, sir.

16       Q.      And which case of these cases, which did

17   that happen in?

18       A.      This happened in the Miami case, let's

19   see, they tried to Daubert me out during trial, they

20   actually asked for -- here it is right here.  Elisa

21   Chovel versus the City of Miami, 11th Judicial

22   Circuit in Miami, Dade County, Florida.  There's the

23   case number.  The patient had had a stroke, so

24   they --

27

```
 1      Q.      That's the second case on the top of
 2   Page 2?
 3      A.      Yes, sir.
 4      Q.      Okay.
 5      A.      Defense counsel wanted to have a
 6   challenge right in court.  The jury was dismissed, I
 7   was put through the process and the judge said,
 8   there's absolutely no way Mr. Krause is not
 9   qualified to opine in this case.
10      Q.      That's the only case you're aware of
11   where you faced a Daubert challenge?
12      A.      Well, to my face.  I mean, there were
13   certainly some other cases, I can't recall which
14   ones they were, that tried to Daubert me out.  They
15   were very unsuccessful.
16      Q.      Right.  That being the only case you
17   actually had to testify in court as to your
18   qualifications?
19      A.      Yes, sir.
20      Q.      Have any of the cases where you've
21   testified involved a factual situation that is
22   similar to the facts in this case, where a patient
23   took LSD or some other illegal drug, was restrained
24   by police, transported via ambulance to a hospital,
```

1    and subsequently expired?

2        A.      No, sir.

3        Q.      Have you had other cases that you have

4    reviewed and either given an opinion or not that

5    involved a similar set of facts?

6        A.      No, sir.

7        Q.      Okay.  I'm going to go into your report,

8    let's make sure you have a copy of that in front of

9    you to refer to.

10       A.      I do, sir.  I think.  Well, I thought I

11   had one.

12       Q.      I have one if you don't.

13       A.      Right here, sir.  I do.

14       Q.      I'm going to get into that, but first of

15   all, let me just be sure.  Am I correct that the

16   opinions you're giving in this case would only be

17   focused on EMT Stacie Graham?

18       A.      Yes, sir.

19       Q.      You're offering no criticism of, say,

20   the Southaven Police Department?

21       A.      No, sir.

22       Q.      You're offering no criticism of any

23   Baptist Hospital personnel who worked in the ER

24   department, nurses or other staff, correct?

 1      A.      No, sir.

 2      Q.      You're offering no criticism of Dr.

 3 Oliver, the ER physician?

 4      A.      No, sir.

 5      Q.      Just so we get a context of the EMT

 6 services we're talking about, there's a document

 7 that we've premarked, that would be the run record?

 8      A.      Yes, sir.

 9      Q.      I hand you that to you.  That's Exhibit

10 6.  I think on the top right-hand corner it has the

11 various times where the EMT responded, is that

12 correct?

13      A.      Yes, sir.

14      Q.      Would you go through those from the

15 first call until the EMT was totally off the scene?

16      A.      The call was received at 19:55:11, do

17 you want them all enumerated?

18      Q.      Yes, if you would.

19      A.      They were dispatched at 19:55:11.  They

20 were en route at 19:55:12.  They were on the scene

21 at 20:01:13.  They were at the patient at 20:02:19.

22 They depart the scene at 20:14:44.

23      Q.      Let me stop you there just a second.  So

24 between arriving at the scene and getting to the

30

1    patient then, I may have misunderstood you.  Those

2    last two you referenced, one was arriving on the

3    scene?

4         A.        Yes, sir.

5         Q.        What was the next one you referenced?

6         A.        At patient.

7         Q.        What time was that?

8         A.        20:02:19.

9         Q.        So then from the time at patient until

10   they departed the scene, how long was that?

11        A.        It's about 12 minutes.

12        Q.        Is that excessive or normal, in your

13   opinion, or do you have an opinion about that?

14        A.        No, that's a good time.  That's a

15   reasonable time.  Mr. Goode is already restrained at

16   that point and they're not doing a lot.  I mean,

17   they put him on the cot, they start moving toward

18   the ambulance.  It's a reasonable time.

19        Q.        So during that time period from when

20   they arrive on the scene until he's placed in the

21   ambulance, do you have any real criticism of Ms.

22   Graham, just during that limited time period?

23        A.        By the time --

24        Q.        Between arriving on the scene and

31

1  putting their hands on Mr. Goode and placing him in

2  the ambulance?

3      A.      Yes.

4      Q.      So I know there's a separate time period

5  we're talking about that's the actual ambulance ride

6  to Baptist.  I'm just going to segment those out.

7              If we're critical of Ms. Graham during

8  this initial time period that we just talked about,

9  what would those specific criticisms be?

10     A.      The specific criticism, from the time

11 she arrives until Mr. Goode is being placed in the

12 back of the ambulance is leaving him prone.  There

13 is absolutely no support for leaving Mr. Goode in

14 the prone position.

15             The literature is full of references not

16 to leave them in that position.  The protocols are

17 very clear that Mr. Goode should not be left in that

18 position.

19             So from the time she makes contact with

20 him until he's placed in the back of the ambulance,

21 she had an opportunity to intervene.  She did not.

22     Q.      Okay.  So during that limited time

23 period we're talking about, before he's placed in

24 the ambulance, that would be your criticism, leaving

1    him in the prone position?

2        A.      Yes, sir.  And it's not a limited time.

3    Remember, all we're suggesting, all I'm saying is

4    that all she had to do was move him 90 degrees.  All

5    she had to do was get him off his stomach.  And I

6    have had cases myself in which that interaction

7    alone can happen within seconds.

8        Q.      Again, what I'm just trying to do is

9    make sure, because I want to get into all your

10   criticism, I want to make sure we cover them all.

11       A.      Yes, sir.

12       Q.      During this initial time period right

13   before he's placed into the ambulance, okay, your

14   only criticism at that point would be the leaving

15   him in the prone position as opposed to turning him

16   on his side?

17       A.      Well, but that's a very significant

18   criticism.

19       Q.      I'm not saying it's not, I'm just saying

20   that is your criticism during this time period?

21       A.      In that short, brief time period.

22       Q.      That 12 minutes or so?

23       A.      It's not 12 minutes.  She's at his side

24   at 20:02, then there's 12 minutes that they depart.

33

1    Q.      Right.

2    A.      So they're not, these times don't

3  indicate what happened in the back of the ambulance.

4    Q.      Okay.

5    A.      So as soon as her hands are on at 20:02,

6  she has the opportunity to start intervention,

7  almost immediately.  And in this initial phase, so

8  he's in the back of the ambulance, all she would

9  have had to do was get him on his side.  Because I

10  understand she needs to get him in a more controlled

11  environment.

12    Q.      Which would be the back of the

13  ambulance?

14    A.      Which is in the back of the ambulance.

15    Q.      So he's placed in the back of the

16  ambulance, at that point pick back up with the

17  chronology, what's the time period before arrival at

18  the hospital?

19    A.      Well, the records say that she's at the

20  patient at 20:02:19.  They depart the scene at

21  20:14:44.  So that time period is from when she puts

22  her hands on him until they leave the scene.

23          So depending on where she is in the gap,

24  and that's not enumerated here, how much time she's

1  in the back of the ambulance with him.  From the

2  time they depart the scene until they are at the

3  destination, the destination is 20:26:59.  So about

4  12 more minutes in the back of the ambulance.

5        Then it's not until 21:10 that the

6  patient is transported or transferred over to

7  hospital staff.  So she has him, well, geez, almost

8  40 minutes under her care as opposed to what's on

9  her record here.

10     Q.     So the ambulance ride itself indicates,

11  as indicated on the record, took about 12 minutes to

12  get from the scene to Baptist Hospital?

13     A.     Yes.  They departed 20:14:44, and it

14  says arrived at, or at destination at 20:26:59,

15  about 12 minutes.

16     Q.     Have you looked at any of the hospital

17  records to determine when the hospital took over

18  care of Mr. Goode?

19     A.     Yes.

20     Q.     When is that?

21     A.     I don't have that in front of me, but I

22  would have to look at the BHS documents and I could

23  research them for, if you would like me to, but I

24  don't have the exact time, no.

1    Q.    Just in your experience as an EMT in

2 transporting individuals to a hospital, to an ER, at

3 what point do you typically perceive that you have

4 tendered the patient over to the ER staff for care?

5    A.    Let me just go back to a record.  It

6 says here that the arrival is 20:28.  It says here

7 code vitals are at 20:33.  So I would believe that

8 that's when he's in the hospital, the 20:33 time

9 frame, along there, but I don't have -- that's the

10 best I have.

11    Q.    That would be when the hospital staff

12 took his vitals?

13    A.    Yes, sir, when they began to assess him.

14    Q.    Going back to my other question, would

15 that be the point, or what would the point be in

16 your experience when a patient is transferred out of

17 EMT care into ER care?

18    A.    Well, it can vary.  The transfer period

19 can actually vary, depending on how busy the ER is,

20 what's the status of the patient that you bring

21 them, do they have an available bed to put him in,

22 what the staffing center at the hospital was, but

23 typically the period could be anywhere from two to

24 three minutes to 10 minutes or more and is

36

1    situational upon the receiving facility.

2        Q.      As an EMT, you're not permitted to give

3    actual patient care in the ER, are you?

4        A.      Well, no, sir.  I mean, you're certainly

5    not going to stand idly by while the patient is in

6    duress because you're in a facility.  I have had

7    opportunities on numerous occasions over 36 years to

8    where interventions were, absolutely had to be done

9    by me still in contact with that patient.  In fact,

10   my responsibility doesn't end when I cross the

11   threshold of the emergency department.  There hasn't

12   been an official transfer of patient care.

13             So that person still belongs to me until

14   there has been that exchange of information and

15   acceptance by the emergency department personnel.

16       Q.      Would that typically be at the triage

17   point?

18       A.      The triage point could be one spot, but

19   depending on again, sir, patients, sometimes we

20   don't stand in the triage bay because we're going to

21   get them into a particular room to hand them.

22       Q.      Do you have an opinion in this

23   particular case when Ms. Graham would have handed

24   off care to the Baptist personnel?

37

1     A.     There's nothing clear and definitive.  I

2 mean, they go into the emergency department, the

3 emergency department takes over.  I mean, the only

4 thing I can go to is her own statement when she says

5 she transferred care at 21:10.  I mean, that's the

6 record she put in.

7     Q.     Okay.  But we also have the record you

8 referred to a moment ago where vitals were taken at

9 20:33?

10     A.     Yes, sir.

11     Q.     Have you reviewed the deposition

12 testimony of the nursing staff at Baptist?

13     A.     Yes.

14     Q.     Didn't that deposition testimony

15 indicate that care was taken over much earlier than

16 the time frame Ms. Graham referenced in that run

17 report?

18     A.     Yes.

19     Q.     Would you agree that once a patient is

20 accepted in the ER department as a patient, at that

21 point the EMT's responsibility to provide care does,

22 in fact, end?

23     A.     Well, I think it ends to a point.  But

24 if there's mismanagement of the patient, then it

1    shouldn't end.  I mean, you know, Mr. Goode is still

2    on his belly, which as you know, I'll argue he

3    shouldn't have been, but typically what happens, my

4    experience has been emergency departments tend to

5    follow the path of the EMS crew that brings him in.

6    I mean, they will make deviations based on their

7    recognition and assessment.  But my experience has

8    showed me that if I say that this patient is a

9    seizure patient, or a chest pain patient, they'll

10   typically follow that lead until they make another

11   determination.

12           I mean, they are relying upon the EMS

13   crews to lay the groundwork for them in how they

14   initially approach the patient, then they can

15   diverge from that, however they see fit.

16   Q.      So the EMT will provide the initial

17   information to the ER department about the situation

18   with the patient or the problem the patient is

19   experiencing, would that be accurate?

20   A.      Yes, sir.

21   Q.      But then the ER department, through its

22   nursing staff and its physicians, will determine

23   whether the existing course of treatment is the best

24   course or something else should be tried?

1    A.       Yes, sir.

2    Q.       Or implemented.  You would recognize, I

3  guess, and acknowledge that an ER is a higher level

4  of care for a patient than an ambulance an EMT?

5    A.       Yes, sir.  That's why we take them

6  there.

7    Q.       Absolutely.  That's why Mr. Goode was

8  taken to the ER department that night?

9    A.       Yes.

10    Q.       For higher level of care?

11    A.       Yes, sir.

12    Q.       Would you agree that Mr. Goode's

13  complaint or his problem that night was, in fact, an

14  LSD overdose?

15                    MR. McCORMACK:  Object to the form.

16    A.       That was the initial problem.  That was

17  the initial then, but then all the physiological

18  things that happened trailing that are what the EMS

19  personnel can intervene on and correct.  I mean,

20  that was the initial stimulus.

21            But the resulting physiological

22  conditions are what we can change.

23    Q.       The EMTs responded to the situation with

24  a patient who they believed had overdosed on illegal

40

```
1   drugs, correct?

2       A.      Yes, sir.  I've done that routinely.

3       Q.      That was the situation that they

4   expected to address when they arrived at the scene?

5       A.      Yes, sir.

6       Q.      I want to look at your report, July 31,

7   2017 report.  Have you provided any supplemental

8   reports or additional reports since this report?

9       A.      No, sir.

10      Q.      There's a list of materials that you

11  indicate you had reviewed, being documents 1 through

12  18?

13      A.      Yes, sir.

14      Q.      It includes deposition testimony and

15  some other material.  Have you reviewed any

16  additional material other than what is set forth in

17  your report?

18      A.      No, sir.

19      Q.      So since you generated the report, you

20  have not been provided any additional depositions of

21  experts or anything like that?

22      A.      No, sir.

23      Q.      Have you reviewed any of the expert

24  designations of any of the defendants in this case?
```

 1      A.      No, sir.

 2      Q.      Did you have any conversations or other

 3   communications with plaintiff's counsel prior to

 4   generating the July 31 report?

 5      A.      No, sir, not that I can think of.

 6      Q.      Explain the process then with the

 7   Leading Technologies, that you'll generate a report.

 8   Do you send the report directly to, in this case,

 9   Mr. Edwards, or does it go through Leading

10   Technologies?

11      A.      No.  Once Leading Technologies makes the

12   connection, Leading Technologies, on my end, has no

13   further intervention.  I have dealt strictly with

14   Mr. Edwards or Mr. McCormack.

15      Q.      So Mr. Edwards or Mr. McCormack would

16   have sent you the material that you've listed in

17   your report, numbers 1 through 18?

18      A.      Well, they certainly would not have sent

19   me the reference materials, sir, the 13, 14, 15, 16,

20   17 and 18 was not sent to me.  Nor was 12.  I found

21   12 on my own as well.  So 12 through 18 were my own

22   research and development.

23      Q.      So counsel did not send you any type of

24   articles, texts or any other publications?

1    A.       No, sir.  I found them myself.

2    Q.       Okay.  You simply were provided the

3    deposition testimony, EMS patient care report, the

4    policies and procedures, dispatch information, and

5    any other things, as you said, numbers 1 through 11?

6    A.       Yes, sir.

7    Q.       And in finding that video that's listed

8    as number 12, were you just Googling what had

9    happened at the scene?

10   A.       Yes, sir.  I was looking for anything

11   that would reference what happened in this scenario

12   that popped up.

13   Q.       Have you asked to review any additional

14   material in this case such as the deposition of Ms.

15   Goode or any of Mr. Goode's friends?

16   A.       No, sir.

17   Q.       On Page 1 of your report, it states that

18   you have extensive experience transporting patients,

19   including patients that are violent, screaming and

20   threatening.  Also experienced transporting patients

21   in police custody.  Just briefly tell me about your

22   experience with those types of patients.

23   A.       Okay.  This spans the gamut of 36 years,

24   but certainly I've been in incidents where drug

1    overdose patients are violent, screaming, they're

2    coming unglued.  I've been in instances where

3    patients have been shot or have been injured, and at

4    the same time were also in police custody.

5              I have personally been on scene where at

6    initial arrival the patient is in the prone position

7    in a hog-tie fashion where we've gotten him over on

8    his side immediately.  I've had, I was in the back

9    of a rig where a gentleman tried to rob a hotel

10   poker game, and in his attempt to rob the poker

11   game, shot a police officer.  He then, in turn, was

12   shot, fractured his femur, he's in the back of the

13   ambulance with several police officers in police

14   custody, managing these patients.  We are trained to

15   deal with these types of patients.  It's not

16   something unusual.

17        Q.     You've been involved with patients who

18   have been threatening or potentially violent?

19        A.     Oh, yes, sir.

20        Q.     And, again, you've had cases where

21   police officers were required to be in the back of

22   the ambulance with you to maintain custody over the

23   patient, also to protect the EMTs, correct?

24        A.     Well, not so much protection, but, I

44

1   mean, their presence was like a big watchdog on a

2   porch.  I mean, they were there if we needed their

3   help, they would help us, but they weren't there to

4   protect us, they were there to maintain the

5   integrity of the custody.

6        Q.      Have you ever had a situation where you

7   felt physically threatened by a patient?

8        A.      Me?

9        Q.      Yes, sir.

10       A.      No, sir.

11       Q.      You're a fairly large guy, though,

12  correct?

13       A.      Yes, sir.

14       Q.      Do you have any knowledge about Ms.

15  Graham, how large she is or her experience dealing

16  with patients like Mr. Goode?

17       A.      Well, she's not a big person.  But what

18  she did have to her advantage in the back of that

19  ambulance were two of those watchdogs that I

20  referenced earlier.

21               So had she been, in my opinion, under

22  any threat, all she would have had to do was ask the

23  officers to help intervene, and then it is my guess

24  they would have helped her.

45

1    Q.      I'm going to go to Page 3 of your

2  report.

3    A.      Yes, sir.

4    Q.      You sort of go through a summary of what

5  occurred with Mr. Goode, that he was at a concert,

6  that he ingested some drops of LSD, his reaction was

7  that of having a bad trip.  Where did you obtain

8  this factual background information, from the

9  depositions or from some summary provided by

10 counsel?

11   A.      No, this was, the initial part was on a

12 discussion of the case, that this is how he had

13 gotten in that scenario, that he was having a bad

14 trip, and as I started reading the depositions, you

15 can tell from Ms. Graham that this guy is having

16 some problems, and that she's basically aware of a

17 drug overdose.  And so those are my words in a

18 summation of what is happening.

19   Q.      You said an initial conversation, an

20 initial conversation with whom?

21   A.      Mr. Edwards.

22   Q.      And how long did your initial

23 conversation with Mr. Edwards last, approximately?

24   A.      Boy, half an hour.

1      Q.      Do you recall, other than this factual

2   summary, what the two of you discussed about the

3   case?

4      A.      No, sir.  It was early July, I was on an

5   island, I don't recall.

6      Q.      Was this conversation memorialized in a

7   follow-up e-mail or letter?

8      A.      No, sir.

9      Q.      But it gave you some sense as to the

10  factual background of the case?

11     A.      Yes, sir.

12     Q.      What had occurred?  Now, there's a

13  statement, police were called to the scene, after

14  some time Mr. Goode was tased by one of the police

15  officers.

16              In the deposition testimony you

17  reviewed, does it indicate to you that Mr. Goode

18  was, in fact, not tased, but rather there was an

19  attempt to tase him?

20     A.      Well, the fire happened, I don't know if

21  both bars made target, I don't know if they made

22  contact.  But that whole evolution of process is

23  that, you know, the process was attempted.  Whether

24  both bars hit him, I don't know that.

1    Q.      Both bars do have to hit the individual

2  before there's electric shock, correct?

3    A.      That's my understanding, yes, sir.

4    Q.      Are you aware of any testimony then that

5  indicates Mr. Goode was, in fact, not tased or not

6  shocked at the scene?

7    A.      I don't know of anything that says that,

8  no, sir.

9    Q.      In regard to the statement that he was,

10  in fact, tased, what would you base that on?

11    A.      The fact that the weapon was discharged.

12  There is no indication to me that I have been able

13  to find at this point that clearly says it was a hit

14  or not.

15    Q.      So you're just basing that on the fact

16  that it was, in fact, discharged?

17    A.      It was discharged.  Whether it hit him

18  or not, that's the law enforcement types of, of the

19  incident that I did not opine upon.  The accuracy of

20  that officer with his taser is not in my purview.

21    Q.      You state that Mr. Goode's behavior was

22  erratic.  What is your understanding of exactly what

23  Mr. Goode's behavior was at the scene at the time,

24  at or around the time the police officers arrived?

1    A.    Well, by this time, he was experiencing

2  hallucinations, he was hollering, he was running

3  around.  If you were to see him, people would

4  definitely pay attention to him and his behavior,

5  that he's running around, he's non-compliant.  He is

6  certainly not orderly.

7    Q.    You believe at that point he posed a

8  danger to himself and to potentially others?

9    A.    Yes, sir.  Certainly to himself.  I

10  don't know about his threat to others.  He's a guy

11  who's 6 foot tall, maybe 150, 60 pounds.  He's not a

12  strapping lad.  But he certainly could have been a

13  danger to himself.

14    Q.    If someone runs out in traffic on a busy

15  street, that poses a danger to others as well,

16  correct?

17    A.    Yes, sir.

18    Q.    Now, you have an image number one, that

19  image is taken from the McLaughlin video?

20    A.    No, sir.  That's out of the newspaper.

21  There's a newspaper article also where that image

22  shows Mr. Goode being put in the back of the

23  ambulance.  It is also replicated in the video

24  itself.

49

1      Q.      Image two then is, you represent is the

2    four-point restraint or hog-tied position, in that

3    image number 2, the hands and feet are bound close

4    and securely together, correct?

5      A.      Yes, sir.

6      Q.      Now, in this particular case, with the

7    four-point restraint where there is a linked chain

8    that allows for movement, do you still consider that

9    to be a hog tie?

10     A.      Unequivocally, yes, sir.

11     Q.      You see no distinction between the

12   image, image 2 and the chain and shackles used in

13   this particular case with Mr. Goode?

14     A.      This image 2 might have a little bit

15   more closer proximity than image 1, but positionally

16   it's the same thing.

17     Q.      Positionally being up on the stock?

18     A.      Yes, sir.  And hands and feet behind him

19   in a drawn-up position.

20     Q.      Okay.  Again, the fact that there is

21   some 18 inches or so of flexibility to move, that

22   makes no difference to you in your opinions?

23     A.      Well, you say it's 18 inches, that's the

24   length of a chain.  If you cut it in half, it's 9

1    inches.  Because it loops around the legs.  So he

2    has a 9-inch gap, he doesn't have 18.  So the best

3    he can do is basically get one leg a little bit

4    straighter than the other, but he cannot, he is

5    still bound in a hog-tied position.

6         Q.      Again, that ability to move somewhat

7    makes no distinction to you between that and the

8    hog-tie position shown in image 2 where the hands

9    and feet are securely together behind the back?

10        A.      Well, as I said, the image number 2 is a

11   representation of what image 1 is.  Image 1 is a

12   little bit grainy, we can't really define that.

13   We'd need to have the original for that.

14             But basically that is the position that

15   we're talking about, and that is hog-tied.

16        Q.      Is image 2, is that an image that you

17   found on the Internet just to sort of link to image

18   1 as sort of a representation?

19        A.      Yes, sir.  In fact, I even identify

20   that, I say in the report, image 2 is a general

21   representation of Mr. Goode's position prior to and

22   during his transport in the ambulance.

23        Q.      Right.  I want to go over to Page 4.

24        A.      Okay, sir.

51

1      Q.      This is where you sort of go through the

2  treatment that was provided to Mr. Goode.  If you

3  could, just run through for me what exactly did Ms.

4  Graham do from arrival on the scene during transport

5  of Mr. Goode to the hospital, things that she did

6  do.  We'll talk about the things you say she didn't

7  do later, but let's focus on what she did do.

8      A.      Okay.  Well, certainly we can go right

9  through the report itself, is that she did provide

10  him some medical treatment, she indicated that she

11  did an assessment, the specificity of the assessment

12  isn't really identified.

13          She indicates that she put him on a

14  cardiac monitor, it showed an SVT, she identified

15  that.  He was not provided any oxygen, but you asked

16  me to let that go for now.  She takes an initial set

17  of vital signs and monitors his PsO2 and SpO2,

18  that's the oxygen saturation level in his blood

19  line.  The record indicates that she started an

20  I.V., and then at that point pretty much then

21  stepped back and didn't provide him a lot more

22  therapy after that.

23          There is no indication that she provided

24  him any oxygen, but she saw an SVT, she took an

1   initial set of vital signs, and then she left him in

2   the position that he was in.  So very little did she

3   actually do.

4        Q.      The SVT, the supraventricular

5   tachycardia, that's an elevated heart rate?

6        A.      Yes, sir.

7        Q.      Was Baptist informed of the SVT through

8   Ms. Graham, to your knowledge?

9        A.      I don't know the content and quality of

10  that record, that audio record or whatever she sent

11  them.  I don't know that.

12       Q.      You state there was a significantly

13  accelerated and life-threatening heart rate.  Is

14  that what you're referring to, the SVT?

15       A.      Yes, sir.

16       Q.      What was the heart rate at the time it

17  was checked in the ambulance?

18       A.      Her record indicates, well, I look at

19  the, if you look at the report, there's one on the

20  back here, this is around 150, 156, I mean, it gives

21  the number in the top of the record, but if you know

22  how to read these, you can see he's well over 150

23  beats per minute.

24       Q.      That's during the ambulance ride itself?

1    A.    Yes, sir.  That's what I'm aware of.

2    Q.    Then was his heart rate checked upon

3  admission to Baptist ER?

4    A.    I would have to go back to the hospital

5  records, but the primary focus of my involvement was

6  what happened before those thresholds.

7    Q.    So we can compare the heart rate as

8  measured in the ambulance ride to the heart rate

9  measured at Baptist to determine whether or not it

10  stayed consistent, increased or decreased, correct?

11    A.    You could use those comparatives.  If

12  you go back to her report, at 20:20 the heart rate

13  is at 164.  Five minutes later, it's now 186.  So in

14  five minutes, his heart rate is accelerated 22 more

15  beats per minute.  His heart rate is continuing to

16  move up.

17    Q.    When was the 150 to 156 measurement?

18    A.    This record, I don't know if they

19  stamped it or not.  Let's take a look.  This says

20  20:10:57.  So that would be consistent with, he

21  first got it, so she puts it on him, he's at 156,

22  that's at 10, 10 minutes later he's now up to 164.

23  Five minutes later he's now up to 186.

24    Q.    Was there any other testing of his heart

54

1   rate during the course of the ambulance ride, to

2   your knowledge?

3       A.      Testing in what way, sir?

4       Q.      The determination of beats per minute.

5   Those are the only ones we're aware of?

6       A.      Yeah, these are the only ones that I'm

7   aware of.  20:20, 20:25 are what she puts in here as

8   being SVT.

9       Q.      And how did she determine the heart

10  rate, what type of device did she use?

11      A.      Well, there's a couple of different

12  ways.  You can check your pulse, first of all,

13  that's one.  The second one is she used a cardiac

14  monitor, she placed the three leads on the patient,

15  there was actually four that go on, the fourth one

16  is a ground, but she places three leads on the

17  patient through which she can get a general view of

18  his cardiac heart rate.  Lead two is the most

19  commonly used, it tells us very clearly what the

20  heart is doing and it allows us to make a

21  differential diagnosis on what's going on with the

22  patient.

23      Q.      Do you have any knowledge as to whether

24  Mr. Goode was continuing to struggle, thrash around,

1    yell, things like that during the course of the

2    ambulance ride?

3         A.       Yes, sir.

4         Q.       What do you know about that?

5         A.       That he did continue to thrash and fight

6    and fight against whatever he thought he was in.  I

7    mean, there are statements made, I think Ms. Goode,

8    or, excuse me, Ms. Graham is the one who says he

9    doesn't even know that we're there.  He's just

10   acting out.

11        Q.       Was he yelling during the course of the

12   ride?

13        A.       Yes.

14        Q.       Do you know if he was making any

15   threats?

16        A.       Well, that's in debate.  Ms. Graham says

17   he was.  In fact, I think she even quotes him as

18   saying that, she indicates that, she says, Mr. Goode

19   says if I get out of here, I'll kill all of you.

20                 Well, the police officers don't

21   substantiate that.  When they were asked, they said,

22   no, they never heard that.  They were in the back of

23   the ambulance with her.  There's also a statement

24   that says Mr. Goode had no idea who was around him.

1    He was talking out of his head.

2              So if I tell you if I get out of these

3    chains, I'm going to kill you, I have to be aware

4    that you're there.  You know, and the other

5    testimony is to the point where they don't even, he

6    doesn't even know where he is.

7         Q.      I know you referenced that in your

8    report, we may talk about that as well, but are you

9    okay?

10        A.      I have a screw in my elbow and if I ding

11   it the right way, I know about it.

12        Q.      Do you not believe Ms. Graham's account

13   that there was a threat made by Mr. Goode?

14        A.      Well, I think it's up to who you

15   believe.  She says it.  The police officers say they

16   never heard it, and she contradicts in saying he

17   doesn't know where he is.  So whose story do you

18   buy?  I don't think Ms. Graham was in any danger

19   whatsoever.

20        Q.      Would you agree, though, her perception

21   being at the scene may have been different than

22   yours?

23        A.      Well, her perception may be different;

24   however, she's supposed to have been trained how to

1　function within these environments.  She is in a

2　controlled environment, she has two police officers

3　less than a few feet away from her.  Her job is to

4　manage Mr. Goode in the appropriate fashion.

5　　　　Q.　　　Do you have any criticism of her

6　education or training?

7　　　　A.　　　Well, she's certified as a paramedic, so

8　she is supposed to know what's going on in these

9　protocols.  She's supposed to function within these

10　protocols.  It appears she's been trained

11　appropriately.  Did she act appropriately?  That's

12　what our discussion is about.

13　　　　Q.　　　Right.  Now, you state here, further Mr.

14　Goode's blood saturation level upon entering the

15　emergency department was 90 percent.

16　　　　A.　　　Yes, sir.

17　　　　Q.　　　Do you have any knowledge as to what his

18　normal baseline O2 sat level might have been?

19　　　　A.　　　Yes, I can.  I mean, you and I sitting

20　here and Mr. Goode sitting in his room is going to

21　be right around 90 to 100 percent.  If he's not,

22　we've got some problems and he's going to be seen.

23　So to be at 90 is a problem.

24　　　　Q.　　　For someone who's had physical exertion

1    or who's been yelling, does that make any difference

2    in an O2 sat level?

3        A.      Sure, it will bring it down, but also we

4    see now two things are starting to happen.  He has

5    an accelerated heart rate.  That heart rate is

6    pumping up.  If you think about an impeller pump,

7    that impeller is moving so fast that he's not able

8    to circulate blood volume, he now becomes oxygen

9    deficient.  So his hypoxia is kicking in.

10            If he's laying on his chest, he cannot

11   possibly inhale deeply enough to offset that margin.

12   You think about excessive running or activity.

13   Well, what do we do?  We're standing up or we might

14   bend over a little bit, but we're allowing our chest

15   wall to expand to pull in that new oxygen.  Being in

16   a hog-tied position, Mr. Goode never had that

17   opportunity.

18       Q.      In your experience, does smoking include

19   smoking marijuana cigarettes, can that affect the

20   ability of your lungs to take in oxygen and reduce

21   your O2 sat levels?

22       A.      Well, I think there is some disease

23   process involved, but I don't know that that applies

24   in this case.

59

1    Q.    Were you aware that Mr. Goode did

2  frequently smoke marijuana?

3    A.    I think I had read something to that

4  effect, I don't recall.  But we're talking about the

5  here and now, you know.  I had a cigar last night

6  sitting in the backyard.  It doesn't mean that my

7  pulse oximetry today is lower.

8    Q.    Upon arrival to the ER department, you

9  say his blood saturation level was 90 percent, are

10  you aware of any supplemental oxygen being provided

11  at any point in the Baptist ER?

12    A.    Once again, sir, once I transferred past

13  that threshold, I didn't look at them too much.  I

14  mean, he was, apparently tried to be given some, and

15  I don't recall the specifics.  My focus was what was

16  on the back of that ambulance.

17    Q.    Okay.  So again, you've not reviewed all

18  of the Baptist ER records?

19    A.    I went through the initial induct into

20  where he was brought into the system, he was

21  evaluated by the ER physician, he was drawing a

22  crowd because of his misbehavior, he was put into a

23  separate isolated room, and the only one supervising

24  him was a police officer.

1      He was given some medication, and then

2  abandoned within the emergency department by the

3  medical staff, and left in a room with a police

4  officer.

5      Q.      Now, based on your -- I want to go back.

6  We talked about it a moment ago, but based on your

7  review of all the records in this case, and the

8  deposition testimony, at which point exactly was Mr.

9  Goode transferred from EMT care to ER care?

10      A.      Once that physician put his hands on him

11  or his nurse or the nurses put their hands on Mr.

12  Goode, and it is understood by Ms. Graham that they

13  are now directing his treatment, she's out of there.

14      Q.      You state, in part, that prolonged

15  hypoxia or low oxygen saturation levels will lead to

16  a lethal cardiac arrythmia if not corrected.  How

17  long, in your experience, would the hypoxia have to

18  occur, how prolonged would it have to be potentially

19  to lead to some type of cardiac event?

20      A.      Well, that's patient determinant.  It

21  really is patient determinant.  You can't say five

22  minutes, 10 minutes, that is inaccurate.  There are

23  a number of different physiological things that you

24  have to pay attention to, how long has this

61

1  individual been having respiratory difficulty, what

2  is their ability to have adequate ventilation.  It's

3  not respiratory rate, it's the adequacy of the

4  ventilation that's important.

5         And then, depending on what other

6  activities are going on, Mr. Goode here is thrashing

7  and fighting about, he's becoming more and more

8  acidotic, which causes other problems.  The

9  respiratory rate will pick up, there's a whole cycle

10  here that happens.  So I can't give you a five

11  minute, 10 minute, it's situational.

12     Q.     Let's go over to Page 5 of the report

13  then under background.

14     A.     Yes, sir.

15     Q.     You state that Ms. Graham held a

16  position of public trust as an emergency responder.

17  What do you mean by that term, public trust?

18     A.     Well, when people call 911, they have an

19  expectation that the people who are going to show up

20  on their door or show up in the street have a level

21  of training and experience to where they can manage

22  their problem.  The public trusts us when we show up

23  to take care of their problems.

24     Q.     You state down further in that same

```
 1   paragraph, Stacie Graham had a duty to act; however,
 2   she made a conscious decision not to do so.  I want
 3   to be sure I understand what you're saying there.
 4              Are you saying that she made a conscious
 5   evaluation of the care that Mr. Goode needed or
 6   didn't need, or are you saying that she consciously
 7   decided to deprive him of medical care knowing that
 8   he needed it?
 9       A.     Yes, sir.  That's exactly what I'm
10   saying.
11       Q.     You're saying that she knew that Mr.
12   Goode needed care but made a conscious decision not
13   to give him that care.
14       A.     Yes, sir.
15       Q.     Okay.  That's what I want to talk about
16   then, your opinions in that regard and what you base
17   those opinions on.
18       A.     Yes, sir.
19       Q.     If you could just sort of walk me
20   through all of your criticisms and opinions
21   concerning Ms. Graham, and I'll follow up with some
22   questions.
23       A.     Okay.  Well, she knows and she testified
24   that she knows that Mr. Goode should not have been
```

1  transported in the prone position, she knew it.  But

2  she even says, at one point she says that there's

3  protocols.  She admits to knowing that she's

4  violating the protocol.  She says that she just

5  didn't do it.  So she knew there was a way to manage

6  it, and let me put it this way.  Ms. Graham had an

7  opportunity to save Mr. Goode's life.  One of the

8  first things she could have done is get him on his

9  side, get him moved.  So she had an opportunity to

10  save this guy's life, but she made conscious choices

11  not to do it.

12          The first one, she didn't rotate him 90

13  degrees to get him on his side.  The second one is

14  she didn't use the chemical restraints that were

15  available to her to knock down his aggressive

16  behavior.  The protocols are very clear that

17  patients, that problems can happen if you don't

18  control this thrashing, fighting.  She chose not to

19  give him the medication.  It's in her deposition.

20  It's quite clear that she was able to start the I.V.

21          Now, and here's one more thing.  None of

22  these interventions are highly technical, they don't

23  require some high level training, they don't require

24  special equipment.  She had all of these tools in

64

 1    the back of the ambulance with her to fix the
 2    problems, yet she admits to not doing it.  So there
 3    are my criticisms.
 4        Q.      She don't rotate, did not use chemical
 5    restraint?
 6        A.      Yes.  She didn't provide him any oxygen,
 7    I mean, he needed oxygen, she had a pulse oximetry
 8    of 90.  If you look at the Mississippi protocol, the
 9    Mississippi protocol, this is, what do they call
10    this one, what number did they give it?
11        Q.      They said he had a pulse oximetry of 90
12    during the course of the ambulance ride?
13        A.      Yes.  She would have had to, she says
14    there's an initial one, and moderate hypoxia, that's
15    identified as moderate hypoxia, 90.  Here's the
16    protocols in response to that.
17                Immediate need to increase the delivery
18    of oxygen in a patient.  Now, I understand where she
19    says that you wouldn't keep it on, that, let me find
20    it.  Let me find it.
21        Q.      That's the SpO2?
22        A.      Yes.  The oxygen level.  I identify the
23    protocols, we'll go to that, but let me go to more
24    of the testimony that I want to identify.

65

1        She said he wouldn't keep it on, that he
2    wouldn't keep the oxygen on because he was thrashing
3    around.  No kidding.  I mean, if he's thrashing
4    around, the mask is going to come off.  And then she
5    makes the statement, this is one of the statements
6    that blew me away.  She says her rationale for
7    transporting Mr. Goode in the prone position, she
8    says, well, you can transport patients in a prone
9    position.  It's to the patient's comfort, and, hey,
10   everybody sleeps on their stomachs.  That's
11   ridiculous.
12       Q.    You're reading from her, an excerpt from
13   her deposition, correct?
14       A.    Yes, sir.  And that, so that tells me
15   her mindset here, that she thinks this is perfectly
16   fine, yet her protocols tell her absolutely not, the
17   national literature says absolutely not.  There is
18   no literature that I'm aware of that says leaving a
19   patient in a prone position is acceptable.  But yet,
20   she chooses to do it.  That's a conscious decision
21   she made.
22       Q.    She's giving an explanation in her
23   deposition as to why she made that decision,
24   correct?

66

1     A.     Yes.  Because people sleep on their

2 stomachs.  Well, when I'm sleeping on my stomach,

3 I'm not in a hog-tied position, I'm not thrashing

4 about against restraints.  I'm not on some chemical

5 that I ingested.  This rationale is, it's beyond the

6 pale.  I simply cannot justify this in any fashion.

7     Q.     Is that, if you are ranking your

8 criticisms of Ms. Graham, so I understand it, would

9 that be your number one criticism, this

10 transportation in a prone position?

11     A.     Well, I'll tell you one and two are real

12 close, but absolutely, that's number one.

13 Especially when the protocols on physical restraint,

14 number 16 and 17.  Number 16, now, there's, the

15 procedure is 605, protocol 605.  There is no

16 ambiguity here.  I mean, I don't need to be a

17 trained EMT or paramedic, someone on the street

18 could read number 16 which says, "Do not", in

19 capital letters and bold, "restrain patient in a

20 hobbled, hog-tied, or prone position".  Number 17,

21 in bold letters, capital letters, "Do not sandwich

22 patients between devices, such as long boards or

23 Reeve's stretchers, for transport.  Devices like

24 backboards should be padded appropriately", and they

1    didn't do that, but it's still very clear on leaving

2    a patient in a compressed position.

3              And then number 20, 20 says, "Never

4    apply restraints near the patient's neck or apply

5    restraints or pressure in a fashion that restricts

6    the patient's respiratory effort".  Being in a

7    prone, hog-tied position absolutely restricts a

8    patient's respiratory effort.

9        Q.    This SOP 605, does that, is that not

10   speaking to a situation where EMTs are actually the

11   ones restraining a patient at the scene?

12       A.    No, sir, that doesn't indicate that at

13   all.  It says this is how you're to transport

14   patients who are restrained.  Then what's important

15   too is on the next page where they start to weigh

16   into chemical restraints, and it says, number 2, and

17   this is important, "There is a risk of serious

18   complications or death if a patient continues to

19   struggle violently against restraints".  Mr. Goode

20   meets all of that particular criteria.

21             Chemical restraint by sedation may be

22   indicated in some dangerous, agitated patients.

23   Now, Graham says he is that.  Graham identifies him

24   as dangerous, she was in fear.  But what doesn't

1  make any sense here at all is that she was able to

2  infuse an I.V., which requires up close and personal

3  contact.  Once you put that I.V. tubing on, there's

4  a port 12 to 18 inches away from the patient where

5  she wouldn't even be close to administer some

6  medication to bring Mr. Goode down out of that

7  aggressive nature.  But she chose not to do it.

8       Q.     Did Ms. Graham talk about in her

9  deposition the type of potential chemical restraints

10  that were available to her?

11       A.     Well, it says in their protocols, it's

12  in the protocols, that she had Valium or Versed.

13       Q.     Going back to SOP 605 just a moment,

14  though, when you read through the first, say, 2, 3

15  and 4 portions of that, aren't those speaking to

16  EMTs who are themselves going to restrain a patient

17  when it tells the EMTs, use the minimum amount of

18  force, assure adequate personnel are present and

19  that police assistance has arrived.  Plan your

20  approach and activities before restraining.

21       Those are telling the EMTs, if you're

22  going to restrain a patient, here's how you do it,

23  correct?

24       A.     Yes, sir.

1    Q.    Also, number 1, what is the main

2  priority under this SOP?

3    A.    Well, the main priority, according to

4  number 1, safety of fire department/EMS personnel is

5  the main priority; however, that does not relieve

6  them of their responsibility to make sure the safety

7  of the patient is addressed as well.

8    Q.    Under the SOP, safety of fire

9  department/EMS personnel is the main priority in any

10  situation where a patient exhibits aggressive or

11  combative behaviors and needs to be restrained.

12        Now, you would agree in this case that

13  Mr. Goode exhibited aggressive or combative

14  behaviors?

15    A.    Well, not in this, because when the fire

16  department got there, he was already restrained.

17  His initial aggressive behavior was towards the

18  police officers and the potential public.  So there

19  was no threat to the fire department personnel.  He

20  was already hog-tied.

21    Q.    Prior to being placed in police custody,

22  you would agree he exhibited aggressive or combative

23  behaviors?

24    A.    I guess you could interpret that.

1    That's situational as well.

2        Q.      And if he's making threats to

3    individuals, I'm going to kill you if I get loose,

4    things like that that have been recounted by other

5    folks in depositions, would that be considered

6    aggressive or combative behavior?

7        A.      That's only recounted in one deposition,

8    and that's Ms. Graham.  The police officers who were

9    in the room, probably closer than you and I are

10   sitting today, sir, in the back of the ambulance,

11   and I'm very familiar with the confines of an

12   ambulance, those police officers never heard that.

13   Two of them.

14       Q.      What about personnel in the Baptist ER,

15   have you read any depositions of any nurses or other

16   personnel who indicated he was, in fact, making

17   threats or screaming?

18       A.      There is no question he was screaming,

19   he was hallucinating.

20       Q.      You agree that Mr. Goode needed to be

21   restrained, you just have a difference of opinion as

22   to how he should have been restrained, is that an

23   accurate statement?

24       A.      That's not just my opinion.  I mean,

1    it's also the opinion of the protocol.  And it's

2    also the opinions of the nationally accepted texts

3    that are out there.  Let's talk about Essentials of

4    Paramedic Care, Second Edition.  This was written in

5    2007.  Here's what the texts talk about when it

6    talks about aggressive patients.  Then it says

7    EMT/paramedics, patients should not, italicized, be

8    transported while restrained in a prone position.

9    Restraint in a prone position has been associated

10   with positional asphyxia.  In addition, nothing

11   should be placed over the face, head or neck of the

12   patient.

13          Now, let's go down a little bit further

14   because this is important and it gets to your point

15   of the protocol.  It says, as soon as the team has

16   control of the patient's movement, however, the team

17   must work to move the patient into a supine

18   four-point restraint position on his back.  A

19   patient should never, again, italicized, be hobbled

20   or hog-tied with the arms and legs tied together

21   behind the back.  During transport, a patient should

22   never, again, italicized, be restrained to a

23   stretcher in the prone position or sandwiched

24   between backboards or mattresses, they didn't do

1    that.  Once the patient has been restrained, he

2    should never be left unattended.

3            Here's another thing.  A patient who has

4    undergone physical restraints should not be allowed

5    to continue to struggle against the restraint.

6    Struggling against restraints may lead to severe

7    acidosis and fatal dysrhythmia.

8            In general, for the safety of the

9    patient and the EMS personnel, physical restraints

10   applied in the field should not be removed until the

11   patient is in the hospital.  I can buy that.  That's

12   not a problem.

13           The other point in chemical restraint,

14   the goal is to subdue the patient's excessive

15   agitation and his struggle against physical

16   restraint, because we know what's going to happen if

17   we let this guy fight.  That's just one reference.

18   We talk about the other one, Emergency Care in the

19   Streets.  Emergency Care in the Streets, this is

20   written in 2011.  It says, never place your patient

21   face down because it is impossible to adequately

22   monitor the patient, and this position may inhibit

23   the breathing of an impaired or exhausted patient.

24           And then lastly, when preparing to

1   secure the patient to the stretcher, it is of the

2   utmost importance to have the patient in the supine

3   position.  If the patient is placed in a prone

4   position, a condition called positional asphyxia can

5   develop.  In prone positioning, the increased weight

6   of the patient's lungs or his or her inability to

7   fully expand the thoracic cavity could render the

8   patient unable to breathe creating a preventable,

9   life-threatening emergency.

10              So it's well documented that he never

11   should have been left that way.

12      Q.      The articles that you've cited in your

13   report, are those all of the articles and materials

14   that you've relied upon in this case?

15      A.      Well, sir, these are textbooks, they're

16   not articles.  And then we get in the American Heart

17   Association where they talk about the SVT, the

18   dangers of that, these two textbooks are the primary

19   indicators I've used.  There are a series of

20   articles that talked about transporting violent

21   patients, and I read these as a reference but I

22   don't cite these in the report.

23      Q.      The two that you do cite there, you just

24   held up, would you identify those again for me?

74

```
 1      A.      Yes, sir.  The first one that I read is
 2   Essentials of Paramedic Care, I think you have it
 3   identified as 10.
 4      Q.      Right.
 5      A.      And I don't know what you have
 6   identified as Emergency Care, sir.  It's the orange
 7   one, on the very back there, that's identified as 5.
 8      Q.      5.
 9      A.      5.  5 and 10 are the two that I have
10   spoken about.
11      Q.      So to understand your position on the
12   protocols, do you view those as absolute rules or
13   guidelines for use by the EMTs?
14      A.      Well, they have dual functions.  These
15   are the, let's see what the record says.  I'll let
16   that speak for itself.  It says, let me go back.
17   The protocols say, I apologize for the delay.
18      Q.      That's fine, take your time.
19      A.      Okay.  Here's what it says.  On Page 5.
20   "The Southaven fire and EMS department have, as a
21   part of the operational directives", and the
22   question was are these absolutes or can they do what
23   they want.
24      Q.      That wasn't exactly my question, are
```

1   they absolutes, are they guidelines which can be

2   deviated from based upon the discretion of the EMT?

3        A.      Well, these are the fundamental aspects

4   in which they are able to function under.  It says

5   that these procedures are promulgated by the State

6   of Mississippi, Division of Emergency Medical

7   Services, and the first paragraph in the

8   introduction states this.  "These standing orders

9   and protocols are to be used by EMS personnel

10  licensed by the State of Mississippi, Division of

11  Emergency Medical Services, to render appropriate

12  care".  Then in Section 11, EMTs are expected to

13  perform their duties in accordance with these rules

14  that were generated.

15       Q.      "Expected to perform their duties in

16  accordance with the local, State and federal

17  guidelines in accordance with the State of

18  Mississippi statutes and rules of Mississippi

19  emergency services".

20       A.      Yes, sir.

21       Q.      That would include those protocols?

22       A.      Yes, sir.  That's right out of Article

23  11 of the protocols.

24       Q.      Are there any other local, State,

1  federal guidelines, statutes or rules other than

2  protocols that you reviewed in this case or which

3  you think might be applicable to Ms. Graham?

4      A.      Well, what we're talking about here is

5  pretty good, and I can bring all of those in.  The

6  local and State protocols are these.  This is it.

7      Q.      You just held up the --

8      A.      Mississippi Emergency Medical Services

9  Standard Operating Procedures.  And there's 248

10  pages of them.  Certainly not all 248 pages are

11  applicable to Mr. Goode.  I don't want to suggest

12  that.  But here are the local and State things.

13          Now, there are, I can't find you a

14  federal rule that says this, but what I can provide

15  for you is a federal standard of care where it is

16  promulgated, here's what's happening across the

17  United States.  I mean, nobody, there is no protocol

18  that I'm aware of, even my own, that allows for a

19  patient such as Mr. Goode to be transported in a

20  prone position for all the clearly and widely known

21  reasons why you don't do it.

22      Q.      Just for the benefit of the attorneys on

23  the phone, the documents you held up as indicative

24  of a national standard of care?

77

```
 1      A.      5 and 10.

 2      Q.      Exhibits 5 and 10?

 3      A.      Yes, sir.

 4      Q.      So, again, I guess going back to my

 5  original question then, are the protocols absolute

 6  guidelines which must be followed, excuse me,

 7  absolute rules which must be followed, or are they

 8  guidelines provided to EMTs which can be deviated

 9  from in some situations based on their discretion?

10      A.      No, sir.

11              MR. McCORMACK:  Object to the form.

12          You can answer.

13      A.      It's very clear they're expected to

14  perform their duties within these guidelines.

15      Q.      Let's go to Page 6 where we talk about

16  protocol 202.

17      A.      Yes, sir.

18      Q.      Drug ingestion.  Now, you've referenced

19  that protocol, you state on the top of the next page

20  the things that Stacie Graham, you believe, failed

21  to do.  One, conduct a complete patient assessment.

22  Do you have that in front of you?  I just want to go

23  through those with you then.

24              In regard to protocol 202, drug
```

1  ingestion, what did Stacie Graham fail to do in

2  regard to patient assessment?

3      A.      What is not noted here, we have to use

4  her record.  This is the record she generated, she

5  did take a blood pressure, she had a pulse, she had

6  a respiratory rate.  There is no documented SpO2,

7  there is no documented blood glucose number, I mean,

8  what was his glucose?  That's important.  It can't

9  be just discounted.  These are all pieces of the

10  puzzle that, when brought together, give you what is

11  going on with the patient.  You can't just discount

12  all of these.

13          I have worked with patients who are

14  violent and thrashing.  These are things that can be

15  done.  You just have to use your training and do

16  them.  So my criticism in 202 is she didn't complete

17  the completed assessment.  She didn't provide oxygen

18  to Mr. Goode.  He didn't get it.  She didn't do a

19  blood glucose check.  Is it an absolute that, hey,

20  there might be some indication on why Mr. Goode is

21  acting out.  For example, hypoglycemic patients, low

22  blood sugar, can act extremely violent as if

23  they're, in fact, having an overdose or some other

24  problem.  Or simply knowing a blood glucose level

79

1  can say, well, here's our problem.  Give him some

2  D50 and let's bring him out of it.  So that's an

3  important variable.

4       Q.       That's what I wanted to ask you, what

5  the significance of a blood glucose check would have

6  been to you.

7       A.       The significance is that on hypoglycemic

8  patients, they do have an altered mental status and

9  they can be fighting as if there's a belt on the

10  line.  So what has to happen is that we have to

11  raise their blood sugar back up.  So it is possible,

12  it is possible that Mr. Goode had a hypoglycemic

13  problem, but we don't know that.  It's our job, EMS'

14  job to start filtering out what's wrong with this

15  guy, and is that one of the elements, no or yes.

16  But in this case we don't know.

17       Q.       So the glucose check would have been

18  essentially to rule out hypoglycemia as the cause of

19  his acting out?

20       A.       It could have been a potential cause,

21  absolutely.

22       Q.       So then we talked about failure, in your

23  opinion, to monitor the O2 sat levels, we have

24  talked about conducting a complete patient

1    assessment, correct?

2        A.      Yes, sir.

3        Q.      Provide oxygen and airway maintenance.

4    During the course of the ambulance ride, are you

5    aware of any physical indications that would be

6    visible to me or to a police officer or to Ms.

7    Graham, of Mr. Goode having difficulty breathing?

8    If he's yelling, for instance, is that indicative of

9    a problem breathing or adequate oxygenation?

10       A.      That's a great question, and the answer

11   is I have no expectations of the police officers

12   being able to see and/or recognize medical

13   conditions unless they're trained in that.

14           But he is yelling.  Now, a respiratory

15   problem, for example, could be one's statements or

16   one's words don't tell me definitively that he has a

17   good airway or that he's being ventilated well.  For

18   example, a patient who may holler "help", that's not

19   indicative of whether or not they have a good pulse

20   ox or not.  I mean, you have to determine that.

21           Someone who is conversing like you and I

22   are, sir, all as an observer, I can tell you pretty

23   much your and my airways are ventilating pretty

24   well.  But if someone is screaming, that wouldn't

1  surprise me.  I have had patients who are in dire

2  straits who are able to scream because they're on,

3  you know, they're having a lot of problems.  So the

4  fact that he's screaming, I don't think that that

5  will tip it one way or the other.

6      Q.      Even if the screaming continues for 30

7  minutes or in excess of 30 minutes?

8      A.      I would expect him to be hollering,

9  certainly.  I mean, that does not mean that he's not

10  becoming hypoxic.

11      Q.      Are there any other criticisms then in

12  regard to SOP 202, drug ingestion, other than the

13  four we've talked about?

14      A.      No.  I brought that in because I think

15  it starts to show a pattern, now there's a pattern

16  here that's developing.  As we continue, there are

17  more and more omissions in Ms. Graham's treatment of

18  Mr. Goode, it sets a pattern.  She chose not to do

19  these things.

20      Q.      There are two other SOPs that you

21  referenced in here that you believe were violated,

22  605 and 612.

23      A.      Yes, sir.

24      Q.      I want to do the same thing with 605,

82

1    we've talked about it a little bit already, the

2    physical restraints?

3         A.       Yes, sir.

4         Q.       Other than the opinions you've already

5    given us that Mr. Goode should have been moved onto

6    his side, is there any other criticism you have in

7    regard to SOP 605 on the restrained issue?

8         A.       Well, yes.  I believe I spoke about

9    that.  Getting him off his back, or getting him off

10   his stomach is certainly a number one priority,

11   right there when we start talking about the chemical

12   restraints, it's very clear in identifying that

13   chemical restraints can be used here.

14            It is on the second page of that

15   protocol that says that there is a risk of serious

16   complications or death if a patient continues to

17   struggle violently against restraints.  Chemical

18   restraint by sedation may be indicated in some

19   dangerous agitated patients.  And then it gives you

20   3, 4 and 5.  4 is very clear, in that Valium, 2 to 5

21   milligrams I.V. or Versed, 2 to 5 milligrams I.V.,

22   or I.M., that's even a better one.  If you look at

23   Versed, she wouldn't have had to stick it in the

24   vessel.  She could have stabbed him in his buttocks

1    or in a big muscle such as the deltoid to deliver

2    that medication, which would have brought him off of

3    his aggressive demeanor.  But she states in her

4    testimony she consciously chose not to do that.

5        Q.      Does she state why, why did she

6    consciously decide not to do it?

7        A.      She thought she was in fear of her life.

8    And it doesn't wash, because she started the I.V.,

9    which required up close and physical contact with

10   Mr. Goode.  And as I mentioned a little bit earlier,

11   she could have given both of those medications 12 to

12   18 inches away from the physical contact of Mr.

13   Goode.  So she could have sat back in the seat and

14   given him the medication.

15       Q.      She was also, they were transporting him

16   to the ER for higher level of care where chemical

17   sedation would also be available in your experience,

18   correct?

19       A.      Yes, sir.

20       Q.      Would it not be better to have that sort

21   of medication administered by a nurse or a physician

22   or under the order of a physician?

23       A.      Well, two things.  She already has the

24   order of the physician right here in the protocols.

1    This is the order.  She's allowed to do it.  No, it

2    would not have been better.  Time is of the issue

3    here.  The longer he fights, it says it very clear,

4    there's a risk of serious complications or death if

5    a patient continues to struggle violently against

6    restraints.

7              So the whole time he's in the back of

8    that ambulance, it's contributing to that very

9    sentence, his risk of death is growing.

10   Q.       Now, it states in number 2, chemical

11   restraint by sedation may be indicated in some

12   dangerous, agitated patients.  Now, that "may", the

13   use of the word "may" is discretionary, is it not?

14   A.       Well, it may, yes.  She sets the tone.

15   Because she identifies him as dangerous, agitated

16   and, I mean, she says it.  He's aggressive, man,

17   we've got to do something.  She's identified it.

18   Q.       But a moment ago you sort of discounted

19   her description of him as being dangerous and

20   aggressive.

21   A.       Well, I discounted because I don't

22   believe it's accurate.  I mean, he is of no threat

23   to her.  She says that he's this way.  That's her

24   interpretation.  But this protocol applies because

85

```
 1    she's identified Mr. Goode as dangerous and
 2    agitated.  She says it.  So then use the chemical
 3    reactant.  She says that she chose not to do it.
 4    That means she knew that she could do it.
 5         Q.      The protocol says, may be indicated in
 6    some dangerous, agitated patients.  So it doesn't
 7    require it in all cases where the patient may be
 8    dangerous or agitated, correct?
 9         A.      Well, "may" is an operative word, sure.
10    But this is a case where he clearly needed it, she
11    knew he needed it, but she made the choice not to do
12    it.
13         Q.      So you would agree "may" does give
14    discretion to the EMT in the decision whether to
15    administer some type of chemical restraint or not?
16         A.      I don't know that it gives them
17    discretion.  It says, that's the way it's written,
18    may be indicated.  This is one of those cases where
19    it is indicated.  There is no question about it.
20         Q.      Are you aware as to whether or not Mr.
21    Goode did receive some type of medication to calm
22    him in the ER?
23         A.      Yes.
24         Q.      How long would that have been after he
```

1   arrived and was transported from EMT care to ER

2   care?

3       A.      It was within a few minutes.  I think

4   the physician here gave him Haldol.  I can't

5   remember the exact dosage of Haldol that he gave

6   him, but the question then is why would he have

7   given it to him.  The reason he gave it to him was

8   to break him out of this aggressive, agitated state.

9   The docs knew it.  She knew it.  But it took all

10  that much more time before he was administered until

11  he got to the emergency department.

12      Q.      Again, just based on your review of the

13  documentation, how long was Mr. Goode in the

14  emergency department from the time care was tendered

15  by the EMTs until he passed away?

16      A.      I think he was found to be in cardiac

17  arrest, my papers are going everywhere.  I think he

18  was found in cardiac arrest somewhere around, it's

19  after 20:33 because at 20:33 they have an SpO2 of 90

20  percent.  I don't have a time here when they started

21  giving the medications.

22      Q.      So earlier you said it was a few minutes

23  after he arrived, it may have been longer than that?

24      A.      It may have been a bit longer.  I don't

1    have that.  I know that he arrives in the emergency

2    department at 20:28 and is pronounced dead at 21:44.

3    I don't have all of those times enumerated and,

4    again, because it's not what I was asked to --

5         Q.     We can agree he was in the ER

6    approximately an hour?

7         A.     I'm not going to agree to anything until

8    I can verify it.  If you're telling me that that's

9    the record, then I have no reason to believe you're

10   lying to me.

11        Q.     I'm not going to represent anything to

12   you in the course of your deposition.  Okay.  I want

13   to make sure, is there anything else in regard to

14   SOP 605, other than what we've already talked about,

15   any other criticisms of Ms. Graham, any other

16   opinions you would hold in regard to that protocol?

17        A.     Well, I think I've articulated my

18   positions.  I don't see a need to regurgitate them

19   again just for both of our sake.

20        Q.     I agree.  I just want to make sure we

21   have covered all of your opinions in regard to that

22   particular protocol.

23        A.     Yes, sir.

24        Q.     The next protocol would be SOP 612 which

1    is titled excited delirium taser use.  Would you

2    agree that this protocol recognizes excited delirium

3    as a condition?

4        A.      It does.  This word is transferred back

5    and forth, and I think it's clearly pointed out, you

6    know, agitation as well.  I mean, this, it is termed

7    here excited delirium, I've read excited agitation

8    as well.  It may be nothing more than semantics.

9        Q.      Are you aware there is a diagnosis of

10   excited delirium or a condition called excited

11   delirium?

12                       MR. McCORMACK:  Object to the form.

13            You can answer.

14       A.      Yes, I am.

15       Q.      You're not sure that's what this refers

16   to, though, is the actual condition?

17       A.      Well, it depends on, like I said, this

18   is, if you look at the symptoms, changes in loss of

19   consciousness, ongoing disorientation, agitation,

20   hallucinations, these are all similar symptoms that

21   Mr. Goode is exhibiting.  Some facilities call it

22   excited agitation, others call it delirium.

23       Q.      And in any regards, SOP 612 deals with

24   the situation where a patient has been tased?

1    A.    Well, I don't know that that is

2  inclusive of both.  I think it may be, here's one

3  and another.  The protocol itself isn't, doesn't

4  write about tased.  I mean, it just talks about

5  these conditions and how to manage them.  Why taser

6  use is attached, I'd have to ask the author.

7    Q.    In referring to your report, you say,

8  records including Mr. Goode had been tased by a

9  police officer.  Due to that fact, Ms. Graham was

10  required to follow protocol 612 as well.

11        So in reading your report, my assumption

12  was that's why you referenced 612, was your belief

13  that he, in fact, had been tased.

14    A.    And we talked about that, yes.  So that

15  brings in all of these other assessment tools of EKG

16  monitoring, oxygen saturation, Valium.  Those are

17  all things that would have been able to intervene or

18  help in the condition that Mr. Goode presented to

19  her.

20    Q.    Given that introductory language you had

21  about due to the fact he was tased, this protocol

22  applies, if he was, in fact, not tased and there was

23  no shock delivered, would you believe protocol 612

24  would still be applicable?

1     A.     Yes.

2     Q.     You have listed in that regard five

3 things that you believe Ms. Graham failed to do,

4 we've gone through those.  I believe you have

5 covered every one of these in your prior criticism

6 as well, correct?

7     A.     Yes, sir.

8     Q.     So there would be no new criticism based

9 on your belief that she violated 612 other than what

10 we've already talked about, provide oxygen and

11 airway maintenance, supportive care, as she didn't

12 reposition Mr. Goode from a prone position, assess

13 blood glucose level, monitor oxygen saturation

14 levels, provide Valium to calm Mr. Goode, right?

15     A.     Yes, sir.

16     Q.     We've talked about all of those?

17     A.     Yes, sir.

18     Q.     And would your opinions about those

19 matters be any different in regard to protocol 612

20 than they were in regard to the other protocols

21 we've already talked about?

22     A.     No.  But what this does, though, is

23 start drawing a connection.  Here are a number of

24 protocols that I've identified that have similar

1    conditions that she didn't attend to.

2        Q.      You made a statement earlier that

3    related to Mr. Goode's death, I just want to be

4    clear.  Now, we all agree Mr. Goode did not die

5    during the course of the ambulance ride, correct?

6        A.      Well, he didn't die, but he was getting

7    sicker and sicker and sicker and he was climbing the

8    ladder.  And this is where my position is.  Ms.

9    Graham had an opportunity to save his life, and she

10   didn't do it.  The series of events from the onset

11   of his position on led to the problem, and once the

12   circle starts spinning, there comes a point where it

13   doesn't stop.

14            She could have intervened on two

15   occasions, at least that we know of, the simplest

16   one, turning him 90 degrees, get him on his side so

17   his chest can expand.  The other one, which she

18   admitted to knowing, is using the chemical restraint

19   to get him to stop fighting.

20            If you backtrack that just a little bit,

21   had Ms. Graham done the two things that could have

22   saved his life, he wouldn't have been stuck in a

23   holding room with a physician after been given

24   Haldol and left to himself where, the next time they

 1   find him, he's in cardiac arrest.

 2            The reason he was moved into that room

 3   is because he was creating a scene in the emergency

 4   department.  Backtrack a little bit and say, look,

 5   if Ms. Graham would have given him a medication to

 6   calm him, he never would have been put in that room,

 7   he would have stayed where he was and had

 8   monitoring.

 9            So she had an opportunity to save this

10   man's life and consciously chose not to do it.

11       Q.       Through not repositioning him on the

12   side, not administering chemical, some type of

13   chemical sedative?

14       A.       Those are the two.  Then give the guy

15   some oxygen, let's bring his heart rate back down.

16   You've got to bring these things down.  The dominoes

17   are falling, sir.  And she doesn't do anything to

18   stop the dominoes.  She was in a position to do so.

19       Q.       You said we're climbing the rungs of the

20   ladder, I think is what you said?

21       A.       Yes, sir.

22       Q.       When Mr. Goode arrived at the Baptist

23   ER, though, you're not taking a position that he was

24   not, he was in a critical or terminal condition, are

1    you?

2      A.      He was absolutely in a critical

3    situation, yes, sir.  Because all of those events

4    have now lasted 20-some minutes or longer.  I mean,

5    and the longer those last, the more critical he

6    becomes.  So by the time he gets into the emergency

7    department, he's in a very precarious position.

8      Q.      I want to be sure I understand your

9    opinion.  I believe it is, despite what may have

10   happened or not happened in the ER, you blame Mr.

11   Goode's death on Ms. Graham?

12     A.      Well, I think it's a total event.  It's

13   a total event.  If Ms. Graham's intervention could

14   have come in earlier, they could have, she could

15   have stopped the wheel from spinning early.  The

16   wheel was still spinning by the time he ended up in

17   the emergency department, then it goes downhill from

18   there.

19           But her interventions, her early

20   interventions, that's the whole point of emergency

21   medical services, the fact that ambulances are

22   stocked with the equipment and the tools and the

23   personnel that they are was to bring the emergency

24   department to the bedside of the patient out in the

1    field.  She had the tools to do what was needed to

2    be done, she didn't do it.

3         Q.      The remainder of your report, Page 11,

4    11 and 12 is where you get into the opinion.  I

5    think, as we've gone through the report, we have

6    covered your opinions, correct?

7         A.      Yes, sir.

8         Q.      So in looking through the bottom of Page

9    11, Page 12, and Page 13, just above your signature,

10   have we already covered, through your testimony, all

11   of the opinions that you hold in this case?

12        A.      Yes, sir.

13                MR. DILLARD:  Let's go off the

14                record, let's take a short break, I would

15                like to look through my notes for just a

16                moment.

17                MR. McCORMACK:  Okay.

18                THE WITNESS:  Okay.

19                (A brief recess was taken.)

20        Q.      During the course of your examination,

21   Mr. Krause, have we discussed all of the material

22   that you have reviewed in reaching your opinions?

23        A.      Yes, sir.

24        Q.      And have we discussed all of the

1   material that you have actually relied upon in

2   reaching your opinions?

3        A.      Yes, sir.

4        Q.      Have we fully discussed all of the

5   opinions that you hold in this case and which you

6   may offer at trial?

7        A.      Yes, sir.

8        Q.      And we've fully discussed the basis for

9   each of those opinions, correct?

10       A.      Yes, sir.

11       Q.      To date, for your work performed, how

12  much have you charged and been paid?

13       A.      I think we're right around $5,000.

14       Q.      Does that include the deposition fee

15  that my office paid, or is that separate?

16       A.      That's separate.

17       Q.      I see your rate of compensation for

18  review is $250 per hour.  Does that apply to all

19  work you perform including, say, travel and

20  attendance at trial, or is there any different fee

21  structure?

22       A.      There is no different fee structure.

23       Q.      So if it's $250 per hour, it's when you

24  leave Toledo until you come back?

1    A.     Well, I don't do that.  And my fee

2  structure tells you that.  I think that's nickel and

3  diming you to death, and I don't think that's fair

4  to the attorneys.

5         I have a travel day, which is a flat

6  $1500, I have a trial day which is a flat $2,000.  I

7  don't bill you for sleeping, I don't bill you for

8  walking.  I think that's unfair.

9    Q.     Okay.  So for those events, it is a flat

10  fee?

11    A.     Yes, sir.

12    Q.     Got you.  But your review work,

13  generating a report, things like that, would be at

14  the $250 an hour rate?

15    A.     Yes, sir.

16           MR. DILLARD:  Mr. Krause, I'm going

17         to tender you over, if any of the attorneys

18         have any questions.

19           THE WITNESS:  Thank you, sir.

20              - - -

21           EXAMINATION

22  BY MR. McINTOSH:

23    Q.     Mr. Krause, my name is John Martin

24  McIntosh, I represent the defendant Baptist Memorial

97

1  Hospital - DeSoto, Inc.  Are you able to hear me
2  okay?
3      A.      Yes, sir, I can.
4      Q.      I have a few questions for you.  If we
5  cut out or you don't understand a question I ask
6  you, please let me know, okay?
7      A.      Yes, sir.
8      Q.      Mr. Krause, as I've reviewed your report
9  and appreciated your testimony here today, it is my
10 understanding that your opinions in this case are
11 limited to the pre-hospital paramedic care of Mr.
12 Goode, is that correct?
13     A.      Yes, sir.
14     Q.      That is, you don't plan to offer any
15 opinions concerning the nursing or physician care
16 and treatment rendered to Mr. Goode in the emergency
17 department, do you?
18     A.      No, sir.
19     Q.      You have no nursing or emergency
20 physician training, do you, sir?
21     A.      Well, I did attend nursing school, yes,
22 sir, but I am not --
23     Q.      Did you obtain a nursing degree?
24     A.      No, sir.  I'm not an R.N.  I left

```
1   nursing school to pursue the pre-hospital aspect of

2   medicine.

3       Q.      Would I be correct, sir, that you're not

4   holding yourself out in this case as an expert in

5   emergency department nursing or emergency medicine

6   as practiced by emergency physicians?

7       A.      That's correct, sir.

8               MR. McINTOSH:  Thank you, sir.

9           That's all the questions I have for you.

10              THE WITNESS:  Yes, sir.

11                      - - -

12                  EXAMINATION

13  BY MS. WADDELL:

14      Q.      Mr. Krause, this is Amanda Waddell, I,

15  along with Mr. Gass who is also on the line,

16  represent Dr. Oliver.  And just to follow up with,

17  on Mr. McIntosh's questions, just to make sure the

18  record is clear, you are not a licensed physician,

19  correct?

20      A.      No, ma'am.

21      Q.      And you have neither attended nor

22  graduated from any medical school, correct?

23      A.      That's correct.

24      Q.      You have never worked as a physician,
```

1    correct?

2        A.       No, ma'am.

3                        MS. WADDELL:  That's all I have.

4                Thank you.

5                        THE WITNESS:  Yes, ma'am.

6                           - - -

7                        EXAMINATION

8    BY MR. McCORMACK:

9        Q.       Mr. Krause, my name is Kevin McCormack,

10   as you know, I represent the plaintiff Troy Goode's

11   widow, Kelli Goode, and his minor child.  I'm going

12   to have a few questions for you.

13                There's a diagram in your report on Page

14   3 that you were asked about, it's this red diagram

15   on Page 3.  Do you see that?

16       A.       Yes, sir.

17       Q.       You've called that the hog-tie position?

18       A.       Yes, sir.

19       Q.       You also say that it was called the

20   four-point restraint by Southaven Police Officer

21   Baggett, is that accurate from your report?

22       A.       Yes, sir.

23       Q.       When EMS personnel talk about a

24   four-point restraint, is this what they talk about?

 1      A.      That's exactly what they talk about.
 2  The flip of that is when they're on the cot on their
 3  back, we've restrained all four limbs, but that's
 4  clearly different than what these images are.
 5      Q.      So what are EMS personnel trained to do
 6  for a four-point restraint?
 7      A.      Well, the ambulance approach to a
 8  four-point restraint with the paramedics and EMS
 9  personnel is to get them over on their back so
10  they're on their back, they can have chest
11  expansion.
12              But to take each of the four limbs and
13  restrain those individually using soft restraints
14  and securing them to the cot so they can't move off
15  of the cot, then use the cot straps that are on the
16  ambulance cot themselves to assist them in
17  restraining the patient.
18      Q.      You just mentioned soft restraints.  Was
19  Mr. Goode restrained with soft restraints?
20      A.      Oh, no, these are anything but soft
21  restraints.  These are hand custom chains.
22      Q.      Are soft restraints able to hold
23  agitated patients, in your experience?
24      A.      Oh, yes.  If they're applied properly.

1    The restraints are going to hold a very agitated

2    patient very well, even significant sized guys, like

3    myself.  I mean, certainly the stature of Mr. Goode

4    would not have tore them off.

5         Q.      Have you ever had patients in your own

6    experience that you've restrained using the soft

7    restraints?  You've done that in the past, right?

8         A.      Yes.

9         Q.      Have you ever done that on a patient

10   much larger than Mr. Goode?

11        A.      Oh, yes.

12        Q.      Have you ever done it on a patient who

13   is agitated?

14        A.      That's really one of the reasons we do

15   it, yes, absolutely.

16        Q.      How about patients who are on heavy

17   stimulant drugs like cocaine or methamphetamines?

18        A.      We aren't able to discern right at that

19   moment unless somebody tells us what the drug is,

20   but patients who are acting in the same or similar

21   circumstances as Mr. Goode are retained in that

22   four-point position, which is on their back and

23   their limbs individually restrained, yes.

24        Q.      Have you ever seen, in those patients

```
1    who are agitated, have you ever seen the four-point
2    restraints fail when they were properly applied?
3         A.     Never.
4         Q.     You made reference to the ACLS protocol
5    and we've made it an exhibit here, but we haven't
6    talked about it much today.  Does the ACLS protocol
7    inform the care that an EMS, that a paramedic or
8    other EMS personnel are supposed to give to a
9    patient?
10        A.     Yes.  The American Heart Association
11   promulgated this document, it's the Advanced Cardiac
12   Vascular Life Support Provider Manual.  This manual
13   addresses cardiology problems both for pre-hospital,
14   hospital physicians, nurses, this is the document
15   that educates the pre-hospital, the care of
16   individuals.
17        Q.     Did Ms. Graham comply with this ACLS
18   protocol?
19        A.     No.
20        Q.     In her treatment of Mr. Goode?
21        A.     No, sir.
22        Q.     Explain that to us.  What did she do
23   wrong?
24        A.     Well, what we have, I mean, she, Ms.
```

1  Graham, identified SVT.  And you do not need a

2  12-lead to have a differential diagnosis of SVT.

3          Now, in this textbook, SVT in a patient

4  is broken into two particular sections; a stable

5  patient which could be me, as I sit here in front of

6  you now with an accelerated heart rate, but I'm

7  still talking, my blood pressure is still

8  reasonable, I mean, those are stable patients.

9          Then there are unstable patients, and

10 the unstable patients are a great example of what

11 Mr. Goode is.  I mean, if you look at the signs and

12 symptoms of an unstable patient, you can see right

13 here, acutely altered mental status.  Now, we know

14 he has a heart rate greater than 150 beats per

15 minute, and at one point it gets all the way up to

16 180.

17         So these guys, "these", I say these guys

18 as a patient group, these are profoundly unstable

19 patients, and they need to be cardioverted.  We need

20 to stop that heart rate.  In this case there were a

21 couple of things that could be done.  You could have

22 given him a death card, or you could have actually

23 used synchronized cardioversion.  But you've got to

24 bring that heart rate down because it's very clear

1   that the longer they go at this rate, the more sick

2   they become.  They become acidotic, they become

3   hypoxic, that heart rate is clicking along so fast

4   that the brain isn't being perfused well, the

5   kidneys aren't being perfused well.  There's a lot

6   of serious medical problems that can develop from

7   sustained SVT.

8        Q.     You mentioned in your response to that

9   question that you don't need a 12-lead in order to

10  perform a differential diagnosis.  With the rhythm

11  strip and the information that Ms. Graham had, did

12  she have enough information to begin treating Mr.

13  Goode for his accelerated heart rate?

14       A.     Well, absolutely.  And, in fact, she

15  even documents that.  She writes in her patient care

16  chart, SVT.  And then when you start piecing the

17  rest of the puzzle together, that he's profoundly

18  agitated, he's not communicating, he's altered

19  mental status, he's thrashing and fighting about,

20  you start putting that all together, you can start

21  seeing you have a profoundly unstable patient in

22  front of you.

23       Q.     You mentioned the pulse oximeter, and

24  you also mentioned that the I.V. was part of the

1    treatment that Ms. Graham was able to give.  Do you

2    have any opinions about whether or not Mr. Goode's

3    oxygen levels should have been monitored with pulse

4    oximetry in the ambulance?

5        A.        Absolutely, they should have been

6    monitored.  I mean, his agitated state, if you go

7    through the protocols that we identified, I mean,

8    pulse oximetry is in all of them.  I mean, we need

9    to know what this gentleman's oxygenation saturation

10   levels are because it can give us insight as to

11   what's going on with him.

12              I mean, for example, agitated patients

13   may be profoundly hypoxic, and separate of any drug

14   ingestion.  So you could have an agitated patient

15   who you find them to be uncooperative and moveable,

16   they're hypoxic, give them some oxygen.  You will

17   see a change in their mental status.

18       Q.        You mentioned briefly that Ms. Graham

19   said she couldn't get the pulse oximeter to stay on

20   because Mr. Goode was moving around too much.

21              If she was unable to, well, first of

22   all, do you have any opinions on whether or not her

23   failure to do pulse oximetry was a violation of the

24   standard of care?

```
 1      A.      Well, it is.  The failure to use pulse
 2  oximetry is, because the protocols tell you to do
 3  it.  Now he's agitated, so it's going to be a little
 4  more difficult to do that.  I mean, we're talking
 5  about something that clips on a finger.  I mean,
 6  it's not, if I'm flailing around, it's going to be
 7  hard potentially to get that.  So how do you resolve
 8  that.  Well, you knock them down.  You give them
 9  medication to get them out of his agitated state,
10  and then you can start monitoring his pulse
11  oximetry.
12      Q.      Assuming that Ms. Graham is unable to
13  get pulse oximetry, even after putting in an I.V.,
14  even with the assistance of police officers, if she
15  was unable to get the pulse oximetry on, is there
16  anything she could have done to make sure that Mr.
17  Goode was not going hypoxic?
18      A.      Oh, yes.  And separate of even having
19  that number, you give the patient oxygen.  I mean,
20  because you can't overdose someone on oxygen.  I
21  mean, in this condition.  We're not talking about a
22  COPD, we're not talking about some of those other
23  cases.  Give him oxygen.  If you don't know, just
24  give him oxygen.  I've never had a patient who has
```

1    arrested because they had a pulse oximetry of 100

2    percent.  If you don't know, give it to him.

3        Q.     The multiple standard operating

4    procedures that you cite in your report mention

5    giving oxygen.  Is it a violation of each of those

6    operating procedures to fail to give oxygen in this

7    case?

8        A.     It's the cumulative effect.  That's why

9    I looked at the individual protocols, and they all

10   state, give him oxygen, give him oxygen.  So these

11   were all opportunities to provide Mr. Goode

12   oxygenation which, she didn't do it.

13       Q.     Now, one of the things that you've

14   mentioned a few times is that Mr. Goode should have

15   been turned on his side for transport, and I believe

16   you provided some diagrams of how that's done in an

17   EMS setting.  Have we made that an exhibit to this

18   deposition?

19       A.     Yeah.  I'm holding -- well, the one I

20   have here isn't referenced, I gave counsel the one

21   with the textbook cover and the year of publication.

22   But this one is Figure 53 of the textbook, it's the,

23   I gave it to counsel, it's a depiction of four ways

24   of positioning a patient on an ambulance cot.

1    Q.      Are those, all of those safe and secure

2  ways to transport a patient?

3    A.      Absolutely, yes.  These are all safe and

4  appropriate ways to transport a patient.

5    Q.      Have you ever used those yourself?

6    A.      Every single one of them.

7    Q.      When you have an agitated patient, are

8  you able to turn the patient on their side?

9    A.      Yes.  And, in fact, Picture B, Picture B

10 shows how you want to get a patient on their side.

11 Now, EMS isn't easy, I mean, if it was, everybody

12 would do it.  But my point here is even with the

13 agitation that Mr. Goode exhibited even early on,

14 getting him on his side is the most critical thing,

15 we need to be able to make sure he's being

16 ventilated.  And having him face down and prone does

17 not facilitate that at all.

18          And so you can either have him facing

19 you or facing the other way.

20                MR. DILLARD:  For the record, that

21          would be part of Exhibit 7.

22    A.      Yes, sir.  Get him on his side, get him

23 on his side.  That is of the utmost importance.

24    Q.      In your experience in dealing with

1　agitated patients, have you ever had the police

2　assist you in positioning a patient or restraining a

3　patient?

4　　　A.　　Well, in my experience, in 36 years, the

5　police officers have always, I've never, never run

6　into a police officer who said, no, I'm not going to

7　turn him on his side.  I have had police officers

8　help me reposition patients.  I have had police

9　officers in the ambulance with us.  Anytime that I

10　have needed the police officers to help me do

11　something, they have always been forthcoming in

12　assistance.  I've never seen one say, no.

13　　　Q.　　You talked a little bit about the

14　hand-off between EMS and a hospital.  Have you ever

15　seen a hospital, when a patient is transferred to

16　them, leave that patient in a prone, hog-tied

17　position?

18　　　A.　　Absolutely not.  And I can speak to

19　this, because I've been in the emergency

20　departments, I've delivered them patients, none of

21　mine have been up that way, but, I mean, they

22　wouldn't allow it.  They just simply would not allow

23　it.

24　　　　　　My experience in major hospitals within

1    the city has been, even if they've been brought in

2    in a hog-tied position, the physicians and nurses

3    get them out of that thing as quickly as they can

4    and will restrain them on their backs.  I've never

5    seen a hospital not pay attention to that.

6        Q.       I want to talk a little bit about what

7    Ms. Graham did when she came up on the scene.  Now,

8    Mr. Goode was already in restraints when Ms. Graham

9    arrived?

10       A.       Yes, sir.

11       Q.       What was she required to do when she

12   came upon a hog-tied, prone patient who needs to be

13   transported to the hospital?  What was she required

14   to do there to meet the standard of care?

15       A.       Well, it's quite simple and I suggested

16   this earlier.  All she had to do was rotate him 90

17   degrees.  I mean, it's not highly technical, she

18   didn't need any special equipment.  All she had to

19   do was say, guys, get him on his side.  That's the

20   first and foremost thing, if she would have just got

21   him on his side.  And then once he was placed on the

22   ambulance cot, maintained in that position.  She

23   didn't even have to touch the patient really, she

24   could have asked the police officers to help her.

1    But it's, all she would have had to do was rotate

2    him.

3        Q.      Is that opinion to a reasonable degree

4    of medical certainty as a paramedic?

5        A.      Absolutely.  I mean, it's even contained

6    within the protocols and all of the texts that I

7    identified in our discussion today.

8        Q.      Have you ever administered chemical

9    restraints to an agitated patient?

10       A.      Yes, sir, I have.  The biggest issue

11   now, and I'll tell you, I face it with some

12   regularity, is bath salts.  Bath salts and their

13   ingestion produces extremely aggressive and violent

14   patients.  It would have been quite comical to be a

15   spectator a few months ago when I'm literally

16   wrestling around an intersection with a gentleman

17   who was later found to be on bath salts.  We had to

18   give him ketamine to help control him because he was

19   truly in a very critical condition.

20       Q.      Once you give those chemical restraints,

21   what follow-up care do you have to do?  Do you have

22   to continue your care after you give those chemical

23   restraints?

24       A.      Well, it's very definitive.  Once you

1  give chemical restraints, you have to monitor those

2  patients in the back of the ambulance.  You have to

3  make sure they have a respiratory rate, that their

4  heart rate stays up, that they're ventilating well,

5  and ventilation is different from respiration.

6  Respiration is a numerical value.  Ventilation is

7  the actual exchange of gas in the chest cavity and

8  that can be determined by the patient's status, and

9  SpO2 is one of them.

10      Q.      You had mentioned earlier that altered

11  mental status can be caused by a number of things,

12  you've mentioned low blood sugar, you've also

13  mentioned hypoxia.  When you have a patient with

14  altered mental status, do you ever just assume

15  what's causing that?

16      A.      Well, if you're smart, in medicine, you

17  never assume anything.  I mean, we know that there

18  could be an entire variety of things causing altered

19  mental status.  So that's why the protocols that I

20  work under, that are in Mississippi as well, clearly

21  tell you to start, here's how we assess that out.

22  Here's how we put together pieces of a puzzle.  And

23  those pieces of a puzzle are what show us what's

24  wrong with the patient.  So glucose is important.

1    Q.      Now, is it possible to have more than

2  one thing causing an altered mental status?

3    A.      Certainly.  It's absolutely possible

4  that this guy has a diabetic condition, but he's

5  also a drug user.  So, I mean, there are potentially

6  multiple things that can cause that.

7            So when you have a patient who has a low

8  blood sugar, what can you do, you give him some D50.

9  You're not going to hurt him.  So if it fixes the

10  problem, well, then, it's a glucose issue; if it

11  doesn't, then move on.  There are two medications

12  that you can give to almost every patient and not

13  hurt them.  Three.  Narcan, which is if they have a

14  narcotic on board, will help to fix that; glucose,

15  which, if they're hypoglycemic, will fix that, and

16  oxygen.  Any three of them, you can give those three

17  to you and I sitting here, it's not going to kill

18  us.

19    Q.      You were asked very early on how many

20  patients you've cared for in the past year.

21            Over the span of your career, do you

22  have an estimate, I know you won't have an exact

23  number, but do you have an estimate of how many

24  patients you have personally cared for in an EMS

1   setting?

2       A.      I can give you parameters.  Let me just

3   say, the city of Toledo, this district responds to

4   some 65,000 calls for service a year, somewhere in

5   there, 60s, mid 50s.  I work every third day.

6   Certainly the number is in the thousands.  I don't

7   have a top number, I can't say a hundred thousand.

8   I don't know.  But certainly thousands.

9       Q.      How common is it for, in those thousands

10  of patients, how common is it for you to experience

11  an agitated patient?

12      A.      It's rare.  I mean, it's not a daily

13  occurrence.  But it's certainly, the agitation could

14  be related to a lot of different things, but it's

15  several times a month, I'll bet.

16      Q.      Have you ever transported a patient

17  hog-tied?

18      A.      Never.  And when I have arrived, and a

19  case which jumps out at me is when a police officer

20  did have someone in a hog-tied position, face down,

21  and as I was walking toward the patient, I was

22  already chirping to the police officers, let's get

23  him on his side, let's get him on his side.  I don't

24  care why you've got him, that's not my business, but

1  my business is to make sure that this guy can be

2  ventilated.  I got him on his side.  Even at times

3  before I was putting my hands on the patient, guys,

4  we've got to get him on his side.

5      Q.      Why do you want to get him on his side?

6      A.      Well, it goes back to what we've been

7  talking about, and the fact when he's on his chest

8  in that position, or she's on her chest in that

9  position, they have a limited ability to have

10  adequate ventilation.  It truly compresses their

11  ability to be well-ventilated.  I don't care why

12  they're in your custody, officer, but I need to get

13  this patient on his side so he can be properly

14  ventilated.

15             That's the reason why, because we know

16  that with time, being on their chest and highly

17  agitated, they're going to arrest.

18      Q.      While Troy Goode was hog-tied and prone

19  in the ambulance during Ms. Graham's care of him,

20  was his condition improving or was it deteriorating?

21      A.      He was deteriorating.

22      Q.      How do you know that?

23      A.      Well, I know that by, let's just look at

24  a couple of different things that are on the record

116

 1    reflected by Ms. Graham.  The biggest thing that

 2    you've got to look at right here is the pulse rate.

 3    What's happening with his pulse rate?  The pulse

 4    rate is continuing to rise, she has a 156 number,

 5    then it goes to 164, now it's at 186.  That heart

 6    rate is non-sustainable.

 7            And if you couple in the heart rate

 8    along with his position and the other circumstances

 9    that you have as an awareness of what's going on

10    shows that he is deteriorating.

11            And, lastly, the fact that he has a

12    pulse oximetry upon arrival at 90 percent, you don't

13    get that way in 30 seconds.  You get that way over

14    time.

15        Q.      Now, you mentioned one of the reasons

16    that you doubt Ms. Graham saying that she felt very

17    threatened is because she was able to get an I.V.

18    into Mr. Goode's arm.  How hard is it to get an I.V.

19    into an agitated patient?

20        A.      Well, I speak from experience.  If a

21    patient is thrashing and rushing and fighting you,

22    inserting an I.V. is a rather technical thing.  I

23    mean, you've got a little vein and you've got this

24    needle that you have to thread into that little

117

1   vein, it requires, if you've ever given blood or had

2   a blood test done, you realize there has to be some

3   skill involved.  I mean, just think of yourselves,

4   if you've ever given blood or had a blood test, you

5   start thrashing around, the probability of that

6   phlebotomist hitting the target greatly diminishes.

7   So you hold still.

8             So even as a practitioner, me sticking

9   those needles in, I've had to have patients' arms

10  held in place so I can get the needle into the vein

11  and slide the catheter in and then secure it.  So it

12  takes a little bit to do.  It's not like a dart that

13  you just kind of pitch at and it goes in.

14            So if she was able to do that, it tells

15  me that he's within an area that she can operate,

16  that she's able to do that, then she should be able

17  to do other things.

18      Q.     I'm going to give you a hypothetical

19  here.  Hypothetically, assume that you have a

20  patient who has the same vital readings that Mr.

21  Goode had upon admission to the Baptist ER.  Assume

22  that that patient has a red face, has their mouth

23  open and looks as though they are trying to get a

24  breath and says the word, breathe.  Would those be

1 signs to you, as a paramedic, that this person is in

2 respiratory distress?

3      MR. DILLARD:  Object to the form of

4    the question.

5      MR. McINTOSH:  Join the objection.

6      MR. MACAW:  Join the objection.

7      MS. WADDELL:  Join.

8      MR. DILLARD:  You can answer.

9  A.  Well, let's take him out of the

10 emergency department, put him in his room with us.

11 If he exhibited all of those signs, he exhibited

12 those signs, he absolutely has respiratory distress.

13  Q.  Let me ask the question more broadly.

14 Can you tell us what are some common signs of

15 respiratory distress that you have to look for as a

16 medical care provider?

17  A.  Well, respiratory distress, you know,

18 when I -- counsel, I'll use you, if you don't mind.

19 If I was assessing counsel sitting next to me here,

20 I would look at his respiratory rate and quality,

21 how well is he breathing, what's his pulse oximetry,

22 what is his skin color, is he able to communicate

23 with me in sentences.  We go right back to the thing

24 of, you know, just because a patient says, breath, I

1    mean, that doesn't mean that he's adequately

2    breathing.  You know, there are dying patients I've

3    had that, you know, are saying, help, you know, that

4    they're not breathing well.  So you want to look at

5    a number of those things.  What is the skin color,

6    what is his respiratory rate and quality, what is

7    his mental status, is he alert, is he communicating,

8    is he dealing with me well one-on-one, is he

9    speaking in full sentences, what is his heart rate,

10   what is his pulse oximetry.

11            So those are the things that draw that

12   picture for me and give me an idea of someone's

13   respiratory status.

14       Q.    What sort of skin color changes are

15   common in people who are having respiratory issues?

16       A.    Well, what you'll see many times are

17   cyanotic patients, but, that caveat is held out that

18   patients who are agitated or have been in fights who

19   are aggressive, it would not surprise me to have a

20   red face because all of that profusion is going on

21   as well.  So it wouldn't surprise me if they had a

22   red face.

23       Q.    All right.  Mr. Krause, based on your

24   review of materials in this case, are you familiar

1    with the Mississippi standard of care for a

2    paramedic?

3        A.      Yes.

4        Q.      Did Ms. Graham violate that standard of

5    care?

6        A.      Yes.  In her own admission, she admitted

7    she did it.

8        Q.      Is that an opinion you hold to a

9    reasonable degree of medical certainty?

10       A.      Absolutely.

11       Q.      Did that violation of the standard of

12   care cause a deterioration in Mr. Goode's medical

13   condition?

14       A.      Yes.

15                      MR. DILLARD:  I'm going to object to

16               the form in that it calls for causation

17               from medical testimony.

18       Q.      Based on your review of the medical

19   records, did it cause a deterioration in Mr. Goode's

20   medical condition?

21                      MR. DILLARD:  Same objection.

22       A.      Yes.

23       Q.      Is that an opinion that you hold to a

24   reasonable degree of medical certainty?

```
 1      A.      Yes.
 2                  MR. McCORMACK:  I think that's all
 3          I've got for you.  Thank you, Mr. Krause.
 4                  THE WITNESS:  Yes, sir.
 5                  MR. McCORMACK:  I'll hand you back
 6          over to Brad who I think has a few more
 7          questions for you.
 8                      -  -  -
 9                  RE-EXAMINATION
10  BY MR. DILLARD:
11      Q.      Just a couple more, sir.  Looking
12  through the material that you brought with you
13  today, I did notice some handwritten notes here.
14      A.      Yes, sir.
15      Q.      What are these notes?
16      A.      Those are, I didn't have the physical
17  copy of the deposition, I was reading it
18  electronically, and these were notes which prodded
19  my thought process.
20      Q.      Could we take a look at those?
21      A.      Absolutely.
22      Q.      So these would be several pages of just
23  handwritten notes where you went through
24  individuals' depositions or through the file and
```

122

1    made notes of matters you deemed significant?

2        A.      Yes, sir.

3        Q.      Okay.  I'd like to attach a copy as an

4    exhibit, the next exhibit to your deposition.  We

5    can mark that, have a copy made when we conclude.

6        A.      Yes, sir.

7        Q.      Are there other materials here other

8    than things that we have made exhibits, such as this

9    current DOT National Standard curriculum?  Is this

10   something you intend to rely on?

11       A.      Well, I think it speaks to one of the

12   issues here in, and I don't know if this is 5 or 10,

13   this exhibit, but in this exhibit, there's a phrase

14   that says contrary to the methods recommended in the

15   U.S. DOT curriculum, EMTs and para -- should not be

16   transported.  In the early '90s when this curriculum

17   was being written, it's well over 20-some years now,

18   there was a reference in a DOT curriculum about

19   transporting a patient in a prone position.  That

20   was before a lot of the research had come out, and a

21   lot of the edifications came out.  And there was a

22   sense to add to, suggest that maybe that was

23   appropriate.

24               Well, it's clearly been debunked in the

 1   last 20-plus years, and this particular document

 2   specifically addresses those two questions.

 3        Q.      Okay.  I'm going to make some of these

 4   additional documents another exhibit.  So we'll

 5   include the DOT --

 6        A.      Sure.

 7        Q.      We have a letter, July 3, 2017 letter

 8   from Mr. Edwards' office that encloses various

 9   material.

10        A.      Yes, sir.

11        Q.      We'll make that part of that same

12   exhibit.  We have a document marked Roman numeral V,

13   Restraints at the top.  What is that?

14        A.      Well, I'm not being a wise guy, sir,

15   it's V because there's a series of protocols, this

16   is Lucas County protocol, and this Lucas County

17   protocol is what we operate under.

18              And so I wanted to draw, you know, as

19   I'm sitting in my office, if I'm going to be

20   critical of the State of Mississippi, what am I

21   doing, because I'd look like a jerk if Lucas County

22   said, yeah, put him on his face all the time.  Well,

23   it shows consistency, in my opinion, and says here

24   very clearly, in number 3, this is the Lucas County

124

1   protocol under which we function, and I have

2   functioned within the last several years.

3          Number 3, restrain the patient in a

4   lateral or supine position.  No devices such as

5   backboards, splints or other devices will be on top

6   of the patient.  The patient will never be

7   restrained in a prone position, the "never" is in

8   bold type.  So this just shows consistency.  Hey,

9   we're doing it here in Lucas County, Ohio, that's

10  exactly what Mississippi says they should do as

11  well.  It shows consistency.

12      Q.     To make sure we have the same document,

13  that's February 2014 at the bottom?

14      A.     Yes, sir.

15      Q.     We'll make that part of that next

16  exhibit.  What other material do you have in here

17  other than the documents we already made exhibits?

18  I noticed some standards, I believe, referred to.

19  Do you mind if I stand up and look with you?

20      A.     No, sir.  These are just the protocols

21  themselves, sir, that we were talking about.  This

22  is 605, this is pulse oximetry, this is 107, SVT,

23  this is 112, SVT with a pulse.  This is another copy

24  of 605.  Another copy of 612.

125

```
 1     Q.     All right.  If I can see those.  We're
 2  going to add those into this group, we're going to
 3  make a cumulative exhibit.  Then there's a document
 4  that looks like an article maybe, Firehouse?
 5     A.     These are a series of articles, there's
 6  a few of them in here.  Transporting violent
 7  patients.  This one was written in 1996.  It talks
 8  about not putting a guy or a patient in a prone
 9  position and all the reasons why you don't do it.
10            This is an article written by The
11  Commercial Appeal, it's by Jody Callahan, it's an
12  article written in the newspaper that says cardiac
13  problem cause of death, not hog-tie restraint, says
14  DA.  It's just a copy of that article.
15     Q.     This is specifically in regard to Mr.
16  Troy Goode?
17     A.     Yes, sir.
18     Q.     This article?
19     A.     Yes, sir.  In fact, the second byline,
20  Troy Goode was behaving erratically, so on and so
21  forth.  That's out of the newspaper.
22            This one is written by a guy out of EMS
23  World, it's How to Deal with Combative Patients.  It
24  was from February 3, 2012.  He basically talks about
```

126

do not restrain the patient in a prone position, do
not hog-tie a patient, it goes on to talk about why
you don't do that.

       This is another article, family of a man
who died while restrained on stretcher gets
$875,000. The family of a 27-year-old who died from
positional asphyxia when secured in a prone position
received a settlement from a lawsuit. Five EMTs
involved in the incident were suspended. This is
out of Millville, New Jersey, it's out of 2015, a
similar case such as this.

       The last article is also out of a
journal, it's called Excited Delirium, and it's a
medical emergency, not a willful resistance. In
other words, the application here, and this is out
of 2015 as well, it's not that Mr. Goode was being a
jerk and trying to fight the police, his testimony
indicated he had no idea who was there. He's
suffering a medical emergency, and it should have
been managed that way and it wasn't. That's the
series of those.

   Q.    Are these all articles that you would
have found just doing the Internet searches?

   A.    Yes, sir.

1    Q.      We'll make those part of the next

2  exhibit.  And is there anything else we have not

3  already attached as exhibits?

4    A.      No, sir.  Unless you didn't include the

5  ACLS manual, but I think you did.

6              MR. McCORMACK:  I believe that's one

7          of the earlier marked exhibits.

8    A.      I tried to send a lot of those over so

9  you had them ahead of time.  Yeah, there you go.

10   Q.      That's Exhibit 6?

11   A.      Yes, sir.

12   Q.      Okay.  I think we've covered then

13 everything that you've reviewed and otherwise relied

14 upon in reaching your opinions?

15   A.      Yes, sir.

16   Q.      And we've looked then at the content of

17 your file in regard to this matter?

18   A.      Yes, sir.

19              MR. DILLARD:  All right.  Thank you,

20          sir.  Any other attorneys have any further

21          questions?

22              MR. McINTOSH:  No further questions

23          here.

24              MS. WADDELL:  None here.

```
 1                     MR. MACAW:  None here.

 2                          -  -  -

 3                     RE-EXAMINATION

 4   BY MR. McCORMACK:

 5       Q.        I want to follow up on what you just

 6   went through.  Mr. Krause, you mentioned that you

 7   believe excited delirium is a medical emergency, you

 8   were referencing the article there.  Is there a way

 9   that if you believe in excited delirium, is there a

10   way to treat a patient who has it?

11       A.        Well, absolutely.  In fact, you have a

12   protocol that addresses that.  Mississippi

13   protocols, if I may, sir, may I have that pile back?

14   Thank you.  Your own protocols say that it's an

15   issue and it's 612.  It says, hey, if you have this

16   condition or you believe this to be the condition,

17   give the patient oxygen, make sure their airway is

18   open, supportive care is you talking to the patient,

19   trying to calm the patient down, those are the,

20   position, get them in the right position, pulse

21   oximetry, then it goes on to the paramedic care

22   which would be get an I.V. in him, check their blood

23   glucose level, you can titrate more glucose if

24   that's the issue.  12-lead if it's appropriate, and
```

129

```
 1   then volume.  So even Mississippi protocols address,
 2   if you believe that's the problem, how to manage it.
 3       Q.      So assuming that we believe that excited
 4   delirium is a real condition and assuming Ms. Graham
 5   thought that, did she appropriately treat Mr. Goode
 6   for that condition?
 7       A.      No, sir.
 8       Q.      If a person, if you believe that that is
 9   a condition, you believe that a patient has it,
10   should that patient be hog-tied?
11       A.      Absolutely not.
12       Q.      Why not?
13       A.      Well, it all goes back to the very same
14   thing.  You get a patient in that restrained
15   position, you get them in the prone position,
16   they're going to stop breathing at some point.
17              You have to get them off their stomach.
18   You have to get them on their side.  I think even
19   one of the articles specifically addresses that.
20   And let me go to it.  It's an article on excited
21   delirium and it says, hey, that there's still
22   controversy, is it agitation, what is it, but what
23   does it look like.  Then here's what it says.  You
24   know, make sure that you don't get this guy on his
```

1  back, you know, chemical sedation is needed as

2  quickly as possible to reduce the risk of impending

3  death.  So if you were to believe that, I mean, it's

4  very clear, it's also included in their protocols.

5          But it says chemical sedation is needed

6  as quickly as possible to reduce the risk of

7  impending death.  Available medical personnel need

8  to be called to the scene, it's us that were already

9  there, this is what happens.  Well, then, here.

10  Here's what it also says.  This isn't that far out

11  of the realm.  Unfortunately up to 250 people die as

12  a result of excited delirium each year in the United

13  States, an estimated 8 to 14 percent of those with

14  the condition.  That's a significant number.

15          So there's ways to manage it, and your

16  own protocols tell you how to do it, yours being

17  Mississippi.

18      Q.      Is hog-tying part of the protocol for

19  how to treat it?

20      A.      Absolutely not.

21      Q.      That would actually hurt rather than

22  help?

23      A.      Oh, yeah.  It's counterproductive.

24                  MR. McCORMACK:  Thank you, Mr.

```
 1              Krause.  Nothing further from me.

 2                   THE WITNESS:  Yes, sir.

 3                   MR. DILLARD:  Do you want the

 4              witness to read and sign?

 5                   THE WITNESS:  Read and sign.

 6                   MR. DILLARD:  Very good.

 7              Do you guys want to talk to the

 8              court reporter about ordering a copy or

 9              what you might like to order?

10                   MS. WADDELL:  Yes.  This is Amanda

11              Waddell, I need a full and condensed copy,

12              please.

13                   MR. McINTOSH:  This is John Martin

14              McIntosh, I want a full, condensed and

15              electronic copy, please.

16                   MR. MACAW:  This is Matt Macaw, I'll

17              take the same as John Mark.

18                   MR. GASS:  Ric Gass does not need a

19              copy.  Thanks.

20                   COURT REPORTER:  Would you like a

21              full and a condensed also?

22                   MR. DILLARD:  Full and condensed.

23                   COURT REPORTER:  And an E-trans?

24                   MR. DILLARD:  Yes.
```

1           COURT REPORTER:  Do you also need

2      anything at this time?

3           MR. McCORMACK:  We'll do the

4      condensed and E-trans.

5           (Court Reporter marked Exhibit

6      Numbers 11 and 12.)

7           (Deposition concluded and witness

8      excused at 12:10 p.m.)

9           (Signature reserved.)

10                - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                        SIGNATURE PAGE

2          Date of Deposition:  October 11, 2017

3          Correction page(s) enclosed?  Yes____  No___

4          How many correction pages?____

5

6

7              _____

8                  ROBERT C. KRAUSE, EMT    DATE

9

10

11                         -  -  -

12

13

14

15

16

17

18

19

20      Please return this signed signature page along
        with errata page(s) to:

21            COLLINS REPORTING SERVICE, INC.
                   615 Adams Street
22                 Toledo, Ohio 43604
                    (419) 255-1010

23
      Worksheet No.: M172466

24

```
 1                  C E R T I F I C A T E

 2

 3          I, MAUREEN POWERS, a Notary Public in and

 4   for the State of Ohio, duly commissioned and

 5   qualified, do hereby certify that the within-named

 6   witness was by me first duly sworn to tell the

 7   truth, the whole truth and nothing but the truth in

 8   the cause aforesaid; that the testimony then given

 9   was by me reduced to stenotype in the presence of

10   said witness and afterwards transcribed; that the

11   foregoing is a true and correct transcription of the

12   testimony so given as aforesaid.

13        I do further certify that this deposition

14   was taken at the time and place in the foregoing

15   caption specified.

16        I do further certify that I am not a

17   relative, employee of or attorney for any of the

18   parties in this action; that I am not a relative or

19   employee of an attorney of any of the parties in

20   this action; that I am not financially interested in

21   this action, nor am I or the court reporting firm

22   with which I am affiliated under a contract as

23   defined in the applicable civil rule.

24
```

135

1        IN WITNESS WHEREOF, I have hereunto set my

2   hand and affixed my seal of office at Toledo, Ohio

3   on this 19th day of October, 2017.

4

5   _____

                    MAUREEN POWERS

6                    Notary Public
             in and for the State of Ohio

7

    My Commission expires July 23, 2019.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**A**

abandoned 60:2
ability 50:6 58:20 61:2 115:9,11
able 24:5,13 47:12 58:7 63:20 68:1
  75:4 80:12 81:2 89:17 97:1 100:22
  101:18 105:1 108:8,15 116:17
  117:14,16,16 118:22
absolute 74:12 77:5,7 78:19
absolutely 10:23 24:9 26:8 27:8
  31:13 36:8 39:7 65:16,17 66:12
  67:7 79:21 93:2 101:15 104:14
  105:5 108:3 109:18 111:5 113:3
  118:12 120:10 121:21 128:11
  129:11 130:20
absolutes 74:22 75:1
academic 8:21,23 9:1
Academic-wise 9:16
accelerated 52:13 53:14 58:5 103:6
  104:13
acceptable 65:19
acceptance 36:15
accepted 37:20 71:2
accident 11:24 12:4,13
accidents 11:15
account 56:12
accuracy 47:19
accurate 38:19 70:23 84:22 99:21
acidosis 72:7
acidotic 61:8 104:2
acknowledge 39:3
ACLS 102:4,6,17 127:5
act 18:13 57:11 62:1 78:22
acting 55:10 78:21 79:19 101:20
action 134:18,20,21
active 10:9,11 20:21
actively 10:8
activities 61:6 68:20
activity 58:12
actual 31:5 36:3 88:16 112:7
acutely 103:13
Adams 2:3 133:21
add 122:22 125:2
addition 71:10
additional 40:8,16,20 42:13 123:4
address 40:4 129:1
addressed 69:7
addresses 102:13 123:2 128:12
  129:19
adequacy 61:3
adequate 61:2 68:18 80:9 115:10
adequately 72:21 119:1
adhere 22:20
administer 68:5 85:15
administered 83:21 86:10 111:8
administering 92:12
administrative 11:11
admission 53:3 117:21 120:6
admits 63:3 64:2
admitted 91:18 120:6
advanced 6:19 12:10 102:11
advantage 44:18
advertise 16:20,24
affect 58:19
affiliated 16:6,13,21 134:22
affixed 135:2
aforesaid 134:8,12
agency 25:14
aggressive 63:15 68:7 69:10,13,17,22
  70:6 71:6 83:3 84:16,20 86:8
  111:13 119:19

agitated 67:22 82:19 84:12,15 85:2,6
  85:8 86:8 100:23 101:1,13 102:1
  104:18 105:6,12,14 106:3,9 108:7
  109:1 111:9 114:11 115:17 116:19
  119:18
agitation 72:15 88:6,7,19,22 108:13
  114:13 129:22
ago 7:18 37:8 60:6 84:18 111:15
agree 8:3 22:23 37:19 39:12 56:20
  69:12,22 70:20 85:13 87:5,7,20
  88:2 91:4
agreement 8:12 15:15
ahead 7:5 127:9
airway 80:3,17 90:11 128:17
airways 80:23
alert 119:7
allow 109:22,22
allowed 21:5 23:20 72:4 84:1
allowing 58:14
allows 49:8 54:20 76:18
altered 79:8 103:13 104:18 112:10,14
  112:18 113:2
Amanda 3:21 98:14 131:10
ambiguity 66:16
ambulance 10:22 11:1,4 12:1,20,24
  13:4,8 27:24 30:18,21 31:2,5,12,20
  31:24 32:13 33:3,8,13,14,16 34:1,4
  34:10 39:4 43:13,22 44:19 48:23
  50:22 52:17,24 53:8 54:1 55:2,23
  59:16 64:1,12 70:10,12 80:4 84:8
  91:5 100:7,16 105:4 107:24 109:9
  110:22 112:2 115:19
ambulances 93:21
American 6:18 21:21 73:16 102:10
amount 68:17
and/or 80:12
annual 18:17
answer 8:14 77:12 80:10 88:13 118:8
anymore 16:24
Anytime 109:9
apologize 74:17
apparently 59:14
Appeal 125:11
APPEARANCES 3:1 4:1
appears 57:10
applicable 14:24 76:3,11 89:24
  134:23
application 126:15
applied 72:10 100:24 102:2
applies 58:23 84:24 89:22
apply 67:4,4 95:18
appreciated 97:9
approach 38:14 68:20 100:7
appropriate 24:23 57:4 75:11 108:4
  122:23 128:24
appropriately 24:17 57:11,11 66:24
  129:5
approximately 45:23 87:6
area 9:1 10:14,17 14:23 117:15
areas 18:14
argue 38:2
arm 116:18
arms 71:20 117:9
arrangement 15:11
arrest 86:17,18 92:1 115:17
arrested 107:1
arrival 33:17 35:6 43:6 51:4 59:8
  116:12
arrive 12:4 30:20
arrived 34:14 40:4 47:24 68:19 86:1
  86:23 92:22 110:9 114:18

arrives 31:11 87:1
arriving 29:24 30:2,24
arrythmia 60:16
article 6:19 7:2 48:21 75:22 125:4,10
  125:12,14,18 126:4,12 128:8
  129:20
articles 41:24 73:12,13,16,20 125:5
  126:22 129:19
articulated 87:17
asked 16:16 17:23 18:3,15 26:20
  42:13 51:15 55:21 87:4 99:14
  110:24 113:19
asking 19:6 20:5
aspect 98:1
aspects 75:3
asphyxia 71:10 73:4 126:7
assess 24:5 35:13 90:12 112:21
assessing 118:19
assessment 24:21,21 38:7 51:11,11
  77:21 78:2,17 80:1 89:15
assist 100:16 109:2
assistance 68:19 106:14 109:12
associated 71:9
Associate's 9:2
Association 6:18 13:17 21:22 73:17
  102:10
assume 112:14,17 117:19,21
assuming 106:12 129:3,4
assumption 89:11
assure 68:18
attach 122:3
attached 89:6 127:3
attempt 43:10 46:19
attempted 46:23
attend 91:1 97:21
attendance 95:20
attended 98:21
attention 13:3 48:4 60:24 110:5
attorney 15:15,20 17:22 134:17,19
attorneys 7:19 14:22 15:1,10 76:22
  96:4,17 127:20
audio 52:10
author 89:6
auto 11:24
available 16:5 25:13 35:21 63:15
  68:10 83:17 130:7
Avenue 3:4 4:10
average 19:1,7
aware 16:23 20:15 26:9 27:10 45:16
  47:4 53:1 54:5,7 56:3 59:1,10
  65:18 76:18 80:5 85:20 88:9
awareness 116:9
a.m 2:1
a/k/a 1:12

**B**

B 22:13 108:9,9
Bachelor's 9:3
back 6:5 11:3 12:20,24 13:8 21:7
  24:12 31:12,20 33:3,8,12,14,15,16
  34:1,4 35:5,14 43:8,12,21 44:18
  48:22 50:9 51:21 52:20 53:4,12
  55:22 59:16 60:5 64:1 68:13 70:10
  71:18,21 74:7,16 77:4 79:11 82:9
  83:13 84:7 88:4 92:15 95:24 100:3
  100:9,10 101:22 112:2 115:6
  118:23 121:5 128:13 129:13 130:1
backboards 66:24 71:24 124:5
background 8:19,21 9:21,22 45:8
  46:10 61:13

backs 110:4
backtrack 91:20 92:4
backyard 59:6
bad 45:7,13
Baggett 1:10 3:10 99:21
BALLIN 3:3,3
Baptist 1:16 4:2 28:23 31:6 34:12
  36:24 37:12 52:7 53:3,9 59:11,18
  70:14 92:22 96:24 117:21
bars 46:21,24 47:1
base 22:7 47:10 62:16
based 24:21 38:6 60:5,6 75:2 77:9
  86:12 90:8 119:23 120:18
baseline 57:18
basic 17:24 23:3
basically 19:12 45:16 50:3,14 125:24
basics 14:14
basing 47:15
basis 11:13 16:10 18:16 19:7 26:13
  95:8
bath 111:12,12,17
battalion 10:6,11,12,12,18,20 11:8,14
  18:19
battalions 10:14
bay 36:20
beats 52:23 53:15 54:4 103:14
becoming 21:8 61:7 81:10
bed 35:21
bedside 93:24
began 35:13
behalf 1:6 3:2,9,16 4:2,7
behaving 125:20
behavior 47:21,23 48:4 63:16 69:17
  70:6
behaviors 69:11,14,23
belief 89:12 90:9
believe 6:24 15:10,24 35:7 48:7 56:12
  56:15 77:20 81:21 82:8 84:22 87:9
  89:23 90:3,4 93:9 107:15 124:18
  127:6 128:7,9,16 129:2,3,8,9 130:3
believed 39:24
BELL 3:20
Bellevue 9:5
belly 38:2
belongs 36:13
belt 79:9
bend 58:14
benefit 8:18 76:22
best 8:14 35:10 38:23 50:2
bet 114:15
better 82:22 83:20 84:2
beyond 66:5
BHS 34:22
big 44:1,17 83:1
biggest 111:10 116:1
bill 15:20 96:7,7
billing 15:19
bit 13:15 14:14 22:13 49:14 50:3,12
  58:14 71:13 82:1 83:10 86:24
  91:20 92:4 109:13 110:6 117:12
blame 93:10
blanket 20:12,15
blending 23:21
blew 65:6
blood 51:18 57:14 58:8 59:9 78:5,7
  78:19,22,24 79:5,11 90:13 103:7
  112:12 113:8 117:1,2,4,4 128:22
BLS 12:9
Blvd 3:7
board 113:14
boards 66:22

**Bob** 14:20 16:8,10
**bodies** 21:21
**body** 19:17,19
**bold** 66:19,21 124:8
**Bond** 1:10 3:10
**Boston** 22:3
**bottom** 94:8 124:13
**bound** 49:3 50:5
**Bowling** 9:8
**Box** 3:13
**boy** 13:1 45:24
**Brad** 7:17 121:6
**Bradley** 3:13
**brain** 104:4
**break** 86:8 94:14
**breath** 117:24 118:24
**breathe** 73:8 117:24
**breathing** 72:23 80:7,9 118:21 119:2
119:4 129:16
**brief** 32:21 94:19
**briefly** 42:21 105:18
**bring** 8:24 35:20 58:3 68:6 76:5 79:2
92:15,16 93:23 103:24
**brings** 38:5 89:15
**broad** 9:20
**broadly** 118:13
**Broadway** 3:18
**broken** 103:4
**brought** 59:20 78:10 81:14 83:2
110:1 121:12
**Bruce** 1:14 3:11
**Bureau** 19:22,23
**business** 114:24 115:1
**busy** 35:19 48:14
**buttocks** 82:24
**buy** 56:18 72:11
**byline** 125:19

**C**

**C** 1:22 5:3 7:9,16 133:8 134:1,1
**California** 22:5,8
**call** 14:23 29:15,16 61:18 64:9 88:21
88:22
**Callahan** 125:11
**called** 10:13 16:15 26:9 46:13 73:4
88:10 99:17,19 126:13 130:8
**calls** 114:4 120:16
**calm** 85:21 90:14 92:6 128:19
**Canada** 10:3
**capital** 66:19,21
**captain** 18:10
**caption** 134:15
**car** 11:15 12:13
**card** 103:22
**cardiac** 51:14 54:13,18 60:16,19
86:16,18 92:1 102:11 125:12
**cardiology** 102:13
**Cardiovascular** 6:19
**cardioversion** 103:23
**cardioverted** 103:19
**care** 6:15,21,23 7:3 21:19,20 22:14,16
22:18,24 24:23 34:8,18 35:4,17,17
36:3,12,24 37:5,15,21 39:4,10 42:3
60:9,9 61:23 62:5,7,12,13 71:4
72:18,19 74:2,6 75:12 76:15,24
83:16 86:1,2,14 90:11 97:11,15
102:7,15 104:15 105:24 110:14
111:21,22 114:24 115:11,19
118:16 120:1,5,12 128:18,21
**cared** 113:20,24

**career** 113:21
**case** 6:12 8:6 11:2 15:9 18:2 21:8,15
26:16,18,23 27:1,9,10,16,22 28:16
36:23 40:24 41:8 42:14 45:12 46:3
46:10 49:6,13 58:24 60:7 69:12
73:14 76:2 79:16 85:10 94:11 95:5
97:10 98:4 103:20 107:7 114:19
119:24 126:11
**caseload** 19:6
**cases** 26:16 27:13,20 28:3 32:6 43:20
85:7,18 106:23
**catheter** 117:11
**causation** 120:16
**cause** 79:18,20 113:6 120:12,19
125:13 134:8
**caused** 112:11
**causes** 61:8
**causing** 112:15,18 113:2
**caveat** 119:17
**cavity** 73:7 112:7
**center** 10:15 35:22
**certain** 14:23
**certainly** 19:5,10 21:22 27:13 36:4
41:18 42:24 48:6,9,12 51:8 76:10
81:9 82:10 101:3 113:3 114:6,8,13
**certainty** 111:4 120:9,24
**certificate** 17:16
**certificates** 13:22
**certification** 19:11
**certifications** 20:21
**certified** 9:10 57:7
**certify** 134:5,13,16
**chain** 49:7,12,24
**chains** 56:3 100:21
**challenge** 26:10 27:6,11
**challenged** 26:12
**change** 39:22 105:17
**changed** 14:14
**changes** 25:18 88:18 119:14
**charged** 95:12
**Charlton** 1:4
**chart** 104:16
**check** 54:12 78:19 79:5,17 128:22
**checked** 52:17 53:2
**chemical** 63:14 64:4 66:4 67:16,21
68:9 72:13 82:11,13,17 83:16
84:10 85:2,15 91:18 92:12,13
111:8,20,22 112:1 130:1,5
**chest** 23:18 38:9 58:10,14 91:17
100:10 112:7 115:7,8,16
**chief** 10:6
**child** 99:11
**chirping** 114:22
**choice** 85:11
**choices** 63:10
**chooses** 65:20
**chose** 63:18 68:7 81:18 83:4 85:3
92:10
**Chovel** 26:21
**chronology** 33:17
**cigar** 59:5
**cigarettes** 59:18
**Cincinnati** 9:3
**circle** 91:12
**Circuit** 26:22
**circulate** 58:8
**circumstances** 23:1,13 101:21 116:8
**cite** 73:22,23 107:4
**cited** 73:12
**city** 1:9 3:9 7:19,20 10:6,15,15,18
26:21 110:1 114:3

**civil** 134:23
**Clare** 13:16
**classrooms** 17:22
**clear** 6:6 8:2 23:6,7 31:17 37:1 63:16
63:20 67:1 77:13 82:12,20 84:3
91:4 98:18 103:24 130:4
**clearinghouse** 14:21
**clearly** 47:13 54:19 76:20 85:10 88:5
100:4 112:20 122:24 123:24
**clicking** 104:13
**climbing** 91:7 92:19
**clips** 106:5
**close** 23:2 49:3 66:12 68:2,5 83:9
**closer** 13:1 49:15 70:9
**cocaine** 101:17
**code** 35:7
**Collins** 2:2 133:21
**color** 118:22 119:5,14
**combative** 69:11,13,22 70:6 125:23
**come** 16:13 65:4 93:14 95:24 122:20
**comes** 91:12
**comfort** 65:9
**comical** 111:14
**coming** 43:2
**Commerce** 4:5
**Commercial** 125:11
**Commission** 135:7
**commissioned** 134:4
**common** 114:9,10 118:14 119:15
**commonly** 54:19
**communicate** 118:22
**communicating** 104:18 119:7
**communications** 41:3
**companies** 16:22
**company** 14:9 16:14 17:2,7,14
**comparatives** 53:11
**compare** 53:7
**compensated** 15:8
**compensation** 95:17
**complaint** 39:13
**complete** 16:3 77:21 78:16 79:24
**completed** 78:17
**completing** 9:7
**complications** 67:18 82:16 84:4
**comply** 102:17
**compressed** 67:2
**compresses** 115:10
**concerning** 62:21 97:15
**concert** 45:5
**conclude** 122:5
**concluded** 132:7
**condensed** 131:11,14,21,22 132:4
**condition** 73:4 88:3,10,16 89:18
92:24 106:21 111:19 113:4 115:20
120:13,20 128:16,16 129:4,6,9
130:14
**conditions** 39:22 80:13 89:5 91:1
**conduct** 77:21
**conducting** 79:24
**conference** 13:14
**confines** 70:11
**connection** 41:12 90:23
**conscious** 62:2,4,12 63:10 65:20
**consciously** 62:6 83:4,6 92:10
**consciousness** 88:19
**consider** 49:8
**considered** 70:5
**consistency** 123:23 124:8,11
**consistent** 18:22 53:10,20
**Consultants** 17:8
**Consulting** 18:5

**contact** 31:19 36:9 46:22 68:3 83:9
83:12
**contain** 12:7
**contained** 111:5
**content** 26:14 52:9 127:16
**context** 29:5
**continue** 55:5 72:5 81:16 111:22
**Continued** 4:1
**continues** 67:18 81:6 82:16 84:5
**continuing** 53:15 54:24 116:4
**contract** 15:14 134:22
**contradicts** 56:16
**contrary** 122:14
**contributing** 84:8
**control** 14:16 63:18 71:16 111:18
**controlled** 13:10 57:2
**controversy** 129:22
**conversation** 45:19,20,23 46:6
**conversations** 41:2
**conversing** 80:21
**COPD** 23:20 106:22
**copies** 25:5
**copy** 6:24 25:2,9,10 28:8 121:17
122:3,5 124:23,24 125:14 131:8,11
131:15,19
**corner** 29:10
**corporation** 1:17,18 17:9
**correct** 8:8 13:24 16:2 28:15,24 29:12
39:19 40:1 43:23 44:12 47:2 48:16
49:4 53:10 65:13,24 68:23 80:1
83:18 85:8 90:6 91:5 94:6 95:9
97:12 98:3,7,19,22,23 99:1 134:11
**corrected** 60:16
**correction** 133:3,4
**cost** 16:18,19
**cot** 30:17 100:2,14,15,16 107:24
110:22
**counsel** 7:24 27:5 41:3,23 45:10
107:20,23 118:18,19
**counterproductive** 130:23
**country** 21:23
**county** 12:7 20:14 21:12 22:9,12,13
26:22 123:16,16,21,24 124:9
**couple** 16:9 54:11 103:21 115:24
116:7 121:11
**course** 38:23,24 54:1 55:1,11 64:12
80:4 87:12 91:5 94:20
**court** 1:1 6:1 8:15 26:6 27:6,17 131:8
131:20,23 132:1,5 134:21
**cover** 32:10 107:21
**covered** 87:21 90:5 94:6,10 127:12
**creating** 73:8 92:3
**crew** 38:5
**crews** 10:19 38:13
**criteria** 67:20
**critical** 31:7 92:24 93:2,5 108:14
111:19 123:20
**criticism** 28:19,22 29:2 30:21 31:10
31:24 32:10,14,18,20 57:5 66:9
78:16 82:6 90:5,8
**criticisms** 31:9 62:20 64:3 66:8 81:11
87:15
**cross** 36:10
**crowd** 59:22
**cumulative** 107:8 125:3
**current** 10:6 11:19 13:18 22:18 122:9
**currently** 9:7
**curriculum** 21:24 22:2 122:9,15,16
122:18
**custody** 42:21 43:4,14,22 44:5 69:21
115:12

custom 100:21
cut 14:11 49:24 97:5
CV 7:2 9:13 14:7
cyanotic 119:17
cycle 61:9

**D**

D 5:1
DA 125:14
Dade 26:22
daily 11:13 114:12
danger 48:8,13,15 56:18
dangerous 67:22,24 82:19 84:12,15 84:19 85:1,6,8
dangers 73:18
dart 117:12
database 14:24 15:3
date 2:1 95:11 133:2,8
dated 7:24
Daubert 26:10,19 27:11,14
day 96:5,6 114:5 135:3
dead 87:2
deal 11:12 43:15 125:23
dealing 44:15 108:24 119:8
deals 88:23
dealt 41:13
death 67:18 82:16 84:4,9 91:3 93:11 96:3 103:22 125:13 130:3,7
debate 55:16
debunked 122:24
Deceased 1:4
decide 83:6
decided 62:7
decision 62:2,12 65:20,23 85:14
decisions 24:15
decreased 53:10
deemed 122:1
deeply 58:11
defendant 3:16 4:2,7 96:24
defendants 1:20 3:9 7:20 40:24
Defense 27:5
deficient 58:9
define 50:12
defined 134:23
definitely 48:4
definitive 37:1 111:24
definitively 80:16
degree 9:1,2,3,5 97:23 111:3 120:9,24
degrees 8:22,23 32:4 63:13 91:16 110:17
delay 74:17
delirium 88:1,2,7,10,11,22 126:13 128:7,9 129:4,21 130:12
deliver 83:1
delivered 89:23 109:20
delivery 64:17
deltoid 83:1
demeanor 83:3
DENISE 1:3
depart 29:22 32:24 33:20 34:2
departed 30:10 34:13
department 19:22 22:1 28:20,24 36:11,15 37:2,3,20 38:17,21 39:8 57:15 59:8 60:2 69:16,19 74:20 86:11,14 87:2 92:4 93:7,17,24 97:17 98:5 118:10
departments 38:4 109:20
department/EMS 69:4,9
depending 12:6 33:23 35:19 36:19 61:5

depends 11:2 19:5 88:17
depiction 107:23
deposition 1:22 6:8 7:6 8:7 19:3 37:11,14 40:14 42:3,14 46:16 60:8 63:19 65:13,23 68:9 70:7 87:12 95:14 107:18 121:17 122:4 132:7 133:2 134:13
depositions 25:24 40:20 45:9,14 70:5 70:15 121:24
deprive 62:7
description 6:10 84:19
designations 40:24
Desoto 4:3 97:1
despite 93:9
destination 34:3,3,14
deteriorating 115:20,21 116:10
deterioration 120:12,19
determinant 60:20,21
determination 24:7,22 38:11 54:4
determine 23:20 34:17 38:22 53:9 54:9 80:20
determined 112:8
develop 22:7 23:19 73:5 104:6
developing 24:8 81:16
development 22:22 41:22
deviate 23:11
deviated 75:2 77:8
deviations 38:6
device 54:10
devices 66:22,23 124:4,5
diabetic 113:4
diagnosis 23:19 24:10,11 54:21 88:9 103:2 104:10
diagram 99:13,14
diagrams 107:16
dictating 12:15
die 91:4,6 130:11
died 126:5,6
Diego 22:4
difference 49:22 58:1 70:21
differences 22:9
different 14:6 21:13 24:3 54:11 56:21 56:23 60:23 90:19 95:20,22 100:4 112:5 114:14 115:24
differential 23:19 54:21 103:2 104:10
difficult 106:4
difficulty 61:1 80:7
Dillard 3:13 5:3,5 6:4 7:14,17 94:13 96:16 108:20 118:3,8 120:15,21 121:10 127:19 131:3,6,22,24
diming 96:3
diminishes 117:6
ding 56:10
dire 81:1
direct 15:15
directing 60:13
directives 74:21
directly 41:8
discern 101:18
discharged 47:11,16,17
discipline 11:12 19:16
discount 78:11
discounted 78:9 84:18,21
discretion 23:11,14,23 75:2 77:9 85:14,17
discretionary 84:13
discussed 46:2 94:21,24 95:4,8
discussion 45:12 57:12 111:7
disease 58:22
dismissed 27:6
disorientation 88:19

dispatch 42:4
dispatched 29:19
disqualified 26:7
distinction 49:11 50:7
distress 118:2,12,15,17
district 1:1,1 114:3
diverge 38:15
division 1:2 12:3 75:6,10
docs 86:9
Doctorate 9:7
document 14:2,6,9 15:23 16:1 23:6 23:22 25:17,22 26:9 102:11,14 123:1,12 124:12 125:3
documentation 86:13
documented 73:10 78:6,7
documents 13:11 34:22 40:11 76:23 104:15 123:4 124:17
doing 17:20,21,23 30:16 54:20 64:2 123:21 124:9 126:23
dominoes 92:16,18
Donja 1:18 3:16
door 61:20
dosage 86:5
DOT 122:9,15,18 123:5
doubt 116:16
downhill 93:17
Dr 29:2 98:16
draw 119:11 123:18
drawing 59:21 90:23
drawn-up 49:19
drops 45:6
drug 11:16 27:23 42:24 45:17 77:18 77:24 81:12 101:19 105:13 113:5
drugs 40:1 101:17
dual 74:14
due 26:13 89:9,21
duly 7:10 134:4,6
duress 36:6
duties 11:11,21 75:13,15 77:14
duty 62:1
dying 119:2
dysrhythmia 72:7
D50 79:2 113:8

**E**

E 5:1 134:1,1
earlier 37:15 44:20 83:10 86:22 91:2 93:14 110:16 112:10 127:7
early 14:11 16:15 46:4 93:15,19 108:13 113:19 122:16
east 10:15
EASTLAND 3:6
easy 108:11
edifications 122:21
Edition 6:17,22 7:4 71:4
edits 16:4
educates 102:15
education 13:22 57:6
educational 8:19,21 9:21,22 21:20
Edwards 41:9,14,15 45:21,23 123:8
effect 59:4 107:8
effort 67:6,8
either 8:7,15 26:13 28:4 108:18
EKG 89:15
elbow 56:10
electric 47:2
electronic 131:15
electronically 121:18
elements 79:15
elevated 52:5

Elisa 26:20
emergencies 11:16
emergency 1:17 4:7 6:15 11:10 17:7 18:5 22:1 36:11,15 37:2,3 38:4 57:15 60:2 61:16 72:18,19 73:9 74:6 75:6,11,19 76:8 86:11,14 87:1 92:3 93:6,17,20,23 97:16,19 98:5,5 98:6 109:19 118:10 126:14,19 128:7
employee 134:17,19
employees 18:6
EMS 9:23 19:22,23 38:5,12 39:18 42:3 72:9 74:20 75:9 79:13 99:23 100:5,8 102:7,8 107:17 108:11 109:14 113:24 125:22
EMT 1:22 5:3 6:21,22 7:9,21 9:23 10:8 20:16 22:24 24:4 28:17 29:5 29:11,15 35:1,17 36:2 38:16 39:4 60:9 66:17 75:2 85:14 86:1 133:8
EMTs 11:23 12:14,14 19:20,24 21:10 21:18 24:19 39:23 43:23 67:10 68:16,17,21 74:13 75:12 77:8 86:15 122:15 126:8
EMT's 37:21
EMT-related 19:12
EMT/paramedics 71:7
en 29:20
enclosed 133:3
encloses 123:8
ended 93:16
ends 37:23
enforcement 18:9,11 47:18
engine 12:5
engineering 9:4
entering 57:14
entire 9:11 112:18
enumerated 29:17 33:24 87:3
environment 33:11 57:2
environments 57:1
equipment 63:24 93:22 110:18
ER 28:23 29:3 35:2,4,17,19 36:3 37:20 38:17,21 39:3,8 53:3 59:8,11 59:18,21 60:9 70:14 83:16 85:22 86:1 87:5 92:23 93:10 117:21
errata 133:20
erratic 47:22
erratically 125:20
Especially 66:13
essentially 22:23 79:18
Essentials 7:3 71:3 74:2
established 22:16,17 23:4
estimate 113:22,23
estimated 130:13
evaluate 23:18
evaluated 59:21
evaluation 62:5
event 60:19 93:12,13
events 91:10 93:3 96:9
everybody 65:10 108:11
evolution 46:22
exact 34:24 86:5 113:22
exactly 47:22 51:3 60:8 62:9 74:24 100:1 124:10
examination 5:2,3,4,4,5 7:13 94:20 96:21 98:12 99:7
example 12:4 22:8 24:2 78:21 80:15 80:18 103:10 105:12
excerpt 65:12
excerpts 6:17,20
excess 81:7
excessive 30:12 58:12 72:14

exchange 36:14 112:7
excited 88:1,2,7,7,10,10,22 126:13
128:7,9 129:3,20 130:12
excuse 55:8 77:6
excused 132:8
execute 15:14
exertion 57:24
exhausted 72:23
exhibit 5:10,10,11,11,12,12,13,13,14
5:14,15,15 6:1,8,9,11,13,14,17,20
6:22,24 7:2 13:12 14:3 25:8,11,21
25:21 29:9 102:5 107:17 108:21
122:4,4,13,13 123:4,12 124:16
125:3 127:2,10 132:5
exhibited 69:13,22 108:13 118:11,11
exhibiting 88:21
exhibits 5:9 6:5 7:6 69:10 77:2 122:8
124:17 127:3,7
existing 38:23
exists 24:4
expand 58:15 73:7 91:17
expansion 100:11
expect 81:8
expectation 61:19
expectations 80:11
expected 40:4 75:12,15 77:13
experience 35:1,16 38:4,7 42:18,22
44:15 58:18 60:17 61:21 83:17
100:23 101:6 108:24 109:4,24
114:10 116:20
experienced 42:20
experiencing 38:19 48:1
expert 14:22 17:3,18,24 18:10,13,18
19:2 26:7 40:23 98:4
experts 14:22 15:2 16:16 40:21
expired 28:1
expires 135:7
Explain 41:6 102:22
explanation 65:22
extensive 42:18
extremely 78:22 111:13
eyes 24:5,13
e-mail 46:7
E-trans 131:23 132:4

## F

F 3:6 134:1
face 27:12 71:11 72:21 108:16 111:11
114:20 117:22 119:20,22 123:22
faced 27:11
facilitate 108:17
facilities 88:21
facility 36:1,6
facing 108:18,19
fact 36:9 37:22 39:13 46:18 47:5,10
47:11,15,16 49:20 50:19 55:17
70:16 78:23 81:4 89:9,13,21,22
93:21 104:14 108:9 115:7 116:11
125:19 128:11
facts 27:22 28:5
factual 27:21 45:8 46:1,10
fail 78:1 102:2 107:6
failed 77:20 90:3
failure 79:22 105:23 106:1
fair 96:3
fairly 44:11
fall 10:18
falling 92:17
familiar 8:10 15:11 70:11 119:24
family 126:4,6

far 18:16 130:10
fashion 43:7 57:4 66:6 67:5
fast 58:7 104:3
fatal 72:7
fear 67:24 83:7
February 124:13 125:24
federal 75:16 76:1,14,15
fee 95:14,20,22 96:1,10
feet 49:3,18 50:9 57:3
felt 44:7 116:16
femur 43:12
field 10:4 72:10 94:1
fight 55:5,6 72:17 126:17
fighting 61:7 63:18 79:9 91:19
104:19 116:21
fights 84:3 119:18
Figure 107:22
file 121:24 127:17
filled 12:10
filtering 79:14
financial 15:11
financially 134:20
find 47:13 64:19,20 76:13 92:1
105:15
finding 42:7
fine 65:16 74:18
finger 106:5
finish 8:13,14
fire 9:2,4,24 10:12,17 11:9 12:2,5
46:20 69:4,8,15,19 74:20
firefighters 12:5,8,11 13:17
firefighting 10:1
Firehouse 125:4
firemen 11:20 12:13,15
fires 11:15
firm 134:21
first 7:10 21:3 25:8 28:14 29:15 53:21
54:12 63:8,12 68:14 74:1 75:7
105:21 110:20 134:6
FISHMAN 3:3
fit 38:15
five 13:3 18:23 53:13,14,23 60:21
61:10 90:2 126:8
fix 64:11 113:14,15
fixes 113:9
flailing 106:6
flat 96:5,6,9
flexibility 49:21
flip 100:2
Florida 26:22
focus 11:13 51:7 53:5 59:15
focused 28:17
folks 70:5
follow 38:5,10 62:21 89:10 98:16
128:5
followed 77:6,7
follows 7:12
follow-up 46:7 111:21
foot 48:11
force 68:18
foregoing 134:11,14
foremost 110:20
form 17:14 39:15 77:11 88:12 118:3
120:16
format 14:14
Formed 17:11
forth 40:16 88:5 125:21
forthcoming 109:11
found 41:20 42:1 50:17 86:16,18
111:17 126:23
four 6:12 18:23 54:15 81:13 100:3,12

107:23
fourth 6:21 54:15
four-point 49:2,7 71:18 99:20,24
100:6,8 101:22 102:1
four-year 26:1
fractured 43:12
frame 35:9 37:16
frequently 59:2
Friend 1:5
friends 42:15
front 3:22 13:12 28:8 34:21 77:22
103:5 104:22
full 7:15 8:20 31:15 119:9 131:11,14
131:21,22
fully 73:7 95:4,8
function 20:1 23:5,8 57:1,9 75:4
124:1
functioned 20:13 124:2
functions 74:14
fundamental 75:3
further 41:13 57:13 61:24 71:13
127:20,22 131:1 134:13,16
future 13:16

## G

game 43:10,11
gamut 42:23
gap 33:23 50:2
Garrett 3:6,6
gas 112:7
Gass 31:18 98:15 131:18,18
geez 17:15 34:7
general 50:20 54:17 72:8
generate 14:16 41:7
generated 14:8,9 18:18 21:20 40:19
75:14 78:14
generating 19:4 41:4 96:13
gentleman 14:20 43:9 111:16
gentleman's 105:9
geographic 10:14
geographical 10:16
getting 29:24 82:9,9 91:6 108:14
give 8:18 23:11 36:2 61:10 62:13
63:19 64:10 78:10 79:1 85:13
92:14 102:8 105:1,10,16 106:8,19
106:23,24 107:2,6,10,10 111:18,20
111:22 112:1 113:8,12,16 114:2
117:18 119:12 128:17
given 19:2 28:4 59:14 60:1 82:5
83:11,14 86:7 89:20 91:23 92:5
103:22 117:1,4 134:8,12
gives 52:20 82:19 85:16
giving 19:3 28:16 65:22 86:21 107:5
glucose 78:7,8,19,24 79:5,17 90:13
112:24 113:10,14 128:23,23
go 6:5 7:5 15:19 17:16 28:7 29:14
35:5 37:2,4 41:9 45:1,4 50:23 51:1
51:8,16 53:4,12 54:15 60:5 61:12
64:23,23 71:13 74:16 77:15,22
94:13 104:1 105:6 118:23 127:9
129:20
goal 72:14
goes 15:17 93:17 115:6 116:5 117:13
126:2 128:21 129:13
going 6:5 9:15 21:7 25:1 28:7,14 31:6
35:14 36:5,20 45:1 54:21 56:3 57:8
57:20,22 61:6,19 65:4 68:12,13,22
70:3 72:16 77:4 78:11 86:17 87:7
87:11 96:16 99:11 101:1 105:11
106:3,6,17 109:6 113:9,17 115:17

116:9 117:18 119:20 120:15 123:3
123:19 125:2,2 129:16
good 18:1 30:14 76:5 80:17,19 131:6
Goode 1:3,4 30:15 31:1,11,13,17
34:18 38:1 39:7 42:15 44:16 45:5
46:14,17 47:5 48:22 49:13 51:2,5
54:24 55:7,18,24 56:13 57:4,20
58:16 59:1 60:9,12 61:6 62:5,12,24
65:7 67:19 68:6 69:13 70:20 76:11
76:19 78:18,20 79:12 80:7 81:18
82:5 83:10,13 85:1,21 86:13 88:21
89:8,18 90:12,14 91:4 92:22 97:12
97:16 99:11 100:19 101:3,10,21
102:20 103:11 104:13 105:20
106:17 107:11,14 108:13 110:8
115:18 117:21 125:16,20 126:16
129:5
Goode's 39:12 42:15 47:21,23 50:21
57:14 63:7 91:3 93:11 99:10 105:2
116:18 120:12,19
Googling 42:8
gotten 43:7 45:13
governing 19:17,19 21:21
graduated 98:22
Graham 1:12 3:10 7:21 28:17 30:22
31:7 36:23 37:16 44:15 45:15 51:4
52:8 55:8,16 56:18 60:12 61:15
62:1,21 63:6 66:8 67:23,23 68:8
70:8 76:3 77:20 78:1 80:7 87:15
89:9 90:3 91:9,21 92:5 93:11
102:17 103:1 104:11 105:1,18
106:12 110:7,8 116:1,16 120:4
129:4
Graham's 56:12 81:17 93:13 115:19
grainy 50:12
great 80:10 103:10
greater 103:14
greatly 117:6
Green 9:8
ground 54:16
groundwork 38:13
group 16:17 103:18 125:2
growing 84:9
Guardian 1:5
guess 39:3 44:23 69:24 77:4
guidelines 19:24 23:9,11,15 74:13
75:1,17 76:1 77:6,8,14
guy 44:11 45:15 48:10 72:17 79:15
92:14 113:4 115:1 123:14 125:8,22
129:24
guys 101:2 103:17,17 110:19 115:3
131:7
guy's 63:10

## H

Haldol 86:4,5 91:24
half 45:24 49:24
hallucinating 70:19
hallucinations 48:2 88:20
hand 9:15 25:4 29:9 36:21 100:21
121:5 135:2
handed 36:23
handles 18:11
hands 31:1 33:5,22 49:3,18 50:8
60:10,11 115:3
handwritten 121:13,23
hand-off 109:11
happen 13:15 26:17 32:7 58:4 63:17
72:16 79:10
happened 17:21 26:18 33:3 39:18

42:9,11 46:20 53:6 93:10,10
**happening** 45:18 76:16 116:3
**happens** 12:15 38:3 61:10 130:9
**hard** 106:7 116:18
**head** 56:1 71:11
**hear** 97:1
**heard** 7:7 55:22 56:16 70:12
**heart** 6:18 21:22 52:5,13,16 53:2,7,8
53:12,14,15,24 54:9,18,20 58:5,5
73:16 92:15 102:10 103:6,14,20,24
104:3,13 112:4 116:5,7 119:9
**heavy** 101:16
**held** 61:15 73:24 76:7,23 117:10
119:17
**hell** 25:15
**help** 44:3,3,23 80:18 89:18 109:8,10
110:24 111:18 113:14 119:3
130:22
**helped** 16:8 44:24
**hereunto** 135:1
**hey** 65:9 78:19 124:8 128:15 129:21
**high** 63:23
**higher** 19:9 39:3,10 83:16
**highly** 63:22 110:17 115:16
**hiring** 15:20
**history** 8:19,24 9:20 13:22
**hit** 22:13 46:24 47:1,13,17
**hitting** 117:6
**hobbled** 66:20 71:19
**hog** 49:9
**hog-tie** 43:7 50:8 99:17 125:13 126:2
**hog-tied** 49:2 50:5,15 58:16 66:3,20
67:7 69:20 71:20 109:16 110:2,12
114:17,20 115:18 129:10
**hog-tying** 130:18
**hold** 87:16 94:11 95:5 100:22 101:1
117:7 120:8,23
**holding** 91:23 98:4 107:19
**holler** 80:18
**hollering** 48:2 81:8
**homeland** 9:6
**hospital** 4:3 12:21 13:9 27:24 28:23
33:18 34:7,12,16,17 35:2,8,11,22
51:5 53:4 72:11 97:1 102:14
109:14,15 110:5,13
**hospitals** 109:24
**HOSPITAL-DESOTO** 1:16
**hotel** 43:9
**hour** 45:24 87:6 95:18,23 96:14
**hours** 19:6,8
**hundred** 114:7
**hurt** 113:9,13 130:21
**hypoglycemia** 79:18
**hypoglycemic** 78:21 79:7,12 113:15
**hypothetical** 12:12 117:18
**Hypothetically** 117:19
**hypoxia** 58:9 60:15,17 64:14,15
112:13
**hypoxic** 81:10 104:3 105:13,16
106:17

**I**

**idea** 17:24 55:24 119:12 126:18
**identified** 51:12,14 64:15 74:3,6,7
84:17 85:1 90:24 103:1 105:7
111:7
**identifies** 67:23 84:15
**identify** 50:19 64:22,24 73:24
**identifying** 82:12
**idly** 36:5

**illegal** 27:23 39:24
**image** 48:18,19,21 49:1,3,12,14,15
50:8,10,11,11,16,16,17,20
**images** 100:4
**imagine** 14:10 16:15
**Immediate** 64:17
**immediately** 33:7 43:8
**impaired** 72:23
**impeller** 58:6,7
**impending** 130:2,7
**implementation** 24:19
**implemented** 39:2
**importance** 73:2 108:23
**important** 24:4 61:4 67:14,17 71:14
78:8 79:3 112:24
**impossible** 72:21
**improving** 115:20
**inability** 73:6
**inaccurate** 60:22
**inches** 49:21,23 50:1 68:4 83:12
**incident** 12:6 13:2 47:19 126:9
**incidents** 10:10,20 11:17 42:24
**include** 58:18 75:21 95:14 123:5
127:4
**included** 130:4
**includes** 9:12 40:14
**including** 42:19 89:8 95:19
**inclusive** 89:2
**income** 18:17
**increase** 64:17
**increased** 53:10 73:5
**indicate** 33:3 37:15 40:11 46:17
67:12
**indicated** 34:11 51:10 67:22 70:16
82:18 84:11 85:5,18,19 126:18
**indicates** 34:10 47:5 51:13,19 52:18
55:18
**indication** 47:12 51:23 78:20
**indications** 80:5
**indicative** 76:23 80:8,19
**indicators** 73:19
**individual** 47:1 61:1 107:9
**individually** 1:3,10,10,11,11,12,13,13
1:14,14,15,15 100:13 101:23
**individuals** 35:2 70:3 102:16 121:24
**induct** 59:19
**inform** 102:7
**information** 14:15 15:1 16:4 36:14
38:17 42:4 45:8 104:11,12
**informed** 52:7
**infuse** 68:2
**ingested** 45:6 66:5
**ingestion** 77:18 78:1 81:12 105:14
111:13
**inhale** 58:11
**inhibit** 72:22
**initial** 31:8 32:12 33:7 38:16 39:16,17
39:20 43:6 45:11,19,20,22 51:16
52:1 59:19 64:14 69:17
**initially** 38:14
**injured** 6:16 43:3
**inserting** 116:22
**insight** 105:10
**instance** 80:8
**instances** 43:2
**instructor** 9:23 10:1
**integrity** 44:5
**intend** 122:10
**interact** 24:6,14
**interaction** 32:6
**interested** 16:17 134:20

**Internet** 50:17 126:23
**interpret** 69:24
**interpretation** 84:24
**interruption** 9:12
**intersection** 111:16
**intervene** 31:21 39:19 44:23 89:17
**intervened** 91:14
**intervention** 33:6 41:13 93:13
**interventions** 36:8 63:22 93:19,20
**introduction** 75:8
**introductory** 89:20
**involve** 10:21 15:12
**involved** 10:24 11:7 12:19 21:8 27:21
28:5 43:17 58:23 117:3 126:9
**involvement** 53:5
**island** 46:5
**isolated** 59:23
**issue** 82:7 84:2 111:10 113:10 128:15
128:24
**issues** 9:7 18:11 119:15 122:12
**italicized** 71:7,19,22
**itemize** 9:13
**I.M** 82:22
**I.V** 51:20 63:20 68:2,3 82:21,21 83:8
104:24 106:13 116:17,18,22
128:22

**J**

**J** 1:12 3:10,18
**James** 3:6,21
**Jason** 1:11 3:10
**Jefferson** 3:4
**Jeremy** 1:10 3:10
**jerk** 123:21 126:17
**Jersey** 126:10
**job** 11:20 57:3 79:13,14
**Jody** 125:11
**Joel** 1:11 3:10
**John** 1:16 4:4 96:23 131:13,17
**Join** 118:5,6,7
**Joseph** 1:14 3:11
**journal** 126:13
**Jr** 1:14 3:11
**judge** 27:7
**Judicial** 26:21
**July** 6:13 7:24 40:6 41:4 46:4 123:7
135:7
**jumps** 114:19
**jurisdictions** 20:11
**jury** 27:6
**justify** 66:6

**K**

**K** 1:14 3:11
**keep** 64:19 65:1,2
**Kelli** 1:3 99:11
**ketamine** 111:18
**Kevin** 3:3 99:9
**kicking** 58:9
**kidding** 65:3
**kidneys** 104:5
**kill** 55:19 56:3 70:3 113:17
**kind** 24:1 25:16 117:13
**kitchen** 24:12
**KIZER** 3:20
**knew** 17:23 62:11 63:1,5 85:4,11 86:9
86:9
**knock** 63:15 106:8
**know** 8:3 16:3,10,11 18:1 20:9,12
22:12 31:4 38:1,2 46:20,21,23,24

47:7 48:10 52:9,11,21 53:18 55:4,9
55:14 56:4,6,7,11,17 57:8 58:23
59:5 72:16 74:5 79:13,16 81:3
85:16 87:1 88:6 89:1 91:15 97:6
99:10 103:13 105:9 106:23 107:2
112:17 113:22 114:8 115:15,22,23
118:17,24 119:2,3,3 122:12 123:18
129:24 130:1
**knowing** 62:7 63:3 78:24 91:18
**knowledge** 26:6 44:14 52:8 54:2,23
57:17
**known** 76:20
**knows** 62:23,24
**Krause** 1:22 5:3 6:11 7:9,16,17 27:8
94:21 96:16,23 97:8 98:14 99:9
119:23 121:3 128:6 131:1 133:8
**Krause's** 6:13 7:1
**KUHN** 4:9
**K-r-a-u-s-e** 7:16

**L**

**L** 3:13
**lad** 48:12
**ladder** 91:8 92:20
**Lamar** 3:7
**language** 89:20
**lapse** 20:23 21:5
**lapsed** 21:3
**large** 24:20 44:11,15
**larger** 101:10
**lasted** 93:4
**lastly** 72:24 116:11
**late** 20:24
**lateral** 124:4
**law** 18:9,11 47:18
**laws** 17:11
**lawsuit** 126:8
**lay** 38:13
**laying** 58:10
**lead** 38:10 54:18 60:15,19 72:6
**leader** 18:19
**leadership** 9:8
**Leading** 6:10 14:3,9,18 15:3,8,13,18
15:19 16:7,22 41:7,9,11,12
**leads** 54:14,16
**leave** 31:16 33:22 95:24 109:16
**leaving** 31:12,13,24 32:14 65:18 67:1
**led** 91:11
**left** 21:4 31:17 52:1 60:3 72:2 73:11
91:24 97:24
**leg** 50:3
**legs** 50:1 71:20
**Lemuel** 1:18 3:16
**length** 49:24
**lethal** 60:16
**letter** 46:7 123:7,7
**letters** 66:19,21,21
**let's** 26:18 28:8 51:7 53:19 61:12 71:3
71:13 74:15 77:15 79:2 92:15
94:13,14 114:22,23 115:23 118:9
**level** 12:10 24:14 39:3,10 51:18 57:14
57:18 58:2 59:9 61:20 63:23 64:22
78:24 83:16 90:13 128:23
**levels** 58:21 60:15 79:23 90:14 105:3
105:10
**licensed** 20:16 75:10 98:18
**licenses** 13:23
**licensure** 9:11 19:11
**life** 6:19 63:7,10 83:7 91:9,22 92:10
102:12

life-threatening 52:13 73:9
limbs 100:3,12 101:23
limitations 19:14
limited 30:22 31:22 32:2 97:11 115:9
line 5:3 10:10 51:19 79:10 98:15
link 50:17
linked 49:7
list 6:11 7:1 8:6 13:21 25:1,24 40:10
listed 41:16 42:7 90:2
literally 111:15
literature 31:15 65:17,18
little 13:15 14:14 19:9 22:13 23:22
   49:14 50:3,12 52:2 58:14 71:13
   82:1 83:10 91:20 92:4 106:3
   109:13 110:6 116:23,24 117:12
LLC 1:18 3:17 4:8 6:10 14:4,19 16:7
local 75:16,24 76:6,12
localities 22:6
long 16:6 30:10 45:22 60:17,24 66:22
   85:24 86:13
longer 84:3 86:23,24 93:4,5 104:1
look 9:13,19 17:16 25:1 34:22 40:6
   52:18,19 53:19 59:13 64:8 82:22
   88:18 92:4 94:15 103:11 115:23
   116:2 118:15,20 119:4 121:20
   123:21 124:19 129:23
looked 13:11 16:1 34:16 107:9
   127:16
looking 14:13 42:10 94:8 121:11
looks 117:23 125:4
loops 50:1
loose 70:3
loss 88:18
lot 13:2 30:16 51:21 81:3 104:5
   114:14 122:20,21 127:8
low 60:15 78:21 112:12 113:7
lower 19:10 59:7
LSD 27:23 39:14 45:6
Lucas 12:7 20:14 21:12 123:16,16,21
   123:24 124:9
lungs 58:20 73:6
lying 87:10

M

M 3:3
Macaw 4:9 118:6 128:1 131:16,16
mad 8:15
main 69:1,3,5,9
maintain 43:22 44:4
maintained 9:11 110:22
maintenance 80:3 90:11
major 109:24
making 55:14 70:2,16
man 84:16 126:4
manage 24:17 57:4 61:21 63:5 89:5
   129:2 130:15
managed 126:20
management 9:6
managing 43:14
manual 6:18 102:12,12 127:5
man's 92:10
margin 58:11
marijuana 58:19 59:2
mark 4:4 122:5 131:17
marked 6:1 14:3 25:4,5,10 123:12
   127:7 132:5
Martin 96:23 131:13
mask 65:4
Massachusetts 22:3
Master's 9:4

material 19:3 40:15,16 41:16 42:14
   94:21 95:1 121:12 123:9 124:16
materials 21:21 40:10 41:19 73:13
   119:24 122:7
Matt 131:16
matter 127:17
matters 90:19 122:1
Matthew 4:9
mattresses 71:24
Maureen 2:5 134:3 135:5
ma'am 98:20 99:2,5
McCormack 3:3 5:5,6 39:15 41:14
   41:15 77:11 88:12 94:17 99:8,9
   121:2,5 127:6 128:4 130:24 132:3
McDONALD 4:9
McIntosh 4:4 5:4 96:22,24 98:8
   118:5 127:22 131:13,14
McIntosh's 98:17
McLaughlin 48:19
McNUTT 3:12
mean 11:4 23:23 24:9,12 27:12 30:16
   36:4 37:2,3,5 38:1,6,12 39:19 44:1
   44:2 52:20 57:5 57:19 59:6,14
   61:17 64:7 65:3 66:16 70:24 76:17
   78:7 80:20 81:9,9 84:16,22 88:6
   89:4 93:4 101:3 102:24 103:8,11
   105:6,7,8,12 106:4,5,19,21 108:11
   109:21 110:17 111:5 112:17 113:5
   114:12 116:23 117:3 119:1,1 130:3
means 22:2 85:4
measured 53:8,9
measurement 53:17
medic 11:5 12:8
medical 11:15 20:1 21:22 22:1 51:10
   60:3 62:7 75:6,11 76:8 80:12 93:21
   98:22 104:6 111:4 118:16 120:9,12
   120:17,18,20,24 126:14,19 128:7
   130:7
medication 60:1 63:19 68:6 83:2,14
   83:21 85:21 92:5 106:9
medications 83:11 86:21 113:11
medicine 98:2,5 112:16
meet 22:10 110:14
meets 67:20
Memorial 1:16 4:2 96:24
memorialized 46:6
Memphis 3:4,22 4:10
mental 79:8 103:13 104:19 105:17
   112:11,14,19 113:2 119:7
mention 107:4
mentioned 13:6 22:18 83:10 100:18
   104:8,23,24 105:18 107:14 112:10
   112:12,13 116:15 128:6
met 7:18
methamphetamines 101:17
methods 22:21 122:14
Miami 26:18,21,22
Michigan 20:20,24
mid 114:5
Mike 1:13 3:10
milligrams 82:21,21
Millville 126:10
Milwaukee 3:19
mind 118:18 124:19
mindset 65:15
mine 10:15 109:21
minimum 22:11,14,15 68:17
mining 16:16
minor 1:6 99:11
minute 52:23 53:15 54:4 61:11,11
   103:15

minutes 30:11 32:22,23,24 34:4,8,11
   34:15 35:24,24 53:13,14,22,23
   60:22,22 81:7,7 86:3,22 93:4
misbehavior 59:22
mismanagement 37:24
Mississippi 1:1,17 3:7,14 4:5 20:7
   21:10,14 23:3,8,11 26:4 64:8,9
   75:6,10,18,18 76:8 112:20 120:1
   123:20 124:10 128:12 129:1
   130:17
misunderstood 30:1
MITCHELL 3:12
moderate 64:14,15
modified 19:13
moment 20:6 21:8 37:8 60:6 68:13
   84:18 94:16 101:19
moments 7:18
monitor 19:20 51:14 54:14 72:22
   79:23 90:13 112:1
monitored 105:3,6
monitoring 89:16 92:8 106:10
monitors 51:17
month 19:2 114:15
monthly 19:7
months 13:3 19:9,10 111:15
Mother 1:5
mouth 117:22
move 32:4 49:21 50:6 53:16 71:17
   100:14 113:11
moveable 105:15
moved 63:9 82:5 92:2
movement 49:7 51:24
moving 30:17 58:7 105:20
Mueller 1:13 3:10
MULLINS 3:17
multiple 25:12 107:3 113:6
muscle 83:1
M.D 1:19 3:16
M172466 133:23

N

N 3:7,22 5:1
name 7:15,17 17:7 96:23 99:9
named 14:20
Narcan 113:13
narcotic 113:14
national 21:17 22:5,8 65:17 76:24
   122:9
nationally 71:2
Natural 1:5
nature 68:7
near 67:4
neck 67:4 71:11
need 14:22 17:1 50:13 62:6 64:17
   66:16 87:18 103:1,19,19 104:9
   105:8 108:15 110:18 115:12 130:7
   131:11,18 132:1
needed 44:2 62:5,8,12 64:7 70:20
   85:10,11 94:1 109:10 130:1,5
needle 116:24 117:10
needles 117:9
needs 33:10 69:11 110:12
neither 98:21
never 55:22 56:16 58:16 67:3 70:12
   71:19,22 72:2,20 73:10 92:6 98:24
   102:3 106:24 109:5,5,12 110:4
   112:17 114:18 124:6,7
new 58:15 90:8 126:10
newspaper 48:20,21 125:12,21
nice 8:15

nickel 96:2
night 39:8,13 59:5
non-compliant 48:5
non-sustainable 116:6
normal 30:12 57:18
north 3:18 10:16
NORTHERN 1:1
Notary 2:5 134:3 135:6
noted 78:3
notes 94:15 121:13,15,18,23 122:1
notice 6:8 121:13
noticed 124:18
number 5:10,10,11,11,12,12,13,13,14
   5:14,15,15 6:5 7:20 8:9 19:6 26:23
   42:8 48:18 49:3 50:10 52:21 60:23
   64:10 66:9,12,14,14,18,20 67:3,16
   69:1,4 78:7 82:10 84:10 90:23
   106:19 112:11 113:23 114:6,7
   116:4 119:5 123:24 124:3 130:14
numbers 6:2 41:17 42:5 132:6
numeral 123:12
numerical 112:6
numerous 36:7
nurse 60:11 83:21
nurses 28:24 60:11 70:15 102:14
   110:2
nursing 37:12 38:22 97:15,19,21,23
   98:1,5

O

object 39:15 77:11 88:12 118:3
   120:15
objection 7:7 118:5,6 120:21
observer 80:22
obstetrical 13:2
obtain 45:7 97:23
obviously 8:7
occasion 12:18 18:7 21:9
occasions 13:7 36:7 91:15
occur 60:18
occurred 45:5 46:12
occurrence 114:13
occurring 11:14
October 2:1 133:2 135:3
offer 95:6 97:14
offering 28:19,22 29:2
office 3:13 95:15 123:8,19 135:2
officer 43:11 47:20 59:24 60:4 80:6
   89:9 99:20 109:6 114:19 115:12
officers 7:21 43:13,21 44:23 46:15
   47:24 55:20 56:15 57:2 69:18 70:8
   70:12 80:11 106:14 109:5,7,9,10
   110:24 114:22
official 36:12
offset 58:11
Oh 10:9 43:19 100:20,24 101:11
   106:18 130:23
Ohio 2:4 9:24 17:12,13 19:19,21 20:9
   20:12,15,17 124:9 133:22 134:4
   135:2,6
okay 9:1 10:21 27:4 28:7 31:22 32:13
   33:4 37:7 42:2,23 49:20 50:24 51:8
   56:9 59:17 62:15,23 74:19 87:12
   94:17,18 96:9 97:2,6 122:3 123:3
   127:12
Oliver 1:19 3:16 29:3 98:16
omissions 81:7
once 37:19 41:11 59:12,12 60:10 68:3
   72:1 91:11 110:21 111:20,24
ones 27:14 54:5,6 67:11

one's 80:15,16
one-on-one 119:8
ongoing 88:19
onset 91:10
open 117:23 128:18
opening 23:6
operate 12:10 21:13 117:15 123:17
operating 76:9 107:3,6
operation 13:24
operational 11:13 74:21
operative 85:9
opine 27:9 47:19
opinion 28:4 30:13,13 36:22 44:21
  70:21,24 71:1 79:23 93:9 94:4
  111:3 120:8,23 123:23
opinions 26:14 28:16 49:22 62:16,17
  62:20 71:2 82:4 87:16,21 90:18
  94:6,11,22 95:2,5,9 97:10,15 105:2
  105:22 127:14
opportunities 36:7 107:11
opportunity 31:21 33:6 58:17 63:7,9
  91:9 92:9
opposed 32:15 34:8
orange 74:6
order 83:22,24 84:1 104:9 131:9
ordering 131:8
orderly 48:6
orders 75:8
organization 12:3
organizational 9:8
original 50:13 77:5
overall 24:22
overdose 39:14 43:1 45:17 78:23
  106:20
overdosed 39:24
overdoses 11:16
oversee 11:19 14:12
overview 9:20
ox 80:20
Oxford 1:2 3:7
oximeter 104:23 105:19
oximetry 59:7 64:7,11 105:4,8,23
  106:2,11,13,15 107:1 116:12
  118:21 119:10 124:22 128:21
oxygen 51:15,18,24 58:8,15,20 59:10
  60:15 64:6,7,18,22 65:2 78:17 80:3
  89:16 90:10,13 92:15 105:3,16
  106:19,20,23,24 107:5,6,10,10
  113:16 128:17
oxygenation 80:9 105:9 107:12
O2 57:18 58:2,21 79:23

**P**

padded 66:24
page 5:3 27:2 42:17 45:1 50:23 61:12
  67:15 74:19 77:15,19 82:14 94:3,8
  94:9,9 99:13,15 133:11,19
pages 76:10,10 121:22 133:4
page(s) 133:3,20
paid 95:12,15
pain 23:18 38:9
Painter 1:13 3:11
pale 66:6
papers 86:17
para 122:15
paragraph 62:1 75:7
paramedic 7:3 9:10 12:7 22:2 57:7
  66:17 71:4 74:2 97:11 102:7 111:4
  118:1 120:2 128:21
paramedicine 9:23

paramedics 22:3 23:5 100:8
parameters 114:2
part 11:20 13:12 21:3 24:20 25:10
  45:11 60:14 74:21 104:24 108:21
  123:11 124:15 127:1 130:18
particular 36:21,23 49:6,13 67:20
  87:22 103:4 123:1
parties 134:18,19
parts 23:6
passed 86:15
pasted 14:11
path 38:5
patient 6:23 12:19 13:9 24:2,5,6,6,12
  24:13,14,18,22 26:23 27:22 29:21
  30:1,6,9 33:20 34:6 35:4,16,20
  36:3,5,9,12 37:19,20,24 38:8,9,14
  38:18,18 39:4,24 42:3 43:6,23 44:7
  54:14,17,22 60:20,21 64:18 65:19
  66:19 67:2,11,18 68:4,16,22 69:7
  69:10 71:12,17,19,21 72:1,3,9,11
  72:20,22,23 73:1,2,3,8 76:19 77:21
  78:2,11 79:24 80:18 82:16 84:5
  85:7 88:24 93:24 100:17 101:2,9
  101:12 102:9 103:3,5,12,18 104:15
  104:21 105:14 106:19,24 107:24
  108:2,4,7,8,10 109:2,3,15,16
  110:12,23 111:9 112:13,24 113:7
  113:12 114:11,16,21 115:3,13
  116:19,21 117:20,22 118:24
  122:19 124:3,6,6 125:8 126:1,2
  128:10,17,18,19 129:9,10,14
patients 10:22 11:1,5 36:19 42:18,19
  42:20,22 43:1,3,14,15,17 44:16
  63:17 65:8 66:22 67:14,22 71:6,7
  73:21 78:13,21 79:8 81:1 82:19
  84:12 85:6 100:23 101:5,16,20,24
  103:8,9,10,19 105:12 109:1,8,20
  111:14 112:2 113:20,24 114:10
  117:9 119:2,17,18 125:7,23
patient's 65:9 67:4,6,8 71:16 72:14
  73:6 112:8
pattern 81:15,15,18
pay 15:10 48:4 60:24 110:5
Pennsylvania 20:20 21:2
people 12:24 48:3 61:18,19 66:1
  119:15 130:11
perceive 35:3
percent 18:21 57:15,21 59:9 86:20
  107:2 116:12 130:13
percentage 18:16
perception 56:20,23
perfectly 65:15
perform 17:3 75:13,15 77:14 95:19
  104:10
performed 95:11
performing 19:2
perfused 104:4,5
period 13:6 26:1 30:19,22 31:4,8,23
  32:12,20,21 33:17,21 35:18,23
permitted 36:2
person 36:13 44:17 118:1 129:8
personal 1:4 13:13 14:7 16:10 68:2
personally 10:24 12:19 15:14 43:5
  113:24
personnel 28:23 36:15,24 39:19
  68:18 69:4,9,19 70:14,16 72:9 75:9
  93:23 99:23 100:5,9 102:8 130:7
persons 1:6
pertinent 13:23
phase 33:7
Philadelphia 21:2,4

phlebotomist 117:6
phone 76:23
phrase 122:13
physical 57:24 66:13 72:4,9,15 80:5
  82:2 83:9,12 121:16
physically 44:7
physician 29:3 59:21 60:10 83:21,22
  83:24 86:4 91:23 97:15,20 98:18
  98:24
physicians 1:18 4:8 38:22 98:6
  102:14 110:2
physiological 39:17,21 60:23
pick 33:16 61:9
picture 108:9,9 119:12
pieces 78:9 112:22,23
piecing 104:16
pile 128:13
pitch 117:13
place 2:2 72:20 117:10 134:14
placed 19:14 30:20 31:11,20,23 32:13
  33:15 54:14 69:21 71:11 73:3
  110:21
places 54:16
placing 31:1
plaintiff 99:10
Plaintiffs 1:7 3:2
plaintiff's 7:23 41:3
plan 68:19 97:14
please 97:6 131:12,15 133:19
PLLC 3:6
point 14:11 30:16 32:14 33:16 35:3
  35:15,15 36:17,18 37:21,23 47:13
  48:7 51:20 56:5 59:11 60:8 63:2
  71:14 72:13 91:12 93:20 103:15
  108:12 129:16
pointed 48:5
poker 43:10,10
police 7:21 18:10 27:24 28:20 42:21
  43:4,11,13,13,21 46:13,14 47:24
  55:20 56:15 57:2 59:24 60:3 68:19
  69:18,21 70:8,12 80:6,11 89:9
  99:20 106:14 109:1,5,6,7,8,10
  110:24 114:19,22 126:17
policies 42:4
Poplar 4:10
popped 42:12
porch 44:2
port 68:4
portions 6:14 7:2 68:15
posed 48:7
poses 48:15
position 10:6 11:19 23:10 31:14,16
  31:18 32:1,15 43:6 49:2,19 50:5,8
  50:14,21 52:2 58:16 61:16 63:1
  65:7,9,19 66:3,10,20 67:2,7 71:8,9
  71:18,23 72:22 73:3,4 74:11 76:20
  90:12 91:8,11 92:18,23 93:7 99:17
  101:22 109:17 110:2,22 114:20
  115:8,9 116:8 122:19 124:4,7
  125:9 126:1,7 128:20,20 129:15,15
positional 71:10 73:4 126:7
positionally 49:15,17
positioning 73:5 107:24 109:2
positions 87:18
possible 79:11,12 113:1,3 130:2,6
possibly 58:11
Post 3:13
potential 68:9 69:18 79:20
potentially 11:12 43:18 48:8 60:18
  106:7 113:5
pounds 48:11

Powers 2:5 134:3 135:5
practiced 98:6
practices 21:22
practitioner 117:8
precarious 93:7
Prehospital 6:21
premarked 6:4 29:7
preparing 72:24
presence 44:1 134:9
present 68:18
presented 89:18
pressure 67:5 78:5 103:7
pretty 51:20 76:5 80:22,23
preventable 73:8
pre-hospital 97:11 98:1 102:13,15
Price 1:11 3:10
primary 53:5 73:18
prior 21:8 41:3 50:21 69:21 90:5
priority 69:2,3,5,9 82:10
probability 117:5
probably 20:24 70:9
problem 24:3,7 38:18 39:13,16 57:23
  61:22 72:12 78:24 79:1,13 80:9,15
  91:11 113:10 125:13 129:2
problems 45:16 57:22 61:8,23 63:17
  64:2 81:3 102:13 104:6
procedure 66:15
procedures 42:4 75:5 76:9 107:4,6
process 8:10 27:7 41:6 46:22,23
  58:23 121:19
prodded 121:18
produces 111:13
professional 13:23
profoundly 103:18 104:17,21 105:13
profusion 119:20
programs 9:24
prolonged 60:14,18
promulgated 75:5 76:16 102:11
prone 31:12,14 32:1,15 43:6 63:1
  65:7,8,19 66:10,20 67:7 71:8,9,23
  73:3,5 76:20 90:12 108:16 109:16
  110:12 115:18 122:19 124:7 125:8
  126:1,7 129:15
pronounced 87:2
properly 100:24 102:2 115:13
protect 43:23 44:4
protection 43:24
protocol 20:12 22:22 63:4 64:8,9
  66:15 71:1,15 76:17 77:16,19,24
  82:15 84:24 85:5 87:16,22,24 88:2
  89:3,10,21,23 90:19 102:4,6,18
  123:16,17 124:1 128:12 130:18
protocols 19:24 20:2,7,10,14,15 21:7
  21:9,12,14,18 22:7,10 23:12,16
  24:1,17,20 31:16 57:9,10 63:3,16
  64:16,23 65:16 66:13 68:11,12
  74:12,17 75:9,21,23 76:2,6 77:5
  83:24 90:20,24 105:7 106:2 107:9
  111:6 112:19 123:15 124:20
  128:13,14 129:1 130:4,16
provide 18:20 37:21 38:16 51:9,21
  64:6 76:14 78:17 80:3 90:10,14
  107:11
provided 25:9 40:7,20 42:2 45:9 51:2
  51:15,23 59:10 77:8 107:16
provider 6:18 102:12 118:16
provides 15:1
proximity 49:15
prudent 22:24
PsO2 51:17
public 2:5 19:22 61:16,17,22 69:18

134:3 135:6
**publication** 6:15,21 107:21
**publications** 41:24
**pull** 58:15
**pulse** 54:12 59:7 64:7,11 78:5 80:19
  104:23 105:3,8,19,23 106:1,10,13
  106:15 107:1 116:2,3,3,12 118:21
  119:10 124:22,23 128:20
**pump** 58:6
**pumping** 58:6
**pursue** 98:1
**purview** 47:20
**push** 12:9
**put** 9:16 11:6 12:23 14:12 24:5 27:7
  30:17 35:21 37:6 48:22 51:13
  59:22 60:10,11 63:6 68:3 92:6
  112:22 118:10 123:22
**puts** 33:21 53:21 54:7
**putting** 31:1 104:20 106:13 115:3
  125:8
**puzzle** 78:10 104:17 112:22,23
**P.A** 3:12 4:4
**P.C** 3:3
**P.L.C** 3:20
**p.m** 132:8

### Q

**qualifications** 26:13 27:18
**qualified** 27:9 134:5
**quality** 52:9 118:20 119:6
**question** 8:1,13 35:14 70:18 74:22,24
  77:5 80:10 85:19 86:6 97:5 104:9
  118:4,13
**questions** 7:22 62:22 96:18 97:4 98:9
  98:17 99:12 121:7 123:2 127:21,22
**quickly** 110:3 130:2,6
**quite** 63:20 110:15 111:14
**quotes** 55:17

### R

**R** 4:9 134:1
**RAINEY** 3:20
**raise** 79:11
**ranking** 66:7
**rare** 114:12
**rate** 52:5,13,16 53:2,7,8,12,14,15
  54:1,10,18 58:5,5 61:3,9 78:6
  92:15 95:17 96:14 103:6,14,20,24
  104:1,3,13 112:3,4 116:2,3,4,6,7
  118:20 119:6,9
**rationale** 65:6 66:5
**Raymond** 3:21
**reaching** 94:22 95:2 127:14
**reactant** 85:3
**reaction** 45:6
**read** 52:22 59:3 66:18 68:14 70:15
  73:21 74:1 88:7 131:4,5
**reading** 45:14 65:12 89:11 121:17
**readings** 117:20
**real** 30:21 66:11 129:4
**realize** 117:2
**really** 50:12 51:12 60:21 101:14
  110:23
**realm** 130:11
**reason** 20:5 26:7 86:7 87:9 92:2
  115:15
**reasonable** 30:15,18 103:8 111:3
  120:9,24
**reasonably** 22:24
**reasons** 76:21 101:14 116:15 125:9

**recall** 27:13 46:1,5 59:4,15
**receive** 85:21
**received** 29:16 126:8
**receiving** 36:1
**recess** 94:19
**recognition** 38:7
**recognize** 24:3 39:2 80:12
**recognizes** 88:2
**recommended** 122:14
**record** 6:23 9:17 29:7 34:9,11 35:5
  37:6,7 51:19 52:10,10,18,21 53:18
  74:15 78:4,4 87:9 94:14 98:18
  108:20 115:24
**records** 33:19 34:17 53:5 59:18 60:7
  89:8 120:19
**recounted** 70:4,7
**red** 99:14 117:22 119:20,22
**reduce** 58:20 130:2,6
**reduced** 134:9
**Reeve's** 66:23
**refer** 28:9
**reference** 41:19 42:11 72:17 73:21
  102:4 122:18
**referenced** 20:6 30:2,5 37:16 44:20
  56:7 77:18 81:21 89:12 107:20
**references** 14:3 31:15
**referencing** 128:8
**referred** 37:8 124:18
**referring** 52:14 89:7
**refers** 88:15
**reflected** 116:1
**regard** 47:9 62:16 77:24 78:2 81:12
  82:7 87:13,16,21 90:2,19,20
  125:15 127:17
**regards** 88:23
**regularity** 111:12
**regurgitate** 87:18
**related** 91:3 114:14
**relative** 134:17,18
**relied** 73:14 95:1 127:13
**relieve** 69:5
**rely** 122:10
**relying** 38:12
**remainder** 94:3
**remember** 32:3 86:5
**removed** 72:10
**render** 73:7 75:11
**rendered** 97:16
**repeat** 8:4
**rephrase** 8:4
**replicated** 48:23
**report** 6:14,23 7:23 20:5 25:9 28:7
  37:17 40:6,7,8,17,19 41:4,7,8,17
  42:3,17 45:2 50:20 51:9 52:19
  53:12 56:8 61:12 73:13,22 89:7,11
  94:3,5 96:13 97:8 99:13,21 107:4
**reporter** 2:5 6:1 8:15 131:8,20,23
  132:1,5
**reporting** 2:2 25:14 133:21 134:21
**reports** 19:4 40:8,8
**reposition** 90:12 109:8
**repositioning** 92:11
**represent** 49:1 87:11 96:24 98:16
  99:10
**representation** 50:11,18,21
**Representative** 1:4
**representing** 7:19
**require** 63:23,23 85:7
**required** 13:2 43:21 83:9 89:10
  110:11,13
**requires** 68:2 117:1

**research** 22:19 34:23 41:22 122:20
**researches** 14:23
**reserved** 132:9
**resistance** 126:14
**resolve** 106:7
**respiration** 112:5,6
**respiratory** 61:1,3,9 67:6,8 78:6
  80:14 112:3 118:2,12,15,17,20
  119:6,13,15
**respond** 10:10,19 11:24 12:12 24:16
**responded** 29:11 39:23
**responder** 61:16
**responding** 11:9,15
**responds** 114:3
**response** 64:16 104:8
**responsibility** 36:10 37:21 69:6
**rest** 104:17
**restrain** 66:19 68:16,22 100:13 104:0
  124:3 126:1
**restrained** 27:23 30:15 67:14 69:11
  69:16 70:21,22 71:8,22 72:1 82:7
  100:3,19 101:6,23 124:7 126:5
  129:14
**restraining** 67:11 68:20 100:17 109:2
**restraint** 49:2,7 64:5 66:13 67:21
  71:9,18 72:5,13,16 82:18 84:11
  85:15 91:18 99:20,24 100:6,8
  125:13
**restraints** 63:14 66:4 67:4,5,16,19
  68:9 72:4,6,9 82:2,12,13,17 84:6
  100:13,18,19,21,22 101:1,7 102:2
  110:8 111:9,20,23 112:1 123:13
**restricts** 67:5,7
**result** 130:12
**resulting** 39:21
**resume** 6:9,11 13:13,21 16:1
**retained** 15:9,13 18:2 101:21
**retaining** 15:16
**return** 133:19
**REVIERE** 3:20
**review** 21:9 42:13 60:7 86:12 95:18
  96:12 119:24 120:18
**reviewed** 21:14 28:4 37:11 40:11,15
  40:23 46:17 59:17 76:2 94:22 97:8
  127:13
**reviewing** 19:3
**revoked** 19:13
**Re-Examination** 5:5,6 121:9 128:3
**rhythm** 104:10
**Ric** 3:18 131:18
**Rich** 1:11 3:10
**Richard** 1:15 3:11
**ride** 31:5 34:10 52:24 53:8 54:1 55:2
  55:12 64:12 80:4 91:5
**ridiculous** 65:11
**rig** 43:9
**right** 15:17 26:20 27:6,16 28:13
  32:12 33:1 50:23 51:8 56:11 57:13
  57:21 74:4 75:22 82:11 83:24
  90:14 95:13 101:7,18 103:12 116:2
  118:23 119:23 125:1 127:19
  128:20
**right-hand** 29:10
**rigs** 12:9
**rise** 116:4
**risk** 67:17 82:15 84:4,9 130:2,6
**rob** 43:9,10
**Robert** 1:22 5:3 7:9,16 133:8
**Roman** 123:12
**room** 16:12 24:11 36:21 57:20 59:23
  60:3 70:9 91:23 92:2,6 118:10

**rotate** 63:12 64:4 110:16 111:1
**route** 29:20
**routinely** 10:19 40:2
**RPR** 2:5
**rule** 76:14 79:18 134:23
**rules** 74:12 75:13,18 76:1 77:7
**run** 6:23 14:20 29:7 37:16 51:3 109:5
**rungs** 92:19
**running** 48:2,5 58:12
**runs** 48:14
**rushing** 116:21
**R.G** 1:5
**R.N** 97:24

### S

**S** 4:5
**safe** 108:1,3
**safety** 9:4 19:22 69:4,6,8 72:8
**sake** 87:19
**salts** 111:12,12,17
**SAMS** 3:12
**San** 22:4
**sandwich** 66:21
**sandwiched** 71:23
**sat** 57:18 58:2,21 79:23 83:13
**saturation** 51:18 57:14 59:9 60:15
  89:16 90:13 105:9
**save** 63:7,10 91:9 92:9
**saved** 91:22
**saw** 51:24
**saying** 32:3,19,19 55:18 56:16 62:3,4
  62:6,10,11 116:16 119:3
**says** 20:13 34:14 35:6,6 37:4 47:7,13
  53:19 55:8,16,18,19,24 56:15 63:2
  63:2,4 64:13,19 65:6,8,17,18 66:18
  67:3,13,16,23 68:11 71:6,15 72:20
  74:15,16,19 75:4 76:14 82:15 84:3
  84:16,23 85:2,3,5,17 117:24
  118:24 122:14 123:23 124:10
  125:12,13 128:15 129:21,23 130:5
  130:10
**Scallorn** 1:12 3:10
**scenario** 24:7 42:11 45:13
**scene** 11:4,7,20 12:14,16 24:21 29:15
  29:20,22,24 30:3,10,20,24 33:20,22
  34:2,12 40:4 42:9 43:5 46:13 47:6
  47:23 51:4 56:21 67:11 92:3 110:7
  130:8
**school** 97:21 98:1,22
**science** 9:2
**scream** 81:2
**screaming** 42:19 43:1 70:17,18 80:24
  81:4,6
**screw** 56:10
**seal** 135:2
**searches** 126:23
**seat** 83:13
**Sebring** 1:14 3:11
**second** 7:3 27:1 29:23 54:13 63:13
  71:4 82:14 125:19
**seconds** 32:7 116:13
**Section** 75:12
**sections** 103:4
**secure** 73:1 108:1 117:11
**secured** 126:7
**securely** 49:4 50:9
**securing** 100:14
**security** 9:5,6
**sedation** 67:21 82:18 83:17 84:11
  130:1,5

**sedative** 92:13
**see** 24:15 26:19 38:15 48:3 49:11
  52:22 58:4 74:15 80:12 87:18
  95:17 99:15 103:12 105:17 119:16
  125:1
**seeing** 104:21
**seen** 8:6 57:22 101:24 102:1 109:12
  109:15 110:5
**segment** 31:6
**seizure** 38:9
**semantics** 88:8
**send** 41:8,23 127:8
**sense** 46:9 68:1 122:22
**sent** 25:12,14,18 41:16,18,20 52:10
**sentence** 84:9
**sentences** 118:23 119:9
**separate** 14:2 31:4 59:23 95:15,16
  105:13 106:18
**separately** 11:23
**series** 73:19 91:10 123:15 125:5
  126:21
**serious** 67:17 82:15 84:4 104:6
**serve** 10:8
**service** 2:2 15:5 114:4 133:21
**services** 16:20 17:3,8 18:5,19 19:12
  29:6 75:7,11,19 76:8 93:21
**set** 17:3 19:24 21:17 23:15 28:5 40:16
  51:16 52:1 135:1
**sets** 81:18 84:14
**setting** 107:17 114:1
**settlement** 126:8
**severe** 72:6
**shackles** 49:12
**she'll** 18:13
**shock** 47:2 89:23
**shocked** 47:6
**shootings** 11:16
**short** 32:21 94:14
**shot** 43:3,11,12
**shove** 12:9
**show** 61:19,20,22 81:15 112:23
**showed** 38:8 51:14
**shown** 50:8
**shows** 48:22 108:10 116:10 123:23
  124:8,11
**sick** 6:16 104:1
**sicker** 91:7,7,7
**side** 10:15 32:16,23 33:9 43:8 63:9,13
  82:6 91:16 92:12 107:15 108:8,10
  108:14,22,23 109:7 110:19,21
  114:23,23 115:2,4,5,13 129:18
**sign** 131:4,5
**signature** 94:9 132:9 133:1,19
**signed** 133:19
**significance** 12:6 79:5,7
**significant** 32:17 101:2 122:1 130:14
**significantly** 52:12
**signs** 24:15 51:17 52:1 103:11 118:1
  118:11,12,14
**similar** 20:9 21:13,16 23:1 27:22 28:5
  88:20 90:24 101:20 126:11
**similarly** 1:6
**simple** 110:15
**simplest** 91:15
**simply** 21:1 42:2 66:6 78:24 109:22
**single** 108:6
**sir** 7:15 8:5,9,11,17,20 10:9 11:22
  12:17 14:1,5 15:4,7,17,22 16:12
  17:10,13 18:24 19:15,18 20:4,8,22
  21:6,11 25:3,7,12,23 26:2,5,8,11,15
  27:3,19 28:2,6,10,13,18,21 29:1,4,8

29:13 30:4 32:2,11 35:13 36:4,19
  37:10 38:20 39:1,5,11 40:2,5,9,13
  40:18,22 41:1,5,19 42:1,6,10,16
  43:19 44:9,10,13 45:3 46:4,8,11
  47:3,8 48:9,17,20 49:5,10,18 50:19
  50:24 52:6,15 53:1 54:3 55:3 57:16
  59:12 61:14 62:9,14,18 65:14
  67:12 68:24 70:10 73:15 74:1,6
  75:20,22 77:3,10,17 80:2,22 81:23
  82:3 83:19 87:23 90:7,15,17 92:17
  92:21 93:3 94:7,12,23 95:3,7,10
  96:11,15,19 97:3,7,13,18,20,22,24
  98:3,7,8,10 99:16,18,22 102:21
  108:22 110:10 111:10 121:4,11,14
  122:2,6 123:10,14 124:14,20,21
  125:17,19 126:24 127:4,11,15,18
  127:20 128:13 129:7 131:2
**sit** 24:10 103:5
**sitting** 57:19,20 59:6 70:10 113:17
  118:19 123:19
**situated** 1:6
**situation** 27:21 38:17 39:23 40:3 44:6
  67:10 69:10 88:24 93:3
**situational** 36:1 61:11 70:1
**situations** 77:9
**six** 10:18
**sized** 101:2
**skill** 117:3
**skin** 118:22 119:5,14
**Skype** 118:9
**sleep** 66:1
**sleeping** 66:2 96:7
**sleeps** 65:10
**slide** 117:11
**slight** 22:9
**smart** 112:16
**smoke** 59:2
**smoking** 58:18,19
**soft** 100:13,18,19,20,22 101:6
**somebody** 101:19
**someone's** 119:12
**somewhat** 50:6
**soon** 33:5 71:15
**SOP** 67:9 68:13 69:2,8 81:12 82:7
  87:14,24 88:23
**SOPs** 81:20
**sort** 8:23 9:20 15:24 19:13 45:4 50:17
  50:18 51:1 62:19 83:20 84:18
  119:14
**Southaven** 1:9 3:9 6:22 7:19,20 28:20
  74:20 99:20
**Southeastern** 1:17 4:7
**span** 113:21
**spans** 42:23
**speak** 74:16 109:18 116:20
**speaking** 67:10 68:15 119:9
**speaks** 122:11
**special** 63:24 110:18
**specific** 31:9,10
**specifically** 123:2 125:15 129:19
**specificity** 51:11
**specifics** 59:15
**specified** 134:15
**spectator** 111:15
**Spence** 1:15 3:11
**spend** 19:1
**spinning** 91:12 93:15,16
**splints** 124:5
**spoke** 82:8
**spoken** 74:10
**spot** 36:18

**SpO2** 51:17 64:21 78:6 86:19 112:9
**Sr** 3:13
**stabbed** 82:24
**stable** 103:4,8
**Stacie** 1:12 3:10 7:21 28:17 62:1
  77:20 78:1
**staff** 28:24 34:7 35:4,11 37:12 38:22
  60:3
**staffing** 11:12 35:22
**stamped** 53:19
**stand** 36:5,20 124:19
**standard** 21:19,20 22:5,14,15,17,24
  76:9,15,24 105:24 107:3 110:14
  120:1,4,11 122:9
**standardized** 21:17,23,24
**standards** 22:8,21 23:3 124:18
**standing** 58:13 75:8
**start** 23:17,20 30:17 33:6 63:20 67:15
  79:14 82:11 90:23 104:16,20,20
  106:10 112:21 117:5
**started** 17:19 45:14 51:19 83:8 86:20
**starting** 58:4
**starts** 81:15 91:12
**state** 7:15 9:8,24 10:2 17:11,13 19:21
  20:17 21:10 26:3 47:21 52:12
  57:13 60:14 61:15,24 75:5,10,16
  75:17,24 76:6,12 77:19 83:5 86:8
  105:6 106:9 107:10 123:20 134:4
  135:6
**statement** 37:4 46:13 47:9 55:23 65:5
  70:23 91:2
**statements** 55:7 65:5 80:15
**states** 1:1 10:2 22:20 42:17 75:8
  76:17 83:3 84:10 130:13
**stations** 10:17
**stature** 101:3
**status** 35:20 79:8 103:13 104:19
  105:17 112:8,11,14,19 113:2 119:7
  119:13
**statutes** 75:18 76:1
**stay** 105:19
**stayed** 53:10 92:7
**stays** 112:4
**stenotype** 134:9
**stepped** 51:21
**stick** 82:23
**sticking** 117:8
**stimulant** 101:17
**stimulus** 39:20
**stock** 49:17
**stocked** 93:22
**stomach** 32:5 66:2 82:10 129:17
**stomachs** 65:10 66:2
**stop** 8:3 29:23 91:13,19 92:18 103:20
  129:16
**stopped** 93:15
**story** 56:17
**straighter** 50:4
**straits** 81:2
**strapping** 48:12
**straps** 100:15
**street** 2:3 3:22 4:5 48:15 61:20 66:17
  133:21
**Streets** 72:19,19
**stretcher** 71:23 73:1 126:5
**stretchers** 66:23
**strictly** 17:18 41:13
**strip** 104:11
**stroke** 26:23
**structure** 95:21,22 96:2
**struggle** 54:24 67:19 72:5,15 82:17

84:5
**Struggling** 72:6
**stuck** 91:22
**subdue** 72:14
**subject** 19:16
**submitted** 7:23
**subsequently** 28:1
**substantiate** 55:21
**suffering** 126:19
**sugar** 78:22 79:11 112:12 113:8
**suggest** 76:11 122:22
**suggested** 110:15
**suggesting** 32:3
**Suite** 3:4,7,18,22 4:10
**summary** 45:4,9 46:2
**summation** 14:15 15:24 45:18
**supervise** 10:17
**supervising** 59:23
**supervisor** 10:9
**supine** 71:17 73:2 124:4
**supplemental** 40:7 59:10
**support** 6:20 31:13 102:12
**supportive** 90:11 128:18
**supposed** 56:24 57:8,9 102:8
**supraventricular** 52:4
**sure** 6:6 11:18 12:24 14:13 16:17
  25:6,13 28:8,15 32:9,10 58:3 62:3
  69:6 85:9 87:13,20 88:15 93:8
  98:17 106:16 108:15 112:3 115:1
  123:6 124:12 128:17 129:24
**surprise** 81:1 119:19,21
**suspended** 19:13 126:9
**sustained** 104:7
**SVT** 51:14,24 52:4,7,14 54:8 73:17
  103:1,2,3 104:7,16 124:22,23
**swear** 7:7
**switch** 23:16
**sworn** 7:10 134:6
**symptoms** 88:18,20 103:12
**synchronized** 103:23
**system** 59:20

---

**T**

**T** 134:1,1
**tachycardia** 52:5
**take** 39:5 53:19 58:20 61:23 74:18
  78:5 94:14 100:12 118:9 121:20
  131:17
**taken** 11:6 37:8,15 39:8 48:19 94:19
  134:14
**takes** 37:3 51:16 117:12
**talk** 23:15 51:6 56:8 62:15 68:8 71:3
  71:5 72:18 73:17 77:15 99:23,24
  100:1 110:6 126:2 131:7
**talked** 14:7 24:20 31:8 60:6 73:20
  79:22,24 81:13 82:1 87:14 89:14
  90:10,16,21 102:6 109:13
**talking** 29:6 31:5,23 50:15 56:1 59:4
  76:4 82:11 103:7 106:4,21,22
  115:7 124:21 128:18
**talks** 71:6 89:4 125:7,24
**tall** 48:11
**target** 46:21 117:6
**tase** 46:19
**tased** 46:14,18 47:5,10 88:24 89:4,8
  89:13,21,22
**taser** 47:20 88:1 89:5
**teach** 9:23 10:1
**teaching** 17:20,20,23
**team** 71:15,16

**technical** 63:22 110:17 116:22
**technician** 22:2
**techniques** 10:1
**Technologies** 6:10 14:3,10,18 15:3,8
  15:14,20 16:7,22 41:7,10,11,12
**telephone** 3:6,21 4:4,9
**tell** 7:10 24:16,16 42:21 45:15 56:2
  65:16 66:11 80:16,22 106:2 111:11
  112:21 118:14 130:16 134:6
**telling** 68:21 87:8
**tells** 54:19 65:14 68:17 96:2 101:19
  117:14
**tend** 38:4
**tender** 96:17
**tendered** 35:4 86:14
**Tennessee** 1:18 3:4,22 4:10
**Tenth** 6:17
**term** 61:17
**termed** 88:6
**terminal** 92:24
**test** 117:2,4
**testified** 7:12 8:7 26:3 27:21 62:23
**testify** 27:17
**testimony** 6:12 7:1 25:2 26:1 37:12
  37:14 40:14 42:3 46:16 47:4 56:5
  60:8 64:24 83:4 94:10 97:9 120:17
  126:17 134:8,12
**testing** 53:24 54:3
**textbook** 103:3 107:21,22
**textbooks** 73:15,18
**texts** 22:18 41:24 71:2,5 111:6
**Thank** 9:16 13:19 96:19 98:8 99:4
  121:3 127:19 128:14 130:24
**Thanks** 131:19
**therapy** 51:22
**thing** 18:2 25:16 37:4 49:16 63:21
  72:3 81:24 108:14 110:3,20 113:2
  116:1,22 118:23 129:14
**things** 11:13 18:3,12 19:4 39:18 42:5
  51:5,6 55:1 58:4 60:23 63:8 70:4
  76:12 77:20 78:14 81:19 83:23
  89:17 90:3 91:21 92:16 96:13
  103:21 107:13 112:11,18 113:6
  114:14 115:24 117:17 119:5,11
  122:8
**think** 16:8 25:5 28:10 29:10 37:23
  41:5 55:7,17 56:14,18 58:6,12,22
  59:3 74:2 76:3 81:4,14 86:3,16,17
  87:17 88:5 89:2 92:20 93:12 94:5
  95:13 96:2,3,8 117:3 121:2,6
  122:11 127:5,12 129:18
**thinks** 65:15
**third** 114:5
**thoracic** 73:7
**thought** 28:10 55:6 83:7 121:19
  129:5
**thousand** 114:7
**thousands** 114:6,8,9
**thrash** 54:24 55:5
**thrashing** 61:6 63:18 65:2,3 66:3
  78:14 104:19 116:21 117:5
**thread** 116:24
**threat** 44:22 48:10 56:13 69:19 84:22
**threatened** 44:7 116:17
**threatening** 42:20 43:18
**threats** 55:15 70:2,17
**three** 10:14 16:9 18:23 35:24 54:14
  54:16 113:13,16,16
**threshold** 36:11 59:13
**thresholds** 53:6
**tie** 49:9

**tied** 71:20
**time** 7:6 8:1 9:12 11:3 12:23 13:6
  19:1 30:7,9,14,15,18,19,22,23 31:4
  31:8,10,19,22 32:2,12,20,21 33:17
  33:21,24 34:2,24 35:8 37:16 43:4
  46:14 47:23,24 48:1 52:16 74:18
  84:2,7 86:10,14,20 91:24 93:6,16
  115:16 116:14 123:22 127:9 132:2
  134:14
**times** 8:8 29:11 33:2 87:3 107:14
  114:15 115:2 119:16
**tip** 81:5
**titled** 88:1
**titrate** 128:23
**today** 7:22 24:11 59:7 70:10 97:9
  102:6 111:7 121:13
**Todd** 1:9 3:10
**told** 23:23
**Toledo** 2:4 10:5,7 12:5,7,8,11 95:24
  114:3 133:22 135:2
**tone** 84:14
**tools** 63:24 89:15 93:22 94:1
**top** 13:14 27:1 29:10 52:21 77:19
  114:7 123:13 124:5
**tore** 101:4
**total** 18:17 93:12,13
**totally** 29:15
**touch** 110:23
**Tower** 3:21
**traffic** 48:14
**trailing** 39:18
**trained** 22:4 43:14 56:24 57:10 66:17
  80:13 100:5
**training** 8:22,23 9:12 13:22 57:6
  61:21 63:23 78:15 97:20
**transcribed** 134:10
**transcription** 134:11
**transfer** 35:18 36:12
**transferred** 34:6 35:16 37:5 59:12
  60:9 88:4 109:15
**transport** 11:5 50:22 51:4 65:8 66:23
  67:13 71:21 107:15 108:2,4
**transportation** 6:16 10:22 13:9 22:1
  66:10
**transported** 27:24 34:6 63:1 71:8
  76:19 86:1 110:13 114:16 122:16
**transporting** 11:1 12:19 35:2 42:18
  42:20 65:7 73:20 83:15 122:19
  125:6
**travel** 95:19 96:5
**treat** 128:10 129:5 130:19
**treating** 23:17 24:2 104:12
**treatment** 38:23 51:2,10 60:13 81:17
  97:16 102:20 105:1
**triage** 36:16,18,20
**trial** 8:8 26:1,19 95:6,20 96:6
**tried** 26:19 27:14 38:24 43:9 59:14
  127:8
**trip** 45:7,14
**Troy** 1:4 99:10 115:18 125:16,20
**true** 134:11
**truly** 111:19 115:10
**trust** 61:16,17
**trusts** 61:22
**truth** 7:11,11,11 134:7,7,7
**trying** 11:18 32:8 117:23 126:17
  128:19
**tubing** 68:3
**Tupelo** 3:14 4:5
**turn** 43:11 108:8 109:7
**turned** 107:15

**turning** 32:15 91:16
**two** 12:5 13:10 16:9 25:5,17 30:2
  35:23 44:19 46:2 49:1 54:18 57:2
  58:4 66:11 70:13 73:18,23 74:9
  81:20 83:23 91:14,21 92:14 103:4
  113:11 123:2
**Tyler** 1:11 3:10
**type** 11:9 17:2 41:23 54:10 60:19
  68:9 85:15,21 92:12 124:8
**types** 9:6 11:16 22:21 42:22 43:15
  47:18
**typical** 22:6
**typically** 11:9 35:3,23 36:16 38:3,10

---

**U**

**unable** 73:8 105:21 106:12,15
**unattended** 72:2
**uncooperative** 105:15
**undergone** 72:4
**understand** 8:2 11:18 33:10 62:3
  64:18 66:8 74:11 93:8 97:5
**understanding** 47:3,22 97:10
**understood** 60:12
**Unequivocally** 49:10
**unfair** 96:8
**unfolds** 11:7
**Unfortunately** 130:11
**unglued** 43:2
**United** 1:1 10:2 76:17 130:12
**units** 11:5 12:7,8
**University** 9:3,5,9
**unstable** 103:9,10,12,18 104:21
**unsuccessful** 27:15
**unusual** 43:16
**UPCHURCH** 4:4,4
**use** 22:21 53:11 54:10 63:14 64:4
  68:17 74:13 78:3,15 84:13 85:2
  88:1 89:6 100:15 106:1 118:18
**user** 113:5
**utmost** 73:2 108:23
**U.S** 122:15

---

**V**

**V** 123:12,15
**Valium** 68:12 82:20 89:16 90:14
**value** 112:6
**variable** 79:3
**variety** 10:20 18:12 112:18
**various** 29:11 123:8
**vary** 35:18,19
**Vascular** 102:12
**vein** 116:23 117:1,10
**ventilated** 80:17 108:16 115:2,14
**ventilating** 80:23 112:4
**ventilation** 61:2,4 112:5,6 115:10
**verify** 87:8
**Versed** 68:12 82:21,23
**versus** 18:18 26:21
**vessel** 82:24
**video** 42:7 48:19,23
**view** 54:17 74:12
**violate** 120:4
**violated** 81:21 90:9
**violating** 63:4
**violation** 105:23 107:5 120:11
**violent** 42:19 43:1,18 73:20 78:14,22
  111:13 125:6
**violently** 67:19 82:17 84:5
**visible** 80:6
**vital** 24:15 51:17 52:1 117:20

**vitals** 35:7,12 37:8
**volume** 58:8 129:1
**voluntarily** 21:5
**vs** 1:8

---

**W**

**Waddell** 3:21 5:4 98:13,14 99:3
  118:7 127:24 131:10,11
**walk** 62:19
**walked** 16:11
**walking** 96:8 114:21
**wall** 17:17 58:15
**want** 8:20,21 9:17,20 20:9 21:1 25:6
  29:17 32:9,10 40:6 50:23 60:5 62:2
  62:15 64:24 74:23 76:11 77:22
  81:24 87:12,20 91:3 93:8 108:10
  110:6 115:5 119:4 128:5 131:3,7
  131:14
**wanted** 25:12 27:5 79:4 123:18
**wash** 83:8
**wasn't** 74:24 126:20
**watchdog** 44:1
**watchdogs** 44:19
**way** 22:4 27:8 54:3 56:11 63:5,6
  73:11 81:5 84:23 85:17 103:15
  108:19 109:21 116:13,13 126:20
  128:8,10
**ways** 54:12 107:23 108:2,4 130:15
**weapon** 47:11
**Weatherford** 1:15 3:11
**WEBER** 3:17
**website** 14:12
**weigh** 67:15
**weight** 73:5
**welcome** 13:20
**well-ventilated** 115:11
**went** 12:20 59:19 121:23 128:6
**weren't** 25:15 44:3
**we'll** 12:23 20:6 51:6 64:23 123:4,11
  124:15 127:1 132:3
**we're** 6:6 12:3 29:6 31:5,7,23 32:3
  36:20 50:15 54:5 55:9 58:13,14
  59:4 76:4 92:19 95:13 106:4,21,22
  124:9 125:1,2
**we've** 29:7 43:7 57:22 81:13 82:1
  84:17 87:14 90:4,10,16,21 94:5
  95:8 100:3 102:5 115:4,6 127:12
  127:16
**whatsoever** 56:19
**wheel** 93:15,16
**WHEREOF** 135:1
**widely** 76:20
**widow** 99:11
**wife** 18:9
**willful** 126:14
**William** 1:13 3:11
**Wisconsin** 3:19
**wise** 123:14
**within-named** 134:5
**witness** 5:3 7:10 18:2,13 94:18 96:19
  98:10 99:5 121:4 131:2,4,5 132:7
  134:6,10 135:1
**WITTE** 1:12
**word** 84:13 85:9 88:4 117:24
**words** 23:17 45:17 80:16 126:15
**work** 8:19,24 9:20 13:22 17:18 18:18
  18:18 19:2 21:1 71:17 95:11,19
  96:12 112:20 114:5
**worked** 28:23 78:13 98:24
**working** 10:4 23:8

**Worksheet** 133:23
**World** 125:23
**wouldn't** 16:11 64:19 65:1,2 68:5
 80:24 82:23 91:22 109:22 119:21
**wrestling** 111:16
**write** 89:4
**writes** 104:15
**written** 71:4 72:20 85:17 122:17
 125:7,10,12,22
**wrong** 79:14 102:23 112:24

**X**

**X** 5:1

**Y**

**Yano** 14:21 15:17
**yeah** 17:24 54:6 107:19 123:22 127:9
 130:23
**year** 12:23 13:5,7 107:21 113:20
 114:4 130:12
**years** 6:12 16:9,9,9 17:16,17 18:11,23
 20:14 36:7 42:23 109:4 122:17
 123:1 124:2
**yell** 55:1
**yelling** 55:11 58:1 80:8,14
**Y-a-n-o** 14:21

**$**

**$1500** 96:6
**$2,000** 96:6
**$250** 95:18,23 96:14
**$5,000** 95:13
**$875,000** 126:6

**1**

**1** 5:10,10,10,11,11,12,12,13,13,14,14
 6:2,8 40:11 41:17 42:5,17 49:15
 50:11,11,18 69:1,4
**1-10** 1:16
**10** 5:14 6:2 7:2 17:16,17 35:24 53:22
 53:22 60:22 61:11 74:3,9 77:1,2
 122:12
**100** 57:21 107:1
**103** 3:7
**107** 124:22
**11** 2:1 5:15 42:5 75:12,23 94:3,4,9
 132:6 133:2
**11th** 26:21
**112** 124:23
**12** 5:4,15 30:11 32:22,23,24 34:4,11
 34:15 41:20,21,21 42:8 68:4 83:11
 94:4,9 132:6
**12-lead** 103:2 104:9 128:24
**12:10** 132:8
**121** 5:5
**1250** 3:4
**128** 5:6
**13** 5:3 41:19 94:9
**132** 5:15,15
**14** 41:19 130:13
**141** 4:5
**15** 41:19
**150** 48:11 52:20,22 53:17 103:14
**156** 52:20 53:17,21 116:4
**16** 41:19 66:14,14,18
**164** 53:13,22 116:5
**17** 41:20 66:14,20
**18** 10:17 40:12 41:17,20,21 49:21,23
 50:2 68:4 83:12
**180** 103:16

**186** 53:13,23 116:5
**19th** 135:3
**19:55:11** 29:16,19
**19:55:12** 29:20
**1981** 9:11 10:5
**1990** 21:3
**1991** 21:3
**1993** 10:5
**1996** 125:7

**2**

**2** 5:10 6:9 14:3 27:2 49:3,12,14 50:8
 50:10,16,20 67:16 68:14 82:20,21
 84:10
**20** 18:21 67:3,3
**20-plus** 123:1
**20-some** 93:4 122:17
**20:01:13** 29:21
**20:02** 32:24 33:5
**20:02:19** 29:21 30:8 33:20
**20:10:57** 53:20
**20:14:44** 29:22 33:21 34:13
**20:20** 53:12 54:7
**20:25** 54:7
**20:26:59** 34:3,14
**20:28** 35:6 87:2
**20:33** 35:7,8 37:9 86:19,19
**200** 3:4
**2007** 71:5
**2011** 72:20
**2012** 125:24
**2014** 124:13
**2015** 126:10,16
**2017** 2:1 6:13 7:24 13:16,17 40:7
 123:7 133:2 135:3
**2019** 135:7
**202** 77:16,24 78:16 81:12
**204** 3:7
**21** 5:4
**21:10** 34:5 37:5
**21:44** 87:2
**22** 53:14
**223-3300** 3:19
**23** 135:7
**234-0804** 3:8
**241** 3:18
**248** 76:9,10
**250** 130:11
**255-1010** 133:22
**26** 20:14
**260-6953** 4:6
**27-year-old** 126:6
**2917** 13:15

**3**

**3** 5:6,11 6:11 25:8,19,21 45:1 68:14
 82:20 99:14,15 123:7,24 124:3
 125:24
**3:17CV60-DMB-RP** 1:8
**30** 19:8 81:6,7 116:13
**300** 3:18
**31** 6:13 7:24 40:6 41:4
**330** 4:10
**333-8101** 3:23
**34** 18:10
**36** 36:7 42:23 109:4
**38103** 3:4,22
**38119** 4:10
**38655** 3:7
**38802** 3:14

**38804** 4:5

**4**

**4** 5:11 6:13 50:23 68:15 82:20,20
**40** 34:8
**414** 3:19
**419** 133:22
**43604** 2:4 133:22

**5**

**5** 5:12,15,15 6:14 61:12 74:7,8,9,9,19
 77:1,2 82:20,20,21 122:12
**50** 3:22
**50s** 114:5
**525-6278** 3:5
**526-0606** 4:11
**53** 107:22
**53202** 3:19
**5400** 4:10

**6**

**6** 5:10,10,11,11,12,12,13,13,14,14
 6:17 29:10 48:11 77:15 127:10
**60** 48:11
**60s** 114:5
**605** 66:15,15 67:9 68:13 81:22,24
 82:7 87:14 124:22,24
**610** 3:22
**612** 81:22 87:24 88:23 89:10,12,23
 90:9,19 124:24 128:15
**615** 2:3 133:21
**65,000** 114:4
**662** 3:8,14 4:6

**7**

**7** 5:3,5,13 6:20 108:21
**7120** 3:13

**8**

**8** 5:13 6:22 130:13
**80s** 21:1
**842-3871** 3:14

**9**

**9** 5:5,14 6:24 13:12 25:11,20,21 49:24
**9-inch** 50:2
**9:40** 2:1
**90** 32:4 57:15,21,23 59:9 63:12 64:8
 64:11,15 86:19 91:16 110:16
 116:12
**90s** 122:16
**901** 3:5,23 4:11
**911** 61:18
**96** 5:4
**98** 5:4
**99** 5:5

C E R T I F I C A T E

I certify that _____Robert C. Krause, EMT_____ has

been given the allotted time to read and sign the deposition transcript

and has failed to do so.

　　　IN WITNESS WHEREOF, I have hereunto set my hand and

affixed my seal of office at Toledo, Ohio, on

this __20th__ day of __November__, 20 _17_.


_____
MAUREEN POWERS
Notary Public
In and for the State of Ohio


My Commission expires on July 23, 2019.




■ COLLINS REPORTING SERVICE, INC.
615 Adams Street ▪ Toledo, OH 43604 ▪ Tel: 419-255-1010
Fax: 419-244-8222 ▪ collinsreporting.com