1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF MISSISSIPPI
 2                        OXFORD DIVISION

 3   KELLI DENISE GOODE,                )
     Individually, and also as         )
 4   the Personal Representative       )
     of Troy Charlton Goode,           )
 5   Deceased, and as Mother,          )
     Natural Guardian, and Next        )
 6   Friend of R.G., a Minor, and      )
     also on behalf of all             )
 7   similarly situated persons,       )
                                       )
 8                PLAINTIFFS,           )
                                       )
 9   VS.                               )
                                       )
10   THE CITY OF SOUTHAVEN, TODD       )   CIVIL ACTION NO.
     BAGGETT, Individually,            )   3:17CV60-DMB-RP
11   JEREMY BOND, Individually,        )
     TYLER PRICE, Individually,        )
12   JOEL RICH, Individually,          )
     JASON SCALLORN,                   )
13   Individually, STACIE J.           )
     GRAHAM, a/k/a WITTE,              )
14   Individually, MIKE MUELLER,       )
     Individually, WILLIAM             )
15   PAINTER, JR., Individually,       )
     BRUCE K. SEBRING,                 )
16   Individually, JOSEPH SPENCE,      )
     Individually, RICHARD A.          )
17   WEATHERFORD, Individually,        )
     JOHN DOES 1-10, BAPTIST           )
18   MEMORIAL HOSPITAL-DESOTO, a       )
     Mississippi Corporation,          )
19   SOUTHEASTERN EMERGENCY            )
     PHYSICIANS, LLC, a Tennessee      )
20   Corporation, and LEMUEL           )
     DONJA OLIVER, M.D.,               )
21                                     )
                  DEFENDANTS.          )
22
23   * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
24          ORAL DEPOSITION OF DARRELL COSLIN
25   * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Electronically signed by Linda Webster (201-289-050-5808)

f6856601-66fe-40d9-b039-9379273000e5

1    ANSWERS AND DEPOSITION OF DARRELL COSLIN,

2    produced as a witness at the instance of the

3    Defendants, taken in the above-styled and -numbered

4    cause on the 1st day of November, 2017, A.D.,

5    beginning at 9:19 a.m., before Linda J. Webster, a

6    Certified Shorthand Reporter in and for the State

7    of Texas, in the offices of Charles W. Nichols,

8    located at 617 East Lacy Street, Palestine, Texas,

9    in accordance with the Federal Rules of Civil

10   Procedure and the agreement hereinafter set forth.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Electronically signed by Linda Webster (201-289-050-5808)          f6856601-66fe-40d9-b039-9379273000e5

```
 1                    A P P E A R A N C E S
 2    FOR THE PLAINTIFFS:
          MR. KEVIN M. MCCORMACK, ESQ.
 3        Ballin, Ballin & Fishman, PC
          200 Jefferson Avenue
 4        Suite 1250
          Memphis, Tennessee 38103
 5        (901) 525-6278
          (901) 525-6294 (Fax)
 6        kmccormack@bbfpc.com
 7
      FOR THE DEFENDANT THE CITY OF SOUTHAVEN, TODD
 8    BAGGETT, JEREMY BOND, TYLER PRICE, JOEL RICH, JASON
      SCALLORN, STACIE J. GRAHAM, MIKE MUELLER, WILLIAM
 9    PAINTER, JR., BRUCE K. SEBRING, JOSEPH SPENCE, and
      RICHARD A. WEATHERFORD:
10        MR. BERKLEY N. HUSKISON, ESQ.
          Mitchell, McNutt & Sams, P.A.
11        Post Office Box 1366
          Columbus, Mississippi 39703-1366
12        (662) 328-2316
          (662) 328-8035 (Fax)
13        bhuskison@mitchellmcnutt.com
14
      FOR THE DEFENDANT LEMUEL DONJA OLIVER, M.D.:
15        MS. AMANDA WADDELL, ESQ.
          (appearing via telephone)
16        Rainey, Kizer, Reviere & Bell, PLC
          50 North Front Street
17        Suite 610
          Memphis, Tennessee 38103
18        (901) 333-8101
          (901) 577-1416 (Fax)
19        awaddell@raineykizer.com
20        MR. RIC GASS, ESQ.
          (appearing via telephone)
21        Gass, Weber, Mullins, LLC
          241 North Broadway
22        Suite 300
          Milwaukee, Wisconsin 53202
23        (414) 224-7697
          gass@gwmlaw.com
24
25
```

Electronically signed by Linda Webster (201-289-050-5808)

f6856601-66fe-40d9-b039-9379273000e5

```
1    FOR THE DEFENDANT BAPTIST MEMORIAL HOSPITAL-DESOTO:
         MR. JOHN MARK MCINTOSH, ESQ.
2        (appearing via telephone)
         Upchurch and Upchurch, PA
3        141 South Commerce Street
         Suite B
4        Tupelo, Mississippi 38804
         (662) 260-6953
5        (662) 269-3713 (Fax)
         jmcintosh@upchurchpa.com
6

7    FOR THE DEFENDANT SOUTHEASTERN EMERGENCY
     PHYSICIANS, LLC:
8        MR. LOYS A. "TREY" JORDAN, ESQ.
         (appearing via telephone)
9        McDonald Kuhn, PLLC
         5400 Poplar Avenue
10       Suite 330
         Memphis, Tennessee 38119
11       (901) 526-0606
         tjordan@mckuhn.com
12

13   WITNESS' ADDRESS:
         6087 Anderson County Road 404
14       Palestine, Texas 75803

15

     ALSO PRESENT:
16       MR. MICHAEL MART - Deposition Resources,
           Technical Advisor
17

18
                    REPORTER'S RECORD
19
            Uh-huh = Yes - Affirmative response
20           Huh-uh = No - Negative response

21     Quotation marks are used for clarity and do not
               necessarily indicate a direct quote.
22

23

24

25
```

Deposition Resources, Inc.
800.295.4109

Electronically signed by Linda Webster (201-289-050-5808)

f6856601-66fe-40d9-b039-9379273000e5

1                           I N D E X

2                                                           Page

3          Appearances................................     3

4          Stipulations...............................     6

5     WITNESS:  DARRELL COSLIN

6          Examination by Mr. Huskison...............     7

7          Examination by Mr. McCormack..............    112

8          Reporter's Certificate.....................    140

9

10                          E X H I B I T S

11    No.     Description                              Page

12    A       Coslin Consulting Report.............     8

13    B       Diagram depicting restraint in ......    19
              hog-tied position
14
      C       Photograph...........................    20
15
      D       Witness Statement of Alan Wilson.....    29
16
      E       Voluntary Statement Form of Amanda ..    32
17            Anderson

18    F       Witness Statement of Lisa Smith......    34

19    G       Witness Statement of Vanessa ........    34
              Johnson
20
      H       Google Earth Map.....................    49
21
      I       Notice of Deposition of Darrell .....   109
22            Coslin

23

24

25

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1    A G R E E M E N T S

2        It is hereby agreed by and between the parties

3    hereto through their attorneys appearing herein

4    that any and all objections to any question or

5    answer herein except as to the form of the question

6    and nonresponsiveness of answers may be made upon

7    the offering of this deposition in evidence upon

8    the trial of this cause with the same force and

9    effect as though the witness were present in person

10   and testifying from the witness stand.

11       It is further agreed by and between the parties

12   hereto through their attorneys appearing herein

13   that signature of the witness is waived.

14

15

16

17

18

19

20

21

22

23

24

25

Electronically signed by Linda Webster (201-289-050-5808)          f6856601-66fe-40d9-b039-9379273000e5

```
 1              P R O C E E D I N G S
 2                 DARRELL COSLIN,
 3   having been first duly sworn, testified as follows:
 4                   EXAMINATION
 5   BY MR. HUSKISON:
 6        Q.  Good morning, Mr. Coslin.  I'm Berk
 7   Huskison.  I'm here on behalf of the Southaven
 8   defendants in the case filed by Troy Goode to take
 9   your deposition.  You've been identified as a
10   police tactics expert in the case.  Do you
11   understand that's what you're here to testify about
12   today?
13        A.  Yes, sir.
14                 MR. HUSKISON:  Before we get started,
15   Mr. Coslin, if we can, I think it would be good for
16   everybody -- everybody attending to introduce
17   themselves for the court reporter to make a record
18   of it.
19                 MR. MCCORMACK:  Here live is Kevin
20   McCormack for the plaintiff.
21                 MR. HUSKISON:  What we're doing now so
22   that everybody here is introducing themselves and
23   who they represent for the court reporter.  All
24   right, guys.  Can you hear me?
25                 MR. GASS:  Yeah.
```

Electronically signed by Linda Webster (201-289-050-5808)          f6856601-66fe-40d9-b039-9379273000e5

1  MR. HUSKISON: What we're doing now,

2  since everybody else is off camera, we are trying

3  to introduce everybody who is listening in to the

4  court reporter so she can record the names of

5  everybody that's participating.

6  All right. Anyone listening on the

7  phone, please introduce yourself to the court

8  reporter.

9  MR. GASS: Ric Gass on behalf of

10  Dr. Oliver.

11  MS. WADDELL: Amanda Waddell also on

12  behalf of Dr. Oliver.

13  MR. JORDAN: Trey Jordan on behalf of

14  Southeastern Emergency Physicians.

15  MR. MCINTOSH: John Mark McIntosh on

16  behalf of Baptist Memorial Hospital of DeSoto.

17  (Exhibit A was marked.)

18  Q. (BY MR. HUSKISON) Okay. We'll get

19  started. As I said earlier, I'm Berk Huskison here

20  on behalf of Southaven. If you would, Mr. Coslin,

21  for the record -- tell me, and I've seen -- we've

22  got your report. I put it in front of you.

23  MR. GASS: We can't hear whoever is

24  asking the questions.

25  MR. HUSKISON: Y'all are just going to

Electronically signed by Linda Webster (201-289-050-5808)

f6856601-66fe-40d9-b039-9379273000e5

1    have to listen on the phone because we've got to

2    get started, and I don't know what else to do.  We

3    can't -- I'm not in charge.  I don't know how to

4    get all of this stuff set up.

5              (Break was had from 9:24 a.m. to

6              9:26 a.m.)

7        Q.  (BY MR. HUSKISON)  All right.  Now, you've

8    been designated, Mr. Coslin, as an expert on police

9    tactics in this case, correct?

10       A.  That's correct.

11       Q.  Are you going to provide -- police tactics

12   is your area of expertise.  You're not an expert in

13   medical care or anything like that, correct?

14       A.  No, sir.

15       Q.  Now, we're talking about primarily an

16   incident with Troy Goode on July 18, 2015, in

17   Southaven, Mississippi, correct?

18       A.  Yes, sir.

19       Q.  Now, I've seen your report, and I want to

20   go through some of that with you.  How many years

21   have you been in law enforcement?

22       A.  Coming up on 33 years.

23       Q.  And just give me a brief -- in the

24   33 years, I know you worked several years with

25   Dallas --

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1       A.   Yes, sir.

2       Q.   -- the Dallas Police Department.  Tell me

3   about what your -- what your experiences were, what

4   were your jobs, and so on, as briefly as you can.

5       A.   Well, 33 years isn't brief, unfortunately.

6       Q.   Certainly.

7       A.   I spent 30 years with the Dallas Police

8   Department.  At Dallas, I served as a patrolman, a

9   supervisor, a member of the Dallas SWAT team.  I

10  served as a field training officer training new

11  recruits in the field.  I served as a narcotics

12  detective for five years.  I was assigned to an ATF

13  task force working violent crime -- working on the

14  violent crime task force with them.  I have

15  supervised a -- the jail personnel assigned to

16  place -- for the Dallas Police Department to place

17  people in jail, the civilian staff as well as sworn

18  staff in the jail.

19           I worked in communications, and I've

20  been an instructor -- a law enforcement instructor

21  since 1991 and spent the last five years of my time

22  with Dallas as a staff instructor at our in-service

23  training academy where my key role was the teaching

24  of police use of force, search and seizure, those

25  kind of things, coordinating the field training

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1    program where we instructed the new FTOs how to be

2    trainers, and various other tasks.

3         Q.   Now, you were in Dallas from February of

4    1985 to May of 2015?

5         A.   That's correct.

6         Q.   Why did you leave the Dallas Police

7    Department?

8         A.   Because I retired.

9         Q.   And what did you do after you retired?

10        A.   I relocated to Palestine, Texas, with my

11   wife, and I began a consulting firm, Coslin

12   Consulting, which I own and operate, to do

13   use-of-force consulting, training, policy review,

14   those sort of things, and also work for the Smith

15   County Sheriff's Office in Tyler, Texas.

16        Q.   What is your position with the Smith County

17   Sheriff's Department?

18        A.   I am now serving as an administrative

19   supervisor.  I'm the administrative superintendent

20   to the sheriff and serve as his public information

21   officer dealing with all media relations.

22        Q.   In that role since you've been in Smith

23   County, do you -- do you have duties of going out

24   in the field, being out and about as a regular

25   police officer, or are you mostly inside?

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1      A.  I did, up until February of this year, and

2  then I took this administrative position where I'm

3  inside the majority of the time.

4      Q.  And since you've been a police officer --

5  and I know 31 years -- have you ever been sued

6  before?

7      A.  It will be 33 years.

8      Q.  33.  I'm sorry.  I didn't mean to

9  shortchange you.  Again, have you ever been sued

10  before?

11      A.  No, sir.

12      Q.  All right.  Has your city or your county

13  that you work for ever been sued because of

14  something that you did?

15      A.  No, sir.

16      Q.  Training since 1991, tell me what that

17  would involve.  Just give me a little idea of what

18  you do.

19      A.  I'm responsible for developing training,

20  coordinating training, and providing training to

21  both new recruits and in-service officers, so

22  Dallas was so large that it divides academies.  We

23  had two separate academies.  You had a basic

24  academy for all new recruit officers that we

25  trained, and we have approximately 200 recruits in

Electronically signed by Linda Webster (201-289-050-5808)                                    f6856601-66fe-40d9-b039-9379273000e5

1    training at any given time, and then you would have

2    our in-service academy that did -- and all of the

3    continuing education for all the officers once they

4    graduate from the academy, and that was to service

5    the 3,600 officer department.

6         Q.   As part of that training, did you have any

7    experience in the -- any training with the use of a

8    Taser?

9         A.   Yes.

10        Q.   What about with the use of a canine?

11        A.   A little bit.  I was never a canine

12   handler.  That's not something that I did, but I'm

13   aware of our canine policies and procedures and the

14   routine of the canine officers, but I wasn't

15   specifically a canine handler.

16        Q.   That's not something that -- do you have

17   expertise in that, in your -- in your mind?

18        A.   As far as standard police operations, yes,

19   sir.

20        Q.   Okay.  But you've never trained on canines?

21        A.   I've never served as a canine officer.

22        Q.   That's kind of a separate training, is it

23   not?

24        A.   Yes, sir.

25        Q.   Now, in your training, particularly your

Electronically signed by Linda Webster (201-289-050-5808)           f6856601-66fe-40d9-b039-9379273000e5

1    recent training, does -- is there any specific

2    training for officers dealing with somebody that

3    may have, in this case, a bad trip on LSD?

4         A.   Well, it would fall under -- one of the big

5    things in training over the last several years in

6    law enforcement is dealing with excited delirium,

7    and so we're talking about people who may have some

8    kind of a drug or drug-induced psychosis.  There's

9    also critical -- critical incident training where

10   we're dealing with -- or our crisis intervention

11   training where we're dealing with people who are --

12   may be mentally unstable either due to

13   psychological reasons or, once again, drug --

14   drug-related psychosis involving that person, so

15   those are the two key studies or -- or training

16   topics that have occurred over the last decade, I

17   guess, that would relate to -- that someone who was

18   on LSD would fall into that category.

19        Q.   You have reviewed information on this case.

20   You'd agree with me, Troy Goode was on a

21   drug-induced hallucination of some sort?

22        A.   There's no reason to doubt that.

23        Q.   Now, were you aware, in reading through

24   what you did, that he also drank alcohol and smoked

25   marijuana during the day?

Electronically signed by Linda Webster (201-289-050-5808)           f6856601-66fe-40d9-b039-9379273000e5

1       A.  I know that his wife, that she -- that he

2    had taken LSD.  It's -- it's been several months

3    since I read through this whole document, and I

4    can't specifically recall right now if they said he

5    was on alcohol or marijuana at the same time.  I

6    don't recall that.

7       Q.  You don't recall -- okay.  But you knew, as

8    you said, he was -- something was going wrong with

9    him out there when all of this -- when all of this

10    occurred?

11       A.  Through reading through the files and

12    everything, it was apparent that Mr. Goode was

13    having some kind of crisis, yes.

14       Q.  Now, one of the other issues in this case,

15    have you ever trained on the use of a four-point

16    restraint?

17       A.  Actually, until this case, I've never heard

18    of someone outside of the medical field referring

19    to this type of restraint as a four-point

20    restraint.  Over the years, it's been referred to

21    as hog-tying or a hog-tie.  There are -- there's a

22    company out there that refers to it as a maximum

23    restraint position.  This is the only time that

24    I've actually heard it being referred to as a

25    four-point restraint.

Electronically signed by Linda Webster (201-289-050-5808)             f6856601-66fe-40d9-b039-9379273000e5

1          Generally, when you hear four-point

2     restraint, we're discussing someone who's either in

3     a bed or gurney that's had all four limbs secured

4     to that person restrained, so we have four points

5     of restraint to the person that's in the bed or

6     gurney.

7          Q.  Did you read the deposition of Tom Long,

8     the police chief at the time?

9          A.  Yes, sir, I did.

10         Q.  Did you see his discussion on that?

11         A.  Yes, sir, I did.

12         Q.  Okay.  And do you have issues with what he

13    was saying?

14         A.  Yes, sir, I do.

15         Q.  Tell me what your issues are.

16         A.  Chief Long, in his deposition, refers to

17    hog-tying as a use of two pair of handcuffs, one to

18    secure the wrist of the individual and another pair

19    of handcuffs used to constrain the feet, the

20    ankles, and securing both handcuffs together where

21    the feet and the hands are basically pulled

22    completely together, putting the individual in an

23    extremely uncomfortable position here.

24              The problem I have with that is

25    handcuffs and leg restraints are two very different

Electronically signed by Linda Webster (201-289-050-5808)          f6856601-66fe-40d9-b039-9379273000e5

1    tools, and they are very different sizes. The

2    handcuffs are designed to secure the wrist area of

3    an individual. They're much smaller in diameter.

4    There's a very, very small amount of population in

5    the United States that handcuffs will actually fit

6    around their ankles. I actually brought a pair of

7    handcuffs and leg restraints to demonstrate this if

8    you'd like. I just don't care to have my leg

9    restraints seized because I like to keep them.

10        Q. Sure.

11        A. But I can show the difference between the

12    diameter size, and the -- and the problem law

13    enforcement would have trying to put handcuffs on a

14    person's ankle. It's almost impossible to do this

15    unless you're dealing with a very, very small

16    person or a child because of the diameter of the

17    ankle.

18        Q. When you -- the way I understood it, and I

19    believe the way Mr. Long described it, is you had

20    the handcuffs on the hand. You had leg shackles,

21    but they were attached with no give in-between?

22        A. Well, when he first describes it in his

23    deposition, he said he used two pair of handcuffs.

24        Q. Okay.

25        A. He said the difference between hog-tying

Electronically signed by Linda Webster (201-289-050-5808)        f6856601-66fe-40d9-b039-9379273000e5

1    and the four-point restraint was, hog-tying you

2    used two pair of handcuffs to secure them where

3    there's no give.  The four-point restraint, the

4    difference is, there's handcuffs on the wrists and

5    there's leg shackles or leg restraints, or, as you

6    refer to them, leg irons placed on their ankles

7    that have a longer -- approximately a 16-inch long

8    chain in the middle to allow that to be looped

9    around the handcuffs to allow for a little bit more

10   give or room between the suspect and their hands.

11        Q.   That allows for movement of the legs to

12   some degree because you're not in a ball?

13        A.   It depends -- to some degree, yes, but it

14   depends on the size of the person being secured.

15   Of course, the larger you are, the more difficult

16   it is and the more confining it is.  If you try to

17   put me in this, it's going to be extremely

18   difficult, since I'm 6 foot 9, to get my feet and

19   arms together.  There's going to be very -- there's

20   not enough slack in the chain to hardly get me

21   together.

22        Q.   Let me show you -- we'll mark it as

23   Exhibit A.

24             MR. MCCORMACK:  Wouldn't that be B?

25             MR. HUSKISON:  That's B, you're right.

Electronically signed by Linda Webster (201-289-050-5808)     f6856601-66fe-40d9-b039-9379273000e5

```
1              (Exhibit B was marked.)
2         Q.  (BY MR. HUSKISON)  What I've shown you,
3    Mr. Coslin, and for the record is a diagram that
4    has been provided in discovery and discussed at
5    other depositions, and it's got, it looks like, an
6    individual, and he's hog-tied in the back of a car;
7    is that right?
8         A.  Correct.
9         Q.  Okay.  And you see how his hands and feet
10   are connected in that picture, correct?
11        A.  Yes, sir.
12        Q.  And everything is together?
13        A.  No, sir.
14        Q.  It's not?
15        A.  No, sir.
16        Q.  Tell me how that's not together.
17        A.  This diagram is showing handcuffs being
18   used on the wrists and a leg iron being used on the
19   ankles.  If you can see the distance between where
20   the wrist connect and where the shackles are on the
21   back of the ankles here, this -- this distance
22   between these two is the distance that is created
23   (indicating).  If you were attempting to put two
24   pairs of handcuffs tied together, the feet and
25   hands would only literally be right on top of each
```

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

```
 1    other.
 2                So if you -- if you look at the
 3    diagram here, you see the distance back here and
 4    this -- and this chain going between the -- your
 5    restraints here on the ankles and restraints on the
 6    hands, this is depicting a leg iron and handcuffs.
 7        Q.   The pictures -- the diagram shows
 8    everything together, though, correct?
 9        A.   Yes, sir.
10        Q.   Okay.  I'm going to show you -- this was
11    another exhibit.  We'll mark it as Exhibit C.
12                (Exhibit C was marked.)
13        Q.   (BY MR. HUSKISON)  And this was an exhibit
14    that has been used in depositions.  I think it may
15    have been Exhibit 24 in the group of exhibits we
16    did early on, and this is an actual picture of Troy
17    Goode at the scene.  And it's not a great picture,
18    but it is a picture -- you can see that he is lying
19    flat down on a gurney, correct?
20        A.   Yes, sir.
21        Q.   His head is -- it looks like it's sideways.
22    You can barely see that, but you can see his head
23    laying down, correct?
24        A.   Yes, sir.  I can tell where his head is
25    supposed to be.
```

Electronically signed by Linda Webster (201-289-050-5808)                f6856601-66fe-40d9-b039-9379273000e5

1    Q.   Okay.  And then his arms are behind him.
2    Do you see that?
3    A.   Yes, sir.
4    Q.   And then you see at least one of his legs
5    is up?
6    A.   Yes, sir.
7    Q.   And it's hard to do distance on here, but
8    there is some slack in there from his hands back to
9    his feet, correct?
10    A.   From one of his feet, right.  One is
11    forward, and one is more to the rear.
12    Q.   And they're kind of -- it looks like his
13    feet are crossed a little bit there.  That's the
14    back of his shoe there?
15                MR. MCCORMACK:  Object to the form,
16    Berk.  Was that a question?
17                MR. HUSKISON:  I want to make sure he
18    understands what he's looking at.  That is the back
19    of his shoe, I believe, right there.
20                THE WITNESS:  So...
21    Q.   (BY MR. HUSKISON)  He's got his legs
22    crossed, and one of them is sticking straight up,
23    correct?
24    A.   You've got -- you've got -- it looks like
25    his left leg is up and to the rear, and his right

1  leg may be bent forward to an extreme forward
2  position.
3      Q.  Okay.  And his knees are on the gurney?
4      A.  Correct.
5      Q.  Okay.  Does this look -- this looks like --
6  we're looking -- thinking back to what Tom Long
7  testified in his deposition, this is the restraint
8  he was trying to describe?
9          MR. MCCORMACK:  Object to the form.
10  Which -- which restraint?  We've already discussed
11  two he discussed.
12      Q.  (BY MR. HUSKISON)  The restraint, which Tom
13  Long refers to as a four-point restraint --
14  four-point restraint, where you've got some give.
15      A.  Uh-huh.
16      Q.  Where you've got a chain wrapped around to
17  allow some give in the legs, that depicts what he
18  was describing in his deposition; is that correct?
19      A.  That is correct, yes, sir.
20      Q.  Okay.  And you see, he's got his legs where
21  he can move them a little bit.  You see one of them
22  up, as a matter of fact, backwards up?
23      A.  Yes, sir.
24      Q.  And his body is laying flat on the gurney?
25      A.  Yes, sir.

Electronically signed by Linda Webster (201-289-050-5808)    f6856601-66fe-40d9-b039-9379273000e5

1      Q.  Okay.  Now, you mentioned that you have

2  never seen any literature, I think you said this in

3  this report, that referenced a four-point

4  restraint.  Is that what I understood you to say?

5      A.  Yes, sir.

6      Q.  Are you familiar with the International

7  Association of Chief of Police manual?

8      A.  I'm -- I'm familiar with the association.

9  I'm not familiar with any publication they put out

10  regarding a four-point restraint.

11      Q.  So you have not reviewed any of their --

12  anything from them that references a four-point

13  restraint?

14      A.  No, sir, I'm not.

15      Q.  Now, we talked about Mr. Goode had ingested

16  marijuana at some point during that evening.  Do

17  you remember what effect that had on him?  He was

18  erratic, correct?

19      A.  Marijuana or LSD?

20      Q.  Excuse me.  LSD.  I'm sorry.

21      A.  Okay.

22      Q.  Do you remember it having an erratic -- he

23  acted erratically after taking the LSD?

24      A.  In the depositions I reviewed, Officer

25  Baggett and Officer -- is it Scallorn?

1    Q.   Scallorn.

2    A.   Scallorn.   They make comments about

3    Mr. Goode's behavior, talking about him running

4    around in circles like a puppy dog, that he was

5    mumbling incoherently, that he was acting very

6    erratic.

7    Q.   Okay.   Do you recall, is that consistent

8    with what you would know somebody that's having a

9    bad trip on LSD is doing?

10   A.   It's possible.   I mean, there could be --

11   there could be many causes of this behavior,

12   whether it's a mental illness issue or a

13   drug-related issue.   Just being an officer showing

14   up on the scene, seeing that kind of behavior, I

15   wouldn't be able to say that guy is on LSD, no.

16   Q.   It's something that you might not recognize

17   right away?

18   A.   Right.   You know there's some kind of

19   crisis or issue going on with the individual, but

20   not necessarily that you could say that was an

21   LSD-induced trip.

22   Q.   Now, Mr. Coslin, when you're reviewing

23   information and taking a look at a situation, it's

24   important to note everything that goes on in the

25   situation that you can find, anything you could

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1    find out, like, the facts.  For example, in an

2    excessive force, how the arrestee was acting?

3         A.   Correct.

4         Q.   And use of force, a lot of times, is

5    dictated and controlled by how they act.  You may

6    have to do more if you can't get them under

7    control.  You would agree with that?

8         A.   Yes.

9         Q.   Okay.  In other words, if you can't get

10   them under control, you step up the force needed to

11   get them under control?  I may be saying that

12   clumsily.

13        A.   That's okay.  As -- as stated by, you know,

14   Graham versus Connor in the Supreme Court decision,

15   the force must be reasonable and -- and only the

16   force necessary to -- to apprehend or control a

17   suspect or subject that we're dealing with at this

18   point in time.

19        Q.   The significant issue there for officers as

20   far as what they're -- what they're trying to do is

21   gain control?

22        A.   At some point in time during this

23   altercation, yes, they did attempt to gain control

24   of Mr. Goode.

25        Q.   And is that consistent with what police

Electronically signed by Linda Webster (201-289-050-5808)          f6856601-66fe-40d9-b039-9379273000e5

1  officers do all over the country when they're --

2  when they're met with some situations, they try --

3  if they're trying to gain control -- they attempt

4  to gain control of a suspect?

5      A.   Well, I mean, if we're referring to an

6  arrest situation where the decision has been made

7  to make an arrest and you're going to have to place

8  this person in custody, absolutely, you're going to

9  take control of the person.  So, I mean, if we're

10  going to be specifically talking about an arrest

11  situation, yes.

12      Q.   Now, let's look for a second at your

13  report -- for a few minutes at your report, and I

14  want to go down to the bottom of page two, and then

15  coming up -- well, actually, let's go to

16  page three.  In that, it's Section 5 of your

17  report.  You're going through and you say the

18  following -- looking at Section 5, the following

19  reflects my understanding of the incident.  Is this

20  a factual summary of what you understood what

21  occurred out there on that evening?

22      A.   I'm sorry?

23      Q.   Make sure.  Section 5.  It's pages 2

24  through 4.

25      A.   Okay.  Section 5, facts and data

Electronically signed by Linda Webster (201-289-050-5808)  f6856601-66fe-40d9-b039-9379273000e5

1    considered, bottom of page two?

2         Q.   Yes, sir.

3         A.   Okay.

4         Q.   Is that section of summary of the facts

5    that you found out there on the scene from your

6    review?

7         A.   This is -- as I stated, this is a -- a

8    brief account of the incident after reviewing the

9    depositions, the reports, statements that were

10   made.   This is just a brief description of the

11   facts as they were described in those accounts of

12   this incident.

13        Q.   Okay.   In looking at -- turn to the top of

14   page three.

15        A.   (Complying.)

16        Q.   The first paragraph there, it looks like

17   you note that Mrs. Goode was driving along Goodman

18   Road.   Mr. Goode said he could not stand the

19   confines, and then Ms. Goode pulled into a parking

20   lot at which time Mr. Goode exited the vehicle and

21   began walking and running.   Do you remember that

22   fact?

23        A.   Yes, sir.

24        Q.   You indicated in your report of the things

25   you reviewed, you reviewed witness statements?

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1    A.   Yes.

2    Q.   Do you recall one of the witnesses saying

3 or indicating that Mr. Goode, in fact, got out of

4 the car before she pulled into the parking lot?

5    A.   I -- not specifically, no.

6    Q.   You don't remember that?

7    A.   I would have to -- I'm not saying it's not

8 there.  Like I said, it's been nearly a year since

9 I read some of these documents.  There's a ton of

10 documents, but that specific statement, I don't

11 remember exactly that being said, no.

12   Q.   And that's something that if you would have

13 reviewed and seen, that would be something -- a

14 pretty important fact that you would note in your

15 factual summary?

16   A.   Not necessarily.

17   Q.   You understand the distinction, Mr. Coslin,

18 between getting out on the roadway -- on the side

19 of the road and before you get into a parking lot?

20   A.   Yes, sir.

21   Q.   It's a little more dangerous if you get out

22 on the roadway, correct?

23   A.   Yes, sir.

24   Q.   Well, let's look at some statements that

25 you reference in your report, if I can get to them.

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1          (Exhibit D was marked.)

2          MR. HUSKISON:  Here you go.

3     Q.  (BY MR. HUSKISON)  We've marked as

4  Exhibit 4 [sic], Mr. Coslin, a statement of Alan

5  Wilson.  Is that one of the statements that you

6  reviewed?

7     A.  Yes, sir, I believe it is.

8     Q.  If you look back on your review list, it's

9  No. 13 back in your report, one of your documents

10  that you reviewed.  In looking at what Mr. Wilson

11  observed, he observed -- why don't you read the

12  second and third sentences if you can find them on

13  there.  "We noticed a silver or gray Volkswagon."

14  Start there.

15     A.  "We noticed a silver or gray Volkswagon

16  pulling into the eastbound emergency lane.  Because

17  of heavy traffic on Goodman, we had to wait some

18  time to pull into the drive.  We observed the two

19  occupants in the Volkswagon looking like they were

20  arguing."

21     Q.  Go ahead.

22     A.  I'm not sure what that word is.

23     Q.  Twice, I think.

24     A.  Is it twice?  "The driver pulled back onto

25  Goodman dangerously missing traffic.  The passenger

Electronically signed by Linda Webster (201-289-050-5808)            f6856601-66fe-40d9-b039-9379273000e5

1    then bolted out of the car and started darting in

2    different directions onto the grass."

3        Q.  Go ahead.

4        A.  "As I finally started to turn in, the car

5    started toward the drive as well as the man on the

6    grass.  The car stopped to let me through.  After

7    parking the car and entering Rio Grande [sic], I

8    continued to watch this.  The woman had parked her

9    car in the driveway near the sign.  There seemed to

10   be more arguing.  The driver's door was open with

11   the driver still seated.  Two or three times, the

12   man kicked or hit the driver as if he was trying to

13   move her out of the way of the driver's seat.  He

14   then began running throughout the parking lot.  The

15   driver moved the car to the parking lot, and she

16   got out.  More verbal confrontation."

17       Q.  Okay.  In your report, when you discuss the

18   facts, you don't mention anything about Troy

19   Goode's behavior that is reported there in that

20   statement, do you?

21       A.  No.  This behavior was consistent with the

22   same reports that Ms. Goode makes and Officer

23   Baggett makes, so to be repetitive and to quote

24   every statement was not necessary here.  This was,

25   like I said, a brief description of the facts that

1    I came up with from reading all of these different

2    depositions.  There was, obviously, a problem with

3    Mr. Goode in the vehicle.  Mrs. Goode was trying to

4    get to the side of the road or to get to a parking

5    area to deal with him.  He was in and out of the

6    vehicle.

7                Here in this statement, it says she

8    pulled to the side of the road.  At the time, he

9    exited the car while it was stationary parked in

10   the emergency lane and ran to the grass, not the

11   traffic.  So this confirms exactly what I'm saying

12   here that there was a disturbance.  Ms. Goode did

13   pull over.  He got out of the car and was running

14   around the parking lot and grassy area outside of

15   this restaurant off Goodman Road.

16       Q.  Did you not consider it significant enough

17   that a gentleman -- that Mr. Goode was getting in

18   and out the car on the side of the roadway to

19   put that in your report?  I don't see that in here.

20       A.  No, sir.  And -- and -- and another deal

21   we're talking about here is this occurred prior to

22   the police arrival, so we know that Mr. Goode was

23   having a crisis, that Mr. Goode did get out of the

24   vehicle, that Ms. Goode recognized this and was

25   attempting to pull over and stop to deal with

1    Mr. Goode.  The exact location of where Mr. Goode

2    exited the vehicle was really not important in

3    determining whether or not the officers use of

4    force in this case was reasonable or not.

5        Q.  Now, that is conduct of the person they

6    were trying to arrest, correct?  That's conduct --

7    that's Troy Goode?

8        A.  That's correct.

9        Q.  Okay.  Now, let's look at another

10   statement.  We'll mark it as -- what are we to?

11              THE COURT REPORTER:  E.

12              (Exhibit E was marked.)

13       Q.  (BY MR. HUSKISON)  This is a statement,

14   Exhibit E, of Amanda Anderson, which she's

15   describing what she observed.  Do you remember

16   reviewing that statement?

17       A.  Yes, sir.

18       Q.  Okay.  Does it generally talk about a

19   disturbance and a wife trying to control her

20   husband?

21       A.  Yes, sir.

22       Q.  And it was such a deal for her that she

23   called 911 on two occasions?

24       A.  That's correct.

25       Q.  You don't mention that in your summary of

1  facts, either, do you?

2      A.  I do not refer to her statement

3  specifically.  I do make clear that there was a

4  disturbance.  Ms. Goode, once again, pulled over.

5  Mr. Goode got out of the car.  The police were

6  called.  These are the facts which I place here

7  in -- actually, I do.  Witness at the location

8  believed that some type of disturbance was

9  occurring and at that -- and at approximately

10  7:45 p.m. called 911.

11      Q.  So you mention in your report about the 911

12  call?

13      A.  Absolutely.

14      Q.  And she was very specific about what she

15  observed in that report and reported to 911?

16      A.  Yes, sir.

17      Q.  You'd agree with me that's pretty

18  significant behavior on the part of Mr. Goode in

19  and around the roadway?

20              MR. MCCORMACK:  Object to the form.

21      A.  I would agree that Mr. Goode, at that time,

22  was in crisis, that there was several witnesses to

23  this disturbance, and it was enough of a

24  disturbance that it caused people to call 911, yes,

25  sir.

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1    Q.   (BY MR. HUSKISON)   Now, Exhibit F, let's

2    look at one more statement, Lisa Smith.

3                (Exhibit F was marked.)

4    Q.   (BY MR. HUSKISON)   Do you remember

5    reviewing Exhibit F, Ms. Lisa Smith's statement?

6    A.   Yes, sir.

7    Q.   In her statement, it talks of Mr. Goode

8    going directly toward a police car where the canine

9    was, correct?

10   A.   Yes, sir.

11   Q.   She references the officer held the canine

12   and had his hand up to the individual.   Do you see

13   that down in the middle?

14   A.   Yes, sir.

15   Q.   It looked as if the officer was trying to

16   calm the individual down.   Do you remember that?

17   A.   Yes, sir.

18   Q.   And she references aggressive and agitated

19   behavior of Troy Goode?

20   A.   Uh-huh.   Yes, sir.

21   Q.   Okay.   And then the last statement from an

22   independent witness, Vanessa Johnson, it's a pretty

23   short one.

24                (Exhibit G was marked.)

25   Q.   (BY MR. HUSKISON)   There's not a whole lot

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

```
 1    to this one, but she references -- I think she's
 2    referring to Mr. Goode coming into Subway and
 3    asking for water and he turned and left?
 4              MR. MCCORMACK:  Object to the form.
 5         A.   Yes, sir.
 6         Q.   (BY MR. HUSKISON)  You read that statement?
 7         A.   Yes, sir.
 8         Q.   She then states in this second sentence,
 9    "He ran to the highway and jumped on a moving car."
10         A.   Yes, sir.
11         Q.   Do you remember reading that?
12         A.   Yes, sir.
13         Q.   And they were chasing by the time the
14    police arrived.  Down there in the next-to-last
15    sentence.  Do you remember seeing that?
16         A.   Yes, sir.
17         Q.   And she mentions -- again, she's the second
18    one that mentions he let the -- Troy Goode himself
19    went and opened the canine door?
20         A.   Yes, sir.  I don't believe that fact is in
21    question.
22         Q.   And these are statements that you reviewed
23    as part of your report?
24         A.   Yes, sir.
25         Q.   Okay.  Now, you indicate, Mr. Coslin, if
```

1   you can pull your report up, on page -- I think

2   it's two different places -- 5 and 7, let me find

3   it for you so I can point you to it.  That

4   Mr. Goode did not -- you conclude that he did not

5   pose a danger to himself or anyone else.  Is that

6   what your conclusion was?

7       A.   Right.  The last paragraph, starting on

8   page four, it says, "It appears beyond dispute that

9   Mr. Goode was, in fact, under the influence of LSD

10  and did, in fact, cause a minor disturbance

11  requiring a police response, but at no time does it

12  appear that Mr. Goode was a danger to the officers

13  or anyone present at the location.  No physical

14  action was taken by Mr. Goode to assault anyone,

15  nor was any verbal threat made by him.  Mr. Goode

16  was unarmed, which was apparent as it was still

17  daylight, and he was wearing light summer

18  clothing."

19            So I didn't say he wasn't a danger to

20  himself.  I said he was not a danger to anyone else

21  present, the officers or any civilians at the

22  scene.

23      Q.   Okay.  You would agree that he was a danger

24  to himself, the way he was acting?

25      A.   I would agree to this, that he could have

Electronically signed by Linda Webster (201-289-050-5808)

f6856601-66fe-40d9-b039-9379273000e5

1  been a danger to himself if his actions had

2  changed. Mr. Goode, from all the documentation

3  I've reviewed, made no attempt to enter traffic.

4  He made no attempt to assault a citizen at the

5  location. He made no attempt to assault the

6  officers at the location. As they described in

7  their own statements, he was running back and forth

8  between the parking lot and a grassy area where

9  they said he was running in circles and talking

10  incoherently.

11      Q. Do you believe that officers have to wait

12  until something bad occurs, some physical harm

13  occurs, before they act?

14      A. It depends on the circumstances. Can you

15  be more specific, please?

16      Q. Well, in this case, Mr. Goode was running

17  up and down along in a grassy area along a busy

18  intersection -- busy road. Do they have to, for

19  example, wait until he runs out in the middle of

20  the road and causes an accident before they can

21  consider him a danger to others?

22              MR. MCCORMACK: Object to the form.

23      A. The way I respond to that is, Officer

24  Baggett, in his deposition, talks about he was the

25  first officer at the scene. He observes Mr. Goode.

1    Through his behavior and physical description, he

2    determines that that is the person involved in the

3    disturbance, which he received a 911 call for.

4    Mr. Baggett -- Officer Baggett at that time does

5    not see a need to approach Mr. Goode.  He, in turn,

6    approaches Mrs. Goode and discusses the situation

7    with him [sic].

8            So by his initial response, it did not

9    appear that Officer Baggett was concerned

10   immediately for Mr. Goode, that he was in immediate

11   danger to run into traffic or assault any other

12   bystander that might be there.  He took no action

13   to stop Mr. Goode's actions at that time.  So by --

14   by going by Officer Baggett's statement, I would

15   assume since he felt no immediate threat posed by

16   Mr. Goode, that there, in fact, was no immediate

17   threat that Mr. Goode had imposed on anyone.  They

18   made no attempt to stop traffic on -- is it Goodman

19   Road.

20       Q.   Correct.

21       A.   They had multiple officers responding to

22   location.  They had the ability to stop traffic.

23   They said it was a high volume of traffic.  There

24   was a concert nearby.  They could have simply

25   stopped the cars, stopped traffic, until they got

Electronically signed by Linda Webster (201-289-050-5808)                                    f6856601-66fe-40d9-b039-9379273000e5

1    Mr. Goode contained, but no one at the scene saw it
2    necessary to do that.  So just trying to understand
3    their statements and what they said and trying to
4    understand the situation as they saw it, I can't
5    see that there was an immediate danger to Mr. Goode
6    running around in this grassy area.

7        Q.  You would agree with me that it's a
8    judgment call on the officers that arrive on the
9    scene and observe what's going on as to whether
10   they try to contain the individual or stop traffic.
11   That's a judgment call.  You would agree with that,
12   wouldn't you?

13       A.  Yes, sir.

14       Q.  Okay.  And in this case, what the officers
15   obviously decided to do was try to contain or
16   control Mr. Goode?

17       A.  And -- eventually, yes.  They tried to
18   contain him.

19       Q.  Now, do you recall Mr. Goode came by where
20   Officer Baggett was talking with Kelli Goode?

21       A.  Yes.

22       Q.  And they had some brief discussion, and he
23   took off running again, correct?

24       A.  He asked him if he was -- I think Officer
25   Baggett asked him if he was okay, and Mr. Goode

1    said no, I'm not, and then turned and ran away

2    again.

3        Q.  Okay.  Initially, Officer Baggett was

4    trying to talk with him?

5        A.  He did have a -- when he was initially

6    trying to talk to Mrs. Goode.  When Mr. Goode came

7    up to them, he did speak to him, yes.  Mr. Goode

8    then left, and at that point in time, if I remember

9    correctly, Officer Baggett made no attempt to go

10   after him or contain him at that point in time.  He

11   continued his conversation with Mrs. Goode.

12       Q.  Other officers were arriving on the scene

13   at that point, correct?

14       A.  Somewhere in that short timeline, yes.  I

15   don't remember exactly the timeline from -- or

16   Officer Baggett's conversation with Mr. Goode and

17   the second officers arrival.  I can't tell you.

18       Q.  Do you remember the officers -- the whole

19   interaction with officers and Mr. Goode was about a

20   12 minutes feed, 7:49 to 8:01?

21       A.  Until the time he was actually in custody

22   and handcuffs?

23       Q.  Yes.

24       A.  Yes.

25       Q.  Okay.  So it was a short time period?

Electronically signed by Linda Webster (201-289-050-5808)    f6856601-66fe-40d9-b039-9379273000e5

1      A.  Well, I mean, that's actually a lengthy
2   time period.

3      Q.  12 minutes is lengthy?

4      A.  Yes.  Well, I mean, if you think about a
5   confrontation, so to speak, whether it's a -- a
6   physical confrontation, which may last a matter of
7   seconds, to a -- a deadly force confrontation,
8   which may last less than a second, so when we are
9   talking about a 11- or 12-minute interaction with
10  somebody, that's a fairly lengthy time, yes, sir.

11     Q.  In particular, it's a short time when
12  you're considering they're trying to catch somebody
13  that's running around and evading them.  That's not
14  that long to try and get somebody under control, is
15  it?

16              MR. MCCORMACK:  Object to the form.

17     A.  Well, I'm not going to run around for
18  12 minutes trying to catch somebody.  That's an
19  extremely long time to be in physical exertion.

20     Q.  (BY MR. HUSKISON)  Sure.

21     A.  So I would have to disagree with you that
22  this is a short amount of time.  In a -- in a
23  police incident, especially when you're trying to
24  control somebody, 11 to 12 minutes is a lengthy
25  part of time to be in some kind of a struggle with

Electronically signed by Linda Webster (201-289-050-5808)        f6856601-66fe-40d9-b039-9379273000e5

1    somebody to try to control them.

2        Q.  Now, you mentioned that one of the reasons

3    you did not believe Troy Goode was a danger to

4    others is because he wasn't running in and out of

5    traffic?

6        A.  He didn't, no.

7        Q.  He was running in and around in a parking

8    lot, correct?

9        A.  Correct.

10       Q.  Would that not create a danger?

11       A.  I don't know how -- he was -- I don't see

12   right offhand how running through this parking lot

13   is necessarily a danger to the officers or anyone

14   else.  Once again, he was not threatening or

15   assaultive in any manner.  He wasn't visibly armed

16   with a weapon, so to have a person who is basically

17   in crisis, let's say, if we're going to refer to

18   like crisis intervention training, this person --

19   the officers arrive.  They don't know until Officer

20   Baggett is told that Mr. Goode has taken LSD.  He

21   doesn't know what's causing this disturbance.  He

22   just sees this person that's acting irrationally,

23   that's -- that is running in circles and talking

24   incoherently.

25       Q.  Well, now, you remember he got a 911 call

Electronically signed by Linda Webster (201-289-050-5808)          f6856601-66fe-40d9-b039-9379273000e5

1    about a domestic issue?

2        A.   Absolutely.  So -- so -- but he shows up

3    and what he sees is -- and he describes it as this

4    person running in circles, speaking incoherently.

5    It was -- and it wasn't even enough that he would

6    immediately address Mr. Goode.  He went to

7    Mrs. Goode to talk to her.  Even when Mr. Goode

8    approached, he wasn't alarmed.  He didn't draw his

9    weapon to defend himself.  He doesn't pull out a

10   Taser.  He just tried to have a conversation with

11   him.

12       Q.   That would be consistent with trying to

13   calm a situation?

14       A.   But he asked me if this person presented a

15   danger to others.  If -- if Mr. Goode was an

16   apparent danger to others, you would expect Officer

17   Baggett's response to be that of a different

18   nature.  He didn't -- he didn't seem disturbed by

19   the approach of Mr. Goode to himself.  He didn't

20   say that he took any kind of defensive position,

21   that he didn't create distance between him and the

22   suspect.  He didn't use any other tool to defend

23   himself against this approach, so just reading his

24   own statement, in no way does Officer Baggett

25   communicate that -- that he observed Mr. Goode as

1    being a danger.

2         Q.  All of what you're talking about, to stop

3    Officer Baggett's conduct, you're talking about

4    when he initially arrived?

5         A.  Yes, sir.

6         Q.  Correct?

7         A.  Okay.  Because this is important.  Officer

8    Baggett arrives, and everything else right now

9    until he gets there is basically based on a

10   uncorroborated 911 call.  He has information

11   there's a disturbance.  He doesn't know who's

12   involved.  He doesn't know what's really going on,

13   so then when Officer Baggett arrives, he has to

14   make his decisions based on his personal

15   observations.  His decision to use force.  His

16   decision not to.  His decision to communicate with

17   Mrs. Goode or Mr. Goode or to talk to any other

18   witness there on the parking lot, his decision to

19   stop traffic or not stop traffic.  Those are all

20   based on his personal observations at the scene

21   from the time he arrives until the time Mr. Goode

22   is taken into custody.

23        Q.  And those are all discretionary decisions

24   that officers have to make all of the time?

25        A.  Absolutely.

Electronically signed by Linda Webster (201-289-050-5808)        f6856601-66fe-40d9-b039-9379273000e5

1    Q.  Okay.

2    A.  Absolutely.  So my point is, Officer

3  Baggett arrives knowing he's coming to a

4  disturbance call.  He sees the individual who he

5  believes is part of the disturbance.  He sees

6  Mrs. Baggett [sic].  He chooses to approach

7  Mrs. Baggett.  He doesn't do anything to secure --

8  I'm sorry -- Mrs. Goode.  He doesn't do anything to

9  secure Mr. Goode.  He doesn't do anything to stop

10 traffic.  He doesn't do anything to tell people to

11 go back into the restaurant, clear the parking lot.

12 He doesn't articulate any facts that would lead me,

13 reading his statement, to believe that Mr. Goode

14 posed an immediate threat or danger to anyone.

15   Q.  You realize, too, that other officers were

16 called and coming to the scene?

17   A.  Absolutely.

18   Q.  Officer Baggett was the first officer

19 there?

20   A.  That's correct.

21   Q.  And as he comes into the parking lot, if

22 Ms. Baggett [sic] is the first one he sees, that

23 might be where he would go?

24   A.  Once again --

25   Q.  We don't even know -- you don't even know

1  and we don't know where Troy Goode was at that

2  time, where was he running at this time.  When he

3  comes in, he sees Ms. Goode.  He wants to talk to

4  her and find out what's going on.  That's pretty

5  consistent with how he should be responding to

6  this, correct?

7          MR. MCCORMACK:  Object to the form.

8      A.  There are exhibits that show a diagram of

9  the location where Officer Baggett explains where

10  he was, where he parked his vehicle, where he

11  observed Mr. Goode, and he addresses the fact that

12  he did see Mr. Goode but he chose to approach

13  Mrs. Goode.  Now, you asked -- you said a while ago

14  that officers have discretion.  They chose what to

15  do and what force is applied.  If I've arrived on

16  location, and my complainant in this case would be,

17  you know, Mrs. Goode here, is over here trying to

18  flag me down, but yet, there's an immediate threat

19  over to my right that I need to address, I'm not

20  going to go talk to her and find out what's going

21  on.  I'm doing to deal with the immediate threat,

22  so you're right.

23          Officers do have discretion, so when

24  Officer Baggett arrived on location, he observed

25  what was going on in the parking lot.  He observed

Electronically signed by Linda Webster (201-289-050-5808)            f6856601-66fe-40d9-b039-9379273000e5

1     both Mr. and Ms. Goode.  He made the observation

2     and then made the decision, his discretion, to

3     approach Mrs. Goode and discuss with her what was

4     going on, which, once again, shows that there was

5     not enough of a visible threat to anyone that

6     Officer Baggett needed to address the threat versus

7     talking to Ms. Goode.

8        Q.  (BY MR. HUSKISON)  So the way I understand

9     you, your testimony, is that at that point when he

10     arrived on the scene, you see no reason that

11     Officer Baggett or any other officer should be

12     trying to get Mr. Goode under control?

13           MR. MCCORMACK:  Object to the form.

14     Misstates the testimony.

15           MR. HUSKISON:  Well, I think that's

16     what he's saying.

17       A.  I'm saying, reviewing the statements of

18     officers involved and their articulation of what

19     was going on there, and that's all I have to go by

20     because you and I weren't present at the time of

21     this disturbance, so I can only relate to the facts

22     that they relay to me in their own words.  Officer

23     Baggett at no time articulates in any way that he

24     felt Mr. Goode was a danger.  And -- and so that

25     would lead me to believe, as a reasonable officer,

Electronically signed by Linda Webster (201-289-050-5808)     f6856601-66fe-40d9-b039-9379273000e5

1    that he didn't feel at that time Mr. Goode was a

2    danger that he needed to address.

3              Now, then, the second officer arrives.

4    Now we have two officers. We've got one officer

5    talking to Mr. Goode -- or Mrs. Goode. The second

6    officer, the cover officer, gets there. He sees

7    the disturbance. He sees Mr. Goode. No one is

8    dealing with Mr. Goode. Would it be unreasonable

9    for him to approach him and talk to him at that

10   point in time? Absolutely not. But when we're

11   talking about the first officer showed up and what

12   his initial decision was, that leaves me with a

13   view of how he felt towards Mr. Goode as being a

14   danger.

15       Q.  (BY MR. HUSKISON)  After he came --

16   Mr. Goode -- Officer Baggett talked to Kelli Goode,

17   Mr. Goode came by, they were in the parking lot,

18   correct?

19       A.  I believe so, yes. They were somewhere in

20   the parking lot.

21       Q.  At that point, Troy Goode took off running

22   or whatever he was doing again out in the grassy

23   area toward the road, correct?

24       A.  I -- I'm not -- I would have to look at the

25   deal. I think there's roads all around.

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1    MR. HUSKISON:  Let's mark our next

2    exhibit.

3            (Exhibit H was marked.)

4    Q.  (BY MR. HUSKISON)  What we're looking at is

5    Exhibit H, and that's the overhead photo of the

6    scene that's been used.  I think it was Exhibit 30

7    in other depositions.  You see, Mr. Coslin, I think

8    where the circle is -- the big circle in the

9    parking lot is where Kelli Goode and Officer

10   Baggett were discussing things?

11           MR. MCCORMACK:  Object to the form.

12   Q.  (BY MR. HUSKISON)  That's what I recall.

13   Do you know that to be where they were?

14   A.  I remember reading in Officer Baggett's

15   deposition where he was asked to mark on the

16   diagram where his location was.  If I remember

17   correctly, he was No. 1 with a circle behind it,

18   which is right there in the parking lot just, I

19   guess, south of No. 4, which is a large circle by

20   the car -- circle the cars.

21   Q.  Okay.  Second row.

22   A.  Okay.

23   Q.  Right?

24           MR. MCCORMACK:  For the sake of the

25   record, is this -- which diagram is this because we

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

```
 1    have multiple markings depending on the diagram?
 2                MR. HUSKISON:  This was Exhibit 30 in
 3    the deposition -- I mean, it's an overhead diagram.
 4                MR. MCCORMACK:  Is this the deposition
 5    of Baggett, Exhibit 30?
 6                MR. HUSKISON:  I think we used it in
 7    every -- most every one of their depositions.
 8                MR. MCCORMACK:  I know, but the
 9    markings are different between them, so I'm trying
10    to make sure I've got it straight, which deposition
11    this came from.
12                MR. HUSKISON:  I don't -- it says
13    Exhibit 30 on it.  I don't know.
14                MR. MCCORMACK:  All right.
15                MR. HUSKISON:  I just want to talk to
16    him a little bit about the diagram and the -- and
17    the distance and whatnot.
18                MR. MCCORMACK:  All right.
19                MR. HUSKISON:  Okay.
20        Q.  (BY MR. HUSKISON)  Now, after Mr. Goode
21    talked with Officer Baggett and Kelli, he went
22    toward the roadway, correct?
23        A.  He said he ran back into the grassy area,
24    so I'm assuming this grassy area is here.  Is this
25    north?  The top of the photograph is north?
```

Electronically signed by Linda Webster (201-289-050-5808)          f6856601-66fe-40d9-b039-9379273000e5

1       Q.  Yes, between there and the road.

2       A.  So I would -- I would assume, which I don't

3  know for a fact, but I would assume this grassy

4  area here north of the parking lot between the

5  roadway is the area where Mr. Goode was occupying

6  most of his time.

7       Q.  Okay.  Where he was running in circles

8  and -- incoherently?

9       A.  Yes.

10      Q.  And I think that's consistent with what

11  everybody talked about.  There's not a great deal

12  of grassy area there, is it?

13            MR. MCCORMACK:  Object to the form.

14      Q.  (BY MR. HUSKISON)  Let me ask it first.

15  There's not a great deal of grassy area there as

16  you look down at that photo, correct?

17            MR. MCCORMACK:  Object to the form.

18      Q.  (BY MR. HUSKISON)  Are you trying to

19  measure?

20      A.  Yeah, I'm trying to.  To answer your

21  question, I mean, it looks like it may be 75- to

22  80-foot wide from north to south.

23      Q.  Okay.  Fair enough.  I don't have the exact

24  dimensions.

25      A.  Okay.

Electronically signed by Linda Webster (201-289-050-5808)

f6856601-66fe-40d9-b039-9379273000e5

1      Q.  And when the next officer arrived, he came

2   driving up on Goodman Road and pulled onto the

3   emergency shoulder of the road.  Do you remember

4   that?

5      A.  Yes, sir.

6      Q.  And that was Scallorn, that was the canine

7   unit?

8      A.  Is that -- is that No. 2 here on the

9   diagram?

10      Q.  Yeah.  I think it is, but anyway, right in

11   that range, in that area?

12      A.  Yes.

13      Q.  He pulled between the road and Mr. Goode?

14      A.  Okay.

15          MR. MCCORMACK:  Object to the form.

16      Q.  (BY MR. HUSKISON)  When you talk about --

17   you agree that it's a dangerous situation when

18   you've got somebody that's having a bad trip on LSD

19   running incoherently and erratically around a

20   grassy area in that close proximity, assuming it's

21   25 yards, whatever it is, in that close proximity

22   to a roadway?

23      A.  It can be, yes.

24      Q.  Now, the witness statements.

25      A.  Uh-huh.

Electronically signed by Linda Webster (201-289-050-5808)        f6856601-66fe-40d9-b039-9379273000e5

1    Q.   I want to make sure I'm clear with you on

2    it.   He exited the vehicle on the roadway.   That's

3    what one of the witnesses stated, correct?

4         A.   Well, to be exact, in that statement you

5    gave me, the witness said they pulled to the

6    emergency shoulder -- to the shoulder here.   He was

7    a passenger in the car, and he exited while they

8    were parked on the emergency shoulder, so it

9    appears that the car wasn't moving at the time, and

10   they had left the roadway and were sitting on the

11   shoulder, and he would have exited immediately into

12   the grassy area and not onto the roadway.

13        Q.   He was -- Goode was moving in and out of

14   cars in the parking lot at least?

15        A.   Okay.

16        Q.   Correct?

17        A.   Yes, sir.

18        Q.   The 911 call was about a domestic issue

19   with his wife.   Do you remember that was what they

20   reported on the 911 call?

21        A.   Yes, sir.

22        Q.   He's running in circles erratically,

23   whatever, everybody has described how he was

24   running.   He was running all about in that grassy

25   area close to a busy road?

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

```
 1        A.   That's correct.

 2                  MR. MCCORMACK:   Object to the form.

 3        Q.   (BY MR. HUSKISON)   When officers did get

 4   him subdued in some fashion, he's still kicking

 5   them.   Do you remember officer testimony about

 6   that?

 7        A.   Yes, sir.

 8        Q.   Spitting at them?

 9        A.   Yes, sir.

10        Q.   Thrashing around on the ground?

11        A.   Yes, sir.

12        Q.   He went and opened a door, a canine unit

13   door, and let a dog out.   Do you remember that?

14        A.   Yes, sir.

15        Q.   And once the dog was subdued by the canine

16   officer, he took off running again.   The dog chased

17   him, and he punched the dog to such a degree that

18   the dog stood down.   Do you remember that?

19                  MR. MCCORMACK:   Object to the form.

20        A.   I -- I agree that that's Officer Scallorn's

21   statement, that he stated that in his deposition.

22   There's -- there's no evidence that that occurred,

23   but that's -- I have no reason to not believe his

24   statement.

25        Q.   (BY MR. HUSKISON)   Okay.   The evidence that
```

1    occurred is the statement of the officer, right?

2       A.  Well, there's no corroborating evidence to

3    the fact that Mr. Goode struck the dog.  We do have

4    evidence that shows that Mr. Goode suffered a dog

5    bite, but Officer Scallorn states that Mr. Goode

6    was able to knock the dog off of him, and the dog

7    wouldn't reengage.

8       Q.  Okay.

9       A.  But as I said, there's no other

10    corroborating evidence to that.  It's just his

11    statement alone.

12       Q.  Even with all of those factors, your report

13    states that you don't believe Mr. Goode was a

14    threat to officers or to others?

15       A.  That's correct.

16       Q.  And you stand by that today?

17       A.  Absolutely.

18       Q.  And you don't believe -- do you believe --

19    I think you said earlier, you do understand he was

20    a threat to himself?

21       A.  Mr. Goode was in crisis.  There's no doubt

22    he was in crisis.  The officers clearly observed he

23    was in crisis.  Not knowing what caused the crisis,

24    is there a possibility Mr. Goode could have run

25    into traffic?  Absolutely.  My only concern with

Electronically signed by Linda Webster (201-289-050-5808)            f6856601-66fe-40d9-b039-9379273000e5

1    that is, look, you said officers have the ability

2    to make decisions.  Officer Scallorn parked his

3    vehicle between Mr. Goode and the roadway which

4    limited his -- it somewhat limited his ability to

5    access the road and access traffic.

6                But both officers now arrive on the

7    scene and realize they have a person who is

8    basically nonresponsive to verbal commands, he's

9    rambling and running around incoherently, but yet,

10   they still don't see the traffic as a danger enough

11   to stop the traffic to prevent Mr. Goode from

12   getting struck by a car because he may -- as you

13   stated earlier, it took 11 or 12 minutes to bring

14   Mr. Goode under control.  This is a lengthy amount

15   of time.

16               They had more than enough time to stop

17   traffic on the roadway if that traffic was such a

18   danger that Mr. Goode could have been injured by a

19   car, but they didn't take that action.  So all I

20   can -- all I can take from that is, they had the

21   ability to do it.  It was a simple task.  They

22   didn't do it, so the officers there must not have

23   seen the traffic and Mr. Goode's relation to that

24   roadway as being a danger.

25       Q.  You've heard each testify that what they

1    were about was trying to get him under control?

2        A.   Absolutely.

3        Q.   And when they arrived on the scene, they

4    had to make decisions of how they can go about

5    getting him under control and protecting him from

6    harm and protecting citizens from harm?

7        A.   Yes.

8        Q.   And the way they chose to do it here is to

9    try to get him under control.  One individual

10   running around a grassy area close to a roadway?

11            MR. MCCORMACK:  Object to the form.

12       A.   They eventually make that decision to try

13   to control Mr. Goode.

14       Q.   (BY MR. HUSKISON)  Okay.  Now, in looking

15   at your report, Mr. Coslin, I want to look at some

16   of the opinions that you reached and just discuss

17   them briefly, page six.  The first opinion, I

18   believe it's in that report, I think it's about

19   midway down, you reference that officers made a

20   reasonable -- objectively reasonable decision that

21   Mr. Goode had committed an offense of disorderly

22   conduct?

23       A.   Yes, sir.  That's correct.

24       Q.   So you -- you are satisfied or at least

25   your report indicates that attempting to subdue him

1    was reasonable, correct?

2        A.   My opinion is that they had probable cause

3    that Mr. Goode had created -- had committed the

4    offense of disorderly conduct.

5        Q.   Okay.

6        A.   So they had an arrestable charge and had a

7    reason to arrest and take him into custody, yes.

8        Q.   You had mentioned -- I think it's in

9    several places in there, that you mention on page

10   seven, about the fourth paragraph, talking about --

11   you're talking about the use of the canine, and you

12   state at the end of that paragraph, "Mr. Goode was

13   not knowingly under arrest and no verbal commands

14   to stop and submit to arrest were given."

15       A.   That's correct.

16       Q.   Do you recall reading testimony from

17   Officer Scallorn, the canine officer, where he told

18   him to stop and lay on the ground?

19       A.   Okay.  Yes.  I remember that.

20       Q.   I assume it's your testimony he's got to

21   use the word "arrest" for Mr. Goode to understand

22   he's maybe under arrest?  Stop and get on the

23   ground is not enough?

24       A.   To address that, there a couple of issues I

25   have here.  The officers of the Southaven Police

1    Department never produced an arrest report for

2    Mr. Goode.  We don't know what the charges were or

3    were going to be because they never charged him

4    with anything, which certainly is odd.  He was

5    taken into custody.  He was in their custody for an

6    hour and a half before he died, and yet, they did

7    not feel it necessary to do an arrest report, so we

8    don't know what the charges were.

9             The -- Officer Baggett talks about

10   disorderly conduct.  I think Officer Scallorn talks

11   about evading arrest or detention, and then Officer

12   Baggett again in his deposition talks about

13   resisting arrest; but yet, there were no charges

14   ever documented with what exactly the actions were

15   of the suspect, how he violated these laws, and

16   what the actions were of the arresting officers.

17            So the issue I have with that is

18   generally for somebody to evade arrest or

19   detention, they have to know that they're being

20   arrested or detained.  This wasn't a vehicular

21   pursuit where there's a fully marked squad car, a

22   police car, with red lights and sirens going that

23   is attempting to perform a traffic stop where the

24   person driving the vehicle would know that that's a

25   marked police car attempting to stop them.

Electronically signed by Linda Webster (201-289-050-5808)          f6856601-66fe-40d9-b039-9379273000e5

1           Here, you have a uniformed officer who

2    is now coming up and talking to him about, get away

3    from his dog, and his only command is to stop and

4    lay down. Well, I don't have to stop and lay down.

5    That's -- that's not against the law for me to

6    stand up. It's not against the law for me to walk

7    away because I have not been detained, so how would

8    Mr. Goode know that he was under arrest, that he

9    did not have the right to leave at this point in

10    time?

11           So what I'm saying is, Officer

12    Scallorn never documents anywhere that he told

13    Mr. Goode, you're either under arrest or being

14    detained so he would know he did not have the right

15    to leave; therefore, fulfilling the elements of the

16    offense where he is evading the officer.

17           So when Officer Scallorn talks about

18    he just gave a command of stop, lay down, what

19    exactly does that mean? That doesn't relay any

20    information to the suspect or arrestee, defendant,

21    plaintiff, whatever term we want to call him. It

22    doesn't relay to him that he has either been

23    legally detained or arrested.

24    Q.  It does convey to him, though, that an

25    officer is requesting him to do something, correct?

Electronically signed by Linda Webster (201-289-050-5808)               f6856601-66fe-40d9-b039-9379273000e5

1       A.  Yes, sir.

2       Q.  And he disobeyed.  He did not comply with

3    that request, did he?

4       A.  No, sir, he did not.

5       Q.  Do you think Troy Goode, absolute the

6    LSD-induced state, would have realized that

7    officers intended for him to stop and get on the

8    ground more clearly if he had not been in the state

9    he was in?

10              MR. MCCORMACK:  Object to the form.

11       A.  I cannot speak to Mr. Goode's, what he

12    would have -- how he would have interpreted that

13    command on or off LSD, sir.

14       Q.  (BY MR. HUSKISON)  But you do interpret --

15    what you do speak to is that you don't believe that

16    he had any idea that he was under arrest.  You can

17    speak to that, but you can't speak to this?

18       A.  What I'm speaking to is that the officers

19    did not document or did not articulate in any way

20    that they informed Mr. Goode that he was being

21    detained or arrested.  They simply told him to get

22    on the ground and stop.

23       Q.  And he didn't obey that request, did he?

24       A.  No, he did not.

25       Q.  And then after that, in an effort to detain

Electronically signed by Linda Webster (201-289-050-5808)     f6856601-66fe-40d9-b039-9379273000e5

1    him, the dog was sent to get him, correct?

2        A.    That's correct.

3        Q.    At that point, Mr. Goode should have had a

4    pretty good idea that the officers were trying to

5    at least detain him.  You would agree with that,

6    wouldn't you?

7        A.    I don't know -- okay.  First, it says that

8    Mr. Goode turned and began to run, and I think

9    Scallorn says he took two steps before he sent the

10   dog.  Well, if I turn to run, how would I see the

11   dog coming?  So I wouldn't know the dog was coming

12   after me.  The officers both talked about how his

13   running in this grassy area was -- was what he had

14   been doing the whole time they were there observing

15   him, so this action with him running was consistent

16   with everything he had done.  So I don't know and I

17   can't testify to the fact that Mr. Goode would have

18   known the dog had been sent to get him.

19              And what I also don't know is when

20   Scallorn made the decision to send the dog, at that

21   point in time, what was Mr. Goode under arrest for

22   at that point in time?  Was he trying -- why was he

23   trying to detain him initially that he would send a

24   canine which is going to bite him?  You know, I

25   don't know -- and Scallorn, that's one of the

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1  reasons, without having the arrest report, I don't

2  know why Scallorn sent the dog, what -- what he was

3  trying to arrest Mr. Goode for at that point in

4  time.

5      Q.   I think if you read through his deposition,

6  he sent the dog to try to get him under control and

7  keep him from running out in the road.  That's what

8  he said?

9               MR. MCCORMACK:  Object to the form.

10     Q.   (BY MR. HUSKISON)  That's really

11 undisputed.  He's the only one that sent the dog,

12 so that's what he sent the dog for?

13              MR. MCCORMACK:  Object to the form.

14 Is there a question there, Berk?

15     Q.   (BY MR. HUSKISON)  If you assume that he

16 sent the dog to get Mr. Goode under control and

17 keep him from running out into traffic, I mean,

18 that's a reasonable situation where he's trying to

19 keep this man from going out into the busy

20 intersection.  That's a reasonable action by a

21 police officer, isn't it?

22              MR. MCCORMACK:  Object to the form,

23 compound.

24     A.   To -- to say it is a reasonable use of

25 force to send a police canine to stop someone from

1    entering a roadway, I would say is unreasonable.

2         Q.   (BY MR. HUSKISON)  And the reason you said

3    that is unreasonable is why?

4         A.   Well, we can go back to the policy and what

5    the policy states about when we can deploy the

6    canine, when it's authorized for that use of force,

7    and I don't believe anywhere in that policy it says

8    you can use a canine to stop somebody from entering

9    a roadway.  Now, I agree with you that if Mr. Goode

10   had entered the roadway, that could have been

11   dangerous for him and anyone else driving.  But

12   does it give the officers the authority to use a

13   canine who is going to bite and cause some serious

14   injury to Mr. Goode from stopping him so that he

15   might not enter the roadway?

16        Q.   The canine policy, and what I want is what

17   your view on this is, but the canine policy does

18   allow use of a canine to keep somebody from

19   injuring themselves, doesn't it?

20        A.   I'm sorry.  Do you have the policy here?

21        Q.   Are you familiar with canine policies?

22        A.   I have read canine policies, yes.

23        Q.   Is that one of the things you're allowed to

24   use a canine to do?

25        A.   To prevent somebody from injuring

Electronically signed by Linda Webster (201-289-050-5808)          f6856601-66fe-40d9-b039-9379273000e5

1    themselves?

2        Q.   Yes.

3        A.   I don't know if it's specifically worded

4    that way, and I don't know that Southaven, in their

5    policy, has that worded that way in their policy.

6        Q.   And I don't have it in front of me, but

7    what I want -- I want you to tell me, you concluded

8    that the release of the canine was objectively

9    unreasonable?

10       A.   That's correct.

11       Q.   Tell me why you concluded that.

12       A.   All right.  On page seven, the fourth

13   paragraph down, the use of the police canine,

14   although not regularly viewed as deadly force, does

15   have a very high potential for significant injuries

16   and would not normally be deployed against a person

17   who was not an active threat to the officer or

18   others.  Canine elements are sometimes employed

19   against a suspect or suspects who are evading

20   arrest, but in this instance, Mr. Goode was not

21   knowingly under arrest and no verbal commands to

22   stop and submit to arrest were given.  Mr. Goode

23   could have also been forced into traffic due to a

24   fear of the canine, which is placing him at greater

25   risk.

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1              When we look at the totality of this

2     and we consider some of the Graham factors here,

3     what was Mr. Goode being detained or arrested for

4     at that point in time.  We know -- we can probably

5     articulate that there was a disorderly conduct

6     offense that occurred, which is a -- it's a

7     misdemeanor.  It's probably the lowest charge you

8     can charge somebody with.

9          Q.  There's also noncompliance with a police

10    order, stop and --

11         A.  Was he charged --

12         Q.  -- get on the ground.

13         A.  I'm sorry.  Was he charged with that?

14         Q.  A lot of things went on after this incident

15    occurred that may have led to no charge or not, but

16    the fact, whether he was charged or not, his

17    conduct was noncompliant with officers.  You agree

18    with that, don't you, whether he was charged with

19    it or not?

20              MR. MCCORMACK:  Object to the form.

21    You can answer.

22         A.  Did he comply with Scallorn's comment of

23    "stop and get on the ground"?  No, he did not, but

24    that's no different than an officer saying stop

25    videotaping me.  You can -- you can -- you can give

Electronically signed by Linda Webster (201-289-050-5808)                                    f6856601-66fe-40d9-b039-9379273000e5

1    an order, but you may not have the legal authority
2    to enforce that order.
3        Q.   (BY MR. HUSKISON)   You would agree with
4    me -- let me stop you just quick and hold your
5    thought.   You would agree with me it would be
6    somewhat different in this case where you have an
7    individual, Mr. Goode, who is -- a call in on 911,
8    domestic violence, has been running aimlessly
9    around the parking lot and grassy area and has
10   opened a canine door?
11       A.   Yes, sir.
12                MR. MCCORMACK:   Object to the form.
13       Q.   (BY MR. HUSKISON)   That's a little
14   different than the scenario you've mentioned.  He's
15   not being compliant with what Officer Scallorn
16   requested him to do?
17       A.   Mr. Goode's behavior has been consistent
18   through this entire episode.  He has ran around the
19   parking lot.  He has ran around the grassy area.
20   He has talked incoherently.  He has not responded
21   appropriately to any conversation anybody has
22   attempted to have with Mr. Goode, so -- and the
23   officers observed this, so at this time, why would
24   they expect him to respond appropriately to stop
25   and get on the ground?  They understand that he's

1     on LSD, that he's having a bad trip. That he is

2     somehow kind of in a crisis, and they're trying to

3     deal with that.

4                Scallorn makes a decision to send the

5     canine, knowing that the canine was going to cause

6     serious injury when he bites Mr. Goode. Officer

7     Scallorn, at this point in time, he said he's doing

8     it not to place him under arrest but keep him from

9     running into the roadway.

10     Q. I'm not saying either way. He testified he

11     released the dog because Mr. Goode was running

12     along the road, and he wanted to try to do what he

13     could to keep him from getting out onto the road.

14     That's what he testified to.

15                MR. MCCORMACK: Object to the form.

16     Counsel is testifying.

17     Q. (BY MR. HUSKISON) I'm repeating testimony

18     from a witness, but go ahead. You can answer.

19                MR. MCCORMACK: Is there a question?

20     Q. (BY MR. HUSKISON) Yeah. He's trying to

21     answer -- the question is, why do you believe that

22     it was objectively unreasonable to use a canine?

23                MR. MCCORMACK: You can continue your

24     answer.

25     A. If Scallorn was attempting to arrest

Electronically signed by Linda Webster (201-289-050-5808)     f6856601-66fe-40d9-b039-9379273000e5

1   Mr. Goode, he failed to notify Mr. Goode that he

2   was being detained or arrested. The only offense

3   that we have at this point in time was disorderly

4   conduct, and as you said, once he failed to get

5   down and stop, as directed by Officer Scallorn, now

6   we have failure to obey a police officer, which I

7   believe is still another misdemeanor charge in the

8   state of Mississippi. We have two misdemeanor --

9   possible misdemeanor charges against Mr. Goode, but

10  then, as you stated, Officer Scallorn's concern was

11  not to arrest him but to prevent him from going

12  into traffic.

13          Now, all of a sudden, the concern is

14  Mr. Goode running into traffic being injured, and

15  he launches the dog after two steps to stop this

16  action. I do not believe anywhere in the policy

17  does it state that a person who is not under

18  arrest, a person who is not evading arrest, who is

19  merely trying to enter traffic and may be a danger,

20  I don't think that says that in their policy, that

21  they're justified in using the dog. Did Officer

22  Scallorn have other options available to him? Yes.

23  They could have shut traffic down prior to this

24  incident. Two, he could have pursued him on foot

25  himself. He was only two steps away from him.

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1    Three, he had a Taser. He could have tased him,

2    which could have the potential of causing injury

3    but much less than that of the dog bite, so there

4    were other force options available to Scallorn than

5    deploying the canine, which he knew would cause a

6    serious injury from the dog bite.

7              Also, in Mr. Goode's condition, we

8    know he's in crisis. Baggett has received

9    information that he's on LSD. They can observe

10   he's having a bad trip, and now we're going to send

11   a dog to pursue him, which, as I've stated in the

12   report, could scare Mr. Goode enough that he would

13   then run into traffic, which he hadn't done before

14   but now that there's a dog pursuing, I'm going to

15   do whatever I can to get away from that dog.

16             So what I'm saying is, under the

17   circumstances, at the time Scallorn chose to deploy

18   his canine partner, I honestly believe that that

19   was not a reasonable use of force based on the

20   other options that are available to him and what

21   the officers observed up to that point in time.

22        Q.   (BY MR. HUSKISON) You believe he had other

23   options that he should have used rather than the

24   canine?

25        A.   Yes, sir.

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1   Q. And that given -- I think you state in the
2   paragraph that given that Mr. Goode was, in your
3   words, not knowingly under arrest and no verbal
4   commands had been made to stop and submit to
5   arrest, and that was important, as well, because
6   you don't see any reason to try to subdue him at
7   that point with a canine?

8   A. I don't see any -- well, one of the key
9   points of not giving the command that he's under
10  arrest or being detained is meeting one of the key
11  elements of charging of resisting or -- evading
12  arrest. That, you know, he did not knowingly evade
13  arrest because he did not know he was attempting
14  to -- they were attempting to arrest him, so that's
15  a legal point as far as -- as what Scallorn had
16  done, and now he's attempting to use force to enact
17  this arrest or now to stop this person from going
18  into traffic.

19              So without the -- without the arrest
20  being in play, if his only intention is to stop
21  this person from going into traffic, then the force
22  becomes even more extreme because he's not even
23  being charged with a crime here.

24  Q. And at the time of the canine apprehension,
25  you understand that -- that Mr. Goode himself had

Electronically signed by Linda Webster (201-289-050-5808)        f6856601-66fe-40d9-b039-9379273000e5

1    opened the door and let the dog out?

2        A.   Yes, sir.

3        Q.   And you understand that he had at least

4    been told to stop and lay on the ground?

5        A.   Yes, sir.

6        Q.   And he did not obey those commands?

7        A.   Yes, sir.

8        Q.   All right.  Now, on down, the next opinion

9    that you offer looks like about the third paragraph

10   up.  "In my opinion, to a reasonable degree of

11   professional certainty, the amount of force used by

12   Scallorn in deploying the Taser was objectively

13   reasonable."  So you see no problem with his

14   deployment of the Taser?

15       A.   No, I don't.

16       Q.   Okay.  And, Mr. Coslin, how do you

17   distinguish -- for my purposes, how do you

18   distinguish the use of the Taser and the use of the

19   canine?

20       A.   The -- and I believe I talk about in here.

21   The -- the Taser is a much less use of force or a

22   lower use of force than the canine.  We know that

23   that canine -- once that canine is launched -- is

24   going to bite the suspect or, in this case,

25   Mr. Goode, and is going to cause damage.  They're

Electronically signed by Linda Webster (201-289-050-5808)            f6856601-66fe-40d9-b039-9379273000e5

1      going to bite and clamp down.  It is a normal

2      reaction for that individual to try to pull away,

3      which makes a much worse wound.  The person may get

4      bit several times before the officer can get the

5      dog off and get the suspect under control.

6                  The Taser, although there is an

7      opportunity for Mr. Goode to fall, he is in a

8      grassy area.  He's not on the concrete parking lot.

9      He's in the grassy area.  He's a much safer

10     place -- if we're going to deploy the Taser, this

11     is an optimal place for us to do it.  We know that

12     when this person goes into the muscle seizure when

13     the electric -- the Taser discharges that they're

14     going to go to muscle lock.  They're going to lose

15     their balance, and they're going to fall.

16                 If they're in a concrete jail cell

17     where there's steel bed frames and everything else,

18     there's a high chance of injury there.  In a

19     parking lot, even where we've got a concrete or

20     asphalt surface, there's a chance of a significant

21     injury occurring from that, but Mr. Goode is

22     located in a grassy area.  The chance of a serious

23     injury is very minimal here, so if we are going to

24     deploy some other means of control, the Taser is a

25     much better option for the officer than the dog.

Electronically signed by Linda Webster (201-289-050-5808)           f6856601-66fe-40d9-b039-9379273000e5

1    It's less likely to injure Mr. Goode.

2        Q.  And that's the basis for that opinion?

3        A.  Yes, sir.

4        Q.  Now, you'd agree, as a police officer, your

5    responsibility is to protect the public, correct?

6        A.  Yes, sir.

7        Q.  Protect persons from harming themselves,

8    correct?

9        A.  Number one priority is preservation of

10   life.

11       Q.  That would be themselves and the person,

12   the arrestee?

13       A.  Yes, sir.

14       Q.  In observing and reviewing what -- all of

15   Mr. Goode's actions here, you agree that it's

16   reasonable for an officer -- officers to want to

17   get him under control?

18       A.  Yes.

19       Q.  At the point that the dog was deployed and

20   the Taser was used, Mr. Goode was not under

21   control?

22       A.  No.  Well, let's -- if I can add to that.

23       Q.  Sure.

24       A.  I guess a better word to use than control

25   would be restrained.  He was not under any kind of

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1    restraint.

2        Q.   That's fine.  So he was not restrained at

3    that point?

4        A.   That's correct.

5        Q.   Now, after the Taser -- I think the

6    testimony is clear, he tripped up in the wiring or

7    whatever he did, he went down?

8        A.   Right.

9        Q.   Officers came on and attempted to restrain

10   him at some point.  Do you remember the testimony

11   about that?

12       A.   Yes, sir.

13       Q.   Now, your opinion in general -- you make a

14   general opinion toward the end -- I think it's on

15   page ten, at the very right before your

16   qualifications, reasonable degree -- "In my

17   opinion, to a reasonable degree of professional

18   certainty, the amount of force used by members of

19   the police department under control of Chief Long

20   was not objectively reasonable."

21                 Now, after the use of the Taser and

22   after the use of the canine, he's on the ground.

23   Officers come in and try to get him under control.

24   Do you remember their testimony, that they had

25   trouble getting him under control?

Electronically signed by Linda Webster (201-289-050-5808)          f6856601-66fe-40d9-b039-9379273000e5

1       A.    Yes, sir.

2       Q.    Trouble restraining him?

3       A.    Yes, sir.

4       Q.    Initially, do you remember the testimony,

5    Mr. Coslin, about that they got his hands cuffed

6    initially and he continued to evade, roll around,

7    whatever he was doing to not -- he was still not

8    restrained or not under control of the officers?

9                MR. MCCORMACK:   Object to the form.

10      Q.    (BY MR. HUSKISON)   Do you remember that

11   testimony?

12      A.    What I remember is they got him handcuffed,

13   and they said he was still moving his feet,

14   thrashing around, and that's when somebody called

15   for leg restraints.

16      Q.    Okay.  Do you remember -- I don't think

17   it's in your report, and I want to be sure that I'm

18   understanding you correctly.  You go straight from

19   they attempted to restrain him to then they called

20   for the leg shackles.  Officer Rich testified that

21   he attempted, after he had his hands behind his

22   back, to get him up and walk him to the police car.

23   Do you remember that testimony?

24      A.    Yes.

25      Q.    That would be consistent with how officers

1    are supposed to try to handle situations, correct?

2        A.   Yes.

3        Q.   And Officer Rich says when he tried to get

4    him up and walking that he continued -- he was

5    concerned he was going to get away from him?

6              MR. MCCORMACK:   Object to form.

7        A.   Yes, sir.

8        Q.   (BY MR. HUSKISON)   Do you remember that

9    testimony?

10       A.   Yes.

11       Q.   And that's actually when the leg shackles

12   were requested after they had to take him back

13   down; is that right?

14             MR. MCCORMACK:   Object to the form.

15       A.   I believe so, yes, sir.

16       Q.   (BY MR. HUSKISON)   Okay.   In a situation

17   like this, Mr. Coslin, in your mind, what's the

18   goal of the officer?   What is their goal?   What are

19   they trying to accomplish out there with Mr. Goode?

20       A.   At that point in time -- at this moment in

21   time?

22       Q.   At that moment in time.   They've got him in

23   handcuffs, and they're trying to get -- keep him

24   under control.   What are they trying to get

25   accomplished?

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1           MR. MCCORMACK:   Object to the form.

2       Q.   (BY MR. HUSKISON)   What should they be

3   trying to get accomplished?

4       A.   Well, their ultimate goal here would be to

5   secure him, and due to the fact they know he's

6   under LSD, get him immediate medical attention.

7       Q.   Get him to a higher level of care?

8       A.   Absolutely.

9       Q.   Okay.  And in this case, and I know you

10  said it's a large amount of time, and I'm not

11  disputing that with you, but it was 7:49 to 8:01

12  was the time frame for them to get him under

13  control or restraint.  I don't think he was ever

14  under control, but restrained -- but to get him

15  restrained and turn him over to the EMS.  Do you

16  remember that timeline?

17          MR. MCCORMACK:   Object to the form.

18      Q.   (BY MR. HUSKISON)   You can answer.

19      A.   Yes, sir.

20      Q.   Do you remember it being 12 minutes?

21      A.   Approximately, yes.  I'd have to go back

22  and read the exact timeline, but I don't dispute

23  that, no.

24      Q.   And in the -- in the normal course,

25  officers, that's what they're attempting to do with

Electronically signed by Linda Webster (201-289-050-5808)                                                f6856601-66fe-40d9-b039-9379273000e5

1    somebody that's having a hallucination, whatever he

2    was going through, to get him restrained and some

3    medical help.  Would you agree with that, that's

4    what they're after?

5         A.  Yes, sir.

6         Q.  And they did that here, didn't they?

7         A.  Yes, sir.

8         Q.  Okay.  We talked about this in the

9    beginning.  You're not offering opinions about the

10   EMTs and how they handle their medical issues or

11   anything like that?

12        A.  No, sir, I'm not.

13        Q.  The same to follow with the doctors and

14   hospital folks?

15        A.  That's correct.

16        Q.  You do mention in your report, there's a

17   discussion, I think it's about hog-tying,

18   positional asphyxia?

19        A.  Yes, sir.

20        Q.  Are you offering opinions on positional

21   asphyxia and how hog-tying relates to that?

22        A.  I'm saying my -- my -- my overall

23   conclusion that the amount of force that they used

24   was unreasonable as specifically relates to the

25   hog-tying four-point restraint, maximum restraint

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1     position, whatever term we want to use to describe

2     the way Mr. Goode was finally restrained, that this

3     restraint hold that they placed him in and the time

4     that he was kept in this restraint hold is

5     extremely unreasonable.

6         Q.   In the studies or in the reports that I

7     think you cited, a Chicago --

8         A.   Their training bulletin, right.

9         Q.   Okay.  And in Dallas, the same thing?

10        A.   Yes, sir, and New York, their training as

11    far as handling these kind of people.

12        Q.   And those reports or those studies, the

13    training materials, they were back in the early,

14    mid '90s?

15        A.   Yes, sir.

16        Q.   You recognize there's a shift after those

17    early findings that -- where positional asphyxia

18    was called into question and that it was -- that

19    hog-tying did not create struggles breathing?

20             MR. MCCORMACK:   Object to the form.

21        Q.   (BY MR. HUSKISON)   Do you recognize that or

22    not?

23        A.   I understand that there is some dispute

24    over what hog-tying or the four-point restraint or

25    whatever we're going to call this in itself causes

1    positional asphyxia, but I'm not arguing the
2    medical scientific studies of this and whose study
3    is valid and whose is not valid.  That's not my
4    argument here.  In -- in the '80s, '90s, there were
5    numerous arrests where the suspect being arrested
6    was placed in this position and, subsequently,
7    deaths occurred, so much so that studies began to
8    be done on why these in-custody deaths were
9    occurring.  One of the original reports stated it
10   was -- one of the byproducts of this position was
11   positional asphyxia and that it could be a
12   contributing factor to these suspects' deaths.
13           I'm not a scientist.  I'm not a
14   doctor.  I don't know who set their experiments up
15   or not.  All I know is people that were arrested
16   that were placed in this position died.  We found
17   that out.  We were informed that this position
18   could be a contributing factor to their death;
19   therefore, the vast majority of agencies throughout
20   the country immediately stopped the use of this
21   technique, this restraint technique, because there
22   were other options available.
23           Putting a person in this position, if
24   it could even -- if we thought it could cause the
25   death of an individual, why would we put them at

Electronically signed by Linda Webster (201-289-050-5808)          f6856601-66fe-40d9-b039-9379273000e5

1    risk if we had other options available?  So most
2    agencies have -- have prevented their -- their
3    officers or deputies from using this type of
4    restraint.  It is -- it is not common in law
5    enforcement.
6        Q.  When you say most, I mean, what -- how do
7    you -- how do you compute that?
8        A.  Well, in my research, I think there was
9    only one agency -- major agency that I found -- I
10   think it was Portland, Washington -- that even
11   still has this in place.  Reading the expert report
12   of -- for your police.
13       Q.  Dr. Gaut?
14       A.  Gaut.
15       Q.  G-a-u-t.
16       A.  Reading his report, he even referenced a
17   survey that was done, and I can't remember if it
18   was by the San Diego police or whatever, but this
19   was in the mid '90s, where only 30 percent of
20   respondents said that they even allowed this back
21   in the '90s, and that was in his report, so I
22   can't -- other than Portland, I haven't been able
23   to find an agency that -- that openly teaches this
24   currently.  They teach various other methods of
25   controlling the individual; not this.

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1        So the argument here is -- is whether
2   this -- this hold causes death through positional
3   asphyxia, if it is a contributing factor in the
4   death, and there are other related complications,
5   law enforcement has known about this for decades.
6   The vast majority of agencies had stopped the
7   practice of hog-tying or four-point restraint, and
8   they have used other techniques to control
9   suspects.  They have taken special precaution to
10  either elevate the person up in a sitting position
11  so that they can breathe effectively, or at least
12  if you can't do that, put them in what's called a
13  recovery position on their side.

14        So to place someone in this position,
15  understanding positional asphyxia and the cause
16  that it may have, you're putting this arrestee at
17  tremendous risk, which once we've got them in
18  custody, you know, we have the duty to protect this
19  individual.  They're our responsibility.  They're
20  not ours to injure.  They're ours to protect.

21        And to place them in this hold,
22  knowing it could contribute to their death and then
23  to leave them in that position for an hour and
24  27 minutes with no relief, with no repositioning,
25  especially when the ambulance shows up, now we have

Electronically signed by Linda Webster (201-289-050-5808)

1 a stretcher, gurney, whatever term you want to call

2 it, that offers the officers on the scene an

3 alternative restraint method, so now -- even if we

4 say putting this person in this four-point

5 restraint at that time was reasonable, once the

6 officers were presented an alternative where now

7 we've got five or six officers here, we've got EMS,

8 fire, medical personnel, we've got a ton of people

9 out here, we can remove the leg shackles from

10 around the handcuffs.

11      We can roll Mr. Goode over, place him

12 on the stretcher, as he should normally be

13 transported, support both wrists with handcuffs to

14 the stretcher, put all five straps across him.  We

15 can even -- we can even put the leg shackles back

16 on and restrain him to the gurney.  Mr. Goode is

17 immobilized.  His breathing is not compromised in

18 any way by his position.  He's under control.  He

19 can't assault or hurt anybody.  The medical people

20 now have better access to the patient they need to

21 care for, and the police are now using a more

22 appropriate restraint, especially knowing that they

23 have a medical crisis on their hands.

24   Q.  The alternative you're talking about when

25 the EMS arrived is just having a gurney?  I mean,

Electronically signed by Linda Webster (201-289-050-5808)        f6856601-66fe-40d9-b039-9379273000e5

1    you don't recall them offering any other

2    alternative to be able to secure Mr. Goode, do you?

3    They just came with a gurney?

4        A.   On that gurney are five two-inch-wide nylon

5    straps they're going to use to secure him to that

6    bed.  It's constructed of a metal frame that now we

7    can secure the handcuffs to.  We transport

8    prisoners all the time, you know, so putting --

9    putting a prisoner, even a violent prisoner, into

10   an ambulance is not something uncommon to law

11   enforcement.  Transporting them prone in a

12   four-point or hog-tied position facedown on a

13   stretcher, that isn't common.

14       Q.   When you reviewed information on this case,

15   you saw the testimony from the EMT, Stacie Graham,

16   about he was -- Mr. Goode was still out of control.

17   Do you remember seeing that?

18       A.   Yes.

19       Q.   Okay.  And the hospital -- once he got to

20   the hospital, the hospital personnel discussed and

21   talked about he was still out of control, everyone

22   was trying to figure out a way to get him under

23   control to better treat him.  You agree that that's

24   what they were trying to do?

25               MR. MCCORMACK:  Object to the form.

Electronically signed by Linda Webster (201-289-050-5808)                     f6856601-66fe-40d9-b039-9379273000e5

1        A.   I agree that they made those comments.

2   Now, we're talking about civilian personnel here

3   dealing with a prisoner.  What does she mean by

4   he's out of control?  He's verbally noncompliant?

5   He's moving around?  He is -- is handcuffed and

6   shackled in a four-point position.  He now has five

7   straps across his person on the gurney securing him

8   to the gurney.  I don't know how much more control

9   we could possibly have over that individual, so I

10  don't understand when she says he's out of control

11  what she means by that.

12       His appearance -- because Officer

13  Baggett talks about he was in the ambulance and

14  never put hands on Mr. Goode after that.  At the

15  hospital, he stayed with him the whole time in the

16  hospital.  He never had to intervene in any way to

17  control Mr. Goode, so these civilians that are

18  testifying that they felt Mr. Goode was out of

19  control, physically, we know he was under control,

20  so I don't understand what their perception of

21  control is.

22       Q.   (BY MR. HUSKISON)  She described it, if

23  you -- do you remember reading where she described

24  him as flailing, falling off the bed, they couldn't

25  keep him on the bed, those kinds of things?  I

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1    think that's what she's talking about.  I think

2    that's what her testimony was.  Do you remember

3    reading that?

4           MR. MCCORMACK:  Object to the form.

5       Q.  (BY MR. HUSKISON)  Whether you agree or

6    disagree with it, do you remember reading it?

7       A.  I -- I do, and it was inconsistent with

8    other witness statements.

9       Q.  Now, the materials that you've read and

10    researched on, I think you've referred to as

11    hog-tying, you've seen Tom Long's discussion about

12    having the chain with a little bit of length to it

13    to give you a little more movement is considered

14    four-point restraint in his mind.  That's what he

15    described it as, and he said that's what others

16    described it as.  The studies that you reviewed,

17    were they reviewing the hog-tie where you're up in

18    a ball, or were they reviewing the four-point

19    restraint where you've got some movement, do you

20    know?

21       A.  See, and this is where -- you asked me this

22    earlier, where I differ with Chief Long's statement

23    about the definition of hog-tying using two pair of

24    handcuffs because that is -- with -- I would say

25    just an estimate, that would be physically

Electronically signed by Linda Webster (201-289-050-5808)        f6856601-66fe-40d9-b039-9379273000e5

1   impossible about 90 percent of the population due

2   to the flexibility of the individual, the size of

3   the individual, and the diameter of the handcuffs

4   not being able to physically place them around

5   their ankles, so I think Chief Long is -- has

6   misstated hog-tying.

7          In your own diagram here, Exhibit B,

8   it's showing this hog-tying using leg shackles with

9   an extended chain. So the -- the difference that

10  he's saying between four-point restraint and

11  hog-tying, I don't believe there is technically a

12  difference. I think Mr. -- Chief Long has -- has

13  improperly stated hog-tying.

14     Q. You referenced Exhibit B, the diagram, and

15  then, of course, Exhibit C, is the actual

16  picture --

17     A. Correct.

18     Q. -- or photo. Hopefully, we can get a

19  better one. You agree with me the way Mr. Goode's

20  feet are, are not up in a ball like they are on the

21  photo -- on the diagram? That is a distinction in

22  the pictures, correct?

23     A. In the picture in Exhibit B in the diagram

24  the drawing of this individual has both feet

25  together side by side, and both hands together side

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1    by side, putting the person in this position.  It

2    doesn't give a size of the individual here as

3    opposed to the size of Mr. Goode, so what I -- what

4    I see in Exhibit C, the photograph, which is very

5    hard to tell, with Mr. Goode on the stretcher is

6    one foot farther forward, one foot farther back.

7    Of course, with the chain, as you move one foot

8    forward, the chain can cycle around the handcuffs

9    allowing one foot to come up slightly back, but

10   we're still -- we're very limited in movement here.

11                This position is extremely painful.

12   It's uncomfortable.  We've got metal braces --

13   metal handcuffs digging into the wrist bones.

14   We've got metal shackles on the bones of the

15   ankles, and then we've got a person put in a

16   position that's unnatural where if they let their

17   feet down, now they're putting pressure on their

18   handcuffs, cutting into their wrists.  If they

19   bring -- and if they bring their feet up or if they

20   pull their hands up, now they're putting more

21   pressure on their ankles.  All of this is extremely

22   uncomfortable for the person in this position, and

23   that would even explain his movements, why he's

24   moving, because this hurts.  Whether you're on LSD

25   or not, this is not a comfortable position to be

Electronically signed by Linda Webster (201-289-050-5808)          f6856601-66fe-40d9-b039-9379273000e5

1    put in.

2              So yes, there's going to be some

3    movement of the suspect here, but, you know, to get

4    back to the original question, hog-tying,

5    four-point restraint, I think Chief Long misstated

6    it.  I think hog-tying as represented in the

7    diagram or Exhibit B here uses handcuffs and

8    shackles just as they were used in Southaven,

9    Mississippi.

10        Q.   From your review of four-point restraint

11   and hog-tying, did you review case law -- some case

12   law?

13        A.   No, I did not.

14        Q.   Okay.  Now, from your review of the police

15   policies and procedures where they did have it, and

16   I think you said there weren't many, do you

17   remember a significant thing being that the

18   arrestee was always monitored or somebody was

19   always observing what was going on?

20        A.   Yes, and that's consistent even without

21   referring to the leg restraints or four-point or

22   hog-tying, when we take somebody into custody,

23   especially somebody that's on drugs as they knew

24   Mr. Goode was, we are going to change their

25   position.  Even if we don't use leg restraints, the

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1    current practices and policies of most agencies is
2    not to leave the person in a prone position for an
3    extreme period of time.

4                One of the training manuals that was
5    presented to me that was presented by Southaven was
6    that it talked about the dangers of positional
7    asphyxia of a suspect being allowed to lay prone
8    for a long time handcuffed with their hands behind
9    their back.  Training would show to elevate the
10   person to a sitting position as quickly as possible
11   or at least into, what we call, a recovery position
12   on their side.  It gives the officer some control
13   over the person, but it allows them to get off
14   their stomach and breathe better.  We can bend them
15   at their hips to allow the diaphragm to work
16   properly.

17                The officers were trained in
18   positional asphyxia.  They knew about the
19   positional asphyxia, and they didn't take any steps
20   to relieve him of this.

21        Q.   The training materials that I saw -- that
22   I've reviewed and the ones that you have in your
23   report all seemed to indicate that the -- the
24   officers first responsibility is to get a suspect
25   under control?

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1       A.   Correct.

2       Q.   And in this case, that was what they were

3   attempting to do, to get him under control?

4       A.   Correct.

5       Q.   And I think you've heard testimony or you

6   read testimony from the officers and then from the

7   EMT personnel and from the hospital that although

8   he was restrained, he never was in control of

9   himself.  He was consistently fighting and arguing

10  and saying incoherent type of things.  Do you

11  remember seeing that?

12      A.   Yes.

13      Q.   Do you agree with me that officers, their

14  responsibility is to get control of the suspect and

15  get him to where he can be treated or whatever with

16  medical help?

17      A.   Absolutely.  I would -- I would agree

18  that's what the goal here should have been.

19      Q.   And here, the officers in this case spent

20  12 minutes -- if I'm missing that, I think it was

21  12 minutes, but what the records show subduing him,

22  restraining him, trying to get him under control,

23  at which point they provided -- he was turned over

24  to the EMTs with officers -- he's still in the

25  custody of our officers.  And their goal is to get

Electronically signed by Linda Webster (201-289-050-5808)          f6856601-66fe-40d9-b039-9379273000e5

1    him to a better place healthcare-wise, correct?

2                MR. MCCORMACK:  Object to the form.

3    You can answer.

4        A.   I would assume that that's their goal here

5    is to get him the proper medical treatment he

6    needs, but that does relieve their responsibility

7    of the force that they've applied to Mr. Goode and

8    monitoring Mr. Goode and adjusting that force as

9    necessary.  To simply place Mr. Goode in this

10   four-point restraint, even if initially that's

11   reasonable, which I don't believe it is because

12   they had other alternatives, and leave him there

13   with no attempt to change that position would

14   certainly be unreasonable.

15               You know, the officers are responsible

16   for this prisoner.  Once they take custody of him,

17   they're responsible for him, and they place him in

18   this position.  The EMS didn't put him in this

19   position.  The hospital didn't put him in this

20   position.  They did.  It's their responsibility to

21   get him out of this position as time warrants, so

22   even if we say this position originally was

23   reasonable, they had other techniques they could

24   have applied without using the four-point

25   restraint.

Electronically signed by Linda Webster (201-289-050-5808)        f6856601-66fe-40d9-b039-9379273000e5

1      They had a different way. They had a

2  better way of securing Mr. Goode when the gurney

3  arrived on scene. They didn't transition. He was

4  transported that way to the hospital. Once again,

5  knowing about positional asphyxia, knowing they're

6  supposed to monitor the suspect, Officer Baggett

7  testifies that he found an inhaler on Mr. Goode.

8  He spoke with his wife, and she confirmed that he

9  was an asthma patient, that he suffered from

10  asthma, which now, we have a person in a four-point

11  restraint that has asthma. Officer Baggett's aware

12  of that. He notifies the emergency medical

13  personnel of this fact. There's no other need for

14  Officer Baggett from that point on, any physical

15  intervention to help control Mr. Goode.

16      So when we speak about control and

17  what civilians see as control, he was incoherent.

18  Is that what they mean by he's out of control? He

19  didn't respond to questions. He moved. Well, he's

20  in an extremely uncomfortable position. He's going

21  to move. He's going to try to find some relief

22  somehow, so there's going to be movement; but how

23  much movement can he actually move when he's in

24  this position with five straps across him. He

25  wasn't going to fall off the gurney. He wasn't

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1   going to roll over. He couldn't physically roll

2   over. He didn't have the ability to, so to say he

3   was out of control, he wasn't out of physical

4   control. They -- they established physical control

5   over Mr. Goode.

6        Q. (BY MR. HUSKISON) Do you remember reading

7   anything about while he was in the hospital that he

8   flailed to such an extent that he fell out of the

9   bed or was falling out of the bed and they had to

10  get him back in the bed?

11             MR. MCCORMACK: Object to the form.

12       A. No, sir.

13       Q. (BY MR. HUSKISON) You don't remember that?

14       A. No, sir.

15       Q. You do agree with me, Mr. Coslan, that --

16             MR. MCCORMACK: Coslin.

17             MR. HUSKISON: Coslin. I'm sorry.

18             THE WITNESS: You're good.

19       Q. (BY MR. HUSKISON) That he was monitored

20  constantly. Officers were with him. The first

21  12 minutes, officers were with him. The EMS

22  transport, he had an EMT back there and officers.

23  You get to the hospital, you have hospital

24  personnel monitoring him the full time. Do you

25  agree with that?

Electronically signed by Linda Webster (201-289-050-5808)                f6856601-66fe-40d9-b039-9379273000e5

1     A.  Not necessarily.  Was Mr. Coslin left alone

2  at any point in time?  No, I don't believe he was

3  left alone at any point in time, so when we talk

4  about the officers' duty to monitor and observe

5  their arrestee now, Mr. Goode, and because now they

6  have him in this restraint position, they're going

7  to leave him in this restraint position, but they

8  know about positional asphyxia, they all say that,

9  but they have to stay with him and monitor to make

10  sure he doesn't have any medical problems.

11     Q.  What they're doing -- let me back you up.

12  They're observing respiratory issues, whether he's

13  having trouble breathing.  That's part of what

14  they're observing, correct?

15     A.  And -- and -- that's correct.  And Officer

16  Baggett, in this deposition, says that he was

17  having -- everybody says that he was having

18  breathing issues.

19     Q.  I think you misread his testimony.  What he

20  was saying was everybody outside says he was having

21  breathing issues, but I was there, and he was

22  talking and screaming.

23          MR. MCCORMACK:  Object to the form.

24     Q.  (BY MR. HUSKISON)  I think you misread his

25  testimony.  If you'll read back over that, you'll

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1    see that he's referring to what everybody is

2    getting on -- getting on him about, it's not what

3    he observed.

4              MR. MCCORMACK:   Object to the form.

5         Q.   (BY MR. HUSKISON)   Because he testified

6    clearly that he did not observe any breathing

7    issues with Mr. Goode, but anyway.

8              MR. MCCORMACK:   Object to the form.

9    Counsel is testifying.   You can continue your

10   answer.

11        A.   Reading his deposition, that is not how I

12   took it.   It was -- it was apparent to me that

13   Officer Baggett said that everybody knew he was

14   having breathing issues.   Because someone could

15   talk, that doesn't mean they're not having

16   breathing issues.   In his testimony or in his

17   deposition, Officer Baggett, while at the hospital,

18   addresses one of the nurses prior to everybody

19   leaving, and he brings up the issue that, hey, do

20   we need to reposition him?   Do we need to take

21   these restraints off and -- and move him so you

22   guys can take care of him because we can do that

23   while everybody is here.   I have enough people here

24   that we can do that.

25              So Officer Baggett himself said at

Electronically signed by Linda Webster (201-289-050-5808)          f6856601-66fe-40d9-b039-9379273000e5

1    some point in time by even offering this that there

2    was an alternative other than this restraint, that

3    he had other ways of restraining him, that they

4    could physically handle him, they could put him in

5    a different position and restrain him to the bed,

6    stretcher, whatever he was on at that point in time

7    because he had people to help him do so, and they

8    could secure him to the bed.

9              They talked about that same nurse, I

10   think, about soft restraints, and I believe the

11   comment was a soft restraint -- the nurse told him

12   the soft restraints wouldn't work, but they still

13   had metal restraints.  They had handcuffs, and

14   Chief Long talked about in his deposition that they

15   had terminated an officer in Southaven that had

16   struck a prisoner that was handcuffed to a gurney,

17   so they had used this technique of handcuffing

18   people to a gurney to secure them in the past, not

19   soft restraints.  So their officers had experience

20   with handcuffing people to a gurney.

21             Officer Baggett saw a need enough so

22   that he made it clear to the personnel there that

23   we can take him out of this restraint and restrain

24   him; therefore, once again, by making that

25   statement, the amount of force being applied still

1    more than an hour into this deal, they haven't

2    relieved him of this force, they haven't documented

3    in any way that Mr. Goode is still a threat, a

4    danger, he's resisting in any way.

5             He's moving because of -- because the

6    position they have him in is extremely

7    uncomfortable.  He's going to continue to move.

8    He's on LSD.  He's having a bad trip.  He's going

9    to continue to move, but we can secure his hands.

10   We can strap him to the gurney.  We can get him out

11   of this position.  We can put him on his back where

12   he can breathe, and we even relieve the chance of

13   positional asphyxia.

14      Q.  (BY MR. HUSKISON)  You're assuming what

15   officer -- what you believe Officer Baggett was

16   meaning when he was asked that question, correct?

17   You don't know what he was thinking.  You're just

18   assuming that?

19      A.  Well, in reviewing his -- his deposition,

20   if Officer Baggett didn't have the physical means

21   of changing Mr. Goode's position, changing the way

22   he was restrained, why would he offer to do so?

23      Q.  But you're assuming.  I mean, you're

24   assuming that that's what he was talking about and

25   that he had other effective means to restrain him.

Electronically signed by Linda Webster (201-289-050-5808)                                              f6856601-66fe-40d9-b039-9379273000e5

1    You're assuming that?

2         A.   Well, I think he makes that clear in his

3    statement because he specifically said while

4    everybody is here, before everybody leaves because

5    then I'll be by myself, and so it's going to be

6    more difficult for me to move him by myself, so

7    yes, I believe that's exactly what he's trying to

8    confer to the nurse or whatever medical person is

9    there, that I physically have the ability to change

10   Mr. Goode's position to resecure him to the bed in

11   a different manner if that will help you guys treat

12   him medically while he has some people there.

13              He talked about having the people

14   there to do it because later on, he wouldn't be

15   able to do it by himself or it would be more

16   difficult, so I -- I don't know what else to assume

17   from that statement other than the fact that he

18   realized that there was an ability to change his

19   position and that it would probably serve a medical

20   benefit.

21        Q.   Could you assume from his statement that he

22   was asking them did they have any way to control

23   him if we move him?

24        A.   No, sir.

25        Q.   Could you assume that?  You couldn't assume

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1    that?

2       A.  I don't understand what you're -- could you

3    rephrase that, please?

4       Q.  My question is this:  Officer Baggett and

5    all of the folks that testified about it in the

6    emergency room testified that they considered it

7    but they didn't have any other way to control him

8    because he was so out of control in terms of moving

9    around and thrashing about that they had to do

10   something before taking him out and releasing him

11   from the restraints that he was in to get him under

12   control.  That's what the testimony from every

13   witness has been.

14      A.  Okay.  So --

15            MR. MCCORMACK:  Object to the form.

16   What's the question, Berk?

17      Q.  (BY MR. HUSKISON)  Is -- based on what all

18   of that testimony is, do you still assume that

19   Officer Baggett was saying, I've got other ways I

20   can restrain him?  Is that what you're saying?

21      A.  Officer Baggett is the arresting officer.

22   He is there with Mr. Goode at the hospital.  He's

23   the one that has custody of Mr. Baggett [sic].  He

24   is, as we talked about earlier, assessing the

25   situation and can make decisions on appropriate

1      uses of force or how he's going to handle the

2      situation.  He still has care and custody of

3      Mr. Goode.  Whether other civilian witnesses who

4      aren't trained in restraining or controlling

5      prisoners believes that Mr. Goode is out of control

6      and they have no way of restraining him, that

7      really isn't relevant to Officer Baggett's point of

8      view that, hey, I'm here, I'm offering to change

9      this person's position, I have people here to do

10     so.

11                 If he offered it, why -- how would

12     he -- why would he offer if he didn't have the

13     ability to do it?  So that's -- that takes

14     precedence over a civilian nurse or someone else

15     who isn't trained in restraining suspects or

16     arrested people.  Officer Baggett also talks about

17     a security guard from the hospital coming into the

18     room with him saying, what's going on, and leaves.

19     Well, the security guard comes by, and there's such

20     a little problem here that he just leaves.  There's

21     so little of a problem with Mr. Goode that all of

22     the officers leave, that they just left Officer

23     Baggett there to monitor him because he's still a

24     prisoner in their custody, so they have to leave

25     some officer there.

Electronically signed by Linda Webster (201-289-050-5808)

f6856601-66fe-40d9-b039-9379273000e5

1          And at that point, Officer Baggett's

2     monitoring is him sitting in the back of the room

3     on his phone. He's trying to stay out of

4     everybody's way. There's no physical control of

5     Mr. Goode. There's no intervening with Mr. Goode

6     while the doctors and nurses are trying to care for

7     him. He's just in the room, and I don't know to

8     what extent that is really monitoring the person.

9          MR. MCCORMACK: We've been going for a

10    little while now. Is this a good time for a break?

11          MR. HUSKISON: Yeah. I'm about done.

12          MR. MCCORMACK: I just need to run to

13    the restroom.

14          MR. HUSKISON: We'll take a short

15    break.

16          MR. MCCORMACK: Five minutes.

17          (Break was had from 11:21 a.m. to

18          11:31 a.m.)

19     Q.  (BY MR. HUSKISON) All right. We are back

20    on. I just want to follow up with a few things. I

21    noticed in your report you testified in a 2016

22    case, Jones versus McIntosh?

23     A.  Yes.

24     Q.  What kind of case was that?

25     A.  It was a case with excessive force.

Electronically signed by Linda Webster (201-289-050-5808)          f6856601-66fe-40d9-b039-9379273000e5

1       Q.  And were you testifying on behalf of the

2   plaintiff or the defendant?

3       A.  The plaintiff.

4       Q.  And was it -- did it go to trial?

5       A.  It did.  They got through summary judgment,

6   and I believe there was an undisclosed settlement.

7   Well, I would say they had numerous hearings that

8   got past summary judgment that was ruled in favor

9   of the plaintiff, and then there was a

10   settlement -- an undisclosed settlement reached

11   after that.

12       Q.  What was the excessive force you testified

13   to in that case?

14       A.  It was regarding a young lady who was

15   arrested for DWI.  She was brought in to the

16   city-operated detention facility.  She was

17   processed in and placed into a single cell.  A

18   short time later, she had removed the Gideon's

19   Bible and beginning -- began tearing pages out of

20   the Bible and pushing it out the slot of the door.

21   The sergeant who was there for the police

22   department operating the facility gave her several

23   verbal commands to stop tearing up the Bible and

24   give it to him.  She refused.

25              He entered the cell, pinned her

Electronically signed by Linda Webster (201-289-050-5808)               f6856601-66fe-40d9-b039-9379273000e5

1   against the wall of the cell, which is a small,

2   like, 8-by-10 concrete cell with two metal bunk

3   beds, all concrete floors and walls, a metal

4   commode.  He pins her against the wall, removes the

5   Bible from her hands, throws it on a bed, and then

6   takes two or three steps back, pulls her arm, puts

7   his hand on the back of her head and slams her into

8   the floor and wall across the room causing -- I

9   believe she had four different fractures in her

10  jaw, a broken nose.  She lost six teeth, and that

11  was the -- the basics of the complaint.

12      Q.  It's got the individual -- it's got

13  McIntosh.  Is that the sheriff?

14      A.  That's the sergeant involved.

15      Q.  What county was that in?

16      A.  I think it's the City of Wylie.

17      Q.  Do you remember what court it was in?  Is

18  it here in Texas?

19      A.  Yes.  Just a second, and I'll tell you

20  exactly.  I think it was in the Northern District,

21  but...

22      Q.  Eastern District of Texas.  Does that sound

23  right?

24      A.  Eastern District, yes, sir.

25      Q.  Okay.  And as far as you know, did you

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

```
 1    testify by deposition in that case?

 2        A.  Yes, sir.

 3        Q.  Looking through your list of documents that

 4    you reviewed, No. 1, it's at the very back of that

 5    next-to-last page, plaintiffs' statement of facts.

 6    What is that?

 7        A.  It is a document provided to me by the

 8    plaintiffs' counsel where they give notice, I

 9    believe to the court, what their statement of facts

10    are in this case.

11        Q.  You believe that was a document that was

12    filed with the court?

13        A.  I -- I believe so.

14            MR. HUSKISON:  We can go off the

15    record just a second.

16            (Discussion off the record.)

17        A.  I don't know if it's the same one.  It's on

18    here, and I don't know if I have a written copy of

19    that in my file out in my truck, but I believe it

20    says exactly what this -- plaintiffs' statement of

21    facts.

22            MR. HUSKISON:  Do you have an extra

23    copy of that?

24            MR. MCCORMACK:  I do not, but I

25    believe that's the same one.
```

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1        Q.   (BY MR. HUSKISON)   And what you're looking

2    at, Mr. Coslin, is a factual predicate that's

3    included in plaintiffs' expert disclosures; is that

4    right?

5        A.   I don't know if that's the actual document

6    that I'm talking about here.   I know it is on here

7    (indicating).   You requested copies of all

8    documents and stuff I reviewed.

9        Q.   Okay.

10       A.   Instead of printing out a gazillion pages

11   of stuff --

12       Q.   You brought it for me?

13       A.   Yes.

14       Q.   That was my next question.   That

15   plaintiffs' statement is on there?

16       A.   Yes, sir.

17       Q.   Whatever it is?

18       A.   All of the stuff is on here, including --

19   what is not on here is, I think, Dr. Gaut -- is

20   that his name, correct?

21       Q.   Uh-huh.

22       A.   I received his report after writing this.

23       Q.   Okay.

24       A.   And it's on here because I have since

25   reviewed his report.

1      Q.  On that -- and is that for me?

2      A.  Yes, sir, it is for you.

3      Q.  Good.  On that -- the document that you've

4  provided, did you have any e-mails or

5  correspondence with plaintiffs' counsel about your

6  testimony or anything like that?

7      A.  About testimony, no.  Do I have e-mails

8  back and forth with the plaintiffs' attorneys?

9  Yes.

10     Q.  Do you have those on there?

11     A.  Absolutely not.

12     Q.  Would you please provide those to the

13  attorney so you can review them?  Anything they

14  communicated back and forth with you is

15  discoverable.  Okay?  Can you provide that with

16  him -- to me?

17            MR. MCCORMACK:  Object to the

18  statement that anything -- any communications

19  between us and the expert are discoverable.  That's

20  not what the law is, but I will state that we are

21  happy to review any e-mails, and any that are not

22  privileged, we're happy to produce.

23            MR. HUSKISON:  Okay.  Please do that.

24     Q.  (BY MR. HUSKISON)  Now, we marked while we

25  were out a notice of deposition.  It's the notice I

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1    filed in this case.  It is Exhibit I, and looking

2    through that, it requested you bring some things.

3    Is that what you've included on the thumbnail thing

4    you provided?

5        A.  Yes, sir.

6            (Exhibit I was marked.)

7        Q.  (BY MR. HUSKISON)  Is there anything in

8    there, Mr. Coslin, that we've requested that you

9    did not provide?

10       A.  Other than attorney e-mails, I believe

11   everything is there.

12       Q.  Okay.  How much are you being paid?  What's

13   your compensation?

14       A.  The fee schedule is on there, as well.

15       Q.  Okay.

16       A.  That's one of the things you asked for.

17   For this case -- my fees have since gone up, but

18   for this case, I bill at $125 an hour per work done

19   in consulting, reviewing, or writing reports.

20   Anything that would require me to be away from my

21   office, such as deposition, is a flat fee of $1,000

22   a day plus any expenses.  Those fees have since

23   changed, but they're not relevant to this case.

24       Q.  You reference or you listed one case that

25   you testified in by way of deposition, I think you

```
1    said.  Are you involved in any other cases
2    currently?
3         A.   I -- I have several cases that I am
4    reviewing and advising on.  Since that report was
5    issued, I have testified through deposition in
6    another case, and it's included on that thumb
7    drive, as well.
8         Q.   What kind of case was that?
9         A.   It was an excessive force case.
10        Q.   Did you testify for the plaintiff or the
11   defendant?
12        A.   For the plaintiff.
13        Q.   Your consulting business or, I guess,
14   expert testifying business was -- 2015, is that
15   when you started?
16        A.   Yes, sir.
17             MR. MCCORMACK:  Object to the form of
18   that.
19        Q.   (BY MR. HUSKISON)  You do that on the side
20   from your job with Smith County?
21        A.   Yes, sir.
22             MR. HUSKISON:  Mr. Coslin, I
23   appreciate your time.  We'll let some of these
24   others ask questions, and I may have some follow-up
25   after they ask.  Thank you.
```

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

```
 1                    THE WITNESS:  Thank you, sir.
 2                    MR. MCCORMACK:  Do you want to go to
 3       the phones?
 4                    THE WITNESS:  All right, guys.  We are
 5       back on the speakerphone now.  Can everybody hear?
 6                    MR. MCINTOSH:  Yes, I can hear.
 7                    MS. WADDELL:  Amanda Waddell, yes.
 8                    MR. JORDAN:  Yes.
 9                    THE WITNESS:  Okay.  Good.  All right.
10       This is Darrell Coslin.  We are going to continue
11       on.  Is there anybody that has questions?
12                    MR. JORDAN:  This is Trey Jordan on
13       behalf of SET.  I have no questions, sir.
14                    MR. MCINTOSH:  This is John Mark
15       McIntosh on behalf of Baptist Memorial DeSoto.  I
16       have no questions, as well.
17                    MS. WADDELL:  This is Amanda Waddell
18       on behalf of Dr. Oliver.  I, likewise, do not have
19       any questions.
20                    THE WITNESS:  Is that everybody?
21                    MR. MCCORMACK:  I think so.  Yeah.
22                    THE WITNESS:  All right.  If you have
23       no questions, I think what we're going to do is
24       we're going to mute this and go back on the
25       computer and let Kevin start his cross.
```

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1              EXAMINATION

2  BY MR. MCCORMACK:

3      Q.  Mr. Coslin, as you know, my name is Kevin

4  McCormack.  I represent Kelli Goode, the widow of

5  Troy Goode.  I want to ask you some questions

6  about -- well, I want to start off with questions

7  about hog-tying.  Are you familiar with the term

8  hog-tying?

9      A.  Yes, sir, I am.

10     Q.  As that's used in police practices, what

11 does it mean?

12     A.  Hog-tying is in reference to a way of

13 restraint using both handcuffs and leg restraints

14 to secure a suspect or an arrested person.  The

15 person is laid prone.  He was placed in hand

16 restraints or handcuffs.  One leg restraint or a

17 leg iron is placed on an ankle, then that leg is

18 brought forward, allowing the officer to loop the

19 chain separating the two ends of the leg iron

20 through the middle part of the handcuffs and then

21 back down to the opposite ankle or leg and where it

22 is secured to the other leg.  So now we have both

23 hands and feet bound and bound together behind a

24 person's back as they lay prone on the ground.

25     Q.  There was some discussion about whether two

Electronically signed by Linda Webster (201-289-050-5808)          f6856601-66fe-40d9-b039-9379273000e5

1   sets of the handcuffs could be used to perform a

2   hog-tie.  In your experience, is that how a hog-tie

3   is performed?

4       A.  No.  I -- this is the first I've heard of

5   that.  We talked earlier about Chief Long

6   describing hog-tying and four-point restraint being

7   two different things, and the basis -- the basic

8   fact that he stated it was a difference between the

9   two, in hog-tying, you use two pair of handcuffs.

10  In a four-point restraint, you would use handcuffs

11  and then a pair of leg irons, as he said, or leg

12  restraints to connect together allowing for a

13  little more give or room between the hands and the

14  feet.

15      Q.  I see you have a set of handcuffs here.  Is

16  this a standard set -- standard size set of

17  handcuffs?

18      A.  Yeah.  These are -- I mean, whether they're

19  ASPs, Smith & Wesson, Peerless, they're usually the

20  same.  You will have handcuffs that are

21  double-hinged in the middle where they take the

22  chain out where it doesn't allow the twisting, but

23  this is a very typical, very common handcuff, and

24  they're all the same diameter basically.

25      Q.  Would that diameter of handcuff, could you

Electronically signed by Linda Webster (201-289-050-5808)          f6856601-66fe-40d9-b039-9379273000e5

1    fit it around a suspect's wrist?

2        A.   Most suspects from children -- it's hard on

3    small children.  Some small females because it will

4    only go that small, and there's some people that

5    have extremely small hands that you have to be very

6    careful with.  Some very small people, they may

7    pull through this, but for most adults, I'd say

8    this works on probably 99 percent of the population

9    of adult age that would be arrested.

10       Q.   Well, would it work on adult ankles?  If

11   you were trying to fit that around an adult's

12   ankle, would that work?

13       A.   It would be very difficult because of the

14   size.  This being very small, that is the absolute

15   largest diameter you can make this handcuff.  It's

16   on the first click, and that's only one barb on

17   this handcuff that's actually holding in the

18   locking mechanism.  The diameter here is so small

19   that it's almost impossible to get it on an adult

20   prisoner's ankles because the diameter of the ankle

21   is much larger, so this becomes extremely difficult

22   to use, and you physically couldn't do it on

23   probably 90 percent of the population.

24       Q.   Mr. Coslin, I'm about six feet tall and

25   about 170 pounds.  Do you think you would be able

Electronically signed by Linda Webster (201-289-050-5808)          f6856601-66fe-40d9-b039-9379273000e5

1   to get that on my leg?

2       A.   I seriously doubt it.

3       Q.   If you can't get that set of handcuffs on

4   somebody's leg, how would it be possible for

5   hog-tying to involve these two sets of handcuffs?

6       A.   It wouldn't.

7       Q.   All right.  You were shown a couple of

8   exhibits that demonstrate hog-tying.  Could you

9   pull out Exhibit B there?

10      A.   (Complying.)

11      Q.   Could you tell us what Exhibit B is?

12      A.   It looks like a hand-drawn diagram.  It

13  says it's a restraint and hog-tie position.  It

14  shows a caricature of an individual laying in what

15  appears to be the backseat of a vehicle, prone,

16  with his hands and -- in handcuffs, and his legs

17  secured in leg restraints with the handcuffs and

18  leg restraints interlocked together.

19      Q.   Does that diagram accurately -- fairly and

20  accurately represent the position that Troy Goode

21  was in when he was restrained by the Southaven

22  police?

23      A.   Yes, it does.

24      Q.   Was Troy Goode hog-tied?

25      A.   Yes, he was.

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1    Q.   You were asked some questions about

2    different witness statements.  When you're judging

3    a use of force by the police, what witness

4    statements are you primarily looking at?  Which

5    are, I guess, the key ones to understand the

6    officer's point of view?

7    A.   Well, to understand the officer's point of

8    view, I -- I -- I focus very much on the officers'

9    statements themselves.  The officers have the

10   training and experience and they're able to

11   articulate or they know what facts they need to

12   articulate to describe the necessity of their

13   actions or what they're observing going on.  Most

14   officers are very good at documenting their

15   observations on a scene because they routinely have

16   to do these in their reports, whether it's an

17   arrest or offense report or whatever it may be.  So

18   if I'm looking at trying to understand what the

19   officer is going through or seeing, I want to -- I

20   want to hear it in his words or her words.

21   Q.   Based on your review of the officers'

22   statements in this case, when they arrived on the

23   scene, did it appear to you that they felt Troy

24   Goode was a threat to himself or others?

25              MR. HUSKISON:  Object to the form.

1    What the officers felt?  I don't think he can

2    testify to that, but anyway.

3                    MR. MCCORMACK:   I'll rephrase that.

4        Q.   (BY MR. MCCORMACK)   Based on your review of

5    the officers' statements, were there any objective

6    facts that indicated that they felt Troy Goode was

7    a threat to himself or others?

8        A.   They did not document anything that would

9    lead me to believe that, and their actions that

10   they did document, it would actually lead me to

11   believe the opposite, that they were comfortable

12   enough to not address Mr. Goode, to speak to his

13   wife, to not immediately pursue him when -- after

14   he approached Officer Baggett, so by his own

15   observation and his own actions, it would lead me

16   to believe, especially Officer Baggett, did not

17   feel that there was an immediate threat posed by

18   Mr. Goode.

19       Q.   In the event that the officers arriving on

20   the scene had felt that Troy Goode was a threat to

21   himself or others because he might run into

22   traffic, did the officers have any options to

23   control that threat?

24       A.   Yes.   The -- the easiest option at that

25   point in time because to control a person who's

1 running around, especially now that we know that

2 this gentleman is high on LSD and he's not acting

3 rationally, if traffic is a concern, the easiest

4 thing is to stop the traffic. That's a very simple

5 path, whether parking cars, stopping traffic,

6 halting the traffic, allowing them time to

7 apprehend Mr. Goode. Once they start making an

8 approach to apprehend Mr. Goode, whether it's

9 themselves or with a canine in this case, which was

10 deployed, we don't know how Mr. Goode is going to

11 respond. We don't know the ease of this detention.

12         As it was stated earlier, I believe it

13 took 11 or 12 minutes from the time officers

14 arrived until the time he was detained or placed

15 under -- in restraints, so we don't know what is

16 going to happen with Mr. Goode, his reaction to us

17 approaching him. We do know he's in crisis. We

18 don't -- we know he's not in a normal mental state,

19 so his reaction may not be that of a normal person,

20 so if I have the opportunity and there was time

21 here and there was enough officers responding,

22 there is an opportunity to simply stop the traffic

23 if that was an issue.

24     Q.  Based on your review of the records, I

25 believe there were five officers on the scene,

1    would that be enough officers for them to stop
2    traffic on this road?
3        A.  Yes.  Absolutely.
4        Q.  Is that a hard procedure to do?
5        A.  Absolutely not.
6        Q.  Is it a common police procedure, to stop
7    traffic?
8        A.  Yes.
9        Q.  Are officers trained in how to do that?
10       A.  Yes.
11       Q.  Instead of stopping traffic, the officers
12   sent a canine after Troy Goode.  Based on your
13   review of the records and your experience as a
14   police officer for 33 years, is it reasonable to
15   send a canine officer after a suspect when you fear
16   that suspect might run into traffic?
17       A.  No.  I do not believe that would be a
18   reasonable act.
19       Q.  Why not?
20       A.  Once again, in this case with Mr. Goode, we
21   know he's not acting rationally or we know that it
22   is very common for people to have a fear of
23   animals, especially a fear of dogs.  It is not out
24   of the realm to fear a police canine who we know
25   are trained to attack and bite people.  Mr. Goode's

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1    reaction to the canine would be very unpredictable,
2    and he -- there was no documentation previously by
3    the officers that Mr. Goode had made an attempt to
4    go into traffic. If that had happened, they didn't
5    speak of it, and they took no action prior to this
6    to stop that from occurring, so now the canine is
7    deployed.
8              If Mr. Goode fears that he's being
9    pursued by this canine, his pattern of running in
10   circles in this grassy area, he may divert from
11   that in attempting to elude a canine and then run
12   into traffic which has not been stopped at this
13   time.
14       Q.   You were asked some questions about Officer
15   Scallorn's statement -- Officer Scallorn's
16   testimony that he said Troy Goode should get on the
17   ground and stop. Is that a sufficient verbal
18   warning that a person is being detained or under
19   arrest?
20       A.   No, sir, it's not.
21       Q.   Why not?
22       A.   In most -- in most statutes that I'm aware
23   of, a person has to knowingly or intentionally
24   violate a law, so to prove that element, we would
25   have to show here for evading arrest, which is what

Electronically signed by Linda Webster (201-289-050-5808)        f6856601-66fe-40d9-b039-9379273000e5

1  it was alluded to that Mr. Goode was doing at that

2  point in time, he would have to knowingly and

3  intentionally evade an officer attempting to arrest

4  him.

5  If Mr. Goode was not privy to that

6  information that he was being detained or arrested,

7  that that was what the officer's intention was, it

8  would not meet the onus of the offense to charge

9  him with resisting -- or evading arrest.  So it's

10  hard to evade somebody that's attempting to arrest

11  you if you don't know they're attempting to arrest

12  you.

13  Q.  Those words alone; get on the ground and

14  stop, do those indicate that a person is under

15  arrest?

16  A.  No, not specifically.

17  Q.  You were asked quite a few questions about

18  the use of restraint at certain times, and I want

19  to be clear on this.  Is the evaluation of the

20  force being used a one-time evaluation, or is it a

21  continuing evaluation?

22  A.  It is continuing.  When we -- when we talk

23  about reasonable use of force, it's -- from -- from

24  my understanding of Graham versus Connor and how we

25  look at an officer's force as being reasonable, is

1    at the -- at the time the force was being used, at

2    that very moment, was it reasonable based on the

3    Graham factors? Was the person resisting? Were

4    they under arrest, and what was the severity of the

5    charge? Were they actively resisting the arrest?

6    Was that force used reasonable under those

7    circumstances when it was applied?

8           Knowing that there is a possibility of

9    death to an arrestee or detainee who has been

10   placed in a hog-tie or four-point position, that

11   that force is extreme, that restraint is extreme,

12   Mr. Goode was -- now there's some confusion whether

13   or not he was even under arrest. There was -- it

14   was stated earlier that Officer Scallorn was simply

15   trying to stop Mr. Goode from entering the roadway.

16   That's why he deployed the canine and evidently the

17   Taser, that he was not attempting to effect an

18   arrest. But then they immediately handcuffed him

19   and they never released him, but, you know, whether

20   his intent was to stop him from going into the road

21   or place him under arrest -- I kind of lost my

22   train of thought. Where were we going with this.

23       Q. I was asking about evaluation of the use of

24   force as a continuing evaluation.

25       A. So -- so now we've got Mr. Goode in these

Electronically signed by Linda Webster (201-289-050-5808)          f6856601-66fe-40d9-b039-9379273000e5

1    restraints -- in this maximum restraint when they

2    had other options available.  They handcuffed him.

3    They put the leg irons on him.  They tie him

4    together.  They get him in this four-point

5    restraint position, hog-tie position, was -- was

6    Mr. Goode at that point in time in any way

7    resisting?  His behavior never changed from their

8    first observations up until the time of his death.

9    He was incoherent.  He was not responsive.  He was

10   either moving in some way, whether it was running,

11   flailing about, moving prior to or after -- during

12   or after being restrained.  His -- his mannerisms,

13   his actions were consistent throughout this whole

14   event.

15           Once he was restrained and the

16   resistance ended, that necessity for that extreme

17   force, that four-point restraint, it no longer

18   exists; so therefore, the officers have to say,

19   okay, this is not an issue.  This is not a threat.

20   We need to release him from this extreme position.

21   Especially aware of all of the other factors that

22   go along with being in this position, whether

23   they're scientifically verified or not, if you

24   believe this is a problem for us and we were

25   trained on this, it's important that we take notice

1    of this and evaluate what we've got going on here,

2    and the evaluation in this situation is constant

3    throughout his detention.

4        Q.   Let's take it a couple of different times

5    then.   Let's look at when the ambulance has arrived

6    and there's now a stretcher and the cot restraints.

7    When I say the cot restraints, you already

8    mentioned that they're about two-inch thick nylon

9    straps?

10       A.   Right.

11       Q.   At that point, was the continuing use of

12   the hog-tie a reasonable decision, a reasonable use

13   of force by these officers?

14       A.   Absolutely not.

15       Q.   Why is that?

16       A.   Due to the known dangers of the hog-tie

17   position, even if we want to say the officers had

18   no other alternative before the ambulance showed

19   up, they did, but let's say they didn't, that this

20   was the only way they could effectively restrain

21   Mr. Goode, once the stretcher showed up, they had

22   another restraint device, and it is common protocol

23   to transport a prisoner that needs medical

24   attention on their back, secured to the stretcher,

25   with handcuffs and straps.

Electronically signed by Linda Webster (201-289-050-5808)                          f6856601-66fe-40d9-b039-9379273000e5

1          Once a stretcher was brought to

2    Mr. Goode's position with all the other officers

3    around, the leg restraints should have been

4    removed.  He should have been removed from being on

5    his stomach, rolled over onto his side or his back,

6    lifted up in a team lift, placed on a stretcher

7    while officers were there to secure both arms,

8    uncuff one cuff, cuff him to the bed rail, cuff his

9    other hand to the opposite bed rail, secure his

10   body with all five restraints on the gurney, and

11   even if it was necessary, reconnect the leg irons

12   back through the gurney where even if he was

13   physically strong enough to damage one of the

14   restraints on the gurney, he wasn't going to get

15   through the leg restraint.

16          And I don't know any human being

17   that's can rip those five nylon belts off a gurney.

18   These are designed to transport very large patients

19   in a moving vehicle and keep them secured so they

20   don't get injured in transport.  This would have

21   been the acceptable, common, traditional way of

22   transporting this person to the hospital.

23        Q.  Is transporting or keeping a suspect in a

24   hog-tied position a common accepted use of force

25   from your experience as a police officer?

Electronically signed by Linda Webster (201-289-050-5808)          f6856601-66fe-40d9-b039-9379273000e5

1     A.  Absolutely not.

2     Q.  I want to talk to you about another point

3  in time.  Once Troy was in the hospital, was the --

4  well, let me step back from that for a second.

5  When a suspect is in the hospital, do the police

6  still have the, I guess, responsibility to make

7  sure that that suspect is safe?

8     A.  Yes.

9     Q.  Once Troy Goode was in the hospital, was

10  the continued use of the hog-tie there an

11  acceptable use of force?

12     A.  It was absolutely not acceptable.  It was

13  not reasonable, by any means.

14     Q.  You mentioned that there are alternatives

15  to the hog-tie position.  Let's talk about when you

16  first have a suspect who is unruly, agitated, what

17  alternatives do you have to control their legs

18  other than putting them in the hog-tie position?

19     A.  Well, one very simple method is stacking

20  weight, and what this is, say you're in Mr. Goode's

21  position.  They've got him on the ground.  They

22  were able to quickly detain him on the ground, get

23  control of his arms, and put him in handcuffs.

24  That did not take long.  That was not a significant

25  battle with Mr. Goode.  At that point in time, they

1    say he becomes -- he was kicking and flailing his
2    legs.  He's prone.  He's facedown.  All we have to
3    do is stack weight on his legs, hold him down.
4    There's five officers there to control this
5    gentleman's legs, so you can simply stack weight
6    holding his legs, securing his legs, where he's no
7    longer able to kick anyone.  That's the first step.

8            Two, we can simply rotate him over
9    into a sitting position where his body is now at a
10   90-degree turn.  We don't want to push him forward
11   where we're compressing his diaphragm.  Once again,
12   it's restricting his breathing.  We want to keep
13   him upright in a seated position with his legs out
14   in front of him.  Now he's in a position where he's
15   at a 90-degree angle.  To lift your foot up at that
16   point in time and try to kick somebody is almost
17   impossible.

18           We can employ the leg irons.  We
19   can -- we can secure the feet.  Whether he's prone
20   or whether he's on his side in a recovery position
21   or whether he's sitting, we can place the leg irons
22   on Mr. Goode and only keep them on his ankles, and
23   then an officer stands on the chain between his
24   legs to keep him from moving his feet.  He's not
25   going to be able to lift a 200-pound officer off

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1    the ground standing on the chains, so we can

2    physically control him that way without having to

3    put him in this -- what other people refer to as a

4    maximum restraint position because it's -- this is

5    such an extreme restraint, there were other ways

6    that were just as easy or easier to apply that

7    would not pose a danger to Mr. Goode.

8        Q.  Besides the positional asphyxia issue, are

9    there any other reasons that police generally don't

10   hog-tie suspects?

11       A.  Well, most officers don't carry leg irons.

12   It's not a -- unless you're in the business of

13   transporting prisoners and like in a jail facility,

14   so they're taking prisoners from a jail to trial,

15   moving them from one detention center to another in

16   a transport van, it's not common for most officers

17   to have leg irons in their -- in their duty bag.

18   They just aren't used.  The common thing is hand

19   restraints.  Like I said, it is so simple to

20   restrain other people's legs doing other techniques

21   like we just discussed that the leg irons for a

22   patrol officer is not a very -- very necessary

23   tool.

24       Q.  There's been testimony in this case that

25   the leg irons were not standard issue for the

Electronically signed by Linda Webster (201-289-050-5808)    f6856601-66fe-40d9-b039-9379273000e5

```
1    Southaven Police Department, but that the
2    department did know that they were in use and
3    accepted their use.  If a police department accepts
4    the use of restraint mechanisms, do they have a
5    responsibility to train their officers in how to
6    use that restraint mechanism?
7            MR. HUSKISON:  Object to the form.
8        A.  Any tool a police officer can be provided
9    with, he should be trained in how to use.  If
10   you're going to give him a gun, he should be
11   trained on how to use that gun.  If we're going to
12   give him a patrol rifle or a shotgun, they need to
13   be trained in that weapon system.  A Taser, there's
14   training for a Taser.  OC spray, handcuffs, we
15   train them how to handcuff, so any -- any device,
16   tool, that we're going to deploy, especially on
17   citizens, the officers need to know and have
18   training on how to use that thing and use it
19   effectively and appropriately.
20           I believe in Chief Long's deposition,
21   he talks about the -- the leg restraints being used
22   and that the four-point restraint was authorized by
23   the department, but I didn't find it in their
24   policy anywhere.  They had a policy regarding
25   handcuffing and specifically relates how people
```

Electronically signed by Linda Webster (201-289-050-5808)                                    f6856601-66fe-40d9-b039-9379273000e5

1    would handcuff, that they do the handcuff behind

2    their back unless they're injured or elderly or

3    minors under a certain age, and that it was only a

4    temporary restraint, that they were not meant to be

5    a long-term restraint. But nowhere in their

6    restraint policy did it -- did it address leg irons

7    or the four-point restraint that I saw, that I was

8    aware of.

9        Q.  (BY MR. MCCORMACK)  Was the failure to

10    address the four-point restraint or leg irons

11    important to you in your review of this case?

12        A.  With -- without the department creating a

13    policy and establishing guidelines for -- for this

14    use and appropriate training for this use, it tends

15    to allow for officers' personal interpretation.

16    One, what kind of restraint device is allowed?

17    Whether it's a style of leg irons like this,

18    whether it's a Velcro strap type of leg restraint

19    or plastic flex cuffs, there are very different

20    types of cuffs to be used to restrain someone's

21    legs.  The policy doesn't -- lack of policy shows

22    lack of control over what the officers can and

23    cannot employ.  It doesn't show any kind of

24    guidelines for its use, when it's appropriate to

25    use, how long it can be used, when it's

Electronically signed by Linda Webster (201-289-050-5808)

1  inappropriate to use.  It doesn't show requirements

2  of any training.

3           Most departments, when they have,

4  like, even a Taser policy, for the use of the

5  Taser, the officers, the first thing they have to

6  do is go through the Taser certification course,

7  and that's one of the requirements before the

8  officer can even carry the Taser or employ the

9  Taser.  So the -- most policies will address

10  required training to even use this tool, whether

11  it's a baton or OC spray or Taser or anything else.

12           The lack of that policy being in place

13  shows a total lack of control over the tool --

14  the -- the specific tool, how it's used, when it's

15  used, and any restrictions upon its use.  Like, the

16  time it can be deployed, you know, that -- they

17  restrict the use of handcuffs and say it's a

18  temporary restraining device, not meant for

19  long-term restraint.  So would we assume that leg

20  irons, being of the same type of restraint, be a

21  temporary device?  And would temporary be an hour

22  and 27 minutes?

23           So in this case, Mr. Goode was kept in

24  this position with his leg irons for that period of

25  time prior to his death, so not having a policy and

Electronically signed by Linda Webster (201-289-050-5808)                                                     f6856601-66fe-40d9-b039-9379273000e5

1    not having training and control of this device is,

2    I believe, a major error on the part of the -- the

3    police department and their policymakers at that

4    point in time.

5        Q.  You just mentioned some training.  Did you

6    review the Mississippi Law Enforcement Training

7    Academy Manual?

8        A.  Yes, I did.

9        Q.  In that manual -- if I can find the page.

10   In that manual, it says there are two main areas of

11   concern in the application of handcuffs.  One is

12   positional asphyxia.  When a violator has been

13   arrested and handcuffed in a facedown position,

14   officers must get the suspect up to at least a

15   seated position as soon as possible.  People who

16   remain on their stomachs for varying periods of

17   time will suffocate themselves due to their own

18   body weight.

19              My question for you is, is that

20   statement consistent with the training that you see

21   in other police departments throughout the country?

22       A.  As far as the concern for positional

23   asphyxia, for prone restraint suspects, and the

24   need to immediately remove them or relieve them

25   from that position, yes.  His exact verbiage may

Electronically signed by Linda Webster (201-289-050-5808)                     f6856601-66fe-40d9-b039-9379273000e5

1     not be the same across the country, but the --

2     the -- the concerns of the suspect suffering from

3     positional asphyxia were being prone and restrained

4     behind his back, yes, that is consistent.

5         Q.  When you're dealing with this hog-tie

6     position -- well, have you ever seen it used in

7     your own career?

8         A.  Yes.

9         Q.  How often?

10        A.  Once.

11        Q.  One time in 33 years?

12        A.  Yes.

13        Q.  When that person was hog-tied, were they

14     placed into a recovery position?

15        A.  No, they weren't.

16        Q.  What did you do as the response to that?

17        A.  Well, he was -- this incident occurred with

18     a prisoner of mine that was transported to the

19     Dallas County jail.  This prisoner was driving a

20     stolen vehicle.  I got in a foot pursuit with this

21     person, got in a fight with this individual.  He

22     attempted to disarm me and take my gun.  Got in a

23     second pursuit.  Finally, was able to restrain this

24     person and get him handcuffed.  This individual was

25     a very large gentleman.  He was a college football

Electronically signed by Linda Webster (201-289-050-5808)      f6856601-66fe-40d9-b039-9379273000e5

1    player at the time, transported him to jail without

2    leg restraints or any of this other stuff, simply

3    in handcuffs. Got him into the booking area in the

4    Dallas County jail.

5            At that point in time, handcuffs are

6    removed. The individual is being noncooperative

7    with wanting to be fingerprinted. We're trying to

8    fingerprint. This was back in the day when they

9    actually used real ink and cards and it's not all

10   computerized. And every time they tried to roll

11   his prints, he would smudge them. So we're going

12   to restrain him again, so we were going to put him

13   back in handcuffs so they could manually print him

14   in the handcuffs.

15           The fight was on. I had control of

16   the top half of his body. The jailers grabbed the

17   bottom half. He wound up on the floor, and the

18   next thing I know, I have 15 Dallas County jailers

19   coming in, and they are taking over the fight, and

20   they show up with -- we've got him handcuffed, and

21   they showed up with leg irons, which is something I

22   didn't carry. We didn't carry them. We didn't

23   have them. And they tied that one ankle. They ran

24   it up through there, and they caught that other

25   ankle, and before you knew it, they had this

Electronically signed by Linda Webster (201-289-050-5808)                              f6856601-66fe-40d9-b039-9379273000e5

1    gentleman hog-tied on the floor.

2        Q.   So you weren't the one who applied that?

3        A.   No, I did not.

4        Q.   All right.  Have you ever had the hog-tie

5    restraint applied to you personally?

6        A.   Yes.

7        Q.   Is it generally understood that the hog-tie

8    restraint using these shackles -- and I'm not

9    talking about using two sets of handcuffs.  I'm

10   talking about using the shackles -- is painful for

11   the suspect who's in them?

12       A.   It's extremely uncomfortable.  It could be

13   very painful.  Of course, the size of the suspect,

14   these handcuffs and leg irons don't get any bigger.

15   I mean, they don't -- so the bigger the suspect is,

16   the -- the more pressure put on the individual, the

17   more uncomfortable they become, but even for a

18   smaller person, a person of average size, you've

19   got metal on bone, basically, where we have

20   handcuffs pulling against the wrist.  You have the

21   metal leg irons pulling against the ankles.

22                    You have your arms back in an

23   unnatural position behind your back now being

24   lifted up away from the body putting more tension

25   across your upper chest.  Your legs and feet are

Electronically signed by Linda Webster (201-289-050-5808)          f6856601-66fe-40d9-b039-9379273000e5

1     going to pull backwards towards your hands.  To get

2     any kind of relief whatsoever, you have to bend

3     backwards to relieve the pressure off the cuffs,

4     which is physically almost impossible, so you have

5     the pulling of the feet and the hands away from

6     each other causing pressure on the -- on the wrist

7     and the ankles from this metal digging into the

8     bone.  Extremely very painful.  There's a lot of

9     nerves through those areas, and there's very little

10    muscle tissue around there.  It's just basically

11    compressing of nerve onto a bone, so it's very

12    uncomfortable here.

13              Of course, like I said, the larger the

14    individual is, the more difficult this is going to

15    be for this person to be in that position, so

16    there's nothing pleasant or comfortable about this

17    being hog-tied or in this four-point restraint.

18        Q.   Now, you also mentioned that police

19    departments across the country generally don't

20    allow this to be used.  Is that your understanding?

21        A.   Yes, that is my understanding, that this

22    technique is very rare in law enforcement.

23        Q.   And why is that?

24        A.   Because of the whole -- the whole knowledge

25    of positional asphyxia, the numerous deaths in

Electronically signed by Linda Webster (201-289-050-5808)                    f6856601-66fe-40d9-b039-9379273000e5

1    custodies that involved the use of this hog-tying.
2    Like I said, when this became prevalent in the late
3    '80s, early '90s, there were numerous deaths in
4    custodies involving this position.  Studies were
5    done.  Whether -- whether the science is there to
6    articulate that doing this will cause someone to
7    die of positional asphyxia, I don't know.  I don't
8    know if it does or not, but I know it -- it has
9    been shown as a contributing factor in numerous
10   deaths when this was applied.

11                    So law enforcement, once they were
12   made aware of this, adopted -- generally adopted
13   different practices and standards and training to
14   avoid a situation.  There were other restraints
15   available to the officers other than this hog-tying
16   or four-point restraint that was less dangerous to
17   the arrested person or to the person being
18   restrained, so this is not a widely accepted manner
19   of restraint.

20                    There are agencies that in the past
21   used what was called a lateral vascular neck
22   restraint.  Lay people would refer to it as a
23   chokehold.  This restraint would put pressure on
24   the suspect's neck causing -- what they believe it
25   caused was a pooling of blood on the brain, which

1  would cool the brain, and would cause a person to
2  pass out allowing the officers to immediately get
3  them into handcuffs.  It was a very short time, but
4  it gave them enough control temporarily to -- to
5  put the person in handcuffs.

6          There were numerous deaths where the
7  term excited delirium came up and came into law
8  enforcement.  A lot of these deaths involved
9  struggles with law enforcement prior to, you know,
10  there was -- whether it was preexisting health
11  conditions with the suspects, use of illegal drugs
12  or alcohol, and then the struggle with law
13  enforcement, whether it was through an LVNR or any
14  other physical confrontation that the individuals
15  would suddenly die in custody shortly after that
16  struggle.

17          There was a time that they believed
18  that the LVNR, the lateral vascular neck restraint,
19  it was a contributing factor in those deaths, so
20  the same as with hog-tying, most agencies
21  restricted the use of the lateral vascular neck
22  restraint unless it was a deadly force situation,
23  so the same kind of science.

24          We -- we may not be able to show that
25  it is for certain that that lateral vascular --

Electronically signed by Linda Webster (201-289-050-5808)          f6856601-66fe-40d9-b039-9379273000e5

1   lateral vascular neck restraint was a cause of that

2   individual's death, but there was enough

3   circumstances to say we need to reevaluate this.

4   Is there something else we can do as law

5   enforcement to restrain the individual without

6   using that to help save lives, and so the same --

7   basically, policies were applied to the LVNR as was

8   applied to hog-tying, whether -- whether it caused

9   a death or not, we think it might, so we're not

10  going to do it anymore.

11      Q.  If you have two potential techniques, one

12  of which might cause death and one of which you

13  know will not, and they're both equally effective

14  in controlling the person, is it fair to say that

15  police departments should use the one that won't

16  cause death?

17      A.  Well, that would be the reasonable

18  alternative, I would think.

19          MR. MCCORMACK:  So do I.  I think

20  that's all of the questions I have for you.  I'll

21  pass you back over to Berk.

22          MR. HUSKISON:  No more questions.

23          (End of proceedings at 12:20 p.m.)

24

25

1   STATE OF TEXAS }

2     I, Linda J. Webster, a Certified Shorthand

3   Reporter in and for the State of Texas, do hereby

4   certify that, pursuant to the agreement

5   hereinbefore set forth, there came before me on the

6   1st day of November, A.D., 2017, at 9:19 a.m., at

7   the offices of Charles W. Nichols, located at 61

8   East Lacy Street, in the City of Palestine, State

9   of Texas, the following named person, to wit:

10   DARRELL COSLIN, who was by me duly cautioned and

11   sworn to testify the truth, the whole truth and

12   nothing but the truth, of his knowledge touching

13   and concerning the matters in controversy in this

14   cause; and that he was thereupon carefully examined

15   upon his oath, and his examination was reduced to

16   writing under my supervision; that the deposition

17   is a true record of the testimony given by the

18   witness being waived pursuant to agreement of the

19   parties; and that the amount of time used by each

20   party at the deposition is as follows:

21   MR. KEVIN M. MCCORMACK   - 0 hours, 39 minutes;

22   MR. BERKLEY N. HUSKISON   - 2 hours, 10 minutes;

23   MS. AMANDA WADDELL   - 0 hours, 0 minutes;

24   MR. TREY JORDAN   - 0 hours, 0 minutes;

25   MR. RIC GASS   - 0 hours, 0 minutes;

Electronically signed by Linda Webster (201-289-050-5808)   f6856601-66fe-40d9-b039-9379273000e5

1    MR. JOHN MARK MCINTOSH    - 0 hours, 0 minutes.

2         I further certify that I am neither attorney or

3    counsel for, nor related to or employed by, any of

4    the parties to the action in which this deposition

5    is taken, and further that I am not a relative or

6    employee of any attorney or counsel employed by the

7    parties hereto, or financially interested in the

8    action.

9         I further certify that, before completion of

10   the deposition, the Deponent did not request to

11   review the transcript.

12        In witness whereof, I have hereunto set my hand

13   and affixed my seal this 16th day of November,

14   A.D., 2017.

15

16

17

18   LINDA J. WEBSTER, CSR, RPR

19   Deposition Resources, Inc.
     515 North Church Street
20   Palestine, Texas 75801
     (903) 723-9100
21   (903) 723-9102 (Fax)
     E-mail:  Efile@depositionresources.com
22   Firm No. 409
     Cert. No. 8106
23   Cert. Expires:  12/31/18

24

25

Electronically signed by Linda Webster (201-289-050-5808)          f6856601-66fe-40d9-b039-9379273000e5