**In the Matter Of:**

*Page 1 KELLI DENISE GOODE vs*

*CITY OF SOUTHAVEN*

*2:16-cv-02029*

*CYRIL WECHT*

*March 21, 2017*



ALPHA REPORTING CORPORATION

*1st in Reporting, 1st in Service, 1st in Technology*

We Bridge the State and Cover the Nation!

**www.alphareporting.com**

800-556-8974

Cyril Wecht - March 21, 2017

| 1 | IN THE UNITED STATES DISTRICT COURT |
| | FOR THE WESTERN DISTRICT OF TENNESSEE |
| 2 | WESTERN DIVISION |

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF TENNESSEE
2                  WESTERN DIVISION

3

KELLI DENISE GOODE,              )   CIVIL DIVISION
4    individually, and also       )
     as the Personal              )
5    Representative of Troy        )   No. 2:16-cv-02029
     Charlton Goode,              )       SHM-cgc
6    Deceased, and as Mother       )
     Natural Guardian, and        )   DEPOSITION OF
7    Next Friend of R.G., a        )   CYRIL H. WECHT, M.D., J.D.
     Minor, and also on           )   MARCH 21, 2017
8    behalf of all similarly       )
     situated persons,            )   Called on behalf of
9                                 )   Defendant
            Plaintiff,            )
10       vs.                       )   Counsel of record for
                                  )   this Party:
11   THE CITY OF SOUTHAVEN,        )   Marty R. Phillips, Esq.
     TODD BAGGETT,                )   RAINEY, KIZER,
12   Individually, JEREMY         )   REVIERE & BELL, PLC
     BOND, Individually,           )   105 S. Highland Avenue
13   TYLER PRICE,                 )   Jackson, TN 38301
     Individually, JOEL           )   731-426-3128
14   RICH, Individually,           )
     JASON SCALLORN,              )
15   Individually, STACIE J.      )
     GRAHAM a/k/a WITTE,          )
16   Individually, MIKE           )
     MUELLER, Individually,        )
17   WILLIAM PAINTER, JR.,         )
     Individually, BRUCE K.       )
18   SEBRING, Individually,        )
     JOSEPH SPENCE,               )
19   Individually, RICHARD        )
     A. WEATHERFORD,              )
20   Individually, JOHN DOES      )
     1-10, BAPTIST MEMORIAL       )
21   HOSPITAL-DESOTO, a           )
     Mississippi Corporation       )
22   SOUTHEASTERN EMERGENCY       )
     PHYSICIANS, INC., a          )
23   Tennessee Corporation,        )
     and LEMUEL DONJA            )
24   OLIVER, M.D.,                )

25          Defendants.

**Alpha Reporting Corporation**

Cyril Wecht - March 21, 2017

2

```
 1              DEPOSITION OF CYRIL H. WECHT, M.D., J.D.,
 2    a witness herein, called by the Defendant, Jemuel
 3    Donja Oliver, MD, taken pursuant to the Federal Rules
 4    of Civil Procedure, by and before Kathy D. Landock, a
 5    Registered Merit Reporter, Certified Realtime
 6    Reporter and a Notary Public in and for the
 7    Commonwealth of Pennsylvania, at 1119 Penn Avenue,
 8    Suite 404, Pittsburgh, PA 15222, on Tuesday,
 9    March 21, 2017 commencing at 9:09 a.m.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Alpha Reporting Corporation**

**Cyril Wecht - March 21, 2017**

3

```
 1   COUNSEL PRESENT:

 2

 3   For the Plaintiff:
          John Timothy Edwards, Esquire
 4        BALLIN, BALLIN & FISHMAN, PC
          200 Jefferson Avenue
 5        Suite 1250
          Memphis, TN 38103
 6        T. 901-525-6278
          E. tedwards@bbfpc.com
 7

 8   For the Defendant, Lemeul Donja Oliver, MD:
          Marty R. Phillips, Esquire
 9        RAINEY, KIZER, REVIERE & BELL, PLC
          105 South Highland Avenue
10        Jackson, TN 38301
          T. 731-426-3128
11        E. mphillips@raneykizer.com

12   and

13        J. Ric Gass, Esquire
          GASS WEBER MULLINS, LLC
14        309 North Water Street
          Milwaukee, WI 53202
15        T. 414-224-7697
          E. gass@gasswebermullins.com
16

17   For the Defendants, City of Southaven, Todd Baggett,
     Jeremy Bond, Tyler Price, Joel Rich, Jason Scallorn,
18   Stacie Graham, Mike Mueller, William Painter, Jr.,
     Bruce Sebring, and Richard Weatherford:
19        (Via Telephone Conference):
          L. Bradley Dillard, Esquire
20        MITCHELL McNUTT & SAMS, PA
          105 South Front Street
21        Tupelo, MS 38804
          T. 662-842-3871
22        E. bdillard@mitchellmcnutt.com

23

24

25
```

**Alpha Reporting Corporation**

Cyril Wecht - March 21, 2017

4

```
 1   COUNSEL PRESENT (Cont.):

 2

 3   For the Defendant, Baptist Memorial
     Hospital-Desoto, Inc.:
 4           David W. Upchurch, Esquire
             John M. McIntosh, Esquire (Via Telephone)
 5           UPCHURCH & UPCHURCH, PA
             141 South Commerce Street
 6           Suite B
             Tupelo, MS 38803
 7           T. 662-260-6952
             E. dupchurch@upchurchpa.com

 8

 9   For the Defendant, Southeastern Emergency
     Physicians, Inc.:
10           Stephen P. Miller, Esquire
             McDONALD KUHN
11           5400 Poplar Avenue
             Suite 330
12           Memphis, TN 38119
             T. 901-526-0606
13           E. smiller@mckuhn.com

14

15                          -   -   -

16

17

18

19

20

21

22

23

24

25
```

**Alpha Reporting Corporation**

**Cyril Wecht - March 21, 2017**

5

I N D E X

WITNESS                                    PAGE

CYRIL H. WECHT, M.D., J.D.

    by Mr. Phillips                           7
    by Mr. Upchurch                         133
    by Mr. Dillard                          149


                    E X H I B I T S

                                          PAGE

Exhibit No. 1       Authorization          11

Exhibit No. 2       Autopsy Report         13

Exhibit No. 3       Toxicology Report      22

Exhibit No. 4       Summary of Clinical
                    History                40

Exhibit No. 5       Journal Article        88

Exhibit No. 6       Article                94

Exhibit No. 7       Article                100

Exhibit No. 8       Dr. DiMaio excerpts    102

Exhibit No. 9       Fee Schedule           114

Exhibit No. 10      Invoices               114

Exhibit No. 11      Notice of Deposition   123

Exhibit No. 12      PCP Records            124

Exhibit No. 13      August 2015 Letter from
                    Mr. Upchurch           126

Exhibit No. 14      July 18, 2015
                    Interview Statement    127

Cyril Wecht - March 21, 2017

**6**

```
 1           E X H I B I T S (Cont.)

                                      PAGE
 2

 3   Exhibit No. 15      Correspondence Folder     129

 4   Exhibit No. 16      Autopsy Report Folder     129

 5   Exhibit No. 17      Timeline Folder           130

 6   Exhibit No. 18      September 28, 2015
                         Letter                    132
 7

 8   Exhibit Nos. 19-35  Reproduction of
                         Dr. Wecht's File Folders 152

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Cyril Wecht - March 21, 2017

7

1          P R O C E E D I N G S

2                  -   -   -

3          CYRIL H. WECHT, M.D., J.D.,

4  having been first duly sworn, was examined and

5  testified as follows:

6                  -   -   -

7          E X A M I N A T I O N

8  BY MR. PHILLIPS:

9      Q.    Tell us your name, please, sir.

10     A.    Cyril H. Wecht.

11     Q.    Dr. Wecht, your CV indicates you had a

12  birthday yesterday; is that right?

13     A.    Yes.

14     Q.    Happy belated birthday.

15     A.    Thank you.

16     Q.    You were 86 yesterday?

17     A.    Yes.

18     Q.    Did you do a private autopsy on Trey Goode?

19     A.    Yes.

20     Q.    I said Trey.  Excuse me, Troy Goode.

21     A.    Yes.

22     Q.    Where was that done?

23     A.    Carlow University, where I do all my

24  autopsies.  It's about ten minutes from here, what we

25  call the Oakland section of town, toward the

Cyril Wecht - March 21, 2017

8

1    universities.

2        Q.    The report that we've been submitted in this

3    case for you indicates that that autopsy was done on

4    July 20, 2015.  Is that date correct?

5        A.    Yes.  I believe you still have some records

6    down there.  May I see those?

7              July 23, 2015, correct.

8        Q.    I'm sorry, what date did you say?

9        A.    July 23, 2015.

10       Q.    In the letter dated December 5, 2016 to

11   Mr. Edwards, which has been provided to us as part of

12   your disclosure, on page 3 of that letter it says

13   postmortem exam on July 20, 2015, Dr. Wecht's

14   autopsy, and then it lists a number.

15       A.    Then that's incorrect.  The correct date is

16   July 23, because that's what was dictated right by me

17   at the autopsy.

18       Q.    Do you know how the date of July 20 came to

19   be included in the report?

20       A.    Can I see that letter, please?

21       Q.    Sure.

22       A.    Is this the page here?

23       Q.    Yes, sir.  See at the very bottom where it

24   references postmortem.

25       A.    The answer is it's a mistake.  The report

**Alpha Reporting Corporation**

Cyril Wecht - March 21, 2017

9

1   that I sent him on December 5, 2016, my mistake or my

2   secretary's mistake, but the correct date is July 23.

3       Q.   Did you list a time that you performed the

4   autopsy?

5       A.   It says here 3:30 p.m., that's eastern

6   standard time.

7       Q.   Is that the time it was commenced or

8   completed?

9       A.   That's when it started.

10      Q.   How long did it take?

11      A.   Oh, I don't know, usually about an hour and

12  a half in a case like this.

13      Q.   Did anybody assist you with the autopsy?

14      A.   Yes.  I have an assistant, Joseph Mancuso,

15  my long time assistant.

16      Q.   What is Mr. Mancuso's training?

17      A.   He's trained as a pathology assistant.  He

18  is a licensed funeral director.  He's a licensed

19  embalmer.  And he's then been doing autopsies for

20  about 40 years or so, as an assistant.

21      Q.   What did he actually do with regard to

22  Mr. Goode's autopsy?

23      A.   He helps me with -- he does the heavy

24  lifting with the body.  And then he will do a lot of

25  physical things, getting the body ready, take it out

Cyril Wecht - March 21, 2017

10

1  of the Zeigler case in which it had been submitted;

2  and in this case taking apart the strings from the

3  previous autopsy and looking at the organs and so on.

4  Those are the things that he does.

5      Q.  Would he have any role in providing any

6  gross description or microscopic description?

7      A.  No.

8      Q.  All of that would have been done by you?

9      A.  Yes.

10     Q.  Was the body embalmed when it came to you?

11     A.  No.

12     Q.  Do you recall or can you tell us when you

13  were first contacted about this matter?

14     A.  It would have been as I recall then by phone

15  from Mr. Edwards probably a few days before the body

16  was sent to me.  So I would just say it could have

17  been around July 20, a day or two possibly earlier.

18  Sometime around there.

19     Q.  Sometime around July 20 you think?

20     A.  Yeah, a few days prior to the body being

21  shipped to me.

22     Q.  Do you recognize that document, sir?

23     A.  Yes.  This is the authorization for the

24  autopsy.

25     Q.  Does it bear a fax date at the top?

**Alpha Reporting Corporation**

Cyril Wecht - March 21, 2017

11

1    A.    July 21, 2015.

2    Q.    The authorization is signed by Mrs. Goode

3  and also an attorney; is that right?

4    A.    Yes.

5       MR. PHILLIPS:    Mark the authorization as

6  Exhibit No. 1.

7       (Deposition Exhibit No. 1 was marked for

8  identification.)

9  BY MR. PHILLIPS:

10   Q.    When you were initially contacted by

11 Mr. Edwards, what information were you given?

12   A.    I don't recall specifically, but my

13 recollection is I was told that this was a young man

14 who had the basics; had gone to a concert with his

15 wife and friends and then had some behavioral

16 problems afterwards; I'm not sure if I was told then

17 that he had taken LSD, I probably was; and then he

18 was arrested, and that he died sometime thereafter

19 within a couple of hours after being in police

20 custody; and then an autopsy had been done there and

21 the family wanted a second autopsy.

22   Q.    Were you given any information about the

23 manner in which he was restrained?

24   A.    At that time, I don't think so.  I do

25 believe some comment was made about his having been

Cyril Wecht - March 21, 2017

1    restrained, but not in the kind of detail that I

2    subsequently came to learn.

3        Q.    At the time that you did the autopsy on July

4    23, had you been provided any records to review about

5    Mr. Goode?

6        A.    No.  As I recall, I did not have the records

7    at that time.

8        Q.    Did you prepare an autopsy report?

9        A.    Yes.

10       Q.    Do you have any idea why it has not been

11   previously provided to us before today?

12       A.    You would have to speak to Mr. Edwards about

13   that.

14       Q.    Do you have your autopsy report in front of

15   you?

16       A.    Yes.

17       MR. PHILLIPS:  I would like to mark it as

18   Exhibit No. 2, please.  I'm happy to make whatever

19   accommodations we need to, doctor, with regard to

20   copies and all so you have a complete file when we

21   leave.

22       THE WITNESS:  What did you say, the second

23   part?

24   BY MR. PHILLIPS:

25       Q.    I'm happy to make any accommodations for

**Alpha Reporting Corporation**

Cyril Wecht - March 21, 2017

13

1  copying.

2      A.   I can have it copied now.

3      Q.   I would rather not stop.

4      A.   You want to refer to it?

5      Q.   Yes.  We can substitute a copy later.

6           (Deposition Exhibit No. 2 was marked for

7  identification.)

8  BY MR. PHILLIPS:

9      Q.   Did you let Mr. Edwards or Mr. McCormack

10 know that you had prepared an autopsy report?

11     A.   Yes, best of my recollection is it would

12 have been sent to Mr. Edwards.

13     Q.   Do you have any correspondence showing that

14 the autopsy report was sent to counsel who retained

15 you?

16     A.   Not specifically, no.

17     Q.   I've not had a chance to read your autopsy

18 report, but in the report did you reach a conclusion,

19 did you state a conclusion as to the cause of death?

20     A.   No, I did not.

21     Q.   Why is that that you did not state a

22 conclusion as to the cause of death in your autopsy

23 report?

24     A.   I did not find anything in the autopsy

25 itself that permitted me to give an anatomical

Cyril Wecht - March 21, 2017

14

1  pathological cause of death.

2      Also, I knew that an autopsy had been done.

3  I always want to see the original autopsy report.  I

4  also knew the toxicology tests were being performed

5  there and that I was going to submit some stuff for

6  toxicology also.

7      So that's the way you handle it then,

8  pending further information, toxicology results and

9  clinical background.

10      Q.    At the time of the autopsy you were able to

11  make a gross observation of the body and the organs;

12  right?

13      A.    Yes.

14      Q.    Meaning with the naked eye?

15      A.    Yes.

16      Q.    And you're also preparing slides that you'll

17  evaluate under the microscope?

18      A.    Yes.  I take pieces of tissue and submit

19  them to the histopathologist for preparation of

20  slides.

21      Q.    And are you the one who actually analyzes

22  the slides?

23      A.    Yes.

24      Q.    Does your autopsy report, which we've marked

25  as Exhibit No. 2, describe what you saw on the

Cyril Wecht - March 21, 2017

1   microscopic examinations?

2       A.   No, it does not.

3       Q.   Is there anything that you have prepared

4   that would tell us how you interpreted the slides?

5       A.   I don't know if anything specific is there

6   in terms of findings because there wasn't anything of

7   a definitive nature insofar as determining cause of

8   death.

9            Yes, if you'll look on page 4 of my autopsy

10  report you'll see the statement 29 H and E, this

11  refers to the kind of stain, stain slides labeled CHW

12  15-275 T. Goode show autolyzed organs without any

13  specific histopathologic alterations.

14           So that sums it up, there wasn't anything of

15  a specific relevant nature insofar as determining

16  cause of death is concerned.

17      Q.   Do I understand correctly then, Dr. Wecht,

18  that based upon your gross description and your

19  findings at autopsy you could not reach a conclusion

20  as to cause of death; right?

21      A.   Yes.

22      Q.   And based upon your analysis of the

23  pathology slides, you could not reach a conclusion as

24  to cause of death?

25      A.   I could not.

**Alpha Reporting Corporation**

Cyril Wecht - March 21, 2017

16

1    Q.    On that page to which you just referenced

2    from your report, it's the letter dated December 5,

3    2016 to Mr. Edwards, you give a reference to this

4    particular case, CHW.  Do you see that?

5    A.    Yes.

6    Q.    That's because you're the one who did the

7    autopsy, those are your initials?

8    A.    Yes.

9    Q.    And then 15, is that the year of the exam?

10   A.    Yes.

11   Q.    And what does 275 mean?

12   A.    That was the number of the autopsy as of

13   that time.

14   Q.    For the year 2015?

15   A.    As of July 23, yes.

16   Q.    So that would mean that Mr. Goode's autopsy

17   was the 275th autopsy you had done that year; is that

18   right?

19   A.    Up until July 23, yes.

20   Q.    Sure, at the time you assigned the number?

21   A.    Yes.

22   Q.    Did you talk to anyone besides Mr. Edwards

23   before doing the autopsy?

24   A.    No.

25   Q.    Did you ultimately get a copy of the autopsy

Alpha Reporting Corporation

Cyril Wecht - March 21, 2017

17

1  report prepared by the Mississippi medical examiner?

2      A.    Yes.

3      Q.    Do you know when you received that?

4      A.    No, I do not have a date showing the time

5  that I received that report.

6      Q.    Do you know at what point in time you did

7  reach a conclusion as to cause of death?

8      A.    Yes.  It would have been sometime shortly

9  before I submitted my report, some days.  But once I

10  conclude things, then I go about and I submit the

11  report.

12          The report was submitted, my narrative

13  report, to Mr. Edwards dated December 5, 2016.  So I

14  would say probably sometime after Thanksgiving, at

15  the end of November and going into the first couple

16  days of December, that's when I would have finalized

17  everything and prepared a report, because once I put

18  everything together, then that's the time I do the

19  final report.

20      Q.    And you would not have reached a conclusion

21  as to cause of death until then?

22      A.    I might have had some thoughts, I'm sure I

23  did, but I would say that I would not have reached a

24  final conclusion until I had reviewed everything and

25  thought it through and so on until around the time

18

1    that I sent it.

2        Q.    I want you to assume that Mr. Edwards

3    provided a statement to the press on November 18,

4    2015 in which he said that he had made arrangements

5    for an independent autopsy and that he had been in

6    possession of the doctor's opinion for months.

7        A.    I'm sorry, what was the date of that.

8        Q.    November 18, 2015.

9        A.    The statement was what?

10       Q.    The statement was made on November 18, 2015

11   that he had made arrangements for an independent

12   autopsy to be performed and that he had been in

13   possession of the doctor's opinions for months.

14            MR. EDWARDS:   Object to the form.

15   BY MR. PHILLIPS:

16       Q.    Is that an accurate statement, as far as you

17   know?

18       A.    I can't speak for Mr. Edwards.  I'm sure

19   that I would have talked with him.  As to what he

20   concluded or inferred from any comments that I made,

21   I can't tell you.

22            I can only tell you that my recollection is

23   based upon really more a matter of my modus operandi

24   than a specific chronological recollection down to

25   the day or even the specific week, that when I get

Cyril Wecht - March 21, 2017

1    around to writing the written report it's pretty darn

2    close to when I have finalized things in my mind,

3    because I'm pretty active and got a lot of reports to

4    do and so on, so it doesn't make sense for me to

5    think things through and then come back to them weeks

6    or months later.

7         It may well be that I discussed with

8    Mr. Edwards after having received information of the

9    background of this event and discussion about what

10   had transpired and then referring to the original

11   autopsy report that I may well have told him what I

12   was thinking.  That certainly is quite possible and

13   logical.

14        As to what Mr. Edwards chose to say, I can't

15   tell you.  Attorneys say things whenever they want to

16   for their purposes, as all of you gentlemen I'm sure

17   know.  How that relates to the rest of reality and

18   the rest of the world involved in the matter, that's

19   something that I can't deal with.  That's part of the

20   legal process.

21        Q.   As of December 5, 2016 when you wrote this

22   report to which you made reference earlier, had you

23   reviewed the autopsy report from the Mississippi

24   medical examiner?

25        A.    When I submitted my report on December 5, is

**Alpha Reporting Corporation**

1  that your question?

2      Q.   Yes, sir.  By that time had you reviewed the

3  autopsy report from the Mississippi medical examiner?

4      A.   I'm trying to see here.  Because you asked

5  me earlier when had I received it, and I told you I

6  don't know.  I'm looking at my report to see if I

7  refer to that initial autopsy report.  I do not.

8          That kind of suggests to me, I can't be

9  positive, but it kind of suggests to me that I had

10 not received it, although I don't see why I would not

11 have received it.  I just can't be certain.  Usually,

12 however, I would mention what had been issued in such

13 a report, and I see no such reference.

14     Q.   In fact, in your December 5, 2016 letter to

15 Mr. Edwards there's not a reference to the autopsy

16 report from Mississippi, is there?

17     A.   That is correct.

18     Q.   Are you telling us that it would be your

19 practice to make reference to it if you had received

20 it and reviewed it up until that point?

21     A.   Usually I do.  It's not any rigid,

22 self-imposed rule, but much more often, most often I

23 do make reference to an earlier autopsy report.

24     Q.   Did you do toxicology studies yourself or

25 have them done?

Cyril Wecht - March 21, 2017

21

1    A.    I submitted stuff for toxicology.  I myself,
2  I'm not a toxicologist, I don't do the testing.
3    Q.    Yes, sir, but you retrieved samples and
4  submitted them for analysis; is that right?
5    A.    Yes, I did.
6    Q.    Do you have copies of the toxicology studies
7  there?
8    A.    Yes, I do.
9    Q.    Have you provided that to anybody before
10  today?
11    A.    Again, I would think that I had passed this
12  on to Mr. Edwards, but I cannot say for certain
13  because I do not have such a covering letter.
14    Q.    May I see the toxicology reports?
15    A.    Wait a minute, this one does say to
16  Mr. Edwards on August 14, 2016.  So I correct what I
17  just said, there is a cover letter for this.
18    Q.    Is this the entirety of the toxicology
19  analysis that you had done?
20    A.    Not that I had done.  That's the entirety of
21  their report.
22    Q.    Yes, sir.  But you requested them to do the
23  analysis is my point?
24    A.    Oh, yes.  Of course.
25    Q.    That's the entirety of the report you got

22

1   back?

2       A.    Yes.   This is all I have, from the liver

3   tissue that I submitted to them.

4             MR. PHILLIPS:   Let's mark this as Exhibit

5   No. 3.

6             (Deposition Exhibit No. 3 was marked for

7   identification.)

8   BY MR. PHILLIPS:

9       Q.    Are you able to tell when you received the

10  toxicology results that we've marked at Exhibit

11  No. 3, Dr. Wecht?

12      A.    Well, they should have a date on their

13  report.   Their report, report issued it says here

14  August 4, 2015.

15      Q.    Can you tell us when you received it then?

16      A.    Well, usually it takes a day or two in the

17  mail.   A couple days usually it comes in.   So it

18  would have been August 5, August 6, something like

19  that.

20      Q.    The specimens that were taken would have

21  been drawn on July 23 at the time of your autopsy;

22  right?

23      A.    Yes.   Not drawn because there were no body

24  fluids.   It was liver tissue that was submitted and

25  brain tissue.   I submitted liver, kidney and brain to

Cyril Wecht - March 21, 2017

23

1  them.  They chose to do tests on liver.

2      Q.    So there's no blood submitted?

3      A.    No.

4      Q.    Why is that?

5      A.    Because the body had already been autopsied.

6  There was no blood.  Any little seepage that remained

7  would have been exposed and any results would not be

8  valid because whatever seepage there was also would

9  have been a confluence of fluid from who knows where

10  in the body.  So there's no way you can submit blood

11  in a case like this.

12      Q.    Does that impede at all the ability to do a

13  toxicology analysis if one is drawing a specimen or

14  retrieving a specimen about five days after death as

15  opposed to doing it shortly after death?

16      A.    No.  Within a matter of a few days, you

17  don't need blood.  It's always best to have urine and

18  blood and bile from the gallbladder in a fresh case,

19  but you can get body organs and tissues, and if they

20  have not been embalmed, then you can get a reliable

21  test from tissues.

22          The liver is the source of metabolism for

23  most of the drugs in the body, and that's why that is

24  the organ of preference for the toxicology lab to

25  test.

Cyril Wecht - March 21, 2017

24

1    Q.    What did that report indicate with regard to
2    the toxicology analysis?
3    A.    Just a positive test for a metabolite of
4    some kind, Beta-Phenethylamine and Delta-9 Carboxy
5    THC, Tetrahydrocannabinol, 870 nanograms per gram.
6    Q.    Is that the active ingredient in marijuana?
7    A.    No.  I believe it's an inactive.  Delta-9,
8    this is an inactive metabolite.  Delta-9 Carboxy
9    THC is an inactive metabolite and so stated, by the
10   way, in the autopsy report.  It's not my subjective
11   interpretation.
12        It's Delta-9 THC that is the active
13   metabolite.  Delta-9 Carboxy THC is an inactive
14   metabolite.
15   Q.    From marijuana?
16   A.    Yes.
17   Q.    What else did it show?
18   A.    Well, as I referred to, some
19   Beta-Phenethylamine, which is I think just -- I'm not
20   sure from which drug it comes.  It's not one of the
21   toxic drugs.
22   Q.    Any other positive findings?
23   A.    No, not in this report, no.
24   Q.    Did you have made available to you the
25   toxicology report that was done in Mississippi?

**Alpha Reporting Corporation**

Cyril Wecht - March 21, 2017

25

1    A.    Yes.

2    Q.    What is the date on the toxicology report

3  from Mississippi?

4    A.    September 17, 2015.

5    Q.    September what?

6    A.    17, 2015.

7    Q.    Thank you.

8          Do you know when you received that report?

9    A.    No, I have no specific date when it was

10  submitted to me.  Hold on.  No, I was thinking about

11  photos that came in later.  No, I cannot tell you the

12  date when I received it from Mr. Edwards.

13    Q.    In your report, which is your letter of

14  December 5, 2016 to Mr. Edwards, did you make any

15  reference at all to the toxicology report you had

16  received?

17    A.    No, I don't believe so.

18    Q.    Did you make any reference at all to the

19  toxicology report from Mississippi?

20    A.    No, I see no specific reference.

21    Q.    Isn't that something you would normally do,

22  make reference to the toxicology information and use

23  that as part of your analysis in your report?

24    A.    I would if I felt that it was relevant.  If

25  I felt that it had played any role in leading to the

26

1    death, of course I would include it because it would
2    be a substantive, highly relevant component of such a
3    report.  If it is of no consequence, then I might not
4    refer to it.
5        Q.    Would it be your practice not even to
6    reference the fact it had been done?
7        A.    I cannot tell you.  Much of the time I will
8    reference it, sometimes for the reasons I just stated
9    I would not.
10           The other thing here is, I think you already
11   asked me when did I receive all of those things.  I'm
12   just wondering, and I said I don't recall when I
13   received everything, including the autopsy report
14   from Mississippi, of which the toxicology report is
15   an integral component.
16           So I'm not sure if I had it at that time.  I
17   probably did have it because I, of course, discussed
18   in conclusions of my report whether LSD was a cause
19   of death or contributed to the death.  So I can't be
20   certain.
21           But as I've already said, those
22   toxicological findings from the same laboratory,
23   National Medical Services, on the report, on the
24   original autopsy report, I find nothing there that is
25   of substantive significance to my analysis of the

Cyril Wecht - March 21, 2017

27

1   case, specifically in determining the cause of this

2   man's death.

3      Q.   Does the Mississippi toxicology report give

4   an LSD concentration, does it report an LSD

5   concentration?

6      A.   Yes, it does.

7      Q.   Would you look at page 4 of your report

8   dated December 5, 2016.

9      A.   Yes.

10      Q.   Next to the last -- well, three paragraphs

11   from the bottom, second sentence, you state, I do not

12   find any LSD concentration reported for Mr. Troy

13   Goode.

14      Did you make that statement?

15      A.   Yes.  And I'm referring to the NMS report

16   that I had received, that is correct.

17      Q.   Did you not have the Mississippi toxicology

18   report?

19      A.   My answer is as I gave it two minutes ago, I

20   kind of think I did not because I did not refer to it

21   at all, but I cannot be absolutely certain because I

22   don't have the date when I received that material.

23      Q.   You made a conclusion about LSD without

24   knowing the concentration of LSD in Mr. Goode's body

25   at the time of death, didn't you?

**Alpha Reporting Corporation**

Cyril Wecht - March 21, 2017

28

1     A.     That indeed may be possible.  Again, I

2  referred to the NMS report which I had received.

3     Q.     Other than your report which we've marked as

4  an exhibit regarding the autopsy, Exhibit No. 2, did

5  you make any notes pertaining to the autopsy?

6     A.     No.

7     Q.     Did you take any photographs?

8     A.     No.

9     Q.     Any videotapes?

10    A.     No.  I dictate -- no, sorry.  Video, no,

11 there are no videos.

12    Q.     Is it typical to take photographs at the

13 time of autopsy?

14    A.     That varies from one office to another.

15 Some offices, the larger medical examiner coroner's

16 offices routinely take photos.

17          In my case when photos are deemed relevant,

18 they are taken usually by the state police or

19 detectives attending the autopsy.  Sometimes I will

20 take photos myself in private autopsies when they are

21 relevant.  If the photos are not going to be

22 relevant, I do not take photos.

23    Q.     Did you write any letter reporting your

24 findings other than the December 5, 2016 letter to

25 Mr. Edwards?

Cyril Wecht - March 21, 2017

29

1    A.    No, I have no such letter.

2    Q.    Tell me if you recognize that document.

3    A.    This looks like the report that I submitted

4  to Mr. Edwards.  Yes, it appears to be exactly the

5  same thing.

6    Q.    What is the date on that letter?

7    A.    September 28, 2015.

8    Q.    Is that your letter?

9    A.    Yes.

10        MR. EDWARDS:  May I ask where you got this?

11        MR. PHILLIPS:  It's in the Sun Life records.

12        MR. EDWARDS:  Preliminary reports are not

13  discoverable under the federal rules.  I believe

14  that's what that is.

15  BY MR. PHILLIPS:

16    Q.    Is this your report regarding your findings

17  pertaining to Mr. Troy Goode?

18    A.    Yes.  It appears to be exactly my report.  I

19  don't see any changes.  Number of pages, jumping to

20  the end.  Yes, it definitely came from me, and it

21  appears to be the same.

22    Q.    So when you told us earlier that you didn't

23  reach a conclusion as to the cause of death until

24  maybe end of November, early December 2016, was that

25  an error on your part?

**Alpha Reporting Corporation**

30

1    A.    Yes.  Obviously, then I had reached a

2  conclusion in September.  Of course that explains why

3  Mr. Edwards was making the public statement that he

4  did.

5    Q.    Do you know why this is designated work

6  product at the top?

7    A.    Yes.  I submitted it to Mr. Edwards for him

8  to look at to see if there are any mistakes, any

9  errors, whether there was something that I had not

10  referred to.  That's the reason it was sent to him.

11    Q.    Was this report, and I'm referring to the

12  one dated September 28, 2015, was it in any way

13  designated as a preliminary report or draft report?

14    A.    Well, referred to as work product.  So to me

15  that's synonymous with a draft report or a

16  preliminary report or privileged, confidential.

17  Those terms are used by me synonymously to

18  characterize it as not the final written report.

19    Q.    Is there any significant difference between

20  the letter of September 28, 2015 and your letter of

21  December 5, 2016?

22    A.    No.  I think I've stated a couple of times

23  already here today that my fast perusal, it is

24  exactly the same.  I see no difference at all in

25  anything.  Spacing looks to me to be exactly the same

31

1   thing.  No, it looks to me to be exactly the same.

2          MR. GASS:  Are you both looking at December

3   reports?

4          MR. EDWARDS:  This is September.

5          MR. GASS:  And the one he was looking at?

6          MR. EDWARDS:  December.

7   BY MR. PHILLIPS:

8      Q.   The autopsy that you did on July 23, 2015,

9   how would it differ from the autopsy that was

10  performed by you as the first autopsy?

11     A.   I don't know what you mean how it would

12  differ.  Obviously, the organs have been resected

13  internally, brain and thoracic, abdominal organs.  So

14  reopening those lines of incision, you don't see the

15  organs in situ.

16         External examination doesn't differ, what

17  somebody says they see and what I see; but as far as

18  the outside of the body is concerned, except for a

19  little bit of early discoloration or so on, but

20  basically the same, not exactly.

21         And then not seeing the organs in situ

22  obviously is different than the original autopsy.

23         MR. DILLARD:  I'm sorry, what was the date

24  of that autopsy?

25         THE WITNESS:  My autopsy?

Cyril Wecht - March 21, 2017

32

```
 1          MR. DILLARD:  Yes, sir.  Was it the July 20?
 2          THE WITNESS:  July 23.
 3          MR. EDWARDS:  July 20 was the State of
 4   Mississippi autopsy.
 5   BY MR. PHILLIPS:
 6      Q.   So when you received the body, had the
 7   organs been removed from the body?
 8      A.   Yes.
 9      Q.   So the organs came to you separate and apart
10   from the body?
11      A.   Well, no, not separate.  They're with the
12   body.
13      Q.   But they had been removed from the body?
14      A.   But they had been detached from their
15   respective soft tissue moorings.
16          A couple of things that I did that had not
17   been done, I removed the testes.  I also removed --
18   as I recall, made a couple of additional incisions.
19   And then I also dissected musculature in the back,
20   the paravertebral musculature and soft tissues, and I
21   also removed the spinal cord.  Otherwise, the organs
22   had been detached and submitted.
23      Q.   Could you just list for us, please, the
24   organs that had been removed before the body came to
25   you?
```

33

1    A.   Brain, lungs, heart, liver, kidney,
2  pancreas, adrenal gland, bladder, prostate, spleen.
3  Those are the organs that are removed.
4    Q.   Why didn't you go to Mississippi to do the
5  autopsy since the body was there?
6    A.   I always have the body sent to me.  It is
7  preferable for me to do the autopsy here.  And I
8  always ask for the body to be sent to me, either
9  driven or sent by air.
10         It also is less expensive for the attorney,
11 but that's not my main reason or concern, but I
12 always do point that out to the attorney.  But I have
13 bodies sent to me not that often, but several in the
14 course of the year every year.  And they come to me,
15 most of them are from the areas around here where
16 they can be driven, but a couple or more will be sent
17 by air during the course of a year.
18   Q.   You didn't find any indication in your
19 analysis of the lung tissue of any pulmonary disease,
20 did you?
21   A.   No.  Nothing that I could determine.  As
22 I've already mentioned, both in the report and
23 discussing it today, tissue showed early autolysis,
24 decomposition, so there's some things of a specific
25 microscopic nature that might not be discernible, but

Cyril Wecht - March 21, 2017

34

1  I did not find anything grossly such as a tumor or

2  infarct or emphysema, did not find anything like

3  that.

4      Q.    No evidence of asthma?

5      A.    Well, I cannot tell you in terms of a severe

6  asthma producing some bronchiectasis or even

7  emphysematous change, the answer is I did not.

8            Whether there was some evidence

9  microscopically of the bronchial tree, I cannot

10  determine that because of early decomposition that

11  would change the mucosal appearance, that is the

12  lining, the mucosa of the airways.

13      Q.    Did you find any ocular petechial

14  hemorrhages?

15      A.    Externally on the conjunctiva, I did not and

16  I did not remove the eyes.  But I saw no evidence of

17  -- you said ocular, didn't you?

18      Q.    Yes, sir.

19      A.    No, I saw no evidence of injuries to the

20  eyes.

21      Q.    Did you find any facial petechial

22  hemorrhages?

23      A.    No.

24      Q.    Did you find any pleural petechial

25  hemorrhages?

Cyril Wecht - March 21, 2017

35

1    A.    No.

2    Q.    Were there any rib fractures?

3    A.    Yes, there were -- well, no.  I say here the

4    bony thorax appears to be intact on palpation except

5    for the postpartum incision.  No, I saw no evidence

6    of rib fractures.

7    Q.    Did you know the Mississippi medical

8    examiner reported rib fractures?

9    A.    Yes, sir, I came to know that later on, and

10   I think they attributed that to resuscitation.

11   Q.    Did you conclude that there were rib

12   fractures present or did you disagree with the

13   finding that there were rib fractures?

14   A.    I've already told you that I did not find

15   rib fractures.  The second part of your question, I

16   have no disagreement.  They would appear to be the

17   kinds of fractures that we see many times in people

18   who have been resuscitated, right third through fifth

19   and through the seventh.

20         So no, I would not disagree with that,

21   especially when they say no associated soft tissue

22   hemorrhage.  I would agree with that.

23   Q.    When you do a private autopsy as you did on

24   July 23, 2015 on Troy Goode, what is the charge for

25   doing that?

36

1     A.   $3,850 for the autopsy.  And then -- that's

2  my charge.  Then if they want toxicology then I

3  charge them whatever the amount is that NMS charges.

4  I think that may be $800, and then the transportation

5  costs.

6        Mr. Edwards sent a check for $6,475, and the

7  covering letter indicated that that was for autopsy,

8  toxicology and transportation of the decedent.  My

9  charge is $3,850 for a private autopsy.

10     Q.   In the report that you prepared dated

11  December 5, 2016, the initial section, and I'm not

12  talking about the autopsy report, doctor, I'm talking

13  about your letter to Mr. Edwards dated December 5,

14  2016.

15        Do you have your letter to Mr. Edwards dated

16  December 5, 2016 in front of you?

17     A.   I do.

18     Q.   The information in the first five paragraphs

19  of the clinical summary, did that information come

20  from Mrs. Goode?

21     A.   Well, it came to me from Mr. Edwards.  I

22  cannot tell you where he obtained it.  I had no

23  contact in any way by letter or phone with

24  Mrs. Goode.  So everything I received came from

25  Mr. Edwards.

Cyril Wecht - March 21, 2017

37

1    Q.   Do I understand you then to say that you
2  never talked to Mrs. Goode?
3    A.   I have not talked with her, never have
4  talked with her.
5    Q.   And you haven't received any information in
6  writing or otherwise from Mrs. Goode about the events
7  of July 18?
8    A.   No.  I think that one of the time lines
9  submitted as I recall referred to information from
10  Mrs. Goode, but again transmitted to me via
11  Mr. Edwards, not directly to me.
12       But my recollection is that one of the time
13  lines, because I received a couple of different time
14  lines, I just have a recollection that something was
15  according to Mrs. Goode.
16       So I'm sure that some of the information
17  came from her via Mr. Edwards, but not in personal
18  handwriting.
19    Q.   Look at the September 28, 2016 letter you
20  wrote to Mr. Edwards, please.  Do you see at the top
21  of page 2 you cite the source for the preceding
22  statements as being Mrs. Goode?
23    A.   Yes.
24    Q.   But you didn't communicate with Mrs. Goode
25  directly?

38

1    A.    I told you, sir, I have never spoken with

2  Mrs. Goode in my life.

3    Q.    The information in the clinical summary, did

4  you assume those facts to be true?

5    A.    Yes.  And I had collateral information, as I

6  have already referred to by way of time lines, I also

7  had the police report.  So the overall scenario is I

8  think pretty consistent from the different sources,

9  whether there's a difference in the specific isolated

10 fact or difference in a specific minute or so, that,

11 I cannot attest to; however, my recollection is that

12 I found nothing of any significant inconsistency

13 among the various chronological reports and summaries

14 as to the events that transpired.

15        I believe that what I did receive was

16 sufficient to portray a picture for me that was

17 sufficient to arrive at conclusions and opinions.

18   Q.    In your December 5, 2016 report, you make a

19 statement on page 2 about the summary of Mr. Goode's

20 clinical history submitted by Mr. Tim Edwards.

21   A.    What page was that?

22   Q.    Page 2, sir, three paragraphs from the

23 bottom.

24   A.    Yes.

25   Q.    Do you have a copy of the clinical summary

1    that Mr. Edwards submitted to you?

2         A.   Do I have a copy?

3         Q.   The statement in the report says, the

4    summary of Mr. Goode's clinical history submitted by

5    Mr. Tim Edwards, and then you go on to say what it

6    indicates.  I'm looking for that document that you

7    reference in your letter.

8         A.   Well, they would be probably more than one

9    document by that time.  I had received copies of the

10   hospital record, I had received the police report.

11   So those are the things that I referred to submitted

12   by Mr. Edwards.  Everything that I got from him is

13   here.

14        Q.   What I'm trying to understand, doctor, is

15   if, besides the medical records, was there something,

16   some kind of summary?

17        A.   Yes.  Here's a summary right here.

18        Q.   Page 2 of this document says at the top

19   summary of clinical history.  Am I right, sir, right

20   here?

21        A.   Yes.  Here's another one, by the way.

22        Q.   Are there any other summaries of the

23   clinical history you were provided besides these two

24   that you've given me?

25        A.   Here's another one.

40

1      Q.    Are there additional ones in your files?

2      A.    No.   That appears to be everything.   Wait,

3  here's another one.   Something may be duplicative.

4          Then I got this statement of facts, looks

5  like a legal document.   So those are the things that

6  I received.

7      Q.    Are these the items to which you make

8  reference in your report when you refer to the

9  summary of the clinical history submitted by

10  Mr. Edwards?

11      A.    Yes, collectively.

12          MR. PHILLIPS:   Let's mark these collectively

13  as the next exhibit.

14          MR. UPCHURCH:   Mr. Phillips, are there five

15  documents in that collective exhibit?

16          MR. PHILLIPS:   Yes, there are five different

17  things stapled separately.

18          (Deposition Exhibit No. 4 was marked for

19  identification.)

20  BY MR. PHILLIPS:

21      Q.    There's reference in your report I believe

22  to a videotape.   Did you get any videotape of what

23  happened out on Goodman Road?

24      A.    No.

25      Q.    In the September 28, 2015 letter, next to

Cyril Wecht - March 21, 2017

41

1    the last paragraph on page 2 you cite as a source

2    attorney and video at scene.  Do you see that?

3         A.    Yes.

4         Q.    Were you provided a video of what happened

5    at the scene?

6         A.    No.

7         Q.    And you've never reviewed one?

8         A.    I have not seen a video, no.

9         Q.    In your December 5, 2016 report, on page 4,

10   what's listed there at the top beginning with

11   abrasions, contusions, down through hemorrhage into

12   left there at the end, is that the summary of your

13   gross findings at autopsy?

14        A.    Well, where is the autopsy report, do you

15   have it there?

16        Q.    Yes, sir.

17        A.    Yes, it appears to be identical listing.

18        Q.    And then the following sentence that begins

19   29 H and E stain slides in your report, that is your

20   general summary of your analysis of the slides;

21   right?

22        A.    Yes.

23        Q.    Because you told us, Dr. Wecht, that there

24   was no indication of cause of death on your gross

25   findings and no indication of cause of death on the

Cyril Wecht - March 21, 2017

1   microscopic findings, does that mean that your

2   conclusion about cause of death is based on history?

3      A.   Based on history, what we call a clinical

4   pathological correlation.

5      Q.   Can you tell us when you received the

6   medical records that you reviewed in this case?

7      A.   No, I do not have a covering -- wait, I'm

8   sorry.  Here I have a note from Mr. Edwards dated

9   August 10, doctor, here are Troy's medical records

10   from his primary care physician.

11         That email is dated August 10, 2015.  So I

12   guess I would have received it -- well, it's email,

13   so I received it that day.

14      Q.   Did that transmittal include the records

15   from Baptist Hospital or just records from his

16   primary care physician?

17      A.   This looks like only from the physician.  It

18   does not appear to include the hospital record.  The

19   hospital record came separately, and I cannot tell

20   you the time on that.

21      Q.   I'm interested in trying to determine if we

22   can when you received the Baptist records from the

23   visit of July 18, 2015.

24      A.   I cannot tell you when I received that.  I

25   do not have a covering note on that.

Cyril Wecht - March 21, 2017

43

1    Q.   Did you actually review the medical records

2  from Baptist or did you rely upon the clinical

3  summaries provided to you by Mr. Edwards and his

4  office?

5    A.   I had records from Mr. Edwards, information

6  from Mr. Edwards.  Here is an August 17, 2015 email

7  from Mr. Edwards referring to reports from the

8  Southaven Police Department.  So I had those, because

9  there's a covering note on that.

10        The autopsy report from the original

11  pathologist.  I cannot tell you specifically when I

12  received the Baptist OneCare Hospital record, whether

13  I had that or not.  There is no covering note on

14  that, so I cannot tell you about the hospital record,

15  when I received it.

16    Q.   Whenever you received those hospital

17  records, did you review them or did you rely upon the

18  summaries of those records provided to you by

19  Mr. Edwards and his office?

20    A.   No, I reviewed them, I reviewed everything

21  that has been sent to me.  Once again, just to make

22  it clear, if I found anything of an inconsistent

23  nature of any significance, I would certainly tell

24  you.

25        There are different things, references here

Cyril Wecht - March 21, 2017

44

1    or there, but for me as I have reviewed all these

2    records and as I have analyzed and interpreted them

3    for my purpose, I find nothing that is inconsistent.

4         Obviously, some things are more detailed

5    than others, but the scenario is the same, it doesn't

6    change from one report to another.

7         Q.   Did you review any depositions taken in this

8    case, doctor?

9         A.   No.

10        Q.   You have been an editor for different

11   journals, haven't you?

12        A.   Yes.  A member of the editorial board or

13   board of editors, not the editor.  I'm the editor on

14   some things, but mostly on the editorial boards.

15        Q.   I was thinking about the section on page 29

16   of your CV that's labeled professional publications,

17   editorial positions.

18        A.   Yes.

19        Q.   And then you have a series listed there.

20        A.   Yes.

21        Q.   When you hold an editorial position in

22   connection with some journal or publication, what

23   responsibility do you have?

24        A.   You're sent articles to review and then you

25   send back your analysis, whether it's accepted,

45

1  whether it needs to be revised, any comments and

2  suggestions, that's what you do as a member of an

3  editorial board of a professional journal in my

4  fields of legal medicine and forensic science.

5      Q.    Do you have any responsibility to ensure

6  that the publications in those journals are based

7  upon valid research?

8      A.    I review what's sent to me.  If you're

9  asking me do I go back and check every citation and

10  reference, no, I do not do that.  I review the

11  article and submit my comments.

12      Q.    When you review an article, do you determine

13  if the conclusions and statements in there are

14  scientifically sound in your field?

15      A.    I usually make a comment or so on.  The

16  kinds of comments, the extent of the comments will

17  vary from one paper review to another.

18      Q.    What is the American Journal of Forensic

19  Medicine and Pathology?

20      A.    It's the publication of the National

21  Association -- well, I don't know if it still is.  It

22  used to be the publication of the National

23  Association of Medical Examiners.  It may still be.

24  I know there's still an affiliation.

25          But it is a professional publication.  It

Cyril Wecht - March 21, 2017

46

1   started off I know as the official publication of the

2   National Association of Medical Examiners.  I think

3   it is now an independent journal with some

4   affiliation, but I think I have to pay separately for

5   that now, as I recall.  I don't think it comes with

6   my dues.

7      Q.   You have been on the editorial board for

8   that publication, haven't you?

9      A.   Yes.

10      Q.   Are you still?  I think it was page 29 of

11   the CV where I saw that, doctor.

12      A.   These are a list of articles by me.

13      Q.   May I help you?

14      A.   Here, I have the editorial list.

15      Q.   Page 29 of that document.

16      A.   Yes, right.  What is the name of that?

17      Q.   The American Journal of Forensic Medicine

18   and Pathology.

19      A.   Yes.  It says here 1979 to the present, so I

20   am still a member of that journal.

21      Q.   Do you regularly meet with that board to

22   provide input or regularly review articles for them?

23      A.   No, I do not meet with them.  And I cannot

24   say that I regularly provide -- they come in quite

25   infrequently as I recall for that particular journal.

Cyril Wecht - March 21, 2017

47

1       I have several journals for which I review

2   articles.  My recollection is for that one that I

3   don't get many articles to review.

4       Q.   Do you read that journal yourself regularly?

5       A.   I go through it when I receive it, yes.

6       Q.   Do you refer to it occasionally in your work

7   and rely upon it?

8       A.   I do not recall a specific reference, but I

9   incorporate and collocate information from various

10  journals as well as other informational sources.  I

11  don't in some way delineate and separate these things

12  in my mind.  They just all go into my brain and come

13  out whenever applicable.

14      I sometimes will refer to a specific

15  journal.  I do not recall the last time I referred to

16  that journal specifically in any kind of a report.

17      Q.   Is the American Journal of Forensic Medicine

18  and Pathology a reliable authority?

19      A.   Well, all journals are reference sources.

20  It's difficult to answer your question about a

21  reliable authority.  People differ.  Of course you

22  see that in letters to the editor almost all the time

23  with people expressing different opinions.  And then

24  sometimes years later an article that shows that

25  something is incorrect or needed to be changed

48

1   significantly.

2           So I'm not waffling on this.  I can't tell

3   you when you say authoritative; it's a respected

4   journal, a respected editor, a respected professional

5   organization and so on.

6           Is it authoritative?  Articles express views

7   of the authors.  Does that make it authoritative?  It

8   is certainly, if it's been peer-reviewed, then it's a

9   respected article, but you may disagree with it.

10  That happens all the time in all kinds of

11  professional publications, including scientific ones,

12  let alone things in the realm of law and political

13  science and politics and other things which are much

14  more subjective.

15          But in my field of forensic science and my

16  field of legal medicine, there are differences of

17  opinion on things.  And so, not to say that this

18  journal or this article says this and therefore that

19  is the authority; it doesn't work that way.

20      Q.   So can there be disagreement among

21  reasonable pathologists about a cause of a particular

22  patient's death?

23      A.   Yes.

24      Q.   Is the American Journal of Forensic Medicine

25  and Pathology peer-reviewed -- are the articles in

49

1    there peer-reviewed?

2         A.    Yes, I believe they are.

3         Q.    Is it a widely used journal?

4         A.    Well, all the members in name get it, and I

5    can't tell you how many other people, I have no

6    knowledge of that.  But if you are a -- well, it used

7    to be that you all get it, every member of name

8    received it.  Now it's a fair amount of money.  I

9    can't tell you.  I still get it, I pay that extra

10   money.  I can't tell you, but probably most by far of

11   named members I'm sure do subscribe to the journal,

12   but I can't tell you if it's 100 percent.

13        Q.    Is it generally a trustworthy journal?

14        A.    My answers would be the same as to

15   trustworthy, authoritative.  I don't know what you

16   mean by trustworthy.  You know, it's a series of

17   articles that have been reviewed by people, and they

18   set fort their opinions.

19             But it is not as if putting something down

20   in writing makes it a definitive, unassailable

21   nature.

22             I'll tell you very simply, like I always

23   say, forensic medicine, forensic pathology is not an

24   absolute science; it's not physics, mathematics or

25   chemistry or arguably astronomy.  So there are

50

1    differences of opinion, as I'm sure there will be in
2    this case.  I'm here to express my opinion, sir, and
3    I'm prepared to do that.
4         Q.   You wouldn't pay to receive a journal that
5    you thought was untrustworthy, would you?
6         A.   I don't know what you mean by untrustworthy.
7    I don't use that word.  You asked me before about
8    authoritative, that's usually a word that is more --
9    I pay to receive it to learn what people have to say
10   about various matters.  Some of them are very
11   esoteric, things of an extremely rare nature.
12            It's just something that you do if you're
13   active in the field from my perspective to try to
14   keep abreast of things because you don't get new
15   textbooks every year.
16        Q.   What is the Journal of Forensic Sciences?
17        A.   That's the publication of the American
18   Academy of Forensic Sciences.
19        Q.   Are you a member of that academy?
20        A.   Yes.
21        Q.   Have you served on the editorial board for
22   this publication?
23        A.   Yes.  Not now, not for some years, but I had
24   been on the editorial board of that publication.
25        Q.   Is that a journal that you read regularly?

Cyril Wecht - March 21, 2017

51

1    A.    I receive it and I read through it, yes.

2    Q.    Is it widely used in your field?

3    A.    Again, it goes to all the members of the

4  American Academy of Forensic Sciences, and that's the

5  largest forensic scientific group in the country I

6  believe.  So the people in the various scientific

7  specialties and subspecialties get that.

8         The American Academy of Forensic Sciences is

9  comprised of about I think eight or nine sections now

10 and the different forensic scientific fields, so it's

11 a panoply, it's a potpourri of different forensic

12 scientific specialty areas.

13   Q.    Is it a respected journal in your field?

14   A.    Yes.  My comments are the same.  The

15 articles are peer-reviewed.  And is it respected?

16 Yes, respected.  Are there statements and conclusions

17 that one may differ with?  Absolutely.

18   Q.    Are there any sources, whether they be

19 journals or textbooks, in your field that you could

20 identify for me as being a reliable authority?

21   A.    My answer would be the same for all of the

22 journals in my field, exactly what I have told you;

23 they're peer-reviewed articles, that means they have

24 some credibility, that have been reviewed by two or

25 more members of an editorial board, final review I

52

1    guess coming from the editor-in-chief.  So they're

2    not considered to be things of a superficial,

3    undocumented nature.

4          Some people rely more upon one journal than

5    another perhaps.  I certainly can't speak for all of

6    my colleagues.  There is no one journal that is -- I

7    was going to say like the Bible, a lot of people

8    don't accept the Bible either.  So I can't say

9    anything more than I have about these journals.

10         Q.   What sources would you go to if you needed a

11   reference work, what would be your?

12         A.   I have a lot of textbooks on pathology and

13   forensic pathology going back from different people,

14   and I have various medical books and journal

15   articles, and sometimes in cases attorneys will send

16   me some things, too, that they may acquire.

17         And to a great extent I base things on my

18   experience now of 55 years in forensic pathology.

19   That plays a major role.  Not as a matter of

20   egocentricity, but in my 55 years for me and my

21   20,000 autopsies that I have done and 40,000 others

22   that I have reviewed, supervised or signed off on

23   play a major role in leading me to conclusions and

24   opinions on a particular case, whether it's an

25   autopsy that I do or a consultation that I am

53

1  reviewing.

2      Q.    Is there a particular textbook to which you

3  would make reference if you needed to consult one?

4      A.    No.   It varies.   There are some --

5      Q.    Is there a particular journal that you would

6  reference if you needed to reference a journal?

7      A.    No.   The same answer I gave you.   I will

8  grab different things, for example, there's some

9  books on neuropathology, there's some books on liver,

10 there are books that relate to specific organ

11 systems, and then you got other books in the realm of

12 clinical pathology, plus the journals you have

13 mentioned and many other journals.

14     Q.    In your report of December 5, 2016 you did

15 not cite any specific medical literature, did you?

16     A.    No.

17     Q.    Does that mean that you do not intend to

18 cite or rely upon any specific medical literature in

19 this case for your opinions?

20     A.    No, I would not say that.   I may -- I'm sure

21 that I have read things and am relying upon them that

22 I am aware of, and I most likely did go back to one

23 or more books or articles as I was preparing this

24 report, I have no specific recollection, if I felt

25 that some statement I was making -- well, in this

Cyril Wecht - March 21, 2017

54

1    case I would say for example that, yes, in my report
2    where I refer to a specific number I think at the end
3    of my report about quantities -- let me see that.
4          Q.    Are you looking for your December 5 letter?
5          A.    Yes, my report.
6                MR. McINTOSH:    I want to state for the
7    record that I am exiting the deposition.
8          A.    Here on page 4, it gives some specific
9    numbers, I'm sure I got that from an article or a
10   book somewhere.  If I give a specific number like
11   that, I referred to the specific quantities of LSD.
12   I would not have known, I doubt that I would have had
13   that in my mind, but let's say I get a case next week
14   or next month, I have a fairly good memory, I may
15   remember the number so the next time it may be coming
16   from my mind.  In this case I believe that I would
17   have gotten those numbers from some article.  I don't
18   believe I would have had those numbers in my mind.
19         Q.    Is there any particular medical literature
20   or article that you can tell us you consulted with
21   regard to the LSD opinions on page 4 that you're
22   referencing?
23         A.    I know there are articles on LSD, and I
24   think I definitely read one or two articles.  I
25   cannot give you the authors' names.  Several people

55

1    have written about LSD.

2            And of course something else, too, that I

3    referred to for numbers, I received a copy of a

4    report submitted to Mr. Edwards from a recognized

5    expert in the field of LSD, Dr. David E. Nichols,

6    Ph.D., N-i-c-h-o-l-s.  He gives specific numbers and

7    he gives specific references to published papers.  So

8    I had the benefit of that also in referring to LSD.

9        Q.    Did you rely upon Dr. Nichols' report to

10   form your opinions?

11       A.    No.  My opinions were the same insofar as

12   whether or not LSD caused the death.  I did not need

13   or rely upon Dr. Nichols' report.  I am a forensic

14   pathologist, and he is not.  I found his report very

15   illuminating and very erudite, but I did not need his

16   report, I did not rely upon his report to arrive at

17   the conclusion that I did vis-a-vis the arguable role

18   of LSD in leading to Mr. Goode's death.

19       Q.    What is the date of his report, the copy

20   that you have?

21       A.    January 11, 2016.

22       Q.    I may not have understood your answer to

23   this question, so forgive me if I'm repeating myself,

24   you have not cited in your report a specific article

25   or piece of literature; correct?

Cyril Wecht - March 21, 2017

56

1    A.    Yes.

2    Q.    Do you intend in this case in conjunction

3  with any opinion you give to cite a specific journal

4  article or textbook?

5    A.    No.  If I were testifying today I would give

6  the answers that I've already given you, so I would

7  not have a specific name.  It may be that Mr. Edwards

8  will want me to refer to a specific article based

9  upon the opinions I've given, the quantitative

10  numbers I have expressed and so on, in which case I

11  would do so.

12        But let's say I were testifying today, my

13  answers would be, as I have given you, that I have no

14  specific article I'm referring to, but I have

15  acknowledged that I did acquire specific quantitative

16  numbers relative to LSD toxicity as referred to in my

17  report.

18    Q.    You didn't in the section on positional

19  asphyxia make any reference to the literature even

20  generally, did you?

21    A.    No.

22    Q.    Has Mr. Edwards or anybody else provided you

23  any articles for you to review in conjunction with

24  this case?

25    A.    No, not that I recall.

Cyril Wecht - March 21, 2017

57

1     Q.    Have you published anything yourself
2  pertaining to positional asphyxia?
3     A.    I don't recall.  I know I've dealt with this
4  and commented on it hundreds and hundreds of times.
5  I think I probably have.  I would have to go through
6  -- one just caught my eye right here now,
7  Investigation and Analysis of Police-Related Deaths,
8  No. 56 in my CV at the Arnold Markle Symposium, Henry
9  C. Lee Forensic Science, University of New Haven.
10     Q.    Was that a lecture or publication?
11     A.    That's a publication based upon a lecture.
12     Q.    Is there a citation given there for that?
13     A.    Yes.  Published in the proceedings of that.
14  I think that any article here which talks about
15  police-related deaths, there's another one I gave at
16  the American College of Forensic Examiners, I
17  remember that one, in Branson, Missouri, that it
18  would definitely have included reference to that.
19          I know that there are others.  And I have
20  written about this in my textbook, in my own book, so
21  I know that I've written about this because I've been
22  involved in these cases.
23     Q.    Let me try to ask a better question.
24          I'm not asking about lectures that you may
25  have given.  I'm asking about publications that would

**Alpha Reporting Corporation**

58

1    appear in peer-reviewed journals.  Have you submitted

2    any publications to peer-reviewed journals on the

3    topic of positional asphyxia?

4        A.   I do not know offhand if I've had any

5    submitted to a peer-reviewed journal.  I have had

6    many published in association with lectures given at

7    various meetings.  They would not have been

8    peer-reviewed.

9        Q.   Have you conducted any research or testing

10   regarding positional asphyxia?

11       A.   No.

12       Q.   Have you submitted any publication to a

13   peer-reviewed journal regarding LSD?

14       A.   No.

15       Q.   Excited delirium?

16       A.   No.  Well, no, I do not believe so, no.

17       Q.   What is the name of your textbook that you

18   make reference to?

19       A.   Forensic Pathology in Civil and Criminal

20   Cases.

21       Q.   And you would not acknowledge your own

22   textbook as a reliability authority, would you?

23       A.   No, people will disagree with me, some

24   people.  So my answer for my own book is the same as

25   I have expressed with regard to other people's books

Cyril Wecht - March 21, 2017

59

1  and articles.  These are my opinions.  Much of it is

2  hard science which would not differ from one book to

3  another, but there are variations.  And then there

4  are areas then which are more subjective.

5      Q.   Are you familiar with a book called the

6  Handbook of Forensic Pathology by Vincent DiMaio?

7      A.   I'm familiar with a book by Dr. Vincent

8  DiMaio.  I didn't recall it as a handbook.  I thought

9  it's a bigger book.  So I don't know that I have a

10  handbook.  I know Dr. DiMaio has a couple of books or

11  more.  So I'm familiar with the books that he has

12  published, that he has written, yes.

13      Q.   Do you refer to Dr. DiMaio's books on

14  occasion?

15      A.   I probably do.  I think I have one of his

16  books.  And as I say, I'll just grab a book.

17  Sometimes I'll look something up in two or three

18  books.

19      Q.   Have you, in fact, cited Dr. DiMaio's book

20  in testimony in other cases?

21      A.   I do not know.  It is certainly possible

22  that I've done so, but I can't remember specifically.

23  I can't tell you.

24      Q.   Is Dr. DiMaio a respected expert in your

25  field?

Cyril Wecht - March 21, 2017

60

1    A.   Yes.

2    Q.   Are you familiar with Forensic Pathology, a

3  text whose primary author is Dr. David Dolinak?

4    A.   David?

5    Q.   Dolinak.

6    A.   Dolinak?

7    Q.   Yes, sir.

8    A.   No, that one I do not know at all, neither

9  the name of the book nor the author, Dolinak, no.

10    Q.   What is the Journal of Legal and Forensic

11  Medicine?

12    A.   Which one is that, of Legal and Forensic

13  Medicine?  I'm trying to remember which organization

14  publishes that.  I know the name, but I'm confused as

15  to -- can you tell me, I don't know which

16  organization -- I'm familiar with that name, I just

17  don't know which professional organization publishes

18  that.

19    Q.   Is that a journal to which you make

20  reference?

21    A.   Again, I think it's a journal that I

22  receive.  And my answer would be the same as I have

23  expressed regarding other journals.

24    Q.   So you think it's one that you receive and

25  regularly review?

Cyril Wecht - March 21, 2017

61

```
1       A.   I believe that it sounds like one of the
2   journals that I receive.
3            MR. UPCHURCH:  Mr. Phillips, I need a brief
4   break when you come to a good stopping point.
5            MR. PHILLIPS:  I should have told the doctor
6   that when we started, should you need a break, I will
7   be happy to give you one.  Mr. Upchurch has baled us
8   all out, so we'll take a break now.
9            (Whereupon, a short recess was taken off the
10  record.)
11  BY MR. PHILLIPS:
12       Q.   Would you locate the toxicology report from
13  Mississippi, please?
14            MR. EDWARDS:  You say the toxicology report,
15  there are actually two from Mississippi.  Which one?
16            MR. PHILLIPS:  Just get them both.
17            THE WITNESS:  Yes, I have that report.
18  BY MR. PHILLIPS:
19       Q.   I'm looking specifically for page 3 of 5 on
20  the tox report for Mississippi, there's a reference
21  comment No. 5.  Do you see that?
22       A.   Yes, page 3 of 5, yes.
23       Q.   Reference comment No. 5?
24       A.   Yes.
25       Q.   Would you read that, please?
```

Cyril Wecht - March 21, 2017

62

1    A.   "LSD (lysergic acid diethylamide) subclavian

2  blood.  LSD is a U.S. DEA Schedule I substance with

3  no medical use.  It is generally classified as a

4  hallucinogen or psychodelic drug and may produce

5  illusion, both auditory and visual.  Physiological

6  effects are primarily sympathomimetic, and may

7  include madrases, hyperthermia, seizures, panic and

8  paranoid reactions.

9       Flashback reactions are not uncommon in the

10  experienced user.  Effects may develop in as little

11  as 15 minutes and generally last no more than eight

12  hours but in rare cases may proceed or exceed 12

13  hours.

14       Blood concentrations of LSD between 4 and 6

15  ng/mL are usually seen one to two hours after the

16  usual psychodelic dose; however, levels as high as 16

17  ng/mL have been reported.

18       Death due to the pharmacological effects of

19  LSD is rare, with most of this occurring as a result

20  of LSD-induced suicide and accidental trauma."

21    Q.   Do you agree with what you just read?

22    A.   Yes.

23    Q.   You've made reference in your report to the

24  fact that Troy Goode took LSD on July 18, 2015;

25  correct?

Cyril Wecht - March 21, 2017

63

1   A.   Yes.

2   Q.   What impact did LSD have on Troy Goode?

3   A.   It caused him to be become hallucinogenic.

4   He was clearly hallucinating and suffering from the

5   effects of LSD.  I think it's referred to

6   colloquially as a bad trip.

7   Q.   The erratic behavior that is described in

8   your report, is that the result of LSD?

9   A.   Yes.

10   Q.   The reference in your report to his feeling

11   claustrophobiic and getting out of the car twice,

12   pacing in circles saying I don't know what to do, I

13   don't know what to do, is that all attributable to

14   his LSD ingestion?

15   A.   Yes.

16   Q.   Does marijuana in any way potentiate the

17   effects of LSD?

18   A.   Not to my knowledge.  Marijuana is

19   pharmacologically characterized as a mild

20   hallucinogen.  I'm not aware of any references to any

21   kind of synergistic effect.  I have not encountered

22   it myself in any of my cases.

23        It's an interesting question because, as

24   I've already said, marijuana has a mild

25   hallucinogenic effect.  It is theoretically possible

Cyril Wecht - March 21, 2017

64

1    that it could contribute a little bit, I just don't
2    know of any study.  I can't answer that in a
3    definitive way.
4        Q.    Does marijuana produce a hallucinogenic
5    effect?
6        A.    Well, I told you it's a mild hallucinogenic.
7    I'm not aware, from what I know and hear and read
8    about marijuana that it produces anything like what
9    was manifested by Mr. Goode, not at all.  I've never
10   heard of anything like that among marijuana users.
11       Q.    In your report with reference to Mr. Goode's
12   condition in the emergency room you say that he
13   appeared to be extremely agitative and combative.  Is
14   that related to his LSD ingestion?
15       A.    I think it is, along with an extremely
16   uncomfortable physical position of being hogtied over
17   a prolonged period of time, of some difficulty in
18   breathing easily.  Primarily I think the effects are
19   due to LSD, but I think definitely enhanced and
20   aggravated by those physical circumstances.
21       Q.    You state in your report in the ER he was
22   screaming uncontrollably and disrupting the entire
23   department.  Is that, too, related to LSD ingestion?
24       A.    My answer would be the same, primarily due
25   to LSD but also due to the hogtied position, which

Cyril Wecht - March 21, 2017

65

1   makes it difficult to breathe, to the overall
2   physical situation in which he found himself.
3          But basically and primarily due to LSD with
4   those aggravating enhancing factors.
5      Q.   You state further he appeared floridly
6   psychotic.  Is that, too, from his narcotic
7   ingestion?
8      A.   Yes.  I think those things which could be
9   considered psychotic are primarily due to LSD.
10     Q.   He stated "I don't know how to explode".  Is
11  that something you also attribute to his LSD
12  ingestion?
13     A.   Well, it's a statement that he made as
14  reported to me.  I think, again, my answer is the
15  same.  It's all part of his reaction to LSD.  It's
16  part of the overall hallucinatory state in which he
17  found himself.
18     Q.   Were you aware that he had used LSD on at
19  least two prior occasions, one in 2008 and one in
20  2013?
21     A.   No, I don't think I know anything about past
22  experience.
23     Q.   Would that make any difference to any
24  conclusion you reach in the case?
25     A.   No.  There's nothing of a lingering nature

**Cyril Wecht - March 21, 2017**

66

1    at all; once it's over with LSD it's over.  So no,

2    that would be of no relevance to me.

3        Q.   Can LSD ingestion cause excited delirium?

4        A.   I have to start by telling you that I do not

5    accept excited delirium as a scientific diagnosis, so

6    therefore I can't answer that question.

7            But the second part of the answer is that if

8    you take the effects of LSD producing these kinds of

9    hallucinogenic delusional thoughts, expressions and

10   physical actions, then they can lead to a state of

11   great excitation.

12           I'm not aware, I'm trying to think of the

13   people who do believe in such a diagnosis, whether

14   they -- I can't speak for them because they related

15   cocaine and stimulants.  I can't answer that question

16   for the reasons I've given.

17       Q.   What, does acronym NAME stand for?

18       A.   National Association of Medical Examiners.

19       Q.   Doesn't that organization except excited

20   delirium?

21       A.   I believe they do.

22       Q.   Are you a member of that organization?

23       A.   Yes.

24       Q.   Isn't excited delirium accepted and

25   discussed?

Cyril Wecht - March 21, 2017

67

1   A.    Yes, by many people, and rejected by others.

2   Q.    So it is accepted in the forensic pathology

3   literature generally, isn't it?

4   A.    I can't tell you generally.  I'm telling you

5   that I'm aware that it has been accepted by some

6   groups and by many individuals and by some people who

7   have written books on it, and others do not accept

8   it, it's been rejected with some very strong

9   derogatory statements by various people, Canadian

10  Medical Association, Royal Canadian Police, I think

11  some of the European groups and so on.

12        But I am very much aware that it has been

13  accepted by NAME and by other people who are

14  experienced, competent forensic pathologists.

15  Q.    Does the forensic pathology literature

16  recognize that LSD ingestion can cause excited

17  delirium?

18  A.    That's exactly the question you asked me

19  before.  I gave my answer.  And I'm not sure if the

20  people who believe in excited delirium have related

21  this to LSD.  I don't know.  I'm not telling you no.

22  I'm telling you I don't know.

23        The cases that I've dealt with in which

24  excited delirium has been proposed, expounded, they

25  have related almost always to people who have had

68

1   cocaine or amphetamine or the central nervous system

2   stimulants.  I just can't think offhand whether they

3   have related it to hallucinogenic compounds.  I'm not

4   saying they haven't, but I don't remember.

5           All the references that I have encountered

6   have been to cocaine, amphetamines, MDMA, Xtasy,

7   those kinds of drugs.  But it may well be that others

8   have related it to LSD, I just don't know.

9       Q.   Can LSD ingestion cause a cardiac

10  arrhythmia?

11      A.   Well, yes, we see it in this case, it

12  produced supraventricular tachycardia, which is an

13  arrhythmia.  That's the kind of arrhythmia I think

14  that has been referred to by people writing about

15  LSD.

16      Q.   Can LSD injection produce a cardiac

17  arrhythmia that can lead to death?

18      A.   No, because, to get to the heart of the

19  matter, the reports show somewhere I've seen from 9

20  to 11 percent of Americans have ingested LSD one or

21  more times.

22          Using the higher number, some people have

23  estimated as many as 31 million Americans have used

24  LSD, and there are just no deaths, a couple have been

25  reported, it's quite arguable in the literature

69

1  whether they were scientifically shown to have been

2  attributed.

3        That's why I said a handful or so, not to

4  quibble, one or two or three or four, literally a

5  handful; and many authors have said none, others say

6  maybe the one case or so on.

7        I have never seen LSD listed in any of the

8  autopsy reports, about 40,000, rough estimate, that I

9  have seen death certificates and/or autopsy reports

10  nor have I ever listed it myself, and I've already

11  told you what is set forth in the literature.

12        So the answer, therefore, to your question

13  of a fatal cardiac arrhythmia is no, because that

14  indeed would be the mechanism of death were it to

15  occur as a result of LSD from cardiac arrhythmia.

16  And I just have not experienced that.

17        Q.   Can LSD indirectly lead to death?

18        A.   Indirectly, cases of people committing

19  suicide or being killed accidently under the

20  influence of LSD, I can understand that, and I'm

21  aware of some reported cases.

22        In fact, gee, I remember a long time ago the

23  U.S. government had somebody they were experimenting

24  on who jumped out of a building or so on in New York

25  City.  So the answer indirectly, yes.

Cyril Wecht - March 21, 2017

1    Q.   In your report of December 5, 2016 you list
2  a couple of questions that you answer.  The first is
3  on page 4 and the second is on the top of page 5.
4  Did somebody suggest these questions to you?
5    A.   No.  These are questions that I pose to
6  myself and respond based on what I think is the
7  essence of the matter as it relates to me.
8    Q.   So nobody raised with you concern about LSD
9  use before you prepared your report?
10    A.   Oh, I'm sure the question had been raised in
11  the discussion with Mr. Edwards.  It was no secret.
12  I didn't come up with something that hadn't been
13  thought of.
14        But the answer to your question is, I mean,
15  obviously it was a question on Mr. Edwards' mind.
16  But did he state that question in that form to me?
17  No.  These are my words.
18        Obviously, I knew that Mr. Edwards would
19  like to know and would need to know what my thoughts
20  were in terms of LSD and Mr. Goode's death.
21    Q.   Was it also made clear to you that he was
22  interested in your opinion about whether positional
23  asphyxia played a role?
24    A.   Yes, sure.  We had talked about that.  By
25  that time I had the information about the hogtied

Cyril Wecht - March 21, 2017

71

1    position.

2           So once again, my answer is exactly the

3    same, the question is in my words, the objective and

4    the purpose of the question and the answer thereto is

5    something that I obviously recognized to be the

6    essence of the case, of course.

7           Q.   You made reference earlier to some

8    difficulty breathing that Mr. Goode had?

9           A.   Yes.

10          Q.   Can you point me to anything in the medical

11   record at Baptist Hospital that would indicate he was

12   having difficulty breathing?

13          A.   Well, yes, the respiratory rate as I recall

14   rose, the blood pressure dropped -- I mean, the blood

15   pressure first it rose and then it dropped.  The

16   respiratory rate raised.  And the oxygen level

17   dropped to about 90 percent.

18          So that is a clear manifestation of some

19   respiratory difficulty.  90 percent is not

20   acceptable.  Healthy, normal guy, I'm sure Mr. Goode

21   walking around before all of this happened he would

22   have had a much higher oxygen level.  So that is the

23   most specific diagnostic reflection of respiratory

24   compromise.

25          Q.   Did you see any assessment done by anybody

Cyril Wecht - March 21, 2017

72

1    in the emergency department who actually saw

2    Mr. Goode where they indicated he was having trouble

3    breathing?

4        A.    I don't recall a specific statement by --

5    they did not assess under pulmonary, chest, "too

6    combative to assess fully".  And pulmonary/chest,

7    there's no comment there at all.

8            The respiratory rate was 24.  The oxygen

9    level is 90 percent, which I have already referred

10   to.  So do I see a statement about respiratory

11   difficulty?  No, they did not listen with a

12   stethoscope, they did not do an auscultation test,

13   they said that they were unable to do that.

14       Q.    But wouldn't a trained health care

15   professional observing a patient be able to discern

16   difficulty breathing without putting a stethoscope on

17   the chest?

18            MR. EDWARDS:  Object to the form.

19            THE WITNESS:  The answer is yes, but a

20   trained health care professional person would do a

21   lot of other things, too, like somebody is in your

22   hospital and he's in a hogtied position and you're

23   seeing these laboratory changes is to remove him from

24   the hogtied position.

25            I'm not trying to be sarcastic or clever

1      here.   What I'm saying is in answer to your question,
2      what would trained hospital personnel do, again,
3      trained hospital personnel, you don't see a lot of
4      the injuries that were found by the pathologist in
5      Mississippi and by me that are reflected in the
6      hospital record.
7               So I'm not here to make comments on any
8      aspect of the case that might deal with medical
9      malpractice, but I'm pointing out when you ask me in
10     this case about observations and comments by health
11     care professionals, that's part of my answer, the
12     record speaks for itself, what they saw and what they
13     stated and what they did not comment upon or observe.
14     So I don't know what to tell you.
15     BY MR. PHILLIPS:
16         Q.   Are you not in this case offering any
17     opinions on the standard of care, are you?
18         A.   No, I am not.
19         Q.   And your practice doesn't include seeing
20     living patients, does it?
21         A.   No.
22         Q.   And it doesn't include assessing living
23     patients, does it?
24         A.   It doesn't include what?
25         Q.   Assessing living patients.

Cyril Wecht - March 21, 2017

74

1    A.    Assessing, no.

2    Q.    Did you mention in your report of December

3    5, 2016 the important things that you saw in the

4    medical records?

5    A.    No, I do not believe.  Let me see.  No, the

6    only comment of a tangential nature is on page 3, in

7    that 8:49 to 9:22 block where I state Troy was in a

8    hospital room with police, still in a hogtied

9    position, and I give the source from the police

10    incident report.  Then I say police, not medical

11    personnel, advised medical personnel that Troy was no

12    longer breathing.

13        So that's the only reference that I see to

14    anything in my report about the hospital.  As I've

15    said, in answer to your question today and I'm sure

16    in my mind at that time I was not approaching this as

17    I would do in a report dealing with medical

18    malpractice.

19        One thing, sir, I just noticed on that page

20    3 also up above, I do say that triage reflected

21    oxygen saturation of 90 percent and respiration of

22    24, so that is a reference to the hospital record.

23    Q.    You noted that Mr. Goode was said to be

24    screaming and yelling while in the emergency

25    department; right?

Cyril Wecht - March 21, 2017

75

1      A.    Yes.

2      Q.    Isn't that some indication of ability to

3 breathe and ventilate?

4      A.    No.    If I understand your question, as a

5 matter of fact the opposite might be true.    When

6 you're having difficulty in breathing, that is one of

7 the most -- well, that is the most fundamental

8 voluntary/involuntary physiological phenomenon, the

9 need to breathe; the panic that ensues when you are

10 having a compromise of oxygen.

11          And so then the yelling, the exhortations

12 are likely to be greater than, for example, if you're

13 having an experience with some pain or some other

14 kind of distress.

15          The inability to breathe is the most

16 frightening, horrific situation that a human being

17 finds himself in, that an animal finds itself in, but

18 we'll talk about human beings.

19          So in that situation it is well known in

20 these cases of the combativeness, of the yelling and

21 the screaming, it's just a terrible situation in

22 which you are not able to breathe properly.

23      Q.    But you have to have air in your lungs to be

24 able to yell and scream, don't you, doctor?

25      A.    Absolutely, but at no --

76

1     Q.    To do that repeatedly indicates you're able
2    to fill your lungs with oxygen, yell and scream, fill
3    your lungs with oxygen, yell and scream; right?
4     A.    I would accept the statement except when you
5    say fill.  To take in some oxygen and to breathe and
6    be able to verbalize, my answer is yes.  But that
7    doesn't mean that you're filling, that you're
8    removing the CO2 and taking in oxygen in the normal
9    fashion.  It just means, sure, and I at no time ever
10   have I thought or commented or believe that his mouth
11   and nose were closed and that he was unable to do any
12   breathing.
13         It's a matter of the compromised nature of
14   the normal respiratory physiological function, not a
15   matter of physical or mechanical asphyxiation
16   blocking the airway.
17    Q.    Did you see in the medical record any
18   reference to any abnormal color in this patient
19   before he coded?
20    A.    No, I do not recall any reference to any
21   kind of discoloration.
22    Q.    Is it your conclusion that Mr. Goode died of
23   a cardiac event?
24    A.    Yes.  It's my conclusion that he died as a
25   result -- everybody dies when the heart stops

77

1    beating.  I believe that he died as a result of

2    cardiorespiratory failure.

3         I believe that he died as a result of

4    compromise of normal breathing process as a result of

5    his prolonged hogtied position anywhere from an hour

6    and 20 to an hour and 30 minutes as I calculate the

7    numbers, a portion of which also included even I

8    think five circular straps over his body, too, in the

9    EMS vehicle.

10        So I believe that that would be the final

11   cause of death, cardiorespiratory failure brought

12   about by respiratory compromise, then we see evidence

13   of cardiac effect with the supraventricular

14   tachycardia noted a couple of times and then

15   reflected on a portion of ECG strip, although I don't

16   read ECG strips, but just taking their interpretation

17   of what I understand there's a limited ECG reading.

18        So that's the answer to your question, that

19   to me is the cause of death here.  This was an

20   otherwise healthy individual with no problems other

21   than a chronic asthmatic condition, which I

22   understand was reported, I've been told that

23   Mrs. Goode did mention that to the police, that her

24   husband had asthma, although as you have asked me, I

25   cannot myself state that as an anatomical diagnosis

78

1    based upon my autopsy.

2           But otherwise, this is a healthy man.  And

3    I've given you my thoughts on LSD and on excited

4    delirium based upon my experience dealing with these

5    kinds of matters of positional asphyxiation, this is

6    my opinion which I express with a reasonable degree

7    of medical forensic scientific certainty.

8        Q.    You don't interpret EKGs, do you?

9        A.    I prefer the English, ECG.

10       Q.    Sorry.

11       A.    That's okay.  No, I've already said that,

12   no, I don't interpret them.  I already volunteered

13   that.  I just refer to the interpretation by somebody

14   who read that.

15       Q.    Mr. Goode's death is also consistent with

16   excited delirium leading to a cardiac arrhythmia,

17   isn't it?

18       A.    No, it is not.  So again, I'll preface my

19   response by saying that I don't accept excited

20   delirium as a scientifically documented diagnosis.

21   But let's take it hypothetically.

22          No, number one, you do not have something

23   that is found in these cases of hyperthermia; number

24   two, most, not 100 percent, but almost all of these

25   cases involve people who have been -- who have taken

79

1  a central nervous system stimulant, cocaine most

2  frequently, amphetamine, methamphetamine, MDMA, Xtasy

3  and so on, sometimes with high levels of alcohol.  We

4  don't have that.

5        And then also the cases that I've dealt

6  with, they have been cases in which somebody placed

7  in the -- somebody who dies as a result of what

8  others accept as excited delirium, and these have

9  always interestingly been police-related deaths in my

10  experience somehow, it doesn't seem to happen with

11  other people, only when they have an altercation with

12  a policeman, that they die then and there.  They

13  don't die an hour and a half later.

14        So for those reasons, just dealing

15  hypothetically, again, that if this were to be

16  considered as excited delirium, my response is as

17  I've given it, no hyperthermia, no precipitating

18  pharmacological agent, and the delayed death, I do

19  not believe this would meet the criteria of excited

20  delirium for those who believe in excited delirium.

21     Q.   Do you see any symptoms that Mr. Goode had

22  that are consistent with excited delirium?

23     A.   Yes, for those who believe in excited

24  delirium; combativeness, excitation, screaming,

25  yelling, yes, those are things that are reported in

Cyril Wecht - March 21, 2017

80

1    such cases.

2         Q.    Have you ever concluded that any person's

3    death was related to excited delirium?

4         A.    No, because I do not believe in that

5    diagnosis.

6         Q.    There was no weight on Mr. Goode's back

7    while he was in the emergency department, was there?

8         A.    No, none that I saw reported.

9         Q.    And in the emergency department he was not

10   strapped down; right?

11        A.    He was not.

12        Q.    Can one have positional asphyxia by being

13   restrained in some manner other than prone maximal

14   restraint?

15        A.    Prone maximal restraint.  Yes, not all cases

16   involve a total hogtied position.  Some have a

17   partial binding, not necessarily complete, wrist to

18   wrist or ankle to ankle.  And also in many -- some,

19   many, I don't know the percentage breakdown, but in

20   many cases, probably -- well, in many of the cases,

21   too, you have additional involvement of one or more

22   people pressing down on the victim's back, neck,

23   back, you have that as an additional component in

24   many such cases.

25        Q.    That doesn't exist here?

Cyril Wecht - March 21, 2017

81

1        A.    Not to my knowledge.

2        Q.    Have you ever evaluated a case where there

3    was a concern about positional asphyxia and concluded

4    that the patient did not die of positional asphyxia?

5        A.    I don't know.  The answer is, I can't give

6    you a specific case.  I may have, but I cannot refer

7    to a specific case.

8        Q.    How long does it normally take for a patient

9    to asphyxiate?

10       A.    Oh, that will vary greatly.  The answer is,

11   total cessation for whatever reason of oxygen, we're

12   talking about four to six minutes of oxygen reservoir

13   in the brain, you may wind up with some damage, but

14   that's usually the figures that people give.

15           It can vary.  Some people in frigid

16   conditions, even in ice water, can last longer.

17   Forget the people who train for this, pearl divers,

18   some of them are absolutely incredible.

19           But the average person, you know, we talk

20   about four to six minutes.  Now, that's total, total

21   blockage in whatever fashion, you're smothered by a

22   landslide, I had some of those cases not a couple

23   weeks or so ago, young man just working with his

24   father in a ditch and everything just came down upon

25   him.

Cyril Wecht - March 21, 2017

82

1          So if you have partial compromise, it will

2     take longer.  Well, look at a carbon monoxide case

3     for example, it may take a long time before you die,

4     before you reach a level in which the oxygen supply

5     is just inadequate for your body's needs.

6          So it varies.  There's all kinds of

7     situations.  You have to deal with each one based

8     upon the circumstances of that case.

9          Q.   We talked earlier about the American Journal

10    of Forensic Pathology of which you have served on the

11    editorial board.  I want to ask you about a

12    particular article which appeared in Volume 19,

13    September 1998, on pages 201 through 205.

14          The title of the article is Reexamination of

15    Custody Restraint Position in Positional Asphyxia.

16    Let me pass you a copy here so you can look at what

17    I'm talking about.

18          Look at the last sentence of the first

19    paragraph under the abstract on page 1.  Do you see

20    that?

21          A.   Yes.

22          Q.   Would you read that last sentence, please?

23          A.   "We conclude that the hogtied restraint

24    position by itself does not cause respiratory

25    compromise to the point of asphyxiation and that

Cyril Wecht - March 21, 2017

83

1    other factors are responsible for the sudden death of

2    individuals placed in this position."

3         Q.    Do you agree with that statement?

4         A.    No.

5         Q.    Is that statement inconsistent with the

6    opinion you've reached in this case?

7         A.    Yes, except for the last part, by the way.

8    The last part is actually consistent when they see

9    sudden deaths.  Now, of course they don't give a

10   temporal definition or parameters, but that's an

11   interesting comment and consistent with what I said a

12   little while ago about excited delirium, the

13   suddenness of such a case.

14        But taking the overall statement otherwise,

15   yes, I disagree.  And this gets to what we talked

16   about an hour or two ago, whenever, about journals

17   and articles.  I definitely disagree with this

18   statement.

19        Q.    Your position is that the maximum restraint

20   position causes respiratory compromise; right?

21        A.    Yes, indeed.

22        Q.    And that's what this study expressly

23   rejected; right?

24        A.    That's correct.  They disagree, and

25   evidently their findings and statements have not been

**Alpha Reporting Corporation**

84

1    accepted either by the overwhelming majority of

2    federal, state and local police agencies in the

3    United States of America that specifically instruct

4    their police officers not to place somebody in a

5    hogtied position and certainly not to keep them in

6    that position for any period of time.

7           So evidently this has not been accepted by a

8    lot of other people, too, besides me.

9           MR. EDWARDS:  Was this a study funded by the

10   San Diego Police Department?

11   BY MR. PHILLIPS:

12       Q.   Is this a study that is peer-reviewed,

13   doctor?

14       A.   I would imagine.  I would believe that the

15   article published in this journal had been

16   peer-reviewed, yes.

17       Q.   What does that mean if it's been

18   peer-reviewed?

19       A.   It means that two or more, but usually two,

20   members of the editorial board -- well, not

21   necessarily limited to the editorial board, but two

22   other people, either on the editorial board or people

23   in the same field of medicine or whatever, have

24   looked at the article and expressed their opinions.

25       Q.   Look at page 7, the conclusions section.

Cyril Wecht - March 21, 2017

85

1       A.      Yes.

2       Q.      Read the last sentence, please.

3       A.      "Although restraints in general, in general,

4    increase the psychological and physiologic stress on

5    the individual, no evidence suggests that body

6    position alone causes hypoventilation, respiratory

7    compromise, or positional asphyxia in the hogtied

8    custody restraint position."

9       Q.      Do you agree with that statement?

10      A.      Absolutely not.  I myself have had cases in

11   which, very famous case around here, Johnny Gamut,

12   33-year-old guy, cases of healthy people with no

13   disease at all, and I mean, no, I absolutely do not

14   agree with this statement and this -- well, I won't

15   repeat myself about all the other people and

16   organizations and groups, including law enforcement

17   with very specific guidelines and instructions that

18   have been in place for years.

19              In fact, it's now 2017, these guidelines,

20   these instructions, most of them have now been

21   adopted for now about a decade, it varies greatly.

22   But this is not something that is brand new on the

23   table.

24      Q.      This is a conclusion published by a well

25   recognized journal in your field that's

Cyril Wecht - March 21, 2017

86

1    peer-reviewed, based upon research that's been done?

2        A.    Yes, that's what the authors state.

3        Q.    So this is a position that reasonable

4    forensic pathologists can take; right, based upon

5    this research?

6        A.    I can't speak for anybody else.  I've

7    already answered you that I am well aware that many

8    of my colleagues accept the phenomenon of excited

9    delirium.  I recognize that and --

10       Q.    This has nothing to do with excited

11   delirium.  This has --

12       A.    In a hogtied position.

13       Q.    -- to do with that restrain causes

14   respiratory compromise?

15       A.    I'm sorry.  That, I can't comment on.  I'm

16   sorry, I was jumping to excited delirium.

17             I don't know, when you say my colleagues,

18   may I see that again?  I can't speak for all forensic

19   pathologists.  I cannot answer your question.  I

20   think most forensic pathologists do believe that a

21   hogtied position could lead to death.  That is my

22   belief.  Can I cite you a source?  Have I conducted a

23   survey?  No, I have not.

24             But I think that most of my forensic

25   pathologists nowadays if they're confronted and given

Cyril Wecht - March 21, 2017

87

1    the information about a prolonged hogtied position
2    that they would accept it.  But I can't give you an
3    article to refer to.
4        Q.    This is a conclusion published in a
5    peer-reviewed forensic pathology journal?
6        A.    Yes.  I do not recognize -- you'll see these
7    are emergency room physicians.  So they're speaking
8    for themselves.  My only comment is these are not by
9    forensic pathologists.  These are by emergency room
10   physicians.  Big difference.
11       Q.    Given the fact that it's published in a
12   forensic pathology journal indicates that peer
13   reviewers reviewed it, thought it valid and accurate
14   and worthy of publication; true?
15       A.    Well --
16       Q.    Is that true?
17       A.    Well --
18       Q.    Can you answer my question before you
19   explain?
20       A.    I'm going to answer.  I'm going to give you
21   the answer.  You read something, and as a reviewer,
22   validity based upon what they represented doesn't
23   mean that you yourself believe that, but you believe
24   it is something that has been validly analyzed by the
25   authors and that it has a right, so to speak, of

88

1  being published.

2          I'm not equivocating on this.  I'm just

3  saying that you don't reject an article as an

4  editorial board or other reviewer because you

5  disagree with the conclusions.  You review it to see

6  does it have sufficient scholarliness, is it

7  sufficiently and properly -- and the answer is yes,

8  they did review it and whoever it was and they

9  concluded that it was worthy of publication.  That's

10  what it connotes.

11          And then as you are aware, in the legal

12  journals, let alone the lay public, that's where

13  letters to the editor come in from people who

14  disagree.

15          MR. PHILLIPS:  Let's mark this article as

16  the next exhibit.

17          (Deposition Exhibit No. 5 was marked for

18  identification.)

19  BY MR. PHILLIPS:

20    Q.   I want to show you an article from the

21  Journal of Forensic Scientists 2007, Volume 2, No. 1.

22  This is, again, a journal for which you have served

23  as an editor or on the editorial board; correct?

24    A.   Yes.  I don't believe I was an editor, but

25  on the editorial board, yes.

Cyril Wecht - March 21, 2017

89

1      Q.    This is an article entitled Ventilatory and

2  Metabolic Demands During Aggressive Physical

3  Restraint in Healthy Adults; right?

4      A.    Yes.

5      Q.    The last sentence in the second paragraph on

6  the left says what?

7      A.    "However, a recent study reported that,

8  although PMRP alone -- where am I?  Sorry.  I lost my

9  place.  Let me start again.

10          "However, a recent study reported that,

11  although PMRP by itself resulted in a small,

12  restrictive ventilatory pattern compared with seated

13  measurements, there is no evidence of

14  hypoventilation, hypercapnia or hypoxemia."

15      Q.    Do you agree with that statement?

16      A.    No.

17      Q.    PMRP is defined early in the article as

18  prone maximal restraint position?

19      A.    Yes.

20      Q.    And that's the position that Troy Goode was

21  in?

22      A.    Yes.

23      Q.    So this article says, it's referring to a

24  recent study that shows no evidence of

25  hypoventilation, hypercapnia or hypoxemia; right?

90

1      A.    That's correct, with healthy adults in an

2  investigative setting, yes, that's correct.  Not

3  exactly what you have in a setting involving police

4  and nor does it address the question of time, such as

5  we have in this case.

6           In fact, they talk about sudden death.  If

7  you look on page 173 under discussion, the first

8  sentence again, although sudden death has occurred in

9  individuals placed in the PMRP, on and on and on.

10          So once again we have the reference to the

11 temporal component of so-called -- well, to these

12 kinds of deaths.  We see the use of the word sudden,

13 even back on page 171 the right-hand side, the second

14 sentence I see cases of sudden death of restrained

15 individuals often involve those who continue to

16 struggle after being restrained.

17     Q.    Let me direct you back to page 173.  You

18 started to read a sentence but you didn't complete

19 it.  Let's complete it.  It's on the right-hand

20 column under discussion, "although sudden death has

21 occurred in individuals placed in PMRP, the cause of

22 death and whether body position was a factor remain

23 controversial".

24          That's what the complete sentence says'

25 right?

Cyril Wecht - March 21, 2017

91

1     A.    Yes.

2     Q.    Do you agree with that, that that is a

3  controversial topic?

4     A.    Do I agree that it's controversial?  Yes, I

5  would have to agree that it's controversial, yes.

6     Q.    And on page 171 at the bottom there's a

7  reference to a copyright by the American Academy of

8  Forensic Scientists.  Do you see that?

9     A.    Yes.

10     Q.    Is that the organization that publishes the

11  Journal of Forensic Science?

12     A.    Yes.

13     Q.    Are you a member of that organization?

14     A.    Yes.

15     Q.    And have served on its editorial board?

16     A.    Yes.

17     Q.    Page 173 in the right-hand column, "prior

18  studies in healthy subjects have found no evidence of

19  significant hypoventilation when subjects were placed

20  in PMRP".

21          Did I read at that correctly?

22     A.    Yes.

23     Q.    Do you agree with that statement?

24     A.    Well, do I agree?  I don't believe that

25  they're telling a lie.  I believe that their study --

Cyril Wecht - March 21, 2017

1  do I believe that it is a comparable situation?  No.

2  But I'm not suggesting that they made this up.

3      Q.   You agree that there have been prior studies

4  showing what they reference?

5      A.   Well, yes.  In fact, you just showed me a

6  prior study some minutes ago.  Yes, I agree that

7  there have been such studies.

8      Q.   And then it continues on 173, "our results

9  in this study appear to support these findings".

10 Right?

11     A.   Yes.

12     Q.   So this is yet another study consistent with

13 prior studies that show no evidence of significant

14 hypoventilation when subjects are in prone maximum

15 restraint position; correct?

16     A.   Yes, that is correct.  What seems to be

17 absent here, and I haven't had a chance to read the

18 article, what seems to be absent here is the

19 alternative explanation for the death.

20          I don't see anything talking about

21 myocardial infarction, atherosclerosis of the

22 coronary arteries, cerebral vascular accident,

23 cerebral hemorrhage.  I don't see anything like that.

24 So they don't tell me how these people died.

25     Q.   Look on page 175, the concluding sentence,

**Alpha Reporting Corporation**

93

1   if you would, please.  Actually the next to the last

2   concluding sentence, left-hand column.

3       A.   Yes.

4       Q.   "Based on these observations in healthy

5   subjects, we conclude that PMRP in prone positioning

6   with moderate weight force on the back do not in and

7   of themselves restrict metabolic or ventilatory

8   demands to any clinically important degree.  As such,

9   factors other than isolated ventilatory failure

10  should be considered when evaluating deaths occurring

11  in the setting of restraint in the field."

12          Did I read that correctly?

13      A.   Yes, you read it correctly and --

14      Q.   Do you agree?

15      A.   No.  My answer is the same as before.  This

16  is interesting that these authors don't tell us what

17  the other things are that should be considered.  I

18  would love to know then what causes the death of a

19  26- or a 33-year-old person in good health with no,

20  no, pathological processes found at autopsy at all.

21          I would love to know then, tell me, what did

22  they die from?  Tell me, what did they die from?  Was

23  it a visitation from God?  What did they die from?

24          And I have not seen that in this article, I

25  have not seen it anywhere in all of these cases of

94

1    excited delirium or the negated reports of people who

2    have died while in a hogtied position.

3            They never tell me, gee, what caused the

4    death.  You die from something.  And you usually die

5    from cardiac arrhythmia when it happens like that of

6    a sudden nature.  That's the only thing that can

7    cause sudden death.  Forget about cyanide or

8    strychnine or some poison like that.

9            The only thing that causes death is

10   something that causes your heart to beat irregularly

11   and then you set into motion a whole chain of events

12   in which the brain is deprived of oxygen and then the

13   brain controlling the lungs and heart doesn't do its

14   job and the cycle worsens and that's it very fast, as

15   quickly as it takes me to explain it.

16           But that's how you die.  And there's no

17   other way that you die.  That's how you die.  And

18   tell me, tell me, gentlemen, tell me what did these

19   people die from.

20       Q.   May I have the article, please.  It will be

21   Exhibit No. 6.

22           (Deposition Exhibit No. 6 was marked for

23   identification.)

24   BY MR. PHILLIPS:

25       Q.   I'll show you an article now, doctor, from

95

1  the Journal of Forensic and Legal Medicine published

2  in 2013. The title of this article is The Effect of

3  the Prone Maximal Restraint Position With and Without

4  Weight Force on Cardiac Output and Other Hemodynamic

5  Measures; correct?

6      A.   Yes.

7      Q.   This is yet another publication in the

8  literature in the field of forensic pathology; right?

9      A.   Yes. Again, submitted by emergency room

10  physicians.

11      Q.   But peer-reviewed, all of these articles

12  that we've looked at are peer-reviewed, aren't they?

13      A.   Yes, I believe so.

14      Q.   And accepted for publication in forensic

15  pathology journals?

16      A.   Yes.

17      Q.   Look on page 993.

18      A.   Okay.

19      Q.   Right-hand column, first full paragraph,

20  "Previously, it had been postulated that the hogtie,

21  hobble or the PMR-O position placed individuals at

22  risk for asphyxiation from ventilatory compromise

23  from so-called positional asphyxia. However, studies

24  investigating the position have found that while PMR,

25  and even just the prone position itself, results in a

Cyril Wecht - March 21, 2017

96

1  small restrictive pattern on pulmonary function

2  testing, there are no studies indicating that the

3  position leads to hypoventilation or hypoxia, and

4  multiple studies indicating that there is no effect

5  upon oxygenation."

6          Did I read it correctly?

7      A.   Yes.

8      Q.   Do you agree with that statement?

9      A.   No.  I accept the statement from the authors

10  and referring to studies.  Do I believe in what the

11  statement sets forth?  No.

12      Q.   Yes, sir.  That's a fair distinction.  Let

13  me refine my question a bit.

14          You do not dispute that there have been

15  multiple studies indicating that there's no effect of

16  the prone maximal restraint position upon

17  oxygenation, you don't dispute that statement?

18      A.   Right, I don't know the number, but no, I

19  don't dispute it.  You've already shown several of

20  these today.

21      Q.   And those findings of those multiple studies

22  that we just referenced there in those two sentences,

23  that's contrary to your opinion in this case; right?

24      A.   Yes, that's right.

25      Q.   This would be contrary to the basis of the

97

1    opinion you hold in this case, wouldn't it?

2        A.    Well, yes, except that I must point out to

3    have some volunteers engage in an experimental

4    situation, to be conducted right here in this room

5    right now is an awful lot different from the

6    psychological emotional state that we have with

7    Mr. Goode and in other cases in which I, myself, have

8    done autopsies where it was clear that the person

9    died as a result of having been placed in that

10   position.

11       Q.    Look at page 994, please, in the right

12   column.  It's the paragraph just above -- it's on the

13   right.

14       A.    Wait a minute.

15       Q.    994.

16       A.    I have it.

17       Q.    It's the paragraph beginning "in summary".

18       A.    Yes, I see it.

19       Q.    It says, "In summary, our findings do not

20   support the contention that PMR with or without

21   weight force of up to 100 pounds results in a

22   decrement in CO, carbon dioxide, sufficient to cause

23   an inherent risk of cardiovascular collapse".

24             Is that what it says?

25       A.    Yes, that's what it says.  By the way, they

Cyril Wecht - March 21, 2017

98

1  have it CO, they probably mean CO -- anyway, just let
2  it be, I'm not going to correct them editorially, but
3  something's wrong.  Anyway, I understand what they're
4  saying.  Yeah, go ahead.
5       Q.   The last sentence of that paragraph --
6  actually, the next sentence says, "These findings are
7  consistent with field case reports in which similar
8  sudden deaths occurred in non-prone and non-PMR
9  positions".
10          Did I read that correctly?
11      A.   Wait a minute.  I kind of lost you.  One
12  second.  Yes, that's right.
13      Q.   Next sentence, "These findings are also
14  consistent with a recent large prospective
15  epidemiological study of police use of force in which
16  prone position was not found to be associated with
17  sudden death".
18          Did I read that correctly?
19      A.   Yes.
20      Q.   And you don't dispute that there was a large
21  prospective epidemiologic study making that finding,
22  do you?
23      A.   No, if they cite it, I'm not aware of it,
24  but they give you the reference.  I accept the
25  correctness.

Cyril Wecht - March 21, 2017

99

1    Q.    Then the last sentence of that particular

2    paragraph, "as such, it appears another cause of

3    cardiovascular collapse is more likely in these types

4    than decreased CO secondary to prone position with

5    weight force".

6          Did I read that correctly?

7    A.    Yes.

8    Q.    Conclusions at the bottom of the page,

9    "Cardiac output is not significantly affected by the

10   PMR compared with the prone or supine positions, with

11   without application of 50 to 100 pounds of weight

12   force to the back".

13         Did I read that correctly?

14   A.    That's correct.

15   Q.    You don't dispute that that's the conclusion

16   and finding of this research that's published in this

17   particular forensic journal, do you?

18   A.    That's right.  Once again I'm looking for

19   the explanation for the people who died.  They don't

20   tell that.

21         The other thing is, you can do this with me

22   at my age right now, the oldest person in the room,

23   lying down on the ground and put 100 pounds of

24   weight, let the young lady, our stenographer, she

25   doesn't weigh much more than that, sit on my back,

100

1  and I assure you I will not have a problem breathing.

2        It's a hell of a lot different than four or

3  five cops around there that have me in the hogtied

4  position.  I can just imagine the language and the

5  situation between the victim and the police.  A

6  little bit different.

7        That's the problem with all of these

8  studies.  Let's have a controlled study, Joe, you lie

9  on the ground, Susan, lie on the ground, and we put

10  some weight on you and so on.  Boy, that is

11  different, day and night.

12        MR. PHILLIPS:  We'll mark this article as

13  the next exhibit.

14        (Deposition Exhibit No. 7 was marked for

15  identification.)

16  BY MR. PHILLIPS:

17     Q.   We made reference earlier to Dr. Vincent

18  DiMaio and his book on forensic pathology.  Do you

19  recognize this as the cover page from that book?

20     A.   No.  See, I don't have this book because I

21  see a co-author Suzanna Dana.  No, I don't have this

22  book.  I think I have a textbook by Dr. DiMaio, but

23  this one I do not have.

24     Q.   On page 169, I'm sorry, I don't have an

25  extra copy of this, letter D says, "research by Chan,

101

1    et al. determined that the original experiments were

2    in error.  He found that while placing an individual

3    face down in the hogtied position following strenuous

4    exercise, e.g. a struggle, did produce restrictive

5    pulmonary functioning as measured by pulmonary

6    function test.  These results were not clinically

7    relevant.  There was no evidence of hypoxia".

8         Is that what letter D says.

9         A.   Yes, I'm sure you read it.  Yes, that's what

10   it says.

11        Q.   Do you agree with Dr. DiMaio's conclusion

12   there?

13        A.   Well, again, I'm accepting that he is

14   quoting the article by Chan, et al. correctly.  Do I

15   agree with the findings?  No, I do not.

16        Q.   Then letter E on page 169 says, "Subsequent

17   testing in which weights were applied to the thorax

18   also did not produce clinically relevant decreases in

19   pulmonary functioning.  Thus, there is no proof that

20   ordinary force placed on an individual by kneeling on

21   them or lying across their body compromises

22   respiration".

23        Did I read that correctly?

24        A.   Yes, I'm sure you did.  My comment is the

25   same.  Again, my other comments are also the same;

Cyril Wecht - March 21, 2017

102

1    what causes the death and how come all of the

2    recognizable police agencies in the country,

3    including the International Association of Police

4    Chiefs, have issued orders not to place somebody in a

5    hogtied position?

6         MR. PHILLIPS: We'll mark the DiMaio

7    excerpts as the next exhibit.

8         (Deposition Exhibit No. 8 was marked for

9    identification.)

10   BY MR. PHILLIPS:

11       Q.  Would you agree, doctor, that there is a

12   significant body of medical literature that disagrees

13   with the conclusions that you've reached in this

14   case?

15        MR. EDWARDS: Objection; asked and answered.

16        THE WITNESS: Yes.

17   BY MR. PHILLIPS:

18       Q.  When you undertook your analysis of this

19   case, did you make any survey of the scientific

20   literature to see what the research, testing and

21   publications had shown regarding whether positional

22   asphyxia causes the problems that you attribute to

23   it?

24       A.  I did not conduct a specific extensive

25   research because I was then, as I am today, familiar

103

1  with these positions, not every one of the papers

2  that you have presented to me, but I've been long

3  aware of such findings.  So I was well aware of that.

4  I did not have to conduct any research to know that

5  there are people who have other opinions.

6       Q.    What current positions or jobs do you hold?

7       A.    Well, I'm an independent person.  I am a

8  forensic pathologist.  I do autopsies for district

9  attorneys and coroners in four surrounding counties

10  here in southwestern Pennsylvania, but I'm an

11  independent contractor, I'm not on their payroll.  I

12  get paid for the work that I do.

13            I get a small, they give it nominally to the

14  adjunct professors at the Duquesne University School

15  of Law, to cover parking, I don't know, $2,200,

16  $2,500.  I think that's the only payment that I

17  receive from anybody.

18            All the other work involves payment that I

19  receive from coroners, district attorneys, private

20  families for whom I do autopsies, like I did

21  yesterday and will be doing again this afternoon, and

22  for my consultations with attorneys in all kinds of

23  cases, civil and criminal.  So that's where my income

24  comes from.

25       Q.    Do you currently hold any position with any

Cyril Wecht - March 21, 2017

1    medical school?

2        A.    Yes.    I'm an adjunct professor of pathology,

3    University of Pittsburgh School of Medicine, and I'm

4    -- no, sorry.    Clinical professor of pathology,

5    University of Pittsburgh School of Medicine; adjunct

6    professor of epidemiology, Graduate School of Public

7    Health, University of Pittsburgh.

8            Then I have several other faculty positions,

9    but those are the ones that relate to -- well, no,

10   there's another one at Carlow University, I'm a

11   distinguished professor of pathology.    I don't know

12   if you said medical schools.    That's not a medical

13   school, it's a university, Carlow, distinguished

14   professor of pathology at Carlow University.

15           I have three faculty appointments at

16   Duquesne University, but they're not in pathology;

17   they're law, health sciences and pharmacology

18   toxicology.

19       Q.    We walked through these various articles

20   earlier in the case.    My question to you at this

21   point is as follows:    Can you cite to me any

22   published peer-reviewed article that supports your

23   position and conclusion in this case?

24       A.    I have no articles that I could cite to you

25   at this time.    I believe there are, if Mr. Edwards

Cyril Wecht - March 21, 2017

1   were to find it necessary, I would look for those.

2   As we sit here today I cannot cite you an article,

3   but I know that there are such articles and such

4   statements.

5          In fact, that of course is the very

6   foundation that is the predicate upon which law

7   enforcement agencies all over the country, at the

8   federal, state and local levels, have adopted the

9   policies that they have.

10      Q.   You read with me through the articles that

11  we addressed that there was at one time some

12  consideration that the prone maximal restraint

13  position led to the problems that you described, but

14  subsequent testing and research disproved that

15  theory.  You read that with me, didn't you?

16      A.   I read what the authors say, and I disagree

17  with that.  Here again, if that were to be true, how

18  come there has not been any retraction, any recision,

19  indeed any modification whatsoever of all of the

20  promulgated guidelines to which I have referred

21  several times here today?  It evidently has not

22  reached those levels of law enforcement.

23      Q.   Is there a difference between a medical

24  examiner and a coroner?

25      A.   Well, the difference is in most places the

106

1    coroner -- by definition the coroner as traditionally

2    acknowledged doesn't have to be a forensic

3    pathologist.  Medical examiners by definition in this

4    country are to be forensic pathologists.  So those

5    are the differences.

6            Most coroner systems involve election, and I

7    think all medical examiner positions involve

8    appointments by some governmental agency.

9        Q.    Do you currently hold the position of

10   coroner anywhere?

11       A.    No.

12       Q.    When have you last held such a position?

13       A.    January '06.

14       Q.    What is the last coroner position that you

15   held?

16       A.    That's the last coroner position.  I am the

17   forensic pathologist for these four coroners, I have

18   been for a couple of other coroners, too.  But at the

19   present time for these four coroners, I am their sole

20   forensic pathologist.

21       Q.    But the last coroner position you held would

22   have been for Allegheny County?

23       A.    Yes.

24       Q.    How did it come to be that you stopped being

25   the coroner of Allegheny County?

Cyril Wecht - March 21, 2017

107

1  A.  They adopted a medical examiner system by
2  election in November of '05.  And then I was
3  appointed the medical examiner and resigned that
4  month, in January of '06.
5  Q.  Why did you resign?
6  A.  If you want to get into on the record,
7  you're going to pay for the next two hours.  You open
8  up that door, that's fine.  I love to talk about it.
9  I love to talk about it.  But you're not going to
10  open up the door and close it.  I'm going to make
11  this very clear that I know you cannot talk about
12  this.  If you want to talk about, we're going to do
13  it, sir.  I'm going to go into great detail.
14        I resigned because the federal government
15  indicted me for 84 felony counts.  And I'm going to
16  go through every single point, okay, in which finally
17  the 3rd Circuit Court of Appeals, three Republicans,
18  said that the judge who handled the case had to be
19  removed because he was biased.  And it was turned
20  over to another federal judge who ripped the U.S.
21  Attorney's office apart, and all the charges were
22  dropped completely in June of 2009.
23        Do you want to walk with me on the streets
24  of Pittsburgh and see what the people of Pittsburgh
25  think about me?  Do you want to go down that road,

Cyril Wecht - March 21, 2017

108

1    sir, fine, we're going to go down that road

2    politically.

3             I know and you know that you cannot bring

4    this up in a court of law.  I think it is despicable

5    for you to open up this door.  I thought you would

6    behave like a gentleman.  You have shown me that in

7    truth you are not.  You're like so many other defense

8    attorneys, anything goes, anything goes at all.

9             It doesn't go here.  You're in my territory.

10   You're in my room.  So you want to come up with this

11   stuff, fine, we're going to deal with it.  We'll go

12   through whatever you want.  We'll talk about the U.S.

13   attorney who is so disagreed that she left Pittsburgh

14   and it took her four years to get a job.  We're going

15   to talk about it all.  Do you want to talk about,

16   let's talk about.  Don't play games with me.

17        Q.   Did you ever practice as a lawyer?

18        A.   Once I was in a court co-counsel, once I

19   took a deposition, and once I took a case pro bono

20   from the federal court to plead somebody guilty.

21            I was a member of a law firm, Wecht Law

22   Firm, as a listed member, of counsel.  Practicing are

23   the three things that I have mentioned, and I think

24   I've done a few little things for people as friends,

25   maybe writing a will or so on.  But no, I haven't

Cyril Wecht - March 21, 2017

109

1   practiced as a lawyer.  I just have not had the time.
2   I have kept up my legal license and have it to this
3   day.
4       Q.    Have you ever represented either party to a
5   civil case as the lawyer yourself?
6       A.    No.
7       Q.    How about in a criminal case?
8       A.    No.
9       Q.    Your CV reflects that you are a member of
10  the Association of Trial Lawyers of America; is that
11  right?
12      A.    I have been.  It's been a long time, I think
13  it's 10, 15, 20 years since I was a member, but I had
14  been a member for many years.
15      Q.    Do you know that to be an organization
16  comprised of plaintiff's attorneys?
17      A.    Yes.
18      Q.    And you also were a member of the Medical
19  Malpractice Committee of the American Association of
20  Trial Lawyers of America?
21      A.    I don't remember.  If I was, I was.  That is
22  a committee, I don't recall ever being in the
23  committee meetings.  But if it's so listed, I was.
24      Q.    It is, it's listed on your CV.
25            Were you a member of the Pennsylvania Trial

**Alpha Reporting Corporation**

110

1    Lawyers Association?

2        A.    Yes.

3        Q.    Is that an organization comprised of

4    predominantly plaintiff's lawyers?

5        A.    Yes.  And I haven't been a member of that

6    either -- I guess I dropped out of all of those about

7    the same time.  It should be reflected in my CV.  I

8    set it forth in the CV that I was a member of those

9    organizations, but I know I'm safe in saying ten

10   years, I'm pretty certain it would be 15 to 20 years.

11       Q.    You're aware, aren't you, doctor, that there

12   are professional associations for defense attorneys,

13   civil defense attorneys?

14       A.    Yes.  And I was a member of the American

15   Association of Hospital Attorneys, too, which is a

16   defense organization, as I recall, for some years and

17   haven't been a member of that organization for a long

18   time.  But yes, I know that there are defense

19   organizations.

20       Q.    Have you been to any seminars put on by the

21   American Association of Trial Lawyers as it pertains

22   to expert witnesses and how to be an expert witness?

23       A.    Yes, I was.  Back then in those years with

24   ATLA, yes, I did attend and speak at several ATLA

25   meetings way back in the '70s and '80s, maybe into

Cyril Wecht - March 21, 2017

1   the '90s.  Yes, I did speak at several of those.

2       Q.   Have you ever attended any other seminars or

3   programs on how to be an expert witness in a medical

4   case?

5       A.   I haven't attended.  Well, I've spoken at

6   several meetings.  I don't know what the exact titles

7   were, and I've written about being an expert witness

8   and what to expect several times.  Again, they're all

9   listed in my CV.

10      Q.   Have you ever been convicted of any crime?

11      A.   No.

12      Q.   Have you ever pled guilty to any crime?

13      A.   No.

14      Q.   Have you ever had any adverse action taken

15  on your medical license?

16      A.   No.

17      Q.   Have you ever had a complaint filed against

18  you by any medical board, any licensing board?

19      A.   No, not to my knowledge.

20      Q.   Have you ever been fired from any position

21  of employment you've held?

22      A.   I already referred to the fact that I was

23  asked to resign in January of 2006 from that position

24  of medical examiner.

25      Q.   Is that the only occasion?

Cyril Wecht - March 21, 2017

112

1    A.    Yes.

2    Q.    You don't have privileges at any hospital to

3    treat patients, do you?

4    A.    No.  I'm not a treating physician.  And my

5    hospital -- the hospital where I was chairman of the

6    department of pathology closed 1999, 2000.  I have

7    not had a hospital affiliation since that time.

8    Q.    There are folks who do clinical pathology

9    work, reviewing specimens on living patients and

10   patients in hospitals?

11   A.    Yes.  And I did that through my five-year

12   residency and then from 1962 to the year 2000, for

13   those 38 years I did it at several hospitals.  And

14   I'm board certified in clinical pathology as well as

15   anatomic and forensic pathology.

16   Q.    As I understood your testimony, that part of

17   your practice ended in the year 2000 sometime?

18   A.    Yes.  The hospital closed, the parent

19   hospital closed so they closed the St. Francis

20   Central Hospital, that's correct, in the year 2000.

21   Q.    Have you ever had a civil suit filed against

22   you?

23   A.    I think there was one once, and then I was

24   dropped out.  It really involved my colleague, but I

25   was named initially, and I don't know whatever

113

1    happened, but I was dropped out of it.  I was never

2    deposed or anything.  But I do recall one time that I

3    was named at the beginning of a lawsuit.

4        Q.   Do you think that's the only time you've

5    been sued in a civil case?

6        A.   Yes, when I was the chairman of the

7    department of pathology, and the action was against

8    the hospital and my colleague and they named me.

9    That's the only case involving the medical field.

10       Q.   What was it alleged that you did wrong in

11   the civil case?

12       A.   That I was chairman and therefore respondeat

13   superior.  My colleague was charged with having made

14   a wrong diagnosis, and I was named also.

15       Q.   Even though you personally didn't evaluate

16   the specimen or make the report?

17       A.   That's correct.  My name was not on the

18   report.

19       Q.   Do you have a copy of your current fee

20   schedule there in front of you, doctor?

21       A.   Yes.  It's right there.

22       Q.   May I have this copy?

23       A.   Yes.  I brought extras.

24       Q.   This is the fee schedule governing this

25   particular case?

Cyril Wecht - March 21, 2017

114

1    A.    Yes.

2          MR. PHILLIPS:   We'll mark it as the next

3    exhibit.

4          (Deposition Exhibit No. 9 was marked for

5    identification.)

6    BY MR. PHILLIPS:

7    Q.    Do you have with you today the invoices

8    showing the charges you made for your work in this

9    particular case?

10   A.    Yes.

11   Q.    These invoices when taken together will show

12   all of the fees that you've been paid up through the

13   beginning time of the deposition today?

14   A.    Yes.

15   Q.    I see in here the check from my firm for the

16   $3,500 payment for today's deposition.  You got that;

17   right?

18   A.    Yes.

19         MR. PHILLIPS:   We'll mark the invoices as

20   collective Exhibit No. 10.

21         (Deposition Exhibit No. 10 was marked for

22   identification.)

23   BY MR. PHILLIPS:

24   Q.    Your fee schedule indicates that there can

25   be supplemental fees in given cases?

Cyril Wecht - March 21, 2017

115

1      A.    Yes.

2      Q.    Did that apply to this particular case?

3      A.    No.   The only payment was the original

4   submission fee and then the payment for the meeting

5   and the work with Mr. Edwards relative to the

6   deposition.

7      Q.    Is it your practice to require prepayment of

8   fees?

9      A.    Yes.

10     Q.    For all stages of the case?

11     A.    Well, yes, although not quite.   I require

12  submission or many times -- most of the time, always

13  I guess -- well, I shouldn't say always, almost

14  always with defense attorneys.   I know that they

15  don't have the payment, it's coming from their

16  insurance company clients, and so I don't get the

17  payment upon submission there.   But there's the

18  acknowledgement that they will pay.   And then I

19  require payment for depositions in advance.

20          Where I do not require payment in advance is

21  in those cases that you referred to where I sometimes

22  get supplemental materials of a substantial nature,

23  lengthy depositions, investigative reports and so on,

24  I do not charge an advance because I'm into the case

25  and I get these things and I let it go.   So anyway,

116

1     that's what happens, but otherwise I do request

2     payment in advance with everybody else pretty much.

3          Once in a while a governmental agency, yeah,

4     governmental agencies, I don't get paid in advance

5     when I testified, district attorneys and all my

6     homicide cases, I don't get paid in advance.  Those

7     are all bills that are submitted afterwards.

8          Q.   Do you require attorneys who retain you to

9     sign contracts?

10         A.   No.  I do, when an attorney tells me that

11    they can't pay, their client is going to pay or

12    something, I do ask them to send me a letter to that

13    effect.  And where attorneys are appointed by the

14    court or public defenders, I do ask them to send me a

15    copy of the court order or the court's approval for

16    payment of the fee.  I do request that.

17         Q.   I didn't see in your materials any of the

18    defense expert disclosures in this case.  Have you

19    been provided with those?

20         A.   No, I have not been.

21         Q.   Do you know Dr. Greg Davis?

22         A.   I know that he's a forensic pathologist.  I

23    don't know him personally.

24         Q.   Do you know that he is a forensic

25    pathologist at the University of Kentucky?

Cyril Wecht - March 21, 2017

1    A.    Yes, I think that's where I thought he is,
2  yes.
3    Q.    Is he a well respected forensic pathologist?
4    A.    As far as I know he is a respected board
5  certified forensic pathologist.  I have not had any
6  dealings with him, any cases, but I accept him as a
7  board certified respected forensic pathologist.
8    Q.    Do you know Dr. Gary Vilke, V-i-l-k-e?
9    A.    No, I do not know him at all.  I know
10  nothing about him, where he is or anything.
11    Q.    Did you notice he was one of the authors on
12  some of the articles?
13    A.    Yes, I remember that name.
14    Q.    You didn't know he was one of the experts
15  for the defense in this case?
16    A.    No.  I don't know who the experts for the
17  defense are.
18    Q.    Give me your best estimate of how many times
19  you have been consulted as an expert witness in a
20  legal case, whether it be criminal or civil.
21    A.    I would say, starting off in the early
22  years, I would say I get about probably on average
23  maybe three to four cases a month civil and criminal,
24  some workers' comp.  That's pretty much been the
25  average.  Yeah, I would say around there.

Cyril Wecht - March 21, 2017

118

1      I would tend to say about 36 to 50 in the
2  course of a year combined.  That does not include the
3  cases that I do autopsies in where the district
4  attorney subsequently calls me to testify.  There are
5  maybe a dozen of those a year.  So that's the answer.
6      Q.    Times how many years of doing this?
7      A.    Well, I started in the fall of 1962 when I
8  came back to Pittsburgh after finishing all my
9  training.  But gee, I don't know, a case or two and
10  then a couple of cases a year, then a few cases more.
11  So probably it wasn't until maybe half a dozen years
12  later that I could talk about the kind of average
13  number that I gave you.  But for the first several
14  years I had nowhere near that number.
15      Q.    So if you were estimating for us the total
16  number of times you've been consulted as an expert?
17      A.    Consulted?
18      Q.    Yes, in a case of litigation, what would
19  that number be?
20      A.    Consulted?  Well, then if we go, let me say
21  '67 to '17, because that's easy numbers.  33 and 17
22  is 50.  50 times 35 is 1,750.  Then probably it comes
23  out to be a couple thousand cases, throw in the
24  earlier years.  So probably then rough numbers maybe
25  2,000 to 3,000 since 1962.

119

1    Q.   How many times would you estimate you've

2   given depositions in cases where you've been retained

3   as an expert?

4    A.   Only about an average maybe of three or four

5   a year.  So that would be, again, probably about 250

6   to 300 depositions.

7    Q.   How many times have you testified at trial

8   approximately?

9    A.   Well, I testify roughly about a dozen times

10   a year for the district attorneys on the homicides

11   that I do.  Aside from that, testimony, maybe on

12   average just now, two or three times a year.  The

13   overwhelming majority of cases insofar as my

14   involvement is concerned do not wind up with me

15   testifying.

16    Q.   Give me your best estimate of the number of

17   times you've testified at trial total?

18    A.   At trial?

19    Q.   Total, for all the years.

20    A.   For all the years, again, excluding the

21   homicide cases for district attorneys that are

22   follow-ups to autopsies that I've done, how many

23   times have I testified?  There again, I don't know,

24   250 to 350, something like that.  I don't know.

25    Q.   In the civil cases in which you've been

**Cyril Wecht - March 21, 2017**

1    consulted as an expert, can you help us understand

2    what portion of those have been at the request of the

3    plaintiff and what portion has been at the request of

4    the defense?

5         A.    What percentage of what, consultations?

6         Q.    Yes, sir, in civil cases.

7         A.    Well, that has varied.  I would say for the

8    first -- I would say up into the -- roughly, this is

9    nothing fixed, but roughly probably through the 1980s

10   it was about 85 percent plaintiff.

11            The 1990s to the present time it's been

12   60-65 plaintiff and about 35-40 defense in civil

13   cases consultant.

14        Q.    Give me the same approximation with regard

15   to the depositions you've given in civil cases, what

16   percent for plaintiff, what percent for defense?

17        A.    They would play out the same way.  As I've

18   said, there aren't that many depositions.  So in the

19   years up through into the 1990s, nine out of ten

20   probably would have been for plaintiff.

21            1990s to the present time, probably when I

22   have a deposition, it's probably about seven out of

23   ten were for plaintiff and about three out of ten for

24   defense.  Something like that.

25        Q.    How about trial, same question?

**Alpha Reporting Corporation**

Cyril Wecht - March 21, 2017

121

1    A.    The same.   I thought I gave you that.   Oh,
2  you want trial testimony.   Again, gee, I just don't
3  testify that much.   Very little in civil cases.   Very
4  little.   It's hard to give a percentage.   So few
5  cases.
6          I'm trying to remember the last time I
7  testified in court in a civil case, and I can't
8  remember when that was.   Again, it would be into the
9  1990s when I did testify in court, probably about
10 eight times out of ten would have been for the
11 plaintiff and a couple times for the defense, as best
12 as I can recollect.
13         I never thought about it.   So few cases in
14 which I testify civilly that it's hard for me to come
15 up with a percentage.
16    Q.    Before this case, have you ever been
17 involved in a case at the request of Mr. Tim Edwards
18 or his law firm before?
19    A.    I don't recall Mr. Edwards at all.   I do
20 recall the name Ballin.   I think I had a case with
21 Mr. Ballin, but I'm just not sure, but I think did.
22 I don't remember what it was or whenever.   The name
23 is familiar.
24    Q.    Do you know how many cases you had for
25 Mr. Ballin?

**Alpha Reporting Corporation**

Cyril Wecht - March 21, 2017

122

1     A.   I think only one, as far as I believe, only

2  one.  I don't know what it was.

3     Q.   Have you ever been excluded as an expert

4  witness by any court?

5     A.   No, not to my knowledge.

6     Q.   Have you ever been prohibited from giving

7  any particular opinion in a given case, even though

8  you may have been permitted to testify about other

9  things?  You look confused.  Do you need me to

10  rephrase?

11     A.   Yes.

12     Q.   You understand this as a lawyer, a judge

13  could rule that a witness cannot testify at all, and

14  you've told me that has not happened; correct?

15     A.   Yes.

16     Q.   And then a judge could rule that a witness

17  may testify but may not express some of the opinions

18  he wishes to give.  I'm asking you now if the latter

19  has happened to you?

20     A.   Oh, I don't know.  There's always objections

21  by attorneys.  I don't remember a judge's response.

22  I'm sure sometimes objections are sustained, of

23  course.  Not anything as a matter of judicial law

24  unprecipitated by a lawyer's objection as a judicial

25  ruling of a preparatory nature.  I'm not aware

**Alpha Reporting Corporation**

**Cyril Wecht - March 21, 2017**

123

1    anything like that.  No.

2            MR. PHILLIPS:  I want to mark the deposition

3    notice as the next exhibit.

4            (Deposition Exhibit No. 11 was marked for

5    identification.)

6            MR. GASS:  Can I have a question read back.

7            (Requested portion of testimony was read

8    back by reporter.)

9    BY MR. PHILLIPS:

10       Q.   Doctor, in the deposition notice we asked

11   you to bring certain things with you today.  Have you

12   made an attempt to comply with bringing all of your

13   materials related to this case with you?

14       A.   Yes.

15       Q.   Are there any materials you have related to

16   this case that are not in the room with us today?

17       A.   No.

18       Q.   Let's identify clearly for the record the

19   materials that you have reviewed in this case.  I

20   think we may have covered some of them in the course

21   of our conversation.  We've got the summaries

22   provided to you by Mr. Edwards; right?

23       A.   Yes.

24       Q.   We've got the medical records that came at

25   some point from Baptist Hospital?

**Alpha Reporting Corporation**

Cyril Wecht - March 21, 2017

124

1    A.    Yes.

2    Q.    And what other documents have you reviewed?

3    A.    Other medical records of Mr. Goode from his

4  primary care physician having nothing to do with this

5  case, I received those records, too.

6    Q.    Did those impact your opinions at all?

7    A.    No.    They just confirmed that he had asthma,

8  but otherwise had nothing to do really with my

9  opinion, other than as it may relate to the asthmatic

10 condition and as I'm aware of it.    But as I've

11 already said, I only know of this from the records

12 and from Mr. Edwards, not from my autopsy findings.

13    Q.    Are those the records from the primary care

14 physician?

15    A.    Yes.

16         MR. PHILLIPS:    Let's mark those as the next

17 exhibit.

18         (Deposition Exhibit No. 12 was marked for

19 identification.)

20 BY MR. PHILLIPS:

21    Q.    Ultimately, did you review the autopsy

22 report from Mississippi?

23    A.    Yes.

24    Q.    And the tox reports from Mississippi?

25    A.    Yes.

**Cyril Wecht - March 21, 2017**

125

1  Q. And the tox reports that you requested be

2  done?

3  A. Yes.

4  Q. Is there anything else you reviewed other

5  than what we just listed here together?

6  A. Well, there's, yeah, I had two expert

7  reports; one from, that's been referred to today,

8  from Dr. David Nichols.

9  Q. And the date on that, please?

10  A. January 11, 2016.

11  Q. Yes, sir.

12  A. And then I have a report from a cardiology

13  expert retained by Mr. Edwards, from Dr. Parim,

14  P-a-r-i-m, Parikh, P-a-r-i-k-h, dated January 31,

15  2017, a report to Mr. Edwards from Dr. Parikh.

16  Q. Does that have any bearings on your

17  opinions?

18  A. Well, yes, it does. It's consistent with

19  and corroborative of from a clinician, from a

20  cardiologist. So I've arrived at my opinions

21  independently, however, so you ask did it have any

22  effect, just the effect that, speak for myself, that

23  I would always have when someone that I do not know

24  and especially in a different area of medicine sets

25  forth an opinion that is very consistent with mine;

Cyril Wecht - March 21, 2017

126

1    so in that sense it has.  But my opinion had already

2    been submitted, as you can tell, because I did not

3    get Dr. Parikh's report until February of this year.

4    It was not submitted to Mr. Edwards until January 31

5    of this year.

6         Q.    Is there anything else you reviewed?

7         A.    Yeah.   There's a statement here from an

8    attorney representing the hospital that I had

9    received.   There's something else, a letter that was

10   sent to Attorney Edwards by I think one of the

11   gentlemen here today, Attorney David Upchurch, dated

12   August 31, 2015.  I was sent a copy of that letter.

13   I also --

14        Q.    Hang on just a minute.  Did this letter,

15   August of 2015 from Mr. Upchurch, have any bearing on

16   any of your opinions?

17        A.    Well, only in the sense that it corroborated

18   what I already knew, namely that no heart monitoring

19   had taken place prior to the code that was called.

20   That was confirmed by Attorney Upchurch.  It just

21   confirmed what I already knew.

22             MR. PHILLIPS:  We'll mark that as the next

23   exhibit number.

24             (Deposition Exhibit No. 13 was marked for

25   identification.)

127

1        THE WITNESS:  Then I received a statement

2   taken by -- it is an interview conducted by Keith

3   Hainey of somebody identified as HR manager.  That

4   was sent to me on July 23, 2015.  Mr. Edwards sent

5   that to me.  The date of the interview was July 18,

6   2015.  This interview is of someone who was at the

7   hospital when this occurred.  That was sent to me.

8   BY MR. PHILLIPS:

9        Q.   Did that have any bearing on your opinions

10   in the case?

11        A.   Not directly.  Again, it confirmed the fact

12   that -- it just confirmed the observations set forth

13   that I was already aware of in terms of what was

14   taking place and how the police were conducting

15   themselves and so on.  So it blends in consistent

16   with, supportive of my overall understanding of this

17   case.

18        MR. PHILLIPS:  We'll mark it as the next

19   exhibit.

20        (Deposition Exhibit No. 14 was marked for

21   identification.)

22   BY MR. PHILLIPS:

23        Q.   What else have you reviewed in the case that

24   we've not previously identified, doctor?

25        A.   The photo, the disk that came with the

Cyril Wecht - March 21, 2017

1   autopsy from Mississippi.  I just received a few days

2   ago photos of the autopsy from the medical examiner's

3   office sent to me by Mr. Edwards' office.

4       Q.   Have you reviewed the photos?

5       A.   Yes, I have looked at them.

6       Q.   Did those photos have any bearing on any

7   opinion you hold in the case?

8       A.   No, they're of no relevance one way or the

9   other.

10      Q.   Have we covered everything that you've

11  reviewed in this case?

12      A.   Yes, I believe so.

13      Q.   What correspondence do you have with

14  Mr. Edwards --

15      A.   You've seen it, here it is.

16      Q.   Let me finish the question, if I could.

17           What correspondence do you have from

18  Mr. Edwards or his firm that we've not already marked

19  as an exhibit?

20      A.   Nothing.  It's what was here.

21      Q.   It looks like you have something in your

22  hand?

23      A.   Yeah, but you already had this folder.

24      Q.   We haven't marked it.

25           MR. PHILLIPS:  The correspondence will be

Cyril Wecht - March 21, 2017

129

1    collective Exhibit No. 15.

2              (Deposition Exhibit No. 15 was marked for

3    identification.)

4    BY MR. PHILLIPS:

5        Q.    What is in this file?

6        A.    This is the one from my autopsy report.

7    That's the label that we put on here in my office

8    with the autopsy number and a couple of letters, and

9    the autopsy report is around somewhere.

10             MR. PHILLIPS:  We'll mark these materials as

11   the next exhibit.

12             (Deposition Exhibit No. 16 was marked for

13   identification.)

14   BY MR. PHILLIPS:

15       Q.    Have we covered it all or are there things

16   remaining?

17       A.    No, I think you have it all.

18       Q.    That folder you have in front of you says

19   timeline?

20       A.    These are the timelines, yes.

21       Q.    Is that separate than what we've already

22   marked?

23       A.    Yes, that's different.  It's not the

24   timeline that was marked before.  These are just

25   other timelines.  They're all consistent.

130

1      MR. PHILLIPS:  We'll mark these as the next
2  exhibit.
3      (Deposition Exhibit No. 17 was marked for
4  identification.)
5  BY MR. PHILLIPS:
6    Q.    Did you bring any records that would show
7  your income just from being an expert witness in the
8  last few years?
9    A.    No.
10   Q.    Are you able to estimate that for us?
11   A.    My income from what?
12   Q.    Serving as an expert witness, whether it be
13 consultations, depositions, trials, reviews.
14   A.    No.  All monies that I make go into just one
15 account, Cyril H. Wecht Pathology and Associates.  I
16 have no breakdown.  We report all of it to our
17 accountant and it all goes in together.
18   Q.    What would you estimate would be the
19 percentage of your annual income that you derive from
20 your expert witness work?
21   A.    Well, most of my income by far is from
22 autopsies and then what flows from those autopsies.
23 So, gee, I don't know, it's probably maybe roughly
24 two to one, something like that.  I can't be sure
25 exactly a percentage.

Cyril Wecht - March 21, 2017

1    Q.   I'm sorry, I didn't understand the

2  percentage.

3    A.   Roughly two to one in terms of the

4  percentages of my income from autopsies and what

5  flows from that with the district attorneys and

6  testimony and so on on the one hand, and then the

7  money from consultations that I make.

8    Q.   So express for me as a percentage your

9  estimate of your percentage of your income from your

10  expert witness related work.

11    A.   I just gave you the estimate.

12    Q.   You gave me a ratio.  How would you express

13  it as a percentage?

14    A.   It would be about roughly -- well, then a

15  percentage that comes out to be roughly 65/35,

16  something like that.

17    Q.   With 65 being which portion?

18    A.   Of my autopsies and what flows from the

19  autopsies.

20    Q.   Do you advertise your services as an expert

21  witness?

22    A.   No.

23    Q.   Other than what we've already marked as an

24  exhibit, were you provided any facts or data by

25  Plaintiff's counsel that you considered in forming

**Alpha Reporting Corporation**

132

1    your opinions?

2        A.    No.   I've talked with Mr. Edwards, he's told

3    me a lot of things, but nothing that is startlingly

4    or significantly new and nothing different, no.   No,

5    nothing.

6        Q.    We talked earlier about your September 28,

7    2015 letter.   Remember me showing you a copy of that?

8        A.    Yes.

9            MR. PHILLIPS:   I want to mark that as the

10   next exhibit.

11           (Deposition Exhibit No. 18 was marked for

12   identification.)

13   BY MR. PHILLIPS:

14       Q.    I think you told me earlier that you did not

15   have a copy of the September 28, 2015 letter in your

16   file; correct?

17       A.    That's right.

18       Q.    Do you know why you didn't retain a copy of

19   that letter?

20       A.    Because it was sent to Mr. Edwards marked I

21   think work product for him to look over and tell me

22   if there was anything that I had not addressed.   And

23   apparently, and I don't know this as a matter of

24   specific recollection, but I can only infer

25   reasonably that Mr. Edwards probably did not get back

Cyril Wecht - March 21, 2017

133

1  to me until around the time that the final report was

2  generated.  But it is exactly the same, with no

3  changes.

4      Q.   Do you have an electronic file with any

5  information about this case?

6      A.   No.

7      Q.   So everything that you have is on paper and

8  there's no electronic file at all?

9      A.   I have no electronic files.

10         MR. PHILLIPS:  Dr. Wecht, these other

11  counsel have been waiting patiently to question you.

12  I'm going to yield to some of the other gentlemen in

13  the room to ask questions.  I may or may not have

14  additional questions when they finish, but I

15  appreciate your time.

16         MR. UPCHURCH:  Let's take a brief recess.

17         (Whereupon, a short recess was taken off the

18  record.)

19                    -  -  -

20         E X A M I N A T I O N

21  BY MR. UPCHURCH:

22      Q.   Dr. Wecht, my name is David Upchurch.  We

23  met immediately prior to your deposition some hours

24  ago.  I'll endeavor in my questioning not to be

25  repetitive of Mr. Phillips.  I would ask of you if

Cyril Wecht - March 21, 2017

134

1    you don't understand a question that I ask, if you
2    would please let me know that, I'll be more than
3    happy to rephrase the question.
4            In looking at the documents that have been
5    marked as Exhibit No. 4, there were timelines or
6    summaries that were provided to you, and I have a few
7    questions about those.
8            I'm looking at a summary that was sent to
9    you by email dated Tuesday, August 11, 2015 by
10   Ms. Asbridge in Mr. Edwards' office.  In that email
11   there is a delineation of some events that gave rise
12   to this lawsuit.
13           There is a note that at 2:30, and I'm
14   quoting now, "Troy smoked at home (a joint); from a
15   batch he had previously smoked from; no issues; Kelli
16   has what's left; Troy a daily smoker; purchases from
17   the same person".
18           Did you make any request to receive a batch
19   of the marijuana that Troy smoked for testing
20   purposes?
21       A.   Not that I recall.  If there had been any
22   discussion it would have been to have it submitted to
23   NMS to have them do the testing.  But no, not that I
24   recall.
25       Q.   Do you have any knowledge that that

Alpha Reporting Corporation

135

1    marijuana that was referred to in the statement I

2    just read you has been tested by AMS or any other

3    laboratory?

4            MR. EDWARDS:   NMS.

5    BY MR. PHILLIPS:

6        Q.   Sorry.  NMS.

7        A.   There's a report from NMS on marijuana with

8    a very high level.  I don't know if that relates to

9    that batch or not.

10       Q.   Do you have any information as to the name

11   of the person from whom Troy purchased his marijuana?

12       A.   No.

13       Q.   Same question or similar question, several

14   times, several bullets down on this same email, it

15   says "Troy and others gathered around in a circle

16   (doing liquid LSD)".

17           Do you have any information, Dr. Wecht, as

18   to how Troy consumed the LSD that's at issue in this

19   case?

20       A.   My recollection is they put something on the

21   back of his hand and licked it or something.  That's

22   my understanding.

23       Q.   Continuing on that bullet point says, "(Mike

24   Friedman had same vial over a year; Troy used LSD on

25   paper previously while in Chicago from same vial) no

Cyril Wecht - March 21, 2017

136

1    issues".

2         Did you ever make a request of Mr. Edwards

3    to receive a copy of the vial of LSD referenced in

4    this notation that I've just read to you so that it

5    could be tested?

6         A.   No.

7         Q.   Do you have any knowledge that any such vial

8    of LSD has been tested by any laboratory?

9         A.   No, I have no knowledge of anything like

10   that.

11        Q.   In this same email, Dr. Wecht, there is a

12   note that talks about the officers' interactions with

13   Mr. Goode.  And it says, and it's referencing the

14   attack is referenced in here of one of the police

15   dogs, and the bullet point says this:  "At this point

16   Kelli was trying to film incident with cell phone

17   saying, quote, I am filming you, close quote."

18        Did you receive any film from Mr. Edwards

19   depicting the incident at the scene with police and

20   Mr. Goode?

21        A.   No.

22        Q.   Do I understand correctly from your

23   testimony this morning that because you do not accept

24   excited delirium as a scientific diagnosis, you did

25   not consider that diagnosis as a potential cause of

Cyril Wecht - March 21, 2017

137

1    Mr. Goode's death in this case?

2        A.    That would be correct.  I mean, I

3    anticipated it and told Mr. Edwards that, but did I

4    consider it?  No.  Your question contains the answer.

5        Q.    Although not stated in this fashion, your

6    opinion is that Mr. Goode's death was secondary to

7    positional asphyxia?

8        A.    Secondary?  It was caused by positional

9    asphyxiation, yes.

10       Q.    Define for me positional asphyxiation.

11       A.    Well, in this case it's the full classical

12   hogtied position with the individual, Mr. Goode, in a

13   prone position, that's face, abdomen down, wrists

14   tied behind him together and legs tied together at

15   the ankles and brought up in flexed position at the

16   knees.  That's the classical hogtied position.

17             That is the physical scenario in which a

18   person then in my opinion can die as a result of the

19   respiratory compromise and then the subsequent

20   effects on cardiac activity.  That's positional

21   asphyxiation.

22             So positional refers to the anatomic lie of

23   the individual, the position of that person.  And

24   asphyxiation, deprivation of oxygen or diminution of

25   oxygen.  And that to me is the way in which this

138

1    works.

2         And then the heart gets insulted and you

3    have the cycle of diminished oxygenation to the brain

4    and then diminished compromise control by the brain

5    of cardiac and respiratory function, which leads to

6    further diminution of oxygen.  And that cycle just

7    works very, very rapidly.  And then ultimately you

8    have cardiorespiratory arrest and death.

9         Q.   Let me read this definition to you of

10   positional asphyxia and see if you agree with it.

11   "Cessation of adequate breathing by means of

12   restraint and can occur by either positioning to

13   compromise the airway, compression to inhibit the

14   respiratory function or a combination of both such

15   mechanisms."

16        A.   Well, I agree with it, but I don't think

17   it's complete.  Read it one more time, please.

18        Q.   Yes, sir.  "Cessation of adequate breathing

19   by means of restraint and can occur by either

20   positioning to compromise the airway or compression

21   to inhibit the respiratory function or a combination

22   of both such mechanisms."

23        A.   Well, first of all, it's not cessation.

24   Ultimately of course when you go into

25   cardiorespiratory arrest there is cessation, but the

Cyril Wecht - March 21, 2017

139

1    position does not lead to cessation in the way that

2    if something collapses upon you or somebody stuffs

3    something in your mouth or covers up your nose and

4    throat, so-called burking.

5            So I would use diminution, compromise rather

6    than cessation.  There was nothing obstructing the

7    airway here at all.  And then compression, I wouldn't

8    use that word, it's not compression necessarily.  You

9    can have positional asphyxiation without anybody

10   pressing down on your chest, which does occur in many

11   of these cases with one or more policemen pressing

12   down knees, feet, baton or what have you.

13           So no, I would not -- I don't think it's a

14   correctly, fully, properly stated definition from my

15   perspective of positional asphyxiation.  No, I don't

16   agree with it.  I don't accept that.  It's part of

17   it.  You can get that happening of course in either

18   of those two ways, but that doesn't depict the entire

19   set of etiological factors.

20       Q.   Would it surprise you to know, Dr. Wecht,

21   that I took that definition out of a text that you

22   published?

23       A.   Yes, it would.  It has to be revised then.

24   What publication is it, if I can ask?

25       Q.    Your text Investigating and Prevention of

1  Officer-Involved Deaths?

2      A.   Did I write that?

3      Q.   Yes, sir.

4      A.   When was that?  Where was it published?

5      Q.   Don't know.

6      A.   I don't mind criticizing myself.  Could I

7  just see that again, please.

8      Q.   Yes, sir.  There's your book, Investigation

9  and Prevention of Officer-Involved Death.  You're one

10 of the authors.

11     A.   Yes, I wrote that with Dr. Lee and two

12 retired police chiefs.

13     Q.   How do you understand in this case that

14 Mr. Goode was hogtied, to use your term; do you

15 understand that his hands and the shackles on his

16 feet were actually bound together where his hands

17 were touching his feet?

18     A.   No, I don't think that the feet were brought

19 up to that point.  My understanding is that the

20 wrists were tied behind him, his ankles were tied

21 behind him and that there was a long shaft that went

22 up along his back that coursed I guess under or over

23 those two sets of handcuffs.

24          It's not my understanding that the four

25 portions of his upper and lower appendages were

141

1   contiguous.

2       Q.   Is a person who is obese or a person who has

3   a large abdomen at an increased risk for experiencing

4   positional asphyxia?

5       A.   Yes.

6       Q.   Is that because the size of the stomach is

7   then -- or the stomach contents are pushed upwards

8   and then there's pressure placed upon the diaphragm?

9       A.   More so the liver than the gastric contents,

10   because you don't know whether somebody has eaten or

11   not, obviously they have a big full stomach.

12        No, sir, it's more so the liver which

13   occupies and goes a little bit past the midline from

14   the right side and comes up into the diaphragm.

15       Q.   Would we agree, doctor, that Mr. Goode was

16   certainly not obese by any definition?

17       A.   Yes.  The weights that I see, no, he was not

18   obese.

19       Q.   Would you also agree that there are

20   preexisting physical conditions that can increase

21   one's risk for positional asphyxia, such as heart

22   disease?

23       A.   Oh, sure.  If you have heart disease you

24   would be that much more susceptible, depending upon

25   how severe it is.  If you have valvular disease or if

142

1　you have atherosclerosis of the coronary arteries,

2　sure, that could further compromise the picture

3　because you already have some compromise of the

4　normal cardiovascular flow.

5　　　Q.　Would bronchitis fall into that list of

6　preexisting diseases that might increase one's risk

7　for positional asphyxia?

8　　　A.　If you had a chronic bronchial condition

9　like asthma, bronchiectasis, or significant chronic

10　bronchitis, it could.

11　　　Q.　What about emphysema?

12　　　A.　Emphysema could, too, yes.

13　　　Q.　What about an exacerbation of an asthmatic

14　condition?

15　　　A.　If somebody has asthma, then that person

16　would be more susceptible to any kind of diminution

17　or deprivation of oxygen because the disease is in

18　place and there is that tendency, and we don't know

19　the etiology of many asthmatic conditions, but

20　there's something there that causes the bronchioles

21　to constrict, producing that kind of obstruction and

22　diminished oxygen flow.

23　　　　So yes, if you have a significant or you

24　have an asthmatic condition, it could make you more

25　susceptible.

Cyril Wecht - March 21, 2017

143

1    Q.    Are there any other physical conditions that
2    you would add to that list of conditions that would
3    increase one's risk for experiencing positional
4    asphyxia?
5    A.    No.  Hepatic, adrenal, cerebral.  No,
6    basically, you're dealing with the heart and lungs
7    and the components thereof.  So in the case of the
8    heart, obviously the coronary arteries and the
9    valves.  And in the case of the lungs, the trachea,
10   somebody could have, you know, we already talked
11   about bronchitis, if he had some problem involving
12   the pharyngeal area, the epiglottic area, the higher
13   area before it goes into the lung tissue.
14         But as far as other body organ systems, no,
15   not getting into psychological things, how it would
16   be handled.
17   Q.    My question was dealt to medical conditions.
18   A.    Limited to the respiratory and cardiac and
19   if he had anything in the oral pharyngeal system.
20   Then of course if somebody had dentures, that could
21   produce a problem, but we don't have that in this
22   case.
23   Q.    You did not find any evidence of underlying
24   heart disease for Mr. Goode, did you?
25   A.    No.

Cyril Wecht - March 21, 2017

144

1    Q.    You did not find any underlying disease of
2  bronchitis or emphysema?
3    A.    No.
4    Q.    And found neither grossly nor
5  microscopically any asthmatic condition that you
6  could report, did you?
7    A.    That's right.
8    Q.    Am I correct in understanding your prior
9  testimony to questions asked by Mr. Phillips that you
10  did not find on your autopsy any evidence of ischemic
11  encephalopathy?
12    A.    No.  The brain had been sectioned and
13  nothing was grossly evident or microscopically.
14    Q.    Am I likewise correct in understanding that
15  you did not find any gross or microscopic evidence of
16  multi-organ system failure?
17    A.    That's correct.
18    Q.    You discussed with Mr. Phillips some
19  symptoms that you would attribute to the theory of
20  excited delirium, a medical condition that you don't
21  recognize, and we certainly understand that, but see
22  if you'll agree with me about a list of symptoms that
23  are associated with that diagnosis.  One would be an
24  individual who is impervious to pain?
25    A.    No, I can't agree with that.  I'm aware that

Cyril Wecht - March 21, 2017

1    people who believe in excited delirium and these

2    police-related deaths, they confer upon the victim

3    literally Superman abilities, they can lift cars and

4    harrow them through space and they don't feel pain

5    and so on.  No, I do not.  There is nothing that

6    makes the person, that happens to the nervous system,

7    the sensory nerves, impervious to pain.  No, I do not

8    agree with that.

9        Q.    All right, sir.  What about the symptom of

10   having a significant increased or great strength as

11   you just mentioned that you believe that is a symptom

12   of excited deliria?

13       A.    I'm aware of that.  The answer is this:

14   When you're faced with an emergency, can you

15   sometimes do things that you might not ordinarily

16   consider and so on?  Yes.  But not the kind of

17   increased physical strength that is attributed to

18   these people by the proponents of excited delirium.

19   No, I do not agree with that.  You don't all of a

20   sudden become Clark Kent in disguise.

21       Q.    What about hyperthermia?

22       A.    Again, I'm aware of that finding.  I do

23   agree that in those cases which they classify,

24   categorize as excited delirium that they list

25   hyperthermia.  And I've discussed that in this case

146

1    it was not present.

2         Q.   What about sweating?

3              MR. EDWARDS:   Excuse me, did you say hypo or

4    hyperthermia?

5    BY MR. PHILLIPS:

6         Q.   Hyper.

7         A.   Hyper.

8         Q.   What about sweating?

9         A.   That would depend to a large degree on the

10   environment.  Certainly if you're struggling and so

11   on, it goes on for a period of time, you might begin

12   to sweat.  It depends how long a time, how much the

13   struggle is, what kind of clothing, what is the

14   temperature.  So that would vary.

15        Q.   What about do you believe that bizarre and

16   violent behaviors is a symptom associated with

17   excited deliria?

18        A.   Again, I attribute this to the combination

19   of the inability to breathe normally, the entire

20   scenario, your body being bound in that fashion and

21   the police there and yelling at you and so on, I can

22   just imagine the choice epithets that were used,

23   although I have no recordation of that.

24              Combative, yes; when you can't breathe and

25   you're bound in that fashion, I understand why you

147

1   would become combative.  But again, as you have

2   already stated, what I'm saying is I understand that

3   this is considered to be a component of the excited

4   delirium phenomenon.  And I don't accept excited

5   delirium, but I am aware of that sign.

6          Signs are things that you can see, by the

7   way.  And symptoms are things that are expressed by

8   the person.  So you got a combination of signs and

9   symptoms there.

10      Q.   Yes, sir.  I'm reading from your book where

11  it says excited delirium symptoms include:

12  Impervious to pain, great strength, hyperthermia,

13  sweating, bizarre and violent behavior, aggression,

14  hyperactivity, hallucinations, confusion and

15  disorientation, foaming at the mouth, drooling and

16  dilated pupils.

17         Do you agree with that list of symptoms

18  associated with excited delirium?

19      A.   For those people, yes, who believe in

20  excited delirium, yes, those are the list of signs

21  and symptoms.

22      Q.   Do you know whether or not this case has

23  been scheduled for trial?

24      A.   No.  I have no trial date.

25      Q.   Have you been requested to appear at trial

148

1   in this case?

2       A.    There's been no discussion at all with

3   Mr. Edwards about that, but if I am called to testify

4   pursuant to my report, this deposition, etcetera, I

5   shall testify, but there's been no discussion.  I

6   haven't any idea at all what the status of this case

7   is.

8           MR. UPCHURCH:  Thank you, sir.  That's all

9   the questions I have for you.

10          MR. GASS:  Can we go off the record a

11  minute.  I have one thing I want to ask that I'm

12  confused on.

13          MR. EDWARDS:  We're not going to have two

14  lawyers.

15          MR. GASS:  That's why I said we're going off

16  the record.

17          MR. EDWARDS:  I just want to make clear that

18  we've got one lawyer per client.

19          (Whereupon, a short recess was taken off the

20  record.)

21          MR. MILLER:  My name is Steve Miller, I'm

22  the attorney for Southeastern Emergency Physicians.

23  I don't have any questions for you.  Pass the

24  witness.

25          MR. UPCHURCH:  Brad, any questions?

Cyril Wecht - March 21, 2017

149

1    MR. DILLARD: Just one or two brief
2    questions.
3              -  -  -
4         E X A M I N A T I O N
5    BY MR. DILLARD:
6    Q.    Doctor, this is Brad Dillard, I represent
7    the Southaven Defendants.
8         You referenced at length in your report the
9    phrase hogtied in conjunction with four-point
10   restraint. In your opinion is there any difference
11   between the phrase hogtied and four-point restraint?
12   A.    No, I guess I would take that synonymously.
13   Four-point, right, the two wrists and the two ankles.
14   Some people may use hogtied in a strict classical,
15   limiting it to ankles brought up in hyperflexion to
16   wrists posteriorly, and I would not argue with that
17   then.
18        So that differentiation could be made
19   between that kind of hogtie if that's what somebody
20   is talking about. I am aware, as I was asked earlier
21   a little bit ago, that the ankles were not brought up
22   to the wrists.
23   Q.    Your use of the term hogtied then would
24   simply be any type of shackle or device where the
25   ankles and the wrists are bound together regardless

Cyril Wecht - March 21, 2017

150

1    of the length of the chain or the ability to move;

2    would that be correct?

3        A.   Well, yeah, in this case where they're all

4    tied, and there's a rod pole or shaft that goes along

5    the length of the body.  Yes, that's the way I would

6    use that in this case.

7        Q.   Just to be sure I'm clear, doctor, your

8    opinions in this case are limited to Mr. Goode's

9    cause of death; correct?

10       A.   If you're asking me am I going to be an

11   expert on -- I've already talked about medical

12   malpractice, I'm not going to express any opinions on

13   that regarding the EMS hospital doctors and nurses,

14   and I'm not going to express opinions other than that

15   which I know that fall into my domain as I have

16   referred to several times today regarding law

17   enforcement agencies and so on.

18           But if this were, let's say, an analog of a

19   medical malpractice case against law enforcement

20   officers, no, I'm not going to be expressing opinions

21   on that.  Just the overall scenario, but not breaking

22   it down into specific actions attributed to any

23   particular officer.

24       Q.   Yes, sir.  The full scope of your opinions

25   has been discussed during the examination primarily

Cyril Wecht - March 21, 2017

151

```
1    by other counsel; correct?
2        A.    Yes.  I do not believe that there's anything
3    that was not covered.  Mr. Edwards will come in with
4    his own approach, but I think everything has been
5    covered.  I'm not aware of any area -- I may be asked
6    other questions about specific actions here and
7    there, but there's nothing that we haven't talked
8    about.
9              MR. DILLARD:  Thank you.  No further
10   questions.
11             MR. PHILLIPS:  I have one housekeeping
12   matter.  Doctor, I was told I need to bring a check
13   if we went over four hours.  What is the amount
14   owing?
15             THE WITNESS:  $500.
16             MR. PHILLIPS:  I'm about to give you that
17   check now.
18             THE WITNESS:  Thank you.
19             MR. GASS:  Just housekeeping on the rest of
20   the exhibits, madam court reporter, are you going to
21   give us hard copies, electronic copies?
22             COURT REPORTER:  Whatever you prefer.
23   Please let me know what you would like.
24             MR. EDWARDS:  For the Plaintiff, I want an
25   electronic copy, E-Tran, and electronic copies of the
```

Cyril Wecht - March 21, 2017

152

1    exhibits.  And Dr. Wecht will get the hard back.

2            THE WITNESS:  And a hard copy of the

3    transcript?

4            MR. EDWARDS:  I will get you that.

5            COURT REPORTER:  Do you want to read the

6    transcript?

7            MR. EDWARDS:  Do you want to read and sign?

8            THE WITNESS:  I'll need a hard copy unless

9    you tell me.

10           MR. EDWARDS:  Let's reserve signature.

11           MR. UPCHURCH:  I would like an electronic

12   and a hard copy, and I assume that will come with a

13   condensed and a word index.

14           MR. PHILLIPS:  Marty Phillips, I get the

15   original since I set the deposition and of course

16   copies of all the exhibits.  I also want an

17   electronic copy, and will you provide a condensed

18   version as well?

19           COURT REPORTER:  Yes.

20           MR. MILLER:  Same for me, Stephen Miller.

21   Not the original, but a copy.

22           MR. DILLARD:  This is Brad Dillard, I'll

23   take the same as Mr. Upchurch ordered, please.

24           (Deposition Exhibit Nos. 19 through 35 were

25   marked for identification.)

Alpha Reporting Corporation

153

1   MR. GASS:  Let me make a record of what has

2   been marked.  Exhibit No. 19 is an empty folder.

3   What I'm asking is that there be just a photocopy of

4   these folders with the exhibit sticker.

5        Exhibit No. 20 has papers in it, so both the

6   outside of the folder and the papers that are inside

7   of it.  Exhibit No. 21, same thing, photocopy of the

8   outside plus the papers that are in it.  Exhibit

9   No. 22, photocopy of the outside plus the papers

10  inside.

11       Exhibit No. 23 is a CD disk that we would

12  want a copy of.  Exhibit No. 24, outside of the

13  folder plus the papers that are in it.  Exhibit

14  No. 25, the 1-11-2016 Purdue letter.  Exhibit No. 26

15  email packet.  Exhibit No. 27 Wecht letter of

16  December 5, 2016.  Exhibit No. 28, the packet of

17  photos plus a copy of all photos inside.

18       Exhibit No. 29, just a copy of the empty

19  folder.  Exhibit No. 30, copy of the empty folder.

20  No. 31, a copy of the empty folder.  32, copy of the

21  empty folder.  33, a complete copy.  And his slides

22  have been marked, there are two yellow trays, one is

23  marked Exhibit No. 34 and one is marked Exhibit

24  No. 35.  Those we don't need copies of.

25       MR. EDWARDS:  Show that those will be

Cyril Wecht - March 21, 2017

154

1  retained by Dr. Wecht.

2          MR. PHILLIPS:  Lay those on the copier and

3  make a copy of the front page.

4          (At 1:35 p.m., the deposition was concluded.

5  Signature was not waived.)

Cyril Wecht, MD - March 21, 2017

*ORIGINAL*

155

1    ERRATA SHEET

2                                              REASON FOR

3    PAGE    LINE CHANGE/CORRECTION    CHANGE/CORRECTION

4    *41*        *lines 1-8*

5               *Correction -*

6                    *I had received a video of the*

7    *scene from Attorney Edwards.*

8                    *I viewed that video as part*

9    *of my overall review and analysis of*

10   *this case.*

11                            *Cyril H Wecht MD*

12                            *6 April 2017*

13

14

15

16

17

18

19

20

21

22

23

24

25

**Alpha Reporting Corporation**

156

1           C E R T I F I C A T E

2                   - - -

3           I, CYRIL H. WECHT, MD, JD, do hereby certify

4    that I have read the foregoing transcript and it is a

5    true and correct copy of my deposition, except for

6    the changes, if any, made by me on the attached

7    Deposition Correction Sheet.

8

9                    _Cyril H. Wecht_

10           CYRIL H. WECHT, MD, JD

11

12           Date    6 April 2017

13

14

15

16        Sworn to + subscribed

17        before me this 7th

18        day of April, 2017

19

20            _MWKuy_

21

22        COMMONWEALTH OF PENNSYLVANIA
                    NOTARIAL SEAL
23        Richard W. Kelly Jr., Notary Public
          City of Pittsburgh, Allegheny County
24        My Commission Expires May 6, 2019
          MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES
25

**Alpha Reporting Corporation**

Cyril Wecht - March 21, 2017

157

```
 1   COMMONWEALTH OF PENNSYLVANIA )
                                  ) SS
 2   COUNTY OF WASHINGTON         )

 3

 4                     CERTIFICATE

 5          I, Kathy D. Landock, a Notary Public in and
     for the Commonwealth of Pennsylvania, do hereby
 6   certify that the witness, CYRIL H. WECHT, MD, JD, was
     by me first duly sworn to testify the truth, the
 7   whole truth, and nothing but the truth; that the
     foregoing deposition was taken at the time and place
 8   stated herein; and that the said deposition was
     recorded stenographically by me and then reduced to
 9   typewriting under my direction, and constitutes a
     true record of the testimony given by said witness,
10   all to the best of my skill and ability.

11          I further certify that I am not a relative,
     employee or attorney of any of the parties, or a
12   relative or employee of either counsel, and that I am
     in no way interested directly or indirectly in this
13   action.

14          IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office this 24th day of
15   March, 2017.

16

17              Kathy D. Landock, Notary Public
                Certified Realtime Reporter
18

19   My Commission Expires:
     March 24, 2019
20

21

22

23

24

25
```

**Alpha Reporting Corporation**

**Cyril Wecht - March 21, 2017**

**$**

**$2,200** 103:15
**$2,500** 103:16
**$3,500** 114:16
**$3,850** 36:1,9
**$500** 151:15
**$6,475** 36:6
**$800** 36:4

**0**

**05** 107:2
**06** 106:13 107:4

**1**

**1** 11:6,7 82:19 88:21
**1,750** 118:22
**10** 42:9,11 109:13 114:20,21
**100** 49:12 78:24 97:21 99:11,23
**11** 55:21 68:20 123:4 125:10 134:9
**12** 62:12 124:18
**13** 126:24
**14** 21:16 127:20
**15** 16:9 62:11 109:13 110:10 129:1,2
**15-275** 15:12
**16** 62:16 129:12
**169** 100:24 101:16
**17** 25:4,6 43:6 118:21 130:3
**171** 90:13 91:6
**173** 90:7,17 91:17 92:8
**175** 92:25
**18** 18:3,8,10 37:7 42:23 62:24 127:5 132:11

**19** 82:12 152:24
**1962** 112:12 118:7,25
**1979** 46:19
**1980s** 120:9
**1990s** 120:11,19,21 121:9
**1998** 82:13
**1999** 112:6

**2**

**2** 12:18 13:6 14:25 28:4 37:21 38:19,22 39:18 41:1 88:21
**2,000** 118:25
**20** 8:4,13,18 10:17,19 32:1,3 77:6 109:13 110:10
**20,000** 52:21
**2000** 112:6,12,17,20
**2006** 111:23
**2007** 88:21
**2008** 65:19
**2009** 107:22
**201** 82:13
**2013** 65:20 95:2
**2015** 8:4,7,9,13 11:1 16:14 18:4,8,10 22:14 25:4,6 29:7 30:12,20 31:8 35:24 40:25 42:11,23 43:6 62:24 126:12,15 127:4,6 132:7,15 134:9
**2016** 8:10 9:1 16:3 17:13 19:21 20:14 21:16 25:14 27:8 28:24 29:24 30:21 36:11,14, 16 37:19 38:18 41:9 53:14 55:21 70:1 74:3 125:10
**2017** 85:19 125:15
**205** 82:13

**21** 11:1
**23** 8:7,9,16 9:2 12:4 16:15,19 22:21 31:8 32:2 35:24 127:4
**24** 72:8 74:22
**250** 119:5,24
**26-** 93:19
**275** 16:11
**275th** 16:17
**28** 29:7 30:12,20 37:19 40:25 132:6,15
**29** 15:10 41:19 44:15 46:10,15
**2:30** 134:13

**3**

**3** 8:12 22:5,6,11 61:19, 22 74:6,20
**3,000** 118:25
**30** 77:6
**300** 119:6
**31** 68:23 125:14 126:4, 12
**33** 118:21
**33-year-old** 85:12 93:19
**35** 118:22 152:24
**35-40** 120:12
**350** 119:24
**36** 118:1
**38** 112:13
**3:30** 9:5
**3rd** 107:17

**4**

**4** 15:9 22:14 27:7 40:18 41:9 54:8,21 62:14 70:3 134:5
**40** 9:20

**40,000** 52:21 69:8

**5**

**5** 8:10 9:1 16:2 17:13 19:21,25 20:14 22:18 25:14 27:8 28:24 30:21 36:11,13,16 38:18 41:9 53:14 54:4 61:19,21, 22,23 70:1,3 74:3 88:17
**50** 99:11 118:1,22
**55** 52:18,20
**56** 57:8

**6**

**6** 22:18 62:14 94:21,22
**60-65** 120:12
**65** 131:17
**65/35** 131:15
**67** 118:21

**7**

**7** 84:25 100:14
**70s** 110:25

**8**

**8** 102:8
**80s** 110:25
**84** 107:15
**85** 120:10
**86** 7:16
**870** 24:5
**8:49** 74:7

**9**

**9** 68:19 114:4
**90** 71:17,19 72:9 74:21

**Alpha Reporting Corporation**

**Cyril Wecht - March 21, 2017**

**90s** 111:1
**993** 95:17
**994** 97:11,15
**9:22** 74:7

---

**A**

---

**abdomen** 137:13 141:3
**abdominal** 31:13
**abilities** 145:3
**ability** 23:12 75:2 150:1
**abnormal** 76:18
**abrasions** 41:11
**abreast** 50:14
**absent** 92:17,18
**absolute** 49:24
**absolutely** 27:21 51:17 75:25 81:18 85:10,13
**abstract** 82:19
**academy** 50:18,19 51:4,8 91:7
**accept** 52:8 66:5 67:7 76:4 78:19 79:8 86:8 87:2 96:9 98:24 117:6 136:23 139:16 147:4
**acceptable** 71:20
**accepted** 44:25 66:24 67:2,5,13 84:1,7 95:14
**accepting** 101:13
**accident** 92:22
**accidental** 62:20
**accidently** 69:19
**accommodations** 12:19,25
**account** 130:15
**accountant** 130:17
**accurate** 18:16 87:13

**acid** 62:1
**acknowledge** 58:21
**acknowledged** 56:15 106:2
**acknowledgement** 115:18
**acquire** 52:16 56:15
**acronym** 66:17
**action** 111:14 113:7
**actions** 66:10 150:22 151:6
**active** 19:3 24:6,12 50:13
**activity** 137:20
**add** 143:2
**additional** 32:18 40:1 80:21,23 133:14
**address** 90:4
**addressed** 105:11 132:22
**adequate** 138:11,18
**adjunct** 103:14 104:2, 5
**adopted** 85:21 105:8 107:1
**adrenal** 33:2 143:5
**adults** 89:3 90:1
**advance** 115:19,20,24 116:2,4,6
**adverse** 111:14
**advertise** 131:20
**advised** 74:11
**affected** 99:9
**affiliation** 45:24 46:4 112:7
**afternoon** 103:21
**age** 99:22
**agencies** 84:2 102:2 105:7 116:4 150:17
**agency** 106:8 116:3

**agent** 79:18
**aggravated** 64:20
**aggravating** 65:4
**aggression** 147:13
**Aggressive** 89:2
**agitative** 64:13
**agree** 35:22 62:21 83:3 85:9,14 89:15 91:2,4,5, 23,24 92:3,6 93:14 96:8 101:11,15 102:11 138:10,16 139:16 141:15,19 144:22,25 145:8,19,23 147:17
**ahead** 98:4
**air** 33:9,17 75:23
**airway** 76:16 138:13, 20 139:7
**airways** 34:12
**alcohol** 79:3
**alleged** 113:10
**Allegheny** 106:22,25
**alterations** 15:13
**altercation** 79:11
**alternative** 92:19
**America** 84:3 109:10, 20
**American** 45:18 46:17 47:17 48:24 50:17 51:4,8 57:16 82:9 91:7 109:19 110:14,21
**Americans** 68:20,23
**amount** 36:3 49:8 151:13
**amphetamine** 68:1 79:2
**amphetamines** 68:6
**AMS** 135:2
**analog** 150:18
**analysis** 15:22 21:4, 19,23 23:13 24:2 25:23 26:25 33:19 41:20 44:25 57:7 102:18

**analyzed** 44:2 87:24
**analyzes** 14:21
**anatomic** 112:15 137:22
**anatomical** 13:25 77:25
**and/or** 69:9
**animal** 75:17
**ankle** 80:18
**ankles** 137:15 140:20 149:13,15,21,25
**annual** 130:19
**answers** 49:14 56:6,13
**anticipated** 137:3
**apparently** 132:23
**Appeals** 107:17
**appearance** 34:11
**appeared** 64:13 65:5 82:12
**appears** 29:4,18,21 35:4 40:2 41:17 99:2
**appendages** 140:25
**applicable** 47:13
**application** 99:11
**applied** 101:17
**apply** 115:2
**appointed** 107:3 116:13
**appointments** 104:15 106:8
**approach** 151:4
**approaching** 74:16
**approval** 116:15
**approximately** 119:8
**approximation** 120:14
**area** 125:24 143:12,13 151:5
**areas** 33:15 51:12 59:4

**Alpha Reporting Corporation**

**Cyril Wecht - March 21, 2017**

arguable 55:17 68:25

arguably 49:25

argue 149:16

Arnold 57:8

arrangements 18:4, 11

arrest 138:8,25

arrested 11:18

arrhythmia 68:10,13, 17 69:13,15 78:16 94:5

arrive 38:17 55:16

arrived 125:20

arteries 92:22 142:1 143:8

article 45:11,12 47:24 48:9,18 54:9,17,20 55:24 56:4,8,14 57:14 82:12,14 84:15,24 87:3 88:3,15,20 89:1,17,23 92:18 93:24 94:20,25 95:2 100:12 101:14 104:22 105:2

articles 44:24 46:12,22 47:2,3 48:6,25 49:17 51:15,23 52:15 53:23 54:23,24 56:23 59:1 83:17 95:11 104:19,24 105:3,10 117:12

Asbridge 134:10

aspect 73:8

asphyxia 56:19 57:2 58:3,10 70:23 80:12 81:3,4 82:15 85:7 95:23 102:22 137:7 138:10 141:4,21 142:7 143:4

asphyxiate 81:9

asphyxiation 76:15 78:5 82:25 95:22 137:9,10,21,24 139:9, 15

assess 72:5,6

assessing 73:22,25 74:1

assessment 71:25

assigned 16:20

assist 9:13

assistant 9:14,15,17, 20

Associates 130:15

association 45:21,23 46:2 58:6 66:18 67:10 102:3 109:10,19 110:1, 15,21

associations 110:12

assume 18:2 38:4 152:12

assure 100:1

asthma 34:4,6 77:24 124:7 142:9,15

asthmatic 77:21 124:9 142:13,19,24 144:5

astronomy 49:25

atherosclerosis 92:21 142:1

ATLA 110:24

attack 136:14

attempt 123:12

attend 110:24

attended 111:2,5

attending 28:19

attest 38:11

attorney 11:3 33:10,12 41:2 108:13 116:10 118:4 126:8,10,11,20 148:22

Attorney's 107:21

attorneys 19:15 52:15 103:9,19,22 108:8 109:16 110:12,13,15 115:14 116:5,8,13 119:10,21 122:21 131:5

attributable 63:13

attribute 65:11 102:22 144:19 146:18

attributed 35:10 69:2 145:17 150:22

auditory 62:5

August 21:16 22:14,18 42:9,11 43:6 126:12,15 134:9

auscultation 72:12

author 60:3,9

authoritative 48:3,6,7 49:15 50:8

authority 47:18,21 48:19 51:20 58:22

authorization 10:23 11:2,5

authors 48:7 69:5 86:2 87:25 93:16 96:9 105:16 117:11 140:10

authors' 54:25

autolysis 33:23

autolyzed 15:12

autopsied 23:5

autopsies 7:24 9:19 28:20 52:21 97:8 103:8,20 118:3 119:22 130:22 131:4,18,19

autopsy 7:18 8:3,14, 17 9:4,13,22 10:3,24 11:20,21 12:3,8,14 13:10,14,17,22,24 14:2,3,10,24 15:9,19 16:7,12,16,17,23,25 18:5,12 19:11,23 20:3, 7,15,23 22:21 24:10 26:13,24 28:4,5,13,19 31:8,9,10,22,24,25 32:4 33:5,7 35:23 36:1, 7,9,12 41:13,14 43:10 52:25 69:8,9 78:1 93:20 124:12,21 128:1, 2 129:6,8,9 144:10

average 81:19 117:22, 25 118:12 119:4,12

aware 53:22 63:20 64:7 65:18 66:12 67:5, 12 69:21 86:7 88:11 98:23 103:3 110:11

122:25 124:10 127:13 144:25 145:13,22 147:5 149:20 151:5

awful 97:5

---

**B**

back 19:5 22:1 32:19 44:25 45:9 52:13 53:22 80:6,22,23 90:13,17 93:6 99:12,25 110:23, 25 118:8 123:6,8 132:25 135:21 140:22 152:1

background 14:9 19:9

bad 63:6

baled 61:7

Ballin 121:20,21,25

Baptist 42:15,22 43:2, 12 71:11 123:25

base 52:17

based 15:18,22 18:23 42:2,3 45:6 56:8 57:11 70:6 78:1,4 82:7 86:1,4 87:22 93:4

basically 31:20 65:3 143:6

basics 11:14

basis 96:25

batch 134:15,18 135:9

baton 139:12

bear 10:25

bearing 126:15 127:9 128:6

bearings 125:16

beat 94:10

beating 77:1

begin 146:11

beginning 41:10 97:17 113:3 114:13

begins 41:18

behave 108:6

**Alpha Reporting Corporation**

Cyril Wecht - March 21, 2017

behavior 63:7 147:13

behavioral 11:15

behaviors 146:16

beings 75:18

belated 7:14

belief 86:22

benefit 55:8

Beta-phenethylamine 24:4,19

biased 107:19

Bible 52:7,8

big 87:10 141:11

bigger 59:9

bile 23:18

bills 116:7

binding 80:17

birthday 7:12,14

bit 31:19 64:1 96:13 100:6 141:13 149:21

bizarre 146:15 147:13

bladder 33:2

blends 127:15

block 74:7

blockage 81:21

blocking 76:16

blood 23:2,6,10,17,18 62:2,14 71:14

board 44:12,13 45:3 46:7,21 50:21,24 51:25 82:11 84:20,21,22 88:4,23,25 91:15 111:18 112:14 117:4,7

boards 44:14

bodies 33:13

body 9:24,25 10:10,15, 20 14:11 22:23 23:5, 10,19,23 27:24 31:18 32:6,7,10,12,13,24 33:5,6,8 77:8 85:5

90:22 101:21 102:12 143:14 146:20 150:5

body's 82:5

bono 108:19

bony 35:4

book 54:10 57:20 58:24 59:2,5,7,9,16,19 60:9 100:18,19,20,22 140:8 147:10

books 52:14 53:9,10, 11,23 58:25 59:10,11, 13,16,18 67:7

bottom 8:23 27:11 38:23 91:6 99:8

bound 140:16 146:20, 25 149:25

Boy 100:10

Brad 148:25 149:6 152:22

brain 22:25 31:13 33:1 47:12 81:13 94:12,13 138:3,4 144:12

brand 85:22

Branson 57:17

break 61:4,6,8

breakdown 80:19 130:16

breaking 150:21

breathe 65:1 75:3,9, 15,22 76:5 146:19,24

breathing 64:18 71:8, 12 72:3,16 74:12 75:6 76:12 77:4 100:1 138:11,18

bring 108:3 123:11 130:6 151:12

bringing 123:12

bronchial 34:9 142:8

bronchiectasis 34:6 142:9

bronchioles 142:20

bronchitis 142:5,10 143:11 144:2

brought 77:11 113:23 137:15 140:18 149:15, 21

building 69:24

bullet 135:23 136:15

bullets 135:14

burking 139:4

**C**

calculate 77:6

call 7:25 42:3

called 59:5 126:19 148:3

calls 118:4

Canadian 67:9,10

car 63:11

carbon 82:2 97:22

Carboxy 24:4,8,13

cardiac 68:9,16 69:13, 15 76:23 77:13 78:16 94:5 95:4 99:9 137:20 138:5 143:18

cardiologist 125:20

cardiology 125:12

cardiorespiratory 77:2,11 138:8,25

cardiovascular 97:23 99:3 142:4

care 42:10,16 72:14,20 73:11,17 124:4,13

Carlow 7:23 104:10, 13,14

cars 145:3

case 8:3 9:12 10:1,2 16:4 23:11,18 27:1 28:17 42:6 44:8 50:2 52:24 53:19 54:1,13,16 56:2,10,24 65:24 68:11 69:6 71:6 73:8,10,16 81:2,6,7 82:2,8 83:6,13 85:11 90:5 96:23 97:1 98:7 102:14,19 104:20,

23 107:18 108:19 109:5,7 111:4 113:5,9, 11,25 114:9 115:2,10, 24 116:18 117:15,20 118:9,18 121:7,16,17, 20 122:7 123:13,16,19 124:5 127:10,17,23 128:7,11 133:5 135:19 137:1,11 140:13 143:7, 9,22 145:25 147:22 148:1,6 150:3,6,8,19

cases 52:15 57:22 58:20 59:20 62:12 63:22 67:23 69:18,21 75:20 78:23,25 79:5,6 80:1,15,20,24 81:22 85:10,12 90:14 93:25 97:7 103:23 114:25 115:21 116:6 117:6,23 118:3,10,23 119:2,13, 21,25 120:6,13,15 121:3,5,13,24 139:11 145:23

categorize 145:24

caught 57:6

caused 55:12 63:3 94:3 137:8

cell 136:16

central 68:1 79:1 112:20

cerebral 92:22,23 143:5

certainty 78:7

certificates 69:9

certified 112:14 117:5, 7

cessation 81:11 138:11,18,23,25 139:1, 6

chain 94:11 150:1

chairman 112:5 113:6, 12

Chan 100:25 101:14

chance 13:17 92:17

change 34:7,11 44:6

**Cyril Wecht - March 21, 2017**

changed 47:25

characterize 30:18

characterized 63:19

charge 35:24 36:2,3,9 115:24

charged 113:13

charges 36:3 107:21 114:8

check 36:6 45:9 114:15 151:12,17

chemistry 49:25

chest 72:5,17 139:10

Chicago 135:25

chiefs 102:4 140:12

choice 146:22

chose 19:14 23:1

chronic 77:21 142:8,9

chronological 18:24 38:13

CHW 15:11 16:4

circle 135:15

circles 63:12

Circuit 107:17

circular 77:8

circumstances 64:20 82:8

citation 45:9 57:12

cite 37:21 41:1 53:15, 18 56:3 86:22 98:23 104:21,24 105:2

cited 55:24 59:19

City 69:25

civil 58:19 103:23 109:5 110:13 112:21 113:5,11 117:20,23 119:25 120:6,12,15 121:3,7

civilly 121:14

Clark 145:20

classical 137:11,16

149:14

classified 62:3

classify 145:23

claustrophobiic 63:11

clear 43:22 70:21 71:18 97:8 107:11 148:17 150:7

clever 72:25

client 116:11 148:18

clients 115:16

clinical 14:9 36:19 38:3,20,25 39:4,19,23 40:9 42:3 43:2 53:12 104:4 112:8,14

clinically 93:8 101:6, 18

clinician 125:19

close 19:2 107:10 136:17

closed 76:11 112:6,18, 19

clothing 146:13

co-author 100:21

co-counsel 108:18

CO2 76:8

cocaine 66:15 68:1,6 79:1

code 126:19

coded 76:19

collapse 97:23 99:3

collapses 139:2

collateral 38:5

colleague 112:24 113:8,13

colleagues 52:6 86:8, 17

collective 40:15 114:20 129:1

collectively 40:11,12

College 57:16

collocate 47:9

colloquially 63:6

color 76:18

column 90:20 91:17 93:2 95:19 97:12

combative 64:13 72:6 146:24 147:1

combativeness 75:20 79:24

combination 138:14, 21 146:18 147:8

combined 118:2

commenced 9:7

comment 11:25 45:15 61:21,23 72:7 73:13 74:6 83:11 86:15 87:8 101:24

commented 57:4 76:10

comments 18:20 45:1, 11,16 51:14 73:7,10 101:25

committee 109:19,22, 23

committing 69:18

communicate 37:24

comp 117:24

company 115:16

comparable 92:1

compared 89:12 99:10

competent 67:14

complaint 111:17

complete 12:20 80:17 90:18,19,24 138:17

completed 9:8

completely 107:22

comply 123:12

component 26:2,15 80:23 90:11 147:3

components 143:7

compounds 68:3

compression 138:13, 20 139:7,8

comprised 51:9 109:16 110:3

compromise 71:24 75:10 77:4,12 82:1,25 83:20 85:7 86:14 95:22 137:19 138:4,13,20 139:5 142:2,3

compromised 76:13

compromises 101:21

concentration 27:4,5, 12,24

concentrations 62:14

concern 33:11 70:8 81:3

concerned 15:16 31:18 119:14

concert 11:14

conclude 17:10 35:11 82:23 93:5

concluded 18:20 80:2 81:3 88:9

concluding 92:25 93:2

conclusion 13:18,19, 22 15:19,23 17:7,20,24 27:23 29:23 30:2 42:2 55:17 65:24 76:22,24 85:24 87:4 99:15 101:11 104:23

conclusions 26:18 38:17 45:13 51:16 52:23 84:25 88:5 99:8 102:13

condensed 152:13,17

condition 64:12 77:21 124:10 142:8,14,24 144:5,20

conditions 81:16 141:20 142:19 143:1,2, 17

**Cyril Wecht - March 21, 2017**

conduct 102:24 103:4

conducted 58:9 86:22 97:4 127:2

conducting 127:14

confer 145:2

confidential 30:16

confirmed 124:7 126:20,21 127:11,12

confluence 23:9

confronted 86:25

confused 60:14 122:9 148:12

confusion 147:14

conjunction 56:2,23 149:9

conjunctiva 34:15

connection 44:22

connotes 88:10

consequence 26:3

consideration 105:12

considered 52:2 65:9 79:16 93:10,17 131:25 147:3

consistent 38:8 78:15 79:22 83:8,11 92:12 98:7,14 125:18,25 127:15 129:25

constrict 142:21

consult 53:3

consultant 120:13

consultation 52:25

consultations 103:22 120:5 130:13 131:7

consulted 54:20 117:19 118:16,17,20 120:1

consumed 135:18

contact 36:23

contacted 10:13 11:10

contention 97:20

contents 141:7,9

contiguous 141:1

continue 90:15

continues 92:8

Continuing 135:23

contractor 103:11

contracts 116:9

contrary 96:23,25

contribute 64:1

contributed 26:19

control 138:4

controlled 100:8

controlling 94:13

controversial 90:23 91:3,4,5

contusions 41:11

conversation 123:21

convicted 111:10

copied 13:2

copies 12:20 21:6 39:9 151:21,25 152:16

cops 100:3

copy 13:5 16:25 38:25 39:2 55:3,19 82:16 100:25 113:19,22 116:15 126:12 132:7, 15,18 136:3 151:25 152:2,8,12,17,21

copying 13:1

copyright 91:7

cord 32:21

coronary 92:22 142:1 143:8

coroner 105:24 106:1, 6,10,14,16,21,25

coroner's 28:15

coroners 103:9,19 106:17,18,19

correct 8:4,7,15 9:2 20:17 21:16 27:16

55:25 62:25 83:24 88:23 90:1,2 92:15,16 95:5 98:2 99:14 112:20 113:17 122:14 132:16 137:2 144:8,14,17 150:2,9 151:1

correctly 15:17 91:21 93:12,13 96:6 98:10,18 99:6,13 101:14,23 136:22 139:14

correctness 98:25

correlation 42:4

correspondence 13:13 128:13,17,25

corroborated 126:17

corroborative 125:19

costs 36:5

counsel 13:14 108:22 131:25 133:11 151:1

counties 103:9

country 51:5 102:2 105:7 106:4

counts 107:15

County 106:22,25

couple 11:19 17:15 22:17 30:22 32:16,18 33:16 37:13 59:10 68:24 70:2 77:14 81:22 106:18 118:10,23 121:11 129:8

coursed 140:22

court 107:17 108:4,18, 20 116:14,15 121:7,9 122:4 151:20,22 152:5, 19

court's 116:15

cover 21:17 100:19 103:15

covered 123:20 128:10 129:15 151:3,5

covering 21:13 36:7 42:7,25 43:9,13

covers 139:3

credibility 51:24

crime 111:10,12

criminal 58:19 103:23 109:7 117:20,23

criteria 79:19

criticizing 140:6

current 103:6 113:19

custody 11:20 82:15 85:8

CV 7:11 44:16 46:11 57:8 109:9,24 110:7,8 111:9

cyanide 94:7

cycle 94:14 138:3,6

Cyril 7:3,10 130:15

**D**

daily 134:16

damage 81:13

Dana 100:21

darn 19:1

data 131:24

date 8:4,8,15,18 9:2 10:25 17:4 18:7 22:12 25:2,9,12 27:22 29:6 31:23 55:19 125:9 127:5 147:24

dated 8:10 16:2 17:13 27:8 30:12 36:10,13,15 42:8,11 125:14 126:11 134:9

David 55:5 60:3,4 125:8 126:11 133:22

Davis 116:21

day 10:17 18:25 22:16 42:13 100:11 109:3

days 10:15,20 17:9,16 22:17 23:14,16 128:1

DEA 62:2

deal 19:19 73:8 82:7 108:11

**Cyril Wecht - March 21, 2017**

dealing 74:17 78:4 79:14 143:6

dealings 117:6

dealt 57:3 67:23 79:5 143:17

death 13:19,22 14:1 15:8,16,20,24 17:7,21 23:14,15 26:1,19 27:2, 25 29:23 41:24,25 42:2 48:22 55:12,18 62:18 68:17 69:9,14,17 70:20 77:11,19 78:15 79:18 80:3 83:1 86:21 90:6,8, 14,20,22 92:19 93:18 94:4,7,9 98:17 102:1 137:1,6 138:8 140:9 150:9

deaths 57:7,15 68:24 79:8 93:9 90:12 93:10 98:8 140:1 145:2

decade 85:21

decedent 36:8

December 8:10 9:1 16:2 17:13,16 19:21,25 20:14 25:14 27:8 28:24 29:24 30:21 31:2,6 36:11,13,16 38:18 41:9 53:14 54:4 70:1 74:2

decomposition 33:24 34:10

decreased 99:4

decreases 101:18

decrement 97:22

deemed 28:17

Defendants 149:7

defenders 116:14

defense 108:7 110:12, 13,16,18 115:14 116:18 117:15,17 120:4,12,16,24 121:11

Define 137:10

defined 89:17

definition 83:10 106:1, 3 138:9 139:14,21 141:16

definitive 15:7 49:20 64:3

degree 78:6 93:8 146:9

delayed 79:18

delineate 47:11

delineation 134:11

deliria 145:12 146:17

delirium 58:15 66:3,5, 20,24 67:17,20,24 78:4,16,20 79:8,16,20, 22,24 80:3 83:12 86:9, 11,16 94:1 136:24 144:20 145:1,18,24 147:4,5,11,18,20

Delta-9 24:4,7,8,12,13

delusional 66:9

demands 89:2 93:8

dentures 143:20

department 43:8 64:23 72:1 74:25 80:7, 9 84:10 112:6 113:7

depend 146:9

depending 141:24

depends 146:12

depict 139:18

depicting 136:19

deposed 113:2

deposition 11:7 13:6 22:6 40:18 54:7 88:17 94:22 100:14 102:8 108:19 114:4,13,16,21 115:6 120:22 123:2,4, 10 124:18 126:24 127:20 129:2,12 130:3 132:11 133:23 148:4 152:15,24

depositions 44:7 115:19,23 119:2,6 120:15,18 130:13

deprivation 137:24 142:17

deprived 94:12

derive 130:19

derogatory 67:9

describe 14:25

description 10:6 15:18

designated 30:5,13

despicable 108:4

detached 32:14,22

detail 12:1 107:13

detailed 44:4

detectives 28:19

determine 33:21 34:10 42:21 45:12

determined 101:1

determining 15:7,15 27:1

develop 62:10

device 149:24

diagnosis 66:5,13 77:25 78:20 80:5 113:14 136:24,25 144:23

diagnostic 71:23

diaphragm 141:8,14

dictate 28:10

dictated 8:16

die 79:12,13 81:4 82:3 93:22,23 94:4,16,17,19 137:18

died 11:18 76:22,24 77:1,3 92:24 94:2 97:9 99:19

Diego 84:10

dies 76:25 79:7

diethylamide 62:1

differ 31:9,12,16 47:21 51:17 59:2

difference 30:19,24 38:9,10 65:23 87:10 105:23,25 149:10

differences 48:16 50:1 106:5

differentiation 149:18

difficult 47:20 65:1

difficulty 64:17 71:8, 12,19 72:11,16 75:6

dilated 147:16

Dillard 31:23 32:1 149:1,5,6 151:9 152:22

Dimaio 59:6,8,10,24 100:18,22 102:6

Dimaio's 59:13,19 101:11

diminished 138:3,4 142:22

diminution 137:24 138:6 139:5 142:16

dioxide 97:22

direct 90:17

directly 37:11,25 127:11

director 9:18

disagree 35:12,20 48:9 58:23 83:15,17,24 88:5,14 105:16

disagreed 108:13

disagreement 35:16 48:20

disagrees 102:12

discern 72:15

discernible 33:25

disclosure 8:12

disclosures 116:18

discoloration 31:19 76:21

discoverable 29:13

discussed 19:7 26:17 66:25 144:18 145:25 150:25

discussing 33:23

discussion 19:9 70:11 90:7,20 134:22 148:2,5

disease 33:19 85:13

**Alpha Reporting Corporation**

## Cyril Wecht - March 21, 2017

141:22,23,25 142:17
143:24 144:1

**diseases** 142:6

**disguise** 145:20

**disk** 127:25

**disorientation** 147:15

**disproved** 105:14

**dispute** 96:14,17,19
98:20 99:15

**disrupting** 64:22

**dissected** 32:19

**distinction** 96:12

**distinguished** 104:11,
13

**distress** 75:14

**district** 103:8,19 116:5
118:3 119:10,21 131:5

**ditch** 81:24

**divers** 81:17

**doctor** 12:19 36:12
39:14 42:9 44:8 46:11
61:5 75:24 84:13 94:25
102:11 110:11 113:20
123:10 127:24 141:15
149:6 150:7 151:12

**doctor's** 18:6,13

**doctors** 150:13

**document** 10:22 29:2
39:6,9,18 40:5 46:15

**documented** 78:20

**documents** 40:15
124:2 134:4

**dogs** 136:15

**Dolinak** 60:3,5,6,9

**domain** 150:15

**door** 107:8,10 108:5

**dose** 62:16

**doubt** 54:12

**dozen** 118:5,11 119:9

**draft** 30:13,15

**drawing** 23:13

**drawn** 22:21,23

**driven** 33:9,16

**drooling** 147:15

**dropped** 71:14,15,17
107:22 110:6 112:24
113:1

**drug** 24:20 62:4

**drugs** 23:23 24:21 68:7

**due** 62:18 64:19,24,25
65:3,9

**dues** 46:6

**duly** 7:4

**duplicative** 40:3

**Duquesne** 103:14
104:16

E

**E-TRAN** 151:25

**e.g.** 101:4

**earlier** 10:17 19:22
20:5,23 29:22 71:7
82:9 100:17 104:20
118:24 132:6,14
149:20

**early** 29:24 31:19
33:23 34:10 89:17
117:21

**easily** 64:18

**eastern** 9:5

**easy** 118:21

**eaten** 141:10

**ECG** 77:15,16,17 78:9

**editor** 44:10,13 47:22
48:4 88:13,23,24

**editor-in-chief** 52:1

**editorial** 44:12,14,17,
21 45:3 46:7,14 50:21,
24 51:25 82:11 84:20,
21,22 88:4,23,25 91:15

**editorially** 98:2

**editors** 44:13

**Edwards** 8:11 10:15
11:11 12:12 13:9,12
16:3,22 17:13 18:2,14,
18 19:8,14 20:15
21:12,16 25:12,14
28:25 29:4,10,12 30:3,
7 31:4,6 32:3 36:6,13,
15,21,25 37:11,17,20
38:20 39:1,5,12 40:10
42:8 43:3,5,6,7,19 55:4
56:7,22 61:14 70:11,18
72:18 84:9 102:15
104:25 115:5 121:17,
19 123:22 124:12
125:13,15 126:4,10
127:4 128:14,18 132:2,
20,25 135:4 136:2,18
137:3 146:3 148:3,13,
17 151:3,24 152:4,7,10

**Edwards'** 70:15 128:3
134:10

**effect** 63:21,25 64:5
77:13 95:2 96:4,15
116:13 125:22

**effects** 62:6,10,18
63:5,17 64:18 66:8
137:20

**egocentricity** 52:20

**EKGS** 78:8

**election** 106:6 107:2

**electronic** 133:4,8,9
151:21,25 152:11,17

**email** 42:11,12 43:6
134:9,10 135:14
136:11

**embalmed** 10:10
23:20

**embalmer** 9:19

**emergency** 64:12 72:1
74:24 80:7,9 87:7,9
95:9 145:14 148:22

**emotional** 97:6

**emphysema** 34:2
142:11,12 144:2

**emphysematous**
34:7

**employment** 111:21

**EMS** 77:9 150:13

**encephalopathy**
144:11

**encountered** 63:21
68:5

**end** 17:15 29:20,24
41:12 54:2

**endeavor** 133:24

**ended** 112:17

**enforcement** 85:16
105:7,22 150:17,19

**engage** 97:3

**English** 78:9

**enhanced** 64:19

**enhancing** 65:4

**ensues** 75:9

**ensure** 45:5

**entire** 64:22 139:18
146:19

**entirety** 21:18,20,25

**entitled** 89:1

**environment** 146:10

**epidemiologic** 98:21

**epidemiological**
98:15

**epidemiology** 104:6

**epiglottic** 143:12

**epithets** 146:22

**equivocating** 88:2

**ER** 64:21

**erratic** 63:7

**error** 29:25 101:2

**errors** 30:9

**erudite** 55:15

**esoteric** 50:11

**Cyril Wecht - March 21, 2017**

essence 70:7 71:6

estimate 69:8 117:18 119:1,16 130:10,18 131:9,11

estimated 68:23

estimating 118:15

et al 101:1,14

etcetera 148:4

etiological 139:19

etiology 142:19

European 67:11

evaluate 14:17 113:15

evaluated 81:2

evaluating 93:10

event 19:9 76:23

events 37:6 38:14 94:11 134:11

evidence 34:4,8,16,19 35:5 77:12 85:5 89:13, 24 91:18 92:13 101:7 143:23 144:10,15

evident 144:13

evidently 83:25 84:7 105:21

exacerbation 142:13

exact 111:6

exam 8:13 16:9

examination 31:16 150:25

examinations 15:1

examined 7:4

examiner 17:1 19:24 20:3 28:15 35:8 105:24 106:7 107:1,3 111:24

examiner's 128:2

examiners 45:23 46:2 57:16 66:18 106:3

exceed 62:12

excerpts 102:7

excitation 66:11 79:24

excited 58:15 66:3,5, 19,24 67:16,20,24 78:3,16,19 79:8,16,19, 20,22,23 80:3 83:12 86:8,10,16 94:1 136:24 144:20 145:1,12,18,24 146:17 147:3,4,11,18, 20

excluded 122:3

excluding 119:20

Excuse 7:20 146:3

exercise 101:4

exhibit 11:6,7 12:18 13:6 14:25 22:4,6,10 28:4 40:13,15,18 88:16,17 94:21,22 100:13,14 102:7,8 114:3,4,20,21 123:3,4 124:17,18 126:23,24 127:19,20 128:19 129:1,2,11,12 130:2,3 131:24 132:10,11 134:5 152:24

exhibits 151:20 152:1, 16

exhortations 75:11

exist 80:25

exiting 54:7

expect 111:8

expensive 33:10

experience 52:18 65:22 75:13 78:4 79:10

experienced 62:10 67:14 69:16

experiencing 141:3 143:3

experimental 97:3

experimenting 69:23

experiments 101:1

expert 55:5 59:24 110:22 111:3,7 116:18 117:19 118:16 119:3 120:1 122:3 125:6,13 130:7,12,20 131:10,20 150:11

experts 117:14,16

explain 87:19 94:15

explains 30:2

explanation 92:19 99:19

explode 65:10

exposed 23:7

expounded 67:24

express 48:6 50:2 78:6 122:17 131:8,12 150:12,14

expressed 56:10 58:25 60:23 84:24 147:7

expressing 47:23 150:20

expressions 66:9

expressly 83:22

extensive 102:24

extent 45:16 52:17

External 31:16

Externally 34:15

extra 49:9 100:25

extras 113:23

extremely 50:11 64:13,15

eye 14:14 57:6

eyes 34:16,20

---

**F**

---

face 101:3 137:13

faced 145:14

facial 34:21

fact 20:14 26:6 38:10 59:19 62:24 69:22 75:5 85:19 87:11 90:6 92:5 105:5 111:22 127:11

factor 90:22

factors 65:4 83:1 93:9 139:19

facts 38:4 40:4 131:24

faculty 104:8,15

failure 77:2,11 93:9 144:16

fair 49:8 96:12

fairly 54:14

fall 118:7 142:5 150:15

familiar 59:5,7,11 60:2,16 102:25 121:23

families 103:20

family 11:21

famous 85:11

fashion 76:9 81:21 137:5 146:20,25

fast 30:23 94:14

fatal 69:13

father 81:24

fax 10:25

February 126:3

federal 29:13 84:2 105:8 107:14,20 108:20

fee 113:19,24 114:24 115:4 116:16

feel 145:4

feeling 63:10

fees 114:12,25 115:8

feet 139:12 140:16,17, 18

felony 107:15

felt 25:24,25 53:24

field 45:14 48:15,16 50:13 51:2,13,19,22 55:5 59:25 84:23 85:25 93:11 95:8 98:7 113:9

fields 45:4 51:10

figures 81:14

file 12:20 129:5 132:16 133:4,8

filed 111:17 112:21

**Cyril Wecht - March 21, 2017**

files 40:1 133:9

fill 76:2,5

filling 76:7

film 136:16,18

filming 136:17

final 17:19,24 30:18
51:25 77:10 133:1

finalized 17:16 19:2

finally 107:16

find 13:24 26:24 27:12
33:18 34:1,2,13,21,24
35:14 44:3 105:1
143:23 144:1,10,15

finding 35:13 98:21
99:16 145:22

findings 15:6,19 24:22
26:22 28:24 29:16
41:13,25 42:1 83:25
92:9 96:21 97:19 98:6,
13 101:15 103:3
124:12

finds 75:17

fine 107:8 108:1,11

finish 128:16 133:14

finishing 118:8

fired 111:20

firm 108:21,22 114:15
121:18 128:18

five-year 112:11

fixed 120:9

Flashback 62:9

flexed 137:15

floridly 65:5

flow 142:4,22

flows 130:22 131:5,18

fluid 23:9

fluids 22:24

foaming 147:15

folder 128:23 129:18

folks 112:8

follow-ups 119:22

force 93:6 95:4 97:21
98:15 99:5,12 101:20

forensic 45:4,18 46:17
47:17 48:15,24 49:23
50:16,18 51:4,5,8,10,
11 52:13,18 55:13
57:9,16 58:19 59:6
60:2,10,12 67:2,14,15
78:7 82:10 86:4,18,20,
24 87:5,9,12 88:21
91:8,11 95:1,8,14
99:17 100:18 103:8
106:2,4,17,20 112:15
116:22,24 117:3,5,7

Forget 81:17 94:7

forgive 55:23

form 18:14 55:10 70:16
72:18

forming 131:25

fort 49:18

found 38:12 43:22
55:14 65:2,17 73:4
78:23 91:18 93:20
95:24 98:16 101:2
144:4

foundation 105:6

four-point 149:9,11,13

fractures 35:2,6,8,12,
13,15,17

Francis 112:19

frequently 79:2

fresh 23:18

Friedman 135:24

friends 11:15 108:24

frightening 75:16

frigid 81:15

front 12:14 36:16
113:20 129:18

full 95:19 137:11
141:11 150:24

fully 72:6 139:14

function 76:14 96:1

101:6 138:5,14,21

functioning 101:5,19

fundamental 75:7

funded 84:9

funeral 9:18

─────────

**G**

gallbladder 23:18

games 108:16

Gamut 85:11

Gary 117:8

GASS 31:2,5 123:6
148:10,15 151:19

gastric 141:9

gathered 135:15

gave 27:19 53:7 57:15
67:19 118:13 121:1
131:11,12 134:11

gee 69:22 94:3 118:9
121:2 130:23

general 41:20 85:3

generally 49:13 56:20
62:3,11 67:3,4

generated 133:2

gentleman 108:6

gentlemen 19:16
94:18 126:11 133:12

give 13:25 16:3 27:3
54:10,25 56:3,5 61:7
74:9 81:5,14 83:9 87:2,
20 98:24 103:13
117:18 119:16 120:14
121:4 122:18 151:16,
21

giving 122:6

gland 33:2

God 93:23

good 54:14 61:4 93:19

Goode 7:18,20 11:2
12:5 15:12 27:13 29:17
35:24 36:20,24 37:2,6,

10,15,22,24 38:2 62:24
63:2 64:9 71:8,20 72:2
74:23 76:22 77:23
79:21 89:20 97:7 124:3
136:13,20 137:12
140:14 141:15 143:24

Goode's 9:22 16:16
27:24 38:19 39:4 55:18
64:11 70:20 78:15 80:6
137:1,6 150:8

Goodman 40:23

governing 113:24

government 69:23
107:14

governmental 106:8
116:3,4

grab 53:8 59:16

Graduate 104:6

gram 24:5

great 52:17 66:11
107:13 145:10 147:12

greater 75:12

greatly 81:10 85:21

Greg 116:21

gross 10:6 14:11 15:18
41:13,24 144:15

grossly 34:1 144:4,13

ground 99:23 100:9

group 51:5

groups 67:6,11 85:16

guess 42:12 52:1
110:6 115:13 140:22
149:12

guidelines 85:17,19
105:20

guilty 108:20 111:12

guy 71:20 85:12

─────────

**H**

Hainey 127:3

half 9:12 79:13 118:11

**Alpha Reporting Corporation**

**Cyril Wecht - March 21, 2017**

hallucinating 63:4

hallucinations 147:14

hallucinatory 65:16

hallucinogen 62:4 63:20

hallucinogenic 63:3, 25 64:4,6 66:9 68:3

hand 128:22 131:6 135:21

handbook 59:6,8,10

handcuffs 140:23

handful 69:3,5

handle 14:7

handled 107:18 143:16

hands 140:15,16

handwriting 37:18

Hang 126:14

happen 79:10

happened 40:23 41:4 71:21 113:1 122:14,19

happening 139:17

happy 7:14 12:18,25 61:7 134:3

hard 59:2 121:4,14 151:21 152:1,2,8,12

harrow 145:4

Haven 57:9

health 72:14,20 73:10 93:19 104:7,17

healthy 71:20 77:20 78:2 85:12 89:3 90:1 91:18 93:4

hear 64:7

heard 64:10

heart 33:1 68:18 76:25 94:10,13 126:18 138:2 141:21,23 143:6,8,24

heavy 9:23

held 106:12,15,21 111:21

hell 100:2

helps 9:23

Hemodynamic 95:4

hemorrhage 35:22 41:11 92:23

hemorrhages 34:14, 22,25

Henry 57:8

Hepatic 143:5

high 62:16 79:3 135:8

higher 68:22 71:22 143:12

highly 26:2

histopathologic 15:13

histopathologist 14:19

history 38:20 39:4,19, 23 40:9 42:2,3

hobble 95:21

hogtie 95:20 149:19

hogtied 64:16,25 70:25 72:22,24 74:8 77:5 80:16 82:23 84:5 85:7 86:12,21 87:1 94:2 100:3 101:3 102:5 137:12,16 140:14 149:9,11,14,23

hold 25:10 44:21 97:1 103:6,25 106:9 128:7

home 134:14

homicide 116:6 119:21

homicides 119:10

horrific 75:16

hospital 39:10 42:15, 18,19 43:12,14,16 71:11 72:22 73:2,3,6 74:8,14,22 110:15 112:2,5,7,18,19,20 113:8 123:25 126:8 127:7 150:13

hospitals 112:10,13

hour 9:11 77:5,6 79:13 83:16

hours 11:19 62:12,13, 15 107:7 133:23 151:13

housekeeping 151:11,19

HR 127:3

human 75:16,18

hundreds 57:4

husband 77:24

Hyper 146:6,7

hyperactivity 147:14

hypercapnia 89:14,25

hyperflexion 149:15

hyperthermia 62:7 78:23 79:17 145:21,25 146:4 147:12

hypo 146:3

hypothetically 78:21 79:15

hypoventilation 85:6 89:14,25 91:19 92:14 96:3

hypoxemia 89:14,25

hypoxia 96:3 101:7

─────────

**I**

ice 81:16

idea 12:10 148:6

identical 41:17

identification 11:8 13:7 22:7 40:19 88:18 94:23 100:15 102:9 114:5,22 123:5 124:19 126:25 127:21 129:3, 13 130:4 132:12 152:25

identified 127:3,24

identify 51:20 123:18

illuminating 55:15

illusion 62:5

imagine 84:14 100:4 146:22

immediately 133:23

impact 63:2 124:6

impede 23:12

impervious 144:24 145:7 147:12

important 74:3 93:8

inability 75:15 146:19

inactive 24:7,8,9,13

inadequate 82:5

incident 74:10 136:16, 19

incision 31:14 35:5

incisions 32:18

include 26:1 42:14,18 62:7 73:19,22,24 118:2 147:11

included 8:19 57:18 77:7

including 26:13 48:11 85:16 102:3

income 103:23 130:7, 11,19,21 131:4,9

inconsistency 38:12

inconsistent 43:22 44:3 83:5

incorporate 47:9

incorrect 8:15 47:25

increase 85:4 141:20 142:6 143:3

increased 141:3 145:10,17

incredible 81:18

independent 18:5,11 46:3 103:7,11

independently 125:21

index 152:13

indicating 96:2,4,15

**Alpha Reporting Corporation**

**Cyril Wecht - March 21, 2017**

indication 33:18 41:24,25 75:2

indicted 107:15

indirectly 69:17,18,25

individual 77:20 85:5 101:2,20 137:12,23 144:24

individuals 67:6 83:2 90:9,15,21 95:21

infarct 34:2

infarction 92:21

infer 132:24

inferred 18:20

influence 69:20

information 11:11,22 14:8 19:8 25:22 36:18, 19 37:5,9,16 38:3,5 43:5 47:9 70:25 87:1 133:5 135:10,17

informational 47:10

infrequently 46:25

ingested 68:20

ingestion 63:14 64:14, 23 65:7,12 66:3 67:16 68:9

ingredient 24:6

inherent 97:23

inhibit 138:13,21

initial 20:7 36:11

initially 11:10 112:25

initials 16:7

injection 68:16

injuries 34:19 73:4

input 46:22

instruct 84:3

instructions 85:17,20

insulted 138:2

insurance 115:16

intact 35:4

integral 26:15

intend 53:17 56:2

interactions 136:12

interested 42:21 70:22

interesting 63:23 83:11 93:16

interestingly 79:9

internally 31:13

International 102:3

interpret 78:8,12

interpretation 24:11 77:16 78:13

interpreted 15:4 44:2

interview 127:2,5,6

investigating 95:24 139:25

Investigation 57:7 140:8

investigative 90:2 115:23

invoices 114:7,11,19

involve 78:25 80:16 90:15 106:6,7

involved 19:18 57:22 112:24 121:17

involvement 80:21 119:14

involves 103:18

involving 90:3 113:9 143:11

irregularly 94:10

ischemic 144:10

isolated 38:9 93:9

issue 135:18

issued 20:12 22:13 102:4

issues 134:15 136:1

items 40:7

---

**J**

J.D. 7:3

January 55:21 106:13 107:4 111:23 125:10, 14 126:4

job 94:14 108:14

jobs 103:6

Joe 100:8

Johnny 85:11

joint 134:14

Joseph 9:14

journal 44:22 45:3,18 46:3,17,20,25 47:4,15, 16,17 48:4,18,24 49:3, 11,13 50:4,16,25 51:13 52:4,6,14 53:5,6 56:3 58:5,13 60:10,19,21 82:9 84:15 85:25 87:5, 12 88:21,22 91:11 95:1 99:17

journals 44:11 45:6 47:1,10,19 51:19,22 52:9 53:12,13 58:1,2 60:23 61:2 83:16 88:12 95:15

judge 107:18,20 122:12,16

judge's 122:21

judicial 122:23,24

July 8:4,7,9,13,16,18 9:2 10:17,19 11:1 12:3 16:15,19 22:21 31:8 32:1,2,3 35:24 37:7 42:23 62:24 127:4,5

jumped 69:24

jumping 29:19 86:16

June 107:22

---

**K**

Keith 127:2

Kelli 134:15 136:16

---

Kent 145:20

Kentucky 116:25

kidney 22:25 33:1

killed 69:19

kind 12:1 15:11 20:8,9 24:4 27:20 39:16 47:16 63:21 68:13 75:14 76:21 98:11 118:12 142:16,21 145:16 146:13 149:19

kinds 35:17 45:16 48:10 66:8 68:7 78:5 82:6 90:12 103:22

kneeling 101:20

knees 137:16 139:12

knew 14:2,4 70:18 126:18,21

knowing 27:24

knowledge 49:6 63:18 81:1 111:19 122:5 134:25 136:7,9

---

**L**

lab 23:24

label 129:7

labeled 15:11 44:16

laboratory 26:22 72:23 135:3 136:8

lady 99:24

landslide 81:22

language 100:4

large 98:14,20 141:3 146:9

larger 28:15

largest 51:5

law 48:12 85:16 103:15 104:17 105:6,22 108:4, 21 121:18 122:23 150:16,19

lawsuit 113:3 134:12

lawyer 108:17 109:1,5

**Cyril Wecht - March 21, 2017**

122:12 148:18

**lawyer's** 122:24

**lawyers** 109:10,20 110:1,4,21 148:14

**lay** 88:12

**lead** 66:10 68:17 69:17 86:21 139:1

**leading** 25:25 52:23 55:18 78:16

**leads** 96:3 138:5

**learn** 12:2 50:9

**leave** 12:21

**lecture** 57:10,11

**lectures** 57:24 58:6

**led** 105:13

**Lee** 57:9 140:11

**left** 41:12 89:6 108:13 134:16

**left-hand** 93:2

**legal** 19:20 40:5 45:4 48:16 60:10,12 88:11 95:1 109:2 117:20

**legs** 137:14

**length** 149:8 150:1,5

**lengthy** 115:23

**let alone** 48:12 88:12

**letter** 8:10,12,20 16:2 20:14 21:13,17 25:13 28:23,24 29:1,6,8 30:20 36:7,13,15,23 37:19 39:7 40:25 54:4 100:25 101:8,16 116:12 126:9,12,14 132:7,15,19

**letters** 47:22 88:13 129:8

**level** 71:16,22 72:9 82:4 135:8

**levels** 62:16 79:3 105:8,22

**license** 109:2 111:15

**licensed** 9:18

**licensing** 111:18

**licked** 135:21

**lie** 91:25 100:8,9 137:22

**life** 29:11 38:2

**lift** 145:3

**lifting** 9:24

**likewise** 144:14

**limited** 77:17 84:21 143:18 150:8

**limiting** 149:15

**lines** 31:14 37:8,13,14 38:6

**lingering** 65:25

**lining** 34:12

**liquid** 135:16

**list** 9:3 32:23 46:12,14 70:1 142:5 143:2 144:22 145:24 147:17, 20

**listed** 41:10 44:19 69:7,10 108:22 109:23, 24 111:9 125:5

**listen** 71:8

**listing** 41:17

**lists** 8:14

**literally** 69:4 145:3

**literature** 53:15,18 54:19 55:25 56:19 67:3,15 68:25 69:11 95:8 102:12,20

**litigation** 118:18

**liver** 22:2,24,25 23:1, 22 33:1 53:9 141:9,12

**living** 73:20,22,25 112:9

**local** 84:2 105:8

**locate** 61:12

**logical** 19:13

**long** 9:10,15 69:22 81:8 82:3 103:2 109:12 110:17 140:21 146:12

**longer** 74:12 81:16 82:2

**looked** 84:24 95:12 128:5

**lost** 89:8 98:11

**lot** 9:24 19:3 52:7,12 72:21 73:3 84:8 97:5 100:2 132:3

**love** 93:18,21 107:8,9

**lower** 140:25

**LSD** 11:17 26:18 27:4, 12,23,24 54:11,21,23 55:1,5,8,12,18 56:16 58:13 62:1,2,14,19,24 63:2,5,8,14,17 64:14, 19,23,25 65:3,9,11,15, 18 66:1,3,8 67:16,21 68:8,9,15,16,20,24 69:7,15,17,20 70:8,20 78:3 135:16,18,24 136:3,8

**LSD-INDUCED** 62:20

**lung** 33:19 143:13

**lungs** 33:1 75:23 76:2, 3 94:13 143:6,9

**lying** 99:23 101:21

**lysergic** 62:1

----

**M**

**M.D.** 7:3

**madam** 151:20

**made** 11:25 18:4,10, 11,20 19:22 24:24 27:23 32:18 62:23 65:13 70:21 71:7 92:2 100:17 113:13 114:8 123:12 149:18

**madrases** 62:7

**mail** 22:17

**main** 33:11

**major** 52:19,23

**majority** 84:1 119:13

**make** 12:18,25 14:11 19:4 20:19,23 25:14, 18,22 27:14 28:5 38:18 40:7 43:21 45:15 48:7 53:3 56:19 58:18 60:19 65:23 73:7 102:19 107:10 113:16 130:14 131:7 134:18 136:2 142:24 148:17

**makes** 49:20 65:1 145:6

**making** 30:3 53:25 98:21

**malpractice** 73:9 74:18 109:19 150:12, 19

**man** 11:13 78:2 81:23

**man's** 27:2

**manager** 127:3

**Mancuso** 9:14

**Mancuso's** 9:16

**manifestation** 71:18

**manifested** 64:9

**manner** 11:23 80:13

**marijuana** 24:6,15 63:16,18,24 64:4,8,10 134:19 135:1,7,11

**mark** 11:5 12:17 22:4 40:12 88:15 100:12 102:6 114:2,19 123:2 124:16 126:22 127:18 129:10 130:1 132:9

**marked** 11:7 13:6 14:24 22:6,10 28:3 40:18 88:17 94:22 100:14 102:8 114:4,21 123:4 124:18 126:24 127:20 128:18,24 129:2,12,22,24 130:3 131:23 132:11,20 134:5 152:25

**Markle** 57:8

**Marty** 152:14

**Cyril Wecht - March 21, 2017**

material 27:22

materials 115:22 116:17 123:13,15,19 129:10

mathematics 49:24

matter 10:13 18:23 19:18 23:16 52:19 68:19 70:7 75:5 76:13, 15 122:23 132:23 151:12

matters 50:10 78:5

maximal 80:13,15 89:18 95:3 96:16 105:12

maximum 83:19 92:14

Mccormack 13:9

Mcintosh 54:6

MDMA 68:6 79:2

Meaning 14:14

means 51:23 76:9 84:19 138:11,19

measured 101:5

measurements 89:13

Measures 95:5

mechanical 76:15

mechanism 69:14

mechanisms 138:15, 22

medical 17:1 19:24 20:3 26:23 28:15 35:7 39:15 42:6,9 43:1 45:23 46:2 52:14 53:15,18 54:19 62:3 66:18 67:10 71:10 73:8 74:4,10,11,17 76:17 78:7 102:12 104:1,12 105:23 106:3,7 107:1,3 109:18 111:3,15,18,24 113:9 123:24 124:3 128:2 143:17 144:20 150:11,19

medicine 45:4,19 46:17 47:17 48:16,24 49:23 60:11,13 84:23 95:1 104:3,5 125:24

meet 46:21,23 79:19

meeting 115:4

meetings 58:7 109:23 110:25 111:6

member 44:12 45:2 46:20 49:7 50:19 66:22 91:13 108:21,22 109:9, 13,14,18,25 110:5,8, 14,17

members 49:4,11 51:3,25 84:20

memory 54:14

mention 20:12 74:2 77:23

mentioned 33:22 53:13 108:23 145:11

met 133:23

metabolic 89:2 93:7

metabolism 23:22

metabolite 24:3,8,9, 13,14

methamphetamine 79:2

microscope 14:17

microscopic 10:6 15:1 33:25 42:1 144:15

microscopically 34:9 144:5,13

midline 141:13

mike 135:23

mild 63:19,24 64:6

Miller 148:21 152:20

million 68:23

mind 19:2 47:12 54:13, 16,18 70:15 74:16 140:6

mine 125:25

minute 21:15 38:10 97:14 98:11 126:14 148:11

minutes 7:24 27:19 62:11 77:6 81:12,20

92:6

Mississippi 17:1 19:23 20:3,16 24:25 25:3,19 26:14 27:3,17 32:4 33:4 35:7 61:13, 15,20 73:5 124:22,24 128:1

Missouri 57:17

mistake 8:25 9:1,2

mistakes 30:8

moderate 93:6

modification 105:19

modus 18:23

money 49:8.10 131:7

monies 130:14

monitoring 126:18

monoxide 82:2

month 54:14 107:4 117:23

months 18:6,13 19:6

moorings 32:15

morning 136:23

motion 94:11

mouth 76:10 139:3 147:15

move 150:1

mucosa 34:12

mucosal 34:11

multi-organ 144:16

multiple 96:4,15,21

musculature 32:19,20

myocardial 92:21

---

**N**

---

N-I-C-H-O-L-S 55:6

naked 14:14

named 49:11 112:25 113:3,8,14

names 54:25

nanograms 24:5

narcotic 65:6

narrative 17:12

National 26:23 45:20, 22 46:2 66:18

nature 15:7,15 33:25 43:23 49:21 50:11 52:3 65:25 74:6 76:13 94:6 115:22 122:25

necessarily 80:17 84:21 139:8

neck 80:22

needed 47:25 52:10 53:3,6

negated 94:1

nerves 145:7

nervous 68:1 79:1 145:6

neuropathology 53:9

ng/ml 62:15,17

Nichols 55:5 125:8

Nichols' 55:9,13

night 100:11

NMS 27:15 28:2 36:3 134:23 135:4,6,7

nominally 103:13

non-pmr 98:8

non-prone 98:8

normal 71:20 76:8,14 77:4 142:4

Nos 152:24

nose 76:11 139:3

notation 136:4

note 42:8,25 43:9,13 134:13 136:12

noted 74:23 77:14

notes 28:5

notice 117:11 123:3,10

**Cyril Wecht - March 21, 2017**

noticed 74:19

November 17:15 18:3, 8,10 29:24 107:2

nowadays 86:25

number 8:14 16:12,20 29:19 54:2,10,15 68:22 78:22,23 96:18 118:13, 14,16,19 119:16 126:23 129:8

numbers 54:9,17,18 55:3,6 56:10,16 77:7 118:21,24

nurses 150:13

---

**O**

Oakland 7:25

obese 141:2,16,18

Object 18:14 72:18

objection 102:15 122:24

objections 122:20,22

objective 71:3

observation 14:11

observations 73:10 93:4 127:12

observe 73:13

observing 72:15

obstructing 139:6

obstruction 142:21

obtained 36:22

occasion 59:14 111:25

occasionally 47:6

occasions 65:19

occupies 141:13

occur 69:15 138:12,19 139:10

occurred 90:8,21 98:8 127:7

occurring 62:19 93:10

ocular 34:13,17

offering 73:16

offhand 58:4 68:2

office 28:14 43:4,19 107:21 128:3 129:7 134:10

officer 150:23

Officer-involved 140:1,9

officers 84:4 150:20

officers' 136:12

offices 28:15,16

official 46:1

oldest 99:22

one's 141:21 142:6 143:3

Onecare 43:12

open 107:7,10 108:5

operandi 18:23

opinion 18:6 48:17 50:1,2 56:3 70:22 78:6 83:6 96:23 97:1 122:7 124:9 125:25 126:1 128:7 137:6,18 149:10

opinions 18:13 38:17 47:23 49:18 52:24 53:19 54:21 55:10,11 56:9 59:1 73:17 84:24 103:5 122:17 124:6 125:17,20 126:16 127:9 132:1 150:8,12, 14,20,24

opposed 23:15

opposite 75:5

oral 143:19

order 116:15

ordered 152:23

orders 102:4

ordinarily 145:15

ordinary 101:20

organ 23:24 53:10 143:14

organization 48:5 60:13,16,17 66:19,22 91:10,13 109:15 110:3, 16,17

organizations 85:16 110:9,19

organs 10:3 14:11 15:12 23:19 31:12,13, 15,21 32:7,9,21,24 33:3

original 14:3 19:10 26:24 31:22 43:10 101:1 115:3 152:15,21

output 95:4 99:9

overwhelming 84:1 119:13

owing 151:14

oxygen 71:16,22 72:8 74:21 75:10 76:2,3,5,8 81:11,12 82:4 94:12 137:24,25 138:6 142:17,22

oxygenation 96:5,17 138:3

---

**P**

P-A-R-I-K-H 125:14

P-A-R-I-M 125:14

p.m. 9:5

pacing 63:12

pages 29:19 82:13

paid 103:12 114:12 116:4,6

pain 75:13 144:24 145:4,7 147:12

palpation 35:4

pancreas 33:2

panic 62:7 75:9

panoply 51:11

paper 45:17 133:7 135:25

papers 55:7 103:1

paragraph 41:1 82:19 89:5 95:19 97:12,17 98:5 99:2

paragraphs 27:10 36:18 38:22

parameters 83:10

paranoid 62:8

paravertebral 32:20

parent 112:18

Parikh 125:14,15

Parikh's 126:3

Parim 125:13

parking 103:15

part 8:11 12:23 19:19 25:23 29:25 35:15 65:15,16 66:7 73:11 83:7,8 112:16 139:16

partial 80:17 82:1

party 109:4

pass 82:16 148:23

passed 21:11

past 65:21 141:13

pathological 14:1 42:4 93:20

pathologist 43:11 55:14 73:4 103:8 106:3,17,20 116:22,25 117:3,5,7

pathologists 48:21 67:14 86:4,19,20,25 87:9 106:4

pathology 9:17 15:23 45:19 46:18 47:18 48:25 49:23 52:12,13, 18 53:12 58:19 59:6 60:2 67:2,15 82:10 87:5,12 95:8,15 100:18 104:2,4,11,14,16 112:6,8,14,15 113:7 130:15

patient 72:15 76:18 81:4,8

patient's 48:22

---

**Cyril Wecht - March 21, 2017**

**patiently** 133:11

**patients** 73:20,23,25 112:3,9,10

**pattern** 89:12 96:1

**pay** 46:4 49:9 50:4,9 107:7 115:18 116:11

**payment** 103:16,18 114:16 115:3,4,15,17, 19,20 116:2,16

**payroll** 103:11

**pearl** 81:17

**peer** 87:12

**peer-reviewed** 48:8, 25 49:1 51:15,23 58:1, 2,5,8,13 84:12,16,18 86:1 87:5 95:11,12 104:22

**pending** 14:8

**Pennsylvania** 103:10 109:25

**people** 35:17 47:21,23 49:5,17 50:9 51:6 52:4, 7,13 54:25 58:23,24 66:13 67:1,6,9,13,20, 25 68:14,22 69:18 78:25 79:11 80:22 81:14,15,17 84:8,22 85:12,15 88:13 92:24 94:1,19 99:19 103:5 107:24 108:24 145:1, 18 147:19 149:14

**people's** 58:25

**percent** 49:12 68:20 71:17,19 72:9 74:21 78:24 120:10,16

**percentage** 80:19 120:5 121:4,15 130:19, 25 131:2,8,9,13,15

**percentages** 131:4

**performed** 9:3 14:4 18:12 31:10

**period** 64:17 84:6 146:11

**permitted** 13:25 122:8

**person** 72:20 81:19 93:19 97:8 99:22 103:7 134:17 135:11 137:18, 23 141:2 142:15 145:6 147:8

**person's** 80:2

**personal** 37:17

**personally** 113:15 116:23

**personnel** 73:2,3 74:11

**perspective** 50:13 139:15

**pertaining** 28:5 29:17 57:2

**pertains** 110:21

**perusal** 30:23

**petechial** 34:13,21,24

**Ph.d.** 55:6

**pharmacological** 62:18 79:18

**pharmacologically** 63:19

**pharmacology** 104:17

**pharyngeal** 143:12,19

**phenomenon** 75:8 86:8 147:4

**Phillips** 7:8 11:5,9 12:17,24 13:8 18:15 22:4,8 29:11,15 31:7 32:5 40:12,14,16,20 61:3,5,11,16,18 73:15 84:11 88:15,19 94:24 100:12,16 102:6,10,17 114:2,6,19,23 123:2,9 124:16,20 126:22 127:8,18,22 128:25 129:4,10,14 130:1,5 132:9,13 133:10,25 135:5 144:9,18 146:5 151:11,16 152:14

**phone** 10:14 36:23 136:16

**photo** 127:25

**photographs** 28:7,12

**photos** 25:11 28:16, 17,20,21,22 128:2,4,6

**phrase** 149:9,11

**physical** 9:25 64:16,20 65:2 66:10 76:15 89:2 137:17 141:20 143:1 145:17

**physician** 42:10,16,17 112:4 124:4,14

**physicians** 87:7,10 95:10 148:22

**physics** 49:24

**physiologic** 85:4

**physiological** 62:5 75:8 76:14

**picture** 38:16 142:2

**piece** 55:25

**pieces** 14:18

**Pittsburgh** 104:3,5,7 107:24 108:13 118:8

**place** 84:4 85:18 89:9 102:4 126:19 127:14 142:18

**places** 105:25

**placing** 101:2

**plaintiff** 120:3,10,12, 16,20,23 121:11 151:24

**plaintiff's** 109:16 110:4 131:25

**play** 52:23 108:16 120:17

**played** 25:25 70:23

**plays** 52:19

**plead** 108:20

**pled** 111:12

**pleural** 34:24

**PMR** 95:24 97:20 99:10

**PMR-O** 95:21

**PMRP** 89:8,11,17 90:9,

21 91:20 93:5

**point** 17:6 20:20 21:23 33:12 61:4 71:10 82:25 97:2 104:21 107:16 123:25 135:23 136:15 140:19

**pointing** 73:9

**poison** 94:8

**pole** 150:4

**police** 11:19 28:18 38:7 39:10 43:8 67:10 74:8,9,10 77:23 84:2,4, 10 90:3 98:15 100:5 102:2,3 127:14 136:14, 19 140:12 146:21

**police-related** 57:7,15 79:9 145:2

**policeman** 79:12

**policemen** 139:11

**policies** 105:9

**political** 48:12

**politically** 108:2

**politics** 48:13

**portion** 77:7,15 120:2, 3 123:7 131:17

**portions** 140:25

**portray** 38:16

**pose** 70:5

**position** 44:21 64:16, 25 71:1 72:22,24 74:9 77:5 80:16 82:15,24 83:2,19,20 84:5,6 85:6, 8 86:3,12,21 87:1 89:18,20 90:22 92:15 94:2 95:3,21,24,25 96:3,16 97:10 98:16 99:4 100:4 101:3 102:5 103:25 104:23 105:13 106:9,12,14,16,21 111:20,23 137:12,13, 15,16,23 139:1

**positional** 56:18 57:2 58:3,10 70:22 78:5 80:12 81:3,4 82:15 85:7 95:23 102:21

**Cyril Wecht - March 21, 2017**

137:7,8,10,20,22
138:10 139:9,15 141:4,
21 142:7 143:3

**positioning** 93:5
138:12,20

**positions** 44:17 98:9
99:10 103:1,6 104:8
106:7

**positive** 20:9 24:3,22

**possession** 18:6,13

**possibly** 10:17

**posteriorly** 149:16

**postmortem** 8:13,24

**postpartum** 35:5

**postulated** 95:20

**potential** 136:25

**potentiate** 63:16

**potpourri** 51:11

**pounds** 97:21 99:11,
23

**practice** 20:19 26:5
73:19 108:17 112:17
115:7

**practiced** 109:1

**Practicing** 108:22

**preceding** 37:21

**precipitating** 79:17

**predicate** 105:6

**predominantly** 110:4

**preexisting** 141:20
142:6

**preface** 78:18

**prefer** 78:9 151:22

**preferable** 33:7

**preference** 23:24

**preliminary** 29:12
30:13,16

**preparation** 14:19

**preparatory** 122:25

**prepare** 12:8

**prepared** 13:10 15:3
17:1,17 36:10 50:3
70:9

**preparing** 14:16 53:23

**prepayment** 115:7

**present** 35:12 46:19
106:19 120:11,21
146:1

**presented** 103:2

**press** 18:3

**pressing** 80:22
139:10,11

**pressure** 71:14,15
141:8

**pretty** 19:1,3 38:8
110:10 116:2 117:24

**Prevention** 139:25
140:9

**previous** 10:3

**previously** 12:11
95:20 127:24 134:15
135:25

**primarily** 62:6 64:18,
24 65:3,9 150:25

**primary** 42:10,16 60:3
124:4,13

**prior** 10:20 65:19 91:17
92:3,6,13 126:19
133:23 144:8

**private** 7:18 28:20
35:23 36:9 103:19

**privileged** 30:16

**privileges** 112:2

**pro** 108:19

**problem** 100:1,7
143:11,21

**problems** 11:16 77:20
102:22 105:13

**proceed** 62:12

**proceedings** 57:13

**process** 19:20 77:4

**processes** 93:20

**produce** 62:4 64:4
68:16 101:4,18 143:21

**produced** 68:12

**produces** 64:8

**producing** 34:6 66:8
142:21

**product** 30:6,14
132:21

**professional** 44:16
45:3,25 48:4,11 60:17
72:15,20 110:12

**professionals** 73:11

**professor** 104:2,4,6,
11,14

**professors** 103:14

**programs** 111:3

**prohibited** 122:6

**prolonged** 64:17 77:5
87:1

**promulgated** 105:20

**prone** 80:13,15 89:18
92:14 93:5 95:3,25
96:16 98:16 99:4,10
105:12 137:13

**proof** 101:19

**properly** 75:22 88:7
139:14

**proponents** 145:18

**proposed** 67:24

**prospective** 98:14,21

**prostate** 33:2

**provide** 46:22,24
152:17

**provided** 8:11 12:4,11
18:3 21:9 39:23 41:4
43:3,18 56:22 116:19
123:22 131:24 134:6

**providing** 10:5

**psychodelic** 62:4,16

**psychological** 85:4
97:6 143:15

**psychotic** 65:6,9

**public** 30:3 88:12
104:6 116:14

**publication** 44:22
45:20,22,25 46:1,8
50:17,22,24 57:10,11
58:12 87:14 88:9 95:7,
14 139:24

**publications** 44:16
45:6 48:11 57:25 58:2
102:21

**published** 55:7 57:1,
13 58:6 59:12 84:15
85:24 87:4,11 88:1
95:1 99:16 104:22
139:22 140:4

**publishes** 60:14,17
91:10

**pulmonary** 33:19 72:5
96:1 101:5,19

**pulmonary/chest**
72:6

**pupils** 147:16

**purchased** 135:11

**purchases** 134:16

**purpose** 44:3 71:4

**purposes** 19:16
134:20

**pursuant** 148:4

**pushed** 141:7

**put** 17:17 99:23 100:9
110:20 129:7 135:20

**putting** 49:19 72:16

**Q**

**quantitative** 56:9,15

**quantities** 54:3,11

**question** 20:1 35:15
47:20 55:23 57:23
63:23 66:6,15 67:18
69:12 70:10,14,15,16
71:3,4 73:1 74:15 75:4
77:18 86:19 87:18 90:4
96:13 104:20 120:25

**Alpha Reporting Corporation**

## Cyril Wecht - March 21, 2017

123:6 128:16 133:11 134:1,3 135:13 137:4 143:17

**questioning** 133:24

**questions** 70:2,4,5 133:13,14 134:7 144:9 148:9,23,25 149:2 151:6,10

**quibble** 69:4

**quickly** 94:15

**quote** 136:17

**quoting** 101:14 134:14

---

**R**

**raised** 70:8,10 71:16

**rapidly** 138:7

**rare** 50:11 62:12,19

**rate** 71:13,16 72:8

**ratio** 131:12

**reach** 13:18 15:19,23 17:7 29:23 65:24 82:4

**reached** 17:20,23 30:1 83:6 102:13 105:22

**reaction** 65:15

**reactions** 62:8,9

**read** 13:17 47:4 50:25 51:1 53:21 54:24 61:25 62:21 64:7 77:16 78:14 82:22 85:2 87:21 90:18 91:21 92:17 93:12,13 96:6 98:10,18 99:6,13 101:9,23 105:10,15,16 123:6,7 135:2 136:4 138:9,17 152:5,7

**reading** 77:17 147:10

**ready** 9:25

**reality** 19:17

**realm** 48:12 53:11

**reason** 30:10 33:11 81:11

**reasonable** 48:21 78:6 86:3

**reasons** 26:8 66:16 79:14

**recall** 10:12,14 11:12 12:6 26:12 32:18 37:9 46:5,25 47:8,15 56:25 57:3 59:8 71:13 72:4 76:20 109:22 110:16 113:2 121:19,20 134:21,24

**receive** 26:11 38:15 47:5 50:4,9 51:1 60:22, 24 61:2 103:17,19 134:18 136:3,18

**received** 17:3,5 19:8 20:5,10,11,19 22:9,15 25:8,12,16 26:13 27:16,22 28:2 32:6 36:24 37:5,13 39:9,10 40:6 42:5,12,13,22,24 43:12,15,16 49:8 55:3 124:5 126:9 127:1 128:1

**recent** 89:7,10,24 98:14

**recess** 61:9 133:16,17 148:19

**recision** 105:18

**recognizable** 102:2

**recognize** 10:22 29:2 67:16 86:9 87:6 100:19 144:21

**recognized** 55:4 71:5 85:25

**recollect** 121:12

**recollection** 11:13 13:11 18:22,24 37:12, 14 38:11 47:2 53:24 132:24 135:20

**record** 39:10 42:18,19 43:12,14 54:7 61:10 71:11 73:6,12 74:22 76:17 107:6 123:18 133:18 148:10,16,20

**recordation** 146:23

**records** 8:5 12:4,6 29:11 39:15 42:6,9,14, 15,22 43:1,5,17,18

44:2 74:4 123:24 124:3,5,11,13 130:6

**Reexamination** 82:14

**refer** 13:4 20:7 26:4 27:20 40:8 47:6,14 54:2 56:8 59:13 78:13 81:6 87:3

**reference** 16:3 19:22 20:13,15,19,23 25:15, 18,20,22 26:6,8 39:7 40:8,21 45:10 47:8,19 52:11 53:3,6 56:19 57:18 58:18 60:20 61:20,23 62:23 63:10 64:11 71:7 74:13,22 76:18,20 90:10 91:7 92:4 98:24 100:17

**referenced** 16:1 96:22 136:3,14 149:8

**references** 8:24 43:25 55:7 63:20 68:5

**referencing** 54:22 136:13

**referred** 24:18 28:2 30:10,14 37:9 38:6 39:11 47:15 54:11 55:3 56:16 63:5 68:14 72:9 105:20 111:22 115:21 125:7 135:1 150:16

**referring** 19:10 27:15 30:11 43:7 55:8 56:14 89:23 96:10

**refers** 15:11 137:22

**refine** 96:13

**reflected** 73:5 74:20 77:15 110:7

**reflection** 71:23

**reflects** 109:9

**regard** 9:21 12:19 24:1 54:21 58:25 120:14

**regularly** 46:21,22,24 47:4 50:25 60:25

**reject** 88:3

**rejected** 67:1,8 83:23

**relate** 53:10 104:9

124:9

**related** 64:14,23 66:14 67:20,25 68:3,8 80:3 123:13,15 131:10

**relates** 19:17 70:7 135:8

**relative** 56:16 115:5

**relevance** 66:2 128:8

**relevant** 15:15 25:24 26:2 28:17,21,22 101:7,18

**reliability** 58:22

**reliable** 23:20 47:18,21 51:20

**rely** 43:2,17 47:7 52:4 53:18 55:9,13,16

**relying** 53:21

**remain** 90:22

**remained** 23:6

**remaining** 129:16

**remember** 54:15 57:17 59:22 60:13 68:4 69:22 109:21 117:13 121:6,8,22 122:21 132:7

**remove** 34:16 72:23

**removed** 32:7,13,17, 21,24 33:3 107:19

**removing** 76:8

**reopening** 31:14

**repeat** 85:15

**repeatedly** 76:1

**repeating** 55:23

**repetitive** 133:25

**rephrase** 122:10 134:3

**report** 8:2,19,25 12:8, 14 13:10,14,18,23 14:3,24 15:10 16:2 17:1,5,9,11,12,13,17, 19 19:1,11,22,23,25 20:3,6,7,13,16,23 21:21,25 22:13 24:1, 10,23,25 25:2,8,13,15,

**Cyril Wecht - March 21, 2017**

19,23 26:3,13,14,18,
23,24 27:3,4,7,15,18
28:2,3 29:3,16,18
30:11,13,15,16,18
33:22 36:10,12 38:7,18
39:3,10 40:8,21 41:9,
14,19 43:10 44:6 47:16
53:14,24 54:1,3,5 55:4,
9,13,14,16,19,24 56:17
61:12,14,17,20 62:23
63:8,10 64:11,21 70:1,
9 74:2,10,14,17
113:16,18 124:22
125:12,15 126:3 129:6,
9 130:16 133:1 135:7
144:6 148:4 149:8

**reported** 27:12 35:8
62:17 65:14 68:25
69:21 77:22 79:25 80:8
89:7,10

**reporter** 123:8 151:20,
22 152:5,19

**reporting** 28:23

**reports** 19:3 21:14
29:12 31:3 38:13 43:7
68:19 69:8,9 94:1 98:7
115:23 124:24 125:1,7

**represent** 149:6

**represented** 87:22
109:4

**representing** 126:8

**Republicans** 107:17

**request** 116:1,16
120:2,3 121:17 134:18
136:2

**requested** 21:22 123:7
125:1 147:25

**require** 115:7,11,19,20
116:8

**research** 45:7 58:9
86:1,5 99:16 100:25
102:20,25 103:4
105:14

**resected** 31:12

**reserve** 152:10

**reservoir** 81:12

**residency** 112:12

**resign** 107:5 111:23

**resigned** 107:3,14

**respected** 48:3,4,9
51:13,15,16 59:24
117:3,4,7

**respective** 32:15

**respiration** 74:21
101:22

**respiratory** 71:13,16,
19,23 72:8,10 76:14
77:12 82:24 83:20 85:6
86:14 137:19 138:5,14,
21 143:18

**respond** 70:6

**respondeat** 113:12

**response** 78:19 79:16
122:21

**responsibility** 44:23
45:5

**responsible** 83:1

**rest** 19:17,18 151:19

**restrain** 86:13

**restrained** 11:23 12:1
80:13 90:14,16

**restraint** 80:14,15
82:15,23 83:19 85:8
89:3,18 92:15 93:11
95:3 96:16 105:12
138:12,19 149:10,11

**restraints** 85:3

**restrict** 93:7

**restrictive** 89:12 96:1
101:4

**result** 62:19 63:8 69:15
76:25 77:1,3,4 79:7
97:9 137:18

**resulted** 89:11

**results** 14:8 22:10 23:7
92:8 95:25 97:21 101:6

**resuscitated** 35:18

**resuscitation** 35:10

**retain** 116:8 132:18

**retained** 13:14 119:2
125:13

**retired** 140:12

**retraction** 105:18

**retrieved** 21:3

**retrieving** 23:14

**review** 12:4 43:1,17
44:7,24 45:8,10,12,17
46:22 47:1,3 51:25
56:23 60:25 88:5,8
124:21

**reviewed** 17:24 19:23
20:2,20 41:7 42:6
43:20 44:1 49:17 51:24
52:22 87:13 123:19
124:2 125:4 126:6
127:23 128:4,11

**reviewer** 87:21 88:4

**reviewers** 87:13

**reviewing** 53:1 112:9

**reviews** 130:13

**revised** 45:1 139:23

**rib** 35:2,6,8,11,13,15

**right-hand** 90:13,19
91:17 95:19

**rigid** 20:21

**ripped** 107:20

**rise** 134:11

**risk** 95:22 97:23 141:3,
21 142:6 143:3

**road** 40:23 107:25
108:1

**rod** 150:4

**role** 10:5 25:25 52:19,
23 55:17 70:23

**room** 64:12 74:8 87:7,9
95:9 97:4 99:22 108:10
123:16 133:13

**rose** 71:14,15

**rough** 69:8 118:24

**roughly** 119:9 120:8,9
130:23 131:3,14,15

**routinely** 28:16

**Royal** 67:10

**rule** 20:22 122:13,16

**rules** 29:13

**ruling** 122:25

- - - - - - - -

**S**

**safe** 110:9

**samples** 21:3

**San** 84:10

**sarcastic** 72:25

**saturation** 74:21

**says'** 90:24

**scenario** 38:7 44:5
137:17 146:20 150:21

**scene** 41:2,5 136:19

**schedule** 62:2 113:20,
24 114:24

**scheduled** 147:23

**scholarliness** 88:6

**school** 103:14 104:1,3,
5,6,13

**schools** 104:12

**science** 45:4 48:13,15
49:24 57:9 59:2 91:11

**sciences** 50:16,18
51:4,8 104:17

**scientific** 48:11 51:5,
6,10,12 66:5 78:7
102:19 136:24

**scientifically** 45:14
69:1 78:20

**Scientists** 88:21 91:8

**scope** 150:24

**scream** 75:24 76:2,3

**screaming** 64:22
74:24 75:21 79:24

**Cyril Wecht - March 21, 2017**

seated 89:12

secondary 99:4 137:6, 8

secret 70:11

secretary's 9:2

section 7:25 36:11 44:15 56:18 84:25

sectioned 144:12

sections 51:9

seepage 23:6,8

seizures 62:7

self-imposed 20:22

seminars 110:20 111:2

send 44:25 52:15 116:12,14

sense 19:4 126:1,17

sensory 145:7

sentence 27:11 41:18 82:18,22 85:2 89:5 90:8,14,18,24 92:25 93:2 98:5,6,13 99:1

sentences 96:22

separate 32:9,11 47:11 129:21

separately 40:17 42:19 46:4

September 25:4,5 29:7 30:2,12,20 31:4 37:19 40:25 82:13 132:6,15

series 44:19 49:16

served 50:21 82:10 88:22 91:15

services 26:23 131:20

Serving 130:12

set 49:18 69:11 94:11 110:8 127:12 139:19 152:15

sets 96:11 125:24 140:23

setting 90:2,3 93:11

seventh 35:19

severe 34:5 141:25

shackle 149:24

shackles 140:15

shaft 140:21 150:4

shipped 10:21

short 61:9 133:17 148:19

shortly 17:8 23:15

show 15:12 24:17 68:19 88:20 92:13 94:25 114:11 130:6

showed 33:23 92:5

showing 13:13 17:4 92:4 114:8 132:7

shown 69:1 96:19 102:21 108:6

shows 47:24 89:24

side 90:13 141:14

sign 116:9 147:5 152:7

signature 152:10

signed 11:2 52:22

significance 26:25 43:23

significant 30:19 38:12 91:19 92:13 102:12 142:9,23 145:10

significantly 48:1 99:9 132:4

signs 147:6,8,20

similar 98:7 135:13

simply 49:22 149:24

single 107:16

sir 7:9 8:23 10:22 20:2 21:3,22 32:1 34:18 35:9 38:1,22 39:19 41:16 50:2 60:7 74:19 96:12 107:13 108:1 120:6 125:11 138:18 140:3,8 141:12 145:9

147:10 148:8 150:24

sit 99:25 105:2

situ 31:15,21

situation 65:2 75:16, 19,21 92:1 97:4 100:5

situations 82:7

size 141:6

slides 14:16,20,22 15:4,11,23 41:19,20

small 89:11 96:1 103:13

smoked 134:14,15,19

smoker 134:16

smothered 81:21

so-called 90:11 95:23 139:4

soft 32:15,20 35:21

sole 106:19

something's 98:3

sound 45:14

sounds 61:1

source 23:22 37:21 41:1 74:9 86:22

sources 38:8 47:10,19 51:18 52:10

Southaven 43:8 149:7

Southeastern 148:22

southwestern 103:10

space 145:4

Spacing 30:25

speak 12:12 18:18 52:5 66:14 86:6,18 87:25 110:24 111:1 125:22

speaking 87:7

speaks 73:12

specialties 51:7

specialty 51:12

specific 15:5,13,15 18:24,25 25:9,20 33:24

38:9,10 47:8,14 53:10, 15,18,24 54:2,8,10,11 55:6,7,24 56:3,7,8,14, 15 71:23 72:4 81:6,7 85:17 102:24 132:24 150:22 151:6

specifically 11:12 13:16 27:1 43:11 47:16 59:22 61:19 84:3

specimen 23:13,14 113:16

specimens 22:20 112:9

spinal 32:21

spleen 33:2

spoken 38:1 111:5

St 112:19

stages 115:10

stain 15:11 41:19

stand 66:17

standard 9:6 73:17

stapled 40:17

start 66:4 89:9

started 9:9 46:1 61:6 90:18 118:7

starting 117:21

startlingly 132:3

state 13:19,21 27:11 28:18 32:3 54:6 64:21 65:5,16 66:10 70:16 74:7 77:25 84:2 86:2 97:6 105:8

stated 24:9 26:8 30:22 65:10 73:13 137:5 139:14 147:2

statement 15:10 18:3, 9,10,16 27:14 30:3 38:19 39:3 40:4 53:25 65:13 72:4,10 76:4 83:3,5,14,18 85:9,14 89:15 91:23 96:8,9,11, 17 126:7 127:1 135:1

statements 37:22 45:13 51:16 67:9 83:25

**Cyril Wecht - March 21, 2017**

105:4

**States** 84:3

**status** 148:6

**stenographer** 99:24

**Stephen** 152:20

**stethoscope** 72:12,16

**Steve** 148:21

**stimulant** 79:1

**stimulants** 66:15 68:2

**stomach** 141:6,7,11

**stop** 13:3

**stopped** 106:24

**stopping** 61:4

**stops** 76:25

**strapped** 80:10

**straps** 77:8

**streets** 107:23

**strength** 145:10,17 147:12

**strenuous** 101:3

**stress** 85:4

**strict** 149:14

**strings** 10:2

**strip** 77:15

**strips** 77:16

**strong** 67:8

**struggle** 90:16 101:4 146:13

**struggling** 146:10

**strychnine** 94:8

**studies** 20:24 21:6 91:18 92:3,7,13 95:23 96:2,4,10,15,21 100:8

**study** 64:2 83:22 84:9, 12 89:7,10,24 91:25 92:6,9,12 98:15,21 100:8

**stuff** 14:5 21:1 108:11

**stuffs** 139:2

**subclavian** 62:1

**subjective** 24:10 48:14 59:4

**subjects** 91:18,19 92:14 93:5

**submission** 115:4,12, 17

**submit** 14:5,18 17:10 23:10 45:11

**submitted** 8:2 10:1 17:9,12 19:25 21:1,4 22:3,24,25 23:2 25:10 29:3 30:7 32:22 37:9 38:20 39:1,4,11 40:9 55:4 58:1,5,12 95:9 116:7 126:2,4 134:22

**subscribe** 49:11

**subsequent** 101:16 105:14 137:19

**subsequently** 12:2 118:4

**subspecialties** 51:7

**substance** 62:2

**substantial** 115:22

**substantive** 26:2,25

**substitute** 13:5

**sudden** 83:1,9 90:6,8, 12,14,20 94:6,7 98:8, 17 145:20

**suddenness** 83:13

**sued** 113:5

**suffering** 63:4

**sufficient** 38:16,17 88:6 97:22

**sufficiently** 88:7

**suggest** 70:4

**suggesting** 92:2

**suggestions** 45:2

**suggests** 20:8,9 85:5

**suicide** 62:20 69:19

**suit** 112:21

**summaries** 38:13 39:22 43:3,18 123:21 134:6

**summary** 36:19 38:3, 19,25 39:4,16,17,19 40:9 41:12,20 97:17,19 134:8

**sums** 15:14

**Sun** 29:11

**superficial** 52:2

**superior** 113:13

**Superman** 145:3

**supervised** 52:22

**supine** 99:10

**supplemental** 114:25 115:22

**supply** 82:4

**support** 92:9 97:20

**supportive** 127:16

**supports** 104:22

**supraventricular** 68:12 77:13

**surprise** 139:20

**surrounding** 103:9

**survey** 86:23 102:19

**Susan** 100:9

**susceptible** 141:24 142:16,25

**sustained** 122:22

**Suzanna** 100:21

**sweat** 146:12

**sweating** 146:2,8 147:13

**sworn** 7:4

**sympathomimetic** 62:6

**Symposium** 57:8

**symptom** 145:9,11 146:16

**symptoms** 79:21 144:19,22 147:7,9,11, 17,21

**synergistic** 63:21

**synonymous** 30:15

**synonymously** 30:17 149:12

**system** 68:1 79:1 107:1 143:19 144:16 145:6

**systems** 53:11 106:6 143:14

---

**T**

**table** 85:23

**tachycardia** 68:12 77:14

**takes** 22:16 94:15

**taking** 10:2 76:8 77:16 83:14 127:14

**talk** 16:22 75:18 81:19 90:6 107:8,9,11,12 108:12,15,16 118:12

**talked** 18:19 37:2,3,4 70:24 82:9 83:15 132:2,6 143:10 150:11 151:7

**talking** 36:12 81:12 82:17 92:20 149:20

**talks** 57:14 136:12

**tangential** 74:6

**telling** 20:18 66:4 67:4, 21,22 91:25

**tells** 116:10

**temperature** 146:14

**temporal** 83:10 90:11

**ten** 7:24 110:9 120:19, 23 121:10

**tend** 118:1

**tendency** 142:18

**term** 140:14 149:23

**Cyril Wecht - March 21, 2017**

terms 15:6 30:17 34:5
70:20 127:13 131:3

terrible 75:21

territory 108:9

test 23:21,25 24:3
72:12 101:6

tested 135:2 136:5,8

testes 32:17

testified 7:5 116:5
119:7,17,23 121:7

testify 118:4 119:9
121:3,9,14 122:8,13,17
148:3,5

testifying 56:5,12
119:15

testimony 59:20
112:16 119:11 121:2
123:7 131:6 136:23
144:9

testing 21:2 58:9 96:2
101:17 102:20 105:14
134:19,23

tests 14:4 23:1

Tetrahydrocannabin
ol 24:5

text 60:3 139:21,25

textbook 53:2 56:4
57:20 58:17,22 100:22

textbooks 50:15 51:19
52:12

Thanksgiving 17:14

THC 24:5,9,12,13

theoretically 63:25

theory 105:15 144:19

thereof 143:7

thereto 71:4

thing 26:10 29:5 31:1
74:19 94:6,9 99:21
148:11

things 9:25 10:4 17:10
19:2,5,15 26:11 32:16
33:24 39:11 40:5,17
43:25 44:4,14 47:11

48:12,13,17 50:11,14
52:2,16,17 53:8,21
65:8 72:21 74:3 79:25
93:17 108:23,24
115:25 122:9 123:11
129:15 132:3 143:15
145:15 147:6,7

thinking 19:12 25:10
44:15

thoracic 31:13

thorax 35:4 101:17

thought 17:25 50:5
59:8 70:13 76:10 87:13
108:5 117:1 121:1,13

thoughts 17:22 66:9
70:19 78:3

thousand 118:23

throat 139:4

throw 118:23

tied 137:14 140:20
150:4

Tim 38:20 39:5 121:17

time 9:3,6,7,15 11:24
12:3,7 14:10 16:13,20
17:4,6,18,25 20:2
22:21 26:7,16 27:25
28:13 37:8,12,13 38:6
39:9 42:20 47:15,22
48:10 54:15 64:17
69:22 70:25 74:16 76:9
82:3 84:6 90:4 104:25
105:11 106:19 109:1,
12 110:7,18 112:7
113:2,4 114:13 115:12
120:11,21 121:6 133:1,
15 138:17 146:11,12

timeline 129:19,24

timelines 129:20,25
134:5

times 30:22 35:17 57:4
68:21 77:14 105:21
111:8 115:12 117:18
118:6,16,22 119:1,7,9,
12,17,23 121:10,11
135:14 150:16

tissue 14:18 22:3,24,
25 32:15 33:19,23

35:21 143:13

tissues 23:19,21 32:20

title 82:14 95:2

titles 111:6

today 12:11 21:10
30:23 33:23 56:5,12
74:15 96:20 102:25
105:2,21 114:7,13
123:11,16 125:7
126:11 150:16

today's 114:16

told 11:13,16 19:11
20:5 29:22 35:14 38:1
41:23 51:22 61:5 64:6
69:11 77:22 122:14
132:2,14 137:3 151:12

top 10:25 30:6 37:20
39:18 41:10 70:3

topic 58:3 91:3

total 80:16 81:11,20
118:15 119:17,19

touching 140:17

town 7:25

tox 61:20 124:24 125:1

toxic 24:21

toxicity 56:16

toxicological 26:22

toxicologist 21:2

toxicology 14:4,6,8
20:24 21:1,6,14,18
22:10 23:13,24 24:2,25
25:2,15,19,22 26:14
27:3,17 36:2,8 61:12,
14 104:18

trachea 143:9

traditionally 106:1

train 81:17

trained 9:17 72:14,20
73:2,3

training 9:16 118:9

transcript 152:3,6

transmittal 42:14

transmitted 37:10

transpired 19:10
38:14

transportation 36:4,8

trauma 62:20

treat 112:3

treating 112:4

tree 34:9

Trey 7:18,20

triage 74:20

trial 109:10,20,25
110:21 119:7,17,18
120:25 121:2 147:23,
24,25

trials 130:13

trip 63:6

trouble 72:2

Troy 7:20 27:12 29:17
35:24 62:24 63:2 74:7,
11 89:20 134:14,16,19
135:11,15,18,24

Troy's 42:9

true 38:4 75:5 87:14,16
105:17

trustworthy 49:13,15,
16

truth 108:7

Tuesday 134:9

tumor 34:1

turned 107:19

type 149:24

types 99:3

typical 28:12

---

**U**

U.S. 62:2 69:23 107:20
108:12

ultimately 16:25
124:21 138:7,24

**Alpha Reporting Corporation**

**Cyril Wecht - March 21, 2017**

unable 72:13 76:11

unassailable 49:20

uncomfortable 64:16

uncommon 62:9

uncontrollably 64:22

underlying 143:23 144:1

understand 15:17 37:1 39:14 69:20 75:4 77:17,22 98:3 120:1 122:12 131:1 134:1 136:22 140:13,15 144:21 146:25 147:2

understanding 127:16 135:22 140:19, 24 144:8,14

understood 55:22 112:16

undertook 102:18

undocumented 52:3

United 84:3

universities 8:1

university 7:23 57:9 103:14 104:3,5,7,10, 13,14,16 116:25

unprecipitated 122:24

untrustworthy 50:5,6

Upchurch 40:14 61:3, 7 126:11,15,20 133:16, 21,22 148:8,25 152:11, 23

upper 140:25

upwards 141:7

urine 23:17

user 62:10

users 64:10

usual 62:16

---

**V**

V-I-L-K-E 117:8

valid 23:8 45:7 87:13

validity 87:22

validly 87:24

valves 143:9

valvular 141:25

variations 59:3

varied 120:7

varies 28:14 53:4 82:6 85:21

vary 45:17 81:10,15 146:14

vascular 92:22

vehicle 77:9

ventilate 75:3

ventilatory 89:1,12 93:7,9 95:22

verbalize 76:6

version 152:18

vial 135:24,25 136:3,7

victim 100:5 145:2

victim's 80:22

video 28:10 41:2,4,8

videos 28:11

videotape 40:22

videotapes 28:9

views 48:6

Vilke 117:8

Vincent 59:6,7 100:17

violent 146:16 147:13

vis-a-vis 55:17

visit 42:23

visitation 93:23

visual 62:5

Volume 82:12 88:21

voluntary/ involuntary 75:8

volunteered 78:12

volunteers 97:3

---

**W**

waffling 48:2

wait 21:15 40:2 42:7 97:14 98:11

waiting 133:11

walk 107:23

walked 104:19

walking 71:21

wanted 11:21

water 81:16

ways 139:18

Wecht 7:3,10,11 15:17 22:11 41:23 108:21 130:15 133:10,22 135:17 136:11 139:20 152:1

Wecht's 8:13

week 18:25 54:13

weeks 19:5 81:23

weigh 99:25

weight 80:6 93:6 95:4 97:21 99:5,11,24 100:10

weights 101:17 141:17

whatsoever 105:19

widely 49:3 51:2

wife 11:15

wind 81:13 119:14

wishes 122:18

witnesses 110:22

wondering 26:12

word 50:7,8 90:12 139:8 152:13

words 70:17 71:3

work 30:5,14 47:6 48:19 52:11 103:12,18 112:9 114:8 115:5 130:20 131:10 132:21

workers' 117:24

working 81:23

works 138:1,7

world 19:18

worsens 94:14

worthy 87:14 88:9

wrist 80:17,18

wrists 137:13 140:20 149:13,16,22,25

write 28:23 140:2

writing 19:1 37:6 49:20 68:14 108:25

written 19:1 30:18 55:1 57:20,21 59:12 67:7 111:7

wrong 98:3 113:10,14

wrote 19:21 37:20 140:11

---

**X**

Xtasy 68:6 79:2

---

**Y**

year 16:9,14,17 33:14, 17 50:15 112:12,17,20 118:2,5,10 119:5,10,12 126:3,5 135:24

years 9:20 47:24 50:23 52:18,20 85:18 108:14 109:13,14 110:10,16, 23 112:13 117:22 118:6,11,14,24 119:19, 20 120:19 130:8

yell 75:24 76:2,3

yelling 74:24 75:11,20 79:25 146:21

yesterday 7:12,16 103:21

yield 133:12

York 69:24

young 11:13 81:23

Cyril Wecht - March 21, 2017

99:24

## Z

**Zeigler** 10:1