**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**


**CIVIL ACTION NO. 3:17-cv-060 DMB-RP**


**KELLI DENISE GOODE, Individually,**
**and also as the Personal**
**Representative of Troy Charlton**
**Goode, Deceased, and as Mother,**
**Natural Guardian, and Next Friend**
**of R.G., a Minor, and also on**
**behalf of all similarly situated**
**persons,**

    **Plaintiff,**

**vs.**

**THE CITY OF SOUTHAVEN, TODD BAGGETT,**
**Individually, JEREMY BOND, Individually,**
**TYLER PRICE, Individually, JOEL RICH,**
**Individually, JASON SCALLORN,**
**Individually, STACIE J. GRAHAM a/k/a**
**WITTE, Individually, MIKE MUELLER,**
**Individually, WILLIAM PAINTER, JR.,**
**Individually, BRUCE K. SEBRING,**
**Individually, JOSEPH SPENCE,**
**Individually, RICHARD A. WEATHERFORD,**
**Individually, JOHN DOES 1-10,**
**BAPTIST MEMORIAL HOSPITAL - DESOTO,**
**a Mississippi Corporation,**
**SOUTHEASTERN EMERGENCY, INC., a**
**Tennessee Corporation, and LEMUEL**
**DONJA OLIVER, M.D.,**

    **Defendants.**

_____


**DEPOSITION OF MICHAEL F. ARNALL, MD**


_____


**ANIMAS REPORTING SERVICE**
**919 County Road 142, Durango, Colorado 81303**

2

```
 1              BE IT REMEMBERED that on, to wit, the 19th day of

 2      October, 2017, this matter came on for the taking of the

 3      deposition of MICHAEL F. ARNALL, MD, before Sherry L. Rowe,

 4      Certified Shorthand Reporter, a Registered Merit Reporter,

 5      Registered Professional Reporter, and Notary Public of ANIMAS

 6      REPORTING SERVICE, 919 County Road 142, Durango, Colorado

 7      81301, taken at the DoubleTree by Hilton, San Juan Conference

 8      Room, 501 Camino del Rio, Durango, Colorado 81301, at the hour

 9      of 8:52 a.m.

10

11                       A P P E A R A N C E S

12

13      FOR THE PLAINTIFF:

14                          Mr. Tim Edwards
                            BALLIN, BALLIN & FISHMAN, PC
15                          200 Jefferson Avenue, Ste. 1250
                            Memphis, Tennessee 38103
16                          Phone:  901.525.6278
                            Email:  tedwards@bbfpc.com
17

18

19      FOR THE DEFENDANTS CITY OF SOUTHAVEN, TODD BAGGETT, JEREMY
        BOND, TYLER PRICE, JOEL RICH, JASON SCALLORN, STACIE GRAHAM,
20      MIKE MUELLER, WILLIAM PAINTER, JR., BRUCE SEBRING, and RICHARD
        WEATHERFORD:
21
                            Mr. L. Bradley Dillard (By Phone)
22                          MITCHELL, McNUTT & SAMS, PA
                            105 South Front Street
23                          Tupelo, Mississippi 38804
                            Phone:  662.842.3871
24                          Email:  bdillard@mitchellmcnutt.com
                                    kdoty@mitchellmcnutt.com
25
```

3

```
 1  FOR THE DEFENDANT BAPTIST MEMORIAL HOSPITAL-DESOTO, INC.:

 2                          Mr. John Mark McIntosh (By Phone)
                            UPCHURCH & UPCHURCH, PA
 3                          141 S. Commerce Street, Ste. B
                            Tupelo, Mississippi 38804
 4                          Phone:  662.260.6953
                            Email:  mmcintosh@upchurchpa.com
 5

 6

 7  FOR THE DEFENDANT SOUTHEASTERN EMERGENCY PHYSICIANS, INC.:

 8                          Mr. Matthew R. Macaw (By Phone)
                            McDONALD KUHN, PLLC
 9                          5400 Poplar Avenue, Ste. 330
                            Memphis, Tennessee 38119
10                          Phone:  901.526.0606
                            Email:  mmacaw@mckuhn.com
11

12

13  FOR THE DEFENDANT LEMUEL DONJA OLIVER, MD:

14                          Mr. Marty R. Phillips
                            RAINEY, KIZER, REVIERE & BELL, PLC
15                          50 North Front Street, Ste. 610
                            Memphis, Tennessee 38103
16                          Phone:  731.423.2414
                            Email:  mphillips@raineykizer.com
17

18                          Mr. James R. Gass
                            GASS WEBER MULLINS, LLC
19                          241 North Broadway, Ste. 300   ???
                            Milwaukee, Wisconsin 53202
20                          Phone:  414.224.7697
                            Email:  gass@gwmlaw.com
21

22

23

24

25
```

4

1                          I N D E X

2                                                              Page

3   Appearances                                                  2

4   Witness – **MICHAEL F. ARNALL, MD**

5         Examination by Mr. Phillips                            7

6         Examination by Mr. Dillard                           143

7         Examination by Mr. McIntosh                          155

8         Examination by Mr. Edwards                           166

9   Witness' Signature/Correction Pages                   177/178

10  Reporter's Certificate                                     179

11

12

13

14                       E X H I B I T S

15                                              FORMALLY MARKED/
    EXHIBIT                                         IDENTIFIED
16                                                     PAGE

17
      1   Copy of Color Photographs of Glass Slides,
18        CHW 15-275                                            15

19    2   Parkes and Carson, "Sudden death during
          restraint: do some positions affect lung
20        function?"                                            65

21    3   Letters, BMJ Volume 316, 11 April 1998,
          Pages 1164 – 1171                                     69
22
      4   corrections.com, "Reducing the Risk
23        Associated with Use of Restraints,"
          Meghan Fay, 7/27/2000                                 72
24

25

1                          E X H I B I T S

2                              (Cont.)

3

4        5     Handbook of Forensic Pathology,
               Second Edition, DiMaio and Dana,
5              Pages 168 – 169                                    79

6        6     Forensic Pathology: Principles and Practice,
               2005, David Doinak, Page 309                       83
7
         7     Medicolegal Investigation of Death, 4th
8              Edition,Spitz and Fisher, Page 832                 85

9        8     Excited Delirium Syndrome, DiMaio-DiMaio,
               Page 126                                           90
10
         9     Karch's Pathology of Drug Abuse, Third
11             Edition, Page 309                                  95

12       10    (Late exhibit) NIH, Page 5                         105

13       11    Journal of Forensic and Legal Medicine,
               19 (2012) 7–11, "Excited delirium syndrome
14             (ExDS):  Redefining an old diagnosis,"
               G.M. Vilke, et al.                                 108
15
         12    The Journal of Emergency Medicine,Vol.
16             43, No. 5, pp 897–905, 2012, Clinical
               Reviews, "Excited Delirium Syndrome
17             (EXDS): Defining Based On a Review Of
               The Literature," G.M. Vilke, et al.                109
18
         13    Notice of Deposition                              116
19
         14    Dr. Arnall's Notebook of Documents                118
20
         15    Pharmacological Basis of Therapeutics,
21             Goodman & Gilman, Page 311                         125

22       16    Harrison's Principles of Internal
               Medicine, 11th Edition, Page 2,117                 125
23
         17    Drug Safety Information for Healthcare
24             Professionals, Haloperidol (Haldol)               168

25

**ANIMAS REPORTING SERVICE**
**919 County Road 142, Durango, Colorado 81303**

```
 1                    E X H I B I T S

 2                        (Cont.)

 3

 4

 5     18    "Cardiorespiratory consequences to
             hobble restraint," M. Roeggla, et al.,
 6           1997                                           176

 7     19    American Journal of Emergency Medicine,
             2001, "Factors Associated With Sudden
 8           Death of Individuals Requiring
             Restraint for Excited Delirium," Samuel
 9           J. Stratton, MD, MPH, et al.                   176

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          **MICHAEL F. ARNALL, MD,**

2    was called as a witness by the Defendant Oliver, and having

3    been first duly sworn, testified upon his oath as follows, to

4    wit:

5                          EXAMINATION

6    BY MR. PHILLIPS:

7          Q    State your name, please.

8          A    Michael Frank Arnall, A-R-N-A-L-L.

9          Q    Dr. Arnall, I'm Marty Phillips.  We met a short time

10   ago.  And I am one of the attorneys, along with Mr. Gass, who's

11   here today, representing Dr. Oliver, one of the Defendants in

12   this case.

13         You understand that you have been disclosed by the

14   Plaintiff as an expert witness who may testify in this case,

15   right?

16         A    Yes.

17         Q    And you understand that that's the purpose for which

18   we're here to take your deposition today?

19         A    Yes.

20         Q    I was advised by Mr. Edwards' paralegal this week

21   that you required a thousand-dollar payment for the deposition;

22   is that right?

23         A    Yes.

24         Q    Here's a thousand-dollar check from my firm to you.

25         A    Thank you.

1    Q    Your area of specialty is what?

2    A    Forensic pathology.  I'm board-certified in anatomic

3  pathology, clinical pathology, and forensic pathology.

4    Q    Is that the only area of expertise that you hold?

5    A    In previous court appearances, I've been qualified to

6  express an opinion as a licensed physician in the practice of

7  medicine.

8        So, in -- in -- in response, while I'm

9  board-certified in those three specialty areas, obviously I'm a

10  licensed physician.  I've been a laboratory director at several

11  different facilities.  So I've testified in those areas of

12  medicine that a laboratory director would be consulted by other

13  physicians.  And that, you know, from time to time includes

14  laboratory testing and endocrinology or hematology.

15        I did a separate forensic -- separate fellowship in

16  surgical pathology, which is that specialty which attends to

17  the issue of everything you'd receive from the operating room,

18  but in particular morphologic appearance of cancers and

19  infectious diseases.

20        But predominantly in forensic pathology and all the

21  areas of training in forensic pathology.  Obviously, there's

22  training in toxicology, because that's one of our fundamental

23  aspects; training in trauma that humans receive, you know, as a

24  cause of their death.  So there's multiple disciplines.

25        As a forensic pathologist, we determine cause and

1  manner of the death.  And the cause of death could be

2  essentially anything you see in an index of a -- of a medical

3  textbook.

4      Q    When is the last time you provided care to a living

5  patient?

6      A    2004 and prior to that.  In 2005, I went to

7  essentially all forensic pathology.

8              (Short interruption in deposition, hotel

9              staff person entering, short discussion.)

10     Q    (BY MR. PHILLIPS)  When is the last time you have

11 worked as an emergency room physician?

12     A    I've never worked as an emergency room physician.  I

13 might make one comment with respect to the previous question.

14 On occasion, I'm consulted by district attorneys here in

15 Colorado to evaluate patients who received injuries but who are

16 not dead yet.

17              So, strictly speaking, that's not treating the

18 patient.  But, you know, in an abundance of caution, I will

19 disclose that, yes, I have seen patients who aren't dead.  And

20 that's because prosecuting attorneys have asked me to evaluate

21 injuries in patients who did not receive lethal injuries.

22     Q    You are not going to be offering opinions on the

23 standard of care required of an emergency room physician, are

24 you?

25     A    I -- in candor, I seriously doubt that Plaintiff's

1  attorney will ask me, and I seriously doubt a judge would allow

2  me to express an opinion.

3          On the other hand, I do have textbooks which address

4  some of the -- those issues which you've just stated.  I'm well

5  aware that I neither practiced as an emergency room physician

6  nor trained as, other than being in an emergency room as a --

7  as a -- in training.  And so I seriously doubt my opinion would

8  be accepted by a court or even allowed to be expressed.

9          Although, I would say that, in evaluating this case,

10  I have read the opinions expressed about the standard of care.

11  Much of it I'm aware of, just because I've spent, you know,

12  decades in medicine.

13          Some of the issues I have looked up in -- in texts

14  because they -- they sounded to be divergent from what I had

15  experienced.

16          And part of that is -- is -- goes under the rubric of

17  evaluating the credibility of other medical opinions, which I

18  inevitably read regarding this case.  Although, candidly, I

19  seriously doubt a judge will allow me to express an opinion.  I

20  did evaluate the opinion of other physicians.  I just seriously

21  doubt anyone is going to allow me to express an opinion in a

22  court of law.  But have I looked at it?  Have I evaluated it?

23  Yes, I have.

24      Q   Well, that really wasn't my question, whether you've

25  looked at it.

1          My question is:  You're not going to try to offer

2     opinions on what the standard of care requires of an emergency

3     room physician in this case, are you?

4          A     Oh.  That is not in my report, and I will not be

5     issuing that opinion in --

6          Q     Okay.

7          A     -- in the courtroom.  However, I understand it may

8     well come up in this deposition.  I just suspect it won't be

9     allowed in -- in open court.  And it's certainly not -- as you

10    know, it's not in my report.

11         Q     It's not in your report, and it's not an area of

12    medicine in which you have experience practicing, and it's not

13    an area in which you hold yourself out as an expert, correct?

14         A     I will not hold myself out as an expert to the court;

15    that is correct.  But I suspect we're going to be discussing it

16    today.

17         Q     Okay.  Did you tell me that you'd never worked as an

18    emergency room physician?

19         A     I never worked as an emergency room physician.

20    Although, as you might surmise, as a laboratory director, I'm

21    called from time to time, prior to my -- prior to 2005, to

22    either see laboratory results of -- of patients in the

23    emergency room or from time to time actually look at a patient

24    in an emergency room by an emergency room physician.

25              But I myself am not board-certified, have no

1    internship or residency in emergency room training, do not hold

2    myself out to be an expert.

3        Q    Okay.  Thank you.  Are you aware that there is

4    another forensic pathology expert the Plaintiff has identified

5    in this case, Dr. Cyril Wecht?

6        A    I am.  I've read his report, and I brought his report

7    in the package of hard copies that I have received.  And I have

8    it.

9        Q    Did you read his Autopsy Report or just his Rule 26

10   report in this case?

11       A    Under Plaintiff's Tab 10 of the package I received, I

12   have a December 5, 2016, letter from Cyril Wecht to

13   Dr. Edwards (sic), that has a "Clinical Summary," a

14   "Post-Mortem Examination," and an "Opinion."  It has toxicology

15   results.

16            And I also brought with me today a package of glass

17   slides that I received, and they are labeled CHW, which I

18   interpret as Cyril H. Wecht.  15-275 with the name T. Goode.

19   And I'm going to hand those over to you for your inspection.

20       Q    Did you review Dr. Wecht's deposition?

21       A    I don't recall reviewing his deposition.

22       Q    Have you been provided with any of the exhibits that

23   were marked in his deposition?

24       A    Other than what I've told you so far, I don't recall

25   that I have.

1    Q    Do you have any disagreements with Dr. Wecht's

2  opinion as expressed in the letter to Mr. Edwards that he

3  wrote, that you just referenced?

4    A    I don't disagree with anything that he has stated.

5  If you were to compare and contrast my report with his, you

6  would see that I had added the issue of the Ativan and Haldol

7  in my evaluation of substances which exacerbated the problems

8  of the decedent.  I don't know if you call that a disagreement,

9  but you're gonna see that they're not the same.

10    Q    Dr. Wecht did not at all implicate Haldol or Ativan

11  as a cause of Mr. Goode's death, right?

12    A    That -- and that is why I have specifically

13  highlighted that difference between our reports.

14    Q    So do you discern that there's disagreement between

15  the two of you on the issue of the involvement of Haldol and

16  Ativan?

17    A    I suppose that's a matter of semantics.  That I know

18  of, he hasn't specifically disputed it.  So I don't know that

19  there is a discrepancy.  But I clearly have disclosed to you

20  that our opinions are not identical, insomuch as I have

21  implicated those two substances, and he has not.  And that's

22  fair to say.

23    Q    Do you think a reasonable forensic pathologist could

24  evaluate this case and conclude that Haldol and Ativan played

25  no role in Mr. Goode's death?

1    A    I do not.  I believe that a reasonable forensic

2  pathologist would have to agree that Ativan, in particular,

3  could reasonably have contributed to the death of this

4  individual.

5    Q    Can reasonable forensic pathologists disagree on the

6  cause of a particular person's death?

7    A    Yes.

8    Q    Did you know that Dr. Wecht had been deposed in this

9  case?

10    A    I don't recall if I knew that he had a deposition.  I

11  knew that he had a report.

12    Q    Did you know that he had an Autopsy Report that he

13  did outside of the Rule 26 Report provided to Mr. Edwards in

14  this case?

15    A    I don't recall that specifically, no.  This is what I

16  have.  And I didn't inquire any further, I don't believe.

17    Q    The slides that you have, the glass slides, are all

18  prepared by Dr. Wecht?

19    A    I believe they all carry his initials.

20    Q    The "CHW" designation that you mentioned earlier?

21    A    That is correct.

22    Q    Have you reviewed any glass slides prepared by

23  anybody else?

24    A    I have not.

25    Q    Do you know if there are any others available?

1      A    I know that the Barnhart autopsy indicates there's a

2   microscopic exam.  So I essentially know that such glass slides

3   do exist.  I have not seen them.

4      Q    You have not evaluated the Barnhart glass slides; is

5   that correct?

6      A    That is correct.

7      Q    For purposes of identifying the slides that you had

8   reviewed on the record, can we sometime after today make a

9   photocopy of those slides and attach that paper copy as an

10  exhibit?  Would that be a reasonable way to identify the

11  slides?

12     A    Yes, it is.  It is a traditional way to identify

13  them.

14     Q    Let's make the photocopy of the glass slides you

15  reviewed Exhibit 1 to your deposition.

16     A    And I suspect we can do that at this facility today.

17     Q    Okay.  Whatever we need to do to accommodate that, we

18  will.

19     A    I suspect their business office has the ability to do

20  that.

21            MR. GASS:  Could I see the box of slides,

22  please?

23            THE WITNESS:  (Complying.)  It's possible you

24  could take a picture of them with a smartphone.

25     Q    (BY MR. PHILLIPS)  You actually reviewed the slides,

1    a photo of which we've marked as Exhibit 1?

2         A    Yes.

3         Q    Was there anything that you could discern on the

4    slides that led you to reach a conclusion as to cause of death

5    in this case?

6         A    In the sense that sometimes what one does not see can

7    be as important as what one does see.  I will tell you that I

8    specifically looked for microscopic morphological criteria for

9    asthma, insomuch as this patient does have a history of asthma.

10        There are five particular findings that a forensic

11   pathologist would look at under the microscope for -- with the

12   intent of determining whether asthma contributed significantly

13   to death.

14        Those include eosinophils, mucous plugging of

15   airways, smooth muscle hyperplasia around the bronchi, that

16   sometimes gives a festooned or serpiginous appearance to the

17   mucosa, hyperplasia of mucous glands and wide-mouthed mucous

18   glands.  I saw none of those findings in these slides.

19        So I did have a specific intent, when I looked at

20   these slides, and that was to evaluate the possibility of a

21   significant contribution of asthma.  And while asthma may have

22   contributed, I saw none of the compelling findings that I've

23   just outlined that one frequently sees in asthma deaths.

24        Q    So, from the perspective of a forensic pathologist,

25   you saw no evidence on the glass slides of asthma in Mr. Goode;

1  is that right?

2      A      Correct.

3      Q      And, therefore, you have no basis to say that asthma

4  caused or contributed to his death; is that right?

5      A      Well, I'll disagree with that only because the

6  forensic pathologist takes both a history and physical exam.

7            A physical exam in this instance is the microscopic

8  examination, but the history of this patient is reactive airway

9  disease.

10            So, even in the absence of physical findings, a

11  physician is obligated to attend to the history.  And this

12  history does include reactive airway disease.

13      Q      You're aware that that history exists, but you didn't

14  find evidence of that disease at autopsy?

15      A      That is correct.

16      Q      Okay.  You did not have the opportunity to do a gross

17  inspection of Mr. Goode's organs or body, did you?

18      A      Correct.

19      Q      Now, aside from looking for asthma or evidence of

20  asthma on these glass slides that we've marked as Exhibit 1,

21  did you look for other abnormalities?

22      A      Yes.

23      Q      Did you find any abnormalities in these slides?

24      A      No.

25      Q      Is there anything in these glass slides that you've

1    analyzed that would lead you to a particular cause of death for

2    Mr. Goode?

3         A    There are no positive findings.  However, in

4    medicine, one uses different types of tests to either include

5    or exclude entries into the differential diagnosis, that list

6    of the different diagnoses that may explain the disease process

7    one is examining.

8              In this instance, for instance, the absence of

9    criteria for asthma death allows me to reasonably exclude that

10   as one of the major contributors to death.

11             In that sense, it does allow me to narrow the

12   differential diagnosis and come to a conclusion.  But there are

13   no positive findings which point me to a specific disease

14   process.

15             It is the negative findings, the findings which are

16   absent, which allow me to exclude disease processes and thus

17   reach an answer.

18             So I -- I understand that one person who asks that

19   question might have meant to say:  "Well, are there any

20   positive findings which gave you the answer?"

21             And the answer is "No."  But negative findings do

22   allow me to reasonably exclude possibilities.

23        Q    Can one see evidence of a cardiac arrhythmia on

24   pathology slides, such as you've reviewed?

25        A    The arrhythmia itself is an electrical phenomenon and

1  cannot be seen on a glass side.  Although, there may be

2  morphological correlates, morphological findings which suggest

3  the possibility of arrhythmias based on our understanding, for

4  instance, of cardiac, normal and abnormal, appearance of

5  myocardium.

6         In this instance, however, I saw no abnormal findings

7  of the myocardium.  So I could not see an arrhythmia because

8  it's an electrical phenomenon, and I saw no morphological

9  correlates which suggested that an arrhythmia might occur just

10 based on the appearance of the myocardium.

11    Q    Can one see evidence of pulmonary compromise on glass

12 slides done at autopsy?

13    A    The pulmonary function tests are not seen on glass

14 slides.  But one can see, for instance, mucous plugging in

15 another case, which would allow me to reasonably conclude that,

16 because the airways are plugged with mucous, that the pulmonary

17 function will inevitably be compromised.

18         So I can see morphological correlates which allow me

19 to conclude that those tests would be abnormal.  But, of

20 course, pulmonary function tests themselves are not tests that

21 are seen on glass slides.

22    Q    Was there any evidence of any pulmonary compromise

23 when you looked at these slides?

24    A    I saw no morphologic correlates which would suggest

25 that there was any underlying, acute or chronic, pulmonary

1  disease.

2      Q    You have indeed read not only Dr. Barnhart's Autopsy

3  Report, but also Dr. Barnhart's deposition that Mr. Edwards

4  took a few weeks ago, correct?

5      A    Correct.

6      Q    Dr. Barnhart did not implicate Haldol and Ativan as

7  playing a role in Mr. Goode's death, did she?

8      A    I am aware of that.  That is correct.

9      Q    There's no mention of that as a cause of death in her

10  Autopsy Report, is there?

11      A    I agree with that statement.

12      Q    And if you read her deposition, you saw that

13  Mr. Edwards asked her that precise question, and she expressed

14  the opinion that Haldol and Ativan did not contribute to

15  Mr. Goode's death.  Did you see that?

16      A    I am aware that is true.

17      Q    It would appear that she and Dr. Wecht are in

18  agreement on that issue; is that right?

19      A    I understand she specifically disputes it.  I don't

20  know whether Dr. Wecht specifically disputes it.  That is to

21  say, if you were -- if he -- if the question was posed to him,

22  I do not know what his response would be.

23      Q    We know that he didn't include it in the report that

24  you've seen?

25      A    That I'm aware of.  And, obviously, before this

1  litigation is finished, someone is going to ask him.

2      Q     Wouldn't a forensic pathologist normally list in a
3  report those things that he or she believed contributed to the
4  cause of death?

5      A     There are lumpers and splitters.  Those are the terms
6  that we use in medicine.  Some individuals are more terse in
7  their opinion.  Some are more verbose.

8          If he thought it was significant, I agree with you he
9  would've included it.  It is possible that, when you ask him,
10 "Could it have contributed?" he may well consider that it was a
11 possibility.  That's speculation.  I don't know.  I haven't
12 asked him yet.

13         But I would say to you, to be prepared, that he might
14 agree, "Well, it might have contributed, but it may not have
15 been significant."  I don't know what he's going to say.

16         But if he thought it was an important part of the
17 cause of death, then I agree with you.  He would've included
18 it.

19     Q     With regard to your opinion pertaining to Haldol and
20 Ativan, is it your opinion that it may have contributed but was
21 not significant?

22     A     By way of completeness, I'm going to give you a
23 slight more verbose answer.  The onset action for IV Ativan,
24 lorazepam, is about 15 minutes.  This individual received that
25 intravenous injection at about eight minutes after.

1    Some fifteen minutes later, they had received

2  bicarbonate in resuscitation.  The estimate by the police

3  officer was about ten minutes.  In looking back at the medical

4  record, it looks like it was less than 15 minutes.

5    So I believe that the period of time between the

6  intravenous injection of lorazepam and the cessation of

7  respiration was somewhere between 10 and 15 minutes.  That is

8  about the time of onset of an intravenous injection of

9  lorazepam.  Lorazepam is a well-known respiratory depressant.

10    In a person who has obvious metabolic acidosis from

11  the rough equivalent of prolonged isometric exercise -- and by

12  that, I mean the hogtying, the struggle -- and who is assuredly

13  in some state of exhaustion from this prolonged struggle, I

14  believe it is reasonable to conclude that a respiratory

15  depressant, which is lorazepam, acting in its published time

16  frame of action, and understanding that there is some biologic

17  variability, I believe it is reasonable to conclude that this

18  respiratory depressant at the least contributed, if not

19  significantly contributed, to the respiratory distress and

20  ultimate cessation of respirations that this patient

21  experienced.

22    Q    My question was whether you have concluded that

23  Haldol and Ativan may have contributed to his death, but it

24  can't be determined with certainty?  Is that your position?

25    A    No, I tell you that lorazepam is a respiratory

1    depressant.  I tell you that the time frame from the

2    administration of this lorazepam to the cessation of

3    respirations is the time frame that is published as the time

4    frame -- the time it took for this person to get the injection

5    and stop breathing is the published time frame of the action of

6    lorazepam from an intravenous injection.  I find that temporal

7    relationship to be compelling.  I believe it contributed.  That

8    is my opinion.

9        Q    But temporal association is not the same as

10   causation, though, is it?

11       A    In forensic pathology, we believe in strict linkage.

12   And in evaluating strict linkage of causality, temporal

13   relationships are one of the criteria we use to assess causal

14   relationships.

15            And I -- I believe we -- we actually specifically

16   believe that in either Vern Adams' chapter in "Medicolegal

17   Investigation of Death" or Dolinak's discussion of strict

18   linkage in "Forensic Pathology."

19       Q    Is temporal association different than causation?

20       A    Temporal association is a criteria for assessing

21   causation.

22       Q    Just because there's a temporal association does not

23   mean that there is cause and effect, though, right?

24       A    I agree with that statement.

25       Q    Okay.  Is it your opinion that Haldol played any role

1  in Mr. Goode's death?

2       A      The intravenous injection of Haldol is problematic.

3  But in looking at the effect of lorazepam, the causality, in my

4  opinion, is more compelling in the case of lorazepam.  Even

5  though the intravenous injection of Haldol -- notwithstanding

6  the fact I won't be expressing an expert opinion on emergency

7  medicine treatment, in terms of toxicology, the intravenous

8  injection of Haldol is problematic.

9              But, nonetheless, I specifically cited lorazepam, and

10  that's because lorazepam is specifically associated with

11  respiratory depression.

12      Q      I'm focusing on Haldol right now.  With regard to

13  Haldol, you're not going to express the opinion that Haldol

14  contributed to Mr. Goode's death, are you?

15      A      I will say that the -- while the intravenous

16  injection of Haldol is problematic and may well have

17  contributed, it is much less compelling than in the instance of

18  lorazepam, which is much more straightforward.

19             So I -- I differentiate the potential causality, and

20  I assess Haldol to be a much lesser probability than lorazepam,

21  which I find to be much more compelling because of its

22  published association with respiratory depression.

23      Q      With regard to Haldol, would it be your opinion that

24  it may have contributed, but you can't be certain whether it

25  did?

1      A      Yes.

2      Q      Okay.  And the basis for your opinion relative to

3   Ativan is that it is a respiratory depressant?

4      A      Yes.

5      Q      Is there any other basis that you have for your

6   opinion that Ativan contributed to Mr. Goode's death?

7      A      In addition to everything we've discussed?  No.

8      Q      What dose of Ativan was he given?

9      A      Two milligrams intravenous.

10     Q      Just one dose, right?

11     A      That is what I read, and I read that on -- on Page 14

12  of BMH-D Medications - Clinical Orders, I see "LORazepam

13  (ATIVAN) Injection 2 mg..."  And I see Last "Administration"

14  date 7/18/2015, July 18, 2015, at 28 -- 2108, 2-1-0-8 hours.

15     Q      Were there levels of Ativan detected in the

16  toxicology studies done postmortem?

17     A      In looking at the Autopsy Report, NMS Lab, I see

18  lorazepam, 8.7 nanograms per mil from the subclavian blood.

19     Q      Is that a therapeutic level?

20     A      Yes.

21     Q      It is not a high level, is it?

22     A      I agree.

23     Q      Did you know that the Plaintiff has identified an

24  expert who says that Mr. Goode should've received more Ativan?

25     A      That I was not aware of aware of.

**ANIMAS REPORTING SERVICE**
**919 County Road 142, Durango, Colorado 81303**

1    Q    Have you reviewed any disclosures or reports from

2    defense experts in this case?

3    A    I have a package from Dr. -- the package is from the

4    Plaintiff's attorney, but it includes an expert report by

5    Dr. Vilke, the Curriculum Vitae, and two articles coauthored by

6    Dr. Vilke.  And I believe I've brought with me a textbook

7    entitled "Sudden Deaths in Custody," for which Dr. Vilke is one

8    of the coauthors.

9    Q    Did you review Dr. Vilke's supplemental report, or

10   only his original report?

11   A    I will show you the report that I have.  It's dated

12   February 28th of 2017.  And this, I believe, is the only report

13   that I've received that is originating from Mr. Vilke.

14   Q    Okay.  And you have not then read the reports of any

15   of the forensic pathology experts identified by any Defendant?

16   A    Only Dr. Barnhart, to the best of my knowledge.  I

17   don't recall any others, other than Dr. Barnhart.  And I

18   understand that Dr. Barnhart is not per se a defense expert,

19   but merely a fact witness.

20   Q    She is the forensic pathologist who did the autopsy.

21   A    Right.  And that's why I designate her as a fact

22   witness.  And even though she may well be subpoenaed by the

23   defense, I recognize the difference between a person who did

24   the autopsy and a person subsequently contracted to review

25   work.  I obviously recognize that.

1    Q    Did you know that she gave a deposition in this case

2  because she was subpoenaed by the Plaintiff?

3    A    I have received an electronic copy of that

4  deposition.

5    Q    How is her role different than yours in this case?

6    A    She is the forensic pathologist of record who is

7  commanded, choose your own verb, by the state to conduct an

8  investigation into the cause and manner of death.

9        I, on the other hand, am not commanded by the state,

10  but I am contracted by one of the representatives of the

11  litigants.  And so I perceive that there is a difference there,

12  as -- and all forensic pathologists understand there's a

13  difference between those two.

14    Q    Is there any advantage that a forensic pathologist

15  has who does an autopsy?

16    A    The forensic pathologist who does the autopsy has the

17  ability to take every sample that they believe may be relevant.

18        A subsequent pathologist is limited to the samples

19  and more generally the inquiries made by the original

20  pathologist.  There's a difference.

21    Q    Do you think that a forensic pathologist, who did an

22  autopsy, is entitled to any deference as compared to a

23  consultant who may have been retained after the litigation

24  began?

25    A    I'm not going to be arbitrarily argumentative.  But

1  in the sense of deference, what is the meaning --

2      Q    With regard to the cause of death or opinions

3  expressed.

4      A    I believe there may be an initial impression that a

5  person hired by the state has a position that is perceived as

6  more disinterested.  And then subsequent inquiry and the

7  position of that opinion with a published text, will reveal or

8  fail to reveal any subsequent assignment of credibility to that

9  opinion.  But I agree they initially begin with a greater sense

10  of disinterest.

11      Q    Do you know Dr. Greg Davis?

12      A    I don't recall meeting him, but the forensic

13  pathologists are few and far between.  I may well have met him.

14  We're not drinking buddies.  I don't recall any prolonged

15  conversations with him.  There aren't very many of us, so it'd

16  be no surprise if we'd bumped into each other at a meeting.

17  There's only about 400 of us total.  We can all get into one

18  room.

19      Q    You have not reviewed his report in this case, have

20  you?

21      A    I have not.

22      Q    Do you know Dr. Gerald Gowitt?

23      A    I do not, that I know of.

24      Q    You've not reviewed his report in this case, have

25  you?

1  A  That is correct.

2  Q  Other than Dr. Vilke's February 2017 report, is there

3 any other report of any defense expert you have reviewed?

4  A  I'm thinking. Not that I recall. I don't think I

5 have.

6  Q  Have you reviewed any postmortem photographs of

7 Mr. Goode?

8  A  No. Not that I recall. I have a disk with a

9 pre-mortem video at a hospital and at a scene, but I believe

10 those are pre-mortem.

11  Q  That's referenced in your report, isn't it?

12  A  It's a disk in this binder that --

13  Q  Yes.

14  A  -- I believe you looked at.

15  Q  You're -- oh. Have you -- you reviewed Dr. Nichols'

16 deposition?

17  A  I do not believe so.

18  Q  Based upon your review of these records, did you

19 conclude that Mr. Goode had taken any illegal drugs before his

20 death?

21  A  Yes.

22  Q  What?

23  A  LSD.

24  Q  Anything else?

25  A  I understand that he had taken marijuana, which is

1  illegal in his jurisdiction but not in ours.

2      Q    You described in your report behavior that Mr. Goode

3  exhibited after taking LSD, right?

4      A    Yes.

5      Q    And what behavior do you understand LSD caused in

6  this case?

7      A    Colloquially, he had a bad trip.  More specifically,

8  he was running around; he was talking in a nonsensical fashion;

9  he was uttering phrases that made no sense to a sober, rational

10  individual.

11      Q    Such as?

12      A    I believe he said something to the effect of "I don't

13  know how to explode."  I perhaps recall that.  That, of course,

14  makes no sense to a sober, rational person.  So he clearly was

15  running around and acting in what we'd consider an irrational

16  fashion.

17      Q    Out of control?

18      A    Yes.

19      Q    Combative?

20      A    That is my understanding, yes.  Although I didn't see

21  it in the videos, my understanding from the accounts is he was

22  out of control and combative.

23          As I understand it, he walked up to a police car and

24  in an uninvited fashion opened the door to the police car.

25  Clearly, you know, socially and legally unacceptable behavior.

1     Q     And you relate all of that behavior to his ingestion

2   of LSD?

3     A     Likely.  Although marijuana is a hallucinogen, I

4   believe it's likely related to his LSD.

5     Q     Did marijuana use contribute to that behavior?

6     A     It may have, but it is a less common response to

7   marijuana and a more common -- much more common response to

8   LSD.

9          In this jurisdiction, marijuana is quite common, and

10  yet this behavior is not common.  So I tell you that this

11  response to marijuana is possible, but quite uncommon.

12    Q     When you say this jurisdiction, you're referring to

13  Colorado --

14    A     State of Colorado which --

15    Q     -- where we are today?

16    A     -- is where we are today.

17    Q     Okay.  the pages of your report are not numbered, but

18  as I count them, on the sixth page of your report -- if you

19  could locate that page, please.  It has a heading at the

20  bottom.  It says "The Baptist Medical Records."  Are we looking

21  at the same page?

22    A     Yes.

23    Q     In the incomplete paragraph that begins that page,

24  the last sentence says, in part:  "Likewise, the excited state

25  precipitated by ingestion of LSD..."

1          Do you see that phrase?  You refer to "the excited
2    state precipitated by ingestion of LSD."
3       A    Ah, at the top --
4       Q    Yes, sir.
5       A    -- yes.
6       Q    Tell us what you mean by that phrase, "the excited
7    state precipitated by ingestion of LSD"?
8       A    As I understand the description of his behavior, any
9    common person seeing him run around in circles would agree that
10   he was quite excited.
11         No one would dispute that a person running around in
12   circles, opening up a police car door uninvited, that type of
13   behavior clearly -- and that you could use multiple different
14   adjectives, and individuals would, but "excited" is an
15   adjective that no one would dispute.
16      Q    And it's the way that you chose to characterize it in
17   your report, an "excited state precipitated by ingestion of
18   LSD"?
19      A    Yes.
20      Q    Did you read that Mr. Goode was claustrophobic?
21      A    I don't recall the specific sentence, but my general
22   recollection is that he had -- he may well have expressed that
23   opinion, you know, during the sequence of events.
24      Q    I'm not suggesting to you that somebody actually used
25   the word "claustrophobic."  But did he have that sensation of

1  being claustrophobic?

2      A    I don't recall the specific symptoms, but it's -- my

3  recollection is that he went through a series of altered

4  perceptions, and I believe that was one of them.  And that

5  again is common with LSD.

6      Q    So, if -- if there's a description in the materials

7  that he could not stand being in the confines of the automobile

8  and got out, that would be something you've seen with LSD?

9      A    I myself have not seen that many individuals, you

10  know, who died while under the influence of LSD.  I've never

11  seen a person who died because of LSD.

12          But LSD came -- came and largely went before I

13  started practicing forensic pathology.  And I've never seen a

14  person who died because of LSD, and I've seen individuals --

15  many individuals who exercise bad judgment because of other

16  drugs.  But LSD is not as popular right now as other

17  hallucinogenic drugs.

18      Q    Was Mr. Goode under the influence of LSD on the date

19  of his death?

20      A    Assuredly.

21      Q    Do you known of circumstances where LSD has

22  indirectly caused someone's death?

23      A    Individuals exercise extremely poor judgment

24  frequently because of altered perception while under the

25  influence of LSD and partake in severely untoward behavior

1   which results in their death.

2        Q    Was Mr. Goode's arrest in the hospital a sudden one?

3        A    I've contemplated that question.  And insomuch as

4   this person's medical course was prolonged over a considerable

5   period of time, and indeed there was an initial pulse oximetry

6   reading of 90 percent, which is the cusp of the requirement for

7   therapy with oxygen, I think it inappropriate to call this a

8   sudden death because there was a clear indication of

9   physiologic abnormalities for a prolonged period of time before

10  his ultimate respiratory arrest.

11       Q    What were those indications?

12       A    Well, there's a pulse oximetry reading which is

13  clearly abnormal.  With a prolonged struggle in a hogtie

14  position, there was assuredly a metabolic acidosis.  Although I

15  do not have a blood test from the hospital that verifies that,

16  I'm completely comfortable diagnosing a metabolic acidosis

17  based on that period of a version of isometric exercise in the

18  hogtie position.

19            There is a description by the female civilian in the

20  emergency room, which describes the decedent as -- I'll just

21  summarize -- exhausted.

22            In light of those physiologic abnormalities and a

23  prolonged time period until cessation of breathing, I don't

24  think I would call this either sudden or unexpected, because of

25  that prolonged time period.

1          When I think of sudden and unexpected, I think of a

2     person carrying on a casual conversation and then, you know,

3     they're grasping their throat or grasping their chest and

4     keeling over in front of everybody in an unexpected fashion.

5     Q     Do you have --

6     A     This is -- this is not that case.

7     Q     Do you have an understanding as to how long it was

8     from the time from which Mr. Goode stopped fighting or

9     struggling until he arrested?

10    A     Some of the accounts indicate that the time period

11    was quite short.  And I refer to the account by the police

12    officer who recounts that this person had a period of, you

13    know, about ten minutes.

14          My perception is that that account disagrees or is

15    not consistent with the account by the female civilian, who

16    gives an account of a person, who I interpret as subdued, as

17    they're being transported to the other room.  So my perception

18    is there's a discrepancy in opinions by different witnesses.

19    Q     Did you take on the role as one who decides which

20    witness to believe and which to reject, or is that somebody

21    else's job?

22    A     As a forensic pathologist, I train the younger

23    physicians coming up that one must attend to what everyone

24    says, but there are going to be inevitably discrepancies.  So

25    that, at some point, one is going to have to make an assessment

1   as to who is more likely accurate or less likely accurate.  I
2   will have to make an assessment at some point.
3           In this instance, to some extent, it's not critical
4   that I sort that out.  I could've figured out that, after a
5   prolonged period of isometric exercises, the individual would
6   be exhausted.  And I would've -- I would've made that
7   assessment independent of the civilian that has that eyewitness
8   account.
9           And I have -- for purposes of my assessment of the
10  contribution of lorazepam, I have, in addition to the
11  eyewitness account of the police officer, attempted to verify
12  that as -- as you've seen, using time documentation in the
13  medical record.
14          And that was my discussion of the time frame of the
15  onset of the action of lorazepam given in an intravenous
16  injection.  I both used -- as we've discussed earlier today,
17  both the verbal description of the police officer as well as
18  the timestamp declarations in the medical record.
19          So, yes, I -- I will assess their credibility, and I
20  will use as many ancillary clues, pieces of documentation, as I
21  can, to create the most reliable timeline that I'm able to do
22  in making my opinion.  Yes, I do assess their credibility.
23      Q   Is there a difference between the assessment done and
24  reported by the healthcare providers versus Mrs. Tharp, who I
25  believe is the lay witness to whom you've made reference?

1          MR. EDWARDS:  I'm sorry, could you read that

2    back?

3          (Record read back by reporter.)

4          MR. EDWARDS:  Yeah, object to the form.

5    A    I believe there's a discrepancy.  As I understand,

6    the healthcare providers, as I best understand it, had

7    indicated that there was screaming and that type of activity,

8    clear to the time of the intravenous injection of lorazepam.

9          Because the description by the lay witness was a

10   description of a person between hospital rooms, while she

11   doesn't have a timestamp on that observation, I interpret that

12   so as to mean before he reached his secondary room.

13         So I perceive a difference in their timing of his

14   subdued behavior, but I agree that -- I don't recall that she

15   put a timestamp or made a recollection of the specific -- I

16   don't recall that she made a specific recollection of the time.

17   But as I put the circumstances back together, I believe they

18   are different, only because of the location of the patient when

19   each observation was made.

20   Q    (BY MR. PHILLIPS)  Would it make any difference, in

21   the conclusion you've reached, if the description by the

22   medical providers is accurate?

23   A    As to my cause or manner of death, it will make a

24   difference.

25   Q    You have not read Dr. Oliver's deposition, have you?

1    A    I do not believe I have.

2    Q    And do you know that there are some other hospital

3    personnel who have been deposed, whose depositions you've not

4    read?

5    A    In this package I showed you, I believe there's an

6    RN, Jeffrey Baker.  I have read that deposition.  I don't

7    believe I've read any of the depositions of any of the other

8    healthcare providers, that I recall.

9         Right now, I tell you, based on what I've seen, it's

10   unlikely that there is anything that they would say that's

11   going to alter my opinion.  I would, of course, be happy to

12   read them.

13   Q    Is there any reason you wouldn't consider the

14   deposition testimony of the eyewitnesses before reaching an

15   opinion?

16   A    I would, of course, be happy to read them.  But I

17   tell you that the opinion, particularly on the lorazepam, is

18   based substantially on the only eyewitness, the police officer,

19   and the medical record.

20        And it -- I believe it unlikely that any of the other

21   healthcare providers are going to dispute the time record

22   that's in the published medical record.  It's possible they

23   would dispute it.

24        And if they did, I'd have to listen to what they had

25   to say.  For instance, if they said, "Well, we never

1 administered lorazepam," obviously, I'd have to consider that

2 and judge that with the medical record.

3        So, when you asked, "Should you consider it?" yeah,

4 if they specifically dispute the medical record, then I'm gonna

5 have to consider that.

6     Q    Well, shouldn't you consider the testimony of the

7 eyewitnesses to the patient's condition in the emergency room

8 if you're going to be providing opinions about his condition in

9 the emergency room?

10     A    Of all of the opinions I've read, there appears to be

11 widespread consensus that he was acting in an irrational and

12 excited fashion.

13     Q    While in the emergency room?

14     A    Yes.

15     Q    Okay.

16     A    Both before and after arrival.  So I do not doubt

17 that he had this response to LSD, colloquially bad trip, more

18 specifically combative, irrational, "I don't know how to

19 explode."  Clearly acting in that fashion.  I don't dispute

20 that.

21        I -- I don't understand -- I'm not aware that there

22 is any dispute that he was hogtied.  Plus, I got to see the

23 videotape.  So that the police accounts of when this event

24 started at the concert and the medical record documentation of

25 when it terminated with his cessation of breathing appears to

1    be beyond dispute, as near as I can tell.

2            If someone were to say, "Well, you know, it wasn't at

3    a concert," or "We didn't give lorazepam," or "He wasn't

4    combative," that would be important.  But it doesn't sound like

5    that's going to occur.

6            I believe, in my medical opinion, I have seen

7    sufficient documentation, have seen the Autopsy Report, to

8    reach this conclusion, or I would not have reached it.

9        Q    You did consider among the Baptist medical records --

10           THE REPORTER:  I'm sorry, you did

11   consider?

12       Q    (BY MR. PHILLIPS)  You did consider among the Baptist

13   medical records the note that Dr. Oliver made, right?

14       A    I will tell you what I have from the medical records.

15   I have on Page 8 a note signed by Dr. Oliver, drug abuse, acute

16   psychosis, and cardiopulmonary arrest.

17           I have a history and physical examination by

18   Dr. Oliver, which is Pages 6 and 7.  I have a diagnosis of

19   respiratory failure by Dr. Oliver and intubation time of

20   9:27 p.m.

21       Q    Did you accept Dr. Oliver's description of the

22   patient, at the time Dr. Oliver saw the patient, as being

23   accurate?

24       A    I will recount what it says.  I note that he says:

25   "I was unable to gather any meaningful history from the patient

1  because he continued to scream violently and incoherently

2  during the encounter.  He kept repeating 'I do not know how to

3  explode.'"

4          So, yes, I understand what Dr. Oliver has said --

5      Q    My -- my question --

6      A    -- and I take that at face value.  I do understand

7  that, in assessing the timeline, that there is a -- an account

8  by a civilian female in the ER, which does appear to have some

9  discrepancies with any assertion that he was acting in the same

10 fashion up until the moment he got the intravenous injection of

11 Ativan and Haldol.  I understand there's a discrepancy.

12         But in making my determination that he was in a

13 hogtie restraint, that he had a pulse oximetry reading of 90,

14 my assessment that he would've had a significant metabolic

15 acidosis, that discrepancy doesn't play into my diagnosis.  I

16 understand that it exists, but it doesn't compel me to go one

17 way or another away from those diagnoses.

18     Q    I simply wanted to know, having refreshed yourself on

19 what Dr. Oliver described in his notes as the patient's

20 condition when he saw the patient, if you accept that factual

21 description as true, or if you think it's an inaccurate

22 description, or have no opinion on that topic?

23     A    Do I accept it as true?  It is certainly similar to

24 the descriptions given by multiple individuals.  So there is

25 significant reason to believe that, for a period of time, it is

1   completely accurate.

2          As to how long the -- the activity was like that, I

3   understand there's a discrepancy.  But at one time or another,

4   do I believe that Dr. Oliver actually saw and heard these

5   things?  I believe that's reasonable to believe.

6          I'm just saying I don't know how long he behaved in

7   that fashion.  And in assessing the hypoxia due to the hogtying

8   and the respiratory depression by the lorazepam, I'm not sure

9   that discrepancy is a compelling aspect of either disputing my

10  medical opinion or accepting it.

11      Q    Do you understand that Mrs. Tharp, the lay witness to

12  whom you've made reference, saw the patient before

13  Dr. Oliver saw the patient and did not see the patient at the

14  time Dr. Oliver was evaluating the patient?

15      A    I do not know the relationship between those two --

16  the time relationship between those two events.  I do not know.

17      Q    Is an oxygen saturation of 90 percent

18  life-threatening?

19      A    It is on the cusp of a measurement that would require

20  oxygen therapy.  In addition, that statement is obviously

21  appropriate to make in any individual.  I caution you that this

22  particular individual had another significant physiologic

23  challenge, and that is metabolic acidosis, so that this patient

24  is different than other patients who do not have a significant

25  metabolic acidosis.

1        And I would caution any medical caregiver that a

2   pulse oximetry reading of 90 in and of itself carries certain

3   cautionary admonishments, more so in a person who had another

4   underlying physiologic problem, and that's metabolic acidosis.

5        Q    In your practice, do you normally use and respond to

6   oxygen saturation measurements?

7        A    Since 2005, no.  I do -- since -- other than seeing

8   patients with trauma, all the patients have been dead patients.

9        Q    Is it your opinion that, had Mr. Goode been

10  restrained in a different manner, he would have been combative

11  and struggled?

12       A    The answer to that question is "Yes."

13       Q    Why?

14       A    Because he was combative and struggled prior to the

15  time he was restrained, when he was running around, opening the

16  door uninvited to the police car.  It is reasonable to conclude

17  that, if he was acting in an irrational fashion before he was

18  restrained, he would continue after he was restrained,

19  irregardless -- not the "irregardless," the word.  It's not a

20  word.  But regardless of -- regardless of the type of

21  restraint, I believe it reasonable to conclude that he would've

22  continued his unreasonable behavior.

23       Q    And irrespective of the manner of restraint, if he

24  continued his struggle against the restraint, how would that

25  affect him?

1    A    Even if there was no restraint, every individual is
2  going to tire as they run around, and everyone is going to
3  understand that intuitively.
4         Forensic pathologists have identified the hogtying as
5  a particular type of restraint which is problematic.  There are
6  other types of restraint which may be more or less problematic.
7         I'm certainly familiar with individuals who have been
8  restrained chemically.  In some instances, an individual would
9  be given a version of curare and paralyzed and intubated.  That
10  individual would not experience the muscular activity, of
11  course, of a person who's running around either restrained or
12  not restrained.  So there are different ways of restraining a
13  person both physically and chemically.
14         So, when you say both of us agree that
15  irrespect --
16              THE REPORTER:  I'm sorry?
17    A    Both of us agree that -- the word -- not
18  irrespectively or whatever, is not a word, but the type of
19  restraint is going to affect the degree of muscular activity.
20         A chemical restraint with paralysis by one of the
21  curare medications, there would be no muscular activity because
22  the person is paralyzed.  With other types of restraint, there
23  will be relative degrees of muscular usage.
24         If pressure is applied to the back, that doesn't
25  change muscular usage; it changes respiratory effort.  In some

1   sense, it changes muscular effort because, if there's pressure

2   on the back, one still needs to move one's chest wall in order

3   to breathe.  If there's pressure on the stomach, one still

4   needs to move one's diaphragm in order to inflate the lungs.

5          So pressure on the back will exacerbate the muscles

6   used for respiratory effort, both diaphragm and intercostal

7   muscles.

8          The type of restraint will also affect the amount of

9   isometric activity of the muscles of the extremities.  And that

10  is why forensic pathologists have identified the hogtie

11  restraint, both because of pressure on the abdomen, making it

12  more difficult to move one's diaphragm, as well as the

13  inevitable isometric struggle against the restraint, causing

14  exhaustion and concomitantly metabolic acidosis.

15      Q    (BY MR. PHILLIPS) Let me ask my question again

16  because --

17      A    Please.

18      Q    -- with respect, I don't think you've answered it.

19      A    Please.

20      Q    If you'll focus on my questions and try to answer

21  them, that would help us move along.

22      A    Please.

23      Q    If Mr. Goode had been restrained in some manner other

24  than what you've been referring to as the hogtie position, you

25  have said that you think it likely that he would've continued

1   to struggle against those restraints?

2       A    I agree.

3       Q    My question to you simply is:  How would that

4   struggle against a different type of restraint have affected

5   Mr. Goode, in your opinion?

6            MR. EDWARDS:  Object to the form, unless you

7   specify the form of restraint that you're asking about.

8       A    And, of course, because I -- there are different

9   types of restraints, it's a bit of a guess or speculation.

10      Q    (BY MR. PHILLIPS)  Well, let me refine it for you.

11  Suppose he is supine with his arms and legs tied in some

12  fashion to the gurney, and he struggles against those

13  restraints.  How would that likely impact him?

14      A    The supine position has been identified in the

15  forensic literature as the position in which it is easier to

16  breathe.  And depending on the nature of the restraint of his

17  extremities, he may or may not respond in a more docile

18  fashion.

19      Q    Would his combating or struggling against that type

20  of restraint drive his heart rate up probably?

21      A    If he is struggling with or without restraints, his

22  heart rate will be accelerated.  So that even when he was

23  outside restraints, running around, his heart rate would be

24  accelerated because he was running around.

25      Q    Would you expect his running around, as you've

1  described also, to increase his blood pressure?

2      A    It would definitely increase his cardiac output.  It

3  would probably increase his pressure and pulse.

4      Q    If he were restrained supine with his arms and legs

5  attached to the side of the hospital gurney, would he still

6  have the effects that you've described as being similar to

7  isometric weightlifting?

8      A    It is possible that he would, or it is possible that

9  he wouldn't, depending on his perception of his -- and we both

10 agree he has an altered perception and a sense of

11 claustrophobia and other types of altered perception.  But his

12 response to his environment is going to affect his level of the

13 equivalent of isometric exercise.  I agree, it will change.

14           MR. PHILLIPS:  This is a good time for us

15 to take a short break.  Why don't we do that, and we'll resume

16 shortly.  Fellas on the phone, we're gonna take a short break,

17 and we'll be back in a few minutes.

18           (Recess taken at 10:02 a.m. and back in

19           session at 10:12 a.m.)

20     Q    (BY MR. PHILLIPS)  Was Mr. Goode at risk for sudden

21 death irrespective of the manner in which he was restrained?

22           MR. EDWARDS:  Object to form.

23     A    There are no autopsy findings to suggest he was

24 predisposed to sudden death from any type of natural disease.

25 There is a history of asthma.  Although, as I've stated, I saw

1    no findings in the microscopic examination.  And neither

2    marijuana nor LSD are associated with sudden, unexpected death,

3    you know, due to the -- particularly the marijuana at this

4    level.  But marijuana and LSD are not associated with

5    toxicological death.

6            So I don't see anything in either his history or

7    Autopsy Report or toxicology which would indicate that he was

8    at any greater risk of sudden, unexpected death than the

9    background population.

10   Q    (BY MR. PHILLIPS)  Well, given the fact that he had

11   taken LSD and, as you've said colloquially, was having a bad

12   trip, if he were restrained in some other fashion, but

13   combative and struggling against those restraints, would he be

14   at risk for sudden death?

15           MR. EDWARDS:  Object to the form.

16   A    And, again, you know, to be fair, I don't know to

17   what type of restraint you are referring.  There are perhaps

18   types of restraints which would have also compromised his

19   respiratory effort and exacerbated his perceptions, albeit

20   altered, that caused him to struggle.

21           There are other types of restraints which would not

22   have been as exacerbatory (sic) or would not have tended to

23   exacerbate his underlying physiology.  So the answer could go

24   both ways, depending on the type of restraint.

25   Q    (BY MR. PHILLIPS)  What is beta phenethylamine?

**ANIMAS REPORTING SERVICE**
**919 County Road 142, Durango, Colorado 81303**

1      A    I don't recall specifically -- I've got

2    Goodman & Gilman.  We can look it up.

3      Q    Do you know what that is?

4      A    No.

5      Q    Did you see the toxicology studies that Dr. Wecht

6    did?

7      A    I have them here.  I see beta phenethylamine.

8      Q    That was found present on the toxicology studies that

9    Dr. Wecht did?

10     A    Yes.

11     Q    Do you know the significance of that --

12     A    I do not.

13     Q    -- being in Mr. Goode's body?

14     A    I do not.

15     Q    You've made reference earlier to there being

16   situations where pressure is applied to the back of folks when

17   they're restrained.  Remembering making that comment?

18     A    I do.

19     Q    In the emergency room, was there any pressure or

20   weight being applied to his back?

21     A    I did not see any specific description of that, no.

22     Q    Do you have an understanding as to how restricted he

23   was in the restraint that was being used on him?

24     A    I have an understanding.

25     Q    Do you have any understanding as to whether he could

1   move his legs back and forth?

2        A    My understanding is that, within the construct of

3   cuffs around his or restraints around his legs, and secured to

4   the restraints around his wrists, it still did allow for

5   movement, yes.  That's my understanding.

6        Q    And would that be a good thing for the patient?

7        A    The more they can move, the better for the patient.

8        Q    I mean, it would be possible to restrain somebody so

9   that they could not move their legs at all; is that --

10       A    I agree.

11       Q    He was not restrained in that manner?

12       A    I agree -- to the best of my knowledge, I agree.

13       Q    There were no straps across him in the emergency

14  department, were there?

15       A    In the emergency department, I don't recall that

16  description.  I do recall a description of five straps that may

17  have been present at an earlier time period.

18       Q    But not in the emergency room?

19       A    Not that I recollect.

20       Q    So would that mean that he was less restrained in the

21  emergency room than he had been previously?

22       A    That is possible.

23       Q    If there had been straps over him, if there had been

24  weight on his back, and there was neither straps on him nor

25  weight on his back in the emergency room, he would be less

1   restrained in the emergency room than he had been previously,

2   correct?

3        A     To an extent, I agree.

4        Q     Is acidosis normally determined through laboratory

5   testing?

6        A     Yes.

7        Q     What kind of testing?

8        A     You can do a blood test to determine the pH, meaning

9   acidic or basic nature of the blood.

10       Q     Arterial blood gasses?

11       A     Yes.

12       Q     We don't have that data for Mr. Goode, do we?

13       A     I agree.

14       Q     So we don't have a laboratory basis or a test that

15  would lead or support the conclusion of a diagnosis of acidosis

16  in this patient?

17       A     I agree.

18            MR. EDWARDS:  Doctor, let me see that, please.

19            THE WITNESS:  (Handing notebook.)

20            MR. EDWARDS:  Thank you.

21       Q     (BY MR. PHILLIPS)  If a patient is yelling and

22  screaming, what does that indicate about his ability to breathe

23  and move air through his lungs

24       A     That he is able to pass air over his vocal cords,

25  yes.

1      Q     With -- with every occasion that the patient wanted

2  to yell or scream, there would have to be an inspiration of

3  breath to be able to yell or scream, right?

4      A     Yes.

5      Q     Is bicarbonate used after cardiac arrest to treat

6  metabolic acidosis?

7      A     Yes.

8      Q     And to treat the metabolic acidosis that's associated

9  with cardiac arrest?

10     A     In a cardiopulmonary arrest, a substantial part of

11  the ensuing acidosis will be related to the lack of

12  respiration.  That portion I would term a respiratory acidosis,

13  because the person is no longer blowing off $CO_2$.

14         So this person, in my medical opinion, had an

15  underlying metabolic acidosis because of muscular activity.

16  And then when this individual stopped breathing, that was

17  exacerbated by the onset of what is now respiratory acidosis

18  from cessation of blowing off $CO_2$.

19     Q     In your practice currently, are you normally involved

20  in diagnosing acidosis in patients?

21     A     Well, in live ones, no.  But in dead patients, I do

22  review medical charts on a regular basis to assist me in

23  determining why they're dead.

24         And I'll go further.  Individuals may die, for

25  instance, of alcoholic ketoacidosis.  That is a diagnosis I

1  make.  And while I cannot measure acidosis in a postmortem

2  individual and reliably predict their pre-mortem status based

3  on pH, because they now have an overlying respiratory acidosis,

4  I can measure ketones in the vitreous humor.

5       And I use those ketones along with vitreous urea

6  nitrogen and creatinine to determine whether individuals may

7  have a -- either an alcoholic ketoacidosis or diabetic

8  ketoacidosis, and I do make those diagnoses as a cause of

9  death.  But I make those based on an inference of their

10 acidotic state in a postmortem individual, based on their renal

11 function and ketones in the vitreous humor.

12      So it is something I have to deal with, because I

13 have to make that diagnosis.  I just do it a different way

14 because in dead people you can't use an arterial blood gas to

15 reliably determine pre-mortem acidotic state.  In a living

16 person, you can't take their vitreous humor.

17 Q    We know from your report that you've set forth your

18 cause-of-death opinion in this case, right?

19 A    Yes.

20 Q    And what role do you think positional asphyxia had in

21 Mr. Goode's death?

22 A    I've referenced the textbooks.  And when you go to

23 the textbooks, you're going to find why my opinion exists.  I

24 believe that the restraint significantly contributed to

25 respiratory compromise, and I cite the pulse oximetry reading

1    as some laboratory evidence of that.

2              And it is my, you know, training and experience in

3    medicine where I point to the metabolic acidosis caused by

4    straining against the restraint.  And I believe I've cited the

5    forensic literature which indicates that it is reasonable to

6    conclude in this particular type of restraint that the struggle

7    against those restraints contributed significantly,

8    sufficiently, to assign a degree of causality to the death.

9    And that comes right out of the literature, and I've cited

10   that.

11   Q    Sometimes I ask bad questions, so I apologize if I've

12   done that.  Can a patient have primary causes of death and

13   secondary causes of death?

14   A    Yes.  And by secondary, I mean contributory causes.

15   We use the word contributory.  But I -- I knew what you meant.

16   You meant secondary or contributory.  And I agree.

17   Q    Yeah.  And what category is positional asphyxia, in

18   your opinion?

19   A    Obviously, in this case I've cited two important

20   factors:  Lorazepam, respiratory depression; restraint causing

21   hypoxia and metabolic acidosis.

22             And I've agreed with you that different forensic

23   pathologists may reasonably assess different causality --

24   different degrees of causality.

25             In this instance, I believe I'm attending quite

1   closely to the forensic texts when I say that the hogtie

2   restraint contributed to a degree, which I won't put a metric

3   on, a number, but sufficient to list it as a cause of death.

4   And I base that on the published literature.

5          But I -- in this case, I have also admonished the

6   reader of my report that, while the forensic literature clearly

7   identifies this hogtie as a sufficient cause of death, and it

8   is certainly within the forensic pathology standard of practice

9   to use that as a cause of death, and this person did indeed

10  have that restraint -- in this particular case, I've admonished

11  the reader of my report that, because of the -- what I believe

12  is a very strong temporal relationship -- and we've talked

13  about causality and temporal relationships. But because of the

14  temporal relationship, I have admonished the reader that the

15  administration of a respiratory depressant in the setting of

16  what I already believe to be a methodology sufficient to cause

17  death, lorazepam has to be considered as contributing in a

18  sufficiently significant fashion that I believe it must be

19  listed.

20         So I've listed those two causes, and I -- I believe

21  both of those fall well within the published forensic

22  literature.

23         As to a metric or a number, I can't put a metric or a

24  number on them. But I believe it is reasonable to list both of

25  them based on the published forensic literature.

1    Q    Did Mr. Goode's fighting against the restraints

2  contribute to his death?

3    A    I believe the answer to that question is "Yes."

4    Q    How so?

5    A    It is his fight against those restraints, the use of

6  those muscles, which exacerbated metabolic acidosis.  So I am

7  convinced that the physical struggle against those restraints

8  contributed to his -- what we call physiologic challenge, or

9  physiologic insult.  I'm not saying, "You dirty rat."  By

10  physiologic insult, I'm saying the perturbation in his

11  physiology, and that is specifically metabolic acidosis.

12    Q    Did the LSD contribute at all to his death, in your

13  opinion?

14    A    While LSD, to the best of my knowledge, in the

15  history of medicine, has never been known to cause death, it

16  certainly caused his combative state.

17          And I have told you that his combative state and his

18  combat against the restraints is the etiology or cause of his

19  metabolic acidosis.  So I believe there is a relationship, yes.

20  Of course, there is a relationship.

21          But I also caution you, to the best of my knowledge,

22  LSD in and of itself, either through toxicological means, has

23  never caused a death that I'm aware of.  And I brought three

24  textbooks which specifically state that so that we can review

25  "Why would I issue that statement?"

57

1    Q    But the way it contributes, in your opinion, is not

2 because it was at a toxic level, but because it led to the

3 struggle and combativeness against the restraints?

4    A    And anyone -- even the most casual, non-medical

5 individual would understand that.  His struggle was a

6 consequence of his ingestion of LSD.

7    Q    You have made a point in your report as to how

8 Mr. Goode's death should be classified.  Do you remember

9 commenting on that near the end of your report?

10    A    Yes, I do.

11    Q    Is that at all important for the conclusion you reach

12 as to his cause of death?

13    A    Cause and manner are different.  In this -- certainly

14 in this jurisdiction, the coroner has, you know, those two

15 obligations.  And that is -- those two obligations apply to,

16 you know, every state and, you know, the other country in which

17 I practiced forensic pathology.  Even down in New Zealand

18 that's required.  Cause and manner.

19        Manner, we only have five choices, as you likely

20 know:  Homicide, suicide, accident, natural, and undetermined.

21 So those are separate issues.

22        So, when you say -- if you ask, you know, "How are

23 they linked?" they're separate issues.  Those are separate

24 issues.  Obviously, the manner depends on the cause, but the

25 cause does not depend on the manner.

1  Q    What is the basis for your opinion that his death --

2  his manner of death should be classified as a homicide?

3  A    That comes right out of the published literature that

4  I've -- that I've cited here, and I've brought some of it with

5  me so we could look over that together.

6       And -- and the basis of the reasoning is this:

7  Homicide is defined as death at the hands of another.  And then

8  by another, they mean another human being.

9       In this instance, there was indisputably a violent

10 struggle.  And the hogtying -- I don't believe there's any

11 dispute that those handcuffs were affixed by another human

12 being.

13      So that the literature indicates that, when there is

14 a violent struggle between human beings, and the forensic

15 pathologist believes that that violent struggle contributed to

16 death, then the appropriate determination of manner is homicide

17 because of the definition of death at the hands of another.

18 Q    That's not to suggest that you're opining that

19 another intended to cause Mr. Goode's death, is it?

20 A    I agree entirely with your statement.  In making the

21 medical determination of homicide, it is as I have described,

22 death at the hands of another.

23      My medical determination is different than a legal

24 determination.  And every time this issue comes up in court, if

25 you were to review my transcripts, you would see that I assure

59

1    the court that I am not invading the province of the court, and

2    that is determining the legal nature of the event.  I'm only

3    determining the medical nature of the event, but I will not

4    invade the court's ability to determine the legal nature of the

5    event.  So my use of the term "homicide" is a medical term.

6        Q    You understand that the case we're here to discuss is

7    a civil and not a criminal case, right?

8        A    I agree.  That is my understanding.  This has --

9    there are no state attorneys or prosecuting attorneys involved

10   in this case whatsoever, neither on the telephone or in any

11   aspect of this case.

12       Q    And if a forensic pathologist reached a conclusion as

13   to manner of death, it was homicide, it would then be up to the

14   prosecutor in that jurisdiction to consider that information

15   along with everything else and make a determination about

16   whether to pursue that under the criminal laws?

17       A    Right.  And that's what I mean by province of the

18   court and the associated officers of the court, who are the

19   prosecuting attorneys.  And I will not invade that province.

20       Q    Do you think that even your opinion pertaining to

21   Ativan should be classified as a homicide?

22       A    The answer to that is -- I will just say complex.  I

23   have contemplated that issue at length.  It -- if we have that

24   discussion, it would be the case that I would begin to express

25   my understanding or opinion about standard of care.  Those are

1  my caveats.  I will proceed to discuss it further if you wish.

2     Q    Well, confining it to just manner of death, is it

3  your opinion that the administration of Ativan should be

4  classified -- in his death, if it's related to that, should be

5  classified as a homicide?

6     A    If Ativan was the only issue, I probably would not

7  have classified it as a homicide.  But I tell you:  It is

8  severely problematic to administer a respiratory depressant to

9  an individual who has these -- this medical condition.

10  Assuredly metabolic acidosis, notwithstanding the absence of a

11  laboratory test; assuredly exhaustion, despite the difference

12  in descriptions of the individual.

13         It is severely problematic to administer a

14  respiratory depressant and then leave the patient in the

15  custody of an individual who, to the best of my knowledge, has

16  no formal medical or nursing training in anything, particularly

17  cardiac or pulmonary monitoring or physiology; has no

18  credentials at the facility; no continuing medical or nursing

19  education.  That is severely problematic.

20         And because, I guess, I've spent so much time in

21  this, I understand that the question of acting recklessly, and

22  so as to endanger, might arise.  However, notwithstanding my --

23  notwithstanding my understanding of the situation,

24  relinquishing this patient after administering a respiratory

25  depressant to a person with no training and no credentials, to

1  the best of my knowledge, that is problematic.

2          The question might arise, but I would not have

3  initiated a legal problem by causing merely the administration

4  of lorazepam, Ativan.  Under those problematic circumstances, I

5  probably would not have called that a homicide, but I do

6  understand that it is severely problematic.

7      Q    That gets into the standard-of-care issues that we

8  talked about earlier, right?

9      A    And that's why I --

10     Q    Okay.

11     A    -- I indicated that.  I've already agreed I'm not

12  gonna be admitted as an expert in standard of care, but that

13  I'm not ignorant of that standard of care nonetheless.

14     Q    You're aware, from reading Dr. Barnhart's deposition,

15  that she did not link Mr. Goode's death to positional asphyxia

16  or the manner of restraint, right?

17     A    While I don't remember her specific words, it is my

18  impression that she has specifically disputed that any aspect

19  of the hogtie caused death.

20     Q    Did you read and consider the entirety of

21  Dr. Barnhart's deposition?

22     A    I've read it multiple times --

23     Q    Okay.

24     A    -- and I have considered it at length.  I -- I

25  understand that her opinion and my opinion at this time are

1  diametrically opposed.  I don't believe I've ever met her.  But

2  I understand that our opinions are diametrically opposed.  And

3  I understand she made no mention whatsoever of lorazepam.

4          Nonetheless, I continue to assert that for what I

5  believe to be an excellent reason.

6      Q    In your report, if you could locate it for me, there

7  is, on what I think is the next to the last page, a page that

8  begins with the heading "Opinions."

9      A    Got it.

10     Q    Do you see that?

11     A    Yeah.

12     Q    On this page, you cite some literature or other

13  sources, don't you?

14     A    Yes.

15     Q    Do you have all of these materials with you today

16  that you've cited on the next to the last page of your report?

17     A    I didn't bring them all, but -- because some of them

18  are available on the Internet; they can easily be reached.

19          Others of them, actually -- the texts I actually

20  brought hard copies.  But the references on the Internet, I did

21  not bring hard copies of those, but they're easily available to

22  everybody.

23     Q    Okay.  I have tried to retrieve what you cited, and I

24  don't have a clean copy to mark, but I'm happy to supply those

25  after today, if we need to.

1     A     Okay.

2     Q     Is the first citation, on the next to the last page

3 of your report, to an article titled "Sudden death during

4 restraint: do some positions affect lung function?"

5     A     I recall this specific title, but I'll take a peek at

6 what you've got.

7     Q     I'll just tell you that's the first citation in your

8 report.

9              MR. GASS:  I'm sorry, what was the page,

10 Marty?

11              MR. PHILLIPS:  It's the next to the last page of

12 the report.

13              MR. GASS:  Okay, I'm there.  Thanks.

14              THE WITNESS:  I'm just gonna bring it

15 up on my smartphone.

16              MR. PHILLIPS:  All right.  Would you pass my

17 copy back, please?

18              THE WITNESS:  I'm gonna compare it when I

19 punch it --

20              MR. PHILLILPS:  Oh, okay.

21              THE WITNESS:  -- up on the smartphone to

22 what you've got.

23              MR. PHILLIPS:  Sure.

24              THE WITNESS:  (Looking.)

25              MR. EDWARDS:  Off the record.

1           (Discussion off record re Internet.)

2           MR. PHILLIPS:  Okay.  Well, let's go back on the

3   record.

4   Q   (BY MR. PHILLIPS)  Are you able to review that on the

5   Internet, the article here?

6           MR. GASS:  What's the title of it?

7           MR. PHILLIPS:  "Sudden death during restraint:

8   do some positions affect lung function?"

9           MR. EDWARDS:  Is that PubMed.

10          THE WITNESS:  PubMed.

11          MR. EDWARDS:  It may only give you the --

12          THE WITNESS:  This right now is just

13  giving me the abstract.

14          MR. PHILLIPS:  The cite is 138 Med.Sci.

15  Law, Vol. 48, No. 2.  Does that help?

16          THE WITNESS:  I do have the abstract, but

17  it's just not giving me the entire article here.

18          MR. PHILLIPS:  Okay.  Well, let's go back

19  on the record.  I think we can proceed.

20  Q   (BY MR. PHILLIPS)  Doctor, before we went off the

21  record, we were looking at the next to the last page of your

22  report, and the first citation on the page.

23          And I think that you have been able to confirm that

24  the first citation is to an article entitled "Sudden death

25  during restraint:  do some positions affect lung function?"

1   And that is published at 138 Med.Sci. Law (2008) Vol 48, No. 2.

2       A    Yes.

3       Q    Is that right?

4       A    That is correct.

5       Q    Are the authors of this study medical doctors?

6       A    This -- what I'm looking at is the abstract, and the

7   one article does not have the "MD" suffix after his name or her

8   name.

9       Q    So the two listed do not appear MDs --

10      A    Correct.

11      Q    -- appear to be MDs, right?

12      A    I agree.

13      Q    And this is from the United Kingdom; is that right?

14  A study done in the United Kingdom?

15      A    May I see your copy?

16      Q    Coventry University?

17      A    That's not on the abstract that I'm looking at, but

18  it may well be on the full copy that you have.

19      Q    Okay.  I will supply, after today, a clean copy of

20  this article.  We'll mark it as Exhibit 2, so we'll have it in

21  the record since you've identified it for us.

22      A    Yes.

23           MR. GASS:  Actually, Doctor, if you'll

24  just hit the author information plus button.

25      A    Coventry University, Priority Street, Coventry, UK.

**ANIMAS REPORTING SERVICE**
**919 County Road 142, Durango, Colorado 81303**

1      Q      (BY MR. PHILLIPS)  So it's a study from the UK?

2      A      Yes.  Or an article from the UK.

3      Q      Did this article measure blood pressure?

4      A      I don't recall.  And on my summary here, it doesn't

5  indicate.

6      Q      Did it measure oxygen saturation level?

7      A      On my copy, it doesn't -- on my abstract copy, that's

8  not indicated one way or another.

9      Q      Did it measure heart rate?

10      A      On my abstract copy, that's not indicated one way or

11  another.  And I don't recall from memory.

12      Q      Did it measure the patient's vital signs over time?

13      A      Similarly, I don't recall from memory, and it's not

14  included on this abstract copy.

15      Q      What was measured?

16      A      Well, since I don't have the entire article, and I

17  don't recall it from memory, I'm unable to answer that question

18  at this time.

19      Q      Well, if it is forced vital capacity, what is that,

20  if that's what's measured in the article?

21      A      That is the capacity -- the volume that an individual

22  can expel it from their lungs.

23      Q      That's measuring one puff of exhale?

24      A      Yes.

25      Q      And the reduction in function of forced vital

1  capacity, FVC, is listed at a mean of 23.8 percent?

2       A    Yes.

3       Q    Would that remaining unimpaired function still be

4  within the normal range?

5       A    A 23-percent reduction would not in and of itself be

6  fatal.

7       Q    My question was:  Could one have a reduction of

8  approximately 23 percent and yet the function still be -- would

9  be within the normal range of function?

10       A    And again I don't recall that from memory, and I

11  don't have the entire article in front of me.

12       Q    Can a patient have some reduction in lung function

13  and still have lung function within the normal limits?

14       A    Yes.

15       Q    Can patients have some reduction in lung function and

16  it not be disabling or fatal to them?

17       A    Yes.

18       Q    Is there a difference between assessing whether there

19  is a statistical reduction in lung function and measuring

20  whether it has any clinical significance for a patient?

21       A    Yes.

22       Q    Do you recall what this article said about the

23  clinical significance?

24       A    No, but I would be happy to review it.

25       Q    I'm gonna cite the copy that I have, which will

1   become Exhibit 2.  This is on Page 140.  And I'll read you the

2   statement, and you're welcome to look at it if you need to.

3           It says:  "We report statistically significant

4   reductions in measures of lung function for two restraint

5   positions:  Position 4 and position 5.  However, it remains

6   open to debate whether these constitute clinically significant

7   and potentially fatal restrictions."

8       A   I would agree with that statement.  I'm not reading

9   it with you, but I agree with that statement conceptually, yes.

10      Q   So this article does not reach the conclusion that

11  the particular restraint results in a clinically significant

12  change in lung function or a potentially fatal change in lung

13  function, right?

14      A   Not necessarily.  That is correct.

15      Q   The second source you cite on the next to the last

16  page of your opinion gives us a title.  "Acute Excited States

17  And Sudden Death, Death After Restraint Can Be Avoided."

18          Do you see that one?

19      A   I do.

20      Q   Did you bring that source with you?

21      A   I did not.  It's available on the Internet, and I'm

22  punching it up now.

23      Q   Thank you.

24      A   I have that -- part of it in front of me.

25      Q   Is that a Letter to the editor?

1     A    Yes.

2     Q    Published in the British Medical Journal?

3     A    Yes.

4     Q    Volume 316?

5     A    Yes.

6     Q    April 1998?

7     A    Yes.

8     Q    This is not a research study, is it?

9     A    Correct.

10    Q    This is not a peer-reviewed article?

11    A    I agree.

12    Q    This is a person's opinion from the UK, who chose to

13 write a letter to the editor, right?

14    A    I agree.

15    Q    It also does not reach the conclusion that the method

16 of restraint results in a clinically significant change in a

17 person's lung function, does it?

18    A    It makes the statement:  "Any person who is

19 restrained prone has trouble breathing...," but it does not

20 specify metrics of change in pulmonary function.  I agree.

21    Q    Okay.  We'll mark a copy of this article as

22 Exhibit 3, and I'll supply that later as well.  I said article.

23 It's actually a Letter to the editor as we agreed, right?

24    A    We agree.

25    Q    The next source you cite on the next to the last page

1    of your report is something entitled "Reducing the Risk

2    Associated With Use Of Restraints."  Is that right?

3         A    Correct.

4         Q    That is in the next-to-last paragraph on the page

5    titled "Opinions"?

6         A    I agree.

7         Q    Can you retrieve that document, please?

8         A    Yes.

9         Q    Do you have it?

10        A    I do.

11        Q    Is it from a website --

12        A    Yes.

13        Q    -- called "corrections.com"?

14        A    Yes.

15        Q    What is that?

16        A    It is obviously an opinion of an individual.  This is

17   not a peer-reviewed journal article.

18        Q    Is this person, who is espousing this opinion, a

19   medical doctor?

20        A    No.

21        Q    What is this person's training?

22        A    I'm not aware of this person's training.

23        Q    The person is Meghan Fay, listed as assistant editor?

24        A    Yes.

25        Q    And the publication date is July 27th of 2000?

1    A    Correct.

2    Q    Do you regularly read this source?

3    A    No.

4    Q    Is it reflective of any study that has been done to

5    determine -- to determine the effects of particular kinds of

6    restraint on lung function?

7    A    While it is not in and of itself a study, and is not

8    a peer-reviewed article, as I've already stated to you, in the

9    published peer-reviewed forensic literature, there is -- it is

10   our training that this type of restraint is problematic.  In

11   that sense, there are multiple individuals who reflect that

12   literature.

13          This in and of itself is not a peer-reviewed journal

14   article.  If you ask, "Does it reflect opinions?" the answer

15   is, "Yeah, of course, it does."  But is it in and of itself a

16   peer-reviewed controlled medical study?  No, it is not.  Does

17   it reflect opinions published in the peer-reviewed literature,

18   as I've already stated?  Yes, it does.

19   Q    This is not a source that forensic pathologists

20   normally read, is it?

21   A    That is correct.  It was my -- my intention to

22   demonstrate to you that, in addition to the peer-reviewed

23   published forensic literature, there is -- there are other

24   publications that reflect that literature that are commonly

25   available to the individual who may not be reading forensic

1    texts.

2          Q    We'll mark a copy of this website statement as

3    Exhibit 4.

4                The other literature that you cite on the next to the

5    last page of your report is cited with regard to how the manner

6    of death should be classified, right?

7          A    Correct.

8          Q    Did you cite any other literature about whether the

9    hogtie position as you've called it, or the prone maximal

10   restraint position as others refer to it, leads to positional

11   asphyxia?

12         A    In the -- in the sense that these are discussions of

13   restraint asphyxia -- I mean, that is the topic of these

14   discussions.  And the reason they have opined that this is

15   death at the hands of another is because they believe that this

16   is death at the hands of another.  And that --

17         Q    You cited, in the section about the manner of death,

18   Dr. DiMaio's book, right?

19         A    "Forensic Pathology," Second Edition (indicating).

20         Q    You cited Dr. DiMaio?

21         A    I did.

22         Q    Are you familiar with his "Handbook of Forensic

23   Pathology," Second Edition?

24         A    His "Handbook of Forensic Pathology."  I have his

25   "Forensic Pathology," and I have his "Excited Delirium

1  Syndrome."  I don't know that I have that text, no.

2      Q    Okay.  Here's the cover page of it.  Does that look

3  familiar to you?

4      A    I do not have that.

5      Q    Is Dr. DiMaio's publication a reliable authority in

6  the field of forensic pathology?

7      A    I'm not gonna recognize any of these texts as

8  authoritative because they don't agree on all topics.  I will

9  recognize it as a learned treatise.

10     Q    Is that true with the ones we've marked as exhibits

11  as well?

12     A    Those other exhibits fall below the level of --

13  certainly the last one fell below the level of learned

14  treatise.  And the Letter to the editor is just that.  It's a

15  Letter to the editor.  I do not recognize that as a learned

16  treatise.  That is what it is; it's a Letter to the editor.

17     Q    So Exhibits 3 and 4 don't qualify as learned

18  treatises, in your opinion?

19     A    No.

20     Q    How about Exhibit 2?

21     A    What's that?

22     Q    That's the first one we looked at, "Sudden death

23  during restraint..."

24     A    That's a published article.  It's peer-reviewed.

25  That has to be taken in the context of all peer-reviewed

1 published articles, and it has been peer-reviewed and

2 published.

3        It is obviously subject to correction in the future

4 if science -- the understanding of science changes, which it

5 always does.

6        So it's a published peer-reviewed journal article.

7 That's exactly what it is. And there are obvious caveats

8 associated with that. So I would not call that authoritative,

9 because even the author would agree it's subject to change.

10   Q   Have you necessarily reached a conclusion in this

11 case that the manner in which Mr. Goode was restrained was

12 clinically significant?

13   A   I believe that it was. I believe that it caused a

14 pulse oximetry reading of 90, and I've already opined that it

15 contributed significantly to his death, so much so that I've

16 also opined that its contribution to his death compels me to

17 make the diagnosis of manner of death as homicide because I

18 believe that this is death at the hands of another, and that

19 the mechanism of that hands of another is not a gunshot; it's

20 not a knife; it is restraint.

21   Q   We looked at the passage together in Exhibit 2 that

22 said it was still open to debate whether these findings were

23 clinically significant and potentially fatal.

24        So you have reached the conclusion, with regard to

25 Mr. Goode, that the article you cite, Exhibit 2, has not

1  reached with regard to this position, right?

2      A      In this case, I have the advantage of --

3      Q      Is that right?

4      A      I reached the conclusion in this case that they

5  didn't reach, because they know nothing about this case.  This

6  is a case with a pulse oximetry reading of 90 percent, and this

7  is a case where a person is dead.

8      Q      In the "Handbook of Forensic Pathology," Second

9  Edition, that Dr. DiMaio has --

10     A      I have not read that.

11     Q      Okay.  Let me make reference to some statements, and

12  you tell me if you agree with them.  This is on Page 169.  It's

13  under the heading "Hogtying -- Positional/Restraint Asphyxia."

14             Letter D on Page 169 says:  "Research by Chan et al.[3]

15  determined that the original experiments were in error.  He

16  found that while placing an individual facedown in the hogtie

17  position following strenuous exercise, e.g., a struggle, did

18  not" (sic) "produce restrictive pulmonary functioning as

19  measured by a pulmonary function test, these results were not

20  clinically relevant.  There was no evidence of hypoxia."

21             Do you agree with that statement?

22     A      Yes, I do.

23     Q      Is that at odds with the opinion you're expressing in

24  this case?

25     A      Superficially, obviously, it's at odds.  And perhaps

1  the answer, "I agree with that statement," is -- while indeed

2  that is a statement, I agree that both -- I agree with DiMaio's

3  interpretation of Chan's studies.  So is that what Chan said?

4  Yes, it is.  Is that at odds with my diagnosis?  Yes, of

5  course, it is.

6        Q     And so the conclusion that Chan reached, to which

7  Dr. DiMaio made reference, is at odds with your conclusion in

8  this case; is that right?

9        A     If you believe Chan and -- this is my answer.  You

10 want it or not?

11       Q     Okay.  Page 169 --

12       A     Oh, so you don't want the answer?  So continue.

13       Q     Oh, I thought you were finished.  Go ahead.

14       A     I asked you a question, "Do you want the answer?"

15       Q     I thought you just gave it to me.

16       A     No, I asked you if you wanted my answer.

17       Q     What question are you answering?

18       A     The one you asked.

19       Q     Okay.

20       A     If you believe Chan --

21       Q     Okay.

22       A     -- that there's no compromise in respiratory

23 function, then the measured pulse oximetry in this case of 90

24 indicates, in no uncertain terms, that something was

25 perpetrated on this decedent in excess of the 50 pounds that

**ANIMAS REPORTING SERVICE**
**919 County Road 142, Durango, Colorado 81303**

1  Chan cites in his studies.

2          One must conclude, if you believe Chan, that some

3  type of malevolent behavior occurred that caused a pulse

4  oximetry reading of 90 percent, which Chan does not anticipate

5  from applying even 50 pounds of pressure to a person in the

6  prone hogtie position.  Now, I don't know that that malevolent

7  behavior occurred in excess of 50 pounds.

8          I also indicate to you that the time period that Chan

9  used in his studies is different than the time period that this

10  patient experienced before their death.

11          So that, while superficially you say, "You're at odds

12  with Chan," Chan's studies do not recapitulate all of the

13  circumstances of this case.

14          And if you believe Chan, that there should've been no

15  change in pulse oximetry, then you must conclude that some

16  malevolent behavior occurred in excess of putting 50 pounds of

17  pressure on the back of this person in a hogtie position.

18          I'm not prepared to assert that that malevolent

19  behavior occurred, but one must conclude it occurred if you

20  believe that Chan's studies are accurate.  That's my answer.

21      Q    We may have covered this earlier, but I want to be

22  sure I understand.

23      A    Please.

24      Q    From the materials you've read, you don't see any

25  evidence that any pressure was applied to Mr. Goode's back in

1    the emergency department, do you?

2         A    Right.  And that is why I prefaced my statement with:

3    If you believe Chan, then you must conclude that some type of

4    malevolent behavior occurred in excess of 50 pounds of pressure

5    on the back of a hogtied person.

6              But since there is no record of such malevolent

7    behavior, I'm not going to assume that it occurred.  And one of

8    the reasons why I'm not compelled to make that conclusion was

9    that Chan didn't take a person out to the time period that this

10   patient experienced.

11             So I don't believe that anyone is compelled to

12   believe that malevolent behavior must have occurred in light of

13   the fact that Chan didn't take his experiments out that far.

14             So I'm not saying malevolent behavior occurred.  But

15   if you believe that, if Chan had taken his experiments out that

16   far and gotten the same results, then I'm saying one must

17   conclude that some type of malevolent behavior in excess of

18   50 pounds on the back must have occurred.

19        Q    Is it your contention that there was some pressure

20   put on Mr. Goode's back before he got to the emergency room?

21        A    I have no record of that.

22        Q    Okay.

23        A    And in the videotapes, there's -- that I've seen, the

24   brief videotapes, there's no evidence of that.

25        Q    In what we've marked -- or what we're going to mark

1  as Exhibit 4 --

2              MR. PHILLIPS:  Is that what we're up to

3  now?

4              MR. GASS:  5, I think.

5              MR. PHILLIPS:  5, okay.  That's the DiMaio book

6  from which I've been asking you questions.

7              THE WITNESS:  Please continue.

8              MR. PHILLIPS:  Yes, sir.

9      Q    (BY MR. PHILLIPS)  On Page 169, Part E, DiMaio

10  writes:  "Subsequent tests in which weights were applied to the

11  thorax also did not produce clinically relevant decreases in

12  pulmonary functioning."

13          Do you agree with that statement?

14      A    As I -- I also have restated that that is also my

15  interpretation of Chan's results.  So, of course, I agree with

16  DiMaio's interpretation of Chan's experiments, because I also

17  restated that.  And I actually specified up to 50 pounds.

18      Q    And then the last sentence on Part E says:  "Thus,

19  there is no proof that ordinary force placed on an individual

20  by kneeling on them or lying across their body compromises

21  respiration."

22          Do you agree with that statement?

23      A    In -- as a summary of Chan's experiments, I agree

24  that is the summary.

25          But I also caution you that empirically the forensic

1  pathology community has indicated that it is reasonable to

2  diagnose restraint asphyxia in the setting of a hogtie.

3          As to whether pressure was applied or not, I do not

4  know.  In this case, empirically I tell you there was a pulse

5  oximetry reading of 90 percent.

6      Q    Is there some forensic text or journal that you have

7  available to you, outside of what you've cited here, that we've

8  already made reference to, that supports the idea that

9  position -- that the prone maximal restraint position leads to

10 clinically significant decrease in pulmonary function and

11 ventilation?

12     A    Well, they certainly assert that it leads to death.

13 As to the mechanism of that death, you're asking:  Do they

14 specifically cite change in pulmonary function?

15         They discuss that possibility, but I -- I don't

16 recall -- other than stating that, yes, it's associated with

17 death, I don't know that they specified the specific mechanism

18 by which the empiric observation that these individuals

19 frequently die -- I don't know that they cite the specific

20 with -- in a pedantic fashion, I don't know if they cite the

21 specific mechanism.  But, of course, they cite the empiric

22 observation that these individuals frequently die.

23     Q    Well, we've talked about the conclusions reached in

24 the Chan study --

25     A    Yes.

1     Q     -- a little bit now.  Are you aware of any statement

2 in any of these forensic texts, that you brought with you, that

3 would dispute Chan's conclusion?

4     A     Well, Chan did his study in response to contradictory

5 statements.  I mean, that was the reason for doing the study.

6           So, while I don't remember the exact page, I mean

7 there's a reason he did the study, and that was in response to

8 specific statements to the effect that pulmonary function is

9 compromised.

10           And certainly individuals have cited the hogtie

11 position and the prone position as restricting pulmonary

12 function, and that was the reason for these experiments.

13           But, as I've said, you know, to an extent these

14 experiments apply; but to an extent he really didn't take them

15 out to the time period that this person experienced.

16     Q     Here's what I --

17     A     And empirically this person does have hypoxia.

18     Q     Here's what I'm trying to determine, Dr. Arnall.

19     A     Please.

20     Q     Okay.  I want to know if there is any statement in

21 these books, that you have on the table with you, that would be

22 at odds with the statements we've read from Chan's study and

23 from Dr. DiMaio's book about whether the prone maximal

24 restraint position leads to clinically significant decrease in

25 pulmonary function.  And if so, I'd like you to open the book

1  and show me the statements.

2     A   I don't recall any specific statement about pulmonary

3  function.  They clearly indicate that death is associated with

4  this, but I don't recall that they specify pulmonary function

5  as the mechanism.

6       Although, many of the texts speak to the issue that,

7  you know, obesity is associated with individuals in a hogtie

8  position, in particular associated with excited delirium.  And

9  they specify that, in individuals who are obese and have

10  excited delirium in a hogtie position, it is that obesity

11  pressing against the diaphragms which restricts pulmonary

12  function.

13       And I can -- I can try to find that reference.  I

14  mean, I can go ahead and try to find that reference if you wish

15  about obesity and excited delirium and hogtie and restriction

16  of pulmonary function.  (Looking.)

17       Reading Page 309 of "Forensic Pathology, Principles

18  and Practice" by David Dolinak.  The copyright is 2005.  Under

19  a chapter entitled "Hog-tying" (sic) -- I'm just gonna excerpt

20  it.  Obviously, you're welcome to read the context of the

21  statement.

22       "Hog-tying" (sic).  "During or shortly after the

23  restraining process, the subject may rarely develop difficulty

24  breathing or may be found unresponsive."

25       So there's a reference to breathing.  I interpret

1  breathing as pulmonary function.

2      Q    Would you agree with me that to say that a person

3  died while in restraint is not necessarily to say that a person

4  died because of the restraint?

5      A    I agree.  I agree with that statement.

6      Q    Isn't Dr. Dolinak really telling us that some people

7  have died while restrained?

8      A    Yes.

9      Q    Okay.  I wanna mark that expert from the Dolinak text

10 as Exhibit 6.

11          Is there any other statement from any other textbook

12 that you think would support your opinion in this case?

13     A    Let me read one more sentence --

14     Q    Please.

15     A    -- that perhaps would be helpful to our discussion.

16     Q    Please.

17     A    "Quite often these deaths are not solely asphyxial in

18 that nature, but rather, there is an interplay between varying

19 degrees of asphyxia with heart disease, sympathomimetic drug

20 abuse, and the body's physiologic response to stress and

21 exertion."

22          And he goes on, in the last, an admonition.  "During

23 patient transport by a" medical -- "emergency medical services,

24 the supine or lateral body position is encouraged rather than

25 the prone position to limit the possible deleterious effects

84

1    that mechanical/positional asphyxia may have on respiration."

2        I believe that directly addresses the issue you've

3    raised.  And there's even an admonition to medical personnel,

4    "Don't do this."

5    Q    Is there any statement to which you need to refer us

6    in any of the other texts you've brought?

7    A    I'll look.  And, again, that's one excerpt.  You

8    know, I haven't gone back through the entire text.  I found

9    that in 30 seconds.

10   Q    Had you looked at that text before today to see if it

11   addressed the topic we're discussing today?

12   A    Yes.  And I -- there are multiple passages in the

13   textbook which may touch upon issues relevant to this

14   discussion, and that's why I brought it.

15           MR. GASS:  Do you remember the page --

16           THE WITNESS:  309.

17           MR. GASS:  -- that you were reading from?

18           THE WITNESS:  309.

19           MR. GASS:  Thank you.

20           MR. PHILLIPS:  That's not the one he read from.

21           THE WITNESS:  This one here.

22           MR. GASS:  Oh.

23   A    Harrison's textbook merely states that no one has

24   died of LSD.  (Looking.)  I'm looking at "Medicolegal

25   Investigation of Death," Spitz and Fisher, 4th Edition, Page

1   832.

2           "An overweight individual, with a body mass

3   index...in excess of 30...is especially susceptible for

4   respiratory arrest when held this way due to protuberance of

5   the anterior abdominal wall, which upon compression causes

6   upward displacement of the abdominal organs and interference

7   with the movements of the diaphragm."

8           And this is the third paragraph under the topic of --

9   and I'll read the -- the first sentence of Paragraph 3 above

10  it.  "The *hogtie restraint position*, also known as the *hobble*

11  *or prone restraint*, is a type of restraint, often used by

12  police, where the victim is face down on the ground, i.e.,

13  prone, handcuffed behind his back, ankles tied and the wrist

14  and ankle bindings are then tied together."

15      Q    Let's make a copy -- let's make a copy of those

16  pages, to which you just made reference to in the Spitz and

17  Fisher text, Exhibit 7.

18          Go ahead if you need to tell me something else.

19      A    The last paragraph in the first column of Page

20  132 (sic) --

21      Q    Is it Page 132, Doctor?

22      A    I'm sorry, 832.  832.  This cites studies by Neuman,

23  which dispute an earlier paragraph, where he says *hogtie*

24  *restraint position*, this method of restraint did not cause

25  clinically relevant impairment of ventilation.

1      Q     That statement would be at odds with your conclusion
2   in this case, wouldn't it?
3      A     It would be at odds with the paragraph -- three
4   paragraphs before.
5      Q     And at odds with the conclusion you reached in this
6   case?
7      A     It would be at odds with the empirically-derived
8   pulse oximetry reading of 90 percent.
9      Q     Would it be at odds with your conclusion?
10     A     Yes.
11     Q     Okay.  Did Mr. Goode have a body mass index greater
12  than 30?
13     A     No.
14     Q     So he would not fit the category of risks described
15  in that text, would he?
16     A     For respiratory compromise, no.  However, body mass
17  index is -- would not be an issue in discussing his metabolic
18  acidosis due to straining against the restraints, what I
19  referred to as a type of isometric exercise.
20     Q     Is there anything else you need to tell me about from
21  the Spitzer (sic) text, or are we completed?
22     A     Well, I'll continue reading.  I mean, again, I
23  haven't memorized this text in its entirety.  But I think
24  you'll begin to understand that all of these texts refer to the
25  hogtie restraint and specify that it has been associated with

1    deaths.

2            And they -- you and I have already agreed that there

3    is a discussion into the -- in the literature, a discussion

4    that is frequently contradictory, as to the specific mechanism

5    by which this restraint is associated with so many deaths.

6            So I agree there is discussion in this textbook.  I

7    pointed out that, even in the same column, there's a discussion

8    of the fact that, as you and I have discussed, there is debate

9    between physicians as to just how so many people die in the

10   hogtie-restraint position.

11           So I agree that there is discussion and disagreement

12   as to the specific methodology, but every one of these

13   textbooks addresses the issue of deaths in the hogtie position

14   because it happens so often.

15   Q    Is there any other textbook that has a statement you

16   need to make reference to?

17   A    Even the existence of the text by Chan and Vilke --

18   even its existence indicates that there is a reason to discuss

19   the mechanism of death in so many hogtie-restraint-associated

20   deaths.

21   Q    You're talking about the one entitled "Sudden Deaths

22   in Custody"?

23   A    I am.

24   Q    Is there any portion of that text that supports your

25   opinion in this case?

1    A    You know, I -- obviously, I -- I can read through it.

2    I haven't memorized it sentence-by-sentence.  I'm just saying:

3    If the issue of hogtie-restraint deaths didn't exist, the

4    textbook wouldn't exist.

5         I'm now looking at this DiMaio-DiMaio, "Excited

6    Delirium..." text.  As we have discussed, there are many

7    citations where DiMaio disputes the respiratory contribution to

8    death in a hogtie position.  Obviously, he does.  So there's no

9    point in disputing that he doesn't, 'cause he does.

10        I would admonish you that -- for instance, on Page

11   126 of "Excited Delirium Syndrome," the author states:  "The

12   authors of this book have concluded that the *single most*

13   *important factor* that determines if individuals experiencing

14   excited delirium die is the violent physical exertion inherent

15   in the *struggle*.  This is true whether the excited delirium is

16   due to drugs, mental illness, or a combination of both.

17   Placing an individual in the *prone position* is not a critical

18   element for most excited delirium syndrome deaths."

19        They go on to say:  "After restraining the patient"

20   -- this is the next paragraph.  "After restraining the patient,

21   continual assessment of the individual's level of consciousness

22   and breathing should be maintained with 'face-to-face'

23   observation by one member of the team.  One should monitor the

24   vital signs for signs of cardiac irregularities."

25        They actually recommend lorazepam in this text.

1        Q        And is that Ativan?

2        A        Yes.  Then they go on to say:  "The patient should be

3    maintained in a sitting position for maximum breathing

4    ability."

5                In responding to individuals who contest the

6    respiratory contribution, why would you make this admonition to

7    healthcare-givers if it wasn't relevant?  You understand the

8    inherent contradiction?

9                Why would you admonish them to have the person in a

10   particular position for breathing if position of breathing was

11   irrelevant?  It's an obvious contradiction in logic.

12               Obviously, why would you require continuous

13   monitoring by a member of the team?  They're not talking about

14   a football team.  They're talking about a medical team.  Why

15   would they have that admonition if it wasn't relevant?

16               So you are correct.  There are multiple references in

17   this text that state breathing is not important; respiratory

18   function is not compromised.  And, yet, within the same text,

19   there are specific admonitions that clearly indicate that

20   breathing and continuing monitoring is critical.

21               So I make the concession you're right; that's what

22   they say.  And, yet, when you read it, it makes no sense they

23   would -- they would have these conclusions.

24               And again, you know, I've taken three or four minutes

25   to briefly read through a couple of paragraphs.  But I think

1   you understand that a forensic pathologist, in reading all of

2   this over the course of 30 years, is going to get a general

3   impression:  Wait a second, a lot of people die in a hogtie

4   position.  They've written books about it.  Yeah, they're

5   arguing about it and the specific mechanism, but it does occur.

6          In this particular case, while we can argue about the

7   theoretical aspects of the hogtying position, you have an

8   empiric observation of a pulse oximetry reading of 90 percent.

9          He says most of the time it's not relevant.  But, in

10   this case, empirically you have a -- not a partial pressure of

11   oxygen, but a pulse oximetry that indicates that respiratory

12   compromise is important.

13          Also, I specifically read to you the physician's

14   diagnosis, and that was respiratory distress.

15   Q   That was the diagnosis at the time of the code,

16   though, right?

17   A   That is correct.

18   Q   Let's make as Exhibit 8 the excerpts from the

19   "Excited Delirium..." text to which you just made reference.

20   A   And I think I told you the page.

21   Q   You did, I think, yes.

22          MR. GASS:  Can you give it to me again and give

23   me the book, so I can --

24   A   126.  And again I'm not saying there aren't other

25   references, but I think I've given you a sense or flavor of the

1  fact that these texts obviously do accept that people die in

2  this position, and that indeed is the etiology for the

3  discussion of a point.  If those deaths didn't occur, we

4  wouldn't be arguing about it.

5       Q    (BY MR. PHILLIPS)  Is excited delirium a diagnosis

6  that you recognize as a forensic pathologist?

7       A    I do recognize that diagnosis.  I do, yes.

8       Q    Is it commonly accepted among forensic pathologists?

9       A    The issue of semantics.  What's the definition of

10 "common"?  I will say everyone understands -- all forensic

11 pathologists have both read about and heard discussions of

12 excited delirium in our national meetings.  So it's a common

13 topic.  You know, it's not an orphan topic.  It's a common

14 topic.

15       I think all of us who have worked in a big city have

16 seen cases that cause us to place that diagnosis in the

17 differential diagnosis of a death of a specific patient.

18      Q    Have you ever concluded that a particular patient

19 died from excited delirium?

20      A    I've done about 4,000 autopsies.  I don't recall that

21 I made that diagnosis, but I assure you I have considered it on

22 multiple occasions.

23      Q    Has it been in your differential on multiple

24 occasions?

25      A    Right.  When I say consider it, that means it's been

92

1 in my differential diagnosis. I knew it was something that I

2 was required to contemplate.

3     Q    Is Mr. Goode's death consistent with an excited

4 delirium syndrome?

5     A    "Consistent with" is the term that physicians use as

6 the least statistically significant. So that when I use the

7 word -- you know, the phrase "consistent with," you know, it

8 has almost no causal -- no statistically significant meaning.

9     I have told you that he clearly was excited. A

10 person would say, "Well, he was delirious." But is this an

11 excited delirium death? I would say, "No." And I would cite

12 for you the specific factors that I consider when I consider

13 excited delirium.

14     I look to the issue: Is this person obese? And some

15 of the articles have cited, "Well, these people average

16 220 pounds." Others use, you know, BMI. But individuals in

17 excited delirium deaths are significantly obese. Individuals

18 in excited delirium deaths frequently are hyper, H-Y-P-E-R,

19 hyperthermic. They have a fever.

20     And one of the -- one of the articles says, "Well,

21 they average 104 degrees Fahrenheit." So some of the -- some

22 of the authors cite a specific temperature on average. Others

23 just say, "Well, they're hyperthermic."

24     Other individuals cite cardiomegaly. Some will say,

25 "Well, on average, in the cases we looked at, the -- the weight

1  was in the 400-gram range."  Normal weight being 250 to

2  350 grams.

3          In this case, this person is not obese, does not have

4  an elevated basil BMI.  This person was not hyper, H-Y-P-E-R,

5  thermic.  Actually, he was a little bit below.  He was 98.2

6  instead of 98.6.  This person does not have underlying heart

7  disease and certainly did not have cardiomegaly.

8          And last, but not least, you know, as we've talked

9  about, fundamental to the discussion of excited delirium is, as

10  you ostensibly pointed out, they're not hypoxic.  In this case,

11  we have documentation of hypoxia that is on the cusp of a

12  requirement to treat with oxygen.  It is of non-trivial

13  hypoxia.

14          So that, for instance, you know, if this was a -- an

15  LSD-related death due to excited delirium, as near as I can

16  tell, it'd be the first case in recorded history.  All of us

17  involved in this case -- all of the physicians would be rushing

18  to publish it.

19          Except to publish it, we'd have to go through a

20  peer-review panel.  And a peer-review panel would say:  "Well,

21  wait a second.  Excited delirium, thank you very much.  What

22  about our obesity?  What about our heart disease?  What about,

23  you know, no hypoxia?  What about hyperthermia?"

24          It's unclear this would pass the scrutiny of a

25  peer-reviewed panel.  Because all of the other associated

1 criteria, which is what I look at when I look at a patient, the

2 excited delirium being in the differential diagnosis, the peer

3 review is gonna look for the same criteria that I look at.

4     Q    Are there any symptoms or signs that Mr. Goode had

5 that are consistent with excited delirium?

6     A    He was excited, and he was delirious.  So the answer

7 to that question is "Yes," he clearly was excited; he clearly

8 was delirious.  The statement, "I don't know how to explode."

9 Of course, that's a person who is talking in a completely

10 irrational fashion.  So that is a -- a -- both a -- a sign and

11 a symptom.

12     Q    What else?

13     A    I am aware that Vilke has cited Karch as saying that

14 LSD was associated with excited delirium, but I would be quick

15 to show you Karch's textbook saying that no one's ever died due

16 to LSD.  So, as far as an excited delirium death, even Karch

17 says not happened.

18     Q    Are you aware of literature that has associated LSD

19 with excited delirium?

20     A    That's Vilke's reference to Karch.

21     Q    Okay.

22     A    He cites Karch's two studies in the '90s, but this

23 textbook by Karch is written in 2002.  And Karch -- I'm looking

24 at Karch's "Pathology of Drug Abuse," 3rd Edition.  I'm looking

25 at Page 309, second paragraph, and the paragraph has actually a

1   numeric 4.5.4.1.4.

2          "No LSD related deaths were listed in the Medical

3   Examiner component of the most recent DAWN report (Kissin,"

4   K-I-S-S-I-N, "and Garfield, 2000)."

5      Q    We'll mark that excerpt as Exhibit 9.

6      A    So even subsequent to his references as excited

7   delirium might be associated with LSD, in a subsequent

8   publication by the same author, he cites a reference that

9   indicates that no LSD-related deaths have ever occurred.  I

10  think that's relevant to your question.

11     Q    Is there any other forensic pathology texts that you

12  plan to cite that you contend supports your opinion or is

13  relevant to your opinion, other than those you've already

14  talked to us about today?

15     A    I have no plan on citing any others.

16     Q    Okay.  Do you recognize the "Sudden Deaths in

17  Custody" text as being a learned treatise?

18     A    I do.

19             MR. EDWARDS:  Is that the one by Ross and Chan?

20             MR. PHILLIPS:  Yes, he cited it earlier.

21             MR. EDWARDS:  Okay.  Just making sure we had --

22     A    I do recognize it as a learned treatise.

23     Q    (BY MR. PHILLIPS)  And you're aware that there's a

24  chapter in that text on positional and restraint asphyxia and a

25  chapter on excited delirium?

1        A       Yes, I do.

2        Q       Are you aware of other studies in the field of

3   forensic pathology that have addressed the issue of the prone

4   maximal restraint position and whether it results in asphyxia,

5   positional asphyxia?

6        A       Of course, there are additional studies.  I haven't

7   memorized them all, but I think I've given you a flavor that

8   numerous -- a flavor for the fact that numerous individuals

9   have attempted to address this issue with controlled studies.

10  And as we both agree, there is significant debate on the topic.

11       Q       On the topic of whether the prone maximal restraint

12  position results in positional asphyxia?

13       A       Yes.

14       Q       Are there reasonable pathologists who conclude that

15  it does not?

16       A       The answer is "Yes."

17               MR. EDWARDS:  Object to the form of the

18  question.  What's a reasonable pathologist?

19       A       There are individuals who are regularly employed as

20  board-certified forensic pathologists.  And we've even

21  discussed the fact that Dr. Barnhart, who is regularly

22  employed, is board-certified, has stated that positional

23  asphyxia did not contribute to this death.  I'm aware of that,

24  yes.

25       Q       (BY MR. PHILLIPS)  Are you familiar with the

1   "American Journal of Forensic Medicine and Pathology"?

2       A    Yes.

3       Q    Who publishes that journal?

4       A    Is that the orange journal published by NAME?  I --

5   you know, obviously I subscribe to them.  NAME -- NAME is

6   one --

7                THE REPORTER:  I'm sorry?

8       A    NAME, the National Association of Medical Examiners,

9   is associated with the publication of one.  And I don't

10  remember whether that specifically is NAME-published but -- or

11  published by Elsevier.  I don't recall.

12      Q    (BY MR. PHILLIPS)  Is the "American Journal of

13  Forensic Medicine and Pathology" one that you read --

14      A    I do.

15      Q    -- and rely upon?

16      A    I do.

17      Q    You consider it a learned treatise?

18      A    I do.

19      Q    It's peer-reviewed?

20      A    Yes, it is.

21      Q    Are you familiar with the article from that journal

22  entitled "Reexamination of custody restraint position and

23  positional asphyxia," from 1997, by Chan, Vilke, and Neuman?

24      A    I don't recall it specifically, but obviously I'm

25  happy to look at a specific passage, if you wish.

1    Q    If it states, "We conclude that the hogtie restraint

2    position by itself does not cause respiratory compromise to the

3    point of asphyxiation and that other factors are responsible

4    for the sudden deaths of individuals placed in this position,"

5    do you agree with that statement?

6    A    I believe my report specifically cites just such a

7    phenomenon, and that is when I cite the metabolic acidosis

8    associated with struggle against the restraints.

9         So I believe anyone who has listened to this

10   discourse this morning would understand that even I have cited

11   other physiologic issues which contribute to the problem.

12   Q    Aside from the restraint?

13   A    Aside from the ventilatory compromise.

14   Q    Okay.

15   A    But both the ventilatory compromise, which I believe

16   is what that sentence refers to, as well as the metabolic

17   acidosis, as I believe I have stated in my report, contribute

18   to the problem.

19        Although, in this particular case, there is another

20   third independent issue, and that is the administration of a

21   respiratory depressant, lorazepam.

22   Q    Do you recognize the "Journal of Forensic Science" as

23   a learned treatise?

24   A    I do.

25   Q    Is it peer-reviewed?

```
 1      A    Yes.

 2      Q    Is it one that you normally read and rely upon?

 3      A    I do.

 4      Q    Are you familiar with the article published in

 5   January of 2007, in that journal, entitled "Ventilatory and

 6   Metabolic Demands During Aggressive Physical Restraint in

 7   Healthy Adults"?

 8      A    I don't recall it specifically.  I likely have read

 9   it.  I'd be happy to respond to it, a passage in it.

10           MR. EDWARDS:  Who is the author, please?

11           MR. PHILLIPS:  Is it Michaelwicz, the lead

12   author?  Does that sound right?  M-I-C-H-A-E-L-W-I-C-Z.  And,

13   for the record, it was Exhibit 6 to Dr. Wecht's deposition.

14           MR. EDWARDS:  Okay.

15      Q    (BY MR. PHILLIPS)  If that article concludes as

16   follows, "Based upon these observations in healthy subjects, we

17   conclude that the PMRP," the prone maximum restraint position,

18   "and prone positioning with moderate weight force on the back

19   do not in and of themselves restrict metabolic or ventilatory

20   demands to any clinically important degree," do you agree with

21   that statement?

22      A    Read it again, please.

23      Q    "Based upon these observations in healthy subjects,

24   we conclude that PMRP and prone positioning with moderate

25   weight force on the back do not in and of themselves restrict
```

1  metabolic or ventilatory demands to any clinically important

2  degree."

3           MR. EDWARDS:  Object to the form of the

4  question.  That gives no background as to what the experiments

5  consisted of, how long they were conducted, or anything else.

6    Q    (BY MR. PHILLIPS)  Do you agree with that statement I

7  read?

8    A    And, again, before I'd agree with the statement, I

9  probably should review exactly what they're speaking to, you

10  know, the specifics of what they've summarized.

11          And I would reiterate my admonition that, if such a

12  treatment (sic) was true -- if such a statement was true, then

13  the pulse oximetry of -- a reading of 90 could only be

14  interpreted as evidence of some other malevolent behavior, in

15  excess of what they did during that experiment, had occurred to

16  this decedent.

17          I'm not prepared to make that assertion, that there's

18  other malevolent behavior.  But I have to make that conclusion

19  if I believed unequivocally that the hogtie position had no

20  significant effect on either respiration or metabolic

21  condition.

22          And I've already stated to you that I am comfortable

23  that this patient did have metabolic acidosis based on his

24  struggle against the restraint.  And I say that in the context

25  of all of the other discussions of individuals who are

**ANIMAS REPORTING SERVICE**
**919 County Road 142, Durango, Colorado 81303**

1  undergoing isometric strength against those restraints.

2          So I understand what they have said, but you

3  understand my concerns with that statement?

4      Q    Okay.  Are you able to tell me whether you agree or

5  disagree with the statement I read?

6      A    Well, I don't agree with it obviously in its entirety

7  for the reasons I've just explained to you --

8      Q    But this does --

9      A    -- and the particulars as applies to this patient.

10     Q    This does take into account metabolic demands

11 according to the statement I read, right?

12     A    I understand that.  And I -- in no sense do I believe

13 that this person struggled against those restraints for that

14 period of time and experienced no metabolic acidosis.  I don't

15 believe that at all.

16     Q    Are you familiar with the "Journal of Forensic and

17 Legal Medicine"?

18     A    Yes.

19     Q    Is it a learned treatise?

20     A    It is, but I don't read that all time.  But I am

21 aware of it.

22     Q    It is literature within the field of forensic

23 pathology, though?

24     A    I agree.

25     Q    Are you familiar with the article from 2013, "The

1   effect of prone maximal restraint position with and without

2   weight force on cardiac output and other hemodynamic measures"?

3       A    I believe I've read it, but I don't -- I haven't

4   memorized it.  So, if you wish to cite a specific passage, I'd

5   be happy to discuss it.

6       Q    Your contention is that the position impacted

7   respiratory status, not cardiac status, right?

8       A    It's obviously difficult to discuss respiratory

9   function without discussing cardiac function.  Having said

10  that, I don't believe that the prone position compromises

11  cardiac output.

12      Q    Okay.

13      A    So I -- I agree -- I agree with that part of it.

14      Q    Okay.

15      A    But I also caution you that, as pulmonary function is

16  compromised, one must contemplate the response of the cardiac

17  muscle.  And, in particular, since I've already stated that

18  this person had a metabolic acidosis, although I freely admit

19  that there's no laboratory tests that confirms that, one has to

20  contemplate that in terms of cardiac function.

21           But I don't believe the prone position in and of

22  itself compresses the heart to the extent that it reduces

23  cardiac output.  I agree with that.

24      Q    Are you familiar with the "Forensic Science

25  International" publication?

1     A     I am.

2     Q     Is that a learned treatise, in your view?

3     A     Yes.

4     Q     Peer-reviewed?

5     A     Yes.

6     Q     One you regularly review?

7     A     I've reviewed it many times.

8     Q     You -- you have, I think, freely acknowledged that
9     there are publications in the medical literature, specifically
10    in your field of forensic pathology, that disagree with the
11    conclusion you're reaching in this case, right?

12    A     The reason I don't agree with your particular
13    statement, and this is semantics, is that, as I've stated to
14    you, many of these experiments do not extend to the time period
15    that this person experienced.

16          So, while they are relevant, they do not specifically
17    recapitulate this situation.  So that I contest your statement
18    that they dispute my opinion because they don't address the
19    specifics of this case.

20          Also, I've specifically identified the fact that we
21    have an empirically-derived metric, the pulse oximetry, which
22    would indicate that none of these studies are relevant to this
23    case because they -- all the studies indicate no compromise in
24    pulmonary function.

25          And our discussion has been:  Well, this -- what

1   happened to this gentleman didn't compromise pulmonary

2   function.  And I know I've reiterated, to the point of being

3   irritating, that empirically it already did.  It's too late to

4   discuss the fact that it might not have, because it did.  And

5   we have an empirically-derived measurement to that effect.

6          So that, when I say it doesn't specifically contest

7   my opinion, you know, either the experiments didn't go out to

8   the time period that they did, or the experiments specifically

9   state that there's no pulmonary compromise, and that

10  specifically doesn't address this patient.

11     Q    There are published studies, though, that reach

12  conclusions that are different than the bases you're using to

13  reach your opinions, though, right?

14     A    I agree with that statement.

15     Q    Okay.  In your report -- and, again, the pages aren't

16  numbered, but let me try and locate it.  I think it's Page 5.

17  There's a statement just above the heading that says the

18  "Baptist Medical Records."  I'll give you a minute to catch up

19  with me.

20     A    Got it.

21     Q    In the last paragraph above that, it cites the

22  National Institute of Health.

23     A    NIH.

24     Q    Do you have some publication from the National

25  Institute of Health?

1     A    I would have to go back to my notes to see where I

2  derived that.

3     Q    Well, the reason I asked the question, Doctor, is:

4  When I get to the "Opinions" page, and I see the citations, I

5  didn't see anything cited from the National Institute of

6  Health.  And we've gone through your articles, and I don't

7  think we had anything from the National Institute of Health.

8     A    And, again, I will have to go back.  I didn't make a

9  specific citation there.  I'll have to go back and determine

10 where I derived that specific statement.

11    Q    You don't have that literature among the materials

12 you brought with you today, do you?

13    A    No.

14    Q    And it's not cited in your report in the "Opinions"

15 section, is it?

16    A    I don't have a citation on that paragraph; that is

17 correct.

18    Q    If there is some publication from the National

19 Institute of Health that you have reviewed and rely upon in

20 this case, I'd ask you to provide that to Mr. Edwards, and

21 we're gonna mark it as late filed Exhibit 10, okay?

22    A    Fair enough.

23    Q    And if there is not one, just let Mr. Edwards know

24 that there's not one, and he can advise us accordingly.

25    A    I will do so.

1              MR. PHILLIPS:  Let's take another timeout.  How

2     about it?

3              (Recess taken at 11:57 a.m. and back in

4              session at 12:10 p.m.)

5              MR. PHILLIPS:  We'll go back on the record.

6     Q     (BY MR. PHILLIPS)  Did you review and consider the

7     articles cited by Dr. Vilke in his report?

8     A     Which article?  I received two articles in my

9     package.  I received "Excited Delirium Syndrome," defined --

10    "Defining Based On A Review Of The Literature."  And I also

11    received "Excited delirium syndrome...Redefining an old

12    diagnosis."

13    Q     Did you read and consider both of those articles?

14    A     I have read them at length, yes.

15    Q     Okay.  Do you agree with the articles?

16    A     In what sense?

17    Q     Well, is there anything that the article advances

18    that you reject?

19             MR. EDWARDS:  Well, I object to the form.

20    That's not -- you know, that will require combing through it.

21    A     (Reading.)  As an example, you may call it

22    disagreement, or just maybe I, you know, think that they worded

23    it awkwardly.  Here's a sentence, Page 8, Column 2,

24    paragraph -- about Paragraph 4.  "Autopsies, which did not

25    include histochemical or neurochemical examination, did not

1   reveal a definite cause of death, although trauma and natural

2   disease were excluded."  And this is referring to obviously

3   these excited delirium syndromes.

4           If you read Karch, which they obviously have referred

5   to, you know that many of these cases are current in the

6   context of cocaine, obviously.

7           Most cocaine users, if you look closely at the heart,

8   as Karch has outlined in his text, are going to have either a

9   degree of cardiomegaly and/or interstitial fibrosis of the

10  myocardium.  It's quite common with cocaine.

11          So that -- and, in particular, since we've already

12  discussed the fact -- and obviously it's widely accepted that

13  excited delirium deaths are associated with obesity and

14  enlarged hearts.  To say that there's no natural disease

15  like -- I'm sorry, but that -- that disputes, you know, all of

16  the other literature if you're meaning any natural disease.

17          If you're meaning, you know, sufficient natural

18  disease caused death, well, I think that's probably what they

19  meant to say.  But the way they said it is awkward, and it's

20  patently false.  But I don't think they meant it to be a

21  contradiction of all of those observations.  It's just, you

22  know, appallingly poorly worded.

23          When they say trauma has been excluded, in those

24  individuals who had the maximal restraint, it doesn't take a

25  pathologist to say, "Well, wait a second.  Whether they call it

1  hogtying or maximal restraint, that's a traumatic process, and

2  it's a traumatic process that's manifest with obvious

3  physiologic changes, metabolic acidosis."

4         Anyone who's done isometric exercises for 90

5  minutes -- I played rugby for 80, and we actually had rest

6  periods in rugby.  You come out completely exhausted with leg

7  cramps, obviously a manifestation of metabolic acidosis.

8         So, as we go through these articles, there are

9  obviously sentences which, you know, if you're cynical, you'd

10  say they're patently false.  But I think it's fair to say,

11  "Well, they weren't meant in an awkward fashion, and perhaps

12  they didn't mean to say exactly what it appears as though

13  they're saying."

14         So, you know, are there gonna be aspects in here they

15  disagree with?  Yeah, that everybody is gonna -- can reasonably

16  disagree with.  And even they would say, "Oh, that was poorly

17  worded, and even we disagree with that -- a statement like

18  that."

19         If you want me to go through every little sentence, I

20  can do that.  But you understand I'm not going to -- to agree

21  with these in their entirety.

22    Q    Okay.  Let's mark the first excited delirium article

23  as Exhibit 11.

24             MR. EDWARDS:  Which one is that?

25             MR. PHILLIPS:  Tell us the citation, Doctor.

1          MR. EDWARDS:  Which journal?

2          THE WITNESS:  "Journal of Forensic and

3   Legal Medicine."

4          MR. EDWARDS:  Got it.

5          THE WITNESS:  19 (2012), Pages 7-11.

6          MR. PHILLIPS:  That will be Exhibit 11.  And

7   what is the second article.

8          THE WITNESS:  Clinical Reviews.  I think

9   this is "The Journal of Emergency Medicine," Vol. 43, No. 5,

10  Page 897.

11         MR. PHILLIPS:  That will be Exhibit 12.

12     Q    (BY MR. PHILLIPS)  Other than Exhibit 11 and 12, did

13  you consider any of the other articles cited by Dr. Vilke in

14  his report?

15     A    He talked about LSD being associated with excited

16  delirium.  I didn't look up the two articles that he referred

17  to, but I went ahead and looked as Karch's book, which is a

18  subsequent publication, in order to decipher:  "Did Karch

19  actually believe that anyone on LSD had ever died of excited

20  delirium?"

21         And while he doesn't make that specific statement,

22  the fact that he cites the fact that no one's ever died of LSD,

23  I'm going to interpret that so as to mean that while he --

24  while Vilke has asserted that he's associated LSD with excited

25  delirium on a subsequent publication a few years later, and I

1   doubt that he forgot his initial publication used earlier, he

2   specifically cites that no one's ever died as a consequence of

3   LSD.  So I'm going to interpret that so as to mean that, you

4   know, while I didn't read the article, they may have had

5   excited delirium due to LSD, but apparently they didn't die.

6       Q    Let me ask for your help.  If you could try and focus

7   on my question and answer, I'd like to get us out of here

8   expeditiously.

9            My question simply is:  Did you review any of the

10  other articles cited by Dr. Vilke, other than the ones we've

11  marked as Exhibit 11 or 12?  Yes, you did; or, no, you didn't.

12      A    Not that I know of.

13      Q    All right.  Thank you.

14      A    Although, you know, I didn't read every article -- I

15  didn't read all of the citations.  And it may well be the case

16  that I accidentally read one of them, and now I told you that I

17  haven't reviewed them, but I haven't reviewed them in the

18  context of this case.

19      Q    Got it.  When you did your report, why didn't you

20  state that there was debate among forensic pathologists about

21  whether the prone maximal restraint position led to positional

22  asphyxia?

23      A    For all the reasons we've discussed during this

24  deposition.

25      Q    Why didn't you make any reference to debate or

**ANIMAS REPORTING SERVICE**
**919 County Road 142, Durango, Colorado 81303**

1    controversies in the medical literature in your report?

2        A    What is the sentence that you just cited?

3        Q    I haven't cited a sentence.  I'm just asking you why

4    you didn't point out in your report some of the things you've

5    pointed out today, which there are those who've reached

6    differing conclusions on this topic?

7        A    This is an expression of my opinion.  It is

8    intuitive to obviously a casual observer, because this is

9    subject to litigation, there's going to be divergent opinions.

10       Q    Have you done any testing or research regarding prone

11   maximal restraint position?

12       A    No.

13       Q    Or positional asphyxia?

14       A    No.

15       Q    Have you done any testing on that topic?

16       A    No.

17       Q    Done any lecturing on that topic?

18       A    I do lecture at the local college and have lectured

19   to the University of Colorado medical students, and -- although

20   I don't do it now, and have spoken at the Colorado Coroners

21   Association.

22            Although, at the Coroners Association, I don't recall

23   speaking on restraint asphyxia.  But in other lectures it's

24   certainly one of the topics that we cover.

25       Q    Outside the work that you've done in this case, have

1    you ever reviewed the literature pertaining to positional

2    asphyxia?

3         A    Yes.

4         Q    Have you --

5         A    It'd be in the context -- I think I've told you that

6    I've had cases where excited delirium was in the differential

7    diagnosis.  In that context, I would refresh my memory on what

8    people had to say about specific issues.  So I --

9         Q    For your opinions in this case, did you assume that

10   the oxygen saturation reading was accurate?

11        A    Being a clinical pathologist, obviously I'm well

12   aware of the sensitivity and specificity of different

13   measurements.  I'm well aware that measurements may or may not

14   be precise and also may or may not be accurate, and precision

15   and accuracy are different.

16             But I understand it's going to be one of the issues

17   that is admitted into evidence in this case.  I also understand

18   it's -- it's one of the measurements upon which -- because it's

19   in the medical record and also because it's routine, that if

20   you have a measurement that for some reason you don't believe,

21   the community standard of practice is to repeat the stupid

22   measurement and find out whether it's accurate or not.

23             I am well aware that -- at least according to the

24   medical record, it wasn't repeated.  In light of the fact it

25   wasn't repeated, well, assumptions are prone to make people, as

1   you know, look asinine.

2          Notwithstanding that admonition, I say to you that,

3   if a measurement is not repeated, they're -- either someone

4   made a catastrophic error; they suspected it wasn't accurate

5   and didn't repeat it, which is seriously problematic; or based

6   on the clinical situation, at least the people in that

7   situation believed that it might be accurate.

8          Have I successfully communicated the fact that it

9   might not be accurate, but no one repeated it, and the people

10  that were there apparently didn't feel the need to repeat it

11  and didn't repeat it, and based on his struggling activity,

12  it's credible to believe that he may well have experienced

13  that.

14     Q    I thought I asked a simple and clear question.  I'll

15  try it again.

16     A    You did, but the answer isn't as simple as the

17  question.

18     Q    Let me try it again, and see if you can answer it

19  directly.  For purposes of forming your opinions in the case,

20  did you rely upon the O2 saturation level of 90 percent as

21  being accurate?

22     A    As a forensic pathologist and as a clinical

23  pathologist, I'm well aware that it may or may not be accurate.

24     Q    Did you reach a conclusion one way or the other?

25     A    Well, I answered that question previously, and it

1    was -- I give it a degree of probability of being accurate.

2       Q    Okay.  But you --

3       A    Based on the fact that it wasn't repeated, it's

4    probably more accurate -- at least they thought it might be

5    accurate because they didn't repeat it.

6            But, again, nobody is perfect.  It could be

7    inaccurate.  I'm well aware of that, not only because I'm a

8    forensic pathologist, but because I'm a clinical pathologist.

9    It could be inaccurate.  I'm well aware of that.  I know that

10   it exists, and it's something that I have to deal with.

11      Q    Okay.  An oxygen saturation level of 90 percent is

12   not fatal in and of itself, is it?

13      A    I agree.

14      Q    There was no reference by any medical provider about

15   Mr. Goode having difficulty breathing, was there?

16            MR. McINTOSH:  Marty?

17            MR. PHILLIPS:  Yes.

18            MR. McINTOSH:  This is John Mark.  You cut

19   out on that last question.  Would you mind repeating it?

20            THE WITNESS:  No, I'm just -- I'm

21   reviewing the record.  That's why you're not hearing anything,

22   'cause I'm not saying anything.

23            MR. McINTOSH:  I know.  I did not hear

24   Marty's question, but --

25            MR. PHILLIPS:  I think I can repeat it while the

1    doctor's looking.  I think I asked:  There was no evidence in

2    the medical record by any provider that Mr. Goode had

3    difficulty breathing?  If that was not it, that's close.

4              MR. McINTOSH:  Thank you.

5        A    I believe I agree with you.

6        Q    (BY MR. PHILLIPS)  There was no indication in the

7    medical record of his having any discoloration, was there?

8    Before the code?

9        A    I believe I agree with you.

10       Q    You didn't do an autopsy in this case, did you?

11       A    That is correct.

12       Q    Do you know why the Plaintiff sought your services

13   since they already had Dr. Wecht disclosed as an expert?

14       A    I asked that question.  I'm aware.

15       Q    And what information were you given?

16       A    They put an inquiry on some type of legal chat room

17   and got my name from an individual who I had worked with some

18   20 years ago in Florida.

19       Q    Did you ask why they needed you if they already had

20   Dr. Wecht, who had done a private autopsy?

21       A    Apparently, the person in Florida said I was a good

22   guy, and -- no, I'm being serious.  I was a good guy and knew

23   my medicine.  That's my understanding, you know, through

24   hearsay.

25       Q    You have seen a copy of the notice for your

1  deposition that we served today, right?

2      A    Yes.

3      Q    And you're aware that it asked you to bring certain

4  things with you to the deposition?

5      A    Yes.

6      Q    And have you endeavored to comply with that request?

7      A    Yes.

8              MR. PHILLIPS:  I wanna mark the deposition

9  notice as the next exhibit, and that would be No. 13; is that

10  right?

11             (Exhibit 13 marked for examination.)

12     Q    (BY MR. PHILLIPS)  Before I get back to the

13  deposition notice, Doctor, we were talking a moment ago about

14  the O2 saturation level.

15     A    Yes.

16     Q    If the O2 saturation level were not actually

17  90 percent, would that impact any opinion you hold in this

18  case?

19     A    It wouldn't change it, no.

20     Q    With regard to the deposition notice, you were asked

21  to bring your entire file in connection with the case.  Have

22  you done that?

23     A    Yes, I have.

24     Q    What do you have that we've not previously

25  identified?

1    A    I have this binder, which you-all have been looking

2   at, with multiple tabs.  I have a package that contains the

3   Vilke articles, which we have identified.

4    Q    Those are Exhibits 11 and 12?

5    A    I believe so.  His Curriculum Vitae and his opinion

6   which we've not identified.

7    Q    You identified that for us earlier, didn't you?  His

8   report of February 2017?

9    A    I said I had -- I don't know if we marked it as an

10  exhibit.

11   Q    No, no, we didn't.

12   A    Okay.

13   Q    But you did identify it for the record.

14   A    I indicated to you that I do not have a hard copy

15  with me today, but I have reviewed the deposition by the

16  civilian female in the emergency room and also Dr. Barnhart.

17   Q    Did you make any markings on those depositions?

18   A    I haven't, but I only have them in a PDF format.  So

19  I haven't -- I don't write -- you can't write on them.  At

20  least I don't have the program necessary to write on a PDF

21  document.

22   Q    You have made markings in this binder, though, that

23  Mr. Edwards is currently looking at, right?

24   A    Markings there.  Also markings on various of the

25  pages, as you have seen of the Vilke package.

1    Q    All right.

2         MR. PHILLIPS:  Let's mark the binder as

3    Exhibit 14, and I wanna be sure we get a color copy of that

4    that captures your highlights and markings.

5    Q    (BY MR. PHILLIPS)  What else do you have that we have

6    not identified or marked as an exhibit?

7    A    We have identified the glass slides.

8    Q    Yes.

9    A    I think -- I think we're good.

10   Q    Item 2 asked you to bring all the records, data, and

11   other matters or information you reviewed in order to form your

12   opinions in the case.

13        Have you done that, and have we identified those

14   matters already?

15   A    Right, with the exception I commented.  And that is,

16   as we've discussed, you know, I have contemplated cases similar

17   to this on multiple occasions, and I have not brought all of

18   those autopsy reports.  But over the course of decades, those,

19   obviously, you know, contribute to my opinion.

20   Q    Yes, but this is specifically asking for things that

21   you reviewed in order to form your opinions.  And I'm

22   interested in knowing if we have that.

23   A    Yes, you do.

24   Q    Okay.  Do you have records showing your income from

25   expert witness work?

1        MR. EDWARDS:  He -- he has all of his work --

2   what do you mean?  Everything he does is -- is as an expert

3   witness.  If you wanna know the percentage of his income

4   related to consulting with attorneys like me, the percentage,

5   which is all you're entitled to, he's -- he'll be glad to

6   testify to that.  He's not gonna give you any financial

7   information.

8       Q    (BY MR. PHILLIPS)  Are you willing to tell me the

9   amount of money that you make per year for your work in

10  consulting with attorneys in civil cases like this?

11      A    My salary is derived only for medicolegal

12  consultation.  I don't have any other jobs.  As you know, I

13  don't treat live patients.

14        This year, as in previous years, I'm contracted to

15  consult to determine medicolegal cause of death so that my

16  entire income -- I mean, I have a gross income for

17  Michael Arnall, MD, PA.

18        THE REPORTER:  I'm sorry?

19        THE WITNESS:  Michael Arnall, MD, PA.

20      A    That gross income is all derived from medicolegal

21  consultation.

22        As far as consultations related to cases in which I

23  did not do the autopsy, but I'm consulting on an external case,

24  that is not my primary case, that I may do two or three of

25  those cases in a given year.  In some years, I've done as many

1  as 500 autopsies.  All of my money is -- income is derived from

2  consulting on those autopsies.

3        As you might imagine, anyone who is doing 500 cases

4  has little or no time to do anything else.  So that I tell you

5  that, in a given year, I may have two or three cases that are

6  not related directly to an autopsy that I performed or I'm

7  being paid by either a district attorney or a public defender

8  or, in rare instances, an autopsy I did may subsequently cause

9  civil litigation to occur, and yet I'm caused -- I'm caused --

10  and that's why I delineated Dr. Barnhart as a fact witness,

11  because she -- she did the autopsy.

12        In greater than 95 percent of all of my work, I'm a

13  fact witness indicating what I did at the autopsy.  Indeed, I

14  express an opinion because I'm qualified as a -- as a forensic

15  pathologist and asked, "Well, what's your opinion about this?"

16        But as far as consultation work for cases external to

17  my personal practice, it may be two or three, maybe once in a

18  while four cases in a year.  But it is quite minimal.

19  Q    Any notes that you have made about this case would be

20  contained on the documents we've marked as exhibits; is that

21  right?

22  A    I have no other pieces of paper, lined or blank, that

23  have notes on them.  I find it easiest just to either put an

24  arrow by a line that I find significant for a particular

25  reason, or in some instances I actually make additional words

1   indicating why I thought that was significant.

2          But the majority of the time, if I put an arrow

3   there, you know, I know why that sentence is pertinent, and

4   that is my note.

5   Q    All of your notes in this case would be contained on

6   the documents we've marked as an exhibit; is that right?

7   A    Every one.

8   Q    Okay, good.

9          MR. GASS:  Marty, could we just go off the

10  record for a minute?

11         MR. PHILLIPS:  Yeah.

12         (Discussion off record.)

13         MR. PHILLIPS:  Back on the record.

14  Q    (BY MR. PHILLIPS)  You were asked to bring

15  correspondence between you and Plaintiff's counsel, or any

16  member of counsel's staff.  Do you have correspondence that

17  you've exchanged with Mr. Edwards or his firm?

18  A    On the compensation?

19  Q    Yes.

20  A    He asked me what I charge.

21         I said, "It's $150-an-hour."

22         He said, "I will send you a check for $2500 as a

23  retainer."

24         That was a verbal exchange, and I received a check

25  for $2500 as a retainer.

1        Subsequent to that, I have submitted no bills.

2   I'm -- my time spent on this case is still such that

3   $150-an-hour, you know, times the hours I've spent, is still

4   under the $2500.

5        So I've sent no additional bill.  I know that's

6   getting ahead of myself to -- to No. 6.  But the 2500 is what I

7   received, and I believe I'm still inside that retainer at

8   $150-an-hour.

9        Q    Do you have the bills that you've submitted in this

10  case, or have there not been any yet?

11       A    I just said I didn't.

12       Q    Okay.  That's what I understood.  Do you know how

13  much time you spent on the case before the deposition started

14  today?

15       A    You know, I have not quantitated that.

16       Q    Do you keep records of time spent so you can submit

17  accurate bills, when you do submit a bill?

18       A    I do not keep an accurate record, and -- my bills

19  aren't that accurate.  That's just a concession of reality.

20       Q    Have you ever advertised as an expert?

21       A    No.  I understand that my name, you know, appears

22  somewhere on some list because people call me, but I -- I do

23  not know what those are.  And in this case I know that it was a

24  specific word-of-mouth reference from a person who I know in

25  Florida.

1    Q    Do you have a copy of your current CV?

2             MR. EDWARDS:  It's what you've got.

3             MR. PHILLIPS:  It's the same as the --

4             MR. EDWARDS:  Yes.

5             MR. PHILLIPS:  Okay.

6    Q    (BY MR. PHILLIPS)  Were you provided with any facts

7 or data from Plaintiff's counsel that you considered in forming

8 your opinions?

9    A    Yes.

10    Q    Is it in the binder?

11    A    Yes, it is.

12    Q    Okay.

13    A    And in the package from Vilke.

14    Q    Okay.  The Vilke articles in his report that --

15    A    Yes.

16    Q    -- that we talked about?

17        All right.  Have you been provided with any other

18 assumptions from Plaintiff's counsel that you've considered in

19 forming your opinions?

20    A    Nothing in addition to that.

21    Q    All right.  Have you considered any texts, treatises,

22 journal articles, other than the ones that are mentioned in

23 your report or other than the ones we've talked about here

24 today?

25    A    No, with the caveat that this is a topic about which

124

1   all forensic pathologists, including myself, have been reading

2   for years.

3          So that, if there is some article that I have used to

4   consider a similar case on a previous occasion, it --

5   obviously, there are other articles that I have read that

6   aren't provided.  They weren't used specifically in this case,

7   but there are certainly numerous other articles that I've read

8   in consideration of similar cases on previous occasions, and

9   those obviously play a part in the opinion I formed in this

10  case.

11      Q    Do you intend to use any sort of summary or

12  demonstrative aid with any testimony you give at trial?

13      A    At this time, I have no such intent.  I've not

14  created any exhibits.  I haven't promised I'm going to create

15  any exhibits or demonstratives, but I don't know what I'm going

16  to be asked for in the future.

17      Q    I think that there are some textbooks lying on the

18  table to which you've not yet made reference.  Is there

19  anything you need to tell us about any of the other, I guess,

20  three textbooks or so that we've not made reference to here?

21      A    Goodman & Gilman as a specific reference to no deaths

22  related to LSD on -- (reading).  I'm looking for the page.  I'm

23  looking on Page 311 of "Pharmacological Basis of Therapeutics,"

24  Fifth Edition.

25          And on Page 311, it states:  "In man, deaths

1 attributable to direct drug effects are unknown, although fatal

2 accidents and suicides during states of LSD intoxication have

3 been reported."

4     Q   We'll mark that excerpt from Goodman & Gilman as

5 Exhibit 15.

6     A   That's the last paragraph of Page 311.

7           MR. GASS:  Thank you.

8     A   I believe I tangentially referenced Goodman & Gilman,

9 although I will cite -- I mean, Harrison's --

10     Q   (BY MR. PHILLIPS)  Harrison's?

11     A   -- Principles of -- I'm looking at Goodman and -- I'm

12 sorry.  I'm looking at Harrison's textbook, "Principles of

13 Internal Medicine," and the Edition is 11th, Page 2,117, Column

14 1.

15           First paragraph:  "To date there have been no

16 clinical reports of death caused by the direct effects of LSD."

17     Q   We'll mark that excerpt as Exhibit 16.

18           MR. GASS:  Thank you.

19     Q   (BY MR. PHILLIPS)  I think the only remaining text to

20 which you may not have made reference to is Tintinalli.  Is

21 there any particular reference you made to it?

22     A   (Looking.)

23     Q   Is there any particular reference that you've made

24 reference to from Tintinalli?  If not, we need not spend any

25 more time on this.

1      A     There was a reason I brought this, and -- spppha.  I

2    can't find it immediately.  And, in addition, I'll -- I'll

3    summarize it.  It was a reference -- you'd asked me about the

4    administration of lorazepam.  That's an issue we've discussed

5    in this deposition.  And I stated to you that it was

6    problematic if you don't monitor the patient after you give

7    lorazepam.

8          This was merely a reference that asserted that

9    continuous monitoring of the patient after administration of

10   lorazepam is recommended.  So I -- I've given you that

11   statement.  This was merely one of innumerable references which

12   indicate that that's appropriate.

13     Q     Was there any reference that you made to the DiMaio

14   "Forensic Pathology" text?  I'm not sure we --

15     A     DiMaio is the same individual who published the other

16   text.  And, you know, I brought that, if that was something

17   that was going to be referenced.

18     Q     Is there any particular part of that text, that you

19   hold in your hand, that you make reference to?

20     A     Obviously, coming to a deposition, I don't know the

21   questions you're gonna ask, but I know potential questions that

22   are gonna be asked.

23          And you've asked some questions in reference to -- to

24   obviously the documents that I received from Vilke.  And, you

25   know, I didn't know how in depth you were gonna cover the

1 position between my opinion and his. Although, as I said, it's

2 different, as -- as you know.

3      There are other areas of his opinion which you

4 haven't covered. So I haven't made opinions on it, and I don't

5 know if references in the text are relevant, because you

6 haven't asked any questions on those topics.

7     Q    So there's nothing about the "Forensic Pathology"

8 text, Second Edition, that you need to make reference to based

9 on anything we've talked about or any opinion you've expressed

10 in your report?

11     A    I agree.

12     Q    Okay. Can excited delirium deaths occur in the

13 absence of restraint?

14     A    Yes.

15     Q    Can excited delirium cause cardiac arrhythmia?

16     A    Yes.

17     Q    Is excited delirium something that is not because of

18 a drug overdose but rather a reaction that occurs at a

19 recreational level?

20     A    Yes.

21     Q    Can people die of excited delirium even if they are

22 restrained in the supine position?

23     A    I believe so, yes.

24     Q    Is it your contention that LSD was helpful to

25 Troy Goode?

1    A    I made the comment in the report, I believe, that

2  insomuch as I believe he experienced a metabolic acidosis in a

3  paradoxical sense, his hyperventilation and screaming, as noted

4  by the medical personnel, is a compensatory mechanism.  That is

5  to say, a compensatory respiratory alkalosis that compensates

6  for the metabolic acidosis of straining against the restraints,

7  the isometric exercise.

8         So that, in some ironic sense, not a therapeutic

9  sense, and you never treat a person with LSD for this purpose,

10  but in this particular case, hyperventilation and screaming

11  perhaps even inadvertently acted as a compensatory mechanism to

12  equilibrate --

13              THE REPORTER:  To what?

14              THE WITNESS:  Equilibrate.

15    A    -- his blood pH that was acidotic, in my opinion, due

16  to the isometric exercise.

17    Q    (BY MR. PHILLIPS)  Was Mr. Goode psychotic in the

18  emergency room?

19    A    His behavior could be termed as psychotic.  I'm not

20  so sure that the diagnosis of clinical psychosis would be

21  appropriate to a person under the effects of LSD, but his

22  behavior certainly appeared psychotic.

23    Q    I noticed in reviewing your CV, Dr. Arnall, that

24  there are several positions that you have previously held that

25  you no longer hold; is that right?

129

1      A      Correct.

2      Q      Have you ever been fired from any position you've

3  held?

4      A      Fired?  Certainly I've never received a termination

5  letter.  The coroners in the state have the ability to call

6  whoever they want.  And the coroner in Boulder stopped using

7  me, but no firing, that I know of.

8            And I ran against the coroner in Adams County, and

9  that coroner stopped using me.  Perhaps it was unwise to run

10  against them in a general election.  But I don't know that

11  there was any letter of firing, but they certainly stopped

12  using me.

13      Q      Why was it you left your position in Florida?

14      A      In the case of Southwest Florida, the group

15  relinquished their practice at two smaller hospitals, and I

16  picked up those hospitals.  So the group no longer used those

17  hospitals, but the hospitals were happy to see me there.  So

18  that's why I wouldn't call it a firing, because they continued

19  to ask for my services.  It's just that the group -- they sold

20  their office, and the senior member retired.

21            As far as Belle Glade Hospital, there was an

22  opportunity to move to Lawnwood Regional Medical Center, and so

23  I seized that opportunity.  Belle Glade Hospital actively

24  contemplated publicly closing their hospital for -- 'cause it

25  was not cost effective.  So I merely jumped ship from Belle

1  Glade, and that was also substantially the reason for

2  Clewiston.

3         In Lawnwood Regional Medical Center, I had an

4  acrimonious relationship with two other pathologists at some

5  certain point.  The hospital was rated by the Federal Bureau of

6  Investigation.  The other two pathologists were arrested by the

7  Department of Justice and pled guilty to some criminal charges.

8         That acrimony led to a very uncomfortable

9  relationship.  And it obviously didn't seem as though that was

10 going anywhere positive, insomuch as doctors had been arrested

11 and lost their license as a direct consequence of

12 irregularities that I had observed.

13    Q    Why did you leave your position at Adams County,

14 Colorado?

15    A    I ran against the coroner, and she stopped using me.

16 She never enunciated why she stopped using me, but I certainly

17 ran against her in the election, and I believe I became a

18 political liability.

19    Q    Why did you leave your position in Larimer County,

20 Colorado?

21    A    The individuals in Larimer County cross-covered for

22 me, and I cross-covered for them.  And at a certain point,

23 while they did not enunciate the reason they did not want to

24 cross-cover for me, they decided not to cross-cover for me, and

25 they did not need me to cross-cover for them after they started

1  cross-covering for me.  I worked there predominantly on

2  weekends only.  I didn't work there full-time.

3       Q    Why did you leave your position in Weld County,

4  Colorado?

5       A    It's the same group.  They're side-by-side.

6       Q    Why did you leave the position in New Zealand?

7       A    I had a chance to go down to work for the Ministry of

8  Justice in New Zealand.  The Ministry of Justice and the

9  Department of Pathology is chronically short of forensic

10 pathologists.

11           So, while it's usually very difficult to get a job

12 down there, if you have a -- a needed specialty, it's very

13 easy.  So they had hired the individual who trained me for a

14 six-month rotation, and then rehired him and his wife for a

15 18-month rotation.

16           When they came back to the states, as is routinely

17 the case, the organization down there advertised for a forensic

18 pathologist.  And I picked up a four-and-a-half-month stint

19 down for the Ministry of Justice.

20           I did that during a time period where I was not

21 working for Adams County.  On an occasion previous to the time

22 that the female coroner stopped using me, there was a male

23 coroner.

24           That situation was a situation where the female

25 employees in the coroner's office, under the male coroner, came

132

1   to me and said that they wanted me to do something.  And, in

2   particular, they wanted me to stop their supervisor from giving

3   them invited massages.

4           So that I indicated to the coroner and the supervisor

5   that they were gonna have to stop touching the girls.  And that

6   led to the firing of the supervisor.  But, subsequent to that,

7   the elected coroner used the closed-circuit equipment in the

8   autopsy room to follow the women around, looking at the area

9   between their chin and their bellybutton.  So that the women

10  asked me to take a picture of the monitor we had, so they could

11  fire a federal -- file a federal complaint.

12          So I took that picture of the monitor.  Within three

13  minutes, the elected coroner had come in, had ordered that

14  evidence that was going to be used in a federal complaint to be

15  destroyed and then fired me.  That went to litigation, and the

16  collection of female employees and I got a $1.6 million

17  settlement through litigation.

18          And it was during that time period, that I was

19  discharged from the coroner's office, that I went down to New

20  Zealand.

21     Q    Discharged from which coroner's office?

22     A    Adams County Coroner's Office --

23     Q    Okay.

24     A    -- by the male coroner.  After that was over, one of

25  the female Plaintiffs and myself ran for office, I in one

1  party, she in the other.  She won the election, and it is my

2  belief that I remained a political liability since I was able

3  to run for election on subsequent occasions as well.  Although,

4  she never verbalized that.

5      Q     Why did you leave your position in Boulder County?

6      A     That was never verbalized, but I will tell you that

7  there was -- the last case I ever did there was a case in which

8  a woman had come to Boulder for an abortion, a late-term

9  abortion, from out of state, was staying at a hotel or motel,

10  and had delivered the child in a motel.

11          I was assigned to do the autopsy on the child, to

12  determine whether the child had been delivered alive and killed

13  or delivered dead.

14          During that autopsy, the police officer and the

15  coroner's office's employee talked extensively about

16  prosecuting the woman for homicide.

17          However, it was obvious from the autopsy that this

18  was a natural death related to nuchal cord, the cord wrapped

19  around the child's head -- neck multiple times.

20          In response to my determination that there was no

21  crime committed, despite the fact that the coroner's office's

22  representative and police officer seemed dead intent on

23  pursuing homicide charges, the coroner went doctor-shopping and

24  got a second autopsy.

25          The second autopsy revealed the same thing as the

1   first, nuchal cord, natural cause of death.  Neither the

2   pathologist who did the second autopsy, Rob Kurtzman, nor I,

3   ever did another case for Boulder County.

4           Now, no reason was put down on paper.  So it is

5   speculation on my part that the last case I did and the last

6   case that Dr. Kurtzman did was the cause for the fact that we

7   were never called again.  So that is speculation.  None of that

8   was ever verbalized, none of that was ever put in writing.

9       Q   Why did you leave your position in Broomfield County,

10  Colorado.

11      A   Broomfield and Adams have a joint contract.  So

12  whoever does the autopsies for Adams does the autopsies for a

13  very small county called Broomfield.

14      Q   Other than the one place you identified where there

15  was an acrimonious relationship that you had with some of the

16  other pathologists, were there any other places you worked

17  where you had an acrimonious relationship with the other

18  pathologists?

19      A   Well, not exactly as -- 'cause one of them apparently

20  attempted to hire an undercover police officer to assassinate

21  the other.  So nothing's been as acrimonious as -- and that's

22  not a joke, actually.  It's in the Miami Herald.  Nothing has

23  been as acrimonious, and no other people have been arrested

24  other than in that case.

25      Q   Has there -- has there ever been a place, where you

1  weren't terminated, but you were asked to leave or forced to

2  resign in lieu of termination?

3      A    Well, I told you about the elected coroner in Adams

4  County, who, over the course of three minutes, both ordered

5  evidence destroyed that was gonna be used in a complaint and

6  also -- and fired -- said, "You're outta here."

7          And I actually have an audio recording of that, of

8  that firing.  But, again, that was subject to litigation and --

9      Q    Is there any other instance besides that where you

10 resigned in lieu of termination or have been terminated?

11     A    No.  And in New Zealand they offered me a permanent

12 position before I came back.  So that -- obviously, that was

13 the opposite of firing.  They asked me to stay on forever.

14     Q    Do you hold any medical examiner or coroner position

15 currently?

16     A    Coroners are elected.  I have not been elected to

17 office, and I'm not a formal -- using the term "medical

18 examiner," formally as appointed by a governmental agency, no.

19         There are prosecuting attorneys who will refer to me

20 colloquially as the medical examiner because -- to designate me

21 as doctor, as opposed to a non-physician coroner in the State

22 of Colorado.  But no formal appointment as a medical examiner

23 by a governmental authority and no elected position as a

24 coroner.

25     Q    Have you ever done an autopsy of a person who was

1 restrained at the time of death where you concluded that the

2 death was not related to the restraint?

3     A    There may have been a person who was in handcuffs

4 running away and shot, but that's not what you're referring to.

5 But I think there's an answer to your question, but -- but I

6 know it's not what you're referring to. Who was restrained and

7 I did not diagnose the death related to the restraint?

8     Q    Yes, a patient who was in restraints at the time of

9 his or her death, which you concluded the death was not related

10 to the restraint or manner of restraint.

11     A    No.

12     Q    Have you ever been arrested?

13     A    No.

14     Q    Do you have privileges at any hospital currently?

15     A    No.

16     Q    When have you last had any hospital privileges?

17     A    Lawnwood Regional Medical Center, 2004.

18           THE REPORTER: Where? I'm sorry.

19           THE WITNESS: Lawnwood,

20 L-A-W-N-W-O-O-D.

21     A    And that was where doctors got arrested, and that

22 wasn't a profitable situation.

23     Q    (BY MR. PHILLIPS) Have you ever had any hospital

24 privileges revoked or restricted?

25     A    No.

1    Q    Have you ever had any adverse action taken on your

2  medical license in any state?

3    A    No.

4    Q    Are your board certifications reflected on your CV?

5    A    I'm sure they are, yes.

6    Q    Okay.  And any publications you have are also

7  reflected on the CV?

8    A    There's one pub and one presentation at a meeting,

9  but those are minimal.  Just -- there's just two on -- at the

10  end of the CV.

11    Q    And they have nothing to do with the issues we're

12  discussing in this case, right?

13    A    Correct.

14    Q    As an expert witness in a civil case, have you been

15  involved in any other case involving restraint besides this

16  one?

17    A    In a civil case.  I've been involved in civil cases

18  where there was a death in a prison, but it wasn't related to

19  four-point restraint or any -- I don't think I've been involved

20  in a civil case where I didn't do, you know, the autopsy.  I

21  don't think I've ever been consulted, you know, in a case where

22  I didn't do the autopsy, in a case where hogtie or any type of

23  four-point restraint was involved.

24        Although, I have testified in civil cases, but

25  they're related to other, you know, problems of patients who

138

1  were in a prison, but it wasn't restraint per se.

2      Q     Have you given any deposition testimony, that you can

3  recall, that pertained to positional asphyxia or excited

4  delirium?

5      A     Deposition.  In Florida, we do depositions in

6  criminal cases, but we don't do depositions in criminal cases

7  in Colorado.  I don't recall any restraint deaths that I did in

8  Florida.

9          As we discussed, even the use of the term of

10  "homicide" in the State of Colorado usually does not end up in

11  criminal litigation, because the district attorney understands

12  that the medical term "homicide" is not equivalent to the legal

13  term "homicide."

14          So I don't recall any depositions in which four-point

15  restraint, maximal restraint, hogtie restraint -- I don't

16  recall any, no.

17      Q     Or excited delirium?

18      A     Or -- strangulation, yes.  But excited delirium,

19  hogtie, no.

20      Q     Okay.

21      A     It was a civil case that had -- that it had to do

22  with --

23      Q     Mr. Edwards and his firm are the ones who retained

24  you to be involved in this case, obviously.  Have you worked

25  with them before?

1    A    Never.

2    Q    Did you know them before this case?

3    A    None whatsoever.  In fact, I didn't understand how he

4  got ahold of me.

5    Q    And you learned later it was through that chat room

6  that you told us about?

7    A    Yes.

8    Q    How many civil cases have you reviewed as an expert

9  witness?

10          MR. EDWARDS:  Within the past four years.

11  That's all he's required to produce.

12          MR. PHILLIPS:  I don't think I'm confined to

13  that.

14          MR. EDWARDS:  I think you are.  I think the rule

15  specifically says, and we've disclosed -- I mean, to talk about

16  20,000 autopsies?

17          MR. GASS:  In civil cases?

18          MR. EDWARDS:  How many civil cases have you been

19  involved in?  Can you remember?

20          MR. GASS:  (No response.)

21          MR. EDWARDS:  That's what I thought.

22    A    I am asked to review either a case I've done -- I may

23  get a call from an attorney.  Even though I've done the

24  autopsy, I may still get a call, "What are your thoughts?"

25          And there are other attorneys, including but not

1   limited to my little brother, who will call me and ask me for

2   my thoughts on a case.  But it is usually a case those -- the

3   vast majority do not -- to my knowledge, do not end up in

4   litigation.

5          And I -- as I say, I don't recall any depositions on

6   excited delirium except for the case where a person was, you

7   know, put in a strangle-hold during an altercation at the bar.

8   I'm sure that was excited delirium.  It was just an intoxicated

9   person put into a strangle-hold by a bouncer.

10     Q    (BY MR. PHILLIPS)  Have you given deposition

11  testimony in any civil case at the request of any Defendant?

12     A    I do a lot of criminal defense consultation.  Let me

13  contemplate civil defense.  I certainly recall one case in

14  which I testified for the defense, which was a -- the company

15  that runs the jail in a -- an in-custody death.  But that

16  wasn't related to hogtie or restraint.  That was related to

17  withdrawal from a medication and subsequent dehydration.  That

18  was the defense for a -- a company in a -- and a physician who

19  worked in the jail.

20     Q    Can you recall having given trial testimony in a

21  civil case at the request of the Defendant?

22     A    Civil case.  As I've said, I don't do very much civil

23  work.  I do a lot of criminal work and a lot of criminal

24  defense.  I don't recall, but I don't do very much civil work.

25     Q    I know your report says that your fee in this case is

1  $150-an-hour.  Is that your fee for all work in this case?

2      A     It is a number which -- I'll tell you where it

3  derives from.  The State of Colorado pays $150-an-hour for

4  expert testimony for an MD.

5          And I will tell you philosophically that, when I

6  charge $150, no one asks me in court what my fee is, 'cause no

7  one wants to hear the $150-an-hour.  So that -- that is

8  precisely my charge.  It is a flat rate.  If I'm working on

9  your case, it's $150-an-hour.

10     Q     Including deposition time, trial time, and

11 everything?

12     A     Flat rate.

13         MR. PHILLIPS:  Doctor, others have been

14 waiting very patiently to ask you questions.  So I'm going to

15 yield to them, and that'll give me a chance to reflect and see

16 if I have other questions I may wanna ask you.  But I

17 appreciate your time.

18         Anybody on the phone have any questions?

19         MR. McINTOSH:  Marty, this is John Mark

20 McIntosh.  Brad, do you wanna go ahead?

21         THE REPORTER:  I can't understand you.

22         MR. DILLARD:  I'm fine with doing that.

23         MR. McINTOSH:  Okay, you go ahead.

24         MR. DILLARD:  This is -- this is Brad

25 Dillard.  I represent The City of Southaven Defendants in this

1   case.

2            THE REPORTER:  I can't understand.

3            MR. DILLARD:  Can you hear me okay?

4            THE REPORTER:  It's garbled.

5            MR. DILLARD:  Hello?

6            THE REPORTER:  It's not clear.  I've had

7   this --

8            MR. EDWARDS:  Brad, she can't understand.

9   You're garbled.

10           MR. DILLARD:  Okay.

11           MR. EDWARDS:  She cannot understand you.

12           THE WITNESS:  Brad, go ahead and issue the

13  question, and I'll try to repeat it.  And if -- if the -- if my

14  repetition of the question is close, then we'll proceed.  Is

15  that -- is that a fair way to proceed?  Notwithstanding the

16  difficulties of this electronic connection.

17           MR. DILLARD:  Let's try to do that.  I

18  will speak slowly.  If you have any difficulty hearing me, just

19  let me know.

20           THE WITNESS:  I will.

21           MR. DILLARD:  Thank you.

22           THE REPORTER:  And this is Brad, right?

23           MR. EDWARDS:  Yeah, Brad Dillard.

24           MR. DILLARD:  Brad Dillard for the

25  Southaven Defendants.

143

```
1              THE WITNESS:  Please proceed.

2                          EXAMINATION

3  BY MR. DILLARD:

4      Q    Doctor, the opinions that you are giving in this case

5  are limited to cause of death, correct?

6      A    I also issued an opinion as to the manner of death.

7  So it's cause and manner.

8      Q    You are not rendering opinions in regard to the

9  specific manner in which the Southaven Police Department placed

10 Mr. Goode into custody and detained him, are you?

11     A    During this deposition, we have touched upon my

12 opinions concerning different aspects of care, but I believe

13 that I have stated that I'm not going to hold myself out as an

14 expert.

15          And I've conceded that, even if I attempted to do so,

16 it is unlikely that a judge would allow me to do so, based on

17 my, you know, conceded lack of -- of, you know, formal

18 training, you know, in -- certainly in emergency medicine.

19          And that segment certainly -- also applies to police

20 procedures.  I am not a police officer.  I am not POST,

21 P-O-S-T, trained.  I have not attended a police academy.

22     Q    And, similarly, Doctor, you would not render opinions

23 in this case as to the standard of care for an EMT who may have

24 transported Mr. Goode via ambulance to the Baptist ER; is that

25 correct?
```

1    A    I have touched on that issue insomuch as I have said

2    that, if you believe the experimental works of Chan, that there

3    should be no hypoxia.  Then the presence of hypoxia might

4    compel you to conclude that there had been some malevolent

5    activity or pressure on the back.

6         However, I also have conceded that I'm -- you know,

7    have no specific training in either emergency medicine, other

8    than as a medical student, and certainly no training as an EMT.

9         So that I agree that it is unlikely that a judge

10   would allow me to issue an opinion on that.  And I have not

11   been asked to issue an opinion on that, and I do not anticipate

12   issuing an opinion other than to say that there are certain

13   findings which, you know, the trier of fact may attend to.

14        But I'm not going to issue an opinion other than to

15   say I am well aware of the facts that might lead a person to

16   contemplate, you know, that issue.  I will not render a

17   definitive opinion on that.

18   Q    On the third page of your report, you referenced that

19   "Mr. Goode was taken to the ground by a K9 dog."  What have you

20   reviewed that would indicate to you that the K9 actually took

21   Mr. Goode to the ground?

22   A    And, again, I have -- I have nothing other than

23   the -- you know, the reference by police.  I have no

24   photographs of Mr. Goode on the ground.

25        And that certainly may be a conjunction of the fact

**ANIMAS REPORTING SERVICE**
**919 County Road 142, Durango, Colorado 81303**

1   that the K9 indeed -- and I don't think there's any dispute

2   that the K9 did interact physically with Mr. Goode.  And

3   subsequent to that interaction, Mr. Goode was on the ground.

4           But I freely admit that I -- I was not there, and I

5   do not have a videotape.  And I will -- you know, obviously, my

6   opinion as to that sequence of events is not going to be

7   admitted because I wasn't there, and I didn't see it.

8           I just understand that there was a physical

9   interaction between Mr. Goode and the dog, K9.  And at a

10  subsequent time period, Mr. Goode was on the ground.  That is

11  the extent of my assertion in that instance.

12  Q     You go on to state that "Serious bite wounds were

13  inflicted on Mr. Goode's arm."  What knowledge would you have

14  about the nature of the serious bite wounds?

15  A     I believe if you go to the medical record -- and I'm

16  looking at it right now.  Give me a moment to reference the

17  specific -- I am looking at the emergency department provider

18  notes by Dr. Oliver, on my Page 4, which merely states:

19          "He then opened the door to the police dog unit and

20  was bitten by the police dog."

21          I go to Page 3, where the physical examination under

22  "Musculoskeletal" reads:  "Dog bite marks to left shoulder and

23  upper arm."

24          And then I believe that there is a general reference

25  to abrasions and contusions under "Evidence of Injury" in the

1  Autopsy Report.  Although, I do not believe the Autopsy Report

2  specifies that those abrasions and contusions are diagnostic of

3  a bite.

4          However, on Page 4 of 4, the Autopsy Report states:

5  "Abrasions and lacerations/puncture wounds of the left lower

6  arm were consistent with a reported K9 unit bite."

7          So that would be the extent of the documentation in

8  the medical record and Autopsy Report concerning bite marks.

9      Q    You go on to state, Doctor, that "Mr. Goode was also

10 hit by a Taser dart fired by an Officer."

11         In making that statement, are you asserting that

12 Mr. Goode was actually shot by use of a Taser or that it was

13 simply deployed and one dart struck him?

14     A    I will tell you that I specifically looked in the

15 Autopsy Report to determine whether there were a pair of

16 characteristic puncture marks, and I did not find any reference

17 to Taser puncture marks in the Autopsy Report.

18         I will tell you that, while I cannot cite the

19 specific reference -- and you probably don't want me to take

20 the time to do so.  It is my recollection that an electrical

21 discharge was not administered because both electrodes did not

22 securely strike.

23         It is my recollection that only one electrode struck,

24 and one did not.  Although, I tell you that, in looking at the

25 Autopsy Report, I see no reference to any type of puncture mark

1    related to either one or two electrodes.

2       Q    Doctor, further down on that same page, there's a

3    statement that the ambulance in a non-emergent manner leisurely

4    transferred Mr. Goode to Baptist Memorial Hospital-Desoto.

5           You're not rendering any opinion in this case that a

6    delay in transfer caused or contributed to Mr. Goode's death,

7    are you?

8       A    I agree with your statement.  In fact, to the

9    contrary, I've specifically cited the prolonged nature of the

10   interaction as exacerbating what I believe to be metabolic

11   acidosis.

12      Q    Continuing on to the next page of your report, the

13   second paragraph, it states that "At 8:33 p.m., Mr. Goode was

14   triaged at Baptist."

15          Do you recognize this as the point that care

16   transitioned from the Southaven EMTs to the Baptist Emergency

17   Room Department?

18      A    I'm going to give you a -- a more verbose answer, but

19   it's not because of any attempt to hide the ball.  Under any

20   other circumstances, I would say that, when a patient is

21   triaged in an emergency department, I would opine that care has

22   formally transitioned.

23          The reason I qualify that statement, in this

24   particular case, is that it is my understanding that there has

25   been an assertion that the supervision of the medical status of

1  the patient was (a) conducted by a police officer, not a

2  paramedic, but a police officer; and (b) that the supervision

3  complied with the community standard of practice.

4       So I understand that caveat does not include any

5  allegation of paramedic supervision of the patient in the

6  emergency room, but I issue that caveat because I understand

7  that this case has a bit of a departure from any other

8  circumstance in which I would opine that, once a patient is

9  triaged in an emergency department, medical care has

10  transitioned formally and practically for all purposes.

11     Q    Would you agree, Doctor, that the Baptist ER would

12  provide a higher level of care than either EMTs or police

13  officers could provide either on the scene or via

14  transportation in an ambulance?

15     A    Again, this is not argumentative.  But, in this

16  particular case, it's my understanding that the paramedics

17  actually had continuous cardiac monitoring.  And that's

18  something that, as I have already stated, to the best of my

19  knowledge, was not provided by the hospital.

20          So, ironically, while generally speaking you are

21  correct a hospital should be able to provide a superior level

22  of care in this case, because of the specific issues, it may

23  well be the case that one could reasonably argue that the

24  paramedics provided a superior level of care.  I understand the

25  irony of that statement, but I've also explained the nature of

1    it.

2        Q    Let me rephrase that question just slightly.  Would

3    you expect a hospital ER to be able to provide a higher

4    standard of care by their trained nurses and physicians and

5    equipment available in the ER department?

6        A    Yes, of course.

7        Q    You were asked a few questions by Mr. Phillips

8    concerning pressure on Mr. Goode's back.  And on the next page,

9    I believe, of your report -- it's on the same page where at the

10   bottom there's a heading style "The Baptist Medical Records."

11       A    Yes.

12       Q    Midway in the middle of that page, there's a

13   statement that "Testimony in the case appears to have

14   established that officers applied weight to Mr. Goode's back

15   during restraint."

16            Do you see that statement?

17       A    Wait a second.  I see that statement.  And I -- right

18   now, I don't recall specifically where I got that from.  I will

19   have to go back and -- to the -- to the statements that I've

20   read, to determine exactly where I got that.  I can't show that

21   to you right -- that's my understanding.

22            But, again, I say to you I was not present.  I did

23   not see it.  And, you know, it is unlikely that my hearsay

24   testimony would be allowed in any -- in any -- at any point.

25            MR. EDWARDS:  Well, that's not correct.  If you

150

1    don't recall, you don't recall.

2         A    I don't recall it.  I'll have to -- I'll have to

3    figure out where I got that from.

4         Q    (BY MR. DILLARD)  And my question in regard to that,

5    Doctor, is:  Would it be fair to say that nowhere in your

6    report do you indicate or attempt to quantify the amount of

7    weight that may have been applied to Mr. Goode's back during

8    restraint or how long a period of time that that weight may

9    have been applied?

10        A    I agree.

11        Q    I'm gonna flip over to the very last substantive page

12   of your report, which would be essentially Page 2 of your

13   opinions.  Are you there, Doctor?

14        A    Here.

15        Q    Thank you.  The last full paragraph of your opinion

16   states that:  "Based upon a reasonable degree of medical

17   certainty, Mr. Goode's death was caused by the manner of

18   restraint and positioning (precipitating asphyxia) and the

19   subsequent intravenous administration of chemical restraints

20   which exacerbated asphyxia and ultimately precipitated

21   cardio-pulmonary arrest" (sic).

22        A    That is correct.

23        Q    Did I read that correctly?

24        A    Yes, you did.

25        Q    Okay.  So, am I correct that, in your opinion, these

1   two events in combination precipitated Mr. Goode's death?

2      A    Yes.

3      Q    The manner of restraint and positioning, would you

4   indicate precipitated asphyxia?

5      A    And, as I have said, inevitably exacerbated the

6   problem with metabolic acidosis. Yes.

7      Q    And the second part of your opinion, the subsequent

8   intravenous administration of chemical restraints, you opine

9   exacerbated or worsened the asphyxia, correct?

10     A    Correct.

11     Q    And am I reading this correctly that, when you say

12   the subsequent intravenous administration of chemical

13   restraints, which exacerbated asphyxia and ultimately

14   precipitated cardiopulmonary arrest -- are you opining that the

15   administration of the restraint is what ultimately precipitated

16   the cardiopulmonary arrest?

17     A    It was certainly the last straw among straws. It was

18   the last physiologic challenge. It was the last event, and I

19   believe a medically significant event obviously, and

20   contributed to the cardiopulmonary arrest.

21     Q    How quickly, in your experience, Doctor, if you know,

22   would repositioning or use of a different type of restraint

23   have reduced or eliminated any respiratory compromise that you

24   have testified to today?

25     A    Well, the respiratory compromise would be quite

152

1  quick.  The resolution of the metabolic acidosis would take

2  longer.  But the -- the resolution of the respiratory

3  compromise would be less than one minute.

4         And, again, I'll add, notwithstanding the -- the --

5  the -- the obvious fact here that the entire period of struggle

6  had obviously caused exhaustion.  But, all things being equal,

7  repositioning him would improve his condition.

8      Q    Do you have an opinion, Doctor, as to the latest

9  point in time that repositioning or a change in restraints or

10 some other intervention would have prevented Mr. Goode's death,

11 in your opinion?

12     A    Certainly timing is an issue about which we are

13 frequently asked.  And empirically it took this long.  It is

14 difficult to say with precision -- and I certainly could not

15 cite you any references to, you know, specify a metric answer

16 to your question.  I can't tell you how much sooner would have

17 avoided this problem.  I have no --

18     Q    Are you able --

19     A    Go ahead.

20     Q    I'm sorry, Doctor, go ahead.

21     A    I'm just reiterating I can't do that; I don't know

22 how to do that.

23     Q    And I understand your testimony that you can't

24 perhaps break this down to a certain minute or second.  So

25 let's use some sort of general time frames that you have listed

1    in your report, one of which being the 8:33 p.m. triage at

2    Baptist.

3           Would you be able to opine, to a reasonable degree of

4    medical certainty, whether any changes in positioning, changes

5    in restraints, or other medical interventions would have

6    prevented death if implemented before or after the 8:33 p.m.

7    triage period?

8      A    I believe it is fair to say that, the sooner changes

9    were initiated, the more likely a favorable outcome.  And when

10   you ask about the triage time period, that is a significant

11   time period before respiratory arrest.

12          So I believe, generally speaking, although I cannot

13   quantitate it, that a resolution of the -- what I believe to be

14   the precipitating factors in a significantly improved time

15   period, would have significantly improved his probability of

16   survival.

17     Q    Doctor, I'm not sure if I've -- if I totally

18   understood your -- your response.  Are you saying that

19   repositioning or a change in restraints or another medical

20   intervention, if implemented after the 8:33 p.m. triage period,

21   would more likely than not, in your opinion, have resulted in

22   Mr. Goode surviving?

23     A    Generally speaking, yes.  However, I call to your

24   attention that that question doesn't take into account the

25   administration of the chemical restraint, the Ativan, the

1    lorazepam, which I obviously freely stated contributed.

2            But it is fair to say that, if you had improved his

3    physical condition and also if you had failed to administer a

4    respiratory depressant, lorazepam, then his probability of

5    survival would likely have been improved.  And I -- I think

6    that's easy for everyone to understand in light of the opinion

7    that I have expressed.

8            I would point out to you that, while on triage,

9    whether it's right or whether it's wrong, the pulse oximetry

10   was 90, which I've said is on the cusp of oxygen therapy.  If

11   one had -- taking him at that point, one would say, "Well, he

12   obviously is alive at that point."

13           If you had failed to exacerbate his physiologic

14   dilemma, there's good reason to believe he would have continued

15   to be alive.

16           And that triage point, with his pulse oximetry of 90,

17   is the point at which care, to a significant degree or to a

18   total degree, transitioned from paramedics to emergency

19   department.  There's still some ambiquity as to whether care

20   transitioned from police to emergency department at the time of

21   triage.

22       Q    Okay.

23           MR. DILLARD:  Thank you, Doctor.  I'll

24   tender the witness.

25           THE REPORTER:  How much --

1           MR. McINTOSH:  Doctor, this is John Mark

2 McIntosh.

3           THE REPORTER:  Just --

4           MR. McINTOSH:  I represent the Defendant

5 Baptist Memorial Hospital-Desoto, Inc.  Are you able to hear me

6 okay?

7           THE REPORTER:  Mr. McIntosh, how long are

8 do you think -- how long are we gonna go?  I just need a few

9 minutes to confirm a job for tomorrow.

10           MR. PHILLIPS:  Want a quick break?

11           (Discussion off record at, recess taken

12           1:43 p.m. and back in session at 1:50

13           p.m.)

14           MR. McINTOSH:  Doctor, as I said before we

15 took a break, my name is John Mark McIntosh, and I represent

16 the Defendant Baptist Memorial Hospital-Desoto, Inc.  Are you

17 able to hear me all right?

18           THE WITNESS:  I am.

19           MR. McINTOSH:  Please let me know if that

20 changes.

21           THE WITNESS:  I will.

22                    EXAMINATION

23 BY MR. McINTOSH:

24   Q   Doctor, I don't mean to -- to beat a dead horse, but

25 since I'm last in line, I think I'll have to.  Am I --

156

1      A      I understand.

2      Q      I'm sorry to interrupt you.  Am I correct that you

3  are not holding yourself out as an expert in the field of

4  emergency nursing?

5      A      Correct.

6      Q      Would I also be correct that you have not been asked

7  to offer nor do you plan to offer opinions as to the standard

8  of care as to the nurses who rendered care and treatment to

9  Mr. Goode on July 18, 2016?

10     A      That is correct.  I have made certain observations,

11 but I -- I will not issue an opinion as to the standard of

12 nursing care nor the standard of medical care.  Even though, as

13 you know, I have made observations, I will not issue an opinion

14 on the standard of care by the nurses or doctors.

15     Q      Doctor, I noticed in your report, under materials

16 that you listed and you reviewed, you identified two videos.

17 Other than the videos listed in your report, have you reviewed

18 any other videos in connection with your review of this matter?

19     A      Nope, not that -- I don't think so.  All I've got is

20 one disk, and that's it.

21     Q      I also saw identified on there a single photo of

22 Mr. Goode with his son.  The same question, but with regard to

23 photographs.  Have you reviewed any other photographs, other

24 than this photo of Mr. Goode with his son, in connection with

25 your review of this case?

**ANIMAS REPORTING SERVICE**
**919 County Road 142, Durango, Colorado 81303**

1     A    You know, there's a USA Today article that was in

2  this package, and that USA article may have -- may contain some

3  kind of a photograph.  I'm looking right now.  Yeah, the USA

4  article has a family photograph of son, father, and mother.

5     Q    No other photographs that you've reviewed though,

6  correct?

7     A    Not that I recall, nope.

8     Q    Okay.  Is there any document, item, or material that

9  you've requested in connection with your review that you have

10  not been provided?

11           THE REPORTER:  I'm sorry, I didn't hear --

12  I didn't hear the very first part.  I'm sorry.

13           MR. EDWARDS:  I didn't either.

14           MR. McINTOSH:  Sorry.  Let me repeat that.

15  Thanks for letting me know.

16     Q    (BY MR. McINTOSH)  Is there any document, item, or

17  material that you have requested in connection with your review

18  that you have not received?

19     A    I had made the comment to the Plaintiff's attorney

20  that I would be willing to review the autopsy glass slides.  We

21  covered that topic.  I have not reviewed them, but I would

22  certainly be willing to review them.

23           Even as I say that, the findings of asthma are

24  systemic.  And it is unlikely that I would find any compelling

25  findings of asthma on any other slides of the lung than the

1    ones I've already seen.

2            That is why I feel comfortable stating that, while I

3    am well aware that I've not reviewed the Barnhart autopsy

4    slides, it is unlikely that I am going to find any evidence of

5    the systemic disease, asthma, present on her slides if they

6    were not present on the Cyril Wecht slides.

7    Q    So you've requested the slides from Dr. Barnhart; is

8    that correct?

9    A    I don't -- insomuch as I've said I'd be happy to

10   review them, yeah, that counts as a request.  But you

11   understand the nature -- it's not a demand or an ultimatum.

12   I've just said that, you know, it would be prudent for me to

13   review slides.

14           As I've said to you, I have reviewed numerous slides

15   of the lungs.  And at this point, it is my professional opinion

16   that additional review is unlikely to reveal anything in the

17   way of asthma, because I have seen multiple sections of lung,

18   and this is a systemic disease and is not present focally.

19           That is to say, it is extraordinarily uncommon that

20   you would find evidence of asthma on one slide that you didn't

21   find on all of the others.

22   Q    Doctor, at this -- at this juncture, do you feel that

23   you have been provided with sufficient factual materials in

24   order to form your opinions in this case?

25   A    Yes, I do.  And that's -- that's clearly inherent in

1 the fact that I issued an opinion. But I will go further to
2 reaffirm that, yes, when I issued the opinion, I believe that I
3 had everything necessary to issue that opinion.
4      Q    Have you ever personally spoken with Kelli Goode,
5 Mr. Goode's widow?
6      A    No.
7      Q    Have you ever received any information, in writing or
8 otherwise, from or authored by Mrs. Goode concerning the events
9 of July 18, 2015?
10     A    Not that I recall, no. If it's not in this package,
11 and I don't recall anything in that package, I don't think I've
12 seen anything from her.
13     Q    Have you communicated directly with any eyewitnesses
14 to the events underlying this lawsuit?
15     A    None whatsoever.
16     Q    Doctor, you were briefly asked earlier about when you
17 were first contacted in connection with your review of this
18 case. Can you provide me with an approximate date of when you
19 were first contacted?
20     A    It was probably in May or early June.
21     Q    Of this year?
22     A    Yes.
23     Q    You testified earlier concerning a legal chat room
24 where inquiry was made. Do you know the name of that legal
25 chat room?

1    A    Nope.

2    Q    Do you know the number of the individual who worked

3  with you 20 years ago that you testified to earlier?

4    A    I remember her first name.  It was Susan.

5    Q    Doctor, in your report, under the "Factual Predicate"

6  section on Page 2, you identify that Mr. Goode placed some LSD

7  on his palm.  What is the source of your understanding that

8  Mr. Goode placed LSD on his palm?

9    A    I don't recall that specifically, and I haven't

10 referenced that.

11   Q    Do you have any understanding as to the amount of LSD

12 consumed or injected by Mr. Goode?

13   A    I do not.  And, as a forensic pathologist, I would

14 tell you that the dosages are frequently nonuniform so that it

15 would be difficult, even for the person who sold the drug, to

16 determine the exact quantity of LSD that was present and the

17 dosage given to any of the individuals who purchased it.

18   Q    Do you have any understanding as to the source of the

19 LSD that Mr. Goode ingested or consumed?

20   A    Other than generally speaking, it was at or near a --

21 a concert.  I have no names of any drug dealers.

22   Q    Do you have any knowledge who, if anyone, is

23 currently in possession of any of the remainder of the batch of

24 LSD that Mr. Goode ingested or consumed?

25   A    I do not know.

1    Q    Do you know if that LSD has ever been tested?

2    A    I do not.

3    Q    Are you aware that Mr. Goode ingested LSD on two

4  previous occasions in 2008 and 2013 which resulted in him being

5  hospitalized?

6         MR. EDWARDS:  Objection to the form.

7    A    I haven't received any medical records about

8  admissions.  Although, I'm generally aware that this was not

9  his first time with LSD.

10    Q    (BY MR. McINTOSH)  Would that make any difference in

11  your conclusion you've reached in this case?

12    A    No.

13    Q    I believe you testified earlier, Doctor, that you are

14  aware that Mr. Goode, on the toxicology report, had marijuana

15  in his system; is that correct?

16    A    I'm gonna get that in front of me right now.

17    Q    My question is this, Doctor:  Is there any particular

18  reason why you failed to reference his use of marijuana in your

19  report?

20    A    I don't think it contributed to his death.

21    Q    Doctor, I failed to ask you a question with regard to

22  the LSD.  Would you agree with me that Mr. Goode's LSD

23  ingestion led to his encounter with the police, his arrest, and

24  subsequent admission to the hospital?

25         MR. EDWARDS:  Objection to the form.

1     A     Yes.

2     Q     (BY MR. McINTOSH)  Doctor, did you find any

3   reference, in your review of Mr. Goode's records from the

4   hospital, that he was acutely asthmatic on July 18, 2015?

5     A     No.

6     Q     Doctor, is it your opinion that Mr. Goode was having

7   difficulty breathing and in respiratory distress throughout the

8   entirety of his admission to the emergency department?

9     A     I have the -- the metric of the pulse oximetry, and

10  it is my belief that his position of restraint did not change.

11        But restate your question one more time, please.

12    Q     My question is this, Doctor:  Is it your opinion that

13  Mr. Goode was having difficulty breathing and in respiratory

14  distress throughout the entirety of the time period that he was

15  in the emergency department?

16    A     I do not know that with certainty, and there's no

17  medical record that gives metrics that would allow me to draw a

18  conclusion.

19    Q     Doctor, you were asked questions earlier about the

20  accuracy of the blood oxygenation reading of 90 percent?

21    A     I recall those questions.

22    Q     Would you agree with me that the healthcare

23  providers, who were present with Mr. Goode at the time of that

24  reading, would be in the best position to assess the accuracy

25  of that reading?

1    A    I'd give you a general statement that it is sometimes

2   a lamentation that individuals, looking at a situation with a

3   retrospectoscope, may have a more accurate appraisal of the

4   accuracy of any particular observation.

5        That having been said, I will agree that the

6   physician on scene had the ability to examine this patient and

7   perform additional tests.

8        In that sense, the position -- the physician on scene

9   had the ability to perform a physical examination, auscultate

10  the lungs, order additional testing, which it obviously is

11  superior to my ability, where I only have the one measurement.

12   Q    Doctor, do you accept as accurate the nurses'

13  descriptions of Mr. Goode's behavior and condition in the

14  medical records?

15   A    With the caveat that I understand that there is a

16  civilian female visitor to the emergency room, which has a

17  divergent observation, I have said that there appears to be

18  divergent opinions as to his behavior and condition.

19       But I've also agreed that there is no timestamp, that

20  I recall, on the civilian female visitor observation, other

21  than the patient was not in a room but on a gurney being

22  transported when the observation was made.

23       So I am aware that there is controversy concerning

24  the specific behavior of the patient, but I also understand

25  that the nurses, you know, have entered their observations at

1   specific times.

2            I understand that's not a definitive answer, but it's

3   also not intended to be a definitive answer, because I

4   understand there's a controversy.

5       Q    Doctor, can you identify for me any entries in the

6   medical record as to Mr. Goode's condition and behavior which

7   you believe to be inaccurate?

8       A    I cannot.

9       Q    Doctor, you -- you mentioned a moment ago the

10  witness.  Am I correct that you're speaking as to Janet Tharp?

11           THE REPORTER:  As to who?  Janet?

12           MR. McINTOSH:  Tharp.

13           THE REPORTER:  Oh.

14           MR. EDWARDS:  Tharp, T-H-A-R-P.

15      A    Yes.

16      Q    (BY MR. McINTOSH)  And you have reviewed her

17  deposition, correct?

18      A    Correct.

19      Q    Do you recall, from your review of that deposition,

20  how long Mrs. Tharp personally viewed Mr. Goode as he was

21  wheeled by in the hallway?

22      A    I don't have a metric, but it was my belief that the

23  encounter was brief and only amounted to the period of time it

24  took to pass her by.

25      Q    In light of the limited time period that she observed

1  Mr. Goode, does that change your opinions as to the weight of

2  her testimony?

3      A    No.

4      Q    Doctor, are you aware of any gross or microscopic

5  pathological evidence that Mr. Goode experienced asphyxia on

6  July 18, 2015?

7      A    No.  I am aware of the observation of hyperinflation

8  and collapse, but I do not use that as a criteria for asphyxia.

9      Q    So the answer would be "No," correct?

10     A    It is "No," and that's the reason it's "No."

11     Q    Doctor, do you know whether this case has been

12 scheduled for trial?

13     A    I asked that question, and it's my understanding that

14 there may be a trial in June of next year.  But, again, I'm not

15 the right person to ask about that.

16     Q    Have you been requested by counsel to appear at

17 trial?

18     A    They didn't make that specific request, but I infer

19 that from -- why else would they be paying me?

20     Q    Doctor, you were posed a question earlier as to

21 whether or not -- if the blood oxygenation reading of

22 90 percent were not accurate, whether that would change your

23 opinions, and I believe your response was that it would not.

24     A    Correct.

25     Q    Can you explain to me why that would not change your

1  opinion?

2      A    The literature regarding this maximal restraint

3  characteristically does not have metrics of oxygenation of the

4  blood, and yet the forensic literature still accepts this as a

5  diagnosis.  So that in most cases in which this diagnosis is

6  made, there are no metrics.  There is no measured oxygenation

7  of the blood.

8            I merely reiterate that, while literature with which

9  we are all familiar, has been presented so as to challenge my

10 opinion, there is at least one metric in this case which

11 appears to be at odds with the published literature, and I

12 think I've explained that in -- at length.

13           MR. McINTOSH:  Thank you, Doctor.  I have

14 no further questions.

15           MR. EDWARDS:  Do you have anymore?

16           MR. PHILLIPS:  Not at this time.

17           MR. EDWARDS:  Doctor, I have --

18           MR. MACAW:  This is Matt --

19           MR. EDWARDS:  Oh, I'm sorry, go ahead.

20           MR. MACAW:  This is Matt Macaw for

21 Southeastern Emergency Physicians.  I have no questions.

22           MR. EDWARDS:  All right.  I do have a few

23 questions for the Doctor.  Let me see these, please.

24 //

25 //

```
 1                        EXAMINATION

 2   BY MR. EDWARDS:

 3       Q    I'm looking at the medical reports, and you were

 4   asked by Mr. Phillips, and maybe Mr. McIntosh also, about any

 5   indication in the medical records about respiratory distress.

 6   Do you recall that?

 7       A    Yes.

 8       Q    Look on Page 7 of the Baptist records and read what

 9   you've marked there.

10       A    I believe I already responded to one of the questions

11   initially, that the diagnosis was made by Dr. Oliver on Page 7

12   of respiratory failure.

13            And I believe the attorney followed up on that

14   question by asking whether that diagnosis was made at or about

15   the time of the cardiopulmonary arrest.

16       Q    Okay.  Is respiratory failure an indication of

17   respiratory distress?

18       A    I -- no, in truth I equate those.  Yes, I do.

19       Q    Doctor, you were also asked some questions by

20   Mr. Phillips about Haldol.  Do you remember that?

21       A    I do.

22       Q    Are you aware that the FDA issued a black-box warning

23   concerning Haldol, indicating that it might cause problems

24   with -- and you may have to help me -- with Torsades de

25   Pointes?
```

1      A     That's a cardiac -- that's a type of cardiac

2  arrhythmia, Torsades de Pointes.

3      Q     And QT prolongation?

4      A     Again QT prolongation is a specific change in the

5  electrocardiograms.  And -- and I have spoken to the issue of

6  respiratory depressant of lorazepam.  I believe I stated that I

7  had a -- a discomfort of intravenous administration of Haldol.

8            But, in this particular case, I read the description

9  of the physician -- of the police officer as irregularity in

10  breathing.  And so that is why I tend to favor the irregular

11  respirations as a consequence of the respiratory depressant

12  effect of lorazepam, and I have not focused on the potential

13  arrhythmogenic nature of intravenous Haldol.  Although, I

14  believe I indicated that I had a level of discomfort with that

15  intravenous administration.

16      Q     And is that because haloperidol, Haldol, is not

17  approved for intravenous administration?

18      A     And its association with, you know, problematic

19  issues revolving around the heart.

20      Q     Okay.

21            MR. EDWARDS:  Let's mark that as the next

22  exhibit, please.

23            (Discussion off record about numbering of

24             exhibits, and Exhibit 17 marked for

25             identification.)

1          MR. EDWARDS:  Doctor, I --

2          MR. PHILLIPS:  Let me just note an objection to

3    Exhibit 17 as being beyond the scope of his disclosure

4    opinions, but go ahead.

5    Q    (BY MR. EDWARDS)  Doctor, in the context of excited

6    delirium, there is always, quote, sudden death, unquote; is

7    that accurate?

8          MR. PHILLIPS:  Objection, leading.

9          (Mr. Gass leaving.)

10   A    The description in the literature, as well as the --

11   the -- the descriptions in the literature indicate that it is

12   usually the case that the individuals attending the -- the

13   individual in excited delirium are surprised at the change in

14   medical status.  So, yes.

15         Although, as I've indicated, in an individual who's

16   developing exhaustion and respiratory acidosis, I'm not sure I

17   would use the term it's unexpected, because I already know they

18   have a physiologic challenge.

19   Q    (BY MR. EDWARDS)  So would you classify Troy Goode as

20   a sudden death?

21   A    Well, I haven't because I believe that the causes of

22   his demise were prolonged over a period of many, many, many

23   minutes.  I think up to 90 minutes.

24   Q    And that's not sudden death?

25   A    That's not my definition.

**ANIMAS REPORTING SERVICE**
**919 County Road 142, Durango, Colorado 81303**

1      Q      Okay.  Now, you've been asked repeatedly about

2    Dr. DiMaio.

3      A      Yes.

4      Q      And -- and Dr. DiMaio has written on the subject of

5    excited delirium; is that correct?

6      A      Yes.

7      Q      Okay.  I wanna ask you about something from

8    Dr. DiMaio's "Forensic Pathology" book, and where he's talking

9    about certifying the cause of death related to excited

10   delirium.

11            And let me read this to you and then ask you:  "First

12   is to sign out the cause of death as 'excited delirium' and

13   then list 'struggle,' 'cocaine intoxication,' etc., as

14   contributory causes."

15            Now, my question is:  Do you agree with that?

16     A      As I've said, there are lumpers and splitters in

17   medicine, and I recall that DiMaio has specified the

18   methodology in which he would sign out some of these cases.

19            So, you know, in some sense, I understand why he is

20   saying that.  In this -- in this instance, I agree -- as I've

21   stated, there are likely multiple physiologic challenges to

22   this individual.  I specified those.

23            But I believe their -- their fundamental origin was

24   substantially related to his maximal restraint hogtie position.

25   But I've also told you that the last or ultimate or, you know,

1  end physiologic challenge was an administration of intravenous

2  lorazepam, but you can't ignore the underlying physiologic

3  condition in which, you know, an individual receives the

4  intravenous lorazepam.

5          A person with exhaustion and metabolic acidosis is

6  assuredly going to respond in a different fashion than a person

7  who is at rest and comfortable and has no other physiologic

8  challenges.

9          Q    I understand.  My question, and I'll simplify it for

10  you:  Doctor, Dr. DiMaio says for a forensic pathologist or to

11  a forensic pathologist, "If you find a death to be from the

12  diagnosis of excited delirium, you put that in the report"?

13         A    I -- okay, I didn't understand.  Yeah, if you have a

14  diagnosis, you just say it.

15         Q    Right.

16         A    If you're diagnosing excited delirium, then you just

17  write it down.

18         Q    Did Dr. Barnhart write down "excited delirium"?

19         A    Well, as we all know, the answer to that question is

20  "No."

21         Q    And did Dr. Barnhart expressly put a finding in her

22  report that ruled out excited delirium; that is, of

23  hyperthermia?

24         A    As I've outlined, there are a number of metrics

25  associated with excited delirium, and Dr. Barnhart's report

1  excludes those metrics, which I've already detailed.

2       Q    Okay.  You were also asked about some authorities --

3  let me see if I have those.  You were asked about some

4  authorities on whether or not putting somebody in a hogtie and

5  in a restraint or -- I'm sorry -- in a -- a prone position

6  causes the diminution of respiratory function.  Do you recall

7  those questions?

8       A    We had extensive discussions on that topic.

9       Q    Yeah.  Okay.  I beg your pardon.  I've gotten my

10 stuff out of whack here.

11           Okay.  And you were asked about some European

12 studies.  Is the University of Vienna a reputable academic

13 institution?

14      A    I have no personal knowledge of the University of

15 Vienna, other than to say that one of the heroes of pathology

16 comes from Vienna.  But that was in the 1700s.

17           So I have no personal knowledge of the University of

18 Vienna.  I would have to evaluate each opinion issued by one of

19 their faculty members, you know, one-by-one.

20      Q    Well, let me ask you about an opinion from the

21 University of Virginia -- Vienna.  "Hobble restraint in the

22 prone position leads to a dramatic impairment of hemodynamics

23 and respiration."

24           MR. PHILLIPS:  Let me object as beyond the

25 disclosure.

1    Q   (BY MR. EDWARDS)  You agree or disagree?

2            MR. McINTOSH:  Join.

3    Q   (BY MR. EDWARDS)  You can answer.  You -- you

4  can --

5    A   Obviously, it is my opinion that in this case the

6  restraints contributed likely for more than one reason, both

7  respiratory and metabolic acidosis, to the death.  So I

8  obviously do not contest that opinion.

9    Q   Okay.  And from UCLA, a report of -- from

10  December 1992 to December 1998, there were 20 cases of excited

11  delirium deaths associated with struggle and restraint that

12  were witnessed by EMS personnel.

13        All sudden death victims in the series had been

14  hobble-restrained.  Are you familiar with those figures?

15            MR. PHILLIPS:  I'll object to it being beyond

16  the disclosure to the testimony of counsel and lack of

17  foundation.

18            MR. EDWARDS:  Okay.  You may answer.

19            MR. McINTOSH:  Join.

20            THE REPORTER:  Wait a minute.  Who's

21  saying that on the other end?

22            MR. McINTOSH:  This is John Mark McIntosh

23  saying "Join."

24            THE REPORTER:  Okay, thanks.

25            MR. DILLARD:  This is Brad Dillard.  Are

1    we agreeing that one objection by defense counsel will suffice

2    for all?  Or do we need --

3                    MR. EDWARDS:  Yeah, that's fine.

4                    MR. DILLARD:  -- individual --

5                    MR. EDWARDS:  Yes.

6                    MR. DILLARD:  Thank you.

7        A    As I've said, you know, this is not the first time

8    that -- that either I or any forensic pathologist has crossed

9    this bridge, and that there are numerous individual articles

10   that ultimately led to the opinions stated in the subsequent

11   hard-bound medical textbooks.

12                   So that I am aware that the authors of those

13   hard-bound medical textbooks did not issue their opinions in a

14   vacuum.  There are numerous iterations of concerns regarding

15   this issue.  So that, as you bring them up one-by-one, those

16   constitute merely the body of literature which led to the

17   summation of those concerns in the published hard-bound texts.

18       Q    (BY MR. EDWARDS)  Is it your opinion that Mr. Goode

19   went from breathing adequately to (snapping fingers) immediate

20   cessation of breathing, or was there some stage of diminution

21   of breathing?

22       A    There is -- there are always -- well, in this case,

23   it is my opinion that there were stages of diminution.  I

24   believe those -- that progress of diminution was described by

25   the police officer, and I can either reiterate that from his

175

1  testimony, or we can just --

2      Q   That's fine.

3      A   -- accept my summary and move on.

4      Q   Is -- is the -- is the change in respiration the

5  reason that there should be a medically-trained person in the

6  room with somebody that has received chemical restraints under

7  the circumstances of Troy Goode?

8          MR. PHILLIPS:  I'll object as calling for a

9  standard-of-care opinion, lack of qualification, foundation,

10  and beyond the disclosure.

11     Q   (BY MR. EDWARDS)  You may answer.

12     A   Of course, the answer is "Yes."

13     Q   All right.

14         MR. EDWARDS:  No further questions.

15         MR. PHILLIPS:  Would you give me the cite to the

16  two articles you mentioned?

17         MR. EDWARDS:  Yes, I'll -- actually, I'll --

18         MR. PHILLIPS:  Or do you wanna just email

19  them to me?

20         MR. EDWARDS:  No, let's just mark them.

21  Why don't we do that, so you'll have them.

22         MR. PHILLIPS:  All right.

23         MR. EDWARDS:  Okay.  So --

24         MR. PHILLIPS:  Subject to my objection,

25  that's fine.

**ANIMAS REPORTING SERVICE**
**919 County Road 142, Durango, Colorado 81303**

1           MR. EDWARDS:  I understand.  Okay.  So the

2   Vienna article is "Cardiorespiratory consequences to hobble

3   restraint."

4           MR. PHILLIPS:  That will be Exhibit 18?

5           THE REPORTER:  Uh-huh.

6           MR. PHILLIPS:  And then the UCLA article will be

7   Exhibit 19?

8           THE REPORTER:  (Nodding head.)

9           MR. EDWARDS:  Yes, the article by Stratton.

10   et al., from UCLA.

11           MR. PHILLIPS:  Any other questions from

12   anybody on the phone?

13           MR. McINTOSH.  No further questions here.

14   This is John Mark.

15           MR. DILLARD:  This is Brad Dillard.  No

16   questions.

17           MR. EDWARDS:  All right.  We're good.  We're

18   hanging up.  Thank you.

19           MR. PHILLIPS:  Bye, fellas.

20           MR. EDWARDS:  Oh, we're reserving signature.

21           (Deposition concluded at 2:30 p.m., and

22           Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, 11,

23           12, 14, 15, 16, 18, and 19 marked for

24           identification.)

25

1                    SIGNATURE OF WITNESS

2          I, **MICHAEL F. ARNALL, MD,** hereby certify that I have

3     read the foregoing transcript of my deposition taken on the

4     19th day of October, 2017, and that I have listed all

5     corrections thereto on the following page herein.  Except for

6     said corrections, it is a true and correct copy of my testimony

7     given on that day.

8

9          _____

10         **MICHAEL F. ARNALL, MD**

11              (  )  NO CORRECTIONS

12              (  )  CORRECTIONS ATTACHED

13

14

15    STATE OF COLORADO     )
                            )   ss.
16    COUNTY OF             )

17

18          Subscribed and sworn to before me this _____ day of

19    _____, 2017.

20

21              _____
                              Notary Public
22

23    My commission expires: _____

24

25

1  PAGE  LINE  CORRECTION                                    REASON

2  ____  ____  _____    _____

3  ____  ____  _____    _____

4  ____  ____  _____    _____

5  ____  ____  _____    _____

6  ____  ____  _____    _____

7  ____  ____  _____    _____

8  ____  ____  _____    _____

9  ____  ____  _____    _____

10 ____  ____  _____    _____

11 ____  ____  _____    _____

12 ____  ____  _____    _____

13

14

15

16

17

18

19

20

21

22

23

24

25

1  STATE OF COLORADO  )
                      ) ss.
2  COUNTY OF LA PLATA )

3

4          I, Sherry L. Rowe, a Registered Merit Reporter,

5  Registered Professional Reporter, and Certified Shorthand

6  Reporter, DO HEREBY CERTIFY that I did administer the oath to

7  the witness herein, **MICHAEL F. ARNALL, MD,** prior to the taking

8  of this deposition; that I did thereafter report in

9  stenographic shorthand the questions and answers set forth

10 herein, and the foregoing is a true and correct transcription

11 of the proceedings had upon the taking of this deposition.

12         I FURTHER CERTIFY that I am neither employed by nor

13 related to any of the parties or attorneys in this case, and

14 that I have no interest whatsoever in the final disposition of

15 this case in any court.

16         I FURTHER CERTIFY that I have retained the Original

17 Copy of this deposition to seal and deliver to

18 Mr. Marty R. Phillips, Esq.

19         WITNESS MY HAND AND SEAL this 20th day of November,

20 2017.

21

22         _____

           SHERRY L. ROWE, CSR, CCR, RPR, RMR
23

24 MY COMMISSION EXPIRES:  3/22/2021

25

DEPOSITION OF
# MICHAEL F. ARNALL, MD

## 10/19/17

_____

## CIVIL ACTION NO. 3:17-cv-060 DMB-RP

## KELLI DENISE GOODE vs
## THE CITY OF SOUTHAVEN, et al.

_____

United States District Court
Northern District of Mississippi
Oxford Division

ANIMAS REPORTING SERVICE
animas@animas.net

1.877.385.4268                                        970.385.4268

MICHAEL F. ARNALL, MD

**A**

A-R-N-A-L-L 7:8
a.m 2:9 47:18,19 106:3
a/k/a 1:14
abdomen 45:11
abdominal 85:5 85:6
ability 15:19 27:17 51:22 59:4 89:4 129:5 163:6,9 163:11
able 36:21 51:24 52:3 64:4,23 101:4 133:2 148:21 149:3 152:18 153:3 155:5,17
abnormal 19:4,6 19:19 34:13
abnormalities 17:21,23 34:9 34:22
abortion 133:8,9
abrasions 145:25 146:2,5
absence 17:10 18:8 60:10 127:13
absent 18:16
abstract 64:13 64:16 65:6,17 66:7,10,14
abundance 9:18
abuse 5:10 40:15 83:20 94:24
academic 172:12
academy 143:21
accelerated 46:22,24

accept 40:21 41:20,23 91:1 163:12 175:3
accepted 10:8 91:8 107:12
accepting 42:10
accepts 166:4
accident 57:20
accidentally 110:16
accidents 125:2
accommodate 15:17
account 35:11 35:14,15,16 36:8,11 41:7 101:10 153:24
accounts 30:21 35:10 39:23
accuracy 112:15 162:20,24 163:4
accurate 36:1,1 37:22 40:23 42:1 77:20 112:10,14,22 113:4,7,9,21 113:23 114:1,4 114:5 122:17 122:18,19 163:3,12 165:22 169:7
acidic 51:9
acidosis 22:10 34:14,16 41:15 42:23,25 43:4 45:14 51:4,15 52:6,8,11,12 52:15,17,20 53:1,3 54:3,21 56:6,11,19 60:10 86:18 98:7,17 100:23 101:14 102:18

108:3,7 128:2 128:6 147:11 151:6 152:1 169:16 171:5 173:7
acidotic 53:10 53:15 128:15
acknowledged 103:8
acrimonious 130:4 134:15 134:17,21,23
acrimony 130:8
acted 128:11
acting 22:15 30:15 39:11,19 41:9 43:17 60:21
action 1:4 21:23 22:16 23:5 36:15 137:1
actively 129:23
activity 37:7 42:2 44:10,19 44:21 45:9 52:15 113:11 144:5
acute 19:25 40:15 68:16
acutely 162:4
Adams 129:8 130:13 131:21 132:22 134:11 134:12 135:3
Adams' 23:16
add 152:4
added 13:6
addition 25:7 36:10 42:20 71:22 123:20 126:2
additional 96:6 120:25 122:5 158:16 163:7

163:10
address 10:3 96:9 103:18 104:10
addressed 84:11 96:3
addresses 84:2 87:13
adequately 174:19
adjective 32:15
adjectives 32:14
administer 60:8 60:13 154:3 179:6
administered 39:1 146:21
administering 60:24
administration 23:2 25:13 55:15 60:3 61:3 98:20 126:4,9 150:19 151:8,12,15 153:25 168:7 168:15,17 171:1
admission 161:24 162:8
admissions 161:8
admit 102:18 145:4
admitted 61:12 112:17 145:7
admonish 88:10 89:9
admonished 55:5,10,14
admonishments 43:3
admonition 83:22 84:3

89:6,15 100:11 113:2
admonitions 89:19
Adults 99:7
advances 106:17
advantage 27:14 75:2
adverse 137:1
advertised 122:20 131:17
advise 105:24
advised 7:20
affect 4:19 43:25 44:19 45:8 47:12 63:4 64:8,25
affixed 58:11
agency 135:18
Aggressive 99:6
ago 7:10 20:4 115:18 116:13 160:3 164:9
agree 14:2 20:11 21:8,14,17 23:24 25:22 28:9 32:9 37:14 44:14,17 46:2 47:10,13 50:10,12,12 51:3,13,17 54:16 58:20 59:8 65:12 68:8,9 69:11 69:14,20,24 70:6 73:8 74:9 75:12,21 76:1 76:2,2 79:13 79:15,22,23 83:2,5,5 87:6 87:11 96:10 98:5 99:20 100:6,8 101:4 101:6,24

1.877.385.4268          970.385.4268

MICHAEL F. ARNALL, MD

102:13,13,23
103:12 104:14
106:15 108:20
114:13 115:5,9
127:11 144:9
147:8 148:11
150:10 161:22
162:22 163:5
170:15,20
173:1
**agreed** 54:22
61:11 69:23
87:2 163:19
**agreeing** 174:1
**agreement** 20:18
**Ah** 32:3
**ahead** 76:13
82:14 85:18
109:17 122:6
141:20,23
142:12 152:19
152:20 166:19
169:4
**ahold** 139:4
**aid** 124:12
**air** 51:23,24
**airway** 17:8,12
**airways** 16:15
19:16
**al** 5:14,17 6:5,9
176:10
**al.[3]** 75:14
**albeit** 48:19
**alcoholic** 52:25
53:7
**alive** 133:12
154:12,15
**alkalosis** 128:5
**allegation** 148:5
**allow** 10:1,19,21
18:11,16,22
19:15,18 50:4
143:16 144:10
162:17

**allowed** 10:8
11:9 149:24
**allows** 18:9
**alter** 38:11
**altercation**
140:7
**altered** 33:3,24
47:10,11 48:20
**ambiquity**
154:19
**ambulance**
143:24 147:3
148:14
**American** 6:7
97:1,12
**amount** 45:8
119:9 150:6
160:11
**amounted**
164:23
**analyzed** 18:1
**anatomic** 8:2
**ancillary** 36:20
**and/or** 107:9
**ANIMAS** 2:5
**ankle** 85:14
**ankles** 85:13
**answer** 18:17,20
18:21 21:23
43:12 45:20
48:23 56:3
59:22 66:17
71:14 76:1,9
76:12,14,16
77:20 94:6
96:16 110:7
113:16,18
136:5 147:18
152:15 164:2,3
165:9 171:19
173:3,18
175:11,12
**answered** 45:18
113:25

**answering** 76:17
**answers** 179:9
**anterior** 85:5
**anticipate** 77:4
144:11
**anybody** 14:23
141:18 176:12
**anymore** 166:15
**apologize** 54:11
**appallingly**
107:22
**apparently**
110:5 113:10
115:21 134:19
**appear** 20:17
41:8 65:9,11
165:16
**appearance** 8:18
16:16 19:4,10
**appearances** 4:3
8:5
**appeared**
128:22
**appears** 39:10
39:25 108:12
122:21 149:13
163:17 166:11
**applied** 44:24
49:16,20 77:25
79:10 80:3
149:14 150:7,9
**applies** 101:9
143:19
**apply** 57:15
81:14
**applying** 77:5
**appointed**
135:18
**appointment**
135:22
**appraisal** 163:3
**appreciate**
141:17
**appropriate**

42:21 58:16
126:12 128:21
**approved**
168:17
**approximate**
159:18
**approximately**
67:8
**April** 4:21 69:6
**arbitrarily**
27:25
**area** 8:1,4 11:11
11:13 132:8
**areas** 8:9,11,21
127:3
**argue** 90:6
148:23
**arguing** 90:5
91:4
**argumentative**
27:25 148:15
**arm** 145:13,23
146:6
**arms** 46:11 47:4
**Arnall** 1:23 2:3
4:4 7:1,8,9
81:18 119:17
119:19 128:23
177:2,9 179:7
**Arnall's** 5:19
**arrest** 34:2,10
40:16 52:5,9
52:10 85:4
150:21 151:14
151:16,20
153:11 161:23
167:15
**arrested** 35:9
130:6,10
134:23 136:12
136:21
**arrhythmia**
18:23,25 19:7
19:9 127:15

168:2
**arrhythmias**
19:3
**arrhythmogenic**
168:13
**arrival** 39:16
**arrow** 120:24
121:2
**arterial** 51:10
53:14
**article** 63:3 64:5
64:17,24 65:7
65:20 66:2,3
66:16,20 67:11
67:22 68:10
69:10,21,22
70:17 71:8,14
73:24 74:6,25
97:21 99:4,15
101:25 106:8
106:17 108:22
109:7 110:4,14
124:3 157:1,2
157:4 176:2,6
176:9
**articles** 26:5
74:1 92:15,20
105:6 106:7,8
106:13,15
108:8 109:13
109:16 110:10
117:3 123:14
123:22 124:5,7
174:9 175:16
**aside** 17:19
98:12,13
**asinine** 113:1
**asked** 9:20 20:13
21:12 39:3
76:14,16,18
105:3 113:14
115:1,14 116:3
116:20 118:10
120:15 121:14

1.877.385.4268                                970.385.4268

MICHAEL F. ARNALL, MD

121:20 124:16 126:3,22,23 127:6 132:10 135:1,13 139:22 144:11 149:7 152:13 156:6 159:16 162:19 165:13 167:4,19 170:1 172:2,3,11

**asking** 46:7 79:6 80:13 111:3 118:20 167:14

**asks** 18:18 141:6

**aspect** 42:9 59:11 61:18

**aspects** 8:23 90:7 108:14 143:12

**asphyxia** 53:20 54:17 61:15 72:11,13 75:13 80:2 83:19 84:1 95:24 96:4,5,12,23 97:23 110:22 111:13,23 112:2 138:3 150:18,20 151:4,9,13 165:5,8

**asphyxial** 83:17

**asphyxiation** 98:3

**assassinate** 134:20

**assert** 62:4 77:18 80:12

**asserted** 109:24 126:8

**asserting** 146:11

**assertion** 41:9 100:17 145:11 147:25

**assess** 23:13 24:20 36:19,22 54:23 162:24

**assessing** 23:20 41:7 42:7 67:18

**assessment** 35:25 36:2,7,9 36:23 41:14 88:21

**assign** 54:8

**assigned** 133:11

**assignment** 28:8

**assist** 52:22

**assistant** 70:23

**associated** 4:23 6:7 24:10 48:2 48:4 52:8 59:18 70:2 74:8 80:16 82:3,7,8 86:25 87:5 93:25 94:14,18 95:7 97:9 98:8 107:13 109:15 109:24 171:25 173:11

**association** 23:9 23:19,20,22 24:22 97:8 111:21,22 168:18

**assume** 78:7 112:9

**assumptions** 112:25 123:18

**assure** 58:25 91:21

**assuredly** 22:12 33:20 34:14 60:10,11 171:6

**asthma** 16:9,9 16:12,21,21,23 16:25 17:3,19

17:20 18:9 47:25 157:23 157:25 158:5 158:17,20

**asthmatic** 162:4

**Ativan** 13:6,10 13:16,24 14:2 20:6,14 21:20 21:23 22:23 25:3,6,8,13,15 25:24 41:11 59:21 60:3,6 61:4 89:1 153:25

**attach** 15:9

**attached** 47:5 177:12

**attempt** 147:19 150:6

**attempted** 36:11 96:9 134:20 143:15

**attend** 17:11 35:23 144:13

**attended** 143:21

**attending** 54:25 169:12

**attends** 8:16

**attention** 153:24

**attorney** 10:1 26:4 120:7 138:11 139:23 157:19 167:13

**attorneys** 7:10 9:14,20 59:9,9 59:19 119:4,10 135:19 139:25 179:13

**attributable** 125:1

**audio** 135:7

**auscultate** 163:9

**author** 65:24 74:9 88:11

95:8 99:10,12

**authored** 159:8

**authoritative** 73:8 74:8

**authorities** 172:2,4

**authority** 73:5 135:23

**authors** 65:5 88:12 92:22 174:12

**automobile** 33:7

**autopsies** 91:20 106:24 120:1,2 134:12,12 139:16

**autopsy** 12:9 14:12 15:1 17:14 19:12 20:2,10 25:17 26:20,24 27:15 27:16,22 40:7 47:23 48:7 115:10,20 118:18 119:23 120:6,8,11,13 132:8 133:11 133:14,17,24 133:25 134:2 135:25 137:20 137:22 139:24 146:1,1,4,8,15 146:17,25 157:20 158:3

**available** 14:25 62:18,21 68:21 71:25 80:7 149:5

**Avenue** 2:15 3:9

**average** 92:15 92:21,22,25

**avoided** 68:17 152:17

**aware** 10:5,11

12:3 17:13 20:8,16,25 25:25,25 39:21 56:23 61:14 70:22 81:1 94:13,18 95:23 96:2,23 101:21 112:12,13,23 113:23 114:7,9 115:14 116:3 144:15 158:3 161:3,8,14 163:23 165:4,7 167:22 174:12

**awkward** 107:19 108:11

**awkwardly** 106:23

**B**

**b** 3:3 4:14 5:1 6:1 148:2

**back** 22:3 37:2,3 37:17 44:24 45:2,5 47:17 47:18 49:16,20 50:1,24,25 63:17 64:2,18 77:17,25 78:5 78:18,20 84:8 85:13 99:18,25 105:1,8,9 106:3,5 116:12 121:13 131:16 135:12 144:5 149:8,14,19 150:7 155:12

**background** 48:9 100:4

**bad** 30:7 33:15 39:17 48:11 54:11

**BAGGETT** 1:12 2:19

1.877.385.4268                                970.385.4268

MICHAEL F. ARNALL, MD

Page 4

Baker 38:6
ball 147:19
BALLIN 2:14
  2:14
Baptist 1:17 3:1
  31:20 40:9,12
  104:18 143:24
  147:4,14,16
  148:11 149:10
  153:2 155:5,16
  167:8
bar 140:7
Barnhart 15:1,4
  20:6 26:16,17
  26:18 96:21
  117:16 120:10
  158:3,7 171:18
  171:21
Barnhart's 20:2
  20:3 61:14,21
  171:25
base 55:4
based 5:17 19:3
  19:10 29:18
  34:17 38:9,18
  53:2,9,10
  55:25 99:16,23
  100:23 106:10
  113:5,11 114:3
  127:8 143:16
  150:16
bases 104:12
basic 51:9
basil 93:4
basis 5:20 17:3
  25:2,5 51:14
  52:22 58:1,6
  124:23
batch 160:23
bdillard@mit...
  2:24
beat 155:24
beg 172:9
began 27:24

begins 31:23
  62:8
behalf 1:8
behaved 42:6
behavior 30:2,5
  30:25 31:1,5
  31:10 32:8,13
  33:25 37:14
  43:22 77:3,7
  77:16,19 78:4
  78:7,12,14,17
  100:14,18
  128:19,22
  163:13,18,24
  164:6
beings 58:14
belief 133:2
  162:10 164:22
believe 14:1,16
  14:19 22:5,14
  22:17 23:7,11
  23:15,16 26:6
  26:12 27:17
  28:4 29:9,14
  29:17 30:12
  31:4 33:4
  35:20 36:25
  37:5,17 38:1,5
  38:7,20 40:6
  41:25 42:4,5,5
  43:21 53:24
  54:4,25 55:11
  55:16,18,20,24
  56:3,19 58:10
  62:1,5 72:15
  74:13,13,18
  76:9,20 77:2
  77:14,20 78:3
  78:11,12,15
  84:2 98:6,9,15
  98:17 101:12
  101:15 102:3
  102:10,21
  109:19 112:20

113:12 115:5,9
  117:5 122:7
  125:8 127:23
  128:1,2 130:17
  143:12 144:2
  145:15,24
  146:1 147:10
  149:9 151:19
  153:8,12,13
  154:14 159:2
  161:13 164:7
  165:23 167:10
  167:13 168:6
  168:14 169:21
  170:23 174:24
believed 21:3
  100:19 113:7
believes 58:15
BELL 3:14
Belle 129:21,23
  129:25
bellybutton
  132:9
best 26:16 37:6
  50:12 56:14,21
  60:15 61:1
  148:18 162:24
beta 48:25 49:7
better 50:7
beyond 40:1
  169:3 172:24
  173:15 175:10
bicarbonate
  22:2 52:5
big 91:15
bill 122:5,17
bills 122:1,9,17
  122:18
binder 29:12
  117:1,22 118:2
  123:10
bindings 85:14
biologic 22:16
bit 46:9 81:1

93:5 148:7
bite 145:12,14
  145:22 146:3,6
  146:8
bitten 145:20
black-box
  167:22
blank 120:22
blood 25:18
  34:15 47:1
  51:8,9,10
  53:14 66:3
  128:15 162:20
  165:21 166:4,7
blowing 52:13
  52:18
BMH-D 25:12
BMI 92:16 93:4
BMJ 4:21
board 137:4
board-certified
  8:2,9 11:25
  96:20,22
body 17:17
  49:13 79:20
  83:24 85:2
  86:11,16
  174:16
body's 83:20
BOND 1:12 2:19
book 72:18 79:5
  81:23,25 88:12
  90:23 109:17
  170:8
books 81:21
  90:4
bottom 31:20
  149:10
Boulder 129:6
  133:5,8 134:3
bouncer 140:9
box 15:21
Brad 141:20,24
  142:8,12,22,23

142:24 173:25
  176:15
Bradley 2:21
break 47:15,16
  152:24 155:10
  155:15
breath 52:3
breathe 45:3
  46:16 51:22
breathing 23:5
  34:23 39:25
  52:16 69:19
  82:24,25 83:1
  88:22 89:3,10
  89:10,17,20
  114:15 115:3
  162:7,13
  168:10 174:19
  174:20,21
bridge 174:9
brief 78:24
  164:23
briefly 89:25
  159:16
bring 62:17,21
  63:14 68:20
  116:3,21
  118:10 121:14
  174:15
British 69:2
Broadway 3:19
bronchi 16:15
Broomfield
  134:9,11,13
brother 140:1
brought 12:6,16
  26:6 56:23
  58:4 62:20
  81:2 84:6,14
  105:12 118:17
  126:1,16
BRUCE 1:15
  2:20
buddies 28:14

1.877.385.4268                                           970.385.4268

MICHAEL F. ARNALL, MD

bumped 28:16
Bureau 130:5
business 15:19
button 65:24
Bye 176:19

_____

**C**

C 2:11
call 13:8 34:7,24
  56:8 74:8
  106:21 107:25
  122:22 129:5
  129:18 139:23
  139:24 140:1
  153:23
called 7:2 11:21
  61:5 70:13
  72:9 134:7,13
calling 175:8
Camino 2:8
cancers 8:18
candidly 10:18
candor 9:25
capacity 66:19
  66:21 67:1
captures 118:4
car 30:23,24
  32:12 43:16
cardiac 18:23
  19:4 47:2 52:5
  52:9 60:17
  88:24 102:2,7
  102:9,11,16,20
  102:23 127:15
  148:17 168:1,1
cardio-pulmo...
  150:21
cardiomegaly
  92:24 93:7
  107:9
cardiopulmon...
  40:16 52:10
  151:14,16,20
  167:15

Cardiorespira...
  6:5 176:2
care 9:4,23
  10:10 11:2
  59:25 61:12,13
  143:12,23
  147:15,21
  148:9,12,22,24
  149:4 154:17
  154:19 156:8,8
  156:12,12,14
caregiver 43:1
carries 43:2
carry 14:19
carrying 35:2
Carson 4:19
case 7:12,14
  10:9,18 11:3
  12:5,10 13:24
  14:9,14 16:5
  19:15 24:4
  26:2 27:1,5
  28:19,24 30:6
  35:6 53:18
  54:19 55:5,10
  59:6,7,10,11
  59:24 74:11
  75:2,4,5,6,7,24
  76:8,23 77:13
  80:4 83:12
  86:2,6 87:25
  90:6,10 93:3
  93:10,16,17
  98:19 103:11
  103:19,23
  105:20 110:15
  110:18 111:25
  112:9,17
  113:19 115:10
  116:18,21
  118:12 119:23
  119:24 120:19
  121:5 122:2,10
  122:13,23

124:4,6,10
  128:10 129:14
  131:17 133:7,7
  134:3,5,6,24
  137:12,14,15
  137:17,20,21
  137:22 138:21
  138:24 139:2
  139:22 140:2,2
  140:6,11,13,21
  140:22,25
  141:1,9 142:1
  143:4,23 147:5
  147:24 148:7
  148:16,22,23
  149:13 156:25
  158:24 159:18
  161:11 165:11
  166:10 168:8
  169:12 173:5
  174:22 179:13
  179:15
cases 91:16
  92:25 107:5
  112:6 118:16
  119:10,22,25
  120:3,5,16,18
  124:8 137:17
  137:24 138:6,6
  139:8,17,18
  166:5 170:18
  173:10
casual 35:2 57:4
  111:8
catastrophic
  113:4
catch 104:18
category 54:17
  86:14
causal 23:13
  92:8
causality 23:12
  24:3,19 54:8
  54:23,24 55:13

causation 23:10
  23:19,21
cause 8:24,25
  9:1 13:11 14:6
  16:4 18:1 20:9
  21:4,17 23:23
  27:8 28:2
  37:23 53:8
  55:3,7,9,16
  56:15,18 57:12
  57:13,18,24,25
  58:19 85:24
  88:9 91:16
  98:2 107:1
  114:22 119:15
  120:8 127:15
  129:24 134:1,6
  134:19 141:6
  143:5,7 167:23
  170:9,12
cause-of-death
  53:18
caused 17:4 30:5
  33:22 48:20
  54:3 56:16,23
  61:19 74:13
  77:3 107:18
  120:9,9 125:16
  147:6 150:17
  152:6
causes 54:12,13
  54:14 55:20
  85:5 169:21
  170:14 172:6
causing 45:13
  54:20 61:3
caution 9:18
  42:21 43:1
  56:21 79:25
  102:15
cautionary 43:3
caveat 123:25
  148:4,6 163:15
caveats 60:1

74:7
CCR 179:22
Center 129:22
  130:3 136:17
certain 24:24
  43:2 116:3
  130:5,22
  144:12 152:24
  156:10
certainly 11:9
  41:23 44:7
  55:8 56:16
  57:13 73:13
  80:12 81:10
  93:7 111:24
  124:7 128:22
  129:4,11
  130:16 140:13
  143:18,19
  144:8,25
  151:17 152:12
  152:14 157:22
certainty 22:24
  150:17 153:4
  162:16
Certificate 4:10
certifications
  137:4
Certified 2:4
  179:5
certify 177:2
  179:6,12,16
certifying 170:9
cessation 22:6
  22:20 23:2
  34:23 39:25
  52:18 174:20
challenge 42:23
  56:8 151:18
  166:9 169:18
  171:1
challenges
  170:21 171:8
Chan 75:14 76:3

1.877.385.4268                                    970.385.4268

MICHAEL F. ARNALL, MD

76:6,9,20 77:1
77:2,4,8,12,14
78:3,9,13,15
80:24 81:4
87:17 95:19
97:23 144:2
**Chan's** 76:3
77:12,20 79:15
79:16,23 81:3
81:22
**chance** 131:7
141:15
**change** 44:25
47:13 68:12,12
69:16,20 74:9
77:15 80:14
116:19 152:9
153:19 162:10
165:1,22,25
168:4 169:13
175:4
**changes** 44:25
45:1 74:4
108:3 153:4,4
153:8 155:20
**chapter** 23:16
82:19 95:24,25
**characteristic**
146:16
**characteristic...**
166:3
**characterize**
32:16
**charge** 121:20
141:6,8
**charges** 130:7
133:23
**Charlton** 1:6
**charts** 52:22
**chat** 115:16
139:5 159:23
159:25
**check** 7:24
121:22,24

**chemical** 44:20
150:19 151:8
151:12 153:25
175:6
**chemically** 44:8
44:13
**chest** 35:3 45:2
**child** 133:10,11
133:12
**child's** 133:19
**chin** 132:9
**choices** 57:19
**choose** 27:7
**chose** 32:16
69:12
**chronic** 19:25
**chronically**
131:9
**CHW** 4:18
12:17 14:20
**circles** 32:9,12
**circumstance**
148:8
**circumstances**
33:21 37:17
61:4 77:13
147:20 175:7
**citation** 63:2,7
64:22,24 105:9
105:16 108:25
**citations** 88:7
105:4 110:15
**cite** 53:25 62:12
64:14 67:25
68:15 69:25
72:4,8 74:25
80:14,19,20,21
92:11,22,24
95:12 98:7
102:4 125:9
146:18 152:15
175:15
**cited** 24:9 54:4,9
54:19 58:4

62:16,23 72:5
72:17,20 80:7
81:10 92:15
94:13 95:20
98:10 105:5,14
106:7 109:13
110:10 111:2,3
147:9
**cites** 77:1 85:22
94:22 95:8
98:6 104:21
109:22 110:2
**citing** 95:15
**city** 1:12 2:19
91:15 141:25
**civil** 1:4 59:7
119:10 120:9
137:14,17,17
137:20,24
138:21 139:8
139:17,18
140:11,13,21
140:22,22,24
**civilian** 34:19
35:15 36:7
41:8 117:16
163:16,20
**classified** 57:8
58:2 59:21
60:4,5,7 72:6
**classify** 169:19
**claustrophobia**
47:11
**claustrophobic**
32:20,25 33:1
**clean** 62:24
65:19
**clear** 34:8 37:8
113:14 142:6
**clearly** 13:19
30:14,25 32:13
34:13 39:19
55:6 82:3
89:19 92:9

94:7,7 158:25
**Clewiston** 130:2
**clinical** 5:16 8:3
12:13 25:12
67:20,23 109:8
112:11 113:6
113:22 114:8
125:16 128:20
**clinically** 68:6
68:11 69:16
74:12,23 75:20
79:11 80:10
81:24 85:25
99:20 100:1
**close** 115:3
142:14
**closed-circuit**
132:7
**closely** 55:1
107:7
**closing** 129:24
**clues** 36:20
**CO2** 52:13,18
**coauthored** 26:5
**coauthors** 26:8
**cocaine** 107:6,7
107:10 170:13
**code** 90:15
115:8
**collapse** 165:8
**collection**
132:16
**college** 111:18
**colloquially** 30:7
39:17 48:11
135:20
**color** 4:17 118:3
**Colorado** 2:6,8
9:15 31:13,14
111:19,20
130:14,20
131:4 134:10
135:22 138:7
138:10 141:3

177:15 179:1
**column** 85:19
87:7 106:23
125:13
**combat** 56:18
**combating**
46:19
**combative** 30:19
30:22 39:18
40:4 43:10,14
48:13 56:16,17
**combativeness**
57:3
**combination**
88:16 151:1
**combing** 106:20
**come** 11:8 18:12
108:6 132:13
133:8
**comes** 54:9 58:3
58:24 172:16
**comfortable**
34:16 100:22
158:2 171:7
**coming** 35:23
126:20
**commanded**
27:7,9
**comment** 9:13
49:17 128:1
157:19
**commented**
118:15
**commenting**
57:9
**Commerce** 3:3
**commission**
177:23 179:24
**committed**
133:21
**common** 31:6,7
31:7,9,10 32:9
33:5 91:10,12
91:13 107:10

1.877.385.4268                                        970.385.4268

MICHAEL F. ARNALL, MD

commonly 71:24
91:8
communicated
113:8 159:13
community 80:1
112:21 148:3
company 140:14
140:18
compare 13:5
63:18
compared 27:22
compel 41:16
144:4
compelled 78:8
78:11
compelling
16:22 23:7
24:4,17,21
42:9 157:24
compels 74:16
compensates
128:5
compensation
121:18
compensatory
128:4,5,11
complaint
132:11,14
135:5
completed 86:21
completely
34:16 42:1
94:9 108:6
completeness
21:22
complex 59:22
complied 148:3
comply 116:6
Complying
15:23
component 95:3
compresses
102:22
compression

85:5
compromise
19:11,22 53:25
76:22 86:16
90:12 98:2,13
98:15 103:23
104:1,9 151:23
151:25 152:3
compromised
19:17 48:18
81:9 89:18
102:16
compromises
79:20 102:10
conceded 143:15
143:17 144:6
conceptually
68:9
concerning
143:12 146:8
149:8 159:8,23
163:23 167:23
concerns 101:3
174:14,17
concert 39:24
40:3 160:21
concession
89:21 122:19
conclude 13:24
19:15,19 22:14
22:17 29:19
43:16,21 54:6
77:2,15,19
78:3,17 96:14
98:1 99:17,24
144:4
concluded 22:22
88:12 91:18
136:1,9 176:21
concludes 99:15
conclusion 16:4
18:12 37:21
40:8 51:15
57:11 59:12

68:10 69:15
74:10,24 75:4
76:6,7 78:8
81:3 86:1,5,9
100:18 103:11
113:24 161:11
162:18
conclusions
80:23 89:23
104:12 111:6
concomitantly
45:14
condition 39:7,8
41:20 60:9
100:21 152:7
154:3 163:13
163:18 164:6
171:3
conduct 27:7
conducted 100:5
148:1
Conference 2:7
confined 139:12
confines 33:7
confining 60:2
confirm 64:23
155:9
confirms 102:19
conjunction
144:25
connection
116:21 142:16
156:18,24
157:9,17
159:17
consciousness
88:21
consensus 39:11
consequence
57:6 110:2
130:11 168:11
consequences
6:5 176:2
consider 21:10

30:15 38:13
39:1,3,5,6 40:9
40:11,12 59:14
61:20 91:25
92:12,12 97:17
106:6,13
109:13 124:4
considerable
34:4
consideration
124:8
considered
55:17 61:24
91:21 123:7,18
123:21
consisted 100:5
consistent 35:15
92:3,5,7 94:5
146:6
constitute 68:6
174:16
construct 50:2
consult 119:15
consultant 27:23
consultation
119:12,21
120:16 140:12
consultations
119:22
consulted 8:12
9:14 137:21
consulting 119:4
119:10,23
120:2
consumed
160:12,19,24
Cont 5:2 6:2
contacted
159:17,19
contain 157:2
contained
120:20 121:5
contains 117:2
contemplate

92:2 102:16,20
140:13 144:16
contemplated
34:3 59:23
118:16 129:24
contend 95:12
contention
78:19 102:6
127:24
contest 89:5
103:17 104:6
173:8
context 73:25
82:20 100:24
107:6 110:18
112:5,7 169:5
continual 88:21
continue 43:18
62:4 76:12
79:7 86:22
continued 41:1
43:22,24 45:25
129:18 154:14
continuing
60:18 89:20
147:12
continuous
89:12 126:9
148:17
contract 134:11
contracted
26:24 27:10
119:14
contradiction
89:8,11 107:21
contradictory
81:4 87:4
contrary 147:9
contrast 13:5
contribute 20:14
31:5 56:2,12
96:23 98:11,17
118:19
contributed

1.877.385.4268                                                              970.385.4268

MICHAEL F. ARNALL, MD

14:3 16:12,22
17:4 21:3,10
21:14,20 22:18
22:19,23 23:7
24:14,17,24
25:6 53:24
54:7 55:2 56:8
58:15 74:15
147:6 151:20
154:1 161:20
173:6
contributes 57:1
contributing
55:17
contribution
16:21 36:10
74:16 88:7
89:6
contributors
18:10
contributory
54:14,15,16
170:14
control 30:17,22
controlled 71:16
96:9
controversies
111:1
controversy
163:23 164:4
contusions
145:25 146:2
conversation
35:2
conversations
28:15
convinced 56:7
copies 12:7
62:20,21
copy 4:17 15:9
27:3 62:24
63:17 65:15,18
65:19 66:7,7
66:10,14 67:25

69:21 72:2
85:15,15
115:25 117:14
118:3 123:1
177:6 179:17
copyright 82:18
cord 133:18,18
134:1
cords 51:24
coroner 57:14
129:6,8,9
130:15 131:22
131:23,25
132:4,7,13,24
133:23 135:3
135:14,21,24
coroner's 131:25
132:19,21,22
133:15,21
coroners 111:20
111:22 129:5
135:16
Corporation
1:18,19
correct 11:13,15
14:21 15:5,6
17:2,15,18
20:4,5,8 29:1
51:2 65:4,10
68:14 69:9
70:3 71:1,21
72:7 89:16
90:17 105:17
115:11 129:1
137:13 143:5
143:25 148:21
149:25 150:22
150:25 151:9
151:10 156:2,5
156:6,10 157:6
158:8 161:15
164:10,17,18
165:9,24 170:5
177:6 179:10

correction 74:3
178:1
corrections
177:5,6,11,12
corrections.com
4:22 70:13
correctly 150:23
151:11
correlates 19:2,9
19:18,24
correspondence
121:15,16
cost 129:25
could've 36:4
counsel 121:15
123:7,18
165:16 173:16
174:1
counsel's 121:16
count 31:18
country 57:16
counts 158:10
county 2:6 129:8
130:13,19,21
131:3,21
132:22 133:5
134:3,9,13
135:4 177:16
179:2
couple 89:25
course 19:20
30:13 34:4
38:11,16 44:11
46:8 56:20
71:15 76:5
79:15 80:21
90:2 94:9 96:6
118:18 135:4
149:6 175:12
court 1:1 8:5
10:8,22 11:9
11:14 58:24
59:1,1,18,18
141:6 179:15

court's 59:4
courtroom 11:7
Coventry 65:16
65:25,25
cover 73:2
111:24 126:25
covered 77:21
127:4 157:21
cramps 108:7
create 36:21
124:14
created 124:14
creatinine 53:6
credentials
60:18,25
credibility 10:17
28:8 36:19,22
credible 113:12
crime 133:21
criminal 59:7,16
130:7 138:6,6
138:11 140:12
140:23,23
criteria 16:8
18:9 23:13,20
94:1,3 165:8
critical 36:3
88:17 89:20
cross-cover
130:24,24,25
cross-covered
130:21,22
cross-covering
131:1
crossed 174:8
CSR 179:22
cuffs 50:3
curare 44:9,21
current 107:5
123:1
currently 52:19
117:23 135:15
136:14 160:23
Curriculum

26:5 117:5
cusp 34:6 42:19
93:11 154:10
custody 26:7
60:15 87:22
95:17 97:22
143:10
cut 114:18
CV 123:1
128:23 137:4,7
137:10
cynical 108:9
Cyril 12:5,12,18
158:6

## D

D 4:1 75:14
Dana 5:4
dart 146:10,13
data 51:12
118:10 123:7
date 25:14 33:18
70:25 125:15
159:18
dated 26:11
David 5:6 82:18
Davis 28:11
DAWN 95:3
day 2:1 177:4,7
177:18 179:19
de 167:24 168:2
dead 9:16,19
43:8 52:21,23
53:14 75:7
133:13,22
155:24
deal 53:12
114:10
dealers 160:21
death 4:19 5:7
6:8 8:24 9:1,1
13:11,25 14:3
14:6 16:4,13
17:4 18:1,9,10

1.877.385.4268                                970.385.4268

MICHAEL F. ARNALL, MD

20:7,9,15 21:4
21:17 22:23
23:17 24:1,14
25:6 27:8 28:2
29:20 33:19,22
34:1,8 37:23
47:21,24 48:2
48:5,8,14 53:9
53:21 54:8,12
54:13 55:3,7,9
55:17 56:2,12
56:15,23 57:8
57:12 58:1,2,7
58:16,17,19,22
59:13 60:2,4
61:15,19 63:3
64:7,24 68:17
68:17 72:6,15
72:16,17 73:22
74:15,16,17,18
77:10 80:12,13
80:17 82:3
84:25 87:19
88:8 91:17
92:3,11 93:15
94:16 96:23
107:1,18
119:15 125:16
133:18 134:1
136:1,2,7,9,9
137:18 140:15
143:5,6 147:6
150:17 151:1
152:10 153:6
161:20 169:6
169:20,24
170:9,12
171:11 173:7
173:13
**deaths** 16:23
26:7 83:17
87:1,5,13,20
87:21 88:3,18
91:3 92:17,18

95:2,9,16 98:4
107:13 124:21
124:25 127:12
138:7 173:11
**debate** 68:6
74:22 87:8
96:10 110:20
110:25
**decades** 10:12
118:18
**Deceased** 1:7
**decedent** 13:8
34:20 76:25
100:16
**December** 12:12
173:10,10
**decided** 130:24
**decides** 35:19
**decipher** 109:18
**declarations**
36:18
**decrease** 80:10
81:24
**decreases** 79:11
**Defendant** 3:1,7
3:13 7:2 26:15
140:11,21
155:4,16
**Defendants** 1:20
2:19 7:11
141:25 142:25
**defender** 120:7
**defense** 26:2,18
26:23 29:3
140:12,13,14
140:18,24
174:1
**deference** 27:22
28:1
**defined** 58:7
106:9
**Defining** 5:17
106:10
**definite** 107:1

**definitely** 47:2
**definition** 58:17
91:9 169:25
**definitive**
144:17 164:2,3
**degree** 44:19
54:8 55:2
99:20 100:2
107:9 114:1
150:16 153:3
154:17,18
**degrees** 44:23
54:24 83:19
92:21
**dehydration**
140:17
**del** 2:8
**delay** 147:6
**deleterious**
83:25
**delineated**
120:10
**delirious** 92:10
94:6,8
**delirium** 5:9,13
5:16 6:8 72:25
82:8,10,15
88:6,11,14,15
88:18 90:19
91:5,12,19
92:4,11,13,17
92:18 93:9,15
93:21 94:2,5
94:14,16,19
95:7,25 106:9
106:11 107:3
107:13 108:22
109:16,20,25
110:5 112:6
127:12,15,17
127:21 138:4
138:17,18
140:6,8 169:6
169:13 170:5

170:10 171:12
171:16,18,22
171:25 173:11
**delirium'** 170:12
**deliver** 179:17
**delivered** 133:10
133:12,13
**demand** 158:11
**demands** 99:6
99:20 100:1
101:10
**demise** 169:22
**demonstrate**
71:22
**demonstrative**
124:12
**demonstratives**
124:15
**DENISE** 1:5
**department**
50:14,15 78:1
130:7 131:9
143:9 145:17
147:17,21
148:9 149:5
154:19,20
162:8,15
**departure** 148:7
**depend** 57:25
**depending** 46:16
47:9 48:24
**depends** 57:24
**deployed** 146:13
**deposed** 14:8
38:3
**deposition** 1:23
2:3 5:18 7:18
7:21 9:8 11:8
12:20,21,23
14:10 15:15
20:3,12 27:1,4
29:16 37:25
38:6,14 61:14
61:21 99:13

110:24 116:1,4
116:8,13,20
117:15 122:13
126:5,20 138:2
138:5 140:10
141:10 143:11
164:17,19
176:21 177:3
179:8,11,17
**depositions** 38:3
38:7 117:17
138:5,6,14
140:5
**depressant** 22:9
22:15,18 23:1
25:3 55:15
60:8,14,25
98:21 154:4
168:6,11
**depression**
24:11,22 42:8
54:20
**depth** 126:25
**derived** 105:2,10
119:11,20
120:1
**derives** 141:3
**described** 30:2
41:19 47:1,6
58:21 86:14
174:24
**describes** 34:20
**description** 32:8
33:6 34:19
36:17 37:9,10
37:21 40:21
41:21,22 49:21
50:16,16 168:8
169:10
**descriptions**
41:24 60:12
163:13 169:11
**designate** 26:21
135:20

1.877.385.4268                                              970.385.4268

MICHAEL F. ARNALL, MD

designation 14:20
**DESOTO** 1:17
despite 60:11 133:21
destroyed 132:15 135:5
detailed 172:1
detained 143:10
detected 25:15
determination 41:12 58:16,21 58:23,24 59:15 133:20
determine 8:25 51:8 53:6,15 59:4 71:5,5 81:18 105:9 119:15 133:12 146:15 149:20 160:16
determined 22:24 51:4 75:15
determines 88:13
determining 16:12 52:23 59:2,3
develop 82:23
developing 169:16
diabetic 53:7
diagnose 80:2 136:7
diagnoses 18:6 41:17 53:8
diagnosing 34:16 52:20 171:16
diagnosis 5:14 18:5,12 40:18 41:15 51:15 52:25 53:13

74:17 76:4
90:14,15 91:5
91:7,16,17,21
92:1 94:2
112:6
106:12 112:7
128:20 166:5,5
167:11,14
171:12,14
**diagnostic** 146:2
**diametrically** 62:1,2
**diaphragm** 45:4 45:6,12 85:7
**diaphragms** 82:11
**die** 52:24 80:19 80:22 87:9 88:14 90:3 91:1 110:5 127:21
**died** 33:10,11,14 83:3,4,7 84:24 91:19 94:15 109:19,22 110:2
**difference** 13:13 26:23 27:11,13 27:20 36:23 37:13,20,24 60:11 67:18 161:10
**different** 8:11 18:4,6 23:19 27:5 32:13 35:18 37:18 42:24 43:10 44:12 46:4,8 53:13 54:22,23 54:24 57:13 58:23 77:9 104:12 112:12 112:15 127:2 143:12 151:22 171:6

differential 18:5 18:12 91:17,23 92:1 94:2 112:6
differentiate 24:19
differing 111:6
difficult 45:12 102:8 131:11 152:14 160:15
difficulties 142:16
difficulty 82:23 114:15 115:3 142:18 162:7 162:13
dilemma 154:14
**Dillard** 2:21 4:6 141:22,24,25 142:3,5,10,17 142:21,23,24 142:24 143:3 150:4 154:23 173:25,25 174:4,6 176:15 176:15
**DiMaio** 5:4 72:20 75:9 76:7 79:5,9 88:7 126:13,15 170:2,4,17 171:10
**DiMaio's** 72:18 73:5 76:2 79:16 81:23 170:8
**DiMaio-DiMaio** 5:9 88:5
**diminution** 172:6 174:20 174:23,24
**direct** 125:1,16 130:11
**directly** 84:2

113:19 120:6 159:13
director 8:10,12 11:20
dirty 56:9
disabling 67:16
disagree 13:4 14:5 17:5 101:5 103:10 108:15,16,17 173:1
disagreement 13:8,14 87:11 106:22
disagreements 13:1
disagrees 35:14
discern 13:14 16:3
discharge 146:21
discharged 132:19,21
disciplines 8:24
disclose 9:19
disclosed 7:13 13:19 115:13 139:15
disclosure 169:3 172:25 173:16 175:10
disclosures 26:1
discoloration 115:7
discomfort 168:7,14
discourse 98:10
discrepancies 35:24 41:9
discrepancy 13:19 35:18 37:5 41:11,15 42:3,9
discuss 59:6

60:1 80:15 87:18 102:5,8 104:4
discussed 25:7 36:16 87:8 88:6 96:21 107:12 110:23 118:16 126:4 138:9
discussing 11:15 84:11 86:17 102:9 137:12
discussion 9:9 23:17 36:14 59:24 64:1 83:15 84:14 87:3,3,6,7,11 91:3 93:9 103:25 121:12 155:11 168:23
discussions 72:12,14 91:11 100:25 172:8
disease 17:9,12 17:14 18:6,13 18:16 20:1 47:24 83:19 93:7,22 107:2 107:14,16,18 158:5,18
diseases 8:19
disinterest 28:10
disinterested 28:6
disk 29:8,12 156:20
displacement 85:6
disposition 179:14
dispute 32:11,15 38:21,23 39:4 39:19,22 40:1 58:11 81:3

1.877.385.4268                    970.385.4268

MICHAEL F. ARNALL, MD

85:23 103:18
145:1
**disputed** 13:18
61:18
**disputes** 20:19
20:20 88:7
107:15
**disputing** 42:9
88:9
**distress** 22:19
90:14 162:7,14
167:5,17
**district** 1:1,1
9:14 120:7
138:11
**divergent** 10:14
111:9 163:17
163:18
**DIVISION** 1:2
**DMB-RP** 1:4
**docile** 46:17
**doctor** 51:18
64:20 65:23
70:19 85:21
105:3 108:25
116:13 135:21
141:13 143:4
143:22 146:9
147:2 148:11
150:5,13
151:21 152:8
152:20 153:17
154:23 155:1
155:14,24
156:15 158:22
159:16 160:5
161:13,17,21
162:2,6,12,19
163:12 164:5,9
165:4,11,20
166:13,17,23
167:19 169:1,5
171:10
**doctor's** 115:1

**doctor-shoppi...**
133:23
**doctors** 65:5
130:10 136:21
156:14
**document** 70:7
117:21 157:8
157:16
**documentation**
36:12,20 39:24
40:7 93:11
146:7
**documents** 5:19
120:20 121:6
126:24
**dog** 144:19
145:9,19,20,22
**Doinak** 5:6
**doing** 81:5 120:3
141:22
**Dolinak** 82:18
83:6,9
**Dolinak's** 23:17
**DONJA** 1:19
3:13
**door** 30:24
32:12 43:16
145:19
**dosage** 160:17
**dosages** 160:14
**dose** 25:8,10
**DoubleTree** 2:7
**doubt** 9:25 10:1
10:7,19,21
39:16 110:1
**Dr** 5:19 7:9,11
12:5,13,20
13:1,10 14:8
14:18 20:2,3,6
20:17,20 26:3
26:5,6,7,9,16
26:17,18 28:11
28:22 29:2,15
37:25 40:13,15

40:18,19,21,22
41:4,19 42:4
42:13,14 49:5
49:9 61:14,21
72:18,20 73:5
75:9 76:7
81:18,23 83:6
96:21 99:13
106:7 109:13
110:10 115:13
115:20 117:16
120:10 128:23
134:6 145:18
158:7 167:11
170:2,4,8
171:10,18,21
171:25
**dramatic** 172:22
**draw** 162:17
**drinking** 28:14
**drive** 46:20
**drug** 5:10,23
40:15 83:19
94:24 125:1
127:18 160:15
160:21
**drugs** 29:19
33:16,17 88:16
**due** 42:7 48:3
85:4 86:18
88:16 93:15
94:15 110:5
128:15
**duly** 7:3
**Durango** 2:6,8

————————
**E**
**E** 2:11,11 4:1,14
5:1 6:1 79:9,18
**e.g** 75:17
**earlier** 14:20
36:16 49:15
50:17 61:8
77:21 85:23

95:20 110:1
117:7 159:16
159:23 160:3
161:13 162:19
165:20
**early** 159:20
**easier** 46:15
**easiest** 120:23
**easily** 62:18,21
**easy** 131:13
154:6
**Edition** 5:4,11
5:22 72:19,23
75:9 84:25
94:24 124:24
125:13 127:8
**Edition,Spitz**
5:8
**editor** 68:25
69:13,23 70:23
73:14,15,16
**education** 60:19
**Edwards** 2:14
4:8 12:13 13:2
14:13 20:3,13
37:1,4 46:6
47:22 48:15
51:18,20 63:25
64:9,11 95:19
95:21 96:17
99:10,14 100:3
105:20,23
106:19 108:24
109:1,4 117:23
119:1 121:17
123:2,4 138:23
139:10,14,18
139:21 142:8
142:11,23
149:25 157:13
161:6,25
164:14 166:15
166:17,19,22
167:2 168:21

169:1,5,19
173:1,3,18
174:3,5,18
175:11,14,17
175:20,23
176:1,9,17,20
**Edwards'** 7:20
**effect** 23:23 24:3
30:12 81:8
100:20 102:1
104:5 168:12
**effective** 129:25
**effects** 47:6 71:5
83:25 125:1,16
128:21
**effort** 44:25 45:1
45:6 48:19
**eight** 21:25
**either** 11:22
18:4 23:16
34:24 42:9
44:11 48:6
53:7 56:22
100:20 104:7
107:8 113:3
120:7,23
139:22 144:7
147:1 148:12
148:13 157:13
174:8,25
**elected** 132:7,13
135:3,16,16,23
**election** 129:10
130:17 133:1,3
**electrical** 18:25
19:8 146:20
**electrocardiog...**
168:5
**electrode** 146:23
**electrodes**
146:21 147:1
**electronic** 27:3
142:16
**element** 88:18

1.877.385.4268                                    970.385.4268

MICHAEL F. ARNALL, MD

**elevated** 93:4
**eliminated**
  151:23
**else's** 35:21
**Elsevier** 97:11
**email** 2:16,24
  3:4,10,16,20
  175:18
**emergency** 1:18
  3:7 5:15 6:7
  9:11,12,23
  10:5,6 11:2,18
  11:19,23,24,24
  12:1 24:6
  34:20 39:7,9
  39:13 49:19
  50:13,15,18,21
  50:25 51:1
  78:1,20 83:23
  109:9 117:16
  128:18 143:18
  144:7 145:17
  147:16,21
  148:6,9 154:18
  154:20 156:4
  162:8,15
  163:16 166:21
**empiric** 80:18
  80:21 90:8
**empirically**
  79:25 80:4
  81:17 90:10
  104:3 152:13
**empirically-de...**
  86:7 103:21
  104:5
**employed** 96:19
  96:22 179:12
**employee** 133:15
**employees**
  131:25 132:16
**EMS** 173:12
**EMT** 143:23
  144:8

**EMTs** 147:16
  148:12
**encounter** 41:2
  161:23 164:23
**encouraged**
  83:24
**endanger** 60:22
**endeavored**
  116:6
**endocrinology**
  8:14
**enlarged** 107:14
**ensuing** 52:11
**entered** 163:25
**entering** 9:9
**entire** 64:17
  66:16 67:11
  84:8 116:21
  119:16 152:5
**entirely** 58:20
**entirety** 61:20
  86:23 101:6
  108:21 162:8
  162:14
**entitled** 26:7
  27:22 64:24
  70:1 82:19
  87:21 97:22
  99:5 119:5
**entries** 18:5
  164:5
**enunciate**
  130:23
**enunciated**
  130:16
**environment**
  47:12
**eosinophils**
  16:14
**equal** 152:6
**equate** 167:18
**equilibrate**
  128:12,14
**equipment**

132:7 149:5
**equivalent** 22:11
  47:13 138:12
**ER** 41:8 143:24
  148:11 149:3,5
**error** 75:15
  113:4
**especially** 85:3
**espousing** 70:18
**Esq** 179:18
**essentially** 9:2,7
  15:2 150:12
**established**
  149:14
**estimate** 22:2
**et** 5:14,17 6:5,9
  75:14 176:10
**etiology** 56:18
  91:2
**European**
  172:11
**evaluate** 9:15,20
  10:20 13:24
  16:20 172:18
**evaluated** 10:22
  15:4
**evaluating** 10:9
  10:17 23:12
  42:14
**evaluation** 13:7
**event** 39:23 59:2
  59:3,5 151:18
  151:19
**events** 32:23
  42:16 145:6
  151:1 159:8,14
**everybody** 35:4
  62:22 108:15
**evidence** 16:25
  17:14,19 18:23
  19:11,22 54:11
  75:20 77:25
  78:24 100:14
  112:17 115:1

132:14 135:5
  145:25 158:4
  158:20 165:5
**exacerbate** 45:5
  48:23 154:13
**exacerbated**
  13:7 48:19
  52:17 56:6
  150:20 151:5,9
  151:13
**exacerbating**
  147:10
**exacerbatory**
  48:22
**exact** 81:6
  160:16
**exactly** 74:7
  100:9 108:12
  134:19 149:20
**exam** 15:2 17:6
  17:7
**examination** 4:5
  4:6,7,8 7:5
  12:14 17:8
  40:17 48:1
  106:25 116:11
  143:2 145:21
  155:22 163:9
  167:1
**examine** 163:6
**examiner** 95:3
  135:14,18,20
  135:22
**Examiners** 97:8
**examining** 18:7
**example** 106:21
**excellent** 62:5
**exception**
  118:15
**excerpt** 82:19
  84:7 95:5
  125:4,17
**excerpts** 90:18
**excess** 76:25

77:7,16 78:4
  78:17 85:3
  100:15
**exchange** 121:24
**exchanged**
  121:17
**excited** 5:9,13
  5:16 6:8 31:24
  32:1,6,10,14
  32:17 39:12
  68:16 72:25
  82:8,10,15
  88:5,11,14,15
  88:18 90:19
  91:5,12,19
  92:3,9,11,13
  92:17,18 93:9
  93:15,21 94:2
  94:5,6,7,14,16
  94:19 95:6,25
  106:9,11 107:3
  107:13 108:22
  109:15,19,24
  110:5 112:6
  127:12,15,17
  127:21 138:3
  138:17,18
  140:6,8 169:5
  169:13 170:5,9
  170:12 171:12
  171:16,18,22
  171:25 173:10
**exclude** 18:5,9
  18:16,22
**excluded** 107:2
  107:23
**excludes** 172:1
**ExDS** 5:14,17
**exercise** 22:11
  33:15,23 34:17
  47:13 75:17
  86:19 128:7,16
**exercises** 36:5
  108:4

1.877.385.4268                                    970.385.4268

MICHAEL F. ARNALL, MD

**exertion** 83:21 88:14
**exhale** 66:23
**exhausted** 34:21 36:6 108:6
**exhaustion** 22:13 45:14 60:11 152:6 169:16 171:5
**exhibit** 4:15 5:12 15:10,15 16:1 17:20 65:20 68:1 69:22 72:3 73:20 74:21,25 79:1 83:10 85:17 90:18 95:5 99:13 105:21 108:23 109:6,11,12 110:11 116:9 116:11 117:10 118:3,6 121:6 125:5,17 168:22,24 169:3 176:4,7
**exhibited** 30:3
**exhibits** 12:22 73:10,12,17 117:4 120:20 124:14,15 168:24 176:22
**exist** 15:3 88:3,4
**existence** 87:17 87:18
**exists** 17:13 41:16 53:23 114:10
**expect** 46:25 149:3
**expeditiously** 110:8
**expel** 66:22
**experience**

11:12 44:10 54:2 151:21
**experienced** 10:15 22:21 77:10 78:10 81:15 101:14 103:15 113:12 128:2 165:5
**experiencing** 88:13
**experiment** 100:15
**experimental** 144:2
**experiments** 75:15 78:13,15 79:16,23 81:12 81:14 100:4 103:14 104:7,8
**expert** 7:14 11:13,14 12:2 12:4 24:6 25:24 26:4,18 29:3 61:12 83:9 115:13 118:25 119:2 122:20 137:14 139:8 141:4 143:14 156:3
**expertise** 8:4
**experts** 26:2,15
**expires** 177:23 179:24
**explain** 18:6 165:25
**explained** 101:7 148:25 166:12
**explode** 30:13 39:19 94:8
**explode.'** 41:3
**express** 8:6 10:2 10:19,21 24:13 59:24 120:14
**expressed** 10:8

10:10 13:2 20:13 28:3 32:22 127:9 154:7
**expressing** 24:6 75:23
**expression** 111:7
**expressly** 171:21
**extend** 103:14
**extensive** 172:8
**extensively** 133:15
**extent** 36:3 51:3 81:13,14 102:22 145:11 146:7
**external** 119:23 120:16
**extraordinarily** 158:19
**extremely** 33:23
**extremities** 45:9 46:17
**eyewitness** 36:7 36:11 38:18
**eyewitnesses** 38:14 39:7 159:13

**F**
**F** 1:23 2:3 4:4 7:1 177:2,9 179:7
**face** 41:6 85:12
**face-to-face'** 88:22
**facedown** 75:16
**facilities** 8:11
**facility** 15:16 60:18
**fact** 24:6 26:19 26:21 48:10 78:13 87:8 91:1 96:8,21

103:20 104:4 107:12 109:22 109:22 112:24 113:8 114:3 120:10,13 133:21 134:6 139:3 144:13 144:25 147:8 152:5 159:1
**factor** 88:13
**factors** 6:7 54:20 92:12 98:3 153:14
**facts** 123:6 144:15
**factual** 41:20 158:23 160:5
**faculty** 172:19
**Fahrenheit** 92:21
**fail** 28:8
**failed** 154:3,13 161:18,21
**failure** 40:19 167:12,16
**fair** 13:22 48:16 105:22 108:10 142:15 150:5 153:8 154:2
**fall** 55:21 73:12
**false** 107:20 108:10
**familiar** 44:7 72:22 73:3 96:25 97:21 99:4 101:16,25 102:24 166:9 173:14
**family** 157:4
**far** 12:24 28:13 78:13,16 94:16 119:22 120:16 129:21
**fashion** 30:8,16

30:24 35:4 39:12,19 41:10 42:7 43:17 46:12,18 48:12 55:18 80:20 94:10 108:11 171:6
**fatal** 67:6,16 68:7,12 74:23 114:12 125:1
**father** 157:4
**favor** 168:10
**favorable** 153:9
**Fay** 4:23 70:23
**FDA** 167:22
**February** 26:12 29:2 117:8
**federal** 130:5 132:11,11,14
**fee** 140:25 141:1 141:6
**feel** 113:10 158:2,22
**fell** 73:13
**fellas** 47:16 176:19
**fellowship** 8:15
**female** 34:19 35:15 41:8 117:16 131:22 131:24 132:16 132:25 163:16 163:20
**festooned** 16:16
**fever** 92:19
**fibrosis** 107:9
**field** 73:6 96:2 101:22 103:10 156:3
**fifteen** 22:1
**Fifth** 124:24
**fight** 56:5
**fighting** 35:8 56:1

1.877.385.4268　　　　　　　　　　　　　970.385.4268

MICHAEL F. ARNALL, MD

figure 150:3
figured 36:4
figures 173:14
file 116:21
　132:11
filed 105:21
final 179:14
financial 119:6
find 17:14,23
　23:6 24:21
　53:23 82:13,14
　112:22 120:23
　120:24 126:2
　146:16 157:24
　158:4,20,21
　162:2 171:11
finding 171:21
findings 16:10
　16:18,22 17:10
　18:3,13,15,15
　18:20,21 19:2
　19:6 47:23
　48:1 74:22
　144:13 157:23
　157:25
fine 141:22
　174:3 175:2,25
fingers 174:19
finished 21:1
　76:13
fire 132:11
fired 129:2,4
　132:15 135:6
　146:10
firing 129:7,11
　129:18 132:6
　135:8,13
firm 7:24 121:17
　138:23
first 7:3 63:2,7
　64:22,24 73:22
　85:9,19 93:16
　108:22 125:15
　134:1 157:12

159:17,19
160:4 161:9
170:11 174:7
Fisher 5:8 84:25
　85:17
FISHMAN 2:14
fit 86:14
five 16:10 50:16
　57:19
flat 141:8,12
flavor 90:25
　96:7,8
flip 150:11
Florida 115:18
　115:21 122:25
　129:13,14
　138:5,8
focally 158:18
focus 45:20
　110:6
focused 168:12
focusing 24:12
folks 49:16
follow 132:8
followed 167:13
following 75:17
　177:5
follows 7:3
　99:16
football 89:14
force 79:19
　99:18,25 102:2
forced 66:19,25
　135:1
foregoing 177:3
　179:10
forensic 5:4,6,13
　8:2,3,15,20,21
　8:25 9:7 12:4
　13:23 14:1,5
　16:10,24 17:6
　21:2 23:11,18
　26:15,20 27:6
　27:12,14,16,21

28:12 33:13
35:22 44:4
45:10 46:15
54:5,22 55:1,6
55:8,21,25
57:17 58:14
59:12 71:9,19
71:23,25 72:19
72:22,24,25
73:6 75:8
79:25 80:6
81:2 82:17
90:1 91:6,8,10
95:11 96:3,20
97:1,13 98:22
101:16,22
102:24 103:10
109:2 110:20
113:22 114:8
120:14 124:1
126:14 127:7
131:9,17
160:13 166:4
170:8 171:10
171:11 174:8
forever 135:13
forgot 110:1
form 37:4 46:6,7
　47:22 48:15
　96:17 100:3
　106:19 118:11
　118:21 158:24
　161:6,25
formal 60:16
　135:17,22
　143:17
formally 4:15
　135:18 147:22
　148:10
format 117:18
formed 124:9
forming 113:19
　123:7,19
forth 50:1 53:17

179:9
found 49:8
　75:16 82:24
　84:8
foundation
　173:17 175:9
four 89:24
　120:18 139:10
four-and-a-ha...
　131:18
four-point
　137:19,23
　138:14
frame 22:16
　23:1,3,4,5
　36:14
frames 152:25
Frank 7:8
freely 102:18
　103:8 145:4
　154:1
frequently 16:23
　33:24 80:19,22
　87:4 92:18
　152:13 160:14
Friend 1:7
front 2:22 3:15
　35:4 67:11
　68:24 161:16
full 65:18 150:15
full-time 131:2
function 4:20
　19:13,17,20
　53:11 63:4
　64:8,25 66:25
　67:3,8,9,12,13
　67:15,19 68:4
　68:12,13 69:17
　69:20 71:6
　75:19 76:23
　80:10,14 81:8
　81:12,25 82:3
　82:4,12,16
　83:1 89:18

102:9,9,15,20
103:24 104:2
172:6
functioning
　75:18 79:12
fundamental
　8:22 93:9
　170:23
further 14:16
　52:24 60:1
　147:2 159:1
　166:14 175:14
　176:13 179:12
　179:16
future 74:3
　124:16
FVC 67:1

——————

G

G.M 5:14,17
garbled 142:4,9
Garfield 95:4
gas 53:14
Gass 3:18,18
　7:10 15:21
　63:9,13 64:6
　65:23 79:4
　84:15,17,19,22
　90:22 121:9
　125:7,18
　139:17,20
　169:9
gass@gwmla...
　3:20
gasses 51:10
gather 40:25
general 32:21
　90:2 129:10
　145:24 152:25
　163:1
generally 27:19
　148:20 153:12
　153:23 160:20
　161:8

1.877.385.4268                          970.385.4268

MICHAEL F. ARNALL, MD

Page 15

gentleman 104:1
Gerald 28:22
getting 122:6
Gilman 5:21
 49:2 124:21
 125:4,8
girls 132:5
give 21:22 40:3
 64:11 90:22,22
 104:18 114:1
 119:6 124:12
 126:6 141:15
 145:16 147:18
 163:1 175:15
given 25:8 36:15
 41:24 44:9
 48:10 90:25
 96:7 115:15
 119:25 120:5
 126:10 138:2
 140:10,20
 160:17 177:7
gives 16:16
 35:16 68:16
 100:4 162:17
giving 64:13,17
 132:2 143:4
glad 119:5
Glade 129:21,23
 130:1
glands 16:17,18
glass 4:17 12:16
 14:17,22 15:2
 15:4,14 16:25
 17:20,25 19:1
 19:11,13,21
 118:7 157:20
go 41:16 48:23
 52:24 53:22
 64:2,18 76:13
 82:14 85:18
 88:19 89:2
 93:19 104:7
 105:1,8,9

106:5 108:8,19
121:9 131:7
141:20,23
142:12 145:12
145:15,21
146:9 149:19
152:19,20
155:8 159:1
166:19 169:4
goes 10:16 83:22
going 9:22 10:21
 11:1,15 12:19
 21:1,15,22
 24:13 27:25
 35:24,25 38:11
 38:21 39:8
 40:5 44:2,2,19
 47:12 53:23
 78:7,25 90:2
 107:8 108:20
 109:23 110:3
 111:9 112:16
 124:14,15
 126:17 130:10
 132:14 141:14
 143:13 144:14
 145:6 147:18
 158:4 171:6
gonna 13:9 39:4
 47:16 61:12
 63:14,18 67:25
 73:7 82:19
 94:3 105:21
 108:14,15
 119:6 126:21
 126:22,25
 132:5 135:5
 150:11 155:8
 161:16
good 47:14 50:6
 115:21,22
 118:9 121:8
 154:14 176:17
Goode 1:5,7

12:18 16:25
18:2 25:24
29:7,19 30:2
32:20 33:18
35:8 43:9
45:23 46:5
47:20 51:12
74:11,25 86:11
94:4 114:15
115:2 127:25
128:17 143:10
143:24 144:19
144:21,24
145:2,3,9,10
146:9,12 147:4
147:13 153:22
156:9,22,24
159:4,8 160:6
160:8,12,19,24
161:3,14 162:6
162:13,23
164:20 165:1,5
169:19 174:18
175:7
Goode's 13:11
 13:25 17:17
 20:7,15 24:1
 24:14 25:6
 34:2 49:13
 53:21 56:1
 57:8 58:19
 61:15 77:25
 78:20 92:3
 145:13 147:6
 149:8,14 150:7
 150:17 151:1
 152:10 159:5
 161:22 162:3
 163:13 164:6
Goodman 5:21
 49:2 124:21
 125:4,8,11
gotten 78:16
 172:9

governmental
 135:18,23
Gowitt 28:22
GRAHAM 1:14
 2:19
grams 93:2
grasping 35:3,3
greater 28:9
 48:8 86:11
 120:12
Greg 28:11
gross 17:16
 119:16,20
 165:4
ground 85:12
 144:19,21,24
 145:3,10
group 129:14,16
 129:19 131:5
Guardian 1:7
guess 46:9 60:20
 124:19
guilty 130:7
gunshot 74:19
gurney 46:12
 47:5 163:21
guy 115:22,22
―――――――
H
H 4:14 5:1 6:1
 12:18
H-Y-P-E-R
 92:18 93:4
Haldol 5:24 13:6
 13:10,15,24
 20:6,14 21:19
 22:23 23:25
 24:2,5,8,12,13
 24:13,16,20,23
 41:11 167:20
 167:23 168:7
 168:13,16
hallucinogen
 31:3

hallucinogenic
 33:17
hallway 164:21
haloperidol 5:24
 168:16
hand 10:3 12:19
 27:9 126:19
 179:19
Handbook 5:4
 72:22,24 75:8
handcuffed
 85:13
handcuffs 58:11
 136:3
Handing 51:19
hands 58:7,17
 58:22 72:15,16
 74:18,19
hanging 176:18
happened 94:17
 104:1
happens 87:14
happy 38:11,16
 62:24 67:24
 97:25 99:9
 102:5 129:17
 158:9
hard 12:7 62:20
 62:21 117:14
hard-bound
 174:11,13,17
Harrison's 5:22
 84:23 125:9,10
 125:12
he'll 119:5
head 133:19
 176:8
heading 31:19
 62:8 75:13
 104:17 149:10
Health 104:22
 104:25 105:6,7
 105:19
healthcare 5:23

1.877.385.4268                                    970.385.4268

MICHAEL F. ARNALL, MD

36:24 37:6
38:8,21 162:22
**healthcare-giv...**
89:7
**healthy** 99:7,16
99:23
**hear** 114:23
141:7 142:3
155:5,17
157:11,12
**heard** 42:4
91:11
**hearing** 114:21
142:18
**hearsay** 115:24
149:23
**heart** 46:20,22
46:23 66:9
83:19 93:6,22
102:22 107:7
168:19
**hearts** 107:14
**held** 85:4 128:24
129:3
**Hello** 142:5
**help** 45:21 64:15
110:6 167:24
**helpful** 83:15
127:24
**hematology** 8:14
**hemodynamic**
102:2
**hemodynamics**
172:22
**Herald** 134:22
**heroes** 172:15
**hide** 147:19
**high** 25:21
**higher** 148:12
149:3
**highlighted**
13:13
**highlights** 118:4
**Hilton** 2:7

**hire** 134:20
**hired** 28:5
131:13
**histochemical**
106:25
**history** 16:9
17:6,8,11,12
17:13 40:17,25
47:25 48:6
56:15 93:16
**hit** 65:24 146:10
**hobble** 6:5 85:10
172:21 176:2
**hobble-restrai...**
173:14
**Hog-tying** 82:19
82:22
**hogtie** 34:13,18
41:13 45:10,24
55:1,7 61:19
72:9 75:16
77:6,17 80:2
81:10 82:7,10
82:15 85:10,23
86:25 87:13
88:8 90:3 98:1
100:19 137:22
138:15,19
140:16 170:24
172:4
**hogtie-restraint**
87:10 88:3
**hogtie-restrai...**
87:19
**hogtied** 39:22
78:5
**hogtying** 22:12
42:7 44:4
58:10 75:13
90:7 108:1
**hold** 8:4 11:13
11:14 12:1
116:17 126:19
128:25 135:14

143:13
**holding** 156:3
**homicide** 57:20
58:2,7,16,21
59:5,13,21
60:5,7 61:5
74:17 133:16
133:23 138:10
138:12,13
**horse** 155:24
**hospital** 1:17
29:9 34:2,15
37:10 38:2
47:5 129:21,23
129:24 130:5
136:14,16,23
148:19,21
149:3 161:24
162:4
**Hospital-Desoto**
3:1 147:4
155:5,16
**hospitalized**
161:5
**hospitals** 129:15
129:16,17,17
**hotel** 9:8 133:9
**hour** 2:8
**hours** 25:14
122:3
**human** 58:8,11
58:14
**humans** 8:23
**humor** 53:4,11
53:16
**hyper** 92:18
93:4
**hyperinflation**
165:7
**hyperplasia**
16:15,17
**hyperthermia**
93:23 171:23
**hyperthermic**

92:19,23
**hyperventilati...**
128:3,10
**hypoxia** 42:7
54:21 75:20
81:17 93:11,13
93:23 144:3,3
**hypoxic** 93:10

_____
**I**
_____

**i.e** 85:12
**idea** 80:8
**identical** 13:20
**identification**
168:25 176:24
**identified** 4:15
12:4 25:23
26:15 44:4
45:10 46:14
65:21 103:20
116:25 117:3,6
117:7 118:6,7
118:13 134:14
156:16,21
**identifies** 55:7
**identify** 15:10
15:12 117:13
160:6 164:5
**identifying** 15:7
**ignorant** 61:13
**ignore** 171:2
**illegal** 29:19
30:1
**illness** 88:16
**imagine** 120:3
**immediate**
174:19
**immediately**
126:2
**impact** 46:13
116:17
**impacted** 102:6
**impairment**
85:25 172:22

**implemented**
153:6,20
**implicate** 13:10
20:6
**implicated**
13:21
**important** 16:7
21:16 40:4
54:19 57:11
88:13 89:17
90:12 99:20
100:1
**impression** 28:4
61:18 90:3
**improve** 152:7
**improved**
153:14,15
154:2,5
**in-custody**
140:15
**inaccurate**
41:21 114:7,9
164:7
**inadvertently**
128:11
**inappropriate**
34:7
**include** 16:14
17:12 18:4
20:23 106:25
148:4
**included** 21:9,17
66:14
**includes** 8:13
26:4
**including** 124:1
139:25 141:10
**incoherently**
41:1
**income** 118:24
119:3,16,16,20
120:1
**incomplete**
31:23

1.877.385.4268                                            970.385.4268

MICHAEL F. ARNALL, MD

**increase** 47:1,2
47:3
**independent**
36:7 98:20
**index** 9:2 85:3
86:11,17
**indicate** 35:10
48:7 51:22
66:5 77:8 82:3
89:19 103:22
103:23 126:12
144:20 150:6
151:4 169:11
**indicated** 37:7
61:11 66:8,10
80:1 117:14
132:4 168:14
169:15
**indicates** 15:1
54:5 58:13
76:24 87:18
90:11 95:9
**indicating** 72:19
120:13 121:1
167:23
**indication** 34:8
115:6 167:5,16
**indications**
34:11
**indirectly** 33:22
**indisputably**
58:9
**individual** 14:4
21:24 30:10
36:5 42:21,22
44:1,8,10
52:16 53:2,10
57:5 60:9,12
60:15 66:21
70:16 71:25
75:16 79:19
85:2 88:17
115:17 126:15
131:13 160:2

169:13,15
170:22 171:3
174:4,9
**individual's**
88:21
**Individually** 1:5
1:12,12,13,13
1:14,14,15,15
1:16,16,17
**individuals** 6:8
21:6 32:14
33:9,14,15,23
41:24 44:7
52:24 53:6
71:11 80:18,22
81:10 82:7,9
88:13 89:5
92:16,17,24
96:8,19 98:4
100:25 107:24
130:21 160:17
163:2 169:12
**inevitable** 45:13
**inevitably** 10:18
19:17 35:24
151:5
**infectious** 8:19
**infer** 165:18
**inference** 53:9
**inflate** 45:4
**inflicted** 145:13
**influence** 33:10
33:18,25
**information**
5:23 59:10
65:24 115:15
118:11 119:7
159:7
**ingested** 160:19
160:24 161:3
**ingestion** 31:1
31:25 32:2,7
32:17 57:6
161:23

**inherent** 88:14
89:8 158:25
**initial** 28:4 34:5
110:1
**initially** 28:9
167:11
**initials** 14:19
**initiated** 61:3
153:9
**injected** 160:12
**injection** 21:25
22:6,8 23:4,6
24:2,5,8,16
25:13 36:16
37:8 41:10
**injuries** 9:15,21
9:21
**Injury** 145:25
**innumerable**
126:11
**inquire** 14:16
**inquiries** 27:19
**inquiry** 28:6
115:16 159:24
**inside** 122:7
**insomuch** 13:20
16:9 34:3
128:2 130:10
144:1 158:9
**inspection** 12:19
17:17
**inspiration** 52:2
**instance** 17:7
18:8,8 19:4,6
19:14 24:17
36:3 38:25
52:25 54:25
58:9 88:10
93:14 135:9
145:11 170:20
**instances** 44:8
120:8,25
**Institute** 104:22
104:25 105:5,7
**intoxicated**

105:19
**institution**
172:13
**insult** 56:9,10
**intend** 124:11
**intended** 58:19
164:3
**intent** 16:12,19
124:13 133:22
**intention** 71:21
**interact** 145:2
**interaction**
145:3,9 147:10
**intercostal** 45:6
**interest** 179:14
**interested**
118:22
**interference**
85:6
**Internal** 5:22
125:13
**International**
102:25
**Internet** 62:18
62:20 64:1,5
68:21
**internship** 12:1
**interplay** 83:18
**interpret** 12:18
35:16 37:11
82:25 109:23
110:3
**interpretation**
76:3 79:15,16
**interpreted**
100:14
**interrupt** 156:2
**interruption** 9:8
**interstitial** 107:9
**intervention**
152:10 153:20
**interventions**
153:5

140:8
**intoxication**
125:2
**intoxication,'**
170:13
**intravenous**
21:25 22:6,8
23:6 24:2,5,7
24:15 25:9
36:15 37:8
41:10 150:19
151:8,12 168:7
168:13,15,17
171:1,4
**intubated** 44:9
**intubation**
40:19
**intuitive** 111:8
**intuitively** 44:3
**invade** 59:4,19
**invading** 59:1
**investigation** 5:7
23:17 27:8
84:25 130:6
**invited** 132:3
**involved** 52:19
59:9 93:17
137:15,17,19
137:23 138:24
139:19
**involvement**
13:15
**involving** 137:15
**ironic** 128:8
**ironically**
148:20
**irony** 148:25
**irrational** 30:15
39:11,18 43:17
94:10
**irregardless**
43:19,19
**irregular** 168:10
**irregularities**

1.877.385.4268                                                      970.385.4268

MICHAEL F. ARNALL, MD

88:24 130:12
**irregularity**
168:9
**irrelevant** 89:11
**irrespect** 44:15
**irrespective**
43:23 47:21
**irrespectively**
44:18
**irritating** 104:3
**isometric** 22:11
34:17 36:5
45:9,13 47:7
47:13 86:19
101:1 108:4
128:7,16
**issue** 8:17 13:6
13:15 20:18
56:25 58:24
59:23 60:6
82:6 84:2
86:17 87:13
88:3 91:9
92:14 96:3,9
98:20 126:4
142:12 144:1
144:10,11,14
144:16 148:6
152:12 156:11
156:13 159:3
168:5 174:13
174:15
**issued** 143:6
159:1,2 167:22
172:18
**issues** 10:4,13
57:21,23,24
61:7 84:13
98:11 112:8,16
137:11 148:22
168:19
**issuing** 11:5
144:12
**it'd** 28:15 93:16

112:5
**item** 118:10
157:8,16
**iterations**
174:14
**IV** 21:23

_____

**J**

**J** 1:14 6:9
**jail** 140:15,19
**James** 3:18
**Janet** 164:10,11
**January** 99:5
**JASON** 1:13
2:19
**Jefferson** 2:15
**Jeffrey** 38:6
**JEREMY** 1:12
2:19
**job** 35:21 131:11
155:9
**jobs** 119:12
**JOEL** 1:13 2:19
**John** 1:17 3:2
114:18 141:19
155:1,15
173:22 176:14
**Join** 173:2,19,23
**joint** 134:11
**joke** 134:22
**JOSEPH** 1:16
**journal** 5:13,15
6:7 69:2 70:17
71:13 74:6
80:6 97:1,3,4
97:12,21 98:22
99:5 101:16
109:1,2,9
123:22
**JR** 1:15 2:20
**Juan** 2:7
**judge** 10:1,19
39:2 143:16
144:9

**judgment** 33:15
33:23
**July** 25:14 70:25
156:9 159:9
162:4 165:6
**jumped** 129:25
**juncture** 158:22
**June** 159:20
165:14
**jurisdiction** 30:1
31:9,12 57:14
59:14
**Justice** 130:7
131:8,8,19

_____

**K**

**K** 1:15
**K-I-S-S-I-N**
95:4
**K9** 144:19,20
145:1,2,9
146:6
**Karch** 94:13,16
94:20,23,23
107:4,8 109:18
**Karch's** 5:10
94:15,22,24
109:17
**kdoty@mitch...**
2:24
**keeling** 35:4
**keep** 122:16,18
**Kelli** 1:5 159:4
**kept** 41:2
**ketoacidosis**
52:25 53:7,8
**ketones** 53:4,5
53:11
**killed** 133:12
**kind** 51:7 157:3
**kinds** 71:5
**Kingdom** 65:13
65:14
**Kissin** 95:3

**KIZER** 3:14
**kneeling** 79:20
**knew** 14:10,11
54:15 92:1
115:22
**knife** 74:20
**know** 8:13,23
9:18 10:11
11:10 13:8,17
13:18 14:8,12
14:25 15:1,2
20:20,22,23
21:11,15 25:23
27:1 28:11,22
28:23 30:13,25
32:23 33:10
35:2,13 38:2
39:18 40:2
41:2,18 42:6
42:15,16 48:3
48:16,16 49:3
49:11 53:17
54:2 57:14,16
57:16,20,22
73:1 75:5 77:6
80:4,17,19,20
81:13,20 82:7
84:8 88:1
89:24 91:13
92:7,7,16 93:8
93:14,23 94:8
97:5 100:10
104:2,7 105:23
106:20,22
107:5,15,17,22
108:9,14 110:4
110:12,14
113:1 114:9,23
115:12,23
117:9 118:16
118:19 119:3
119:12 121:3,3
122:3,5,12,15
122:21,23,23

122:24 124:15
126:16,20,21
126:25,25
127:2,5 129:7
129:10 136:6
137:20,21,25
139:2 140:7,25
142:19 143:17
143:17,18
144:6,13,16,23
145:5 149:23
151:21 152:15
152:21 155:19
156:13 157:1
157:15 158:12
159:24 160:2
160:25 161:1
162:16 163:25
165:11 168:18
169:17 170:19
170:25 171:3
171:19 172:19
174:7
**knowing** 118:22
**knowledge**
26:16 50:12
56:14,21 60:15
61:1 140:3
145:13 148:19
160:22 172:14
172:17
**known** 33:21
56:15 85:10
**KUHN** 3:8
**Kurtzman** 134:2
134:6

_____

**L**

**L** 2:3,21 179:4
179:22
**L-A-W-N-W-...**
136:20
**LA** 179:2
**Lab** 25:17

1.877.385.4268                                          970.385.4268

MICHAEL F. ARNALL, MD

**laboratory** 8:10
8:12,14 11:20
11:22 51:4,14
54:1 60:11
102:19
**lacerations/pu...**
146:5
**lack** 52:11
143:17 173:16
175:9
**lamentation**
163:2
**largely** 33:12
**Larimer** 130:19
130:21
**late** 5:12 104:3
105:21
**late-term** 133:8
**lateral** 83:24
**latest** 152:8
**law** 10:22 64:15
65:1
**Lawnwood**
129:22 130:3
136:17,19
**laws** 59:16
**lawsuit** 159:14
**lay** 36:25 37:9
42:11
**lead** 18:1 51:15
99:11 144:15
**leading** 169:8
**leads** 72:10 80:9
80:12 81:24
172:22
**learned** 73:9,13
73:15,17 95:17
95:22 97:17
98:23 101:19
103:2 139:5
**leave** 60:14
130:13,19
131:3,6 133:5
134:9 135:1

**leaving** 169:9
**lecture** 111:18
**lectured** 111:18
**lectures** 111:23
**lecturing** 111:17
**led** 16:4 57:2
110:21 130:8
132:6 161:23
174:10,16
**left** 129:13
145:22 146:5
**leg** 108:6
**legal** 5:13 58:23
59:2,4 61:3
101:17 109:3
115:16 138:12
159:23,24
**legally** 30:25
**legs** 46:11 47:4
50:1,3,9
**leisurely** 147:3
**LEMUEL** 1:19
3:13
**length** 59:23
61:24 106:14
166:12
**lesser** 24:20
**let's** 15:14 64:2
64:18 85:15,15
90:18 106:1
108:22 118:2
142:17 152:25
168:21 175:20
**lethal** 9:21
**letter** 12:12 13:2
68:25 69:13,23
73:14,15,16
75:14 129:5,11
**Letters** 4:21
**letting** 157:15
**level** 25:19,21
47:12 48:4
57:2 66:6
73:12,13 88:21

113:20 114:11
116:14,16
127:19 148:12
148:21,24
168:14
**levels** 25:15
**liability** 130:18
133:2
**license** 130:11
137:2
**licensed** 8:6,10
**lieu** 135:2,10
**life-threatening**
42:18
**light** 34:22
78:12 112:24
154:6 164:25
**Likewise** 31:24
**limit** 83:25
**limited** 27:18
140:1 143:5
164:25
**limits** 67:13
**line** 120:24
155:25 178:1
**lined** 120:22
**link** 61:15
**linkage** 23:11,12
23:18
**linked** 57:23
**list** 18:5 21:2
55:3,24 122:22
170:13
**listed** 55:19,20
65:9 67:1
70:23 95:2
152:25 156:16
156:17 177:4
**listen** 38:24
**listened** 98:9
**literature** 5:17
46:15 54:5,9
55:4,6,22,25
58:3,13 62:12

71:9,12,17,23
71:24 72:4,8
87:3 94:18
101:22 103:9
105:11 106:10
107:16 111:1
112:1 166:2,4
166:8,11
169:10,11
174:16
**litigants** 27:11
**litigation** 21:1
27:23 111:9
120:9 132:15
132:17 135:8
138:11 140:4
**little** 81:1 93:5
108:19 120:4
140:1
**live** 52:21
119:13
**living** 9:4 53:15
**LLC** 3:18
**local** 111:18
**locate** 31:19
62:6 104:16
**location** 37:18
**logic** 89:11
**long** 35:7 42:2,6
100:5 150:8
152:13 155:7,8
164:20
**longer** 52:13
128:25 129:16
152:2
**look** 11:23 16:11
17:21 49:2
58:5 68:2 73:2
84:7 92:14
94:1,1,3,3
97:25 107:7
109:16 113:1
167:8
**looked** 10:13,22

10:25 16:8,19
19:23 29:14
73:22 74:21
84:10 92:25
109:17 146:14
**looking** 17:19
22:3 24:3
25:17 31:20
63:24 64:21
65:6,17 82:16
84:24,24 88:5
94:23,24 115:1
117:1,23
124:22,23
125:11,12,22
132:8 145:16
145:17 146:24
157:3 163:2
167:3
**looks** 22:4
**lorazepam** 21:24
22:6,9,9,15,25
23:2,6 24:3,4,9
24:10,18,20
25:12,18 36:10
36:15 37:8
38:17 39:1
40:3 42:8
54:20 55:17
61:4 62:3
88:25 98:21
126:4,7,10
154:1,4 168:6
168:12 171:2,4
**lost** 130:11
**lot** 90:3 140:12
140:23,23
**lower** 146:5
**LSD** 29:23 30:3
30:5 31:2,4,8
31:25 32:2,7
32:18 33:5,8
33:10,11,12,14
33:16,18,21,25

1.877.385.4268 970.385.4268

MICHAEL F. ARNALL, MD

Page 20

39:17 48:2,4
48:11 56:12,14
56:22 57:6
84:24 94:14,16
94:18 95:2,7
109:15,19,22
109:24 110:3,5
124:22 125:2
125:16 127:24
128:9,21 160:6
160:8,11,16,19
160:24 161:1,3
161:9,22,22

**LSD-related**
93:15 95:9
**lumpers** 21:5
170:16
**lung** 4:19 63:4
64:8,25 67:12
67:13,15,19
68:4,12,12
69:17 71:6
157:25 158:17
**lungs** 45:4 51:23
66:22 158:15
163:10
**lying** 79:20
124:17

_____

**M**

**M** 6:5
**M-I-C-H-A-E...**
99:12
**M.D** 1:19
**Macaw** 3:8
166:18,20,20
**maintained**
88:22 89:3
**major** 18:10
**majority** 121:2
140:3
**making** 36:22
41:12 45:11
49:17 58:20

95:21 146:11
**male** 131:22,25
132:24
**malevolent** 77:3
77:6,16,18
78:4,6,12,14
78:17 100:14
100:18 144:4
**man** 124:25
**manifest** 108:2
**manifestation**
108:7
**manner** 9:1 27:8
37:23 43:10,23
45:23 47:21
50:11 57:13,18
57:19,24,25
58:2,16 59:13
60:2 61:16
72:5,17 74:11
74:17 136:10
143:6,7,9
147:3 150:17
151:3
**marijuana**
29:25 31:3,5,7
31:9,11 48:2,3
48:4 161:14,18
**mark** 3:2 62:24
65:20 69:21
72:2 78:25
83:9 95:5
105:21 108:22
114:18 116:8
118:2 125:4,17
141:19 146:25
155:1,15
168:21 173:22
175:20 176:14
**marked** 12:23
16:1 17:20
73:10 78:25
110:11 116:11
117:9 118:6

120:20 121:6
167:9 168:24
176:23
**MARKED/** 4:15
**markings**
117:17,22,24
117:24 118:4
**marks** 145:22
146:8,16,17
**Marty** 3:14 7:9
63:10 114:16
121:9 141:19
179:18
**Marty's** 114:24
**mass** 85:2 86:11
86:16
**massages** 132:3
**material** 157:8
157:17
**materials** 33:6
62:15 77:24
105:11 156:15
158:23
**Matt** 166:18,20
**matter** 2:2 13:17
156:18
**matters** 118:11
118:14
**Matthew** 3:8
**maximal** 72:9
80:9 81:23
96:4,11 102:1
107:24 108:1
110:21 111:11
138:15 166:2
170:24
**maximum** 89:3
99:17
**McDONALD**
3:8
**McIntosh** 3:2
4:7 114:16,18
114:23 115:4
141:19,20,23

155:1,2,4,7,14
155:15,19,23
157:14,16
161:10 162:2
164:12,16
166:13 167:4
173:2,19,22,22
176:13
**McNUTT** 2:22
**MD** 1:23 2:3
3:13 4:4 6:9
7:1 65:7
119:17,19
141:4 177:2,9
179:7
**MDs** 65:9,11
**mean** 22:12
23:23 32:6
37:12 50:8,20
54:14 58:8
59:17 67:1
72:13 81:5,6
82:14 86:22
108:12 109:23
110:3 119:2,16
125:9 139:15
155:24
**meaning** 28:1
51:8 92:8
107:16,17
**meaningful**
40:25
**means** 56:22
91:25
**meant** 18:19
54:15,16
107:19,20
108:11
**measure** 53:1,4
66:3,6,9,12
**measured** 66:15
66:20 75:19
76:23 166:6
**measurement**

42:19 104:5
112:20,22
113:3 163:11
**measurements**
43:6 112:13,13
112:18
**measures** 68:4
102:2
**measuring** 66:23
67:19
**mechanical/po...**
84:1
**mechanism**
74:19 80:13,17
80:21 82:5
87:4,19 90:5
128:4,11
**Med.Sci** 64:14
65:1
**medical** 9:2
10:17 22:3
31:20 34:4
36:13,18 37:22
38:19,22 39:2
39:4,24 40:6,9
40:13,14 42:10
43:1 52:14,22
58:21,23 59:3
59:5 60:9,16
60:18 65:5
69:2 70:19
71:16 83:23,23
84:3 89:14
95:2 97:8
103:9 104:18
111:1,19
112:19,24
114:14 115:2,7
128:4 129:22
130:3 135:14
135:17,20,22
136:17 137:2
138:12 144:8
145:15 146:8

1.877.385.4268                               970.385.4268

MICHAEL F. ARNALL, MD

147:25 148:9
149:10 150:16
153:4,5,19
156:12 161:7
162:17 163:14
164:6 167:3,5
169:14 174:11
174:13
**medically**
151:19
**medically-trai...**
175:5
**medication**
140:17
**medications**
25:12 44:21
**medicine** 5:13
5:22 6:7 8:7,12
10:12 11:12
18:4 21:6 24:7
54:3 56:15
97:1,13 101:17
109:3,9 115:23
125:13 143:18
144:7 170:17
**Medicine,Vol**
5:15
**medicolegal** 5:7
23:16 84:24
119:11,15,20
**meeting** 28:12
28:16 137:8
**meetings** 91:12
**Meghan** 4:23
70:23
**member** 88:23
89:13 121:16
129:20
**members** 172:19
**Memorial** 1:17
3:1 147:4
155:5,16
**memorized**
86:23 88:2

96:7 102:4
**memory** 66:11
66:13,17 67:10
112:7
**Memphis** 2:15
3:9,15
**mental** 88:16
**mention** 20:9
62:3
**mentioned**
14:20 123:22
164:9 175:16
**merely** 26:19
61:3 84:23
126:8,11
129:25 145:18
166:8 174:16
**Merit** 2:4 179:4
**met** 7:9 28:13
62:1
**metabolic** 22:10
34:14,16 41:14
42:23,25 43:4
45:14 52:6,8
52:15 54:3,21
56:6,11,19
60:10 86:17
98:7,16 99:6
99:19 100:1,20
100:23 101:10
101:14 102:18
108:3,7 128:2
128:6 147:10
151:6 152:1
171:5 173:7
**method** 69:15
85:24
**methodology**
55:16 87:12
170:18
**metric** 55:2,23
55:23 103:21
152:15 162:9
164:22 166:10

**metrics** 69:20
162:17 166:3,6
171:24 172:1
**mg** 25:13
**Miami** 134:22
**Michael** 1:23
2:3 4:4 7:1,8
119:17,19
177:2,9 179:7
**Michaelwicz**
99:11
**microscope**
16:11
**microscopic**
15:2 16:8 17:7
48:1 165:4
**middle** 149:12
**Midway** 149:12
**MIKE** 1:14 2:20
**mil** 25:18
**milligrams** 25:9
**million** 132:16
**Milwaukee** 3:19
**mind** 114:19
**minimal** 120:18
137:9
**Ministry** 131:7
131:8,19
**Minor** 1:8
**minute** 104:18
121:10 152:3
152:24 173:20
**minutes** 21:24
21:25 22:1,3,4
22:7 35:13
47:17 89:24
108:5 132:13
135:4 155:9
169:23,23
**Mississippi** 1:1
1:18 2:23 3:3
**MITCHELL**
2:22
**mmacaw@mc...**

3:10
**mmcintosh@...**
3:4
**moderate** 99:18
99:24
**moment** 41:10
116:13 145:16
164:9
**money** 119:9
120:1
**monitor** 88:23
126:6 132:10
132:12
**monitoring**
60:17 89:13,20
126:9 148:17
**morning** 98:10
**morphologic**
8:18 19:24
**morphological**
16:8 19:2,2,8
19:18
**motel** 133:9,10
**mother** 1:7
157:4
**move** 45:2,4,12
45:21 50:1,7,9
51:23 129:22
175:3
**movement** 50:5
**movements** 85:7
**MPH** 6:9
**mphillips@rai...**
3:16
**mucosa** 16:17
**mucous** 16:14
16:17,17 19:14
19:16
**MUELLER**
1:14 2:20
**MULLINS** 3:18
**multiple** 8:24
32:13 41:24
61:22 71:11

84:12 89:16
91:22,23 117:2
118:17 133:19
158:17 170:21
**muscle** 16:15
102:17
**muscles** 45:5,7,9
56:6
**muscular** 44:10
44:19,21,23,25
45:1 52:15
**Musculoskeletal**
145:22
**myocardium**
19:5,7,10
107:10

**N**

**N** 2:11 4:1
**name** 7:7 12:18
65:7,8 97:4,5,5
97:8 115:17
122:21 155:15
159:24 160:4
**NAME-publis...**
97:10
**names** 160:21
**nanograms**
25:18
**narrow** 18:11
**national** 91:12
97:8 104:22,24
105:5,7,18
**natural** 1:7
47:24 57:20
107:1,14,16,17
133:18 134:1
**nature** 46:16
51:9 59:2,3,4
83:18 145:14
147:9 148:25
158:11 168:13
**near** 40:1 57:9
93:15 160:20

1.877.385.4268                                      970.385.4268

MICHAEL F. ARNALL, MD

**necessarily**
68:14 74:10
83:3
**necessary**
117:20 159:3
**neck** 133:19
**need** 15:17
62:25 68:2
84:5 85:18
86:20 87:16
113:10 124:19
125:24 127:8
130:25 155:8
174:2
**needed** 115:19
131:12
**needs** 45:2,4
**negative** 18:15
18:21
**neither** 10:5
48:1 50:24
59:10 134:1
179:12
**Neuman** 85:22
97:23
**neurochemical**
106:25
**never** 9:12 11:17
11:19 33:10,13
38:25 56:15,23
128:9 129:4
130:16 133:4,6
134:7 139:1
**New** 57:17 131:6
131:8 132:19
135:11
**next-to-last** 70:4
**Nichols'** 29:15
**NIH** 5:12 104:23
**nitrogen** 53:6
**NMS** 25:17
**Nodding** 176:8
**non-emergent**
147:3

**non-medical**
57:4
**non-physician**
135:21
**non-trivial**
93:12
**nonsensical** 30:8
**nonuniform**
160:14
**nope** 156:19
157:7 160:1
**normal** 19:4
67:4,9,13 93:1
**normally** 21:2
43:5 51:4
52:19 71:20
99:2
**North** 3:15,19
**NORTHERN**
1:1
**Notary** 2:5
177:21
**note** 40:13,15,24
121:4 169:2
**notebook** 5:19
51:19
**noted** 128:3
**notes** 41:19
105:1 120:19
120:23 121:5
145:18
**nothing's** 134:21
**notice** 5:18
115:25 116:9
116:13,20
**noticed** 128:23
156:15
**notwithstandi...**
24:5 60:10,22
60:23 113:2
142:15 152:4
**November**
179:19
**nuchal** 133:18

134:1
**number** 55:3,23
55:24 141:2
160:2 171:24
**numbered** 31:17
104:16
**numbering**
168:23
**numeric** 95:1
**numerous** 96:8
96:8 124:7
158:14 174:9
174:14
**nurses** 149:4
156:8,14
163:25
**nurses'** 163:12
**nursing** 60:16
60:18 156:4,12

─────────────

**O**

**O2** 113:20
116:14,16
**oath** 7:3 179:6
**obese** 82:9 92:14
92:17 93:3
**obesity** 82:7,10
82:15 93:22
107:13
**object** 37:4 46:6
47:22 48:15
96:17 100:3
106:19 172:24
173:15 175:8
**objection** 161:6
161:25 169:2,8
174:1 175:24
**obligated** 17:11
**obligations**
57:15,15
**observation**
37:11,19 80:18
80:22 88:23
90:8 163:4,17

163:20,22
165:7
**observations**
99:16,23
107:21 156:10
156:13 163:25
**observed** 130:12
164:25
**observer** 111:8
**obvious** 22:10
74:7 89:11
108:2 133:17
152:5
**obviously** 8:9,21
20:25 26:25
39:1 42:20
54:19 57:24
70:16 74:3
75:25 82:20
88:1,8 89:12
91:1 97:5,24
101:6 102:8
107:2,4,6,12
108:7,9 111:8
112:11 118:19
124:5,9 126:20
126:24 130:9
135:12 138:24
145:5 151:19
152:6 154:1,12
163:10 173:5,8
**occasion** 9:14
52:1 124:4
131:21
**occasions** 91:22
91:24 118:17
124:8 133:3
161:4
**occur** 19:9 40:5
90:5 91:3
120:9 127:12
**occurred** 77:3,7
77:16,19,19
78:4,7,12,14

78:18 95:9
100:15
**occurs** 127:18
**October** 2:2
177:4
**odds** 75:23,25
76:4,7 77:11
81:22 86:1,3,5
86:7,9 166:11
**offer** 11:1 156:7
156:7
**offered** 135:11
**offering** 9:22
**office** 15:19
129:20 131:25
132:19,21,22
132:25 135:17
**office's** 133:15
133:21
**officer** 22:3
35:12 36:11,17
38:18 133:14
133:22 134:20
143:20 146:10
148:1,2 168:9
174:25
**officers** 59:18
148:13 149:14
**oh** 11:4 29:15
63:20 76:12,13
84:22 108:16
164:13 166:19
176:20
**okay** 11:6,17
12:3 15:17
17:16 23:25
25:2 26:14
31:17 39:15
61:10,23 62:23
63:1,13,20
64:2,18 65:19
69:21 73:2
75:11 76:11,19
76:21 78:22

1.877.385.4268                                          970.385.4268

MICHAEL F. ARNALL, MD

79:5 81:20
83:9 86:11
94:21 95:16,21
98:14 99:14
101:4 102:12
102:14 104:15
105:21 106:15
108:22 114:2
114:11 117:12
118:24 121:8
122:12 123:5
123:12,14
127:12 132:23
137:6 138:20
141:23 142:3
142:10 150:25
154:22 155:6
157:8 167:16
168:20 170:1,7
171:13 172:2,9
172:11 173:9
173:18,24
175:23 176:1
**old** 5:14 106:11
**Oliver** 1:19 3:13
7:2,11 40:13
40:15,18,19,22
41:4,19 42:4
42:13,14
145:18 167:11
**Oliver's** 37:25
40:21
**once** 120:17
148:8
**one's** 45:2,4,12
94:15 109:22
110:2
**one-by-one**
172:19 174:15
**ones** 52:21 73:10
110:10 123:22
123:23 138:23
158:1
**onset** 21:23 22:8

36:15 52:17
**open** 11:9 68:6
74:22 81:25
**opened** 30:24
145:19
**opening** 32:12
43:15
**operating** 8:17
**opine** 147:21
148:8 151:8
153:3
**opined** 72:14
74:14,16
**opining** 58:18
151:14
**opinion** 8:6 10:2
10:7,19,20,21
11:5 12:14
13:2 20:14
21:7,19,20
23:8,25 24:4,6
24:13,23 25:2
25:6 28:7,9
32:23 36:22
38:11,15,17
40:6 41:22
42:10 43:9
46:5 52:14
53:18,23 54:18
56:13 57:1
58:1 59:20,25
60:3 61:25,25
68:16 69:12
70:16,18 73:18
75:23 83:12
87:25 95:12,13
103:18 104:7
111:7 116:17
117:5 118:19
120:14,15
124:9 127:1,3
127:9 128:15
143:6 144:10
144:11,12,14

144:17 145:6
147:5 150:15
150:25 151:7
152:8,11
153:21 154:6
156:11,13
158:15 159:1,2
159:3 162:6,12
166:1,10
172:18,20
173:5,8 174:18
174:23 175:9
**opinions** 9:22
10:10,17 11:2
13:20 28:2
35:18 39:8,10
62:2,8 70:5
71:14,17
104:13 105:4
105:14 111:9
112:9 113:19
118:12,21
123:8,19 127:4
143:4,8,12,22
150:13 156:7
158:24 163:18
165:1,23 169:4
174:10,13
**opportunity**
17:16 129:22
129:23
**opposed** 62:1,2
135:21
**opposite** 135:13
**orange** 97:4
**order** 45:2,4
109:18 118:11
118:21 158:24
163:10
**ordered** 132:13
135:4
**Orders** 25:12
**ordinary** 79:19
**organization**

131:17
**organs** 17:17
85:6
**origin** 170:23
**original** 26:10
27:19 75:15
179:16
**originating**
26:13
**orphan** 91:13
**ostensibly** 93:10
**outcome** 153:9
**outlined** 16:23
107:8 171:24
**output** 47:2
102:2,11,23
**outside** 14:13
46:23 80:7
111:25
**outta** 135:6
**overdose** 127:18
**overlying** 53:3
**overweight** 85:2
**OXFORD** 1:2
**oximetry** 34:5
34:12 41:13
43:2 53:25
74:14 75:6
76:23 77:4,15
80:5 86:8 90:8
90:11 100:13
103:21 154:9
154:16 162:9
**oxygen** 34:7
42:17,20 43:6
66:6 90:11
93:12 112:10
114:11 154:10
**oxygenation**
162:20 165:21
166:3,6

———————
**P**
**P** 2:11,11

**P-O-S-T** 143:21
**p.m** 40:20 106:4
147:13 153:1,6
153:20 155:12
155:13 176:21
**PA** 2:22 3:2
119:17,19
**package** 12:7,11
12:16 26:3,3
38:5 106:9
117:2,25
123:13 157:2
159:10,11
**page** 4:2,16 5:6
5:8,9,11,12,21
5:22 25:11
31:18,19,21,23
40:15 62:7,7
62:12,16 63:2
63:9,11 64:21
64:22 68:1,16
69:25 70:4
72:5 73:2
75:12,14 76:11
79:9 81:6
82:17 84:15,25
85:19,21 88:10
90:20 94:25
104:16 105:4
106:23 109:10
124:22,23,25
125:6,13
144:18 145:18
145:21 146:4
147:2,12 149:8
149:9,12
150:11,12
160:6 167:8,11
177:5 178:1
**pages** 4:9,21 5:5
31:17 40:18
85:16 104:15
109:5 117:25
**paid** 120:7

1.877.385.4268                          970.385.4268

MICHAEL F. ARNALL, MD

**PAINTER** 1:15
2:20
**pair** 146:15
**palm** 160:7,8
**panel** 93:20,20
93:25
**paper** 15:9
120:22 134:4
**paradoxical**
128:3
**paragraph**
31:23 70:4
85:8,9,19,23
86:3 88:20
94:25,25
104:21 105:16
106:24,24
125:6,15
147:13 150:15
**paragraphs** 86:4
89:25
**paralegal** 7:20
**paralysis** 44:20
**paralyzed** 44:9
44:22
**paramedic**
148:2,5
**paramedics**
148:16,24
154:18
**pardon** 172:9
**Parkes** 4:19
**part** 10:16 21:16
31:24 52:10
68:24 79:9,18
102:13 124:9
126:18 134:5
151:7 157:12
**partake** 33:25
**partial** 90:10
**particular** 8:18
14:2,6 16:10
18:1 42:22
44:5 54:6

55:10 68:11
71:5 82:8
89:10 90:6
91:18 98:19
102:17 103:12
107:11 120:24
125:21,23
126:18 128:10
132:2 147:24
148:16 161:17
163:4 168:8
**particularly**
38:17 48:3
60:16
**particulars**
101:9
**parties** 179:13
**party** 133:1
**pass** 51:24 63:16
93:24 164:24
**passage** 74:21
97:25 99:9
102:4
**passages** 84:12
**patently** 107:20
108:10
**pathological**
165:5
**pathologist** 8:25
13:23 14:2
16:11,24 17:6
21:2 26:20
27:6,14,16,18
27:20,21 35:22
58:15 59:12
90:1 91:6
96:18 107:25
112:11 113:22
113:23 114:8,8
120:15 131:18
134:2 160:13
171:10,11
174:8
**pathologists**

14:5 27:12
28:13 44:4
45:10 54:23
71:19 91:8,11
96:14,20
110:20 124:1
130:4,6 131:10
134:16,18
**pathology** 5:4,6
5:10 8:2,3,3,3
8:16,20,21 9:7
12:4 18:24
23:11,18 26:15
33:13 55:8
57:17 72:19,23
72:24,25 73:6
75:8 80:1
82:17 94:24
95:11 96:3
97:1,13 101:23
103:10 126:14
127:7 131:9
170:8 172:15
**patient** 9:5,18
11:23 16:9
17:8 22:20
37:18 40:22,22
40:25 41:20
42:12,13,13,14
42:23 50:6,7
51:16,21 52:1
54:12 60:14,24
67:12,20 77:10
78:10 83:23
88:19,20 89:2
91:17,18 94:1
100:23 101:9
104:10 126:6,9
136:8 147:20
148:1,5,8
163:6,21,24
**patient's** 39:7
41:19 66:12
**patiently** 141:14

**patients** 9:15,19
9:21 11:22
42:24 43:8,8,8
52:20,21 67:15
119:13 137:25
**paying** 165:19
**payment** 7:21
**pays** 141:3
**PC** 2:14
**PDF** 117:18,20
**pedantic** 80:20
**peek** 63:5
**peer** 94:2
**peer-review**
93:20,20
**peer-reviewed**
69:10 70:17
71:8,9,13,16
71:17,22 73:24
73:25 74:1,6
93:25 97:19
98:25 103:4
**people** 53:14
83:6 87:9 90:3
91:1 92:15
112:8,25 113:6
113:9 122:22
127:21 134:23
**perceive** 27:11
37:13
**perceived** 28:5
**percent** 34:6
42:17 67:1,8
75:6 77:4 80:5
86:8 90:8
113:20 114:11
116:17 120:12
162:20 165:22
**percentage**
119:3,4
**perception**
33:24 35:14,17
47:9,10,11
**perceptions** 33:4

48:19
**perfect** 114:6
**perform** 163:7,9
**performed**
120:6
**period** 22:5 34:5
34:9,17,23,25
35:10,12 36:5
41:25 50:17
77:8,9 78:9
81:15 101:14
103:14 104:8
131:20 132:18
145:10 150:8
152:5 153:7,10
153:11,15,20
162:14 164:23
164:25 169:22
**periods** 108:6
**permanent**
135:11
**perpetrated**
76:25
**person** 9:9 18:18
22:10 23:4
26:23,24 28:5
30:14 32:9,11
33:11,14 35:2
35:12,16 37:10
43:3 44:11,13
44:22 52:13,14
53:16 55:9
60:25 69:18
70:18,23 75:7
77:5,17 78:5,9
81:15,17 83:2
83:3 89:9
92:10,14 93:3
93:4,6 94:9
101:13 102:18
103:15 115:21
122:24 128:9
128:21 135:25
136:3 140:6,9

1.877.385.4268                                        970.385.4268

MICHAEL F. ARNALL, MD

144:15 160:15
165:15 171:5,6
175:5
**person's** 14:6
34:4 69:12,17
70:21,22
**personal** 1:6
120:17 172:14
172:17
**personally** 159:4
164:20
**personnel** 38:3
84:3 128:4
173:12
**persons** 1:9
**perspective**
16:24
**pertained** 138:3
**pertaining** 21:19
59:20 112:1
**pertinent** 121:3
**perturbation**
56:10
**pH** 51:8 53:3
128:15
**Pharmacologi...**
5:20 124:23
**phenethylamine**
48:25 49:7
**phenomenon**
18:25 19:8
98:7
**PHILLILPS**
63:20
**Phillips** 3:14 4:5
7:6,9 9:10
15:25 37:20
40:12 45:15
46:10 47:14,20
48:10,25 51:21
63:11,16,23
64:2,4,7,14,18
64:20 66:1
79:2,5,8,9

84:20 91:5
95:20,23 96:25
97:12 99:11,15
100:6 106:1,5
106:6 108:25
109:6,11,12
114:17,25
115:6 116:8,12
118:2,5 119:8
121:11,13,14
123:3,5,6
125:10,19
128:17 136:23
139:12 140:10
141:13 149:7
155:10 166:16
167:4,20 169:2
169:8 172:24
173:15 175:8
175:15,18,22
175:24 176:4,6
176:11,19
179:18
**philosophically**
141:5
**phone** 2:16,21
2:23 3:2,4,8,10
3:16,20 47:16
141:18 176:12
**photo** 16:1
156:21,24
**photocopy** 15:9
15:14
**photograph**
157:3,4
**photographs**
4:17 29:6
144:24 156:23
156:23 157:5
**phrase** 32:1,6
92:7
**phrases** 30:9
**physical** 17:6,7
17:10 40:17

56:7 88:14
99:6 145:8,21
154:3 163:9
**physically** 44:13
145:2
**physician** 8:6,10
9:11,12,23
10:5 11:3,18
11:19,24 17:11
140:18 163:6,8
168:9
**physician's**
90:13
**physicians** 3:7
8:13 10:20
35:23 87:9
92:5 93:17
149:4 166:21
**physiologic** 34:9
34:22 42:22
43:4 56:8,9,10
83:20 98:11
108:3 151:18
154:13 169:18
170:21 171:1,2
171:7
**physiology**
48:23 56:11
60:17
**picked** 129:16
131:18
**picture** 15:24
132:10,12
**pieces** 36:20
120:22
**place** 91:16
134:14,25
**placed** 79:19
98:4 143:9
160:6,8
**places** 134:16
**placing** 75:16
88:17
**Plaintiff** 1:10

2:13 7:14 12:4
25:23 27:2
115:12
**Plaintiff's** 9:25
12:11 26:4
121:15 123:7
123:18 157:19
**Plaintiffs** 132:25
**plan** 95:12,15
156:7
**PLATA** 179:2
**play** 41:15 124:9
**played** 13:24
23:25 108:5
**playing** 20:7
**PLC** 3:14
**please** 7:7 15:22
31:19 45:17,19
45:22 51:18
63:17 70:7
77:23 79:7
81:19 83:14,16
99:10,22 143:1
155:19 162:11
166:23 168:22
**pled** 130:7
**PLLC** 3:8
**plugged** 19:16
**plugging** 16:14
19:14
**plus** 39:22 65:24
**PMRP** 99:17,24
**point** 18:13
35:25 36:2
54:3 57:7 88:9
91:3 98:3
104:2 111:4
130:5,22
147:15 149:24
152:9 154:8,11
154:12,16,17
158:15
**pointed** 87:7
93:10 111:5

**Pointes** 167:25
168:2
**police** 22:2
30:23,24 32:12
35:11 36:11,17
38:18 39:23
43:16 85:12
133:14,22
134:20 143:9
143:19,20,21
144:23 145:19
145:20 148:1,2
148:12 154:20
161:23 168:9
174:25
**political** 130:18
133:2
**poor** 33:23
**poorly** 107:22
108:16
**Poplar** 3:9
**popular** 33:16
**population** 48:9
**portion** 52:12
87:24
**posed** 20:21
165:20
**position** 22:24
28:5,7 34:14
34:18 45:24
46:14,15 68:5
68:5 72:9,10
75:1,17 77:6
77:17 80:9,9
81:11,11,24
82:8,10 83:24
83:25 85:10,24
87:10,13 88:8
88:17 89:3,10
89:10 90:4,7
91:2 96:4,12
97:22 98:2,4
99:17 100:19
102:1,6,10,21

1.877.385.4268 970.385.4268

MICHAEL F. ARNALL, MD

110:21 111:11
127:1,22 129:2
129:13 130:13
130:19 131:3,6
133:5 134:9
135:12,14,23
162:10,24
163:8 170:24
172:5,22
**positional** 53:20
54:17 61:15
72:10 95:24
96:5,12,22
97:23 110:21
111:13 112:1
138:3
**Positional/Res...**
75:13
**positioning**
99:18,24
150:18 151:3
153:4
**positions** 4:19
63:4 64:8,25
68:5 128:24
**positive** 18:3,13
18:20 130:10
**possession**
160:23
**possibilities**
18:22
**possibility** 16:20
19:3 21:11
80:15
**possible** 15:23
21:9 31:11
38:22 47:8,8
50:8,22 83:25
**POST** 143:20
**Post-Mortem**
12:14
**postmortem**
25:16 29:6
53:1,10

**potential** 24:19
126:21 168:12
**potentially** 68:7
68:12 74:23
**pounds** 76:25
77:5,7,16 78:4
78:18 79:17
92:16
**pp** 5:16
**practically**
148:10
**practice** 5:6 8:6
43:5 52:19
55:8 82:18
112:21 120:17
129:15 148:3
**practiced** 10:5
57:17
**practicing** 11:12
33:13
**pre-mortem**
29:9,10 53:2
53:15
**precipitated**
31:25 32:2,7
32:17 150:20
151:1,4,14,15
**precipitating**
150:18 153:14
**precise** 20:13
112:14
**precisely** 141:8
**precision** 112:14
152:14
**Predicate** 160:5
**predict** 53:2
**predisposed**
47:24
**predominantly**
8:20 131:1
**prefaced** 78:2
**prepared** 14:18
14:22 21:13
77:18 100:17

**presence** 144:3
**present** 49:8
50:17 149:22
158:5,6,18
160:16 162:23
**presentation**
137:8
**presented** 166:9
**pressing** 82:11
**pressure** 44:24
45:1,3,5,11
47:1,3 49:16
49:19 66:3
77:5,17,25
78:4,19 80:3
90:10 144:5
149:8
**prevented**
152:10 153:6
**previous** 8:5
9:13 119:14
124:4,8 131:21
161:4
**previously** 50:21
51:1 113:25
116:24 128:24
**PRICE** 1:13
2:19
**primary** 54:12
119:24
**Principles** 5:6
5:22 82:17
125:11,12
**prior** 9:6 11:21
11:21 43:14
179:7
**Priority** 65:25
**prison** 137:18
138:1
**private** 115:20
**privileges**
136:14,16,24
**probability**
24:20 114:1

153:15 154:4
**probably** 46:20
47:3 60:6 61:5
100:9 107:18
114:4 146:19
159:20
**problem** 43:4
61:3 98:11,18
151:6 152:17
**problematic**
24:2,8,16 44:5
44:6 60:8,13
60:19 61:1,4,6
71:10 113:5
126:6 168:18
**problems** 13:7
137:25 167:23
**procedures**
143:20
**proceed** 60:1
64:19 142:14
142:15 143:1
**proceedings**
179:11
**process** 18:6,14
82:23 108:1,2
**processes** 18:16
**produce** 75:18
79:11 139:11
**professional** 2:5
158:15 179:5
**Professionals**
5:24
**profitable**
136:22
**program** 117:20
**progress** 174:24
**prolongation**
168:3,4
**prolonged** 22:11
22:13 28:14
34:4,9,13,23
34:25 36:5
147:9 169:22

**promised** 124:14
**prone** 69:19
72:9 77:6 80:9
81:11,23 83:25
85:11,13 88:17
96:3,11 99:17
99:18,24 102:1
102:10,21
110:21 111:10
112:25 172:5
172:22
**proof** 79:19
**prosecuting**
9:20 59:9,19
133:16 135:19
**prosecutor**
59:14
**protuberance**
85:4
**provide** 105:20
148:12,13,21
149:3 159:18
**provided** 9:4
12:22 14:13
123:6,17 124:6
148:19,24
157:10 158:23
**provider** 114:14
115:2 145:17
**providers** 36:24
37:6,22 38:8
38:21 162:23
**providing** 39:8
**province** 59:1,17
59:19
**prudent** 158:12
**psychosis** 40:16
128:20
**psychotic**
128:17,19,22
**pub** 137:8
**public** 2:5 120:7
177:21
**publication**

1.877.385.4268                    970.385.4268

MICHAEL F. ARNALL, MD

70:25 73:5
95:8 97:9
102:25 104:24
105:18 109:18
109:25 110:1
**publications**
71:24 103:9
137:6
**publicly** 129:24
**publish** 93:18,19
**published** 22:15
23:3,5 24:22
28:7 38:22
55:4,21,25
58:3 65:1 69:2
71:9,17,23
73:24 74:1,2,6
97:4,11 99:4
104:11 126:15
166:11 174:17
**publishes** 97:3
**PubMed** 64:9,10
**puff** 66:23
**pulmonary**
19:11,13,16,20
19:22,25 60:17
69:20 75:18,19
79:12 80:10,14
81:8,11,25
82:2,4,11,16
83:1 102:15
103:24 104:1,9
**pulse** 34:5,12
41:13 43:2
47:3 53:25
74:14 75:6
76:23 77:3,15
80:4 86:8 90:8
90:11 100:13
103:21 154:9
154:16 162:9
**punch** 63:19
**punching** 68:22
**puncture** 146:16

146:17,25
**purchased**
160:17
**purpose** 7:17
128:9
**purposes** 15:7
36:9 113:19
148:10
**pursue** 59:16
**pursuing** 133:23
**put** 37:15,17
55:2,23 78:20
115:16 120:23
121:2 134:4,8
140:7,9 171:12
171:21
**putting** 77:16
172:4

――――― **Q** ―――――

**QT** 168:3,4
**qualification**
175:9
**qualified** 8:5
120:14
**qualify** 73:17
147:23
**quantify** 150:6
**quantitate**
153:13
**quantitated**
122:15
**quantity** 160:16
**question** 9:13
10:24 11:1
18:19 20:13,21
22:22 34:3
41:5 43:12
45:15 46:3
56:3 60:21
61:2 66:17
67:7 76:14,17
94:7 95:10
96:18 100:4

105:3 110:7,9
113:14,17,25
114:19,24
115:14 136:5
142:13,14
149:2 150:4
152:16 153:24
156:22 161:17
161:21 162:11
162:12 165:13
165:20 167:14
170:15 171:9
171:19
**questions** 45:20
54:11 79:6
126:21,21,23
127:6 141:14
141:16,18
149:7 162:19
162:21 166:14
166:21,23
167:10,19
172:7 175:14
176:11,13,16
179:9
**quick** 94:14
152:1 155:10
**quickly** 151:21
**quite** 31:9,11
32:10 35:11
54:25 83:17
107:10 120:18
151:25
**quote** 169:6

――――― **R** ―――――

**R** 2:11 3:8,14,18
179:18
**R.G** 1:8
**RAINEY** 3:14
**raised** 84:3
**ran** 129:8
130:15,17
132:25

**range** 67:4,9
93:1
**rare** 120:8
**rarely** 82:23
**rat** 56:9
**rate** 46:20,22,23
66:9 141:8,12
**rated** 130:5
**rational** 30:9,14
**reach** 16:4 18:17
40:8 57:11
68:10 69:15
75:5 104:11,13
113:24
**reached** 37:12
37:21 40:8
59:12 62:18
74:10,24 75:1
75:4 76:6
80:23 86:5
111:5 161:11
**reaching** 38:14
103:11
**reaction** 127:18
**reactive** 17:8,12
**read** 10:10,18
12:6,9 20:2,12
25:11,11 26:14
32:20 37:1,3
37:25 38:4,6,7
38:12,16 39:10
61:20,22 68:1
71:2,20 75:10
77:24 81:22
82:20 83:13
84:20 85:9
88:1 89:22,25
90:13 91:11
97:13 99:2,8
99:22 100:7
101:5,11,20
102:3 106:13
106:14 107:4
110:4,14,15,16

124:5,7 149:20
150:23 167:8
168:8 170:11
177:3
**reader** 55:6,11
55:14
**reading** 34:6,12
41:13 43:2
53:25 61:14
68:8 71:25
74:14 75:6
77:4 80:5
82:17 84:17
86:8,22 90:1,8
100:13 106:21
112:10 124:1
124:22 151:11
162:20,24,25
165:21
**reads** 145:22
**reaffirm** 159:2
**reality** 122:19
**really** 10:24
81:14 83:6
**reason** 38:13
41:25 62:5
72:14 81:5,7
81:12 87:18
103:12 105:3
112:20 120:25
126:1 130:1,23
134:4 147:23
154:14 161:18
165:10 173:6
175:5 178:1
**reasonable**
13:23 14:1,5
15:10 22:14,17
42:5 43:16,21
54:5 55:24
80:1 96:14,18
150:16 153:3
**reasonably** 14:3
18:9,22 19:15

1.877.385.4268                                                970.385.4268

MICHAEL F. ARNALL, MD

148:23
**reasoning** 58:6
**reasons** 78:8
  101:7 110:23
**recall** 12:21,24
  14:10,15 26:17
  28:12,14 29:4
  29:8 30:13
  32:21 33:2
  37:14,16 38:8
  49:1 50:15,16
  63:5 66:4,11
  66:13,17 67:10
  67:22 80:16
  82:2,4 91:20
  97:11,24 99:8
  111:22 138:3,7
  138:14,16
  140:5,13,20,24
  149:18 150:1,1
  150:2 157:7
  159:10,11
  160:9 162:21
  163:20 164:19
  167:6 170:17
  172:6
**recapitulate**
  77:12 103:17
**receive** 8:17,23
  9:21
**received** 9:15
  12:7,11,17
  21:24 22:1
  25:24 26:13
  27:3 106:8,9
  106:11 121:24
  122:7 126:24
  129:4 157:18
  159:7 161:7
  175:6
**receives** 171:3
**recess** 47:18
  106:3 155:11
**recklessly** 60:21

**recognize** 26:23
  26:25 73:7,9
  73:15 91:6,7
  95:16,22 98:22
  147:15
**recollect** 50:19
**recollection**
  32:22 33:3
  37:15,16
  146:20,23
**recommend**
  88:25
**recommended**
  126:10
**record** 15:8 22:4
  27:6 36:13,18
  37:3 38:19,21
  38:22 39:2,4
  39:24 63:25
  64:1,3,19,21
  65:21 78:6,21
  99:13 106:5
  112:19,24
  114:21 115:2,7
  117:13 121:10
  121:12,13
  122:18 145:15
  146:8 155:11
  162:17 164:6
  168:23
**recorded** 93:16
**recording** 135:7
**records** 29:18
  31:20 40:9,13
  40:14 104:18
  118:10,24
  122:16 149:10
  161:7 162:3
  163:14 167:5,8
**recount** 40:24
**recounts** 35:12
**recreational**
  127:19
**Redefining** 5:14

106:11
**reduced** 151:23
**reduces** 102:22
**Reducing** 4:22
  70:1
**reduction** 66:25
  67:5,7,12,15
  67:19
**reductions** 68:4
**Reexamination**
  97:22
**refer** 32:1 35:11
  72:10 84:5
  86:24 135:19
**reference** 36:25
  42:12 49:15
  75:11 76:7
  80:8 82:13,14
  82:25 85:16
  87:16 90:19
  94:20 95:8
  110:25 114:14
  122:24 124:18
  124:20,21
  125:20,21,23
  125:24 126:3,8
  126:13,19,23
  127:8 144:23
  145:16,24
  146:16,19,25
  161:18 162:3
**referenced** 13:3
  29:11 53:22
  125:8 126:17
  144:18 160:10
**references** 62:20
  89:16 90:25
  95:6 126:11
  127:5 152:15
**referred** 86:19
  107:4 109:16
**referring** 31:12
  45:24 48:17
  107:2 136:4,6

**refers** 98:16
**refine** 46:10
**reflect** 71:11,14
  71:17,24
  141:15
**reflected** 137:4,7
**reflective** 71:4
**refresh** 112:7
**refreshed** 41:18
**regard** 21:19
  24:12,23 28:2
  72:5 74:24
  75:1 116:20
  143:8 150:4
  156:22 161:21
**regarding** 10:18
  111:10 166:2
  174:14
**regardless** 43:20
  43:20
**Regional** 129:22
  130:3 136:17
**Registered** 2:4,5
  179:4,5
**regular** 52:22
**regularly** 71:2
  96:19,21 103:6
**rehired** 131:14
**reiterate** 100:11
  166:8 174:25
**reiterated** 104:2
**reiterating**
  152:21
**reject** 35:20
  106:18
**relate** 31:1
**related** 31:4
  52:11 60:4
  95:2 119:4,22
  120:6 124:22
  133:18 136:2,7
  136:9 137:18
  137:25 140:16
  140:16 147:1

170:9,24
  179:13
**relationship**
  23:7 42:15,16
  55:12,14 56:19
  56:20 130:4,9
  134:15,17
**relationships**
  23:13,14 55:13
**relative** 25:2
  44:23
**relevant** 27:17
  75:20 79:11
  84:13 85:25
  89:7,15 90:9
  95:10,13
  103:16,23
  127:5
**reliable** 36:21
  73:5
**reliably** 53:2,15
**relinquished**
  129:15
**relinquishing**
  60:24
**rely** 97:15 99:2
  105:19 113:20
**remainder**
  160:23
**remained** 133:2
**remaining** 67:3
  125:19
**remains** 68:5
**remember** 57:8
  61:17 81:6
  84:15 97:10
  139:19 160:4
  167:20
**REMEMBER...**
  2:1
**Remembering**
  49:17
**renal** 53:10
**render** 143:22

1.877.385.4268                                    970.385.4268

MICHAEL F. ARNALL, MD

144:16
**rendered** 156:8
**rendering** 143:8
147:5
**repeat** 112:21
113:5,10,11
114:5,25
142:13 157:14
**repeated** 112:24
112:25 113:3,9
114:3
**repeatedly** 170:1
**repeating** 41:2
114:19
**repetition**
142:14
**rephrase** 149:2
**report** 11:4,10
11:11 12:6,6,9
12:10 13:5
14:11,12,13
20:3,10,23
21:3 25:17
26:4,9,10,11
26:12 28:19,24
29:2,3,11 30:2
31:17,18 32:17
40:7 48:7
53:17 55:6,11
57:7,9 62:6,16
63:3,8,12
64:22 68:3
70:1 72:5 95:3
98:6,17 104:15
105:14 106:7
109:14 110:19
111:1,4 117:8
123:14,23
127:10 128:1
140:25 144:18
146:1,1,4,8,15
146:17,25
147:12 149:9
150:6,12 153:1

156:15,17
160:5 161:14
161:19 171:12
171:22,25
173:9 179:8
**reported** 36:24
125:3 146:6
**reporter** 2:4,4,5
37:3 40:10
44:16 97:7
119:18 128:13
136:18 141:21
142:2,4,6,22
154:25 155:3,7
157:11 164:11
164:13 173:20
173:24 176:5,8
179:4,5,6
**Reporter's** 4:10
**REPORTING**
2:6
**reports** 13:13
26:1,14 118:18
125:16 167:3
**repositioning**
151:22 152:7,9
153:19
**represent**
141:25 155:4
155:15
**representative**
1:6 133:22
**representatives**
27:10
**representing**
7:11
**reputable**
172:12
**request** 116:6
140:11,21
158:10 165:18
**requested** 157:9
157:17 158:7
165:16

**require** 42:19
89:12 106:20
**required** 7:21
9:23 57:18
92:2 139:11
**requirement**
34:6 93:12
**requires** 11:2
**Requiring** 6:8
**research** 69:8
75:14 111:10
**reserving** 176:20
**residency** 12:1
**resign** 135:2
**resigned** 135:10
**resolution** 152:1
152:2 153:13
**respect** 9:13
45:18
**respiration** 22:7
52:12 79:21
84:1 100:20
172:23 175:4
**respirations**
22:20 23:3
168:11
**respiratory** 22:9
22:14,18,19,25
24:11,22 25:3
34:10 40:19
42:8 44:25
45:6 48:19
52:12,17 53:3
53:25 54:20
55:15 60:8,14
60:24 76:22
85:4 86:16
88:7 89:6,17
90:11,14 98:2
98:21 102:7,8
128:5 151:23
151:25 152:2
153:11 154:4
162:7,13 167:5

167:12,16,17
168:6,11
169:16 172:6
173:7
**respond** 43:5
46:17 99:9
171:6
**responded**
167:10
**responding** 89:5
**response** 8:8
20:22 31:6,7
31:11 39:17
47:12 81:4,7
83:20 102:16
133:20 139:20
153:18 165:23
**responsible** 98:3
**rest** 108:5 171:7
**restate** 162:11
**restated** 79:14
79:17
**restrain** 50:8
**restrained** 43:10
43:15,18,18
44:8,11,12
45:23 47:4,21
48:12 49:17
50:11,20 51:1
69:19 74:11
83:7 127:22
136:1,6
**restraining**
44:12 82:23
88:19,20
**restraint** 4:19
6:5,8 41:13
43:21,23,24
44:1,5,6,19,20
44:22 45:8,11
45:13 46:4,7
46:16,20 48:17
48:24 49:23
53:24 54:4,6

54:20 55:2,10
61:16 63:4
64:7,25 68:4
68:11,17 69:16
71:6,10 72:10
72:13 73:23
74:20 80:2,9
81:24 83:3,4
85:10,11,11,24
85:24 86:25
87:5 95:24
96:4,11 97:22
98:1,12 99:6
99:17 100:24
102:1 107:24
108:1 110:21
111:11,23
127:13 136:2,7
136:10,10
137:15,19,23
138:1,7,15,15
138:15 140:16
149:15 150:8
150:18 151:3
151:15,22
153:25 162:10
166:2 170:24
172:5,21
173:11 176:3
**restraints** 4:23
46:1,9,13,21
46:23 48:13,18
48:21 50:3,4
54:7 56:1,5,7
56:18 57:3
70:2 86:18
98:8 101:1,13
128:6 136:8
150:19 151:8
151:13 152:9
153:5,19 173:6
175:6
**restrict** 99:19,25
**restricted** 49:22

1.877.385.4268                                                970.385.4268

MICHAEL F. ARNALL, MD

136:24
**restricting** 81:11
**restriction** 82:15
**restrictions** 68:7
**restrictive** 75:18
**restricts** 82:11
**resulted** 153:21
161:4
**results** 11:22
12:15 34:1
68:11 69:16
75:19 78:16
79:15 96:4,12
**resume** 47:15
**resuscitation**
22:2
**retained** 27:23
138:23 179:16
**retainer** 121:23
121:25 122:7
**retired** 129:20
**retrieve** 62:23
70:7
**retrospectosco...**
163:3
**reveal** 28:7,8
107:1 158:16
**revealed** 133:25
**REVIERE** 3:14
**review** 5:17
12:20 26:9,24
29:18 52:22
56:24 58:25
64:4 67:24
94:3 100:9
103:6 106:6,10
110:9 139:22
156:18,25
157:9,17,20,22
158:10,13,16
159:17 162:3
164:19
**reviewed** 14:22
15:8,15,25

18:24 26:1
28:19,24 29:3
29:6,15 103:7
105:19 110:17
110:17 112:1
117:15 118:11
118:21 139:8
144:20 156:16
156:17,23
157:5,21 158:3
158:14 164:16
**reviewing** 12:21
114:21 128:23
**Reviews** 5:16
109:8
**revoked** 136:24
**revolving** 168:19
**RICH** 1:13 2:19
**RICHARD** 1:16
2:20
**right** 7:15,22
13:11 17:1,4
20:18 23:23
24:12 25:10
26:21 30:3
33:16 38:9
40:13 52:3
53:18 54:9
58:3 59:7,17
61:8,16 63:16
64:12 65:3,11
65:13 68:13
69:13,23 70:2
72:6,18 75:1,3
76:8 78:2
89:21 90:16
91:25 99:12
101:11 102:7
103:11 104:13
110:13 116:1
116:10 117:23
118:1,15
120:21 121:6
123:17,21

128:25 137:12
142:22 145:16
149:17,21
154:9 155:17
157:3 161:16
165:15 166:22
171:15 175:13
175:22 176:17
**Rio** 2:8
**risk** 4:22 47:20
48:8,14 70:1
**risks** 86:14
**RMR** 179:22
**RN** 38:6
**Road** 2:6
**Rob** 134:2
**Roeggla** 6:5
**role** 13:25 20:7
23:25 27:5
35:19 53:20
**room** 2:8 8:17
9:11,12,23
10:5,6 11:3,18
11:19,23,24,24
12:1 28:18
34:20 35:17
37:12 39:7,9
39:13 49:19
50:18,21,25
51:1 78:20
115:16 117:16
128:18 132:8
139:5 147:17
148:6 159:23
159:25 163:16
163:21 175:6
**rooms** 37:10
**Ross** 95:19
**rotation** 131:14
131:15
**rough** 22:11
**routine** 112:19
**routinely** 131:16
**Rowe** 2:3 179:4

179:22
**RPR** 179:22
**rubric** 10:16
**rugby** 108:5,6
**rule** 12:9 14:13
139:14
**ruled** 171:22
**run** 32:9 44:2
129:9 133:3
**running** 30:8,15
32:11 43:15
44:11 46:23,24
46:25 136:4
**runs** 140:15
**rushing** 93:17

_____

**S**

**S** 2:11 3:3 4:14
5:1 6:1
**Safety** 5:23
**salary** 119:11
**sample** 27:17
**samples** 27:18
**SAMS** 2:22
**Samuel** 6:8
**San** 2:7
**saturation** 42:17
43:6 66:6
112:10 113:20
114:11 116:14
116:16
**saw** 16:18,22,25
19:6,8,24
20:12 40:22
41:20 42:4,12
42:13 47:25
156:21
**saying** 42:6 56:9
56:10 78:14,16
88:2 90:24
94:13,15
108:13 114:22
153:18 170:20
173:21,23

**says** 25:24 31:20
31:24 35:24
40:24,24 68:3
75:14 79:18
85:23 90:9
92:20 94:17
104:17 139:15
140:25 171:10
**SCALLORN**
1:13 2:19
**scene** 29:9
148:13 163:6,8
**scheduled**
165:12
**science** 74:4,4
98:22 102:24
**scope** 169:3
**scream** 41:1
52:2,3
**screaming** 37:7
51:22 128:3,10
**scrutiny** 93:24
**se** 26:18 138:1
**seal** 179:17,19
**SEBRING** 1:15
2:20
**second** 5:4 68:15
72:19,23 75:8
90:3 93:21
94:25 107:25
109:7 127:8
133:24,25
134:2 147:13
149:17 151:7
152:24
**secondary** 37:12
54:13,14,16
**seconds** 84:9
**section** 72:17
105:15 160:6
**sections** 158:17
**secured** 50:3
**securely** 146:22
**see** 9:2 11:22

1.877.385.4268                    970.385.4268

MICHAEL F. ARNALL, MD

Page 31

| | | | | |
|---|---|---|---|---|
| 13:6,9 15:21 | 112:12 | **shorthand** 2:4 | 153:14,15 | **smartphone** |
| 16:6,7 18:23 | **sent** 122:5 | 179:5,9 | **signs** 66:12 | 15:24 63:15,21 |
| 19:7,11,14,18 | **sentence** 31:24 | **shortly** 47:16 | 88:24,24 94:4 | **smooth** 16:15 |
| 20:15 25:12,13 | 32:21 79:18 | 82:22 | **similar** 41:23 | **snapping** 174:19 |
| 25:17 30:20 | 83:13 85:9 | **shot** 136:4 | 47:6 118:16 | **sober** 30:9,14 |
| 32:1 39:22 | 98:16 106:23 | 146:12 | 124:4,8 | **socially** 30:25 |
| 42:13 48:6 | 108:19 111:2,3 | **should've** 25:24 | **similarly** 1:8 | **sold** 129:19 |
| 49:5,7,21 | 121:3 | 77:14 | 66:13 143:22 | 160:15 |
| 51:18 58:25 | **sentence-by-s...** | **shoulder** 145:22 | **simple** 113:14 | **solely** 83:17 |
| 62:10 65:15 | 88:2 | **show** 26:11 82:1 | 113:16 | **somebody** 32:24 |
| 68:18 77:24 | **sentences** 108:9 | 94:15 149:20 | **simplify** 171:9 | 35:20 50:8 |
| 84:10 105:1,4 | **separate** 8:15,15 | **showed** 38:5 | **simply** 41:18 | 172:4 175:6 |
| 105:5 113:18 | 57:21,23,23 | **showing** 118:24 | 46:3 110:9 | **someone's** 33:22 |
| 129:17 141:15 | **sequence** 32:23 | **sic** 12:13 48:22 | 146:13 | **son** 156:22,24 |
| 145:7 146:25 | 145:6 | 75:18 82:19,22 | **single** 88:12 | 157:4 |
| 149:16,17,23 | **series** 33:3 | 85:20 86:21 | 156:21 | **sooner** 152:16 |
| 166:23 172:3 | 173:13 | 100:12 150:21 | **sir** 32:4 79:8 | 153:8 |
| **seeing** 32:9 43:7 | **serious** 115:22 | **side** 19:1 47:5 | **sitting** 89:3 | **sorry** 37:1 40:10 |
| **seen** 9:19 15:3 | 145:12,14 | **side-by-side** | **situated** 1:8 | 44:16 63:9 |
| 19:1,13,21 | **seriously** 9:25 | 131:5 | **situation** 60:23 | 85:22 97:7 |
| 20:24 33:8,9 | 10:1,7,19,20 | **sign** 94:10 | 103:17 113:6,7 | 107:15 119:18 |
| 33:11,13,14 | 113:5 | 170:12,18 | 131:24,24 | 125:12 136:18 |
| 36:12 38:9 | **serpiginous** | **signature** | 136:22 163:2 | 152:20 156:2 |
| 40:6,7 78:23 | 16:16 | 176:20 177:1 | **situations** 49:16 | 157:11,12,14 |
| 91:16 115:25 | **served** 116:1 | **Signature/Cor...** | **six-month** | 166:19 172:5 |
| 117:25 158:1 | **SERVICE** 2:6 | 4:9 | 131:14 | **sort** 36:4 124:11 |
| 158:17 159:12 | **services** 83:23 | **signed** 40:15 | **sixth** 31:18 | 152:25 |
| **sees** 16:23 | 115:12 129:19 | **significance** | **slide** 158:20 | **sought** 115:12 |
| **segment** 143:19 | **session** 47:19 | 49:11 67:20,23 | **slides** 4:17 12:17 | **sound** 40:4 |
| **seized** 129:23 | 106:4 155:12 | **significant** 16:21 | 14:17,17,22 | 99:12 |
| **semantics** 13:17 | **set** 53:17 179:9 | 21:8,15,21 | 15:2,4,7,9,11 | **sounded** 10:14 |
| 91:9 103:13 | **setting** 55:15 | 41:14,25 42:22 | 15:14,21,25 | **source** 68:15,20 |
| **send** 121:22 | 80:2 | 42:24 55:18 | 16:4,18,20,25 | 69:25 71:2,19 |
| **senior** 129:20 | **settlement** | 68:3,6,11 | 17:20,23,25 | 160:7,18 |
| **sensation** 32:25 | 132:17 | 69:16 74:12,23 | 18:24 19:12,14 | **sources** 62:13 |
| **sense** 16:6 18:11 | **severely** 33:25 | 80:10 81:24 | 19:21,23 118:7 | **South** 2:22 |
| 28:1,9 30:9,14 | 60:8,13,19 | 92:6,8 96:10 | 157:20,25 | **Southaven** 1:12 |
| 45:1 47:10 | 61:6 | 100:20 120:24 | 158:4,5,6,7,13 | 2:19 141:25 |
| 71:11 72:12 | **Sherry** 2:3 179:4 | 121:1 151:19 | 158:14 | 142:25 143:9 |
| 89:22 90:25 | 179:22 | 153:10 154:17 | **slight** 21:23 | 147:16 |
| 101:12 106:16 | **ship** 129:25 | **significantly** | **slightly** 149:2 | **Southeastern** |
| 128:3,8,9 | **short** 7:9 9:8,9 | 16:12 22:19 | **slowly** 142:18 | 1:18 3:7 |
| 163:8 170:19 | 35:11 47:15,16 | 53:24 54:7 | **small** 134:13 | 166:21 |
| **sensitivity** | 131:9 | 74:15 92:17 | **smaller** 129:15 | **Southwest** |

1.877.385.4268                                    970.385.4268

MICHAEL F. ARNALL, MD

129:14
**speak** 82:6
142:18
**speaking** 9:17
100:9 111:23
148:20 153:12
153:23 160:20
164:10
**specialty** 8:1,9
8:16 131:12
**specific** 16:19
18:13 32:21
33:2 37:15,16
49:21 61:17
63:5 80:17,19
80:21 81:8
82:2 87:4,12
89:19 90:5
91:17 92:12,22
97:25 102:4
105:9,10
109:21 112:8
122:24 124:21
143:9 144:7
145:17 146:19
148:22 163:24
164:1 165:18
168:4
**specifically**
13:12,18 14:15
16:8 20:19,20
23:15 24:9,10
30:7 39:4,18
49:1 56:11,24
61:18 80:14
90:13 97:10,24
98:6 99:8
103:9,16,20
104:6,8,10
110:2 118:20
124:6 139:15
146:14 147:9
149:18 160:9
**specificity**

112:12
**specifics** 100:10
103:19
**specified** 79:17
80:17 170:17
170:22
**specifies** 146:2
**specify** 46:7
69:20 82:4,9
86:25 152:15
**speculation**
21:11 46:9
134:5,7
**SPENCE** 1:16
**spend** 125:24
**spent** 10:11
60:20 122:2,3
122:13,16
**Spitz** 84:25
85:16
**Spitzer** 86:21
**splitters** 21:5
170:16
**spoken** 111:20
159:4 168:5
**spppha** 126:1
**ss** 177:15 179:1
**STACIE** 1:14
2:19
**staff** 9:9 121:16
**stage** 174:20
**stages** 174:23
**stand** 33:7
**standard** 9:23
10:10 11:2
55:8 59:25
61:12,13
112:21 143:23
148:3 149:4
156:7,11,12,14
**standard-of-c...**
61:7 175:9
**started** 33:13
39:24 122:13

130:25
**state** 7:7 22:13
27:7,9 28:5
31:14,24 32:2
32:7,17 53:10
53:15 56:16,17
56:24 57:16
59:9 89:17
104:9 110:20
129:5 133:9
135:21 137:2
138:10 141:3
145:12 146:9
177:15 179:1
**stated** 10:4 13:4
47:25 71:8,18
96:22 98:17
100:22 102:17
103:13 126:5
143:13 148:18
154:1 168:6
170:21 174:10
**statement** 20:11
23:24 42:20
56:25 58:20
68:2,8,9 69:18
72:2 75:21
76:1,2 78:2
79:13,22 81:1
81:20 82:2,21
83:5,11 84:5
86:1 87:15
94:8 98:5
99:21 100:6,8
100:12 101:3,5
101:11 103:13
103:17 104:14
104:17 105:10
108:17 109:21
126:11 146:11
147:3,8,23
148:25 149:13
149:16,17
163:1

**statements**
75:11 81:5,8
81:22 82:1
149:19
**states** 1:1 68:16
84:23 88:11
98:1 124:25
125:2 131:16
145:18 146:4
147:13 150:16
**stating** 80:16
158:2
**statistical** 67:19
**statistically** 68:3
92:6,8
**status** 53:2
102:7,7 147:25
169:14
**stay** 135:13
**staying** 133:9
**Ste** 2:15 3:3,9,15
3:19
**stenographic**
179:9
**stint** 131:18
**stomach** 45:3
**stop** 23:5 132:2
132:5
**stopped** 35:8
52:16 129:6,9
129:11 130:15
130:16 131:22
**straightforward**
24:18
**straining** 54:4
86:18 128:6
**strangle-hold**
140:7,9
**strangulation**
138:18
**straps** 50:13,16
50:23,24
**Stratton** 6:9
176:9

**straw** 151:17
**straws** 151:17
**Street** 2:22 3:3
3:15 65:25
**strength** 101:1
**strenuous** 75:17
**stress** 83:20
**strict** 23:11,12
23:17
**strictly** 9:17
**strike** 146:22
**strong** 55:12
**struck** 146:13,23
**struggle** 22:12
22:13 34:13
43:24 45:13
46:1,4 48:20
54:6 56:7 57:3
57:5 58:10,14
58:15 75:17
88:15 98:8
100:24 152:5
173:11
**struggle,'** 170:13
**struggled** 43:11
43:14 101:13
**struggles** 46:12
**struggling** 35:9
46:19,21 48:13
113:11
**student** 144:8
**students** 111:19
**studies** 25:16
49:5,8 76:3
77:1,9,12,20
85:22 94:22
96:2,6,9
103:22,23
104:11 172:12
**study** 65:5,14
66:1 69:8 71:4
71:7,16 80:24
81:4,5,7,22
**stuff** 172:10

1.877.385.4268                                                970.385.4268

MICHAEL F. ARNALL, MD

**style** 149:10
**subclavian** 25:18
**subdued** 35:16 37:14
**subject** 74:3,9 82:23 111:9 135:8 170:4 175:24
**subjects** 99:16 99:23
**submit** 122:16 122:17
**submitted** 122:1 122:9
**subpoenaed** 26:22 27:2
**subscribe** 97:5
**Subscribed** 177:18
**subsequent** 27:18 28:6,8 79:10 95:6,7 109:18,25 122:1 132:6 133:3 140:17 145:3,10 150:19 151:7 151:12 161:24 174:10
**subsequently** 26:24 120:8
**substances** 13:7 13:21
**substantial** 52:10
**substantially** 38:18 130:1 170:24
**substantive** 150:11
**successfully** 113:8
**sudden** 4:19 6:7

26:7 34:2,8,24 35:1 47:20,24 48:2,8,14 63:3 64:7,24 68:17 73:22 87:21 95:16 98:4 169:6,20,24 173:13
**suffice** 174:1
**sufficient** 40:7 55:3,7,16 107:17 158:23
**sufficiently** 54:8 55:18
**suffix** 65:7
**suggest** 19:2,24 47:23 58:18
**suggested** 19:9
**suggesting** 32:24
**suicide** 57:20
**suicides** 125:2
**summarize** 34:21 126:3
**summarized** 100:10
**summary** 12:13 66:4 79:23,24 124:11 175:3
**summation** 174:17
**superficially** 75:25 77:11
**superior** 148:21 148:24 163:11
**supervision** 147:25 148:2,5
**supervisor** 132:2 132:4,6
**supine** 46:11,14 47:4 83:24 127:22
**supplemental** 26:9
**supply** 62:24

65:19 69:22
**support** 51:15 83:12
**supports** 80:8 87:24 95:12
**suppose** 13:17 46:11
**sure** 42:8 63:23 77:22 95:21 118:3 126:14 128:20 137:5 140:8 153:17 169:16
**surgical** 8:16
**surmise** 11:20
**surprise** 28:16
**surprised** 169:13
**survival** 153:16 154:5
**surviving** 153:22
**Susan** 160:4
**susceptible** 85:3
**suspect** 11:8,15 15:16,19
**suspected** 113:4
**sworn** 7:3 177:18
**sympathomim...** 83:19
**symptom** 94:11
**symptoms** 33:2 94:4
**syndrome** 5:9,13 5:16 73:1 88:11,18 92:4 106:9,11
**syndromes** 107:3
**system** 161:15
**systemic** 157:24 158:5,18

|  **T**  |
| --- |
**T** 4:14 5:1 6:1 12:18
**T-H-A-R-P** 164:14
**Tab** 12:11
**table** 81:21 124:18
**tabs** 117:2
**take** 7:18 15:24 27:17 35:19 41:6 47:15,16 53:16 63:5 78:9,13 81:14 101:10 106:1 107:24 132:10 146:19 152:1 153:24
**taken** 2:7 29:19 29:25 47:18 48:11 73:25 78:15 89:24 106:3 137:1 144:19 155:11 177:3
**takes** 17:6
**talk** 139:15
**talked** 55:12 61:8 80:23 93:8 95:14 109:15 123:16 123:23 127:9 133:15
**talking** 30:8 87:21 89:13,14 94:9 116:13 170:8
**tangentially** 125:8
**Taser** 146:10,12 146:17
**team** 88:23 89:13,14,14
**tedwards@bb...**

2:16
**telephone** 59:10
**tell** 11:17 16:7 22:25 23:1 31:10 32:6 38:9,17 40:1 40:14 60:7 63:7 75:12 80:4 85:18 86:20 93:16 101:4 108:25 119:8 120:4 124:19 133:6 141:2,5 146:14 146:18,24 152:16 160:14
**telling** 83:6
**temperature** 92:22
**temporal** 23:6,9 23:12,19,20,22 55:12,13,14
**ten** 22:3 35:13
**tend** 168:10
**tended** 48:22
**tender** 154:24
**Tennessee** 1:19 2:15 3:9,15
**term** 52:12 59:5 59:5 92:5 135:17 138:9 138:12,13 169:17
**termed** 128:19
**terminated** 39:25 135:1,10
**termination** 129:4 135:2,10
**terms** 21:5 24:7 76:24 102:20
**terse** 21:6
**test** 34:15 51:8 51:14 60:11 75:19

1.877.385.4268                                               970.385.4268

MICHAEL F. ARNALL, MD

**tested** 161:1
**testified** 7:3 8:11
  137:24 140:14
  151:24 159:23
  160:3 161:13
**testify** 7:14
  119:6
**testimony** 38:14
  39:6 124:12
  138:2 140:11
  140:20 141:4
  149:13,24
  152:23 165:2
  173:16 175:1
  177:6
**testing** 8:14 51:5
  51:7 111:10,15
  163:10
**tests** 18:4 19:13
  19:19,20,20
  79:10 102:19
  163:7
**text** 28:7 73:1
  80:6 83:9 84:8
  84:10 85:17
  86:15,21,23
  87:17,24 88:6
  88:25 89:17,18
  90:19 95:17,24
  107:8 125:19
  126:14,16,18
  127:5,8
**textbook** 9:3
  26:6 83:11
  84:13,23 87:6
  87:15 88:4
  94:15,23
  125:12
**textbooks** 10:3
  53:22,23 56:24
  87:13 124:17
  124:20 174:11
  174:13
**texts** 10:13 55:1

62:19 72:1
73:7 81:2 82:6
84:6 86:24
91:1 95:11
123:21 174:17
**thank** 7:25 12:3
  51:20 68:23
  84:19 93:21
  110:13 115:4
  125:7,18
  142:21 150:15
  154:23 166:13
  174:6 176:18
**thanks** 63:13
  157:15 173:24
**Tharp** 36:24
  42:11 164:10
  164:12,14,20
**theoretical** 90:7
**therapeutic**
  25:19 128:8
**Therapeutics**
  5:20 124:23
**therapy** 34:7
  42:20 154:10
**thereto** 177:5
**thermic** 93:5
**thing** 50:6
  133:25
**things** 21:3 42:5
  111:4 116:4
  118:20 152:6
**think** 13:23
  27:21 29:4
  34:7,24 35:1,1
  41:21 45:18,25
  53:20 59:20
  62:7 64:19,23
  79:4 83:12
  86:23 89:25
  90:20,21,25
  91:15 95:10
  96:7 103:8
  104:16 105:7

106:22 107:18
107:20 108:10
109:8 112:5
114:25 115:1
118:9,9 124:17
125:19 136:5
137:19,21
139:12,14,14
145:1 154:5
155:8,25
156:19 159:11
161:20 166:12
169:23
**thinking** 29:4
**third** 5:10 85:8
  98:20 144:18
**thorax** 79:11
**thought** 21:8,16
  76:13,15
  113:14 114:4
  121:1 139:21
**thoughts** 139:24
  140:2
**thousand-dollar**
  7:21,24
**three** 8:9 56:23
  86:3 89:24
  119:24 120:5
  120:17 124:20
  132:12 135:4
**throat** 35:3
**tied** 46:11 85:13
  85:14
**Tim** 2:14
**time** 7:9 8:13,13
  9:4,10 11:21
  11:21,23,23
  22:5,8,15 23:1
  23:3,3,4,5 34:5
  34:9,23,25
  35:8,10 36:12
  36:14 37:8,16
  38:21 40:19,22
  41:25 42:3,14

42:16 43:15
47:14 50:17
58:24 60:20
61:25 66:12,18
77:8,9 78:9
81:15 90:9,15
101:14,20
103:14 104:8
120:4 121:2
122:2,13,16
124:13 125:25
131:20,21
132:18 136:1,8
141:10,10,17
145:10 146:20
150:8 152:9,25
153:10,11,14
154:20 161:9
162:11,14,23
164:23,25
166:16 167:15
174:7
**timeline** 36:21
  41:7
**timeout** 106:1
**times** 61:22
  103:7 122:3
  133:19 164:1
**timestamp**
  36:18 37:11,15
  163:19
**timing** 37:13
  152:12
**Tintinalli**
  125:20,24
**tire** 44:2
**title** 63:5 64:6
  68:16
**titled** 63:3 70:5
**today** 7:11,18
  11:16 12:16
  15:8,16 31:15
  31:16 36:16
  62:15,25 65:19

84:10,11 95:14
105:12 111:5
116:1 117:15
122:14 123:24
151:24 157:1
**TODD** 1:12 2:19
**told** 12:24 56:17
  90:20 92:9
  110:16 112:5
  135:3 139:6
  170:25
**tomorrow** 155:9
**top** 32:3
**topic** 41:22
  72:13 84:11
  85:8 91:13,13
  91:14 96:10,11
  111:6,15,17
  123:25 157:21
  172:8
**topics** 73:8
  111:24 127:6
**Torsades** 167:24
  168:2
**total** 28:17
  154:18
**totally** 153:17
**touch** 84:13
**touched** 143:11
  144:1
**touching** 132:5
**toxic** 57:2
**toxicological**
  48:5 56:22
**toxicology** 8:22
  12:14 24:7
  25:16 48:7
  49:5,8 161:14
**traditional**
  15:12
**train** 35:22
**trained** 10:6
  131:13 143:21
  149:4

1.877.385.4268                                              970.385.4268

MICHAEL F. ARNALL, MD

training 8:21,22
  8:23 10:7 12:1
  54:2 60:16,25
  70:21,22 71:10
  143:18 144:7,8
transcript 177:3
transcription
  179:10
transcripts
  58:25
transfer 147:6
transferred
  147:4
transitioned
  147:16,22
  148:10 154:18
  154:20
transport 83:23
transportation
  148:14
transported
  35:17 143:24
  163:22
trauma 8:23
  43:8 107:1,23
traumatic 108:1
  108:2
treat 52:5,8
  93:12 119:13
  128:9
treating 9:17
treatise 73:9,14
  73:16 95:17,22
  97:17 98:23
  101:19 103:2
treatises 73:18
  123:21
treatment 24:7
  100:12 156:8
triage 153:1,7
  153:10,20
  154:8,16,21
triaged 147:14
  147:21 148:9

trial 124:12
  140:20 141:10
  165:12,14,17
tried 62:23
trier 144:13
trip 30:7 39:17
  48:12
trouble 69:19
Troy 1:6 127:25
  169:19 175:7
true 20:16 41:21
  41:23 73:10
  88:15 100:12
  100:12 177:6
  179:10
truth 167:18
try 11:1 45:20
  82:13,14
  104:16 110:6
  113:15,18
  142:13,17
trying 81:18
Tupelo 2:23 3:3
two 13:15,21
  25:9 26:5
  27:13 42:15,16
  54:19 55:20
  57:14,15 65:9
  68:4 94:22
  106:8 109:16
  119:24 120:5
  120:17 129:15
  130:4,6 137:9
  147:1 151:1
  156:16 161:3
  175:16
TYLER 1:13
  2:19
type 32:12 37:7
  43:20 44:5,18
  45:8 46:4,19
  47:24 48:17,24
  54:6 71:10
  77:3 78:3,17

  85:11 86:19
  115:16 137:22
  146:25 151:22
  168:1
types 18:4 44:6
  44:22 46:9
  47:11 48:18,21

──────────
      U
──────────
UCLA 173:9
  176:6,10
Uh-huh 176:5
UK 65:25 66:1,2
  69:12
ultimate 22:20
  34:10 170:25
ultimately
  150:20 151:13
  151:15 174:10
ultimatum
  158:11
unable 40:25
  66:17
unacceptable
  30:25
uncertain 76:24
unclear 93:24
uncomfortable
  130:8
uncommon
  31:11 158:19
undercover
  134:20
undergoing
  101:1
underlying
  19:25 43:4
  48:23 52:15
  93:6 159:14
  171:2
understand 7:13
  7:17 11:7
  18:18 20:19
  26:18 27:12

  29:25 30:5,23
  32:8 37:5,6
  39:21 41:4,6
  41:11,16 42:3
  42:11 44:3
  57:5 59:6
  60:21 61:6,25
  62:2,3 77:22
  86:24 89:7
  90:1 98:10
  101:2,3,12
  108:20 112:16
  112:17 122:21
  139:3 141:21
  142:2,8,11
  145:8 148:4,6
  148:24 152:23
  154:6 156:1
  158:11 163:15
  163:24 164:2,4
  170:19 171:9
  171:13 176:1
understanding
  19:3 22:16
  30:20,21 35:7
  49:22,24,25
  50:2,5 59:8,25
  60:23 74:4
  115:23 147:24
  148:16 149:21
  160:7,11,18
  165:13
understands
  91:10 138:11
understood
  122:12 153:18
undetermined
  57:20
unequivocally
  100:19
unexpected
  34:24 35:1,4
  48:2,8 169:17
unimpaired

  67:3
uninvited 30:24
  32:12 43:16
unit 145:19
  146:6
United 1:1 65:13
  65:14
University 65:16
  65:25 111:19
  172:12,14,17
  172:21
unknown 125:1
unquote 169:6
unreasonable
  43:22
unresponsive
  82:24
untoward 33:25
unwise 129:9
UPCHURCH
  3:2,2
upper 145:23
upward 85:6
urea 53:5
USA 157:1,2,3
usage 44:23,25
use 4:23 21:6
  23:13 31:5
  32:13 36:20
  43:5 53:5,14
  54:15 55:9
  56:5 59:5 70:2
  92:5,6,16
  124:11 138:9
  146:12 151:22
  152:25 161:18
  165:8 169:17
users 107:7
uses 18:4
usually 131:11
  138:10 140:2
  169:12
uttering 30:9

1.877.385.4268                    970.385.4268

MICHAEL F. ARNALL, MD

Page 36

| **V** | | | | |
|---|---|---|---|---|
| **vacuum** 174:14 | 110:10 117:3 | **wasn't** 10:24 | **website** 70:11 | **wife** 131:14 |
| **value** 41:6 | 117:25 123:13 | 40:2,3 89:7,15 | 72:2 | **WILLIAM** 1:15 |
| **variability** 22:17 | 123:14 126:24 | 112:24,25 | **Wecht** 12:5,12 | 2:20 |
| **various** 117:24 | **Vilke's** 26:9 29:2 | 113:4 114:3 | 12:18 13:10 | **willing** 119:8 |
| **varying** 83:18 | 94:20 | 136:22 137:18 | 14:8,18 20:17 | 157:20,22 |
| **vast** 140:3 | **violent** 58:9,14 | 138:1 140:16 | 20:20 49:5,9 | **Wisconsin** 3:19 |
| **ventilation** | 58:15 88:14 | 145:7 | 115:13,20 | **wish** 60:1 82:14 |
| 80:11 85:25 | **violently** 41:1 | **way** 15:10,12 | 158:6 | 97:25 102:4 |
| **ventilatory** | **Virginia** 172:21 | 21:22 32:16 | **Wecht's** 12:20 | **wit** 2:1 7:4 |
| 98:13,15 99:5 | **visitor** 163:16,20 | 41:17 53:13 | 13:1 99:13 | **withdrawal** |
| 99:19 100:1 | **Vitae** 26:5 117:5 | 57:1 66:8,10 | **week** 7:20 | 140:17 |
| **verb** 27:7 | **vital** 66:12,19,25 | 85:4 107:19 | **weekends** 131:2 | **witness** 4:4 7:2 |
| **verbal** 36:17 | 88:24 | 113:24 142:15 | **weeks** 20:4 | 7:14 15:23 |
| 121:24 | **vitreous** 53:4,5 | 158:17 | **weight** 49:20 | 26:19,22 35:20 |
| **verbalized** 133:4 | 53:11,16 | **ways** 44:12 | 50:24,25 92:25 | 36:25 37:9 |
| 133:6 134:8 | **vocal** 51:24 | 48:24 | 93:1 99:18,25 | 42:11 51:19 |
| **verbose** 21:7,23 | **Vol** 64:15 65:1 | **we'll** 47:15,17 | 102:2 149:14 | 63:14,18,21,24 |
| 147:18 | 109:9 | 65:20,20 69:21 | 150:7,8 165:1 | 64:10,12,16 |
| **verifies** 34:15 | **volume** 4:21 | 72:2 95:5 | **weightlifting** | 79:7 84:16,18 |
| **verify** 36:11 | 66:21 69:4 | 106:5 125:4,17 | 47:7 | 84:21 109:2,5 |
| **Vern** 23:16 | **vs** 1:11 | 142:14 | **weights** 79:10 | 109:8 114:20 |
| **version** 34:17 | | **we're** 7:18 11:15 | **welcome** 68:2 | 118:25 119:3 |
| 44:9 | **W** | 28:14 47:16 | 82:20 | 119:19 120:10 |
| **versus** 36:24 | **wait** 90:3 93:21 | 59:6 78:25 | **Weld** 131:3 | 120:13 128:14 |
| **victim** 85:12 | 107:25 149:17 | 79:2 84:11 | **well-known** 22:9 | 136:19 137:14 |
| **victims** 173:13 | 173:20 | 105:21 118:9 | **went** 9:6 33:3,12 | 139:9 142:12 |
| **video** 29:9 | **waiting** 141:14 | 137:11 176:17 | 64:20 109:17 | 142:20 143:1 |
| **videos** 30:21 | **walked** 30:23 | 176:17,20 | 132:15,19 | 154:24 155:18 |
| 156:16,17,18 | **wall** 45:2 85:5 | **we've** 16:1 17:20 | 133:23 174:19 | 155:21 164:10 |
| **videotape** 39:23 | **wanna** 83:9 | 25:7 36:16 | **weren't** 108:11 | 177:1 179:7,19 |
| 145:5 | 116:8 118:3 | 55:12 73:10 | 124:6 135:1 | **Witness'** 4:9 |
| **videotapes** | 119:3 141:16 | 78:25 80:7,23 | **whack** 172:10 | **witnessed** |
| 78:23,24 | 141:20 170:7 | 81:22 93:8 | **whatsoever** | 173:12 |
| **Vienna** 172:12 | 175:18 | 96:20 105:6 | 59:10 62:3 | **witnesses** 35:18 |
| 172:15,16,18 | **want** 76:10,12 | 107:11 110:10 | 139:3 159:15 | **WITTE** 1:14 |
| 172:21 176:2 | 76:14 77:21 | 110:23 116:24 | 179:14 | **woman** 133:8,16 |
| **view** 103:2 | 81:20 108:19 | 117:6 118:16 | **wheeled** 164:21 | **women** 132:8,9 |
| **viewed** 164:20 | 129:6 130:23 | 120:20 121:6 | **who've** 111:5 | **won** 133:1 |
| **Vilke** 5:14,17 | 146:19 155:10 | 123:23 124:20 | **wide-mouthed** | **word** 32:25 |
| 26:5,6,7,13 | **wanted** 41:18 | 126:4 127:9 | 16:17 | 43:19,20 44:17 |
| 87:17 94:13 | 52:1 76:16 | 139:15 | **widely** 107:12 | 44:18 54:15 |
| 97:23 106:7 | 132:1,2 | **WEATHERF...** | **widespread** | 92:7 |
| 109:13,24 | **wants** 141:7 | 1:16 2:20 | 39:11 | **word-of-mouth** |
| | **warning** 167:22 | **WEBER** 3:18 | **widow** 159:5 | 122:24 |

1.877.385.4268                                                      970.385.4268

MICHAEL F. ARNALL, MD

| | | | | |
|---|---|---|---|---|
| **worded** 106:22 | **X** 4:1,14 5:1 6:1 | **108** 5:14 | 76:11 79:9 | **2007** 99:5 |
| 107:22 108:17 | ——— Y ——— | **109** 5:17 | **17** 5:23 168:24 | **2008** 65:1 161:4 |
| **words** 61:17 | **yeah** 37:4 39:3 | **11** 4:21 5:13 | 169:3 | **2012** 5:13,16 |
| 120:25 | 54:17 62:11 | 108:23 109:6 | **1700s** 172:16 | 109:5 |
| **work** 26:25 | 71:15 90:4 | 109:12 110:11 | **176** 6:6,9 | **2013** 101:25 |
| 111:25 118:25 | 108:15 121:11 | 117:4 176:22 | **177/178** 4:9 | 161:4 |
| 119:1,9 120:12 | 142:23 157:3 | **11:57** 106:3 | **179** 4:10 | **2015** 25:14 |
| 120:16 131:2,7 | 158:10 171:13 | **116** 5:18 | **18** 6:5 25:14 | 159:9 162:4 |
| 140:23,23,24 | 172:9 174:3 | **1164** 4:21 | 156:9 159:9 | 165:6 |
| 141:1 | **year** 119:9,14,25 | **1171** 4:21 | 162:4 165:6 | **2016** 12:12 |
| **worked** 9:11,12 | 120:5,18 | **118** 5:19 | 176:4,23 | 156:9 |
| 11:17,19 91:15 | 159:21 165:14 | **11th** 5:22 125:13 | **18-month** | **2017** 2:2 26:12 |
| 115:17 131:1 | **years** 90:2 | **12** 5:15 109:11 | 131:15 | 29:2 117:8 |
| 134:16 138:24 | 109:25 115:18 | 109:12 110:11 | **19** 5:13 6:7 | 177:4,19 |
| 140:19 160:2 | 119:14,25 | 117:4 176:23 | 109:5 176:7,23 | 179:20 |
| **working** 131:21 | 124:2 139:10 | **12:10** 106:4 | **1992** 173:10 | **20th** 179:19 |
| 141:8 | 160:3 | **125** 5:21,22 | **1997** 6:6 97:23 | **2108** 25:14 |
| **works** 144:2 | **yell** 52:2,3 | **1250** 2:15 | **1998** 4:21 69:6 | **220** 92:16 |
| **worsened** 151:9 | **yelling** 51:21 | **126** 5:9 88:11 | 173:10 | **23** 67:8 |
| **would've** 21:9 | **yield** 141:15 | 90:24 | **19th** 2:1 177:4 | **23-percent** 67:5 |
| 21:17 36:6,6 | **you-all** 117:1 | **13** 5:18 116:9,11 | | **23.8** 67:1 |
| 41:14 43:21 | **younger** 35:22 | **132** 85:20,21 | ——— 2 ——— | **241** 3:19 |
| 45:25 | | **138** 64:14 65:1 | **2** 4:3,19 25:13 | **250** 93:1 |
| **wouldn't** 21:2 | ——— Z ——— | **14** 5:19 25:11 | 64:15 65:1,20 | **2500** 121:22,25 |
| 38:13 47:9 | **Zealand** 57:17 | 118:3 176:23 | 68:1 73:20 | 122:4,6 |
| 86:2 88:4 91:4 | 131:6,8 132:20 | **140** 68:1 | 74:21,25 | **26** 12:9 14:13 |
| 116:19 129:18 | 135:11 | **141** 3:3 | 106:23 118:10 | **27th** 70:25 |
| **wounds** 145:12 | | **142** 2:6 | 150:12 160:6 | **28** 25:14 |
| 145:14 146:5 | ——— 0 ——— | **143** 4:6 | 176:22 | **28th** 26:12 |
| **wrapped** 133:18 | | **15** 4:18 5:20 | **2-1-0-8** 25:14 | |
| **wrist** 85:13 | ——— 1 ——— | 21:24 22:4,7 | **2,117** 5:22 | ——— 3 ——— |
| **wrists** 50:4 | **1** 4:17 15:15 | 125:5 176:23 | 125:13 | **3** 4:21 69:22 |
| **write** 69:13 | 16:1 17:20 | **15-275** 4:18 | **2:30** 176:21 | 73:17 85:9 |
| 117:19,19,20 | 125:14 176:22 | 12:18 | **20** 115:18 160:3 | 145:21 176:22 |
| 171:17,18 | **1-10** 1:17 | **150** 141:6 | 173:10 | **3/22/2021** |
| **writes** 79:10 | **1.6** 132:16 | **150-an-hour** | **20,000** 139:16 | 179:24 |
| **writing** 134:8 | **1:43** 155:12 | 121:21 122:3,8 | **200** 2:15 | **3:17-cv-060** 1:4 |
| 159:7 | **1:50** 155:12 | 141:1,3,7,9 | **2000** 70:25 95:4 | **30** 84:9 85:3 |
| **written** 90:4 | **10** 5:12 12:11 | **155** 4:7 | **2001** 6:7 | 86:12 90:2 |
| 94:23 170:4 | 22:7 105:21 | **16** 5:22 125:17 | **2002** 94:23 | **300** 3:19 |
| **wrong** 154:9 | **10:02** 47:18 | 176:23 | **2004** 9:6 136:17 | **309** 5:6,11 82:17 |
| **wrote** 13:3 | **10:12** 47:19 | **166** 4:8 | **2005** 5:6 9:6 | 84:16,18 94:25 |
| | **104** 92:21 | **168** 5:5,24 | 11:21 43:7 | **311** 5:21 124:23 |
| ——— X ——— | **105** 2:22 5:12 | **169** 5:5 75:12,14 | 82:18 | 124:25 125:6 |

1.877.385.4268                                              970.385.4268

MICHAEL F. ARNALL, MD

Page 38

**316** 4:21 69:4
**330** 3:9
**350** 93:2
**38103** 2:15 3:15
**38119** 3:9
**38804** 2:23 3:3
**3rd** 94:24

---
**4**

**4** 4:22 68:5 72:3
    73:17 79:1
    106:24 145:18
    146:4,4 176:22
**4,000** 91:20
**4.5.4.1.4** 95:1
**400** 28:17
**400-gram** 93:1
**414.224.7697**
    3:20
**43** 5:16 109:9
**48** 64:15 65:1
**4th** 5:7 84:25

---
**5**

**5** 5:4,12,16
    12:12 68:5
    79:4,5 104:16
    109:9 176:22
**50** 3:15 76:25
    77:5,7,16 78:4
    78:18 79:17
**500** 120:1,3
**501** 2:8
**53202** 3:19
**5400** 3:9

---
**6**

**6** 5:6 40:18
    83:10 99:13
    122:6 176:22
**610** 3:15
**65** 4:20
**662.260.6953**
    3:4
**662.842.3871**

2:23
**69** 4:21

---
**7**

**7** 4:5 5:7 40:18
    85:17 167:8,11
    176:22
**7-11** 5:13 109:5
**7/18/2015** 25:14
**7/27/2000** 4:23
**72** 4:23
**731.423.2414**
    3:16
**79** 5:5

---
**8**

**8** 5:9 40:15
    90:18 106:23
    176:22
**8.7** 25:18
**8:33** 147:13
    153:1,6,20
**8:52** 2:9
**80** 108:5
**81301** 2:7,8
**83** 5:6
**832** 5:8 85:1,22
    85:22
**85** 5:8
**897** 109:10
**897-905** 5:16

---
**9**

**9** 5:10 95:5
    176:22
**9:27** 40:20
**90** 5:9 34:6
    41:13 42:17
    43:2 74:14
    75:6 76:23
    77:4 80:5 86:8
    90:8 100:13
    108:4 113:20
    114:11 116:17
    154:10,16

162:20 165:22
    169:23
**901.525.6278**
    2:16
**901.526.0606**
    3:10
**90s** 94:22
**919** 2:6
**95** 5:11 120:12
**98.2** 93:5
**98.6** 93:6