**In the Matter Of:**

# *KELLI DENISE GOODE vs*
# *CITY OF SOUTHAVEN*
# *3:17-cv-060-DMB-RP*

## *ERIN BARNHART*
## *September 20, 2017*



*1st in Reporting, 1st in Service, 1st in Technology*

We Bridge the State and Cover the Nation!
**www.alphareporting.com**
800-556-8974

Erin Barnhart - September 20, 2017

1              IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF MISSISSIPPI
2                       OXFORD DIVISION

3

4    KELLI DENISE GOODE,              )
     Individually, and also as       )
5    the Personal                    )
     Representative of Troy          )
6    Charlton Goode, Deceased,       )
     and as Mother, Natural          )
7    Guardian, and Next Friend       )
     of R.G., a Minor, and          )
8    also on behalf of all           )
     similarly situated              )
9    persons,                        )
          Plaintiff,                 )
10                                   )
     v.                              )   Civil Action No.
11                                   )      3:17-cv-060-DMB-RP
                                     )
12   THE CITY OF SOUTHAVEN, et       )
     al.,                            )
13        Defendants.               )

14

15

16

17   ***********************************************************

18            ORAL AND VIDEOTAPED DEPOSITION OF

19                  ERIN BARNHART, M.D.

20                  September 20, 2017

21   ***********************************************************

22

23

24

25

**Alpha Reporting Corporation**

2

1          ORAL AND VIDEOTAPED DEPOSITION OF ERIN

2    BARNHART, M.D., produced as a witness at the instance of

3    Mr. Tim Edwards, counsel for Plaintiff, was taken in the

4    above-styled and numbered cause on September 20, 2017,

5    from 11:32 a.m. to 1:56 p.m., before Julie R. Borski,

6    Certified Shorthand Reporter, in and for the State of

7    Texas, reported by computerized stenotype machine at the

8    offices of The Lanier Law Firm, 6810 FM 1960 West,

9    Houston, Texas, pursuant to the Federal Rules of Civil

10   Procedure and the provisions stated on the record or

11   attached hereto.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Erin Barnhart - September 20, 2017**

```
                                                              3
1                    A P P E A R A N C E S

2
    FOR ERIN BARNHART, M.D.:
3
         Mr. Matt McCracken
4        DEANS & LYONS, LLP
         First City Tower
5        1001 Fannin Street
         Suite 1925
6        Houston, Texas   77002
         Tel:  832.803.0333
7        Fax:  832.380.2747
         E-mail:  mmccracken@deanslyons.com
8
    FOR THE PLAINTIFF:
9
         Mr. Tim Edwards
10       Mr. Kevin McCormack
         BALLIN, BALLIN & FISHMAN, PC
11       200 Jefferson Avenue
         Suite 1250
12       Memphis, Tennessee   38103
         Tel:  901.525.6278
13       Fax:  901.525.6294
         E-mail:  tedwards@bbfpc.com
14                kmccormack@bbfpc.com

15       Mr. Hiram C. Eastland, III (Via Teleconference)
         Mr. James Garrett   (Via Teleconference)
16       EASTLAND & GARRETT, PLLC
         103 North Lamar Boulevard
17       Suite 204
         Post Office Box 3059
18       Oxford, Mississippi   38655
         Tel:  662.234.0804
19       Fax:  662.510.0804
         E-mail:  he3@eastlandgarret.com
20
    FOR DEFENDANT BAPTIST MEMORIAL HOSPITAL-DESOTO, INC.:
21
         Mr. David Upchurch
22       UPCHURCH UPCHURCH, PA
         141 S. Commerce Street
23       Suite B
         Tupelo, Mississippi   38804
24       Tel:  662.260.6950
         Fax:  662.269.3713
25       E-mail:  dupchurch@upchurchpa.com
```

**Alpha Reporting Corporation**

Erin Barnhart - September 20, 2017

4

```
 1   FOR DEFENDANT LEMUEL DONJA OLIVER, M.D.:

 2        Mr. Marty R. Phillips, Esq.
          RAINEY KIZER REVIERE & BELL, PLC
 3        105 S. Highland Avenue
          P.O. Box 1147
 4        Jackson, Tennessee  38301
          Tel:  731.423.2414
 5        Fax:  731.426.8150
          E-mail:  mphillips@raienykizer.com
 6
          Mr. James R. Gas, Esq. (Via Videoconference)
 7        GASS, WEBER, MULLINS, LLC
          241 N. Broadway
 8        Suite 300
          Milwaukee, Wisconsin  53202
 9        Tel:  414.223.3300
          Fax:  414.224.6116
10        E-mail:  gass@gwmlaw.com

11   FOR DEFENDANTS CITY OF SOUTHAVEN, TODD BAGGETT, JEREMY
     BOND, TYLER PRICE, JOEL RICH, JASON SCALLORN, STACIE J.
12   GRAHAM, MIKE MUELLER, WILLIAM PAINTER, JR., BRUCE K.
     SEBRING, JOSEPH SPENCE AND RICHARD A. WEATHERFORD:
13
          Mr. L. Bradley Dillard, Esq (Via Teleconference)
14        MITCHELL, MCNUTT & SAMS, PA
          105 S. Front Street
15        Tupelo, Mississippi  38804
          Tel:  662.842.3871
16        Fax:  662.842.8450
          E-mail:  bdillard@mitchellmcnutt.com
17
     FOR DEFENDANT SOUTHEASTERN EMERGENCY PHYSICIANS, INC.:
18
          Mr. Loys A. "Trey" Jordan, III (Via Teleconference)
19        MCDONALD KUHN, PLLC
          5400 Poplar Avenue
20        Suite 330
          Memphis, Tennessee  38119
21        Tel:  901.526.0606
          E-mail:  tjordan@mckuhn.com
22

23   ALSO PRESENT:

24        Mr. Trey Solis, The Videographer

25
```

**Alpha Reporting Corporation**

**Erin Barnhart - September 20, 2017**

5

1                                      INDEX

2

3                                                              PAGE

4    Stipulations.............................................2

5    Appearances..............................................3

6

7    Testimony of ERIN BARNHART, M.D.

8         Examination by Mr. Edwards.......................7
          Examination by Mr. Phillips.....................81
9         Examination by Mr. Upchurch.....................89
          Examination by Mr. Dillard......................90
10
          Further Examination by Mr. Edwards..............91
11        Further Examination by Mr. Phillips.............99
          Further Examination by Mr. Edwards.............100
12

13   Changes and Signature.................................104

14   Reporter's Certificate................................106

15

16                                    EXHIBITS

17   EXHIBIT                 DESCRIPTION                    PAGE

18   Exhibit No. 1   Autopsy Report
                     (NO BATES NUMBERS)...................11
19
     Exhibit No. 2   A Guide For Manner of Death
20                   Classification (NO BATES NUMBERS)....44

21   Exhibit No. 3   Toxicology Report
                     (NO BATES NUMBERS)...................47
22
     Exhibit No. 4   Supplemental Report
23                   (NO BATES NUMBERS)...................51

24

25

**Alpha Reporting Corporation**

6

1          THE VIDEOGRAPHER:  Today is September 20th,

2   2017.  The time is approximately 11:32 a.m.  This

3   deposition is being taken at the Lanier Law Firm, 6810

4   FM-1960 West, Houston, Texas 77069.  This is the case

5   number, 3:17-cv-060-DMB-RP, filed in the United States

6   District Court for the Northern District of Mississippi,

7   Oxford Division in the case Kelli Denise Goode, et al.,

8   versus the City of Southaven, et al.  The deponent today

9   is Erin Barnhart, M.D.

10          Counsel, will you please represent

11   yourselves, after which the court reporter will swear in

12   the witness.

13          MR. EDWARDS:  Tim Edwards and Kevin

14   McCormack for Mrs. Goode.

15          MR. UPCHURCH:  David Upchurch on behalf of

16   the defendant Baptist Memorial Hospital-DeSoto, Inc.

17          MR. PHILLIPS:  Marty Phillips and Ric Gass

18   for Dr. Oliver.

19          MR. MCCRACKEN:  Matt McCracken for

20   Dr. Barnhart.

21          MR. JORDAN:  Trey Jordan participating by

22   telephone for Southeast Emergency Physicians.

23          MR. DILLARD:  Brad Dillard via telephone

24   for the Southaven defendants.

25          MR. EASTLAND:  Hiram Eastland and Jim

Erin Barnhart - September 20, 2017

7

1   Garrett attending by telephone for Goode plaintiffs.

2                    ERIN BARNHART, M.D.,

3   having been first duly sworn, testified as follows:

4                    E X A M I N A T I O N

5   BY MR. EDWARDS:

6       Q.  Your name, please, ma'am.

7       A.  Erin Barnhart.

8       Q.  And you are Dr. Barnhart?

9       A.  I am.

10      Q.  You are a medical doctor?

11      A.  Yes.

12      Q.  And as a forensic pathologist -- which is your

13  field, correct?

14      A.  That's correct.

15      Q.  All right.  I assume you've given depositions

16  before?

17      A.  I have.

18      Q.  Okay.  If you don't understand any of my

19  questions, please tell me.  All right?

20      A.  All right.

21      Q.  Okay.  What is your current job position?

22      A.  I'm currently the chief medical examiner for

23  Galveston County.

24      Q.  And how long have you held that position?

25      A.  Since October 15th of 2015.

**Alpha Reporting Corporation**

8

1   Q.  All right.  And so you also live in Galveston?

2   A.  I do.

3   Q.  Since you are more than 100 miles from the

4   courthouse where this case will be tried, we are taking

5   your deposition in lieu of appearance because you're too

6   far for a subpoena.

7         Do you understand that?

8   A.  Yes.

9   Q.  So your testimony here today is if -- is as if

10  you were in a courtroom, right?

11  A.  Yes.

12  Q.  Okay.  Now, before you went to Galveston --

13  you're a chief medical examiner?

14  A.  I currently am, yes.

15  Q.  Okay.  What does that mean?  That it's only

16  temporary or...

17  A.  No.  It means I oversee the office.

18  Q.  And before you took -- you came to Galveston,

19  you were employed by the State of Mississippi medical

20  examiner's office?

21  A.  That's correct.

22  Q.  How long were you there?

23  A.  For almost four and a half years.

24  Q.  And what was your position at the Mississippi

25  ME's office?

9

1    A.   I was deputy chief medical examiner.

2    Q.   Was that your position throughout your four and

3  a half years?

4    A.   It was.

5    Q.   Did you work somewhere before coming to -- to

6  Jackson, Mississippi?

7    A.   No.   Prior to that, I was in training.

8    Q.   Where did you do your training?

9    A.   I completed my pathology residency at

10  University of Texas Medical Branch in Galveston.   I

11  completed my forensic pathology training at Miami-Dade

12  County Medical Examiner's office in Miami, Florida, and

13  I completed a surgical pathology fellowship back at UTMB

14  in Galveston.   After that, I moved to Jackson to assume

15  my position there.

16    Q.   I see.

17          And your field of medicine is -- well, what

18  is your field of medicine?

19    A.   The forensic pathology is a subset of anatomic

20  pathology which deals specifically with the

21  determination of the cause and manner of death.

22    Q.   Okay.   Are there any other medical specialties

23  which focus on the determining cause of death?

24    A.   No.

25    Q.   Is the American Journal of Forensic Medicine

Erin Barnhart - September 20, 2017

1  and Pathology a publication upon which professionals in
2  your field rely?
3      A.   It would -- it's -- it's one of many journals
4  --
5      Q.   Right.
6      A.   -- yes.
7      Q.   Do you consider it authoritative?
8      A.   I actually don't take it myself, but it's --
9  it's a commonly-read journal.
10     Q.   Is it peer -- are the articles in that journal
11  peer-reviewed?
12     A.   I believe some are.
13     Q.   Okay.  Are there journals that -- in your field
14  which you would point out as being authoritative and
15  reliable?
16     A.   Again, there -- there are many journals out
17  there, some better than others.
18     Q.   Is there one upon which you particularly rely
19  or read on a regular basis?
20     A.   No.  I would say it goes on -- on an
21  article-by-article basis.
22     Q.   All right.  You performed the autopsy on Troy
23  Goode; is that correct?
24     A.   I did.
25     Q.   And that was on July 20, 2015?

**Alpha Reporting Corporation**

Erin Barnhart - September 20, 2017

11

1    A.   Yes.

2    Q.   Okay.  And have you reviewed that autopsy

3    report recently?

4    A.   I have.

5         MR. EDWARDS:  Well, so what we'll do is

6    mark that as Exhibit 1.

7         And I'll hand that to you.

8         (Exhibit Number 1 marked.)

9    Q.   (BY MR. EDWARDS)  And you should feel free to

10   rely upon that as needed.  I want to ask you a few

11   things about the report, Doctor.

12        In that report, you note that Mr. Goode's

13   lungs weighed 900 grams and 840 grams?

14   A.   Yes.

15   Q.   That is approximately double the normal weight

16   for a healthy individual?

17   A.   Approximately, yes.

18   Q.   Okay.  Mr. Goode's lungs were much heavier than

19   normal because of buildup of fluid?

20   A.   That's right.

21   Q.   And fluid in lungs can accumulate as a result

22   of asphyxia?

23        MR. PHILLIPS:  Objection, leading.

24        MR. UPCHURCH:  Join.

25   A.   The fluid in the lungs is a very non-specific

Alpha Reporting Corporation

12

1    finding.  I would say probably over half of all of our

2    decedents have pulmonary edema.  Fluid builds up in the

3    lungs as the heart stops beating and as the lungs stop

4    working.

5        Q.  (BY MR. EDWARDS)  Can fluid buildup be a result

6    of asphyxia?

7        A.  It can, yes.

8        Q.  What is asphyxia?

9        A.  Asphyxia is a -- is a general term relating to

10   lack of oxygenation.  It can be due to a variety of

11   mechanisms.

12       Q.  Well, generally when you speak of asphyxia, are

13   you talking about lack of oxygen?

14       A.  Yes.

15       Q.  You also found that Mr. Goode's liver, kidneys

16   and spleen were congested?

17       A.  Yes.

18       Q.  Were they congested with fluid?

19       A.  Congested with blood.

20       Q.  All right.  Was the congestion in his liver,

21   kidneys and spleen consistent with a lack of oxygen?

22       A.  Again, congestion is extremely non-specific,

23   found in the majority of our decedents and would not

24   make me favor one -- one cause of death over any other,

25   really.

Erin Barnhart - September 20, 2017

13

1    Q.  All right.  Do you -- can lack of oxygen result

2  in a buildup of fluid in the liver, kidneys and spleen?

3    **A.  I would -- the heart ceasing to beat in anyone**

4  **will lead to a buildup of blood in the organs.**

5    Q.  All right.  Thank you, but can you answer my

6  question.

7              Would a lack of oxygen -- could a lack of

8  oxygen lead to a buildup of fluid in the liver, kidneys

9  and spleen?

10    **A.  It's possible, but I don't believe it would be**

11  **due to the lack of oxygen specifically.**

12    Q.  Well, certainly a buildup in liver, kidneys and

13  spleen does not rule out lack of oxygen?

14    **A.  It would not rule it out, no.**

15    Q.  Is congestion of internal organs a common

16  finding in asphyxia cases?

17    **A.  It's common in general.**

18    Q.  Is it common in asphyxia cases?

19    **A.  Yes.**

20    Q.  You also noted that there were petechiae.

21              Am I pronouncing that correctly?

22    **A.  Petechiae.**

23    Q.  Petechiae in Mr. Goode's back and lateral

24  torso; is that correct?

25    **A.  I did, yes.**

**Alpha Reporting Corporation**

Erin Barnhart - September 20, 2017

14

1     Q.  Are petechiae a common finding where the

2  individual dies of asphyxia?

3     **A.  They are associated with asphyxia most often**

4  **when they're found in the islets, or the conjunctival**

5  **surfaces, the inner aspects of the eyelids.  They can be**

6  **positional in nature, meaning the dependant portion of a**

7  **decedent can accumulate petechiae.  Again, they're quite**

8  **non-specific.**

9     Q.  Okay.  But my question was are petechiae a

10  common finding where an individual dies of asphyxia?

11     **A.  They're fairly common.**

12     Q.  In your report, you note that findings on

13  microscopic exam of lungs was alternating areas of

14  hyperexpansion in at -- atelectasis; is that correct?

15     **A.  Yes.**

16     Q.  What does that mean?

17     **A.  It's very common and it means that some**

18  **portions of the lungs are overinflated and some areas**

19  **are under-inflated.**

20     Q.  Is it a -- an abnormal finding?

21     **A.  I would -- no.  And -- and it's often due to**

22  **our handling of the lung tissue.  Obviously during**

23  **removal and sectioning of the tissue, we're placing**

24  **pressure on it, so a lot of that may be artifactual.**

25     Q.  Can a finding -- is a finding of atelectasis

Erin Barnhart - September 20, 2017

15

1    and alternating areas of -- with hyperexpansion

2    consistent with oxygen deprivation?

3        A.   I wouldn't say they're associated, no.

4        Q.   Well, is it consistent with oxygen deprivation,

5    those findings?

6        A.   Again, I don't think there's any association

7    between the two.

8        Q.   All right.  Is there peer-reviewed literature

9    that would be at variance with your answer?

10       A.   I have no idea.

11       Q.   Are you aware of any literature that says

12   alternating areas of hyperexpansion and collapse are a

13   common histological finding in cases of asphyxia?

14       A.   I'm not aware of that.

15       Q.   Did you look into Mr. Goode's medical

16   background before signing your report?

17       A.   I was given some medical records from the day

18   that he died.  I don't recall having any other medical

19   records other than -- than those from his terminal

20   admission.

21       Q.   Okay.  And those would have been from Baptist

22   Memorial Hospital --

23       A.   I believe --

24       Q.   -- DeSoto?

25       A.   -- so.

**Alpha Reporting Corporation**

Erin Barnhart - September 20, 2017

16

1    Q.   Was there anything to indicate that Mr. Goode

2  had a history which contributed to or caused his death?

3    A.   Not that I was aware of, no.

4    Q.   There was nothing in his history that would

5  lead you to conclude that a condition existing before he

6  was shackled and chained would have been a substantial

7  contributing cause to his death?

8    A.   No.

9    Q.   You put in your report that the cause of death

10  was, quote, complications of LSD toxicity, right?

11   A.   Yes.

12   Q.   What does that mean?

13   A.   Frankly, it's rather broad and I intended it to

14  mean that the ingestion of LSD was the precipitating

15  factor that led to the series of events ending in his

16  death.

17   Q.   Was the precipitating factor of what events?

18   A.   His death.

19   Q.   Well, LSD does not cause death.

20   A.   I -- I would generally agree with you.

21   Q.   Well, do you know of any situation where LSD

22  toxicity has caused death?

23   A.   No.

24   Q.   None in the literature either, correct?

25   A.   Not that I know of.

Erin Barnhart - September 20, 2017

17

1      Q.  LSD is not addictive, correct?

2              MR. PHILLIPS:  Objection, leading.

3      Q.  (BY MR. EDWARDS)  Is LSD addictive?

4      A.  To my knowledge, no.

5      Q.  Is LSD a stimulant?

6      A.  I'm -- I'm probably not -- not qualified to

7  answer that.  I know it can have some stimulant

8  qualities.

9      Q.  Do you know if L -- that's a bad question.

10             Does LSD cause severe stimulation of the

11 central nervous system?

12     A.  Yes.

13     Q.  It does?

14     A.  To my knowledge, yes.

15     Q.  Can you cite us to any authority on that?

16     A.  Generally the symptoms include psychosis,

17 paranoia, hyperactivity.  Those would -- to me, would

18 seem to be nervous system stimulation.

19     Q.  In your opinion, does LSD have the same

20 physiologic effects as alcohol, cocaine or amphetamines?

21     A.  It's a different class of drugs.

22     Q.  So your answer is, no, it does not have the

23 same physiologic effects?

24     A.  It probably has some overlapping physiologic

25 effects.

**Alpha Reporting Corporation**

18

1   Q.  Like what?

2   A.  **Hyperactivity, hallucinations, paranoia,**

3   **potential psychosis.**

4   Q.  All right.  What about stimulation of -- of

5   aggressive tendencies?

6   A.  **I think that's a possible side effect of many**

7   **substances.**

8   Q.  Can you give us any reference to where LSD has

9   made someone aggressive?

10  A.  **I can't -- I can't cite any sort of case**

11  **report.**

12  Q.  All right.  LS -- LSD is a hallucinogenic; is

13  that correct?

14  A.  **Yes.**

15  Q.  Is it in the same category as drugs such as

16  peyote?

17  A.  **I think so, yes.**

18  Q.  Peyote is a naturally-occurring substance used

19  in religious ceremonies among Southwest U.S. Indian

20  tribes?

21          MR. PHILLIPS:  Objection, leading.

22  Q.  (BY MR. EDWARDS)  To your knowledge?

23  A.  **I'll -- I'll take your word for it.  Yes,**

24  **that's what I've heard.**

25  Q.  Okay.  And same question about psilocybin

19

1   mushrooms.  Is that an hallucinogenic?

2        A.   I believe it is, yes.

3        Q.   Are you familiar with the -- the

4   naturally-occurring drug known as ayahuasca?

5        A.   No.

6        Q.   Is there any scientific evidence that supports

7   the proposition that hallucinogenics from a toxicity

8   standpoint cause death?

9        A.   From a toxicity standpoint, I don't know of any

10  data to that effect.

11       Q.   In contrast, is cocaine known to cause death?

12       A.   Possibly, yes.

13       Q.   Right.  Not always, but there have been many

14  reports of cocaine-related deaths in your profession?

15       A.   Yes, generally in combination with other --

16  other drugs.

17       Q.   All right.  Methamphetamine is another drug

18  which is known among forensic pathologists to be a

19  possible cause of death?

20       A.   Yes.

21       Q.   Are you familiar with the term excited

22  delirium?

23       A.   I am, yes.

24       Q.   And how are you familiar with that?

25       A.   I actually believe that Mr. Goode's death and

Erin Barnhart - September 20, 2017

20

1  the circumstances leading to his death are highly

2  suspicious for excited delirium.

3        Q.  You did not put that in your report, did you?

4        A.  I did not, but I believe that it falls under

5  the heading of complications of LSD toxicity.

6        Q.  Well, do you know Dr. De Maio?

7        A.  I do.

8        Q.  Did you talk to --

9        A.  I'm sorry.

10       Q.  Who sent you a text --

11       A.  I'm sorry.  Not personally.  Let me rephrase --

12       Q.  Okay.

13       A.  -- that.  I know of him.

14       Q.  Have you talked to Dr. Di Maio?

15       A.  No.

16       Q.  Have you seen Dr. Di Maio's book on excited

17 delirium?

18       A.  I believe I have.

19       Q.  Are you aware that Dr. Di Maio says that when

20 there is a forensic pathology diagnosis of excited

21 delirium, that that should be in the report on -- of

22 autopsy?

23       A.  I think you would have to say that on a

24 case-by-case basis.

25       Q.  Well, let me see if I can...

**Alpha Reporting Corporation**

Erin Barnhart - September 20, 2017

1        MR. EDWARDS:  No, let me use that one.

2    Q.  (BY MR. EDWARDS)  Have you seen this --

3    **A.  I have --**

4    Q.  -- text?

5    **A.  -- yes.**

6    Q.  It is Forensic Pathology Second Edition by

7 Dr. Di Maio, and apparently, his brother.

8            There are two of them?

9    **A.  Yes.**

10    Q.  Let me see if I can find this, Doctor.

11            Dr. Di Maio says the -- in the

12 aforementioned cases -- and this is on excited delirium,

13 and you're welcome to look at this.  In the

14 aforementioned cases, the authors suggest two ways of

15 certifying the cause of death.  First is to sign out the

16 cause of death as, quote, excited delirium, unquote, and

17 then list, quote, struggle, unquote, quote, cocaine

18 intoxication, unquote, et cetera, as contributory

19 causes.

20            The other way is to sign out the cause of

21 death in a descriptive manner, for instance,

22 cardiopulmonary arrest during violent struggle and

23 individual under influence of cocaine, alcohol, et

24 cetera.

25            Do you agree or disagree with Dr. Di Maio?

**Alpha Reporting Corporation**

Erin Barnhart - September 20, 2017

22

1    A.   I think it's a fine suggestion.   I don't think

2  he meant -- intended it to be an order.

3    Q.   Okay.   Why did you not list excited delirium as

4  a cause of death?

5    A.   Frankly, because Mr. Goode did not have a

6  recorded fever that I could find in his medical records.

7  If there had been proof of hypothermia, I think I would

8  have gone that route.

9    Q.   Well, you bring up a good point.

10         Doctor -- Dr. Stratton, who is one of the

11  people referenced by Dr. Vilke who has been disclosed in

12  this case, says that hypothermia is invariably present

13  in cases deemed to be cases of death caused by excited

14  delirium.

15         Do you agree or disagree?

16    A.   I -- I think generally it is a feature which

17  is, again, why I didn't call this excited delirium.

18    Q.   No, I'm sorry.   Doctor -- Dr. Stratton, relying

19  upon some articles or some writings by Dr. Karch -- are

20  you familiar with Dr. Karch in Great Britain?

21    A.   I believe I've heard of him, yes.

22    Q.   Okay.   Dr. Stratton and Dr. Karch say that

23  invariably, hyperthermia is present in cases deemed to

24  be those of death caused by excited delirium.

25         Do you agree or disagree?

**Alpha Reporting Corporation**

23

1          MR. PHILLIPS:  I'll object to the

2  statements of counsel and the lack of foundation.

3          MR. EDWARDS:  Okay.

4    **A.  Generally I agree, which is, again, why I did**

5  **not call this excited delirium.**

6    Q.  (BY MR. EDWARDS)  All right.  What -- what

7  findings other than -- what findings were there that

8  would have even raised excited delirium as a cause of

9  death, in your mind?

10    A.  The circumstantial information regarding his

11  behavior, which was -- seemed to be hyperactive, loud

12  and incoherent shouting, paranoia, possible aggression,

13  erratic behavior, all of which reportedly occurred

14  subsequent to the ingestion of a drug, I think, would

15  make any forensic pathologist very suspicious for

16  excited delirium.

17          MR. GASS:  Tim, this is Ric Gass.  Could

18  you give us the page you were quoting from in Di Maio,

19  please.

20          MR. EDWARDS:  504.

21          MR. GASS:  Thank you.

22          **THE WITNESS:  Would you mind if I looked at**

23  **that book?**

24          MR. EDWARDS:  You may look at anything you

25  like.

Erin Barnhart - September 20, 2017

24

1          THE WITNESS:   Thank you.

2               MR. EDWARDS:   Uh-huh.   And I should say,

3   Doctor, any time you want to see anything, you are

4   certainly welcome to do it, so please just tell me.

5       Q.  (BY MR. EDWARDS)  Dr. Vilke in some of his

6   writings -- first of all, let me ask you this.

7               Is the Journal of Emergency Medicine one

8   with which you are familiar?

9       A.   Honestly, I'm not very familiar with journals

10   and other specialties.

11      Q.   Okay.  Well, Dr. Vilke wrote that -- about

12   excited delirium, "Most of these cases were found to be

13   associated with the introduction and abuse of cocaine in

14   North America.  Since then, this connection between

15   excited delirium and cocaine has continued.

16   Additionally, excited delirium has now been recognized

17   to occur in association with other elicit drugs of

18   abuse, particularly cocaine, methamphetamine and PCP, as

19   well as with certain types of mental illness and their

20   associated treatment and medications."

21              Would you agree or disagree with Dr. Vilke?

22      A.   I would agree.

23      Q.   Okay.  Dr. Vilke -- well, let me ask you this.

24              Are you aware of any situations, cases,

25   literature, that says LSD is a cause of excited

**Alpha Reporting Corporation**

Erin Barnhart - September 20, 2017

25

1  delirium?

2      A.  Not specifically, but I have heard it mentioned

3  in association with excited delirium.  I feel confident

4  that -- that some case could be found.

5      Q.  Do you know of any?

6      A.  No.

7      Q.  What is the mechanism by which excited delirium

8  causes death?

9      A.  I don't know that it's known exactly, but it's,

10  I -- I think, known to -- or thought to be

11  neurologically mediated in combination with ill effects

12  on the heart resulting from things like catecholamine

13  release and electrolyte disturbances in the body.

14      Q.  Did you check Mr. Goode's catecholamine level?

15      A.  No.  Postmortem catecholamines are not

16  reliable.

17      Q.  Okay.  Can you direct us to any authority that

18  says LSD has an impact on the heart?

19      A.  I wouldn't know who to direct you to to answer

20  that.

21              MR. JORDAN:  And I apologize, folks.  Our

22  siren is just going off here.  This is Trey Jordan.  Is

23  this -- is this impacting your ability to hear?

24              MR. EDWARDS:  It's rather a nuisance, yes.

25              MR. MCCRACKEN:  It's not for whom the bell

Alpha Reporting Corporation

Erin Barnhart - September 20, 2017

26

1  tolls.

2          MR. JORDAN:  I'm just going to cover up the

3  phone.  Sorry about that.

4          MR. GASS:  Trey, don't you have a mute

5  button you could push?

6          MR. EDWARDS:  Okay.

7      Q.  (BY MR. EDWARDS)  Doctor, did you consider the

8  fact that Mr. Goode was hog-tied, also known as maximal

9  restraint, as a complication of LSD?

10     **A.  I'm sorry.  Can you re-ask the question.**

11     Q.  Yes.

12          In reaching the conclusion in your report,

13  did you consider the fact that Mr. Goode was hog-tied in

14  maximal restraint as a complication of LSD?

15     **A.  I -- I considered it in my -- I definitely**

16  **considered it.  I believe in part, that is encompassed**

17  **under this umbrella of complications of LSD toxicity.**

18          **So, yes, I would say -- if -- if the**

19  **question is do I include that underneath this umbrella**

20  **of complications, I would say yes.**

21     Q.  Okay.  And how was it, in your opinion, that

22  the hog-tieing contributed to his death?

23     **A.  I -- I think --**

24          MR. DILLARD:  This is Brad Dillard.  I'm

25  going to object to the use of the term "hog-tied."

Erin Barnhart - September 20, 2017

27

1            MR. EDWARDS:  Well, your experts have --
2    who have been disclosed refer to it as "hog-tide."
3            MR. DILLARD:  I made my objection.  Thank
4    you.
5            MR. PHILLIPS:  I'll object as lacking
6    foundation for the question also.
7       Q.  (BY MR. EDWARDS)  Go ahead, Doctor.
8       A.  I'm sorry.  I --
9            MR. DILLARD:  The same objection.
10      A.  -- forgot the question.
11      Q.  (BY MR. EDWARDS)  Yeah.  How, in your opinion,
12   based upon a reasonable degree of medical certainty, did
13   the method of restraint known as maximal restraint or
14   hog-tieing, also in a prone position, contribute to the
15   death of Mr. Goode?
16      A.  I'm not sure that it did contribute.  I think
17   that the -- the part of it that I considered was the
18   fact that it could have led to increased agitation,
19   increased psychosis, increased metabolic demands on the
20   body, which would have worsened his excited delirium,
21   potentially.
22      Q.  Right.  Okay.
23            Is it your experience that somebody that is
24   bound in such a fashion is typically in a quite excited
25   state?

**Alpha Reporting Corporation**

28

1    A.   Yes, I think that would go without saying.

2    Q.   Is that what we lay people might call the

3  flight-or-fight syndrome?

4    A.   I think so.

5    Q.   Okay.  Now, following on up, the agitation

6  increase caused by the method of restraint would have

7  what physiologic effects?

8    A.   I don't know that I can say exactly.  I think

9  that probably depends on the individual.  It depends on

10  the environment.  It depends on a host of other factors,

11  if they have natural illness, if they're intoxicated, if

12  they're on drugs.

13        But, again, I think -- I think the

14  potential for increased catecholamine release, increased

15  stress on the heart, is -- is a possibility.

16    Q.   From the method of restraint?

17    A.   Or from just being restrained in general.

18    Q.   Well, have you ever dealt with a case involving

19  a decedent who had been restrained in a hog-tied

20  fashion?

21    A.   I feel certain that I have, but I can't think

22  of a specific case.

23    Q.   What, from your point of view, would have been

24  the situation with Mr. Goode's breathing immediately

25  preceding death?  Would he have had agonal breathing?

Erin Barnhart - September 20, 2017

29

1         MR. UPCHURCH:  Object to the form.

2    **A.  No, I can't say that he definitely would have**

3    **had agonal breathing.**

4    Q.  (BY MR. EDWARDS)  Would he have simply stopped

5    breathing, going from normal breathing to stopping

6    breathing?

7    **A.  I think that's probably more likely, but,**

8    **again, I -- I -- I can't be certain.  I wasn't there.**

9    Q.  So you can't say to a reasonable degree of

10   medical certainty whether or not he went through some

11   transitional phase from being healthy to dead?

12   **A.  I don't think I can, no.**

13   Q.  All right.  What about his heartbeat?  Do you

14   have an opinion as to whether immediately preceding

15   death, his heartbeat would have been in sinus rhythm or

16   in arrhythmia?

17   **A.  I would expect there to be arrhythmias in**

18   **anyone who's actively dying, so to speak.  But I can't**

19   **say what -- what type of arrhythmia he would have had,**

20   **no.**

21   Q.  Do you have any evidence that he was in

22   arrhythmia well before his death?

23   **A.  I don't recall any of that specifically.**

24   Q.  Did you receive the records from the emergence

25   -- emergency medical services?

**Alpha Reporting Corporation**

Erin Barnhart - September 20, 2017

30

1      A.   I -- I think I did, but I can't be certain.   It
2    was a long time ago.

3      Q.   If the EMS had recorded SVT, supraventricular
4    tachycardia, would that be of significance to you in
5    your professional capacity?

6      A.   It wouldn't change anything about my diagnosis.
7    It -- it means that his -- his heart was beating very
8    fast, which under the circumstances, I don't think is
9    surprising.

10     Q.   Did you review the monitoring of his heart rate
11   while he was at Baptist Hospital?

12     A.   The actual EKG strips?

13     Q.   Yes.

14     A.   I would not have, no.

15     Q.   Did you review the monitoring of his blood
16   oxygen saturation while he was at the Baptist Hospital?

17     A.   Again, I did review some medical records, but I
18   don't recall -- I'm not sure if it was all of them.

19     Q.   Well, did you see any monitoring of his blood
20   saturation?

21     A.   Not that I recall.

22     Q.   Is that something which you would have liked to
23   have seen in order to reach your opinion?

24     A.   It would be helpful.

25     Q.   I believe that -- do you know Gary Vilke?

**Alpha Reporting Corporation**

Erin Barnhart - September 20, 2017

31

1      A.   No.

2      Q.   You mentioned agitation, acidosis and maybe

3  something else as a result of excited delirium; is that

4  correct?

5      A.   I did not mention acidosis.

6      Q.   You did not?

7      A.   No.

8      Q.   All right.  Is acidosis a complication of

9  excited delirium?

10     A.   I wouldn't say so specifically.  That's more of

11  a metabolic derangement.

12     Q.   Okay.  So can this concept of excited delirium

13  cause acidosis?

14     A.   Probably, but I -- I -- that's -- it's not

15  something that I would rely on to make the diagnosis.

16     Q.   Can excited delirium be managed with standard

17  medical interventions?

18          MR. PHILLIPS:  Objection, lack of

19  foundation, lack of qualification and beyond the scope

20  of her role as a forensic pathologist.

21     Q.   (BY MR. EDWARDS)  You may answer, Doctor.

22     A.   I don't treat live patients.

23     Q.   So do you -- do you not know one way or another

24  as to whether excited delirium is treatable medically?

25     A.   No, I really don't.

Alpha Reporting Corporation

Erin Barnhart - September 20, 2017

32

1    Q.   Okay.  Does everybody in excited delirium die?

2    A.   I'm not sure that all do; but I know that if

3    not all, then a very, very high percentage of people do.

4    Q.   A very high percentage?

5    A.   I guess what I'm saying is there may be some

6    people who have survived excited delirium.  I have not

7    heard of any of those cases specifically.

8    Q.   Well, if Dr. Vilke says it's less than 10

9    percent death rate in people with excited delirium,

10   would you take issue with that?

11   A.   No.  And, again, I'm probably getting into an

12   area that I -- that I'm not an expert in.  I'm not sure

13   what the survival rate is.  Because, again, I only see

14   people who haven't survived things.

15   Q.   Okay.  But you do agree that tactile hyper --

16   hyperthermia is always associated with excited delirium?

17   A.   I'm not sure that it always is, but to my

18   knowledge, it generally is.

19   Q.   Would you argue with the statement that it is

20   invariably associated with excited delirium death?

21   A.   I don't know that I would argue with it.

22   Q.   All right.  And in your report, you indicated

23   that Mr. Goode was restrained after a struggle; is that

24   correct?

25   A.   In the opinion section?  Yes, I did.

Erin Barnhart - September 20, 2017

33

1    Q.  All right.  And how did you come to have that
2  information?
3    A.  The information that I had, or would have had,
4  I believe, at the time of autopsy would have come from
5  the investigator -- who in Mississippi is the coroner --
6  and then potentially EMS reports, police reports and
7  medical records.
8    Q.  Well, what was the struggle which was related
9  to you?
10   A.  As I recall, he was running around in a parking
11 lot.  I think there was even an attempt to taze him
12 which failed.  And I guess, frankly, part of it is the
13 assumption that if you end up restrained on a gurney,
14 there was a struggle to get you onto the gurney.
15   Q.  An assumption?
16   A.  I -- I don't recall specifically what
17 information I had and from whom, but simply that he did
18 struggle with law enforcement officers who were trying
19 to, I guess, take him into custody or take him to the
20 hospital.
21   Q.  How many law enforcement officers did it
22 require to subdue him?
23   A.  I don't have any idea.
24   Q.  In these cases of excited delirium where they
25 talk about super human strength, it typically takes,

**Alpha Reporting Corporation**

Erin Barnhart - September 20, 2017

34

1   what, six, seven, eight officers to subdue those people?

2       A.   Oh, I would say it depends on the person being

3   subdued and probably -- probably what drugs they're on.

4       Q.   Certainly cocaine is a drug that would cause

5   one to become in an excited agitated state?

6       A.   I would think so, yes.

7       Q.   Yeah.  And cocaine is one which you have seen

8   or have seen reports of that caused the person to be --

9   to be aggressive towards police?

10      A.   Yes.

11      Q.   Mr. Goode was a small man?

12      A.   He wasn't small, but he was not -- he wasn't --

13  he certainly wasn't obese.  A hundred and seventy

14  pounds, 72 inches is what I have.

15      Q.   Where did you get 172 pounds?

16      A.   We would have weighed him at the morgue.

17      Q.   All right.  Now, you noted in here in your

18  report I'm still referring to, that he had some

19  abrasions on his right cheek and chin; is that accurate?

20      A.   Yes.

21      Q.   Was it reported to you where he got those?

22      A.   No, I don't believe so.

23      Q.   Let me back up to the struggle thing.

24           Was it reported to you that Mr. Goode was

25  threatening the police officers?

Alpha Reporting Corporation

35

1    A.   I don't recall having that information, no.

2    Q.   Was it reported to you that Mr. Goode was

3  unarmed?

4    A.   I don't know that that was specifically

5  reported to me.  I didn't -- I was never told that he

6  was armed.

7    Q.   All right.  In your report, going back to the

8  opinion section, you specifically noted that emergency

9  records indicate the body temperature was normal?

10   A.   I did.

11   Q.   And the reason you did that is because that was

12  a finding -- if his body temperature had been elevated,

13  that would be a finding that is invariably associated

14  with excited delirium?

15   A.   I included that -- generally, I include my

16  opinion section to serve as sort of a -- a general

17  outline of my -- or a general summary of my thought

18  process in order for -- if another doctor comes behind

19  me and reviews my report, to know what I was thinking.

20  And I know that probably if they had the case

21  information, their question would be why didn't she call

22  this excited delirium.  So I -- I put that sentence in

23  there basically to answer that question.

24   Q.   Because he didn't -- his temperature was

25  normal, you did not conclude it was excited delirium?

Erin Barnhart - September 20, 2017

36

1    A.   Well -- and, again, I -- I -- I think I only

2    had one reading from the emergency room, so I didn't

3    have anything from EMS.  I didn't have anything prior to

4    when EMS got there.  And I couldn't be sure that he

5    wasn't given medication that could have lowered a fever.

6    I just didn't have any of that information.  So that's

7    why I mentioned specifically in the emergency room he

8    didn't have a fever.

9        Q.   Right.

10            And you do recall that the temperature was

11   taken at triage before he was medicated, right?

12       A.   No, I don't recall when it was.

13       Q.   If he was -- if he had a normal temperature

14   upon arrival and presentation at the emergency

15   department, then he did not have elevated body

16   temperature, right?

17       A.   I think he could have prior to that.

18       Q.   You -- do you have any evidence of that?

19       A.   No, but I don't have any evidence that he

20   didn't.

21       Q.   Well, is that the way you make your decisions

22   as to cause of death, is speculation?

23       A.   Of course not.

24       Q.   You looked for elevated temperature

25   specifically trying to link the death to the syndrome

Erin Barnhart - September 20, 2017

37

1  that some recognize as excited delirium?

2      A.  I was -- I was looking for that because

3  everything about this case seemed consistent with it.

4      Q.  But the finding normal body temperature rules

5  out excited delirium?

6      A.  I don't know that it does.  And, again, I only

7  have, you know, one single reading.

8      Q.  Correct.  But assuming that there's no evidence

9  that he was of elevated temperature, and you don't have

10  an essential element for concluding excited delirium?

11      A.  I think it's -- I think one could argue that

12  excited delirium may be possible without hypothermia.

13      Q.  Point -- point me to any authority that says

14  that.

15      A.  I can't.

16      Q.  Okay.  In fact, Dr. Stratton, et al., in an

17  article relied upon by a number of people say -- says,

18  "Hypothermia is important when considering factors

19  associated with sudden death with restrained excited

20  delirium."

21          Do you agree?

22      A.  So he says important.  I don't disagree that

23  it's important.

24      Q.  He goes on and says, "Karch and others have

25  noted that those who died from restrained excited

**Alpha Reporting Corporation**

Erin Barnhart - September 20, 2017

38

1  delirium are invariably hypothermic."

2           Agree or disagree?

3       A.  Again, it is generally considered to be part of

4  excited delirium.  I'm not arguing that point.

5       Q.  But the lack of hypothermia is the reason that

6  you could not put into your report death due to excited

7  delirium?

8       A.  It's the reason I chose to be more general.

9       Q.  Now, Doctor, help with this pronunciation.

10          Is it subgaleal?

11      A.  Subgaleal.

12      Q.  Subgaleal?  You found subgaleal hemorrhage on

13  both sides of the parietal skull; is that correct?

14      A.  Yes.

15      Q.  For the jury's benefit, would you put your hand

16  up to the area that is the parietal skull.

17      A.  The parietal skull is the -- is the upper

18  lateral portion of the skull.

19      Q.  And by lateral, you mean rear?

20      A.  No.

21      Q.  Or sides?

22      A.  I mean sides.

23      Q.  Okay.  Is it more to the rear of the head than

24  it is to the front?

25      A.  No.  Lateral would be, you know, anywhere along

**Alpha Reporting Corporation**

Erin Barnhart - September 20, 2017

39

1   the side of the head.

2       Q.   What were your findings about the subgaleal

3   bleeding -- or hemorrhage?  I'm sorry.

4       A.   Nothing specific.  Subgaleal hemorrhage is just

5   essentially a bruise of the scalp.

6       Q.   Well, how does that happen?

7       A.   From -- from -- from contact with some object.

8       Q.   Right.

9                Well, you understand that his -- that

10  Mr. Goode's hands were handcuffed behind him?

11      A.   Yes.

12      Q.   And his legs were shackled?

13      A.   I don't know that I know that specifically, but

14  that's what I've heard.

15      Q.   And that his legs and hands were bound together

16  behind his back?

17      A.   Again, I -- I've heard suggestion of that, but

18  I haven't seen anything definitive.

19      Q.   Okay.  And he was prone, facedown?

20      A.   Yes.

21      Q.   Well, my question, then, is how did these --

22  this hemorrhaging on both sides of his head occur?

23      A.   My -- my best guess would be that he had his

24  face -- his head alternately turned from one side or the

25  other and there were impacts on these sides of his head.

**Alpha Reporting Corporation**

Erin Barnhart - September 20, 2017

40

1    Q.   And you think that would be possible from a
2    hog-tied position?
3    **A.   That he could move his head?  Yes.**
4    Q.   And bang his head down?
5    **A.   I think it's possible.**
6    Q.   Do you know?
7    **A.   No, I suppose not.**
8    Q.   The subgaleal hemorrhaging also should -- could
9    have occurred from someone striking Mr. Goode?
10   **A.   Yes, it could have.**
11   Q.   Nowhere in your report do you mention the
12   manner of restraint, whether hog-tied or maximal prone
13   position restraint.
14            Why is that?
15   **A.   First of all, hog-tied, I think, is more of a**
16   **colloquial term.  I don't know that there's any specific**
17   **definition of what it is.  I know what I picture when**
18   **you say that.  And to the best of my recollection, I**
19   **knew that his arms and legs were restrained, but beyond**
20   **that, I don't know that I know a whole lot else about --**
21   **I never saw any photographs, for example.  I'll put it**
22   **that way.**
23   Q.   Did you ever look at the YouTube video of the
24   placing of -- of Mr. Goode into the ambulance?
25   **A.   I did see a video, I believe -- well, when I**

**Alpha Reporting Corporation**

41

1   was still in Mississippi and the coroner may have shown

2   it to me, but I don't have any idea.  And actually, I

3   didn't realize it was on YouTube.  If it was on YouTube,

4   then somebody in my office could have shown it to me

5   also.

6                And I do recall that he was on a -- a

7   gurney outside an ambulance and that -- I definitely

8   remember that his wrists were behind him.

9        Q.   You mentioned hog-tie is colloquial?

10       A.   Well, I don't know that there's -- I'm not sure

11  that there's a specific definition.

12       Q.   Okay.  Is -- is hog-tie something that is used

13  among forensic pathologists in describing a manner of

14  restraint?

15       A.   I certainly wouldn't.  I'm sure there are some

16  who would.

17       Q.   Well, Dr. Vilke who is not a forensic

18  pathologist said that "ankle and/or leg restraints

19  connected in a hog-tied fashion, also known as position

20  of maximal restraint."  And my question is hog-tie is

21  something that is not a NAPAMA to the medical profession

22  insofar as use to describe a manner of restraint, is it?

23       A.   Again, I would never use that term.  I -- I'm

24  not -- I -- I'm sure others would, clearly.

25       Q.   Do you fault those that would use it?

42

1      A.   That's their choice.

2      Q.   Well, there's nothing professional that would

3  bar using that term, is there?

4      A.   I --

5      Q.   Let me --

6      A.   I think it would be -- okay.  I'm sorry.

7      Q.   Let me re-ask.

8            There's nothing in your specialty of

9  forensic pathology which would bar using the term

10  "hog-tie"?

11      A.   Not specifically.

12      Q.   In your -- the course of your education and

13  training, were you educated about the dangers of

14  hog-tieing someone?

15      A.   Not specifically, no.

16      Q.   Well, what about generally?

17      A.   It's -- it's something that's discussed within

18  forensic pathology, but we don't restrain anyone, so I'm

19  not sure why we would specifically be educated in its

20  dangers.

21      Q.   Well, within the discussions in forensic

22  pathology, is it pointed out that hog-tieing poses a

23  danger to the person in that type of restraint?

24      A.   I think there's some debate about that.

25      Q.   Are there forensic pathologists who caution

Erin Barnhart - September 20, 2017

43

1 | against hog-tieing?

2 |     **A.  Probably.**

3 |     Q.  Are there forensic pathologists who caution

4 | against holding somebody in a prone position?

5 |             MR. PHILLIPS:  I'll object to this line of

6 | questioning as outside her role as a forensic

7 | pathologist who did the autopsy.  She's not been

8 | designated as an expert witness.

9 |     Q.  (BY MR. EDWARDS)  Go ahead, Doctor.

10 |             MR. UPCHURCH:  Join.

11 |     Q.  (BY MR. EDWARDS)  Go ahead.

12 |     **A.  I'm not aware of any -- I'm not aware of anyone**

13 | **who -- who discusses the dangers of an adult being**

14 | **placed in a prone position specifically, but there may**

15 | **be someone.**

16 |     Q.  If the manner in which Mr. Goode was restrained

17 | was a contributing factor to his death, why did you not

18 | classify this as a homicide?

19 |             MR. PHILLIPS:  Objection, lack of

20 | foundation.

21 |     **A.  I don't -- again, I don't know that it was a**

22 | **contributory cause.**

23 |     Q.  (BY MR. EDWARDS)  Are you a member of the

24 | National Association of Medical Examiners?

25 |     **A.  No, I'm not right now.**

**Alpha Reporting Corporation**

Erin Barnhart - September 20, 2017

44

1     Q.  Have you ever been?

2     **A.  Yes.**

3     Q.  Is it -- is it a reputable organization within

4 the field of forensic pathology?

5     **A.  It is, yes.**

6     Q.  Are you familiar with "A Guide for the Manner

7 of Death Classification"?

8     **A.  I am.**

9     Q.  All right.

10         MR. EDWARDS:  We'll mark this as Exhibit 2.

11         (Exhibit Number 2 marked.)

12         MR. GASS:  Tim, while that's being marked,

13 could you point me to where that subgaleal reference is

14 that you were questioning Dr. Barnhart about.

15         THE COURT REPORTER:  Who's speaking?

16         MR. EDWARDS:  Ric Gass.

17         MR. GASS:  This is Ric Gass.  I'm sorry.

18         THE COURT REPORTER:  That's okay.

19         MR. EDWARDS:  Evidence of injury on page 2

20 of 4.

21         MR. GASS:  And which paragraph?

22         MR. EDWARDS:  Evidence of injury.

23         MR. GASS:  There are three paragraphs under

24 that title.

25         **THE WITNESS:  It's the first paragraph.**

45

1          MR. GASS:  I'm wondering which of the

2    paragraphs it's in.

3          MR. EDWARDS:  The one on page 2.

4          MR. GASS:  Page 2 has a section labeled

5    "Evidence of Injury".

6          MR. PHILLIPS:  It's the third sentence of

7    the first -- it's the third sentence under that heading.

8          MR. GASS:  I see it.  Thank you.

9      Q.  (BY MR. EDWARDS)  Okay.  Doctor, have you seen

10   this document before?

11     **A.  Yes.**

12     Q.  All right.  My question for you is this:  There

13   are, beginning on page 8, a number of sections to

14   classify deaths; is that correct?

15     **A.  I'm not sure.  I would have to look at it.**

16     Q.  Please.  Do you have a copy?

17     **A.  No.**

18     Q.  Sorry.

19          MR. EDWARDS:  Here you are.

20          **THE WITNESS:  Thanks.**

21     **A.  I'm sorry.  Could you repeat the question.**

22     Q.  (BY MR. EDWARDS)  Yes.

23          Beginning on page 8, there is a section

24   entitled "Principles and Recommendations For Specific

25   Types of Cases".

Erin Barnhart - September 20, 2017

46

1     A.  Yes.

2     Q.  All right.  Now, my question for you is -- take

3  your time, but which one of these sections would

4  Mr. Goode fall into?

5     A.  Well, I'll start by saying I don't know that

6  this is -- I don't know that this is intended to be

7  comprehensive.  It's meant to be helpful for -- for

8  complicated -- for complicated cases.  But let's see if

9  I can find something here.

10     Q.  Well, first, let me ask you this question.

11          On page 9 under number 4, it says "Deaths

12  directly due to the acute toxic effects of a drug or a

13  poison."

14          Mr. Goode does not fit into that category,

15  correct?

16     A.  No, because I would not say it -- it's directly

17  and solely attributable to toxic effects.  Or I would

18  have simply called it an overdose.

19     Q.  On that -- on that point -- and you obtained a

20  toxicology report, right?

21     A.  I did.

22     Q.  And that toxicology report showed that

23  Mr. Goode had a very small amount of LSD in his system?

24     A.  I believe so, yes.

25     Q.  Here's a copy.

Erin Barnhart - September 20, 2017

47

```
 1              MR. EDWARDS:  I'll mark this as Exhibit 3.
 2              (Exhibit Number 3 marked.)
 3      Q.   (BY MR. EDWARDS)  Actually, it showed that he
 4  had -- he had only one nanogram per milliliter; is that
 5  right?
 6      A.   Yes.
 7      Q.   Okay.  That's a very small amount, yes?
 8      A.   Yes.
 9      Q.   And he had -- do you know of a toxic level for
10  LSD?
11      A.   No.  I don't think it's been established, and I
12  think LSD in general is -- is not very toxic.
13      Q.   Actually, Doctor, are you familiar with the
14  work of Dr. Gable, G-A-B-L-E?
15      A.   I don't think so.
16      Q.   So your testimony is that a toxic level for LSD
17  has not been established?
18      A.   I'm -- I'm sure he did establish one.  Right?
19      Q.   Actually, he didn't.  He guessed at 4800
20  nanograms per liter.
21      A.   Okay.
22      Q.   Which would be 4800 times what Mr. Goode had,
23  right?
24              MR. PHILLIPS:  I'll object to the testimony
25  of counsel and the lack of foundation to the question.
```

Alpha Reporting Corporation

Erin Barnhart - September 20, 2017

48

1    A.  In the postmortem samples, yes.

2    Q.  (BY MR. EDWARDS)  Okay.  All right.  And you

3  were -- so we can rule out number 4, right, on page 9?

4    A.  Yes.

5    Q.  Okay.  Do you see any of these areas in which

6  Mr. Goode falls?

7    A.  Probably not because, again, this is a rather

8  unusual case.  I don't -- I wouldn't expect it to fit

9  neatly into one of these -- into one of these

10  categories.  There is a section that does deal with

11  positional restraint and law enforcement officers, and I

12  assume that's the -- the section that you're referring

13  to.

14    Q.  Section 16?

15    A.  Yes.

16    Q.  Would you agree that out of all of these -- how

17  many are there -- 46 categories, number 16 is the most

18  likely description of how Mr. Goode died?

19         MR. PHILLIPS:  Objection, leading.

20    A.  Again, this is completely not comprehensive,

21  even remotely.  It doesn't have motor vehicle accidents.

22  It doesn't have heart attacks.  It doesn't have cancer.

23  This has a very few very specific scenarios.  It's not

24  meant to -- to be something that you say, okay, every

25  death is going to fit into one of these categories.

Erin Barnhart - September 20, 2017

49

1    Q.  (BY MR. EDWARDS)  Well --

2              MR. GASS:  This is Ric Gass.  Could we have

3    a slowly read title of the document that has been given

4    to the witness, please, as Exhibit 2.

5              MR. EDWARDS:  A Guide For the Manner Death

6    Classification, First Edition, National Association of

7    Medical Examiners.

8    Q.  (BY MR. EDWARDS)  Now, Doctor, thank you for

9    that.  But my question was, out of this document and the

10   40-some-odd classifications for death, the one in which

11   Mr. Goode would most likely fit is number 16?

12             MR. PHILLIPS:  Objection, leading.

13   Q.  (BY MR. EDWARDS)  Is that correct?

14             MR. PHILLIPS:  Objection, leading.

15   A.   There's no way that I can put -- force a case

16   into one of these specific categories that aren't

17   applicable.

18   Q.  (BY MR. EDWARDS)  Doctor, my question was is

19   there any more descriptive classification for

20   Mr. Goode's death --

21   A.   Well, this one --

22   Q.   -- than number 16?

23   A.   -- this one mentions -- mentions positional

24   asphyxia and law enforcement, both of which are things

25   that you're concerned with.  So I guess, yes, it uses

**Alpha Reporting Corporation**

Erin Barnhart - September 20, 2017

50

1   most of the same words.

2       Q.   Okay.   Now, Doctor, the National Association of

3   Medical Examiners recognizes that people may die due to

4   excessive restraints imposed by law enforcement?

5       A.   Of course.

6       Q.   All right.   I'll take that.

7            In your report, you noted that Mr. Goode

8   became unresponsive.

9            How -- how did you come to have that

10  information?

11      A.   Again, it would have been from some of the

12  records I received.

13      Q.   All right.   Did you talk to anyone before

14  signing off on the autopsy report?

15      A.   Anyone?

16      Q.   About the report.

17      A.   I may have spoken to some of the other medical

18  examiners in the office about the case.

19      Q.   And now, what office?

20      A.   In Mississippi.   I'm sorry.

21      Q.   Because by the time you signed this report, you

22  were already in Galveston, right?

23      A.   That's right.   It was one of the reports that I

24  finished while I was in Galveston.

25      Q.   All right.   Why did it take four months post

Alpha Reporting Corporation

Erin Barnhart - September 20, 2017

51

1    autopsy to finish the report?

2        A.    Because I believe I sent away -- so we did

3    toxicology, obviously.  That report was not issued until

4    September 10th, and then the slides had to actually be

5    mailed to me because I was out of state.  And I think --

6    I don't recall.  I thought maybe I had ordered -- I had

7    added on a synthetic cannabinoid screen at some point.

8        Q.    You did, Doctor.

9        A.    Okay.

10              (Exhibit Number 4 marked.)

11       Q.    And let me pass you that.  The highlighting on

12   it is mine.  I didn't mean for that to be copied that

13   way, but you can ignore that.  But it's entitled a

14   supplemental report, and it was a September 17, 2015 --

15       A.    Okay.

16       Q.    -- is that correct?

17       A.    Yes.

18       Q.    Okay.  Now, the -- the first -- the initial

19   toxicology report did not give you the information that

20   you needed in order to establish cause of death?

21       A.    No, I think the way -- I don't recall exactly.

22   But synthetic cannabinoids are a newer -- a newer

23   substance that we're learning more about every day, and

24   I think because of his erratic behavior, I decided it

25   would be a good idea to test for that.

Erin Barnhart - September 20, 2017

52

1 Q. Okay. So you did ask NMS, which is the

2 laboratory up in Pennsylvania, to look specifically what

3 -- for what's known as en bones?

4 A. **I've never heard it referred to that way,**

5 **but...**

6 Q. How -- how do you refer to it?

7 A. **Synthetic cannabinoids.**

8 Q. And -- and in the street, I think they call it

9 en bones?

10 A. **Oh, okay. No, I wasn't aware of that.**

11 Q. Those -- those can be -- they're synthetic

12 drugs, as I understand it.

13 A. **Okay.**

14 Q. Is that right?

15 A. **They are. They're -- they're -- they are**

16 **called things like K2 and Spice and Kush and stuff like**

17 **that.**

18 Q. Okay.

19 A. **They're synthetic cannabinoids. They make some**

20 **people actually psychotic. So that was why I decided to**

21 **test for them.**

22 Q. All right. And the test results were negative?

23 A. **They were.**

24 Q. So from the two toxicology screens that you had

25 run, you did not have any pharmacological evidence of

**Alpha Reporting Corporation**

53

1  cause of death, would that be accurate?

2      A.   No, I don't think that would be accurate.  It's

3  -- it's simply a part of the exam.  I would have had the

4  slides mailed to me, looked at them at some point.  I

5  was also in the process of moving, starting a new job.

6  My files were packed up.  It was just a -- it -- it

7  probably would have done much -- been done earlier if I

8  had not been moving during this process.

9      Q.   Well, my question was, was there any

10  pharmacological cause of death?

11      A.   Yes.  I feel -- I feel like we've already

12  covered this.  My opinion is that LSD was the underlying

13  or initiating feature in this whole sequence of events.

14      Q.   That's the complications of LSD you referenced?

15      A.   Yes.

16      Q.   And the complications are what caused the

17  hog-tieing, correct?

18      A.   Well, yes, the psychosis.

19      Q.   And so that's -- you consider that a

20  complication of LSD, the manner of restraint?

21      A.   I don't think that he would have been

22  restrained otherwise.

23      Q.   Okay.  Well, I'm just asking you, Doctor.  I'm

24  just trying to find out what's at the bottom of

25  complications.

Erin Barnhart - September 20, 2017

54

1      And as I understand what you're saying is
2  that the manner of restraint was a complication of LSD?
3      A.  Yes.  In addition to -- to -- to other things,
4  yes.
5      Q.  As you've described?
6      A.  Yes.
7      Q.  Do you need to add to or subtract from any of
8  what you've said?
9      A.  No, I don't think so.
10     Q.  All right.  The Guide for Manner of Death
11  Classification on page 7 has a section on the but/for
12  principle.
13          Are you familiar with that?
14     A.  I am.
15     Q.  Well, the question -- the question is, in your
16  opinion, but for the manner of restraint of Mr. Goode,
17  would he have died?
18     A.  No.  I would say but for the ingestion of LSD,
19  would Mr. Goode have died.
20     Q.  Because LSD led to the manner of restraint?
21     A.  Yes.
22     Q.  All right.  But let me go back.  I want to ask
23  this specific question under the name National
24  Association of Medical Examiner's document but/for test.
25          But for the manner of restraint, is it your

Erin Barnhart - September 20, 2017

55

1  opinion that Mr. Goode would not have died?

2      A.   That is not my opinion.

3      Q.   All right.  He would have died even with --

4  even without being hog-tied?

5      A.   I believe that's a very good possibility, yes.

6      Q.   And what would the mechanism of death have

7  been?

8      A.   Excited delirium.

9      Q.   But he didn't have the -- you didn't put

10  excited delirium?

11      A.   I only have one temperature reading to go off

12  of.

13      Q.   You don't -- what are all the indicia of

14  excited delirium?  What are the physiologic findings for

15  a diagnosis of excited delirium?

16      A.   I think I mentioned some earlier.  Psychosis,

17  loud outburst, incoherent speech, aggression, paranoia.

18      Q.   Those all sound like different names for the

19  same thing to me as a layperson, an agitated state?

20          MR. PHILLIPS:  I object to the statements

21  and testimony of counsel.

22      Q.   (BY MR. EDWARDS)  What -- what aggression did

23  Mr. Goode commit?

24      A.   I'm -- I simply said that is one of the

25  possible features of excited delirium.  I'm not accusing

Alpha Reporting Corporation

Erin Barnhart - September 20, 2017

56

1   him of being aggressive towards anyone.

2       Q.   Well, what -- what findings on autopsy must you

3   have in order to render an opinion of excited delirium

4   as a cause of death?

5       A.   There aren't any.

6       Q.   There are none?

7       A.   No, there are no definitive autopsy findings

8   for a diagnosis of excited delirium.

9       Q.   So you just put excited delirium down when you

10  can't find something else?

11      A.   I didn't put it down.

12      Q.   You did not have the findings that you as a

13  professional considered necessary to list excited

14  delirium as cause of death?

15      A.   Excited delirium is a largely circumstantial

16  diagnosis.

17      Q.   What does that mean to a lay?

18      A.   It means that there are no specific autopsy

19  findings.

20      Q.   So when do you -- there are no specific autopsy

21  findings.

22           Well, so when do you use it?

23      A.   Again, when the circumstances suggest excited

24  delirium as the diagnosis.  As an example, if you were

25  to find somebody dead on the street, no one had seen

Alpha Reporting Corporation

Erin Barnhart - September 20, 2017

57

1   them die, you had no idea what their history was, you

2   could never call that case excited delirium.  There's --

3   there is no specific finding.

4       Q.  Well, from a scientific standpoint, then how

5   can you replicate the conditions which lead to what

6   might ultimately be classified as an excited delirium

7   death?

8       A.  It's -- it's not an experiment.  It's not

9   something that needs to be replicated.

10      Q.  Why not?  Isn't that the scientific method is

11  you test and retest to see if you get the same result?

12      A.  I think when you're dealing with human lives,

13  there's a slightly different set of criteria.

14      Q.  How do you -- okay.  I hear what you're saying,

15  and I respect that.

16          How do you disprove an excited delirium

17  death?

18      A.  I think one example, if you could show that the

19  person's baseline was erratic behavior and psychosis

20  regardless of whether or not they were on drugs, I think

21  that would be a pretty good indication.

22      Q.  And you bring up a pretty good point.

23          Erratic behavior can stem from many

24  different things, can't it?

25      A.  Sure.

Erin Barnhart - September 20, 2017

58

1    Q.  Okay.  If you -- if a person is not
2 hyperthermic, is that a way to disprove the excited
3 delirium diagnosis?

4    A.  One of several.

5    Q.  Would you agree with the statement that until
6 clarification by further study becomes available, the
7 emergency medicine clinician should be aware that tight
8 restraint of agitated patients with the hobble technique
9 is a high-risk procedure that requires measures to avoid
10 positional asphyxia?

11          MR. PHILLIPS:  I object as lacking
12 foundation and qualification for this witness, and also
13 is calling for an expert opinion on a topic on which
14 she's not been disclosed.

15          MR. UPCHURCH:  Join the objection as --
16 foundation as outside the scope of her province as a
17 treating forensic pathologist in this case.

18    Q.  (BY MR. EDWARDS)  Would you -- would you agree
19 or disagree with that statement?

20    A.  I don't feel comfortable commenting on any
21 practice outside of forensic pathology.

22    Q.  After you were educated by Mr. Phillips?

23    A.  I would have said it anyway.

24    Q.  But you didn't.

25    A.  Should I have interrupted?

Erin Barnhart - September 20, 2017

59

1       MR. PHILLIPS: Object to the statements of
2  counsel.
3       MR. EDWARDS: I object to you getting
4  outside what you're supposed to object to, which is only
5  form, only form.
6       MR. PHILLIPS: I'm objecting concisely --
7       MR. EDWARDS: No, you're not.
8       MR. PHILLIPS: -- and on an appropriate
9  bases. I am.
10     Q.  (BY MR. EDWARDS) Doctor, can you -- from what
11  you have done as a forensic pathologist, tell us what
12  happened in the last eight to minute -- minutes of
13  Mr. Goode's life.
14     **A.  I'm sorry. Can you repeat the question.**
15     Q.  Yes.
16          From your work as a forensic pathologist
17  having done the autopsy, can you tell us what happened
18  physiologically to Mr. Goode during that last eight to
19  ten minutes of his life?
20     **A.  No.**
21     Q.  All right. Now, in this Guide for the Manner
22  of Death Classification that we've marked as Exhibit 2,
23  there is a category for deaths attributable to medical
24  negligence.
25          Are you familiar with that?

60

1      A.   Yes, but I'll review it.  Which number is it?

2      Q.   Let me see if I can locate it.  And you -- you

3  had actually mentioned earlier that this -- this --

4  these categories didn't cover everything, and you

5  mentioned an automobile accident.

6              But 27 does, in fact, cover that, right?

7              MR. GASS:  Jim, can you give us the edition

8  of this and the date of it.

9              MR. EDWARDS:  Yeah, I already did.  It's

10  the first edition.

11             MR. GASS:  I didn't -- I got -- I asked for

12  the title, but now I'm asking is this edition 1 that was

13  approved in February of 2002?

14             MR. EDWARDS:  Yes, as I previously stated.

15             MR. GASS:  Don't -- Tim, don't get pissy

16  about it.  I'm sorry if I missed it.

17     A.   Number 27 actually addresses specifically

18  pedestrians being struck by vehicles, not motor vehicle

19  collisions.

20     Q.   (BY MR. EDWARDS)  All right.  I'll have to...

21             MR. EDWARDS:  You got it?  Yeah, okay.

22     Q.   (BY MR. EDWARDS)  I'll come back to that,

23  Doctor.

24             Would an arterial blood gas result have

25  assisted you in determining the cause of death?

Erin Barnhart - September 20, 2017

61

1    A.    I don't think so, no.

2    Q.    What does an ABG tell you?

3    A.    Well, it measures oxygenation in -- in a sort

4  of current metabolic state, which I would expect to be

5  abnormal.

6    Q.    Well, if -- if an ABG taken at the hospital had

7  shown low blood -- low oxygen saturation, would that be

8  information which would have assisted you?

9    A.    It would be helpful.

10    Q.    Don't you typically have ABG results?

11    A.    No.

12    Q.    Look at -- my question back about the medical

13  care, in 21, the National Association of Medical

14  Examiners does have a classification for negligent

15  medical care, does it not?

16    A.    It does.

17    Q.    Okay.  And have you ever given an opinion that

18  somebody's death was related to negligence in the

19  healthcare provided?

20    A.    I have not, but I know of a couple of cases

21  from colleagues.

22    Q.    Do you have an opinion, based upon a reasonable

23  degree of medical certainty, as to whether grossly

24  negligent medical care contributed to the death of

25  Mr. Goode?

Erin Barnhart - September 20, 2017

62

1           MR. PHILLIPS: Objection, lack of

2  foundation, qualification and scope.

3           MR. UPCHURCH: Join the objection.

4    A.  I have an opinion.  I don't know that it's an

5  expert opinion.

6    Q.  (BY MR. EDWARDS)  What's your opinion?

7    A.  My opinion is that his treatment appeared to be

8  fairly standard, but, again, I don't treat live

9  patients.

10    Q.  Well, as a physician, would you expect his

11  pulse oximetry to be -- or for him to have been

12  monitored with pulse oximetry?

13           MR. PHILLIPS: Same objection.

14           MR. UPCHURCH: Join the objection, outside

15  the scope and province of this witness.

16    Q.  (BY MR. EDWARDS)  You may answer, Doctor.

17    A.  I -- I have no idea about current treatment

18  protocols, current monitoring protocols, emergency room

19  treatment at all.

20    Q.  Okay.  When you have -- have you had cases

21  similar to Mr. Goode before?

22    A.  I have certainly had many cases in which law

23  enforcement are involved.  I have had cases of excited

24  delirium, and I have had cases where I did attribute the

25  cause of death to positional asphyxia.

Erin Barnhart - September 20, 2017

63

1    Q.   And -- okay.  And in those cases where you

2  listed positional asphyxia as the cause of death, what

3  were the findings on autopsy that you used to support

4  that diagnosis?

5    A.   A lot of it is circumstantial, seeing how a

6  decedent was found, for example.

7    Q.   I'm sorry.  The way a decedent?

8    A.   A decedent was found.  For example, if they're

9  stuck in a -- in an awkward-type position that restricts

10  their breathing.  Infants, it's not terribly uncommon,

11  unfortunately, to die from positional asphyxia if they

12  fall into something or fall into a corner between a wall

13  and a mattress.

14         It's also not terribly uncommon that a

15  person will be put in a choke hold and the person

16  administering that choke hold holds it until, for

17  example, the police arrive.  I've had that -- a case

18  where that happened.  Those are probably the -- the main

19  positional asphyxia cases that I've had.

20    Q.   Okay.  And you've already told us about the

21  lack of pathological finding for excited delirium; is

22  that correct?

23    A.   That's correct.

24    Q.   Yeah.  Okay.

25         According to the National Association of

Erin Barnhart - September 20, 2017

64

1   Medical Examiners, over 70 percent of medical examiners

2   have been subjected to pressures to influence the

3   opinion put in the autopsy report.

4           Would you agree with that?

5       A.   I have not heard that statistic.  It seems

6   quite high.

7       Q.   Have you ever been pressured to put a result in

8   an autopsy report?

9       A.   I have not.

10      Q.   Were you contacted by any representative of the

11  City of Southaven before you signed off on this autopsy

12  report?

13      A.   No.

14      Q.   Did -- did you talk to the coroner in DeSoto

15  County?

16      A.   I would have spoken to the coroner -- not

17  before I signed off on it, but I would have spoken to

18  him probably the day of the case.

19      Q.   Did -- did you talk to anyone at Baptist

20  Memorial Hospital before you signed off on the report?

21      A.   No.

22      Q.   Now, did you ever confer with Mrs. Goode about

23  your findings?

24      A.   No.

25      Q.   Are you ethically obligated to do that?

**Alpha Reporting Corporation**

65

1    A.  No.  I -- I -- if someone -- if a family member
2  calls me and would like to talk about a case, I
3  generally do.
4    Q.  Did you -- did you provide Mrs. Goode with the
5  preliminary autopsy findings?
6    A.  I don't know.  That's something that would have
7  been done by our administrative staff at the office.  I
8  think it was -- I think it was standard practice.  I'm
9  not -- I'm not certain.
10    Q.  Are you a member of the American Medical
11  Association?
12    A.  No.
13    Q.  Why not?
14    A.  Because it's extremely expensive.  I do have
15  their life insurance, though.
16    Q.  Well, were you willing to relate the
17  information about your autopsy to Mrs. Goode?
18    A.  Was I willing to?
19    Q.  Yes.
20    A.  Yes, I believe that if she's legal next of kin,
21  I think she would have automatically been sent a copy of
22  the report.
23    Q.  She should have been, right?
24    A.  I -- I think that was standard practice in the
25  office, but, again, I'm not sure.  I -- that's not

Erin Barnhart - September 20, 2017

66

1  something I personally would have done or been

2  responsible for.

3      Q.  When you looked at Dr. Di Maio's book, did you

4  look at the section that we talked about about

5  classification of deaths that may be caused by excited

6  delirium?

7      A.  I did briefly, yes.

8      Q.  All right.  Do you agree that Dr. Di Maio says

9  that if that's your conclusion, it should be put in the

10 autopsy report?

11     A.  He -- he says -- he uses the word suggests.

12 Again, it's just a suggestion.

13     Q.  Has the National Association of Medical

14 Examiners taken an official position as to whether or

15 not excited delirium is a valid medical diagnosis?

16     A.  I -- I don't know that they have.

17     Q.  In excited delirium death cases, is there ever

18 a finding that you'd been involved in -- is there ever a

19 finding before death of low oxygen saturation?

20     A.  In excited delirium cases that I've done?

21     Q.  Yeah.

22     A.  I -- I wouldn't remember that.

23     Q.  Okay.  If there is a finding of low oxygen

24 saturation, does that preclude a finding of excited

25 delirium?

Erin Barnhart - September 20, 2017

67

1    A.   I wouldn't think so, no.

2    Q.   Do you know?

3    A.   It would not preclude me personally from making

4 that diagnosis, I can say.

5    Q.   Were you aware before signing this report that

6 Mr. Goode had had findings above low oxygen sats and

7 supraventricular tachycardia?

8    A.   I don't recall if I knew that.  If it was in

9 the hospital records, I presumably saw it.

10   Q.   Are those findings important to you as a

11 forensic pathologist?

12   A.   They would be helpful.

13   Q.   How would they be helpful?

14   A.   Again, I'm not sure that -- I don't know that

15 it would change my diagnosis, but, sure, I mean, I

16 suppose any additional results are potentially helpful.

17   Q.   Is a diagnosis of complications of LSD as a

18 cause of death a -- something we can find in the medical

19 literature as a reliable diagnosis?

20   A.   The cause of death -- manner of death is

21 limited to five categories.  Cause of death is infinite.

22 You can say any combination of words you want.

23            So -- so I'm not sure how to answer that.

24 I guess you could Google it.

25   Q.   Well, let me ask you more pointedly.

**Alpha Reporting Corporation**

68

1         If you had found that the manner of
2 restraint had caused or contributed to the cause of
3 death, shouldn't you have classified the death as a
4 homicide?
5     A.   If I believed it caused the death, yes.
6     Q.   If it contributed to the death?
7     A.   I'm not convinced that it did.
8     Q.   Well, I'm not -- what is your position on that?
9 Because you said that -- that he died of complications
10 of -- of LSD, right?
11     A.   Right.
12     Q.   And you said that the hog-tie was a
13 complication of LSD, right?
14     A.   It was associated with the LSD intoxication,
15 yes.
16     Q.   Well, is it a complication of the LSD?
17     A.   I'm not convinced that it was.
18     Q.   Well, Doctor, with all due respect, earlier you
19 said that it was.
20         Was it or wasn't it?
21     A.   I said I believe that the fact that he was
22 restrained was secondary to his intoxication.
23     Q.   Okay. So is that a complication of the LSD?
24     A.   The restraint themselves is, but I'm not
25 convinced that it contributed or caused his death.

Erin Barnhart - September 20, 2017

69

1    Q.  Are you convinced that it did not?

2    A.  I'm more convinced -- I'm more convinced that

3 it didn't than it did.

4    Q.  And what's the basis for that?

5    A.  My past experience and the -- the current

6 literature on positional asphyxia deaths.

7    Q.  Okay.  Good.

8         What -- what current literature are you

9 referring to?

10    A.  There are a couple of articles by a guy named

11 Chan, C-H-A-N.  One, he's the first author; one, he's a

12 coauthor.  But they basically take healthy subjects,

13 restrain them, maximally, I suppose, put weights on

14 their back, et cetera, and then check their vital signs.

15 And they didn't really show that their breathing was

16 restricted.

17    Q.  How long did they leave them in that position?

18    A.  I don't recall.  It's been -- it's been a while

19 since I read the articles.

20    Q.  How long was Mr. Goode restrained maximally in

21 a prone position?

22    A.  I don't recall.  I think maybe a couple of

23 hours.

24    Q.  Did the Chan and Newman studies use people that

25 were asthmatic?

**Alpha Reporting Corporation**

Erin Barnhart - September 20, 2017

70

1    A.   Probably not.

2    Q.   Why not?  Why wouldn't they have done that?

3    A.   I don't think it would be ethical to do the

study on somebody that had a health problem.

5    Q.   Does -- were you aware that Mr. Goode was

6  asthmatic?

7    A.   I was not.  And no, and I -- I heard about

8  that, I believe, in a news article at some point, but I

9  was not told that he was asthmatic.

10    Q.   Isn't that something you would have liked to

11  have known?

12    A.   It would have been helpful, yes.  Although,

13  asthma has fairly typical features, grossly and

14  histologically, neither of which I saw.

15    Q.   Is asthma -- asthma is a condition that affects

16  breathing, right?

17    A.   Yes.

18    Q.   And putting somebody in a prone position

19  restricts breathing; is that correct?

20    A.   Potentially.

21    Q.   It compresses -- compresses the diaphragm and

22  the intercostal muscles -- can?

23    A.   It can.

24    Q.   And the diaphragm and intercostal muscles are

25  those which make you breathe, right?

Erin Barnhart - September 20, 2017

71

1    A.   Yes.

2    Q.   Did you give a presentation to the University

3 -- University of Mississippi Medical Center on the

4 subject of when is a heart attack a homicide?

5    A.   Yes.

6    Q.   And what was your conclusion in that?

7    A.   I didn't have a conclusion.  It described a

8 series of criteria that was outlined ages ago by Joe

9 Davis in Miami which is where I trained.  And he

10 outlined a set of criteria in cases where a heart attack

11 may be considered a homicide.  And I became interested

12 in that because I had a relevant case during my training

13 in Miami.

14    Q.   Heart attacks -- heart attacks can be

15 considered homicide when they cause an arrhythmia that

16 is induced by physical or emotional stress provoked by

17 altercation with another person or a restraint; is that

18 fair?

19    A.   Among other things.

20    Q.   Yeah.  Okay.

21         MR. EDWARDS:  We've been going on hour and

22 a half.  Would you like to take a break?

23         THE WITNESS:  I'm okay if y'all are.

24         MR. MCCRACKEN:  I think I need to take a

25 break.

Erin Barnhart - September 20, 2017

72

1    THE VIDEOGRAPHER:  This ends media 1.  Off

2  record 1:04.

3    (Recess from 1:04 p.m. to 1:15 p.m.)

4    THE VIDEOGRAPHER:  This begins media 2.  On

5  record 1:15.

6    Q.  (BY MR. EDWARDS)  Doctor, did you make a

7  determination about Mr. Goode's dopamine transporter

8  levels?

9    A.  No.

10   Q.  So you can't say one way or the other whether

11 they were elevated?

12   A.  No.

13   Q.  All right.  Did you find any evidence that

14 Mr. Goode had an elevation of heat shock protein 70 in

15 his brain?

16   A.  No.

17   Q.  You did not?

18   A.  No.  Those tests are all far beyond our -- our

19 little state's capabilities.

20   Q.  Okay.  Is elevation of heat shock protein 70 an

21 indication of excited delirium?

22   A.  I've heard that some of those areas are being

23 studied, but I don't know anything else about it beyond

24 that.

25   Q.  Okay.  Did you receive any information about

**Alpha Reporting Corporation**

Erin Barnhart - September 20, 2017

73

1 eyewitness reports of the taking of Mr. Goode into
2 custody?
3     **A. Did I receive eyewitness reports?**
4     Q. Yes. Did you have that information?
5     **A. No.**
6     Q. All right. If a witness had described
7 Mr. Goode with a very red face, eyes bulging and
8 laboring for breath, is that information which would
9 have been helpful to you?
10     **A. It would have been helpful. Again, all**
11 **information is -- is helpful.**
12     Q. Were you provided that information?
13     **A. I was -- I was not, no.**
14     Q. Well, before you render an opinion as to cause
15 of death, do you as a forensic pathologist want to have
16 all information available?
17     **A. Well, as much as possible, but I don't**
18 **interview eyewitnesses.**
19     Q. Doctor, I'm -- I'm not being critical. I'm
20 just asking what you had.
21     **A. All -- all information is helpful.**
22     Q. Did you -- were you made aware that Mr. Goode
23 was injected with Haldol and Ativan?
24     **A. Yes, if not through medical records. I assume**
25 **I was made aware through medical records and then from**

74

1    -- clearly from his toxicology report as well.

2        Q.   Okay.  Did Haldol and Ativan contribute to the

3    cause of death?

4        A.   No.

5        Q.   Do you know anything about the clinical

6    treatment for excited delirium?

7        A.   No.

8        Q.   All right.  So the -- I want to make sure I

9    understand your testimony.

10             You did not have the evidence to put

11   excited delirium as the cause of death; is that correct?

12       A.   I felt that by using the term I did, I would

13   encompass excited delirium underneath that category.

14       Q.   Then why didn't you put excited delirium in

15   there?

16       A.   Well, because I did -- I did wish that I had a

17   little bit -- I did wish that I had a documented

18   hypothermia.

19       Q.   You did not have the pathological findings to

20   make you comfortable in assigning the cause of death as

21   excited delirium?

22       A.   Well, there are no pathologic findings.  I

23   didn't have the -- the antemortem data that would have

24   make me -- made me completely comfortable making that

25   diagnosis.

75

1    Q.  Well, you don't -- forensic pathologists are

2  never completely comfortable unless it's just something

3  very obvious that killed the person, correct?

4    A.  **Well, and a lot of times, it is really obvious.**

5    Q.  Right.  But, again, why didn't you put excited

6  delirium as cause of death if you're throwing that in

7  under the umbrella of complications of LSD?

8    A.  **Because I didn't have the hypothermia.**

9    Q.  Which is always present with excited delirium?

10            MR. PHILLIPS:  Objection, asked and

11  answered.

12            MR. UPCHURCH:  Join the objection, multiple

13  times.

14    Q.  (BY MR. EDWARDS)  Correct?

15    A.  **I have answered the question.**

16    Q.  And your answer is yes?

17    A.  **My answer is that, to my knowledge, it is a --**

18  **a pretty typical feature of excited delirium.**

19    Q.  Not pretty typical.

20            It's always present with excited delirium?

21    A.  **I don't know that.**

22    Q.  Do you have any basis for saying that it's not

23  always present?

24    A.  **Excited delirium is a relatively new topic.**

25  **It's a relatively new syndrome to be described.  And in**

Erin Barnhart - September 20, 2017

76

1    saying every single case is a pretty bold statement.

2    I'm not sure that we're at that point yet.

3         Q.  Doctor, excited delirium has been diagnosed

4    since the 19th Century in psychiatric patients, has it

5    not?

6         A.  It has, but in relation to drug use and law

7    enforcement involvement, it's become a more recent

8    issue.

9         Q.  Right.  But originally in the 19th Century,

10   there were reports of excited delirium in psychiatric

11   patients, and then it -- with the advent of cocaine,

12   there became reports of excited delirium related to

13   stimulant drugs, particularly cocaine and amphetamines;

14   is that accurate?

15        A.  I'll take your word for it.

16        Q.  Well, you -- all right.

17             What are the other complications of -- let

18   -- let's list every complication of LSD that you say

19   caused Mr. Goode's death.  Give me every one.

20        A.  I don't think I -- I didn't intend it to be a

21   list.  It's a -- some -- it's generally physiologic and

22   -- and metabolic derangement that -- that ultimately led

23   to his death.

24        Q.  I'm -- Doctor, I'm just using your words.  It

25   says complications of LSD.

Erin Barnhart - September 20, 2017

77

1     A.   Well, if there was a list, I would have
2  provided a list.
3     Q.   Well, what did you mean -- that's what we're
4  here for.   What did you mean that complications of LSD
5  caused the death?
6     A.   I meant all of the physiologic metabolic
7  derangements that occurred subsequent to his ingestion
8  of LSD.
9     Q.   And that's what I want to know.
10          What were those?
11    A.   I can't -- I don't know that I can list every
12 one, but obviously, a probable arrhythmia is going to be
13 one.   Lactic acidosis might be one.   Electrolyte
14 imbalance may be one.   Hypothermia may be one.
15    Q.   But it was not?
16    A.   Not based on the one reading I had.
17    Q.   Do you have any -- any information that he was
18 acidotic?
19    A.   I don't recall.   It could have been in the
20 medical records.
21    Q.   What testing was done at the hospital to
22 determine his physical state?
23    A.   I don't recall.
24    Q.   Okay.   So go ahead with your list.   You've
25 listed three or four.

Erin Barnhart - September 20, 2017

78

1      A.   Yeah, I think -- we'll just -- let's just go
2  with those.
3      Q.   Okay.  Could you tell me again, please.  Give
4  me the ones that you say.  Acidosis.  We didn't have
5  hypothermia, and we don't --
6      A.   Arrhythmia.
7      Q.   Arrhythmia, which you know he was in well
8  before arriving at the hospital?
9      A.   And electrolyte derangements.
10     Q.   Did he have electrolyte derangements?
11     A.   I don't recall.
12     Q.   Well, where would we find it?  Is it mentioned
13  in your report?
14     A.   No.  It would have been in his medical records.
15     Q.   So would you agree that the way you phrase the
16  cause of death is not very helpful?
17     A.   The cause of death is meant to be -- it's not
18  meant to be a physiologic mechanism.  It's -- it's meant
19  to be -- and it's -- and it's not meant to be -- to be a
20  list.
21          So when you say somebody died from blunt
22  force trauma, you don't go through and say, oh, well,
23  they lost blood or they had a contusion of their heart
24  or a laceration of their liver.  It's -- the cause of
25  death isn't intended to describe a mechanism -- a

Alpha Reporting Corporation

Erin Barnhart - September 20, 2017

79

1  physiologic mechanism.

2       Q.  What is the purpose of an autopsy report?

3       **A.  To list the findings -- to list the findings --**

4       Q.  The purpose --

5       **A.  -- at autopsy.**

6       Q.  Sorry.

7            The purpose of an autopsy report is to give

8  a cause of death; right?

9       **A.  Yes.**

10      Q.  And somebody reading your autopsy report is

11 going to say complications of LSD, what's that, right?

12      **A.  I don't know.**

13      Q.  Well, my question -- going back to my question.

14 Another physician reading your autopsy report is going

15 to be told nothing about what caused Troy Goode to die.

16           Do you agree or disagree?

17      **A.  Not mechanistically.  That's not what the**

18 **autopsy is meant to do.**

19      Q.  Well, somebody reading your report, are they

20 going to conclude that toxicity of LSD killed Mr. Goode?

21           MR. PHILLIPS:  Objection, calls for

22 speculation.

23      **A.  I -- I think they would conclude that LSD**

24 **ingestion led to his death.**

25      Q.  (BY MR. EDWARDS)  How is what --

**Alpha Reporting Corporation**

Erin Barnhart - September 20, 2017

80

1    A.   Again, that --

2    Q.   -- that question is about.

3    A.   -- that's the mechanism.  That's not -- that's

4  not the point of the autopsy.  The autopsy is to list

5  the physical findings which are listed here.

6    Q.   The -- the point of the autopsy is for legal

7  purposes, is it not?

8    A.   For vital statistic purposes.

9    Q.   Yeah.  And it also -- you know that -- that

10  autopsies are often used in criminal cases in court,

11  right?

12    A.   Yes.

13    Q.   And you know that if the autopsy report in this

14  case -- and it said homicide, somebody could have gotten

15  indicted for it, right?

16    A.   That's possible.

17    Q.   And you know that if this death was caused by

18  the manner of police restraint and the length of time he

19  was left in that restraint, that should have been

20  classified as a homicide, correct?

21    A.   If death was cause to that, then, yes, I would

22  have called it a homicide.

23         MR. EDWARDS:  One minute, Doctor.

24    Q.   (BY MR. EDWARDS)  Was asphyxia a complication

25  of LSD?

Alpha Reporting Corporation

Erin Barnhart - September 20, 2017

81

1  A.  I don't believe that he asphyxiated, so I would
2  say no.
3  Q.  If he did asphyxiate, would -- could that have
4  been caused by LSD?
5  A.  If he did asphyxiate?  He could have
6  asphyxiated from any number of reasons.
7  Q.  Does any number of reasons include LSD?
8  A.  I'm sorry.  I guess I don't understand the
9  question.
10  Q.  Isn't the answer, no, that LSD doesn't cause
11  asphyxiation?
12  A.  I'm sorry.  What was the question?
13  Q.  I said isn't the answer to the question does
14  LSD cause asphyxiation no?
15  A.  I would have to hear the original question.
16  Q.  The question was -- this is the original
17  question.
18       Does LSD cause asphyxiation?
19  A.  Not in and of itself, no.
20  Q.  Okay.
21       MR. EDWARDS:  I'll pass the witness.
22       MR. PHILLIPS:  Dr. Barnhart, I'm Marty
23  Phillips, and in this case I represent Dr. Oliver.
24            E X A M I N A T I O N
25  BY MR. PHILLIPS:

82

1      Q.   Your responsibility in doing the autopsy of

2   Mr. Troy Goode was to fulfill your role as the chief

3   deputy medical examiner in the state of Mississippi,

4   right?

5      A.   Yes.

6      Q.   And to determine the cause of his death, right?

7      A.   Yes.

8      Q.   And to list that cause of death in an autopsy

9   report, right?

10     A.   Yes.

11     Q.   You, in fact, prepared an autopsy report that

12  has been marked as Exhibit 1 to your deposition by

13  Mr. Edwards, correct?

14     A.   Yes.

15     Q.   And on the document you prepared, you listed

16  the cause of death as complications of LSD toxicity,

17  right?

18     A.   Yes.

19     Q.   That was the conclusion that you reached in

20  your capacity as chief deputy medical examiner for the

21  state of Mississippi relative to the death of Mr. Troy

22  Goode, right?

23     A.   Yes.

24     Q.   You came to that opinion after being provided

25  with some information about the day of Mr. Goode's

83

1  death, right?

2      **A.   Yes.**

3      Q.   You came to that opinion and conclusion having

4  been provided with a copy of some records, including

5  those from Baptist Hospital, right?

6      **A.   Yes.**

7      Q.   You came to that conclusion after personally

8  examining the body of Mr. Troy Goode, right?

9      **A.   Yes.**

10     Q.   You came to that conclusion after carefully

11  inspecting his internal organs, right?

12     **A.   Yes.**

13     Q.   You came to that conclusion after

14  microscopically evaluating tissue from Mr. Goode's body

15  and organs, right?

16     **A.   Yes.**

17     Q.   You came to that conclusion after doing -- or

18  having done toxicology studies to tell you about the

19  drugs that were in Mr. Goode's system at the time of his

20  death, right?

21     **A.   Yes.**

22     Q.   And with the benefit of all that information,

23  you concluded that the cause of death was complications

24  of LSD toxicity, right?

25     **A.   Yes.**

Erin Barnhart - September 20, 2017

84

1    Q.   And is that still your opinion today?

2    A.   It is.

3    Q.   To a reasonable degree of medical certainty?

4    A.   Yes, it is.

5    Q.   You concluded also that the manner of death was

6  an accident, right?

7    A.   Yes.

8    Q.   You recorded that in your autopsy report?

9    A.   Yes.

10   Q.   Is that still your opinion as to the manner of

11 death today to a reasonable degree of medical certainty?

12   A.   Yes.

13   Q.   The toxicology screen that was performed at

14 your direction indicated the presence of marijuana in

15 Mr. Goode's body, right?

16   A.   Yes.

17   Q.   That is an illegal drug, isn't it?

18   A.   Yeah.

19            MR. EDWARDS:   Objection to the form.   What

20 state?

21   Q.   (BY MR. PHILLIPS)   In the state of Mississippi

22 in July of 2015, was it an illegal drug, Doctor?

23   A.   Yes.

24   Q.   And you knew that because of your work in that

25 state at the time, right?

Erin Barnhart - September 20, 2017

85

1  A. Yes.

2  Q. The toxicology screening also showed the
3 presence of LSD, didn't it?

4  A. Yes.

5  Q. That too is an illegal drug in the state of
6 Mississippi in July of 2015?

7  A. Yes.

8  Q. LSD is a DEA schedule I substance, isn't it?

9  A. It is.

10  Q. What does that mean?

11  A. It means that it has no therapeutic -- no known
12 therapeutic value.

13  Q. It causes panic and paranoid reactions, among
14 other things?

15  A. Yes.

16  Q. And one can have those reactions to LSD or have
17 what might be characterized as a bad trip even if one
18 has not taken a high dose of LSD, right?

19  A. That's my understanding, yes.

20  Q. But for the ingestion of LSD, Mr. Goode would
21 not have died, correct?

22  A. That's my opinion, yes.

23  Q. That is your opinion to a reasonable degree of
24 medical certainty, isn't it?

25  A. Yes.

Erin Barnhart - September 20, 2017

86

1    Q.   You were asked several questions by Mr. Edwards
2  concerning literature, can you point to any literature,
3  can you cite any literature.
4              Remember those type of questions?
5    A.   Yes.
6    Q.   Were you asked by Mr. Edwards before the
7  deposition today to locate and bring literature with you
8  to discuss?
9    A.   No.
10   Q.   Have you had any opportunity to look for or
11 locate literature?
12   A.   No.
13   Q.   Mr. Edwards asked you about the findings of
14 edema in Mr. Goode's lungs.
15             Remember those questions?
16   A.   Yes.
17   Q.   I think I understood you to say that that is
18 not an uncommon finding at the time of autopsy?
19   A.   That's correct.  It's very common.
20   Q.   And in Mr. Goode's case, you did not relate the
21 pulmonary edema or the fluid in his lungs to asphyxia,
22 did you?
23   A.   No.  Again, it's -- it's a non-specific
24 finding.
25   Q.   You were also asked about congestion in the

87

1   liver, kidneys and spleen.

2                     Remember those questions?

3       A.   Yes.

4       Q.   That too is a non-specific finding, right?

5       A.   Correct.

6       Q.   It is not an uncommon finding at the time of

7   autopsy, is it?

8       A.   That's correct.

9       Q.   You did not relate the finding of congestion in

10  the liver, kidney and spleen to Mr. Goode to asphyxia in

11  this case, did you?

12      A.   No.

13      Q.   Did you find any petechiae around his eyes?

14      A.   No.

15      Q.   You were asked questions about petechiae around

16  the eyes, but there were none found in Mr. Goode, were

17  there?

18      A.   No.

19      Q.   Even though you didn't conclude that Mr. Goode

20  overdosed on LSD, you still think LSD was the

21  precipitating cause of his death as you've described

22  here today, right?

23      A.   I do.

24      Q.   In your autopsy report, which has been marked

25  as Exhibit 1, you did not attribute Mr. Goode's death to

Erin Barnhart - September 20, 2017

88

1  the manner in which he was restrained, did you?

2      A.  I did not.

3      Q.  It has not been your intention today in

4  response to any question asked to criticize the care

5  provided by the emergency room physician, Dr. Oliver,

6  has it?

7      A.  No.

8      Q.  Are you board-certified, Doctor?

9      A.  I am.

10     Q.  By what boards?

11     A.  The American Board of Pathology in anatomic

12  pathology, clinical pathology and forensic pathology.

13     Q.  How long have you held those board

14  certifications?

15     A.  Anatomic and clinic pathology since 2009;

16  forensic pathology since 2010.

17     Q.  In the years that you have been working as a

18  forensic pathologist, will you tell us the approximate

19  number of autopsies you've been involved with.

20     A.  At last count, I think about 2800.  That's

21  out-of-date.  I would say it's closer to 32 or 3500 at

22  this point.

23     Q.  In the office where you now work in Galveston

24  County, Texas, about how many autopsies a year does that

25  office perform?

Erin Barnhart - September 20, 2017

89

1      A.   About 1200.

2      Q.  When you concluded that Mr. Goode died of

3  complications of LST -- LSD toxicity, did you rely upon

4  your education and training as a forensic pathologist to

5  reach that conclusion?

6      A.  I did.

7      Q.  When you concluded that Mr. Goode died of LSD

8  toxicity -- complications of LSD toxicity, did you rely

9  upon your experience as a forensic pathologist?

10     A.  I did.

11     Q.  Okay.  Have the opinions that you've expressed

12 in response to my questions been given to a reasonable

13 degree of medical certainty?

14     A.  Yes.

15             MR. PHILLIPS:  Thank you, Dr. Barnhart.

16             MR. UPCHURCH:  Doctor, good afternoon.  My

17 name is David Upchurch.  We met prior to your deposition

18 today.  Let me follow up briefly on the questions that

19 have been asked to you regarding the petechiae.

20             E X A M I N A T I O N

21 BY MR. UPCHURCH:

22     Q.  As I understand your discussion with

23 Mr. Edwards at the onset of your deposition, when one

24 has a diagnosis of asphyxia, did I understand correctly

25 that typically, pathological findings will include

Erin Barnhart - September 20, 2017

90

1  petechiae in the eyelids or conjunctivi?

2      **A.**   **Yes.**

3      Q.  If we look at your autopsy report on page 2

4  under external examination, the petechiae that you noted

5  were on the back and lateral torso, correct?

6      **A.**   **Yes.**

7      Q.  You did not find upon your external examination

8  any ocular facial petechiae hemorrhages, did you?

9      **A.**   **No.**

10      Q.  Nor did you find any plural hemorrhages in your

11  evaluation?

12      **A.**   **No, I did not.**

13          MR. UPCHURCH:  Thank you, ma'am.  That's

14  all I have for you.

15          MR. EDWARDS:  Brad?

16          MR. DILLARD:  Yes, sir.

17          Doctor, my name is Brad Dillard.  I'm one

18  of the attorneys for the Southaven defendants.

19          E X A M I N A T I O N

20  BY MR. DILLARD:

21      Q.  And I simply want to be sure I understand your

22  testimony.

23          Am I correct it is not your intention to

24  criticize, nor have you criticized, the actions of the

25  Southaven Police Department or the Southaven EMS in

**Alpha Reporting Corporation**

Erin Barnhart - September 20, 2017

91

1  regard to their interactions with Mr. Troy Goode?

2      A.   No, that's not my intention.

3      Q.   And you, in fact, have offered no such

4  criticisms, correct?

5      A.   Not to my knowledge, no.

6             MR. DILLARD:   Thank you.

7             MR. JORDAN:   This is Trey Jordan on behalf

8  of Southeast Emergency Physicians.   I do not have any

9  questions of the doctor at this time.

10            MR. EDWARDS:   Doctor, very briefly, let me

11 follow up.

12         F U R T H E R   E X A M I N A T I O N

13 BY MR. EDWARDS:

14     Q.   You were asked about marijuana.

15            Marijuana played no part in this death, did

16 it?

17     A.   I don't believe it did.

18     Q.   How many states have legalized marijuana now?

19     A.   I don't know.

20     Q.   It's in excess of 20, isn't it?

21     A.   I don't know.

22     Q.   Are you an LSD expert?

23     A.   No.

24     Q.   You've never written on LSD?

25     A.   No.

Erin Barnhart - September 20, 2017

92

1     Q.   You've never tested LSD?

2     A.   I -- I've tested for it.

3     Q.   Right.  But you've -- have you ever done

4  testing of subjects on LSD?

5     A.   No.

6     Q.   Do you know who Timothy Leary was?

7     A.   I do.

8     Q.   At Harvard?

9     A.   Yes.

10    Q.   Do you know who Al -- Aldous Huxley was?

11    A.   Yes.

12    Q.   Both of them were big proponents of LSD?

13    A.   Yes.

14    Q.   Okay.  You didn't know that Mr. Goode was

15 asthmatic?

16    A.   Again, I found that out somehow later, I

17 believe, through a media article or something.

18    Q.   You weren't told that the police were given his

19 rescue inhaler at the scene?

20    A.   No, I don't recall ever being told that.

21    Q.   Okay.  You weren't made aware of the

22 independent witness who saw Mr. Goode in the hospital

23 and what she said about his condition?

24    A.   No.

25    Q.   You said the -- in response to one of

Alpha Reporting Corporation

Erin Barnhart - September 20, 2017

93

1  Mr. Phillips' questions, the precipitating cause of the

2  death was LSD?

3      A.  Yes.

4      Q.  That's true in every police custody case, that

5  there is some precipitating cause that gets the police

6  to bind the suspect, right?

7      A.  I would think so.

8      Q.  So you could say the precipitating cause in any

9  case was alcohol or public unruliness or whatever,

10  right?  You could say that in any case involving police

11  excessive force?

12      A.  I wouldn't attribute a death to being unruly.

13      Q.  Well, let's -- let's assume you have a case

14  involving alleged police excessive force.  The police

15  got involved with the person that died for some reason.

16          Would you agree?

17      A.  Yes.

18      Q.  So in every case involving police excessive

19  force, you could say the precipitating cause was public

20  drunkenness, for instance?

21      A.  I wouldn't be able to make that generalization.

22  I mean, it -- it would depend on what type of

23  interaction occurred with the police.  Obviously if the

24  police shot someone, that's a very different situation.

25      Q.  Well, that's a -- that's a good analogy.

Alpha Reporting Corporation

94

1          Let's suppose somebody is -- is drunk in
2   public and raising Cain and making a nuisance of
3   themselves.  Somebody calls the police and the police
4   arrive and shoot the person.

5          In that case, would you say that the
6   precipitating cause was the public drunkenness?

7       A.  No.  But I think you're comparing being shot to
8   being restrained, which I've already said I don't feel
9   that that was the cause of death, or a contributory
10  cause --

11      Q.  I -- I know --

12      A.  -- of his death.

13      Q.  -- you said that, but you said that the
14  precipitating cause in response to Mr. Phillips'
15  question was LSD.  Well, the man who was shot over in
16  South Carolina, the precipitating cause was he was drunk
17  in public and then he was shot.

18          And so my question is, in that case, would
19  you say the precipitating cause was the man being
20  publicly unruly and drunk?

21          MR. PHILLIPS:  Object to the statements and
22  testimony of counsel and also the foundation of the
23  question.

24          MR. UPCHURCH:  Join --

25      A.  I would --

Erin Barnhart - September 20, 2017

95

1      MR. UPCHURCH: -- the objection.

2      **A.   I would say no, because, again, I don't think**

3  **being restrained and being shot are analogous.**

4      Q.   (BY MR. EDWARDS)  All right.  Well, let's say

5  -- let's say that somebody's publicly drunk.  And by --

6  by the way, you agree that the most abused drug in the

7  United States by far and away is alcohol, correct?

8      **A.   Yes.**

9      Q.   No question about that, right?

10     **A.   I would think so.**

11     Q.   Yeah.  All right.

12          Well, let's -- let's say that somebody is

13  drunk, some college kid at UT and he's...

14          MR. MCCRACKEN:  They don't drink at UT.

15     Q.   (BY MR. EDWARDS)  A&M.  A&M.  And so the cops

16  show up and bind him in such a fashion that he

17  ultimately dies from that.

18          Was the precipitating cause alcohol, in

19  your mind?

20     **A.   Again, you're attributing someone's death to**

21  **the way in which they were bound, which I would have to**

22  **know more about that history.**

23     Q.   Doctor, you said that the precipitating cause

24  was LSD.

25          The precipitating cause of Mr. Goode being

**Alpha Reporting Corporation**

96

1  bound was because he was having a bad trip, right?

2       A.   Because he was psychotic, yes.

3       Q.   Okay.  And so can you be psychotic from

4  alcohol?

5       A.   I suppose so.

6       Q.   Yeah.  Can you be psychotic from cocaine?

7       A.   Sure.

8       Q.   You can be psychotic because of mental health

9  issues?

10      A.   Sure.

11      Q.   And so in those cases -- let's say this.

12 Suppose he had been mentally ill.

13           Would you have put as his cause of death

14 mental illness as the precipitating cause?

15      A.   If -- if I believed that he had an excited

16 delirium-type picture and I believed that -- depending

17 on the way he was restrained, that the restraints did

18 not cause his death, then, yes, I would make it the

19 underlying cause.

20      Q.   The -- the mental disease?

21      A.   If I believed that that was what precipitated

22 an excited delirium-type picture.

23      Q.   Okay.  And -- and precipitated the police

24 involvement?  I'm using police involvement in these

25 cases.

Erin Barnhart - September 20, 2017

97

1    A.   Right.   Then -- then, yes, assuming that I
2    didn't believe that the police restraint, whatever that
3    was, was non-lethal.
4        Q.   Aren't you -- in these cases what you're doing,
5    you're blaming the victim, aren't you?
6        A.   It's not my job to blame anyone.   That's...
7        Q.   It's your job to tell the truth so that the
8    public record will know why a person died, right?
9        A.   Yes.
10       Q.   And what you've said here tells the public
11   nothing, does it?
12           MR. PHILLIPS:   Objection, argumentative.
13           MR. UPCHURCH:   Join.
14       Q.   (BY MR. EDWARDS)   You may answer.
15       A.   I guess it depends on what the public wants to
16   hear.
17       Q.   Have you ever listed as a cause of death, you
18   personally prior to this, complications of LSD toxicity?
19       A.   No, but I have listed complications of other
20   drug toxicities many times.
21       Q.   Like cocaine?
22       A.   And others or mixed drug toxicity.
23       Q.   Stimulant drugs?
24       A.   No, also depressive-type drugs.
25       Q.   Like what?

98

1      A.   Alprazolam, Bentazepam, opioids, morphine,
2  Soma, Tramadol.  There's -- mixed drug toxicities are
3  very common.
4      Q.   When you have excessive doses, right?
5      A.   Not necessarily.  It would depend on the
6  combination.
7      Q.   Oh, you might -- you -- you're talking about
8  drug interactions?
9      A.   Yes, or just cumulative effect.
10     Q.   Okay.  What cumulative effect was present with
11  Mr. Goode?
12     A.   I never said there was a cumulative effect.
13     Q.   So your answer is none, right?
14     A.   No, I -- I didn't attribute his death to any
15  sort of cumulative effect.
16     Q.   Have you ever heard of any forensic pathologist
17  listing cause of death as complications of LSD?
18     A.   No.
19     Q.   Did you rely upon the Chan and Newman studies
20  to conclude that the manner of a restraint was not the
21  cause of death here?
22     A.   I wouldn't say I relied on them, but it's -- I
23  mean, they -- they are studies that -- that influence
24  the way I think in general.  I don't know that I pulled
25  them out specifically for this case.

99

1    Q.  Can you tell us about the similarities of those

2  studies to the facts of this case?

3    A.  No.  I haven't read them in years.

4    Q.  So the Chan and Newman studies may be factually

5  totally dissimilar to this case?

6    A.  That's possible.  Again, I don't -- I haven't

7  read them in -- in years.

8    Q.  Okay.

9          MR. EDWARDS:  That's all I have, Doctor.

10  Thank you.

11          F U R T H E R   E X A M I N A T I O N

12  BY MR. PHILLIPS:

13    Q.  Dr. Barnhart, as a forensic pathologist, do you

14  have expertise pertaining to drugs in general?

15    A.  In general, yes.

16    Q.  And including LSD?

17    A.  In general, yes.

18    Q.  And in your particular examination of Mr. Troy

19  Goode, you actually looked at and felt his lungs, didn't

20  you?

21    A.  I did.

22    Q.  And when you did that, there was no evidence at

23  all of asthma, was there?

24    A.  No.

25    Q.  And in addition to looking at his lungs and

Erin Barnhart - September 20, 2017

100

1  feeling of his lungs, you also took portions of tissue

2  and analyzed them carefully under a microscope, didn't

3  you?

4      A.  I did.

5      Q.  And when you did that, there was no evidence at

6  all of asthma, was there?

7      A.  No.

8              MR. PHILLIPS:  Thank you.

9          F U R T H E R   E X A M I N A T I O N

10  BY MR. EDWARDS:

11      Q.  Doctor, did you find any ductal

12  over-insufflation and alveoli collapse?  Did you look

13  for those things?

14      A.  I'm sorry.  Can you repeat the first part?

15      Q.  Yes.

16              In your -- did you do a microscopic study

17  of the lung tissue?

18      A.  Yes.

19      Q.  Did you find any evidence of alternating zones

20  of ductal over-insufflation and alveoli collapse?  I'm

21  sorry.

22      A.  Yes.

23      Q.  You did find that?

24      A.  I did.

25      Q.  Those are characteristic -- I'm sorry.  I've

Erin Barnhart - September 20, 2017

101

1    got a frog in my throat.

2              Those are characteristically present in

3    cases of death by suffocation, correct?

4        A.   This is the first time suffocation's been

5    brought up.  Suffocation is a completely different thing

6    from anything we've talked about.

7        Q.   Well...

8        A.   And the -- and the alternating areas of the

9    hyper -- hyperextension and atelectasis are very

10   non-specific.  And, again, as I mentioned, a lot of it

11   has to do with the physical contact we had with the lung

12   tissue which compresses portions of it and ruptures

13   other portions of it.

14       Q.   Doctor, my question stands.  I understand that

15   we haven't talked about suffocation, but the question

16   stands.

17             In cases of -- of -- let me read it to get

18   it correctly -- ductal over-insufflation and alveoli

19   collapse, those are always found where death is

20   determined to be by suffocation?

21       A.   I don't know.

22       Q.   Is the American Journal of Forensic Medical

23   Pathology a reliable periodical in your field?

24       A.   It's -- it's one of many that's -- that may be

25   useful.

Erin Barnhart - September 20, 2017

102

1    Q.   Is it peer-reviewed?

2    A.   **Some of the articles are; some aren't.**

3    Q.   Is it considered authoritative?

4    A.   **Again, it would depend on the article.**

5    Q.   All right.  Are you saying that the American

6    Journal of Medical Pathology might publish an article

7    that was not authoritative?

8    A.   **Yes, as would many journals.**

9    Q.   Okay.

10             MR. EDWARDS:   Thank you.

11             THE VIDEOGRAPHER:   Done?

12             This concludes today's deposition.  Off

13   record 1:53.

14             MR. JORDAN:   This is Trey Jordan.  I would

15   like just a copy of the transcript, the transcript only

16   with a keyword index.  That's all I need.

17             MR. DILLARD:   This is Brad Dillard.  I

18   would like a regular and a condensed version.

19             MR. GASS:   This is Ric Gass.

20             Marty, would you order for us.

21             MR. PHILLIPS:   Yes.  I'll --

22             MR. GASS:   Be sure the condensed and also a

23   copy of the video.

24             MR. PHILLIPS:   Yeah, I'll handle our order.

25   Thank you.

**Alpha Reporting Corporation**

103

1                MR. GASS:  Okay.  Thank you.

2                MR. DILLARD:  This is Brad again.  I would

3    like a copy of the video as well, please.

4                MR. UPCHURCH:  David Upchurch would like a

5    copy of the transcript with a condensed as well, please,

6    and I would like a copy of the video too.

7                MR. EDWARDS:  Same here for the plaintiffs.

8                MR. PHILLIPS:  That's what I want, the full

9    thing, the condensed and the video and, of course, the

10   exhibits.

11               (Proceedings concluded at 1:56 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

104

CHANGES AND SIGNATURE

1

2  WITNESS NAME:  ERIN BARNHART, M.D.

3  DATE OF DEPOSITION:  SEPTEMBER 20, 2017

4  PAGE        LINE      CHANGE                REASON

5  _____

6  _____

7  _____

8  _____

9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

Erin Barnhart - September 20, 2017

105

1          I, ERIN BARNHART, M.D., have read the foregoing

2    deposition and hereby affix my signature that same is

3    true and correct, except as noted above.

4

5

6                              _____

7                              ERIN BARNHART, M.D.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Erin Barnhart - September 20, 2017

106

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF MISSISSIPPI
 2                       OXFORD DIVISION

 3

 4  KELLI DENISE GOODE,            )
    Individually, and also as     )
 5  the Personal                  )
    Representative of Troy         )
 6  Charlton Goode, Deceased,     )
    and as Mother, Natural        )
 7  Guardian, and Next Friend     )
    of R.G., a Minor, and         )
 8  also on behalf of all         )
    similarly situated            )
 9  persons,                      )
         Plaintiff,               )
10                                )
    v.                            )  Civil Action No.
11                                )     3:17-cv-060-DMB-RP
                                  )
12  THE CITY OF SOUTHAVEN, et     )
    al.,                          )
13       Defendants.              )
```

14                    REPORTER'S CERTIFICATION

15              DEPOSITION OF ERIN BARNHART, M.D.

16                     September 20, 2017

17          I, Julie R. Borski, Certified Shorthand

18  Reporter in and for the State of Texas, hereby certify

19  to the following:

20          That the witness, ERIN BARNHART, M.D., was duly

21  sworn by the officer and that the transcript of the oral

22  deposition is a true record of the testimony given by

23  the witness;

24          That the original deposition was delivered to

25  Mr. Tim Edwards, Custodial Attorney.

**Alpha Reporting Corporation**

Erin Barnhart - September 20, 2017

1      That a copy of this certificate was served on

2  all parties shown herein on _____ _____.

3      I further certify that pursuant to FRCP Rule

4  30(f)(1) that the signature of the deponent:

5      _X_ was requested by the deponent or a party

6  before the completion of the deposition and that

7  signature is to be returned within 30 days from the date

8  of receipt of the transcript.  If returned, the attached

9  Changes and Signature Page contains any changes and the

10  reasons therefore.

11      ____ was not requested by the deponent or party

12  before the completion of the deposition.

13      I certify that I am neither attorney or counsel

14  for, related to, nor employed by any of the parties or

15  attorneys in the action in which this proceeding was

16  taken.  Further, I am not relative or employee of any

17  attorney of record in this cause, nor am I financially

18  or otherwise interested in the outcome of this action.

19

20

21

22

23

24

25

Erin Barnhart - September 20, 2017

108

1        Certified to by me this 3rd day of October,

2   2017.

3

4

5                        _____
6                        Julie R. Borski, Texas CSR 9311
                         Expiration Date:  12/31/17
7                        Alpha Reporting Corporation
                         236 Adams Avenue
8                        Memphis, Tennessee  38103
                         901.523.8974

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Erin Barnhart - September 20, 2017**

**Exhibits**

Exhibit 1
Exhibit 2
Exhibit 3
Exhibit 4

**1**

**1** 11:6,8 60:12 72:1
82:12 87:25
**10** 32:8
**100** 8:3
**10th** 51:4
**11:32** 6:2
**1200** 89:1
**15th** 7:25
**16** 48:14,17 49:11,22
**17** 51:14
**172** 34:15
**19th** 76:4,9
**1:04** 72:2,3
**1:15** 72:3,5
**1:53** 102:13

**2**

**2** 44:10,11,19 45:3,4
49:4 59:22 72:4 90:3
**20** 10:25 91:20
**2002** 60:13
**2009** 88:15
**2010** 88:16
**2015** 7:25 10:25 51:14
84:22 85:6
**2017** 6:2
**20th** 6:1
**21** 61:13

**27** 60:6,17
**2800** 88:20

**3**

**3** 47:1,2
**32** 88:21
**3500** 88:21
**3:17-cv-060-dmb-rp**
6:5

**4**

**4** 44:20 46:11 48:3
51:10
**40-some-odd** 49:10
**46** 48:17
**4800** 47:19,22

**5**

**504** 23:20

**6**

**6810** 6:3

**7**

**7** 54:11
**70** 64:1 72:14,20
**72** 34:14
**77069** 6:4

**8**

**8** 45:13,23
**840** 11:13

**9**

**9** 46:11 48:3
**900** 11:13

**A**

A&m 95:15
a.m. 6:2
ABG 61:2,6,10
ability 25:23
abnormal 14:20 61:5
abrasions 34:19
abuse 24:13,18
abused 95:6
accident 60:5 84:6
accidents 48:21
accumulate 11:21
14:7
accurate 34:19 53:1,2
76:14
accusing 55:25
acidosis 31:2,5,8,13
77:13 78:4
acidotic 77:18
actions 90:24
actively 29:18
actual 30:12
acute 46:12
add 54:7
added 51:7
addictive 17:1,3
addition 54:3 99:25
additional 67:16
Additionally 24:16
addresses 60:17
administering 63:16
administrative 65:7
admission 15:20
adult 43:13
advent 76:11
affects 70:15

aforementioned
21:12,14
afternoon 89:16
ages 71:8
aggression 23:12
55:17,22
aggressive 18:5,9
34:9 56:1
agitated 34:5 55:19
58:8
agitation 27:18 28:5
31:2
agonal 28:25 29:3
agree 16:20 21:25
22:15,25 23:4 24:21,22
32:15 37:21 38:2 48:16
58:5,18 64:4 66:8
78:15 79:16 93:16 95:6
ahead 27:7 43:9,11
77:24
alcohol 17:20 21:23
93:9 95:7,18 96:4
Aldous 92:10
alleged 93:14
Alprazolam 98:1
altercation 71:17
alternately 39:24
alternating 14:13
15:1,12 100:19 101:8
alveoli 100:12,20
101:18
ambulance 40:24 41:7
America 24:14
American 9:25 65:10
88:11 101:22 102:5
amount 46:23 47:7
amphetamines 17:20
76:13
analogous 95:3
analogy 93:25
analyzed 100:2

**Alpha Reporting Corporation**

Erin Barnhart - September 20, 2017

anatomic 9:19 88:11, 15

and/or 41:18

ankle 41:18

antemortem 74:23

apologize 25:21

apparently 21:7

appearance 8:5

appeared 62:7

applicable 49:17

approved 60:13

approximate 88:18

approximately 6:2 11:15,17

area 32:12 38:16

areas 14:13,18 15:1,12 48:5 72:22 101:8

argue 32:19,21 37:11

arguing 38:4

argumentative 97:12

armed 35:6

arms 40:19

arrest 21:22

arrhythmia 29:16,19, 22 71:15 77:12 78:6,7

arrhythmias 29:17

arrival 36:14

arrive 63:17 94:4

arriving 78:8

arterial 60:24

article 37:17 70:8 92:17 102:4,6

article-by-article 10:21

articles 10:10 22:19 69:10,19 102:2

artifactual 14:24

aspects 14:5

asphyxia 11:22 12:6,8, 9,12 13:16,18 14:2,3, 10 15:13 49:24 58:10 62:25 63:2,11,19 69:6 80:24 86:21 87:10 89:24

asphyxiate 81:3,5

asphyxiated 81:1,6

asphyxiation 81:11, 14,18

assigning 74:20

assisted 60:25 61:8

association 15:6 24:17 25:3 43:24 49:6 50:2 54:24 61:13 63:25 65:11 66:13

assume 7:15 9:14 48:12 73:24 93:13

assuming 37:8 97:1

assumption 33:13,15

asthma 70:13,15 99:23 100:6

asthmatic 69:25 70:6, 9 92:15

atelectasis 14:14,25 101:9

Ativan 73:23 74:2

attack 71:4,10

attacks 48:22 71:14

attempt 33:11

attending 7:1

attorneys 90:18

attributable 46:17 59:23

attribute 62:24 87:25 93:12 98:14

attributing 95:20

author 69:11

authoritative 10:7,14 102:3,7

authority 17:15 25:17 37:13

authors 21:14

automatically 65:21

automobile 60:5

autopsies 80:10 88:19,24

autopsy 10:22 11:2 20:22 33:4 43:7 50:14 51:1 56:2,7,18,20 59:17 63:3 64:3,8,11 65:5,17 66:10 79:2,5,7, 10,14,18 80:4,6,13 82:1,8,11 84:8 86:18 87:7,24 90:3

avoid 58:9

aware 15:11,14 16:3 20:19 24:24 43:12 52:10 58:7 67:5 70:5 73:22,25 92:21

awkward-type 63:9

ayahuasca 19:4

**B**

back 9:13 13:23 34:23 35:7 39:16 54:22 60:22 61:12 69:14 79:13 90:5

background 15:16

bad 17:9 85:17 96:1

bang 40:4

Baptist 6:16 15:21 30:11,16 64:19 83:5

bar 42:3,9

Barnhart 6:9,20 7:2,7, 8 44:14 81:22 89:15 99:13

based 27:12 61:22 77:16

baseline 57:19

bases 59:9

basically 35:23 69:12

basis 10:19,21 20:24 69:4 75:22

beat 13:3

beating 12:3 30:7

beginning 45:13,23

begins 72:4

behalf 6:15 91:7

behavior 23:11,13 51:24 57:19,23

believed 68:5 96:15, 16,21

bell 25:25

benefit 38:15 83:22

Bentazepam 98:1

big 92:12

bind 93:6 95:16

bit 74:17

blame 97:6

blaming 97:5

bleeding 39:3

blood 12:19 13:4 30:15,19 60:24 61:7 78:23

blunt 78:21

board 88:11,13

board-certified 88:8

boards 88:10

body 25:13 27:20 35:9, 12 36:15 37:4 83:8,14 84:15

bold 76:1

bones 52:3,9

book 20:16 23:23 66:3

bottom 53:24

bound 27:24 39:15 95:21 96:1

Brad 6:23 26:24 90:15, 17 102:17

brain 72:15

Branch 9:10

break 71:22,25

**Erin Barnhart - September 20, 2017**

breath 73:8

breathe 70:25

breathing 28:24,25 29:3,5,6 63:10 69:15 70:16,19

briefly 66:7 89:18 91:10

bring 22:9 57:22 86:7

Britain 22:20

broad 16:13

brother 21:7

brought 101:5

bruise 39:5

builds 12:2

buildup 11:19 12:5 13:2,4,8,12

bulging 73:7

but/for 54:11,24

button 26:5

**C**

C-H-A-N 69:11

Cain 94:2

call 22:17 23:5 28:2 35:21 52:8 57:2

called 46:18 52:16 80:22

calling 58:13

calls 65:2 79:21 94:3

cancer 48:22

cannabinoid 51:7

cannabinoids 51:22 52:7,19

capabilities 72:19

capacity 30:5 82:20

cardiopulmonary 21:22

care 61:13,15,24 88:4

carefully 83:10 100:2

Carolina 94:16

case 6:4,7 8:4 18:10 22:12 25:4 28:18,22 35:20 37:3 48:8 49:15 50:18 57:2 58:17 63:17 64:18 65:2 71:12 76:1 80:14 81:23 86:20 87:11 93:4,9,10,13,18 94:5,18 98:25 99:2,5

case-by-case 20:24

cases 13:16,18 15:13 21:12,14 22:13,23 24:12,24 32:7 33:24 45:25 46:8 61:20 62:20,22,23,24 63:1,19 66:17,20 71:10 80:10 96:11,25 97:4 101:3,17

catecholamine 25:12, 14 28:14

catecholamines 25:15

categories 48:10,17, 25 49:16 60:4 67:21

category 18:15 46:14 59:23 74:13

caused 16:2,22 22:13, 24 28:6 34:8 53:16 66:5 68:2,5,25 76:19 77:5 79:15 80:17 81:4

caution 42:25 43:3

ceasing 13:3

Center 71:3

central 17:11

Century 76:4,9

ceremonies 18:19

certainty 27:12 29:10 61:23 84:3,11 85:24 89:13

certifications 88:14

certifying 21:15

cetera 21:18,24 69:14

chained 16:6

Chan 69:11,24 98:19 99:4

change 30:6 67:15

characteristic 100:25

characteristically 101:2

characterized 85:17

check 25:14 69:14

cheek 34:19

chief 7:22 8:13 9:1 82:2,20

chin 34:19

choice 42:1

choke 63:15,16

chose 38:8

circumstances 20:1 30:8 56:23

circumstantial 23:10 56:15 63:5

cite 17:15 18:10 86:3

City 6:8 64:11

clarification 58:6

class 17:21

classification 44:7 49:6,19 54:11 59:22 61:14 66:5

classifications 49:10

classified 57:6 68:3 80:20

classify 43:18 45:14

clinic 88:15

clinical 74:5 88:12

clinician 58:7

closer 88:21

coauthor 69:12

cocaine 17:20 19:11 21:17,23 24:13,15,18 34:4,7 76:11,13 96:6 97:21

cocaine-related

19:14

collapse 15:12 100:12, 20 101:19

colleagues 61:21

college 95:13

collisions 60:19

colloquial 40:16 41:9

combination 19:15 25:11 67:22 98:6

comfortable 58:20 74:20,24 75:2

commenting 58:20

commit 55:23

common 13:15,17,18 14:1,10,11,17 15:13 86:19 98:3

commonly-read 10:9

comparing 94:7

completed 9:9,11,13

completely 48:20 74:24 75:2 101:5

complicated 46:8

complication 26:9,14 31:8 53:20 54:2 68:13, 16,23 76:18 80:24

complications 16:10 20:5 26:17,20 53:14, 16,25 67:17 68:9 75:7 76:17,25 77:4 79:11 82:16 83:23 89:3,8 97:18,19 98:17

comprehensive 46:7 48:20

compresses 70:21 101:12

concept 31:12

concerned 49:25

concisely 59:6

conclude 16:5 35:25 79:20,23 87:19 98:20

concluded 83:23 84:5 89:2,7

**Erin Barnhart - September 20, 2017**

concludes 102:12

concluding 37:10

conclusion 26:12 66:9 71:6,7 82:19 83:3,7,10, 13,17 89:5

condensed 102:18,22

condition 16:5 70:15 92:23

conditions 57:5

confer 64:22

confident 25:3

congested 12:16,18, 19

congestion 12:20,22 13:15 86:25 87:9

conjunctival 14:4

conjunctivi 90:1

connected 41:19

connection 24:14

considered 26:15,16 27:17 38:3 56:13 71:11,15 102:3

consistent 12:21 15:2, 4 37:3

contact 39:7 101:11

contacted 64:10

continued 24:15

contrast 19:11

contribute 27:14,16 74:2

contributed 16:2 26:22 61:24 68:2,6,25

contributing 16:7 43:17

contributory 21:18 43:22 94:9

contusion 78:23

convinced 68:7,17,25 69:1,2

copied 51:12

cops 95:15

copy 45:16 46:25 65:21 83:4 102:15,23

corner 63:12

coroner 33:5 41:1 64:14,16

correct 7:13,14 8:21 10:23 13:24 14:14 16:24 17:1 18:13 31:4 32:24 37:8 38:13 45:14 46:15 49:13 51:16 53:17 63:22,23 70:19 74:11 75:3,14 80:20 82:13 85:21 86:19 87:5,8 90:5,23 91:4 95:7 101:3

correctly 13:21 89:24 101:18

counsel 6:10 23:2 47:25 55:21 59:2 94:22

count 88:20

County 7:23 9:12 64:15 88:24

couple 61:20 69:10,22

court 6:6,11 44:15,18 80:10

courthouse 8:4

courtroom 8:10

cover 26:2 60:4,6

covered 53:12

criminal 80:10

criteria 57:13 71:8,10

critical 73:19

criticisms 91:4

criticize 88:4 90:24

criticized 90:24

cumulative 98:9,10, 12,15

current 7:21 61:4 62:17,18 69:5,8

custody 33:19 73:2 93:4

**D**

danger 42:23

dangers 42:13,20 43:13

data 19:10 74:23

date 60:8

David 6:15 89:17

Davis 71:9

day 15:17 51:23 64:18 82:25

De 20:6

DEA 85:8

dead 29:11 56:25

deal 48:10

dealing 57:12

deals 9:20

dealt 28:18

death 9:21,23 12:24 16:2,7,9,16,18,19,22 19:8,11,19,25 20:1 21:15,16,21 22:4,13,24 23:9 25:8 26:22 27:15 28:25 29:15,22 32:9,20 36:22,25 37:19 38:6 43:17 44:7 48:25 49:5, 10,20 51:20 53:1,10 54:10 55:6 56:4,14 57:7,17 59:22 60:25 61:18,24 62:25 63:2 66:17,19 67:18,20,21 68:3,5,6,25 73:15 74:3, 11,20 75:6 76:19,23 77:5 78:16,17,25 79:8, 24 80:17,21 82:6,8,16, 21 83:1,20,23 84:5,11 87:21,25 91:15 93:2,12 94:9,12 95:20 96:13,18 97:17 98:14,17,21 101:3,19

deaths 19:14 45:14 46:11 59:23 66:5 69:6

debate 42:24

decedent 14:7 28:19 63:6,7,8

decedents 12:2,23

decided 51:24 52:20

decisions 36:21

deemed 22:13,23

defendant 6:16

defendants 6:24 90:18

definition 40:17 41:11

definitive 39:18 56:7

degree 27:12 29:9 61:23 84:3,11 85:23 89:13

delirium 19:22 20:2, 17,21 21:12,16 22:3, 14,17,24 23:5,8,16 24:12,15,16 25:1,3,7 27:20 31:3,9,12,16,24 32:1,6,9,16,20 33:24 35:14,22,25 37:1,5,10, 12,20 38:1,4,7 55:8,10, 14,15,25 56:3,8,9,14, 15,24 57:2,6,16 58:3 62:24 63:21 66:6,15, 17,20,25 72:21 74:6, 11,13,14,21 75:6,9,18, 20,24 76:3,10,12

delirium-type 96:16, 22

demands 27:19

Denise 6:7

department 36:15 90:25

depend 93:22 98:5 102:4

dependant 14:6

depending 96:16

depends 28:9,10 34:2 97:15

deponent 6:8

deposition 6:3 8:5 82:12 86:7 89:17,23 102:12

depositions 7:15

---

**Erin Barnhart - September 20, 2017**

depressive-type 97:24

deprivation 15:2,4

deputy 9:1 82:3,20

derangement 31:11 76:22

derangements 77:7 78:9,10

describe 41:22 78:25

describing 41:13

description 48:18

descriptive 21:21 49:19

designated 43:8

Desoto 15:24 64:14

determination 9:21 72:7

determine 77:22 82:6

determined 101:20

determining 9:23 60:25

Di 20:14,16,19 21:7,11, 25 23:18 66:3,8

diagnosed 76:3

diagnosis 20:20 30:6 31:15 55:15 56:8,16,24 58:3 63:4 66:15 67:4, 15,17,19 74:25 89:24

diaphragm 70:21,24

die 32:1 50:3 57:1 63:11 79:15

died 15:18 37:25 48:18 54:17,19 55:1,3 68:9 78:21 85:21 89:2,7 93:15 97:8

dies 14:2,10 95:17

Dillard 6:23 26:24 27:3,9 90:16,17,20 91:6 102:17

direct 25:17,19

direction 84:14

directly 46:12,16

disagree 21:25 22:15, 25 24:21 37:22 38:2 58:19 79:16

disclosed 22:11 27:2 58:14

discuss 86:8

discussed 42:17

discusses 43:13

discussion 89:22

discussions 42:21

disease 96:20

disprove 57:16 58:2

dissimilar 99:5

District 6:6

disturbances 25:13

Division 6:7

doctor 7:10 11:11 21:10 22:10,18 24:3 26:7 27:7 31:21 35:18 38:9 43:9 45:9 47:13 49:8,18 50:2 51:8 53:23 59:10 60:23 62:16 68:18 72:6 73:19 76:3,24 80:23 84:22 88:8 89:16 90:17 91:9, 10 95:23 99:9 100:11 101:14

document 45:10 49:3, 9 54:24 82:15

documented 74:17

dopamine 72:7

dose 85:18

doses 98:4

double 11:15

drink 95:14

drug 19:4,17 23:14 34:4 46:12 76:6 84:17, 22 85:5 95:6 97:20,22 98:2,8

drugs 17:21 18:15 19:16 24:17 28:12 34:3 52:12 57:20 76:13

83:19 97:23,24 99:14

drunk 94:1,16,20 95:5, 13

drunkenness 93:20 94:6

ductal 100:11,20 101:18

due 12:10 13:11 14:21 38:6 46:12 50:3 68:18

duly 7:3

dying 29:18

---

**E**

earlier 53:7 55:16 60:3 68:18

Eastland 6:25

edema 12:2 86:14,21

edition 21:6 49:6 60:7, 10,12

educated 42:13,19 58:22

education 42:12 89:4

Edwards 6:13 7:5 11:5,9 12:5 17:3 18:22 21:1,2 23:3,6,20,24 24:2,5 25:24 26:6,7 27:1,7,11 29:4 31:21 43:9,11,23 44:10,16, 19,22 45:3,9,19,22 47:1,3 48:2 49:1,5,8, 13,18 55:22 58:18 59:3,7,10 60:9,14,20, 21,22 62:6,16 71:21 72:6 75:14 79:25 80:23,24 81:21 82:13 84:19 86:1,6,13 89:23 90:15 91:10,13 95:4,15 97:14 99:9 100:10 102:10

effect 18:6 19:10 98:9, 10,12,15

effects 17:20,23,25 25:11 28:7 46:12,17

EKG 30:12

electrolyte 25:13 77:13 78:9,10

element 37:10

elevated 35:12 36:15, 24 37:9 72:11

elevation 72:14,20

elicit 24:17

emergence 29:24

emergency 6:22 24:7 29:25 35:8 36:2,7,14 58:7 62:18 88:5 91:8

emotional 71:16

employed 8:19

EMS 30:3 33:6 36:3,4 90:25

en 52:3,9

encompass 74:13

encompassed 26:16

end 33:13

ending 16:15

ends 72:1

enforcement 33:18,21 48:11 49:24 50:4 62:23 76:7

entitled 45:24 51:13

environment 28:10

Erin 6:9 7:2,7

erratic 23:13 51:24 57:19,23

essential 37:10

essentially 39:5

establish 47:18 51:20

established 47:11,17

et al 6:7,8 37:16

ethical 70:3

ethically 64:25

evaluating 83:14

evaluation 90:11

## Erin Barnhart - September 20, 2017

events 16:15,17 53:13

evidence 19:6 29:21
36:18,19 37:8 44:19,22
45:5 52:25 72:13 74:10
99:22 100:5,19

exam 14:13 53:3

examination 90:4,7
99:18

examiner 7:22 8:13
9:1 82:3,20

examiner's 8:20 9:12
54:24

examiners 43:24 49:7
50:3,18 61:14 64:1
66:14

examining 83:8

excess 91:20

excessive 50:4 93:11,
14,18 98:4

excited 19:21 20:2,16,
20 21:12,16 22:3,13,
17,24 23:5,8,16 24:12,
15,16,25 25:3,7 27:20,
24 31:3,9,12,16,24
32:1,6,9,16,20 33:24
34:5 35:14,22,25 37:1,
5,10,12,19,25 38:4,6
55:8,10,14,15,25 56:3,
8,9,13,15,23 57:2,6,16
58:2 62:23 63:21 66:5,
15,17,20,24 72:21
74:6,11,13,14,21 75:5,
9,18,20,24 76:3,10,12
96:15,22

exhibit 11:6,8 44:10,11
47:1,2 49:4 51:10
59:22 82:12 87:25

existing 16:5

expect 29:1 48:8 61:4
62:10

expensive 65:14

experience 27:23 69:5
89:9

experiment 57:8

expert 32:12 43:8
58:13 62:5 91:22

expertise 99:14

experts 27:1

expressed 89:11

external 90:4,7

extremely 12:22 65:14

eyelids 14:5 90:1

eyes 73:7 87:13,16

eyewitness 73:1,3

eyewitnesses 73:18

### F

face 39:24 73:7

facedown 39:19

facial 90:8

fact 26:8,13 27:18
37:16 60:6 68:21 82:11
91:3

factor 16:15,17 43:17

factors 28:10 37:18

facts 99:2

factually 99:4

failed 33:12

fair 71:18

fairly 14:11 62:8 70:13

fall 46:4 63:12

falls 20:4 48:6

familiar 19:3,21,24
22:20 24:8,9 44:6
47:13 54:13 59:25

family 65:1

fashion 27:24 28:20
41:19 95:16

fast 30:8

fault 41:25

favor 12:24

feature 22:16 53:13
75:18

features 55:25 70:13

February 60:13

feel 11:9 25:3 28:21
53:11 58:20 94:8

feeling 100:1

fellowship 9:13

felt 74:12 99:19

fever 22:6 36:5,8

field 7:13 9:17,18 10:2,
13 44:4 101:23

filed 6:5

files 53:6

find 21:10 22:6 46:9
53:24 56:10,25 67:18
72:13 78:12 87:13
90:7,10 100:11,19,23

finding 12:1 13:16
14:1,10,20,25 15:13
35:12,13 37:4 57:3
63:21 66:18,19,23,24
86:18,24 87:4,6,9

findings 14:12 15:5
23:7 39:2 55:14 56:2,7,
12,19,21 63:3 64:23
65:5 67:6,10 74:19,22
79:3 80:5 86:13 89:25

fine 22:1

finish 51:1

finished 50:24

Firm 6:3

fit 46:14 48:8,25 49:11

flight-or-fight 28:3

Florida 9:12

fluid 11:19,21,25 12:2,
5,18 13:2,8 86:21

FM-1960 6:4

focus 9:23

folks 25:21

follow 89:18 91:11

force 49:15 78:22
93:11,14,19

forensic 7:12 9:11,19,
25 19:18 20:20 21:6

23:15 31:20 41:13,17
42:9,18,21,25 43:3,6
44:4 58:17,21 59:11,16
67:11 73:15 75:1
88:12,16,18 89:4,9
98:16 99:13 101:22

forgot 27:10

form 29:1 59:5 84:19

found 12:15,23 14:4
24:12 25:4 38:12 63:6,
8 68:1 87:16 92:16
101:19

foundation 23:2 27:6
31:19 43:20 47:25
58:12,16 62:2 94:22

frankly 16:13 22:5
33:12

free 11:9

frog 101:1

front 38:24

fulfill 82:2

### G

G-A-B-L-E 47:14

Gable 47:14

Galveston 7:23 8:1,
12,18 9:10,14 50:22,24
88:23

Garrett 7:1

Gary 30:25

gas 60:24

Gass 6:17 23:17,21
26:4 44:12,16,17,21,23
45:1,4,8 49:2 60:7,11,
15 102:19,22

general 12:9 13:17
28:17 35:16,17 38:8
47:12 98:24 99:14,15,
17

generalization 93:21

generally 12:12 16:20
17:16 19:15 22:16 23:4
32:18 35:15 38:3 42:16
65:3 76:21

**Erin Barnhart - September 20, 2017**

**give** 18:8 23:18 51:19 60:7 71:2 76:19 78:3 79:7

**good** 22:9 51:25 55:5 57:21,22 69:7 89:16 93:25

**Goode** 6:7,14 7:1 10:23 16:1 22:5 26:8, 13 27:15 32:23 34:11, 24 35:2 40:9,24 43:16 46:4,14,23 47:22 48:6, 18 49:11 50:7 54:16,19 55:1,23 59:18 61:25 62:21 64:22 65:4,17 67:6 69:20 70:5 72:14 73:1,7,22 79:15,20 82:2,22 83:8 85:20 87:10,16,19 89:2,7 91:1 92:14,22 95:25 98:11 99:19

**Goode's** 11:12,18 12:15 13:23 15:15 19:25 25:14 28:24 39:10 49:20 59:13 72:7 76:19 82:25 83:14,19 84:15 86:14,20 87:25

**Google** 67:24

**grams** 11:13

**Great** 22:20

**grossly** 61:23 70:13

**guess** 32:5 33:12,19 39:23 49:25 67:24 81:8 97:15

**guessed** 47:19

**Guide** 44:6 49:5 54:10 59:21

**gurney** 33:13,14 41:7

**guy** 69:10

––––––––––––––

**H**

**Haldol** 73:23 74:2

**half** 8:23 9:3 12:1 71:22

**hallucinations** 18:2

**hallucinogenic** 18:12 19:1

**hallucinogenics** 19:7

**hand** 11:7 38:15

**handcuffed** 39:10

**handle** 102:24

**handling** 14:22

**hands** 39:10,15

**happen** 39:6

**happened** 59:12,17 63:18

**Harvard** 92:8

**head** 38:23 39:1,22,24, 25 40:3,4

**heading** 20:5 45:7

**health** 70:4 96:8

**healthcare** 61:19

**healthy** 11:16 29:11 69:12

**hear** 25:23 57:14 81:15 97:16

**heard** 18:24 22:21 25:2 32:7 39:14,17 52:4 64:5 70:7 72:22 98:16

**heart** 12:3 13:3 25:12, 18 28:15 30:7,10 48:22 71:4,10,14 78:23

**heartbeat** 29:13,15

**heat** 72:14,20

**heavier** 11:18

**held** 7:24 88:13

**helpful** 30:24 46:7 61:9 67:12,13,16 70:12 73:9,10,11,21 78:16

**hemorrhage** 38:12 39:3,4

**hemorrhages** 90:8,10

**hemorrhaging** 39:22 40:8

**high** 32:3,4 64:6 85:18

**high-risk** 58:9

**highlighting** 51:11

**highly** 20:1

**Hiram** 6:25

**histological** 15:13

**histologically** 70:1

**history** 16:2,4 57:1 95:22

**hobble** 58:8

**hog-tide** 27:2

**hog-tie** 41:9,12,20 42:10 68:12

**hog-tied** 26:8,13,25 28:19 40:2,12,15 41:19 55:4

**hog-tieing** 26:22 27:14 42:14,22 43:1 53:17

**hold** 63:15,16

**holding** 43:4

**holds** 63:16

**homicide** 43:18 68:4 71:4,11,15 80:14,20,22

**Honestly** 24:9

**hospital** 15:22 30:11, 16 33:20 61:6 64:20 67:9 77:21 78:8 83:5 92:22

**Hospital-desoto** 6:16

**host** 28:10

**hour** 71:21

**hours** 69:23

**Houston** 6:4

**human** 33:25 57:12

**hundred** 34:13

**Huxley** 92:10

**hyper** 32:15 101:9

**hyperactive** 23:11

**hyperactivity** 17:17 18:2

**hyperexpansion** 14:14 15:1,12

**hyperextension** 101:9

**hyperthermia** 22:23 32:16

**hyperthermic** 58:2

**hypothermia** 22:7,12 37:12,18 38:5 74:18 75:8 77:14 78:5

**hypothermic** 38:1

––––––––––––––

**I**

**idea** 15:10 33:23 41:2 51:25 57:1 62:17

**ignore** 51:13

**ill** 25:11 96:12

**illegal** 84:17,22 85:5

**illness** 24:19 28:11 96:14

**imbalance** 77:14

**immediately** 28:24 29:14

**impact** 25:18

**impacting** 25:23

**impacts** 39:25

**important** 37:18,22,23 67:10

**imposed** 50:4

**inches** 34:14

**include** 17:16 26:19 35:15 81:7 89:25

**included** 35:15

**including** 83:4 99:16

**incoherent** 23:12 55:17

**increase** 28:6

**increased** 27:18,19 28:14

**independent** 92:22

**index** 102:16

**Erin Barnhart - September 20, 2017**

Indian 18:19

indication 57:21 72:21

indicia 55:13

indicted 80:15

individual 11:16 14:2, 10 21:23 28:9

induced 71:16

Infants 63:10

infinite 67:21

influence 21:23 64:2 98:23

information 23:10 33:2,3,17 35:1,21 36:6 50:10 51:19 61:8 65:17 72:25 73:4,8,11,12,16, 21 77:11 82:25 83:22

ingestion 16:14 23:14 54:18 77:7 79:24 85:20

inhaler 92:19

initial 51:18

initiating 53:13

injected 73:23

injury 44:19,22 45:5

inspecting 83:11

instance 21:21 93:20

insurance 65:15

intend 76:20

intended 16:13 22:2 46:6 78:25

intention 88:3 90:23 91:2

interaction 93:23

interactions 91:1 98:8

intercostal 70:22,24

interested 71:11

internal 13:15 83:11

interrupted 58:25

interventions 31:17

interview 73:18

intoxicated 28:11

intoxication 21:18 68:14,22

introduction 24:13

invariably 22:12,23 32:20 35:13 38:1

investigator 33:5

involved 62:23 66:18 88:19 93:15

involvement 76:7 96:24

involving 28:18 93:10, 14,18

islets 14:4

issue 32:10 76:8

issued 51:3

issues 96:9

**J**

Jackson 9:6,14

Jim 6:25 60:7

job 7:21 53:5 97:6,7

Joe 71:8

Join 11:24 43:10 58:15 62:3,14 75:12 94:24 97:13

Jordan 6:21 25:21,22 26:2 91:7 102:14

journal 9:25 10:9,10 24:7 101:22 102:6

journals 10:3,13,16 24:9 102:8

July 10:25 84:22 85:6

jury's 38:15

**K**

K2 52:16

Karch 22:19,20,22 37:24

Kelli 6:7

Kevin 6:13

keyword 102:16

kid 95:13

kidney 87:10

kidneys 12:15,21 13:2, 8,12 87:1

killed 75:3 79:20

kin 65:20

knew 40:19 67:8 84:24

knowledge 17:4,14 18:22 32:18 75:17 91:5

Kush 52:16

**L**

labeled 45:4

laboratory 52:2

laboring 73:8

laceration 78:24

lack 12:10,13,21 13:1, 7,11,13 23:2 31:18,19 38:5 43:19 47:25 62:1 63:21

lacking 27:5 58:11

Lactic 77:13

Lanier 6:3

largely 56:15

lateral 13:23 38:18,19, 25 90:5

law 6:3 33:18,21 48:11 49:24 50:4 62:22 76:6

lay 28:2 56:17

layperson 55:19

lead 13:4,8 16:5 57:5

leading 11:23 17:2 18:21 20:1 48:19 49:12,14

learning 51:23

Leary 92:6

leave 69:17

led 16:15 27:18 54:20 76:22 79:24

left 80:19

leg 41:18

legal 65:20 80:6

legalized 91:18

legs 39:12,15 40:19

length 80:18

level 25:14 47:9,16

levels 72:8

lieu 8:5

life 59:13,19 65:15

limited 67:21

link 36:25

list 21:17 22:3 56:13 76:18,21 77:1,2,11,24 78:20 79:3 80:4 82:8

listed 63:2 77:25 80:5 82:15 97:17,19

listing 98:17

liter 47:20

literature 15:8,11 16:24 24:25 67:19 69:6,8 86:2,3,7,11

live 8:1 31:22 62:8

liver 12:15,20 13:2,8, 12 78:24 87:1,10

lives 57:12

locate 60:2 86:7,11

long 7:24 8:22 30:2 69:17,20 88:13

looked 23:22 36:24 53:4 66:3 99:19

lost 78:23

lot 14:24 33:11 40:20 63:5 75:4 101:10

loud 23:11 55:17

low 61:7 66:19,23 67:6

**Erin Barnhart - September 20, 2017**

lowered 36:5

LS 18:12

LSD 16:10,14,19,21
17:1,3,5,10,19 18:8,12
20:5 24:25 25:18 26:9,
14,17 46:23 47:10,12,
16 53:12,14,20 54:2,
18,20 67:17 68:10,13,
14,16,23 75:7 76:18,25
77:4,8 79:11,20,23
80:25 81:4,7,10,14,18
82:16 83:24 85:3,8,16,
18,20 87:20 89:3,7,8
91:22,24 92:1,4,12
93:2 94:15 95:24 97:18
98:17 99:16

LST 89:3

lung 14:22 100:17
101:11

lungs 11:13,18,21,25
12:3 14:13,18 86:14,21
99:19,25 100:1

**M**

M.D. 6:9 7:2

made 18:9 27:3 73:22,
25 74:24 92:21

mailed 51:5 53:4

main 63:18

Maio 20:6,14,19 21:7,
11,25 23:18 66:8

Maio's 20:16 66:3

majority 12:23

make 12:24 23:15
31:15 36:21 52:19
70:25 72:6 74:8,20,24
93:21 96:18

making 67:3 74:24
94:2

man 34:11 94:15,19

managed 31:16

manner 9:21 21:21
40:12 41:13,22 43:16
44:6 49:5 53:20 54:2,
10,16,20,25 59:21

67:20 68:1 80:18 84:5,
10 88:1 98:20

marijuana 84:14
91:14,15,18

mark 11:6 44:10 47:1

marked 11:8 44:11,12
47:2 51:10 59:22 82:12
87:24

Marty 6:17 81:22
102:20

Matt 6:19

mattress 63:13

maximal 26:8,14 27:13
40:12 41:20

maximally 69:13,20

Mccormack 6:14

Mccracken 6:19 25:25
71:24 95:14

ME's 8:25

meaning 14:6

means 8:17 14:17 30:7
56:18 85:11

meant 22:2 46:7 48:24
77:6 78:17,18,19 79:18

measures 58:9 61:3

mechanism 25:7 55:6
78:18,25 79:1 80:3

mechanisms 12:11

mechanistically
79:17

media 72:1,4 92:17

mediated 25:11

medical 7:10,22 8:13,
19 9:1,10,12,22 15:15,
17,18 22:6 27:12
29:10,25 30:17 31:17
33:7 41:21 43:24 49:7
50:3,17 54:24 59:23
61:12,13,15,23,24 64:1
65:10 66:13,15 67:18
71:3 73:24,25 77:20
78:14 82:3,20 84:3,11
85:24 89:13 101:22
102:6

medically 31:24

medicated 36:11

medication 36:5

medications 24:20

medicine 9:17,18,25
24:7 58:7

member 43:23 65:1,10

Memorial 6:16 15:22
64:20

mental 24:19 96:8,14,
20

mentally 96:12

mention 31:5 40:11

mentioned 25:2 31:2
36:7 41:9 55:16 60:3,5
78:12 101:10

mentions 49:23

met 89:17

metabolic 27:19 31:11
61:4 76:22 77:6

methamphetamine
19:17 24:18

method 27:13 28:6,16
57:10

Miami 9:12 71:9,13

Miami-dade 9:11

microscope 100:2

microscopic 14:13
100:16

microscopically
83:14

miles 8:3

milliliter 47:4

mind 23:9,22 95:19

mine 51:12

minute 59:12 80:23

minutes 59:12,19

missed 60:16

Mississippi 6:6 8:19,
24 9:6 33:5 41:1 50:20

71:3 82:3,21 84:21
85:6

mixed 97:22 98:2

monitored 62:12

monitoring 30:10,15,
19 62:18

months 50:25

morgue 34:16

morphine 98:1

motor 48:21 60:18

move 40:3

moved 9:14

moving 53:5,8

multiple 75:12

muscles 70:22,24

mushrooms 19:1

mute 26:4

**N**

named 69:10

names 55:18

nanogram 47:4

nanograms 47:20

NAPAMA 41:21

National 43:24 49:6
50:2 54:23 61:13 63:25
66:13

natural 28:11

naturally-occurring
18:18 19:4

nature 14:6

neatly 48:9

necessarily 98:5

needed 11:10 51:20

negative 52:22

negligence 59:24
61:18

negligent 61:14,24

**Erin Barnhart - September 20, 2017**

nervous 17:11,18

neurologically 25:11

newer 51:22

Newman 69:24 98:19 99:4

news 70:8

NMS 52:1

non-lethal 97:3

non-specific 11:25 12:22 14:8 86:23 87:4 101:10

normal 11:15,19 29:5 35:9,25 36:13 37:4

North 24:14

Northern 6:6

note 11:12 14:12

noted 13:20 34:17 35:8 37:25 50:7 90:4

nuisance 25:24 94:2

number 6:5 11:8 37:17 44:11 45:13 46:11 47:2 48:3,17 49:11,22 51:10 60:1,17 81:6,7 88:19

**O**

obese 34:13

object 23:1 26:25 27:5 29:1 39:7 43:5 47:24 55:20 58:11 59:1,3,4 94:21

objecting 59:6

objection 11:23 17:2 18:21 27:3,9 31:18 43:19 48:19 49:12,14 58:15 62:1,3,13,14 75:10,12 79:21 84:19 95:1 97:12

obligated 64:25

obtained 46:19

obvious 75:3,4

occur 24:17 39:22

occurred 23:13 40:9 77:7 93:23

October 7:25

ocular 90:8

offered 91:3

office 8:17,20,25 9:12 41:4 50:18,19 65:7,25 88:23,25

officers 33:18,21 34:1, 25 48:11

official 66:14

Oliver 6:18 81:23 88:5

onset 89:23

opinion 17:19 26:21 27:11 29:14 30:23 32:25 35:8,16 53:12 54:16 55:1,2 56:3 58:13 61:17,22 62:4,5, 6,7 64:3 73:14 82:24 83:3 84:1,10 85:22,23

opinions 89:11

opioids 98:1

opportunity 86:10

order 22:2 30:23 35:18 51:20 56:3 102:20,24

ordered 51:6

organization 44:3

organs 13:4,15 83:11, 15

original 81:15,16

originally 76:9

out-of-date 88:21

outburst 55:17

outline 35:17

outlined 71:8,10

over-insufflation 100:12,20 101:18

overdose 46:18

overdosed 87:20

overinflated 14:18

overlapping 17:24

oversee 8:17

Oxford 6:7

oximetry 62:11,12

oxygen 12:13,21 13:1, 7,8,11,13 15:2,4 30:16 61:7 66:19,23 67:6

oxygenation 12:10 61:3

**P**

p.m. 72:3

packed 53:6

panic 85:13

paragraph 44:21,25

paragraphs 44:23 45:2

paranoia 17:17 18:2 23:12 55:17

paranoid 85:13

parietal 38:13,16,17

parking 33:10

part 26:16 27:17 33:12 38:3 53:3 91:15 100:14

participating 6:21

pass 51:11 81:21

past 69:5

pathologic 74:22

pathological 63:21 74:19 89:25

pathologist 7:12 23:15 31:20 41:18 43:7 58:17 59:11,16 67:11 73:15 88:18 89:4,9 98:16 99:13

pathologists 19:18 41:13 42:25 43:3 75:1

pathology 9:9,11,13, 19,20 10:1 20:20 21:6 42:9,18,22 44:4 58:21 88:11,12,15,16 101:23

102:6

patients 31:22 58:8 62:9 76:4,11

PCP 24:18

pedestrians 60:18

peer 10:10

peer-reviewed 10:11 15:8 102:1

Pennsylvania 52:2

people 22:11 28:2 32:3,6,9,14 34:1 37:17 50:3 52:20 69:24

percent 32:9 64:1

percentage 32:3,4

perform 88:25

performed 10:22 84:13

periodical 101:23

person 34:2,8 42:23 58:1 63:15 71:17 75:3 93:15 94:4 97:8

person's 57:19

personally 20:11 66:1 67:3 83:7 97:18

pertaining 99:14

petechiae 13:20,22,23 14:1,7,9 87:13,15 89:19 90:1,4,8

peyote 18:16,18

pharmacological 52:25 53:10

phase 29:11

Phillips 6:17 11:23 17:2 18:21 23:1 27:5 31:18 43:5,19 45:6 47:24 48:19 49:12,14 55:20 58:11,22 59:1,6, 8 62:1,13 75:10 79:21 81:22,23,25 84:21 89:15 94:21 97:12 99:12 100:8 102:21,24

Phillips' 93:1 94:14

**Alpha Reporting Corporation**

**Erin Barnhart - September 20, 2017**

phone 26:3

photographs 40:21

phrase 78:15

physical 71:16 77:22 80:5 101:11

physician 62:10 79:14 88:5

Physicians 6:22 91:8

physiologic 17:20,23, 24 28:7 55:14 76:21 77:6 78:18 79:1

physiologically 59:18

picture 40:17 96:16,22

pissy 60:15

placing 14:23 40:24

plaintiffs 7:1

played 91:15

plural 90:10

point 10:14 22:9 28:23 37:13 38:4 44:13 46:19 51:7 53:4 57:22 70:8 76:2 80:4,6 86:2 88:22

pointed 42:22

pointedly 67:25

poison 46:13

police 33:6 34:9,25 63:17 80:18 90:25 92:18 93:4,5,10,14,18, 23,24 94:3 96:23,24 97:2

portion 14:6 38:18

portions 14:18 100:1 101:12,13

poses 42:22

position 7:21,24 8:24 9:2,15 27:14 40:2,13 41:19 43:4,14 63:9 66:14 68:8 69:17,21 70:18

positional 14:6 48:11 49:23 58:10 62:25 63:2,11,19 69:6

possibility 28:15 55:5

Possibly 19:12

post 50:25

postmortem 25:15 48:1

potential 18:3 28:14

potentially 27:21 33:6 67:16 70:20

pounds 34:14,15

practice 58:21 65:8,24

preceding 28:25 29:14

precipitated 96:21,23

precipitating 16:14,17 87:21 93:1,5,8,19 94:6, 14,16,19 95:18,23,25 96:14

preclude 66:24 67:3

preliminary 65:5

prepared 82:11,15

presence 84:14 85:3

present 22:12,23 75:9, 20,23 98:10 101:2

presentation 36:14 71:2

pressure 14:24

pressured 64:7

pressures 64:2

pretty 57:21,22 75:18, 19 76:1

previously 60:14

principle 54:12

Principles 45:24

prior 9:7 36:3,17 89:17 97:18

probable 77:12

problem 70:4

procedure 58:9

process 35:18 53:5,8

profession 19:14 41:21

professional 30:5 42:2 56:13

professionals 10:1

prone 27:14 39:19 40:12 43:4,14 69:21 70:18

pronouncing 13:21

pronunciation 38:9

proof 22:7

proponents 92:12

proposition 19:7

protein 72:14,20

protocols 62:18

provide 65:4

provided 61:19 73:12 77:2 82:24 83:4 88:5

province 58:16 62:15

provoked 71:16

psilocybin 18:25

psychiatric 76:4,10

psychosis 17:16 18:3 27:19 53:18 55:16 57:19

psychotic 52:20 96:2, 3,6,8

public 93:9,19 94:2,6, 17 97:8,10,15

publication 10:1

publicly 94:20 95:5

publish 102:6

pulled 98:24

pulmonary 12:2 86:21

pulse 62:11,12

purpose 79:2,4,7

purposes 80:7,8

push 26:5

put 16:9 20:3 35:22 38:6,15 40:21 49:15 55:9 56:9,11 63:15 64:3,7 66:9 69:13

74:10,14 75:5 96:13

putting 70:18

**Q**

qualification 31:19 58:12 62:2

qualified 17:6

qualities 17:8

question 13:6 14:9 17:9 18:25 26:10,19 27:6,10 35:21,23 39:21 41:20 45:12,21 46:2,10 47:25 49:9,18 53:9 54:15,23 59:14 61:12 75:15 79:13 80:2 81:9, 12,13,15,16,17 88:4 94:15,18,23 95:9 101:14,15

questioning 43:6 44:14

questions 7:19 86:1,4, 15 87:2,15 89:12,18 91:9 93:1

quote 16:10 21:16,17

quoting 23:18

**R**

raised 23:8

raising 94:2

rate 30:10 32:9,13

re-ask 26:10 42:7

reach 30:23 89:5

reached 82:19

reaching 26:12

reactions 85:13,16

read 10:19 49:3 69:19 99:3,7 101:17

reading 36:2 37:7 55:11 77:16 79:10,14, 19

realize 41:3

**Erin Barnhart - September 20, 2017**

rear 38:19,23

reason 35:11 38:5,8 93:15

reasonable 27:12 29:9 61:22 84:3,11 85:23 89:12

reasons 81:6,7

recall 15:18 29:23 30:18,21 33:10,16 35:1 36:10,12 41:6 51:6,21 67:8 69:18,22 77:19,23 78:11 92:20

receive 29:24 72:25 73:3

received 50:12

recent 76:7

recently 11:3

recess 72:3

recognize 37:1

recognized 24:16

recognizes 50:3

recollection 40:18

Recommendations 45:24

record 72:2,5 97:8 102:13

recorded 22:6 30:3 84:8

records 15:17,19 22:6 29:24 30:17 33:7 35:9 50:12 67:9 73:24,25 77:20 78:14 83:4

red 73:7

refer 27:2 52:6

reference 18:8 44:13

referenced 22:11 53:14

referred 52:4

referring 34:18 48:12 69:9

regard 91:1

regular 10:19 102:18

relate 65:16 86:20 87:9

related 33:8 61:18 76:12

relating 12:9

relation 76:6

relative 82:21

release 25:13 28:14

relevant 71:12

reliable 10:15 25:16 67:19 101:23

relied 37:17 98:22

religious 18:19

rely 10:2,18 11:10 31:15 89:3,8 98:19

relying 22:18

remember 41:8 66:22 86:4,15 87:2

remotely 48:21

removal 14:23

render 56:3 73:14

repeat 45:21 59:14 100:14

rephrase 20:11

replicate 57:5

replicated 57:9

report 11:3,11,12 14:12 15:16 16:9 18:11 20:3,21 26:12 32:22 34:18 35:7,19 38:6 40:11 46:20,22 50:7, 14,16,21 51:1,3,14,19 64:3,8,12,20 65:22 66:10 67:5 74:1 78:13 79:2,7,10,14,19 80:13 82:9,11 84:8 87:24 90:3

reported 34:21,24 35:2,5

reportedly 23:13

reporter 6:11 44:15,18

reports 19:14 33:6 34:8 50:23 73:1,3 76:10,12

represent 6:10 81:23

representative 64:10

reputable 44:3

require 33:22

requires 58:9

rescue 92:19

residency 9:9

respect 57:15 68:18

response 88:4 89:12 92:25 94:14

responsibility 82:1

responsible 66:2

restrain 42:18 69:13

restrained 28:17,19 32:23 33:13 37:19,25 40:19 43:16 53:22 68:22 69:20 88:1 94:8 95:3 96:17

restraint 26:9,14 27:13 28:6,16 40:12,13 41:14,20,22 42:23 48:11 53:20 54:2,16, 20,25 58:8 68:2,24 71:17 80:18,19 97:2 98:20

restraints 41:18 50:4 96:17

restricted 69:16

restricts 63:9 70:19

result 11:21 12:5 13:1 31:3 57:11 60:24 64:7

resulting 25:12

results 52:22 61:10 67:16

retest 57:11

review 30:10,15,17 60:1

reviewed 11:2

reviews 35:19

rhythm 29:15

Ric 6:17 23:17 44:16, 17 49:2 102:19

role 31:20 43:6 82:2

room 36:2,7 62:18 88:5

route 22:8

rule 13:13,14 48:3

rules 37:4

run 52:25

running 33:10

ruptures 101:12

**S**

samples 48:1

sats 67:6

saturation 30:16,20 61:7 66:19,24

scalp 39:5

scenarios 48:23

scene 92:19

schedule 85:8

scientific 19:6 57:4,10

scope 31:19 58:16 62:2,15

screen 51:7 84:13

screening 85:2

screens 52:24

secondary 68:22

section 32:25 35:8,16 45:4,23 48:10,12,14 54:11 66:4

sectioning 14:23

sections 45:13 46:3

sentence 35:22 45:6,7

September 6:1 51:4, 14

sequence 53:13

series 16:15 71:8

**Alpha Reporting Corporation**

**Erin Barnhart - September 20, 2017**

serve 35:16

services 29:25

set 57:13 71:10

seventy 34:13

severe 17:10

shackled 16:6 39:12

shock 72:14,20

shoot 94:4

shot 93:24 94:7,15,17 95:3

shouting 23:12

show 57:18 69:15 95:16

showed 46:22 47:3 85:2

shown 41:1,4 61:7

side 18:6 39:1,24

sides 38:13,21,22 39:22,25

sign 21:15,20

signed 50:21 64:11,17, 20

significance 30:4

signing 15:16 50:14 67:5

signs 69:14

similar 62:21

similarities 99:1

simply 29:4 33:17 46:18 53:3 55:24 90:21

single 37:7 76:1

sinus 29:15

sir 90:16

siren 25:22

situation 16:21 28:24 93:24

situations 24:24

skull 38:13,16,17,18

slides 51:4 53:4

slightly 57:13

slowly 49:3

small 34:11,12 46:23 47:7

solely 46:17

Soma 98:2

somebody's 61:18 95:5

someone's 95:20

sort 18:10 35:16 61:3 98:15

sound 55:18

South 94:16

Southaven 6:8,24 64:11 90:18,25

Southeast 6:22 91:8

Southwest 18:19

speak 12:12 29:18

speaking 44:15

specialties 9:22 24:10

specialty 42:8

specific 28:22 39:4 40:16 41:11 45:24 48:23 49:16 54:23 56:18,20 57:3

specifically 9:20 13:11 25:2 29:23 31:10 32:7 33:16 35:4,8 36:7, 25 39:13 42:11,15,19 43:14 52:2 60:17 98:25

speculation 36:22 79:22

speech 55:17

Spice 52:16

spleen 12:16,21 13:2, 9,13 87:1,10

spoken 50:17 64:16,17

staff 65:7

standard 31:16 62:8 65:8,24

standpoint 19:8,9 57:4

stands 101:14,16

start 46:5

starting 53:5

state 8:19 27:25 34:5 51:5 55:19 61:4 77:22 82:3,21 84:20,21,25 85:5

state's 72:19

stated 60:14

statement 32:19 58:5, 19 76:1

statements 23:2 55:20 59:1 94:21

states 6:5 91:18 95:7

statistic 64:5 80:8

stem 57:23

stimulant 17:5,7 76:13 97:23

stimulation 17:10,18 18:4

stop 12:3

stopped 29:4

stopping 29:5

stops 12:3

Stratton 22:10,18,22 37:16

street 52:8 56:25

strength 33:25

stress 28:15 71:16

striking 40:9

strips 30:12

struck 60:18

struggle 21:17,22 32:23 33:8,14,18 34:23

stuck 63:9

studied 72:23

studies 69:24 83:18 98:19,23 99:2,4

study 58:6 70:4 100:16

stuff 52:16

subdue 33:22 34:1

subdued 34:3

subgaleal 38:10,11,12 39:2,4 40:8 44:13

subject 71:4

subjected 64:2

subjects 69:12 92:4

subpoena 8:6

subsequent 23:14 77:7

subset 9:19

substance 18:18 51:23 85:8

substances 18:7

substantial 16:6

subtract 54:7

sudden 37:19

suffocation 101:3,5, 15,20

suffocation's 101:4

suggest 21:14 56:23

suggestion 22:1 39:17 66:12

suggests 66:11

summary 35:17

super 33:25

supplemental 51:14

support 63:3

supports 19:6

suppose 40:7 67:16 69:13 94:1 96:5,12

supposed 59:4

supraventricular 30:3 67:7

surfaces 14:5

surgical 9:13

**Erin Barnhart - September 20, 2017**

surprising 30:9

survival 32:13

survived 32:6,14

suspect 93:6

suspicious 20:2 23:15

SVT 30:3

swear 6:11

sworn 7:3

symptoms 17:16

syndrome 28:3 36:25 75:25

synthetic 51:7,22 52:7,11,19

system 17:11,18 46:23 83:19

**T**

tachycardia 30:4 67:7

tactile 32:15

takes 33:25

taking 8:4 73:1

talk 20:8 33:25 50:13 64:14,19 65:2

talked 20:14 66:4 101:6,15

talking 12:13 98:7

taze 33:11

technique 58:8

telephone 6:22,23 7:1

tells 97:10

temperature 35:9,12, 24 36:10,13,16,24 37:4,9 55:11

temporary 8:16

ten 59:19

tendencies 18:5

term 12:9 19:21 26:25 40:16 41:23 42:3,9 74:12

terminal 15:19

terribly 63:10,14

test 51:25 52:21,22 54:24 57:11

tested 92:1,2

testified 7:3

testimony 8:9 47:16, 24 55:21 74:9 90:22 94:22

testing 77:21 92:4

tests 72:18

Texas 6:4 9:10 88:24

text 20:10 21:4

therapeutic 85:11,12

thing 34:23 55:19 101:5

things 11:11 25:12 32:14 49:24 52:16 54:3 57:24 71:19 85:14 100:13

thinking 35:19

thought 25:10 35:17 51:6

threatening 34:25

throat 101:1

throwing 75:6

tight 58:7

Tim 6:13 23:17 44:12 60:15

time 6:2 24:3 30:2 33:4 46:3 50:21 80:18 83:19 84:25 86:18 87:6 91:9 101:4

times 47:22 75:4,13 97:20

Timothy 92:6

tissue 14:22,23 83:14 100:1,17 101:12

title 44:24 49:3 60:12

today 6:1,8 8:9 84:1,11 86:7 87:22 88:3 89:18

today's 102:12

told 35:5 63:20 70:9 79:15 92:18,20

tolls 26:1

topic 58:13 75:24

torso 13:24 90:5

totally 99:5

toxic 46:12,17 47:9,12, 16

toxicities 97:20 98:2

toxicity 16:10,22 19:7, 9 20:5 26:17 79:20 82:16 83:24 89:3,8 97:18,22

toxicology 46:20,22 51:3,19 52:24 74:1 83:18 84:13 85:2

trained 71:9

training 9:7,8,11 42:13 71:12 89:4

Tramadol 98:2

transcript 102:15

transitional 29:11

transporter 72:7

trauma 78:22

treat 31:22 62:8

treatable 31:24

treating 58:17

treatment 24:20 62:7, 17,19 74:6

Trey 6:21 25:22 26:4 91:7 102:14

triage 36:11

tribes 18:20

trip 85:17 96:1

Troy 10:22 79:15 82:2, 21 83:8 91:1 99:18

true 93:4

truth 97:7

turned 39:24

type 29:19 42:23 86:4 93:22

types 24:19 45:25

typical 70:13 75:18,19

typically 27:24 33:25 61:10 89:25

**U**

U.S. 18:19

Uh-huh 24:2

ultimately 57:6 76:21 95:17

umbrella 26:17,19 75:7

unarmed 35:3

uncommon 63:10,14 86:18 87:6

under-inflated 14:19

underlying 53:12 96:19

underneath 26:19 74:13

understand 7:18 8:7 39:9 52:12 54:1 74:9 81:8 89:22,24 90:21 101:14

understanding 85:19

understood 86:17

United 6:5 95:7

University 9:10 71:2,3

unquote 21:16,17,18

unresponsive 50:8

unruliness 93:9

unruly 93:12 94:20

unusual 48:8

Upchurch 6:15 11:24 29:1 43:10 58:15 62:3, 14 75:12 89:16,17,21 90:13 94:24 95:1 97:13

upper 38:17

**Erin Barnhart - September 20, 2017**

**UT** 95:13,14
**UTMB** 9:13

---
**V**
---

**valid** 66:15
**variance** 15:9
**variety** 12:10
**vehicle** 48:21 60:18
**vehicles** 60:18
**version** 102:18
**versus** 6:8
**victim** 97:5
**video** 40:23,25 102:23
**view** 28:23
**Vilke** 22:11 24:5,11,21,
23 30:25 32:8 41:17
**violent** 21:22
**vital** 69:14 80:8

---
**W**
---

**wall** 63:12
**ways** 21:14
**weighed** 11:13 34:16
**weight** 11:15
**weights** 69:13
**West** 6:4
**wondering** 45:1
**word** 18:23 66:11
76:15
**words** 50:1 67:22
76:24
**work** 9:5 47:14 59:16
84:24 88:23
**working** 12:4 88:17
**worsened** 27:20
**wrists** 41:8
**writings** 22:19 24:6

**written** 91:24
**wrote** 24:11

---
**Y**
---

**y'all** 71:23
**year** 88:24
**years** 8:23 9:3 88:17
99:3,7
**Youtube** 40:23 41:3

---
**Z**
---

**zones** 100:19

---

**Alpha Reporting Corporation**