## REPORT OF MARK W. FOWLER, J.D., M.D.

I have been asked to give opinions concerning the medical care provided to Mr. Troy Goode on the date of his death, July 18, 2015. Medical care was rendered both by the Southaven Emergency Medical Service and a physician and nurses at Baptist Memorial Hospital — Desoto. In giving these opinions, I rely upon my education and experience as a medical doctor with a particular emphasis on emergency care. I have also been provided and reviewed the following: Southaven EMS records, Baptist Desoto medical records, and depositions of Stacy Graham, EMS, Lemuel Donja Oliver, M.D., Jeffrey Baker, R.N., and Paul Flock, R.N. I have also been provided by counsel for Mrs. Goode a factual narrative compiled from various depositions taken for case preparation. My opinions are as follows:

### The EMS transport and care

Mr. Goode was transported from the scene of the incident where he was taken into custody by the Southaven Police Department to Baptist Desoto in an ambulance hogtied and prone. A credible body of peer-reviewed literature supports the proposition that holding someone in the prone position interferes with the diaphragm and the voluntary muscles of respiration which may compromise respiratory effectiveness. this is of particular importance in a psychotic patient who may decompensate unexpectedly requiring urgent intervention. Unfortunately, Mr. Goode was left in this hog-tied position until he suffered cardio-respiratory collapse.

Ms. Graham, the EMT, testified that she was unable to get a reading on Mr. Goode's oxygen saturation because Mr. Goode was thrashing about so violently that she could not keep a pulse oximeter on his finger. This seems unlikely since Ms. Graham was able to place an IV in Mr. Goode's left arm during the transport. Further, Ms. Graham did place a 3 lead EKG which on two occasions, 5 minutes apart, registered that Mr. Goode was in supra ventricular tachycardia. In fact, his heart rate jumped from 164 to 186 in that five minute span. Southaven EMS did not address Mr. Goode's SVT in route to the hospital.

Within the same five minute span, Mr. Goode's blood pressure dropped from 126 over 91 to 128 over 61. This is of import because a change of this magnitude may herald the onset of compromised cardiac output. It is important to note that during the transport, Mr. Goode was not only hogtied in a prone position but was strapped down with five restraints on the stretcher.





While Ms. Graham testified Mr. Goode was violent and unruly, she failed to utilize an available chemical restraint in the ambulance which was easily administered nasally, she did not utilize the chemical or see the need to do so apparently.

It is my opinion that the Southaven EMS failed to meet the applicable standard of care in the following respects:

1. The ambulance personnel failed to verify and initiate treatment of the supraventricular tachycardia.

2. Failed to determine the need to administer oxygen to an individual in obvious distress.

3. Failed to turn the patient to the supine position for transport.

### Baptist Desoto and Dr. Oliver

The triage nurse was allegedly advised before the arrival of ambulance transporting Mr. Goode that Mr. Goode was in supra ventricular tachycardia. Jeff Baker, RN, performed triage based upon a history provided by the police. That history stated that Mr. Goode was being transferred to medical care for a dog bite received from the K9 unit of the Southaven Police Department. Police also said that Mr. Goode "did three drops of acid."

Mr. Baker has testified that his physical examination of Mr. Goode yielded a normal temperature of 98.2 degree which was taken orally, respiration was elevated at 24, and oxygen saturation was 90%. The computer system registered an alert beside the oxygen saturation level. The significance of this abnormal reading is that it suggests a number of possibilities that require assessment. One of those possibilities was a mismatch between the real pulse and recorded pulse. Thus an abnormal reading warrants a manual check of the pulse to see if the recorded and actual pulse are the same. A mismatch can herald a cardiac dysrhythmia. This was an important clue that should not have ben missed in Mr. Goode's assessment.

Mr. Baker recorded that "only injury apparent is cut to the left forearm, wound to upper left shoulder." He did not record facial contusions and abrasions which were clearly evident *post mortem*. Facial contusions suggest a head strike, and a head strike always warrants full assessment.

Mr. Baker assigned an acuity level of two which designates a serious physical condition. Mr. Goode remained hogtied in a prone position throughout triage and was transferred to a treatment room in that position.

MWL 01/31/7

In the treatment room, Mr. Goode remained hogtied and prone on the hospital bed. This is a violation of hospital protocol which requires a trained medical person in the room of a shackled patient at all times. The hospital keeps soft restraints on site. Should a patient require restraint, the patient is placed in those soft restraints supine with hands and feet attached to bedrails. Apparently, the only "observation" Mr. Goode got for a period of time was not by a medical person but by a policeman as Mr. Goode was in police custody the entire period of his hospitalization. Dr. Oliver has testified that he arrived in the treatment room to perform an examination of Mr. Goode at approximately 9:00 p.m. although his charting did not occur until 9:08 p.m. There was no cardiac monitoring or supplemental oxygenation. The medical records reflect the administration of IV Haldol at 9:15. Ativan was also administered in an insufficiently low dose of 2 mg. Given the violent nature as described by medical personnel, a dose of 4 mg was indicated. An individual who is floridly psychotic rapidly consumes oxygen and glucose and prolonged struggling results in lactic acidosis. Lactic acidosis can lead to further deterioration if not corrected. The solution was to have given an adequate dose of Ativan which can produce sedation with five minutes. This was not effectively done.

My opinion is that the staff of Baptist Desoto and Dr. Oliver, the attending Emergency Room physician failed to meet the applicable standard of care and were negligent in the following:

1. Failed to promptly assess and treat a supraventricular tachycardia.

2. Failed to properly communicate effectively thereby allowing a supraventricular tachycardia to go untreated.

3. Failed to effectively and thoroughly trouble-shoot a low oxygen saturation reading which would have suggested a cause (cardiac dysrhythmia) warranting treatment.

2. Failed to promptly assess and effectively treat a patient in a psychotic rage, leaving him hogtied in the prone position for over 40 minutes after arrival.

3. Failed to take effective measures to relief the patient's distress by turning him to the supine position, despite the hospital protocol requiring the lease restrictive restraint.

4. Failed to post a trained medical staff member in the room to observe the patient.

As a direct and proximate result of these failures, Mr. Goode experienced cardio-pulmonary arrest in the prone hogtied position in which he arrived and died.

3

MWF 01/13/17

I charge $250.00 per hour for expert consulting. A list of cases in which I have given testimony is attached.

_____
Mark W. Fowler
01/13/17

4

## SUPPLEMENTAL REPORT OF MARK W. FOWLER, J.D., M.D.

My name is Mark W. Fowler. I am a licensed practicing Physician in the State of Tennessee. I am Board Certified in Family medicine, with experience in Emergency room medicine. I have previously given a report in this case the content of which is adopted here. Since providing that report, I have been provided with and considered the following materials: Baptist Memorial Hospital-Desoto's Response to Plaintiff's January 19, 2017 Requests for Admission, Expert Report of Michael LaRochelle, D.O., Expert Report of Alan Jones, M.D., Expert Report of Michael Revelle, M.D., Expert Report of Frederick Carlton, M.D., Expert Report of Michael Stodard, M.D., a copy of 42 C.F.R. 482.13, a photograph of Midazolam HCL, a post mortem photograph of Troy Goode's face showing multiple abrasions, documents with Bates number BMH-D Discovery 0052-0060, and a copy of the Emergency Medicine Patient Safety Foundation's Restraint and Seclusion Patient Safety Briefing, Revised July 16, 2012.

In addition to the contents of my previous report, it is my opinion that the Ativan and Haldol administered to Mr. Goode were fast-acting chemical restraints. It is further my opinion that Mr. Goode should have been continuously monitored with ECG and pulse oximetry from the time of admission since he was in a hogtie restraint with findings of SVT and marginally low blood oxygenation coupled with his preexisting diagnosis of asthma. He also should have had one-on-one continuous observation by a trained medical person the purpose of which is to watch for changes in status such as cardiovascular difficulties. Certainly after administration of the chemical restraints, Mr. Goode should have been closely monitored. Failure to monitor his heart and breathing was a serious breach of the applicable standard of care. I rely upon my education and experience and review of 42 CFR 482.13 to support these opinions In addition, hospital



protocol requires that a patient in Mr. Goode's condition have one-on-one monitoring until his condition is stable.

It is not appropriate to have the patient monitored by non-medical personnel or have the patient in an area where he cannot be directly observed.

I also expect to review the deposition of the BMH-DeSoto corporate representative and comment on the information from this person.

_____
Mark W. Fowler

_07/26/17_
Date

2