**In the Matter Of:**

*KELLI DENISE GOODE vs*

*CITY OF SOUTHAVEN*

*3:17-cv-060-DMB-RP*

*GARY VILKE*

*December 08, 2017*



*1st in Reporting, 1st in Service, 1st in Technology*

We Bridge the State and Cover the Nation!

www.alphareporting.com,

800-556-8974

EXHIBIT 1

**Gary Vilke - December 08, 2017**

```
              IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF MISSISSIPPI
                       OXFORD DIVISION

_____

KELLI DENISE GOODE, INDIVIDUALLY, AND ALSO AS THE
PERSONAL REPRESENTATIVE OF TROY CHARLTON GOODE,
DECEASED, AND AS MOTHER, NATURAL GUARDIAN, AND
NEXT FRIEND OF R.G., A MINOR, AND ALSO ON BEHALF
OF ALL SIMILARLY SITUATED PERSON,

        Plaintiff,

vs.                              No. 3:17-cv-060-DMB-RP


THE CITY OF SOUTHAVEN, et al.,

        Defendants.
_____


                  VIDEOTAPED DEPOSITION

                           OF

                   GARY VILKE, M.D.

                   DECEMBER 8, 2017
```

```
                ALPHA REPORTING CORPORATION
                     236 Adams Avenue
                 Memphis, Tennessee 38103
                       901-523-8974
                   www.alphareporting.com
```

**Gary Vilke - December 08, 2017**

**2**

1    The videotaped deposition of GARY VILKE,
2  M.D., is taken on this, the 8th day of December,
3  2017, on behalf of the Plaintiff, pursuant to
4  notice and consent of counsel, beginning at
5  approximately 8:02 a.m. in the offices of Peterson
6  Reporting Video and Litigation Services, 530 B
7  Street, Suite 350, San Diego, California.
8    This deposition is taken pursuant to the
9  terms and provisions of the Federal Rules of Civil
10  Procedure.
11    All forms and formalities are waived.
12  Objections are reserved, except as to the form of
13  the question, to be disposed of at or before the
14  hearing.
15    The signature of the witness is waived.
16
17
18
19
20
21
22
23
24

**3**

1       A P P E A R A N C E S
2  FOR THE PLAINTIFF:  (TELECONFERENCE APPEARANCE)
         TIM EDWARDS, ESQ.
3        KEVIN McCORMACK, ESQ.
         Ballin, Ballin & Fishman
4        200 Jefferson Avenue
         Suite 1250
5        Memphis, Tennessee 38103
         901-525-6278
6
  TELEPHONIC APPEARANCE:
7        JAMES F. GARRETT, ESQ.
         Eastland & Garrett, PLLC
8        103 North Lamar Blvd.
         Suite 204
9        Oxford, Mississippi 38655
10 FOR THE DEFENDANT, DR. DONJA OLIVER:
         MARTY R. PHILLIPS, ESQ.
11       Rainey, Kizer,
         Reviere & Bell, PLC
12       50 North Front
         Suite 610
13       Memphis, Tennessee 38103
         901-333-8101
14
15 APPEARING VIA TELEPHONE:
         J. RIC GASS, ESQ
16       Gass Weber Mullins, LLC
         309 N. Water Street
17       Milwaukee, Wisconsin 53202
         414-224-7697
18       TELEPHONIC APPEARANCES
19 FOR THE DEFENDANTS, THE CITY OF SOUTHAVEN AND
   INDIVIDUAL SOUTHAVEN DEFENDANTS:
20       BERKLEY N. HUSKISON, ESQ.
         Mitchell, McNutt & Sams, P.A.
21       105 South Front Street
         Tupelo, Mississippi 38804
22       662-620-6260
23
24

**4**

1  FOR THE DEFENDANT, BAPTIST MEMORIAL HOSPITAL-
   DESOTO:
2        DAVID UPCHURCH, ESQ.
         Upchurch & Upchurch, P.A.
3        141 S. Commerce Street
         Suite B
4        Tupelo, Mississippi 38804
         662-260-6953
5
  FOR THE DEFENDANT, SOUTHEASTERN EMERGENCY
6  PHYSICIANS, INC.:
         MATTHEW R. MACAW, ESQ.
7        McDonald Kuhn, PLLC
         5400 Poplar Avenue
8        Suite 330
         Memphis, Tennessee 38119
9        901-526-0606
10
11 ALSO PRESENT:
         JAVAN HEARD, VIDEOGRAPHER
12
13
14
15
16
17
18
19
20
21 COURT REPORTING FIRM:
         PETERSON REPORTING VIDEO & LITIGATION
22       Bobbie Hibbler, CSR, 12475, LCR 029
         530 B Street, Suite 350
23       San Diego, California 92101
         619-260-1069
24

**5**

1        EXAMINATION INDEX
2
3  GARY VILKE, M.D.
     BY MR. EDWARDS . . . . . . . . . . . 9
4    BY MR. HUSKISON. . . . . . . . . . . 232
     FURTHER BY MR. EDWARDS . . . . . . . 233
5
6
7        EXHIBIT INDEX
8  EXHIBIT    DESCRIPTION         PAGE
9  EXHIBIT NO. 1   NOTICE OF DEPOSITION     8
10 EXHIBIT NO. 2   ORDER FROM JUDGE PHAM   47
11 EXHIBIT NO. 3   BLACK BOX INFORMATION
                   FOR HALOPERIDOL         74
12
   EXHIBIT NO. 4   UNRECOGNIZED HYPOXIA AND
13                 RESPIRATORY DEPRESSION   75
                   IN EMERGENCY DEPARTMENT
14                 PATIENTS SEDATED FOR
                   PSYCHOMOTOR AGITATION
15
   EXHIBIT NO. 5   LETTER DATED 1/21/01    87
16
   EXHIBIT NO. 6   (WILL BE PROVIDED)
17
   EXHIBIT NO. 7   BOOK ENTITLED GUIDELINES FOR 98
18                 INVESTIGATING OFFICER-
                   INVOLVED SHOOTINGS,
19                 ARREST-RELATED DEATHS, AND
                   DEATHS IN CUSTODY
20                 (NOT ATTACHED)
21 EXHIBIT NO. 8   ATIVAN (LORAZEPAM) INJECTION 116
22 EXHIBIT NO. 9   PERCEPTIONS OF SUPPORTED
                   AND117 PRONE-      117
23                 RESTRAINT POSITIONS
24

**Gary Vilke - December 08, 2017**

**6**

```
1              EXHIBIT INDEX
2               (CONTINUED)
3  EXHIBIT         DESCRIPTION        PAGE
4  EXHIBIT NO. 10  METABOLIC ACIDOSIS IN   125
                   RESTRAINT-ASSOCIATED
5                  CARDIAC ARREST
6  EXHIBIT NO. 11  CHAPTER 2. OVERVIEW
                   OF THE EMERGENCY      125
7                  SEVERITY INDEX
8  EXHIBIT NO. 12  RESTRAINT ASPHYXIATION
                   IN EXCITED DELIRIUM   148
9
10 EXHIBIT NO. 13  ARTICLE ENTITLED
                   EXCITED DELIRIUM      150
11
   EXHIBIT NO. 14  WHITE PAPER REPORT ON
12                 EXCITED DELIRIUM SYNDROME  151
13 EXHIBIT NO. 15  CHAPTER 7 EXCITED DELIRIUM
                   BY CHARLES WETLI      154
14
   EXHIBIT NO. 16  ANESTHESIA IN THE PRONE
15                 POSITION BY DR. EDGCOMBE  170
16 EXHIBIT NO. 17  EFFECT OF PRONE
                   POSITIONING SYSTEMS ON  178
17                 HEMODYNAMIC AND CARDIAC
                   FUNCTION DURING LUMBAR
18                 SPINE SURGERY
19 EXHIBIT NO. 18  THE PHYSIOLOGICAL IMPACT
                   OF UPPER LIMB POSITION  180
20                 IN PRONE RESTRAINT
21 EXHIBIT NO. 19  ADULT TACHYCARDIA WITH
                   A PULSE ALGORITHM     184
22
   EXHIBIT NO. 20  SUDDEN DEATH DURING RESTRAINT:
23                 DO SOME POSITIONS     188
                   AFFECT LUNG FUNCTION?
24
```

**7**

```
1              EXHIBIT INDEX
2               (CONTINUED)
3  EXHIBIT         DESCRIPTION        PAGE
4  EXHIBIT NO. 21  CARDIORESPIRATORY CONSEQUENCES
                   TO HOBBLE RESTRAINT   193
5
   EXHIBIT NO. 22  THE CARDIOPULMONARY EFFECTS
6                  OF PHYSICAL RESTRAINT IN  197
                   SUBJECTS WITH CHRONIC
7                  OBSTRUCTIVE PULMONARY DISEASE
8  EXHIBIT NO. 23  CARDIAC FUNCTION CHANGES
                   WITH SWITCHING FROM THE  199
9                  SUPINE TO PRONE POSITION
10 EXHIBIT NO. 24  FACTORS ASSOCIATED WITH
                   SUDDEN DEATH OF INDIVIDUALS  205
11                 REQUIRING RESTRAINT FOR
                   EXCITED DELIRIUM
12
   EXHIBIT NO. 25  RESTRAINT IN POLICE USE
13                 OF FORCE EVENTS       209
14 EXHIBIT NO. 26  NATIONAL MODEL EMS
                   CLINICAL GUIDELINES   218
15
   EXHIBIT NO. 27  CMS LETTER ON NEVER
16                 EVENTS 2008           227
17 EXHIBIT NO. 28  DR. VILKE'S EXPERT REPORT  233
18 EXHIBIT NO. 29  DR. VILKE'S SUPPLEMENTAL
                   EXPERT REPORT         233
19
20
21
22
23
24 COURT REPORTER'S CERTIFICATE.................240
```

**8**

```
1        WHEREUPON, EXHIBIT NO. 1 WAS PREMARKED
2  TO THE TESTIMONY OF THE WITNESS AND IS ATTACHED
3  HERETO.)
4
5        THE VIDEOGRAPHER:  Good morning.
6  Today's date is December 8, 2017.  The time is
7  approximately 8:02 a.m.  The location is 530 B
8  Street, Suite 350, San Diego, California 92101.
9  This Case Number is 3:17-cv-060-DMB-RP.  The file
10 is in the United States District Court for the
11 Northern District of Mississippi in the case of
12 Kelli Denise Goode versus the City of Southaven,
13 et al.
14        The deponent today is Dr. Gary
15 Vilke.  Counsel and all present please identify
16 yourselves for the record.
17        MR. EDWARDS:  Tim Edwards and Kevin
18 McCormack for Mrs. Goode.
19        MR. GARRETT:  Jim Garrett also for
20 Mrs. Goode.
21        MR. PHILLIPS:  I'm Marty Phillips here
22 for Dr. Oliver along with Ric Gass.
23        MR. MACAW:  Matt Macaw for Southeastern
24 Emergency Physicians, LLC.
```

**9**

```
1        MR. HUSKISON:  Berkley Huskison
2  telephonically for the Southaven defendants.
3        THE VIDEOGRAPHER:  The court reporter
4  may now swear in or affirm the deponent.
5            GARY VILKE, M.D.,
6  Having been first duly sworn, was examined and
7  testified as follows:
8              EXAMINATION
9  BY MR. EDWARDS:
10    Q.  Doctor, I am Tim Edwards.  Would you
11 state your name please?
12    A.  Gary Michael Vilke.
13    Q.  And, Doctor, you are a resident of San
14 Diego County, California; correct?
15    A.  Yes.
16    Q.  You have been disclosed as an expert by
17 a number of the defendants in this case.  Are you
18 aware of that?
19    A.  I know I've worked with counsel for
20 Dr. Oliver as an expert.  I'm not sure who else
21 has disclosed me as their expert.
22    Q.  Well, you have been adopted by reference
23 by all of the defendants I believe.  Were you
24 aware of that?
```

**Gary Vilke - December 08, 2017**

10

1    A.    I can't say I'm specifically aware of
2 it.  No.
3    Q.    All right, Doctor.  You have given a
4 number of depositions; correct?
5    A.    Yes.
6    Q.    Actually you have testified in defense
7 of police departments who have had in custody in
8 restraint deaths from the East Coast to the West
9 Coast; correct?
10    A.    I have had cases on both coasts.  Yes.
11    Q.    And places in between?
12    A.    Correct.
13    Q.    You are the go-to guy in the United
14 States for hogtied deaths; correct?
15    A.    I have done a lot of research in the
16 area and have been asked to testify many times.
17    Q.    For police departments?
18    A.    Police departments have retained me or
19 their counsel.  Yes.
20    Q.    Yeah.  But not -- you've not testified
21 for any plaintiffs?
22    A.    I think I testified a long time ago for
23 a plaintiff.
24    Q.    Was that before your 1997 study?

11

1    A.    I believe it was shortly thereafter.
2    Q.    You are not a forensic pathologist, are
3 you?
4    A.    I am not.
5    Q.    And you have been proffered in the case
6 to give an opinion on the cause of death of Troy
7 Goode; correct?
8    A.    Correct.
9    Q.    You've never performed an autopsy?
10    A.    Correct.
11    Q.    Your opinion is that Mr. Goode died of
12 what you term excited delirium syndrome; correct?
13    A.    Cardiac arrest due to excited delirium
14 syndrome because of his LSD use.  Yes.
15    Q.    Well, excited delirium syndrome is a
16 controversial concept within the field of
17 medicine; correct?
18    A.    There have been some controversies
19 within the field about that.  Yes.
20    Q.    Excited delirium is not uniformly
21 accepted by medical specialties as a valid
22 condition; correct?
23    A.    It's been accepted by specialties that
24 take care of patients in excited delirium.  But

12

1 you wouldn't expect dermatologists or
2 endocrinologists to recognize what that is.
3    Q.    Has it been accepted by cardiologists?
4    A.    I know cardiologists who have.  I don't
5 believe it's ever gone and been requested to be
6 accepted by their national organization.
7    Q.    So the answer is no, the national
8 organization of cardiologists does not recognize
9 excited delirium?
10    A.    That's a question I don't know.  I don't
11 know that I've been ever asked to answer that
12 question.
13    Q.    Excited delirium is a concept which is
14 heavily involved, if you will, with the
15 functioning of the heart of people under certain
16 stressors; is that correct?
17    A.    The heart is involved in excited
18 delirium.  Yes.
19    Q.    And your opinion is that Mr. Goode died
20 of excited delirium precipitated by LSD use and
21 resulting in cardiac arrest?
22    A.    That's a fair assessment.  Yes.
23    Q.    That means his heart gave out?
24    A.    It went into a dysrhythmia and stopped

13

1 beating correctly.
2    Q.    His heart gave out; correct?
3    A.    It would be a lay term for it.  But the
4 reality is the electrical activity is defective.
5    Q.    Well, you do understand I am a
6 layperson, so I might not use correct medical
7 terms; correct?
8    A.    That's possible.  Sure.
9    Q.    All right.  You have noted in some of
10 your testimony that you are aware of Dr. DiMaio
11 who was the medical examiner for the County of
12 Bexar, San Antonio, Texas; right?
13    A.    I know he's a medical examiner in Texas.
14 I wasn't sure specifically what area.
15    Q.    He is a board certified forensic
16 pathologist; right?
17    A.    I don't know if he has board
18 certification in there.  I know at one point he
19 was.
20    Q.    Forensic pathologists are the ones who
21 determine cause of death through autopsy; right?
22    A.    They're the ones who perform the
23 autopsies and they do perform -- identify cause of
24 death.  Yes.

**Gary Vilke - December 08, 2017**

---

**14**

1  Q.  And when a forensic pathologist can't
2  find a cause of death of a person who died under
3  the influence of drugs and in restraints put on by
4  the police, the default position is excited
5  delirium; correct?
6  **A.  I have never heard that be a default**
7  **position.**
8  Q.  That's where forensic pathologists who
9  believe in the concept of excited delirium go to
10  with cause of death when they can't find any other
11  when a person in police restraints dies under the
12  influence of a drug?
13  **A.  They have to have certain symptoms and**
14  **criteria that would meet the classification for**
15  **excited delirium syndrome.  They don't have to be**
16  **in restraints.  They don't have to be in police**
17  **custody.  But if the findings and the presentation**
18  **is consistent with excited delirium syndrome and**
19  **there is no obvious other source of death like a**
20  **brain hemorrhage or a blood clot, they often will**
21  **use that as a diagnosis to identify the cause of**
22  **death.**
23  Q.  And if they find three or more markers
24  of excited delirium in your opinion, is that

---

**15**

1  sufficient to designate the cause of death as
2  excited delirium?
3  **A.  Again, you sort of have to look at the**
4  **entire picture, the presentation.  Typically**
5  **there's more than three markers.  If you're going**
6  **to identify a specific markers, usually there's,**
7  **you know, five or so.  But there is no**
8  **identifiable specific number that would define**
9  **excited delirium.  A lot of it is the clinical**
10  **presentation, the presence of drugs in the system,**
11  **the way they behave and act, and the lack of other**
12  **causes of sudden death.  If they have sky high**
13  **potassium levels, then the cause of death is**
14  **probably hyperkalemic cardiac arrest.  But you**
15  **have to look at the whole picture.**
16  Q.  But you do recognize certain markers
17  that indicate excited delirium; right?
18  **A.  There are a characteristics that are**
19  **consistent with the diagnosis of excited delirium**
20  **syndrome.  Yes.**
21  Q.  Fair enough, characteristics.  You
22  recognize certain characteristics as being
23  indicative of excited delirium?
24  **A.  They are looked for, and if they're**

---

**16**

1  **present can be consistent with that diagnosis.**
2  Q.  Now Dr. DiMaio in San Antonio has
3  written books on excited delirium syndrome, you're
4  aware of that?
5  **A.  I know he's written at least one.  I'm**
6  **not sure about several books.  He's written on**
7  **chapters as well.**
8  Q.  Dr. DiMaio in his book on excited
9  delirium says that when a forensic pathologist
10  concludes that the cause of death is excited
11  delirium, that's what should go into the autopsy
12  report, specifically death due to excited delirium
13  secondarily struggle or whatever; correct?
14  **A.  You know, I haven't read his book in a**
15  **long time.  So I couldn't say exactly what he put**
16  **in there.**
17  Q.  So you don't know?
18  **A.  I don't know what he said in that book,**
19  **no on that topic.**
20  Q.  And you do know that Dr. Barnhart who
21  was the forensic pathologist on this case -- do
22  you know that?
23  **A.  That is correct.  Yes.**
24  Q.  Okay.  And you know that Dr. Barnhart

---

**17**

1  listed complications of LSD as a cause of death;
2  right?
3  **A.  That is correct.**
4  Q.  Where could you direct me to an
5  authoritative reliable medical text that list
6  complications of LSD as a cause of death?
7  **A.  Complications of LSD certainly can kill**
8  **people.**
9  Q.  That's not what I asked, Doctor.  I
10  asked where could you direct me to an
11  authoritative reliable text that lists
12  complications of LSD as a cause of death?
13  **A.  The ACEP White Paper talks about excited**
14  **delirium syndrome causing death and also**
15  **associated with LSD as one.**
16  Q.  The ACEP White Paper?
17  **A.  Correct.**
18  Q.  That's the one you wrote?
19  **A.  That's the one I participated with it**
20  **with an expert panel.  Yes.**
21  Q.  Other than the one, the ACEP White Paper
22  that you wrote, point me to an authoritative
23  reliable medical text that list complications of
24  LSD as a cause of death?

---

**Gary Vilke - December 08, 2017**

**18**

1    A.   I didn't research specifically for
2 complications of LSD.  I know that it can cause
3 people to do things to kill themselves.  I
4 reviewed articles on that.  But if you're looking
5 for a textbook that says those exact words, I
6 don't know if it's if there or I just haven't
7 looked for it yet.
8    Q.   So your answer is you don't -- you can't
9 point me to an authoritative reliable text that
10 list complications, in quotes, of LSD as a cause
11 of death; correct?
12    A.   That is correct.
13    Q.   All right.  Now can you -- have you done
14 in research in LSD?
15    A.   I've haven't done specific research.
16 You mean, looking at the drug itself?
17    Q.   Yes.
18    A.   Then no.
19    Q.   You're not a pharmacologist either, are
20 you?
21    A.   I am not.  No.
22    Q.   You can't give a toxic level of LSD, can
23 you?
24    A.   LSD itself is to be -- thought to be one

**19**

1 of the safer drugs as far as true pure overdose.
2 But it can cause behaviors and activities that
3 lead to death.
4    Q.   Well, that's not what we have here, is
5 it, with Mr. Goode?  We don't have him jumping out
6 of a window, for instance, or are off a bridge or
7 some other, or killing himself?  We don't have
8 that sort of secondary cause of death secondary to
9 the LSD, do we?
10    A.   Well, the LSD will cause acidosis.  The
11 LSD caused him to hallucinate and be delirious
12 causing him to resist and struggle and fight and
13 be combative.  And that agitation that resistance
14 in that continued fighting caused more acidosis
15 which would lead to the sudden cardiac arrest.
16    Q.   Now, Doctor, you know what, you
17 testified in a case in Nashville I believe where
18 you said that the hogtie restraint reduced oxygen
19 consumption and therefore was beneficial to
20 somebody in a state of excited delirium, did you
21 not?
22    A.   That sounds something familiar that I
23 would say.  Sure.
24    Q.   So what you're saying now is

**20**

1 diametrically opposed to what you said in the case
2 in Nashville?
3    A.   I don't agree with that.
4    Q.   Why don't you?  You said that if
5 somebody is hogtied and they can't move their
6 major muscles, then they're their oxygen
7 consumption would go down and that would be
8 beneficial in calming -- in bringing in more
9 oxygen safeguarding the subject; correct?
10    A.   Sure.  It was protective of Mr. Goode,
11 the position was decreasing his oxygen demand.
12 And it was keeping him from using his large
13 muscles, but he kept resisting and kept
14 struggling, and that was continuing to cause
15 acidosis.  It was less than he would have had had
16 he been using the big muscle groups by moving them
17 more freely.  But his agitation and his consistent
18 the struggling and his consistent yelling was all
19 building up more lactic acid.  So the position was
20 the best to help him.  But unfortunately he kept
21 fighting against it because of the drugs.
22    Q.   How did he -- do you agree that
23 Mr. Goode was hogtied?
24    A.   That's how I understand it, the hands

**21**

1 and the feet were pulled together behind his back.
2    Q.   No question about that; right?
3    A.   That's the position I'm operating under
4 as far as what I assume he was in.
5    Q.   And you have defined in your works the
6 hogtie position is having hands bound behind the
7 back, feet bound, knees bent up, and the hands and
8 feet connected by a chain; right?
9    A.   Connected by something.  Yes.
10    Q.   And what was the distance between
11 Mr. Goode's hands and feet when he was hogtied?
12    A.   As I understand it, it was probably six
13 to eight inches, something along those range.
14 Maybe a little bit more, maybe a little less.
15    Q.   Marijuana played no part in Mr. Goode's
16 death; agreed?
17    A.   I wouldn't opine that it did.  No.
18    Q.   Did you say that Mr. Goode's death was
19 sudden?
20    A.   Did I say it was sudden?
21    Q.   Yes.
22    A.   His cardiac arrest was sudden.  Yes.
23    Q.   Define sudden death?  How do you define
24 sudden death?

**Gary Vilke - December 08, 2017**

22

1    A.    Basically the heart goes into an
2    irregular beat and a sudden change in physiology,
3    the person goes unconscious, has a few agonal
4    respirations, and then is, I guess, dead at that
5    point and resuscitated.
6        Q.    Now when did his heart go into an
7    irregular beat?
8        A.    Around the time where the officer noted
9    that he had calmed down and looked and saw that he
10   had turned blue, just prior to that.
11       Q.    How do you know?
12       A.    Because up to that point he was verbal
13   and saying things and still moving, and then he
14   became quiet.  And then -- all the cadence of that
15   evaluation basically was within a minute or so.
16       Q.    How do you know?
17       A.    Based on the testimony.
18       Q.    Based solely upon the testimony of a
19   defendant police officer; correct?
20       A.    Based on the police officer's reporting,
21   sure.
22       Q.    With a police officer with no medical
23   training; correct?
24       A.    I don't know the background of his

23

1    medical training.  They usually have some basic
2    life support training.  But I don't know the
3    specifics of this officer.
4        Q.    You don't know what happened in the last
5    ten minutes of Troy Goode's life, do you, other
6    than what the police officer said?
7        A.    If you're asking if I was in the room,
8    no.  As I understand though that he was yelling
9    and making noises, and those types of things were
10   being reported.
11       Q.    Doctor, we can agree that you weren't in
12   the room.  My question, so you don't have to
13   qualify your answer with that, you can simply say
14   the only way -- the only information you have is
15   from Officer bag begin; correct?
16       A.    I believe there was a witness in the
17   other room that said he was making noises as well
18   from across the hall.  So that's somebody else
19   saying that he was verbalizing something.  But the
20   most of the work is from Officer Baggett as far as
21   what I understand.
22       Q.    What witness are you referring to in the
23   other room?
24       A.    I'd have to look her name up.  She was

24

1    deposed by -- Janet Tharpe.
2        Q.    And she said -- tell us what your
3    interpretation of Ms. Tharpe's testimony is?
4        A.    She was saying that she was hearing some
5    moaning and some noises that were loud from across
6    the hall that she thought were from Mr. Goode.
7        Q.    She said she was hearing someone yell
8    breathe; correct?
9        A.    She heard the word breathe as well.  But
10   she also reflected that she heard some moaning
11   going on that was very loud.
12       Q.    What did she see when Mr. Goode was
13   passed on the gurney within inches of her?
14       A.    I'm not sure about inches.  But he was
15   alive and had a very red face apparently and his
16   eyes look like they were bugging out.
17       Q.    And was incapable of movement; correct?
18       A.    Her report that he was unable to move is
19   in a position that look like he couldn't move.
20       Q.    Sir, I didn't understand that.
21       A.    She reported that he appeared to be in a
22   position where he couldn't move.
23       Q.    Well, you know from all of your work of
24   hogtying, if you're hogtied you're not going to be

25

1    doing much movement, are you?
2        A.    I disagree with that as well.  People
3    can roll gurneys over and hogtied and flip over
4    and turn if they are so in desire of doing that
5    and under the influence of drugs.  So they can
6    certainly move around a lot.  They just can't do a
7    lot of flexion and extension of the large muscle
8    groups.
9        Q.    So your testimony is you've known people
10   turn over gurneys who were hogtied and represented
11   a threat to others?
12       A.    There's a compound question there.  But
13   I have known people to flip gurneys over who have
14   been restrained.  I have also had people get hurt
15   by head butting and flipping and stuff like that
16   while they're hogtied, sure.
17       Q.    You -- well, strike that.  You have used
18   -- can you refer us to any authoritative reliable
19   medical text that says that LSD causes death?
20       A.    If you're asking about in and of itself
21   just use of it as a toxic medication -- or drug, I
22   don't believe it cause it by itself.  But the
23   behaviors created by LSD as we talked about
24   earlier has been published and caused people to do

**Alpha Reporting Corporation**

**Gary Vilke - December 08, 2017**

26

1 things that end up dying.
2    Q.   Well, we'll talk about this more.  But
3 tell the jury what drugs are commonly associated
4 with excited delirium?
5    A.   Sure.  If you look at the literature
6 they refer to cocaine, methamphetamine, PCP.
7 There's some data about bath salts now that seems
8 to be out there.  And LSD is listed as well.
9    Q.   LSD is virtually unseen in the
10 literature, isn't it?
11    A.   Virtually unseen in the literature
12 under --
13    Q.   In the context of excited delirium?
14    A.   It is not as common as cocaine and
15 methamphetamine.
16    Q.   Not as common.  Cocaine and amphetamine
17 account for 99.9 percent of excited delirium
18 situations; correct?
19    A.   I don't know about that number.  But
20 it's certainly a strong majority of those two
21 drugs, yeah.
22    Q.   You have written that early intervention
23 is the best approach to avoiding death in a person
24 who is in excited delirium due to drug

27

1 intoxication; correct?
2    A.   Early intervention is the best way to
3 try to avoid sudden death.  It doesn't necessarily
4 prevent it.
5    Q.   Well, and you've also written that the
6 people who have the opportunity for the earliest
7 intervention are the EMTs particularly; right?
8    A.   They often are the first ones to have a
9 medical contact with the patient.
10    Q.   And they were in this case?
11    A.   The EMTs were involved in this case.
12 Yes.
13    Q.   And when the EMTs arrived on the scene
14 what was Mr. Goode's status?
15    A.   I believe he was -- actually I don't
16 remember still if he was restrained at that point
17 or not.  But he was agitated, violent, combative.
18 And I don't remember if the police actually
19 already had him restrained or not at the time of
20 their arrival.
21    Q.   Mr. Goode was no threat to anyone when
22 the EMTs arrived; correct?
23    A.   Just to answer the question I don't
24 remember the exact status.  But if he was

28

1 restrained, he was certainly less of a threat than
2 if he wasn't restrained.
3    Q.   Well, if the police officers on the
4 scene said that he was secure and represented no
5 threat, you have no information to the contrary to
6 that, do you?
7    A.   Anybody can be a threat if you're not
8 careful around them.  But if he is restrained,
9 then he would be less of a threat than if he was
10 not restrained.
11    Q.   Doctor, if the police said that Troy
12 Goode was no threat by the time the EMTs got
13 there, do you have any information to contradict
14 that?
15    A.   Zero threat, I think there is no patient
16 that is zero threat, that's what I'm trying to get
17 at.  If he was restrained then he was a less of a
18 threat than if he was not restrained.
19    Q.   You have also written that a patient in
20 an agitated state should have a heart rate monitor
21 placed; right?
22    A.   When feasible, sure.
23    Q.   Well, it was feasible in this case,
24 wasn't it?

29

1    A.   There was a point where it could be put
2 on, sure.
3    Q.   And you've also written that a patient
4 in delirium should have constant pulse oximetry;
5 correct?
6    A.   When feasible, sure.
7    Q.   Well, pulse oximetry was done in this
8 case; right?
9    A.   It was attempted.  Yes.
10    Q.   No.  It was -- there was an assessment
11 at the scene by Richard Weatherford.  Are you
12 aware of that?
13    A.   There was a scene assessment, sure.
14    Q.   And are you aware that Mr. Weatherford
15 did not record the pulse oximetry that he took?
16    A.   I did not see a pulse oximetry reading
17 in the pre-hospital record.
18    Q.   If you do vitals testing you're suppose
19 to record the results; right?
20    A.   If the vital sign testing appears to be
21 reliable I would record them.  If it seems to be
22 inconsistent or not functioning correctly, I would
23 not record them.
24    Q.   Oh, I see.  So if you've got a pulse

**Gary Vilke - December 08, 2017**

---

**30**

1 oximetry reading and you determine that it was not
2 reliable, you just ignore it; is that what you're
3 saying?
4 **A.   No.**
5     Q.   What you would do for good medicine is
6 get another reading, wouldn't you, to see if you
7 can replicate the result?
8 **A.   If feasible you can, yes.  These**
9 **patients are often so agitated or so moving or**
10 **cramped up with the hands with the cuffs that it's**
11 **virtually impossible to get a pulse ox reading.**
12 **And so if you're getting numbers that are very**
13 **inconsistent, then there would be no reason to**
14 **report them because they're not accurate.**
15     Q.   Yes, if you get multiple numbers that
16 are inconsistent; right?
17 **A.   Or multiple numbers -- you're putting**
18 **the pulse ox on and you're getting multiple reads**
19 **over time.  You don't have to keep taking it off**
20 **and putting it on to actually check to see if it's**
21 **reliable.**
22     Q.   Fine.  Was that done?
23 **A.   I don't know.**
24     Q.   It should have been done; correct?

---

**31**

1 **A.   It is something you try to do when the**
2 **person is in the position to be monitored.  But if**
3 **they're still struggling and rolling and spinning,**
4 **there is no utility of trying to hook up wires and**
5 **monitors because they just keep falling off give**
6 **you either artifact or unreliable numbers.**
7     Q.   What is your understanding of the size
8 of Mr. Goode?
9 **A.   I believe he was six foot, roughly 170**
10 **pounds.**
11     Q.   Actually he was closer to 150 on his
12 driver's license.  One seventy was postmortem;
13 correct?
14 **A.   Which probably is a more accurate**
15 **weight, but yes.**
16     Q.   He was bloated?  He was full of fluid?
17 **A.   People don't typically gain weight after**
18 **death.  Their body weight is their body weight.**
19     Q.   And how many officers were on the scene?
20 **A.   I am not exactly sure.  I know there**
21 **were at least three, but I don't remember the**
22 **exact number.**
23     Q.   How many medics were on the scene?
24 **A.   Same answer, I'm not a hundred percent**

---

**32**

1 **sure how many medics were on the scene.  At least**
2 **two, but I don't know.**
3     Q.   Well, assume that there were only
4 five -- actually, there were more like eight.  But
5 are you saying with that manpower present that a
6 pulse oximetry could not be obtained?
7 **A.   I'm saying that people in this state are**
8 **often very difficult to have monitors placed and**
9 **maintained at any functioning status because of**
10 **movement and artifact.**
11     Q.   Well, if that's the case then you've
12 also written that the thing to do is to quickly
13 medicate; right?
14 **A.   That is one of the things we recommend**
15 **doing for patients who are recognized as being in**
16 **this state.**
17     Q.   Right.  So what you do is you use
18 chemical restraints to calm the patient down;
19 right?
20 **A.   Sedating medication, sure.  It's**
21 **semantics.**
22     Q.   Well, no it's not semantics.  The center
23 says that any drugs administered to effect
24 behavioral changes is a chemical restraint, you

---

**33**

1 know that?
2 **A.   There are different levels of chemical**
3 **restrain which is why I try to differentiate**
4 **paralytics or chemical restraint that are used**
5 **often by trauma surgeons.  That would not be**
6 **appropriate in this type of case.  So when I'm**
7 **using the word -- if you're using the words**
8 **chemical restraints to reflect benzodiazepines or**
9 **anti-psychotics to calm somebody, I'm happy to use**
10 **that term.**
11     Q.   No.  I was using the Center for Medicaid
12 Services.  You are aware of that organization,
13 aren't you?
14 **A.   I've heard of them.  Yes.**
15     Q.   You know it's a federal government
16 agency; right?
17 **A.   I haven't really gone into detail what**
18 **they are.  But sure it sounds like a government**
19 **agency.**
20     Q.   You know they promulgate regulations
21 that are binding on hospitals that accept Medicaid
22 or Medicare money; correct?
23 **A.   Again, I haven't looked to their role in**
24 **that kind of detail.**

---

**Gary Vilke - December 08, 2017**

**34**

1    Q.   Let's see -- I'm looking at Dr. DiMaio's
2  Excited Delirium Syndrome: Cause of Death and
3  Prevention.  And I want to read you a brief
4  section of this about excited delirium.  It says
5  acute excited delirium is the section.  The quote
6  is on initial presentation one cannot determine if
7  the excited delirium is due to intrinsic mental
8  disease or the drugs.  In the emergency room one
9  has the theoretical advantage that one has access
10  to medications.  Since such individuals are
11  virtually always struggling medication has to be
12  given intramuscularly.  You agree with that?
13    **A.   I agree with parts of it, not all of it.**
14    Q.   Well, what part do you agree with?
15    **A.   That -- fortunately I would love to have**
16  **it in front of me to be able to give you an exact.**
17  **But we have the advantage of having medications in**
18  **the emergency department, sure I agree with that.**
19  **It's often difficult to tell the difference**
20  **clinically when you're looking at somebody whether**
21  **it's psychiatrically induced or drug induced.**
22  **Sometimes they can be very similar, I agree with**
23  **that.**
24    Q.   Right.  But we don't have any issue

**35**

1  about that here, do we, because Mrs. Goode
2  reported the LSD in time?
3    **A.   Correct.**
4    Q.   So that's not an issue?
5    **A.   You just asked me what I agreed with or**
6  **disagree -- you agree with in this thing.  I just**
7  **gave you the parts that I agreed with that I can**
8  **recall.**
9    Q.   I understand.  Now do you agree or
10  disagree with the statement since such individuals
11  are virtually always struggling medication has to
12  be given intramuscularly; do you agree or
13  disagree?
14    **A.   I would disagree.**
15    Q.   Well, the reason Dr. DiMaio, whether you
16  agree with it or not, says intramuscularly the
17  alternative is intravenously; correct?
18    **A.   That is one other alternative, sure.**
19    Q.   And IV is much more difficult to place
20  than sticking somebody in the arm or the butt with
21  a needle; right?
22    **A.   It technically would be considered more**
23  **challenging than an intramuscular injection, sure.**
24    Q.   Right.  And Troy Goode had an ID placed

**36**

1  by the paramedic; correct?
2    **A.   Correct.**
3    Q.   Which would indicate he was not so out
4  of control that she could not place an IV;
5  correct?
6    **A.   At the time that she was placing the IV**
7  **that would seem to be reasonable.**
8    Q.   Now you have asserted that LSD can cause
9  excited delirium; right?
10    **A.   I opine that it can, sure.**
11    Q.   Okay.  And it is also true that LSD was
12  in its heyday in the '60s and '70s; correct?
13    **A.   It was used more frequently then, sure.**
14    Q.   More frequently.  It was used -- do you
15  know who Timothy Leary was?
16    **A.   I'm sorry?**
17    Q.   Do you know who Timothy Leary was at
18  Harvard University?
19    **A.   The name is familiar.  But I couldn't**
20  **give you any background on it.**
21    Q.   Well, what's your age?
22    **A.   I am 51.**
23    Q.   You remember the Grateful Dead?
24    **A.   Yes.**

**37**

1    Q.   You know all the LSD concerts or all the
2  concerts where LSD was so prevalent?
3    **A.   Absolutely.**
4    Q.   Okay.  And during the heyday of LSD
5  there were zero reporting deaths due to LSD; you
6  agree?
7    **A.   I wouldn't have researched that to the**
8  **point where I could agree or disagree.**
9    Q.   Okay.  So you can't say -- you can't
10  point to one death in the heyday of LSD that was
11  attributed to LSD toxicity; right?
12    **A.   You're talking about toxicity or**
13  **behaviors associated with the drug?**
14    Q.   No.  I'm not talking about behaviors.
15  I'm not talking about people going crazy and
16  jumping off buildings.  I'm talking about toxicity
17  of the drug.
18    **A.   I think we talked earlier I don't**
19  **believe that the LSD is considered a drug that**
20  **typically is in and of itself a toxic drug that**
21  **kills based on it's chemistry.**
22    Q.   And you also agree that in the heyday of
23  LSD use there were zero reported cases of excited
24  delirium attributable to LSD complications;

**Alpha Reporting Corporation**

**Gary Vilke - December 08, 2017**

38

1  correct?

2      A.   In that day the term excited delirium

3  hadn't actually been used.  So it wouldn't have

4  been put out there.  That came out more in the

5  times of the cocaine, heroin, they were seeing

6  more deaths associated with it.

7      Q.   Actually the excited delirium or

8  agitated excited delirium deaths had been reported

9  back into the 19th Century in psychiatric

10 patients; correct?

11     A.   Right.  But you used the one term I

12 think excited delirium, and that term wasn't

13 really being used until the '80s.  So you wouldn't

14 expect to go and see LSD deaths secondary to

15 excited delirium in the '60s or '70s.  It wouldn't

16 have been treated then.

17     Q.   Fair enough.  In the '60s and '70s, did

18 you see one death attributable to agitated

19 delirium caused by LSD, one death?

20     A.   I didn't review the literature from the

21 '60s and '70s.  I know that since -- Ronald

22 O'Halloran I believe reports of a death secondary

23 to LSD and excited delirium in his case theories.

24     Q.   Ronald O'Halloran is a forensic

39

1  pathologist?

2      A.   That is correct.

3      Q.   And Dr. O'Halloran has publicly stated

4  that if hogtying in a prone position has nothing

5  to do with the death of people under the influence

6  of drugs, why does it always occur when those

7  people are in police custody; correct?

8      A.   Why does it meaning the death or the --

9      Q.   Dr. O'Halloran has publicly stated that

10 all deaths in hogtie restraints in excited

11 delirium from drugs occur in police custody?

12     A.   He may have claimed that.  I would

13 disagree with it.

14     Q.   Okay.  Now, Doctor, you do agree that

15 when cocaine came on the scene in the 1980s and

16 thereafter is when we saw the excited delirium

17 deaths attributable to ingestion of that

18 particular drug; right?

19     A.   That's the time period.  Yes.

20     Q.   And cocaine and amphetamines are

21 stimulants; right?

22     A.   They are stimulants.  Yes.

23     Q.   Is it correct that in Dr. Gall's,

24 G-A-L-L, forensic medicine that the descriptions

40

1  of excited delirium like presentations in the late

2  1800s and early 1900s were noted in the medical

3  literature?

4      A.   Bell's mania and other names of it

5  describe the subjects or patients presenting with

6  symptoms consistent with excited delirium in that

7  time period.  Yes.

8      Q.   And going on quoting:  At this time the

9  reports of death from this syndrome started fading

10 coinciding with the introduction of

11 anti-psychotics for the treatment of agitated

12 patients in psychiatric facilities.  Right?

13     A.   The reports did start to go down because

14 people were being treated with medications.  Sure.

15     Q.   And they were down at the time that LSD

16 came on the scene?

17     A.   I guess in that time period, yes the

18 psychiatric patients were being treated with

19 Thorazine and other anti-psychotics.  And that was

20 the same time period that LSD was out there.

21 Sure.

22     Q.   You've stated that in your -- to your

23 understanding Mr. Goode was hogtied; correct?

24     A.   Yes.  He was in a prone maximal

41

1  restraint position, also known as hogtie.

2      Q.   How long did he stay in that position?

3      A.   He was in it from the time the police

4  officers put him in until the time he had his

5  cardiac arrest.  And that was somewhere about an

6  hour and a half in that range.

7      Q.   Is it correct that people who are in a

8  delusional state of excited delirium do not

9  appreciate their surroundings?

10     A.   They are often altered by their

11 surroundings.  They see things.  They hear things.

12 What they interpret from their surroundings is

13 often unknown because of what's going on in their

14 head.

15     Q.   Is it correct that these people are not

16 aware of their condition of delusional state?

17     A.   They typically don't recognize that

18 they're delusional if that's what you're asking.

19 They are just experiencing it.  But they don't

20 have an awareness of that delusion.

21     Q.   Certainly they don't know what they are

22 doing; right?

23     A.   That is usually felt to be the case,

24 yeah.  They're unaware of what they're doing,

**Gary Vilke - December 08, 2017**

42

1  their activities.  Sure.
2      Q.    They are unaware of being bound also;
3  correct?
4      A.    They may realize they can't move.  They
5  may not know why or -- again, what's going on in
6  their head with the drugs that are sort of
7  swimming around and causing confusion and delusion
8  is hard to say in every case it's the same way.
9      Q.    Well, you would agree that it would be
10  unlikely that somebody in an extreme delusional
11  state would know that he had been chained; right?
12      A.    It's possible that they sense something
13  going on that somebody is holding them or
14  dragging, holding them or -- it's hard to say
15  what's happening.  But they may recognize that
16  they can't move.  They may not recognize they
17  can't move.  Again, I think it's they're -- what's
18  going on in their head is very difficult.  But
19  they may or may not be aware specifically.
20      Q.    Well, the state which you describe as
21  excited delirium would be so extreme that a person
22  would be highly unlikely to realize that he was in
23  handcuffs, for instance?
24      A.    He may not recognize it was handcuffs.

43

1  He may recognize that the devil is holding him or
2  other things.  Again, that's sort of the part of
3  delusional stuff.  He hey not know exactly what's
4  going on, but he has probably some awareness.  He
5  recognizes -- they recognize people coming at them
6  because they get paranoid and freak out.  So there
7  is a level of awareness.  But how detailed that is
8  or how accurate that is is really difficult for
9  anybody to understand on all cases.  It's usually
10  more case individual.
11      Q.    You wouldn't expect a person in extreme
12  excited delirium to yell out get me out of these
13  chains, would you?
14      A.    They could.  Sure.
15      Q.    How would they know they were in chains?
16      A.    They could be aware of it.  They could
17  have seen it.  They could be heard jingling.  They
18  could be sensing the sounds, the feel.  Again,
19  it's a delusion.  It's not -- it can wax and wane
20  to some degree.  But the reality is the level of
21  awareness that is happening vary from people to
22  people.  I have seen all kinds of variations on
23  how they seem to -- how they seem to interpret
24  their environment and surroundings.

44

1      Q.    So what you're telling the jury is that
2  there is no checklist as such for determining a
3  person that is in excited delirium?
4      A.    I don't think I said that.  I said that
5  you can't completely define what they are
6  interpreting their environment to be.  There have
7  been some people who say shoot me shoot me making
8  an awareness that there might be a gun with the
9  officer there.  So there's different levels of
10  awareness.  But it doesn't mean that they are not
11  delirious and interpreting their environment and
12  what's going on correctly.
13      Q.    Very well.  Let me ask you -- let's put
14  that aside.  When a person presents with these
15  markers or these characteristics as you said of
16  excited delirium and medical care arrives, that
17  person in a state of excited delirium syndrome
18  should receive pulse oximetry; correct?
19      A.    When feasible, sure.  It's reasonable.
20      Q.    And when is not feasible?
21      A.    When they're moving so much that they
22  can't either get a good tracing or it keeps
23  falling off.  You don't put something on somebody
24  that is either grabbing the wires or can't keep it

45

1  on their fingers.  A lot of times in an acute
2  agitated state people try to put it on but in
3  general it ends up getting pulled off just by
4  virtue of the movement.
5      Q.    For the jury's benefit there are
6  different types of pulse oximeters; is that
7  correct?
8      A.    There's different types of attachments
9  if that's what you're getting at.
10      Q.    Right.  One can go around the head;
11  correct?
12      A.    For pediatrics.  We don't typically use
13  that in adults.
14      Q.    Well, Baptist Hospital does.  Would you
15  argue with that?
16      A.    I'm not aware of it.  So I couldn't say
17  one way or the another.  But if his head was down
18  on the ground it probably would not be as
19  functional because of the movement and things like
20  that.  But I can't say that they did or didn't try
21  it.
22      Q.    Well, if you place a pulse oximetry
23  around the head it's not going to come -- be
24  shaken off by somebody in hogtie; right?

**Gary Vilke - December 08, 2017**

46

1    A.   It certainly could be.  Sure.
2    Q.   Doctor, you understand that your
3  opinions is suppose to be to a reasonable degree
4  of medical certainty; right?
5    A.   Absolutely.
6    Q.   So all of this could be, and may be, and
7  these hypotheticals you understand are not
8  acceptable testimony; correct?
9    A.   If you're asking me questions I'm giving
10  you the answers to those questions.
11    Q.   Has your testimony ever been excluded
12  from a case?  Have you ever been excluded, your
13  testimony in whole or in part from any litigation?
14    A.   Not to my knowledge.  No.
15    Q.   Did you testify in the case of Rich
16  versus the City of Savannah Tennessee?
17    A.   I believe I did.  Yes.
18    Q.   And the United States magistrate judge
19  in that case held that you did not have the
20  expertise to offer some of the opinions you tried
21  to offer?
22    A.   I was not made aware of that.
23    Q.   In that case you were hired by the
24  police after a man died in a confrontation with

47

1  the police?
2    A.   That case is a long time ago.  So I
3  don't remember details of it.  That certainly
4  could be the case.
5    Q.   You attempted to testify that the cause
6  of death was not related to asphyxia in Rich
7  versus City of Savannah; right?
8    A.   Again, it's been a long time since I've
9  reviewed that case.  But it certainly would be
10  possible.
11    Q.   Okay.
12       MR. EDWARDS:  Bobbie, let's mark as the
13  next exhibit -- Bobbie, if you will, hold the
14  second exhibit for the order of Judge Pham in the
15  case of City of Savannah.
16       THE REPORTER:  I've done it.
17  Mr. Edwards.
18       MR. EDWARDS:  Okay.
19       (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
20  WAS MARKED AS EXHIBIT NO. 2 TO THE TESTIMONY OF
21  THE WITNESS AND ATTACHED HERETO.)
22  BY MR. EDWARDS:
23    Q.   Doctor, take a look at that order and
24  tell us that you were aware of the fact that Judge

48

1  Pham excluded much of your testimony in the case
2  of Rich versus City of Savannah?
3       MR. GASS:  Can I have the date the
4  decision that's being referenced.
5       MR. PHILLIPS:  I think it's September
6  30, 2005.
7       MR. EDWARDS:  That is correct.
8       THE WITNESS:  All right.  Thank you.
9  BY MR. EDWARDS:
10    Q.   Have you seen this order before?
11    A.   I have not.  No.
12    Q.   Okay.  So you were unaware that a
13  federal judge here in Memphis had excluded some of
14  your opinions?
15    A.   I was unaware of a federal judge like
16  this.  When I go to court they tell me the areas
17  they want me to talk about.  So it could have been
18  that that's what happened here.  But I was not
19  aware of this order.
20    Q.   Fair enough.  Now I was asking you about
21  the things that should be done medically when a
22  patient presents in a altered mental status like
23  Mr. Goode.  We talked about pulse oximetry is
24  another thing which the paramedic should assess is

49

1  for head trauma?
2    A.   You'll do an assessment of the patient
3  the best you can.  That's part of an evaluation.
4  Sure.
5    Q.   Right.  Head trauma would be included in
6  assessing the patient?
7    A.   If feasible, sure you'll evaluate what
8  you can with what you have in front of you.  But
9  that's part of an assessment, sure.
10    Q.   Well, why would somebody being hogtied
11  not be able to have the condition of his head
12  assessed?
13    A.   Sometimes you can't see the entire
14  portion of the head.  Sometimes you depending
15  on their positioning.  With the agitation
16  component you're not trying to completely disrupt
17  and move around and create a lot of stimuli.
18  You're trying to observe and evaluate, but you're
19  not going to completely necessarily take off every
20  piece of clothing to get a good assessment.
21  You'll look -- based on the history on what you
22  can see visually and look at somebody.
23    Q.   Did Mr. Goode have a hat on?
24    A.   I don't know.  I don't believe he did.

**Alpha Reporting Corporation**

**Gary Vilke - December 08, 2017**

50

1    Q.   Another thing that should be done
2  according to you is a glucose check; right?
3    **A.   At some point a glucose should be**
4  **checked.  Yes.**
5    Q.   Okay.  And what is it that glucose
6  levels would tell you as a physician?
7    **A.   If they're very low that could be an**
8  **etiology for the agitation, or extremely high it**
9  **could be another medical condition, but probably**
10 **not the cause of the agitation, but could be.**
11   Q.   Was a glucose check done on Mr. Goode?
12   **A.   It was.  Yes.**
13   Q.   Postmortem?
14   **A.   I don't think so.  I thought it was done**
15 **prior to his death.**
16   Q.   You have the medical records there and
17 the EMT records; correct?
18   **A.   Yes.**
19   Q.   Show us where a glucose check was done
20 prior to death by either the paramedics or the
21 hospital personnel in the emergency department?
22   **A.   There's a bedside glucose noted 2139 of**
23 **95.**
24   Q.   That's 17 minutes after the code was

51

1  called; right?
2    **A.   That would be --**
3    A.   He was dead?
4    **A.   Well --**
5    Q.   He was dead at that point?
6    **A.   You asked me -- he wasn't pronounced**
7  dead until later than that.  I'm sorry, I
8  misunderstood your question.  If you're asking was
9  there a glucose done prior to his cardiac arrest,
10 I don't believe it was done prior to his cardiac
11 arrest.
12   Q.   Either by the EMS or the hospital
13 personnel; correct?
14   **A.   Not that I am aware of.  A chemistry**
15 **test is ordered prior to his cardiac arrest.  But**
16 **a bedside glucose was not done until the time we**
17 **just talked about.**
18   Q.   Tell the jury what's involved in doing a
19 glucose check?
20   **A.   Typically it's poking the finger with**
21 **some sharp object, a prong or what not getting**
22 **some blood sample and putting into a machine.**
23   Q.   Right there at bedside?
24   **A.   Can be done right at the bedside.  Yes.**

52

1    Q.   I mean, it's a very simple procedure,
2  isn't it?
3    **A.   Basically, yes it's fairly simple.**
4    Q.   It is an essential part of the
5  examination, the medical examination of a person
6  deemed to be in excited delirium; correct?
7    **A.   It is part of the evaluation in somebody**
8  **presenting in excited delirium, particularly if**
9  **there's not an inciting cause.  But it's not -- I**
10 **wouldn't call it essential.**
11   Q.   Have you listed that -- you, Dr. Vilke
12 listed glucose check as part of the exam of a
13 person exhibiting the symptoms of Troy Goode?
14   **A.   I have said that you should check a**
15 **bedside glucose.  Yes.**
16   Q.   ECG is another thing that should be
17 done; right?
18   **A.   ECG as a 12-lead EKG or cardiac**
19 **monitoring?**
20   Q.   Either one.  Was an ECG done in this
21 case?
22   **A.   There was a three lead done in the**
23 **field.  Yes.**
24   Q.   And Lead 2 is the one that tells you

53

1  whether somebody is in supraventricular
2  tachycardia; correct?
3    **A.   It's not necessarily a specific lead.**
4  **You look at certain leads that give you the best**
5  **reading.**
6    Q.   Lead 2 is the one mentioned in the
7  literature for determining SVT, supraventricular
8  tachycardia?
9    **A.   It can be used to look for SVT.  But you**
10 **cannot always tell whether somebody is an SVT**
11 **based on a single lead tracing.  Sometimes you**
12 **need a 12 lead.**
13   Q.   Yeah.  Well, if you need a 12 lead then
14 you do a 12 lead; right?
15   **A.   That would be correct.**
16   Q.   Was a 12 lead done?
17   **A.   It was not done in this case.  No.**
18   Q.   It should have been done if there was
19 any question about the diagnosis of SVT made by
20 Paramedic Graham; correct?
21   **A.   There is no doubt about the diagnosis**
22 **it's not SVT.  But in this case even if you wanted**
23 **to get a 12 lead, it would have been impossible**
24 **based on his behavior.**

**Gary Vilke - December 08, 2017**

54
1    Q.    Were you there, Doctor?
2    A.    I was not there.
3    Q.    Nurse Graham was able to get in -- I'm
4    sorry, Paramedic Graham was able to get in an IV
5    but she couldn't do an adequate ECG; is that what
6    you're saying?
7    A.    Being specific she got an ECG a single
8    lead tracing.  It would not be feasible to do a
9    12-lead EKG the way that Mr. Goode was described
10   as behaving.
11   Q.    So it was okay for the paramedics and
12   the hospital to disregard the finding which is
13   recorded of SVT, that's good medicine?  We're just
14   going to disregard it because we don't think it's
15   accurate; is that what you're saying?
16   A.    The paramedic recorded SVT.  The rhythm
17   strip does not show SVT.  So there was no SVT to
18   disregard even though it was documented in the
19   paramedic record.
20   Q.    Is it good medicine to disregard a
21   diagnosis without verifying that the diagnosis is
22   incorrect is my question?
23   A.    Correct, paramedics do not make
24   diagnosis.  They do assessments.  So there was no

55
1    official diagnosis of SVT being made.  They
2    interpreted rhythm as being potential SVT.  But
3    there was no diagnosis of SVT in this case.
4    Q.    Did she record SVT?
5    A.    That is what she wrote in her record.
6    Q.    The paramedic wrote not once but twice
7    SVT; right?
8    A.    As the monitor, not as a diagnosis.
9    Q.    Okay.  And then so it was okay for the
10   hospital, the emergency department to disregard
11   that?
12   A.    I don't believe the tachycardia was
13   disregarded by the hospital.  They recognized --
14   Q.    It wasn't?
15   A.    They recognized that he was tachycardic
16   and they started therapy for that, which was the
17   sedation to slow his heart rate down.
18   Q.    How quickly was sedation commenced at
19   the hospital?
20   A.    Shortly after the physician was able to
21   evaluate the patient, it was ordered and
22   commenced.
23   Q.    How long was that after he arrived at
24   the hospital?

56
1    A.    He arrived at 2028.  The order was
2    placed approximately 2106.
3    Q.    So 36 minutes later?
4    A.    That looks about correct.  Yes.
5    Q.    And it's also correct you -- you're an
6    emergency physician; correct?
7    A.    I am.  Yes.
8    Q.    You have worked in emergency
9    departments; right?
10   A.    Yes.
11   Q.    Triage nurses can sedate people in Troy
12   Goode's position; correct?
13   A.    Can sedate them in his condition?
14   Q.    Yeah.
15   A.    Not at our hospital, not without an
16   order.
17   Q.    Sure.  But if they a triage nurse
18   determines that a patient is in excited delirium,
19   they can simply ask the doctor for permission to
20   administer something like Versed, for instance?
21   A.    A nurse can make a request.  But a
22   doctor is typically not going to do anything until
23   they get some evaluation of the patient.  Usually
24   you want to see what's going on, get some history,

57
1    get an assessment, vital signs the best you can
2    before you start throwing meds at somebody.  So a
3    triage nurse can request it, doesn't mean they're
4    going to get it.
5    Q.    How do you get the history?
6    A.    From the collateral history --
7    Q.    Of a patient that's delirious?
8    A.    I'm sorry, you interrupted me.  I was
9    saying the collateral history is helpful from
10   either the EMTs or law enforcement that are
11   accompanying them or the patient obviously if they
12   can.  In this case no.
13   Q.    As a matter of fact EMTs or paramedics
14   can administer chemical restraints such as Versed
15   in an ambulance if they deem it necessary; right?
16   A.    If the protocols allow and they meet
17   criteria, there are certainly places that allow
18   for sedation to be used by paramedics.
19   Q.    Mississippi does; correct?
20   A.    I don't know the protocols for
21   Mississippi.
22   Q.    Assume that the Mississippi protocols
23   allow the paramedic to administer a chemical
24   restraint like Versed, obviously Ms. Graham didn't

**Alpha Reporting Corporation**

**Gary Vilke - December 08, 2017**

**58**

1  deem it necessary to sedate Mr. Goode; correct?
2    **A.    Just because protocols allow for**
3  **something, you have to follow the protocol.  I**
4  **don't know the protocol, so I can't say whether or**
5  **not it would have been appropriate or**
6  **inappropriate to do it.  I wasn't asked to review**
7  **the paramedic's care in this case.**
8    Q.    Well, you supervise paramedics; right?
9    **A.    I have.  Yes.**
10   Q.    And you're qualified to speak about
11 paramedics; right?
12   **A.    I have been qualified, sure.**
13   Q.    And you know that paramedics if the
14 circumstances require can administer chemical
15 restraints in an ambulance; correct?
16   **A.    The word require is a strong word.**
17 **Again, if protocols allow for it and they meet**
18 **certain criteria and they don't meet certain**
19 **exclusion criteria and their training and all that**
20 **goes with it, then yes.  Like I said, there are**
21 **certain places that paramedics can gave**
22 **medications for agitated patients.  I don't know**
23 **the protocols here.  I wasn't asked to evaluate**
24 **their treatment of Mr. Goode.**

**59**

1    Q.    And an agitated patient who is agitated
2  due to LSD is a proper subject for a chemical
3  restraint if he is truly out of control; correct?
4    **A.    A person who is extremely agitated on**
5  **any illicit drug can be a candidate for sedation**
6  **in the appropriate setting with the appropriate**
7  **background and history and depending on who is**
8  **giving it which protocols and certain requirements**
9  **are required before giving the medication.**
10   Q.    So you don't know what the Mississippi
11 protocol says one way or another?
12   **A.    That's correct.**
13   Q.    Okay.  Now was Troy Goode an emergency?
14   **A.    I'm sorry, was he an emergency?**
15   Q.    Yes.  Was he considered an emergency
16 patient?
17   **A.    We can consider this state a medical**
18 **emergency for evaluation, sure.  Compared to a cut**
19 **or an ankle strain it's considered a medical**
20 **emergency, sure.**
21   Q.    And for emergency patients it is
22 protocol to get them to the hospital as quickly as
23 possible; right?
24   **A.    As quickly and as safely as possible.**

**60**

1  That's one of the goals, sure.
2    Q.    What you do is if -- for EMS what they
3  do is they turn on the ambulance lights so that
4  they can be an emergency vehicle; correct?
5    **A.    They can do it.  Because of the risks**
6  **associated with going fast lights and sirens**
7  **there's lots of tiers in which -- even though the**
8  **patient may be deemed a quote unquote emergency,**
9  **you would still not go lights and sirens.**
10 **Somebody with severe abdominal pain and a**
11 **borderline heart rate and blood pressure would be**
12 **an emergency, but you wouldn't go lights and**
13 **sirens to get them to the hospital.  So the**
14 **protocol for lights and sirens vary from area to**
15 **area.**
16   Q.    Okay.  So why don't we cut out some of
17 this.  We're not talking about people with
18 abdominal problems.  We're talking -- we're here
19 about excited delirium; okay?
20   **A.    Okay.**
21   Q.    Is an excited delirium patient such as
22 Mr. Goode considered a medical emergency; yes or
23 no?
24   **A.    The answer is consider it a medical**

**61**

1  emergency, sure.
2    Q.    And a medical emergency is to be
3  transferred emergently to the hospital; correct?
4    **A.    Emergently or urgently.  Again, if**
5  **you're defining emergently by lights and sirens, I**
6  **would not agree with that.  I think they should go**
7  **as quickly and safely as possible without the**
8  **necessary need for lights and sirens in these**
9  **cases.**
10   Q.    You would certainly not sit for a number
11 of minutes in the parking lot with the patient in
12 the back taking no action, would you?
13   **A.    I think that I -- I think that as far as**
14 **no action you're doing nothing versus assessing**
15 **and doing other things, you're asking me questions**
16 **about the case I really didn't review.**
17   Q.    Well, Doctor, look, you're coming in to
18 testify about cause of death; right?
19   **A.    Yes.**
20   Q.    And don't you think it's important that
21 you have all of the facts leading up to the death
22 so you can render a valid opinion?
23   **A.    The facts that are applicable to**
24 **determine the cause of death, sure.  What's being**

**Gary Vilke - December 08, 2017**

62

1  done in the back of an ambulance during a period
2  of time is not applicable to determining cause of
3  death.  Whether they were poking him with an IV,
4  doing an assessment, trying to get a pulse ox,
5  trying to put a lead on, or what you said doing
6  nothing, that doesn't apply to my determination of
7  cause of death.  I have the times down that things
8  were going on, but not the necessary specific
9  second to second or minute to minute play by play
10 in the back of the ambulance.
11     Q.   Does weight applied to Mr. Goode's back
12 when he was hogtied and prone have any impact on
13 your opinion?
14     A.   At the time in the hospital or when are
15 you referring to?
16     Q.   At any point in time.
17     A.   In the case of his -- in looking at the
18 -- assessing the whole case, the answer would be
19 if weight was applied during the restraint process
20 by police, the fact that he was alive the next
21 hour plus, hour and a half plus, that would not
22 have any impact on my opinion as far as did the
23 weight have any causation to the cardiac arrest.
24 The straps are being used in the back of the

63

1  ambulance if they were there and he got to the
2  hospital and they were removed and he was still
3  alive and kicking and struggling and showing signs
4  of life and good vital signs -- or not good vital
5  signs, but positive vital signs, that would not
6  impact my opinion.  I note it, but it wouldn't
7  impact my opinion.
8      Q.   Have you not seen cases where there was
9  a delayed asphyxiation death after application of
10 weight?
11     A.   A delayed asphyxiation death after the
12 application of weight?
13     Q.   Was there not a reported -- excuse me,
14 was there not a reported case of death two days
15 after application of weight due to asphyxiation?
16     A.   I would be happy to review that.  If
17 you're referring to somebody who had a cardiac
18 arrest at the time and was asphyxiated and died in
19 the hospital two days later, I guess that's a
20 feasible thing.  But as far as somebody who had
21 weight on them and then they had their cardiac
22 arrest event two days later, I would certainly not
23 think that the weight had an impact on that.
24     Q.   How much weight was put on Mr. Goode at

64

1  any one time?
2      A.   In the hospital there really wasn't much
3  weight at all on him at all.  He was left on the
4  gurney.  In the back of the ambulance he had some
5  straps on him.  The weight that was used to try to
6  get him in custody by police was varying and moved
7  around.  But the reality is the fact that they --
8  after he was restrained he was assessed by
9  paramedics and assessed at the hospital and had a
10 blood pressure and a heart rate and was alive and
11 yelling and streaming.  No matter what that weight
12 was, it wouldn't have impacted his outcome.  It
13 wouldn't be part of his cardiac arrest.
14     Q.   How many police put their weight on
15 Mr. Goode at the scene?
16     A.   I seem to recall about intermittently
17 three police officers were back and forth.  I
18 couldn't give you an exact time or amount.
19     Q.   Do you believe that in a drug induced
20 excited delirium state where there is death, the
21 death is preceded by cycle of alternating struggle
22 and collapse?
23     A.   I'm sorry, could you repeat that again,
24 please?

65

1      Q.   Yes.  Is death in these circumstances
2  preceded by alternating cycle of alternating
3  struggle and collapse?
4      A.   I would not say that that's necessarily
5  uniform, no.  I think it's thought of struggle,
6  struggle, struggle.  And then they have a cardiac
7  arrest is typically what you see, not necessarily
8  an alternating pattern.
9      Q.   Let me give you a quote.  "Death is
10 preceded by a cycle of alternating struggle and
11 collapse."  Agree or disagree?
12     A.   I can't interpret that sentence.  If
13 you're talking about collapse as far as physical
14 exhaustion versus cardiac collapse or
15 cardiovascular collapse, I'm not sure what the
16 context is there.
17     Q.   I'm just quoting Dr. DiMaio.
18     A.   You're giving me one sentence.  So,
19 again, I'm not sure what he means by collapse.  So
20 I can't interpret that sentence.
21     Q.   That's the whole sentence.  That's all I
22 can give you.  Was Mr. Goode ever bradycardic?
23     A.   Not that I recall being -- during the
24 time before he had his cardiac arrest, he was not.

**Alpha Reporting Corporation**

**Gary Vilke - December 08, 2017**

66

1    Q.    How do you know was he monitored?
2    A.    He was -- you mean as far as on a
3  cardiac monitor, not consistently, no.
4    Q.    Was he monitored at all?
5    A.    Well, yeah.  We have his rhythm strips.
6  We know he was on a monitor for at least a small
7  window of period to get that rhythm strip, but he
8  was not --
9    Q.    Is that in the hospital record or the
10  EMT record?
11    A.    The EMT record.
12    Q.    No, Doctor.  At the hospital where he
13  was there for an hour or so, was he ever monitored
14  for cardiac rhythm?
15    A.    Sorry to upset you, I was just asking
16  answering your question was he ever monitored, so
17  we're at the hospital now.  And he had pulse
18  checked but he was not on a cardiac monitor prior
19  to his cardiac arrest.  He was monitored obviously
20  after the cardiac arrest.
21    Q.    But that doesn't do much good, does it?
22    A.    Just answering your question.
23    Q.    So you can't say whether he was ever
24  bradycardic or not; right?

67

1    A.    I can't say -- he certainly was not
2  documented as bradycardic.  His behavior would
3  very consistent with bradycardic.  But I can't say
4  for the exact time he was in the hospital prior to
5  his cardiac arrest that he was not bradycardic.
6    Q.    Can hypoxia cause cardiac arrest?
7    A.    Hypoxia can cause cardiac arrest.  Yes.
8    Q.    When did Mr. Goode's -- was he
9  dysrhythmic?
10    A.    He was tachycardic, which is some define
11  as a dysrhythmia.  And he obviously went into PEA
12  which was a dysrhythmic event.
13    Q.    When did he become dysrhythmic?
14    A.    Well, again --
15    Q.    Can you tell us?
16    A.    If we're defining tachycardia as a
17  dysrhythmia he was dysrhythmic the entire time.
18  It's an irregular rhythm.  It's not a normal sinus
19  rhythm.  It's a sinus tachycardia.
20    Q.    What you do medically to address
21  dysrhythmia is what?
22    A.    You treat what you feel to be the cause
23  of that dysrhythmia.
24    Q.    And I'm asking you what that is?

68

1    A.    Well, in this case it was a sinus
2  tachycardia --
3    Q.    The treatment what was the treatment?
4    A.    Sure.
5    Q.    That should apply?
6    A.    In this case it was a sinus tachycardia
7  most interpreted to be due to drug use and
8  agitation.  So you treat that by starting sedation
9  medication to try to calm the person down, lower
10  the heart rate based on that.
11    Q.    Actually you've testified that when you
12  have people come in to your emergency department
13  under the influence of LSD you often just put them
14  over in the corner until they calm down; right?
15    A.    Depends on what their presentation style
16  is.  As you alluded to there's all kinds of
17  presentations to LSD intoxication.  If they're
18  just mellow and tripping, then yeah you can watch
19  them without a monitor in a corner somewhere.  If
20  they're extremely agitated, then you're going to
21  try to use sedating medications to calm them.
22    Q.    As quickly as possible for the sedation
23  medication?
24    A.    Possible and reasonable, sure.

69

1    THE WITNESS:  Would this be a good place
2  to take a quick break?
3    MR. EDWARDS:  Sure.
4    THE VIDEOGRAPHER:  Time off the record
5  is 9:22 a.m.
6    (WHEREUPON, A BREAK WAS TAKEN AND THE
7  PROCEEDINGS CONTINUED AS FOLLOWS:)
8    THE VIDEOGRAPHER:  Time back on the
9  record is 9:30 a.m.  This begins Media No. 2.
10  Counsel, you may proceed.
11  BY MR. EDWARDS:
12    Q.    Doctor, shifting to another subject, we
13  talked about chemical sedations, chemical
14  restraints.  Haloperidol is a chemical restraint;
15  correct?
16    A.    It's a medication used to sedate people.
17  It can be considered a chemical restraint.
18    Q.    And was Haloperidol used on Mr. Goode?
19    A.    It was.  Yes.
20    Q.    And it was inserted through an IV; is
21  that correct?
22    A.    That's how it was administered.  Yes.
23    Q.    You are aware that the FDA issued a
24  black box warning against IV Haloperidol use?

**Gary Vilke - December 08, 2017**

---

**70**

1    A.    There was a warning out for Haldol use.
2    Q.    And it's because there were deaths
3    experienced after IV administration of Haldol or
4    Haloperidol; correct?
5    A.    There were some reported deaths.  Yes.
6    Q.    So the way Dr. Oliver ordered the
7    administration of Haldol was against the warning
8    from the FDA; right?
9    A.    Well, the warning is to be aware that
10   this can happen.  It's still the commonly used
11   medication in the emergency departments across the
12   U.S.
13   Q.    And if you're going to do that then you
14   need to monitor the patient after you inject it;
15   right?
16   A.    After you put the medication in there
17   and as soon as you start monitoring you would
18   watch the patient.  Yes.
19   Q.    And why do you -- tell the jury why it
20   is after you administer Haldol or Haloperidol that
21   you must watch the patient?
22   A.    The black box warning basically says
23   there is a few cases out of literally millions of
24   administrations of Haldol that caused torsade de

---

**71**

1    pointes, it's specific dysrhythmia that can kill
2    somebody.  And so you're going to watch to make
3    sure if they go into it you're ready to treat it.
4    Q.    It's more than that, isn't it?  If you
5    administer Haldol it can change -- it can affect
6    breathing; correct?
7    A.    It can affect, I'm sorry, what?
8    Q.    Breathing?
9    A.    Haloperidol?  It's usually not
10   considered something that would impede
11   ventilations.  It's a sedating medication, but
12   it's usually not considered significantly
13   ventilatory involved.
14   Q.    Can it change respiration?
15   A.    If it sedates somebody who is breathing
16   quickly because they're agitated, then sure your
17   respiratory rate might decrease.  But it wouldn't
18   change your ventilations.
19   Q.    Well, one of the things that people who
20   are trained to do observation of patients that
21   have received chemical restraints is look for
22   changes in respirations; right?
23   A.    You're looking for -- you're following
24   their breathing patterns, sure.  That's fair.

---

**72**

1    Q.    All right.  And you're also looking for
2    changes in heart rate?
3    A.    At some point when you can monitor them
4    you would reassess them for the sedating
5    qualities.  It should lower the heart rate.
6    That's part of the purpose of using the medicine,
7    sure.
8    Q.    By the way, was Mr. Goode's heart rate
9    measured either by the EMS or the medical
10   personnel at the hospital?
11   A.    It was.  Yes.
12   Q.    And -- I asked the wrong question.  Was
13   his blood pressure taken?
14   A.    It was taken.  Yes.
15   Q.    And what import, if any, that there was
16   a 30 point drop in the diastolic within a few
17   minutes?
18   A.    Physiologically and clinically it
19   wouldn't have changed anything.  The measurements
20   in these types of patients sort of bounce around.
21   And you measure, you know, five blood pressures
22   you're going to get five different numbers, and
23   they could be variable 20, 30 points depending on
24   what's going on there.

---

**73**

1    Q.    Well, once again the only way to know
2    that is by continuing to monitor; correct?
3    A.    If you wanted to recheck the blood
4    pressure multiple times, sure.  That's how you
5    would do that.
6    Q.    And that was not done with Mr. Goode
7    either, was it?
8    A.    He had several blood pressures checked
9    during his time.
10   Q.    He had two blood pressures in the
11   ambulance, but then his blood pressure was not
12   monitored at the hospital; correct?
13   A.    I believe it was checked at the
14   hospital.
15   Q.    You want to show us -- it was measured
16   at 164 at one point; right?
17   A.    His heart rate I think was 164.  His
18   blood pressure was not that obviously.
19   Q.    His blood pressure was normal?
20   A.    That is what I recall.
21   Q.    All right.  Is it accurate that --
22         MR. EDWARDS:  Well, first of all, let's
23   mark the FDA black box.
24         (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

---

**Gary Vilke - December 08, 2017**

74

1  WAS MARKED AS EXHIBIT NO. 3 TO THE TESTIMONY OF
2  THE WITNESS AND IS ATTACHED HERETO.)
3  BY MR. EDWARDS:
4      Q.   Doctor, have studies Shown that more
5  than half of patients develop respiratory
6  depression in response to chemical restraints?
7      **A.   Have half the studies shown?**
8      Q.   No.  Listen to the question.  Have there
9  been studies, peer reviewed studies, publications
10 that have shown that more than half of patients
11 develop respiratory depression in response to
12 chemical restraints?
13     **A.   I know the patients will breathe less**
14 **than when they're agitated.  So their ventilations**
15 **and respirations have been depressed from their**
16 **starting point.  So that would make sense.  It's**
17 **part of the sedation process.**
18     Q.   Are you familiar with the work of
19 Dr. Deitch, D-E-I-T-C-H, from two years ago on
20 unrecognized hypoxia and respiratory depression in
21 emergency department patients sedated for
22 psychomotor agitation?
23     **A.   I am not familiar off the top of my head**
24 **based on that title and author.**

75

1      (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
2  WAS MARKED AS EXHIBIT NO. 4 TO THE TESTIMONY OF
3  THE WITNESS AND IS ATTACHED HERETO.)
4  BY MR. EDWARDS:
5      Q.   Doctor, are you saying you're not
6  familiar with this?
7      **A.   May have reviewed it at some point.  I'm**
8  **not familiar with the details of it right now.**
9      Q.   Okay.  It was published in Western
10 Journal of Emergency Medicine; correct?
11     **A.   That is correct.**
12     Q.   Is that a reliable source for medical
13 information?
14     **A.   It is a peer reviewed journal.**
15     Q.   So is your answer yes it's deemed
16 reliable?
17     **A.   It's as reliable as the peer review is**
18 **reviewing it.  That's what I'm getting at.**
19     Q.   Okay.  Now Mr. Goode also received
20 Ativan; is that correct?
21     **A.   He did.  Yes.**
22     Q.   And is it true that before chemical
23 restraints are applied that any underlying
24 disorder such as hypoxemia or hypoglycemia should

76

1  be treated?
2      **A.   I apologize, I lost you in the question.**
3  **Can you please repeat it?**
4      Q.   Yes, I will be glad to.  Is it accurate
5  to say that before sedating a patient any
6  underlying problem, medical problem should be
7  treated first as a potential pitfall as
8  administering anti-psychotics to a patient who
9  really has an underlying disorder such as
10 hypoxemia or hypoglycemia?
11     **A.   Ideally that would be the case if there**
12 **is a suspicion for it, if it's a diabetic or they**
13 **have a low O2 sats, joint hypoxia, you would want**
14 **to consider addressing those first.  But sometimes**
15 **you do the evaluation after you give the**
16 **medication because of the agitation behavior.**
17     Q.   Are you aware that Mr. Goode had
18 moderate hypoxia --
19     **A.   He had an O2 --**
20     Q.   -- before receiving chemical restraints?
21     **A.   He had a documented O2 sat of 90 percent**
22 **which wouldn't be considered hypoxia that would**
23 **induce this type of behavior.  So that would**
24 **basically rule out the concern for hypoxia in this**

77

1  patient.
2      Q.   Doctor, is 90 percent low?
3      **A.   It is a low normal range.  Yeah.**
4      Q.   Is it a condition which demands
5  supplemental oxygen administration?
6      **A.   It does not demand it.  It can be**
7  **considered.**
8      Q.   It should be administered, correct,
9  supplemental oxygen?
10     **A.   Depending on the circumstances it should**
11 **be considered.  But you have to take a look at the**
12 **entire picture.  We're talking about specifically**
13 **this case or talking about an O2 sat of 90 percent**
14 **in general as a number.  It's case specific.**
15     Q.   Well, the Mississippi SOPs for EMS say a
16 90 percent reading should receive supplemental
17 oxygen, would you take issue with that?
18     **A.   I think it's case by case.  If you have**
19 **somebody who has Eisenmenger's syndrome their O2**
20 **sat may never get above 85.  So you wouldn't need**
21 **to give them supplemental oxygen if that's where**
22 **they live.  That's what I'm saying you have to**
23 **look at case by case.**
24     Q.   Well, case by case if you get a 90

**Gary Vilke - December 08, 2017**

**78**

1  percent reading, you just ignore that?
2      A.  No.
3      Q.  What you do is you check it again;
4  right?
5      A.  Or you look at the clinical scenario and
6  see if that's appropriate for that patient or if
7  it's even a correct reading in that patient.
8      Q.  What was Mr. Goode's O2 saturation after
9  he was admitted to the hospital?
10     A.  The documented O2 sat was 90 percent.
11     Q.  And what was it 45 minutes later, 40
12  minutes later when he coded?
13     A.  You can't pick up an O2 sat during a
14  code basically.  So you wouldn't be able to
15  measure that.
16     Q.  Of course.  What was it just before he
17  coded?
18     A.  I don't have a number to share with you.
19     Q.  You have no idea, do you?
20     A.  I don't know what the number would be at
21  that point.  No.
22     Q.  Because the hospital didn't monitor his
23  blood oxygen saturation; correct?
24     A.  Because of his behavior precluded the

**79**

1  use of a O2 sat monitor to follow him.
2      Q.  That's what you've been told; correct?
3      A.  That's what I read throughout the
4  record.  Yes.
5      Q.  You have written repeatedly that for
6  these types of patients O2 saturation monitoring
7  is a requirement; correct?
8      A.  I don't believe I used the word
9  requirement.  And I said when feasible.
10     Q.  And are you saying -- have you ever had
11  a patient that weighed 250 pounds or more who was
12  in agitated delirium?
13     A.  Yes.
14     Q.  Did you manage that patient?
15     A.  Yes.
16     Q.  Actually in one of your testimonies or
17  one of your reports you say you and two untrained
18  unarmed security guards subdued a patient who was
19  an agitated delirium just the three of you; right?
20     A.  I don't recall that.  But I'd be happy
21  to review that testimony.
22     Q.  You have done that though, haven't you?
23     A.  I've assisted with taking down patients
24  who are agitated.

**80**

1      Q.  Yes.  And the people that take them down
2  typically are nurses; right?
3      A.  If the patient gets agitated in the
4  emergency department they may be the ones.
5  They're the first there to help out, sure.
6      Q.  You think that this -- giving you the
7  benefit of the doubt this 170-pound bean pole was
8  unmanageable?
9      A.  At what point are we talking about?
10     Q.  At any point.  Have you seen pictures of
11  Mr. Goode?
12     A.  I have seen some pictures of him.  Yes.
13     Q.  He was an absolute rail, wasn't he?
14     A.  The BMI calculated about 24 which would
15  make him the normal range.
16     Q.  He was a very skinny man, wasn't he?
17     A.  He was a normal man based on his body
18  mass index for his height and weight.
19     Q.  Okay, fine.  Giving you that, he
20  certainly was not an NFL player, was he?
21     A.  Unless he was a puncher.
22     Q.  Doctor, when you give a chemical
23  restraint that patient needs to be monitored;
24  correct?

**81**

1      A.  The patient -- yeah.  The patient should
2  be monitored after a chemical restraint is
3  utilized, sure.
4      Q.  Because -- and the monitoring needs to
5  be done by a trained staff member --
6      A.  A trained --
7      Q.  -- of the hospital?
8      A.  A trained staff member will be doing the
9  monitoring and reassessing of somebody, sure.
10  That's what you do after you give medications.
11     Q.  And what you want in a hospital -- not
12  what you want, what you must have is appropriate
13  staff for monitoring to have the education,
14  training and demonstrated knowledge based on the
15  specific needs of the patient population in at
16  least the following areas, one of which is the
17  same application and use of all restraints or
18  seclusion used in the hospital including in how to
19  recognize and respond to signs and physical and
20  psychological distress, for example, positional
21  asphyxia; correct?
22     A.  That's a very long statement with a lot
23  of parts to it.  But basically if you have
24  secluded or restrained or excited delirium

**Gary Vilke - December 08, 2017**

82

1  patients, you should be monitoring and reassessing
2  them, paraphrasing the whole piece there.  But,
3  yeah overall the concept seems reasonable.  I'd
4  have to go through line by line to see if there
5  are things that would be case by case, but the
6  concept is reasonable.
7      Q.    The concept of positional asphyxia is
8  something that a trained hospital staff member
9  should be looking for is unequivocal; correct?
10     A.    Positional asphyxia, how are you
11 defining that?
12     Q.    Doctor, come on, don't fence with me on
13 this.  You know what positional asphyxia is, don't
14 you?
15     A.    I know different types.
16     Q.    You've written on it?
17     A.    Sorry, I apologize for upsetting you.
18 I'm saying that there are a number of ways that
19 people define positional asphyxia, particularly
20 the hospital population, the elderly population
21 with restraints and poseys and getting into
22 positions within the gurney that can asphyxiate
23 them.  If you're referring to the class of law
24 enforcement version where you put somebody on

83

1  their stomach and hobble them and hogtie them in a
2  prone maximal restrain position, that really is
3  not a theory that's out there for hospitals to be
4  overly concerned with.
5      Q.    Well, I'm using the definition that's
6  used by the Center for Medicare and Medicaid
7  Services, CMS.
8      A.    Okay.
9      Q.    Are you familiar with that?
10     A.    With their definition I'm not.  No.
11     Q.    You work in an emergency department.
12 Does your emergency department accept federal
13 funds?
14     A.    We do.  Yes.
15     Q.    And you don't know what is required of
16 you in working in a hospital by the CMS that
17 governs hospitals receiving federal funds; is that
18 correct?
19     A.    Your question was do I know the
20 definition of positional restraint I think by CMS
21 and the answer --
22     Q.    That's not what I asked.
23     A.    Okay.  Please ask your question again.
24     Q.    I asked you, you as a physician working

84

1  in a CMS regulated hospital do not know what the
2  requirements are of CMS for chemically restrained
3  patient observation; is that correct?
4      A.    I know that we have certain requirements
5  to follow and we have protocols that are set up to
6  do that.  But if you wanted me to go down a list
7  of all of them off the top of my head, the answer
8  would be no I couldn't give you that list off the
9  top of my head.
10     Q.    You do know the monitoring the physical
11 and psychological well being of a patient who is
12 restrained, including, but not limited to
13 respiratory and circulatory status, skin
14 integrity, vital signs and any special
15 requirements specified by hospital policy
16 associated with the one hour face-to-face
17 evaluation is required by CMS, you do know that,
18 don't you?
19     A.    That's the practice that we tend to do
20 in our hospital.  So if it meets the requirements
21 it would make sense.  Right.
22     Q.    Baptist Memorial Hospital did not do
23 that with Troy Goode; correct?
24     A.    They were monitoring him.  They were --

85

1  they did a set of vital signs.  They were
2  reevaluating him.  And there's an hour-to-hour
3  reassessment.  So he was assessed at that time.
4      Q.    How did they monitor him?
5      A.    They could listen to him.  They would
6  come back and they had somebody else also just
7  watching his physical well being.  There is no
8  requirement --
9      Q.    Who was watching his physical well
10 being?
11     A.    At one point there was a police officer
12 -- well, the whole time there's a police officer
13 in the room.
14     Q.    What was his medical training?
15     A.    I don't know specifically what his
16 medical training was.
17     Q.    What was his ability to detect
18 respiratory distress?
19     A.    His ability to detect respiratory
20 distress would be a change in status.  And he
21 actually did that.
22     Q.    Yes, when he stopped breathing.  What
23 was his ability to recognize agonal breathing?
24     A.    He reported that basically that the

**Gary Vilke - December 08, 2017**

---

**86**

1  change in breathing status was very irregular.  He
2  reported that out to nursing.  That would be
3  agonal breathing.
4      Q.   What medical training does that police
5  officer have?
6      A.   Again, I earlier said I believe most of
7  them have a basic medical or basic life support
8  training as part of --
9      Q.   What medical training did Baggett have
10  so that he was a trained qualified person to
11  observe Troy Goode, Baggett?
12      A.   I said earlier most police officers have
13  a basic --
14      Q.   I'm not asking you, Doctor.  You're not
15  answering the question.  I'm asking you about
16  Officer Baggett, not some police officer in San
17  Diego.
18      A.   Okay.
19      Q.   What training did Baggett have?
20      A.   I don't know.
21      Q.   See that wasn't hard, was it?  Is there
22  a standardized definition of excited delirium that
23  you can direct me to?
24      A.   Not a standardized definition that

---

**87**

1  everybody has exact same language on, no.
2      Q.   All right.  Are there clear reasons why
3  patients that you deem to be an excited delirium
4  die?
5      A.   Are there reasons why?
6      Q.   Are there clear reasons why some
7  patients that you deem to be in excited delirium
8  die?
9      A.   There really is no specific
10  predictability of who -- if you have 10 in a room
11  who might or might not die.  There are certainly
12  indicators postmortem and some premortem type
13  things.  But in general they're very difficult to
14  tell who is going to go into cardiac arrest.
15      Q.   Did you produce a work entitled Excited
16  Delirium Redefining an Old Diagnosis?
17      A.   I did write a paper I believe with that
18  title.  Yes.
19          MR. EDWARDS:  Give us just one second,
20  we'll locate that and we'll mark that.
21          (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
22  WAS MARKED AS EXHIBIT NO. 5 TO THE TESTIMONY OF
23  THE WITNESS AND IS ATTACHED HERETO.)
24  BY MR. EDWARDS:

---

**88**

1      Q.   Doctor, you authored this paper or this
2  report?
3      A.   It looks like it.  Yes.
4      Q.   And sent it to an attorney in Rhode
5  Island?
6      A.   Or Connecticut maybe -- or is it Rhode
7  Island?  Yeah, I guess it was Rhode Island based
8  on this.  Sure.
9      Q.   Okay.  Now in this whatever this report,
10  if you will, you noted that early recognition of
11  cardiac arrest and prompt treatment will increase
12  survivability immensely; is that correct?
13      A.   What page are you on there, I'm sorry?
14      Q.   Page 4.
15      A.   I did write that yeah, for V-fib arrest.
16  Correct.
17      Q.   Okay.  So that being the case, doesn't
18  it follows, does it not, that you need a medically
19  trained person who is competent to detect a
20  cardiac arrest and observe?
21      A.   Well, to determine a cardiac arrest does
22  not obtain a medical degree of training.  It's
23  basically change in status.
24      Q.   And a change in status might be

---

**89**

1  observed; correct?
2      A.   A change in status is basically going
3  from responsive to unresponsive or to stop
4  breathing, that would be the change in status
5  you're looking for and that doesn't require
6  specific medical training to observe that.
7      Q.   How do you know that Officer Baggett was
8  even looking at Mr. Goode immediately prior to the
9  change in status, how do you know that?
10      A.   His testimony was talking about the fact
11  that he was making noises, yelling, talking,
12  whatever it was, and then there was a change in
13  status, and so he went over to look at him.  So he
14  was hearing which is a part of the assessment.  If
15  he's yelling and talking and making noises, he is
16  basically breathing and moving air in.  When there
17  was a change the officer reported that he went to
18  assess him or take a look at him.
19      Q.   Do you know that Officer Baggett was not
20  on his cell phone with his girlfriend?
21      A.   That was not reported.  But I can't say
22  because, I was not in the room.
23      Q.   The best way to detect a change in
24  cardiac status is by looking at rhythm strips;

---

**Alpha Reporting Corporation**

**Gary Vilke - December 08, 2017**

**90**

1 correct?

2 **A.  A rhythm strip would if it was reading**
3 **would show a change in status, that would be**
4 **correct.**

5 Q.  And that would take a medically trained
6 person to notice it on a rhythm strip?

7 **A.  To some degree depending on what the**
8 **rhythm change was.  If it went from the blipping**
9 **QRS complex that we see it's a flat line, you**
10 **know, that's common that people could recognize**
11 **that without having to be medically trained when**
12 **the alarms go off.**

13 Q.  In your hospital do you have any
14 non-medically trained people monitoring rhythm
15 strips?

16 **A.  Rhythm strips, no.**

17 MR. EDWARDS:  Did you mark that, Bobbie?

18 THE REPORTER:  Yes, I did.  It's No. 5.

19 MR. EDWARDS:  Okay.  For number six we
20 are missing that.  Will you hold that?

21 THE REPORTER:  Yes, I will.

22 BY MR. EDWARDS:

23 Q.  Doctor, is it also true that agitation
24 and excited delirium is surprisingly common with

**91**

1 as many as 1.7 million episodes of agitation
2 annually in excited delirium in the United States?

3 **A.  That didn't make sense, I apologize.**

4 Q.  Okay.  Let me reask it because I'm
5 advised that I left out in emergency departments
6 is the frequency of excited delirium surprisingly
7 common?

8 **A.  It does happen in emergency departments.**
9 **Surprisingly common is a -- I guess a relative**
10 **term.**

11 Q.  Well, yeah, but those are your words in
12 the publication of psychiatric emergencies in
13 pregnant women; correct?

14 **A.  Excited delirium in pregnant women, that**
15 **I'm not sure is -- I'd like to see that**
16 **publication before I comment on that part.**

17 Q.  Okay.  Are there a number of things
18 which can cause excited delirium?

19 **A.  That cause excited delirium, was that**
20 **your question?**

21 Q.  Yes.

22 **A.  There are a number of things depending**
23 **on how much you want to break them down.  The two**
24 **major categories are untreated psychiatric**

**92**

1 **disorders and typically stimulant drugs are the**
2 **two big categories.**

3 Q.  Can hypoglycemia cause agitation?

4 **A.  It can cause agitation.  Yes.**

5 Q.  Can heat stroke?

6 **A.  Cause agitation, yes.**

7 Q.  Can thyroid disorders?

8 **A.  Cause agitation, yes.**

9 Q.  Psychiatric issues you already
10 mentioned; right?

11 **A.  Correct.**

12 Q.  And psychotropic drugs used to treat
13 psychiatric issues in and of themselves can cause
14 a condition which appears to be excited delirium;
15 right?

16 **A.  It can cause agitation and symptoms that**
17 **would be similar to some of the symptoms or**
18 **characteristics of excited delirium.**

19 Q.  Right.  And withdrawal from those drugs
20 can also cause symptoms which appear to be
21 attendant to excited delirium; right?

22 **A.  Again, similar characteristics can come**
23 **from drug withdrawal.  Yes.**

24 Q.  Emotional reactions from stressful

**93**

1 situations can cause agitate -- agitation
2 appearing to be excited delirium?

3 **A.  It can have agitation with some**
4 **characteristics that could be similar to agitated**
5 **delirium.**

6 Q.  So it's fair to say there are a number
7 of things which can reproduce a state of agitation
8 which have characteristics to use your word of
9 agitated delirium; correct?

10 **A.  Some characteristics.  Yes.**

11 Q.  In the -- did you author a treatise
12 entitled Guidelines For Investigating Officer
13 Involved Shootings?

14 **A.  A book you mean or --**

15 Q.  Whatever.  Is it a paper or a book, what
16 is it?

17 **A.  The title is familiar.  I need to look**
18 **at -- I've authored many things.  It sounds**
19 **familiar though.**

20 Q.  Well, what's interesting -- here I'll
21 show it to you.  Can you see this?

22 **A.  Yes.**

23 Q.  It says Guidelines for Investigating
24 Officer Involved Shootings, Arrest Related Deaths

**Alpha Reporting Corporation**

**Gary Vilke - December 08, 2017**

---

**94**

1 and Deaths in Custody.

2     **A.   Yes.**

3     Q.   Darrell L. Ross, Gary M. Vilke. That's

4 you, isn't it?

5     **A.   That is correct.**

6     Q.   And this strangely has a publication

7 date of 2018. Can you explain that?

8     **A.   I do not know how publishers work. No,**

9 **I do not. It just came out this past year.**

10     Q.   Okay. But this is a recent publication

11 by you; right?

12     **A.   I'm one of the editors. Yes.**

13     Q.   One of the editors. Are the contents of

14 it reliable?

15     **A.   As reliable as the authors and the**

16 **editors, sure.**

17     Q.   Well, would you have included anything

18 in your compilation which you deem to be

19 unreliable?

20     **A.   That would not be the intent. No.**

21     Q.   You have testified in a number of cases

22 that there are predisposing physical conditions to

23 death in a person exhibiting characteristics of

24 excited delirium; is that correct?

---

**95**

1     **A.   There are -- yes. There are certain**

2 **predisposing conditions that would predispose them**

3 **for having a cardiac arrest. Yes.**

4     Q.   And some of those predisposing

5 conditions are what?

6     **A.   Cardiac enlargement, you know,**

7 **ventricular hypertrophy, coronary artery blockages**

8 **or bridging veins, bridging arteries, kidney**

9 **failure, elevated potassium, things like that.**

10     Q.   Okay. Mr. Goode had which one of those?

11     **A.   I didn't see those -- any of those in**

12 **Mr. Goode.**

13     Q.   Another thing that you wrote might be a

14 predisposing condition to death in excited

15 delirium was sickle cell syndrome; is that

16 correct?

17     **A.   That can be a predisposing factor. Yes.**

18     Q.   And why is that?

19     **A.   Because it's -- under physiologic stress**

20 **can cause the red cells to sickle and decrease**

21 **blood flow to various organs.**

22     Q.   Did Mr. Goode have any pre-existing

23 conditions which you would deem would have put him

24 at risk for excited delirium death?

---

**96**

1     **A.   I think usually I refer to as increased**

2 **risk for cardiac arrest that can be exacerbated by**

3 **the excited delirium. But in his case I didn't**

4 **see any other predisposing factors.**

5     Q.   Can respiratory diseases increase risk

6 for death in excited delirium?

7     **A.   Respiratory diseases have not been shown**

8 **to cause or contribute to cardiac arrest unless**

9 **there is an acute event going on with it, meaning**

10 **if he was having an acute asthma attack that would**

11 **be a different potential issue complicating**

12 **feature, but no. Other than that, the history of**

13 **asthma in and of itself would not be considered a**

14 **complicating predisposing factor.**

15     Q.   In the studies that you've done with

16 Chan and Neuman on this subject you excluded

17 participants that had a history of asthma;

18 correct?

19     **A.   In some of the studies, yes. In others,**

20 **no.**

21     Q.   In any of the studies that you knowingly

22 include somebody with a history of asthma?

23     **A.   Yes.**

24     Q.   Which study was that?

---

**97**

1     **A.   I'd have to look specifically. It was**

2 **either the pepper spray restraint study or the**

3 **study with 25 and 50 pounds of weight on the back.**

4     Q.   Well, we don't have any involvement with

5 pepper stray here, would you agree?

6     **A.   I agree.**

7     Q.   In this text this guidelines for

8 investigating officer involved shootings, et

9 cetera, you state "Whether this behavior and

10 clinical presentation represents a true diagnosis

11 or syndrome remains controversial in medical

12 literature." Is that accurate?

13     **A.   There are people who argue different**

14 **directions, so that would make it controversial.**

15 **So that would be make it accurate, sure.**

16     Q.   All right. There is a lack of consensus

17 in the medical community whether excited delirium

18 even exist. You wrote that?

19     **A.   Again, if there are dissenting people**

20 **who don't agree you don't have consensus. So that**

21 **would be accurate.**

22     Q.   And you know that some medical examiners

23 have asked why is it that the police are always

24 present when somebody dies of excited delirium;

---

**Gary Vilke - December 08, 2017**

98

1  right?

2      A.   I have heard that asked by at least one

3  medical examiner.

4      Q.   Well, the 2015 AAFS seminar brochure

5  contains that statement in it.  Are you aware of

6  that?

7      A.   Not particularly.

8      Q.   What -- you note in your book which --

9          THE WITNESS:  Bobbie, let's reserve a

10  number for the doctor's book which we will

11  maintain at our presence.  It can be obtained --

12  it is available on Amazon as is everything else in

13  the world for anybody who wants to get it.

14          (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

15  WAS MARKED AS EXHIBIT NO. 7 TO THE TESTIMONY OF

16  THE WITNESS AND IS NOT ATTACHED HERETO.)

17  BY MR. EDWARDS:

18      Q.   You wrote in your book, Doctor, or you

19  included in your book medical literature includes

20  suggestions that excited delirium "is a fabricated

21  diagnosis that was created to cover up police

22  brutality."  Did you include that in your book?

23      A.   That is the opinions of some authors.

24  And so for completeness I believe it was included

99

1  in there.  Yes.

2      Q.   You also note that many of the people

3  who die from excited delirium or allegedly were

4  restrained prior to being arrested and

5  transported.  Is that correct?

6      A.   They're restrained I guess after being

7  arrested and transported.  Yes.

8      Q.   And you also note -- you address the

9  prone maximal restraint position which is the

10  hogtie in your book; right?

11      A.   There is writings on that.  Yes.

12      Q.   What physical evidence in this case is

13  there that would in your mind allow you to rule

14  out the cause of death as being excited delirium?

15      A.   To rule out the cause of death?

16      Q.   Yes, sir.  What evidence, what

17  exclusionary evidence is there that would allow

18  you to rule out the cause of death as excited

19  delirium?

20      A.   There wasn't any that I could find.  So

21  he didn't have anything on autopsy that was an

22  obvious other cause of death.  The history

23  mechanism were consistent with it.  So I couldn't

24  rule out excited delirium because I think it is

100

1  the cause of death.

2      Q.   Low oxygen saturation is not consistent

3  with a prone restraint in hogtie, is it?

4      A.   A low oxygen saturation?

5      Q.   Yes, sir.  From your studies?

6      A.   In the studies the position did not

7  lower one's O2 saturation, that's correct.

8      Q.   I just asked you about ruling out.

9  Hyperthermia -- hyper.

10          MR. EDWARDS:  It's hyper, Bobbie, not

11  hypo.

12  BY MR. EDWARDS:

13      Q.   Hyperthermia is invariably associated

14  with excited delirium deaths; correct?

15      A.   It is common in excited delirium deaths.

16  It's not universal.

17      Q.   Well, that's not what Dr. Stratton said

18  from the LA studies, is it?

19      A.   From his pre-hospital studies or his

20  case series?

21      Q.   The paper upon which you relied, the LA

22  Studies where they had the study a group of 221

23  people with the characteristics of excited

24  delirium.  Dr. Stratton wrote hyperthermia is

101

1  invariably associated with excited delirium

2  deaths; correct?

3      A.   I don't recall that specific line.  So

4  I'd have to review the paper.  But like I said, I

5  know that hyperthermia is common in patients who

6  have death from excited delirium.

7      Q.   Mr. Goode was not hyperthermic?

8      A.   There was no --

9      Q.   Correct?

10      A.   There was no documentation for core body

11  temperature.  But the attempted oral temperature

12  was not elevated.

13      Q.   Well, you know that Dr. Barnhart the

14  forensic pathologist that did the autopsy

15  specifically looked for hyperthermia; right?

16      A.   In the medical records so did I.  Yes.

17      Q.   Well, she wrote in her report that he

18  was not hyperthermic; right?

19      A.   There was no evidence of hyperthermia

20  because there's no other documented core body

21  temperature.  But I don't remember exactly how she

22  worded it.

23      Q.   And for that reason she did not put

24  cause of death as excited delirium; correct?

**Alpha Reporting Corporation**

**Gary Vilke - December 08, 2017**

**102**

1    A.   She did not write it in her report.  But
2  she reported it in her deposition.
3    Q.   Right.  When prompted by Mr. Phillips
4  she said oh, yeah that's what I mean by
5  complications of LSD is excited delirium, that's
6  what we're talking about?
7        MR. PHILLIPS:  Object to the statements
8  of counsel and the characterization of the
9  testimony.
10 BY MR. EDWARDS:
11   Q.   Is that what she wrote, Doctor?
12   A.   Sorry.  She said that it was excited
13 delirium that she felt was the cause of death that
14 was the complicating factor of the LSD.
15   Q.   Then why didn't she just put excited
16 delirium, that's what Dr. DiMaio said to do?
17   A.   Based on her deposition she would have
18 preferred to see a core body temperature had been
19 documented and it wasn't.  So she chose to
20 document the way she did, but describe it the way
21 she did in deposition.
22   Q.   If a death in custody -- a death in
23 restraint in custody occurs, should that be
24 classified as homicide?

**103**

1    A.   That is an area that I don't opine in.
2  That's more of a medical examiner pathology area.
3  So I don't give opinions on that topic of manner
4  of death.
5    Q.   You're opining on cause of death which
6  is not your field of expertise; right?
7    A.   I work with cause of death on a regular
8  basis in the emergency department.  I don't
9  determine manner of death which is what you're
10 asking me.
11   Q.   You don't do autopsies; right?
12   A.   That is correct.
13   Q.   You've never had any training in
14 forensic pathology?
15   A.   Emergency medicine is one giant forensic
16 evaluation of patients who come in altered.  So
17 we're seeing patients in the process of dying,
18 immediately after dying, and resuscitated from
19 dying.  So we have a lot of evaluation skills with
20 regards to causes of death.  I just don't do
21 manner of death.
22   Q.   Do you agree that hyperthermia is a
23 harbinger of a bad outcome in persons with excited
24 delirium?

**104**

1    A.   Yes.  Somebody with elevated body
2  temperature is at increased risk to going into
3  cardiac arrest if in a state of excited delirium.
4    Q.   Therefore, it would be standard of care
5  for a hospital with a patient in perceived excited
6  delirium to have their temperature monitored;
7  right?
8    A.   Ideally at some point during the
9  evaluation a core body temperature would be
10 obtained when feasible.  Yes.
11   Q.   Well, if hyperthermia is a harbinger of
12 bad outcome in persons with excited delirium, you
13 got to know what the temperature level is to know
14 if they're in hyperthermia; correct?
15   A.   When you can obtain a core body
16 temperature that would be optimal.  But like many
17 other things in the excited state it's very
18 difficult to obtain safely in acute agitated
19 phase.
20   Q.   Where in your book do you put all of
21 these qualifications that you're throwing out now?
22 If you can obtain them, you don't say that in
23 here, do you?
24   A.   That's --

**105**

1    Q.   You say yes -- you say do this for a
2  person in excited delirium.  You list A, B, C and
3  D.  You don't say do this if you can A, B, C and
4  D; correct?
5        MR. PHILLIPS:  I object to your being
6  argumentative with the witness and being abusive
7  to the witness and you're not even giving him a
8  chance to answer the questions you're posing.
9        MR. EDWARDS:  Well, that's noted.
10 Overruled.
11 BY MR. EDWARDS:
12   Q.   Go ahead, Doctor.
13   A.   The textbook there is for the evaluation
14 afterwards.  It's more based on the postmortem
15 evaluation, but there is some treatment categories
16 in there.  But almost every paper that I can think
17 of is qualified by when feasible or when possible
18 or when safe, not just to stick a rectal probe in
19 a jumping, bouncing, moving around guy and create
20 the risk for more injury.  You wait until they're
21 sedated then you get a better evaluation.
22   Q.   That's all that would have been required
23 was a thermometer in the rectum?
24   A.   You make it sound very easy to do in a

**Alpha Reporting Corporation**

**Gary Vilke - December 08, 2017**

**106**

1 agitated patient. But that is how you would get a
2 core body temperature ultimately.
3     Q. Doctor, one of the studies that you
4 quoted in this book Guidelines for Investigating
5 Officer Involved Shootings, et cetera, was one by
6 Dr. Mash, M-A-S-H?
7     **A. Okay.**
8     Q. Right?
9     **A. She is probably one of the references in**
10 **that book, sure.**
11     Q. And you quoted a two protein biomarker
12 signature can serve as a reliable forensic tool
13 for identifying the excited delirium syndrome at
14 autopsy. Do you agree?
15     **A. That is a paraphrasing of her research,**
16 **but basically there are markers that she has**
17 **identified in certain portions of the brain that**
18 **are consistently different in patients who have**
19 **signs and symptoms consistent with excited**
20 **delirium versus other causes of death.**
21     Q. And you believe based on those studies
22 that you can rely -- determine whether a person
23 has excited delirium on autopsy?
24     **A. Based on her reports and publications if**

**107**

1 the brain meets the certain criteria that she has
2 studied over the years, it would be consistent
3 with a diagnosis of excited delirium. And she's
4 comfortable saying that that's what that is if all
5 the clinical features match up.
6     Q. Was there any such finding in Troy
7 Goode?
8     **A. I am not aware that his brain was sent**
9 **to a Deb Mash's lab in Miami.**
10     Q. Are you saying that Dr. Barnhart was not
11 competent to make that determination?
12     **A. I didn't say that. I'm saying that this**
13 **is a specialized test that as far as I know is**
14 **only done at the brain center down in the**
15 **university of Miami. So that every pathologist**
16 **across the country doesn't do this study. And I'm**
17 **not aware of any others that actually do. So**
18 **Dr. Barnhart would fall in that category rather**
19 **than what you described incompetence.**
20     Q. Well, okay. So you don't have any
21 evidence of the two protein biomarker signature;
22 right?
23     **A. Again, I wasn't aware that the brain was**
24 **sent for that specific study to Deb Mash, so no.**

**108**

1     Q. Now well you understand about prophamine
2 transporter of proteins and heat shock protein 70
3 in the brain with person with excited delirium,
4 you have any appreciation of that?
5     **A. Just the concepts that the dopamine**
6 **transported are down regulated and increases**
7 **amounts of dopamine in the system which sort of**
8 **revs up the system and that is thought one of the**
9 **potential mechanisms of why the excited delirium**
10 **physiologic characteristics develop.**
11     Q. Okay. On autopsy in Mr. Goode there was
12 no protein biomarker signature indicative of
13 excited delirium found; correct?
14     **A. Again, these are things that tend to be**
15 **done at the specialized lab in Miami. So not that**
16 **I'm aware of, no.**
17     Q. Okay. Is the heat shock protein 70 a
18 protein in the brain that accumulates in response
19 to hyperthermia?
20     **A. I'm not sure if it's in response to or**
21 **introduces hyperthermia. It seems to be**
22 **associated with hyperthermia.**
23     Q. Okay. You agree that Troy -- there's no
24 evidence that Troy was ever hyperthermic; correct?

**109**

1     **A. There was no documented elevated**
2 **temperature in Troy Goode.**
3     Q. Do you have any undocumented evidence in
4 your opinion that would indicate that he was
5 hyperthermic?
6     **A. The only documentation of physiology**
7 **that could be consistent with it was some**
8 **diaphoresis noted by the paramedics. But that was**
9 **really the only temperature that was taken was an**
10 **oral temperature that was reported to be tucked**
11 **into a cheek which is obviously not a reliable**
12 **core body temperature. So I didn't see anything**
13 **that showed hyperthermia.**
14     Q. Did you give an expert report in the
15 case of Stetter, S-T-E-T-T-E-R versus Hanover
16 Park?
17     **A. I was involved in that case. Yes.**
18     Q. Is that a case where you retracted your
19 opinion that excited delirium was the cause of
20 death?
21     **A. I don't recall that.**
22     Q. You were hired by the police in that
23 case also; right?
24     **A. I would have to review that. I don't**

**Gary Vilke - December 08, 2017**

---

**110**

1  remember specifically who hired me, whether it was
2  the city, the police.  I don't remember who hired
3  me in that case.
4      Q.   Well, we're not talking about the police
5  I'm talking about a governmental entity.  Those
6  are the only entities that you work for, right,
7  for the police and the government?
8      A.   Sometimes hospitals and individuals
9  depending on what the lawsuits are.  But in
10  general it's the municipalities.
11      Q.   Yeah, you're right.  I should qualify my
12  question.  Civil rights cases you only testify for
13  the police departments; correct?
14      A.   I testify -- I think in the past number
15  of years they're the ones who approach me for my
16  opinions.  And if needed I testify for them, yes.
17      Q.   Let's see if we agree on this.  Once an
18  excited delirium patient is delivered to a
19  hospital by the EMS, that patient becomes the
20  responsibility of the emergency room physician and
21  the hospital personnel; correct?
22      A.   I mean, they certainly have a level of
23  responsibility, sure.  There's a hand off at some
24  point.

---

**111**

1          THE WITNESS:  And whenever you have a
2  time for another five-minute break, I would
3  appreciate it whenever is a good time for you.
4          MR. EDWARDS:  Go right ahead.  Let's
5  take it.
6          THE VIDEOGRAPHER:  Time off the record
7  is 10:25 a.m.
8          (WHEREUPON, A BREAK WAS TAKEN AND THE
9  PROCEEDINGS CONTINUED AS FOLLOWS:)
10          THE VIDEOGRAPHER:  Time back on the
11  record is 10:33 a.m.  Counsel, you may proceed.
12          MR. EDWARDS:  Thank you.  Bobbie, would
13  you hand the doctor Exhibit 4.
14  BY MR. EDWARDS:
15      Q.   Doctor, I'm sorry, did you say that you
16  were not familiar with this?
17      A.   I may have looked at it at some point,
18  but I don't recall the specifics of it.
19      Q.   Okay.  This is dealing with the study by
20  Dr. Deitch about respiratory depression at
21  chemical restraint; is that correct sir?
22      A.   That is what they're looking for in the
23  study looks like.  Yes.
24      Q.   And you said well respiratory depression

---

**112**

1  just means that they could go from elevated
2  respiration to normal respiration; is that
3  correct?
4      A.   I said if you're defining that as
5  respiratory depression, then that would be a form
6  of depression.  Yes.
7      Q.   Except Dr. Deitch found that nearly half
8  of the people after chemical restraint developed
9  hypoxia, low blood oxygen; correct?
10      A.   I haven't read this paper in detail to
11  give you that answer, but I can check for you.
12      Q.   Nearly half.  So assuming that that's
13  correct nearly half of the people receiving
14  chemical restraint go into hypoxia, that requires
15  close monitoring after chemical restraint, does it
16  not?
17      A.   If there was hypoxia involved,
18  monitoring would be part of the evaluation of that
19  hypoxia, sure.
20      Q.   Well, no, if chemical restraints result
21  in nearly half of the people receiving the
22  restraints developing hypoxia, just makes common
23  sense that somebody trained medically needs to
24  observe those people; correct?

---

**113**

1      A.   Again, it depends on the case, the type
2  of patient, the evaluation.  But based on the
3  study, they define looks like hypoxia is O2 sat of
4  93 percent or less for greater than 15 seconds.
5  But as far as the patient population, the
6  medications, and what was being used, and what was
7  the indications for it, I haven't had a chance to
8  better evaluate this paper to see applicability in
9  this case.
10      Q.   Would you agree -- well, Dr. Deitch
11  defines hypoxia below 93 percent?
12      A.   Ninety-three percent or less.  Yes.
13      Q.   And Mr. Goode the only reading we have
14  on him was 90 percent; correct?
15      A.   That's the only documented reading.
16  Yes.
17      Q.   And would you agree that hypoxia is
18  rarely recognized by doctors unless the patient is
19  being monitored by pulse oximetry?
20      A.   Hypoxia is typically defined by pulse
21  oximetry.  So as far as if you're looking --
22  doctors don't recognize hypoxia.  They tend to
23  recognize signs or symptoms of ventilatory
24  impairment or respiratory problems, but not

---

**Alpha Reporting Corporation**

**Gary Vilke - December 08, 2017**

114

1 defining hypoxia.

2     Q.   Well, the purpose of pulse oximetry is

3 to see how much oxygen a patient is getting into

4 the bloodstream; right?

5     **A.   How much of their red cells are**

6 **oxygenated by oxygen.  Yes.**

7     Q.   You can't tell that by looking at a

8 person, can you?

9     **A.   You can't give a -- create a number that**

10 **way, no.  You can't look and say that's a 96 or a**

11 **92, no.**

12     Q.   I want to go back to the chemical

13 restraints administered to Mr. Goode.  We said one

14 of them was the Haldol and the other was Ativan;

15 is that correct?

16     **A.   Yes.**

17     Q.   And Ativan is used for what purpose?

18     **A.   It's a benzodiazepine anxiolytic and has**

19 **sedation properties to help calm and relax people.**

20     Q.   Do you agree that the most important

21 risk associated with use of Ativan injection is

22 respiratory depression?

23     **A.   It's certainly one of the areas that we**

24 **want to look into watch.  It's very important to**

115

1 watch for the ventilatory effects of

2 benzodiazepines.

3     Q.   Right.  It says, and I'm referring to

4 the -- I'm referring to the package insert.  And

5 it says accordingly, airway patency must be

6 assured and respiration monitored closely; right?

7 That's appropriate?

8     **A.   You want to make sure they have an open**

9 **airway and that they're breathing.  That's**

10 **reasonable, sure.**

11     Q.   And that's done again by pulse oximetry

12 among other things?

13     **A.   That is one way of doing it.**

14     Q.   And Mr. Goode was not monitored for his

15 respiration; correct?

16     **A.   He was not on a continuous pulse**

17 **oximetry.**

18     Q.   He was not monitored except during --

19 the only reading that they got on his pulse

20 oximetry or by pulse oximetry was in triage at the

21 hospital; correct?

22     **A.   That was the only pulse oximetry reading**

23 **that I saw.**

24     MR. EDWARDS:  Bobbie, this is on the

116

1 exhibit list number 23 and if you would mark

2 that -- on our exhibit list, if you would mark

3 that as the next exhibit please.

4     MR. GASS:  Is this Exhibit 8?

5     THE REPORTER:  Yes.  It is Exhibit 8.

6     MR. GASS:  Can we have the title of it,

7 please.

8     MR. EDWARDS:  It's the package insert

9 for Ativan.

10     MR. GASS:  Tim, I'll tell you with the

11 echo that's created with you being on a different

12 audio, it's almost impossible to understand what

13 you just said.

14     **THE WITNESS:  I'll say it.  It says that**

15 **Ativan (lorazepam) injection IV.  It's reportedly**

16 **the package inserts.  Looks like it's typed out**

17 **and it's approximately 20 pages.**

18     (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

19 WAS MARKED AS EXHIBIT NO. 8 TO THE TESTIMONY OF

20 THE WITNESS AND ATTACHED HERETO.)

21 BY MR. EDWARDS:

22     Q.   Doctor, do you agree that when a person

23 is restrained in a hogtie that that triggers what

24 laypeople call the flight or fight syndrome?

117

1     **A.   Restraint can cause a flight or fight**

2 **syndrome.  It doesn't always doesn't have to.**

3     Q.   Are you familiar with a study done by

4 Dr. Barnett entitled Perceptions of supported and

5 unsupported prone-restraint positions?

6     **A.   Sounds familiar but I couldn't go**

7 **through the details of the study for you.**

8     Q.   Well, I'll get you a copy.

9     MR. EDWARDS:  Bobbie, it's No. 11 on our

10 list.

11     (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

12 WAS MARKED AS EXHIBIT NO. 9 TO THE TESTIMONY OF

13 THE WITNESS AND IS ATTACHED HERETO.)

14 BY MR. EDWARDS:

15     Q.   Doctor, looking at this, does this

16 refresh your memory that you've seen this paper

17 before?

18     **A.   It vaguely familiar.  But I don't**

19 **remember the details of how they did the study.**

20     Q.   Okay.  It was published in the Journal

21 of Psychiatric and Mental Health Nursing.  You see

22 that?

23     **A.   Yes.**

24     Q.   Okay.  Do you know anything about the

**Gary Vilke - December 08, 2017**

118

1  study or the results that were reached?
2     **A.   I would probably have to answer that no**
3  **at this point.**
4     Q.   Okay.  If you assume that two positions
5  were studied.  One involved prone position with
6  arms straight out at the sides.  The other
7  involving a prone position with arms supporting
8  the chest to avoid pressure on the chest wall
9  okay.  Are you with me?
10    **A.   Yes.**
11    Q.   Would you agree that both of those
12 positions that I just described are less confining
13 than being hogtied?
14    **A.   I mean, it's a different type of**
15 **confinement for the supported prone position.  But**
16 **they are -- certainly have more movement**
17 **availability in parts view one and two.**
18    Q.   Are you surprised that the results of
19 testing those two positions showed that a
20 supported position allowed for greater oxygenation
21 where the chest was not pressed down upon the
22 surface?
23    **A.   I would be surprised that the**
24 **unsupported prone position had any changes in**

119

1  **oxygenation.  So that's -- I would be surprised if**
2  **there was a difference between the two to be**
3  **honest.**
4     Q.   Okay.  Have you seen the Baptist -- have
5  you seen any of the Baptist protocols?
6     **A.   I have not.  No.**
7     Q.   Would you -- assume that there is a
8  Baptist protocol that warrants against putting any
9  pressure on a patient's back who is in the prone
10 position because of dangers to the patient.  Would
11 you agree or disagree with that protocol or with
12 that policy?
13    **A.   Well, that seems very vague and**
14 **generalized.  I mean, if you're doing back surgery**
15 **on somebody they're going to be prone and you're**
16 **going to be putting pressure on them, so it seems**
17 **like a odd specific language in a protocol.**
18    Q.   Well, if Baptist has that protocol,
19 would you take issue with the assumption that by
20 placing any pressure on the patient's back
21 endangered the patient?
22    **A.   I would.**
23        MR. UPCHURCH:  Object to the form.  This
24 is David Upchurch.

120

1     **A.   I would have to look at the whole**
2  **content.  But I think patients are in the prone**
3  **positions on a regular basis for various reasons,**
4  **wound care, dressing changes, things like that.**
5  **So there's going to be pressure.  So I would be**
6  **surprised if this protocol specifically said no**
7  **pressure should be applied.  That's really the**
8  **extent I probably would comment on it right now.**
9  BY MR. EDWARDS:
10    Q.   Well, if it does you disagree with it;
11 is that fair?
12    **A.   I would not agree or disagree.  I would**
13 **just say it seems to be a little bit broader than**
14 **what need to be in a typical policy.**
15    Q.   Is LSD -- help me with this
16 pronunciation, a sympathomimetic agent?
17    **A.   It is a stimulant more in the**
18 **hallucinogenic family.  But it also has stimulant**
19 **properties.**
20    Q.   What's the basis for your statement that
21 it has stimulant properties?
22    **A.   That's just what's known in the medical**
23 **literature, in toxicologic literature.**
24    Q.   I want you to point me to the literature

121

1  that says that LSD is a stimulant?
2     **A.   I think it's sort of generalized known.**
3  **I'd have to actually look to see where it's**
4  **written down.  I know it's there.  I just -- it's**
5  **sort of a more of a common knowledge than a**
6  **area -- but I can certainly look for a reference**
7  **if you'd like.  But I don't have them off the top**
8  **of my head.**
9     Q.   Well, actually, I researched it the most
10 is a Dr. Nichols at UNC and he says it's not.  Do
11 you have any basis to disagree with Dr. Nichols?
12    **A.   That it doesn't have stimulants**
13 **properties, I would definitely disagree with that.**
14 **It does raise heart rate.  It does increase**
15 **breathing rate.  Those are stimulant properties.**
16    Q.   I asked you if LSD is a sympathomimetic,
17 that's S-Y-M-P-A-T-H-O-M-I-M-E-T-C, agent?
18    **A.   Sympathomimetic.  It certainly has**
19 **stimulant properties.  That's what I'm sort of**
20 **saying.  Those are actually -- it's classified as**
21 **a stimulant or a hallucinogenic with stimulant**
22 **properties which would define it that is has**
23 **having sympathomimetic components to it.**
24    Q.   Like to the extent of cocaine?

**Alpha Reporting Corporation**

**Gary Vilke - December 08, 2017**

122

1  A.  Not to that extreme.  No.

2  Q.  To the extent of methamphetamine?

3  A.  Not typically, no.

4  Q.  Those drugs are the ones most commonly

5  associated with the syndrome you term excited

6  delirium; right?

7  A.  That would be correct.

8  Q.  And as we said here today you can't

9  point me to any authority that says LSD is a

10  sympathomimetic agent; correct?

11  A.  Or have stimulant properties, again,

12  it's sort of common knowledge in the emergency

13  department that we see patients with the stimulant

14  changes associated with LSD.  But, again, having

15  to refer to a direct quote, no I'd have to look

16  that up for you.

17  Q.  Okay.  That's all I ask.  So your answer

18  is no you can't tell me as we sit here today an

19  authority that would support the proposition

20  you're asserting that is that LSD is a stimulant?

21  A.  That has stimulant like qualities, yes.

22  Q.  Okay.  Are you familiar with the work by

23  Dr. Hick, Metabolic Acidosis in Restraint-

24  associated Cardiac Arrest?

123

1  A.  I have reviewed that in the past, yes.

2  Q.  Do you disagree with Dr. Hick's

3  conclusion -- well, what was his conclusion in

4  that study?

5  A.  I've read hundreds if not thousands of

6  studies over the last 15 years.  I don't remember

7  his exact conclusion, I apologize.

8  Q.  Do you agree with the statement in that

9  study "continued combativeness despite restraints

10  especially in the setting of sympathomimetic

11  agents such as cocaine seems to be a marker for

12  patients at higher risk for death regardless of

13  pathophysiology."  Do you agree with that?

14  A.  I mean, patients who continue to

15  struggle and struggle, I think you said despite

16  restraints, certainly will continue to create

17  acidosis and would be considered to be a higher

18  risk than somebody who didn't, yeah.

19  Q.  So then it follows that the appropriate

20  medical response as you have said is to get the

21  patient out of the flight or fight syndrome as

22  soon as possible; correct?

23  A.  I don't think I ever said that.  I think

24  I said to start the sedation process to try to

124

1  calm them.

2  Q.  As soon as possible?

3  A.  As soon as possible and safe.  Yes.

4  Q.  In this case you are aware that there

5  was no effort to sedate Mr. Goode until well after

6  he had arrived at the hospital, are you?

7  A.  Effort if you're defining an order and

8  administration that took time.  But all the effort

9  is to get him into a room, get him evaluated, try

10  to get vital signs, that's all part of the effort

11  to prepare to decide what sedation should be used,

12  what medical therapy should be administered.

13  Q.  Are you -- at your hospital do you use

14  the emergency severity index triage flow chart?

15  A.  The ESI scores.  Yes.

16  Q.  What is that for our benefit?

17  A.  It's typically a way that nurses triage

18  patients in certain categories based on certain

19  criteria.  Five being the least acute.  One being

20  the most acute.

21  MR. EDWARDS:  Bobbie, before we go on

22  this article by Dr. Hick is our No. 17 and should

23  be marked as the next exhibit.

24  (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

125

1  WAS MARKED AS EXHIBIT NO. 10 TO THE TESTIMONY OF

2  THE WITNESS AND IS ATTACHED HERETO.)

3  MR. EDWARDS:  Then pull out our number

4  48.

5  (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

6  WAS MARKED AS EXHIBIT NO. 11 TO THE TESTIMONY OF

7  THE WITNESS AND IS ATTACHED HERETO.)

8  BY MR. EDWARDS:

9  Q.  Doctor, is this the index you were

10  referring to that you utilize?

11  A.  This is what our nurses utilize in our

12  department as well.  Yes.

13  Q.  It gives us five categories.  Severity

14  one being immediately the lifesaving intervention?

15  A.  Correct.

16  Q.  And it provides a step by step approach

17  to clinical decision making?

18  A.  It does look like it has a step by step

19  sort of protocol or algorithm here.  Yes.

20  Q.  And it gives -- yeah, okay.  It gives an

21  algorithm of -- each step of the algorithm guides

22  the user towards the appropriate questions to ask

23  or the type of information to gather?

24  A.  Yes.  This looks like it's sort of an

**Alpha Reporting Corporation**

**Gary Vilke - December 08, 2017**

126

1 overview of the indexes is what the chapter is
2 defined as. But it gives some data to how to
3 interpret certain aspects.
4    Q.   Now are you aware that Baptist has
5 adopted this ESI index?
6    **A.   Can't say I was necessarily aware of it,**
7 **but it wouldn't surprise me.**
8    Q.   You would expect it though; right?
9    **A.   They usually some sort of a triaging**
10 **score. It would not be unreasonable.**
11    Q.   Under the ESI protocol the first
12 question is whether a patient requires immediate
13 lifesaving intervention?
14    **A.   You're on Page 8 of this -- number eight**
15 **on the second page of this; is that right?**
16    Q.   Yes, sir.
17    **A.   Okay. It's the Figure 2-1a ESI Triage**
18 **Algorithm?**
19    Q.   Yes.
20    **A.   Okay.**
21    Q.   First question is whether the patient
22 requires immediate lifesaving intervention; right?
23    **A.   That's what the box says. Yes.**
24    Q.   All right. Then it says a patient needs

127

1 immediate life-saving intervention if they require
2 airway, emergency medications, or other
3 hemodynamic interventions and/or any of following
4 clinical conditions: intubated, apneic, pulseless,
5 severe respiratory distress, SPO2 less than 90,
6 acute mental status changes or unresponsive; is
7 that correct?
8    **A.   That is what they list in the box on the**
9 **right.**
10    Q.   And so Mr. Goode was at 90 percent SPO2;
11 right?
12    **A.   Right. So that wouldn't qualify him**
13 **based on that. Correct.**
14    Q.   What was his SPO2 after triage?
15    **A.   Well, this a triage algorithm. So at**
16 **triage he was 90 percent. This is referring to an**
17 **SPO2 of less than 90. But I don't know what the**
18 **number was after his triage.**
19    Q.   Because he wasn't monitored?
20    **A.   Because he didn't have a repeated O2 sat**
21 **done at that point.**
22    Q.   He was not monitored; correct?
23    **A.   Well, he was being monitored, yes. He**
24 **was not on a cardiac or pulse ox monitor.**

128

1    Q.   Did Mr. Goode require immediate life-
2 saving intervention under the ESI index?
3    **A.   It's an interesting index. I've never**
4 **actually looked at it this closely because it's**
5 **usually a nursing based treatment. And it must be**
6 **more of an guideline than an absolute because**
7 **acute mental status changes could be, you know,**
8 **anybody who is acutely confused which is half of**
9 **the drunk and drug intoxicated population in some**
10 **ERs. So typically a level one would be an acute**
11 **heart attack, acute stroke, you know, an**
12 **amputation of an extremity. Typically won't**
13 **consider him an immediate life-saving intervention**
14 **type patient. But if you're looking at the words**
15 **that are in here one could say oh he's an acute**
16 **mental status change due to his LSD. That's a**
17 **direct interpretation rather than a use of this**
18 **which is what the intent is actually meant to be.**
19    Q.   And that being the case he required
20 immediate life-saving intervention?
21    **A.   That's what I'm saying I don't think he**
22 **meets the criteria as these triage scales are**
23 **typically designed. But, again, I'm not an expert**
24 **in triage scales or nursing triage.**

129

1    Q.   All right. Forget the ESI index. In
2 your opinion did Mr. Goode require emergency
3 medical intervention?
4    **A.   He required, you know, in the emergency**
5 **department evaluation and then treatment based on**
6 **what the evaluation is. He didn't require an**
7 **immediate intervention until they had a chance to**
8 **take a look at him. You know, not like a guy**
9 **rolling in with a stroke or a stemi that's already**
10 **predefined in the pre-hospital setting.**
11    Q.   Once he was evaluated and you have seen
12 the evaluation, did he require intervention?
13    **A.   He -- I guess you'd say he required**
14 **sedation or intervention, sure.**
15    Q.   He required supplemental oxygen also;
16 correct?
17    **A.   I don't believe that he required**
18 **supplemental oxygen at the time he was being**
19 **evaluated. He required to be sedated and have a**
20 **chance for a better reassessment.**
21    Q.   But the way -- did he require
22 supplemental oxygen five minutes before he ceased
23 breathing?
24    **A.   Did he require supplemental oxygen five**

**Gary Vilke - December 08, 2017**

130

1  minutes before when, I missed that?

2      Q.   That he ceased breathing?

3      A.   I did not see any indication that he

4  required supplemental oxygen at that point either.

5      Q.   You don't know because there was nothing

6  to tell you one way or another; correct?

7      A.   Well, there was certainly the

8  observation that he was still yelling and

9  verbalizing and moving air in and out.  Typically

10  people who are hypoxic can't breathe or focus on

11  breathing and not yelling and screaming.  So there

12  was some objective data that implied that he was

13  moving air appropriately.  But no O2 sat

14  documented, that's the original question.

15      Q.   And that observation you just mentioned

16  came from a police officer?

17      A.   Came from a police officer.  Again, some

18  person across the hall said he was making noises

19  and was alive, and that other staff were hearing

20  him yelling and disrupting the emergency

21  department.

22      Q.   Well, you need to go back and look at

23  the deposition, Doctor, because when he was

24  yelling breathing he was not -- he was still in

131

1  the decontamination room not across the hall?

2      A.   I thought she heard him after she was

3  across the hall and through the cracked door.  So

4  I apologize if I misinterpreted that.

5      Q.   Do you agree or disagree a patient in

6  severe respiratory distress or with an SVO2 of

7  less than 90 percent may still be breathing but is

8  in need of immediate intervention to maintain an

9  airway and oxygenation status.  This is the

10  patient who will require the physician in the room

11  ordering medications such as those used for rapid

12  sequence intubation or preparing for other

13  interventions for airway and breathing.  That's

14  from the ESI triage at Page 10.  Do you agree or

15  disagree with that?

16      A.   You got me to the right page, sorry.

17  Again, I think earlier we talked about the O2 sat

18  as an absolute number has to be put into the

19  clinical perspective.  I see lots of patients who

20  come in with O2 sats less than 90 percent who do

21  not needs to be intubated or intervened because

22  that's where they live.  And so I think absolutes

23  are not part of a standard thing.  It's something

24  to consider to assess.  But I wouldn't agree with

132

1  it if it's an absolute the way this is written.

2      Q.   So you disagree with the ESI severity

3  index?

4      A.   If the phrase that says a patient in

5  severe respiratory distress or with an O2 sat less

6  than 90 percent may still be breathing but is in

7  need of immediate intervention to maintain an

8  airway and oxygen status.  Again, there are

9  exceptions to that.  So if there is further

10  language that tells you to use your clinical

11  judgment, this is not a replacement for them, I

12  would agree with that.  But if it's saying

13  everybody who has an O2 sat less than 90 percent

14  must be -- is in need of an immediate

15  intervention, I would disagree with that based on

16  my clinical experience.

17      Q.   Don't you think it's a good idea if you

18  get a reading of 90 percent oxygen saturation that

19  you take the same course of action and give

20  supplemental objection?

21      A.   I think you need to look at the clinical

22  scenario surrounding that number.  One, do you

23  believe the number if it's real.  If it's real do

24  they seem to have any respiratory issues?  Are

133

1  they cyanotic?  Are they having difficulty getting

2  air in?  Are they yelling and screaming?  So you

3  should take a look at that number with a clinical

4  eye.  And then if there's things that show that

5  there might be a respiratory depression, they're

6  not breathing well, they're cyanotic, then you

7  might want to consider oxygen.  But across the

8  board I don't think there is a expectation that

9  you immediately put on O2 for somebody who is

10  agitated, combative and had an O2 sat reading

11  that's 90 percent and may not even be accurate.

12      Q.   You keep saying -- give me one fact, a

13  fact, that says that disproves the 90 percent

14  range?

15      A.   Well, there's --

16      Q.   One fact?

17      A.   I'm trying to answer you.  You're

18  interrupting me again.  I apologize for trying to

19  be responsive.

20      Q.   No, you're not trying to answer.  What

21  you're doing is you're guessing.  I want a fact,

22  an indisputable fact that the 90 percent reading

23  taken by the nurse, that was Mr. Baker, was

24  incorrect, one fact?

**Gary Vilke - December 08, 2017**

134

1     A.   In the record there's a notation where
2 there is a zero heart rate. We know that that
3 fact is inaccurate, because we know he had a heart
4 rate at that time. And so that the monitoring
5 equipment was not accurately measuring, that could
6 be a fact that would support the O2 sat not
7 measuring correctly because the pulse is not
8 matching up.
9     Q.   Is that it? You say that because the
10 heart rate is recorded as zero that that
11 translates it into the O2 saturation is incorrect;
12 is that your answer?
13     A.   That's a fact that you requested. And
14 so that would be consistent with the fact that an
15 O2 sat monitor that's not picking up a heart rate
16 correctly may not be picking up the O2 sat
17 completely as well.
18     Q.   The only fact that could be to disprove
19 the 90 percent is another O2 reading of a
20 different level; correct?
21     A.   If it's obtainable that would certainly
22 give you another point. But if you keep getting
23 90 percent and zero, you don't keep documenting
24 that. You look at it it's not working and you'll

135

1 obtain the sat reading later when you have a more
2 calm patient.
3     Q.   Was that done?
4     A.   I don't know if they checked it multiple
5 times at the one time they were doing it or not.
6 I don't recall the specifics of their attempt to
7 get that sat.
8     Q.   Was it done after sedation?
9     A.   After sedation?
10     Q.   Sedation.
11     A.   That was the plan to get him
12 reevaluated. But it was not done until he was
13 actually more into cardiac arrest which unfortunately was the
14 time he went into cardiac arrest.
15     Q.   What is the gold standard for
16 determining excited delirium in your opinion?
17     A.   The gold standard? If we're clinically
18 defining it, it's basically assessing the patient
19 clinically, looking at the characteristics,
20 looking at the predisposing factors, we talked
21 about the drugs or psychiatric disorders,
22 assessing for other possible causes, and then it's
23 a clinical based diagnosis. Ultimately, if you
24 want to get beyond that, you can do the Deb Mash

136

1 study with the brain if it happens to come to it.
2 But from a clinical perspective it's basically
3 looking at the presentation.
4     Q.   Doctor, you have testified -- you've
5 testified repeatedly that the gold standard was
6 ABG testing?
7     A.   For excited delirium?
8     Q.   Arterial blood gas.
9     A.   I know what that it. But it has nothing
10 to do with defining excited delirium syndrome.
11     Q.   What does it have to do with it? It
12 deals with the amount of oxygen in the blood;
13 right?
14     A.   An ABG will give you a partial pressure
15 of oxygen. Correct.
16     Q.   That's what you have said is the gold
17 standard for terming whether somebody is in
18 asphyxia?
19     A.   I don't believe I've ever said that.
20     Q.   You don't?
21     A.   Is in asphyxia, no. It's a measurement
22 for hypoxia.
23     Q.   Okay. Is it the gold standard for
24 determining hypoxia?

137

1     A.   It would be the gold standard over an O2
2 sat reading. Yes.
3     Q.   Was an ABG ordered for Mr. Goode?
4     A.   I'm assuming you mean prior to his
5 cardiac arrest?
6     Q.   Well, yeah. That makes sense.
7     A.   I'm qualifying it because I can't
8 remember if one was ordered later. I did not see
9 an ABG ordered on Mr. -- certainly not performed
10 on Mr. Goode prior to his cardiac arrest. I'd
11 have to double check the orders to see if it was
12 actually ordered.
13     Q.   And if you had had the -- if Dr. Oliver
14 had ordered that and you had that test result, we
15 would know exactly what his oxygen saturation was,
16 would we not?
17     A.   If he had ordered it, it was obtained
18 and completed correctly, we would have the partial
19 pressure of oxygen, not his oxygen saturation. We
20 would know what that number is. Yes.
21     Q.   I'm sorry, I meant to ask we would know
22 whether or not he was hypoxic?
23     A.   We would have an objective measure for
24 that. Correct.

**Alpha Reporting Corporation**

**Gary Vilke - December 08, 2017**

138

1    Q.   But we don't have that?

2    **A.   That is correct.**

3    Q.   And that's something that should have

4    been done, correct, getting an ABG?

5    **A.   At the time of his acute agitation I**

6    **would say no.**

7    Q.   After he registered a 90 on the pulse

8    oximetry, an ABG would have been a real good idea

9    to determine whether or not he was hypoxic;

10   correct?

11   **A.   If you're talking about ideas versus**

12   **reality, sure an ABG will give you the**

13   **measurement.  In the reality that's much harder to**

14   **do than getting an EKG monitor or an IV placed,**

15   **much more unsafe.  So the practicality is it's**

16   **absolutely crazy to try to order that in the acute**

17   **setting like this.**

18   Q.   Well, let me read you a quote.  And I

19   quote, "After adequate physical control is

20   achieved, medical assessment should be immediately

21   initiated indeed because cardiopulmonary arrest

22   might occur suddenly.  EMS should be ideally

23   present and prepared to resuscitate before

24   definitive law enforcement measures are initiated

139

1    when possible.  Although, the need for control

2    measures may take precedence.  Initial assessment

3    should include vital signs, cardiac monitoring,

4    intravenous access, glucose measurement, pulse

5    oximetry, and supplemental oxygen, and careful

6    physical examination."  Agree or disagree?

7    **A.   Well, it should if it's feasible, right.**

8    **That's after the police arrest somebody get him in**

9    **control, that's a paramedic assessment.  You're**

10   **doing what you can do.  It doesn't mean you're**

11   **going to be successful in doing it.  But it's**

12   **certainly all things that should be considered**

13   **based on the physiologic presentation.**

14   Q.   Who wrote that?

15   **A.   I don't know.  It could be me for all I**

16   **know.**

17   Q.   It was you.  In the Journal of Emergency

18   Medicine in 2012 you wrote that; correct?

19   **A.   I'd have to look at it.  But it sounds**

20   **like something I could have written, sure.**

21   Q.   And what I read to you is verbatim what

22   you wrote about how a patient perceived to be --

23   that cardiopulmonary arrest might occur suddenly.

24   That's certainly true; right?

140

1    **A.   I agree with that.**

2    Q.   And that these measures should be taken

3    which include supplemental oxygen, pulse oximetry,

4    cardiac monitoring, glucose measures.  You wrote

5    that; right?

6    **A.   I just said should be.  It's not**

7    **necessarily always feasible or able to be done,**

8    **but sure.  In a perfect situation you do all that.**

9    Q.   You know what, in your paper you didn't

10   put that qualification in there.  You said this is

11   what should be done; right?

12   **A.   I didn't --**

13   Q.   You still agree with that?

14   **A.   I haven't read the whole paper and see**

15   **where I qualified it other places or not.  But,**

16   **again, the word should is -- it didn't say must or**

17   **requires or has to.  It says should.  And that's**

18   **implicit that you have to be -- you have to be**

19   **able to do it in order to complete that task.**

20   Q.   All right.  Well, let's dissect that.

21   You start off by saying after adequate physical

22   control is achieved, that's what you're referring

23   to, right, getting the patient under control?

24   **A.   Right.**

141

1    Q.   When the EMS arrived on the scene

2    Mr. Goode was already hogtied and surrounded by

3    four or five or six officers; correct?

4    **A.   That's what I'm trying to recall.  But**

5    **that sounds familiar that he was already hogtied**

6    **when they arrived.**

7    Q.   He was not a threat to anyone; correct?

8    **A.   He still has a risk.  But he's less of a**

9    **threat being restrained than he was unrestrained.**

10   Q.   Well, if the officers wrote that

11   Mr. Goode is no longer a threat he is secure,

12   would you agree?

13   **A.   I agree that he --**

14   MR. HUSKISON:  I object to the form of

15   that question.

16   BY MR. EDWARDS:

17   Q.   Go ahead.

18   **A.   I agree that if they say he's secure I'd**

19   **have to defer to the expertise in that and not a**

20   **threat.  Again, there's nobody who is a zero**

21   **threat.  But he's certainly not as much of a**

22   **threat as he was before.  He's appropriate to**

23   **assess at that point.**

24   Q.   He was assessed at that point by Richard

**Alpha Reporting Corporation**

**Gary Vilke - December 08, 2017**

142

1  Weatherford.  Did you read that statement?
2      **A.    I have read the materials earlier.  Yes.**
3      Q.    Okay.  Did he receive cardiac
4  monitoring?
5      **A.    He had a rhythm strip done by the**
6  **paramedic, sure.**
7      Q.    He got intravenous access; right?
8      **A.    He did do that.  Yes.**
9      Q.    He didn't get any glucose measurement?
10     **A.    I don't recall one done in the field.**
11  **But I'd have to double check on that.**
12     Q.    Actually, and Mr. Weatherford did pulse
13  oximetry but we don't know what it was; correct?
14     **A.    I believe he tried and couldn't get it**
15  **to read.**
16     MR. HUSKISON:  Again, this is Berk
17  Huskison.  I object to the form.
18  BY MR. EDWARDS:
19     Q.    What's the basis -- the report said he
20  did an assessment and he put a pulse oximetry on.
21  So what is the basis for your statement that he
22  tried and could not get a reading?
23     **A.    That if he had gotten a reading he would**
24  **have documented it.**

143

1      Q.    If you don't get a reading, you know
2  that you didn't get a reading; correct?
3      **A.    I guess that would make sense.  If you**
4  **don't get a reading, you know that.  Yes.**
5      Q.    That's what the EMS did throughout that
6  report, if they couldn't get a reading they put no
7  reading available or words to that effect.  You've
8  reviewed that; correct?
9      **A.    I'd have to refresh myself to the**
10  **specifics of it.  But they do document that way,**
11  **yeah.**
12     Q.    But the pulse oximetry box was blank,
13  didn't say couldn't get a reading; correct?
14     **A.    I'd have to relook at that specifically.**
15     Q.    Well, whatever it says it says, you
16  agree with that?
17     **A.    Whatever --**
18     Q.    You don't have any information different
19  than what's on the EMS report, do you?
20     **A.    Was documented is what's documented.**
21  **Yes.**
22     Q.    All right.  Your writing in the Journal
23  of Emergency Medicine in 2012 says supplemental
24  oxygen is to be given; correct?

144

1      **A.    If that's what it says there, sure.**
2      Q.    So that was violated by the EMS and the
3  hospital; correct?
4      **A.    It says should and --**
5      Q.    No, it doesn't.
6      **A.    The word should was not in that**
7  **sentence?**
8      Q.    Yes, you're correct.  It is in the
9  sentence.  Should include vital signs.  And so
10  what does should mean?
11     **A.    Should means if you can do it to try and**
12  **do it.  It doesn't mean it's an absolute or a**
13  **must.  And if there are reasons not to do it for**
14  **safety purposes or practicality, then that is what**
15  **clinical judgment is for.**
16     Q.    Okay.  And so if the EMS could not
17  perform the assessment the way it should be done,
18  then the hospital should do it; correct?
19     **A.    The assessment of the individual, you**
20  **assess the best you can under the circumstances.**
21  **Both parties EMS and hospitals should be doing the**
22  **best assessment they can.**
23     Q.    Right.  If the EMS -- for instance,
24  somebody who has not been assessed by EMS then it

145

1  falls upon the hospital to do the assessment;
2  correct?
3      **A.    That's the next level of care.  The hand**
4  **off will be there and they will do their typically**
5  **own assessment whether it was done or not by EMS.**
6      Q.    Okay.  And you agree that when a patient
7  comes in in law enforcement restraints -- law
8  enforcement restraints would never be used by a
9  hospital personnel; is that correct?  Hard
10  restraints?
11     **A.    You're talking about handcuffs basically**
12  **or like shackles?**
13     Q.    Yes.
14     **A.    By hospital who, employees?**
15     Q.    Personnel.
16     **A.    Or security.  And many security officers**
17  **carry handcuffs to use as necessary.  They're not**
18  **a primary source of restraint of somebody as a**
19  **patient.**
20     Q.    I see.  So are you not aware that CMS
21  says that the use of law enforcement restraints
22  are not considered to be safe appropriate health
23  care restraint interventions by use by hospital
24  staff to restrain patients?

**Gary Vilke - December 08, 2017**

---

146

1    A.   You said health care, I think health
2  care something else.  You're saying that hospital
3  employees should never use handcuffs basically.
4  And I was saying that there are times where
5  security who are hospital employees do use
6  handcuffs, but not as part of patient care as I
7  believe your CMS commentary is referring to.
8       Q.   All right.  Are you aware that -- you
9  agree that the hospital is still responsible for
10 appropriate patient assessment in the provision of
11 safe appropriate care to its patient (the law
12 enforcement officer's prisoner).  You agree?
13      A.   The hospital employees are going to
14 assess and take care of the patient.  It seems
15 like a reasonable statement of what they do.  Yes.
16      Q.   In the notice of deposition we requested
17 that you bring to this deposition any primary
18 responses showing that LSD can cause excited
19 delirium.  What have you brought?
20      A.   I have brought several articles.  The
21 one that I think we referred to earlier, the
22 Ronald O'Halloran, Larry Lewman article from 1993
23 Restraint Asphyxiation and Excited Delirium.
24      Q.   While we're on that subject, Doctor, and

---

147

1  I will let you go through all of them.  On that
2  O'Halloran article was it a reference to footnotes
3  26 and 27 for the proposition of LSD?
4       A.   In what article?  Twenty-six and twenty-
5  seven out of what article?
6       Q.   The O'Halloran article that you just
7  pulled out?
8       A.   The O'Halloran article does not have 26
9  or 27 references.  I'm not following what you're
10 asking me.
11      Q.   Okay.  Was the LSD reference by
12 Dr. O'Halloran where the patient jumped out of a
13 second story window was under the influence of
14 LSD?
15      A.   I'm rereading this because -- he jumped
16 through a window.  He cut himself.  Is that --
17      Q.   Yes.  That was the LSD reference that
18 Dr. O'Halloran made in conjunction with excited
19 delirium?
20      A.   Correct.
21      Q.   Where the patient jumped out of a window
22 and was basically killed?
23      A.   Screaming obscenities, talking
24 incoherently and spitting.

---

148

1       Q.   And he was hogtied?
2       A.   It took four adults to restrain him and
3  transport him to the hospital emergency room.  So
4  he didn't die out of the window.  He just got cut
5  going through a window.
6       Q.   And subsequently died?
7       A.   He --
8       Q.   I'm sorry, go ahead.
9       A.   Yeah.  He subsequently died, but not
10 from the injuries from his jumping out the window.
11      Q.   He was hogtied; correct?
12      A.   He was handcuffed behind his back, soft
13 restraints and hogtied.  Yes, he was.
14      MR. EDWARDS:  Okay.  Let's mark that
15 article, Bobbie, as the next one.
16           (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
17 WAS MARKED AS EXHIBIT NO. 12 TO THE TESTIMONY OF
18 THE WITNESS AND IS ATTACHED HERETO.)
19 BY MR. EDWARDS:
20      Q.   Doctor, go ahead.  What else do you
21 have?
22      A.   Sure.  I have an article by
23 Dr. Takeuchi, Ahern, and Henderson.  Excited
24 Delirium review.

---

149

1       Q.   Yes.  And what is it about that article
2  that is responsive to our request showing that LSD
3  can cause excited delirium?
4       A.   They note that in their article that LSD
5  can cause excited delirium.
6       Q.   You will agree that's not a primary
7  resource because it's not a primary article?
8       A.   It's a primary article.  It's not a case
9  report if that's what you're asking.  It's an
10 article that references LSD as a etiology for
11 excited delirium syndrome.
12      Q.   It's anecdotal but it is not a case
13 study as you say?
14      A.   Case studies are just -- they report a
15 case.  It's not generalized science.  It's just
16 what somebody cites, publish and reports.
17      Q.   What does Dr. Takeuchi say about LSD and
18 excited delirium?
19      A.   Basically that methamphetamine, PCP, and
20 LSD have been reported in a few series, but by far
21 the most prevalent drug of abuse found on
22 toxicology screening was cocaine.
23      Q.   Okay, yes.  In the reference to the LSD
24 is what he's reporting on somebody else's study or

---

**Gary Vilke - December 08, 2017**

150

1  case note?
2  **A.  It's referring to Dr. O'Halloran's**
3  **paper.  Yes.**
4   Q.  So we're going back to Dr. O'Halloran
5  where the guy jumped out the window and then
6  ultimately died?
7  **A.  Went through a window, yes but did not**
8  **die from the window injury.**
9   Q.  The guy that was hogtied?
10  **A.  Correct.**
11   Q.  Okay.
12   MR. EDWARDS:  Bobbie, mark that one if
13  you will please.
14   (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
15  WAS MARKED AS EXHIBIT NO. 13 TO THE TESTIMONY OF
16  THE WITNESS AND IS ATTACHED HERETO.)
17  BY MR. EDWARDS:
18   Q.  You have something else, Doctor?
19  **A.  I have the ACEP White Paper Report on**
20  **Excited Delirium Syndrome published in 2009.**
21   Q.  Is that yours?
22  **A.  That is where I was with an expert panel**
23  **that published this White Paper.  I was part of**
24  **that.**

151

1   Q.  And what is the reference --
2   MR. EDWARDS:  Bobbie, go ahead and mark
3  that.
4   (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
5  WAS MARKED AS EXHIBIT NO. 14 TO THE TESTIMONY OF
6  THE WITNESS AND IS ATTACHED HERETO.)
7  BY MR. EDWARDS:
8   Q.  What is the reference in that White
9  Paper to LSD?
10  **A.  I'd have to look if there's an actual**
11  **reference.  I'm not sure if actually referenced**
12  **each individual aspect.  But this is also part of**
13  **the experience and expertise of the panel on**
14  **patients -- people who also have had patients with**
15  **LSD clinically excited delirium diagnosed but**
16  **never wrote a case report up on it.**
17   Q.  Well, typically if physicians have an
18  usual case they like to write it up; correct?
19  **A.  Some individuals do.  But most doctors**
20  **just treat their patients and go home.**
21   Q.  Well, but that's -- it enhance your
22  professional stature to be push accomplished?
23  **A.  It does if you're in academic medicine,**
24  **sure.**

152

1   Q.  Well, yeah okay.  So can you tell us
2  anything about the reference to the white paper to
3  LSD and excited delirium?
4  **A.  Well, it just says cases involve**
5  **stimulant abuse most commonly cocaine, though**
6  **methamphetamine, PCP, and LSD have also been**
7  **described.**
8   Q.  Okay.  Described where?
9  **A.  Described -- well, in the literature we**
10  **talked about O'Halloran.  Although, this is not**
11  **referenced in the actual paper directly, the**
12  **O'Halloran paper is referenced in the list of**
13  **papers reviewed by the task force.  And it's also**
14  **been seen by members of the task force but not**
15  **necessarily written up as a case report because**
16  **O'Halloran already wrote it up.**
17   Q.  So all you can tell us about LSD and
18  excited delirium is the anecdotal mention by
19  Dr. O'Halloran?
20  **A.  And members of the task force.**
21   Q.  Who?
22  **A.  Well, I've seen LSD induced excited**
23  **delirium as one.  But I didn't write up a case**
24  **report because there was no need to write up a**

153

1  case report at that time.
2   Q.  Did the patient die?
3  **A.  That I don't believe so.**
4   Q.  Can you -- do you have anymore articles?
5   MR. EDWARDS:  Do we mark that on,
6  Bobbie.
7   THE REPORTER:  We did mark that.
8  BY MR. EDWARDS:
9   Q.  Do you have anymore?
10  **A.  Then I have the Wetli chapter excited**
11  **delirium in Forensic Science and Medicine Sudden**
12  **Deaths in Custody.**
13   Q.  And what was Dr. Wetli's reference to
14  LSD?
15  **A.  It's probably going to be along a**
16  **similar line if I recall, that it is a cause of**
17  **excited delirium.**
18   Q.  That's a conclusion.  What's the fact
19  that supports the conclusion?
20  **A.  I'm looking at the paper to find exactly**
21  **where that line was.  I apologize for not having**
22  **highlighted it.  It says "Today, the entity is**
23  **most common among chronic drug users of stimulant**
24  **drugs such as cocaine and methamphetamine, and**

**Gary Vilke - December 08, 2017**

154

1  sometimes LSD and phencyclidine abusers." But
2  there is no reference noted with that comment
3  right there.
4       Q.   Okay.  So that's hardly a primary
5  source, is it?
6       **A.   Unless he has seen cases of it, he is**
7  **writing it based on his own primary knowledge of**
8  **it.**
9            MR. EDWARDS:  Mark that please, Bobbie.
10           (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
11  WAS MARKED AS EXHIBIT NO. 15 TO THE TESTIMONY OF
12  THE WITNESS AND IS ATTACHED HERETO.)
13  BY MR. EDWARDS:
14       Q.   Doctor, your position that hogtying and
15  places a person prone is without physiological
16  effect; correct?
17       **A.   It's clinically insignificant**
18  **physiologically.**
19       Q.   Okay.  So the studies in which you have
20  participated with Chan and Neuman found there was
21  a diminution in respiration but it was clinically
22  insignificant; is that right?
23       **A.   If you use measuring ventilation**
24  **properties, pulmonary function testings you can**

155

1  find small changes in that in different positions.
2  But physiologically based on O2 sats and end tidal
3  CO2 it was not significant or clinically
4  significant.
5       Q.   The first one of these studies that have
6  generally been referred to as the Chan studies in
7  which you participated was published in 1997?
8       **A.   That is correct.  Yes.**
9       Q.   And that is the study that was done for
10  the case of Price versus San Diego?
11       **A.   That was the case that initiated the**
12  **desire to look into this area more carefully.**
13       Q.   And tell the jury who funded that study?
14       **A.   The funding to do the study was done by**
15  **the County of San Diego.**
16       Q.   That was the defendant in the Price
17  lawsuit; correct?
18       **A.   That was one of the defendants.  Yes.**
19       Q.   And the Price lawsuit arose because a
20  man in custody of the San Diego Police Department
21  who was hogtied died; correct?
22       **A.   I can't remember if was police -- it may**
23  **have been Sheriff's Department.  But he did die in**
24  **a hogtie position.**

156

1       Q.   So the study that was done by you, Chan,
2  and Neuman was used in that litigation to defend
3  the claim of the plaintiff; correct?
4       **A.   That's study was used during that**
5  **litigation.  Yes.**
6            THE VIDEOGRAPHER:  Counsel, there is
7  five minutes left on the disc.
8            MR. EDWARDS:  You want to switch it now?
9            THE VIDEOGRAPHER:  Yes, sir, if that's
10  possible.
11           MR. EDWARDS:  Yeah, go ahead.
12           THE VIDEOGRAPHER:  This concludes media
13  number two.  We're going off the record.  The time
14  is 11:30 a.m.
15           (WHEREUPON, A BREAK WAS TAKEN AND THE
16  PROCEEDINGS CONTINUED AS FOLLOWS:)
17           THE VIDEOGRAPHER:  Time back on the
18  record is 11:35 a.m.  This begins media number
19  three.
20  BY MR. EDWARDS:
21       Q.   Doctor, now we started talking about the
22  1997 Chan study and let's get a little background
23  on that to make sure my understanding is correct.
24  You and Dr. Neuman were working with Dr. Chan at

157

1  the time that the County of San Diego funded this
2  study; is that correct?
3       **A.   Essentially.  Dr. Neuman was the senior**
4  **person on the study.  Dr. Chan was the first**
5  **author.  He and I were I think chief residents**
6  **when we first started the study and Dr. Neuman was**
7  **one of our mentors.**
8       Q.   Okay.  And the study so the jury will
9  understand what we're talking about was on the
10  effect of restraint position and positional
11  asphyxia; is that correct?
12       **A.   Right.  Basically looking at the effects**
13  **on pulmonary function testing of patients in**
14  **restraint positions.**
15       Q.   What the County of San Diego asked you
16  to study was whether placing someone prone on
17  their stomach in a hogtie could cause
18  asphyxiation; right?
19       **A.   That's correct.**
20       Q.   Okay.  And so that's what they funded.
21  They funded this study and you and Dr. Chan and
22  Dr. Neuman conducted the study; right?
23       **A.   Basically to objectively evaluate how**
24  **the position affects pulmonary function values.**

**Yes.**
Q. How many subjects, that is people, did you have in the study?
**A. Did you ask how many subjects? You cut out there.**
Q. Yes.
**A. Okay. We had 15 subjects enrolled.**
Q. People with asthma were excluded from that study?
**A. In this study, yes.**
Q. Were any of the people in that study under the influence of drugs?
**A. Not the we're -- not in this study. No.**
Q. And in this study the results were ultimately used to defend the City of San Diego which allegedly had caused the death of a hogtied prisoner; correct?
**A. I think it was County of San Diego. And it was used during the trial I believe as data.**
Q. Yeah. And who presented the data was Dr. Neuman; right?
**A. Dr. Neuman was an expert in that case. Yes.**
Q. For the County of San Diego?

**A. Correct.**
Q. The accused party; correct?
**A. At least one of the accused parties, sure.**
Q. And Dr. Neuman did not disclose that he had conducted the study with the funding of the County of San Diego; correct?
**A. It's disclosed on the paper here. I don't know what he disclosed or talked about in trial.**
Q. And, again, your conclusion was that the placing of somebody in a prone hogtied position while it did decrease to some degree the intake of oxygen, it was not clinically significant; is that correct?
**A. We didn't say the intake of oxygen. We said that there were small measurable differences in pulmonary function testing volumes, but it did not impact oxygen or carbon dioxide levels.**
Q. So bottom line to the layperson is the San Diego Sheriff's Department didn't kill this guy, Mr. Price or whoever, by putting him in a hogtie prone position bottom line?
**A. Didn't cause asphyxiation.**

Q. Right. But he died?
**A. He did die. Yes.**
Q. Okay. And you've conducted other studies that support that position through the years; right?
**A. Correct.**
Q. And it is also correct that you excluded -- well, first of all, Troy Goode would have never qualified for any of these studies, would he?
**A. Using LSD, no. But if he did not use LSD he could have qualified.**
Q. But you have admitted that all of the studies, however many there are, do not -- did not replicate conditions in the field of a person in excited delirium being arrested by the police; correct?
**A. I think we acknowledged our limitation sections that you cannot exactly reproduce field situations including intoxication by drugs.**
Q. So none of your studies -- how many have you done?
**A. Probably in this area of research with positions and restraints about six I think.**
Q. And none of those replicated the

conditions that Troy Goode was in at the time of his restraint and arrest; correct?
**A. If you're talking about having LSD intoxicated individuals, you are absolutely correct.**
Q. You can't recreate the stressors that somebody being hogtied and put in a prone position by police cause, can you?
**A. Well, the stressors of the position if one feels there's stressors, yes. But the idea of being arrested and/or resisting and/or being on drugs, we can't reproduce that. No.**
Q. Well, there are many more components to stressors on a person being arrested than just being hogtied and lying there prone; right?
**A. There are other potential stressors, sure.**
Q. And those -- you cannot replicate those conditions for purposes of your studies?
**A. You can't exactly replicate certain aspects of it. Correct.**
Q. Well, what you've -- you have said -- and actually you know Dr. Spitz?
**A. I do know Dr. Spitz.**

## Gary Vilke - December 08, 2017

**162**

1  Q.  You know Werner Spitz?
2  **A.  Werner, yes.**
3  Q.  He takes strong issue with your
4  conclusions; correct?
5  **A.  It depends which ones you're referring**
6  **to.**
7  Q.  Well, let me read you -- let me read you
8  a bit from Spitz and Fisher's medical legal
9  investigation of death.  This is an authoritative
10 treatise, is it not?
11 **A.  It is a published textbook.**
12 Q.  It's reliable, it's deemed reliable by
13 forensic pathologists; correct?
14 **A.  Again, it's as reliable as the authors**
15 **and the editors of that book.**
16 Q.  It's widely used by medical examiners?
17 **A.  I know the medical examiners do use that**
18 **as one of their references, sure.**
19 Q.  Thank you.  And Dr. Spitz in talking
20 about the Neuman group, which would include you;
21 right?
22 **A.  Yes.**
23 Q.  He says, in fact, the Neuman group and
24 the conclusion of their study acknowledge that

**163**

1  they had not intended to duplicate the conditions
2  under which restraint position deaths had
3  occurred.  Do you agree?
4  **A.  To reproduce all of the conditions --**
5  **certainly some of them like the position, but not**
6  **all of the conditions, sure.**
7  Q.  He continues, deaths on gurney
8  mattresses, cushioned car seats, or in a restraint
9  position on the ground, and on the floor of police
10 cars with a contoured surface may have increased
11 the abdominal compression had not been addressed
12 in their experiment.  Agree or disagree?
13 **A.  Well, some of our experiments were**
14 **actually done on hospital gurneys, so that would**
15 **have addressed that concern particularly.  But we**
16 **didn't put people on the contoured floors of the**
17 **back of a police car, that's correct.**
18 Q.  Well, let's talk about that.  How long
19 did any of your studies last?
20 **A.  Approximately 15 minutes I think was the**
21 **longest duration of somebody in a restraint**
22 **position.**
23 Q.  So if you're correct and I think you're
24 right, but even if you're correct that Troy Goode

**164**

1  was restrained prone in a hogtie for an hour and a
2  half, that would mean he was six times restrained
3  as long as anybody in any of your tests; correct?
4  **A.  That would be a correct mathematical**
5  **calculation, sure.**
6  Q.  And it's also correct that in your
7  testing you gave people rest periods in between
8  the measurements that you took; right?
9  **A.  The 15 minutes would be a constant 15**
10 **minutes in the position.  There was no rest period**
11 **there.  But if you change position for a different**
12 **measurement, there would be a rest period.  Yes.**
13 Q.  Okay.  And do you agree with Dr. Spitz
14 that the international association of chiefs of
15 police vehemently opposes the use of prone
16 restraint stating that many deaths have occurred
17 of individuals who while in police custody have
18 been restrained in this position?
19 **A.  I haven't reviewed the material.  I know**
20 **that they recommend at different times of their**
21 **publications putting people on the side position**
22 **thinking that it might be more physiologically**
23 **advantageous.  But the reality is those were**
24 **usually done prior to all the research that**

**165**

1  supported the physiologically trial.
2  Q.  Well, we'll talk about that.  Actually
3  there are a number of California EMS's which
4  prohibit the hogtied prone position; correct?
5  **A.  I don't know if they prohibit the use by**
6  **paramedics.  I don't know if they actually**
7  **prohibit the use by law enforcement because that**
8  **would be outside their jurisdiction.**
9  Q.  Well, of course.  But the reason -- and
10 Orange County is one; right?
11 **A.  That prohibits EMS providers from**
12 **putting somebody in a hogtied position?**
13 Q.  Yes.  Transporting via hogtied prone
14 position?
15 **A.  That I don't know.  I'd have to look at**
16 **their protocols whether they're allowed to**
17 **transport or not.**
18 Q.  Okay.  We'll see if we can pull those
19 for you.  Now, Doctor, you noted in the first
20 study Restraint Position and Positional Asphyxia,
21 Chan, et al 1997, "It is possible that our
22 subjects -- that had our subjects remained in a
23 restraint position for a longer period, we may
24 have detected more significant alterations in

**Alpha Reporting Corporation**

**Gary Vilke - December 08, 2017**

166

1  respiratory physiology."  Is that correct?
2      A.   You didn't give me a location.  I'm
3  trying to find it.
4      Q.   585.
5      A.   That looks like what we have written
6  there.  Yes.
7      Q.   Now explain that to the jury what that
8  means, what that sentence means?
9      A.   Sure.  It means that when you write a
10  research paper and publish it in a peer reviewed
11  journal, you have to put down limitations of the
12  study, and it's part of the intellectual honesty.
13  So this really is just referring to the fact that
14  we looked at patients out to 15 minutes.  And
15  that's the limitation of the study.  Could there
16  be changes further out, could be.  But based on
17  the data here if you're asking me to interpret it,
18  then the answer would be no.  But the paper is
19  written with the limitation of the 15 minute
20  window.
21      Q.   What you're saying is that you in one
22  study -- other studies were for shorter periods of
23  time; correct?
24      A.   There were other studies with shorter

167

1  periods of time.  Yes.
2      Q.   So the longest period would be 15
3  minutes and Troy Goode was at least six times
4  that; right?
5      A.   Yes.  Based on the hour and a half it
6  would be six times the length.
7      Q.   And what you're acknowledging in your
8  study is that if you left somebody hogtied and
9  prone for a longer period, there may have been
10  significant alterations in respiratory physiology;
11  correct?
12      A.   Anything is possible.  That is what
13  we're putting in there.  Correct.
14      Q.   And significant change in alterations in
15  respiratory physiology means ability to breathe;
16  right?
17      A.   Significant could be statistically
18  significant, meaning you would still see -- we saw
19  significant changes in the short period of time
20  and our change is not clinically significant.  So
21  could there be more changes, there could be.  It
22  doesn't mean it would actually impact the ability
23  to breathe or ventilate.
24      Q.   You don't know, you never tested for a

168

1  long period -- let me ask this.  Did you ever test
2  for longer than a 15 minute period?
3      A.   Nothing that was ever published.
4  Correct.
5      Q.   Did you ever test, publish anything that
6  would apply directly to Troy Goode's situation of
7  an hour and a half restraint hogtied in prone
8  position?
9      A.   We never had somebody with that
10  duration.  No.
11      Q.   You also noted as a qualification to
12  this study "It is unlikely that this period of
13  exercise would stimulate all of the physiological
14  alterations that may occur with struggle and
15  agitation.  In addition, we did not reproduce the
16  effects of trauma or psychological stress that
17  often occur with apprehended individuals."
18          Did you write that?
19      A.   Yes, we did.
20      Q.   Is that accurate?
21      A.   That's a fair statement based on the
22  limitations of the study.
23      Q.   Now the studies that you relied upon and
24  have relied -- you rely upon in this case and have

169

1  relied upon in all of the cases from Connecticut
2  to San Diego and points in between, are your
3  studies with Chan and Neuman; correct?
4      A.   They are part of it.  And depending on
5  the time -- they're part of my repertoire of
6  articles I review and rely on.
7      Q.   There are a great many articles by
8  professionals in the field of forensic pathology
9  that disagree with you.  You agree with that?
10      A.   There's a great number?  I don't think
11  that there's other studies that have disagreed, at
12  least not in the great number that you refer to.
13      Q.   Okay.  Well, that's probably a bad word,
14  you're right.  You are aware of studies that have
15  been performed in the prone position by people who
16  weren't employed as expert witnesses in court to
17  exonerate police; right?
18      A.   To my knowledge, sure I don't know what
19  all their backgrounds are.  But I know studies
20  were done by other individuals.
21      Q.   Are you familiar with the Edgcombe
22  article Anesthesia in the Prone Position 2008?
23      A.   Edgeco?
24      Q.   Edgcombe.

**Gary Vilke - December 08, 2017**

170

1   A.   I'd to look at it again.  Is that one
2   that was used in one of the depositions?  I'd have
3   to look in --
4        MR. EDWARDS:  Bobbie, it's number eight
5   on our list.
6        (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
7   WAS MARKED AS EXHIBIT NO. 16 TO THE TESTIMONY OF
8   THE WITNESS AND IS ATTACHED HERETO.)
9   BY MR. EDWARDS:
10   Q.   Doctor, have you seen this paper before?
11   A.   I have seen it at some point.  Yes.
12   Q.   For the benefit of us all,
13   anesthesiology is another area of medicine which
14   is concerned with the position in which a patient
15   is placed; is that correct?
16   A.   They do deal with patient position, yes
17   absolutely.
18   Q.   Because it can be dangerous to put
19   somebody under anesthesia when they're prone;
20   right?
21   A.   That's a very broad statement.  You have
22   to be careful about fluid volume statuses,
23   underlying medical conditions, and position can
24   change that.  So you want to be aware of all the

171

1   circumstances.
2   Q.   So your answer is on a broad brush
3   statement is the position that a person is in when
4   under anesthesia can be dangerous; correct?
5   A.   It can have physiologic changes that you
6   have to manage.  I wouldn't call it dangerous if
7   that's the idea of evaluating and planning?
8   Q.   You agree when moving a patient into the
9   prone position an almost universal finding is a
10   decrease in cardiac index?
11   A.   Where are you reading that at, I'm
12   sorry?
13   Q.   165.
14   A.   Thank you.  They certainly write that in
15   there, yeah.
16   Q.   And cardiac index measures the amount of
17   blood a person's heart is pumping divided by their
18   body size; correct?
19   A.   That is the way the measurement is.
20   Yes.
21   Q.   Okay.  And continuing on, the problem of
22   IVC -- what is IVC?
23   A.   The inferior vena cava.
24   Q.   And that's -- is that an artery that

172

1   pumps blood, that the heart pumps blood through?
2   A.   It's a vein that returns blood to the
3   heart.
4   Q.   A vein, okay.  And Dr. Edgcombe notes
5   that the problem of IVC obstruction is well
6   recognized in the prone position.  And that's at
7   167.
8   A.   It says the problem with IVC obstruction
9   is well recognized and various methods have been
10   attempted to reduce blood loss including use of
11   local anesthetic infiltration, spinal and epidural
12   anesthesia, and deliberate hypotension.  So he
13   does make that comment in the full sentence like
14   that.
15   Q.   Okay.  And so to put things into
16   perspective, this concept of the dangers of
17   hogtying in a prone position all interplay with
18   heart functioning in your opinion; is that
19   correct?
20   A.   The data has been measured on it has not
21   shown that cardiac output, blood pressure, or
22   heart rate are impacted by prone position, which
23   would be the functionality of the heart.
24   Q.   So Mr. Goode had no problems with his

173

1   heart to begin with, we talked about that;
2   correct?
3   A.   Nothing that was noted on the autopsy.
4   Correct.
5   Q.   And so Dr. Edgcombe, the
6   anesthesiologist, is saying that turning a patient
7   to the prone position has a measurable effect on
8   cardiac -- cardiovascular physiology, the most
9   consistent of which is a reduction in cardiac
10   index.  And that's at 168.
11   A.   It looks like either -- the best I can
12   tell here without having read the whole paper, his
13   reference seems to be something he's referring to
14   16 patients, reference number 16, which is
15   basically changes with prone position during
16   general anesthesia.  So anesthesia itself had some
17   impact on cardiac function.  So without going
18   through details of it does it apply in this case,
19   it's hard to say.
20   Q.   Okay.  Are you looking -- which study
21   are you looking at please?
22   A.   The Edgcombe, Anesthesia in Prone
23   Position paper.
24   Q.   Well, let me ask it this way, I'm sorry

**Gary Vilke - December 08, 2017**

174

1  we had a glitch.  Dr. Edgcombe is taking the
2  position -- he's an anesthesiologist and he is
3  written that placing somebody in a prone position
4  affects the heart; agree or disagree?
5      A.   He reports that we talked about earlier
6  when moving a position into a prone position an
7  almost universal finding is a decrease in cardiac
8  index, with the next paragraph talking about
9  patients who are under anesthesia.
10     Q.   Okay.  Right.  So as a general
11  proposition would you say you take issue with
12  Dr. Edgcombe, an anesthesiologist?
13     A.   As I said earlier, I'd have to look at
14  the paper that it was referencing there.  But it's
15  16 patients that are under anesthesia when the
16  positions were changed.  And I don't know if these
17  are 90-year-olds with very stiff vessels or
18  80-year-olds, or they're more applicable to
19  younger people with more cardiovascular
20  responsiveness.
21     Q.   Okay.  Well, look at 168.  Dr. Edgcombe
22  says: Obstruction of the IVC, the inferior vena
23  cava is a well recognized complication of prone
24  positioning and is exacerbated by any degree of

175

1  abdominal compression, leading to decreased
2  cardiac output and increased bleeding, venous
3  stasis, and consequent thrombotic complications.
4  Do you have an opinion one way or another on
5  Dr. Edgcombe's assertion?
6      A.   I'll break it down because it's a long
7  sentence if that's okay.  Obstruction of the IVC
8  is a well recognized complication of prone
9  positioning and is exacerbated by any degree of
10  abdominal compression.  You know, these are cases
11  in which you're operating on people and pushing
12  down.  It's a different position because you're
13  actually doing work that creates bleeding
14  disorders or clotting features by adding surgical
15  components to it.  Leading to decreased cardiac
16  output --
17     Q.   Excuse me, let me interrupt you, Doctor.
18  Where in that statement is there any statement
19  about a surgical component or pressure on the
20  back?  Where?
21     A.   In that very statement, there's nothing
22  in that very statement.  But he's referring to
23  surgical procedures with anesthesia.
24     Q.   Okay.  Go ahead.  What else do you have

176

1  to say?
2      A.   Then it says leading to decreased
3  cardiac output and increased bleeding.  As far as
4  decreased cardiac output, that's been measured in
5  non-surgical patients and has not been shown to be
6  affected.  Again, I'm not sure what he is
7  referencing to get that information.  But if it's
8  older patients with cardiovascular stiffness, more
9  calcifications, that is certainly a possibility.
10  But in younger otherwise healthy patients similar
11  to Mr. Goode, that data hasn't been demonstrated
12  in the work that I'm aware of.  I've --
13     Q.   Let me ask you something.  Go ahead,
14  sorry.
15     A.   I was trying to finish this, this is a
16  long thing.  The increased bleeding, venous stasis
17  and consequent thrombotic complications, again,
18  I'd have to read studies about that how the
19  position would actually lead to increased bleeding
20  unless you're referring to operating on somebody
21  and making cutting aspects that would bleed more.
22  Otherwise, putting somebody in a prone position
23  shouldn't make somebody bleed.
24     Q.   Don't you think it's a good idea

177

1  medically that if there's literature out there
2  that is considered to be peer reviewed which
3  states that placing somebody -- a patient in prone
4  position can affect his heart, that it is wise to
5  avoid prone positioning?
6      A.   Well, it says that they also affect
7  their bleeding.  And I don't think that's a true
8  fact.  So just because it's peer reviewed doesn't
9  mean it's applicable to all patients of all types.
10     Q.   Don't you think that when there is
11  reliable literature in medicine saying that the
12  prone position can affect the heart, particularly
13  the inferior vena cava, it is a good idea to avoid
14  placing people in the prone position?
15     A.   I would disagree.
16     Q.   Yes or no?
17     A.   I just said I disagree.
18     Q.   You disagree?
19     A.   Thank you.
20     Q.   You disagree with Dr. Edgcombe.  All
21  right.
22     A.   I disagree with your statement.
23          MR. EDWARDS:  Bobbie, pull out number
24  nine, please.

**Alpha Reporting Corporation**

## Gary Vilke - December 08, 2017

**178**

1    (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
2  WAS MARKED AS EXHIBIT NO. 17 TO THE TESTIMONY OF
3  THE WITNESS AND IS ATTACHED HERETO.)
4  BY MR. EDWARDS:
5    Q.   Doctor, are you familiar with this
6  article by Dr. Dharmavaram, et al, from the Loyola
7  University Medical Center entitled Effect of Prone
8  Positioning Systems on Hemodynamic and Cardiac
9  Function During Lumbar Spine Surgery: An
10  Echocardiographic Surgery?
11    **A.   I have seen the study.  Yes.**
12    Q.   Study, I'm sorry.  Okay.  Now let me ask
13  you about some of his conclusions or their
14  conclusions.  Hemodynamic changes.  What are
15  hemodynamic changes by the way?
16    **A.   Hemodynamic refer to blood based**
17  **changes, usually referring to blood pressure or**
18  **heart rate.**
19    Q.   Okay.  And blood of course is what
20  carries the oxygen to the organs, in particular
21  the brain; right?
22    **A.   That's one of the organs that is**
23  **perfused.  Yes.**
24    Q.   And the brain is -- oxygen is a oxygen

**179**

1  organ, if you will?
2    **A.   It certainly likes oxygen.  Yes.**
3    Q.   And Dr. Dharmavaram and his colleagues
4  concluded hemodynamic changes occur from supine to
5  prone position.  And that's at 1392.  Do you agree
6  or disagree?
7    **A.   I'm taking a look at what they say.  So**
8  **under key points it does say hemodynamic changes**
9  **from supine to prone positioning.**
10    Q.   Agree or disagree?
11    **A.   That's what it says there.**
12    Q.   Yes.  In your professional opinion do
13  you agree or disagree with this conclusion, this
14  finding?
15    **A.   Under the results they note that there**
16  **are no intergroup differences in demographics,**
17  **fluid deficit, baseline hemodynamics or**
18  **differences from supine to prone position were**
19  **noted.  So it seem to have a contradiction in the**
20  **results compared to their key point.**
21    Q.   I see.  So in so far as this particular
22  paper is concerned, you find a basis to disagree
23  with those conclusions?
24    **A.   I'm just saying what they wrote in their**

**180**

1  **paper.  And it seems to contradict to some degree**
2  **this key points.**
3    Q.   All right.
4    MR. EDWARDS:  Bobbie, would you pull out
5  number 10, please.
6    (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
7  WAS MARKED AS EXHIBIT NO. 18 TO THE TESTIMONY OF
8  THE WITNESS AND IS ATTACHED HERETO.)
9  BY MR. EDWARDS:
10    Q.   Doctor, are you familiar with this
11  Barnett study out of Great Britain?
12    **A.   Yes.  I have seen this before too.**
13    Q.   And can you tell us if you disagree with
14  the conclusions?
15    **A.   Their conclusions are their conclusions.**
16  **I'd have to re-review the details of their study.**
17  **But looking at -- I'd have to review the details**
18  **of their study to say whether I truly agree or**
19  **disagree.  There may be some small changes that**
20  **are there that would be agreeable but may not be**
21  **physiologically impactful.**
22    Q.   Well, let's look at their conclusions.
23  And I quote "This study is shown that all three of
24  the prone restraint positions tested imposed

**181**

1  pressure onto the anterior chest wall and
2  restricted lung function.  You agree or disagree?
3    **A.   I mean they're laying on their stomach,**
4  **so there would definitely be some pressure on the**
5  **chest wall.  That's just implicit with the**
6  **position.  As far as their commentary on**
7  **restricted lung function, that's what I'm trying**
8  **to look at what they did and what their data were.**
9  **And based on the data they have in Figure 3**
10  **compared to a seated position, there are some mild**
11  **changes that you can measure in the three**
12  **different positions in pulmonary function testing**
13  **with the caveat that assuming they had done the**
14  **pulmonary function testing following American**
15  **Thoracic Society specifications.  So if that's the**
16  **case, there are some small changes that they**
17  **measure.**
18    Q.   I didn't ask you this but a person -- is
19  there a ACLS protocol for addressing
20  supraventricular tachycardia?
21    **A.   There are ACLS protocols for addressing**
22  **narrow complex tachycardias.**
23    Q.   Were any ACLS protocols implemented for
24  Troy Goode?

**Gary Vilke - December 08, 2017**

182

1    A.    Yes.

2    Q.    Which one?

3    **A.    The pulmonary -- or pulseless electrical**

4    **activity, the V-fib protocols were implemented in**

5    **him.**

6    Q.    Post coding?

7    **A.    Well, yes.  That's when you use it.**

8    Q.    If a patient presents to a hospital to

9    an emergency department in supraventricular

10   tachycardia, should ACLS protocols be implemented?

11   **A.    If they present in true SVT, then you**

12   **would treat them as per SVT protocols.  One of**

13   **them is the ACLS algorithm for narrow complex**

14   **tachycardia.**

15   Q.    Okay.  Is there an ACLS protocol for

16   tachyarrhythmia?

17   **A.    Tachyarrhythmia is the general category,**

18   **then they break them down I believe to narrow and**

19   **wide complexes.**

20   Q.    Okay.  Is there a protocol for

21   tachyarrhythmia?

22   **A.    I think I just said I think there's an**

23   **overall protocol.  But they tend to break them**

24   **down to the two major categories; tachyarrhythmia**

183

1    with wide complex and tachyarrhythmia with narrow

2    complex.

3    Q.    Did Troy Goode present with either

4    wide -- or what was the other complex?

5    **A.    Narrow complex.**

6    Q.    Narrow.  Did he present with either of

7    those?

8    **A.    He had a narrow complex tachycardia.  He**

9    **had a sinus tach.**

10   Q.    Was the ACLS protocol implemented?

11   **A.    To treat the underlying issue for that,**

12   **yes by using sedation.  You have a tachyarrhythmia**

13   **that is sinus tach, you would treat the underlying**

14   **etiology.**

15   Q.    The ACLS protocol calls for chemical

16   sedation?

17   **A.    Typically if it's a sinus tachycardia it**

18   **falls outside of the true treatment portions of**

19   **the ACLS protocol.  And it falls under the**

20   **evaluation portion which is identifying the cause**

21   **and treating that cause.**

22   Q.    Okay.

23         MR. EDWARDS:  Bobbie, would you pull out

24   number 49, please.

184

1          (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

2    WAS MARKED AS EXHIBIT NO. 19 TO THE TESTIMONY OF

3    THE WITNESS AND ATTACHED HERETO.)

4          MR. GASS:  Tim, it would have been nice

5    if there was copies of all these exhibits provided

6    to all of us today.

7          MR. EDWARDS:  Well, I don't know who you

8    think is going to do it.  I'm not going to do it.

9    If you want to see these things, Rick, come to the

10   deposition.

11         MR. GASS:  Tim, the rule provides that

12   if you're going to have exhibits at a deposition

13   you're suppose to have copies.  It's common

14   courtesy and custom to have copies for opposing

15   counsel.

16         MR. EDWARDS:  We do have copies.  We

17   have them sitting here in Memphis and we have them

18   there in San Diego.  You could have come.

19         MR. GASS:  All you had to do was send us

20   PDFs of them and everybody would have had them.

21         MR. EDWARDS:  I am not going to go out

22   abounds for you because you can't get your ass to

23   a deposition, period.

24   BY MR. EDWARDS:

185

1    Q.    Okay.  Doctor, do you have the adult

2    tachycardia with pulse algorithm?

3    **A.    I do.  Yes.**

4    Q.    You do?

5    **A.    Yes.**

6    Q.    Okay, sir.  Now number one, step one,

7    these are sequential; right?

8    **A.    Correct.**

9    Q.    So step one is assess appropriateness

10   for clinical condition, heart rate typically equal

11   to or greater than 150 beats per minute if

12   tachyarrhythmia.  Did I read that correctly?

13   **A.    A heart rate typically greater than or**

14   **equal to.  Yes, you did.**

15   Q.    And then you go to step number two,

16   identify and treat underlying cause.  What does

17   that mean?

18   **A.    That means if it is -- the**

19   **tachyarrhythmia is a tachycardia caused by drugs**

20   **caused by sepsis, caused by fever, caused by**

21   **shock, caused by trauma, you would treat those**

22   **causes and use your clinical judgment and start**

23   **the treatment that would be indicated for either**

24   **of those types of etiologies.**

**Gary Vilke - December 08, 2017**

186

1    Q.   Okay.  And it says maintain patient
2  airway; assist breathing as necessary; right?
3    A.   Yes, it does.
4    Q.   And how do you do that?
5    A.   Basically if they're breathing and
6  they're talking and yelling, you take a look at
7  their airway and make sure it's patent.
8    Q.   Okay.  And then you give supplemental
9  oxygen if hypoxemic; right?
10    A.   That is listed there as an option.  Yes.
11    Q.   And how do you determine if a person is
12  hypoxemic?
13    A.   Either by an O2 sat monitoring or by a
14  blood gas.
15    Q.   Okay.  Well, we know he didn't get a
16  blood gas.  We got an O2 reading of 90 percent.
17  Was Troy hypoxemic?
18    A.   I would not have started oxygen on him
19  based on that O2 sat reading.  So I would not
20  define him as hypoxemic.  He has a low normal O2
21  sat.
22    Q.   Low normal?  What -- normal is 95 and
23  above; correct?
24    A.   No.  Normal is -- that's -- the mid

187

1  range anywhere from 93 to 97.  Sort of up higher
2  is higher.  And then 90 to 92 is sort of a low
3  normal.  Below 90 is what most people will define
4  as hypoxemic.  But you'll see different papers
5  referring to different levels depending on how
6  they want to look at the data.
7    Q.   Give me one authority for the
8  proposition that 90 is normal -- low normal?
9    A.   There are lots of references out there
10  that --
11    Q.   Give me one?
12    A.   We've had numbers of studies we talked
13  today that talk about O2 sats greater than 90
14  percent or 90 percent or greater as being
15  considered normal, below that being hypoxic as
16  defined in their method sections.
17    Q.   Show me one.  We had one that said 93,
18  if it was at 93 you had to start supplementing.
19  The EMS from Mississippi say 90 is mild hypoxia
20  requiring supplemental oxygen.  You disagree with
21  that?
22    A.   If that's what it says, I'm not going to
23  disagree with what they say.
24    Q.   And it says cardiac monitor to identify

188

1  rhythm, monitor blood pressure, and oximetry.
2  What's involved in a cardiac monitoring?
3    A.   Cardiac monitor is placing leads onto
4  the body to try to measure the electrical activity
5  of the heart.
6    Q.   And that was not done?
7    A.   It was done in the field.  It was not
8  done at the hospital.
9    Q.   It should have been done in the
10  hospital?
11    A.   At some point it should have been done,
12  yes.  At some point after he calmed down I think
13  it would be the time to place the cardiac monitor.
14  Yes?
15    Q.   Are you familiar with the Parkes and
16  Carson entitled Sudden death during restraint?
17    A.   I'm sorry, who is the author on that?
18    MR. EDWARDS:  Bobbie, this is our number
19  13.
20    (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
21  WAS MARKED AS EXHIBIT NO. 20 TO THE TESTIMONY OF
22  THE WITNESS AND ATTACHED HERETO.)
23    MR. GASS:  Can you give us the titles
24  and the names of Exhibit 18 and 19 please.

189

1    THE WITNESS:  Eighteen is the
2  physiologic impact of upper limb position in prone
3  restraint.  The lead author is Richard Barnett.
4  Number 19 is the acute -- I'm sorry, the Adult
5  Tachycardia With a Pulse Algorithm put out by the
6  American Heart Association in 2015.
7    MR. GASS:  Thank you, Doctor.
8    THE WITNESS:  You're welcome.
9  BY MR. EDWARDS:
10    Q.   Are you -- my question was, Doctor, have
11  you seen this before?
12    A.   I have seen this before.  Yes.
13    Q.   They did five positions?  They tested
14  five positions' right?
15    A.   I'm just refreshing myself with the
16  details of it.  But that's what it looks like.
17  Yes.
18    Q.   Okay.  And position five was the one
19  close -- was similar to the hogtied position?
20    A.   I'm sorry for the delay, I'm just
21  looking for the methods and they didn't define it.
22  But looks like they have standing -- I'm sorry,
23  there's pictures further back.  Position two flat
24  on the floor, supine.  Front on the floor, prone.

**Alpha Reporting Corporation**

**Gary Vilke - December 08, 2017**

190

1  Number four was prone restraining staff applying
2  body weight to torso sort of a chicken wing.  And
3  five is arms and legs restraint in a flexed
4  position.  So the four leg lock would be the
5  position there.  And that's probably you're right
6  the closest to the position of Mr. Goode.
7      Q.   Okay.  And then Dr. Parkes and Carson
8  conclude that that position you just described
9  caused the greatest change in forced vital
10  capacity at 137.  Is that correct?
11     A.   Based on their graph Figure 1 that's
12  showing the FVC as a percentage of position one it
13  is the biggest change, 70 percent of that.  So I'm
14  just looking at their methodology.  So they
15  measure theirs with a single force maximum
16  exhalation followed by inhalation.  That would not
17  be standard practice.  That's basically -- that's
18  not meeting American Thoracic Society measurements
19  for reproducibility.  But that gives that
20  limitation because it doesn't mean that they gave
21  a best effort in these positions.  They are
22  reporting some changes in the FVC and the FEV1 in
23  Positions 4 and 5, the ones with the hands behind
24  the back.

191

1      Q.   In fact, they conclude that restraint
2  positions should be considered a risk factor for
3  sudden death during restraint and that some
4  restraint positions are demonstrated to present a
5  greater risk to the patient and others.  And
6  that's at 141.
7      A.   They do write that down there.  Yes.
8      Q.   You take issue with that?
9      A.   I take issue with their methodology.  I
10  think I already said which can would impact the
11  results and therefore the conclusions from that
12  perspective.  And, again, sort of the difference
13  between measurable differences and physiologic
14  differences.  They didn't measure end tidal $CO_2$ or
15  $O_2$ sats in these individuals nor checked blood
16  gases.  So we don't know if there's any changes in
17  hypoxia or hypercarbia in this population to say
18  that there's actually a risk factor for sudden
19  death.  I think that's why I think it's a leap to
20  go on to that level.
21     Q.   One of the patients in the Parkes and
22  Carson study there was a 57 percent reduction in
23  FEV1 while restrained in the hogtied position?
24  And that's at 140.

192

1      A.   Right.
2      Q.   Is that correct?
3      A.   Based on their methodology that I sort
4  of quickly looked out --
5      Q.   I think you said --
6      A.   -- it was a single recorded measurement
7  or actually to have valid data you need to have
8  reproducibility of at least three within 10
9  percent.  So if they had a bad FEV1 there because
10  it wasn't their baseline but it was just a bad
11  push and they try to reproduce it, you may have
12  seen different numbers.  So without the
13  reproducibility this data really isn't -- it's not
14  scientifically valid.  It is what it is.  But you
15  can't interpret and say that the 57 percent was
16  real because it wasn't reproduced at least twice.
17     Q.   Don't you think Dr. Parkes and Carson
18  thought it was real when they recorded it?
19     A.   I don't know what they were thinking
20  when they were doing their study.  But if they
21  designed it correctly they should have had
22  American Thoracic Society measurements or a local
23  society which is basically reproducing the testing
24  parameters to demonstrate that they are valid

193

1  numbers.
2      Q.   Are you familiar with the Roeggla,
3  R-O-E-G-G-L-A, study on positioning and its effect
4  on respirations that came out of Austria?
5      A.   Respiration and cardiovascular
6  parameters, yes I'm familiar with that one.
7      Q.   And that study --
8          MR. EDWARDS:  Bobbie, that's number 16,
9  would you pull that out.
10         (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
11  WAS MARKED AS EXHIBIT NO. 21 TO THE TESTIMONY OF
12  THE WITNESS AND IS ATTACHED HERETO.)
13  BY MR. EDWARDS:
14     Q.   Now Dr. Roeggla and his colleagues I
15  think it was at the University of Vienna concluded
16  that the hobble restraint had a 40 percent
17  reduction in forced vital capacity, is that
18  correct, sir?
19     A.   Looking at their data.  Where do you see
20  the 40 percent?  This is the mini version, so I'm
21  really straining the eyes to take a look at it.
22  But where are you seeing that 40 percent listed?
23     Q.   If you'll look under the section on the
24  second page called results it says mean FVC,

**Gary Vilke - December 08, 2017**

---

**194**

1  that's forced vital capacity; right?

2     **A.  Yes.**

3     Q.  Decreased by 39.6 percent?

4     **A.  Correct.**

5     Q.  What is forced vital capacity?

6     **A.  That's the amount of air you can blow**

7  **out over time.**

8     Q.  Why is that -- that's what is recorded

9  when you do a pulmonary function test; right?

10    **A.  That is done through pulmonary function**

11  **testing.  Correct.**

12    Q.  And what is the significance of a almost

13  40 percent reduction in forced vital capacity?

14    **A.  Same issues with this paper as the other**

15  **one, they didn't reproduce their data.  They only**

16  **had six subjects and they misused their other**

17  **equipment, the Portapres device looking at cardiac**

18  **output.  So they -- we know that they misused**

19  **their devices.  So it made it very difficult to**

20  **interpret the data here.  But a 40 percent**

21  **increase -- or decrease if it was factually real**

22  **would be notable.  But there's never been a study**

23  **out there that ever saw anything close to these**

24  **numbers.  And when you look at the way they**

---

**195**

1  **presented their data it implies that there is**

2  **something physiologically wrong with the way they**

3  **measure things.**

4    Q.  Well, it's rather amazing that all of

5  these other studies have something wrong with

6  theirs but yours don't.  Don't you find that

7  strange?

8    **A.  This here if you look at their O2 sat it**

9  **says 97.67 percent.  First of all, let me measure**

10  **that in O2 sat at that level.  Secondly, it's with**

11  **a blood pressure of 85 over 54.  Sat probes**

12  **don't tend to pick up that carefully at those**

13  **levels.  There's a lot of inherent issues with the**

14  **study.  The other pieces they used a Portapres**

15  **measuring device that was -- if you look at the**

16  **company it was not designed to be used for**

17  **changing positions but rather to be used in an ICU**

18  **setting or a proned -- on a bed setting so that**

19  **you can measure changes over time, not changes in**

20  **position from standing to supine to prone.  It**

21  **throws off the way the machine reads on your**

22  **finger.  So they used the equipment wrong.  So**

23  **that's a criticism of this study.**

24    Q.  These guys at the University of Vienna

---

**196**

1  in your opinion don't know what they're doing?

2    **A.  I think it's actually fairly common**

3  **across the board that there were inherent issues**

4  **beyond my own opinion.  It's in the community of**

5  **people who do research in this field that there**

6  **were flaws in this study.**

7    Q.  It also show a very large decrease

8  actually 37.4 percent of cardiac output; right?

9    **A.  That was measured based on their blood**

10  **pressure.  Correct.**

11    Q.  Yes.  Okay.  That's significant, that's

12  clinically significant?

13    **A.  The number is significant.  The**

14  **measurement is flawed.**

15    Q.  Right.  I understand your position.  But

16  assuming that the measurement was accurate, 37.4

17  percent in cardiac output is very clinically

18  significant; correct?

19    **A.  It would be potentially notable in blood**

20  **pressure changes if was the decrease in output**

21  **suddenly, sure.**

22    Q.  A decrease of mean forced vital capacity

23  of 39.6 percent is very clinically significant,

24  isn't it?

---

**197**

1    **A.  It could have clinical implications at**

2  **that level that would you note in measuring oxygen**

3  **saturation or CO2.**

4      MR. EDWARDS:  Bobbie, would you pull out

5  Exhibit 15 on the list.

6      MR. GASS:  Is this Exhibit 15 or is this

7  your No. 15?

8      MR. EDWARDS:  My Number 15 the article

9  is entitled The cardiopulmonary effects of

10  physical restraint in subjects with chronic

11  obstructive pulmonary disease from the Clinical

12  Forensic Medicine.

13      MR. GASS:  And is this now going to

14  become Exhibit 22.

15      THE REPORTER:  It is Exhibit 22.

16      (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

17  WAS MARKED AS EXHIBIT NO. 22 TO THE TESTIMONY OF

18  THE WITNESS AND ATTACHED HERETO.)

19  BY MR. EDWARDS:

20    Q.  Have you seen this article, Doctor?

21    **A.  I have.  Yes.**

22    Q.  And there were eight subjects with COPD

23  placed in the prone, and then the prone restraint

24  position to determine whether physical restraint

---

**Gary Vilke - December 08, 2017**

198

1  was harmful to individuals with pulmonary
2  conditions?
3      A.    Right.
4      Q.    Is that the purpose of that?
5      A.    Eight subjects, yes recruited with COPD.
6      Q.    And of those eight subjects, three could
7  not tolerate the prone position with risk
8  restraints due to a clinical deterioration in
9  symptoms; is that correct?
10     A.    If I remember correctly, a 67-year-old,
11 a 70-year-old, and a 69-year-old were unable to
12 tolerate that position.
13     Q.    So the finding of Dr. Meredith and
14 others -- and let's see.  Their finding was that
15 for people with a lung condition, specifically
16 COPD, the prone position was harmful?
17     A.    For elderly people with significant COPD
18 the prone position did have some impact on them.
19 Yes.
20     Q.    Clinically significant impact; right?
21     A.    For these three individuals they found
22 some findings on them.
23     Q.    You I believe in some of your opinions
24 have referred to a study done by Dr. Shimizu,

199

1  S-H-I-M-I-Z-U.  Am I correct on that?
2      A.    That I referred to that?
3      Q.    I thought you had.  I could be
4  incorrect.
5      A.    I think that may have been one of the
6  other experts in this case may have referred to it
7  and I took a look at it.
8      Q.    Dr. Shimizu --
9          MR. EDWARDS:  Did I give you the number
10 on that, Bobbie?
11         THE REPORTER:  No, you didn't.
12         MR. EDWARDS:  Number 14.
13         (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
14 WAS MARKED AS EXHIBIT NO. 23 TO THE TESTIMONY OF
15 THE WITNESS AND IS ATTACHED HERETO.)
16 BY MR. EDWARDS:
17     Q.    Got it, Doctor?
18     A.    I do.  Thank you.
19     Q.    Have you ever seen this article?
20     A.    I have seen this article before.  Yeah.
21     Q.    And Dr. Shimuzu and et al, in 2014
22 concluded that prone positioning induces
23 significant changes in systolic and diastolic
24 function as well as dyssynchrony; right?

200

1      A.    They do write that --
2      Q.    Cardiac changes from switching from the
3  supine to prone position?
4      A.    They do write that in their conclusions.
5      Q.    Do you disagree with that?
6      A.    Well, I think that they're looking at
7  several different groups there.  So in the group
8  that sort of represented our case here there was
9  no significant changes.  But in other groups that
10 had history of heart attacks or ischemic heart
11 disease without myocardial infarction they did
12 find some changes.
13     Q.    Well, actually at Page 3 of 3 they
14 indicate in all 90 patients in the study heart
15 rate increased and stroke volume index decreased
16 with prone positioning resulting in a decrease of
17 cardiac index, cardiac function was switching
18 supine to prone position.  So it says that all 90
19 patients there was a change in the heart rate
20 cardiac index?
21     A.    The heart rate they said in Group A went
22 from 78 beats per minute to 76 beats per minute.
23 So that would be a change, certainly noting
24 clinically significance.  And --

201

1      Q.    All these articles we've been talking
2  about are negative on placing patients in a prone
3  position; is that correct?
4      A.    Again, this is -- if you're referring to
5  people with history of heart attacks and ischemic
6  heart disease, they have some changes they note.
7  The normal group really does not have anything
8  that would be clinically significant that would be
9  negative towards doing it.  But they do note that
10 there are changes that you can measure in these
11 positions.  But they don't talk about the
12 physiologic impacts of them.
13     Q.    Well, actually this Shimuzu study just
14 says prone positioning induces significant changes
15 in systolic and diastolic function as well as
16 dyssynchrony.  What is dyssynchrony?
17     A.    The heart -- the beating of the heart
18 left to right.
19     Q.    Okay.  Then that doesn't qualify the
20 study group, does it?  They said this happens in
21 all 90 that they studied.
22     A.    But the numbers that they report showing
23 their changes are comparing all patients -- well,
24 they compare supine to prone.  The numbers are

**Alpha Reporting Corporation**

**Gary Vilke - December 08, 2017**

202

1  certainly not anything clinically significant.
2  The heart rate change of six beats is hardly
3  measurable.  Stroke volume indexes between 30 and
4  35 are normal.  So there's nothing there that
5  would be irregular.  There's difference you can
6  measure them, but nothing that was clinically
7  significant in the normal population.  So they're
8  noting the changes.  They're reporting that.  But
9  it doesn't show any clinical significance for the
10 population in these normal groups.  It's just
11 telling you patients who have other medical
12 histories may have some changes.  Even there those
13 are not dramatic, but they're notable.  And that's
14 what they're doing.
15     Q.   Well, it doesn't do much -- add much to
16 medical knowledge to report insignificant changes
17 from one position to another, does it?
18     A.   I think it adds a lot of data.  Any
19 study that shows changes or no changes if done
20 scientifically well is helpful for the medical
21 community.
22     Q.   Okay.  And in that regard all of these
23 articles that we've been reviewing all note
24 adverse changes whether clinically significant or

203

1  not as a result of the prone position; right?
2      A.   That's what I'm saying I don't agree
3  with that.  You know, heart rate from 70 to 76,
4  one could argue the supine position lowers your
5  heart rate.  Again, those types of number changes
6  though statistically significant in reporting
7  don't mean that there's actually some clinical
8  significance behind it.  And that is an adverse
9  effect of the position.
10     Q.   Doctor, let's switch gears once again.
11     A.   Do you mind if I ask a quick question
12 just for my own planning.
13     Q.   All right.
14     A.   How long do you anticipate this going on
15 just because I blocked out the four hours you paid
16 me for, but I wanted to make sure I let people
17 know for things I'm pushing off.  Just an idea,
18 not a push.
19     Q.   I think that we are moving towards a
20 conclusion.  Another 45 minutes maybe.
21     A.   Okay.
22     Q.   Of course it depends on your cohorts
23 there.
24     A.   Sure.

204

1      Q.   You have previously testified that only
2  approximately 10 percent of individuals suffering
3  from excited delirium will die; is that correct?
4      A.   Yeah.  Ten, eleven percent.  It's in
5  that range, yes.
6      Q.   And you wrote in excited delirium
7  syndrome etiology identification and treatment and
8  current practice in forensic medicine.  Was that
9  last year that you wrote that?
10     A.   To be honest I'd have to look at the
11 reference to determine.  I think it was a little
12 longer than that.  It may have been a few years.
13     Q.   Can you see this?  Is this it?
14     A.   A textbook.  I thought you were
15 referring to a binded book.  But that still may
16 have been a little longer.  It may have been
17 published last year.
18     Q.   Okay.  So you were contributed.  It says
19 Gary Vilke and Jason Payne-James wrote on excited
20 delirium syndrome etiology identification and
21 treatment.  That was you?
22     A.   That's fair, yes.
23     Q.   Okay.  And you relied upon a study by
24 Dr. Stratton in 2001 entitled Factors Associated

205

1  With Sudden Death of Individuals Requiring
2  Restraint for Excited Delirium.  Is that correct?
3      A.   That would probably be one of the
4  references in there, sure.
5          MR. EDWARDS:  Let me get a number on
6  that.  Bobbie, this is 43.
7          (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
8  WAS MARKED AS EXHIBIT NO. 24 TO THE TESTIMONY OF
9  THE WITNESS AND ATTACHED HERETO.)
10         MR. GASS:  Would you somebody give us
11 the exhibit number and the title slowly please.
12         THE WITNESS:  Exhibit 24 Factors
13 Associated with Sudden Death of Individuals
14 Requiring Restraint for Excited Delirium.  Lead
15 author is Samuel Stratton.  And it appears to be
16 in the American Journal of Emergency Medicine,
17 Volume 19, May 2001.
18         MR. GASS:  Thank you, Doctor.
19         THE WITNESS:  You're welcome.
20 BY MR. EDWARDS:
21     Q.   Doctor, so that study conducted in LA
22 County involved people in police custody who had
23 been -- who were in a excited delirium state and
24 required hobble restraint; is that correct?

**Gary Vilke - December 08, 2017**

---

**206**

1    A.   That sounds correct.  I'm about to look
2  at the details.  But they were restrained by
3  police to be transported by paramedics.
4    Q.   They were in hogtie restraint; right?
5    A.   I'm looking to see if all of them were.
6  I know some of them were.
7    Q.   Well, at Page 188 in Dr. Stratton's
8  paper he says all -- well, no, I'll correct
9  myself.  There were 214 individuals in
10  Dr. Stratton's study in Los Angeles County; right?
11    A.   I'm reading 216 restrained excited
12  delirium victims encountered during the study, all
13  had been in restrained some form of hobble
14  restraint, either loosely (TARP) or tightly
15  (hogtied).  The TARP technique was used almost
16  exclusively after 1996.
17    Q.   Okay.  Of that population of 216, 18
18  individuals died.
19    A.   There were 18 deaths.  I think 18 deaths
20  were in cardiac arrest while being transported.
21    Q.   Okay.  And those 18 deaths are all
22  people restrained in the hogtie for excited
23  delirium.  And that's at 188; right?
24    A.   It was surely the hobble restraint.  So

---

**207**

1  hogtie implies being close to the hands.  It could
2  be loose where there's more movement with the
3  legs.  But the legs were bound and attached to
4  some level.
5    Q.   Okay.  So of the 18 people who died in
6  Dr. Stratton's study in LA County, all were
7  similarly restrained to the restraint used on Troy
8  Goode?
9    A.   It appears they were of similar
10  positioning, sure.
11    Q.   And these were all people described as
12  being in a state of excited delirium as that which
13  you have attributed to Mr. Goode's state; correct?
14    A.   That is the physiologic presentation of
15  these as well as Mr. Goode.  Yes.
16    Q.   Okay.  So we got 216 people in LA County
17  being studied by Dr. Stratton in regards to police
18  restraints.  And 18 of those people died.  Am I
19  right so far?
20    A.   I can't determine the details.  I think
21  18 went into cardiac arrest and died during
22  transport.  I'm not exactly sure if they actually
23  followed everybody through hospitalization.  But
24  of the ones that happened these happened during

---

**208**

1  transport and died.
2    Q.   And all sudden death victims, the 18 in
3  the series had been hobble restrained; correct?
4    A.   In some form of hobble restraint, yes.
5  Uh-huh (affirmative response).
6    Q.   That's at 188.  So that's LA County.
7  And the Stratton study upon which you referenced
8  in your publication on excited delirium syndrome
9  etiology identification and treatment; right?
10    A.   I believe it's referenced in there.  I
11  didn't double check.  But I believe it's in there
12  if you told me.
13    Q.   Okay.  Two years ago, two years ago, you
14  participated in a study on police restraints in
15  Canada; is that correct?
16    A.   I certainly was participating in a prone
17  restraint study up there.  I'm not sure which one
18  you're referring to.  But I know I've worked with
19  the Canadians on some of their restraints.
20    Q.   Restraint in police use of force events.
21  Hall, et al, 2015.
22    A.   Yes.  That sounds familiar.
23    Q.   Okay.  I'll get you a copy of it.
24      MR. EDWARDS:  Bobbie, this is number 44.

---

**209**

1      (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
2  WAS MARKED AS EXHIBIT NO. 25 TO THE TESTIMONY OF
3  THE WITNESS AND IS ATTACHED HERETO.)
4  BY MR. EDWARDS:
5    Q.   Now this study was published in the
6  Journal of Forensic and Legal Medicine.  Is that
7  correct, Doctor?
8    A.   That is correct.
9    Q.   Okay.  And you're listed as one of the
10  authors; right?
11    A.   I am.
12    Q.   Okay.  So in this study in Canada, you
13  had more than double the amount of individuals
14  being studied than Dr. Stratton had had in LA
15  County, California; right?
16    A.   I mean, which part of this study are you
17  talking about total consecutive use of force
18  events and how many were in prone and not prone
19  positions?
20    Q.   Fair enough.  I'll rephrase it.  In the
21  Canadian study you found that 499 individuals had
22  three or more features of excited delirium?
23    A.   Yes.  Correct.
24    Q.   And 86 individuals had six or more

---

**Gary Vilke - December 08, 2017**

210

1 features of excited delirium?

2     **A.   I think that is correct as well.**

3     Q.   And so out of this population of almost

4 600 people, you had one death; is that correct?

5     **A.   There was one death in this population.**

6 **Correct.**

7     Q.   And the one death in this population was

8 due to cocaine toxicity; correct?

9     **A.   That sounds familiar.  Yes.**

10     Q.   And the one individual who died from

11 cocaine toxicity was hyperthermic; correct?

12     **A.   I'd have to look at the details.  I know**

13 **he was not prone.  But I'd have to check if he was**

14 **hyperthermic.  Yes.  He had hyperthermia as well.**

15     Q.   So I think I was wrong on my number.  I

16 think that the group that you were studying was

17 closer to 500 than 600.  And so out of the 500

18 there was one death -- and these were all people

19 in Canadian police custody; right?

20     **A.   Correct.**

21     Q.   Okay.  And so out of the approximate 500

22 people you had one death that was due to cocaine

23 toxicity and hyperthermia; right?

24     **A.   That's correct.**

211

1     Q.   Now, Doctor, tell the jury how many

2 people in the Canadian study were hogtied?

3     **A.   I'd have to read through this.  If you**

4 **can point me in the direction it's in there if you**

5 **know it, great.  But I can't recall off the top of**

6 **my head if it's even reported in there.**

7     Q.   Doctor, you know that zero of the

8 Canadians were hogtied, none; correct?

9     **A.   Well, that's what I'm looking for.  I**

10 **don't remember specifically.  So to say I know is**

11 **sort of unfair.  I'm not recalling, so I'm reading**

12 **through it.**

13     Q.   Page 34, Section 5.5.

14     **A.   It says there, yes.  Unlike other**

15 **cohorts no individual in our cohort had ankle**

16 **and/or leg restraints connected in a hogtied**

17 **fashion (also known as the position of maximal**

18 **restraint).**

19     Q.   And the reason that is is the entire

20 country of Canada bands hogtying by police;

21 correct?

22     **A.   I don't know if that's really the case.**

23 **I don't know their policies up there.**

24     Q.   Well, you went up to study the police

212

1 practices; right?

2     **A.   I actually worked with the authors to**

3 **evaluate the data, not necessarily to study the**

4 **police practices aspect of it.**

5     Q.   So what we have in contrast is we have a

6 study by Dr. Stratton in Los Angeles upon which

7 you rely in your writings that dealt with 214

8 people, and of those 18 died and everyone was

9 hogtied; correct?

10     **A.   They were hobbled or hogtied.**

11     Q.   Yes.  And then you contrast that to

12 Canada in the study in which you participated for

13 the Canadian police that dealt with a much larger

14 population about 500, and there were no deaths;

15 correct?

16     **A.   If you're talking about -- the 500**

17 **subjects are with three signs of excited delirium**

18 **or more.  Typically you would define it the**

19 **tighter definition.  You're really looking for**

20 **excited delirium of six or more features.  And**

21 **that's a smaller population, but it looks like 86**

22 **patients as well of none of which were hobbled or**

23 **hogtied like you said.**

24     Q.   So we've got hogtying in the U.S. that

213

1 results in deaths; right?  And we've got Canada

2 which doesn't allow hogtying, and we've got no

3 deaths in the study; right?

4     **A.   Well, again, I don't know if Canada does**

5 **not allow it.  You put that into the question**

6 **there.  So I can't agree with the whole statement.**

7 **But there were only one death in the population of**

8 **Canada out of the 86 patients with six or more**

9 **features.  And as you pointed out the Stratton**

10 **study showed that there were the 18 deaths in the**

11 **population who had the restraints placed.**

12     Q.   This were no deaths in Canada that were

13 caused by hogtie; correct?

14     **A.   In this study that would be correct.**

15     Q.   So how do you explain the fact that in

16 the U.S. where police hogtie and we got 18 deaths

17 among if you say 86 people, and in Canada where we

18 got 500 and we don't have any deaths, how do you

19 explain that?

20     **A.   Certainly it could be different types of**

21 **evaluations of the data, types of drugs being**

22 **used, populations being studied.  Those are all**

23 **things that happen with epidemiologic studies**

24 **trying to compare one cohort to another.  So just**

**Gary Vilke - December 08, 2017**

214

1  to take one study and compare it to another study
2  and say all things are equal, scientifically you
3  can't do that. But it's something worth taking a
4  closer look at at some point if you can get a
5  study population to compare with.
6      Q.   Well, Doctor, the Canadian study is one
7  which you designed and participated in?
8      A.   I participated in it. I didn't actually
9  design the methodology. I helped the Canadians
10 evaluate their data once they collected it through
11 the police department.
12     Q.   It was your study at least in part;
13 right?
14     A.   I just said that. Yes.
15     Q.   And Dr. Stratton who did the LA study
16 was somebody you whom you put faith because you
17 accepted his numbers?
18     A.   I report what he reported, sure.
19     Q.   So we got 18 deaths in hogtying in LA
20 County, and none in Canada in a much larger
21 population. And my question is how do you -- you
22 know what Occam's razor is?
23     A.   I do.
24     Q.   What's the Occam's razor answer to this

215

1  question?
2      A.   That the excited delirium syndrome
3  killed the people at both sites because that's the
4  only common thing that's going on with them.
5  There's no hogtie up there and somebody died.
6  There's 18 down here and all of them had excited
7  delirium syndrome, not all of them had a hogtie.
8      Q.   Wrong. Down here in Dr. Stratton's
9  study everyone was hogtied?
10     A.   Correct. You asked me the Occam's razor
11 which means you come up with a single diagnosis
12 that covers for all the findings. The only thing
13 that was across the board in all 19 deaths was the
14 fact that they had a state of excited delirium
15 syndrome. Eighteen of them happen to be hogtied.
16 But the only thing that covers all 19 is the
17 excited delirium presentation.
18     Q.   It was cocaine in Canada that caused the
19 death; right?
20     A.   Cocaine was involved in the excited
21 delirium etiology in that one case, sure.
22     Q.   And cocaine is by far in a way the
23 precipitant of the excited delirium that you say
24 results in death; correct?

216

1      A.   Cocaine is the more common drug along
2  with methamphetamine that causes excited delirium.
3      Q.   It's a stimulant, it's a highly potent
4  stimulant; correct?
5      A.   Cocaine is, yes.
6      Q.   LSD is not; correct?
7      A.   I think we went through that. It has
8  some stimulating qualities. But it's classified
9  as a hallucinogen.
10     Q.   But your information is all anecdotal
11 because you have not studied LSD?
12     A.   I have studied about LSD as part of my
13 training in emergency medicine. But I have not
14 studied LSD as an individual topic as part of my
15 research.
16     Q.   So let me ask you a different question.
17 Since the rate -- how many characteristics of
18 excited delirium did Troy Goode have in your
19 opinion?
20     A.   He had I believe at least six of them.
21 He had violent behavior. He had tolerance to
22 pain, consistent physical activity, not responding
23 to police presence. He was defined as having
24 human strength, rapid breathing, did not tire

217

1  despite physical activity. He was sweating. He
2  had a etiology and he was delusional. So all
3  those things would be well over that six mark.
4      Q.   Okay. So in the Canadian study in which
5  you participated there were 86 persons with six or
6  more markers or characteristics; right?
7      A.   Correct.
8      Q.   As with Troy Goode; right?
9      A.   Correct.
10     Q.   So in taking Dr. Stratton's percentage
11 that you relied upon 10 percent of 86 or between
12 eight and nine people statistically should have
13 died?
14     A.   Correct.
15     Q.   From excited delirium?
16     A.   If you used Sam Stratton's numbers
17 extrapolate across that population, that should be
18 eight or nine. Correct.
19     Q.   Well, you did. You used his numbers;
20 right?
21     A.   I reported his numbers as the time the
22 epidemiologic best numbers that we could tell for
23 patients exhibiting those signs. You know, 11
24 percent went into cardiac arrest based on his

**Gary Vilke - December 08, 2017**

218

1  data.

2      Q.   So let's take a break now.  I'll get my
3  notes together and maybe we can wrap up, okay.

4      **A.   Sounds great.  Thank you.**

5          THE VIDEOGRAPHER:  Time off the record
6  is 1:02 p.m.  This ends media number three.

7          (WHEREUPON, A BREAK WAS TAKEN AND THE
8  PROCEEDINGS CONTINUED AS FOLLOWS:)

9          THE VIDEOGRAPHER:  Time back on the
10  record is 1:09 p.m.  This begins media number
11  found.  Counsel, you may proceed.

12          MR. EDWARDS:  Bobbie, would you pull our
13  number 32, please.

14          (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
15  WAS MARKED AS EXHIBIT NO. 26 TO THE TESTIMONY OF
16  THE WITNESS AND ATTACHED HERETO.)

17      **THE WITNESS:  For those on the phone it**
18  **looks like it's the National Association of State**
19  **EMS Officials, National Model EMS Clinical**
20  **Guidelines, Exhibit 26.**

21  BY MR. EDWARDS:

22      Q.   Are you a member of that association?

23      **A.   National Association of State EMS**
24  **Officials, I am not.**

219

1      Q.   You're familiar with these Model EMS
2  guidelines?

3      **A.   I am not familiar with these either.**
4  **No.**

5      Q.   Well, turn over to Page 46.  And if you
6  will please take a minute and read to yourself the
7  patient safety considerations.

8      **A.   Okay.**

9      Q.   Are there -- there are one through
10  twelve points in this section.  Are there any of
11  these with which you disagree?

12      **A.   Disagree versus style I think is your**
13  **question.  I don't disagree with any of them.  But**
14  **I don't think that all of them are absolute.  It**
15  **says patient should never be transported while**
16  **hobbled, restrained, or restrained in a prone**
17  **position with hands and feet behind the back.**
18  **That's their opinion.  I think that there are**
19  **circumstances where that's sometimes the safest**
20  **way to transport somebody.**

21          **And so I'm not a big fan of the never**
22  **aspect of a recommendation or guideline.  The**
23  **absolutes always make me uncomfortable where I**
24  **would tend to disagree with that type of a thing.**

220

1  Otherwise, you know, patients who have received
2  anti-psychotic medication as a chemical restraint
3  must be monitored closely for the potential
4  development of.  You can't measure somebody for
5  ataxia because they're restrained.  Ataxia is an
6  ambulatory issue.  So some of these things are
7  sort of -- sort of odd to be in a thing.

8          But in and of itself it's a reasonable
9  set of things to think about for taking care of
10  somebody who is agitated.  But, again, I'm not a
11  fan of the never and always type of comments.

12      Q.   Well, the reason that -- the reason that
13  they have here never transport while hobbled or
14  hogtied or restrained in a prone position is a
15  patient safety consideration; right?

16      **A.   It is intended to be a safety**
17  **consideration but often times will create more**
18  **problems trying to switch somebody from a hogtie**
19  **position to a non-hogtie position from a scene**
20  **safety as well as an individual safety of the**
21  **patient perspective.**

22      Q.   Well, what is it that you say prevented
23  Troy Goode from being taken off his stomach and
24  put on his side or restrained in four point

221

1  restraints on the stretcher, what prevented that?

2      **A.   They had been trying to put him on his**
3  **sides a number of times earlier by the paramedic**
4  **reports and he kept wobbling back and forth and**
5  **spitting and twisting so that he wouldn't stay on**
6  **his side.  At the hospital the degree of agitation**
7  **and behavior would potentially create more harm to**
8  **try to switch him out than to just give some**
9  **sedation, calm him down, and then have a more**
10  **compliant less resistive person to put in that**
11  **position when decreasing the risk of harm to the**
12  **patient, and two it decrease the harm to the**
13  **individual trying to restrain him.**

14      Q.   You know what every authority we have
15  says don't leave somebody in a prone position, yet
16  you may need to put them down in the prone to
17  control them but then get them out; isn't that
18  correct?

19      **A.   Every single piece, I don't believe**
20  **that's the case.**

21      Q.   Did you read Sergeant Price's testimony
22  his report where he said Troy was trying to turn
23  on his side and he, Sergeant Price, held him down
24  on his stomach?  Did you read that?

**Gary Vilke - December 08, 2017**

---

**222**

1     A.   I don't recall that specifically.  I do
2  recall him trying to turn him on his side and he
3  kept spitting back and forth.
4          MR. HUSKISON:  This is Berk Huskison and
5  I object to the form of that question.
6  BY MR. EDWARDS:
7     Q.   You didn't read that Sergeant Price
8  prevented Troy from turning on his side; yes or
9  no?
10     A.   I may have read that.  I don't recall
11  the specifics of his commentary on that.
12     Q.   Do you know Sergeant Price's size?
13     A.   I would have to look that up.  I don't
14  know off the top of my head.
15     Q.   Six foot five, 285 pounds, does that
16  sound like Sergeant Price?
17     A.   I still would have to look that up.
18     Q.   Okay.  Orange County EMS policy and
19  procedure for patient restraint -- Orange County
20  is what, is that just above you, it's between LA
21  and San Diego, isn't it?
22     A.   That is correct.
23     Q.   And their EMS policy for patient
24  restraint says that a patient shall be restrained

---

**223**

1  in a supine position or on their side.  Are you
2  aware of that?
3     A.   I am not.
4     Q.   That would be for patient safety,
5  wouldn't it?
6     A.   The intent of their protocol I'm not
7  sure why they chose that.
8     Q.   Well, all these protocols -- we can
9  agree that the EMS should not be placed in a
10  position of peril; right?
11     A.   The EMS should not be placed in a
12  position of peril?
13     Q.   Yes.  Right.  You don't want the EMS to
14  put themselves in a position of peril; right?
15     A.   We want them to be safe, sure.
16     Q.   So once the patient no longer represents
17  a threat, then you turn your attention to the well
18  being of the patient; correct?
19     A.   That's reasonable, sure.
20     Q.   What is a recovery position?
21     A.   The recovery position has been defined
22  by some as taking somebody in a hobble position
23  and rolling them on their side.
24     Q.   You testified to that effect -- did you

---

**224**

1  testify in the Lee versus City of El Monte case?
2     A.   That sounds familiar somewhat.  I don't
3  know if it's trial or deposition testimony.  I
4  can't recall specifically.
5     Q.   Have you ever testified in court?
6     A.   I have.  Yes.
7     Q.   How many times?
8     A.   Probably about 30 to 40 times maybe.
9     Q.   I'm not talking about -- I'm not talking
10  depositions.  I'm talking about going into the
11  courtroom?
12     A.   Yes.  That's what I'm referring to I
13  believe.
14     Q.   Is that what you're talking?
15     A.   Yes.
16     Q.   So 30 to 40 times you have gone into
17  courtrooms throughout the United States in defense
18  of police departments in hogtying cases?
19     A.   No.
20     Q.   In fairness you said some of the cases
21  in which you participated in has been medical
22  negligent cases?
23     A.   Correct.
24     Q.   And in those cases you testified on

---

**225**

1  behalf of the hospital?
2     A.   Or the plaintiff, depending on the case.
3     Q.   Give us the name of a plaintiff where
4  you testified on behalf of?
5     A.   I didn't understand -- you muffled your
6  voice the last bit.
7     Q.   Give us a reference to a case where you
8  testified on behalf of a plaintiff?
9     A.   In deposition or trial or both?
10     Q.   Either.
11     A.   I'd have to pull my Rule 26 report.  It
12  should be in the back there.  I don't have the
13  actual cases listed in front of me.
14     Q.   Would it have been within the past four
15  years?
16     A.   I believe there's some cases in which
17  I've given testimony on a plaintiff's behalf in
18  the last four years.
19     Q.   Okay.  Were you the director of the San
20  Diego County EMS for 2003 to 2006?
21     A.   That's correct.
22     Q.   And as the director of the EMS would you
23  have had the responsibility, among other things,
24  of approving all protocols for EMS?

---

**Gary Vilke - December 08, 2017**

226

1      A.   That would be part of my role.  Yes.
2      Q.   And so the protocols for the San Diego
3  County EMS in effect for 2003 to 2006 would have
4  been approved by you?
5      A.   At some point, yes.  They have a
6  rotating approval.  So if the previous medical
7  director put something through and they're not in
8  cycle to be reviewed, it could be a period and
9  then at some point you generally reviewed them.
10     Q.   In other words, you put your stamp of
11 approval on whatever was put down as a protocol to
12 be followed by EMS?
13     A.   That's what I'm getting at, they rotate
14 through certain intervals for review.  So if it
15 had my stamp on it that would be part of my
16 review.
17     Q.   What is a never event?
18     A.   A never event at least as I understand
19 it is a list of things put out -- I can't remember
20 if it's CMS or one of the regulatory bodies about
21 things that should never happen.  Retain foreign
22 objects I think it falls in that category.
23 There's a list of things that fall into that,
24 that's how they define it.

227

1      Q.   One never event promulgated by CMS is a
2  patient should never die in restraints; correct?
3      A.   That I'd have to look.  It sounds like a
4  reasonable event.  But I don't know if that's the
5  reality or not in their list.
6           THE WITNESS:  This is 50, Bobbie.  Pull
7  that out please.
8           (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
9  WAS MARKED AS EXHIBIT NO. 27 TO THE TESTIMONY OF
10 THE WITNESS AND IS ATTACHED HERETO.)
11 BY MR. EDWARDS:
12     Q.   Doctor, under Table A, Environment
13 Events, death and disability associated with use
14 of restraints within facility.  You see that?
15     A.   I'm working on it.
16           MR. GASS:  Tim, could you please give us
17 the title of what you put in front of the Doctor.
18     THE WITNESS:  I'll say it again.  It
19 probably comes out clearer for me.  It's the CMS
20 Center for Medicare and Medicaid Services CMS,
21 Center for Medicaid and State Operations July 31,
22 2008.  Really it says for Center for Medicaid and
23 State operations, a letter.  It says Dear State
24 Medicaid Director is the title of it.  It's got a

228

1  number SMDL No. 08-004.
2           MR. GASS:  Thank you, Doctor.
3           THE WITNESS:  It's about five pages.
4  BY MR. EDWARDS:
5      Q.   So a never event is a patient -- a death
6  related to a patient in restraints at the
7  hospital?
8      A.   I'm looking for that specifically.
9  There you go.
10     Q.   It's the environmental section, the last
11 one.
12     A.   You're right.  It says death/disability
13 associated with use of restraints within a
14 facility.
15     Q.   Now, Doctor, I'm trying to sum up here.
16 The studies for which you rely to conclude that
17 Troy Goode did not die of any asphyxial event were
18 all of those studies for which you have been
19 involved; is that correct?
20     A.   And there are other studies that I also
21 refer to that I was not involved with that I
22 reviewed.
23     Q.   In all of the studies in which you were
24 involved, Troy Goode would not have qualified for

229

1  participation; correct?
2      A.   That's not correct, unless you're
3  referring to him not being -- I mean, if you're
4  talking about as a person who came off the streets
5  and wanted to participate in a study not on LSD,
6  and acting normal, he could qualify.  If you're
7  talking about somebody on the side of the road
8  going crazy with LSD in his system, then no he
9  would not have been able to participate.
10     Q.   That's what I'm asking you.  That's what
11 we're dealing with, isn't it, this under the
12 influence of LSD?
13     A.   Well, I didn't understand if you were
14 talking about his physiology and background with
15 asthma or if you're talking about the LSD
16 components, that's why I wanted to clarify.
17     Q.   With LSD influence or cocaine influence,
18 or anything else that somebody might use as a
19 recreational drug, those people would not have
20 been proper subjects for your studies?
21     A.   Correct.  We could not use somebody who
22 is under the influence at the time of the
23 research.
24     Q.   And therefore your studies did not

**Alpha Reporting Corporation**

**Gary Vilke - December 08, 2017**

---

**230**

1  address people who were in Troy Goode's state at
2  the time of his restraint and ultimately death?
3      **A.    They do not involve subjects in the**
4  **state of excited delirium syndrome or under the**
5  **influence of LSD.  That part is correct.**
6      Q.    All right, sir.  That's also true of
7  marijuana?  Well, I think we said earlier your
8  opinion forthrightly was that marijuana didn't
9  play any part in Mr. Goode's demise?
10     **A.    Right.  I plan to make no opinion on**
11 **that.**
12     Q.    Well, you've testified in other cases
13 that marijuana doesn't cause death, haven't you?
14     **A.    I tend to leave that alone.  There are**
15 **some data out there that people think that**
16 **marijuana increase risk of sudden death.  I don't**
17 **have enough knowledge based in that area to opine.**
18 **So I just defer any opinion to somebody else who**
19 **may want to.**
20     Q.    Is marijuana legal in your state for any
21 purposes?
22     **A.    Is it legal?  It is legal for some**
23 **purposes, yes.**
24     Q.    And that's true in 28 other states;

---

**231**

1  correct?
2      **A.    I haven't done the recent math, but it's**
3  **certainly getting to that range.**
4      Q.    Okay.  And so, finally, what we have is
5  a study by Dr. Stratton, et al, in LA where 18
6  people in excited delirium and hobble restrained
7  died out of a population of 200, 215, thereabouts;
8  correct?
9      **A.    That's about right.  Yes.**
10     Q.    And in contrast your stay in Canada in a
11 population of almost 500, no person died, no
12 person died except one for cocaine toxicity;
13 right?
14     **A.    If your definition of the 500 as three**
15 **excited delirium syndrome characteristics or**
16 **greater, than yes.  If you're looking at a more**
17 **refined population, it's a smaller group.**
18     Q.    That's fine.  If we use the 86 under
19 Dr. Stratton's study, eight or nine should have
20 died; right?
21     **A.    If the numbers -- if the populations**
22 **were similar, the answer would be that would make**
23 **sense.  Yes.**
24     Q.    But the only difference between those 86

---

**232**

1  in Dr. Stratton's studies were nobody in Canada
2  was hogtied?
3      **A.    That's not the necessarily only**
4  **difference.  Some people in Canada didn't have**
5  **drugs in their system.  There were some potential**
6  **epidemiologic characteristic differences.  But**
7  **from a physical restraint component, there was no**
8  **nobody hobbled or hogtied up in Canada.**
9      MR. EDWARDS:  That's all I have.  Thank
10 you, Doctor.
11     **THE WITNESS:  Thank you.**
12     MR. PHILLIPS:  Does anybody on the phone
13 haves in for Dr. Vilke?
14     MR. MACAW:  No questions for SEP.
15     MR. UPCHURCH:  No questions.
16               EXAMINATION
17 BY MR. HUSKISON:
18     Q.    This is Berk Huskison on behalf of
19 Southaven, I just have one quick question.
20 Doctor, looking at your expert report you've got
21 several findings, but one of those findings is the
22 one I just want to ask you about.  You conclude
23 that the prone maximal restraint positioning did
24 not cause the sudden cardiac arrest and death in

---

**233**

1  Mr. Goode; is that correct?  Do you remember that?
2      **A.    I do.  Yes.**
3      Q.    And is that opinion to a reasonable
4  degree of medical certainty?
5      **A.    Yes, it is.**
6      MR. HUSKISON:  Thank you.  That's all I
7  have.
8                FURTHER EXAMINATION
9  BY MR. EDWARDS:
10     Q.    Doctor, it occurs --
11     MR. EDWARDS:  I'm sorry, did I cut
12 anybody off?  No.
13 BY MR. EDWARDS:
14     Q.    I think that it would be -- you did a
15 report and a supplemental report; right?
16     **A.    Correct.**
17     MR. EDWARDS:  Bobbie, let's mark both of
18 those as separate exhibits, please.
19     (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
20 WAS MARKED AS EXHIBIT NO. 28 & 29 TO THE TESTIMONY
21 OF THE WITNESS AND IS ATTACHED HERETO.)
22 BY MR. EDWARDS:
23     Q.    Doctor, in one of those, I don't
24 remember whether it was the original or the

---

**Alpha Reporting Corporation**

**Gary Vilke - December 08, 2017**

**234**

1 supplemental, you gave an unsupported opinion that
2 there was no requirement of one-on-one observation
3 of Mr. Goode. Do you recall that?
4     **A.    Sounds familiar.**
5     Q.    What's the basis for that conclusion?
6     **A.    That agitated individuals in an**
7 **emergency department don't require one-to-one**
8 **observation.   They require to be monitored and**
9 **re-evaluated and reassessed.   But you don't have**
10 **to have requirement of somebody sitting in the**
11 **room constantly watching that person.**
12     Q.    No, you don't.   You can have video,
13 can't you?
14     **A.    That is another option to use if you**
15 **want to, sure.**
16     Q.    Yeah.   And you can also have remote
17 monitoring of the ECG and the pulse oximetry;
18 right?   You can have that?
19     **A.    Telemetry monitoring is a piece of**
20 **equipment that is available, sure.**
21     Q.    Right.   Or you can have somebody who was
22 not actually in the room but had a visual on the
23 patient?
24     **A.    If you're calling it a one-on-one, they**

**235**

1 **have to have undivided attention.   But that's**
2 **another way of doing it, sure.**
3     Q.    So when you say your opinion that he
4 didn't need one-on-one observation by a trained
5 medical person is what you're referring to; right?
6     **A.    Correct.**
7     Q.    You're not saying that he didn't need
8 to -- his pulse oximetry didn't need to be
9 monitored, are you?
10     **A.    I'm saying that he needed to be**
11 **monitored visually, and that when with either a**
12 **change in status or when he's more calm to then be**
13 **monitored with the more traditional electronic**
14 **monitoring equipment.**
15     Q.    Okay.   So your opinion in your report
16 was limited to the one-on-one visual by a trained
17 medical person?
18     **A.    Somebody in the room is how most people**
19 **define on one-on-one, like an ICU level nursing**
20 **immediately there.**
21     Q.    Okay.   And you've looked at the CMS
22 guidelines on that, have you?
23     **A.    I have not looked at the CMS guidelines.**
24 **I was referring to practice in a typical emergency**

**236**

1 department.
2     Q.    Well, one second please.   Doctor, I do
3 have one other question, it just occurred to me,
4 I'm sorry.   There's so much material here I think
5 you can understand it's difficult to cover all the
6 basis.   But I have one last thing for you.   After
7 sedation, and I'm talking about in your experience
8 since you refer to that a great deal, in your
9 hospital people in the excited delirium state who
10 have been sedated never died; is that correct?
11     **A.    No.   People in excited delirium have**
12 **died.**
13     Q.    I am quoting from your testimony in the
14 case of Lee versus Nashville Metropolitan
15 Government where you said you have not had any
16 patients in excited delirium die after being
17 sedated; true or not?
18     **A.    I have personally had somebody die in**
19 **the process of trying to get them sedated but not**
20 **once they become sedate, no.   That would be a true**
21 **statement.**
22     Q.    Okay.   So you're talking about somebody
23 dying while you're in the process of administering
24 the sedative?

**237**

1     **A.    Correct.   Before they become sedate.**
2     Q.    But thereafter, you haven't had anyone
3 pass away?
4     **A.    Knock on wood, yeah.   Correct.**
5     Q.    Have you had any deaths due to prone
6 positioning in your hospital?
7     **A.    To prone positioning at my hospital?   I**
8 **don't know the totality of cases at my hospital.**
9 **So I guess it's possible that something have**
10 **happened that somebody died while being in a prone**
11 **position, OR or something like that.   But I don't**
12 **know the answer to that.**
13     Q.    Let me ask it a different way.   I said
14 due to prone positioning.   Have you as -- have you
15 had a patient that died while in a prone position
16 in your care?
17     **A.    I don't think so.   I mean, certainly not**
18 **an agitated or sedated person that way.   I'm just**
19 **trying to think of anybody I had to be on their**
20 **stomach for any particular procedure in the ED**
21 **that might have died.   And I can't off the top of**
22 **my head come up with something.   The best answer I**
23 **can come up with is I don't recall any.   No.**
24     Q.    All right.   Have you ever had the

**Gary Vilke - December 08, 2017**

238

1  occasion to report to CMS on death of a patient in
2  restraints?
3      A.   Have I personally?  No.  Not -- again,
4  not that I recall from my career that happening,
5  no.  Has any been reported from our hospital, it's
6  possible.  But I'm not aware of it.
7      Q.   Are you aware of the requirement under
8  the Code of Federal Regulations that death in
9  restraints be reported to CMS?
10     A.   It's I believe on one of the lists of
11 the things that they have to have to be reported.
12 I'm familiar with the list.  I think that is on
13 there.
14     Q.   Whether they are in law enforcement
15 restraints or hospital restraints it has to be
16 reported; correct?
17     A.   That's what where I think the language
18 does not specify.  So I would defer to regulatory
19 to make that decision if that needs to be reported
20 or not.
21     Q.   Have you ever received any CMS, you or
22 your hospital received any CMS warning letters
23 about operational difficulties?
24     A.   I have not received any letters from

239

1  CMS.  I would not necessarily know what my
2  hospital has received because all those types of
3  things are determined usually through regulatory
4  and administration.  So I am not thinking off the
5  top of my head of anything that I'm aware of.
6  Could there have been an e-mail that came out from
7  a chief medical officer at some point in the past
8  about something, it's certainly possible.  But I'm
9  not recalling anything off the top of my head.
10     MR. EDWARDS:  Thank you, Doctor.
11     THE WITNESS:  Thank you.
12     THE VIDEOGRAPHER:  We're going off the
13 record.  This concludes the videotaped deposition
14 media number four.  The time is 1:37 p.m.
15
16
17
18
19
20
21
22
23
24

240

1           C E R T I F I C A T E
2  STATE OF TENNESSEE    )
                         )
3  COUNTY OF SHELBY      )
4
        I, BOBBIE HIBBLER, LCR #029, CSR, Licensed
5  Court Reporter, in and for the State of Tennessee,
   do hereby certify that the above deposition was
6  reported by me, and the transcript is a true and
   accurate record to the best of my knowledge,
7  skills, and ability.
8       I further certify that I am not related to
   nor an employee of counsel or any of the parties
9  to the action, nor am I in any way financially
   interested in the outcome of this case.
10
        I further certify that I am duly licensed
11 by the Tennessee Board of Court Reporting as a
   Licensed Court Reporter as evidenced by the LCR
12 number and expiration date following my name
   below.
13
        I further certify that this transcript is
14 the work product of this court reporting agency
   and any unauthorized reproduction and/or transfer
15 of it will be in violation of Tennessee Code
   Annotated 39-14-104, Theft of Services.
16
17
   _____
18 BOBBIE HIBBLER, LCR #029
   Expiration Date 07-01-2018
19
20
21
22
23
24

**Alpha Reporting Corporation**

**Gary Vilke - December 08, 2017**

---

### Exhibits

Exhibit 1
Exhibit 2
Exhibit 3
Exhibit 4
Exhibit 5
Exhibit 8
Exhibit 9
Exhibit 10
Exhibit 11
Exhibit 12
Exhibit 13
Exhibit 14
Exhibit 15
Exhibit 16
Exhibit 17
Exhibit 18
Exhibit 19
Exhibit 20
Exhibit 21
Exhibit 22
Exhibit 23
Exhibit 24
Exhibit 25
Exhibit 26
Exhibit 27
Exhibit 28
Exhibit 29

---

### 0

**08-004** 228:1

---

### 1

**1** 8:1 190:11

---

**1.7** 91:1

**10** 87:10 125:1 131:14 180:5 192:8 204:2 217:11

**10:25** 111:7

**10:33** 111:11

**11** 117:9 125:6 217:23

**11:30** 156:14

**11:35** 156:18

**12** 53:12,13,14,16,23 148:17

**12-lead** 52:18 54:9

**13** 150:15 188:19

**137** 190:10

**1392** 179:5

**14** 151:5 199:12

**140** 191:24

**141** 191:6

**15** 113:4 123:6 154:11 158:7 163:20 164:9 166:14,19 167:2 168:2 197:5,6,7,8

**150** 31:11 185:11

**16** 170:7 173:14 174:15 193:8

**164** 73:16,17

**165** 171:13

**167** 172:7

**168** 173:10 174:21

**17** 50:24 124:22 178:2

**170** 31:9

**170-pound** 80:7

**18** 180:7 188:24 206:17,19,21 207:5,18, 21 208:2 212:8 213:10, 16 214:19 215:6 231:5

**1800s** 40:2

**188** 206:7,23 208:6

**19** 184:2 188:24 189:4 205:17 215:13,16

---

**1900s** 40:2

**1980s** 39:15

**1993** 146:22

**1996** 206:16

**1997** 10:24 155:7 156:22 165:21

**19th** 38:9

**1:02** 218:6

**1:09** 218:10

**1:37** 239:14

---

### 2

**2** 47:20 52:24 53:6 69:9

**2-1a** 126:17

**20** 72:23 116:17 188:21

**200** 231:7

**2001** 204:24 205:17

**2003** 225:20 226:3

**2005** 48:6

**2006** 225:20 226:3

**2008** 169:22 227:22

**2009** 150:20

**2012** 139:18 143:23

**2014** 199:21

**2015** 98:4 189:6 208:21

**2017** 8:6

**2018** 94:7

**2028** 56:1

**21** 193:11

**2106** 56:2

**2139** 50:22

**214** 206:9 212:7

**215** 231:7

**216** 206:11,17 207:16

**22** 197:14,15,17

**221** 100:22

---

**23** 116:1 199:14

**24** 80:14 205:8,12

**25** 97:3 209:2

**250** 79:11

**26** 147:3,8 218:15,20 225:11

**27** 147:3,9 227:9

**28** 230:24 233:20

**285** 222:15

**29** 233:20

---

### 3

**3** 74:1 181:9 200:13

**30** 48:6 72:16,23 202:3 224:8,16

**31** 227:21

**32** 218:13

**34** 211:13

**35** 202:4

**350** 8:8

**36** 56:3

**37.4** 196:8,16

**39.6** 194:3 196:23

**3:17-cv-060-dmb-rp** 8:9

---

### 4

**4** 75:2 88:14 111:13 190:23

**40** 78:11 193:16,20,22 194:13,20 224:8,16

**43** 205:6

**44** 208:24

**45** 78:11 203:20

**46** 219:5

**48** 125:4

**49** 183:24

---

**Alpha Reporting Corporation**

**Gary Vilke - December 08, 2017**

**499** 209:21

---

**5**

**5** 87:22 90:18 190:23

**5.5** 211:13

**50** 97:3 227:6

**500** 210:17,21 212:14, 16 213:18 231:11,14

**51** 36:22

**530** 8:7

**54** 195:11

**57** 191:22 192:15

**585** 166:4

---

**6**

**600** 210:4,17

**60s** 36:12 38:15,17,21

**67-year-old** 198:10

**69-year-old** 198:11

---

**7**

**7** 98:15

**70** 108:2,17 190:13 203:3

**70-year-old** 198:11

**70s** 36:12 38:15,17,21

**76** 200:22 203:3

**78** 200:22

---

**8**

**8** 8:6 116:4,5,19 126:14

**80-year-olds** 174:18

**80s** 38:13

**85** 77:20 195:11

**86** 209:24 212:21 213:8,17 217:5,11 231:18,24

**8:02** 8:7

---

**9**

**9** 117:12

**90** 76:21 77:2,13,16,24 78:10 113:14 127:5,10, 16,17 131:7,20 132:6, 13,18 133:11,13,22 134:19,23 138:7 186:16 187:2,3,8,13, 14,19 200:14,18 201:21

**90-year-olds** 174:17

**92** 114:11 187:2

**92101** 8:8

**93** 113:4,11 187:1,17, 18

**95** 50:23 186:22

**96** 114:10

**97** 187:1

**97.67** 195:9

**99.9** 26:17

**9:22** 69:5

**9:30** 69:9

---

**A**

**a.m.** 8:7 69:5,9 111:7, 11 156:14,18

**AAFS** 98:4

**abdominal** 60:10,18 163:11 175:1,10

**ABG** 136:6,14 137:3,9 138:4,8,12

**ability** 85:17,19,23 167:15,22

**abounds** 184:22

**ABOVE-MENTIONED** 47:19 73:24 75:1 87:21 98:14 116:18 117:11 124:24 125:5 148:16 150:14 151:4 154:10 170:6 178:1 180:6

184:1 188:20 193:10 197:16 199:13 205:7 209:1 218:14 227:8 233:19

**absolute** 80:13 128:6 131:18 132:1 144:12 219:14

**absolutely** 37:3 46:5 138:16 161:4 170:17

**absolutes** 131:22 219:23

**abuse** 149:21 152:5

**abusers** 154:1

**abusive** 105:6

**academic** 151:23

**accept** 33:21 83:12

**acceptable** 46:8

**accepted** 11:21,23 12:3,6 214:17

**access** 34:9 139:4 142:7

**accompanying** 57:11

**accomplished** 151:22

**account** 26:17

**accumulates** 108:18

**accurate** 30:14 31:14 43:8 54:15 73:21 76:4 97:12,15,21 133:11 168:20 196:16

**accurately** 134:5

**accused** 159:2,3

**ACEP** 17:13,16,21 150:19

**achieved** 138:20 140:22

**acid** 20:19

**acidosis** 19:10,14 20:15 122:23 123:17

**acknowledge** 162:24

**acknowledged** 160:17

**acknowledging** 167:7

**ACLS** 181:19,21,23 182:10,13,15 183:10, 15,19

**act** 15:11

**acting** 229:6

**action** 61:12,14 132:19

**activities** 19:2 42:1

**activity** 13:4 182:4 188:4 216:22 217:1

**actual** 151:10 152:11 225:13

**acute** 34:5 45:1 96:9, 10 104:18 124:19,20 127:6 128:7,10,11,15 138:5,16 189:4

**acutely** 128:8

**add** 202:15

**adding** 175:14

**addition** 168:15

**address** 67:20 99:8 230:1

**addressed** 163:11,15

**addressing** 76:14 181:19,21

**adds** 202:18

**adequate** 54:5 138:19 140:21

**administer** 56:20 57:14,23 58:14 70:20 71:5

**administered** 32:23 69:22 77:8 114:13 124:12

**administering** 76:8 236:23

**administration** 70:3,7 77:5 124:8 239:4

**administrations** 70:24

**admitted** 78:9 160:12

**adopted** 9:22 126:5

---

**Gary Vilke - December 08, 2017**

**adult** 185:1 189:4

**adults** 45:13 148:2

**advantage** 34:9,17

**advantageous** 164:23

**adverse** 202:24 203:8

**advised** 91:5

**affect** 71:5,7 177:4,6, 12

**affected** 176:6

**affects** 157:24 174:4

**affirm** 9:4

**affirmative** 208:5

**age** 36:21

**agency** 33:16,19

**agent** 120:16 121:17 122:10

**agents** 123:11

**agitate** 93:1

**agitated** 27:17 28:20 30:9 38:8,18 40:11 45:2 58:22 59:1,4 68:20 71:16 74:14 79:12,19,24 80:3 93:4, 9 104:18 106:1 133:10 220:10 234:6 237:18

**agitation** 19:13 20:17 49:15 50:8,10 68:8 74:22 76:16 90:23 91:1 92:3,4,6,8,16 93:1,3,7 138:5 168:15 221:6

**agonal** 22:3 85:23 86:3

**agree** 20:3,22 23:11 34:12,13,14,18,22 35:6,9,12,16 37:6,8,22 39:14 42:9 61:6 65:11 97:5,6,20 103:22 106:14 108:23 110:17 113:10,17 114:20 116:22 118:11 119:11 120:12 123:8,13 131:5, 14,24 132:12 139:6 140:1,13 141:12,13,18 143:16 145:6 146:9,12 149:6 163:3,12 164:13 169:9 171:8 174:4

179:5,10,13 180:18 181:2 203:2 213:6 223:9

**agreeable** 180:20

**agreed** 21:16 35:5,7

**ahead** 105:12 111:4 141:17 148:8,20 151:2 156:11 175:24 176:13

**Ahern** 148:23

**air** 89:16 130:9,13 133:2 194:6

**airway** 115:5,9 127:2 131:9,13 132:8 186:2,7

**alarms** 90:12

**algorithm** 125:19,21 126:18 127:15 182:13 185:2 189:5

**alive** 24:15 62:20 63:3 64:10 130:19

**allegedly** 99:3 158:16

**allowed** 118:20 165:16

**alluded** 68:16

**alterations** 165:24 167:10,14 168:14

**altered** 41:10 48:22 103:16

**alternating** 64:21 65:2,8,10

**alternative** 35:17,18

**amazing** 195:4

**Amazon** 98:12

**ambulance** 57:15 58:15 60:3 62:1,10 63:1 64:4 73:11

**ambulatory** 220:6

**American** 181:14 189:6 190:18 192:22 205:16

**amount** 64:18 136:12 171:16 194:6 209:13

**amounts** 108:7

**amphetamine** 26:16

**amphetamines** 39:20

**amputation** 128:12

**and/or** 127:3 161:11 211:16

**anecdotal** 149:12 152:18 216:10

**anesthesia** 169:22 170:19 171:4 172:12 173:16,22 174:9,15 175:23

**anesthesiologist** 173:6 174:2,12

**anesthesiology** 170:13

**anesthetic** 172:11

**Angeles** 206:10 212:6

**ankle** 59:19 211:15

**annually** 91:2

**answering** 66:16,22 86:15

**answers** 46:10

**anterior** 181:1

**anti-psychotic** 220:2

**anti-psychotics** 33:9 40:11,19 76:8

**anticipate** 203:14

**Antonio** 13:12 16:2

**anxiolytic** 114:18

**anymore** 153:4,9

**apneic** 127:4

**apologize** 76:2 82:17 91:3 123:7 131:4 133:18 153:21

**apparently** 24:15

**appeared** 24:21

**appearing** 93:2

**appears** 29:20 92:14 205:15 207:9

**applicability** 113:8

**applicable** 61:23 62:2 174:18 177:9

**application** 63:9,12,15 81:17

**applied** 62:11,19 75:23 120:7

**apply** 62:6 68:5 168:6 173:18

**applying** 190:1

**appreciation** 108:4

**apprehended** 168:17

**approach** 26:23 110:15 125:16

**appropriately** 130:13

**appropriateness** 185:9

**approval** 226:6,11

**approved** 226:4

**approving** 225:24

**approximate** 210:21

**approximately** 8:7 56:2 116:17 163:20 204:2

**area** 10:16 13:14 60:14,15 103:1,2 121:6 155:12 160:22 170:13 230:17

**areas** 48:16 81:16 114:23

**argue** 45:15 97:13 203:4

**argumentative** 105:6

**arm** 35:20

**arms** 118:6,7 190:3

**arose** 155:19

**arrest** 11:13 12:21 15:14 19:15 21:22 41:5 51:9,11,15 62:23 63:18,22 64:13 65:7,24 66:19,20 67:5,6,7 87:14 88:11,15,20,21 93:24 95:3 96:2,8 104:3 122:24 135:14 137:5,10 138:21 139:8, 23 161:2 206:20 207:21 217:24 232:24

**Gary Vilke - December 08, 2017**

arrested 99:4,7 160:15
161:11,14

arrival 27:20

arrived 27:13,22 55:23
56:1 124:6 141:1,6

arrives 44:16

Arterial 136:8

arteries 95:8

artery 95:7 171:24

article 124:22 146:22
147:2,4,5,6,8 148:15,
22 149:1,4,7,8,10
169:22 178:6 197:8,20
199:19,20

articles 18:4 146:20
153:4 169:6,7 201:1
202:23

artifact 31:6 32:10

aspect 151:12 212:4
219:22

aspects 126:3 161:21
176:21

asphyxia 47:6 81:21
82:7,10,13,19 136:18,
21 157:11 165:20

asphyxial 228:17

asphyxiate 82:22

asphyxiated 63:18

asphyxiation 63:9,11,
15 146:23 157:18
159:24

ass 184:22

asserted 36:8

asserting 122:20

assertion 175:5

assess 48:24 89:18
131:24 141:23 144:20
146:14 185:9

assessed 49:12 64:8,9
85:3 141:24 144:24

assessing 49:6 61:14
62:18 135:18,22

assessment 12:22
29:10,13 49:2,9,20
57:1 62:4 89:14 138:20
139:2,9 142:20 144:17,
19,22 145:1,5 146:10

assessments 54:24

assist 186:2

assisted 79:23

association 164:14
189:6 218:18,22,23

assume 21:4 32:3
57:22 118:4 119:7

assuming 112:12
137:4 181:13 196:16

assumption 119:19

assured 115:6

asthma 96:10,13,17,22
158:8 229:15

ataxia 220:5

Ativan 75:20 114:14,
17,21 116:9,15

attached 8:2 47:21
74:2 75:3 87:23 98:16
116:20 117:13 125:2,7
148:18 150:16 151:6
154:12 170:8 178:3
180:8 184:3 188:22
193:12 197:18 199:15
205:9 207:3 209:3
218:16 227:10 233:21

attachments 45:8

attack 96:10 128:11

attacks 200:10 201:5

attempt 135:6

attempted 29:9 47:5
101:11 172:10

attendant 92:21

attention 223:17 235:1

attorney 88:4

attributable 37:24
38:18 39:17

attributed 37:11
207:13

audio 116:12

Austria 193:4

author 74:24 93:11
157:5 188:17 189:3
205:15

authored 88:1 93:18

authoritative 17:5,11,
22 18:9 25:18 162:9

authority 122:9,19
187:7 221:14

authors 94:15 98:23
162:14 209:10 212:2

autopsies 13:23
103:11

autopsy 11:9 13:21
16:11 99:21 101:14
106:14,23 108:11
173:3

availability 118:17

avoid 27:3 118:8
177:5,13

avoiding 26:23

aware 9:18,24 10:1
13:10 16:4 29:12,14
33:12 41:16 42:19
43:16 45:16 46:22
47:24 48:19 51:14
69:23 70:9 76:17 98:5
107:8,17,23 108:16
124:4 126:4,6 145:20
146:8 169:14 170:24
176:12 223:2 238:6,7
239:5

awareness 41:20
43:4,7,21 44:8,10

___

**B**

back 21:1,7 38:9 61:12
62:1,10,11,24 64:4,17
69:8 85:6 97:3 111:10
114:12 119:9,14,20
130:22 148:12 150:4
156:17 163:17 175:20
189:23 190:24 218:9
219:17 221:4 222:3
225:12

background 22:24
36:20 59:7 156:22
229:14

backgrounds 169:19

bad 103:23 104:12
169:13 192:9,10

bag 23:15

Baggett 23:20 86:9,11,
16,19 89:7,19

Baker 133:23

bands 211:20

Baptist 45:14 84:22
119:4,5,8,18 126:4

Barnett 117:4 180:11
189:3

Barnhart 16:20,24
101:13 107:10,18

based 22:17,18,20
37:21 49:21 53:11,24
68:10 74:24 80:17
81:14 88:7 102:17
105:14 106:21,24
113:2 124:18 127:13
128:5 129:5 132:15
135:23 139:13 154:7
155:2 166:16 167:5
168:21 178:16 181:9
186:19 190:11 192:3
196:9 217:24 230:17

baseline 179:17
192:10

basic 23:1 86:7,13

basically 22:1,15 52:3
70:22 76:24 78:14
81:23 85:24 88:23
89:2,16 106:16 135:18
136:2 145:11 146:3
147:22 149:19 157:12,
23 173:15 186:5
190:17 192:23

basis 103:8 120:3,20
121:11 142:19,21
179:22 234:5 236:6

bath 26:7

bean 80:7

**Gary Vilke - December 08, 2017**

**beat** 22:2,7

**beating** 13:1 201:17

**beats** 185:11 200:22 202:2

**bed** 195:18

**bedside** 50:22 51:16, 23,24 52:15

**begin** 23:15 173:1

**begins** 69:9 156:18 218:10

**behalf** 225:1,4,8,17 232:18

**behave** 15:11

**behaving** 54:10

**behavior** 53:24 67:2 76:16,23 78:24 97:9 216:21 221:7

**behavioral** 32:24

**behaviors** 19:2 25:23 37:13,14

**Bell's** 40:4

**beneficial** 19:19 20:8

**benefit** 45:5 80:7 124:16 170:12

**bent** 21:7

**benzodiazepine** 114:18

**benzodiazepines** 33:8 115:2

**Berk** 142:16 222:4 232:18

**Berkley** 9:1

**Bexar** 13:12

**big** 20:16 92:2 219:21

**biggest** 190:13

**binded** 204:15

**binding** 33:21

**biomarker** 106:11 107:21 108:12

**bit** 21:14 120:13 162:8 225:6

**black** 69:24 70:22 73:23

**blank** 143:12

**bleed** 176:21,23

**bleeding** 175:2,13 176:3,16,19 177:7

**blipping** 90:8

**bloated** 31:16

**blockages** 95:7

**blocked** 203:15

**blood** 14:20 51:22 60:11 64:10 72:13,21 73:3,8,10,11,18,19 78:23 95:21 112:9 136:8,12 171:17 172:1, 2,10,21 178:16,17,19 186:14,16 188:1 191:15 195:11 196:9, 19

**bloodstream** 114:4

**blow** 194:6

**blue** 22:10

**BMI** 80:14

**board** 13:15,17 133:8 196:3 215:13

**Bobbie** 47:12,13 90:17 98:9 100:10 111:12 115:24 117:9 124:21 148:15 150:12 151:2 153:6 154:9 170:4 177:23 180:4 183:23 188:18 193:8 197:4 199:10 205:6 208:24 218:12 227:6 233:17

**bodies** 226:20

**body** 31:18 80:17 101:10,20 102:18 104:1,9,15 106:2 109:12 171:18 184:4 190:2

**book** 16:8,14,18 93:14, 15 98:8,10,18,19,22 99:10 104:20 106:4,10 162:15 204:15

**books** 16:3,6

**borderline** 60:11

**bottom** 159:20,23

**bounce** 72:20

**bouncing** 105:19

**bound** 21:6,7 42:2 207:3

**box** 69:24 70:22 73:23 126:23 127:8 143:12

**bradycardic** 65:22 66:24 67:2,3,5

**brain** 14:20 106:17 107:1,8,14,23 108:3,18 136:1 178:21,24

**break** 69:2,6 91:23 111:2,8 156:15 175:6 182:18,23 218:2,7

**breathe** 24:8,9 74:13 130:10 167:15,23

**breathing** 71:6,8,15, 24 85:22,23 86:1,3 89:4,16 115:9 121:15 129:23 130:2,11,24 131:7,13 132:6 133:6 186:2,5 216:24

**bridge** 19:6

**bridging** 95:8

**bring** 146:17

**bringing** 20:8

**Britain** 180:11

**broad** 170:21 171:2

**broader** 120:13

**brochure** 98:4

**brought** 146:19,20

**brush** 171:2

**brutality** 98:22

**bugging** 24:16

**building** 20:19

**buildings** 37:16

**butt** 35:20

**butting** 25:15

**C**

**cadence** 22:14

**calcifications** 176:9

**calculated** 80:14

**calculation** 164:5

**California** 8:8 9:14 165:3 209:15

**call** 52:10 116:24 171:6

**called** 51:1 193:24

**calling** 234:24

**calls** 183:15

**calm** 32:18 33:9 68:9, 14,21 114:19 124:1 135:2,13 221:9 235:12

**calmed** 22:9 188:12

**calming** 20:8

**Canada** 208:15 209:12 211:20 212:12 213:1,4, 8,12,17 214:20 215:18 231:10 232:1,4,8

**Canadian** 209:21 210:19 211:2 212:13 214:6 217:4

**Canadians** 208:19 211:8 214:9

**candidate** 59:5

**capacity** 190:10 193:17 194:1,5,13 196:22

**car** 163:8,17

**carbon** 159:19

**cardiac** 11:13 12:21 15:14 19:15 21:22 41:5 51:9,10,15 52:18 62:23 63:17,21 64:13 65:6, 14,24 66:3,14,18,19,20 67:5,6,7 87:14 88:11, 20,21 89:24 95:3,6 96:2,8 104:3 122:24 127:24 135:14 137:5, 10 139:3 140:4 142:3 171:10,16 172:21 173:8,9,17 174:7

**Gary Vilke - December 08, 2017**

175:2,15 176:3,4 178:8 187:24 188:2,3,13 194:17 196:8,17 200:2, 17,20 206:20 207:21 217:24 232:24

**cardiologists** 12:3,4,8

**cardiopulmonary** 138:21 139:23 197:9

**cardiovascular** 65:15 173:8 174:19 176:8 193:5

**care** 11:24 44:16 58:7 104:4 120:4 145:3,23 146:1,2,6,11,14 220:9 237:16

**career** 238:4

**careful** 28:8 139:5 170:22

**carefully** 155:12 195:12

**carries** 178:20

**carry** 145:17

**cars** 163:10

**Carson** 188:16 190:7 191:22 192:17

**case** 8:9,11 9:17 11:5 16:21 19:17 20:1 27:10,11 28:23 29:8 32:11 33:6 38:23 41:23 42:8 43:10 46:12,15, 19,23 47:2,4,9,15 48:1 52:21 53:17,22 55:3 57:12 58:7 61:16 62:17,18 63:14 68:1,6 76:11 77:13,14,18,23, 24 82:5 88:17 96:3 99:12 100:20 109:15, 17,18,23 110:3 113:1,9 124:4 128:19 149:8,12, 14,15 150:1 151:16,18 152:15,23 153:1 155:10,11 158:22 168:24 173:18 181:16 199:6 200:8 211:22 215:21 221:20 224:1 225:2,7 236:14

**cases** 10:10 37:23 43:9 61:9 63:8 70:23 94:21

110:12 152:4 154:6 169:1 175:10 224:18, 20,22,24 225:13,16 230:12 237:8

**categories** 91:24 92:2 105:15 124:18 125:13 182:24

**category** 107:18 182:17 226:22

**causation** 62:23

**caused** 19:11,14 25:24 38:19 70:24 158:16 185:19,20,21 190:9 213:13 215:18

**causing** 17:14 19:12 42:7

**cava** 171:23 174:23 177:13

**caveat** 181:13

**ceased** 129:22 130:2

**cell** 89:20 95:15

**cells** 95:20 114:5

**center** 32:22 33:11 83:6 107:14 178:7 227:20,21,22

**Century** 38:9

**certainty** 46:4 233:4

**certification** 13:18

**certified** 13:15

**cetera** 97:9 106:5

**chain** 21:8

**chained** 42:11

**chains** 43:13,15

**challenging** 35:23

**Chan** 96:16 154:20 155:6 156:1,22,24 157:4,21 165:21 169:3

**chance** 105:8 113:7 129:7,20

**change** 22:2 71:5,14, 18 85:20 86:1 88:23,24 89:2,4,9,12,17,23 90:3, 8 128:16 164:11

167:14,20 170:24 190:9,13 200:19,23 202:2 235:12

**changed** 72:19 174:16

**changing** 195:17

**chapter** 126:1 153:10

**chapters** 16:7

**characteristic** 232:6

**characteristics** 15:18,21,22 44:15 92:18,22 93:4,8,10 94:23 100:23 108:10 135:19 216:17 217:6 231:15

**characterization** 102:8

**chart** 124:14

**check** 30:20 50:2,11, 19 51:19 52:12,14 78:3 112:11 137:11 142:11 208:11 210:13

**checked** 50:4 66:18 73:8,13 135:4 191:15

**checklist** 44:2

**cheek** 109:11

**chemical** 32:18,24 33:2,4,8 57:14,23 58:14 59:2 69:13,14,17 71:21 74:6,12 75:22 76:20 80:22 81:2 111:21 112:8,14,15,20 114:12 183:15 220:2

**chemically** 84:2

**chemistry** 37:21 51:14

**chest** 118:8,21 181:1,5

**chicken** 190:2

**chief** 157:5 239:7

**chiefs** 164:14

**chose** 102:19 223:7

**chronic** 153:23 197:10

**circulatory** 84:13

**circumstances** 58:14 65:1 77:10 144:20

171:1 219:19

**cites** 149:16

**city** 8:12 46:16 47:7,15 48:2 110:2 158:15 224:1

**Civil** 110:12

**claim** 156:3

**claimed** 39:12

**clarify** 229:16

**class** 82:23

**classification** 14:14

**classified** 102:24 121:20 216:8

**clear** 87:2,6

**clearer** 227:19

**clinical** 15:9 78:5 97:10 107:5 125:17 127:4 131:19 132:10, 16,21 133:3 135:23 136:2 144:15 185:10, 22 197:1,11 198:8 202:9 203:7 218:19

**clinically** 34:20 72:18 135:17,19 151:15 154:17,21 155:3 159:14 167:20 196:12, 17,23 198:20 200:24 201:8 202:1,6,24

**close** 112:15 189:19 194:23 207:1

**closely** 115:6 128:4 220:3

**closer** 31:11 210:17 214:4

**closest** 190:6

**clot** 14:20

**clothing** 49:20

**clotting** 175:14

**CMS** 83:7,16,20 84:1,2, 17 145:20 146:7 226:20 227:1,19,20 235:21,23 238:1,9,21, 22 239:1

**Gary Vilke - December 08, 2017**

**CO2** 155:3 191:14 197:3

**Coast** 10:8,9

**coasts** 10:10

**cocaine** 26:6,14,16 38:5 39:15,20 121:24 123:11 149:22 152:5 153:24 210:8,11,22 215:18,20,22 216:1,5 229:17 231:12

**code** 50:24 78:14 238:8

**coded** 78:12,17

**coding** 182:6

**cohort** 211:15 213:24

**cohorts** 203:22 211:15

**coinciding** 40:10

**collapse** 64:22 65:3, 11,13,14,15,19

**collateral** 57:6,9

**colleagues** 179:3 193:14

**collected** 214:10

**combative** 19:13 27:17 133:10

**combativeness** 123:9

**comfortable** 107:4

**commenced** 55:18,22

**comment** 91:16 120:8 154:2 172:13

**commentary** 146:7 181:6 222:11

**comments** 220:11

**common** 26:14,16 90:10,24 91:7,9 100:15 101:5 112:22 121:5 122:12 153:23 184:13 196:2 215:4 216:1

**commonly** 26:3 70:10 122:4 152:5

**community** 97:17 196:4 202:21

**company** 195:16

**compare** 201:24 213:24 214:1,5

**compared** 59:18 179:20 181:10

**comparing** 201:23

**competent** 88:19 107:11

**compilation** 94:18

**complete** 140:19

**completed** 137:18

**completely** 44:5 49:16,19 134:17

**completeness** 98:24

**complex** 90:9 181:22 182:13 183:1,2,4,5,8

**complexes** 182:19

**compliant** 221:10

**complicating** 96:11, 14 102:14

**complication** 174:23 175:8

**complications** 17:1,6, 7,12,23 18:2,10 37:24 102:5 175:3 176:17

**component** 49:16 175:19 232:7

**components** 121:23 161:13 175:15 229:16

**compound** 25:12

**compression** 163:11 175:1,10

**concept** 11:16 12:13 14:9 82:3,6,7 172:16

**concepts** 108:5

**concern** 76:24 163:15

**concerned** 83:4 170:14 179:22

**concerts** 37:1,2

**conclude** 190:8 191:1 228:16 232:22

**concluded** 179:4 193:15 199:22

**concludes** 16:10 156:12 239:13

**conclusion** 123:3,7 153:18,19 159:11 162:24 179:13 203:20 234:5

**conclusions** 162:4 178:13,14 179:23 180:14,15,22 191:11 200:4

**condition** 11:22 41:16 49:11 50:9 56:13 77:4 92:14 95:14 185:10 198:15

**conditions** 94:22 95:2,5,23 127:4 160:14 161:1,19 163:1,4,6 170:23 198:2

**conducted** 157:22 159:6 160:3 205:21

**confinement** 118:15

**confining** 118:12

**confrontation** 46:24

**confused** 128:8

**confusion** 42:7

**conjunction** 147:18

**connected** 21:8,9 211:16

**Connecticut** 88:6 169:1

**consecutive** 209:17

**consensus** 97:16,20

**consequent** 175:3 176:17

**consideration** 220:15,17

**considerations** 219:7

**considered** 35:22 37:19 59:15,19 60:22 69:17 71:10,12 76:22 77:7,11 96:13 123:17 139:12 145:22 177:2

187:15 191:2

**consistent** 14:18 15:19 16:1 20:17,18 40:6 67:3 99:23 100:2 106:19 107:2 109:7 134:14 173:9 216:22

**consistently** 66:3 106:18

**constant** 29:4 164:9

**constantly** 234:11

**consumption** 19:19 20:7

**contact** 27:9

**content** 120:2

**contents** 94:13

**context** 26:13 65:16

**continue** 123:14,16

**continued** 19:14 69:7 111:9 123:9 156:16 218:8

**continues** 163:7

**continuing** 20:14 73:2 171:21

**continuous** 115:16

**contoured** 163:10,16

**contradict** 28:13 180:1

**contradiction** 179:19

**contrary** 28:5

**contrast** 212:5,11 231:10

**contribute** 96:8

**contributed** 204:18

**control** 36:4 59:3 138:19 139:1,9 140:22, 23 221:17

**controversial** 11:16 97:11,14

**controversies** 11:18

**COPD** 197:22 198:5, 16,17

**Gary Vilke - December 08, 2017**

copies 184:5,13,14,16

copy 117:8 208:23

core 101:10,20 102:18 104:9,15 106:2 109:12

corner 68:14,19

coronary 95:7

correct 9:14 10:4,9,12, 14 11:7,8,10,12,17,22 12:16 13:2,6,7 14:5 16:13,23 17:3,17 18:11,12 20:9 22:19,23 23:15 24:8,17 26:18 27:1,22 29:5 30:24 31:13 33:22 35:3,17 36:1,2,5,12 38:1,10 39:2,7,23 40:23 41:7, 15 42:3 44:18 45:7,11 46:8 48:7 50:17 51:13 52:6 53:2,15,20 54:23 56:4,5,6,12 57:19 58:1, 15 59:3,12 60:4 61:3 69:15,21 70:4 71:6 73:2,12 75:10,11,20 77:8 78:7,23 79:2,7 80:24 81:21 82:9 83:18 84:3,23 88:12,16 89:1 90:1,4 91:13 92:11 93:9 94:5,24 95:16 96:18 99:5 100:7,14 101:2,9,24 103:12 104:14 105:4 108:13, 24 110:13,21 111:21 112:3,9,13,24 113:14 114:15 115:15,21 122:7,10 123:22 125:15 127:7,13,22 129:16 130:6 134:20 136:15 137:24 138:2,4, 10 139:18 141:3,7 142:13 143:2,8,13,24 144:3,8,18 145:2,9 147:20 148:11 150:10 151:18 154:16 155:8, 17,21 156:3,23 157:2, 11,19 158:17 159:1,2, 7,15 160:6,7,16 161:2, 5,21 162:4,13 163:17, 23,24 164:3,4,6 165:4 166:1,23 167:11,13 168:4 169:3 170:15 171:4,18 172:19 173:2, 4 185:8 186:23 190:10

192:2 193:18 194:4,11 196:10,18 198:9 199:1 201:3 204:3 205:2,24 206:1,8 207:13 208:3, 15 209:7,8,23 210:2,4, 6,8,11,20,24 211:8,21 212:9,15 213:13,14 215:10,24 216:4,6 217:7,9,14,18 221:18 222:22 223:18 224:23 225:21 227:2 228:19 229:1,2,21 230:5 231:1,8 233:1,16 235:6 236:10 237:1,4 238:16

correctly 13:1 29:22 44:12 134:7,16 137:18 185:12 192:21 198:10

counsel 8:15 9:19 10:19 69:10 102:8 111:11 156:6 184:15 218:11

country 107:16 211:20

County 9:14 13:11 155:15 157:1,15 158:18,24 159:7 165:10 205:22 206:10 207:6,16 208:6 209:15 214:20 222:18,19 225:20 226:3

court 8:10 9:3 48:16 169:16 224:5

courtesy 184:14

courtroom 224:11

courtrooms 224:17

cover 98:21 236:5

covers 215:12,16

cracked 131:3

cramped 30:10

crazy 37:15 138:16 229:8

create 49:17 105:19 114:9 123:16 220:17 221:7

created 25:23 98:21 116:11

creates 175:13

criteria 14:14 57:17 58:18,19 107:1 124:19 128:22

criticism 195:23

cuffs 30:10

current 204:8

cushioned 163:8

custody 10:7 14:17 39:7,11 64:6 94:1 102:22,23 153:12 155:20 164:17 205:22 210:19

custom 184:14

cut 59:18 60:16 147:16 148:4 158:4 233:11

cutting 176:21

cyanotic 133:1,6

cycle 64:21 65:2,10 226:8

___

**D**

D-E-I-T-C-H 74:19

dangerous 170:18 171:4,6

dangers 119:10 172:16

Darrell 94:3

data 26:7 126:2 130:12 158:19,20 166:17 172:20 176:11 181:8,9 187:6 192:7,13 193:19 194:15,20 195:1 202:18 212:3 213:21 214:10 218:1 230:15

date 8:6 48:3 94:7

David 119:24

day 38:2

days 63:14,19,22

de 70:24

dead 22:4 36:23 51:3, 5,7

deal 170:16 236:8

dealing 111:19 229:11

deals 136:12

dealt 212:7,13

Dear 227:23

death 11:6 13:21,24 14:2,10,19,22 15:1,12, 13 16:10,12 17:1,6,12, 14,24 18:11 19:3,8 21:16,18,23,24 25:19 26:23 27:3 31:18 34:2 37:10 38:18,19,22 39:5,8 40:9 47:6 50:15, 20 61:18,21,24 62:3,7 63:9,11,14 64:20,21 65:1,9 94:23 95:14,24 96:6 99:14,15,18,22 100:1 101:6,24 102:13, 22 103:4,5,7,9,20,21 106:20 109:20 123:12 158:16 162:9 188:16 191:3,19 205:1,13 208:2 210:4,5,7,18,22 213:7 215:19,24 227:13 228:5 230:2,13, 16 232:24 238:1,8

death/disability 228:12

deaths 10:8,14 37:5 38:6,8,14 39:10,17 70:2,5 93:24 94:1 100:14,15 101:2 153:12 163:2,7 164:16 206:19,21 212:14 213:1,3,10,12,16,18 214:19 215:13 237:5

Deb 107:9,24 135:24

December 8:6

decide 124:11

decision 48:4 125:17 238:19

decontamination 131:1

decrease 71:17 95:20 159:13 171:10 174:7 194:21 196:7,20,22 200:16 221:12

**Gary Vilke - December 08, 2017**

decreased 175:1,15 176:2,4 194:3 200:15

decreasing 20:11 221:11

deem 57:15 58:1 87:3, 7 94:18 95:23

deemed 52:6 60:8 75:15 162:12

default 14:4,6

defective 13:4

defend 156:2 158:15

defendant 22:19 155:16

defendants 9:2,17,23 155:18

defense 10:6 224:17

defer 141:19 230:18 238:18

deficit 179:17

define 15:8 21:23 44:5 67:10 82:19 113:3 121:22 186:20 187:3 189:21 212:18 226:24 235:19

defined 21:5 113:20 126:2 187:16 216:23 223:21

defines 113:11

defining 61:5 67:16 82:11 112:4 114:1 124:7 135:18 136:10

definition 83:5,10,20 86:22,24 212:19 231:14

definitive 138:24

degree 43:20 46:3 88:22 90:7 159:13 174:24 175:9 180:1 221:6 233:4

Deitch 74:19 111:20 112:7 113:10

delay 189:20

delayed 63:9,11

deliberate 172:12

delirious 19:11 44:11 57:7

delirium 11:12,13,15, 20,24 12:9,13,18,20 14:5,9,15,18,24 15:2,9, 17,19,23 16:3,9,11,12 17:14 19:20 26:4,13, 17,24 29:4 34:2,4,5,7 36:9 37:24 38:2,7,8,12, 15,19,23 39:11,16 40:1,6 41:8 42:21 43:12 44:3,16,17 52:6, 8 56:18 60:19,21 64:20 79:12,19 81:24 86:22 87:3,7,16 90:24 91:2,6, 14,18,19 92:14,18,21 93:2,5,9 94:24 95:15, 24 96:3,6 97:17,24 98:20 99:3,14,19,24 100:14,15,24 101:1,6, 24 102:5,13,16 103:24 104:3,6,12 105:2 106:13,20,23 107:3 108:3,9,13 109:19 110:18 122:6 135:16 136:7,10 146:19,23 147:19 148:24 149:3,5, 11,18 150:20 151:15 152:3,18,23 153:11,17 160:15 204:3,6,20 205:2,14,23 206:12,23 207:12 208:8 209:22 210:1 212:17,20 215:2, 7,14,17,21,23 216:2,18 217:15 230:4 231:6,15 236:9,11,16

delivered 110:18

delusion 41:20 42:7 43:19

delusional 41:8,16,18 42:10 43:3 217:2

demand 20:11 77:6

demands 77:4

demise 230:9

demographics 179:16

demonstrate 192:24

demonstrated 81:14 176:11 191:4

Denise 8:12

department 34:18 50:21 55:10 68:12 74:21 80:4 83:11,12 103:8 122:13 125:12 129:5 130:21 155:20, 23 159:21 182:9 214:11 234:7 236:1

departments 10:7,17, 18 56:9 70:11 91:5,8 110:13 224:18

depending 49:14 59:7 72:23 77:10 90:7 91:22 110:9 169:4 187:5 225:2

depends 68:15 113:1 162:5 203:22

deponent 8:14 9:4

deposed 24:1

deposition 102:2,17, 21 130:23 146:16,17 184:10,12,23 224:3 225:9 239:13

depositions 10:4 170:2 224:10

depressed 74:15

depression 74:6,11, 20 111:20,24 112:5,6 114:22 133:5

dermatologists 12:1

describe 40:5 42:20 102:20

descriptions 39:24

design 214:9

designate 15:1

designed 128:23 192:21 195:16 214:7

desire 25:4 155:12

detail 33:17,24 112:10

detailed 43:7

details 47:3 75:8 117:7,19 173:18

demonstrated 81:14 176:11 191:4

180:16,17 189:16 206:2 207:20 210:12

detect 85:17,19 88:19 89:23

detected 165:24

deterioration 198:8

determination 62:6 107:11

determine 13:21 30:1 34:6 61:24 88:21 103:9 106:22 138:9 186:11 197:24 204:11 207:20

determined 239:3

determines 56:18

determining 44:2 53:7 62:2 135:16 136:24

develop 74:5,11 108:10

developed 112:8

developing 112:22

development 220:4

device 194:17 195:15

devices 194:19

devil 43:1

Dharmavaram 178:6 179:3

diabetic 76:12

diagnosed 151:15

diagnosis 14:21 15:19 16:1 53:19,21 54:21,24 55:1,3,8 87:16 97:10 98:21 107:3 135:23 215:11

diametrically 20:1

diaphoresis 109:8

diastolic 72:16 199:23 201:15

die 87:4,8,11 99:3 148:4 150:8 153:2 155:23 160:2 204:3 227:2 228:17 236:16, 18

**Gary Vilke - December 08, 2017**

**died** 11:11 12:19 14:2 46:24 63:18 148:6,9 150:6 155:21 160:1 206:18 207:5,18,21 208:1 210:10 212:8 215:5 217:13 231:7,11, 12,20 236:10,12 237:10,15,21

**Diego** 8:8 9:14 86:17 155:10,15,20 157:1,15 158:15,18,24 159:7,21 169:2 184:18 222:21 225:20 226:2

**dies** 14:11 97:24

**difference** 34:19 119:2 191:12 202:5 231:24 232:4

**differences** 159:17 179:16,18 191:13,14 232:6

**differentiate** 33:3

**difficult** 32:8 34:19 35:19 42:18 43:8 87:13 104:18 194:19 236:5

**difficulties** 238:23

**difficulty** 133:1

**Dimaio** 13:10 16:2,8 35:15 65:17 102:16

**Dimaio's** 34:1

**diminution** 154:21

**dioxide** 159:19

**direct** 17:4,10 86:23 122:15 128:17

**direction** 211:4

**directions** 97:14

**directly** 152:11 168:6

**director** 225:19,22 226:7 227:24

**disability** 227:13

**disagree** 25:2 35:6,10, 13,14 37:8 39:13 65:11 119:11 120:10,12 121:11,13 123:2 131:5, 15 132:2,15 139:6 163:12 169:9 174:4

177:15,17,18,20,22 179:6,10,13,22 180:13, 19 181:2 187:20,23 200:5 219:11,12,13,24

**disagreed** 169:11

**disc** 156:7

**disclose** 159:5

**disclosed** 9:16,21 159:8,9

**disease** 34:8 197:11 200:11 201:6

**diseases** 96:5,7

**disorder** 75:24 76:9

**disorders** 92:1,7 135:21 175:14

**disprove** 134:18

**disproves** 133:13

**disregard** 54:12,14, 18,20 55:10

**disregarded** 55:13

**disrupt** 49:16

**disrupting** 130:20

**dissect** 140:20

**dissenting** 97:19

**distance** 21:10

**distress** 81:20 85:18, 20 127:5 131:6 132:5

**District** 8:10,11

**divided** 171:17

**doctor** 9:10,13 10:3 17:9 19:16 23:11 28:11 39:14 46:2 47:23 54:1 56:19,22 61:17 66:12 69:12 74:4 75:5 77:2 80:22 82:12 86:14 88:1 90:23 98:18 102:11 105:12 106:3 111:13, 15 116:22 117:15 125:9 130:23 136:4 146:24 148:20 150:18 154:14 156:21 165:19 170:10 175:17 178:5 180:10 185:1 189:7,10 197:20 199:17 203:10

**205**:18,21 209:7 211:1, 7 214:6 227:12,17 228:2,15 232:10,20 233:10,23 236:2 239:10

**doctor's** 98:10

**doctors** 113:18,22 151:19

**document** 47:19 73:24 75:1 87:21 98:14 102:20 116:18 117:11 124:24 125:5 143:10 148:16 150:14 151:4 154:10 170:6 178:1 180:6 184:1 188:20 193:10 197:16 199:13 205:7 209:1 218:14 227:8 233:19

**documentation** 101:10 109:6

**documented** 54:18 67:2 76:21 78:10 101:20 102:19 109:1 113:15 130:14 142:24 143:20

**documenting** 134:23

**door** 131:3

**dopamine** 108:5,7

**double** 137:11 142:11 208:11 209:13

**doubt** 53:21 80:7

**dragging** 42:14

**dramatic** 202:13

**dressing** 120:4

**driver's** 31:12

**drop** 72:16

**drug** 14:12 18:16 25:21 26:24 34:21 37:13,17, 19,20 39:18 59:5 64:19 68:7 92:23 128:9 149:21 153:23 216:1 229:19

**drugs** 14:3 15:10 19:1 20:21 25:5 26:3,21 32:23 34:8 39:6,11 42:6 92:1,12,19 122:4

135:21 153:24 158:12 160:19 161:12 185:19 213:21 232:5

**drunk** 128:9

**due** 11:13 16:12 26:24 34:7 37:5 59:2 63:15 68:7 128:16 198:8 210:8,22 237:5,14

**duly** 9:6

**duplicate** 163:1

**duration** 163:21 168:10

**dying** 26:1 103:17,18, 19 236:23

**dysrhythmia** 12:24 67:11,17,21,23 71:1

**dysrhythmic** 67:9,12, 13,17

**dyssynchrony** 199:24 201:16

**E**

**e-mail** 239:6

**earlier** 25:24 37:18 86:6,12 131:17 142:2 146:21 174:5,13 221:3 230:7

**earliest** 27:6

**early** 26:22 27:2 40:2 88:10

**East** 10:8

**easy** 105:24

**ECG** 52:16,18,20 54:5, 7 234:17

**echo** 116:11

**Echocardiographic** 178:10

**ED** 237:20

**Edgcombe** 169:21,24 172:4 173:5,22 174:1, 12,21 177:20

**Edgcombe's** 175:5

**Gary Vilke - December 08, 2017**

Edgeco 169:23

editors 94:12,13,16 162:15

education 81:13

Edwards 8:17 9:9,10 47:12,17,18,22 48:7,9 69:3,11 73:22 74:3 75:4 87:19,24 90:17, 19,22 98:17 100:10,12 102:10 105:9,11 111:4, 12,14 115:24 116:8,21 117:9,14 120:9 124:21 125:3,8 141:16 142:18 148:14,19 150:12,17 151:2,7 153:5,8 154:9, 13 156:8,11,20 170:4,9 177:23 178:4 180:4,9 183:23 184:7,16,21,24 188:18 189:9 193:8,13 197:4,8,19 199:9,12,16 205:5,20 208:24 209:4 218:12,21 222:6 227:11 228:4 232:9 233:9,11,13,17,22 239:10

effect 32:23 143:7 154:16 157:10 173:7 178:7 193:3 203:9 223:24 226:3

effects 115:1 157:12 168:16 197:9

effort 124:5,7,8,10 190:21

Eighteen 189:1 215:15

Eisenmenger's 77:19

EKG 52:18 54:9 138:14

EI 224:1

elderly 82:20 198:17

electrical 13:4 182:3 188:4

electronic 235:13

elevated 95:9 101:12 104:1 109:1 112:1

eleven 204:4

else's 149:24

emergencies 91:12

emergency 8:24 34:8, 18 50:21 55:10 56:6,8 59:13,14,15,18,20,21 60:4,8,12,22 61:1,2 68:12 70:11 74:21 75:10 80:4 83:11,12 91:5,8 103:8,15 110:20 122:12 124:14 127:2 129:2,4 130:20 139:17 143:23 148:3 182:9 205:16 216:13 234:7 235:24

emergently 61:3,4,5

Emotional 92:24

employed 169:16

employees 145:14 146:3,5,13

EMS 51:12 60:2 72:9 77:15 110:19 138:22 141:1 143:5,19 144:2, 16,21,23,24 145:5 165:11 187:19 218:19, 23 219:1 222:18,23 223:9,11,13 225:20,22, 24 226:3,12

EMS's 165:3

EMT 50:17 66:10,11

EMTS 27:7,11,13,22 28:12 57:10,13

encountered 206:12

end 26:1 155:2 191:14

endangered 119:21

endocrinologists 12:2

ends 45:3 218:6

enforcement 57:10 82:24 138:24 145:7,8, 21 146:12 165:7 238:14

enhance 151:21

enlargement 95:6

enrolled 158:7

entire 15:4 49:13 67:17 77:12 211:19

entities 110:6

entitled 87:15 93:12 117:4 178:7 188:16 197:9 204:24

entity 110:5 153:22

environment 43:24 44:6,11 227:12

environmental 228:10

epidemiologic 213:23 217:22 232:6

epidural 172:11

episodes 91:1

equal 185:10,14 214:2

equipment 134:5 194:17 195:22 234:20 235:14

ERS 128:10

ESI 124:15 126:5,11,17 128:2 129:1 131:14 132:2

essential 52:4,10

Essentially 157:3

et al 8:13 165:21 178:6 199:21 208:21 231:5

etiologies 185:24

etiology 50:8 149:10 183:14 204:7,20 208:9 215:21 217:2

evaluate 49:7,18 55:21 58:23 113:8 157:23 212:3 214:10

evaluated 124:9 129:11,19

evaluating 171:7

evaluation 22:15 49:3 52:7 56:23 59:18 76:15 84:17 103:16,19 104:9 105:13,15,21 112:18 113:2 129:5,6,12 183:20

evaluations 213:21

event 63:22 67:12 96:9

226:17,18 227:1,4 228:5,17

events 208:20 209:18 227:13

evidence 99:12,16,17 101:19 107:21 108:24 109:3

exacerbated 96:2 174:24 175:9

exact 18:5 27:24 31:22 34:16 64:18 67:4 87:1 123:7

exam 52:12

examination 9:8 52:5 139:6 232:16 233:8

examined 9:6

examiner 13:11,13 98:3 103:2

examiners 97:22 162:16,17

exceptions 132:9

excited 11:12,13,15, 20,24 12:9,13,17,20 14:4,9,15,18,24 15:2,9, 17,19,23 16:3,8,10,12 17:13 19:20 26:4,13, 17,24 34:2,4,5,7 36:9 37:23 38:2,7,8,12,15, 23 39:10,16 40:1,6 41:8 42:21 43:12 44:3, 16,17 52:6,8 56:18 60:19,21 64:20 81:24 86:22 87:3,7,15 90:24 91:2,6,14,18,19 92:14, 18,21 93:2 94:24 95:14,24 96:3,6 97:17, 24 98:20 99:3,14,18,24 100:14,15,23 101:1,6, 24 102:5,12,15 103:23 104:3,5,12,17 105:2 106:13,19,23 107:3 108:3,9,13 109:19 110:18 122:5 135:16 136:7,10 146:18,23 147:18 148:23 149:3,5, 11,18 150:20 151:15 152:3,18,22 153:10,17 160:15 204:3,6,19 205:2,14,23 206:11,22

**Gary Vilke - December 08, 2017**

207:12 208:8 209:22 210:1 212:17,20 215:2, 6,14,17,20,23 216:2,18 217:15 230:4 231:6,15 236:9,11,16

**excluded** 46:11,12 48:1,13 96:16 158:8 160:7

**exclusion** 58:19

**exclusionary** 99:17

**exclusively** 206:16

**excuse** 63:13 175:17

**exercise** 168:13

**exhalation** 190:16

**exhaustion** 65:14

**exhibit** 8:1 47:13,14,20 74:1 75:2 87:22 98:15 111:13 116:1,2,3,4,5, 19 117:12 124:23 125:1,6 148:17 150:15 151:5 154:11 170:7 178:2 180:7 184:2 188:21,24 193:11 197:5,6,14,15,17 199:14 205:8,11,12 209:2 218:15,20 227:9 233:20

**exhibiting** 52:13 94:23 217:23

**exhibits** 184:5,12 233:18

**exist** 97:18

**exonerate** 169:17

**expect** 12:1 38:14 43:11 126:8

**expectation** 133:8

**experience** 132:16 151:13 236:7

**experienced** 70:3

**experiencing** 41:19

**experiment** 163:12

**experiments** 163:13

**expert** 9:16,20,21 17:20 109:14 128:23

150:22 158:22 169:16 232:20

**expertise** 46:20 103:6 141:19 151:13

**experts** 199:6

**explain** 94:7 166:7 213:15,19

**extension** 25:7

**extent** 120:8 121:24 122:2

**extrapolate** 217:17

**extreme** 42:10,21 43:11 122:1

**extremely** 50:8 59:4 68:20

**extremity** 128:12

**eye** 133:4

**eyes** 24:16 193:21

---

**F**

**fabricated** 98:20

**face** 24:15

**face-to-face** 84:16

**facilities** 40:12

**facility** 227:14 228:14

**fact** 47:24 57:13 62:20 64:7 89:10 133:12,13, 16,21,22,24 134:3,6, 13,14,18 153:18 162:23 166:13 177:8 191:1 213:15 215:14

**factor** 95:17 96:14 102:14 191:2,18

**factors** 96:4 135:20 204:24 205:12

**facts** 61:21,23

**factually** 194:21

**fading** 40:9

**failure** 95:9

**fair** 12:22 15:21 38:17 48:20 71:24 93:6

120:11 168:21 204:22 209:20

**fairly** 52:3 196:2

**fairness** 224:20

**faith** 214:16

**fall** 107:18 226:23

**falling** 31:5 44:23

**falls** 145:1 183:18,19 226:22

**familiar** 19:22 36:19 74:18,23 75:6,8 83:9 93:17,19 111:16 117:3, 6,18 122:22 141:5 169:21 178:5 180:10 188:15 193:2,6 208:22 210:9 219:1,3 224:2 234:4 238:12

**family** 120:18

**fan** 219:21 220:11

**fashion** 211:17

**fast** 60:6

**FDA** 69:23 70:8 73:23

**feasible** 28:22,23 29:6 30:8 44:19,20 49:7 54:8 63:20 79:9 104:10 105:17 139:7 140:7

**feature** 96:12

**features** 107:5 175:14 209:22 210:1 212:20 213:9

**federal** 33:15 48:13,15 83:12,17 238:8

**feel** 43:18 67:22

**feels** 161:10

**feet** 21:1,7,8,11 219:17

**felt** 41:23 102:13

**fence** 82:12

**FEV1** 190:22 191:23 192:9

**fever** 185:20

**field** 11:16,19 52:23 103:6 142:10 160:14,

18 169:8 188:7 196:5

**fight** 19:12 116:24 117:1 123:21

**fighting** 19:14 20:21

**Figure** 126:17 181:9 190:11

**file** 8:9

**finally** 231:4

**find** 14:2,10,23 99:20 153:20 155:1 166:3 179:22 195:6 200:12

**finding** 54:12 107:6 171:9 174:7 179:14 198:13,14

**findings** 14:17 198:22 215:12 232:21

**fine** 30:22 80:19 231:18

**finger** 51:20 195:22

**fingers** 45:1

**finish** 176:15

**Fisher's** 162:8

**five-minute** 111:2

**flat** 90:9 189:23

**flawed** 196:14

**flaws** 196:6

**flexed** 190:3

**flexion** 25:7

**flight** 116:24 117:1 123:21

**flip** 25:3,13

**flipping** 25:15

**floor** 163:9 189:24

**floors** 163:16

**flow** 95:21 124:14

**fluid** 31:16 170:22 179:17

**focus** 130:10

**follow** 58:3 79:1 84:5

**foot** 31:9 222:15

**Gary Vilke - December 08, 2017**

footnotes 147:2

force 152:13,14,20 190:15 208:20 209:17

forced 190:9 193:17 194:1,5,13 196:22

foreign 226:21

forensic 11:2 13:15,20 14:1,8 16:9,21 38:24 39:24 101:14 103:14, 15 106:12 153:11 162:13 169:8 197:12 204:8 209:6

Forget 129:1

form 112:5 119:23 141:14 142:17 206:13 208:4 222:5

forthrightly 230:8

fortunately 34:15

found 108:13 112:7 149:21 154:20 198:21 209:21 218:11

freak 43:6

freely 20:17

frequency 91:6

frequently 36:13,14

front 34:16 49:8 189:24 225:13 227:17

full 31:16 172:13

function 154:24 157:13,24 159:18 173:17 178:9 181:2,7, 12,14 194:9,10 199:24 200:17 201:15

functional 45:19

functionality 172:23

functioning 12:15 29:22 32:9 172:18

funded 155:13 157:1, 20,21

funding 155:14 159:6

funds 83:13,17

FVC 190:12,22 193:24

## G

G-A-L-L 39:24

gain 31:17

Gall's 39:23

Garrett 8:19

Gary 8:14 9:5,12 94:3 204:19

gas 136:8 186:14,16

gases 191:16

Gass 8:22 48:3 116:4, 6,10 184:4,11,19 188:23 189:7 197:6,13 205:10,18 227:16 228:2

gather 125:23

gave 12:23 13:2 35:7 58:21 164:7 190:20 234:1

gears 203:10

general 45:3 77:14 87:13 110:10 173:16 174:10 182:17

generalized 119:14 121:2 149:15

generally 155:6 226:9

giant 103:15

girlfriend 89:20

give 11:6 18:22 31:5 34:16 36:20 53:4 64:18 65:9,22 76:15 77:21 80:22 81:10 84:8 87:19 103:3 109:14 112:11 114:9 132:19 133:12 134:22 136:14 138:12 166:2 186:8 187:7,11 188:23 199:9 205:10 221:8 225:3,7 227:16

giving 46:9 59:8,9 65:18 80:6,19 105:7

glad 76:4

glitch 174:1

glucose 50:2,3,5,11, 19,22 51:9,16,19 52:12,15 139:4 140:4 142:9

go-to 10:13

goals 60:1

gold 135:15,17 136:5, 16,23 137:1

good 8:5 30:5 44:22 49:20 54:13,20 63:4 66:21 69:1 111:3 132:17 138:8 176:24 177:13

Goode 8:12,18,20 11:7,11 12:19 19:5 20:10,23 24:6,12 27:21 28:12 31:8 35:1,24 40:23 48:23 49:23 50:11 52:13 54:9 58:1, 24 59:13 60:22 63:24 64:15 65:22 69:18 73:6 75:19 76:17 80:11 84:23 86:11 89:8 95:10,12,22 101:7 107:7 108:11 109:2 113:13 114:13 115:14 124:5 127:10 128:1 129:2 137:3,10 141:2, 11 160:8 161:1 163:24 167:3 172:24 176:11 181:24 183:3 190:6 207:8,15 216:18 217:8 220:23 228:17,24 233:1 234:3

Goode's 21:11,15,18 23:5 27:14 56:12 62:11 67:8 72:8 78:8 168:6 207:13 230:1,9

government 33:15,18 110:7 236:15

governmental 110:5

governs 83:17

grabbing 44:24

Graham 53:20 54:3,4 57:24

graph 190:11

Grateful 36:23

great 169:7,10,12 180:11 211:5 218:4 236:8

greater 113:4 118:20 185:11,13 187:13,14 191:5 231:16

greatest 190:9

ground 45:18 163:9

group 100:22 162:20, 23 200:7,21 201:7,20 210:16 231:17

groups 20:16 25:8 200:7,9 202:10

guards 79:18

guess 22:4 40:17 63:19 88:7 91:9 99:6 129:13 143:3 237:9

guessing 133:21

guideline 128:6 219:22

guidelines 93:12,23 97:7 106:4 218:20 219:2 235:22,23

guides 125:21

gun 44:8

gurney 24:13 64:4 82:22 163:7

gurneys 25:3,10,13 163:14

guy 10:13 105:19 129:8 150:5,9 159:22

guys 195:24

## H

Haldol 70:1,3,7,20,24 71:5 114:14

half 41:6 62:21 74:5,7, 10 112:7,12,13,21 128:8 164:2 167:5 168:7

hall 23:18 24:6 130:18 131:1,3 208:21

**Gary Vilke - December 08, 2017**

**hallucinate** 19:11

**hallucinogen** 216:9

**hallucinogenic** 120:18 121:21

**Haloperidol** 69:14,18, 24 70:4,20 71:9

**hand** 110:23 111:13 145:3

**handcuffed** 148:12

**handcuffs** 42:23,24 145:11,17 146:3,6

**hands** 20:24 21:6,7,11 30:10 190:23 207:1 219:17

**Hanover** 109:15

**happen** 70:10 91:8 213:23 215:15 226:21

**happened** 23:4 48:18 207:24 237:10

**happening** 42:15 43:21 238:4

**happy** 33:9 63:16 79:20

**harbinger** 103:23 104:11

**hard** 42:8,14 86:21 145:9 173:19

**harder** 138:13

**harm** 221:7,11,12

**harmful** 198:1,16

**Harvard** 36:18

**hat** 49:23

**haves** 232:13

**head** 25:15 41:14 42:6, 18 45:10,17,23 49:1,5, 11,14 74:23 84:7,9 121:8 211:6 222:14 237:22 239:5,9

**health** 117:21 145:22 146:1

**healthy** 176:10

**hear** 41:11

**heard** 14:6 24:9,10 33:14 43:17 98:2 131:2

**hearing** 24:4,7 89:14 130:19

**heart** 12:15,17,23 13:2 22:1,6 28:20 55:17 60:11 64:10 68:10 72:2,5,8 73:17 121:14 128:11 134:2,3,10,15 171:17 172:1,3,18,22, 23 173:1 174:4 177:4, 12 178:18 185:10,13 188:5 189:6 200:10,14, 19,21 201:5,6,17 202:2 203:3,5

**heat** 92:5 108:2,17

**heavily** 12:14

**height** 80:18

**held** 46:19 221:23

**helped** 214:9

**helpful** 57:9 202:20

**hemodynamic** 127:3 178:8,14,15,16 179:4,8

**hemodynamics** 179:17

**hemorrhage** 14:20

**Henderson** 148:23

**HERETO** 8:3 47:21 74:2 75:3 87:23 98:16 116:20 117:13 125:2,7 148:18 150:16 151:6 154:12 170:8 178:3 180:8 184:3 188:22 193:12 197:18 199:15 205:9 209:3 218:16 227:10 233:21

**heroin** 38:5

**hey** 43:3

**heyday** 36:12 37:4,10, 22

**Hick** 122:23 124:22

**Hick's** 123:2

**high** 15:12 50:8

**higher** 123:12,17

187:1,2

**highlighted** 153:22

**highly** 42:22 216:3

**hired** 46:23 109:22 110:1,2

**histories** 202:12

**history** 49:21 56:24 57:5,6,9 59:7 96:12,17, 22 99:22 200:10 201:5

**hobble** 83:1 193:16 205:24 206:13,24 208:3,4 223:22 231:6

**hobbled** 212:10,22 219:16 220:13 232:8

**hogtie** 19:18 21:6 39:10 41:1 45:24 83:1 99:10 100:3 116:23 155:24 157:17 159:23 164:1 206:4,22 207:1 213:13,16 215:5,7 220:18

**hogtied** 10:14 20:5,23 21:11 24:24 25:3,10,16 40:23 49:10 62:12 118:13 141:2,5 148:1, 11,13 150:9 155:21 158:16 159:12 161:7, 15 165:4,12,13 167:8 168:7 189:19 191:23 206:15 211:2,8,16 212:9,10,23 215:9,15 220:14 232:2,8

**hogtying** 24:24 39:4 154:14 172:17 211:20 212:24 213:2 214:19 224:18

**hold** 47:13 90:20

**holding** 42:13,14 43:1

**home** 151:20

**homicide** 102:24

**honest** 119:3 204:10

**honesty** 166:12

**hook** 31:4

**hospital** 45:14 50:21 51:12 54:12 55:10,13,

19,24 56:15 59:22 60:13 61:3 62:14 63:2, 19 64:2,9 66:9,12,17 67:4 72:10 73:12,14 78:9,22 81:7,11,18 82:8,20 83:16 84:1,15, 20,22 90:13 104:5 110:19,21 115:21 124:6,13 144:3,18 145:1,9,14,23 146:2,5, 9,13 148:3 163:14 182:8 188:8,10 221:6 225:1 228:7 236:9 237:6,7,8 238:5,15,22 239:2

**hospitalization** 207:23

**hospitals** 33:21 83:3, 17 110:8 144:21

**hour** 41:6 62:21 66:13 84:16 164:1 167:5 168:7

**hour-to-hour** 85:2

**hours** 203:15

**human** 216:24

**hundred** 31:24

**hundreds** 123:5

**hurt** 25:14

**Huskison** 9:1 141:14 142:16,17 222:4 232:17,18 233:6

**hyper** 100:9,10

**hypercarbia** 191:17

**hyperkalemic** 15:14

**hyperthermia** 100:9, 13,24 101:5,15,19 103:22 104:11,14 108:19,21,22 109:13 210:14,23

**hyperthermic** 101:7, 18 108:24 109:5 210:11,14

**hypertrophy** 95:7

**hypo** 100:11

**hypoglycemia** 75:24

**Gary Vilke - December 08, 2017**

76:10 92:3

**hypotension** 172:12

**hypotheticals** 46:7

**hypoxemia** 75:24 76:10

**hypoxemic** 186:9,12, 17,20 187:4

**hypoxia** 67:6,7 74:20 76:13,18,22,24 112:9, 14,17,19,22 113:3,11, 17,20,22 114:1 136:22, 24 187:19 191:17

**hypoxic** 130:10 137:22 138:9 187:15

---

**I**

**ICU** 195:17 235:19

**ID** 35:24

**idea** 78:19 132:17 138:8 161:10 171:7 176:24 177:13 203:17

**ideally** 76:11 104:8 138:22

**ideas** 138:11

**identifiable** 15:8

**identification** 204:7, 20 208:9

**identified** 106:17

**identify** 8:15 13:23 14:21 15:6 185:16 187:24

**identifying** 106:13 183:20

**ignore** 30:2 78:1

**illicit** 59:5

**immediately** 89:8 103:18 125:14 133:9 138:20 235:20

**immensely** 88:12

**impact** 62:12,22 63:6, 7,23 159:19 167:22 173:17 189:2 191:10

198:18,20

**impacted** 64:12 172:22

**impactful** 180:21

**impacts** 201:12

**impairment** 113:24

**impede** 71:10

**implemented** 181:23 182:4,10 183:10

**implications** 197:1

**implicit** 140:18 181:5

**implied** 130:12

**implies** 195:1 207:1

**import** 72:15

**important** 61:20 114:20,24

**imposed** 180:24

**impossible** 30:11 53:23 116:12

**inaccurate** 134:3

**inappropriate** 58:6

**incapable** 24:17

**inches** 21:13 24:13,14

**inciting** 52:9

**include** 96:22 98:22 139:3 140:3 144:9 162:20

**included** 49:5 94:17 98:19,24

**includes** 98:19

**including** 81:18 84:12 160:19 172:10

**incoherently** 147:24

**incompetence** 107:19

**inconsistent** 29:22 30:13,16

**incorrect** 54:22 133:24 134:11 199:4

**increase** 88:11 96:5 121:14 194:21 230:16

**increased** 96:1 104:2 163:10 175:2 176:3,16, 19 200:15

**increases** 108:6

**index** 80:18 124:14 125:9 126:5 128:2,3 129:1 132:3 171:10,16 173:10 174:8 200:15, 17,20

**indexes** 126:1 202:3

**indication** 130:3

**indications** 113:7

**indicative** 15:23 108:12

**indicators** 87:12

**indisputable** 133:22

**individual** 43:10 144:19 151:12 210:10 211:15 216:14 220:20 221:13

**individuals** 34:10 35:10 110:8 151:19 161:4 164:17 168:17 169:20 191:15 198:1, 21 204:2 205:1,13 206:9,18 209:13,21,24 234:6

**induce** 76:23

**induced** 34:21 64:19 152:22

**induces** 199:22 201:14

**infarction** 200:11

**inferior** 171:23 174:22 177:13

**infiltration** 172:11

**influence** 14:3,12 25:5 39:5 68:13 147:13 158:12 229:12,17,22 230:5

**information** 23:14 28:5,13 75:13 125:23 143:18 176:7 216:10

**ingestion** 39:17

**inhalation** 190:16

**inherent** 195:13 196:3

**initial** 34:6 139:2

**initiated** 138:21,24 155:11

**inject** 70:14

**injection** 35:23 114:21 116:15

**injuries** 148:10

**injury** 105:20 150:8

**insert** 115:4 116:8

**inserted** 69:20

**inserts** 116:16

**insignificant** 154:17, 22 202:16

**instance** 19:6 42:23 56:20 144:23

**intake** 159:13,16

**integrity** 84:14

**intellectual** 166:12

**intended** 163:1 220:16

**intent** 94:20 128:18 223:6

**interesting** 93:20 128:3

**intergroup** 179:16

**intermittently** 64:16

**international** 164:14

**interplay** 172:17

**interpret** 41:12 43:23 65:12,20 126:3 166:17 192:15 194:20

**interpretation** 24:3 128:17

**interpreted** 55:2 68:7

**interpreting** 44:6,11

**interrupt** 175:17

**interrupted** 57:8

**interrupting** 133:18

**intervals** 226:14

**Gary Vilke - December 08, 2017**

intervened 131:21

intervention 26:22 27:2,7 125:14 126:13, 22 127:1 128:2,13,20 129:3,7,12,14 131:8 132:7,15

interventions 127:3 131:13 145:23

intoxicated 128:9 161:4

intoxication 27:1 68:17 160:19

intramuscular 35:23

intramuscularly 34:12 35:12,16

intravenous 139:4 142:7

intravenously 35:17

intrinsic 34:7

introduces 108:21

introduction 40:10

intubated 127:4 131:21

intubation 131:12

invariably 100:13 101:1

investigating 93:12, 23 97:8 106:4

investigation 162:9

involve 152:4 230:3

involved 12:14,17 27:11 51:18 71:13 93:13,24 97:8 106:5 109:17 112:17 118:5 188:2 205:22 215:20 228:19,21,24

involvement 97:4

involving 118:7

irregular 22:2,7 67:18 86:1 202:5

ischemic 200:10 201:5

Island 88:5,7

issue 34:24 35:4 77:17 96:11 119:19 162:3 174:11 183:11 191:8,9 220:6

issued 69:23

issues 92:9,13 132:24 194:14 195:13 196:3

IV 35:19 36:4,6 54:4 62:3 69:20,24 70:3 116:15 138:14

IVC 171:22 172:5,8 174:22 175:7

**J**

Janet 24:1

Jason 204:19

Jim 8:19

jingling 43:17

joint 76:13

journal 75:10,14 117:20 139:17 143:22 166:11 205:16 209:6

judge 46:18 47:14,24 48:13,15

judgment 132:11 144:15 185:22

July 227:21

jumped 147:12,15,21 150:5

jumping 19:5 37:16 105:19 148:10

jurisdiction 165:8

jury 26:3 44:1 51:18 70:19 155:13 157:8 166:7 211:1

jury's 45:5

**K**

keeping 20:12

Kelli 8:12

Kevin 8:17

key 179:8,20 180:2

kicking 63:3

kidney 95:8

kill 17:7 18:3 71:1 159:21

killed 147:22 215:3

killing 19:7

kills 37:21

kind 33:24

kinds 43:22 68:16

knees 21:7

Knock 237:4

knowingly 96:21

knowledge 46:14 81:14 121:5 122:12 154:7 169:18 202:16 230:17

**L**

LA 100:18,21 205:21 207:6,16 208:6 209:14 214:15,19 222:20 231:5

lab 107:9 108:15

lack 15:11 97:16

lactic 20:19

language 87:1 119:17 132:10 238:17

large 20:12 25:7 196:7

larger 212:13 214:20

Larry 146:22

late 40:1

law 57:10 82:23 138:24 145:7,21 146:11 165:7 238:14

lawsuit 155:17,19

lawsuits 110:9

lay 13:3

laying 181:3

laypeople 116:24

layperson 13:6 159:20

lead 19:3,15 52:22,24 53:3,6,11,12,13,14,16, 23 54:8 62:5 176:19 189:3 205:14

leading 61:21 175:1,15 176:2

leads 53:4 188:3

leap 191:19

Leary 36:15,17

leave 221:15 230:14

Lee 224:1 236:14

left 64:3 91:5 156:7 167:8 201:18

leg 190:4 211:16

legal 162:8 209:6 230:20,22

legs 190:3 207:3

length 167:6

letter 227:23

letters 238:22,24

level 18:22 43:7,20 104:13 110:22 128:10 134:20 145:3 191:20 195:10 197:2 207:4 235:19

levels 15:13 33:2 44:9 50:6 159:19 187:5 195:13

Lewman 146:22

license 31:12

life 23:2,5 63:4 86:7

life- 128:1

life-saving 127:1 128:13,20

lifesaving 125:14 126:13,22

lights 60:3,6,9,12,14 61:5,8

likes 179:2

**Gary Vilke - December 08, 2017**

**limb** 189:2

**limitation** 160:17 166:15,19 190:20

**limitations** 166:11 168:22

**limited** 84:12 235:16

**list** 17:5,23 18:10 84:6, 8 105:2 116:1,2 117:10 127:8 152:12 170:5 197:5 226:19,23 227:5 238:12

**listed** 17:1 26:8 52:11, 12 186:10 193:22 209:9 225:13

**listen** 74:8 85:5

**lists** 17:11 238:10

**literally** 70:23

**literature** 26:5,10,11 38:20 40:3 53:7 97:12 98:19 120:23,24 152:9 177:1,11

**litigation** 46:13 156:2, 5

**live** 77:22 131:22

**LLC** 8:24

**local** 172:11 192:22

**locate** 87:20

**location** 8:7 166:2

**lock** 190:4

**long** 10:22 16:15 41:2 47:2,8 55:23 81:22 163:18 164:3 168:1 175:6 176:16 203:14

**longer** 141:11 165:23 167:9 168:2 204:12,16 223:16

**longest** 163:21 167:2

**looked** 15:24 18:7 22:9 33:23 101:15 111:17 128:4 166:14 192:4 235:21,23

**loose** 207:2

**loosely** 206:14

**lorazepam** 116:15

**Los** 206:10 212:6

**loss** 172:10

**lost** 76:2

**lot** 10:15 15:9 25:6,7 45:1 49:17 61:11 81:22 103:19 195:13 202:18

**lots** 60:7 131:19 187:9

**loud** 24:5,11

**love** 34:15

**low** 50:7 76:13 77:2,3 100:2,4 112:9 186:20, 22 187:2,8

**lower** 68:9 72:5 100:7

**lowers** 203:4

**Loyola** 178:6

**LSD** 11:14 12:20 17:1, 6,7,12,15,24 18:2,10, 14,22,24 19:9,10,11 25:19,23 26:8,9 35:2 36:8,11 37:1,2,4,5,10, 11,19,23,24 38:14,19, 23 40:15,20 59:2 68:13,17 102:5,14 120:15 121:1,16 122:9, 14,20 128:16 146:18 147:3,11,14,17 149:2, 4,10,17,20,23 151:9,15 152:3,6,17,22 153:14 154:1 160:10,11 161:3 216:6,11,12,14 229:5, 8,12,15,17 230:5

**Lumbar** 178:9

**lung** 181:2,7 198:15

**lying** 161:15

**M**

**M-A-S-H** 106:6

**M.D.** 9:5

**Macaw** 8:23 232:14

**machine** 51:22 195:21

**made** 46:22 53:19 55:1 147:18 194:19

**magistrate** 46:18

**maintain** 98:11 131:8 132:7 186:1

**maintained** 32:9

**major** 20:6 91:24 182:24

**majority** 26:20

**make** 54:23 56:21 71:2 74:16 80:15 84:21 91:3 97:14,15 105:24 107:11 115:8 143:3 156:23 172:13 176:23 186:7 203:16 219:23 230:10 231:22 238:19

**makes** 112:22 137:6

**making** 23:9,17 44:7 89:11,15 125:17 130:18 176:21

**man** 46:24 80:16,17 155:20

**manage** 79:14 171:6

**mania** 40:4

**manner** 103:3,9,21

**manpower** 32:5

**marijuana** 21:15 230:7,8,13,16,20

**mark** 47:12 73:23 87:20 90:17 116:1,2 148:14 150:12 151:2 153:5,7 154:9 217:3 233:17

**marked** 47:20 74:1 75:2 87:22 98:15 116:19 117:12 124:23 125:1,6 148:17 150:15 151:5 154:11 170:7 178:2 180:7 184:2 188:21 193:11 197:17 199:14 205:8 209:2 218:15 227:9 233:20

**marker** 123:11

**markers** 14:23 15:5,6, 16 44:15 106:16 217:6

**Marty** 8:21

**Mash** 106:6 107:24 135:24

**Mash's** 107:9

**mass** 80:18

**match** 107:5

**matching** 134:8

**material** 164:19 236:4

**materials** 142:2

**math** 231:2

**mathematical** 164:4

**Matt** 8:23

**matter** 57:13 64:11

**mattresses** 163:8

**maximal** 40:24 83:2 99:9 211:17 232:23

**maximum** 190:15

**Mccormack** 8:18

**meaning** 39:8 96:9 167:18

**means** 12:23 65:19 112:1 144:11 166:8,9 167:15 185:18 215:11

**meant** 128:18 137:21

**measurable** 159:17 173:7 191:13 202:3

**measure** 72:21 78:15 137:23 181:11,17 188:4 190:15 191:14 195:3,9,19 201:10 202:6 220:4

**measured** 72:9 73:15 172:20 176:4 196:9

**measurement** 136:21 138:13 139:4 142:9 164:12 171:19 192:6 196:14,16

**measurements** 72:19 164:8 190:18 192:22

**measures** 138:24 139:2 140:2,4 171:16

**measuring** 134:5,7 154:23 195:15 197:2

**Gary Vilke - December 08, 2017**

mechanism 99:23

mechanisms 108:9

media 69:9 156:12,18 218:6,10 239:14

Medicaid 33:11,21 83:6 227:20,21,22,24

medical 11:21 13:6,11, 13 17:5,23 22:22 23:1 25:19 27:9 40:2 44:16 46:4 50:9,16 52:5 59:17,19 60:22,24 61:2 72:9 75:12 76:6 85:14, 16 86:4,7,9 88:22 89:6 97:11,17,22 98:3,19 101:16 103:2 120:22 123:20 124:12 129:3 138:20 162:8,16,17 170:23 178:7 202:11, 16,20 224:21 226:6 233:4 235:5,17 239:7

medically 48:21 67:20 88:18 90:5,11 112:23 177:1

Medicare 33:22 83:6 227:20

medicate 32:13

medication 25:21 32:20 34:11 35:11 59:9 68:9,23 69:16 70:11,16 71:11 76:16 220:2

medications 34:10,17 40:14 58:22 68:21 81:10 113:6 127:2 131:11

medicine 11:17 30:5 39:24 54:13,20 72:6 75:10 103:15 139:18 143:23 151:23 153:11 170:13 177:11 197:12 204:8 205:16 209:6 216:13

medics 31:23 32:1

meds 57:2

meet 14:14 57:16 58:17,18

meeting 190:18

meets 84:20 107:1 128:22

mellow 68:18

member 81:5,8 82:8 218:22

members 152:14,20

Memorial 84:22

memory 117:16

Memphis 48:13 184:17

mental 34:7 48:22 117:21 127:6 128:7,16

mention 152:18

mentioned 53:6 92:10 130:15

mentors 157:7

Meredith 198:13

Metabolic 122:23

methamphetamine 26:6,15 122:2 149:19 152:6 153:24 216:2

method 187:16

methodology 190:14 191:9 192:3 214:9

methods 172:9 189:21

Metropolitan 236:14

Miami 107:9,15 108:15

Michael 9:12

mid 186:24

mild 181:10 187:19

million 91:1

millions 70:23

mind 99:13 203:11

mini 193:20

minute 22:15 62:9 166:19 168:2 185:11 200:22 219:6

minutes 23:5 50:24 56:3 61:11 72:17 78:11,12 129:22 130:1 156:7 163:20 164:9,10

166:14 167:3 203:20

misinterpreted 131:4

missed 130:1

missing 90:20

Mississippi 8:11 57:19,21,22 59:10 77:15 187:19

misunderstood 51:8

misused 194:16,18

moaning 24:5,10

Model 218:19 219:1

moderate 76:18

money 33:22

monitor 28:20 55:8 66:3,6,18 68:19 70:14 72:3 73:2 78:22 79:1 85:4 127:24 134:15 138:14 187:24 188:1,3, 13

monitored 31:2 66:1, 4,13,16,19 73:12 80:23 81:2 104:6 113:19 115:6,14,18 127:19,22, 23 220:3 234:8 235:9, 11,13

monitoring 52:19 70:17 79:6 81:4,9,13 82:1 84:10,24 90:14 112:15,18 134:4 139:3 140:4 142:4 186:13 188:2 234:17,19 235:14

monitors 31:5 32:8

Monte 224:1

morning 8:5

move 20:5 24:18,19,22 25:6 42:4,16,17 49:17

moved 64:6

movement 24:17 25:1 32:10 45:4,19 118:16 207:2

moving 20:16 22:13 30:9 44:21 89:16 105:19 130:9,13 171:8

174:6 203:19

muffled 225:5

multiple 30:15,17,18 73:4 135:4

municipalities 110:10

muscle 20:16 25:7

muscles 20:6,13

myocardial 200:11

**N**

names 40:4 188:24

narrow 181:22 182:13, 18 183:1,5,6,8

Nashville 19:17 20:2 236:14

national 12:6,7 218:18,19,23

necessarily 27:3 49:19 53:3 65:4,7 126:6 140:7 152:15 212:3 232:3 239:1

needed 110:16 235:10

needle 35:21

negative 201:2,9

negligent 224:22

Neuman 96:16 154:20 156:2,24 157:3,6,22 158:21,22 159:5 162:20,23 169:3

NFL 80:20

nice 184:4

Nichols 121:10,11

Ninety-three 113:12

noises 23:9,17 24:5 89:11,15 130:18

non-hogtie 220:19

non-medically 90:14

non-surgical 176:5

normal 67:18 73:19 77:3 80:15,17 112:2

**Gary Vilke - December 08, 2017**

186:20,22,24 187:3,8, 15 201:7 202:4,7,10 229:6

**Northern** 8:11

**notable** 194:22 196:19 202:13

**notation** 134:1

**note** 63:6 98:8 99:2,8 149:4 150:1 179:15 197:2 201:6,9 202:23

**noted** 13:9 22:8 40:2 50:22 88:10 105:9 109:8 154:2 165:19 168:11 173:3 179:19

**notes** 172:4 218:3

**notice** 90:6 146:16

**noting** 200:23 202:8

**number** 8:9 9:17 10:4 15:8 26:19 31:22 61:10 77:14 78:18,20 82:18 90:19 91:17,22 93:6 94:21 98:10 110:14 114:9 116:1 125:3 126:14 127:18 131:18 132:22,23 133:3 137:20 156:13,18 165:3 169:10,12 170:4 173:14 177:23 180:5 183:24 185:6,15 188:18 189:4 190:1 193:8 196:13 197:8 199:9,12 203:5 205:5, 11 208:24 210:15 218:6,10,13 221:3 228:1 239:14

**numbers** 30:12,15,17 31:6 72:22 187:12 192:12 193:1 194:24 201:22,24 214:17 217:16,19,21,22 231:21

**nurse** 54:3 56:17,21 57:3 133:23

**nurses** 56:11 80:2 124:17 125:11

**nursing** 86:2 117:21 128:5,24 235:19

## O

**O'HALLORAN** 38:22, 24 39:3,9 146:22 147:2,6,8,12,18 150:4 152:10,12,16,19

**O'Halloran's** 150:2

**O2** 76:13,19,21 77:13, 19 78:8,10,13 79:1,6 100:7 113:3 127:20 130:13 131:17,20 132:5,13 133:9,10 134:6,11,15,16,19 137:1 155:2 186:13,16, 19,20 187:13 191:15 195:8,10

**object** 51:21 102:7 105:5 119:23 141:14 142:17 222:5

**objection** 132:20

**objective** 130:12 137:23

**objectively** 157:23

**objects** 226:22

**obscenities** 147:23

**observation** 71:20 84:3 130:8,15 234:2,8 235:4

**observe** 49:18 86:11 88:20 89:6 112:24

**observed** 89:1

**obstruction** 172:5,8 174:22 175:7

**obstructive** 197:11

**obtain** 88:22 104:15, 18,22 135:1

**obtainable** 134:21

**obtained** 32:6 98:11 104:10 137:17

**obvious** 14:19 99:22

**Occam's** 214:22,24 215:10

**occasion** 238:1

**occur** 39:6,11 138:22 139:23 168:14,17 179:4

**occurred** 163:3 164:16 236:3

**occurs** 102:23 233:10

**odd** 119:17 220:7

**offer** 46:20,21

**officer** 22:8,19,22 23:3,6,15,20 44:9 85:11,12 86:5,16 89:7, 17,19 93:12,24 97:8 106:5 130:16,17 239:7

**officer's** 22:20 146:12

**officers** 28:3 31:19 41:4 64:17 86:12 141:3,10 145:16

**official** 55:1

**Officials** 218:19,24

**older** 176:8

**Oliver** 8:22 9:20 70:6 137:13

**one's** 100:7

**one-on-one** 234:2,24 235:4,16,19

**one-to-one** 234:7

**open** 115:8

**operating** 21:3 175:11 176:20

**operational** 238:23

**operations** 227:21,23

**opine** 21:17 36:10 103:1 230:17

**opining** 103:5

**opinion** 11:6,11 12:19 14:24 61:22 62:13,22 63:6,7 109:4,19 129:2 135:16 172:18 175:4 179:12 196:1,4 216:19 219:18 230:8,10,18 233:3 234:1 235:3,15

**opinions** 46:3,20 48:14 98:23 103:3

110:16 198:23

**opportunity** 27:6

**opposed** 20:1

**opposes** 164:15

**opposing** 184:14

**optimal** 104:16

**option** 186:10 234:14

**oral** 101:11 109:10

**Orange** 165:10 222:18, 19

**order** 47:14,23 48:10, 19 56:1,16 124:7 138:16 140:19

**ordered** 51:15 55:21 70:6 137:3,8,9,12,14, 17

**ordering** 131:11

**orders** 137:11

**organ** 179:1

**organization** 12:6,8 33:12

**organs** 95:21 178:20, 22

**original** 130:14 233:24

**outcome** 64:12 103:23 104:12

**output** 172:21 175:2, 16 176:3,4 194:18 196:8,17,20

**overdose** 19:1

**overly** 83:4

**Overruled** 105:10

**overview** 126:1

**ox** 30:11,18 62:4 127:24

**oximeters** 45:6

**oximetry** 29:4,7,15,16 30:1 32:6 44:18 45:22 48:23 113:19,21 114:2 115:11,17,20,22 138:8 139:5 140:3 142:13,20 143:12 188:1 234:17

**Gary Vilke - December 08, 2017**

235:8

**oxygen** 19:18 20:6,9, 11 77:5,9,17,21 78:23 100:2,4 112:9 114:3,6 129:15,18,22,24 130:4 132:8,18 133:7 136:12, 15 137:15,19 139:5 140:3 143:24 159:14, 16,19 178:20,24 179:2 186:9,18 187:20 197:2

**oxygenated** 114:6

**oxygenation** 118:20 119:1 131:9

**P**

**p.m.** 218:6,10 239:14

**package** 115:4 116:8, 16

**pages** 116:17 228:3

**paid** 203:15

**pain** 60:10 216:22

**panel** 17:20 150:22 151:13

**paper** 17:13,16,21 87:17 88:1 93:15 100:21 101:4 105:16 112:10 113:8 117:16 140:9,14 150:3,19,23 151:9 152:2,11,12 153:20 159:8 166:10, 18 170:10 173:12,23 174:14 179:22 180:1 194:14 206:8

**papers** 152:13 187:4

**paragraph** 174:8

**paralytics** 33:4

**paramedic** 36:1 48:24 53:20 54:4,16,19 55:6 57:23 139:9 142:6 221:3

**paramedic's** 58:7

**paramedics** 50:20 54:11,23 57:13,18 58:8,11,13,21 64:9 109:8 165:6 206:3

**parameters** 192:24 193:6

**paranoid** 43:6

**paraphrasing** 82:2 106:15

**Park** 109:16

**Parkes** 188:15 190:7 191:21 192:17

**parking** 61:11

**part** 21:15 34:14 43:2 46:13 49:3,9 52:4,7,12 64:13 72:6 74:17 86:8 89:14 91:16 112:18 124:10 131:23 146:6 150:23 151:12 166:12 169:4,5 209:16 214:12 216:12,14 226:1,15 230:5,9

**partial** 136:14 137:18

**participants** 96:17

**participate** 229:5,9

**participated** 17:19 154:20 155:7 208:14 212:12 214:7,8 217:5 224:21

**participating** 208:16

**participation** 229:1

**parties** 144:21 159:3

**parts** 34:13 35:7 81:23 118:17

**party** 159:2

**pass** 237:3

**passed** 24:13

**past** 94:9 110:14 123:1 225:14 239:7

**patency** 115:5

**patent** 186:7

**pathologist** 11:2 13:16 14:1 16:9,21 39:1 101:14 107:15

**pathologists** 13:20 14:8 162:13

**pathology** 103:2,14 169:8

**pathophysiology** 123:13

**patient** 27:9 28:15,19 29:3 32:18 48:22 49:2, 6 55:21 56:18,23 57:7, 11 59:1,16 60:8,21 61:11 70:14,18,21 76:5,8 77:1 78:6,7 79:11,14,18 80:3,23 81:1,15 84:3,11 104:5 106:1 110:18,19 113:2, 5,18 114:3 119:10,21 123:21 126:12,21,24 128:14 131:5,10 132:4 135:2,18 139:22 140:23 145:6,19 146:6, 10,11,14 147:12,21 153:2 170:14,16 171:8 173:6 177:3 182:8 186:1 191:5 219:7,15 220:15,21 221:12 222:19,23,24 223:4,16, 18 227:2 228:5,6 234:23 237:15 238:1

**patient's** 119:9,20

**patients** 11:24 30:9 32:15 38:10 40:5,12,18 58:22 59:21 71:20 72:20 74:5,10,13,21 79:6,23 82:1 87:3,7 101:5 103:16,17 106:18 120:2 122:13 123:12,14 124:18 131:19 145:24 151:14, 20 157:13 166:14 173:14 174:9,15 176:5, 8,10 177:9 191:21 200:14,19 201:2,23 202:11 212:22 213:8 217:23 220:1 236:16

**pattern** 65:8

**patterns** 71:24

**Payne-james** 204:19

**PCP** 26:6 149:19 152:6

**PDFS** 184:20

**PEA** 67:11

**pediatrics** 45:12

**peer** 74:9 75:14,17 166:10 177:2,8

**people** 12:15 17:8 18:3 25:2,9,13,14,24 27:6 31:17 32:7 37:15 39:5, 7 40:14 41:7,15 43:5, 21,22 44:7 45:2 56:11 60:17 68:12 69:16 71:19 80:1 82:19 90:10,14 97:13,19 99:2 100:23 112:8,13,21,24 114:19 130:10 151:14 158:2,8,11 163:16 164:7,21 169:15 174:19 175:11 177:14 187:3 196:5 198:15,17 201:5 203:16 205:22 206:22 207:5,11,16,18 210:4,18,22 211:2 212:8 213:17 215:3 217:12 229:19 230:1, 15 231:6 232:4 235:18 236:9,11

**pepper** 97:2,5

**perceived** 104:5 139:22

**percent** 26:17 31:24 76:21 77:2,13,16 78:1, 10 113:4,11,12,14 127:10,16 131:7,20 132:6,13,18 133:11,13, 22 134:19,23 186:16 187:14 190:13 191:22 192:9,15 193:16,20,22 194:3,13,20 195:9 196:8,17,23 204:2,4 217:11,24

**percentage** 190:12 217:10

**Perceptions** 117:4

**perfect** 140:8

**perform** 13:22,23 144:17

**performed** 11:9 137:9 169:15

**perfused** 178:23

**peril** 223:10,12,14

**Gary Vilke - December 08, 2017**

**period** 39:19 40:7,17, 20 62:1 66:7 164:10,12 165:23 167:2,9,19 168:1,2,12 184:23 226:8

**periods** 164:7 166:22 167:1

**permission** 56:19

**person** 14:2,11 22:3 26:23 31:2 42:21 43:11 44:3,14,17 52:5,13 59:4 68:9 86:10 88:19 90:6 94:23 105:2 106:22 108:3 114:8 116:22 130:18 154:15 157:4 160:14 161:14 171:3 181:18 186:11 221:10 229:4 231:11, 12 234:11 235:5,17 237:18

**person's** 171:17

**personally** 236:18 238:3

**personnel** 50:21 51:13 72:10 110:21 145:9,15

**persons** 103:23 104:12 217:5

**perspective** 131:19 136:2 172:16 191:12 220:21

**Pham** 47:14 48:1

**pharmacologist** 18:19

**phase** 104:19

**phencyclidine** 154:1

**Phillips** 8:21 48:5 102:3,7 105:5 232:12

**phone** 89:20 218:17 232:12

**phrase** 132:4

**physical** 65:13 81:19 84:10 85:7,9 94:22 99:12 138:19 139:6 140:21 197:10,24 216:22 217:1 232:7

**physician** 50:6 55:20 56:6 83:24 110:20 131:10

**physicians** 8:24 151:17

**physiologic** 95:19 108:10 139:13 171:5 189:2 191:13 201:12 207:14

**physiological** 154:15 168:13

**physiologically** 72:18 154:18 155:2 164:22 165:1 180:21 195:2

**physiology** 22:2 109:6 166:1 167:10,15 173:8 229:14

**pick** 78:13 195:12

**picking** 134:15,16

**picture** 15:4,15 77:12

**pictures** 80:10,12 189:23

**piece** 49:20 82:2 221:19 234:19

**pieces** 195:14

**pitfall** 76:7

**place** 35:19 36:4 45:22 69:1 188:13

**places** 10:11 57:17 58:21 140:15 154:15

**placing** 36:6 119:20 157:16 159:12 174:3 177:3,14 188:3 201:2

**plaintiff** 10:23 156:3 225:2,3,8

**plaintiff's** 225:17

**plaintiffs** 10:21

**plan** 135:11 230:10

**planning** 171:7 203:12

**play** 62:9 230:9

**played** 21:15

**player** 80:20

**point** 13:18 17:22 18:9 22:5,12 27:16 29:1 37:8,10 50:3 51:5 62:16 72:3,16 73:16 74:16 75:7 78:21 80:9, 10 85:11 104:8 110:24 111:17 118:3 120:24 122:9 127:21 130:4 134:22 141:23,24 170:11 179:20 188:11, 12 211:4 214:4 220:24 226:5,9 239:7

**pointed** 213:9

**pointes** 71:1

**points** 72:23 169:2 179:8 180:2 219:10

**poking** 51:20 62:3

**pole** 80:7

**police** 10:7,17,18 14:4, 11,16 22:19,20,22 23:6 27:18 28:3,11 39:7,11 41:3 46:24 47:1 62:20 64:6,14,17 85:11,12 86:4,12,16 97:23 98:21 109:22 110:2,4,7,13 130:16,17 139:8 155:20,22 160:15 161:8 163:9,17 164:15, 17 169:17 205:22 206:3 207:17 208:14, 20 210:19 211:20,24 212:4,13 213:16 214:11 216:23 224:18

**policies** 211:23

**policy** 84:15 119:12 120:14 222:18,23

**population** 81:15 82:20 113:5 128:9 191:17 202:7,10 206:17 210:3,5,7 212:14,21 213:7,11 214:5,21 217:17 231:7, 11,17

**populations** 213:22 231:21

**Portapres** 194:17 195:14

**portion** 49:14 183:20

**portions** 106:17 183:18

**poseys** 82:21

**posing** 105:8

**position** 14:4,7 20:11, 19 21:3,6 24:19,22 31:2 39:4 41:1,2 56:12 83:2 99:9 100:6 118:5, 7,15,20,24 119:10 154:14 155:24 157:10, 24 159:12,23 160:4 161:7,9 163:2,5,9,22 164:10,11,18,21 165:4, 12,14,20,23 168:8 169:15,22 170:14,16, 23 171:3,9 172:6,17,22 173:7,15,23 174:2,3,6 175:12 176:19,22 177:4,12,14 179:5,18 181:6,10 189:2,18,19, 23 190:4,5,6,8,12 191:23 195:20 196:15 197:24 198:7,12,16,18 200:3,18 201:3 202:17 203:1,4,9 211:17 219:17 220:14,19 221:11,15 223:1,10,12, 14,20,21,22 237:11,15

**positional** 81:20 82:7, 10,13,19 83:20 157:10 165:20

**positioning** 49:15 174:24 175:9 177:5 178:8 179:9 193:3 199:22 200:16 201:14 207:10 232:23 237:6,7, 14

**positions** 82:22 117:5 118:4,12,19 120:3 155:1 157:14 160:23 174:16 180:24 181:12 189:13 190:21,23 191:2,4 195:17 201:11 209:19

**positions'** 189:14

**positive** 63:5

**possibility** 176:9

**Post** 182:6

**Gary Vilke - December 08, 2017**

postmortem 31:12 50:13 87:12 105:14

potassium 15:13 95:9

potent 216:3

potential 55:2 76:7 96:11 108:9 161:16 220:3 232:5

potentially 196:19 221:7

pounds 31:10 79:11 97:3 222:15

practicality 138:15 144:14

practice 84:19 190:17 204:8 235:24

practices 212:1,4

pre-existing 95:22

pre-hospital 29:17 100:19 129:10

preceded 64:21 65:2, 10

precedence 139:2

precipitant 215:23

precipitated 12:20

precluded 78:24

predefined 129:10

predictability 87:10

predispose 95:2

predisposing 94:22 95:2,4,14,17 96:4,14 135:20

preferred 102:18

pregnant 91:13,14

PREMARKED 8:1

premortem 87:12

prepare 124:11

prepared 138:23

preparing 131:12

presence 15:10 98:11 216:23

present 8:15 16:1 32:5 97:24 138:23 182:11 183:3,6 191:4

presentation 14:17 15:4,10 34:6 68:15 97:10 136:3 139:13 207:14 215:17

presentations 40:1 68:17

presented 158:20 195:1

presenting 40:5 52:8

presents 44:14 48:22 182:8

pressed 118:21

pressure 60:11 64:10 72:13 73:4,11,18,19 118:8 119:9,16,20 120:5,7 136:14 137:19 172:21 175:19 178:17 181:1,4 188:1 195:11 196:10,20

pressures 72:21 73:8, 10

prevalent 37:2 149:21

prevent 27:4

prevented 220:22 221:1 222:8

Prevention 34:3

previous 226:6

previously 204:1

Price 155:10,16,19 159:22 221:23 222:7, 16

Price's 221:21 222:12

primary 145:18 146:17 149:6,7,8 154:4,7

prior 22:10 50:15,20 51:9,10,15 66:18 67:4 89:8 99:4 137:4,10 164:24

prisoner 146:12 158:17

probe 105:18

probes 195:11

problem 76:6 171:21 172:5,8

problems 60:18 113:24 172:24 220:18

procedure 52:1 222:19 237:20

procedures 175:23

proceed 69:10 111:11 218:11

PROCEEDINGS 69:7 111:9 156:16 218:8

process 62:19 74:17 103:17 123:24 236:19, 23

produce 87:15

professional 151:22 179:12

professionals 169:8

proffered 11:5

prohibit 165:4,5,7

prohibits 165:11

prompt 88:11

prompted 102:3

promulgate 33:20

promulgated 227:1

prone 39:4 40:24 62:12 83:2 99:9 100:3 118:5, 7,15,24 119:9,15 120:2 154:15 157:16 159:12, 23 161:7,15 164:1,15 165:4,13 167:9 168:7 169:15,22 170:19 171:9 172:6,17,22 173:7,15,22 174:3,6,23 175:8 176:22 177:3,5, 12,14 178:7 179:5,9,18 180:24 189:2,24 190:1 195:20 197:23 198:7, 16,18 199:22 200:3,16, 18 201:2,14,24 203:1 208:16 209:18 210:13 219:16 220:14 221:15, 16 232:23 237:5,7,10, 14,15

prone-restraint 117:5

proned 195:18

prong 51:21

pronounced 51:6

pronunciation 120:16

proper 59:2 229:20

properties 114:19 120:19,21 121:13,15, 19,22 122:11 154:24

prophamine 108:1

proposition 122:19 147:3 174:11 187:8

protective 20:10

protein 106:11 107:21 108:2,12,17,18

proteins 108:2

protocol 58:3,4 59:11, 22 60:14 119:8,11,17, 18 120:6 125:19 126:11 181:19 182:15, 20,23 183:10,15,19 223:6 226:11

protocols 57:16,20,22 58:2,17,23 59:8 84:5 119:5 165:16 181:21, 23 182:4,10,12 223:8 225:24 226:2

provided 184:5

providers 165:11

provision 146:10

psychiatric 38:9 40:12,18 91:12,24 92:9,13 117:21 135:21

psychiatrically 34:21

psychological 81:20 84:11 168:16

psychomotor 74:22

psychotropic 92:12

publication 91:12,16 94:6,10 208:8

publications 74:9 106:24 164:21

**Gary Vilke - December 08, 2017**

**publicly** 39:3,9

**publish** 149:16 166:10 168:5

**published** 25:24 75:9 117:20 150:20,23 155:7 162:11 168:3 204:17 209:5

**publishers** 94:8

**pull** 125:3 165:18 177:23 180:4 183:23 193:9 197:4 218:12 225:11 227:6

**pulled** 21:1 45:3 147:7

**pulmonary** 154:24 157:13,24 159:18 181:12,14 182:3 194:9, 10 197:11 198:1

**pulse** 29:4,7,15,16,24 30:11,18 32:6 44:18 45:6,22 48:23 62:4 66:17 113:19,20 114:2 115:11,16,19,20,22 127:24 134:7 138:7 139:4 140:3 142:12,20 143:12 185:2 189:5 234:17 235:8

**pulseless** 127:4 182:3

**pumping** 171:17

**pumps** 172:1

**puncher** 80:21

**pure** 19:1

**purpose** 72:6 114:2,17 198:4

**purposes** 144:14 161:19 230:21,23

**push** 151:22 192:11 203:18

**pushing** 175:11 203:17

**put** 14:3 16:15 29:1 38:4 41:4 44:13,23 45:2 62:5 63:24 64:14 68:13 70:16 82:24 95:23 101:23 102:15 104:20 131:18 133:9 140:10 142:20 143:6

161:7 163:16 166:11 170:18 172:15 189:5 213:5 214:16 220:24 221:2,10,16 223:14 226:7,10,11,19 227:17

**putting** 30:17,20 51:22 119:8,16 159:22 164:21 165:12 167:13 176:22

---

## Q

**QRS** 90:9

**qualification** 140:10 168:11

**qualifications** 104:21

**qualified** 58:10,12 86:10 105:17 140:15 160:9,11 228:24

**qualify** 23:13 110:11 127:12 201:19 229:6

**qualifying** 137:7

**qualities** 72:5 122:21 216:8

**question** 12:10,12 21:2 23:12 25:12 27:23 51:8 53:19 54:22 66:16,22 72:12 74:8 76:2 83:19,23 86:15 91:20 110:12 126:12, 21 130:14 141:15 189:10 203:11 213:5 214:21 215:1 216:16 219:13 222:5 232:19 236:3

**questions** 46:9,10 61:15 105:8 125:22 232:14,15

**quick** 69:2 203:11 232:19

**quickly** 32:12 55:18 59:22,24 61:7 68:22 71:16 192:4

**quiet** 22:14

**quote** 34:5 60:8 65:9 122:15 138:18,19 180:23

**quoted** 106:4,11

**quotes** 18:10

**quoting** 40:8 65:17 236:13

---

## R

**R-O-E-G-G-L-A** 193:3

**rail** 80:13

**raise** 121:14

**range** 21:13 41:6 77:3 80:15 133:14 187:1 204:5 231:3

**rapid** 131:11 216:24

**rarely** 113:18

**rate** 28:20 55:17 60:11 64:10 68:10 71:17 72:2,5,8 73:17 121:14, 15 134:2,4,10,15 172:22 178:18 185:10, 13 200:15,19,21 202:2 203:3,5 216:17

**razor** 214:22,24 215:10

**re-evaluated** 234:9

**re-review** 180:16

**reached** 118:1

**reactions** 92:24

**read** 16:14 34:3 79:3 112:10 123:5 138:18 139:21 140:14 142:1,2, 15 162:7 173:12 176:18 185:12 211:3 219:6 221:21,24 222:7, 10

**reading** 29:16 30:1,6, 11 53:5 77:16 78:1,7 90:2 113:13,15 115:19, 22 132:18 133:10,22 134:19 135:1 137:2 142:22,23 143:1,2,4,6, 7,13 171:11 186:16,19 206:11 211:11

**reads** 30:18 195:21

**ready** 71:3

**real** 132:23 138:8 192:16,18 194:21

**reality** 13:4 43:20 64:7 138:12,13 164:23 227:5

**realize** 42:4,22

**reask** 91:4

**reason** 30:13 35:15 101:23 165:9 211:19 220:12

**reasonable** 36:7 44:19 46:3 68:24 82:3,6 115:10 146:15 220:8 223:19 227:4 233:3

**reasons** 87:2,5,6 120:3 144:13

**reassess** 72:4

**reassessed** 234:9

**reassessing** 81:9 82:1

**reassessment** 85:3 129:20

**recall** 35:8 64:16 65:23 73:20 79:20 101:3 109:21 111:18 135:6 141:4 142:10 153:16 211:5 222:1,2,10 224:4 234:3 237:23 238:4

**recalling** 211:11 239:9

**receive** 44:18 77:16 142:3

**received** 71:21 75:19 220:1 238:21,22,24 239:2

**receiving** 76:20 83:17 112:13,21

**recent** 94:10 231:2

**recheck** 73:3

**recognition** 88:10

**recognize** 12:2,8 15:16,22 41:17 42:15, 16,24 43:1,5 81:19 85:23 90:10 113:22,23

**recognized** 32:15 55:13,15 113:18 172:6,

**Gary Vilke - December 08, 2017**

9 174:23 175:8

**recognizes** 43:5

**recommend** 32:14 164:20

**recommendation** 219:22

**record** 8:16 29:15,17, 19,21,23 54:19 55:4,5 66:9,10,11 69:4,9 79:4 111:6,11 134:1 156:13, 18 218:5,10 239:13

**recorded** 54:13,16 134:10 192:6,18 194:8

**records** 50:16,17 101:16

**recovery** 223:20,21

**recreate** 161:6

**recreational** 229:19

**recruited** 198:5

**rectal** 105:18

**rectum** 105:23

**red** 24:15 95:20 114:5

**Redefining** 87:16

**reduce** 172:10

**reduced** 19:18

**reduction** 173:9 191:22 193:17 194:13

**reevaluated** 135:12

**reevaluating** 85:2

**refer** 25:18 26:6 96:1 122:15 169:12 178:16 228:21 236:8

**reference** 9:22 121:6 147:2,11,17 149:23 151:1,8,11 152:2 153:13 154:2 173:13, 14 204:11 225:7

**referenced** 48:4 151:11 152:11,12 208:7,10

**references** 106:9 147:9 149:10 162:18 187:9 205:4

**referencing** 174:14 176:7

**referred** 146:21 155:6 198:24 199:2,6

**referring** 23:22 62:15 63:17 82:23 115:3,4 125:10 127:16 140:22 146:7 150:2 162:5 166:13 173:13 175:22 176:20 178:17 187:5 201:4 204:15 208:18 224:12 229:3 235:5,24

**refined** 231:17

**reflect** 33:8

**reflected** 24:10

**refresh** 117:16 143:9

**refreshing** 189:15

**regard** 202:22

**registered** 138:7

**regular** 103:7 120:3

**regulated** 84:1 108:6

**regulations** 33:20 238:8

**regulatory** 226:20 238:18 239:3

**related** 47:6 93:24 228:6

**relative** 91:9

**relax** 114:19

**reliable** 17:5,11,23 18:9 25:18 29:21 30:2, 21 75:12,16,17 94:14, 15 106:12 109:11 162:12,14 177:11

**relied** 100:21 168:23, 24 169:1 204:23 217:11

**relook** 143:14

**rely** 106:22 168:24 169:6 212:7 228:16

**remained** 165:22

**remains** 97:11

**remember** 27:16,18, 24 31:21 36:23 47:3 101:21 110:1,2 117:19 123:6 137:8 155:22 198:10 211:10 226:19 233:1,24

**remote** 234:16

**removed** 63:2

**render** 61:22

**repeat** 64:23 76:3

**repeated** 127:20

**repeatedly** 79:5 136:5

**repertoire** 169:5

**rephrase** 209:20

**replacement** 132:11

**replicate** 30:7 160:14 161:18,20

**replicated** 160:24

**report** 16:12 24:18 30:14 88:2,9 101:17 102:1 109:14 142:19 143:6,19 149:9,14 150:19 151:16 152:15, 24 153:1 201:22 202:16 214:18 221:22 225:11 232:20 233:15 235:15 238:1

**reported** 23:10 24:21 35:2 37:23 38:8 63:13, 14 70:5 85:24 86:2 89:17,21 102:2 109:10 149:20 211:6 214:18 217:21 238:5,9,11,16, 19

**reportedly** 116:15

**reporter** 9:3 47:16 90:18,21 116:5 153:7 197:15 199:11

**reporting** 22:20 37:5 149:24 190:22 202:8 203:6

**reports** 38:22 40:9,13 79:17 106:24 149:16 174:5 221:4

**represented** 25:10

28:4 200:8

**represents** 97:10 223:16

**reproduce** 93:7 160:18 161:12 163:4 168:15 192:11 194:15

**reproduced** 192:16

**reproducibility** 190:19 192:8,13

**reproducing** 192:23

**request** 56:21 57:3 149:2

**requested** 12:5 134:13 146:16

**require** 58:14,16 89:5 127:1 128:1 129:2,6, 12,21,24 131:10 234:7, 8

**required** 59:9 83:15 84:17 105:22 128:19 129:4,13,15,17,19 130:4 205:24

**requirement** 79:7,9 85:8 234:2,10 238:7

**requirements** 59:8 84:2,4,15,20

**requires** 112:14 126:12,22 140:17

**requiring** 187:20 205:1,14

**rereading** 147:15

**research** 10:15 18:1, 14,15 106:15 160:22 164:24 166:10 196:5 216:15 229:23

**researched** 37:7 121:9

**reserve** 98:9

**resident** 9:13

**residents** 157:5

**resist** 19:12

**resistance** 19:13

**resisting** 20:13 161:11

**Gary Vilke - December 08, 2017**

resistive 221:10

resource 149:7

respiration 71:14
112:2 115:6,15 154:21
193:5

respirations 22:4
71:22 74:15 193:4

respiratory 71:17
74:5,11,20 84:13
85:18,19 96:5,7
111:20,24 112:5
113:24 114:22 127:5
131:6 132:5,24 133:5
166:1 167:10,15

respond 81:19

responding 216:22

response 74:6,11
108:18,20 123:20
208:5

responses 146:18

responsibility 110:20,
23 225:23

responsible 146:9

responsive 89:3
133:19 149:2

responsiveness
174:20

rest 164:7,10,12

restrain 33:3 83:2
145:24 148:2 221:13

restrained 25:14
27:16,19 28:1,2,8,10,
17,18 64:8 81:24 84:2,
12 99:4,6 116:23 141:9
164:1,2,18 191:23
206:2,11,13,22 207:7
208:3 219:16 220:5,14,
24 222:24 231:6

restraining 190:1

restraint 10:8 19:18
32:24 33:4 41:1 57:24
59:3 62:19 69:14,17
80:23 81:2 83:20 97:2
99:9 100:3 102:23
111:21 112:8,14,15
117:1 145:18,23

146:23 157:10,14
161:2 163:2,8,21
164:16 165:20,23
168:7 180:24 188:16
189:3 190:3 191:1,3,4
193:16 197:10,23,24
205:2,14,24 206:4,14,
24 207:7 208:4,17,20
211:18 220:2 222:19,
24 230:2 232:7,23

Restraint- 122:23

restraints 14:3,11,16
32:18 33:8 39:10 57:14
58:15 69:14 71:21
74:6,12 75:23 76:20
81:17 82:21 112:20,22
114:13 123:9,16 145:7,
8,10,21 148:13 160:23
198:8 207:18 208:14,
19 211:16 213:11
221:1 227:2,14 228:6,
13 238:2,9,15

restricted 181:2,7

result 30:7 112:20
137:14 203:1

resulting 12:21 200:16

results 29:19 118:1,18
158:14 179:15,20
191:11 193:24 213:1
215:24

resuscitate 138:23

resuscitated 22:5
103:18

Retain 226:21

retained 10:18

retracted 109:18

returns 172:2

review 38:20 58:6
61:16 63:16 75:17
79:21 101:4 109:24
148:24 169:6 180:17
226:14,16

reviewed 18:4 47:9
74:9 75:7,14 123:1
143:8 152:13 164:19
166:10 177:2,8 226:8,9
228:22

reviewing 75:18
202:23

revs 108:8

Rhode 88:4,6,7

rhythm 54:16 55:2
66:5,7,14 67:18,19
89:24 90:2,6,8,14,16
142:5 188:1

Ric 8:22

Rich 46:15 47:6 48:2

Richard 29:11 141:24
189:3

Rick 184:9

rights 110:12

risk 95:24 96:2,5 104:2
105:20 114:21 123:12,
18 141:8 191:2,5,18
198:7 221:11 230:16

risks 60:5

road 229:7

Roeggla 193:2,14

role 33:23 226:1

roll 25:3

rolling 31:3 129:9
223:23

Ronald 38:21,24
146:22

room 23:7,12,17,23
34:8 85:13 87:10 89:22
110:20 124:9 131:1,10
148:3 234:11,22
235:18

Ross 94:3

rotate 226:13

rotating 226:6

roughly 31:9

rule 76:24 99:13,15,18,
24 184:11 225:11

ruling 100:8

**S**

S-H-I-M-I-Z-U 199:1

S-T-E-T-T-E-R 109:15

S-Y-M-P-A-T-H-O-M-
I-M-E-T-C 121:17

safe 105:18 124:3
145:22 146:11 223:15

safeguarding 20:9

safely 59:24 61:7
104:18

safer 19:1

safest 219:19

safety 144:14 219:7
220:15,16,20 223:4

salts 26:7

Sam 217:16

sample 51:22

Samuel 205:15

San 8:8 9:13 13:12
16:2 86:16 155:10,15,
20 157:1,15 158:15,18,
24 159:7,21 169:2
184:18 222:21 225:19
226:2

sat 76:21 77:13,20
78:10,13 79:1 113:3
127:20 130:13 131:17
132:5,13 133:10 134:6,
15,16 135:1,7 137:2
186:13,19,21 195:8,10,
11

sats 76:13 131:20
155:2 187:13 191:15

saturation 78:8,23
79:6 100:2,4,7 132:18
134:11 137:15,19
197:3

Savannah 46:16 47:7,
15 48:2

saving 128:2

scales 128:22,24

**Alpha Reporting Corporation**

**Gary Vilke - December 08, 2017**

**scenario** 78:5 132:22

**scene** 27:13 28:4 29:11,13 31:19,23 32:1 39:15 40:16 64:15 141:1 220:19

**science** 149:15 153:11

**scientifically** 192:14 202:20 214:2

**score** 126:10

**scores** 124:15

**screaming** 130:11 133:2 147:23

**screening** 149:22

**seated** 181:10

**seats** 163:8

**secluded** 81:24

**seclusion** 81:18

**secondarily** 16:13

**secondary** 19:8 38:14, 22

**seconds** 113:4

**section** 34:4,5 193:23 211:13 219:10 228:10

**sections** 160:18 187:16

**secure** 28:4 141:11,18

**security** 79:18 145:16 146:5

**sedate** 56:11,13 58:1 69:16 124:5 236:20 237:1

**sedated** 74:21 105:21 129:19 236:10,17,19 237:18

**sedates** 71:15

**sedating** 32:20 68:21 71:11 72:4 76:5

**sedation** 55:17,18 57:18 59:5 68:8,22 74:17 114:19 123:24 124:11 129:14 135:8,9, 10 183:12,16 221:9 236:7

**sedations** 69:13

**sedative** 236:24

**semantics** 32:21,22

**seminar** 98:4

**send** 184:19

**senior** 157:3

**sense** 42:12 74:16 84:21 91:3 112:23 137:6 143:3 231:23

**sensing** 43:18

**sentence** 65:12,18,20, 21 144:7,9 166:8 172:13 175:7

**SEP** 232:14

**separate** 233:18

**sepsis** 185:20

**September** 48:5

**sequence** 131:12

**sequential** 185:7

**Sergeant** 221:21,23 222:7,12,16

**series** 100:20 149:20 208:3

**serve** 106:12

**Services** 33:12 83:7 227:20

**set** 84:5 85:1 220:9

**setting** 59:6 123:10 129:10 138:17 195:18

**seventy** 31:12

**severe** 60:10 127:5 131:6 132:5

**severity** 124:14 125:13 132:2

**shackles** 145:12

**shaken** 45:24

**share** 78:18

**sharp** 51:21

**Sheriff's** 155:23 159:21

**shifting** 69:12

**Shimizu** 198:24 199:8

**Shimuzu** 199:21 201:13

**shock** 108:2,17 185:21

**shoot** 44:7

**shootings** 93:13,24 97:8 106:5

**short** 167:19

**shorter** 166:22,24

**shortly** 11:1 55:20

**show** 50:19 54:17 73:15 90:3 93:21 133:4 187:17 196:7 202:9

**showed** 109:13 118:19 213:10

**showing** 63:3 146:18 149:2 190:12 201:22

**shown** 74:4,7,10 96:7 172:21 176:5 180:23

**shows** 202:19

**sickle** 95:15,20

**side** 164:21 220:24 221:6,23 222:2,8 223:1,23 229:7

**sides** 118:6 221:3

**sign** 29:20

**signature** 106:12 107:21 108:12

**significance** 194:12 200:24 202:9 203:8

**significant** 155:3,4 159:14 165:24 167:10, 14,17,18,19,20 196:11, 12,13,18,23 198:17,20 199:23 200:9 201:8,14 202:1,7,24 203:6

**significantly** 71:12

**signs** 57:1 63:3,4,5 81:19 84:14 85:1 106:19 113:23 124:10 139:3 144:9 212:17 217:23

**similar** 34:22 92:17,22 93:4 153:16 176:10 189:19 207:9 231:22

**similarly** 207:7

**simple** 52:1,3

**simply** 23:13 56:19

**single** 53:11 54:7 190:15 192:6 215:11 221:19

**sinus** 67:18,19 68:1,6 183:9,13,17

**sir** 24:20 99:16 100:5 111:21 126:16 156:9 185:6 193:18 230:6

**sirens** 60:6,9,13,14 61:5,8

**sit** 61:10 122:18

**sites** 215:3

**sitting** 184:17 234:10

**situation** 140:8 168:6

**situations** 26:18 93:1 160:19

**size** 31:7 171:18 222:12

**skills** 103:19

**skin** 84:13

**skinny** 80:16

**sky** 15:12

**slow** 55:17

**slowly** 205:11

**small** 66:6 155:1 159:17 180:19 181:16

**smaller** 212:21 231:17

**SMDL** 228:1

**society** 181:15 190:18 192:22,23

**soft** 148:12

**solely** 22:18

**SOPS** 77:15

**sort** 15:3 19:8 42:6 43:2 72:20 108:7

**Gary Vilke - December 08, 2017**

121:2,5,19 122:12 125:19,24 126:9 187:1, 2 190:2 191:12 192:3 200:8 211:11 220:7

**sound** 105:24 222:16

**sounds** 19:22 33:18 43:18 93:18 117:6 139:19 141:5 206:1 208:22 210:9 218:4 224:2 227:3 234:4

**source** 14:19 75:12 145:18 154:5

**Southaven** 8:12 9:2 232:19

**Southeastern** 8:23

**speak** 58:10

**special** 84:14

**specialized** 107:13 108:15

**specialties** 11:21,23

**specific** 15:6,8 18:15 53:3 54:7 62:8 71:1 77:14 81:15 87:9 89:6 101:3 107:24 119:17

**specifically** 10:1 13:14 16:12 18:1 42:19 77:12 85:15 97:1 101:15 110:1 120:6 143:14 198:15 211:10 222:1 224:4 228:8

**specifications** 181:15

**specifics** 23:3 111:18 135:6 143:10 222:11

**spinal** 172:11

**Spine** 178:9

**spinning** 31:3

**spitting** 147:24 221:5 222:3

**Spitz** 161:23,24 162:1, 8,19 164:13

**SPO2** 127:5,10,14,17

**spray** 97:2

**staff** 81:5,8,13 82:8 130:19 145:24 190:1

**stamp** 226:10,15

**standard** 104:4 131:23 135:15,17 136:5,17,23 137:1 190:17

**standardized** 86:22, 24

**standing** 189:22 195:20

**start** 40:13 57:2 70:17 123:24 140:21 185:22 187:18

**started** 40:9 55:16 156:21 157:6 186:18

**starting** 68:8 74:16

**stasis** 175:3 176:16

**state** 9:11 19:20 28:20 32:7,16 41:8,16 42:11, 20 44:17 45:2 59:17 64:20 93:7 97:9 104:3, 17 205:23 207:12,13 215:14 218:18,23 227:21,23 230:1,4,20 236:9

**stated** 39:3,9 40:22

**statement** 35:10 81:22 98:5 120:20 123:8 142:1,21 146:15 168:21 170:21 171:3 175:18,21,22 177:22 213:6 236:21

**statements** 102:7

**states** 8:10 10:14 46:18 91:2 177:3 224:17 230:24

**stating** 164:16

**statistically** 167:17 203:6 217:12

**stature** 151:22

**status** 27:14,24 32:9 48:22 84:13 85:20 86:1 88:23,24 89:2,4,9,13, 24 90:3 127:6 128:7,16 131:9 132:8 235:12

**statuses** 170:22

**stay** 41:2 221:5 231:10

**stemi** 129:9

**step** 125:16,18,21 185:6,9,15

**Stetter** 109:15

**stick** 105:18

**sticking** 35:20

**stiff** 174:17

**stiffness** 176:8

**stimulant** 92:1 120:17, 18,21 121:1,15,19,21 122:11,13,20,21 152:5 153:23 216:3,4

**stimulants** 39:21,22 121:12

**stimulate** 168:13

**stimulating** 216:8

**stimuli** 49:17

**stomach** 83:1 157:17 181:3 220:23 221:24 237:20

**stop** 89:3

**stopped** 12:24 85:22

**story** 147:13

**straight** 118:6

**strain** 59:19

**straining** 193:21

**strange** 195:7

**strangely** 94:6

**straps** 62:24 64:5

**Stratton** 100:17,24 204:24 205:15 207:17 208:7 209:14 212:6 213:9 214:15 231:5

**Stratton's** 206:7,10 207:6 215:8 217:10,16 231:19 232:1

**stray** 97:5

**streaming** 64:11

**Street** 8:8

**streets** 229:4

**strength** 216:24

**stress** 95:19 168:16

**stressful** 92:24

**stressors** 12:16 161:6, 9,10,14,16

**stretcher** 221:1

**strike** 25:17

**strip** 54:17 66:7 90:2,6 142:5

**strips** 66:5 89:24 90:15,16

**stroke** 92:5 128:11 129:9 200:15 202:3

**strong** 26:20 58:16 162:3

**struggle** 16:13 19:12 64:21 65:3,5,6,10 123:15 168:14

**struggling** 20:14,18 31:3 34:11 35:11 63:3

**studied** 107:2 118:5 201:21 207:17 209:14 213:22 216:11,12,14

**studies** 74:4,7,9 96:15, 19,21 100:5,6,18,19,22 106:3,21 123:6 149:14 154:19 155:5,6 160:4, 9,13,20 161:19 163:19 166:22,24 168:23 169:3,11,14,19 176:18 187:12 195:5 213:23 228:16,18,20,23 229:20,24 232:1

**study** 10:24 96:24 97:2,3 100:22 107:16, 24 111:19,23 113:3 117:3,7,19 118:1 123:4,9 136:1 149:13, 24 155:9,13,14 156:1, 4,22 157:2,4,6,8,16,21, 22 158:3,9,10,11,13,14 159:6 162:24 165:20 166:12,15,22 167:8 168:12,22 173:20 178:11,12 180:11,16, 18,23 191:22 192:20 193:3,7 194:22 195:14,

**Gary Vilke - December 08, 2017**

23 196:6 198:24 200:14 201:13,20 202:19 204:23 205:21 206:10,12 207:6 208:7, 14,17 209:5,12,16,21 211:2,24 212:3,6,12 213:3,10,14 214:1,5,6, 12,15 215:9 217:4 229:5 231:5,19

**studying** 210:16

**stuff** 25:15 43:3

**style** 68:15 219:12

**subdued** 79:18

**subject** 20:9 59:2 69:12 96:16 146:24

**subjects** 40:5 158:2,4, 7 165:22 194:16 197:10,22 198:5,6 212:17 229:20 230:3

**subsequently** 148:6,9

**successful** 139:11

**sudden** 15:12 19:15 21:19,20,22,23,24 22:2 27:3 153:11 188:16 191:3,18 205:1,13 208:2 230:16 232:24

**suddenly** 138:22 139:23 196:21

**suffering** 204:2

**sufficient** 15:1

**suggestions** 98:20

**Suite** 8:8

**sum** 228:15

**supervise** 58:8

**supine** 179:4,9,18 189:24 195:20 200:3, 18 201:24 203:4 223:1

**supplemental** 77:5,9, 16,21 129:15,18,22,24 130:4 132:20 139:5 140:3 143:23 186:8 187:20 233:15 234:1

**supplementing** 187:18

**support** 23:2 86:7 122:19 134:6 160:4

**supported** 117:4 118:15,20 165:1

**supporting** 118:7

**supports** 153:19

**suppose** 29:18 46:3 184:13

**supraventricular** 53:1,7 181:20 182:9

**surely** 206:24

**surface** 118:22 163:10

**surgeons** 33:5

**surgery** 119:14 178:9, 10

**surgical** 175:14,19,23

**surprise** 126:7

**surprised** 118:18,23 119:1 120:6

**surprisingly** 90:24 91:6,9

**surrounded** 141:2

**surrounding** 132:22

**surroundings** 41:9, 11,12 43:24

**survivability** 88:12

**suspicion** 76:12

**SVO2** 131:6

**SVT** 53:7,9,10,19,22 54:13,16,17 55:1,2,3,4, 7 182:11,12

**swear** 9:4

**sweating** 217:1

**swimming** 42:7

**switch** 156:8 203:10 220:18 221:8

**switching** 200:2,17

**sworn** 9:6

**sympathomimetic** 120:16 121:16,18,23 122:10 123:10

**symptoms** 14:13 40:6 52:13 92:16,17,20 106:19 113:23 198:9

**syndrome** 11:12,14,15 14:15,18 15:20 16:3 17:14 34:2 40:9 44:17 77:19 95:15 97:11 106:13 116:24 117:2 122:5 123:21 136:10 149:11 150:20 204:7, 20 208:8 215:2,7,15 230:4 231:15

**system** 15:10 108:7,8 229:8 232:5

**Systems** 178:8

**systolic** 199:23 201:15

---

**T**

**Table** 227:12

**tach** 183:9,13

**tachyarrhythmia** 182:16,17,21,24 183:1, 12 185:12,19

**tachycardia** 53:2,8 55:12 67:16,19 68:2,6 181:20 182:10,14 183:8,17 185:2,19 189:5

**tachycardias** 181:22

**tachycardic** 55:15 67:10

**takes** 162:3

**Takeuchi** 148:23 149:17

**taking** 30:19 61:12 79:23 174:1 179:7 214:3 217:10 220:9 223:22

**talk** 26:2 48:17 163:18 165:2 187:13 201:11

**talked** 25:23 37:18 48:23 51:17 69:13 131:17 135:20 152:10 159:9 173:1 174:5 187:12

**talking** 37:12,14,15,16 60:17,18 65:13 77:12, 13 80:9 89:10,11,15 102:6 110:4,5 138:11 145:11 147:23 156:21 157:9 161:3 162:19 174:8 186:6 201:1 209:17 212:16 224:9, 10,14 229:4,7,14,15 236:7,22

**talks** 17:13

**TARP** 206:14,15

**task** 140:19 152:13,14, 20

**technically** 35:22

**technique** 206:15

**Telemetry** 234:19

**telephonically** 9:2

**telling** 44:1 202:11

**tells** 52:24 132:10

**temperature** 101:11, 21 102:18 104:2,6,9, 13,16 106:2 109:2,9, 10,12

**ten** 23:5 204:4

**tend** 84:19 108:14 113:22 182:23 195:12 219:24 230:14

**Tennessee** 46:16

**term** 11:12 13:3 33:10 38:2,11,12 91:10 122:5

**terming** 136:17

**terms** 13:7

**test** 51:15 107:13 137:14 168:1,5 194:9

**tested** 167:24 180:24 189:13

**testified** 9:7 10:6,20, 22 19:17 68:11 94:21 136:4,5 204:1 223:24 224:5,24 225:4,8 230:12

**testify** 10:16 46:15 47:5 61:18 110:12,14,

**Gary Vilke - December 08, 2017**

16 224:1

**testimonies** 79:16

**testimony** 8:2 13:10 22:17,18 24:3 25:9 46:8,11,13 47:20 48:1 74:1 75:2 79:21 87:22 89:10 98:15 102:9 116:19 117:12 125:1,6 148:17 150:15 151:5 154:11 170:7 178:2 180:7 184:2 188:21 193:11 197:17 199:14 205:8 209:2 218:15 221:21 224:3 225:17 227:9 233:20 236:13

**testing** 29:18,20 118:19 136:6 157:13 159:18 164:7 181:12, 14 192:23 194:11

**testings** 154:24

**tests** 164:3

**Texas** 13:12,13

**text** 17:5,11,23 18:9 25:19 97:7

**textbook** 18:5 105:13 162:11 204:14

**Tharpe** 24:1

**Tharpe's** 24:3

**theoretical** 34:9

**theories** 38:23

**theory** 83:3

**therapy** 55:16 124:12

**thereabouts** 231:7

**thermometer** 105:23

**thing** 32:12 35:6 48:24 50:1 52:16 63:20 95:13 131:23 176:16 215:4, 12,16 219:24 220:7 236:6

**things** 18:3 22:13 23:9 26:1 32:14 41:11 43:2 45:19 48:21 61:15 62:7 71:19 82:5 87:13 91:17,22 93:7,18 95:9 104:17 108:14 115:12

120:4 133:4 139:12 172:15 184:9 195:3 203:17 213:23 214:2 217:3 220:6,9 225:23 226:19,21,23 238:11 239:3

**thinking** 164:22 192:19 239:4

**Thoracic** 181:15 190:18 192:22

**Thorazine** 40:19

**thought** 18:24 24:6 50:14 65:5 108:8 131:2 192:18 199:3 204:14

**thousands** 123:5

**threat** 25:11 27:21 28:1,5,7,9,12,15,16,18 141:7,9,11,20,21,22 223:17

**thrombotic** 175:3 176:17

**throwing** 57:2 104:21

**throws** 195:21

**thyroid** 92:7

**tidal** 155:2 191:14

**tiers** 60:7

**tighter** 212:19

**tightly** 206:14

**Tim** 8:17 9:10 116:10 184:4,11 227:16

**time** 8:6 10:22 16:15 22:8 27:19 28:12 30:19 35:2 36:6 39:19 40:7,8, 15,17,20 41:3,4 47:2,8 51:16 62:2,14,16 63:18 64:1,18 65:24 67:4,17 69:4,8 73:9 85:3,12 111:2,3,6,10 124:8 129:18 134:4 135:5,14 138:5 153:1 156:13,17 157:1 161:1 166:23 167:1,19 169:5 188:13 194:7 195:19 217:21 218:5,9 229:22 230:2 239:14

**times** 10:16 38:5 45:1 62:7 73:4 135:5 146:4 164:2,20 167:3,6 220:17 221:3 224:7,8, 16

**Timothy** 36:15,17

**tire** 216:24

**title** 74:24 87:18 93:17 116:6 205:11 227:17, 24

**titles** 188:23

**today** 8:14 122:8,18 153:22 184:6 187:13

**Today's** 8:6

**told** 79:2 208:12

**tolerance** 216:21

**tolerate** 198:7,12

**tool** 106:12

**top** 74:23 84:7,9 121:7 211:5 222:14 237:21 239:5,9

**topic** 16:19 103:3 216:14

**torsade** 70:24

**torso** 190:2

**total** 209:17

**totality** 237:8

**toxic** 18:22 25:21 37:20

**toxicity** 37:11,12,16 210:8,11,23 231:12

**toxicologic** 120:23

**toxicology** 149:22

**tracing** 44:22 53:11 54:8

**traditional** 235:13

**trained** 71:20 81:5,6,8 82:8 86:10 88:19 90:5, 11,14 112:23 235:4,16

**training** 22:23 23:1,2 58:19 81:14 85:14,16 86:4,8,9,19 88:22 89:6

103:13 216:13

**transferred** 61:3

**translates** 134:11

**transport** 148:3 165:17 207:22 208:1 219:20 220:13

**transported** 99:5,7 108:6 206:3,20 219:15

**transporter** 108:2

**Transporting** 165:13

**trauma** 33:5 49:1,5 168:16 185:21

**treat** 67:22 68:8 71:3 92:12 151:20 182:12 183:11,13 185:16,21

**treated** 38:16 40:14,18 76:1,7

**treating** 183:21

**treatise** 93:11 162:10

**treatment** 40:11 58:24 68:3 88:11 105:15 128:5 129:5 183:18 185:23 204:7,21 208:9

**triage** 56:11,17 57:3 115:20 124:14,17 126:17 127:14,15,16, 18 128:22,24 131:14

**triaging** 126:9

**trial** 158:19 159:10 165:1 224:3 225:9

**triggers** 116:23

**tripping** 68:18

**Troy** 11:6 23:5 28:11 35:24 52:13 56:11 59:13 84:23 86:11 107:6 108:23,24 109:2 160:8 161:1 163:24 167:3 168:6 181:24 183:3 186:17 207:7 216:18 217:8 220:23 221:22 222:8 228:17, 24 230:1

**true** 19:1 36:11 75:22 90:23 97:10 139:24 177:7 182:11 183:18

**Gary Vilke - December 08, 2017**

230:6,24 236:17,20

**tucked** 109:10

**turn** 25:4,10 60:3 219:5 221:22 222:2 223:17

**turned** 22:10

**turning** 173:6 222:8

**twelve** 219:10

**twenty-** 147:4

**Twenty-six** 147:4

**twisting** 221:5

**type** 33:6 76:23 87:12 113:1 118:14 125:23 128:14 219:24 220:11

**typed** 116:16

**types** 23:9 45:6,8 72:20 79:6 82:15 177:9 185:24 203:5 213:20, 21 239:2

**typical** 120:14 235:24

**typically** 15:4 31:17 37:20 41:17 45:12 51:20 56:22 65:7 80:2 92:1 113:20 122:3 124:17 128:10,12,23 130:9 145:4 151:17 183:17 185:10,13 212:18

---

**U**

**U.S.** 70:12 212:24 213:16

**Uh-huh** 208:5

**ultimately** 106:2 135:23 150:6 158:15 230:2

**unable** 24:18 198:11

**unarmed** 79:18

**unaware** 41:24 42:2 48:12,15

**UNC** 121:10

**uncomfortable** 219:23

**unconscious** 22:3

**underlying** 75:23 76:6,9 170:23 183:11, 13 185:16

**understand** 13:5 20:24 21:12 23:8,21 24:20 35:9 43:9 46:2,7 108:1 116:12 157:9 196:15 225:5 226:18 229:13 236:5

**understanding** 31:7 40:23 156:23

**undivided** 235:1

**undocumented** 109:3

**unequivocal** 82:9

**unfair** 211:11

**uniform** 65:5

**uniformly** 11:20

**United** 8:10 10:13 46:18 91:2 224:17

**universal** 100:16 171:9 174:7

**university** 36:18 107:15 178:7 193:15 195:24

**unknown** 41:13

**Unlike** 211:14

**unmanageable** 80:8

**unquote** 60:8

**unreasonable** 126:10

**unrecognized** 74:20

**unreliable** 31:6 94:19

**unresponsive** 89:3 127:6

**unrestrained** 141:9

**unsafe** 138:15

**unseen** 26:9,11

**unsupported** 117:5 118:24 234:1

**untrained** 79:17

**untreated** 91:24

**Upchurch** 119:23,24 232:15

**upper** 189:2

**upset** 66:15

**upsetting** 82:17

**urgently** 61:4

**user** 125:22

**users** 153:23

**usual** 151:18

**utility** 31:4

**utilize** 125:10,11

**utilized** 81:3

---

**V**

**V-FIB** 88:15 182:4

**vague** 119:13

**vaguely** 117:18

**valid** 11:21 61:22 192:7,14,24

**values** 157:24

**variable** 72:23

**variations** 43:22

**vary** 43:21 60:14

**varying** 64:6

**vehemently** 164:15

**vehicle** 60:4

**vein** 172:2,4

**veins** 95:8

**vena** 171:23 174:22 177:13

**venous** 175:2 176:16

**ventilate** 167:23

**ventilation** 154:23

**ventilations** 71:11,18 74:14

**ventilatory** 71:13 113:23 115:1

**ventricular** 95:7

**verbal** 22:12

**verbalizing** 23:19 130:9

**verbatim** 139:21

**verifying** 54:21

**Versed** 56:20 57:14,24

**version** 82:24 193:20

**versus** 8:12 46:16 47:7 48:2 61:14 65:14 106:20 109:15 138:11 155:10 219:12 224:1 236:14

**vessels** 174:17

**victims** 206:12 208:2

**video** 234:12

**Vienna** 193:15 195:24

**view** 118:17

**Vilke** 8:15 9:5,12 52:11 94:3 204:19 232:13

**violated** 144:2

**violent** 27:17 216:21

**virtually** 26:9,11 30:11 34:11 35:11

**virtue** 45:4

**visual** 234:22 235:16

**visually** 49:22 235:11

**vital** 29:20 57:1 63:4,5 84:14 85:1 124:10 139:3 144:9 190:9 193:17 194:1,5,13 196:22

**vitals** 29:18

**voice** 225:6

**volume** 170:22 200:15 202:3 205:17

**volumes** 159:18

---

**W**

**wait** 105:20

**Alpha Reporting Corporation**

**Gary Vilke - December 08, 2017**

**wall** 118:8 181:1,5

**wane** 43:19

**wanted** 53:22 73:3 84:6 203:16 229:5,16

**warning** 69:24 70:1,7, 9,22 238:22

**warrants** 119:8

**watch** 68:18 70:18,21 71:2 114:24 115:1

**watching** 85:7,9 234:11

**wax** 43:19

**ways** 82:18

**Weatherford** 29:11,14 142:1,12

**weighed** 79:11

**weight** 31:15,17,18 62:11,19,23 63:10,12, 15,21,23,24 64:3,5,11, 14 80:18 97:3 190:2

**Werner** 162:1,2

**West** 10:8

**Western** 75:9

**Wetli** 153:10

**Wetli's** 153:13

**white** 17:13,16,21 150:19,23 151:8 152:2

**wide** 182:19 183:1,4

**widely** 162:16

**window** 19:6 66:7 147:13,16,21 148:4,5, 10 150:5,7,8 166:20

**wing** 190:2

**wires** 31:4 44:24

**wise** 177:4

**withdrawal** 92:19,23

**witnesses** 169:16

**wobbling** 221:4

**women** 91:13,14

**wood** 237:4

**word** 24:9 33:7 58:16 79:8 93:8 140:16 144:6 169:13

**worded** 101:22

**words** 18:5 33:7 91:11 128:14 143:7 226:10

**work** 23:20 24:23 74:18 83:11 87:15 94:8 103:7 110:6 122:22 175:13 176:12

**worked** 9:19 56:8 208:18 212:2

**working** 83:16,24 134:24 156:24 227:15

**works** 21:5

**world** 98:13

**worth** 214:3

**wound** 120:4

**wrap** 218:3

**write** 87:17 88:15 102:1 151:18 152:23, 24 166:9 168:18 171:14 191:7 200:1,4

**writing** 143:22 154:7

**writings** 99:11 212:7

**written** 16:3,5,6 26:22 27:5 28:19 29:3 32:12 79:5 82:16 121:4 132:1 139:20 152:15 166:5, 19 174:3

**wrong** 72:12 195:2,5, 22 210:15 215:8

**wrote** 17:18,22 55:5,6 95:13 97:18 98:18 100:24 101:17 102:11 139:14,18,22 140:4 141:10 151:16 152:16 179:24 204:6,9,19

---

**Y**

**year** 94:9 204:9,17

**years** 74:19 107:2 110:15 123:6 160:5 204:12 208:13 225:15,

18

**yell** 24:7 43:12

**yelling** 20:18 23:8 64:11 89:11,15 130:8, 11,20,24 133:2 186:6

**younger** 174:19 176:10