## REPORT OF MICHAEL ARNALL, M.D.

My name is Michael Arnall, and I am a medical doctor concentrating in the field of forensic pathology. My curriculum vitae is attached to this report.

I have received from the office of legal counsel for Mrs. Goode the following:

1) Photo of Troy Good with his son;

2) Amended complaint;

3) Police report;

4) EMS report;

5) Baptist medical records;

6) Video at the scene of arrest;

7) Video of ambulance unloading Mr. Goode at the hospital;

8) USA Today article;

9) Mississippi State autopsy report signed by Erin Barnhart, M. D.;

10) Autopsy report of Cyril Wecht, M.D.;

11) Report and curriculum vitae of Parin Parikh, M.D.;

12) Report and curriculum vitae of David E. Nichols, Ph.D.;

13) Deposition of Nurse Jeff Baker;



EXHIBIT 9

14) 42 CFR 482.13;

15) Coroner's report;

16) Deposition of Sergeant Matthew Tyler Price; and

17) Deposition of an independent witness, Janet Tharpe.

In addition to the furnished materials, I rely upon my education and experience of a forensic pathologist in stating my opinion as to the cause of death of Troy Goode.

My understanding of the facts of this incident are as follows:

## FACTUAL PREDICATE

On July 18, 2015, Troy Goode and his wife, Kelli, travelled from their home in Cordova, TN to the Snowden Grove music venue in Southaven, MS for a Widespread Panic concert. The Goodes parked under a tree in the parking lot of the venue. They were joined by four or five of Mr. Goode's friends. The males including Mr. Goode placed some amount of LSD onto their palms.

After ingesting the LSD, Mr. Goode became paranoid and claustrophobic. The thought of attending the concert was abandoned, and Mrs. Goode got her husband in the passenger seat of their car so she could drive him home.

Mrs. Goode was driving along Goodman Rd. in Southaven when Mr. Goode said that he could not stand the confines of the automobile. Mrs. Goode pulled into a parking lot in front of a small shopping center after Mr. Goode exited the vehicle.

Mr. Goode began walking about in a grassy area in front of the shopping strip. His actions appeared erratic and without purpose. He could be described as running in circles. A

witness in one of the businesses in the strip shopping center saw what was going on and the witness contacted the Southaven Police Department.

Multiple officers arrived on the scene.

Mr. Goode was taken to the ground by a K9 dog. Serious bite wounds were inflicted on Mr. Goode's arm.

Mr. Goode was also hit by a Taser dart fired by an Officer.

Officers applied pressure into Mr. Goode's back, pulled his arms behind him, handcuffing him. His feet were then bent up and shackled to his hands, a position commonly referred to as "hog-tie." He was face-down on the ground. Mr. Goode was struggling to roll onto his side but was held down in a prone position by officers.

Subsequently an ambulance with emergency medical personnel had arrived. A gurney was taken from the ambulance and lowered to the ground. Police officers picked up Mr. Goode by the shackles and placed him face down on the gurney. Five straps were then used to secure Mr. Goode to the gurney. He was loaded into the ambulance

Responding personnel were told that Mr. Goode was asthmatic and carried an inhaler in his pocket.

The ambulance in non-emergent manner leisurely transferred Mr. Goode to Baptist Memorial Hospital-Desoto. Mr. Goode was transported in the ambulance still hogtied and prone.

During the transport, at 8:20 p.m., an EMT recorded supraventricular tachycardia with a pulse rate of 164. Five minutes later, she again recorded SVT, heart rate of 186 I believe. Within that five minutes, Mr. Goode's diastolic blood pressure dropped 30 points to around 61.

Also during the ambulance transport, the EMT placed an IV in Mr. Goode's left arm. Apparently the EMT had a chemical restraint available in the ambulance. She did not resort to its use in spite of the claim that Mr. Goode was uncontrollable.

At 8:33 p.m., Mr. Goode was triaged at Baptist. His temperature was taken orally and recorded at 98.2 degrees Fahrenheit. His pulse was recorded at 164, and the software apparently registered a warning next to the reading. Respiration was recorded at 24. Blood pressure was recorded at 122/64 mmHg. SpO2 registered 90%, and again, the hospital software apparently recorded a warning alert next to the oxygen reading.

After triage was completed, he was assigned an acuity level of 2 on the ESI index. He was transported, still hogtied and prone, to a room in the Emergency Department. Janet Tharpe was an independent witness in the ED. Mr. Goode was wheeled past her within several feet. She described Mr. Goode's face as "swelled-up and just red. His eyes were bulged out. It was horrifying." Ms. Tharpe further testified that Mr. Goode was totally incapable of movement because of the hogtie. No cardiac monitor or supplemental oxygen was used. I am not aware that oxygen saturation was measured in the treatment room.

I am not aware that vital signs were measured subsequent to transfer to the treatment room in the Emergency Department. At approximately 9:00 p.m., the emergency physician came into the room but performed no examination whatsoever. It is my understanding that the physician gave the excuse for omitting a physical examination that the patient was unruly. This is in sharp contrast to the description of the patient given by the witness Ms. Tharpe. Mr. Goode remained hogtied and prone. The doctor ordered tests including alcohol blood, drug screen urine panel, urinalysis auto microscopic, comprehensive metabolic panel, CBC with differential but no arterial blood gas. I have not seen the test results. It appears

that the test results were never obtained.

The patient had an intravenous catheter in place. There is no explanation given for the failure to obtain results for the tests ordered by the physician.

The doctor also ordered Haldol 5 mg and Ativan 2 mg. Those medications were injected IV by a nurse at 9:08 p.m. Within 14 minutes, the patient had no respirations. After injecting the Haldol and Ativan, the nurse left the room leaving only a police officer with Mr. Goode. There was no medical supervision before the code was called.

At 9:22 p.m., the police officer notified medical personnel that Mr. Goode had stopped breathing. It was only upon arrival in the room of medical personnel after Mr. Goode stopped breathing that the hog-tie was released and Mr. Goode turned off of his stomach. A code was called at that time. Bedside Glucose was measured at 95 mg/dL. The resuscitation was unsuccessful, and the doctor pronounced death at 9:44 p.m. The emergency doctor signed a state of Mississippi Death Certificate listing as the preliminary cause of death as "cardio pulmonary arrest." Months after the autopsy was done in Jackson, MS. the assistant medical examiner, by then relocated to South Texas, signed the report which listed the cause of death as complications of LSD.

Post mortem toxicology was performed twice. The toxicology report from NMS Labs found LSD in the amount of 1.0 mg/mL in Mr. Goode's subclavian blood. There was no evidence of any of the so-called "designer" drugs considered to be highly dangerous.

## THE EFFECTS OF POLICE RESTRAINTS AND POSITION

My professional opinion is that the hogtie in a prone position for an extended period of time was a substantial contributing cause of the death of Mr. Goode. In this case the hogtie restraint lasted 1.5 to 2 hours. A person who is handcuffed and hogtied plus being restrained

prone has trouble breathing. The fact that Mr. Goode was asthmatic was an exacerbating factor to the hogtie in a prone position. Likewise, the excited state precipitated by ingestion of LSD increased his susceptibility to the cardiac arrhythmia which was demonstrated by the EMS ECG.

Regarding the respiration component of the death, it is long been known that positional or restraint asphyxia can occur when a person is hogtied in a prone position. The victim is unable to reposition himself in order to breathe. The asphyxia can be caused by facial compression, neck compression, or chest compression. Passive deaths following custody restraint which are presumed to be positional asphyxia may actually be asphyxia occurring during the restraint process. Testimony in the case appears to have established that officers applied weight to Mr. Goode's back during restraint. An officer admitted that he restrained Mr. Goode so that he could not roll over onto his side, a move which obviously demonstrates an effort to get increased oxygen. It is of import that officers at the time of arrest applied pressure to Mr. Goode to keep Mr. Goode from rolling on his side. The fact that Mr. Goode experienced a restricted ability to breathe is corroborated by the pulse oximeter reading taken during triage and the testimony of Janet Tharpe, an independent witness, who described in detail Mr. Goode's distress while being wheeled down the hall of the Emergency Department.

Likewise, the National Institute of Health has concluded that persons restrained face down with application of body weight on the upper torso and/or in a flex restraint position showed a significant reduction in lung function.

## THE BAPTIST MEDICAL RECORDS

The medical records indicate that Mr. Goode was screaming uncontrollably and actively hallucinating. The record documents that Mr. Goode was combative and agitated. Haldol and

Ativan, which are chemical restraints, were administered intravenously. The attending physician ordered a comprehensive metabolic panel, although there is no record of results of this test. During the attempted resuscitation of Mr. Goode, the physician ordered the administration of sodium bicarbonate. Sodium bicarbonate is used to reverse the condition called acidosis. Acidosis may be due to metabolic causes such as vigorous exercise or respiratory causes such as decreased or compromised respiratory efforts. Mr. Goode experienced both causes of acidosis. He was predictably straining against the prone hogtie restraint as anyone would, a version of isometric weight lifting. The evidence that he was straining against the shackles is shown by the contusions on his wrist and ankles. Mr. Goode was subject to metabolic acidosis and at the same time to involuntarily compromised respiratory effort caused by the prone hogtie restraint. In medical terms, he was subject to respiratory acidosis as well.

Thy hyperventilation associated with yelling and screaming due to the agitated state was a substantial benefit in keeping Mr. Goode alive as it kept him in a compensated condition between the metabolic and respiratory acidosis induced by the prone hogtie restraint and the respiratory alkalosis induced by hyperventilation due to the effects of LSD. Strictly speaking, the effects of LSD and hyperventilation were substantially benefiting Mr. Goode's physiologic attempt to compensate for the restraint-induced metabolic and respiratory acidosis.

When the physician ordered and the nurse administered the chemical restraints, the compensatory respiratory alkalosis was suppressed by the Haldol and Ativan. Mr. Goode should have been closely monitored after the administration of the chemical restraints in order to detect respiratory and cardiac status changes in a timely fashion. Medical personnel failed to monitor Mr. Goode's respiratory and cardiac status so that when his breathing stopped, irreversible damage was caused before the resuscitation began.

## OPINIONS

Many individuals hogtied and prone show a significant reduction in lung function. (www.ncbi.nlm.nih.gov/pubmed/18533573)

Any person who is restrained prone has trouble breathing when hogtied, and the natural reaction is to panic, struggle, sometimes more violently, which can result in greater oxygen deficiency (as evidenced here) and in some cases death (also evidenced here).(www.ncbi.nlm.nih.gov/pmc/articles/PMC1112961/{*Acute Excited States And Sudden Death, Death After Restraint Can Be Avoided*})

Mr. Goode was at high risk from being hogtied and in a prone position due to his asthmatic condition.

Mr. Goode suffered respiratory compromise and cardiac arrhythmias, caused by hogtie restraint, which were substantially contributory to his death.

A struggling, agitated individual breaths faster, has a faster heartbeat, elevated blood pressure and heightened metabolism. Such an individual requires more air and more oxygen. The struggling individual experiences the propensity for metabolic acidosis experienced by all vigorously exercising individuals. The body naturally responds by increased respiration that causes a compensatory respiratory alkalosis. Immobilization of the chest, even if only partially reducing the ability to maintain vital functions such as breathing, predictably exacerbates the risk of cardiac arrhythmia.( http://www.corrections.com/news/article/6887 **Reducing the Risk Associated with Use of Restraints**

The use of prone restraint predictably exacerbates the risk of sudden death and many deaths have occurred in individuals, who while in police custody had been restrained in this position. The death of Troy Goode from a forensic pathology standpoint should be classified as a homicide. His death cannot be classified as a case of natural death or accident.( Medicolegal Investigation of Death, fourth edition, edited by Werner Spitz) and (DiMaio and DiMaio's Forensic Pathology, second edition) and (A Guide for Manner of Death Classification", published by the National Association of Medical Examiners (NAME) 2002) and (Excited Delirium Syndrome, DiMaio and DiMaio, 2006) and (Sudden Deaths in Custody, Ross and Chan

editors, 2006) and (Handbook of Forensic Pathology, 2003, published by the College of American Pathologists)

Based upon a reasonable degree of medical certainty, Mr. Goode's death was caused by the manner of restraint and positioning (precipitating asphyxia) and the subsequent intravenous administration of chemical restraints which exacerbated asphyxia and ultimately precipitated cardio-pulmonary arrest.

My charge for medico-legal consulting is $150.00 per hour.

Electronically signed by Michael Arnall, M.D.
Michael Arnall, M.D.


Date:   July 30, 2017

## REPORT OF MICHAEL ARNALL, M.D.

My name is Michael Arnall, and I am a medical doctor concentrating in the field of forensic pathology. My curriculum vitae is attached to this report.

I have received from the office of legal counsel for Mrs. Goode the following:

1) Photo of Troy Good with his son;

2) Amended complaint;

3) Police report;

4) EMS report;

5) Baptist medical records;

6) Video at the scene of arrest;

7) Video of ambulance unloading Mr. Goode at the hospital;

8) USA Today article;

9) Mississippi State autopsy report signed by Erin Barnhart, M. D.;

10) Autopsy report of Cyril Wecht, M.D.;

11) Report and curriculum vitae of Parin Parikh, M.D.;

12) Report and curriculum vitae of David E. Nichols, Ph.D.;

13) Deposition of Nurse Jeff Baker;



EXHIBIT 9-sup report

14) 42 CFR 482.13;

15) Coroner's report;

16) Deposition of Sergeant Matthew Tyler Price; and

17) Deposition of an independent witness, Janet Tharpe.

In addition to the furnished materials, I rely upon my education and experience of a forensic pathologist in stating my opinion as to the cause of death of Troy Goode.

My understanding of the facts of this incident are as follows:

## FACTUAL PREDICATE

On July 18, 2015, Troy Goode and his wife, Kelli, travelled from their home in Cordova, TN to the Snowden Grove music venue in Southaven, MS for a Widespread Panic concert. The Goodes parked under a tree in the parking lot of the venue. They were joined by four or five of Mr. Goode's friends. The males including Mr. Goode placed some amount of LSD onto their palms.

After ingesting the LSD, Mr. Goode became paranoid and claustrophobic. The thought of attending the concert was abandoned, and Mrs. Goode got her husband in the passenger seat of their car so she could drive him home.

Mrs. Goode was driving along Goodman Rd. in Southaven when Mr. Goode said that he could not stand the confines of the automobile. Mrs. Goode pulled into a parking lot in front of a small shopping center after Mr. Goode exited the vehicle.

Mr. Goode began walking about in a grassy area in front of the shopping strip. His actions appeared erratic and without purpose. He could be described as running in circles. A

witness in one of the businesses in the strip shopping center saw what was going on and the witness contacted the Southaven Police Department.

Multiple officers arrived on the scene.

Mr. Goode was taken to the ground by a K9 dog. Serious bite wounds were inflicted on Mr. Goode's arm.

Mr. Goode was also hit by a Taser dart fired by an Officer.

Officers applied pressure into Mr. Goode's back, pulled his arms behind him, handcuffing him. His feet were then bent up and shackled to his hands, a position commonly referred to as "hog-tie." He was face-down on the ground. Mr. Goode was struggling to roll onto his side but was held down in a prone position by officers.

Subsequently an ambulance with emergency medical personnel had arrived. A gurney was taken from the ambulance and lowered to the ground. Police officers picked up Mr. Goode by the shackles and placed him face down on the gurney. Five straps were then used to secure Mr. Goode to the gurney. He was loaded into the ambulance

Responding personnel were told that Mr. Goode was asthmatic and carried an inhaler in his pocket.

The ambulance in non-emergent manner leisurely transferred Mr. Goode to Baptist Memorial Hospital-Desoto. Mr. Goode was transported in the ambulance still hogtied and prone.

During the transport, at 8:20 p.m., an EMT recorded supraventricular tachycardia with a pulse rate of 164. Five minutes later, she again recorded SVT, heart rate of 186 I believe. Within that five minutes, Mr. Goode's diastolic blood pressure dropped 30 points to around 61.

Also during the ambulance transport, the EMT placed an IV in Mr. Goode's left arm. Apparently the EMT had a chemical restraint available in the ambulance. She did not resort to its use in spite of the claim that Mr. Goode was uncontrollable.

At 8:33 p.m., Mr. Goode was triaged at Baptist. His temperature was taken orally and recorded at 98.2 degrees Fahrenheit. His pulse was recorded at 164, and the software apparently registered a warning next to the reading. Respiration was recorded at 24. Blood pressure was recorded at 122/64 mmHg. SpO2 registered 90%, and again, the hospital software apparently recorded a warning alert next to the oxygen reading.

After triage was completed, he was assigned an acuity level of 2 on the ESI index. He was transported, still hogtied and prone, to a room in the Emergency Department. Janet Tharpe was an independent witness in the ED. Mr. Goode was wheeled past her within several feet. She described Mr. Goode's face as "swelled-up and just red. His eyes were bulged out. It was horrifying." Ms. Tharpe further testified that Mr. Goode was totally incapable of movement because of the hogtie. No cardiac monitor or supplemental oxygen was used. I am not aware that oxygen saturation was measured in the treatment room.

I am not aware that vital signs were measured subsequent to transfer to the treatment room in the Emergency Department. At approximately 9:00 p.m., the emergency physician came into the room but performed no examination whatsoever. It is my understanding that the physician gave the excuse for omitting a physical examination that the patient was unruly. This is in sharp contrast to the description of the patient given by the witness Ms. Tharpe. Mr. Goode remained hogtied and prone. The doctor ordered tests including alcohol blood, drug screen urine panel, urinalysis auto microscopic, comprehensive metabolic panel, CBC with differential but no arterial blood gas. I have not seen the test results. It appears

that the test results were never obtained.

The patient had an intravenous catheter in place. There is no explanation given for the failure to obtain results for the tests ordered by the physician.

The doctor also ordered Haldol 5 mg and Ativan 2 mg. Those medications were injected IV by a nurse at 9:08 p.m. Within 14 minutes, the patient had no respirations. After injecting the Haldol and Ativan, the nurse left the room leaving only a police officer with Mr. Goode. There was no medical supervision before the code was called.

At 9:22 p.m., the police officer notified medical personnel that Mr. Goode had stopped breathing. It was only upon arrival in the room of medical personnel after Mr. Goode stopped breathing that the hog-tie was released and Mr. Goode turned off of his stomach. A code was called at that time. Bedside Glucose was measured at 95 mg/dL. The resuscitation was unsuccessful, and the doctor pronounced death at 9:44 p.m. The emergency doctor signed a state of Mississippi Death Certificate listing as the preliminary cause of death as "cardio pulmonary arrest." Months after the autopsy was done in Jackson, MS. the assistant medical examiner, by then relocated to South Texas, signed the report which listed the cause of death as complications of LSD.

Post mortem toxicology was performed twice. The toxicology report from NMS Labs found LSD in the amount of 1.0 mg/mL in Mr. Goode's subclavian blood. There was no evidence of any of the so-called "designer" drugs considered to be highly dangerous.

### THE EFFECTS OF POLICE RESTRAINTS AND POSITION

My professional opinion is that the hogtie in a prone position for an extended period of time was a substantial contributing cause of the death of Mr. Goode. In this case the hogtie restraint lasted 1.5 to 2 hours. A person who is handcuffed and hogtied plus being restrained

prone has trouble breathing. The fact that Mr. Goode was asthmatic was an exacerbating factor to the hogtie in a prone position. Likewise, the excited state precipitated by ingestion of LSD increased his susceptibility to the cardiac arrhythmia which was demonstrated by the EMS ECG.

Regarding the respiration component of the death, it is long been known that positional or restraint asphyxia can occur when a person is hogtied in a prone position. The victim is unable to reposition himself in order to breathe. The asphyxia can be caused by facial compression, neck compression, or chest compression. Passive deaths following custody restraint which are presumed to be positional asphyxia may actually be asphyxia occurring during the restraint process. Testimony in the case appears to have established that officers applied weight to Mr. Goode's back during restraint. An officer admitted that he restrained Mr. Goode so that he could not roll over onto his side, a move which obviously demonstrates an effort to get increased oxygen. It is of import that officers at the time of arrest applied pressure to Mr. Goode to keep Mr. Goode from rolling on his side. The fact that Mr. Goode experienced a restricted ability to breathe is corroborated by the pulse oximeter reading taken during triage and the testimony of Janet Tharpe, an independent witness, who described in detail Mr. Goode's distress while being wheeled down the hall of the Emergency Department.

Likewise, the National Institute of Health has concluded that persons restrained face down with application of body weight on the upper torso and/or in a flex restraint position showed a significant reduction in lung function.

## **THE BAPTIST MEDICAL RECORDS**

The medical records indicate that Mr. Goode was screaming uncontrollably and actively hallucinating. The record documents that Mr. Goode was combative and agitated. Haldol and

Ativan, which are chemical restraints, were administered intravenously. The attending physician ordered a comprehensive metabolic panel, although there is no record of results of this test. During the attempted resuscitation of Mr. Goode, the physician ordered the administration of sodium bicarbonate. Sodium bicarbonate is used to reverse the condition called acidosis. Acidosis may be due to metabolic causes such as vigorous exercise or respiratory causes such as decreased or compromised respiratory efforts. Mr. Goode experienced both causes of acidosis. He was predictably straining against the prone hogtie restraint as anyone would, a version of isometric weight lifting. The evidence that he was straining against the shackles is shown by the contusions on his wrist and ankles. Mr. Goode was subject to metabolic acidosis and at the same time to involuntarily compromised respiratory effort caused by the prone hogtie restraint. In medical terms, he was subject to respiratory acidosis as well.

Thy hyperventilation associated with yelling and screaming due to the agitated state was a substantial benefit in keeping Mr. Goode alive as it kept him in a compensated condition between the metabolic and respiratory acidosis induced by the prone hogtie restraint and the respiratory alkalosis induced by hyperventilation due to the effects of LSD. Strictly speaking, the effects of LSD and hyperventilation were substantially benefiting Mr. Goode's physiologic attempt to compensate for the restraint-induced metabolic and respiratory acidosis.

When the physician ordered and the nurse administered the chemical restraints, the compensatory respiratory alkalosis was suppressed by the Haldol and Ativan. Mr. Goode should have been closely monitored after the administration of the chemical restraints in order to detect respiratory and cardiac status changes in a timely fashion. Medical personnel failed to monitor Mr. Goode's respiratory and cardiac status so that when his breathing stopped, irreversible damage was caused before the resuscitation began.

## OPINIONS

Many individuals hogtied and prone show a significant reduction in lung function. (www.ncbi.nlm.nih.gov/pubmed/18533573)

Any person who is restrained prone has trouble breathing when hogtied, and the natural reaction is to panic, struggle, sometimes more violently, which can result in greater oxygen deficiency (as evidenced here) and in some cases death (also evidenced here).(www.ncbi.nlm.nih.gov/pmc/articles/PMC1112961/{*Acute Excited States And Sudden Death, Death After Restraint Can Be Avoided*})

Mr. Goode was at high risk from being hogtied and in a prone position due to his asthmatic condition.

Mr. Goode suffered respiratory compromise and cardiac arrhythmias, caused by hogtie restraint, which were substantially contributory to his death.

A struggling, agitated individual breaths faster, has a faster heartbeat, elevated blood pressure and heightened metabolism. Such an individual requires more air and more oxygen. The struggling individual experiences the propensity for metabolic acidosis experienced by all vigorously exercising individuals. The body naturally responds by increased respiration that causes a compensatory respiratory alkalosis. Immobilization of the chest, even if only partially reducing the ability to maintain vital functions such as breathing, predictably exacerbates the risk of cardiac arrhythmia.( http://www.corrections.com/news/article/6887 **Reducing the Risk Associated with Use of Restraints**

The use of prone restraint predictably exacerbates the risk of sudden death and many deaths have occurred in individuals, who while in police custody had been restrained in this position. The death of Troy Goode from a forensic pathology standpoint should be classified as a homicide. His death cannot be classified as a case of natural death or accident.( Medicolegal Investigation of Death, fourth edition, edited by Werner Spitz) and (DiMaio and DiMaio's Forensic Pathology, second edition) and (A Guide for Manner of Death Classification", published by the National Association of Medical Examiners (NAME) 2002) and (Excited Delirium Syndrome, DiMaio and DiMaio, 2006) and (Sudden Deaths in Custody, Ross and Chan

editors, 2006) and (Handbook of Forensic Pathology, 2003, published by the College of American Pathologists)

Based upon a reasonable degree of medical certainty, Mr. Goode's death was caused by the manner of restraint and positioning (precipitating asphyxia) and the subsequent intravenous administration of chemical restraints which exacerbated asphyxia and ultimately precipitated cardio-pulmonary arrest.

My charge for medico-legal consulting is $150.00 per hour.

Electronically signed by Michael Arnall, M.D.
Michael Arnall, M.D.


Date:   July 30, 2017