**In the Matter Of:**

*KELLI DENISE GOODE vs*

*CITY OF SOUTHAVEN*

*2:16-CV-02029-SHM-cgc*

*WILLIAM THOMAS LONG*

*December 01, 2016*



1st in Reporting, 1st in Service, 1st in Technology

We Bridge the State and Cover the Nation!
www.alphareporting.com
800-556-8974

EXHIBIT "A"

**William Thomas Long - December 01, 2016**

8

1  Manley, Mr. Berk, Brad and -- and then the officers

2  present were Joel Rich, Baggett, Jason -- Ty

3  Baggett, excuse me, Jason Scallorn, Tyler Price and

4  myself.

5      Q.    All right, sir.  Where did that meeting

6  occur?

7      A.    Southaven Police Department.

8      Q.    And Brad is an attorney with Mr. Huskison?

9      A.    Yes, sir.  I'm sorry.  I don't know his

10  last name.

11          MR. HUSKISON:  It's Brad Dillard.

12  BY MR. EDWARDS:

13      Q.    All right.  Did you investigate the

14  circumstances of Troy Goode's detention, restraint

15  and death?

16      A.    We did, sir.

17      Q.    And what did you do to investigate?

18      A.    We looked at our policies, procedures,

19  took statements from the officers, had detective --

20  our lieutenant over the detective bureau at that

21  time.  And we discussed his findings at that point.

22  And also we discussed them with the district

23  attorney's office.

24          And the other steps I took, I talked to

25  someone at the attorney general's office in Jackson.

**William Thomas Long - December 01, 2016**

9

```
 1   I do not remember their name at this time.  And I

 2   spoke with our resident FBI office across the street

 3   in Southaven City Hall regarding the case.

 4        Q.   Okay.  So you talked to the State Attorney

 5   General --

 6        A.   Yes, sir.

 7        Q.   -- in Jackson and also the local DA?

 8        A.   Local DA, Mr. John Champion.

 9        Q.   And somebody with the FBI?

10        A.   Yes, sir.  Mr. Tom Bolhke, Southaven

11   Office of the FBI.

12        Q.   Tom -- what was the last name, please?

13        A.   Bolhke.

14        Q.   How do you spell that?

15        A.   B-O-L-H-K-E, I believe, sir.

16        Q.   All right.  Did you give written

17   statements to anyone?

18        A.   No, sir.

19        Q.   Were the statements of officers given to

20   the state attorney general, FBI or the local DA?

21        A.   I know they were not to the state attorney

22   general's office.  I know they were not to the FBI.

23   And I am not sure, sir, whether they were given to

24   the district attorney's office.

25        Q.   Were there any criminal investigations
```

**Alpha Reporting Corporation**

**William Thomas Long - December 01, 2016**

10

1 undertaken as a result of the death of Troy Goode?

2     A.    We attempted to do a criminal

3 investigation. I discussed -- that was one of the

4 discussions with the district attorney's office.

5 From the police perspective, we had a death

6 involving narcotics, drugs. And so that discussion

7 was with the district attorney, at which point he

8 stated he did not feel we would be successful in

9 prosecuting due to Mr. Goode's participation.

10     Q.    All right. What about the state AG? Did

11 they make any such determination?

12     A.    No, sir. They were not interested in the

13 case.

14     Q.    FBI?

15     A.    Not interested in the case.

16     Q.    Okay. Did you represent to the law

17 enforcement authorities that you've referenced that

18 Mr. Goode died of complications of LSD injustice --

19 ingestion?

20     A.    No, sir. At that time, we did not know --

21 this was all within like 24 hours of the death. And

22 we -- we were awaiting autopsy results back. So we

23 were not sure what had happened at that point.

24     The main issue that came up where the AG's

25 office was concerned and where the FBI was concerned

**11**

1   was where Mr. Goode was. And when it was related to

2   them that the actual death had occurred at the

3   hospital, approximately 45 minutes to an hour after,

4   that was not a case they were interested in.

5      Q.   Did they indicate to you that they in some

6   way viewed the responsibility for the death of

7   Mr. Goode as being that of the hospital?

8         MR. MCINTOSH: Object to form.

9     A.   No, sir.

10        THE WITNESS: Oh, sorry, sir.

11        MR. HUSKISON: You can answer.

12     A.   No, sir. Most of what they were

13   interested in was had Mr. Goode been placed

14   unattended in -- in a police vehicle or in a cell.

15   And they said barring those two facts within the

16   death occurring at another location and not in

17   police custody, neither one of them viewed that

18   there were any civil rights violations and,

19   therefore, they would not proceed.

20   BY MR. EDWARDS:

21     Q.   Were they aware that police officers were

22   in Mr. Goode's hospital room the entire time?

23     A.   Yes, sir.

24     Q.   And those two officers were who?

25        MR. HUSKISON: I think it was just one