IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

KELLI DENISE GOODE, Individually,
and also as the Personal Representative of
Troy Charlton Goode, Deceased, and as Mother,
Natural Guardian, and Next Friend of R.G., a
Minor, and also on behalf of all similarly situated persons         **PLAINTIFFS**

V.                                                    CIVIL ACTION NO. 3:17CV60-DMB-RP

**THE CITY OF SOUTHAVEN, et al.**                                   **DEFENDANTS**

### ORDER GRANTING IN PART AND DENYING IN PART
### MOTION TO EXCLUDE EXPERT OPINIONS

This matter is before the court on Plaintiff's Motion to Exclude Delinquently Disclosed Expert Opinions. Docket 403. The plaintiff contends the opinions of Dr. Rick Carlton, Dr. Michael Stodard, and Dr. Gerald Gowitt set forth in their supplement reports should be excluded because they were not timely disclosed by Baptist Memorial Hospital-Desoto ("BMH-D"). As discussed below, the court finds the plaintiff's motion should be granted in part and denied in part.

Expert witness disclosures are governed by Federal Rule of Civil Procedure 26. "The purpose of Rule 26(a) is to provide opposing parties reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." *Guthrie v. Quitman County Hosp., LLC*, 2014 U.S. Dist. LEXIS 183160, *6 (N.D. Miss. Oct. 27, 2014). Rule 26(a)(2) requires a party to disclose very particular information including, among other things, the identity of any retained expert witness it may use at trial and a written, signed report from the expert containing a complete statement of the expert's opinions and the basis and

1

reasons for them, and the facts or data considered by the witness in forming those opinions. In addition, Local Uniform Civil Rule 26(a)(2) requires that:

> [a] party must make full and complete [expert] disclosure as required by Fed.R.Civ.P. 26(a)(2) and L.U.Civ.R. 26(a)(2)(D) no later than the time specified in the case management order . . . . Absent a finding of just cause, failure to make full expert disclosures by the expert designation deadline is grounds for prohibiting introduction of that evidence at trial. . . .
>
> (B) An attempt to designate an expert without providing full disclosure information as required by this rule will not be considered a timely expert designation and may be stricken upon proper motion or sua sponte by the court.

Pursuant to the case management order in this case, the plaintiff was required to make its expert disclosures by August 4, 2017, and the defendants (including BMH-D) were required to make theirs by September 8, 2017. Docket 283. A party who learns that his expert disclosure is in some material respect incomplete or incorrect must supplement or correct the disclosure in a timely manner and in no event later than the discovery deadline. Fed.R.Civ.P. 26(e) and L.U.Civ.R. 26(a)(5). This duty to supplement extends both to information included in an expert's written report and to information given during the expert's deposition. Fed.R.Civ.P. 26(e). If the evidence is intended solely to rebut evidence on the same subject matter identified in another party's expert disclosure, the disclosure must be made within 30 days after the other party's disclosure. Fed.R.Civ.P. 26(a)(2)(D)(ii).

In the instant case, the plaintiff served her expert disclosures on August 4, 2017. Included in these disclosures was a supplemental report of previously-designated expert Dr. Mark Fowler, as well as a report by newly designated expert Dr. Michael Arnall. On September 8, 2017 BMH-D served its expert disclosures, adopting and incorporating by reference its previous expert disclosures, which included written reports by Dr. Rick Carlton, Jr., Dr. Michael Stodard, and Dr. Gerald Gowitt. The defendants deposed Dr. Arnall on October

19, 2017, and they deposed Dr. Fowler on October 20, 2017. BMH-D received a copy of Dr. Fowler's deposition transcript on November 2, 2017 but did not receive Dr. Fowler's deposition errata sheet until December 18, 2017. BMH-D received Dr. Arnall's deposition transcript on December 5, 2017.[1] On the January 2, 2018, the last day of the discovery period, BMH-D served supplemental reports of its experts Dr. Carlton, Dr. Stodard, and Dr. Gowitt.

The plaintiff contends the opinions contained in these supplemental reports are new opinions, are not responsive to any newly-discovered facts or previously undisclosed theories, and therefore should be excluded as untimely. BMH-D disagrees, arguing the subject reports contain opinions either that are not new and that mirror or track previously disclosed opinions, or that address or rebut statements made for the first time by the plaintiff's experts during their depositions. The plaintiff filed no reply to BMH-D's response and supporting memorandum, leaving it to the court alone to test the merit of BMH-D's arguments. The court concludes there is some merit to the positions of both parties, and the court will grant the plaintiff's motion in part and deny it in part accordingly. The specific opinions contained in the subject supplemental reports are discussed in turn below.

### A. Supplemental Report of Dr. Rick Carlton[2]

The numbered paragraphs of Dr. Carlton's supplemental report are discussed in turn below.

> 1. Mr. Goode had a physiologic sinus tachycardia during his admission to the BMH-D emergency department, not AV nodal reentrant tachycardia. Sinus tachycardia is confirmed by the presence of P-waves on the EMS rhythm strip. It is commonly encountered in emergency departments, and is addressed

---

[1] Although this fact is not established elsewhere in the record, at the undersigned's request counsel for BMH-D provided information establishing this fact to the undersigned and copied counsel for the other parties, who did not dispute the information.
[2] Docket 444-7.

3

by treating the underlying cause, which in this case was Mr. Goode's psychosis caused by his LSD use. Dr. Fowler was critical of the emergency department nurses for not "confirming" or "verifying" Mr. Goode's rhythm. Mr. Goode's sinus tachycardia could not be confirmed or verified by ECG until adequate chemical control could be achieved. Supraventricular tachycardia is not a lethal rhythm as Dr. Fowler suggests.

The court agrees with BMH-D that these statements are consistent with Dr. Carlton's opinions offered in his initial report (Docket 444-4) and are not new opinions, with the exception of additional statements offered to rebut opinions offered by the plaintiff's expert Dr. Mark Fowler for the first time during his deposition – Dr. Fowler's opinions that the type of supraventricular tachycardia (SVT) experienced by Troy Goode was an AV nodal reentrant tachycardia and that a sinus rhythm was not indicated because the EMS rhythm strip contained no P-waves, the definitive criteria for a sinus rhythm (Docket 444-10). The court finds Dr. Carlton's rebuttal disclosure was timely, and nothing will be stricken from this paragraph.

2. The standard of care did not require emergency department nurses to administer supplemental oxygen to Mr. Goode in the presence of an O2 sat of 90%, particularly given the fact that Mr. Goode showed no signs of respiratory distress or compromise. Even if accurate, an O2 of 90% would not cause the degree of psychosis or delirium exhibited by Mr. Goode.

The court agrees with BMH-D that these statements were offered to rebut the opinion, offered by Dr. Fowler for the first time during his deposition, that the nursing personnel should have administered oxygen to Troy Goode. The court finds this rebuttal disclosure was timely, and nothing will be stricken from this paragraph.

3. BMH-DeSoto nursing personnel rendered proper and appropriate nursing care to Mr. Goode in the emergency department. The standard of care did not require nursing personnel to maintain continuous ECG and pulse oximetry monitoring of Mr. Goode from the time of his admission. Reliable cardiac and pulse oximetry monitoring could not be accomplished for Mr. Goode until adequate chemical control could be achieved by the Ativan and Haldol ordered by Dr. Oliver. Nor did the standard of care require nursing personnel to provide "one-on-one continuous observation (of Mr. Goode) by a trained

4

medical person" from the time of admission.

The court agrees with BMH-D that the first and last sentences of this paragraph are consistent with previously-disclosed opinions of Dr. Carlton and are not new opinions. However, the second and third sentences go beyond Dr. Carlton's previously-disclosed opinions and rebut an opinion – that Troy Goode should have been continuously monitored with EKG and pulse oximetry from the time of his admission – that was disclosed in Dr. Fowler's supplemental written report provided well in advance of BMH-D's expert designation deadline (Docket 444-11). The court finds this portion of Dr. Carlton's supplemental report is untimely, and these two sentences will be stricken.

4. The standard of care did not require nursing personnel to request removal of Mr. Goode's forensic restraints and to reposition him at any time prior to achieving adequate chemical control. It is folly to suggest that a floridly psychotic patient such as Mr. Goode did not present a danger to himself or others.

The court agrees with BMH-D that these statements are consistent with Dr. Carlton's previously-disclosed opinions and are not new opinions. Nothing will be stricken from this paragraph.

5. It is incorrect to state that a patient is "chemically restrained" at the time one initiates the administration of a sedating medication. A patient is chemically restrained when the selected medication or medications have achieved the desired clinical effect of adequately controlling the patient's behavior. The standard of care did not require BMH-DeSoto "to post a trained medical staff member in the room" to provide direct, one on one observation of Mr. Goode upon the administration of Haldol and Ativan, or to place Mr. Goode in an area where he could be directly observed. It was appropriate and standard of care for Nurse Floch to administer the Ativan and Haldol with the plan to return to Mr. Goode's room to evaluate what effect, if any, the medications had on Mr. Goode's behavior.

The court agrees with BMH-D that these statements – with one exception -- either are consistent with with Dr. Carlton's previously disclosed opinions or are offered in rebuttal to an

opinion – that a patient is chemically restrained at the time sedating medication is administered – that was offered by Dr. Fowler for the first time during his deposition. However, the court disagrees with BMH-D that Dr. Fowler opined for the first time during his deposition that the standard of care required nursing personnel to place Troy Goode in an area where he could be directly observed, as Dr. Fowler stated in his previously-disclosed supplemental report, "It is not appropriate to have the patient monitored by non-medical personnel *or have the patient in an area where he cannot be directly observed*." Docket 444-11 (emphasis added). The court finds the disclosure of Dr. Carlton's rebuttal opinion on this issue is untimely and it will be stricken.

> 6. The standard of care did not require continuous ECG and pulse oximetry monitoring of Mr. Goode at the time Haldol and Ativan were administered. As stated above, reliable cardiac and pulse oximetry monitoring could not be accomplished until adequate control could be achieved.

As discussed above, Dr. Fowler's supplemental report contained his opinion that the standard of care required continuous EKG and pulse oximetry monitoring of Troy Goode. The court does not believe Dr. Carlton's opinion, stated in his initial report, that other diagnostic and therapeutic options were severely limited because of Troy Goode's conduct was specific enough to equate to the specific rebuttal opinion offered in his supplemental report regarding whether EKG and pulse oximetry monitoring was required or possible. The courts finds the disclosure of this opinion is untimely, and this paragraph will be stricken.

> 7. Neither the standard of care nor CFR required one on one monitoring of Mr. Goode by trained medical personnel in his room in the emergency department because he was in forensic restraints. The interpretive guidelines for the 42 CFR 482.13 clearly state that the use of forensic restraints 'are not governed by this rule." It was appropriate for law enforcement to maintain direct supervision of Mr. Goode at all times in the emergency department, since Mr. Goode was in police custody and in forensic restraints.

6

The court believes the statements contained in this paragraph are consistent with Dr. Carlton's previously-disclosed opinions regarding whether personal observation of Troy Goode by trained medical personnel in the room was necessary, and these are not new opinions with the exception of the statements regarding the applicability of the CFR and the specific regulation. Dr. Fowler expressly relied on this regulation in his supplemental report, and yet Dr. Carlton later made no mention of it in his initial report. Dr. Carlton's supplemental opinions as to the standard of care required by the CFR, the applicability of the specific regulation cited by Dr. Fowler, and the basis and reasons for those opinions (i.e., the language of the regulation) is untimely, and references to the CFR will be stricken from this paragraph. Presumably BMH-D will nonetheless be able to establish the language of the regulation during cross-examination of Dr. Fowler.

> 8. Mr. Goode's cardiac arrest and death were the result of his LSD use and the sympathetic discharge and excited delirium syndrome it caused. His arrest and death were not caused by his forensic restraint positioning or the Ativan and Haldol administered in the emergency department.

The court agrees with BMH-D that the opinions contained in this paragraph regarding the cause of death are consistent with Dr. Carlton's previously-disclosed opinions and are not new opinions. An implicit corollary of Dr. Carlton's opinion as to what caused Troy Goode's death is his opinion as to what did not cause Troy Goode's death.[3] Nothing in this paragraph will be stricken.

---

[3] Although once a cause of death has been opined the expert's opinion as to what did not cause the death is implicit, the basis and reasons for such an opinion are not, and in his trial testimony the expert may not rely on bases or reasons that were not properly disclosed during discovery.

### B. Supplemental Report of Dr. Michael Stodard[4]

The individual paragraphs of Dr. Stodard's supplemental report, numbered herein for ease of reference, are discussed in turn below.

> 1. I will refute Dr. Fowler's opinion that supraventricular tachycardia (SVT) is a dangerous, lethal rhythm and that Mr. Goode had an AV nodal reentrant tachycardia. SVT is a heart rhythm frequently treated in the Emergency Department and a rhythm that patients often tolerate for multiple hours or days without adverse consequence. Mr. Goode had a sinus tachycardia as confirmed by the P-waves on the EMS rhythm strip. I will dispute Dr. Fowler's testimony critical of BMH nurses for not confirming Mr. Goode's sinus tachycardia. A reliable EKG could not be performed on Mr. Goode until his agitated/combative state could be controlled chemically.

The court agrees with BMH-D that these statements are consistent with Dr. Stodard's opinions offered in his initial report (Docket 444-5) and are not new opinions, with the exception of additional statements offered to rebut opinions offered by the plaintiff's expert Dr. Mark Fowler for the first time during his deposition – Dr. Fowler's opinions that the type of supraventricular tachycardia (SVT) experienced by Troy Goode was an AV nodal reentrant tachycardia and that a sinus rhythm was not indicated because the EMS rhythm strip contained no P-waves, the definitive criteria for a sinus rhythm. The court finds Dr. Stodard's rebuttal disclosure was timely, and nothing will be stricken from this paragraph.

> 2. I will refute Dr. Fowler's testimony that the standard of care required BMH nurses to apply supplemental oxygen to Mr. Goode in light of his O2 sat reading of 90% and that the O2 sat of 90% contributed to Mr. Goode's agitation and combativeness. An O2 sat of 90%, even if accurate, did not in and of itself require supplemental oxygen. Nurses must clinically correlate an O2 sat reading with the patient and here Mr. Goode did not show signs of clinically significant hypoxia.

The court agrees with BMH-D that these statements are intended to rebut Dr. Fowler's

---
[4] Docket 444-8.

opinion, offered for the first time during his deposition, that the hospital nursing staff should have administered Oxygen to Troy Goode. The court finds this disclosure is timely, and nothing will be stricken from this paragraph.

> 3. I will refute Dr. Fowler's testimony that the decrease in Mr. Goode's diastolic blood pressure from 91 to 61 led to a less effective profusion of heart muscle. He is incorrect.

The court agrees with BMH-D that these statements are intended to rebut Dr. Fowler's opinion on this subject offered for the first time during his deposition. The court finds this disclosure is timely, and nothing will be stricken from this paragraph.

> 4. It is my opinion that BMH nurses properly cared for Mr. Goode given his agitated/combative state. Nurses are required to exercise reasonable nursing judgments and the nursing judgments made by BMH nurses in their care of Mr. Goode were reasonable and in accordance with the standard of care. I will refute Dr. Fowler's opinion that the standard of care required nurses to continuously monitor Mr. Goode with an EKG and pulse oximeter. His delirium prevented reliable monitoring until his behavior could be controlled chemically. I will also refute Dr. Fowler's opinion that the standard of care required a member of the medical staff to provide continuous one on one observation of Mr. Goode. This is not only impractical in an Emergency Department the size of BMH's, it is not the standard of care.

The court agrees with BMH-D that these statements are consistent with opinions disclosed in Dr. Stodard's initial report and track those opinions closely enough so as not to constitute new opinions. Nothing will be stricken from this paragraph.

> 5. I will refute Dr. Fowler's testimony that upon Mr. Goode's admission to the Emergency Department the standard of care required nurses to request law enforcement to remove his restraints and to reposition him. Anyone with sufficient experience in the Emergency Department understands that a floridly psychotic patient such as Mr. Goode is a danger to himself, healthcare providers and others in the ER. I have personally been spit upon, bitten and swung at by patients such as Mr. Goode and have seen nurses sustain bodily injury, including a broken nose, by such patients. The standard of care required chemical control of Mr. Goode's behavior before

9

making any attempt to reposition him.

With the exception of the second to last sentence of this paragraph, the court agrees with BMH-D that these statements are consistent with opinions disclosed in Dr. Stodard's initial report and track those opinions closely enough so as not to constitute new opinions. However, the facts set forth in the second to last sentence, considered by Dr. Stodard in forming his opinions, should have been included in his initial report and were not. The court finds the disclosure in that sentence is untimely, and it will be stricken from this paragraph.

> 6. I will refute Dr. Fowler's opinion that a patient is "chemically restrained" at the moment sedating medications are given. Sedation is not an instantaneous process. It takes time and is patient dependent. I will also refute Dr. Fowler's testimony that a trained medical staff member was required to provide one-on-one observation of Mr. Goode once Ativan and Haldol were administered or that Mr. Goode should have been placed in an area where he could be directly seen. I have ordered Ativan and Haldol on numerous occasions in the ER. It is not only impractical to have one-on-one monitoring of the numerous patients who receive this combination of medicines in the ER, it is not the standard of care. The standard of care is just as Mr. Floch did – administer the medications as ordered by the physician with the plan to perform a med-check to assess the effect of the medications on the patient.

With the exception of one statement, the court agrees with BMH-D that these statements either are intended to rebut an opinion offered by Dr. Fowler for the first time during his deposition or are consistent with opinions disclosed in Dr. Stodard's initial report and track those opinions closely enough so as not to constitute new opinions. However, as discussed above, Dr. Fowler did not opine for the first time during his deposition that the standard of care required nursing personnel to place Troy Goode in an area where he could be directly observed, as he offered that opinion in his previously-disclosed supplemental report. The court finds the disclosure of Dr. Carlton's rebuttal opinion on this issue is untimely, and that portion of this paragraph will be stricken.

> 7. I will refute Dr. Fowler's opinion that the standard of care required continuous EKG and pulse oximetry monitoring once Haldol and Ativan were given. That is not the standard of care, particularly for a patient such as Mr. Goode whose agitated, out of control and combative behavior prevented effective monitoring.

The court agrees with BMH-D that these statements are consistent with opinions disclosed in Dr. Stodard's initial report and track those opinions closely enough so as not to constitute new opinions.   Nothing will be stricken from this paragraph.

> 8. I will refute Dr. Fowler's testimony that the standard of care and/or CFR required one-on-one monitoring of Mr. Goode because he was in law enforcement restraints. My experience has been consistent with the events in this case, i.e., that law enforcement remain with the patient in their custody at all times. As to the CFR, the Interpretive Guidelines for 42 CFR 482.13 expressly provide that law enforcement restraints "are not governed by this rule."

With exception of the references to the CFR, the court agrees with BMH-D that these statements are consistent with opinions disclosed in Dr. Stodard's initial report and track those opinions closely enough so as not to constitute new opinions.   However, Dr. Stodard's supplemental opinions as to the standard of care required by the CFR, the applicability of the specific regulation cited by Dr. Fowler, and the basis and reasons for those opinions (i.e., the language of the regulation) is untimely, as Dr. Fowler expressly relied on the subject regulation in his supplemental report.   References to the CFR will be stricken from this paragraph.

> 9. I remain of the opinion that Mr. Goode died from a fatal cardiac arrhythmia that resulted from excited delirium syndrome caused by his LSD and/or other substance abuse. His death was not caused by the Ativan and Haldol he received or by the position in which he was restrained by law enforcement.

The court agrees with BMH-D that the opinions contained in this paragraph regarding the cause of death are consistent with Dr. Stodard's's previously-disclosed opinions and are not new opinions.   An implicit corollary of Dr. Stodard's opinion as to what caused Troy Goode's death

11

is his opinion as to what did not cause Troy Goode's death.[5]  Nothing in this paragraph will be stricken.

### C. Supplemental Report of Dr. Gerald Gowitt[6]

The numbered paragraphs of Dr. Gowitt's supplemental report are discussed in turn below.

> 12. Dr. Wecht did not produce any scientific literature to support his opinions.

This statement appears to address the opinions of Dr. Wecht which, so far as the undersigned can tell, were disclosed well in advance of BMH-D's expert designation deadline. Thjs disclosure of a fact considered by Dr. Gowitt is untimely and will be stricken.  Presumably BMH-D will be able to establish this fact nonetheless during its cross-examination of Dr. Wecht.

> 13. There is no autopsy or toxicology evidence to support Dr. Arnall's conclusion that Goode's death was caused by the manner of restraint and positioning, which he believes precipitated asphyxia, and the intravenous administration of Ativan and of Haldol, to a lesser extent. There is no autopsy evidence of asphyxia and there is no indication in the medical records that Goode demonstrated respiratory distress. The 8.7 ng/ml postmortem blood level of Ativan is sub-therapeutic (therapeutic range 10-200 ng/ml). The 12 ng/ml blood level of Haldol is low therapeutic (therapeutic range 5-50 ng/ml).

The court disagrees with BMH-D's argument that Dr. Gowitt here merely rebuts the deposition testimony of Dr. Arnall.  Dr. Arnall's opinion which this paragraph purports to rebut was first disclosed in Dr. Arnall's written report well in advance of BMH-D's expert designation deadline.  Docket 444-12.  Dr. Gowitt's rebuttal disclosure is untimely, and this paragraph will be stricken.

> 14. There is no gross or microscopic autopsy evidence to support Dr. Arnall's opinion that Goode had metabolic or respiratory acidosis prior to the code.

---

[5] See *supra* Footnote 3.
[6] Docket 444-9.

Dr. Arnall's opinion which this paragraph purports to rebut was first disclosed in Dr. Arnall's written report well in advance of BMH-D's expert designation deadline. Dr. Gowitt's rebuttal disclosure is untimely, and this paragraph will be stricken.

> 15. The presence of beta-phenethylamine in the liver is most likely due to postmortem production as a result of decomposition.

The court agrees with BMH-D that this opinion is offered to rebut an opinion offered by Dr. Arnall for the first time during his deposition. The court finds this rebuttal disclosure is timely, and it will not be stricken.

> 16. It remains the opinion of the undersigned that Goode died of complications of excited delirium, not from positional asphyxia, the manner of restraint or the administration of Ativan and Haldol.

The court agrees with BMH-D that the opinions contained in this paragraph regarding the cause of death are consistent with Dr. Gowitt's previously-disclosed opinions and are not new opinions. An implicit corollary of Dr. Gowitt's opinion as to what caused Troy Goode's death is his opinion as to what did not cause Troy Goode's death.[7] Nothing in this paragraph will be stricken.

## CONCLUSION

As discussed above, Plaintiff's Motion to Exclude Delinquently Disclosed Expert Opinions is GRANTED IN PART AND DENIED AND PART. The court strikes those portions of the supplemental expert reports of Dr. Carlton, Dr. Stodard and Dr. Gowitt that the court finds to be untimely. So there is no confusion as to the court's ruling, copies of the subject reports are attached hereto with the stricken portions redacted. The subject motion will

---

[7] See *supra* Footnote 3.

be stricken from the pending motions list in the Pretrial Order.

SO ORDERED, this, the 5th day of July, 2018.

/s/ Roy Percy
UNITED STATES MAGISTRATE JUDGE