**FREDERICK B. CARLTON, JR. MD**
**48 COUNTY ROAD 362**
**OXFORD, MISSISSIPPI 38655**

December 29, 2017

David W. Upchurch
P.O. Drawer 2529
Tupelo, MS 38803

Re: Goode v. BMH-DeSoto

Dear Mr. Upchurch,

Since my initial report dated March 20, 2017, I have received the following additional materials:

1. Depositions of
   a. Janet Tidwell, RN
   b. Creseana Gist, RN
   c. Brady Simpson, RN
   d. Kendrick Deberry
   e. Erin Barnhart, MD
   f. David Nichols, PhD
   g. Cyril Wecht, MD
   h. Janet Tharpe
   i. Michael Arnall, MD
   j. Parin Parikh, MD
   k. Mark Fowler, MD;
2. EMS recording and BMH-DeSoto video footage of Mr. Goode;
3. 42 CFR 482.13 and Interpretive Guidelines;
4. Plaintiff's Expert Opinions of Mark Fowler, MD (supplemental); Parin Parikh, MD (supplemental); and Michael Arnall MD.

My original opinions remain unchanged. BMH-DeSoto nursing personnel met the standard of care in all respects in their nursing care and treatment of Mr. Goode and did not do or fail to do anything that proximately caused or contributed to his death.

I continue to dispute the opinions of Dr. Fowler to the extent they are critical of BMH-DeSoto. Specifically,


EXHIBIT "A"

1. Mr. Goode had a physiologic sinus tachycardia during his admission to the BMH-D emergency department, not AV nodal reentrant tachycardia. Sinus tachycardia is confirmed by the presence of P-waves on the EMS rhythm strip. It is commonly encountered in emergency departments, and is addressed by treating the underlying cause, which in this case was Mr. Goode's psychosis caused by his LSD use. Dr. Fowler was critical of the emergency department nurses for not "confirming" or "verifying" Mr. Goode's rhythm. Mr. Goode's sinus tachycardia could not be confirmed or verified by ECG until adequate chemical control could be achieved. Supraventricular tachycardia is not a lethal rhythm as Dr. Fowler suggests.

2. The standard of care did not require emergency department nurses to administer supplemental oxygen to Mr. Goode in the presence of an O2 sat of 90%, particularly given the fact that Mr. Goode showed no signs of respiratory distress or compromise. Even if accurate, an O2 of 90% would not cause the degree of psychosis or delirium exhibited by Mr. Goode.

3. BMH-DeSoto nursing personnel rendered proper and appropriate nursing care to Mr. Goode in the emergency department. ~~The standard of care did not require nursing personnel to maintain continuous ECG and pulse oximetry monitoring of Mr. Goode from the time of his admission. Reliable cardiac and pulse oximetry monitoring could not be accomplished for Mr. Goode until adequate chemical control could be achieved by the Ativan and Haldol ordered by Dr. Oliver~~. Nor did the standard of care require nursing personnel to provide "one-on-one continuous observation (of Mr. Goode) by a trained medical person" from the time of admission.

4. The standard of care did not require nursing personnel to request removal of Mr. Goode's forensic restraints and to reposition him at any time prior to achieving adequate chemical control. It is folly to suggest that a floridly psychotic patient such as Mr. Goode did not present a danger to himself or others.

5. It is incorrect to state that a patient is "chemically restrained" at the time one initiates the administration of a sedating medication. A patient is chemically restrained when the selected medication or medications have achieved the desired clinical effect of adequately controlling the patient's behavior. The standard of care did not require BMH-DeSoto "to post a trained medical staff member in the room" to provide direct, one on one observation of Mr. Goode upon the administration of Haldol and Ativan, ~~or to place Mr. Goode in an area where he could be directly observed~~. It was appropriate and standard of care for Nurse Floch to administer the Ativan and Haldol with the plan to return to Mr. Goode's room to evaluate what effect, if any, the medications had on Mr. Goode's behavior.

6. ~~The standard of care did not require continuous ECG and pulse oximetry monitoring of Mr. Goode at the time Haldol and Ativan were administered. As noted above,~~

~~reliable cardiac and pulseoximetry monitoring could not be accomplished until adequate chemical control could be achieved.~~

7. Neither the standard of care ~~nor CFR~~ required one on one monitoring of Mr. Goode by trained medical personnel in his room in the emergency department because he was in forensic restraints. ~~The interpretive guidelines for the 42 CFR 482.13 clearly states that the use of forensic restraints are not governed by this rule.~~ It was appropriate for law enforcement to maintain direct supervision of Mr. Goode at all times in the emergency department, since Mr. Goode was in police custody and in forensic restraints.

Further,

8. Mr. Goode's cardiac arrest and death were the result of his LSD use and the sympathetic discharge and excited delirium syndrome it caused. His arrest and death were not caused by his forensic restraint positioning or the Ativan and Haldol administered in the emergency department.

All of my opinions are stated to a reasonable degree of medical probability.

If I may be of further assistance, please contact me.

Sincerely,

F. B. Carlton, Jr. MD

December 29, 2017

David W. Upchurch, Attorney-at-Law
Upchurch & Upchurch, P.A.
141 S. Commerce Street
Suite B
Tupelo, MS 38804

Re: Kelli Goode vs Baptist Memorial Hospital-DeSoto, et al
In the United States District Court for the Northern District of Mississippi – Oxford Division
Case No. 3:17-cv-060-DMB-RP

Dear Mr. Upchurch,

Since my letter of March 21, 2017, I have received the following items:
-depositions of Janet Tidwell, RN/Creseana Gist, RN/Brady Simpson, RN/Kendrick Deberry/Cyril Wecht, MD/David Nichols, PhD/Parin Parikh, MD/Erin Barnhart, MD/Mark Fowler, MD/Janet Tharpe
-supplemental reports from Drs. Fowler and Parikh and report from Michael Arnall, MD
-42 CFR 482.13 and Interpretive Guidelines
-EMS recording and BMH video of Mr. Goode being transported into the Emergency Department

My prior opinions remain unchanged.

I will refute Dr. Fowler's opinion that supraventricular tachycardia (SVT) is a dangerous, lethal rhythm and that Mr. Goode had an AV nodal reentrant tachycardia. SVT is a heart rhythm frequently treated in the Emergency Department and a rhythm that patients often tolerate for multiple hours or days without adverse consequence. Mr. Goode had a sinus tachycardia as confirmed by the P-waves on the EMS rhythm strip. I will dispute Dr. Fowler's testimony critical of BMH nurses for not confirming Mr. Goode's sinus tachycardia. A reliable EKG could not be performed on Mr. Goode until his agitated/combative state could be controlled chemically.

I will refute Dr. Fowler's testimony that the standard of care required BMH nurses to apply supplemental oxygen to Mr. Goode in light of his O2 sat reading of 90% and that the O2 sat of 90% contributed to Mr. Goode's agitation and combativeness. An O2 sat of 90%, even if accurate, did not in and of itself require supplemental oxygen. Nurses must clinically correlate an O2 sat reading with the patient and here Mr. Goode did not show signs of clinically significant hypoxia.

I will refute Dr. Fowler's testimony that the decrease in Mr. Goode's diastolic blood pressure from 91 to 61 led to a less effective profusion of heart muscle. He is incorrect.

It is my opinion that BMH nurses properly cared for Mr. Goode given his agitated/combative state. Nurses are required to exercise reasonable nursing judgments and the nursing judgments made by BMH nurses in their care of Mr. Goode were reasonable and in accordance with the standard of care. I will refute Dr. Fowler's opinion that the standard of care required nurses to continuously monitor Mr. Goode with an EKG and pulse oximeter. His delirium prevented reliable monitoring until his behavior could be controlled chemically. I will also refute Dr. Fowler's opinion that the standard of care required a member of the medical staff to provide continuous one-on-one observation of Mr. Goode. This is not only impractical in an Emergency Department the size of BMH's, it is not the standard of care.


EXHIBIT "B"

I will refute Dr. Fowler's testimony that upon Mr. Goode's admission to the Emergency Department the standard of care required nurses to request law enforcement to remove his restraints and to reposition him. Anyone with sufficient experience in the Emergency Department understands that a floridly psychotic patient such as Mr. Goode is a danger to himself, healthcare providers and others in the ER. ~~[redacted]~~ The standard of care required chemical control of Mr. Goode's behavior before making any attempt to reposition him.

I will refute Dr. Fowler's opinion that a patient is "chemically restrained" at the moment sedating medications are given. Sedation is not an instantaneous process. It takes time and is patient dependent. I will also refute Dr. Fowler's testimony that a trained medical staff member was required to provide one-on-one observation of Mr. Goode once Ativan and Haldol were administered ~~[redacted]~~ I have ordered Ativan and Haldol on numerous occasions in the ER. It is not only impractical to have one-on-one monitoring of the numerous patients who receive this combination of medicines in the ER, it is not the standard of care. The standard of care is just as Mr. Floch did – administer the medications as ordered by the physician with the plan to perform a med-check to assess the effect of the medications on the patient.

I will refute Dr. Fowler's opinion that the standard of care required continuous EKG and pulse oximetry monitoring once Haldol and Ativan were given. That is not the standard of care, particularly for a patient such as Mr. Goode whose agitated, out of control and combative behavior prevented effective monitoring.

I will refute Dr. Fowler's testimony that the standard of care ~~[redacted]~~ required one-on-one monitoring of Mr. Goode because he was in law enforcement restraints. My experience has been consistent with the events in this case, i.e., that law enforcement remain with the patient in their custody at all times. ~~[redacted]~~

I remain of the opinion that Mr. Goode died from a fatal cardiac arrhythmia that resulted from excited delirium syndrome caused by his LSD and/or other substance abuse. His death was not caused by the Ativan and Haldol he received or by the position in which he was restrained by law enforcement.

All of my opinions are expressed to a reasonable medical probability.

Respectfully,

*[signature]*, mo

Michael O. Stodard, MD

# Forensic Medicine Associates, Inc.
### Consultants to the Medical and Legal Professions

Gerald T. Gowitt, M.D. (CEO)
Geoffrey P. Smith, M.D.
Stephen B. Hunter, M.D. (Consulting Neuropathologist)
Rick Snow, Ph.D. (Consulting Forensic Anthropologist)
Tammy Hopkins, Executive Assistant

| Office Address | Telephone | Mailing Address |
|---|---|---|
| 3550 Kensington Road | (404) 508-3507 | 2095 Highway 211, N.W. |
| Decatur, Georgia 30032 | Facsimile: | Suite 2F-274 |
| fmavlg@aol.com | (404) 508-3509 | Braselton, Georgia 30517 |

January 2, 2018

David W. Upchurch, Esq.
Upchurch & Upchurch, P.A.
P.O. Drawer 2529
Tupelo, Mississippi 38803

    RE: Kelli Goode v BMH-D, et al.
         (Troy Goode—decedent)

Dear Mr. Upchurch:

Since my initial report, I have received the following materials:

1). <u>Expert Reports:</u>

    C. Parin Parikh, M.D., (plaintiff's cardiologist – supplemental)
    D. Michael F. Arnall, M.D. (plaintiff's forensic pathologist)

2). <u>Deposition Transcripts:</u>

    H. Joel Rich (police officer)
    I. Mathew Price (police officer)
    J. Janet Tharpe
    K. Cyril Wecht, M.D.
    L. Michael Arnall, M.D.
    M. Mark Fowler, M.D.



Page 2

N. Parin Parikh, M.D.
O. Erin Barnhart, M.D.

3). <u>Other</u>

BMH-DeSoto video footage of Mr. Goode.

**Opinions:**

Based upon my training, education and experience, I supplement my initial report as follows:

12. ~~[redacted]~~

13. ~~[redacted]~~

14. ~~[redacted]~~

15. The presence of beta-phenethylamine in the liver is most likely due to postmortem production as a result of decomposition.

16. It remains the opinion of the undersigned that Goode died of complications of excited delirium, not from positional asphyxia, the manner of restraint or the administration of Ativan and Haldol.

All of my opinions are expressed to a reasonable degree of medical certainty.

Respectfully submitted,

*[signature]*

Gerald T. Gowitt, M.D.