# EXHIBIT
# 3

**In the Matter Of:**

*KELLI DENISE GOODE vs*

*CITY OF SOUTHAVEN*

*2:16-cv-02029-SHM-cgc*



*JASON SCALLORN*

*November 30, 2016*



REPORTING
CORPORATION

*1st in Reporting, 1st in Service, 1st in Technology*

We Bridge the State and Cover the Nation!
www.alphareporting.com
800-556-8974

EXHIBIT 3

Jason Scallorn - November 30, 2016

30

1    A.    He was far enough away that I couldn't
2  grab him.
3    Q.    Did you try to grab him?
4    A.    I tried to grab his arm when I went by,
5  but I couldn't.
6    Q.    So you grabbed the dog instead?
7    A.    Yes.
8    Q.    Now, after Mr. Goode had gotten by you,
9  you began giving him commands to stop where he was,
10 right?
11   A.    And to lay down on the ground.
12   Q.    When he didn't comply, you then ordered
13 your dog to attack him?
14   A.    I was walking up to the Tahoe and I kept
15 saying, get on the ground, get on the ground.
16 Because at this time I did not want him running into
17 Goodman Road, traffic was so bad.  I didn't want him
18 causing wrecks.  My goal was to keep him out of
19 Goodman Road.  It was 7 o'clock on a Friday
20 afternoon.
21        There was a Widespread Panic concert,
22 there were people everywhere, and all I could think
23 about was keeping him out of Goodman Road.
24   Q.    That wasn't quite my question.
25   A.    Yes, sir, but I was telling him to get on

**Alpha Reporting Corporation**

Jason Scallorn - November 30, 2016

31

1   the ground.  And when he refused, I said get on the
2   ground or I'm going to use my dog.  At that time, he
3   laughed at me and he took off running west in the
4   grass.
5        Q.    My question was, you commanded your dog to
6   attack him, didn't you?
7        A.    Not initially, not right there.
8        Q.    You didn't command your dog to attack
9   Mr. Goode?
10       A.    Not at that point, not until he took off
11  running.
12       Q.    I understand your testimony, but my
13  question to you is, did you command your dog to
14  attack Mr. Goode?
15       A.    Not that I recall.
16       Q.    You never made that command?
17       A.    No, sir.
18       Q.    You did release your dog to go attack him,
19  right?
20       A.    Yes, sir.
21       Q.    Now, we already talked about your
22  obedience training.  Do you have a command that you
23  give your dog to have him apprehend a suspect?
24       A.    Yes, sir.
25       Q.    What's that command?

Jason Scallorn - November 30, 2016

32

1      A.    Stellin.

2      Q.    Stellin?

3      A.    Stellin.

4      Q.    And you didn't give that command that day?

5      A.    When he took off running I did, but not

6  when he was standing behind the Tahoe.

7      Q.    So that's a yes, you did give the command,

8  stellin?

9      A.    Yes.

10      Q.    Attack?

11      A.    Yes.

12          COURT REPORTER:  I'm sorry, stellin?

13          THE WITNESS:  S-T-E-L-L-I-N.

14  BY MR. McCORMACK:

15      Q.    Sir, I'm handing you what's been filed by

16  your attorney in this case.

17          (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

18  WAS PASSED TO THE WITNESS.)

19  BY MR. McCORMACK:

20      Q.    These are not filed, it has been sent to

21  us.  These are responses to a set of requests for

22  admissions.  Have you seen these before?

23      A.    No, sir, I have not.

24      Q.    Well, I'll tell you, I don't think it's in

25  dispute.  These have been prepared by your

**Alpha Reporting Corporation**

33

1   attorneys.  If you could look at Request No. 7 for

2   me.  Do you see that?

3       A.    Yes.

4       Q.    And in that, we asked whether or not

5   someone in the Department of the City of Southaven

6   had ordered a dog to attack Mr. Goode, do you see

7   that?

8       A.    Yes, sir.

9       Q.    And that was denied, right?

10      A.    I don't understand the question.

11      Q.    Well, it says denied right there, doesn't

12  it?

13      A.    Yes, sir, it does.

14      Q.    So that's not true, you did command your

15  dog to attack Mr. Goode, right?

16      A.    Yes, sir, I did.

17      Q.    All right.

18            MR. McCORMACK:  Let's go ahead and mark

19  those as Exhibit 3 to the deposition.

20            MR. PHILLIPS:  Do we need to --

21            MR. JORDAN:  Since he's already gone on

22  it, you want to make that 3?

23            MR. McCORMACK:  Yeah, let's go ahead and

24  make that 3 and we'll make the RFOs 4.

25            THE WITNESS:  Take this off and put it on

**Jason Scallorn - November 30, 2016**

34

1    that one?

2          MR. McCORMACK:  Yeah, if you can.

3    Sometimes they stick on pretty good.

4    (WHEREUPON, THERE WAS DISCUSSION OFF THE RECORD.)

5          THE WITNESS:  3 on this one, sir?

6          MR. McCORMACK:  Yes, and that will be 4.

7          THE WITNESS:  Yes, sir.

8          (WHEREUPON, THE ABOVE-MENTIONED DOCUMENTS

9    WERE MARKED AS EXHIBIT NOS. 3 AND 4 TO THE TESTIMONY

10   OF THE WITNESS AND IS ATTACHED HERETO.)

11   BY MR. McCORMACK:

12       Q.   Do you know on July 18th, how tall was

13   Mr. Goode?

14       A.   I recall he was about my height, that I

15   recall; maybe a little taller or around my height.

16       Q.   Do you have any idea how much he weighed

17   on that day?

18       A.   No, sir.

19       Q.   Based on you looking at him, would it

20   surprise you if I told you he weighed about 150

21   pounds?

22       A.   He was thin, he was skinny.  I -- it

23   wouldn't surprise me.

24       Q.   Didn't look like a big guy, did he?

25       A.   No, sir.

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

35

1    Q.    Now, when you were there on the side of
2  the road and you said you had gotten out and gotten
3  control of your dog, Wessel, were any other officers
4  on the scene at that point?
5    A.    Todd Baggett.
6    Q.    Other than Todd Baggett, no one else had
7  arrived yet?
8    A.    If they had, I don't recall.
9    Q.    All right.  You don't recall seeing
10  Officer Rich arrive?
11    A.    No, sir.  I know he was there, but I don't
12  recall seeing him arrive.
13    Q.    You don't recall seeing Officer Bond
14  arrive?
15    A.    No, sir.
16    Q.    Okay.  After the dog had attacked
17  Mr. Goode, it knocked him to the ground, right?
18    A.    No, sir.
19    Q.    It did not knock him to the ground?
20    A.    No, sir.
21    Q.    Well, if it didn't knock him to the ground
22  how did he end up on the ground?
23    A.    He tripped.
24    Q.    He tripped.  Was that while the dog was
25  trying to apprehend?

**Jason Scallorn - November 30, 2016**

36

```
 1      A.   No, sir.
 2      Q.   So it's your testimony that the dog was
 3  still attacking him and, I'm sorry, did you recall
 4  the dog?
 5      A.   No, sir.
 6      Q.   You didn't.  So the dog just kept
 7  attacking him?
 8      A.   After I sent Wessel to apprehend
 9  Mr. Goode, I recall Wessel making an apprehension on
10  his arm.  At that time, Mr. Goode punched Wessel,
11  Wessel released from the bite, he fell down, and
12  that's when I started chasing on foot.  Wessel came
13  back beside me, but he would never re-engage.  He
14  just stayed beside me.
15      Q.   So your testimony is that Wessel engaged,
16  Mr. Goode was still standing?
17      A.   Yes.
18      Q.   Mr. Goode, according to you, attacked the
19  dog, punched the dog?
20      A.   Yes, sir.
21      Q.   The dog stopped trying to bite him?
22      A.   Yes.
23      Q.   And then Mr. Goode fell?
24      A.   Yes, sir.
25      Q.   So it's your testimony that the dog didn't
```

Jason Scallorn - November 30, 2016

48

1   shackles?

2       A.    Yes, sir.

3       Q.    You went to your truck and got the

4   shackles?

5       A.    Yes, sir.

6       Q.    And then you went over and handed them to

7   Officer Bond?

8       A.    Yes, sir.

9       Q.    And Officer Bond applied them to his legs,

10  right?

11      A.    Yes, sir.

12      Q.    And he looped them so that his legs -- the

13  shackles were attached to the handcuffs, right?

14      A.    Yes, sir.  I didn't actually see that,

15  because at the time I dropped -- when I gave him the

16  shackles, I turned and went back into the parking

17  lot.

18      Q.    At any point did you see that his hands

19  and his legs were connected?

20      A.    Yes, sir.

21      Q.    It's commonly called the hogtie position,

22  right?

23      A.    We call it the four point restraint.

24      Q.    It's also called the maximal restraint,

25  prone maximal restraint, right?

**Jason Scallorn - November 30, 2016**

49

```
1        A.    Yes, sir.
2        Q.    Is it okay if I call it the hogtie
3    restraint?
4        A.    Yes, sir.
5        Q.    Now, when Mr. Goode was hogtied, he was
6    still face down, right?
7        A.    I believe so.
8        Q.    When he was hogtied, did you turn him on
9    his side so that he could breathe?
10       A.    I wasn't over there.
11       Q.    Did you see any other officer turn him on
12   his side so that he could breathe?
13       A.    I believe they did turn him on his side.
14   I believe Officer Price did.
15       Q.    Did you see that personally?
16       A.    When I was talking to Ms. Goode in the
17   parking lot, I remember looking over and I remember
18   seeing the back of his feet, which would indicate he
19   was laying on his side.
20       Q.    All right.  So you believe that you did
21   see him turned on his side?
22       A.    Yes, sir.
23       Q.    And how long was he turned on his side?
24       A.    I don't know.
25       Q.    Who turned him on his side?
```

99

```
1   it would be a jog.  Then he would -- I remember -- I
2   remember him like skipping, hopping and skipping one
3   time; just irrational.
4       Q.   All right, sir.  As we look at your
5   supplement report, you indicate that Mr. Goode came
6   towards you and you've told Mr. McCormack that?
7       A.   Uh-huh (affirmative response).
8       Q.   Correct?  And at that time, you gave
9   Mr. Goode a loud verbal command to stop walking
10  towards you?
11      A.   Yes, sir.
12      Q.   Why did you give that command?
13      A.   I didn't want him to get to me.  If I
14  could make him lay down on the ground and be
15  compliant, then it would have been over with.
16      Q.   All right, sir.  And that gets to my
17  question.  Did Mr. Goode comply with your demand for
18  him to one, stop coming towards you?
19      A.   No, sir.
20      Q.   Did he comply with your command for him to
21  get on the ground?
22      A.   No, sir.
23      Q.   Did he, in fact, disobey both of those
24  commands?
25      A.   Yes, sir.
```

**100**

1    Q.    Now, looking at the third paragraph of

2  your supplemental report, this is after you get

3  control of your K-9 partner, did you then give

4  Mr. Goode another verbal command to lay down on the

5  ground?

6    A.    Yes, sir.

7    Q.    Why did you give that command?

8    A.    Still trying to get control of him, still

9  trying to get him to comply.

10    Q.    You remark in your memo that at times

11  the -- Mr. Goode was getting dangerously close to

12  Goodman Road.  Did you have concerns at your

13  involvement with Mr. Goode on Goodman Road that he

14  presented a danger to himself in terms of going into

15  traffic on Goodman Road?

16        MR. McCORMACK:  Object to the form of the

17  question.

18    A.    Yes, sir, absolutely.

19        MR. UPCHURCH:  Pardon?

20        MR. McCORMACK:  Objection to the form.

21  BY MR. UPCHURCH:

22    Q.    Did you form the opinion as one of the

23  police officers on the scene, that Mr. Goode

24  presented a danger to the public, in terms of the

25  traffic going back and forth on Goodman Road?

**Jason Scallorn - November 30, 2016**

1          MR. McCORMACK:   Object to the form.

2     A.    Yes, sir.

3  BY MR. UPCHURCH:

4     Q.    Did you form an opinion as the on-site

5  police officer that Mr. Goode was presented a

6  potential danger to the people that would have been

7  in the parking lot area on Goodman Road?

8          MR. McCORMACK:   Object to the form.

9     A.    Yes, sir.

10 BY MR. UPCHURCH:

11    Q.    Did you, after having control of your K-9,

12 give Mr. Goode a verbal command to lay down on the

13 ground?

14    A.    Yes, sir.

15    Q.    Did he, in fact, obey that command?

16    A.    No, sir.

17    Q.    He, in fact, disobeyed that command,

18 didn't he?

19    A.    Yes, sir.

20    Q.    You state in your report that you released

21 your K-9 partner in attempt to apprehend Mr. Goode

22 who was running into traffic -- to keep him from

23 running into traffic on Goodman Road.

24          If we look at Exhibit E, at the time you

25 released your K-9 partner, where was Mr. Goode

103

1      A.    Yes, sir.

2      Q.    Now, again, looking at your Supplemental

3   Incident Report and trying to understand the

4   timeline events, your dog -- K-9 partner apprehended

5   him.  Mr. Goode strikes the dog, gets free from the

6   dog.  And then as I understand it, he starts running

7   east?

8      A.    (Witness nods head affirmatively.)

9      Q.    Is that correct?

10     A.    Yes, sir.  Well, my K-9 partner made the

11  apprehension approximately in this area.

12     Q.    All right.  I want you, could you just,

13  maybe using this black marker, it may show up

14  better.  Could you draw a circle where the K-9

15  apprehension occurred?

16     A.    (Witness complies).

17     Q.    All right.  And that's the circle that's

18  in front of your initials, JS?

19     A.    Yes.

20     Q.    Let's put apprehend there, or

21  apprehension.

22     A.    Write apprehension?

23     Q.    Yeah.

24        MR. HUSKISON:  Like for K-9.

25        MR. UPCHURCH:  K-9 apprehension, that's

104

1    better.

2          MR. McCORMACK:  How about just K-9?

3          MR. UPCHURCH:  How about just K-9?

4    A.    K-9?

5    BY MR. UPCHURCH:

6    Q.    K-9.  That will work.  All right.  Now,

7    sir, if you could, from that area of the K-9

8    apprehension, if you could show us where Mr. Goode

9    went after he struck your partner.

10   A.    At that time, when he struck Weasel, he

11   turned right here and started heading back east.

12   Q.    All right, sir.  Now, again, when he

13   turned and started heading back east, what was his

14   pace, was he running from you, sprinting from you,

15   how do you describe his?

16   A.    He was running.

17   Q.    All right, sir.  And at the point that you

18   dislodged your taser, where would Mr. Goode have

19   been?

20   A.    He was about 15 feet in front of me.

21   Q.    Had he reached your vehicle?

22   A.    No, sir.

23   Q.    All right.  So he was still on the east

24   side of your -- on the west side of your vehicle?

25   A.    Yes.  Or about parallel with it, just that

105

1    area.

2        Q.    All right, sir.  And you've described the

3    events after the attempted tasing occurred and I

4    don't want to rehash those.  But I want to ask this

5    to make sure our understanding is accurate.  Your

6    fellow police officers attempted to apprehend

7    Mr. Goode after he fell following the attempted

8    tasing?

9        A.    Yes, sir.

10       Q.    Do I understand correctly that those

11   officers were able to restrain Mr. Goode's arms by

12   use of handcuffs?

13       A.    Eventually.  He was fighting for a while.

14       Q.    All right.  That's what I want to -- to

15   ask you.

16             Did Mr. Goode, in fact, resist the

17   attempts to apprehend him -- apprehend him from your

18   fellow officers?

19       A.    Yes, sir.

20       Q.    Were they ultimately able to secure his

21   arms and handcuffs behind his back?

22       A.    After -- after a struggle, they were.

23       Q.    All right, sir.  How many officers did it

24   take to struggle with Mr. Goode to ultimately get

25   his hands handcuffed behind his back?

**Jason Scallorn - November 30, 2016**

106

1    A.   That I recall, I believe it was three.

2    Q.   All right, sir.  Are you describing for us

3  Mr. Scallorn, that Mr. Goode was resisting with such

4  force and in such a way that it took three of your

5  colleagues to restrain him in handcuffs?

6        MR. McCORMACK:  Object to the form.

7    A.   Yes -- yes, sir.

8  BY MR. UPCHURCH:

9    Q.   All right, sir.  That's your testimony, is

10  it not?

11    A.   Yes, sir.

12        MR. McCORMACK:  Object to the form.

13  BY MR. UPCHURCH:

14    Q.   Now, you've told Mr. McCormack that leg

15  restraints were also used.  My question is, why?

16    A.   Mr. Goode continued to kick, continued to

17  flail.  When they originally handcuffed him behind

18  his back, he started rolling over.  I guess you

19  would, for lack of a better term, like an alligator

20  roll, and started kicking and flailing and...

21    Q.   All right, sir.  Was he still screaming

22  out as well at this time?

23    A.   Yes, sir.

24    Q.   So we've got a subject who took three of

25  your colleagues to place handcuffs on.  He's

**Jason Scallorn - November 30, 2016**

107

1  screaming, yelling, rolling, and kicking to such an

2  extent, am I correct, that your colleagues requested

3  leg restraints to try to get him appropriately

4  apprehended?

5       MR. McCORMACK:  Object to the form of the

6  question.

7     A.    Yes, sir.

8  BY MR. UPCHURCH:

9     Q.    Look with me, please, sir, at Exhibit 6,

10 marked for your deposition.  Looking on Page 14,

11 that first paragraph ends with:  Due to the

12 subject's condition.  Do you see that?

13    A.    On the first paragraph?

14    Q.    Yes, sir, ending about right there.

15    A.    Yes, sir.

16    Q.    All right.  If you go up about six lines

17 from there, you write, quote:  They were then able

18 to cuff the subject; however, he was still fighting

19 and being uncooperative.

20       That's what you just described for me and

21 the need for leg restraints, correct?

22    A.    Yes.

23       MR. McCORMACK:  Object to the form.

24 BY MR. UPCHURCH:

25    Q.    When you were on Goodman Road, on scene,

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

108

1  responding to the dispatch that you had received

2  regarding Mr. Goode, did Mr. Goode ever obey a

3  verbal command that you or any other officer gave

4  him?

5      A.    No, sir.

6      Q.    Did Mr. Goode continue to be uncooperative

7  until he was restrained in the four point restraint?

8      A.    Yes, sir.

9      Q.    Now, the next paragraph addresses your

10 communication with Ms. Goode, his wife.

11     A.    Yes, sir.

12     Q.    And I don't think that you were asked many

13 questions about that.

14          The communication that you and Ms. Kelli

15 Goode had occurred where, if we're looking at

16 Exhibit 3?

17     A.    Approximately where TB is.

18     Q.    All right.  Looking at your report,

19 Exhibit 6, did Ms. Goode indicate to you, as

20 referenced on the third line of that report, that

21 Mr. Goode was, quote, out of his mind right now,

22 closed quote?

23          MR. McCORMACK:  Object to the form of the

24 question.

25     A.    Yes, sir.

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

94

1       I want follow-up with a few questions that

2  were asked by Mr. Gass.  I don't want to in any way

3  be repetitive, but I want to explore with you the

4  two opportunities that you had to interact with

5  Mr. Goode.

6       I first want to make sure that we have an

7  accurate understanding of your interactions with him

8  and with his wife off of Goodman Road.  And to do

9  that, let's look again, please sir, at Exhibit 3.

10      (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

11  WAS PASSED TO THE WITNESS.)

12    A.   Yes, sir.

13  BY MR. UPCHURCH:

14    Q.   And I'll put that back in front of you.

15  And as a guide to our discussions, I want to look at

16  your Incident Supplement Report, which is marked as

17  Exhibit 5.  You're welcome to view that.

18      (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

19  WAS PASSED TO THE WITNESS.)

20  BY MR. UPCHURCH:

21    Q.   And a copy of the memorandum that you

22  authored, which is exhibited to your deposition as

23  Exhibit 6.

24      (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

25  WAS PASSED TO THE WITNESS.)

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

95

1  BY MR. UPCHURCH:

2      Q.    Again, I'll place those in front of you

3  just by way of reference, if you need them.

4          Do I understand from your prior testimony

5  that you were notified of Mr. Goode and this

6  incident by your dispatch?

7      A.    Yes, sir.

8      Q.    If you look at Exhibit 5, which is your

9  supplemental report, the first sentence of the

10 second paragraph I think addresses that call from

11 dispatch.  Looking at that by way of reminder, what

12 were you informed by dispatch that Mr. Goode was

13 doing at the time?

14         MR. McCORMACK:  Object to the form of the

15 question.

16     A.    To the best of my recollection, it was a

17 9-1-1 call about a physical disturbance between a

18 male and a female.  The male was acting irrational,

19 running through businesses, running from her, acting

20 irrational.

21 BY MR. UPCHURCH:

22     Q.    And did you not report in your

23 supplemental report in the second paragraph that he

24 was running from the scene, west on Goodman Road?

25     A.    Yes, sir.

**Jason Scallorn - November 30, 2016**

96

1    Q.   All right, sir.  Now, you then, as you

2  arrived on scene on Goodman Road, you report, and I

3  want to ask you, did you see Mr. Goode running

4  around in the lawn of the restaurant?

5    A.   Yes, sir.

6    Q.   Now, taking this -- I'm not sure that that

7  red pen will show up.

8         MR. McCORMACK:  I might have a fine tip

9  here.  That might make it easier to draw on there.

10        (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

11  WAS PASSED TO THE WITNESS.)

12        THE WITNESS:  Yes, sir.

13        MR. UPCHURCH:  Thank you.

14  BY MR. UPCHURCH:

15    Q.   Could you identify maybe from the rooftop

16  standpoint on Exhibit 3 where the Mexican restaurant

17  that we've been discussing is located?

18    A.   Yes, sir, it's going to be approximately

19  right here.  Right here is a Lenny's.  Then right

20  here is the Mexican restaurant.

21    Q.   All right, sir.  Would you write Lenny's

22  above where that restaurant would be?

23    A.   (Witness complies).

24    Q.   And then the name of the Mexican

25  restaurant is?

Jason Scallorn - November 30, 2016

97

1    A.    Rancho Grande.

2    Q.    Rancho Grande.  If you'll write that.

3          Now, could you identify for us on Exhibit

4    3, when you were driving up, or arriving at the

5    scene, where Mr. Goode was and what he was doing?

6    A.    He was in this area where this X is.  He

7    was running back and forth like that.

8    Q.    All right, sir.  Was he running back and

9    forth parallel to the road at that time?

10   A.    Yes, sir.

11   Q.    All right.  So if we look at the X on

12   Exhibit 3, he was running -- what direction does

13   Goodman Road run?

14   A.    This is a -- this is east towards Olive

15   Branch.

16   Q.    All right, sir.

17   A.    And that is back west towards Southaven.

18   Q.    All right.  Could you put an E on the east

19   side of that, and then a west on the west side.  So

20   he was running east and west, back on -- parallel

21   with Goodman Road?

22   A.    Yes, sir.

23   Q.    When you arrived, did you note where his

24   wife, Ms. Kelli Goode was?

25   A.    At first I didn't see her, but she was up

1  here talking with Officer Baggett.

2     Q.   All right.  So she was in the area of the

3  parking lot where you've marked Exhibit 3 as TB?

4     A.   Yes, sir.

5     Q.   Looking at your memo, which is marked as

6  Exhibit 6, on the third paragraph there, you

7  indicate that you were advised that there was a

8  white male wearing a white shirt and khaki shorts.

9          Do you recall Mr. Goode, in fact, wearing

10  khaki shorts and a white shirt when you arrived?  Do

11  you have any recollection of that?

12     A.   I have no recollection of what he was

13  wearing.

14     Q.   All right, sir.  But in your memo, that's

15  the best recollection that you have, of information

16  you received from dispatch?

17     A.   Yes, sir.

18     Q.   All right, sir.  When you say in your

19  incident report in the second paragraph that this

20  gentleman was running around in the front lawn, can

21  you describe that with greater particularity for us?

22  Was he -- was he sprinting, was he pacing, was he --

23  how do you describe it?

24     A.   It was a little bit of everything.  For

25  the brief time I saw it, it would be a sprint, then

99

1  it would be a jog.  Then he would -- I remember -- I

2  remember him like skipping, hopping and skipping one

3  time; just irrational.

4       Q.   All right, sir.  As we look at your

5  supplement report, you indicate that Mr. Goode came

6  towards you and you've told Mr. McCormack that?

7       A.   Uh-huh (affirmative response).

8       Q.   Correct?  And at that time, you gave

9  Mr. Goode a loud verbal command to stop walking

10 towards you?

11      A.   Yes, sir.

12      Q.   Why did you give that command?

13      A.   I didn't want him to get to me.  If I

14 could make him lay down on the ground and be

15 compliant, then it would have been over with.

16      Q.   All right, sir.  And that gets to my

17 question.  Did Mr. Goode comply with your demand for

18 him to one, stop coming towards you?

19      A.   No, sir.

20      Q.   Did he comply with your command for him to

21 get on the ground?

22      A.   No, sir.

23      Q.   Did he, in fact, disobey both of those

24 commands?

25      A.   Yes, sir.

100

1    Q.   Now, looking at the third paragraph of

2  your supplemental report, this is after you get

3  control of your K-9 partner, did you then give

4  Mr. Goode another verbal command to lay down on the

5  ground?

6    A.   Yes, sir.

7    Q.   Why did you give that command?

8    A.   Still trying to get control of him, still

9  trying to get him to comply.

10    Q.   You remark in your memo that at times

11  the -- Mr. Goode was getting dangerously close to

12  Goodman Road.  Did you have concerns at your

13  involvement with Mr. Goode on Goodman Road that he

14  presented a danger to himself in terms of going into

15  traffic on Goodman Road?

16       MR. McCORMACK:  Object to the form of the

17  question.

18    A.   Yes, sir, absolutely.

19       MR. UPCHURCH:  Pardon?

20       MR. McCORMACK:  Objection to the form.

21  BY MR. UPCHURCH:

22    Q.   Did you form the opinion as one of the

23  police officers on the scene, that Mr. Goode

24  presented a danger to the public, in terms of the

25  traffic going back and forth on Goodman Road?

101

1        MR. McCORMACK:   Object to the form.

2     A.   Yes, sir.

3  BY MR. UPCHURCH:

4     Q.   Did you form an opinion as the on-site

5  police officer that Mr. Goode was presented a

6  potential danger to the people that would have been

7  in the parking lot area on Goodman Road?

8        MR. McCORMACK:   Object to the form.

9     A.   Yes, sir.

10 BY MR. UPCHURCH:

11    Q.   Did you, after having control of your K-9,

12 give Mr. Goode a verbal command to lay down on the

13 ground?

14    A.   Yes, sir.

15    Q.   Did he, in fact, obey that command?

16    A.   No, sir.

17    Q.   He, in fact, disobeyed that command,

18 didn't he?

19    A.   Yes, sir.

20    Q.   You state in your report that you released

21 your K-9 partner in attempt to apprehend Mr. Goode

22 who was running into traffic -- to keep him from

23 running into traffic on Goodman Road.

24        If we look at Exhibit E, at the time you

25 released your K-9 partner, where was Mr. Goode

**Jason Scallorn - November 30, 2016**

102

1    running?

2         MR. McCORMACK:   Object to the form of the

3    question.

4       A.   Directly west from behind my truck, on the

5    edge of the road.

6    BY MR. UPCHURCH:

7       Q.   All right, sir.  So if we look at Exhibit

8    3, we go to the rear of your vehicle.  Put an R at

9    the rear of that vehicle, please sir.

10      A.   Yes, sir.  (Witness complies).

11      Q.   Okay.  Maybe circle that R just to give

12   us a prominent display of that.  And the F is in the

13   front, and so he was at the -- near the rear of your

14   vehicle running west, parallel with Goodman Road?

15      A.   (Witness nods head affirmatively.)

16      Q.   Again, can you describe his running, was

17   he just walking away from you, was he running, how

18   do you describe his pace?

19      A.   When he left from behind my truck and

20   began running, that, I would say he was sprinting

21   then.

22      Q.   All right, sir.  Away from you?

23      A.   Yes, sir.

24      Q.   And disobeying a verbal command that you

25   had given?

103

1      A.    Yes, sir.

2      Q.    Now, again, looking at your Supplemental

3  Incident Report and trying to understand the

4  timeline events, your dog -- K-9 partner apprehended

5  him.  Mr. Goode strikes the dog, gets free from the

6  dog.  And then as I understand it, he starts running

7  east?

8      A.    (Witness nods head affirmatively.)

9      Q.    Is that correct?

10     A.    Yes, sir.  Well, my K-9 partner made the

11 apprehension approximately in this area.

12     Q.    All right.  I want you, could you just,

13 maybe using this black marker, it may show up

14 better.  Could you draw a circle where the K-9

15 apprehension occurred?

16     A.    (Witness complies).

17     Q.    All right.  And that's the circle that's

18 in front of your initials, JS?

19     A.    Yes.

20     Q.    Let's put apprehend there, or

21 apprehension.

22     A.    Write apprehension?

23     Q.    Yeah.

24         MR. HUSKISON:   Like for K-9.

25         MR. UPCHURCH:   K-9 apprehension, that's

104

1  better.

2         MR. McCORMACK:  How about just K-9?

3         MR. UPCHURCH:  How about just K-9?

4     A.    K-9?

5  BY MR. UPCHURCH:

6     Q.    K-9.  That will work.  All right.  Now,

7  sir, if you could, from that area of the K-9

8  apprehension, if you could show us where Mr. Goode

9  went after he struck your partner.

10    A.    At that time, when he struck Weasel, he

11 turned right here and started heading back east.

12    Q.    All right, sir.  Now, again, when he

13 turned and started heading back east, what was his

14 pace, was he running from you, sprinting from you,

15 how do you describe his?

16    A.    He was running.

17    Q.    All right, sir.  And at the point that you

18 dislodged your taser, where would Mr. Goode have

19 been?

20    A.    He was about 15 feet in front of me.

21    Q.    Had he reached your vehicle?

22    A.    No, sir.

23    Q.    All right.  So he was still on the east

24 side of your -- on the west side of your vehicle?

25    A.    Yes.  Or about parallel with it, just that

105

1   area.

2       Q.   All right, sir.  And you've described the

3   events after the attempted tasing occurred and I

4   don't want to rehash those.  But I want to ask this

5   to make sure our understanding is accurate.  Your

6   fellow police officers attempted to apprehend

7   Mr. Goode after he fell following the attempted

8   tasing?

9       A.   Yes, sir.

10      Q.   Do I understand correctly that those

11  officers were able to restrain Mr. Goode's arms by

12  use of handcuffs?

13      A.   Eventually.  He was fighting for a while.

14      Q.   All right.  That's what I want to -- to

15  ask you.

16           Did Mr. Goode, in fact, resist the

17  attempts to apprehend him -- apprehend him from your

18  fellow officers?

19      A.   Yes, sir.

20      Q.   Were they ultimately able to secure his

21  arms and handcuffs behind his back?

22      A.   After -- after a struggle, they were.

23      Q.   All right, sir.  How many officers did it

24  take to struggle with Mr. Goode to ultimately get

25  his hands handcuffed behind his back?

**Jason Scallorn - November 30, 2016**

106

1      A.    That I recall, I believe it was three.

2      Q.    All right, sir.  Are you describing for us

3   Mr. Scallorn, that Mr. Goode was resisting with such

4   force and in such a way that it took three of your

5   colleagues to restrain him in handcuffs?

6           MR. McCORMACK:  Object to the form.

7      A.    Yes -- yes, sir.

8   BY MR. UPCHURCH:

9      Q.    All right, sir.  That's your testimony, is

10  it not?

11     A.    Yes, sir.

12          MR. McCORMACK:  Object to the form.

13  BY MR. UPCHURCH:

14     Q.    Now, you've told Mr. McCormack that leg

15  restraints were also used.  My question is, why?

16     A.    Mr. Goode continued to kick, continued to

17  flail.  When they originally handcuffed him behind

18  his back, he started rolling over.  I guess you

19  would, for lack of a better term, like an alligator

20  roll, and started kicking and flailing and...

21     Q.    All right, sir.  Was he still screaming

22  out as well at this time?

23     A.    Yes, sir.

24     Q.    So we've got a subject who took three of

25  your colleagues to place handcuffs on.  He's

**Alpha Reporting Corporation**

107

1  screaming, yelling, rolling, and kicking to such an

2  extent, am I correct, that your colleagues requested

3  leg restraints to try to get him appropriately

4  apprehended?

5       MR. McCORMACK:  Object to the form of the

6  question.

7       A.  Yes, sir.

8  BY MR. UPCHURCH:

9       Q.  Look with me, please, sir, at Exhibit 6,

10 marked for your deposition.  Looking on Page 14,

11 that first paragraph ends with:  Due to the

12 subject's condition.  Do you see that?

13      A.  On the first paragraph?

14      Q.  Yes, sir, ending about right there.

15      A.  Yes, sir.

16      Q.  All right.  If you go up about six lines

17 from there, you write, quote:  They were then able

18 to cuff the subject; however, he was still fighting

19 and being uncooperative.

20      That's what you just described for me and

21 the need for leg restraints, correct?

22      A.  Yes.

23      MR. McCORMACK:  Object to the form.

24 BY MR. UPCHURCH:

25      Q.  When you were on Goodman Road, on scene,

Jason Scallorn - November 30, 2016

108

1   responding to the dispatch that you had received
2   regarding Mr. Goode, did Mr. Goode ever obey a
3   verbal command that you or any other officer gave
4   him?
5       A.   No, sir.
6       Q.   Did Mr. Goode continue to be uncooperative
7   until he was restrained in the four point restraint?
8       A.   Yes, sir.
9       Q.   Now, the next paragraph addresses your
10  communication with Ms. Goode, his wife.
11      A.   Yes, sir.
12      Q.   And I don't think that you were asked many
13  questions about that.
14           The communication that you and Ms. Kelli
15  Goode had occurred where, if we're looking at
16  Exhibit 3?
17      A.   Approximately where TB is.
18      Q.   All right.  Looking at your report,
19  Exhibit 6, did Ms. Goode indicate to you, as
20  referenced on the third line of that report, that
21  Mr. Goode was, quote, out of his mind right now,
22  closed quote?
23           MR. McCORMACK:  Object to the form of the
24  question.
25      A.   Yes, sir.

Jason Scallorn - November 30, 2016

109

BY MR. UPCHURCH:

Q.    Did you agree with that statement based upon your observation of Mr. Goode?

A.    Yes, sir.

Q.    Did Ms. Goode indicate to you that he was, quote, out of his mind, closed quote, due to ingestion of illegal drugs?

A.    Yes, sir, she told me he had taken LSD.

Q.    All right, sir.  Continuing to look at your report, did Ms. Goode, in fact, apologize to you for Mr. Goode's behavior?

A.    Yes, sir, she did.

Q.    Did she, in fact, indicate to you that she understood the actions that the police officers had to take with Mr. Goode because of his behavior?

A.    She was upset, but she understood.

Q.    All right, sir.  Looking at the next paragraph that you write, which takes us to -- well, before I transition there, do you have an estimate or a recollection, Mr. Scallorn, of the time that elapsed between your arrival on Goodman Road when you responded to the dispatch, and when Mr. Goode was placed in the EMS for transport to the hospital?

A.    Sir, I don't want to speculate on time.  I can tell you it wasn't long, but I don't want to

110

1    speculate on time.

2        Q.   All right, sir.  Watching your watch

3    wasn't a priority?

4        A.   No, sir, I was busy.

5        Q.   Mr. Gass has asked you about your

6    recollections of seeing Mr. Goode in the

7    decontamination room, and I won't re-plow that

8    testimony.  But you do mention in this paragraph

9    that Mr. Goode was, quote, thrashing around, closed

10   quote.

11            Was that based upon your observation of

12   him in the decontamination room?

13            MR. McCORMACK:   Object to the form.

14       A.    For the brief time I was in there, yes,

15   sir.

16   BY MR. UPCHURCH:

17       Q.   All right, sir.  Can you describe for us

18   what you mean by thrashing around, can you help us

19   understand that observation?

20       A.   He was on a gurney in the four point

21   restraint.  And he had thrashed and created such a

22   disturbance he had almost fallen off the gurney and

23   had to be pulled back on the gurney.  And he was

24   making unintelligible noises, rambling, screaming;

25   couldn't stay in there.

**Jason Scallorn - November 30, 2016**

111

1    Q.    All right, sir.  You go on to state in the

2  next sentence that the subject was still in a much

3  heightened state of impairment and was still being

4  very aggressive.  What do you mean by very

5  aggressive?

6    A.    Just yelling and screaming.  I remember --

7  I don't remember who the medical personnel were, but

8  people were saying, hey, Troy, trying to get his

9  attention.  He would laugh, he would cry, he would

10  scream, he would spit, just -- all at the same time.

11    Q.    All right, sir.  When you were on scene

12  out at Goodman Road, do you ever recall Mr. Goode

13  calmly putting his hands up and saying I'll go or

14  I'll do whatever you all want me to do?

15    A.    No, sir.

16    Q.    That wasn't his behavior, was it?

17    A.    Not at all.

18    Q.    Thank you.  That's all I have for you.

19                    EXAMINATION

20  BY MR. JORDAN:

21    Q.    Officer, my name is Trey Jordan, I have a

22  few questions.

23    A.    Yes, sir.

24    Q.    Again, these are going to be some

25  sequencing questions.

112

1         MR. JORDAN:  Let me get my microphone,

2  hold on one second.

3  BY MR. JORDAN:

4     Q.  When you arrived on the scene, do you

5  recall when you first noticed Ms. Goode, Kelli

6  Goode?

7     A.  I don't recall when I first noticed her.

8  I -- when I looked up, when I was looking at

9  Mr. Goode, like I'm looking at you, over the

10  shoulder I could see Officer Baggett talking to

11  somebody.  I later found out that was Ms. Goode.

12     Q.  Was she attempting to, when you arrived

13  and first made contact with Mr. Goode, was she

14  within, let's say, 25 feet of him, was she close to

15  him?

16     A.  Maybe 25 yards, not feet.

17     Q.  25 yards.  Was she attempting to engage in

18  any kind of communication with him that you could

19  see, swinging, hey, come back from Goodman Road?

20     A.  Not that I saw.

21     Q.  Just for the jurors, so they can

22  understand Goodman Road, describe that road for me.

23  Is it a two-lane road where you might have a car

24  going by every two or three minutes?

25     A.  No, sir, it's a state highway.  It's a

113

1 four-lane divided by a turning lane, east and west.

2 It's the main corridor through DeSoto County. The

3 time of day that that was there, that road is

4 congested. We work tons of wrecks every day on that

5 road. It's a dangerous road.

6       This time it was on a Friday. It was

7 especially congested, because in proximity to where

8 the Snowden Grove Amphitheater was, the concert that

9 Mr. Goode was attending, Goodman Road is the only

10 way to get in to it, so it was extremely congested.

11    Q.  So Goodman Road is the main access to

12 venue where this concert was occurring?

13    A.  Yes, sir.

14    Q.  It is one of the major thoroughfares

15 through the county, correct?

16    A.  Yes, sir.

17    Q.  Is it -- in the area where you first made

18 contact with Mr. Goode, is there a pedestrian

19 crosswalk there, is there a place where -- is there

20 something that would let vehicles to know to slow

21 down if someone ran into the road?

22    A.  No, sir.

23    Q.  Is this an area where it's controlled by a

24 traffic light in the proximity where you made an

25 encounter with him?

Jason Scallorn - November 30, 2016

114

1    A.    There's not a traffic light, I'd say,

2 within three-quarters of a mile either direction.

3    Q.    So the traffic is moving at this point?

4    A.    Yes, sir.

5    Q.    Can you tell me what the posted speed

6 limit is on that road?

7    A.    55 at that point.

8    Q.    55-mile-an-hour-road, major road, and this

9 is the one, the major thoroughfare in the county?

10    A.    Yes, sir.

11        MR. McCORMACK:   Object to the form.

12 BY MR. JORDAN:

13    Q.    Have you ever worked any kind of -- let me

14 back up and ask:  When you arrived at the scene, how

15 close, when you first observed Mr. Goode, was he to

16 the road?  How close was he to entering that

17 roadway?

18    A.    15, 20 yards.

19    Q.    15 or 20 yards.  And he was noncompliant

20 with your commands, correct?

21    A.    Yes, sir.

22        MR. McCORMACK:   Object to the form.

23 BY MR. JORDAN:

24    Q.    You said he was zigzagging when you first

25 noticed his manner of walk?

Jason Scallorn - November 30, 2016

115

1    A.    Yes, sir.

2    Q.    In fact, you described earlier, I think,

3 that as he came toward you, when you first

4 encountered him or came towards your vehicle, he did

5 it kind of in a zigzagging manner; is that correct?

6    A.    Yes, sir.

7    Q.    When you first arrived and encountered

8 him, was this encounter before you had any

9 communication with Ms. Goode?

10    A.    Yes, sir.

11    Q.    Because she later told you that he had

12 taken acid, correct?

13    A.    Yes, sir.

14    Q.    But upon your first encounter, you didn't

15 know if you had a person who was under the influence

16 of alcohol, correct?

17    A.    Yes, sir.

18    Q.    Didn't know if he simply had a mental

19 incapacitation, correct?

20    A.    Yes, sir.

21    Q.    Didn't know if he was on heroine?

22    A.    Correct.

23    Q.    Didn't know if he was on crystal meth?

24    A.    Correct.

25    Q.    You had no idea who you were encountering

116

1  at that time, correct?

2      A.    No idea.

3      Q.    You just knew you had a person coming

4  toward you, noncompliant, who you had been

5  dispatched on a 9-1-1 call, correct?

6          MR. McCORMACK:   Object to the form.

7      A.    Yes, sir.

8  BY MR. JORDAN:

9      Q.    I want to make sure, and I want to break

10 down my question.  You went there on a 9-1-1 call,

11 correct?

12     A.    Yes, sir.

13     Q.    To your knowledge, that is why you were

14 dispatched?

15     A.    Yes, sir.

16     Q.    And, again, the nature of the 9-1-1 call

17 you got from dispatch described the event you were

18 responding to as what?

19     A.    A white male in a physical disturbance

20 with his wife, acting erratically, running in and

21 out of businesses in the area, running through the

22 parking lot.

23     Q.    So when you arrive at the scene, you had

24 at least -- whether it's true or not, you have been

25 advised by dispatch that there has been an

Jason Scallorn - November 30, 2016

117

1   altercation where a male has potentially assaulted a
2   female, correct?
3           MR. McCORMACK:  Object to the form of the
4   question.
5       A.   Yes, sir.
6   BY MR. JORDAN:
7       Q.   An altercation, that's what you were
8   advised of?
9       A.   Yes, sir.
10      Q.   All right.  So you are now on scene.  You
11  are being approached by a person who is
12  non-compliant, correct?
13      A.   Yes, sir.
14      Q.   Who at least you have been advised has
15  potentially attacked a female, correct?
16          MR. McCORMACK:  Object to the form.
17      A.   Yes, sir.
18  BY MR. JORDAN:
19      Q.   All right.  So you get there.  And he, you
20  said you see him about 15 yards from Goodman Road,
21  correct?
22      A.   Yes, sir.
23      Q.   And he approaches you in a zigzag manner.
24  Do you recall, and you may have said this already,
25  but I want to make sure I understand.  What was

**Alpha Reporting Corporation**

118

1    your -- you first tried to engage him with just

2    conversation, correct?

3        A.    Yes, sir.

4        Q.    And is that to try to de-escalate the

5    situation?

6        A.    It's to -- it's an attempt to de-escalate

7    to see if I can get his attention on me, then, you

8    know, whatever he wants to do with me, that's fine.

9    If he can focus on me, he's not running out in the

10   road, he's not assaulting somebody else.  If he

11   wants to come to me and talk, we can talk.  If he

12   wants to come to me and, whatever, but it's me and

13   not the citizens.

14       Q.    Because your goal is to not only protect

15   the citizens --

16       A.    Right.

17       Q.    -- but protect him?

18       A.    Yes.

19       Q.    You told him, come here.  Come to me, come

20   away from the road.  Come see me, right?

21       A.    Yes, sir.

22       Q.    That's what your thought was when you

23   arrived?

24       A.    Yes, sir.

25       Q.    So now he's coming towards you.  And

119

1  instead of continuing towards you then, what does he

2  do?

3      A.    He kept coming, and I -- I was verbally

4  escalating when he wasn't complying.  And when he

5  got close to my truck, I said, lay down on the

6  ground, I have a dog, don't come any closer.  At

7  this point I started getting nervous.  It's not

8  natural to walk up like that.

9      Q.    And when you say you get nervous, as

10 someone comes closer and closer to you, that limits

11 what your options are; is that accurate?

12     A.    If you tell -- yes, sir.  If you tell

13 somebody, hey, you mind if I speak with you, sir,

14 and they walk over to you and you have a consensual

15 conversation, that's one thing.  But when you're

16 giving commands to somebody to stop, and they're

17 being defiant and coming at you and staring at you,

18 that makes you nervous.

19     Q.    Because as a suspect or an individual gets

20 closer to you, then at that point you have to worry

21 about things like knives, him actually grabbing you,

22 correct?

23         MR. McCORMACK:  Object to the form.

24     A.    Yes, sir.

25 BY MR. JORDAN:

Jason Scallorn - November 30, 2016

120

1    Q.   Is that a yes?  Tell me this:  Do officers
2    get killed with their own firearms?
3           MR. McCORMACK:  Object to the form of the
4    question.
5    BY MR. JORDAN:
6    Q.   When they get taken away from officers?
7    A.   Absolutely.
8    Q.   And is that one of the reasons why you
9    want to keep people basically away from your space?
10   A.   Yes, sir.
11   Q.   Because if somebody gets in a physical
12   altercation with you, from your experience as a
13   patrol officer, I think you said you're now a
14   supervising patrol office, correct?
15   A.   Yes, sir.
16   Q.   Is that one of the things that officers
17   are fearful of, somebody gets too close is that they
18   actually get in a physical altercation and have
19   their own gun taken?
20   A.   We teach officers, there's the thing we
21   call the reactionary gap, and it's called that
22   because you can only react at a certain point.  You
23   let somebody get too close in, things go bad.
24   Q.   And, in fact, when someone gets closer in
25   to you, does that start limiting your ability to do

**Jason Scallorn - November 30, 2016**

121

1  anything other than go to a quicker escalation of

2  lethal force?

3      A.    Yes, sir.

4      Q.    Whereas, if somebody is further away from

5  you, you might have the option to taser, the dog,

6  you have -- the further away from you, the more

7  options you have; is that accurate?

8      A.    Yes, sir.

9      Q.    So now he comes up, and then he diverts

10  from you and decides to let the dog out, correct?

11     A.    Yes, sir.

12            MR. McCORMACK:  Object to the form.

13  BY MR. JORDAN:

14     Q.    Did you instruct him to let the dog out?

15     A.    No, sir.

16     Q.    Did he say anything to give you any

17  warning that he was going to let the dog out?

18     A.    No, sir.

19     Q.    So the dog gets out.  Now, where are you

20  positioned with regard to the vehicle when he opens

21  the door?

22     A.    My vehicle is a Tahoe.  The hatchback on

23  the Tahoe, I'm standing on that side facing him.

24  Like, if this is the back of my vehicle, and you're

25  Mr. Goode, I'm standing like, my Tahoe's right here.

**Jason Scallorn - November 30, 2016**

122

1     Q.    And are you using the vehicle at that

2 point to shield you?

3     A.    I'm using it more to shield him.

4     Q.    Okay.  And so when he opens the door, do

5 you have a view that's obscured, relative to seeing

6 the direct action between him and the dog?

7     A.    Yes, sir.

8     Q.    What obscured your view?

9     A.    Well, he opened -- like, I'm standing at

10 the back of the Tahoe and the door is right here.

11 When he opened the door, he was kind of leaned in,

12 and when he opened the door, I leaned over and

13 looked, and I heard a chomp, but I couldn't see

14 nothing.

15     Q.    And when you heard the chomp, that's the

16 dog, you think -- you heard the dog's jaws clamp

17 shut, but it could have been on his shirt, we don't

18 know what he chomped on?

19     A.    Yes, sir.

20     Q.    So then the dog gets out of the vehicle?

21     A.    Yes, sir.

22     Q.    From the time you first encountered him

23 and I mean, laid eyes on him, until the time that he

24 opened the door for the dog to get out, and I know

25 you -- I'm not asking you to speculate, but can you

123

1    give me a range of time that might have elapsed?

2        A.    30, 45 seconds.

3        Q.    So from the time you're on scene, first

4    see him, to the time he's opening the door to let

5    your dog out, 30 to 45 seconds?

6        A.    Yes, sir.

7        Q.    So the dog gets out.  And then, again,

8    tell me what's the next event happened?

9        A.    When he opened the door, and the dog came

10   out, I left from behind the Tahoe to go get my dog

11   because I didn't want -- I had to get him.  I got

12   him.  Well, at that time, Mr. Goode came and stood

13   where I was standing at the Tahoe, at the place

14   where I was trying to keep him from getting to, and

15   I started giving him orders to lay down on the

16   ground.

17       Q.    And you've got the dog by the collar at

18   this time?

19       A.    Yes, sir.

20       Q.    And you don't have your lead out?

21       A.    No, sir.

22       Q.    You've just got the collar.  Because he

23   let the dog out.  You weren't planning on him being

24   out at that time?

25       A.    I didn't plan on letting him out.

124

1    Q.    So now -- are you yelling at him at this

2  point?

3    A.    Yes.

4    Q.    Are you screaming commands?

5    A.    I'm not screaming, per se, but I am giving

6  very loud, very clear, dominating commands.  I am

7  telling him, you will lay down on the ground.  You

8  will comply.

9    Q.    Now, at this point, has Ms. Goode come up

10  to you and said, hey, look, my husband's on acid or

11  anything like that, or is she still away from you?

12    A.    I hadn't spoken to her at this point.

13    Q.    Had you even heard her say anything at

14  this point?

15    A.    No, sir.

16    Q.    Do you hear her screaming at her husband

17  at this point?

18    A.    No, sir.

19    Q.    Do you see her coming anywhere, let's say

20  within 10 feet?

21    A.    No, sir.

22    Q.    All right.  So you're now yelling for him

23  to get on the ground.  Does he comply?

24    A.    No, sir.

25    Q.    What happens then?

125

1     A.    He laughed at me.  And then he took off

2  running west down Goodman Road on the shoulder of

3  the road.

4     Q.    And this is where I think you said, at

5  this point you make the decision to release the dog?

6     A.    Yes, sir.

7     Q.    Now, I want talk about -- I want to make

8  sure I understand the difference between an

9  apprehension and an attack, okay?  You -- police

10 dogs are used to apprehend people, correct?

11    A.    Yes, sir.

12    Q.    The police dogs aren't used to -- the

13 word, I think, attack has been used.  But the dogs

14 are meant to stop a fleeing suspect, for example,

15 correct?

16         MR. McCORMACK:  Object to the form.

17    A.    Yes, sir, they're made to apprehend.

18 BY MR. JORDAN:

19    Q.    And when they apprehend someone, that can

20 be by grabbing a piece of clothing and pulling them

21 down.  It may actually, I think Mr. Goode had a bite

22 on his arm, but it may be a matter of biting his arm

23 as well, correct?

24    A.    Yes.

25         MR. McCORMACK:  Object to the form.

**Jason Scallorn - November 30, 2016**

126

1  BY MR. JORDAN:

2     Q.   But the purpose of the dog, in this case,

3  is to stop the suspect from fleeing, correct?

4     A.   Yes, sir.

5     Q.   Now at this point, were you concerned for

6  Mr. Goode's welfare?

7     A.   Absolutely.

8     Q.   Because where was he, again, at this point

9  in proximity to Goodman Road?

10     A.   Maybe five yards.

11     Q.   Okay.  So now since your encounter, he's

12  moved from 15 yards from Goodman Road, now he's 5

13  yards from Goodman Road?

14     A.   Yes, sir.

15     Q.   And this is a person who's not obeying

16  your commands?

17     A.   Correct.

18         MR. McCORMACK:  Object to the form.

19  BY MR. JORDAN:

20     Q.   Well, was he obeying your commands at this

21  point?

22     A.   No, sir.

23     Q.   So the dog -- when the dog finally was

24  able to reach him and engage with him, how far away

25  were you from Mr. Goode at that point?

**Alpha Reporting Corporation**

1    A.    I'd say 25 yards.

2    Q.    And he's running, so the dog was able to

3  catch up to him?

4    A.    Yes, sir.

5    Q.    I assume the dog is faster than you, me,

6  and Mr. Goode?

7    A.    He's fast.

8    Q.    All right.  Now, so that the jury

9  understands about the training of these dogs, these

10  dogs when they're trained, it is not infrequent,

11  would you agree, that when they encounter a suspect,

12  that the suspect will often hit the dog, kick the

13  dog, I mean, these dogs get some rough treatment,

14  correct?

15    A.    Yes, sir.

16    Q.    Now, just so that I can understand, you

17  have been with this dog -- you have been, and it's

18  Wessel, I know everybody's calling him Weasel, but

19  it's Wessel, correct?

20    A.    Yes, sir.

21    Q.    What kind of dog is Wessel?

22    A.    A Belgian Malinois.

23    Q.    And that's one of the dogs, along with

24  German Shepherds, that's one of the dogs standardly

25  used by police departments, correct?

128

1    A.    That's correct.

2    Q.    Had you seen Wessel previously hit, you

3 know, had been kicked by suspects before that he was

4 trying to help apprehend?

5    A.    I had made a couple of apprehensions prior

6 to that date.  I remember one of them did hit him.

7 But it was more of a slap and not a hit.

8    Q.    And did he remain engaged?

9    A.    Yes, sir.

10    Q.    Because that's what I want to ask you.

11 Mr. Goode hit this trained police dog hard enough

12 that the dog disengaged, correct?

13    A.    Yes, sir.

14         MR. McCORMACK:  Object to the form.

15 BY MR. JORDAN:

16    Q.    Well, when he was hit, did he -- when

17 Mr. Goode hit this dog, did the dog disengage?

18         MR. McCORMACK:  Object to the form.

19    A.    Yes, sir, he did.

20 BY MR. JORDAN:

21    Q.    Where did the dog get hit, in the head?

22    A.    In the nose, the snout.

23    Q.    Now, typically, even when a police dog is

24 trained, K-9 unit disengages, it's brief, and the

25 dog will usually re-engage, correct?

Jason Scallorn - November 30, 2016

129

1      A.    Yes, sir.

2      Q.    For the dog to remain disengaged, the blow

3  that dog would have had to have received would have

4  been a substantial blow, correct?

5            MR. McCORMACK:  Object to the form.

6      A.    Yes, sir.

7  BY MR. JORDAN:

8      Q.    Because those dogs, in their training, are

9  trained to re-engage, even after they let off from

10 the initial contact with the fleeing suspect,

11 correct?

12     A.    When I got -- when I got up to Weasel, we

13 have a saying, it's go find daddy.  Like when they

14 come out of the car, go find, you know, Wessel came

15 to me and would not leave my side.

16     Q.    So basically this dog that's trained to be

17 there to help you, was looking to you for help?

18     A.    Yes, sir.

19     Q.    And he would not, he would not even -- he

20 came and stayed by you?

21     A.    Yes, sir.

22     Q.    And he would not again approach Mr. Goode;

23 is that accurate?

24     A.    Yes, sir, I could tell my dog was hurt.

25     Q.    So now we have a K-9 that's been -- is it

130

1  fair to say that after he had been struck in the

2  nose area by Mr. Goode, that your K-9 at that point

3  was incapacitated?

4      A.   Yes, sir.

5          MR. McCORMACK:  Object to the form.

6  BY MR. JORDAN:

7      Q.   Do you view him to be a partner with you,

8  able to help continue with the effort to apprehend

9  Mr. Goode after Mr. Goode had struck the dog?

10     A.   My dog is never a hindrance to me, but at

11 that moment in time, he became a hindrance because

12 now I'm worried about Mr. Goode.  I'm worried about

13 my dog, and a lot is going on at one time.  So the

14 dog became a hindrance at that point.

15     Q.   Is a dog, is a police dog actually

16 considered to be equipment, or what do you consider

17 a police dog?

18     A.   City Hall will tell you it's a piece of

19 equipment.  My family will tell you it's a member of

20 our family.

21     Q.   So this dog, after the blow, was rendered

22 ineffective to assist you in helping subdue

23 Mr. Goode; is that accurate?

24         MR. McCORMACK:  Object to the form of the

25 question.

131

1      A.    Yes.

2   BY MR. JORDAN:

3      Q.    So now you have a dog that's incapacitated

4   and Mr. Goode, is he still fleeing down Goodman?

5      A.    Yes, sir.

6      Q.    And at this point you decided to deploy

7   the taser?

8      A.    Yes, sir.

9      Q.    And the taser, when you -- let's explain a

10  little bit so I can understand and the jury can too.

11  A taser is a nonlethal option for an officer; is

12  that accurate?

13     A.    Yes, sir.

14     Q.    And it's deployed by firing two barbs that

15  have lead wires on them, correct?

16     A.    Yes, sir.

17     Q.    And for the weapon, the item, the object

18  to be effective, both barbs have to make contact, go

19  through the clothing and actually hit the skin,

20  correct?

21     A.    Yes, sir.

22     Q.    If one barb does not do that, then a

23  charge cannot be delivered by the taser, correct?

24     A.    That's correct.

25     Q.    In this case when you fired, do you

Jason Scallorn - November 30, 2016

132

1   believe that one or both barbs failed to engage?

2       A.   I saw one fly off to the right.  And

3   that's the one that I got caught up in my leg.

4       Q.   And so that we can be clear then, this

5   isn't a situation where you might fire a taser at

6   somebody and one goes through the shirt but the

7   other, like, hits a backpack or something.  You

8   actually saw one of the prongs and the trail wire go

9   off and not even make contact with any part of

10  Mr. Goode, correct?

11      A.   Yes, sir.

12      Q.   And at that point, is the taser able to

13  deliver a charge?

14      A.   No, sir.

15      Q.   All right.  Now you talk about the wires,

16  these are the wires that's unspooled from the taser,

17  correct?

18      A.   Yes, sir.

19      Q.   And you say you actually got tangled up in

20  one?

21      A.   Yes, sir.

22      Q.   And did Mr. Goode get tangled up, you

23  think?

24      A.   Yes, sir.

25      Q.   And is that what you believe caused him to

**Alpha Reporting Corporation**

**Jason Scallorn - November 30, 2016**

133

1  trip?

2      A.    Yes, sir.

3      Q.    So now he's tripped and he's on the

4  ground?

5      A.    Yes, sir.

6      Q.    At this point, have you had any contact

7  with Ms. Goode?

8      A.    No, sir.

9      Q.    Is she up in this area?

10      A.    I didn't see her.

11      Q.    Is she telling you what her husband is on,

12  or that he's on any kind of drugs at this point?

13      A.    I didn't see her.

14      Q.    When he is on the ground, is that when the

15  other officers actually come into his proximity?

16      A.    Yes, sir.  As soon as he tripped and he

17  hit the ground, because I'm running, but it's --

18  best I can because I have Wessel with me.  I don't

19  have my leash yet, so I'm trying to run with this

20  Malinois, hanging onto his collar.  And we came

21  around.  Like, Mr. Goode fell, and we came around.

22  At that time, the officers came and they started to

23  struggle with him.

24      Q.    And you never had any part of trying to

25  handcuff him, correct?

**Alpha Reporting Corporation**

134

1      A.    No, sir.

2      Q.    You, at that point when he was on the

3  ground trying to be cuffed, you took Wessel back to

4  your vehicle?

5      A.    Yes, sir.

6      Q.    And then you actually had to return a

7  second time to your vehicle to get the leg

8  restraints, correct?

9      A.    Yes, sir.  I took Wessel back to my

10 vehicle, just briefly, just made sure his nose

11 wasn't bleeding.  Shut the door, ran back up to the

12 scene, and that's when Officer Bond said I need some

13 shackles.  So I ran back to my truck, got the

14 shackles and came back, gave them to him.

15     Q.    And the entirety of the time that -- let

16 me ask you, from your observations, at any time that

17 the other officers were attempting to cuff

18 Mr. Goode, was he ever compliant?

19     A.    No, sir.

20     Q.    Did he ever say, I give up, I surrender?

21     A.    No, sir.

22     Q.    At any time you ever encountered

23 Mr. Goode, did he ever put his hands up and say, I

24 submit, or give any indication or say anything that

25 would indicate that he was agreeing to be taken into

1  custody?

2          MR. McCORMACK:  Object to the form of the

3  question.  You may answer.

4      A.  Not at all, no, sir.

5  BY MR. JORDAN:

6      Q.  At what -- how long after you arrived at

7  the scene -- let me give you a range of time.  How

8  long after you arrived at the scene, did you have

9  initial communication with Ms. Goode?

10      A.  Like I say, I don't want to speculate on

11  time, but it was -- after I gave Officer Bond the

12  shackles, that's when I went up and began to speak

13  with her.

14      Q.  Was he -- was he still on the ground when

15  you initiated the contact with her?

16      A.  Yes.

17      Q.  When he told you -- did she say that he

18  was on acid, on LSD, do you remember what she said

19  specifically?  Same thing, but I'm asking how she

20  described it.

21      A.  He had taken LSD at the Widespread Panic

22  concert at the Snowden Grove Amphitheater.

23      Q.  Did she tell you how much he had taken?

24      A.  I don't recall.  She said a few hits, I

25  don't know what that --

136

1     Q.   Did she tell you what kind of acid he had

2  taken, the method of delivery, being on blotter

3  paper, liquid acid, on his skin, on his tongue, any

4  idea?

5     A.   No, sir.

6     Q.   Would that information had been helpful to

7  you to know the amount of acid he consumed?  Would

8  you have wanted to know that?

9     A.   It would have been nice to know.

10     Q.   Is that something that would have -- that

11  you would have included in your report if she had

12  told you how much specifically he had taken?

13     A.   Yes, sir.

14     Q.   Or the type that he had taken?

15     A.   Yes, sir.

16     Q.   I think you were asked this earlier, but I

17  want to make sure.  Did she ever indicate that he

18  had any health problems at all?

19     A.   No, sir.

20     Q.   Any issue with asthma?

21     A.   No, sir.

22     Q.   You were asked multiple questions about --

23  when we started today by Counsel who thoroughly went

24  over the obligations, duties and responsibilities of

25  police officers.  Do you remember those?

137

1    A.    Yes, sir.

2    Q.    As a police officer, do you have an

3 obligation and responsibility to protect the general

4 public from a suspect?

5    A.    Yes, sir, I do.

6    Q.    When the suspect is resisting arrest, do

7 you have an obligation to protect the general public

8 from the suspect that might be a danger to others?

9    A.    Absolutely.

10    Q.    Is that what handcuffs -- or is that one

11 reason you have handcuffs, to protect you the

12 officer, the suspect and the general public?

13    A.    Yes, sir.

14    Q.    Are handcuffs -- I think your policy says

15 that, but for someone who's under arrest, they are

16 by policy supposed to be cuffed, correct?

17    A.    Yes, sir.

18    Q.    If Mr. Goode had not been trying to kick

19 at the officers, physically use his feet to harm

20 himself or the officers, would he have been put in

21 leg restraints?

22         MR. McCORMACK:    Object to the form of the

23 question.

24    A.    A four point restraint is the last tool we

25 have in the toolbox.  That's the last-ditch effort.

**Jason Scallorn - November 30, 2016**

138

1  BY MR. JORDAN:

2      Q.    Last-ditch effort for what?

3      A.    To gain compliance and restrain them from

4  hurting themselves or other people.

5      Q.    Have you been kicked before?

6      A.    Absolutely.

7      Q.    Have you been kicked by a handcuffed

8  suspect before?

9      A.    Yes, sir.

10     Q.    How many times has that happened to you?

11     A.    It's not regular, it goes in spurts.  But

12 I can tell you, when you work a night shift and you

13 deal with intoxicated people, you deal with people

14 who are high on drugs, angry people.  I've been

15 kicked, I've been spit on, I've been head-butted,

16 all this by handcuffed people.

17     Q.    When you went to the hospital and

18 encountered, I think you said the room is called the

19 detox room; is that correct?

20     A.    Decon is how it was referred to me.

21     Q.    Decon room.  At that point, had Mr. Goode

22 given any indication that he was going to be any

23 more compliant than the first time you encountered

24 him?

25     A.    No, sir.

**Alpha Reporting Corporation**





**Southaven Police Department**

# Memo

**To:** Lieutenant Little

**From:** Officer Jason Scallorn

**Date:** 07/19/2015

---

Lt. Little, the following memo is in reference to an incident that occurred at 3451 Goodman Road on 07/18/2015 at 7:49 pm. Incident number 201500046947.

On Saturday, July 18, 2015 at 7:46 pm Officer Todd Baggett and Officer Joel Rich were dispatched to the Rancho Grande restaurant located at 3451 Goodman road in reference to a disturbance between a white male and a white female in the parking lot. When I heard the call go out I advised dispatch that I would also go to the call to back the officers up.

While I was en route to the call dispatch advised the responding officers that the white male was wearing a white shirt with khaki shorts and was running west from the scene on Goodman road. Dispatch then advised that the caller stated that the white male had returned to his car and the caller also stated that the white male was acting erratic and was under the influence of narcotics, possibly LSD. At this time I heard Officer Todd Baggett tell dispatch that he was on the scene and that the white male was running from him on foot in the parking lot. Officer Baggett the said on the radio that the white male had returned to him and then he ran away again.

I then arrived on the scene at 7:49 pm and observed a white male running in the front lawn of the shopping center where Rancho Grande is located. I could see that the white male was acting erratic and was getting dangerously close to Goodman Road. I then pulled to the shoulder on the south side of Goodman Road in front of the shopping center in an attempt to keep the white male from running in to traffic on Goodman Road which was very busy at this time due to the time of day and the concert at the Snowden Grove amphitheater.

After I had pulled over on the shoulder I exited my vehicle as the white male was walking toward me in an erratic and aggressive manner. I then walked to the rear of my vehicle and gave the white male a loud verbal command to stop what he was doing and to lie down on the ground. The white male then spoke to me but I was unable to understand what he was saying. The white male then began to walk back and forth beside me vehicle. I then told the white male to lie down again and that he needed to comply with my orders. At this time my K9 partner began to bark and the subject started looking at the back of my truck while he continued to walk back and forth. I then continued to order the white male to

1


EXHIBIT

000013

lie down but at this time he began to act more erratic and was completely uncooperative. Fearing for his safety and the safety of the citizens in the area I told the subject that I did have a police K9 in my truck and that if he did not comply with my orders that I was going to deploy my K9 partner. The white male then said that he was not worried about my dog. At this time I was still standing at the rear of my vehicle. I then remotely unlocked my doors in the event that I was going to have to deploy my K9 partner so that I could keep the white male from running in to traffic on Goodman Road. At this time the white male turned toward me and began to walk in my direction but stopped beside my vehicle and opened the rear door deploying my K9 partner. My K9 partner then exited the vehicle and attempted to apprehend the white male who ran to the rear of my vehicle. I was then able to gain positive control of my K9 and began to give the subject more loud verbal commands to lie down on the ground. The white male still refusing to comply with commands then ran from me west along Goodman Road. When the white male fled I gave a loud verbal warning for him to stop but he continued to run. Then fearing for his safety and the safety of the citizens driving on Goodman Road I sent my K9 partner to make the apprehension in an effort to keep him from running in to traffic on Goodman Road. My K9 partner then caught up with the subject in the grass close to the shoulder of the road and apprehended him with a bite on his left arm. The white male then struck my K9 in the top of the dog's head with a closed fist causing him to release the bite and continued to run. By this time I had caught up to the white and attempted to use my Tazer in another attempt to stop him. When I deployed my Tazer one probe made contact in his back but the other one missed so the Tazer was not effective. The white male then tripped and fell on the ground and began to struggle with Officer Baggett and Officer Rich who had just arrived on scene. They were then able to cuff the subject; however, he was still fighting and being uncooperative. I then observed Officer Bond and Officer Price who had just arrived on scene attempt to help secure the white male. I then began walking back to my vehicle so that I could secure my K9 partner when Officer Bond stated that he needed some leg shackles because the white was kicking and still being resistive. I then secured my K9 partner in my vehicle and brought a pair of leg shackles to Officer Bond. Officer Bond along with the other officers were able to finally secure the subject and dispatch was notified to start EMS due to the subject's condition.

After the white was secured I went and spoke with the subject's wife who witnessed the incident. I asked her what was wrong with him and what would cause him to open the door to a K9 vehicle. The subject's wife told me that he is "out of his mind right now" and that he had taken some illegal narcotics earlier in the day, possibly LSD. I then asked he if that was all that he had taken and she then told me that she did not know. The subject's wife then told me that she was sorry for him making us have to fight with him and that she did not blame us for doing what we had to do because he is "out of his mind right now". At this time Southaven EMS and fire department arrived on the scene and began to tend to the white male. While the paramedics were tending to the white male he continued to scream and yell but what he was saying was incoherent and did not make sense. The fire department then stated to us that the they were going to need two officers ride in the ambulance with them due to the subject's aggressive state and level of impairment. I then advised Lt. Wood who had just arrived on the scene that I was going to leave from here and meet up with the other officers at Baptist Desoto hospital so that I could take pictures of the subject's arm for K9 documentation. I then left from the scene and drove to Baptist Desoto hospital where I met with Officer Baggett and Officer Bond in the emergency room.

When I arrived at the hospital I could hear the white male screaming loudly and cursing from the front door of the emergency room. I then located the room they were in and observed that the white male was still secured to a gurney and was thrashing around. The subject was still at a much heightened state impairment and was still being very aggressive. Hospital personnel were tending to the white male and were attempting to give aid. I was unable to take any photographs at this time due to the medical personnel who were tending to him. I then told Lt. Wood that I was going to go to the police department and start on the paperwork while Officer Baggett stood by at the hospital. I then left from the hospital and went to the Southaven police department and began the paperwork. While I was at the police department doing paperwork I was advised by Lt. Wood that he had received a phone call from Officer Baggett who told him that the white male had coded and that the hospital personnel were performing CPR in attempt to resuscitate the subject. When I arrived at the hospital I located Officer

000014

Baggett who was standing in a hallway beside a door where hospital personnel were attempting to resuscitate him. Several minutes later we were approached by a nurse who told us that the subject had expired. I then notified Lt. Wood that the white male had expired and at this time he made notifications. Hospital personnel stated to me and Officer Baggett that they gave him medication to counteract the narcotics that he had taken but it was unsuccessful. I then stood by at the hospital with Officer Baggett and Lt. Wood until Lt. Little arrived. I spoke with Lt. Little who told me to go ahead and leave the hospital and to write him a memo detailing the incident along with the offense report. I then left the hospital and went to the Southaven police department where I completed the report. End of report.


Jason M. Scallom

Southaven Police Department

K-9 Division.

● Page 3

000015

## ARREST PROCEDURES                                                    6.000

Mississippi State Law allows arrest of person(s) under the following circumstances:

    Persons who may make arrests;
        A. Any Law Enforcement Officer
            1. with warrant
            2. without warrant
        B. Any private citizen

## ARREST(S) BY WARRANT                                                  6.100

A. An arrest(s) shall be made by any officer of the department when there has been a warrant issued by a municipal court judge of this city.

B. An arrest(s) on criminal warrant(s) issued by any judge in any other location within the State of Mississippi for any charge, misdemeanor or felony, may be made by officers of this department upon the following conditions;

    1. A copy of the outstanding warrant has been sent to this department from the law enforcement agency requesting it's service, or the suspect has been entered in the N.C.I.C. system.

    2. The warrant has been verified through official channels to be still outstanding

    3. The requesting law enforcement agency agrees to make travel arrangements to pickup the suspect.

C. An arrest may be made for criminal warrants issued by out of state jurisdictions or Federal Agencies when the following conditions are met;

    1. The warrant is for a <u>felony</u> charge only, and is an extraditable offense from that jurisdiction

    2. A copy of the certified warrant or a copy thereof is in hand, or the suspect has been entered into the N.C.I.C. system.

    3. The jurisdiction has confirmed that they will extradite the suspect.

RESTRICTED LAW ENFORCEMENT DATA
This data is proprietary and will not be duplicated, disclosed or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication



000042

D. Warrants and orders issued by a Chancery Court Judge will only be served by officers of this Department, when the Judge has directed the service of the paper to this department by stating "Command the Southaven Police Department or any of its officers", in the order

E. When a suspect has been arrested for another agency;

  1. This department has charges, note this department's charges and bond and also indicate on the booking sheet that a hold is to be placed for the other agency.

  2. This department has no charges and the arrest was made on another jurisdiction's warrant only, indicate on the booking sheet that a hold has been placed for the other agency only.

  3. Do not charge the suspect with the offenses alleged by the other jurisdictions warrant nor with fugitive from justice. Alert the jail that the suspect has a hold for the other agency so that the Sheriff's Office will take them before a magistrate and handle the extradition process. Include any copies or N.C.I.C. printouts that will be necessary for the Circuit Court.

  4. Advise the other agency to contact the Sheriff's Office to finalize extradition and transportation plans

## WARRANTLESS ARRESTS                                        6.200

A. An officer may arrest any person without a warrant under any of the following conditions;

  1. For a breach of the peace threatened or attempted (misdemeanor) committed in the officer's presence.

  2. When a felony has been committed;

    a. in the officer's presence

    b. not in the officer's presence, but probable cause exists to believe that the suspect was committing, was about to commit or had committed the felony offense.

61

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication

000043

3. An officer may make an arrest on any person on a misdemeanor charge without having a warrant in their possession when the officer has knowledge through official channels that the warrant is in fact outstanding for that person's arrest. In all such cases, the warrant shall be shown to the person as soon as is practicable upon the person's request.

B. An officer shall arrest any person under the following conditions;

1. When there is probable cause to believe that the person arrested has, within twenty-four (24) hours of such arrest, knowingly committed an act of domestic violence under the Mississippi Domestic Violence Laws, section 97-3-7, 97-35-9 through 97-3-15 or 97-3-107

## ARREST BY PRIVATE CITIZEN                           6.300

A. A private citizen may make an arrest under the following conditions;

1. For a breach of the peace or an offense committed in their presence.

2. When the person arrested has committed a felony in their presence, when a felony was committed, not in their presence, but the citizen has reasonable cause to believe that the person arrested committed the offense.

B. In these cases where a citizen has made an arrest, it is required that the person be turned over to an officer as soon as possible. In these such cases, the officer taking custody of the person arrested acts as transporting officer.

1. The citizen must come to the department and swear to and sign an affidavit before a Court or Deputy Court Clerk alleging the offense(s) the person has allegedly committed.

6.301 When an arrest is made by a security officer, the arrest procedure is as set out above.

RESTRICTED LAW ENFORCEMENT DATA
This data is proprietary and will not be duplicated, disclosed or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication

000044

**WHEN ARRESTS ARE TO BE MADE**                                    **6.400**

    A. Officers of this department will make arrest in the following categories;

        1. Felonies
        2. Misdemeanors

            In violation of;
            a. State Law
            b. City Ordinance

**METHOD OF ARREST OR SUMMONS**                                    **6.500**

    A. Violations of State Criminal Codes

        1.  Will be handled by making a physical arrest by means of;

            a. An "on view" arrest
                (1). Followed by officer signing proper affidavit(s)
            b. Or by means of a warrant.

        2. Persons arrested will be transported, processed and allowed to make
           bond if bond is set.

            a. If person cannot make bond or
            b. The arrival of the bondsman or bond is going to be delayed, then
               person will be transported to the DeSoto County Jail.

        3. Traffic law violations may be handled by arrests or by summons only.
           For detailed treatment, see traffic violations section.

        4. Juvenile arrests and summons – for treatment see Juvenile section

    B. Violations of City Ordinances

        1. May be handled by issuing a city summons or by physical arrest.

            a. Check ordinance for detailed treatment such as
                (1) Warning requirements
                (2) Summons only requirements
                (3) Arrest requirements

        2. If person cited is a verified resident of this city
           a. Posting of bond may not be necessary

**RESTRICTED LAW ENFORCEMENT DATA**
**This data is proprietary and will not be duplicated, disclosed or discussed without the written permission of
this agency. Data subject to this restriction is contained throughout this publication**

000045

3. Traffic violations – see traffic section for detailed treatment

## ARREST PROCEDURES                                                    6.600

**6.601  MILITARY ARREST.** When making an arrest of a member of the Armed Forces for being AWOL, a warrant issued by the Armed Forces must first be obtained. If a person has been arrested on other charges and it is determined that they are AWOL, the security police will be notified of the arrest and location of detention.

**6.602  SHOPLIFTING.**

ON VIEW – The officer will retain the merchandise as evidence and will bring make the arrest according to procedure

STORE REPRESENTATIVE – The employee who witnessed the offense must place the offender under arrest, follow the officer to a Court Clerk or Deputy Court Clerk and sign an affidavit for the crime committed. The merchant will retain their merchandise in their possession until court. The officer will make a complete and accurate entry of the merchandise on the report and note that the merchant has possession.

**6.603  ARREST IN PERSONAL QUARLLES** – officers shall not make arrests in their own quarrels or those of their families, except in cases of self-defense

**6.604  GROUP ARRESTS** – In the event that six or more individuals are arrested pursuant to one call, the following applies;

Adult Groups – notification to Chief and Deputy Chief

Juvenile Groups – notification to the Juvenile Division, the Chief and Deputy Chief.
If we transport, all of the subjects should be treated equally. We do not need to pick and chose who we will arrest. Either we charge all of the juveniles with CHINS or other proper related charge, or release all to their parents with no charges.
If alcohol is involved, and we are unsure if a juvenile has or has not been drinking, we will use the intoxilyzer or portable breath machine to make a determination. If you wish to use alcohol charges, make an effort to determine where the alcohol was purchased and by whom.

64

RESTRICTED LAW ENFORCEMENT DATA
This data is proprietary and will not be duplicated, disclosed or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication

000046

6.605 **Domestic Violence** – Domestic violence is described as the abuse of family or household members by attempting or causing bodily injury, serious bodily injury with or without a weapon, placing another in fear of imminent serious bodily injury by physical menace or threat of, or criminal sexual conduct committed against a minor. Family or household members include spouses, former spouses, persons living as spouses, parents and children, persons related by kindred, relationship, parentage, or paternity

A. When an officer responds to a domestic violence call and finds both the victim and alleged assailant present:

1. The officer shall arrest the alleged assailant with or without a warrant if he has probable cause to believe that the person has, within twenty-four (24) hours of such arrest, knowingly committed a misdemeanor which is an act of domestic violence.
2. The officer shall arrest the assailant if the officer actually observes an act of domestic violence committed in his presence.
3. The officer shall file a report titled "Domestic Violence"
4. If probable cause is not sufficient for the officer to make an arrest, the officer shall inform the complainant of their right to bring charges, the process for obtaining a warrant, and shall transport or make arrangements for transport to the police station to sign affidavits before a deputy court clerk
5. The officer shall give the complainant a copy of the Victim's Rights Packet, and shall advise the complainant of sources of shelter, medical care, counseling and other services.
6. Upon request of the complainant, and where feasible, the officer shall transport the complainant to the appropriate facilities, public or private, for shelter.
7. Upon request of the complainant, the officer shall standby, at the residence for the complainant to remove food, clothing, medication and other such personal property as is reasonably necessary to enable the complainant and any minor children who are presently in the care of the complainant to remain elsewhere pending further proceedings.

65

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication

B. When an officer responds to a domestic violence call and the alleged assailant is no longer present:

1. The officer shall file a report titled "Domestic Violence"
2. The officer shall inform the complainant of their right to bring charges, the process for obtaining a warrant, and shall transport or make arrangements for transport to the police station to sign affidavits before a deputy court clerk
3. The officer shall give the complainant a copy of the "Victim's Rights Packet", and shall advise the complainant of sources of shelter, medical care, counseling and other services.
4. Upon request of the complainant, and where feasible, the officer shall transport the complainant to the appropriate facilities, public or private, for shelter.
5. Upon request of the complainant, the officer shall standby at the residence for the complainant to remove food, clothing, medication and other such personal property as is reasonably necessary to enable the complainant and any minor children who are presently in the care of the complainant to remain elsewhere pending further proceedings.

C. An officer may arrest a person for knowingly violating provisions of a protective order or court-approved consent agreement entered by a chancery, county, justice or municipal court pursuant to Protection from Domestic Abuse Law, provided that the person was previously aware of the order (process was served on person), and the order specifically provides for an arrest for such violation.

D. Other acts that may constitute a violation of the Domestic Abuse Law are; Disturbance of Family, Disturbing the Public Peace and Stalking.

E. Any arrest made pursuant to the Domestic Abuse Law, sections 97-3-7(3) and (4), 97-35-9 through 97-35-15, shall be designated as domestic assault or domestic violence on both the arrest docket and the incident report.

RESTRICTED LAW ENFORCEMENT DATA
This data is proprietary and will not be duplicated, disclosed or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication

000048

**6.606 HOLDING/DETENTION CELLS-** are for the temporary detaining Of individuals during the booking process. The cells are used to ensure officer safety and the safety of multiple arrestees being processed. The following protocol will be used when individuals are placed into the holding/detention cells.

A. Except in cases of extreme emergency, the maximum time any Individual should be confined in the holding/detention cells will be four (4) hours. It is the responsibility of the arresting officer to maintain a visual check of the arrestee inside the holding/detention cells. This check should be constant, with the officer communicating verbally as to any needs the arrestee might have regarding access to a restroom facility or other human needs such as water, etc. While normal processing should not usually last longer than an hour, Arresting officers should use one (1) hour as a guide to the needs of their arrestee, with the longer the individual arrestee is held the more frequent the checks on their comfort and needs.

B. It shall also be the policy of the Southaven Police Department, That the on duty dispatchers will monitor the video surveillance system for the booking area, to maintain the safety of the Police officer processing the arrestee and keep watch over individuals confined in the holding/detention cells.

C. All officers are discouraged from entering the Holding/detention cells, while arrestees occupy them, unless accompanied by an additional officer to serve in a back up position. If the need for a physical altercation becomes necessary with a confined arrestee, officers are encouraged to use the Southaven Police Department's alternatives to physical combat (pepper spray and/or stun device) prior to having to physically restrain an arrestee inside the holding/detention cell.

D. Officers are permitted to place multiple arrestees in one Holding/detention cell provided that there has been no former Altercation or disturbance between these individuals and all of the individual arrestees appear calm and passive with the arresting process. Under no circumstances are arrestees of the opposite sex to be placed in one holding/detention cell together.

67

RESTRICTED LAW ENFORCEMENT DATA
This data is proprietary and will not be duplicated, disclosed or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication

000049

E. It will be at the arresting officer's discretion as to whether the Arrestee will remain handcuffed upon being placed in the Holding/detention cell.

F. Any circumstances that occur during booking that require an Arrestee to be confined for more than four (4) hours will be documented in the officers arrest report. In addition beginning after the second hour of confinement, Officers will begin a log in Dispatch with radio communication regarding hourly restroom and/or water needs of the individual arrestee. In the unforeseen event that the arrestee has not been processed after six (6) hours, the arrestee will be offered a meal with beverage.

G. If an officer is processing an arrestee of the opposite sex, Dispatch will be notified to monitor the cameras in booking If another officer is not available to assist.

RESTRICTED LAW ENFORCEMENT DATA
This data is proprietary and will not be duplicated, disclosed or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication

000050

## HANDCUFFING                                                      6.700

A. All persons arrested who are transported by Southaven Police Department officers shall be handcuffed with their hands behind their back and the handcuffs double locked. This includes persons being detained by officers relative to a criminal investigation.

    1. Done to prevent escape or
    2. To prevent injury to themselves or officers

B. Exceptions to section A are as follows;
    1. Any persons 12 years of age or younger
    2. Any person who has an injury or handicap, which may be aggravated by handcuffing
    3. Elderly persons who may be injured by handcuffing

Officers will retain discretion to handcuff the above-listed persons if they deem it necessary to prevent escape or injury.

C. When a prisoner is handcuffed, the handcuffs are not to be used to punish nor inflict pain. They should be tightened only to the degree necessary to prevent escape from the handcuffs

D. In instances of multiple suspects or dangerous felony arrests, a back-up officer should be utilized before proceeding to handcuff and search the suspect if it is practicable to do so under the circumstances.

E. The four approved common positions for handcuffing and searching are; kneeling, prone, standing and standing with support. Officers will retain discretion to utilize the best position under prevailing circumstances.

F. Additionally, the following points should be considered whenever handcuffs are utilized;

    1. Persons should never be handcuffed to any object.
    2. Officers should not handcuff persons to themselves.
    3. Officers should recognize handcuffs as only a temporary restraining device.
    4. Officers are to use caution when removing handcuffs and try to maintain a grip on the cuffs at all times since open handcuffs, controlled by an arrestee, could be used as a weapon.
    5. Officers should maintain control of handcuffed persons by utilizing a hands on technique to prevent escape.

RESTRICTED LAW ENFORCEMENT DATA
This data is proprietary and will not be duplicated, disclosed or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication

000051

6. Utilization of the arrestee's belt is an acceptable method of further controlling the hands. The handcuffs can be placed through the belt to prevent the hands from being looped under the body and brought to the front.

7. Person who have not been handcuffed, but who have been placed in the back of a patrol unit, should not be removed from the unit to be handcuffed without the presence of a back-up unit. All criminal suspects should be searched before being placed in the back of a patrol unit.

RESTRICTED LAW ENFORCEMENT DATA
This data is proprietary and will not be duplicated, disclosed or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication

000052