# EXHIBIT
# 5

**In the Matter Of:**

*KELLI DENISE GOODE vs*

*CITY OF SOUTHAVEN*

*2:16-cv-02029-SHM-cgc*

---

*JOEL RICH*

*November 30, 2016*

---

*1st in Reporting, 1st in Service, 1st in Technology*

We Bridge the State and Cover the Nation!

www.alphareporting.com

800-556-8974

A. No, sir.

Q. You mentioned that he -- he struck the dog?

A. Yes.

Q. How many times did he strike the dog?

A. I don't know specifics, because I was still running towards Mr. Goode and the dog. I -- I can't recall exactly how many times he struck him.

Q. Well, was it one or was it more than one?

A. I can't recall.

Q. After the -- after the dog bit him, did the dog keep biting him or what happened to the dog after that?

A. Mr. Goode punched the K-9, the K-9 disengaged, and I saw him -- I saw Officer Scallorn continue to give verbal commands. He pulled his taser. Discharged it after giving another verbal command. From my observations of Mr. Goode's actions, the taser had no effect. He showed no body language, anything like that as far as the taser having any good affect.

Mr. Goode continued to run. Tripped. I can't recall what -- I don't know what he tripped on, I just saw him trip. And I saw Officer Baggett attempt to handcuff him. At what point Mr. Goode

resisted extremely, he would not comply at all. It was just incoherent mumbling. And that's when I arrived. When I arrived on, Officer Baggett -- or had Officer Baggett and Mr. Goode and attempted -- or assisted Officer Baggett with handcuffing Mr. Goode.

Q. Well, let's go that a little -- go through that a little bit more slowly.

A. Okay.

Q. You said that the dog disengaged?

A. Uh-huh (affirmative response).

Q. Where did the dog go, did it stay there with Mr. Goode?

A. No, sir.

Q. And where did it go?

A. Officer Scallorn called it back to him, went back to Officer Scallorn.

Q. So Officer Scallorn called the dog back?

A. The dog went back to Officer Scallorn.

Q. You said Officer Scallorn called the dog back, he did that, right?

MR. HUSKISON: I think he -- that's not what he said. He said he dog went back to Officer Scallorn. So don't -- you don't need to put words in his mouth. Let him testify.

A. I'm assuming that Officer Scallorn -- the only reason -- the dog listens to Officer Scallorn, that's his handler, so if he went back, the dog went back to Officer Scallorn.

Q. All right. When the dog went back to Officer Scallorn, Officer Scallorn then continued giving commands, right?

A. Yes, sir.

Q. What did Mr. Goode do, did he continue running westbound?

A. He continued to run, I don't recall the direction.

Q. Was he running towards you?

A. I can't recall the direction.

Q. Was he running towards another officer?

A. I can't recall the direction.

Q. Where was Officer Scallorn at that point?

A. He was with his K-9 partner still giving verbal commands to Mr. Goode which were being ignored.

Q. Was he still in the same location that you indicated on that drawing?

A. Approximately.

Q. And you mentioned that Mr. Goode had -- had been running. Could you mark with a -- I don't

know how to mark this one. Could you put a No. 2 where the dog --

MR. McCORMACK: Or did we use K-9 last time?

MR. HUSKISON: We didn't use K-9.

BY MR. McCORMACK:

Q. Use K-9 where the dog apprehended, bit Mr. Goode.

A. (Witness complies).

Q. You wrote that just about on the same X, right?

A. Generalized location, yes, sir.

Q. And you said that after Mr. Goode was bitten by the dog, he continued running. What direction did he run in that time?

A. I can't recall.

Q. You said that he eventually tripped but you couldn't tell what he tripped on. It's true that he tripped immediately after being hit with the taser, right?

A. No, sir.

Q. No? It was how long after being hit with the taser did he trip?

A. I don't know exact times.

Q. Where was he hit with the taser, where on

his body?

A. I don't remember. I can't recall.

Q. Was he hit on the arm?

A. I can't recall.

MR. UPCHURCH: I'm sorry?

THE WITNESS: I can't recall where he was hit.

MR. UPCHURCH: Thank you.

BY MR. McCORMACK:

Q. Did other officers have their tasers out or was Officer Scallorn the only one?

A. I can't recall. I wasn't looking at other officers.

Q. Did you have yours out?

A. No, sir.

Q. You said that Mr. Goode tripped, where was he when he tripped?

A. Approximate location in the field.

Q. That same spot where the X is?

A. Around that area, yes, sir.

Q. After Mr. Goode was on the ground, you said that you went over to try to help handcuff him. Who was the first officer to reach him?

A. Officer Baggett.

Q. Did Officer Baggett call you over?

A. No, sir.

Q. You were going over there on your own, right?

A. I was assisting an officer.

Q. All right. What was the first thing that Officer Baggett did when he got to Troy?

A. Attempted to put handcuffs on him.

Q. How did he attempt to, did he grab his arm, did he put a hand on his back? What was the first thing that he did?

A. I don't recall exactly what he did.

Q. Mr. Goode had fallen forward, right?

A. Yes, sir.

Q. So he was on his stomach at this point?

A. As I recall, yes, sir.

Q. And when you went over to help assist in handcuffing him, what did you do?

A. Upon arriving, I saw Officer Baggett attempting to handcuff him. Mr. Goode was not complying at all with numerous verbal commands. He was attempting to fight. He was trying to roll, best I can describe it, it was like an alligator, he just tried to roll on his side.

So I came up, and I believe Officer Baggett had got the left handcuff on him. And

Mr. Goode, best I can recall, had his arm tucked up underneath. He would not comply with any orders. So I put my right knee on the ground beside Mr. Goode supporting my weight, all my weight. Put my left knee on Mr. Goode's butt to keep him from rolling and attempted to grab Mr. Goode's right arm to give it to Officer Baggett so we could handcuff him.

Q. So it's your testimony that you put your knee on Mr. Goode's body, right?

A. On his butt, and my right knee was supporting my weight, that was my left knee.

Q. Okay. So you were trying to use your -- your knee to help control his lower body, right?

A. No, sir, I was trying to keep him from rolling.

Q. Right. So you were trying to use your knee to keep him -- to control his lower body to keep him from rolling?

A. With no weight on it, yes, sir.

Q. How do you keep somebody from rolling without applying any weight to them?

A. You keep them from rolling.

Q. So it's your testimony that you didn't apply any weight to him, but you were managing to

keep him from rolling, or trying to, with your knee on his butt?

A. On his butt.

Q. All right. And then you grabbed his right arm?

A. Yes, sir.

Q. And pulled it around behind him to handcuff him, right?

A. Yes, sir.

Q. Where was Officer Baggett, was he standing, was he kneeling? What position was he in?

A. I can't recall. He was beside me, I can't recall if he was standing or kneeling or sitting or anything.

Q. Did he have -- what was he using to control Mr. Goode's left hand, was he using his own hand, did he have it pinned under his knee? How was he controlling it?

A. I can't recall.

Q. Do you recall him putting his hand on Mr. Goode's back?

A. I can't recall. If it happened it was a very, very short period of time. I can't recall.

Q. All right. So you don't recall how he was controlling his left arm, but somehow he was

controlling his left arm; is what you're telling us?

A. Yes, sir.

Q. Okay. And you were controlling his right arm?

A. Yes, sir.

Q. And you managed to get him handcuffed, right?

A. After a struggle, yes, sir.

Q. Were there any other officers assisting you with getting him handcuffed?

A. What else was -- what else was occurring, my attention was on Mr. Goode. I don't recall who was around me besides Officer Baggett was beside me. I never -- I don't -- I didn't look around, my attention was on Mr. Goode.

Q. So you don't know where Mr. Price was when you were handcuffing Mr. Goode?

A. No, sir.

Q. Do you know what Officer Scallorn was doing?

A. No, sir.

Q. Once you managed to get Mr. Goode handcuffed, he was on his stomach, right?

A. Yes, sir.

Q. And as I understand it, Officer Scallorn

Case: 3:17-cv-00060-DMB-RP Doc #: 422-5 Filed: 01/23/18 11 of 22 PageID #: 7609

went and got a pair of leg shackles from his SUV, right?

A. I don't know who retrieved the leg shackles.

Q. At some point, leg shackles were provided to -- were you handed leg shackles or were they handed to Officer Baggett?

A. I can't recall who was handed leg shackles. They were not handed to me.

Q. One of the officers was handed leg shackles, right?

A. Yes, sir.

Q. Did you assist in putting the leg shackles on Mr. Goode?

A. No, sir.

Q. What were you doing when the leg shackles were put on Mr. Goode?

A. Attempting to restrain Mr. Goode from rolling off and fighting.

Q. And how were you attempting to keep him from rolling?

A. Physically holding him down.

Q. What part of his body were you holding down?

A. At that point, his shoulders.

Q. All right. Were you doing that with your hands or your knee or some other part of your body?
A. Hands. I was on the knee to the side of him and had my hands on his shoulders to keep him from rolling.
Q. Did you still have your knee on his butt to keep him from rolling?
A. No, sir, both knees on the ground.
Q. So you shifted up and you put your hands on his shoulders?
A. Yes, sir, with both knees on the ground.
Q. Okay. Were there any other officers helping you to keep him from rolling?
A. I can't recall that. I guess my attention was on Mr. Goode. I know there were other officers attempting to put leg shackles on.
Q. Were there any other officers -- how many other officers were attempting to put leg shackles on him?
A. I couldn't -- couldn't tell you a number.
Q. Well, was it one or was it more than one?
A. I can't give you a number. I'm not sure.
Q. You mentioned that there were other officers on the scene. You're holding him down to keep him from rolling and someone is applying leg

Case: 3:17-cv-00060-DMB-RP Doc #: 422-5 Filed: 01/23/18 13 of 22 PageID #: 7611

shackles.

A. Yes, sir.

Q. Do you know who was applying leg shackles?

A. I don't know.

Q. Do you know any of the people who were applying leg shackles?

A. I do not.

Q. Was Officer Baggett still there? I'm sorry, just for me is it Baggett or Baggett?

A. Baggett.

Q. I've been saying it wrong the whole time.

MR. GASS: The other one you eat.

MR. McCORMACK: I was trying to be fancy about it.

MR. GASS: Like going to Target.

BY MR. McCORMACK:

Q. Was Officer Baggett still attempting to help you in restraining him?

A. I can't recall. My attention was on Mr. Goode while they were attempting to put leg shackles on him to stop him from kicking.

Q. Do you remember anything about who was putting leg shackles on him at that point?

A. No, sir, I didn't look back.

Q. Do you have any idea what any of the other

officers were doing who were there on the scene?

A. No, sir. I was -- I was doing what I was attempting to do, my attention was on Mr. Goode and keep him from rolling in the middle of Goodman Road or running into the crowd of people that had gathered in the parking lot.

Q. Did you see -- well, let me ask you this. You know that somebody was putting leg shackles on him, right?

A. Yes, sir.

Q. After the leg shackles were on him, who was there, who was standing there with him?

A. I said my attention was on Mr. Goode.

Q. And now what you've told me so far is that you went over to Mr. Goode when he was face down, tried to control him from rolling, put handcuffs on him, and then someone put leg shackles on him?

A. There was a brief period of time between the handcuffs and the leg shackles which Mr. Goode was actively fighting, attempting to kick. Continued to not follow any verbal orders. There was no compliance at all. There was incoherent mumbling, rambling, cussing.

Q. Now, isn't it true that when he was handcuffed, someone stood him up?

A. I attempted to, to take him to the car.

Q. When you stood him up, was someone helping you to stand him up?

A. Someone was, I can't recall who it was.

Q. You mentioned that Officer Baggett had helped you -- helped you to handcuff him. Was Officer Baggett there with you still?

A. I can't recall who it was.

Q. Eventually you had to take Mr. Goode back down to the ground. Did you do that alone or did someone help you?

A. While attempting to get Mr. Goode to the back of the car, EMS was still -- we had still called for EMS to come. I had noticed a large crowd gathering in the parking lot, little kids running around, and I didn't want Mr. Goode to somehow get loose and run into the crowd. So I put him in the back of the car until EMS arrived and, you know, stay with him in the back of the car just for his safety and for the safety of others.

And on standing him up, he started trying to jerk away and run. I decided that wasn't -- that wasn't safe, so we went back -- we went back down.

Q. You said we went back down. Did someone help you to get him back down or did you do it

alone?

A. I can't recall.

Q. Officer Rich, is there -- I know that you're sick right now. Are you on any kind of medication that would impair your ability to remember what happened on July 18th, 2015?

A. No, sir.

Q. Are you on any kind of medication that would prevent you from recalling and answering questions here today?

A. No, sir.

Q. You said that you don't recall whether someone helped you to take him back down. After Mr. Goode was back down on the ground, that's when leg shackles were applied, right?

A. Yes, sir.

Q. How did you take him back down to the ground?

A. We went back down to the ground, we took him back down. It wasn't a violent slam, it was just we went back down to the ground. I don't know how to explain it.

Q. His hands were handcuffed behind him, right?

A. Yes, sir.

Q. And when he went back down on the ground, he ends up face down, right?
A. Yes, sir. We tried to roll him on his side for a brief period of time, but he started to spit and continued to kick.
Q. Now you said, we tried to roll him on his side; when was that?
A. At some point during -- after we went back down.
Q. Okay. So after he was down on the ground, he was face down and you tried to roll him on his side?
A. Yes, sir.
Q. So when you took him down to the ground -- strike that.
Sir, how much do you weigh as you sit here today?
A. Somewhere around 2- -- 220 pounds.
Q. Were you about the same weight back July 18th, 2015?
A. Yes, sir.
Q. About how tall are you?
A. Six-one.
Q. After the shackles were put on Mr. Goode, the shackles were attached to the handcuffs, right?

MR. SMITH: Yes. I'm a little longwinded, bear with me.

MR. McCORMACK: Let's limit the speaking objections, if we can.

BY MR. McCORMACK:

Q. Given that information that we saw in the law enforcement officers training materials, you wouldn't turn him on his side so that he could breathe?

A. We attempted to.

MR. HUSKISON: Object to the form.

A. Every time it was attempted to turn Mr. Goode on his side he continued to roll. And Mr. Goode showed no signs of being able to -- any struggles to breathe, he continued to yell the entire time.

BY MR. McCORMACK:

Q. I asked you in the -- in the ambulance you didn't try to turn him on his side, did you?

A. In the ambulance, no, sir.

Q. Given what we read, don't you think that maybe you should turn him on his side in the ambulance?

A. Not while she was trying to work on him.

Q. You mentioned that he was still face down

EXHIBIT
Mast
8451 Goodman Rd E
Google Earth
feet
meters
100
400
Google Earth

Case: 3:17-cv-00060-DMB-RP Doc #: 422-5 Filed: 01/23/18 20 of 22 PageID #: 7618

To: Lt. Woods

From: Ofc. Joel Rich #1350

Date: 7/19/15

Subject: Troy Charlton Goode

Sir,

On July 18th, 2015, at approximately 7:45 PM (1945 hours) I, Officer Rich, was dispatched to 3451 Goodman Rd E regarding a disturbance. Officer BAGGETT and K-9 Officer SCALLORN were already on scene upon my arrival, and DUI Officer PRICE was arriving on scene at the same time I was. I observed Officer SCALLORN'S K-9 engaging an individual (later identified as TROY CHARLTON GOODE w/m dob; 8/21/84) who was running in circles in the grass in front of 3451 Goodman Rd E and Mr. GOODE repeatedly striking the K-9. I observed Officer SCALLORN deploy a Taser on Mr. GOODE due to him repeatedly striking the K-9, but was unsuccessful due to only one taser prong connecting with Mr. GOODE. I then observed Mr. GOODE attempt to flee on foot again after Officer SCALLORN called his K-9 back to his vehicle, but in his attempt to flee Mr. GOODE tripped and fell. Due to Mr. GOODE tripping, Officer BAGGETT was able to attempt to place handcuffs on Mr. GOODE to detain him. I observed Mr. GOODE resisting Officer BAGGETT'S attempt to place handcuffs on him, at which point I assisted Officer BAGGETT in placing handcuffs on Mr. GOODE. Mr. GOODE was not complying with any verbal orders, was continuing to be extremely resistive, and appeared to be heavily under the influence of a narcotic or alcohol. I was then told by Officer BAGGETT that Mr. GOODE'S wife (KELLI DENISE GOODE w/f DOB; 4/16/84) stated that Mr. GOODE had taken 3-5 drops of LSD along with 3-4 other unknown

EXHIBIT
13

Case: 3:17-cv-00060-DMB-RP Doc #: 422-5 Filed: 01/23/18 21 of 22 PageID #: 7619

individuals. Due to Mr. GOODE being heavily under the influence of a possible narcotic and also the close proximity to Goodman Rd, I felt it was necessary to physically restrain Mr. GOODE for his own safety. EMS was notified to come to the scene immediately after Mr. GOODE was placed in handcuffs by Officer BAGGETT or Officer SCALLORN, to evaluate his condition and provide necessary medical treatment. I observed a small crowd of individuals had gathered in the parking lot and were watching the incident occur. I also observed there to be several young children in the small crowd. I made the decision to attempt to place Mr. GOODE in the back of Officer BAGGETT'S patrol unit to remove him from possibly being a threat to himself or others, due to the fact that the entire time I was physically restraining Mr. GOODE he was attempting to kick and scratch me, as well as other officers, and had become increasingly more resistive and infuriated. I also observed Mr. GOODE starting to scream incoherently and seemed to be speaking with someone that was not there. I notified Mr. GOODE that I was going to place him in the back of a patrol unit and lifted Mr. GOODE to his feet. Upon attempting to escort Mr. GOODE to a patrol unit he became extremely resistive and was attempting to pull away from me. I then physically took Mr. GOODE back to the ground to restrain him due to the fact that I did not want Mr. GOODE to pull free and possibly become a threat to him or the individuals that were in the parking lot. Mr. GOODE again began to attempt to kick at me and other officers so a decision was made to place leg shackles on Mr. GOODE to prevent him from possibly harming an officer or himself. The leg shackles were placed on Mr. GOODE'S left ankle and the remaining shackle was looped through the handcuffs and then placed on Mr. GOODE'S right ankle. Mr. GOODE was still able to maintain a level of movement while wearing the leg restraints. EMS arrived and evaluated Mr. GOODE and stated he needed to be transported to Baptist Desoto to receive additional care for his possible drug usage. EMS personnel stated that Mr. GOODE needed to stay in restraints due to his extreme incoherence and restiveness and requested two officers to ride with the ambulance to Baptist Desoto. Officer BAGGETT and I rode with Mr. GOODE and EMS personnel to Baptist Desoto and during the transport I observed Mr. GOODE become even more agitated as he began to curse and scream incoherently and attempted to get out of the restraints several times while EMS personnel began to give medical

assistance to Mr. GOODE. Mr. GOODE appeared to be hallucinating very strongly based on him speaking to and about objects that were not there and he appeared to also be interacting with people and objects that were not in the surroundings. The ambulance arrived at Baptist Desoto and Mr. GOODE was taken into the emergency room where he continued to appear to be hallucinating very strongly and began to scream profanity very loudly. Mr. GOODE was taken away from the waiting area of the emergency room and placed in a separate room to be evaluated by medical personnel, due to him screaming profanity and causing a disruption which was upsetting some of the other patients in the emergency room. Once it was confirmed that Mr. GOODE was secure, I was taken back to the scene by Officer BOND to drive Officer BAGGETT'S patrol unit to Baptist Desoto so it would be there when Officer BAGGETT, who stayed with Mr. GOODE at Baptist Desoto, needed it. I drove Officer BAGGETT'S patrol unit back to Baptist Desoto and went inside where I gave him his keys. I located Officer BAGGETT and Mr. GOODE in room 9 where I observed Mr. GOODE appear to still be hallucinating very heavily and screaming incoherently to objects that were not in the room. I gave Officer BAGGETT his keys and returned to Officer BOND'S patrol unit to be escorted back to my own patrol unit, which was still located at 3481 Goodman Rd E. I arrived back at my vehicle and notified dispatch that I was back in service. Later that night I was informed by Officer BOND that Mr. GOODE had passed away at the hospital.