# EXHIBIT 6

# In the Matter Of:

## *KELLI DENISE GOODE vs*
## *CITY OF SOUTHAVEN, et al.*
## *2:16-CV-02029-SHM-cgc*

## *MATTHEW TYLER PRICE*
## *December 07, 2016*



ALPHA REPORTING CORPORATION

*1st in Reporting, 1st in Service, 1st in Technology*

We Bridge the State and Cover the Nation!
www.alphareporting.com
800-556-8974

EXHIBIT 6

Matthew Tyler Price - December 07, 2016

43

1  here.  Did I take that back from you?
2      A.    Yes, sir.
3      Q.    Where it was that you talked to
4  Mrs. Goode, where the two of you were.
5      A.    (Witness complies).
6      Q.    Okay.  So you have shown up in the parking
7  lot where there are some cars parked here now.
8  Right?
9      A.    Yes, sir.  Right at the curb.
10     Q.    Right at the curb.  Okay.  On the north
11 side of the parking lot that would be.  Right?
12     A.    That's correct.  I'm -- her car was parked
13 in a different location.  But as I approached, we
14 met.
15     Q.    And what was the conversation that you had
16 with her?
17     A.    I had to identify her involvement.  I
18 could tell that she was paying attention to what was
19 going on with the detention, later identified
20 Mr. Goode.  And I was trying to ascertain her
21 involvement and said, are you okay, what -- how are
22 you involved in this.  And that's when she
23 identified herself as his wife.
24     Q.    Was anyone else present when you were
25 having this conversation?

Matthew Tyler Price - December 07, 2016

44

1  A.  No, not at the time.
2  Q.  Were there any witnesses with whom you had
3 talked to at the scene?
4  A.  I don't recall any other than just being
5 there with her.
6  Q.  Did -- have you talked to any witnesses
7 since the event?
8  A.  Of the scene?
9  Q.  Yes, sir.
10 A.  No.
11 Q.  Well, tell me about your conversation with
12 Mrs. Goode.  What did you ask or say, and what did
13 she ask or say?
14 A.  It's all to the best of my knowledge.
15 I -- I approached, and I -- I said, who are you, how
16 are you involved.  That's when she said, I am his
17 wife.  I said, what is going on?  She said that he
18 was -- he was acting crazy and running around.  And
19 I asked her, I said why, what's -- what's going on?
20 And she identified that he had taken LSD.
21     At that time, I stopped the conversation,
22 and I yelled to my partners and other police
23 officers there that there was a possibility for
24 exposure to LSD.  I said, LSD.  Everybody glove up.
25     At that point, I returned my attention to

Matthew Tyler Price - December 07, 2016

45

1  Mrs. Goode and asked her how did he take it. And
2  she -- she demonstrated that with a palm skyward,
3  someone placed a drop in the palm of his hand out of
4  a medicine dropper.
5         At that point, I knew that there was a --
6  a skin exposure risk. And I maintained -- at that
7  time when I was on patrol, I maintained several
8  pairs of latex gloves in my pocket. And I --I told
9  the guys, once again, we need to glove up. And
10 some -- I don't recall who or how many, but some of
11 the officers did not have gloves readily available.
12        So I -- I went back to their location.
13 And I had my glove on at the time, placed my hand on
14 Troy's back because he was face down at this point,
15 I can tell you that, and handcuffed to the rear.
16        I place my hand on his back to keep him
17 from raising up. And I stared across his back at
18 Officer Bond and giving him the nod to go ahead, and
19 he could stand and get gloves. And I produced
20 gloves from my right pocket, handed them out to the
21 other officers. And while they got gloved up, I was
22 speaking with Troy.
23        And if it wasn't required to keep him from
24 raising up, I would release pressure. I was trying
25 to make contact with him. Troy, are you okay, calm

Matthew Tyler Price - December 07, 2016

46

1 down, calm down.
2     The other officers got gloved up. And he
3 would continue to try to raise up, thrash about and
4 had a distant gaze. So once the other officers got
5 gloved up, I let them resume control of Troy, and I
6 returned back to Mrs. Goode.
7   Q. So what you've described was that when the
8 officers were gloving up, you indicated you used one
9 hand on Troy's back?
10  A. That's correct.
11  Q. And the purpose of that was what?
12  A. To keep him from raising up or
13 floundering, return him back to lay on his back
14 where he could kick.
15  Q. Well, his -- his legs were bound. Right?
16  A. Not at that time.
17  Q. Okay. Did any officer receive any wound
18 of any degree from a bruise upward from Troy Goode?
19  A. I'm not sure. I know I didn't.
20  Q. Did any EMT receive a wound?
21  A. I'm not sure.
22  Q. Now, in your report, which we will -- let
23 me see that, please.
24      MR. EDWARDS: We'll mark this -- this memo
25 as 37.

Matthew Tyler Price - December 07, 2016

47

```
 1          (WHEREUPON, THE ABOVE-MENTIONED PHOTOGRAPH
 2   WAS MARKED AS EXHIBIT NO. 37 TO THE DEPOSITION AND
 3   IS HERETO ATTACHED.)
 4   BY MR. EDWARDS:
 5       Q.   You indicate very clearly, you asked
 6   Mrs. Goode about the amount of drugs that her
 7   husband had taken.  Correct?
 8       A.   Asked her about the amount of drugs that
 9   he had taken.  Yes.
10       Q.   And her reply to you was he had a drop of
11   liquid of LSD placed in the palm of his hand?
12       A.   That's correct.
13       Q.   That's what she told you?
14       A.   Yes.
15       Q.   Okay.  And that's when you notified the
16   officers to glove up?
17       A.   Yes.
18       Q.   Now, going to the second page, you
19   indicate that Mr. Goode attend -- continued to be
20   aggressive and unruly.  How was he aggressive since
21   he was by this point in -- well, was he -- he was
22   not in leg irons at that point?
23       A.   That's correct.
24       Q.   So what was he doing that made you
25   describe him as being aggressive?
```

1  A.  Not obeying our commands to lie still, to
2  relax, calm down.  He continued to -- to try to roll
3  over or try to kick, was mumbling and was not
4  obeying our commands or requests.
5  Q.  Okay.  Is that it?  Is that what you
6  considered to be aggressive and unruly?  I'm just
7  asking.
8  A.  I mean, I do consider that.  Yes.
9  Q.  Okay.  But have you told us everything
10 that you considered to be aggressive and unruly
11 behavior about Mr. Goode?
12 A.  He was kicking, attempting to roll over.
13 Q.  In other words --
14 A.  All of that.  Yes, sir.
15 Q.  Okay.  He was attempting to get off of his
16 stomach.  Right?
17 A.  Yes.  Or to go anywhere.  He was just --
18 for brief moments, he would relax.  At that point,
19 we would back off the -- the amount of force
20 necessary to keep him secure.  But as he -- he
21 ratcheted back up, we had to go back to more
22 pressure.
23 Q.  I understand.  Now, have you told us
24 everything that you consider to be aggressive and
25 unruly behavior on behalf of Mr. Goode after he was

1 handcuffed?
2     A.    That I can recall.
3     Q.    You go on in your report that -- to calm
4 Mrs. Goode. Was she upset?
5     A.    Yes.
6     Q.    What was she saying?
7     A.    She was saying he doesn't normally act
8 like this. He's -- she mentioned a profession.
9 He's a engineer, I believe. I can't remember
10 exactly. And she said we have a child, and he
11 doesn't act like this, that type of thing. She was
12 crying and emotional.
13     Q.    She was pleading with you not to hurt him,
14 wasn't she?
15     A.    I'm sure that she said, yeah, you know,
16 don't hurt him. And then I reassured her that we
17 weren't.
18     Q.    Okay. Now, Mr. Goode was taken into
19 police custody by this point in time. Right?
20     A.    Yes.
21     Q.    And did -- did you tell Mrs. Goode that
22 Mr. Goode would be transported to Baptist-Desoto
23 Hospital?
24     A.    Yes.
25     Q.    Did she request to come with you?

Matthew Tyler Price - December 07, 2016

50

1  A.  Not with me.  She said, can I go with him.
2  And I explained to her that no passengers were
3  allowed into the ambulance at that time under those
4  circumstances.
5  Q.  Did you tell her that she could come to
6  the hospital in her own vehicle?
7  A.  I asked that she stay there until she made
8  or regained composure of her emotions and have a
9  friend come pick her up.  And she advised that she
10 was calling I believe it was her mother-in-law or
11 either in-law or parent that was on the way to come
12 pick her up.
13 Q.  Did you threaten her with arrest for
14 obstruction of justice?
15 A.  No.
16 Q.  Did any police officer?
17 A.  Not that I observed.
18 Q.  Would she in your mind have been properly
19 charged with obstruction of justice?
20 A.  In what circumstance?
21 Q.  From her behavior vis-a-vis her husband
22 being taken into custody?
23 A.  I didn't observe anything that would have
24 resulted in arrest for obstruction of justice.
25 Otherwise, I would have arrested her for it.

Alpha Reporting Corporation



**To:** Chief Tom Long
**From:** Sgt. Price, M.T. #1288
**Date:** 07/19/15
**Subject:** Incident #201500046947

On 07/18/15 at approximately 7:45 PM; I responded to a call for service concerning a disturbance in the parking lot of Rancho Grande at 3451 Goodman Road East. Upon my arrival, eastbound on Goodman Road, I observed a white male running westbound on the South shoulder, followed by officers. As the male, later identified as Troy C. GOODE, turned southbound towards the parking lot of Rancho Grande, I saw a police canine pursue and bite him on the left side. I parked my vehicle, emergency lights activated, on the South shoulder of the roadway and ran to assist the officers on scene. As I approached and surveyed the scene, I noticed that Sergeant Scallorn had control of his canine, and two officers had Mr. GOODE on the ground. I also noticed a white female, later identified as Kelli D. GOODE, in the parking lot, obviously distraught. I told Officer Baggett that I would secure the female while he continued with the detention and assessment of the male.

I asked Mrs. GOODE about her affiliation with Mr. GOODE, and learned that he was her husband. When asked about what happened, Mrs. GOODE said that her husband had taken LSD in the parking lot of the Widespread Panic concert which resulted in him running down the road in a state of delirium, eluding her attempts to control him, and eventually opening the door of the police canine vehicle. I asked her about the amount of drugs that he had taken, to which she responded that he had a drop of liquid LSD placed in the palm of his hand by an unknown party in the parking lot of the concert. I immediately notified officers in the area to use gloves when handling Mr. GOODE, to avoid possible exposure to the drug. At that time, I assisted the detaining

officers by holding Mr. GOODE on the ground, by the shoulder, while they put on latex gloves. Mr. GOODE continued to be aggressive and unruly, which led to the application of leg irons, securing him against the possibility of further injury to himself or others.

Once secure, I returned to Mrs. GOODE in order to calm and inform her of the common procedures in such situations. I informed her that he would be assessed and transported to the hospital by Emergency Medical Personnel, while in custody. I told Mrs. GOODE that she would not be able to have contact with her husband, due to his custody status, but that he would be able to call her once he was medically cleared, booked, and transferred to the Desoto County Jail. Mrs. GOODE regained her composure and was released at the scene, stating that she had someone on the way (mother or father of Mr. GOODE) to support her.

Respectfully Submitted,

Sgt. Price, M.T. #1288