**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

**KELLI DENISE GOODE, et al.**

**VS.**                                    **CIVIL ACTION NO. 3:17CV60-DMB-RP**

**THE CITY OF SOUTHAVEN, et al.**                          **DEFENDANTS**

---

**THE CITY OF SOUTHAVEN'S BRIEF IN SUPPORT OF**
**RENEWED MOTION FOR SUMMARY JUDGMENT**

---

COMES NOW Defendant the City of Southaven, Mississippi ("Southaven" or "Defendant"), by and through counsel, and submits its Brief in Support of Renewed Motion for Summary Judgment as follows:

**<u>INTRODUCTION AND FACTUAL BACKGROUND</u>**

The individually named Southaven police officer, firefighter and emergency medical technician defendants Todd Baggett, Jeremy Bond, Tyler Price, Joel Rich, Jason Scallorn, Stacie J. Graham a/k/a Witte, Mike Mueller, William Painter, Jr., Bruce K. Sebring, Joseph Spence, and Richard A. Weatherford ("Individual Defendants"), have filed a separate Renewed Motion for Summary Judgment with supporting memorandum as to all federal or state law claims asserted against them in their individual capacities. In order to avoid needless repetition, Southaven adopts and incorporates herein by reference the "Introduction" and "Factual Background" contained in the Individual Defendants' separate Renewed Motion for Summary Judgment and supporting memorandum brief.

**<u>ARGUMENT</u>**

**I.      Evidence Does Not Support Federal Claims Against Southaven**

**1.      Failure to Show Policy or Custom of Southaven**

Plaintiff has no viable federal claims against the Southaven.   Plaintiff alleges that

Southaven had de facto policies (Count 5) and ratified conduct of officers through policies (Count 6) thereby creating city liability. The law is well established that a governmental entity is not liable under 28 U.S.C. §1983 on the theory of respondeat superior for the alleged acts or omissions of its employees. *See*, *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell v. Dept. of Soc. Services*, 436 U.S. 658, 694 (1978); *Johnson v. Deep East Texas Reg'l. Narcotics Trafficking Task Force*, 379 F.3d 293, 308 (5th Cir. 2004); *Whitt v. Stephens County*, 529 F.3d 278, 283-84 (5th Cir. 2008). "A municipality can be found liable under §1983 only where the municipality itself causes the constitutional violation at issue. Respondeat superior or vicarious liability will not attach under §1983." *City of Canton*, 489 U.S. at 385 (citing *Monell v. New York City Dept. of Soc. Services*, 436 U.S. 658, 694-95 (1978)). "It is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable under §1983." *Springfield v. Kibbe*, 480 U.S. 257, 267 (1987).

A municipality is almost never liable for an isolated unconstitutional act on the part of the employee; it is liable only for acts directly attributable to it through "some official action or imprimatur." *Peterson v. City of Ft. Worth*, 588 F.3d 838, 847-48 (5th Cir. 2009) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 568 (5th Cir. 2001)). To establish municipal liability under §1983, a plaintiff must show that (1) an official policy, (2) promulgated by the municipal policy maker, (3) was the moving force behind the violation of the constitutional right. *Piotrowski*, 237 F.3d at 568 (citing *Monell*, 436 U.S. at 694). The plaintiff "must generally demonstrate at least a pattern of similar violations that caused a violation of constitutional rights." *Pernell v. City of Columbus*, 2010 WL 1737639 *5 (N.D. Miss. 2010) (quoting *Thompson v. Upshur Co., Texas*, 245 F.3d 447, 449 (5th Cir. 2001)). An isolated incident is not sufficient to show that a policy or custom exists. *Id.* (citing *Bennett v. City of Slidell*, 728 F.2d

2

762, 768 n.3 (5th Cir. 1984)). The policy must be "persistent, widespread, common, and well-settled." *Brown v. Callahan*, 623 F.3d 249, 256 (5th Cir. 2010).

The Fifth Circuit has defined "official policy" as:

(1)     a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

(2)     a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents a municipal policy. "Isolated violations are not the persistent, often repeated, constant violations that constitute custom and policy."

*Mason v. Lafayette City-Parish Consolidated Government,* 806 F.3d 268, 279-82 (5th Cir. 2015) (citing *Bennett v. City of Slidell*, 728 F.2d 762, 768 n. 3 (5th Cir. 1984)).

A policy or custom is official only "when it results from the decision or acquiescence of the municipal officer or body with 'final policy making authority' over the subject matter of the pending policy." *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 737 (1989). Therefore, the plaintiff must show that the policy was promulgated by the municipality's policy maker.

As the court in *Mason* explained, the "moving force" prong requires the plaintiff to make two showings: causation and culpability. *Mason*, 806 F.3d at 280 (citing *Board of County Commissioners v. Brown*, 520 U.S. 397, 404 (1997)). A plaintiff must show a "direct causal connection . . . between the policy and the alleged constitutional deprivation." *Id.* (citing *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1982)). "The 'moving force' inquiry imposes a causation standard higher than 'but for' causation." *Id.* "Under the culpability requirement, if the policy is facially lawful, a plaintiff must also show that the municipality 'promulgated [the policy] with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result.'" *Id.* (citing *Piotrowski v. City of Houston*, 237 F.3d at 567, 569)). Even

3

a showing of heightened negligence is insufficient to show the deliberate indifference needed to prove municipal liability. *Piotrowski*, 237 F.3d at 529 (citing *Brown*, 520 U.S. at 407).

Plaintiff cites to no policy statement, ordinance, regulation or decision that was officially adopted and promulgated by Southaven's lawmaking officers that is unconstitutional and was a moving force behind the alleged violations of any of the Plaintiff's rights. In the Amended Complaint, Plaintiff references Southaven policies permitting law officers to use levels of force, including police dogs, tasers, prone hogtie restraints, transfer in a prone position and other uses of force. (Amended Complaint, ECF # 107 at ¶ 276). Plaintiff's chief complaint relates to the use of the 4-point restraint by Southaven officers and alleged improper transport of Troy to the hospital. Neither the use of the 4-point restraint nor any of the other restraints are unconstitutional, however, and the Southaven police department's ("SPD") permitted use of those escalating levels of restraint does not create city liability. Troy's restraint and transport were distinguished by his active and prolonged resistance.

These claims fall short of the requirements to assess liability against Southaven as there is no proof of anything done by its policy makers, much less any actions perpetrated with deliberate indifference, resulting in a violation of Troy's constitutional rights. Plaintiff's claims of constitutional violations as to Southaven fail completely. Similarly, Plaintiff has failed to identify any policy, custom or practice of the City of Southaven which resulted in a denial of Kelli Goode's "right to interstate travel," as alleged in the Amended Complaint [ECF #107, para. 326-338], requiring dismissal of this specific claim to the extent it still remains viable. *Ballet v. City of Gretna*, 2009 WL 1789413 * 3 (E.D. La. 2009); ECF #633, p. 25 (noting this claim was "deemed abandoned and waived by separate order of this Court..."). To the extent Plaintiff attempts to assert a claim based on "hospital visitation", such a claim would be solely limited to

4

Baptist-Southaven as Southaven had no control over the Baptist-Southaven premises.

## 2. Failure to Properly Train or Supervise

Plaintiff alleges that Southaven failed to train and supervise officers, firefighters and EMTs in this case. (Amended Complaint at ¶'s 284-287). This claim is general in nature and fails to specify what training was needed and why or how any such training provided by the SPD was deficient. To establish a municipality's failure to train, a plaintiff must show "(1) inadequate training procedures; (2) that inadequate training caused the task force officer's to [wrongfully arrest and use excessive force]; and (3) the deliberate indifference of municipal policy makers." *Quinn v. Guerrero*, 2017 U.S. App. LEXIS, 12290, 23-24 (5th Cir. 2017) (citing *Pineda v. City of Houston*, 291 F.3d 325, 332 (5th Cir. 2002)). "The inadequacy of [the] training must be closely related to the injury." *Id.* Defects in a particular training program must be alleged specifically. *Roberts v. City of Shreveport*, 397 F.3d 287, 298 (5th Cir. 2005). *See also*, *Zimmerman v. Cutler*, 657 Fed. Appx. 340, 347-48 (5th Cir. 2016) (dismissing plaintiff's failure to train cause of action because the plaintiff "failed to adduce any evidence of Department training procedures -- inadequate or otherwise.")

Any claim based on a failure to train and supervise the involved officers fails for any number of reasons. First, all officers, firefighters and EMT's were adequately and well trained. Former Southaven Police Chief Tom Long testified about the restraint and other training offered at the training academies attended by Southaven police officers. (Long depo. at 26-35; Long depo. attached as Ex. 10 to Motion). Each officer was trained on the continuum levels of force. Officers were trained to not leave arrestees placed in a 4-point restraint unattended. (Id. at 28). In addition to the testimony from officers and firefighters on training, Southaven police tactic expert William T. Gaut provided a report outlining the levels of training for officers and

5

firefighters and confirmed that training was sufficient. (Gaut Expert Report at 8-14; Gaut Report attached as Ex. 11 to Motion). The custodian of records' affidavit attached as Exhibit 32 reflects that all officers not only met but exceeded State of Mississippi training requirements. EMTs Weatherford and Graham also were fully trained on issues such as airway management, as reflected in their respective training records and affidavits. (Exhibits 30 and 31).

Going further, Plaintiff fails to articulate what necessary training was <u>not</u> provided to the involved officers or EMTs and how any prescribed training resulted in a constitutional deprivation of Troy, much less that Southaven was deliberately indifferent in regard to training protocol. There is no evidence that any Individual Defendant was inadequately trained. For that reason, the failure to train claim against Southaven fails as a matter of law.

Lastly, Count VIII of the Amended Complaint styled "Class Action-Injunctive Relief" has been abandoned due to Plaintiff's failure to obtain the required certification under F.R.C.P. 23(c), thereby rendering this claim moot.

## II.    Plaintiff's State Law Claims Fail as a Matter of Law

### 1.    All State Law Claims are Barred by Sovereign Immunity

The Mississippi Tort Claims Act ("MTCA") "provides the exclusive civil remedy against a governmental entity and its employees for acts or omissions which give rise to a suit." *City of Jackson v. Sutton*, 797 So. 2d 977, 980 (Miss. 1999); *Miss. Code Ann.* § 11-46-7(1); *see also City of Clinton v. Tornes,* 252 So.3d 34, 37 (Miss. 2019). Any claim filed against a governmental entity and its employees must be brought under this statutory scheme. *Id.* As a governmental entity, Southaven and its employees enjoy protection from lawsuit and liability. *Miss. Code Ann.* §11-46-1, *et seq.*

Section 11-46-9(1) of the MTCA Claims Act sets forth various exemptions from the

6

waiver of sovereign immunity otherwise contained in said Act as to the Southaven defendants, several of which are applicable to the facts of the instant case. Specifically, §11-46-9 provides, in relevant part, as follows:

> (1) A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim;
> ...
> (c) Arising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury;
>
> (d) Based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the party of a governmental entity or employee thereof, whether or not the discretion be abused;
> ...
> (m) Of any claimant who at the time the claim arises is an inmate of any detention center, jail, workhouse, penal farm, penitentiary or other such institution, regardless of whether such claimant is or is not an inmate of any detention center, jail, workhouse, penal farm, penitentiary or other such institution when the claim is filed;

*Miss. Code Ann.* §11-46-9(1)(c)(d)(m).

The "police exemption" (also applicable to firefighters and EMTs in this case) found in subsection (c) above is intended to protect and shield governmental employees "from lawsuits arising out of the performance of their duties in law enforcement, with respect to the alleged victim." *Miss. Dept. of Public Safety v. Durn*, 861 So.2d 990, 997 (Miss. 2002) (quoting *City of Jackson v. Perry*, 764 So.2d 373, 374 (Miss. 2000)). Plaintiff specifically alleges and acknowledges that all actions taken by the Southaven law enforcement officers, firemen and medical personnel at issue in this cause were in the course and scope of their respective employment with the City of Southaven. [Docket #107, para. 12-22]. As a result Southaven is absolutely immune where, as here, the decedent was involved in criminal activity, whether the crime be a felony or misdemeanor. *Miss. Dept. of Public Safety*, 861 So.2d at 997; *Shumpert v. City of Tupelo*, 905 F.3d 310, 325 n. 63 (5th Cir. 2018) (citing *Miss. Dept. of Public Safety*).

7

In *Estate of Williams v. City of Jackson*, 844 So.2d 1161 (Miss. 2003), the decedent was involved in an automobile accident with a City of Jackson fire truck. The decedent was determined to have a blood alcohol content of .20%, twice the legal limit, at the time of the accident. In a subsequent wrongful death suit filed by his estate and heirs, the trial court granted summary judgment in favor of the City of Jackson under *Miss. Code Ann.* §11-46-9(1)(c). In affirming this decision, the Mississippi Supreme Court held that "driving under the influence is criminal activity in Mississippi." *Estate of Williams*, 844 So.2d at 1164. In order for criminal activity to impose a total bar on recovery, "the criminal activity has to have some causal nexus to the wrongdoing of the tortfeasor." *Estate of Williams*, 844 So.2d at 1165 (citing *City of Jackson v. Perry*, 764 So.2d 373, 374 (Miss. 2000)). The *Estate of Williams* court found a "clear nexus" between Williams' decision to drink and drive in violation of the law, and the motor vehicle accident he was involved in, thereby barring his estate and heirs from any recovery under *Miss. Code Ann.* §11-46-9(1)(c).

Similarly, the Mississippi Court of Appeals followed *Estate of Williams* and found criminal conduct by an injured party barred any recovery for alleged acts or omissions of police officers who were engaged in "the performance or execution of duties or activities relating to police ... protection..." *McElroy v. City of Brandon*, 198 So.3d 373, 379-80 (Miss. Ct. App. 2015). In *McElroy*, a police officer was involved in a motor vehicle accident while responding to a burglary call. The other driver, 19 year old McElroy, was found to have alcohol in his system exceeding the legal limit for a minor, and marijuana (an illegal drug). *McElroy*, 198 So.3d at 379-80 (Miss. Ct. App. 2015). In affirming the trial court's grant of summary judgment pursuant to §11-46-9(1)(c) as to all claims asserted by McElroy's wrongful death beneficiaries, the Court of Appeals found that the officer in question was clearly involved in police protection

8

activities and duties in responding to a burglary call, and that a nexus existed between McElroy's illegal activities and the alleged tortious conduct of the police officer. *Id.*

As in both *Estate of Williams* and *McElroy*, Troy Goode was unquestionably engaged in criminal activity during the entire course of his interactions with all Southaven defendants. The LSD consumed by Troy Goode is a Schedule I controlled substance in Mississippi. *Miss. Code Ann.* §41-29-113. Further, Troy Goode was arrested by the Southaven police department for disorderly conduct, public intoxication, failure to obey a lawful command, and for resisting arrest. (Baggett depo. at 32-33). Officers responded to a 911 call concerning Goode, at which time Kelli Goode advised officers Troy Goode had consumed LSD, an illegal drug. (Kelli Goode depo. at p. 23). Ms. Goode also admitted in her deposition that her husband had smoked marijuana before the concert. (Goode depo. at 21). Troy Goode refused to follow instructions of police officers at the scene and resisted officers who attempted to apprehend him. This resistance included his refusal to obey verbal commands to get on the ground and calm down, and continued through his transport to Baptist-Southaven and into the emergency room. But for Troy Goode's illegal act in consuming liquid LSD, no interaction with police officers would have occurred on July 18, 2015; but for his erratic and threatening drug induced behavior, he would not have been placed in custody and restrained. As in *Estate of Williams* and *McElroy*, a clear nexus exists between Troy Goode's illegal, criminal activity and the actions of Southaven's police officers, EMTs and fire personnel, all of whom were involved in "the performance or execution of duties or activities relating to police or fire protection..." under §11-46-9(1)(c). Due to the fact Troy Goode was engaged in criminal activity at all times he was in contact with or in the custody of the Southaven employees, any and all state law claims asserted by the Plaintiff are barred and must be dismissed via summary judgment.

Plaintiff's state law claims are also barred by *Miss. Code Ann.* §11-46-9(1)(d), the discretionary duty or function exemption from liability. The Mississippi Supreme Court held that one determining factor of whether a governmental entity's activity is discretionary in nature or not, is whether the act is prescribed or mandated by statute. *See Poyner v. Gilmore*, 158 So. 922, 923 (Miss. 1935); *J.E. v. Jackson Public Sch. Dist.*, 2018 WL 3628842 *3 (Miss. Ct. App. 2018) (ministerial duties are positively required by "statute, ordinance, or regulation"). "Under this test, conduct is ministerial, and not discretionary, if it is imposed by law and the performance of the duty is not dependent on the employee's judgment." *Jones v. Mississippi Dept. of Transp.*, 744 So.2d 256, 260 (Miss. 1999) (reversed by *Brantley v. City of Horn Lake*, 152 So.3d 1106 (Miss. 2014) and reinstated by *Wilcher*) (quoting *Barrett v. Miller*, 599 So.2d 559, 567 (Miss. 1992)). Further,

> Mississippi's public-policy function test has two parts. "This Court first must ascertain whether the activity in question involved an element of choice or judgment." *Montgomery*, 80 So.3d at 795. If so, this Court also must decide whether that choice or judgment involved social, economic, or political-policy considerations. Id. Only when both parts of the test are met does a government defendant enjoy discretionary-function immunity. This test, of course, presupposes the court has correctly identified "the activity in question"—the allegedly tortious act giving rise to the claim.

*Wilcher v. Lincoln County Board of Supervisors and City of Brookhaven*, 243 So.3d 177 (Miss. 2018).

In the instant case, the Southaven employees' decisions as to how to restrain and transport Goode once in custody, and what medical care EMTs would provide en route to Baptist-Southaven hospital were solely discretionary in nature, as no statute or law either mandates or prohibits the usage of 4 point restraints such as those administered on Goode by the individual Southaven police officers, nor does a statute or law prescribe the exact care which an EMT such as Graham must administer a patient en route to a hospital. Police protection and

health care patently involve judgment of significant social importance. As the actions of the Southaven employees were strictly discretionary in nature, Southaven is exempt from the waiver of sovereign immunity as to Plaintiff's state law claims under §11-46-9(1)(d) and such claims are barred.

Lastly, all state law claims are barred under *Miss. Code Ann.* §11-46-9(1)(m) as Troy Goode was at all relevant times a pre-trial detainee as contemplated under this section. "This exemption from the MTCA's waiver of sovereign immunity applies to both pretrial detainees and convicted inmates." *Anthony v Lamar County, Miss.,* 2017 WL 4706906 (S.D. Miss. 2017) (citing *Liggans v. Coahoma County Sheriff's Dep't*, 823 So. 2d 1152, 1155 (Miss. 2002)). In *Anthony*, the plaintiff was a county pre-trial detainee, who was injured while working on a county garbage truck. In dismissing plaintiff's state law claims, Judge Starrett held that "All of Plaintiff's claims appear to arise from events which occurred while he was a pretrial detainee and, therefore, an "inmate" within the meaning of MISS. CODE ANN. § 11-46-9(1)(m)." *Anthony*, 2017 WL 4706906 at *2. *See also Montgomery v. City of Lumberton*, 2014 WL 4545922 *2 (S.D. Miss. 2014). Troy Goode was either a pre-trial detainee or freeworld. Under the rationale of Judge Starrett in *Anthony*, any state law claims are also subject to dismissal under §11-46-9(1)(m).

### 2. Even Absent Sovereign Immunity, Plaintiff's State Law Claims Fail as a Matter of Law

Plaintiff has asserted a number of varying state law claims in her complaint, including (a) civil conspiracy (count 1); (b) violation of Tennessee Code section 40-32-101 *et seq* (count 9) (which Plaintiff has agreed to dismiss; Exhibit 29); (c) a wrongful death claim under M.C.A. 11-7-13 and/or 11-46-9 (count 10); (d) negligent and intentional infliction of emotional distress (count 11) (conceded by Plaintiff in prior summary judgment response ECF # 464, p. 34); (e)

11

outrage (count 12) (conceded by Plaintiff in prior summary judgment response ECF # 464, p. 34); and (f) medical malpractice by the Southaven EMTs (count 14). (Amended Complaint, ECF #107). Although each and every one of the remaining claims are barred by sovereign immunity as discussed, *supra*, even absent application of sovereign immunity such claims are ripe for summary judgment on their own merits.

**(a). <u>State Law/Civil Conspiracy</u>**.

Although Plaintiff's civil conspiracy claim is addressed *supra*, to the extent Plaintiff's Amended Complaint can be construed to assert a state law claim for civil conspiracy it likewise is ripe for summary judgment as it is barred by the MTCA. "A conspiracy is a combination of persons for the purpose of accomplishing an unlawful purpose or lawful purpose unlawfully." *Ward v. Life Investors Ins. Co. of America*, 383 F. Supp. 2d 882, 890 (S.D. Miss. 2005). In order to succeed on a claim of civil conspiracy, a plaintiff must show (1) the existence of a conspiracy, (2) an overt act in furtherance of that conspiracy, and (3) damages arising therefrom. *Wells v. Shelter General Ins. Co.*, 217 F. Supp. 2d 744, 753 (S.D. Miss. 2002); *see also Delta Chemical & Petroleum, Inc. v. Citizens Bank of Byhalia*, 790 So. 2d 862, 877 (Miss. Ct. App. 2001). Further, "[a] plaintiff must do more than plead facts that may be consistent with a conspiracy—it must plead facts that suggest a prior agreement between the Defendants." *Dowdy & Dowdy Partnership v. Arbitron Inc.*, 2010 WL 3942755 at *4 (S. D. Miss. 2010).

No evidence demonstrates any agreement among the various parties to cause injury to Plaintiff or decedent Troy Goode, or that any injury in fact occurred due to a "conspiracy" existing between any defendants. As described more fully in the Individual Defendants' statement of facts, until Troy Goode was accepted by Baptist-Southaven as a patient, he was in the custody of the Southaven police department and received care from Southaven EMTs/medics

Weatherford and Graham. Upon Troy Goode being accepted as a patient, Southaven had no further responsibility for his medical care. No evidence has been produced concerning communications between Southaven and any other defendant which would be indicative of a conspiracy to deprive Troy Goode of medical care, or otherwise. In the total absence of any evidence of a civil conspiracy, this claim is ripe for summary judgment.

### (b). <u>Wrongful death claim under M.C.A. and/or 11-46-9, and Medical Malpractice</u>

Plaintiff further seeks to hold Southaven liable for the alleged wrongful death of Troy Goode. A "wrongful death" suit under M.C.A. 11-7-13 encompasses claims to recover damages for lethal, wrongful conduct. *England v. England (In re Estate of England*, 846 So. 2d 1060, 1067 (Miss. Ct. App. 2003). A wrongful death claim is predicated on the underlying tort in question which must have proximately caused death. *Caves v. Yarbrough*, 991 So. 2d 142, 149 (Miss. 2008), *Jenkins v. Pensacola Health Trust, Inc.*, 933 So. 2d 923, 926 (Miss. 2006).

The undisputed evidence in this case demonstrates that no act or omission of Southaven or its employees proximately caused or contributed to Troy Goode's death. The following time line of events is instructive:

1. At 1949 (7:49 pm) the first Southaven police department officer, Todd Baggett, arrived at Goodman Road in response to a 911 call concerning Troy Goode, made at 1945 (7:45 p.m.).

2. At approximately 1954 (7:54 p.m.) Troy Goode was in police custody, and was placed in a 4-point restraint. He continued to violently resist officers.

3. At approximately 1957 (7:57 p.m.) Southaven EMTs arrived at Goodman Road via ambulance, to transport Troy Goode to Baptist-Southaven.

4. During transport to Baptist-Southaven, Troy Goode's vitals were noted by EMT

13

Graham to be a BP 126/91, Pulse 164, RR 18 at 2020 (8:20 p.m.), and a BP 128/61, Pulse 186, and RR 18 at 2025 (8:25 p.m.) as reported by EMT Graham.

5. At approximately 2028 (8:28 p.m.) the ambulance arrived at Baptist-Southaven.

6. At approximately 2032 (8:32 p.m.) Nurse Baker entered notations concerning Troy Goode's history, and vitals of "BP 122/64, Pulse 164, Respirations 24, O2 sat 90%, Temp. 98.2 (patient position lying)" were taken at 2033 (8:33 p.m.). (Baptist employees all agreed that Baptist assumed care of Goode beginning at the triage. (Exhibit 17, Tidwell depo. at 47; Exhibit 18, Flock depo. at 43-44; Exhibit 19, Baker depo. at 60; Exhibit 20, Oliver depo. at 99-100)).

7. At 2049 (8:49 p.m.) Mr. Goode was transferred to Room 9 within the Baptist-Southaven emergency department.

8. At 2056 (8:56 p.m.) Nurse Flock performed a nursing assessment which found Troy Goode to be delusional due to drug use and a danger both to himself and others. No distress was noted, however.

9. At 2101 (9:01 p.m.) Mr. Goode was noted to be angry, agitated, combative, aggressive, uncooperative, disoriented and violent. Mr. Goode was screaming loudly and speaking illogically. His MAAS Score was 6 (dangerously agitated, uncooperative). Nurse Flock observed no signs of respiratory distress in Troy Goode.

10. Troy Goode was seen by Dr. Oliver at approximately 2100 (9:00 p.m.).

11. At 2106 (9:06 p.m.) , Dr. Oliver ordered Haldol 5 mg (IV) and Ativan 2 mg (IV) STAT, with orders for CBC, CMP, UA, Drug Screen urine panel, and alcohol blood.

12.     At 2108 (9:08 p.m.) the Haldol and Ativan were administered.

13.     At 2122 (9:22 p.m.) a Code Blue was called, when Officer Baggett discovered Troy Goode was not breathing and called for medical assistance.

14.     At 2127 (9:27 p.m.) Dr. Oliver intubated Mr. Goode.

15.     Troy Goode was pronounced dead at 2144 (9:44 p.m.).

The Code Blue was called approximately one (1) hour after EMT Graham last provided care to Troy Goode of any kind.  Baptist employees Janet Tidwell, Flock and Baker, and Dr. Oliver, all agreed in their depositions that upon admission to the Baptist emergency department neither the Southaven police officers nor EMTs had any continuing responsibility for Troy Goode's medical care.

Q.      Would I be correct that the EMTs who transport the patient in the ambulance typically do not provide medical care within the ER department itself?

A.      Not typically.

Q.      Okay.  Is there any indication in -- in this case that you would have seen outside of the -- the peer review or quality assurance process that would show the EMTs actually provided any care to Mr. Goode inside the ER department?

A.      No, sir.  From chart review, I did not see that.

Q.      Now, from time to time, as in this case, a -- a police officer or law enforcement officer may accompany or stay with a patient in the ER department?

A.      Yes, sir.

Q.      Is that correct?  Those police officers, such as the Southaven police officers on the night we're talking about, are not expected to provide any medical care or nursing care to ER patients.  Correct?

A.      No, sir.

Q.      And you would not have expected the Southaven police officers to provide

1046619

any medical or nursing care to Mr. Goode after he was admitted to the Baptist ER department. Is that correct?

A.    That's correct.

(Exhibit 17, Janet Tidwell depo, Quality Manager for Baptist, at 47-48).

Q.    Would you agree that neither the EMTs nor the Southaven police officers were providing any medical or nursing care to Mr. Goode in the ER that night?

A.    Yeah. Once they pat -- once they entered the triage process, then they would have, at that point, started to release I guess control is not the right word but release the tran -- or to start the transfer of care to the staff.

Q.    And that would actually start at the triage process with Nurse Baker?

A.    Correct.

Q.    And when the patient is transported to Room 9 where you are, would that have completed the hand-off process?

A.    Once I got report from them. Correct.

Q.    Did you get a report from them?

A.    I did.
...
Q.    Did you understand the Southaven police officer who was in attendance in Room 9 was not there to provide any medical care?

A.    Correct.

(Exhibit 18, Paul Flock depo., RN for Baptist, at 44-45; 47-48).

Q.    Now, one police officer stayed with Mr. Goode in Room 9. Correct?

A.    Yes, sir.

Q.    You did not expect that officer to provide any medical or nursing care to Mr. Goode in the emergency department, did you?

A.    No, sir.
. . .
Q.    Do you have any criticism of the Southaven EMTs the night in question as it relates to Mr. Goode?

1046619

A.     No, sir.

Q.     Do you have any criticism of the Southaven Police Department as it relates to Mr. Goode?

A.     No, sir.

(Exhibit 19, Baker depo., RN for Baptist, at 65-66).

Q.     At the point you physically examined Mr. Goode, were there any EMS personnel in the room?

A.     Not that I recall. No.

Q.     And I believe that you stated there was one Southaven police officer in the room?

A.     Yes, sir.

Q.     That officer was not providing any medical care to Mr. Goode, was he?

A.     No, sir, he was not.

Q.     And you would not have expected that officer to provide any medical care to Mr. Goode in the Baptist ER. Correct?

A.     I would not expect that.  No, sir.
...
Q.     You don't have any criticism of the Southaven EMS in regard to the care - - their care of Mr. Goode, do you?

A.     No, sir, I do not.

Q.     Similarly, you don't have any criticism of the Southaven Police Department in regard to their presence in the Baptist ER on the night in question, do you?

A.     I do not have any criticism of that.  No, sir.

(Exhibit 20, Dr. Lemuel Oliver depo. at 99-101).

This is supported by the testimony of Plaintiff's own designated experts, who agreed that

once Troy Goode was triaged at the Baptist emergency department a transition of care had

17

occurred from Southaven to Baptist-Southaven and/or Dr. Lemuel Oliver where a higher level of care was available. (Exhibit 21, Arnall depo. at 147-148; Exhibit 22, Fowler depo. at 170-171; Exhibit 23, Krause depo. at 36-37). Plaintiff's designated cardiology expert Parim Parikh testified that as a physician he would not expect a police officer to provide any medical care to an emergency room patient such as Troy Goode. (Exhibit 24, Parikh depo. at 121). Upon admission to the Baptist-Southaven emergency department, Baptist personnel and Dr. Oliver did not find Troy Goode to be in any immediate distress, and utilized an administration of Ativan and Haldol to calm him due to his drug usage. (Flock depo. at 47; Baker depo. at 51-53; Oliver depo. at 22, 35).

Plaintiff alleges that Troy Goode died as a direct result of remaining in the 4-point restraint for an extended period of time. None of Plaintiff's designated experts specifically opined that Troy Goode's death was caused by the acts or omissions of Southaven and its employees.

(a). Forensic pathologist Michael Arnall testified that Mr. Goode's struggles against restraints resulted in metabolic acidosis which in his opinion contributed to death; as conceded by Dr. Arnall however, in the absence of an ABG (arterial blood gas) being performed, there is no objective evidence that Troy Goode was even in metabolic acidosis. (Exhibit 21, Arnall depo. at 34, 51). Dr. Arnall further opined that there is no reason to believe that Mr. Goode would have struggled any less against a method of restraint different from the 4-point restraint. (Arnall depo. at 43, 56).

(b). Dr. Arnall testified as to the specific cause of death as follows:

Q. Thank you. The last full paragraph of your opinion states that: "Based upon a reasonable degree of medical certainty, Mr. Goode's death was caused by the manner of restraint and positioning (precipitating asphyxia) and the subsequent intravenous administration of chemical restraints

18

which exacerbated asphyxia and ultimately precipitated cardio-pulmonary arrest" (sic).

A. That is correct.

Q. Did I read that correctly?

A. Yes, you did.

**Q.** **Okay. So, am I correct that, in your opinion, these two events in combination precipitated Mr. Goode's death?**

**A.** **Yes.**

(Arnall depo. at pp. 14, 150) (emphasis added).

(c). Dr. Parikh testified:

Q. My question is -- to be sure I understand -- you will -- you will offer no criticism at trial of the Southaven Police Department, correct?

A. I -- I guess I don't have a -- in general, I think that the -- the prone hogtied position that he remained in could have been reevaluated. Does that help answer your question?

Q. I think so. And in your opinion -- again, to be sure I fully understand all of your opinions in this case -- in your opinion, when would that have been reevaluated?

A. I don't think there's an exact time. <u>But when he was triaged and had signs of hypoxia and he continued to be agitated and tachycardic, those could have been times for reassessment.</u>

(Parikh depo. at 121) (emphasis added).

(d). Dr. Cyril Wecht, Plaintiff's second forensic pathologist, testified that nothing in the autopsy he performed permitted him to give an anatomical pathological cause of death. (Exhibit 25, Wecht depo. at 13-14). Based on his gross examination, autopsy findings and microscopic examination, Dr. Wecht was unable to reach a conclusion on the cause of death. (Wecht depo. at 15).

(e). Plaintiff's emergency department expert Dr. Mark Fowler characterized the care

provided to Troy Goode by Southaven EMT Stacy Graham, thusly: she "did the very best she could under difficult circumstances". (Fowler depo. at 174). Ms. Graham **"did her dead level best,"** and obtained a "pristine" EKG reading en route to Baptist-Southaven. (Fowler depo. at 172-173) (emphasis added). Further, Ms. Graham's decision not to use chemical restraints en route to Baptist-Southaven was **"appropriate."** (Fowler depo. at 175) (emphasis added). Dr. Fowler also testified that Mr. Goode **did not die "as a result of what the police did**..." (Fowler depo. at 125-126) (emphasis added).

Although Southaven disagrees with the opinions espoused by Plaintiff's experts, and does not contend that Baptist-Southaven or Dr. Oliver failed to provide adequate care to Troy Goode, Plaintiff's forensic pathologist Dr. Arnall opined that the mere use of prone maximal restraints was not the cause of Troy Goode's death, as the prone position could have affected respirations, but not his cardiac status. (Arnall depo. at 102). Dr. Arnall further had no opinion that a delay in transfer of Troy Goode to Baptist-Southaven hospital caused or contributed to his death. (Arnall depo. at 102, 147). No expert designated by Plaintiff has opined that Troy Goode, upon presentation to the Baptist-Southaven emergency department by Southaven EMS, was in a critical, irreversible medical condition due to the actions or omissions of Southaven's employees.

The Baptist nurses who cared for Troy Goode were consistent in their testimony that had the 4 point restraint posed any problem with Troy Goode's general health or his treatment, they would have asked that the restraints be removed; until the Code Blue they did not request Officer Baggett to remove the shackles. (Baker depo. at 62-64; Flock depo. at 47-48). Consistent with this testimony, Officer Baggett testified that when he asked Baptist personnel about removing the 4-point restraint, he was told that soft hospital restraints would not hold Goode due to his wild and threatening behavior. (Baggett depo. at 59).

20

Defendant Dr. Oliver designated Gary M. Vilke, M.D. as an expert witness in this cause. Dr. Vilke is a board certified emergency department physician with substantial experience in sudden cardiac arrest and sudden cardiac death. He is an expert on the topic of emergency medical care, restraint physiology, Taser electronic control devices, excited delirium syndrome, and in custody cardiac arrest and deaths. In regard to Troy Goode's death, Dr. Vilke testified that Goode's heart went into an irregular heart beat at approximately the time Officer Baggett discovered Goode was not breathing. (Exhibit 25, Vilke depo. at 22). Dr. Vilke further opined that any weight placed on Goode at the scene on Goodman Road while he was in restraints had no effect on his death, as any weight applied during arrest played no role in any cardiac arrest. (Vilke depo. at 62-64). Lastly, Dr. Vilke testified that the prone maximal restraints utilized by the Southaven Police Officers which remained in place at Baptist-Southaven hospital were not the cause of Troy Goode's death. (Vilke depo. at 232-33).

There is simply no evidence that any act or omission of Southaven or its employees caused or contributed to Troy Goode's death in the Baptist-Southaven emergency department on July 18, 2015; accordingly, summary judgment in favor of Southaven as to Plaintiff's wrongful death claim is appropriate.

As to Plaintiff's "medical malpractice" claim, Plaintiff ignores the fact that such a claim cannot be asserted against EMTs.

> This Court has previously defined medical malpractice as the "legal fault by a physician or surgeon." *Hall v. Hilburn*, 466 So.2d 856 (Miss. 1985). The term "physician" was said "to include all persons possessing an M.D. and providing medical or surgical services." *Hall, supra*, 866, n.3. Therefore it is worthy to note that hospitals are not liable for medical malpractice liability since a hospital is not a person licensed as a physician, *Hall, supra*. [Emphasis added].

*Boyd v. Lynch*, 493 So.2d 1315, 1318 (Miss. 1986). Plaintiff elected to assert a very specific claim of "medical malpractice" in this case. None of the Southaven EMTs in question,

21

principally Medic Weatherford or Paramedic Graham, were a "physician or surgeon" and accordingly any "medical malpractice" claim against Southaven for the alleged acts or omissions of its emergency personnel must be dismissed. *See Hall, supra*; *see also Gray v. Beverly Enterprises - Mississippi, Inc.*, 261 F.Supp.2d 652, 657 (S.D. Miss. 2003) rev'd on other grounds, (holding that, under Mississippi law, a nursing home resident failed to state a claim for medical malpractice against nursing home administration where none of the administration was either a surgeon or physician as defined by Mississippi law); *Brandon v. Beverly Enters.*, 2007 U.S. Dist. LEXIS 26627 *3 (N.D. Miss. 2007) (dismissing "medical malpractice" claims asserted against non-physicians).

Even if Plaintiff is permitted to proceed with this claim, under Mississippi substantive law a plaintiff seeking to prevail in a suit based upon allegations of medical negligence against a healthcare provider must establish that the defendant had a duty to act in accordance with an applicable standard of care to prevent injury to a foreseeable plaintiff, that the defendant failed to conform to the applicable standard of care, that the defendant's breach of duty proximately caused the plaintiff's injury, and that the plaintiff suffered actual harm or injury as a proximate result of the defendant's negligent conduct. *Boyd v. Lynch*, 493 So. 2d 1315, 1319 (Miss. 1986). To establish a prima facie case of medical negligence against such a defendant, a plaintiff must present competent expert testimony as to the applicable standard of care, breach thereof, and proximate causation. *Travis v. Stewart*, 680 So. 2d 214, 218-19 (Miss. 1996); *Palmer v. Biloxi Regional Medical Ctr., Inc.*, 564 So. 2d 1346, 1355 (Miss. 1990); *Phillips v. Hull*, 516 So. 2d 488, 491 (Miss. 1987); *Hammond v. Grissom*, 470 So. 2d 1049, 1053 (Miss. 1985) ("In presentation of a case for medical malpractice, a plaintiff is generally required to present expert medical testimony, first, identifying and articulating the requisite standard of care under the

circumstances and thereafter establishing that the defendant physician or hospital failed in some causally significant respect to conform to the required standard of care."). As noted above, Plaintiff lacks requisite expert proof that a breach of the applicable standard of care by any Southaven medical provider was the proximate cause of Troy Goode's death. While Plaintiff's EMT expert Robert Krause opined on standard of care issues, he is not a medical doctor and thus is prohibited from giving causation or damages opinions. *Mid-South Retina, LLC v. Conner*, 72 So.3d 1048 (Miss. 2011); *Sumrall v. Singing River Health Sys.*, 189 So.3d 661 (Miss. Ct. App. 2015). In the absence of such required proof, the court has no alternative but to grant summary judgment in favor of Southaven on Plaintiff's "medical malpractice" claim. In addition, all such state law claims are in any event barred by the MTCA as discussed *supra*.

### 3. Troy Goode's Wrongful Conduct Requires Entry of Summary Judgment

In Mississippi, "no court will lend its aid to a party who grounds his action upon an immoral or illegal act." *Price v, Purdue Pharma Co.*, 920 So.2d 479, 484 (Miss. 2006); *see also Downing v. City of Jackson*, 24 So.2d 661, 664 (1946) (holding that plaintiff "may be barred from any right of action when the incident giving rise to the claim was rooted in the plaintiff's violation of law").

> If a plaintiff cannot open his case without showing that he has broken the law, a court will not aid him. It has been said that the objection may often sound very ill in the mouth of the defendant, but it is not for his sake the objection is allowed; it is founded on general principles of policy which he shall have the advantage of, contrary to the real justice between the parties. The principle of public policy is that no court will lend its aid to a party who grounds his action upon an immoral or illegal act.

*Price*, 920 So.2d at 484 (quoting *Western Union Telegraph Co. v. McLaurin*, 66 So. 739, 740 (1914)). *Price* involved claims against various defendants arising from plaintiff's ingestion of and subsequent addiction to OxyContin, a Schedule II narcotic. In affirming the trial court's

grant of summary judgment based on the wrongful conduct rule, both the Mississippi Court of Appeals, and the Mississippi Supreme Court affirmed, holding that "[t]his Court will not lend aid to a party whose cause of action directly results from an immoral or an illegal act committed by that party." *Id.* at 486.

Similarly, in *Downing v. City of Jackson*, 24 So.2d 661, 664 (1946) Downing was killed in an accident involving a tractor he was driving with an attached trailer. The trailer had no brakes, a violation of Mississippi law which Mr. Downing was fully aware of. The Mississippi Supreme Court affirmed the trial court's entry of a directed verdict in favor of the defendant, holding "we are of the opinion that appellant was barred from any right of action in this case in view of the violation of law in the doing of the things which caused the accident, by her husband, for whose death, in consequence thereof, she sued." *Downing*, 24 So.2d at 664. Because the decedent could not "open his case without showing that he has broken the law," plaintiff was entitled to no recovery and dismissal was required.

As noted above, Troy Goode suffered two prior "bad trips" associated with LSD usage, and both he and Plaintiff Kelli Goode were fully aware that continued criminal usage of LSD could precipitate the same floridly psychotic and uncontrollable behavior that had occurred with both of these prior incidents, which also required involvement of law enforcement and medical personnel. Southaven police officer Baggett testified that at the scene on Goodman Road Kelli Goode "was apologizing for what [Troy] did, said [Troy's] done it before and that she was sorry." (Baggett depo. at 20).

As is more fully discussed in the summary judgment brief of defendant Lemuel Oliver, M.D. and its own discussion of the wrongful conduct rule, Plaintiff's designated expert witnesses concur that Troy Goode's use of LSD, and subsequent "out of control" and "combative"

24

behavior precipitated the use of restraints (Arnall depo. at 30-31; Nichols depo. at 8, 14-16; Nichols depo. attached as Exhibit 27 to Motion) (Troy Goode's "bad trip" from ingesting LSD led to arrest by the Southaven police department); (Fowler depo. at 51-52) (Troy Goode was "floridly psychotic" from his LSD usage, which caused his arrest). Plaintiff's designated pathology expert, Dr. Arnall, also attributes Troy Goode's death to a continuing struggle against the prone maximal restraints, however, Dr. Arnall had no reason to believe that Troy Goode would have struggled any less if a different type of restraint had been used. (Arnall depo. at 43, 56). Dr. Erin Barnhart, the Mississippi medical examiner who performed an autopsy on Troy Goode, found in her autopsy report that the cause of Mr. Goode's death was "Complications of LSD toxicity." (Exhibit 28; Autopsy Report, July 20, 2015). A direct causal connection exists between Troy Goode's illegal ingestion of LSD, his ongoing violent and threatening behavior, and the manner of restraint used. Here, "the incident giving rise to the claim was rooted in the plaintiff's violation of law," *Price*, 920 So. 2d at 485, as Plaintiff's claim is premised upon Troy Goode's use of LSD and his subsequent illegal acts in resisting arrest. Consistent with the authorities cited herein, application of the wrongful conduct rule requires dismissal of all state law claims.

### III.    Plaintiff's Claim for Punitive Damages

In her Amended Complaint [ECF # 107], Plaintiff seeks an award of punitive damages as to all defendants. However, the City of Southaven is absolutely immune from <u>any</u> punitive damages award for claims arising under federal law, *see, e.g.*, *Oden v. Oktibbeha County, Mississippi*, 246 F.3d 458, 465-66 (5th Cir. 2001), cert denied 534 U.S. 948 (2001) (holding that punitive damages are not awardable against governmental entities); *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 263 (1981) (same), or arising under state law. *See Miss. Code Ann.* §11-46-

25

15(2); *City of Jackson, Mississippi v. Williamson*, 740 So.2d. 818 (Miss. 1999) (stating the Mississippi Tort Claims Act clearly prohibits award of punitive damages).   Further, in her initial response Plaintiff conceded that summary judgment was appropriate as to the City of Southaven for any punitive damages claim. (ECF # 464, p. 35).

## CONCLUSION

For all the reasons discussed above and any that the Court deems appropriate, Defendant City of Southaven prays that its Renewed Motion for Summary Judgment be granted, and that Plaintiff's claims against it be dismissed as a matter of law, with prejudice. Defendant City of Southaven specifically adopts and incorporates the arguments of the other Defendants on the issues raised herein as may be contained in their respective motions for summary judgment.

This the 20th day of March, 2019.

CITY OF SOUTHAVEN, Defendant

By:*/s/ Berkley N. Huskison*
BERKLEY N. HUSKISON, MSB 9582
L. BRADLEY DILLARD, MSB 10114
KATHERINE S. KERBY, MSB 3584

Co-Lead Counsel:

Mitchell, McNutt & Sams, P.A.
Post Office Box 1366
Columbus, Mississippi 39703-1366
(662) 328-2316 (telephone)
(662) 328-8035 (facsimile)
bhuskison@mitchellmcnutt.com

Mitchell, McNutt & Sams, P.A.
Post Office Box 7120
Tupelo, Mississippi 38802-7120
(662) 842-3871 (telephone)
(662) 842-8450 (facsimile)
bdillard@mitchellmcnutt.com

Co-Lead Counsel:

Kerby Law Firm, LLC
Post Office Box 551
Columbus, Mississippi 39703
(662)-889-3733 (telephone)
(662)-328-9533 (facsimile)
ksearcyk@bellsouth.net

26

1046619

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system and forwarded such filing via ECF notification to the following:

Tim Edwards, Esquire
Kevin McCormack, Esquire
Ballin, Ballin & Fishman, P.C.
200 Jefferson Avenue, Suite 1250
Memphis, TN 38103-2007
tedwards@bbfpc.com
kmccormack@bbfpc.com
*Attorneys for Plaintiff*

Hiram C. Eastland, III, Esquire
James F. Garrett, Esquire
Eastland & Garrett, PLLC
Post Office Box 3059
Oxford, MS 38655
he3@eastlandgarrett.com
jfg@eastlandgarrett.com
*Attorneys for Plaintiff*

John Mark McIntosh, Esquire
David W. Upchurch, Esquire
Upchurch & Upchurch, P.A.
141 South Commerce Street, Suite B
Tupelo, MS 38804
jmcintosh@upchurchpa.com
dupchurch@upchurchpa.com
*Attorneys for Defendant Baptist Memorial Hospital - Desoto*

Marty R. Phillips, Esquire
Rainey Kizer Reviere & Bell
Post Office Box 1147
Jackson, TN 38302-1147
mphillips@raineykizer.com
*Attorney for Defendant*
*Lemuel Donja Oliver M. D.*

Amanda C. Waddell, Esquire
Rainey Kizer Reviere & Bell
50 North Front Street, Suite 610
Memphis, TN 38103
awaddell@raineykizer.com
*Attorney for Defendant*
*Lemuel Donja Oliver, M. D.*

James R. Gass, Esquire
Gass, Weber, Mullins, LLC
309 North Water Street
Milwaukee, WI 53202
gass@gwmlaw.com
*Attorney for Defendant M. D. Lemuel*
*Donja Oliver*

Michael B. Wallace, Esquire
Wise Carter Child & Caraway, P.A.
Post Office Box 651
Jackson, Mississippi 39205-0651
mbw@wisecarter.com
*Attorney for Defendants Lemuel Donja Oliver, M.D.*
*AND Baptist Memorial Hospital - Desoto*

This the 20th day of March, 2019.

*/s/ Berkley N. Huskison*

27

1046619