# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## OXFORD DIVISION

KELLI DENISE GOODE, Individually,
and also as the Personal Representative of
Troy Charlton Goode, Deceased, and as
Mother, Natural Guardian, and Next
Friend of R.G., a Minor, and also
on behalf of all similarly situated persons.

Plaintiff,

v.                                                        Civil Action No. 3:17-cv-060-MPM-RP

THE CITY OF SOUTHAVEN, et al

Defendants.

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT

This Memorandum of Fact and Law is submitted in support of Plaintiff's Motion for Partial Summary Judgment addressing the Southaven Defendants' use of excessive force in the arrest and detention of Troy Goode on July 18, 2015.

## SUMMARY OF THE CASE

On July 18, 2015, Troy Goode, deceased, and his wife Kelli, travelled from their home in Cordova, TN to the Snowden Grove music venue in Southaven, MS for a music concert. Troy along with some friends ingested a small amount of LSD before the concert commenced. After ingesting the LSD, Troy became paranoid and claustrophobic. The Southaven police were called. They came to the scene in force, ordered the police K-9 to attack Troy, Tased him, and hog-tied him. He was transferred to Baptist Hospital–Desoto by Southaven EMS still hog-tied and prone, an unequivocal violation of EMS protocols for the State of Mississippi.

**Troy was unarmed, by police admissions represented no threat to the police, and was never charged with the commission of any crime even a misdemeanor. He was an Honors Graduate in chemical engineering from Christian Brothers University, a husband, and a father of a toddler son.**

In the hospital, Troy remained in police custody and was left hog-tied and prone as well as unattended by medical personnel in violation of federal regulations governing patient rights. After a period of approximately one and one-half hours in hog-tie and prone positioning, Troy died of heart failure arising from insufficient oxygenation.

## FACTUAL STATEMENT

Pursuant to Fed. R. Civ. P. 56(c), Plaintiff offers the following as her assertion of uncontested facts:

1

### A.     <u>Troy's Initial Encounter with the Southaven Police</u>

1. On July 18, 2015, Troy and Kelli Goode drove to the Snowden Grove venue in Southaven to attend a music concert. Kelli Goode deposition, pg. 11. (Ex. 1)

2. Troy with 4-5 of his friends ingested LSD before the concert. *Id.* at pg. 134.

3. Troy began to act agitated and claustrophobic, leading Troy and Kelli to depart the concert venue and start traveling home in their car. *Id* at pg. 16.

4. Before they could get home, Troy exited the vehicle and began running about in a grassy area near Goodman Road in Southaven, MS. Southaven Incident Report (Ex. 2)

5. On July 18, 2015, Troy Goode was apprehended on Goodman Road by the Southaven Police force. *Id.*

6. Troy was unarmed. Depo. of Todd Baggett (Ex. 3) at pg. 38

7. Troy posed no threat to police officers or others. *Id.* at pg. 30.

8. Officer Baggett was the first Southaven officer to arrive at the scene. *Id.* at pg. 17.

9. Plaintiff Kelli Goode, Troy's spouse, immediately advised Officer Baggett that Troy had ingested some amount of LSD. Depo. of Kelli Goode (Ex. 1) at pg. 23

10. Mrs. Goode also advised Officer Baggett that Troy had breathing problems. Depo. of Todd Baggett (Ex. 3) at pg. 23.

11. Southaven Police Officer Jason Scallorn and his canine partner arrived next on the scene. *Id.* at pg. 33.

### B.     <u>The Southaven Police Order a Canine to Bite Troy</u>

12. Southaven police officers receive basic training from the Mississippi Law Enforcement Officers Training Academy (the "Academy") and then receive

2

additional training every year from the City of Southaven. Depo. of Chief Tom Long (Ex. 4) at 29:8-19.

13. The Mississippi Law Enforcement Officers Training Academy (the "Academy") instructs officers in training that force may be legitimately used for one of two purposes-defense or control. *Police Subject Control Basic Manual* (Ex. 5) at pg. 58.

14. The Academy teaches officers and training that the factors to be considered in determining the amount of force to be imposed are 1) the severity of the crime, 2) the risk a suspect poses to the officer or others, and 3) the need for force in accomplishing control or capture. *Id.*

15. The Academy teaches that a use of force is "reasonably necessary" when it is used for a legitimate purpose (i.e. defense or control) and either a) the Officer tried techniques with lower propensities for pain or injury, and the techniques did not work; b) it reasonably appeared to the Officer that techniques with lower propensities for pain or injury would not have worked to accomplish the particular objectives; or c) it reasonably appeared to the Officer that attempting techniques with lower propensities for pain or injury would have exposed the Officer and others to unreasonable danger. *Id.*

16. In contrast, Southaven police policies and training permit the use of a canine to attack a suspect as the next level of force when verbal attempts to obtain cooperation have failed, regardless of any threat posed by the individual or previous attempts to use lesser force. Depo. of Tom Long (Ex. 4) at 52:7-53:7, Depo. of Jason Scallorn (Ex. 6) at 17:8-25.

17. Troy approached the K9 unit with his hands raised. Depo. Charles Rogers (Ex. 7) at pg. 18.

18. When the K-9 officer arrived on the scene, the back door to the canine compartment of his vehicle was closed and locked. Officer Scallorn intentionally unlocked it, allowing Troy Goode to open the door and release the police dog. Depo. of Jason Scallorn (Ex. 6) at 148:15-149:3.

19. After Scallorn unlocked it, Troy opened the back door of the K9 unit and began to talk to the canine in friendly terms. Depo. of Kelli Goode (Ex. 1) at pg. 24.

20. The canine was a Belgian Malinois, the breed of dog utilized by US Navy Seal teams including Seal Team 6 in the raid to capture Osama Bin Laden. Depo. Todd Baggett (Ex. 3) at pg. 99.

21. According to Southaven officers, the canine "nipped" at Troy. *Id.* at pg. 71.

22. According to Southaven officers, Officer Baggett was approaching the K9 unit when Troy began to run from the canine "back towards the parking lot"—that is, away from Goodman Road. Officer Baggett commenced pursuit. *Id.* at 81:6-12.

23. Officer Baggett was within two feet of Troy when he began pursuit. *Id.* at 92:20-24.

24. Officer Scallorn instructed Officer Baggett to "stop." *Id.* at pg. 93.

25. Officer Scallorn ordered the canine to attack Troy. *Id.* at pg. 83.

26. Troy had run only about two feet by the time the canine bit him. *Id.* at 83:16-20.

27. Troy was facing the officers when the dog attacked. *Id.* at pg. 87.

28. The order given by Southaven police for a canine to attack Troy Goode was in compliance with Southaven policies and procedures. Depo. of Tom Long (Ex. 4) at 12:20-24.

4

29. The canine attacked inflicting serious wounds on Troy's left arm. Depo. of Todd Baggett (Ex. 3) at pg. 86.

30. Troy attempted to run south away from Goodman Road after the dog attacked. *Id.* at pg. 103.

31. Officer Scallorn then discharged his Taser hitting Troy in the back. *Id.*

C. **Southaven Law Enforcement Training on Restraints**

32. The Mississippi Law Enforcement Officers Training Academy (the "Academy") uses a training manual entitled Police Subject Control authored by Ron L. Crew. *Police Subject Control Basic Manual* (Ex. 5) at pg. 58.

33. The Academy does not instruct that the maximal restraint (hands and feet bound together behind the subject's back) or hog-tie is an appropriate means of a subject's restraint. *Id.* at pg. 117-131.

34. The Academy teaches that when a subject is arrested and handcuffed in a face down position, officers **must** get the suspect up to at least a seated position as soon as possible. *Id.* at pg. 118.

35. The Academy warns officers in training that subjects who remain in a prone position for varying periods of time **will suffocate themselves** due to their own body weight. *Id.* at pg. 118.

36. The Academy mandates that each police department ensures that its officers are properly trained in the use of restraints. *Id.* at pg. 62.

37. Southaven Police Officer Todd Baggett was given basic law enforcement training in Arkansas. Depo. of Todd Baggett (Ex. 3) at pg. 7.

38.   The Arkansas Law Enforcement Training protocol warns that positional asphyxia can be fatal to a restrained suspect and that the hog-tie prone position is "troublesome." Arkansas training materials obtained by subpoena *duces tecum* (Ex. 8) at 2-3, 6-8.

39.   The Arkansas Law Enforcement Training protocol instructs the officer to place a restrained suspect in an upright seated position. *Id.*

40.   The Arkansas Law Enforcement Training protocol prohibits transport in a hog-tie. *Id.*

41.   The Arkansas Law Enforcement Training protocol prohibits transport of a subject face-down. *Id.*

42.   The City of Memphis Police protocols prohibit hog-tying subjects.  Memphis Police Protocols obtained by subpoena *duces tecum* (Ex. 9) at 7.

43.   Most law enforcement agencies in the United States, including New York, Dallas, Chicago, and Memphis have banned the use of the hogtie restraint due to the possibility of a suspect dying due to positional asphyxia.  Depo. of Darrell Coslin (Ex. 10) at 79:20-84:23.

44.   In direct opposition to the Academy training manual and policies mentioned above, the City of Southaven has a policy permitting the use of the hogtie restraint by its officers.  Depo. of Tom Long (Ex. 4) at 13:17-20, 17:5-8, 17:24-18:2, Depo. of Jason Scallorn (Ex. 6) at 59:25-60:7.

45.   The City of Southaven has known since the 90's that the prone, hogtied position can cause fatal positional asphyxia.  Depo. of Tom Long (Ex. 4) at 27:18-28:17.

46.   The City of Southaven does not train its police officers how to properly apply a hogtie restraint, how to prevent injury from that restraint, the danger to intoxicated individuals from that restraint, the danger to individuals with respiratory disorders

from that restraint, or the dangers of positional asphyxia caused by that restraint. Depo. of Jason Scallorn (Ex. 6) at 86:1-87:23.

47. The City of Southaven does not train its officers to avoid hogtying or placing prone an intoxicated individual. Southaven Responses to 2nd Req. for Admission (Ex. 11) at ¶¶4-5.

48. The Southaven police officers on the scene were aware that a person can die from the prone, hogtied position. Depo. of Jason Scallorn (Ex. 6) at 61:1-17.

49. In addition to being potentially life-threatening, the hogtie restraint used on Troy is extremely painful. Depo. of Darrell Coslin (Ex. 10) at 88:18-90:9, 135:7-136:1.

**D.    The Initial Application of the Hogtie Restraint**

50. After being bitten by the K-9 and Tased, Troy was pinned to the ground face down by two or three police officers placing their knees on Troy's back. Depo. of Kelli Goode (Ex. 1) at pg. 25.

51. As Officer Scallorn admitted, three Southaven police officers held Troy face down on the ground while applying pressure to his back. Depo. of Jason Scallorn (Ex. 6) at 46:13-25.

52. Troy's hands were shackled behind his back while face down. Depo. of Richard Weatherford (Ex. 12) at 24-25.

53. Troy's feet were then shackled. Depo. of Todd Baggett (Ex. 3) at pg. 114.

54. Officer Baggett bent Troy's knees up while Southaven Police Officer Jeremy Bond shackled his legs and hands together. *Id.*

55. The chain used to join the hands and feet shackles was 15 to 19 inches long before being wrapped around the handcuffs. *Id.* at pg. 13.

56. The City of Southaven EMS had been called and arrived at the scene. Report of Stacie Graham (Ex. 13).

57. Troy was hog-tied and prone on the ground when EMS arrived. *Id.*

58. The hogtie restraint left deep bruises on Troy's wrists and ankles. Depo. of Stacie Graham (Ex. 22) at 61:13-23.

**E. Southaven EMS Training and Protocols on Restraint**

59. Defense expert Emergency Medicine physician Dr. Michael LaRochelle in his 21 years of practice has seen only one patient come into the emergency department hog-tied. Depo. of Michael LaRochelle (Ex. 14) at pg. 39.

60. Dr. LaRochelle immediately ordered that his patient be taken out of hog-tie and restrained supine. *Id.* at pg. 40.

61. That single incident was over 20 years ago in Chicago. *Id.* at pgs. 39-40.

62. The reason the patient was taken out of hog-tie was best care of the patient. *Id.* at pg. 67.

63. Dr. LaRochelle was trained that leaving a patient prone could cause positional asphyxia. *Id.* at pg. 41.

64. The National Association of EMS Physicians warns to never transport a patient who is hobbled/hog-tied. "Patient Restraint in Emergency Medical Services Systems," Nat'l Assn. of EMS Physicians (Ex. 15) at 340.

65. Mississippi State Emergency Medical Services Standard Operating Procedures ("SOPs") forbid transporting patients in the prone position. SOP #605 (Ex. 16).

66. The SOPs forbid transporting patients who are hogtied. *Id.*

67. Medical literature on the topic of Emergency Medical Services is replete with instructions that a patient should not be left in a prone, hogtied position due to the risk of positional asphyxia. Depo. of Robert Krause, EMT (Ex. 17) at 31:4-21, 70:20-73:11, Expert Report of Robert Krause (Ex. 18).

68. Southaven Fire/EMS personnel are trained that they can disregard SOPs that forbid transportation of a patient in the prone, hogtied position if they believe safety of a person "may be at issue." Southaven Responses to 2nd Req. for Admission (Ex. 11) at ¶¶2-3.

    **F.      The Hogtie Restraint was Continued Despite the Danger to Troy**

69. The Southaven Defendants who restrained Troy in the prone, hogtied position knew that Troy had breathing problems, specifically asthma. Depo. of Darrell Coslin (Ex. 10) at 92:19-95:5.

70. It is standard police practice to restrain prisoners to a hospital gurney or stretcher in the supine (face-up) position using handcuffs, nylon straps, and/or leg shackles. Such restraints are easy to apply, effective, and do not compromise breathing. Depo. of Darrell Coslin (Ex. 10) at 82:6-85:13, Depo. Jeffrey Baker (Ex. 19) at pgs. 10-11.

71. There were at least five police officers and five Fire/EMS personnel on the scene when Troy was restrained. Scene Photograph, Price Depo. Ex. 36. (Ex. 20).

72. Officer Price alone is 6'4" and 285 lbs., more than 100 lbs. heavier than Troy. Depo Tyler Price (Ex. 21) at pg. 18.

73. Officer Baggett has acknowledged that repositioning Troy Goode into the supine position, removing the hogtie, and securing him to a stretcher or gurney was within his power. Depo. Todd Baggett (Ex. 3) at 55:16-57:6.

9

74.   Police officers lifted Troy by the shackles placing him on the EMS gurney.  Depo. of Kelli Goode (Ex. 1) at pg. 25.

75.   It is never appropriate to pick a patient up by the shackles to transfer them to an EMS stretcher.  Depo. of Stacie Graham (Ex. 22) at 40:25-41:22.

76.   After being placed on the gurney, Troy was face-down and hog-tied.  Report of Stacie Graham (Ex. 13).

77.   Five straps were added across Troy's body holding him to the gurney.  *Id.*

78.   EMS was advised by Officer Baggett that Troy suffered from breathing problems and carried an inhaler.  Depo. of Todd Baggett (Ex. 3) at  pg. 117.

79.   Paramedic Richard Weatherford performed a medical assessment of Troy. Depo. of Richard Weatherford (Ex. 12) at pg. 34.

80.   Paramedic Weatherford did not record any blood oxygen saturation *Id.* at pg. 62.

81.   Failure to obtain and record the pulse oximetry reading was a violation of Mississippi EMS protocols.  *Id.* at pg. 27.

82.   When Troy was placed on the hospital stretcher, he repeatedly arched his back, raising his chest off the stretcher, and appeared to be convulsing.  Troy appeared to be in distress and trying to relieve pressure on his chest.  He was struggling to breathe.  Decl. of David McLaughlin (Ex. 23) at ¶3.

83.   While Troy was hogtied, prone on the stretcher, Southaven Fire/EMS personnel were warned that the prone, hogtie position was dangerous and could result in Troy's death.  Lieutenant Mike Mueller was warned that, if the Southaven Defendants continued their mistreatment of Troy, "**y'all are going to kill him!**"  *Id.* at ¶6.

84. Lieutenant Mike Mueller acknowledged the danger the prone, hogtied position caused to Troy and admitted that he knew Troy was intoxicated, but took no action to prevent the known risk of death caused by this mistreatment. *Id.* at ¶7.

**G.** **Southaven Fire/EMS Personnel Ignore Troy's Medical Needs**

85. A normal adult heartrate is a maximum of 100 beats per minute.

86. Defendant Graham was aware Troy had a significantly accelerated and life-threatening heart rate which reached 186 beats per minute. Depo. of Robert Krause (Ex. 17) at 52:12-15, 53:7-23.

87. Ms. Graham was aware that Troy's heart rate was putting a "strain on his heart" and that Troy was at risk for cardiac arrest if his heart rate was allowed to go any higher. Depo. of Stacie Graham (Ex. 22) at 57:5-12.

88. Southaven paramedic Stacie Graham diagnosed Troy with a supraventricular tachycardia, a cardiac arrhythmia that required medical treatment, but provided no treatment for that condition. Depo. of Robert Krause (Ex. 17) at 51:1-52:6.

89. Defendant Graham admitted that she knew Troy should not have been transported in the prone, hogtied position. *Id.* at 62:11-64:3.

90. Despite SOPs that instruct that there is a risk of serious complications or death if a patient continues to struggle violently against restraints, Defendant Graham took no action to sedate Troy or minimize his struggling. *Id.* at 81:24-84:9.

91. Defendant Graham violated SOPs 202, 605, and 612, all of which were indicated by Troy's medical conditions as admittedly observed by Defendant Graham. Expert Report of Robert Krause, EMT (Ex. 18) at 6-11.

92.    Defendant Graham observed Troy getting sicker and sicker, knew that treatment detailed within the SOPs was required to save Troy's life, and chose not to provide that treatment.  Depo. of Robert Krause (Ex. 17) at 91:2-94:2.

93.    Defendant Graham violated the Advanced Cardiac Life Support ("ACLS") protocol, which dictates the care that must be provided to patients by EMS personnel, despite clear indications in the medical records she prepared that Troy needed the care outlined in the ACLS.  *Id.* at 102:4-105:17.

94.    Defendant Graham admittedly knew that she was violating the Standard Operating Procedures which govern the care she was supposed to provide to Troy Goode. Depo. of Stacie Graham (Ex. 22) at 28:8-28:15.

95.    Defendant Graham admittedly had the ability to provide life-saving sedation to Troy Goode, but chose not to do so.  *Id.* at 31:8-32:7.

96.    Defendant Graham admits that Troy was transported by Southaven EMS in a manner that violated her EMS training.  *Id.* at 49:16-20.

97.    Defendant Graham admits Troy should have been transported in the supine, face-up position.  *Id.* at 52:3-53:6.

98.    Defendant Graham admits that she had assistance available to move Troy to a supine position and restrain him with soft restraints that were available in the ambulance. *Id.* at 60:2-61:12.

99.    Defendant Graham admits that the soft restraints would not have caused the bruising and indentations on Troy's wrists and ankles that the police handcuffs and shackles left.  *Id.* at 61:13-23.

12

100. Defendant Graham was aware that Troy had asthma, a medical condition that restricts air flow even when it is asymptomatic and that raises the risks of negative outcomes from being placed in a stressful position. *Id.* at 51:2-16.

101. Troy was transported in non-emergent fashion. *Id.* at 24:23-25.

102. Despite Ms. Graham's claim that Troy was uncontrollable, during transport she inserted an IV and obtained ECG readings. Depo. of Stacie Graham (Ex. 22), pg. 42.

103. Despite Ms. Graham's claim of Troy's violent behavior, she did not use the chemical restraint/sedative which she has available in the ambulance. *Id.* at pgs. 14-15.

104. Despite Ms. Graham's claim of Troy's violent, uncontrollable movements, video of Troy Goode's arrival to Baptist Memorial Hospital-Desoto shows Troy lying prone, hogtied, and not moving, with police and medical personnel acting unconcerned and relaxed. *See* BMH-D Ambulance Bay Video (Ex. 24).

105. Upon arrival at Baptist Memorial Hospital-Desoto ("BMH-D"), a triage nurse recorded Troy's blood oxygen level at 90%. Depo. of Jeff Baker (Ex. 19) at pg. 28.

106. A reading of 90% blood oxygen saturation is considered moderate hypoxia with an immediate need to increase FiO2 (oxygen being inhaled). MS EMS SOPs "Reference -- Pulse Oximetry Values" (Ex. 16).

107. A blood oxygen saturation reading of 90% requires that the patient be given supplemental oxygen to prevent further deterioration. Depo. of Michael LaRochelle (Ex. 14) at pg. 100.

13

**H.** **Southaven Police Continued Their Use of Force and Restraint on Troy at the Hospital until Troy Succumbed to His Abuse.**

108.   Troy remained hog-tied, prone, and in police custody for the entire period of hospitalization.  Depo. of Jeffrey Baker (Ex. 19) at pg. 8, Southaven Resp. to Pl. Req. for Admissions filed 7-14-16 (Ex. 31) at Req. 5, 9, 11.

109.   Proper medical procedure is to place the patient on his back with soft restraints. Depo. of Michael LaRochelle (Ex. 14) at 40:12-42:18.

110.   The hospital routinely is called upon to restrain patients. Depo. Kendrick DeBerry (Ex. 25) at pgs. 38-40.

111.   The hospital keeps restraints in the emergency department for such instances.  Depo. of Paul Flock (Ex. 26) at pg. 18.

112.   The hospital does not hog-tie patients.   Depo. Kendrick DeBerry (Ex. 25) at pg. 11.

113.   When Troy was brought into the hospital, Mr. DeBerry, Baptist Memorial Hospital-Desoto security guard approached the police.  *Id.* at pgs. 50-51.

114.   Mr. DeBerry was responsible for ensuring law enforcement complied with hospital policies regarding patients in custody.  *Id.* at pg. 53.

115.   Troy was restrained in a manner which violated Baptist Hospital policy.  *Id.* at pg. 62.

116.   Troy was the sole incident of a patient being hog-tied in Mr. DeBerry's years at the hospital.  *Id.* at pg. 13.

117.   Mr. DeBerry did not object to the officers about Troy being hog-tied. *Id.* at pg. 63.

118.   Mr. DeBerry deferred to the officers in acquiescing to the hog-tie.  *Id.* at pg.63.

119.   During triage, an independent witness heard Troy's scream "breathe."  Depo. Janet Tharpe (Ex. 27) at pg. 10.

120.  After triage, Troy was transported on the gurney still hog-tied and prone to a treatment room.  *Id.* at pgs.12-13.

121.  Ms. Tharpe had never seen a human, only animals, restrained this way.  *Id.* at pg.12.

122.  Troy was wheeled in close proximity past Ms. Tharpe in hog-tie and prone.   *Id.*

123.  Ms. Tharpe described Troy as being red faced, eye bulging, and totally incapable of movement.  *Id.* at pgs. 12-13.

124.  Troy was placed in a treatment room with only the presence of Officer Baggett. Depo. of Todd Baggett (Ex. 3) at pg. 121.

125.  BMH-D Nurse Jeff Baker was surprised and concerned when he learned that Troy remained in hog-tie.  Depo. of Jeff Baker (Ex. 19) at pg. 10.

126.  The police usually remove their shackles and bind the patient to the bed in these situations.  *Id.*

127.  Upon the orders of Dr. Oliver, a nurse administered chemical sedatives [chemical restraints as defined in 42 CFR482.13(e)(1)(B)] into the IV placed by paramedic Stacey Graham during ambulance transportation.  Depo. of Paul Flock (Ex. 26) at pgs. 31-32.

128.  The Centers for Medicare and Medicaid Services regulations mandated one-on-one observation by a medically trained person of Troy after administration of chemical restraints.   CMS State Operations Manual found at <u>CMS.gov</u>.

129.  Officer Baggett, the solitary attendant to Troy, had no medical training.  Depo. of Todd Baggett (Ex. 3) at pg. 150.

130.  The nurse who administered the chemical restraints told Officer Baggett that he (the nurse) would return in 10 minutes.  *Id.* at pg. 130.

131. The nurse did not return before it was determined that Troy was no longer breathing, at least 14 minutes after the nurse had left Troy alone with Officer Baggett. *Id.*

132. Troy died still hog-tied and prone. *Id.* at pg. 145.

133. The length of time that Troy had been hog-tied and prone was approximately 1 hour and 30 minutes, from 7:54 p.m. to 9:22 p.m. Southaven Police Department CAD Incident Detail Form (Ex. 28), Baptist Medical Records (Ex. 29) at 40.

134. The cause of death was listed by the hospital as "cardiopulmonary arrest." Hospital Restraint/Seclusion Death Report Worksheet sent to Centers for Medicare and Medicaid Service (Ex. 30).

135. The City of Southaven "is not aware of any policy or procedure violation by officers and/or first responders involved with the arrest, restraint, medical treatment and transport of Troy Goode." Southaven Responses to Plaintiff's Second Req. for Admission (Ex. 11).

136. After reviewing the use of force by Southaven personnel, the City concluded it "would not have done anything different and that there were no violations of any policy or procedure." Depo. of Chief Tom Long (Ex. 4) at 41:1-14

## RELIEF SOUGHT

By this Motion, Plaintiff asks the Court to find:

1) When a subject is known to be of diminished capacity that the hog-tie restraint is a constitutional violation *per se*; and/or

2) Under the facts of this case, ordering a canine to bite Troy Goode, hogtying Troy when he had a known diminished capacity and keeping him prone, maintaining that

prone hogtie during EMS transport, and maintaining that prone hogtie throughout his arrest for a period in excess of one and one-half hours constituted excessive force in violation of Mr. Goode's Fourth Amendment Rights;

3)    Southaven EMS used excessive force in transporting Troy hog-tied and prone;

4)    Southaven EMS personnel acted with deliberate indifference to Troy's known medical issues and failed to provide treatment for those medical issues;

5)    Defendant City of Southaven's policies and procedures caused Troy to be deprived of his federally protected rights; and,

6)    Defendant City of Southaven failed to properly train Police and EMS personnel.


## PRINCIPLES OF REASONABLY NECESSARY FORCE

The Mississippi Law Enforcement Officers Training Academy, at which all Southaven Police Officers are trained, uses as its training manual Police Subject Control authored by Ron L. Crew, a resident of Florence, Mississippi. The Manual states as follows:

Force may be legitimately used for only one of two purposes; defense or control. The severity of the crime (the government interest in control/capture) influences the level of force considered reasonable. The risk a subject poses to the Officer or others requires asking if defense is necessary. The need for force in accomplishing control or capture is found when a suspect resists arrest or attempts to flee.

A particular force technique will be considered "reasonably necessary" when used for a proper purpose (defense or control) and:

The Officer tried techniques with lower propensities for pain or injury, and the techniques did not work.

It reasonably appeared to the Officer that techniques with lower propensities for pain or injury would not have worked to accomplish the particular objectives.

It reasonably appeared to the Officer that attempting techniques with lower propensities for pain or injury would have exposed the Officer and others to unreasonable danger.

17

Specific ***Cautions*** *by The Mississippi Law Enforcement Academy Manual* are:

> "There are two main areas of concern in the application of Handcuffs. One is "Positional Asphyxia." **When a violator has been arrested and handcuffed in a face-down position, Officers must get the suspect up to a least "seated" position as soon as possible. People who remain on their stomachs for varying periods of time will suffocate themselves due to their own body weight…** (Emphasis added)

Applying the facts of this case to the training maxims:

1) **Severity of the crime:** Troy was charged of the commission of no crime. Running about in a field is hardly a crime. At worst, Troy was suspected of the crime of disorderly conduct. As this Court has recognized, disorderly conduct is a "minor offense." *Wroblewski v. Tyler*, No. 3:17cv146-M, 2018 U.S. Dist. LEXIS 175973, at \*11 (N.D. Miss. Oct. 10, 2018). Troy was, at worst, suspected of a non-violent misdemeanor.

2) **The risks a suspect poses to the officer or others:** Troy Goode was unarmed. (SOF 6). He was a very small man and weighed approximately 160 pounds. He was surrounded by no fewer than four police officers, including one within arm's reach, when Officer Scallorn ordered the dog to bite. (SOF 23-25). After Troy was handcuffed, there were at least three officers pinning him to the ground and others in the immediate vicinity. (SOF 50-51). When he was transferred to the stretcher, there were at least five police officers on the scene and at least five fire/EMS personnel available to help adjust his position. (SOF 71). At worst, the risk Troy posed while restrained was that he might kick an officer, a risk that could be eliminated by having one or even two officers control each leg as his position was adjusted. As Officer Baggett testified, it was possible to adjust Troy's position such that he was supine on the stretcher, a common police and EMS practice. (SOF 70-73). There was no risk of serious harm to justify maintenance of the hogtie restraint.

3)    **The need for force in accomplishing control or capture:**  there were five or more officers and a canine partner on the scene when Troy was pinned to the ground and chained like an animal, i.e. hog-tied.  He was on foot.  All officers were substantially larger men.  Moreover, there is no evidence that the officers tried a lesser amount of force before ordering the canine to attack, discharging a Taser, and then forcefully restraining Troy.

## ARGUMENT

1.    **This Court should find that the hog-tie applied by law enforcement personnel to a person of known or obvious diminished capacity constitutes excessive force in violation of the Fourth Amendment.**

The so called "hog-tie" is the binding of arms and legs together behind the back with an additional chain.  *Hill v. Carroll Cnty.*, 587 F.3d 230, 232 n.1 (5th Cir. 2009).  That Troy Goode was hog-tied in a diminished capacity for in excess of one and one-half hours is uncontroverted. While the Fifth Circuit Court of Appeals has never stated unequivocally that hogtying a person in an agitated state constitutes a constitutional violation *per se*, it has effectively done so.  In the case of *Gutierrez v. City of San Antonio*, factually similar to our case, the Fifth Circuit upheld the trial court's denial of police officers' motion for summary judgment.  139 F.3d 441 (5th Cir. 1998).  The bottom line in *Gutierrez* was:

> In conclusion, our holding today is very limited.  Both the San Diego Study and Criminal Law Update article suggests hog-tying may present a substantial risk of death or serious bodily harm only in a limited set of circumstances – i.e. when a drug-affected person in a state of excited delirium is hog-tied and placed face down in a prone position.  *Id.* at 451.

The fact that Troy was known to be in a state of diminished capacity and agitation due to a controlled substance is undisputed (see SOF 30)

In the case of *Kahn v. Normand*, another hog-tie case, the Fifth Circuit upheld summary judgment on the basis of qualified immunity granted to police officers. What is material and relevant to the case *sub judice* from the *Kahn* decision is twofold:

a) The Appellate Court reaffirmed that the hog-tie restraint in a limited set of circumstances, specifically where it is known to law enforcement personnel that the subject is of diminished capacity, may constitute excessive force; and

b) Unlike the decedent who was the subject in *Hill v. Carroll County*, MS, *supra,* who was held face down in hog-tie for approximately 30 minutes, Kahn was not left face down in the four point restraint for an **extended period of time**. 683 F.3rd 192, 194. (Emphasis added).

The decedent's representative in *Kahn* urged that the Fifth Circuit adopt the position of the Tenth Circuit enunciated in the case of *Cruz v. City of Laramie*, Wyo. 239 F.3d 1183, 1188 (2001) which stands for the proposition that while all hog-tie restraints do not constitute a constitutional violation *per se*, the hog-tie of an individual whose diminished capacity is known or apparent to police officers is violative of the Fourth Amendment. *Kahn*, *supra,* at 199.

In the case s*ub judice*, it is undisputed that Troy Goode was known to be under the influence of a hallucinogen, that he posed no threat to police, that he was hog-tied and placed in a prone position for over three times the period of restraint in the *Hill* case (30 minutes) which the Fifth Circuit in *Kahn* deemed to be "an extended period of time."

Cases from this and other circuits confirm that the use of the hogtie restraint on an individual with diminished capacity due to intoxication, including application of pressure to a prone person's back, constitutes excessive force. For example, the Sixth Circuit held that

it is, "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004), *cert. denied* 544 U.S. 975 (2005). *Accord Martin v. City of Broadview Heights*, 712 F.3d 951, 961 (6th Cir. 2013)(holding that "[t]he prohibition against placing weight on Martin's body after he was handcuffed was clearly established in the Sixth Circuit as of August 2007"), *Darden v. City of Fort Worth*, 880 F.3d 722, 726 (5th Cir. 2018)(denying summary judgment where an officer held an obese suspect down prone, punched and kicked him, and applied weight to his back until the suspect suffered a cardiac arrest). The Tenth Circuit has similarly held that, "the Fourth Amendment protection against excessive force includes the protection of an individual's right to be free from a hog-tie restraint in situations such as the one confronting officers herein," namely, where officers are aware that an individual is intoxicated and agitated. *See Cruz v. Laramie*, 239 F.3d 1183, 1189 (10th Cir. 2001). *Accord Gutierrez v. City of San Antonio* 139 F.3d 441 (5th Cir. 1998).

**2.      Ordering a canine to bite Troy Goode, hogtying Troy Goode in a known diminished capacity and keeping him prone, maintaining that prone hogtie during EMS transport, and maintaining that prone hogtie throughout his arrest for a period in excess of one and one-half hours constituted excessive force in violation of Mr. Goode's Fourth Amendment Rights**

This case involves multiple uses of force against Troy. Where force is continued over a period of time, a court's analysis does not end with the initial application of force. *See Williams v. Bramer*, 180 F.3d 699, 704 (5th Cir. 1999)(finding that a first instance of an officer choking a suspect was not excessive force since it occurred as part of a lawful search, but that a later instance was). Instead, each use and continuation of a use of force must be analyzed separately. This is particularly true where the use of force achieves its goal of

neutralizing the possible threat posed by a suspect. *See Lytle v. Bexar County*, 560 F.3d 404, 413 (5th Cir. 2009) ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased."). *Accord Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993), *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005) ("We therefore hold that force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated").

Here, Southaven police were informed that Troy was of diminished capacity due to ingestion of LSD when they arrived on the scene, before they hogtied him. (SOF 9). Before hogtying Troy, the City of Southaven police were told that Troy had breathing problems. (SOF 10). Despite this knowledge, the Southaven police applied significant weight applied to Troy's back by three police officers and then hog-tied him, a position they knew could cause positional asphyxia. (SOF 48, 50-51).

The hog-tie restraint was maintained when Troy was transferred to the stretcher, despite the police and EMS personnel having the ability to modify his position to prevent both his cardiovascular problems and the severe pain and bruising caused by the hogtie restraint. (SOFs 69-76). Southaven had at least ten police and fire/EMS personnel available to adjust Troy's position, a procedure that posed little danger to anyone and that is routinely performed by police and EMS personnel. (SOFs 70-71). Instead of modifying the position, Southaven police and EMS personnel cooperated to transport Troy hog-tied and prone in violation of EMS protocols. (SOFs 91, 97).

Upon arrival at the hospital, nursing personnel found Troy to be in moderate hypoxia requiring supplemental oxygen. (SOFs 105-107). Troy remained in police custody and the hog-tie restraint continued to be applied to him throughout his stay at the hospital. (SOF

108). Troy remained hog-tied and prone until his death. The period of time that Troy was hog-tied in a prone position was approximately one and one-half hours. (SOF 133).

It has been documented since the year 2000 that individuals suffering extreme agitation or "excited delirium" and who are restrained particularly in the hog-tie position run an eleven percent risk of mortality. *See* "The Factors Associated with Sudden Death of Individuals Requiring Restraint for Excited Delirium," Stratton et al, *American Journal of Emergency Medicine,* Volume 19 No. 3 May 2001. As the Mississippi Law Enforcement Training Academy teaches, individuals held in such a position will suffocate themselves if allowed to remain on their stomachs. (SOFs 32-35).

Our case is factually indistinguishable from that of *Gutierrez, supra,* which was decided by the Fifth Circuit in 1998 or some seventeen years before the incident resulting Troy's death. The facts of *Gutierrez* are these: San Antonio police officers saw Rene Gutierrez on the side of the street and began stumbling in the intersection. Officers saw Gutierrez "running around in circles in the middle of the street." The officers approached Gutierrez, and he began screaming incomprehensively after being handcuffed, Gutierrez advised police officers that he had taken cocaine. EMS was called, Gutierrez kicked one EMS technician in the chest. Gutierrez was then placed in a hog-tie, legs bent backward at a ninety degree angle and joined with the handcuffs of Gutierrez' arms behind his back, in short, a restraint same as that inflicted of Troy. Gutierrez was then placed prone in the police vehicle and taken to the hospital. Upon arrival, medical personnel removed the hog-tie and found that Gutierrez did not have a pulse. *Gutierrez*, *supra*. at 442.

At the trial court level, defendants moved for summary judgment based upon qualified immunity in denying the summary judgment motion in pertinent part, the District

23

Court stated in order to make a determination of whether the hog-tying was an improper use of deadly force, issues regarding the arrestee's drug use, the position in which the arrestee was placed, and whether the appellant's were aware of the dangers of hogtying, had to be resolved by the trier of fact. *Id.* at 441.

In sustaining this ruling of the District Court, the Fifth Circuit found that "hog-tying may present a substantial risk of death or serious bodily harm only in a limited set of circumstances-i.e. when a drug-affected person in a state of excited delirium is hog-tied and placed face down in a prone position. *Id.* at 451.

**In other words, the Fifth Circuit has concluded, and it has been the law since 1998, that hog-tying of a person of diminished capacity exhibiting signs of agitated delirium and placing that person in a prone position constitutes excessive force in violation of the Fourth Amendment.**

There are two additional cases neither of which resulted in a favorable conclusion for the section 1983 claimant but both of which made findings which bolster this claim for partial summary judgment on the issue of excessive force. The first of these cases is *Hill v. Carroll County MS*, supra. The facts of *Hill* may be summarized as follows: Debbie Denise Loggins, deceased, was involved in a physical altercation with another female. The Carroll County Sheriff's Department was notified and officers dispatched. The first officer to arrive found Loggins' opponent in a head lock, and Loggins refused to release the headlock when ordered to do so by the Sheriff's deputy. Suddenly, Loggins released her female victim and attacked the Sheriff's deputy forcing him to the ground. She seized the deputy's flashlight and beat him about the head with it. Loggins was first handcuffed but she continued to kick and curse the deputy. The deputy then retrieved his leg restraints and bound her legs. A

second deputy arrived on the scene, and both officers attempted to load Loggins into the patrol car. However, she violently resisted, kicking, twisting and otherwise fighting with the officers. When the officers were unable to get her in the car, Loggins was placed in hog-tie. The deputies drove Loggins to a courthouse where they met a third officer. Loggins was transferred into the third officer's vehicle still hog-tied and prone and still fighting. Loggins was transported face down and hog-tied for the **half-hour** ride to the jail in Grenada. Upon arrival, Loggins was found to be unresponsive and without a pulse. *Hill, supra*. at 231-232.

It should be noted that Loggins was hog-tied and prone for approximately 30 minutes in contrast to the one and one-half hours plus in Troy's situation.

*Hill* appealed to the Fifth Circuit after the District Court granted the defendants summary judgment based upon qualified immunity. The Fifth Circuit concurred that the violence perpetrated by the decedent, not only against the female opponent but also the police officers, "stern control measures" were justified. *Id.* at 236. The Court went on to note "this holding should not be read to condemn or condone the use of four point restraints." *Id.*

The decision in *Kahn, supra*. was another hog-tie case. As with the Hill decedent, Kahn perpetrated violence against the police officers who were attempting remove him from a place of business. Kahn "forcefully resisted his removal from the store; thrashing his legs; attempting to bite; and according to one officer, reaching for an officer's gun belt." *Id.* at 192. The District Court had dismissed the case on summary judgment predicated upon qualified immunity, and the Fifth Circuit affirmed finding that the level of the decedent's violence necessitated a very forceful response. Pertinent to this Court's consideration was the statement in the Fifth Circuit opinion that "unlike in *Hill*, Kahn was not left face down in

the four point restraint for an **extended period of time**." Emphasis added. Troy Goode, who admittedly exhibited no violence toward officers, was left for at least three times the period that Kahn was hog-tied for what the Fifth Circuit in *Hill* had termed "an extended period." In commenting on the dissent of Judge Garza, the *Kahn* majority noted that a distinguishing factor in <u>Gutierrez</u> was the fact that the officers knew at the time of hog-tying that Gutierrez was in a drug- induced psychosis. Kahn was unable to demonstrate such knowledge. *Id.* at 195. Here, as in *Gutierrez* and unlike *Khan*, the police were informed Troy was in a state of diminished capacity before they applied the hogtie restraint.

The Fifth Circuit again addressed the excessive force issue quite recently in the case of *Darden v. City of Fort Worth*, 866 F.3d 706 (5th Cir. 2017). In *Darden*, the Fifth Circuit reversed a district court's grant of summary judgment where police officers executing a no-knock warrant tased an obese man, forced him onto his stomach, punched and kicked him, and applied pressure to his back, ultimately resulting in death. The Fifth Circuit noted that the decedent in Darden showed signs of hypoxia, "a shortage of oxygen in the blood" that can "be induced by compressing the lungs, which the weight of several persons on one's back can do." *Darden* at 702, fn. 5 (quoting *Richman v. Sheehan*, 512 F.3d 876, 880 (7th Cir. 2008)). As the Fifth Circuit noted, *Darden* "was not a situation where an officer arrived at the scene with little or no information and had to make a split-second decision." *Darden* at 732. Instead, officers had an opportunity and responsibility to reevaluate their use of force as the situation unfolded.

"[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." *Darden* at 732 (quoting *Lytle v. Bexar Cty.*, 560 F.3d 404, 413 (5th Cir. 2009)). Here, officers knew Troy was intoxicated and agitated. (SOF 9). Despite this knowledge, three officers held weight on his back. (SOFs

50-51) .  The City of Southaven has known since the 90's that the hogtie restraint can cause positional asphyxia.  (SOF 45).  The City permits its officers to use that restraint anyway.  Police officers on the scene knew that using the hogtie restraint could cause positional asphyxia, but they applied that restraint anyway and continued its application for an hour and a half, even after Troy was admittedly not a threat to anyone.  (SOFs 52-55, 57, 133, 7).  Troy remained hogtied and prone in police custody until he succumbed to his abuse and died.  In this case, there is simply no justification for restraining Troy prone for one and one-half hours when that is contrary to police training materials, EMS protocols, and authoritative medical literature particularly when he was demonstrably in hypoxia.

3.      **The City of Southaven EMS transportation of Troy Goode hog-tied and prone constituted excessive force.**

Southaven EMS personnel did not restrain Troy in order to provide treatment.  Instead, they cooperated with Southaven police officers to maintain the hogtie on a stretcher as part of the police efforts to seize Troy.  After Troy was hogtied and prone on the stretcher, Southaven EMS personnel added additional restraints in the form of five "straps" across Troy's body.  (SOF 77).

Mississippi Emergency Medical Services SOPs which governed the actions of the City of Southaven EMS required that when a patient was in restraints, use of soft restraints on all four extremities with patient supine on the stretcher is mandatory.  (SOFs 65-66, 70).  Further, if the initial "take down" must be done in a prone position, as soon as the individual is controlled, he/she shall be restrained to the stretcher in the supine position.  Moreover, a patient must **never** be hobbled, hog-tied, or in a prone position.

As previously noted, paramedic Richard Weatherford did an assessment of Troy at the scene of his arrest. Paramedic Weatherford attempted to measure Troy's blood oxygen saturation by way of pulse oximetry but violated EMS protocols by not recording the reading. (SOFs 79-81). This glaring omission must be construed against the City. Moreover, this critical omission was compounded by the transportation of Troy in violation of the requirement of supine positioning and the stricture on hogtying and prone position.

After Troy was restrained to the stretcher, he began convulsing and attempting to lift his chest off the stretcher, and appeared to be having difficulty breathing. (SOF 82). A bystander with experience with positional asphyxia warned the fire/EMS supervisor that the position being used was dangerous and that if it continued, "**y'all are going to kill him!**" (SOF 83). Lieutenant Mueller acknowledged the danger the prone, hogtied position could cause, but took no action to prevent harm to Troy. (SOF 84). By the time Troy reached the hospital, he was experiencing a supraventricular tachycardia, a heart rate of around 186, and he was moderately hypoxic with an oxygen saturation of 90%. (SOF 86, 105-107).

**4. Southaven EMS personnel acted with deliberate indifference to Mr. Goode's known medical issues and failed to provide treatment for his condition.**

The Fourteenth Amendment guarantees pretrial detainees a right "not to have their serious medical needs met with deliberate indifference on the part of the confining officials." *Thompson v. Upshur Cty.*, 245 F.3d 447, 457 (5th Cir. 2001) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). To demonstrate deliberate indifference, a pre-trial detainee must show "subjective knowledge of a substantial risk of serious medical harm, followed by a response

of deliberate indifference." *Nerren v. Livingston Police Dep't*, 86 F.3d 469, 473 (5th Cir. 1996).

As Defendant Stacie Graham recorded, she was subjectively aware that Troy was suffering from supraventricular tachycardia. (SOF 86). She was also aware that Troy was agitated, had been Tased, was intoxicated, and was asthmatic. (SOF 100). Ms. Graham knew that Troy's heart rate was 186, a rate that put a strain on his heart. (SOF 87). Ms. Graham also knew that, if Troy's heartrate was allowed to go any higher, it could cause a fatal cardiac arrest. *Id.*

The City of Southaven has in place standard operating procedures governing the safe transportation of patients. (SOFs 65-66). The SOPs also govern treatment of agitated patients and treatment of patients who have been tased. By her own admission, Ms. Graham knew that these SOPs should be followed to treat Troy's condition. (SOFs 89, 94, 96-97). Instead, Ms. Graham violated these SOPs and refused to provide Troy the care indicated by his condition. (SOFs 88-93).

5. **Southaven policies and procedures caused Mr. Goode to be deprived of his federally protected rights.**

Municipal liability under §1983 requires plaintiffs to show "(1) an official policy (2) promulgated by the municipal policymaker (3) [that] was the moving force behind the violation of a constitutional right." Peterson v. City of Fort Worth, 588 F.3d 838, 847 (5th Cir. 2009). A policy is official if "it results from the decision or acquiescence of the municipal officer or body with 'final policymaking authority' over the subject matter of the offending policy." Id. (quoting Jett v. Dallas Ind. Sch. Dist., 491 U.S. 701, 737, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989)).

As Defendant City of Southaven has repeatedly admitted, the Southaven personnel involved in Troy's arrest, restraint, transport to the hospital, and continued restraint at the hospital all acted pursuant to Southaven policies. Southaven has a policy permitting the use of the prone hogtie restraint on an intoxicated, agitated suspect. (SOF 44, 47). Southaven policies allow officers and paramedics to maintain that restraint during EMS transport. (SOF 68). Southaven policies allow EMS personnel to ignore standard operating procedures which forbid transport in prone restraint and hogtied restraint positions. *Id.*

No Southaven employees or personnel were disciplined in any way for their actions toward Troy Goode. Instead, as Southaven readily admits, all actions of the individual Southaven defendants were in conformity with Southaven's official policies. (SOF 135). By following these policies, the Southaven defendants deprived Troy of his constitutionally protected rights. Far from a case of mere *respondeat superior* liability, the evidence in this case shows that Southaven policies and Southaven employees' adherence to those policies caused Troy's death.

6. **Southaven police officer and EMS training, particularly that of Officers Baggett and Scallorn and Paramedic Graham was inadequate and in effect dangerous.**

The City of Southaven trains its officers and paramedics to follow Southaven policies, even when those policies conflict with Mississippi State police training and state training applicable to EMS personnel. The City of Southaven permits officers to hogtie arrestees. (SOF 44). Southaven was further aware that the hogtie restraint could cause a fatal positional asphyxia. (SOF 45). Despite knowledge that this technique was being used and knowledge that it could be fatal, Southaven chose not to train officers on how to properly apply a hogtie restraint, how to prevent injury from that restraint, the danger to

intoxicated individuals from that restraint, the danger to individuals with respiratory disorders from that restraint, or the dangers of positional asphyxia caused by that restraint. (SOF 46-47).

The deficiencies in Southaven's training are apparent when observing training procedures from the State of Mississippi and the State of Arkansas. As described above, the State of Mississippi training materials on use of force caution that an individual who remains prone "**will suffocate themselves**" if not removed from that prone position. (SOF 35). The State of Mississippi warns that, "**Officers must get the suspect up to at least a 'seated' position as soon as possible.**" (SOF 34). Similarly, the State of Arkansas warns against using the "troublesome position" of the hog-tie and specifically warns that there is to be no transportation of the subject in hog-tie position. (SOF 38-41). The reason for this warning is the fear of positional asphyxia. Similarly, police departments throughout the United States prohibit hog-tying altogether and train officers not to use such a restraint position. (SOF 42-43).

Police officers in Southaven received no such training. Officers are not trained that intoxicated individuals should not be hogtied or held prone. (SOF 47). In fact, City of Southaven Police Chief William Thomas Long testified that hogtying Troy in a prone position for an extended period of time was in accordance with the training protocol in place in Southaven (SOF 136). This "confession" by the Police Chief tainted the actions of all officers involved in the arrest, detention and transportation of Troy.

Southaven's training for EMS personnel is equally troublesome. Southaven has promulgated standard operating procedures for EMS personnel that describe the appropriate treatment to be provided to patients. (SOFs 65-66). Rather than training EMS personnel that

they must follow these procedures, Southaven trains its employees that they may disregard procedures if they feel that safety of a person "may be an issue." (SOF 68). Ms. Graham, acting in compliance with the City's training, disregarded the SOPs and maintained Troy in a prone, hogtied position explicitly forbidden by the SOPs. She did not provide sedation indicated by Troy's condition, did not follow the Advanced Cardiac Life Support protocols, did not provide Troy supplemental oxygen, and did not provide the treatment in compliance with the SOPs indicated by his condition. (SOFs 86-98). As a result of Ms. Graham's compliance with her training by the City of Southaven, when he reached the hospital Troy's heart rate was dangerously high and his oxygen saturation was 90%, indicating he had developed moderate hypoxia. (SOF 105-107). After one and a half hours in the hogtie position, Troy succumbed to his abuse, suffered a cardiopulmonary arrest, and died.

## CONCLUSION

The City of Southaven Police and EMS engaged in conduct which was known to carry a risk of death and which caused Troy's long, painful demise. A 30 year old accomplished chemical engineer, husband and father is dead due to the willful actions of the City of Southaven. Plaintiff requests that the Court hold:

1) When a subject is known to be of diminished capacity that the hog-tie restraint is a constitutional violation *per se*; and/or

2) Under the facts of this case, ordering a canine to bite Troy Goode, hogtying Troy when he had a known diminished capacity and keeping him prone, maintaining that prone hogtie during EMS transport, and maintaining that prone hogtie throughout his

arrest for a period in excess of one and one-half hours constituted excessive force in violation of Mr. Goode's Fourth Amendment Rights;

3) Southaven EMS used excessive force in transporting Troy hog-tied and prone;

4) Southaven EMS personnel acted with deliberate indifference to Troy's known medical issues and failed to provide treatment for those medical issues;

5) Defendant City of Southaven's policies and procedures caused Troy to be deprived of his federally protected rights; and,

6) Defendant City of Southaven failed to properly train Police and EMS personnel.

RESPECTFULLY SUBMITTED

/s/ Kevin McCormack
Tim Edwards, (TN BPR# 5353) *by PHV*
Kevin M. McCormack, (TN BPR# 29295) *by PHV*
Ballin, Ballin & Fishman, P.C.
200 Jefferson Ave., Suite 1250
Memphis, TN 38103
Office (901) 525-6278
Fax (901) 525-6294
tedwards@bbfpc.com
kmccormack@bbfpc.com

/s/ Hiram C. Eastland, III
Hiram C. Eastland, III (MSBN 101560)
James F. Garrett (MSBN 4759)
Eastland & Garrett, PLLC
103 North Lamar Blvd. Ste. 204
Post Office Box 3059
Oxford, MS 38655
Telephone: (662) 234-0804
Facsimile: (662) 510-0804
he3@eastlandgarrett.com
jfg@eastlandandgarrett.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I, the undersigned attorney for Plaintiff, Kelli Goode, hereby certify that a true and correct copy of the foregoing has been sent through the electronic case filing system to the following individual(s):

Mitchell, McNutt & Sams, P.A.
L. Bradley Dillard, Esq.
P.O. Box 7120
Tupelo, MS 38802-7120
bdillard@mitchellmcnutt.com

Mitchell, McNutt & Sams, P.A.
Berkley N. Huskison, Esq.
P.O. Box 1366
Columbus, MS 39703-1366
bhuskison@mitchellmcnutt.com; Fhankins@mitchellmcnutt.com

Kerby Law Firm, LLC
Katherine S. Kerby, Esq.
P.O. Box 551
Columbus, MS 39703
ksearcyk@bellsouth.net
*Attorneys for Defendants City of Southaven,*
*Todd Baggett, Jeremy Bond, Tyler Price, Joel Rich, Jason Scallorn, Stacie J. Graham, Mike*
*Mueller, William Painter, Jr., Bruce K. Sebring, Joseph Spence and Richard A. Weatherford*

Upchurch & Upchurch, P.A.
John M. McIntosh, Esq.
David W. Upchurch, Esq.
P.O. Drawer 2529
Tupelo, MS 38803-2529
jmcintosh@upchurchpa.com
dupchurch@upchurchpa.com
*Attorneys for Defendant Baptist Memorial Hospital-Desoto, Inc.*

Rainey Kizer Reviere & Bell
Marty R. Phillips, Esq.
105 S. Highland Ave.
P.O. Box 1147
Jackson, TN 38302-1147

34

mphillips@raineykizer.com

Rainey Kizer Reviere & Bell
Amanda C. Waddell, Esq.
50 N. Front St., Suite 610
Memphis, TN 38103
awaddell@raineykizer.com

Gass, Weber, Mullins, LLC
James R. Gass, Esq.
241 N. Broadway, Suite 300
Milwaukee, WI 53202
gass@gwmlaw.com
*Attorneys for Defendant Lemuel Donja Oliver, M.D.*

Wise Carter Child & Caraway, P.A.
Charles E. Cowan, Esq.
Michael B. Wallace, Esq.
P.O. Box 651
Jackson, MS 39205-0651
cec@wisecarter.com
mbw@wisecarter.com
*Attorneys for Defendant Baptist Memorial Hospital-Desoto, Inc.*
*and Defendant Lemuel Donja Oliver, M.D.*

Dated this the 20th day of March 2019.

/s/ Kevin McCormack
KEVIN MCCORMACK

35