UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

**KELLI DENISE GOODE, Individually,**                                        PLAINTIFF
**and also as the Personal Representative**
**of Troy Charlton Goode, Deceased, and**
**as Mother, Natural Guardian, and Next**
**Friend of R.G., a Minor, and also on**
**behalf of all similarly situated persons**

**V.**                                                          **NO. 3:17-CV-60-MPM-RP**

**THE CITY OF SOUTHAVEN, et al.**                              **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Before the Court are the renewed motions for summary judgment of Lemuel Oliver, M.D.,

Doc. #645; the City of Southaven, Doc. #636; Todd Baggett, Jeremy Bond, Stacie J. Graham,

Mike Mueller, William Painter, Jr., Tyler Price, Joel Rich, Jason Scallorn, Bruce K. Sebring,

Joseph Spence, and Richard A. Weatherford, Doc. #637; and Baptist Memorial Hospital-Desoto

("BMH-D"), Doc. #640; and a renewed motion for partial summary judgment of Kelli Goode,

Doc. #643.

## I.    Factual Background

### a.   Troy's Arrival and Departure from the Concert Venue

On July 18, 2015, Troy Goode—a 30-year-old male standing approximately six feet tall

and weighing between one hundred fifty and one hundred seventy pounds[1]—and his wife Kelli

Goode traveled from the Memphis, Tennessee area to attend a musical concert at the Snowden

Grove amphitheater in Southaven, Mississippi; the group performing is known as Widespread

---

[1] Although the autopsy conducted by Deputy Chief Mississippi Medical Examiner Erin Barnhart lists Troy's weight as one hundred seventy pounds, Doc. #636-28 at 2, Kelli claims that Troy weighed a mere one hundred fifty pounds and was often likened to a "bean pole." Doc. #107 at 14.

Panic. Doc. #636-28 at 1; Doc. #643-1 at 10–12. Troy smoked marijuana before leaving Memphis. Doc. #643-1 at 21. The couple arrived in Southaven between 4:00 and 4:30 p.m. where Troy consumed lysergic acid diethylamide—commonly known as LSD. *Id*. at 11–13, 19–20.

Kelli testified that around 7:15 p.m.—fifteen minutes before the show—Troy became overtaken with anxiety, and they decided to return home. *Id*. at 13–15. As Kelli drove away from Snowden Grove, Troy exited the vehicle and walked to a grassy area between Goodman Road[2] and a shopping center. *Id*. at 17. According to Kelli, Troy was pacing around the grassy area, waving and wringing his hands, and loudly exclaiming "I don't know what to do." *Id*. at 18. Kelli recalls that as she was comforting Troy, "several police cars and SUVs swarmed the scene." *Id*. at 23. Kelli testified that Troy put his hands up as soon as the police arrived and said "I'll go" to the first officer he saw. *Id*.

### b. Initial Police Interaction and Deployment of Canine and Taser

Todd Baggett was dispatched to 3451 Goodman Road at 7:46 p.m. regarding "a disturbance in the parking lot" that was characterized as a domestic dispute. Doc. #636-4 at 25; Doc. #636-3 at 68. He was the first officer to arrive on the scene and, according to his report, Troy approached him—and Baggett asked if he was alright. Troy then "began running around in the parking lot [and] yelling and talking to himself." Doc. #636-4 at 25. The report indicates Baggett spoke to Kelli, who advised him that "Troy was not himself and had dropped 3 to 5 hits of LSD." *Id*. Kelli's testimony reflects she spoke to a Southaven police officer and related that Troy had taken LSD and was having an anxiety attack. Doc. #643-1 at 23.

A minute or two after Baggett's arrival, Southaven Police Officer Jason Scallorn arrived with his canine partner to provide back-up; he had been advised by a dispatcher that Troy "was

---

[2] Kelli testified that the traffic on Goodman Road was "light" at the time, but witness statements suggest that there was "heavy traffic" on Goodman Road. Doc. #643-1 at 29; Doc. #636-2 at 6.

acting erratic and under the influence of narcotics, possibly LSD." Doc. #636-3 at 68. Baggett testified that, when Scallorn arrived, Troy was running in circles and mumbling incoherently, Doc. #636-4 at 39–41, while Scallorn testified that Troy did not comply with his order to get on the ground and instead began to run, Doc. #636-3 at 30, 99, 118–120.

It is uncontested that Troy released the canine from its compartment in Scallorn's vehicle, but the parties dispute the way in which it happened. Doc. #636-4 at 25; Doc. #636-3 at 69; Doc. #643-1 at 24. Kelli testified that she did not witness the entire encounter between Troy and the canine and was not watching closely when Southaven police attempted to restrain Troy. *See* Doc. #643-1 at 184. Yet according to Kelli, while Troy was attempting to surrender, Scallorn purposefully unlocked the back door—behind which the canine compartment was located— thereby allowing Troy to open the compartment and release the dog. Doc. #644 at 5; Doc. #643-6 at 148–49. However, Kelli also stated that Troy, when he was told to "get down," opened the door to Scallorn's vehicle where the canine was located. Doc. #643-1 at 182–83. An independent witness related seeing Troy "immediately turn[] toward [Scallorn's] vehicle and aggressively walked to the rear passenger door" where the canine compartment was. Doc. #636-2 at 4.

It is undisputed[3] that Scallorn instructed the canine to bite Troy. Troy may have also punched the canine after it attacked him, Doc. #636-4 at 26; Doc. #636-3 at 69; Doc. #643-1 at 24, though Kelli disputes that Troy punched or otherwise touched the canine. Doc. #643-1 at 24, 183– 85. Independent witnesses describe Southaven police initially separating the canine from Troy after he opened the car door, placing the canine back into its compartment, and "trying to calm [Troy] down because he was very aggressive;" the witnesses testified that thereafter, however,

---

[3] Kelli submits that "[t]he Southaven Defendants falsely and in violation of Rule 36 denied a Request for Admission stating that a Southaven police officer ordered the canine to attack. *See* Southaven Response to Plaintiff's Second Requests for Admission … Scallorn later admitted this denial was false." Doc. #661 at 4.

Troy began running and the canine was released with instructions to apprehend Troy—which is when the canine's bite and Troy's alleged punch transpired. Doc. #636-2 at 4, 8.

Scallorn testified that Troy ran toward traffic on Goodman Road after striking the canine,[4] forcing him to deploy his Taser against Troy. Doc. #636-3 at 69. Scallorn testified that the Taser's circuit did not complete—and Troy was not shocked—because one of its probes missed him. *Id.* This account is supported by Baggett's report, Doc. #636-4 at 26; however, Kelli testified "they tased Troy in the back," Doc. #643-1 at 24–25. According to Scallorn and Baggett though, Troy tripped on the Taser wire after the probe missed. Doc #636-3 at 103–05; Doc. #636-4 at 105–09.

Regardless of whether the Taser's circuit completed, or Troy merely tripped on its wires, Troy fell to the ground and was subdued by Southaven police officers, who held Troy down, handcuffed him, and called for an ambulance. Among these officers were Joel Rich and Tyler Price, who both arrived as Troy was tussling with the canine but before Scallorn deployed the Taser, Doc. #636-5 at 21, and Jeremy Bond, who arrived after Scallorn deployed the Taser and Troy was on the ground, Doc. #636-7 at 2.

### c. Use of a Four-Point Restraint on Troy

Baggett, Price, Rich, and Scallorn testified that Troy continued to resist after he fell by screaming, kicking, spitting, and rolling on the ground before he was handcuffed; Baggett claimed Troy "wore out" several officers. Doc #636-3 at 31–33; Doc. #636-4 at 4; Doc. #636-5 at 3–15; Doc. #657-8 at 49. Price, who applied pressure to Troy's back, testified that when Troy would relax for brief moments, and the officers would "back off … the amount of force" used, Troy would "ratchet[] back up," which in turn forced the officers "to go back to more pressure." Doc. #657-8 at 49. Moreover, Rich testified that once handcuffed—despite Rich's efforts to calm Troy

---

[4] Kelli disputes this assertion, contending that multiple police vehicles and officers stood between Troy and Goodman Road. Doc. #661 at 5.

down—Troy attempted to break free and Rich took him back down to the ground. Doc. #636-5 at 15–16. However, Kelli contradicts Rich's testimony, contending that Troy was immediately subdued by the police and did not stand up after he was handcuffed. Doc. #643-1 at 26. According to Kelli, Troy was face-down on the ground, with "multiple officers on top of him with their knees on his back …. And the officers shackled him with his hands and feet behind his back, and then they picked him up [by the shackles] like a bale of hay."[5] *Id*.

At approximately 7:54 p.m.,[6] Scallorn retrieved leg shackles from his truck, and Bond applied them to Troy's legs such that they were shackled to his handcuffs with Troy positioned on his stomach—a position known as a four-point restraint, prone maximal restraint, or hog-tie.[7] Doc. #636-3 at 10. At the time he was placed in the four-point restraint, Troy's criminal offenses were disorderly conduct and resisting arrest.[8] Doc. #643-3 at 33–34. At no time was Troy thought to be armed. *See* Doc. #643-3 at 39. Scallorn explained that Troy was placed in a four-point restraint because he "started rolling over … and started kicking and flailing." Doc. #636-3 at 18. Baggett testified that Troy—who was non-compliant, incoherent, and attempting to kick—was placed in a four-point restraint "so he couldn't injure us or the EMS people on the scene." Doc. #636-4 at 3, 112–13. Kelli disputes that Troy was kicking or spinning, denying that he posed any sort of threat to Southaven Police given his positioning. Doc. #643-1 at 25. Kelli also points to the deposition of Southaven Police Chief Tom Long as evidence that Troy did not threaten—or pose a threat to—

---

[5] Baggett denies that he witnessed an unnamed officer place his knee on Troy's back. Doc. #636-4 at 10.

[6] In previous summary judgment briefing, the parties did not dispute that Troy was handcuffed in a four-point restraint around this time. *See* Doc. #464 at 5. To provide a clear timeline of what occurred that day, the Court will make use of this previously undisputed fact.

[7] The parties have used an array of terms to refer to this restraint and have quibbled about whether Troy was technically "hog-tied." *See* Doc. #643-4 at 14–16 (stating that a hog-tie involves two sets of handcuffs while a four-point restraint involves one set of handcuffs and one set of leg shackles). To avoid inflammatory language and terminological disputes, but without detracting from the seriousness of the allegations, the Court will refer to the way Troy was held as a four-point restraint.

[8] Kelli disputes that Troy committed a crime prior to being placed in a four-point restraint. *See* Doc. #644 at 19.

any Southaven personnel, and notes that Troy did not injure any Southaven employees or damage any Southaven property. Doc. #661 at 6–7.

Baggett testified that Troy had use of one of his legs once restrained, while a medic testified that he could "move his legs about three or four inches." Doc. #643-3 at 14–17; Doc. #636-8 at 10–11. Kelli suggests Troy could move his leg around eight inches. Doc. #661 at 6; Doc. #643-10 at 4–5. When asked why Troy was not turned over from his stomach to his side, Baggett replied that Troy was turned on his side "one time," and that Troy would have been on his side "if he let his foot down." Doc. #636-4 at 3. Baggett also testified that, to prevent Troy from kicking first responders, he was not shackled in the front or otherwise kept in a supine position. *Id*. at 13.

### d.  EMT'S and Firefighters Arrive on Scene

Southaven EMS were dispatched at 7:55 p.m. and arrived on the scene at 8:01 p.m.—the fire truck, Engine 4, arrived shortly before the ambulance, Unit 4. Doc. #636-9 at 26, 28, 33. Firefighter and Medic Richard Weatherford, who arrived on Engine 4 and performed an initial assessment of Troy, testified that he perceived Troy to be a threat, and that his attempts to examine the restrained Troy failed due to his kicking, spitting, and screaming profanities. Doc. #636-8 at 3–7. Kelli disputes Weatherford's assertion, claiming Troy had minimal use of his legs because of the restraints and, therefore, posed no threat to those on scene. Doc. #661 at 6–7.

Weatherford claims that as he tried to examine him, Troy stated "I'm going to kill you motherfuckers, get me out of these fucking handcuffs." Doc. #636-8 at 9. Furthermore, Paramedic Stacie Graham—who arrived soon after Weatherford in Unit 4—testified that she had never encountered anyone as violent or hostile as Troy in her thirteen-year career, and that she was "scared that if he got free, that he was going to harm somebody and kill somebody because of his condition." Doc. #636-9 at 22, 17–18, 22–23. Kelli disputes that Troy threatened Weatherford or

6

Graham because Baggett—who was standing nearby—denied that Troy threatened anyone in his presence. Doc. #661 at 7; Doc. #643-3 at 162.

A restrained-Troy was placed on a stretcher and loaded into the back of the ambulance by Southaven police and firefighters, including Weatherford, Carl Painter and Bruce Sebring,[9] for transit to BMH-D. Doc. #636-8; #636-15; Doc. #636-16. It is undisputed that after Troy was restrained but before the ambulance departed for BMH-D, Kelli informed Baggett and Graham that Troy was asthmatic and handed Troy's inhaler to Baggett. Doc. #643-3 at 24–25, 117; Doc. #643-1 at 27, 190–91. Graham testified that Baggett never gave her the inhaler, but she carried Albuterol, an inhaler, in the ambulance for those experiencing breathing problems. Doc. #643-22 at 57, 69–70. Graham did not administer any Albuterol to Troy. *Id*. at 57.

David McLaughlin, an attorney licensed in Arkansas and Tennessee with experience in positional asphyxia cases, was present on Goodman Road as Troy was being loaded into the ambulance. Doc. #643-23 at 1–2. McLaughlin believed Troy was suffocating; according to his declaration, McLaughlin warned Southaven Fire Department Lieutenant Mike Mueller that "y'all are going to kill him," but Mueller merely replied, "that the situation was not dangerous because Troy was with a paramedic."[10] *Id*. at 2.

### e. Troy's Transport to BMH-D

The ambulance departed from Goodman Road at approximately 8:15 p.m. with Troy and headed to Baptist Memorial Hospital–Desoto ("BMH-D"). Doc. #636-9 at 28. According to

---

[9] Both Painter and Sebring arrived as part of Fire Engine 4 and witnessed Troy in a four-point restraint. Doc. #636-15; Doc. #636-16. The extent of their involvement was assisting with the loading of Troy's stretcher into the ambulance; Weatherford also claims Sebring held Troy's feet and hands at some point so that he would not kick Weatherford and was present in the back of the ambulance during Troy's transport. Doc. #636-8 at 6, 16.

[10] Mueller, Fire Engine 4's lead firefighter who is not an EMT, witnessed Troy in a four-point restraint. Doc. #636-13; Doc. #643-12 at 4. Mueller does not deny speaking to McLaughlin, who he believes had only captured part of Troy's interaction with police, advising he "was just trying to do dama[]ge control for the police because of all the thing[s] that have been happening on TV lately." Doc. #636-14. Mueller did not travel to BMH-D and briefly conversed with Kelli on Goodman Road. *Id*.

Weatherford's statement, an unnamed Southaven Police lieutenant "arrived on scene and said that he was concerned about [Troy's] safety in the back of the patrol car and wanted us to take him [in the ambulance]." Doc. #636-8 at 16. Weatherford requested, pursuant to standard operating procedures, that two officers ride in the ambulance with Troy so that his handcuffs could be removed for medical treatment—so Baggett and Rich rode along. Doc. #636-8 at 56; 643-3 at 18, 129–130. Weatherford, however, did not ride in the ambulance. Doc. #636-8 at 16. In the ambulance, which was driven by Stewart Spence,[11] Troy was further secured with five additional straps on the stretcher,[12] which allowed paramedics to place leads for a cardiac monitor. Doc. #636-9 at 19. Painter rode in the back of the ambulance and "observed [Troy] … still conscious, singing and uttering obscenities." Doc. #422-16. Weatherford and Graham attempted to measure Troy's vital signs and blood pressure and take an EKG reading. Doc. #636-9. Graham was able to obtain IV access and measure vital signs but could not obtain a saturation rate and could only obtain a three-lead EKG.[13] *Id.*

Troy was transported to BMH-D without any lights or sirens on the ambulance. Graham explained that "his vital signs and everything was stable. He did not appear in any stress. His skin color was good and pink. No airway compromise was there. It was open airway and not struggling." Doc. #636-9 at 6–7. Graham also testified that, given the police escort in the ambulance, she was standing beside Troy and able to watch—and assess—his every movement.

---

[11] Spence arrived as a member of Fire Engine 4 and witnessed Troy in a four-point restraint. Doc. #636-12.

[12] Weatherford's statement states that he helped secure Troy with shoulder, torso, and leg straps before he was loaded into the ambulance. Doc. #636-8 at 16. It appears this strap is what Kelli refers to as "the five straps." *See* Doc. #657-14 at 43. Spence also states that "[w]e secured patient with 5 straps with rails up and loaded him into unit 4." Doc. #636-12.

[13] Kelli questions Graham's inability to obtain oxygen saturation via pulse oximeter, given that she was able to obtain IV access and a three lead EKG—which are more difficult to obtain than oxygen saturation from a finger clip. Doc. #661 at 8. According to Kelli, Weatherford obtained Troy's oxygen saturation rate, but it was not recorded. *Id.* Kelli asserts that the failure to record Troy's blood oxygen saturation was a violation of Mississippi EMS protocols. Doc. #644 at 11. Weatherford testified that it was Graham's responsibility, as head of the unit, to record the reading. Doc. #642-12 at 62.

*Id.* at 7. However, Graham related that based on her measurements of his heartrate, Troy was tachycardic. Doc. #636-9 at 6–7. Graham's initial reading of Troy's pulse rate was 164 beats per minute; by the time he arrived at the hospital, his pulse rate had risen to 186 beats per minute. *Id.* at 12. The Mayo Clinic states that a normal adult heartrate is a maximum of 100 beats per minute. https://www.mayoclinic.org/healthy-lifestyle/fitness/expert-answers/heart-rate/faq-20057979 (last visited, April 29, 2019).

Weatherford and Graham acknowledge that transporting Troy prone violated the Standard Operating Procedures for Mississippi EMS, but testified that, given the circumstances and Troy's conduct, they had to prioritize their own safety above his. Doc. #636-8 at 3–4; Doc. #636-9 at 8. Graham testified she felt that it was appropriate and important for the safety of all those involved for Troy to remain in four-point restraints. Doc. #636-9 at 18. Despite the availability of chemical restraints and sedatives in the ambulance, Graham testified that she did not administer either to Troy. Doc. #643-22 at 15–16.

### f. Troy's Arrival at BMH-D and Triage in the Decontamination Room

Troy arrived at BMH-D at 8:28 p.m., was triaged at 8:42 p.m., and placed in a room at 8:49 p.m. Doc. #645-20 at 7. Baggett, one of several police officers present,[14] testified that Troy was "yelling, screaming, kicking … the whole time we were at the hospital up until about the last ten minutes or so." Doc. #643-3 at 118. Kelli disputes that Troy was uncontrollable on arrival at BMH-D, asserting that a "video shows Defendants milling around, apparently unconcerned, and shows

---

[14] BMH-D security guard Kendrick Deberry testified that several Southaven police officers were present. Doc. #653-6 at 70–71. While Baggett remained with Troy in the emergency room, Bond—who had followed the ambulance in his patrol car—drove Rich back to Goodman Road to retrieve Baggett's patrol car once Troy "was secure." Doc. #636-5 at 23; Doc. #636-7 at 5. Rich then drove Baggett's car to BMH-D and went to Room 9 to give Baggett his keys. Doc. #636-5 at 23. Bond then drove Rich back to Goodman Road to retrieve Rich's patrol car, which is when Rich learned Troy had died. *Id.*

Troy lying motionless, hogtied prone, and strapped tightly to the stretcher with 5 nylon straps." Doc. #661 at 8.

BMH-D charts indicate that Troy was diagnosed with a dog bite on his left arm. Doc. #643-29. A nurse recorded Troy's blood oxygen level at ninety percent. Doc. #643-19 at 4; Doc #643-29 at 2. Kelli asserts that a blood oxygen level of ninety indicates moderate hypoxia, Doc. #654 at 5, and requires that a patient be given supplemental oxygen, *Id*. Kelli notes that neither supplemental oxygen nor cardiac monitoring were ordered. *Id.*

Troy was initially triaged in the decontamination room before being placed in Emergency Room 9, at which time "care transition[ed] from the [Southaven] EMTs to the [BMH-D] ER department."[15] Doc. #636-19 at 6. Registered Nurse Jeffrey Baker triaged Troy and decided to place him in the decontamination room before Troy was roomed, as the "hallway was full of people" and the hospital was experiencing "a surge of six to eight ambulances." Doc. #640-11 at 11. Baker, whose notes reflect that Troy had consumed LSD, testified he could hear Troy from inside as he was being unloaded from the ambulance, and that Troy's screaming and cursing was upsetting other patients—so much so that Baker "had to speak to a mother with small children and apologize for the cursing she heard on the other side of the unit." Doc. #643-29 at 10; Doc. #640-11 at 5. Baker testified he observed Troy thrusting his pelvis, moving side-to-side, and shouting, "I am God," "I will fuck you," and "I will kill you" repeatedly. *Id.*

Kelli disputes Baker's testimony on Troy's conduct at BMH-D, countering that Troy was not upsetting other patients, but rather screaming for help. Kelli supports her version with the testimony of Janet Tharpe, who witnessed Troy when he was moved from the decontamination room to Room 9. According to Tharpe, Troy—whose face was bright red and whose eyes were

---

[15] Spence and Graham assisted in transporting Troy to the decontamination room for triage and then to Emergency Room 9, "where [they], with help from nursing staff, placed patient on bed." Doc. #636-9 at 33; Doc. #636-12.

bulging out of his head—was moaning loudly in distress, shouting "breathe," and "appeared unable to move." Doc. #643-27.

Baker, whose notes relate that Troy's airway, breathing, and circulation were within defined limits in the decontamination room, testified that Troy was not in danger because "he was not having any trouble breathing."[16] Doc. #645-12 at 15, 17. Kelli, citing to McLaughlin's declaration, disputes the assertion that Troy was stable, asserting instead that Troy repeatedly arched his back to raise his chest off the stretcher to relieve pressure, and appeared to be convulsing, struggling to breathe, and in distress. Doc. #644 at 11; Doc. #643-23 at 1. Moreover, Baker testified that he was unable to conduct an "accurate … EKG on an ambulance cot with this man upside down kicking and thrashing."[17] Doc. #645-12 at 15. Baker also testified that he could not turn Troy on his side in the decontamination room because Troy "would have toppled out of the stretcher and … busted his head", but that he could have been positioned on his side in a treatment room.[18] Id. Baker testified that he did not ask Southaven police to remove or alter Troy's restraint until after the "code blue" at 9:22 p.m., when he discovered Troy "pulseless and breathless," because he assumed the restraints would be changed when Troy was placed in Emergency Room 9. Id. at 18. Although the City of Southaven claims that BMH-D nurses requested that Troy remain in the four-point restraint, Doc. #437-27, its nurses deny the City of Southaven's claim, Doc. #645-12 at 4; Doc. #645-13 at 4.

---

[16] Kelli disputes this characterization, citing to her experts' testimony that Troy was experiencing tachycardia and required lifesaving treatment. Doc. #661 at 10.

[17] Kelli disputes that Troy was combative, pointing to the video of Troy's arrival in the emergency room, Doc. #643-24, and Janet Tharpe's testimony, Doc. #643-27.

[18] Kelli disputes this fact, asserting that Troy was bound so tightly that he could not thrash around. See Doc. #644 at 14; Doc. #643-27.

### g. Troy's Treatment in the Emergency Room

Registered Nurse Paul Flock and Dr. Lemuel Oliver, a physician practicing in the BMH-D emergency room as an independent contractor under the auspices of Southeastern Emergency Physicians, attended to Troy in Emergency Room 9. Doc. #645-20 at 4–5; Doc. #645-13 at 13.[19] Flock's notes relate that Troy, who remained in a four-point restraint, was in police custody and under police supervision. Doc. #643-29 at 24. At 9:01 p.m., Flock described Troy as "angry; agitated; combative (aggressive); uncooperative" and "completely disoriented and violent." *Id*. Flock's notes relate that Troy exhibited a Mindful Awareness Assessment Score (MAAS) of 6 (dangerously agitated and uncooperative) and displayed severe confusion with an illogical, repetitive, rapid, and excessively loud speech pattern. *Id*. Flock's notes indicate that Troy was not in respiratory distress as his airway, breathing, and circulation were within defined limits. *Id*. Kelli disputes that Troy was combative, aggressive, or violent; rather, Kelli asserts Troy was in respiratory distress, had difficulty breathing, was experiencing tachycardia, and was bound so tightly that he could not thrash around. Kelli also contends that, under the Emergency Severity Index (ESI),[20] Troy's vital signs for heart rate and blood oxygen saturation were in the "danger zone" and consequently Adult Advanced Cardiovascular Life Support (ACLS) protocol[21] should have been—but was not—implemented. Doc. #654 at 8.

Oliver examined Troy for the first and only time at around 9:00 p.m. in Room 9. Doc. #645-30 at 7–8. Oliver testified that the first thing he did was try to "talk [and] calm [Troy] down. He was out of control, screaming loudly." *Id*. at 8. Oliver stated that Troy failed to acknowledge his presence, leading Oliver to determine that Troy was "floridly psychotic" and "too out of control

---

[19] Oliver's deposition incorrectly refers to this entity as Southeast Emergency Physicians. Doc. #645-20 at 4.

[20] The ESI is a five-level emergency department triage algorithm. (AHRQ website: https://www.ahrq.gov/).

[21] Adult Advanced Cardiovascular Life Support guidelines promulgated by the American Heart Association. Doc. #653-9.

to get a good exam." *Id*.; Doc. #643-29 at 2–3. According to Oliver, Troy repeatedly exclaimed "I don't know how to explode." Doc. #643-29 at 4. Oliver testified that Troy was restrained in handcuffs, "with his wrists behind his back, and his feet … shackled." Doc. #645-20 at 16. Dr Oliver testified that the term "hogtie" is not part of "medical training or terminology," and he had never seen a patient shackled in a four-point restraint—in fact, Oliver testified that he had only seen persons restrained in such a matter from "[i]mages on the Internet and TV." *Id*.

Oliver testified that he never instructed Southaven police to maintain Troy in a four-point restraint, stating that "the decision to leave him in [four-point] restraints … rests with the police." *Id*. Flock could not recall if he asked Baggett to remove Troy's physical restraints but testified that Troy posed a threat to himself and others given that he was thrashing "out of control" and "screaming expletives" as Flock treated him. Doc #645-13 at 13–14. Kelli disputes that Troy was out of control, asserting that Troy was bound so tightly that he could not thrash around; as such, Kelli asserts that Troy was not a threat and should have been placed supine in hospital restraints. Flock and Baker testified that no BMH-D personnel requested that Troy remain in a four-point restraint. Doc. #645-13 at 4; 645-12 at 4.

Baggett remained in Room 9 while Oliver treated Troy. Doc. #645-11 at 33. Baggett testified that Oliver "tried to talk to Troy" but that Troy "wouldn't acknowledge him and [acted] like nobody was even in the room." *Id*. According to Baggett, Troy "was still yelling and screaming and kicking his feet" when Oliver attempted to examine him. *Id*. Baggett testified that he did not speak with, or even pay attention to, Oliver. *Id*.

Oliver determined Troy was tachycardic and required sedation, so he ordered Flock to administer Ativan[22] and Haldol[23] at 9:06 p.m., which Flock did at 9:08 p.m. Doc. #645-20 at 8, 11, 19; Doc. #443-29 at 14; Doc. #645-13 at 14. Oliver testified that he initially ordered the nurses to inject the Ativan and Haldol, but "reversed [his order] at the request of the nurses who seemed to be somewhat afraid to approach [Troy] with the needle" as Troy was "combative and out of control and thrashing around." Doc. #645-20 at 19. The Ativan and Haldol were administered by IV. *Id*. Upon stepping out of Troy's room, Oliver also ordered a Complete Blood Count, a Comprehensive Metabolic Panel, a Urine Analysis, Drug Screen urine panel, and alcohol blood test. Doc. #645-20 at 21; Doc. #643-29 at 14–17. Kelli contends that Oliver's "original orders were for intramuscular injection, rather than the off-label and potentially dangerous intravenous injections ultimately ordered." Doc. #661 at 12. Oliver testified that he intended to return to Room 9 and perform "a more complete exam once [Troy] was calm." Doc. #645-20 at 8.

Baggett testified that after Flock administered the IV fluids to Troy—which included Ativan and Haldol—Flock "said he would be back in about ten minutes [when] it takes effect" and departed with other medical personnel, leaving Baggett alone with Troy—who remained in police custody—although Baggett was not a medically trained observer. Doc. #636-4 at 17. Kelli submits that failing to monitor a patient after the administration of chemical restraints through one-on-one observation by a trained medical professional violates Centers for Medicare and Medicaid Services regulation 42 CFR 482.13(e)—which applies to hospitals receiving federal funds. *See* Doc. #654 at 17–18.

---

[22] "Ativan (lorazepam) is in a group of drugs called benzodiazepines." *Cruz v. Colvin*, No. EP-12-CV-00179-ATB, 2013 WL 3338591, at *7 (W.D. Tex. July 1, 2013). Benzodiazepines are a "class of compounds with antianxiety, hypnotic, anticonvulsant, and skeletal muscle relaxant properties." Stedmans Medical Dictionary 99620.

[23] "Haldol is the trademark name for preparations of haloperidol. Haloperidol is an … agent of the butyrophenone group." *Boothe v. Quarterman*, No. CIV.A. C-06-221, 2007 WL 2908802, at *5 (S.D. Tex. Oct. 5, 2007) (internal quotation marks omitted). Butyrophenone is a neuroleptic, "a class of psychotropic drugs used to treat psychosis, particularly schizophrenia." Stedmans Medical Dictionary 601040.

### h. Troy's Death

Baggett testified he "stood at the back" of Room 9 until he pressed a distress button at 9:22 p.m., when he noticed that Troy had stopped moving his feet—the sound of chains grating together had ceased—and was purple in the face. Doc. #643-3 at 131–133. Baggett testified that he struggled to find medical personnel to come to the immediate assistance of Troy. *Id.* at 134–135. After medical personnel responded, Baggett removed Troy's restraints. Oliver intubated Troy at 9:27 p.m., but Troy was declared dead at 9:44 p.m. Doc. #643-29 at 1, 3. Troy's family was notified of his death about five minutes later. *Id.* at 11. Kelli submits that Troy was held in a prone, four-point restraint for at least ninety minutes.

BMH-D's risk assessment states Troy died from "[c]ardiopulmonary arrest." Doc. #643-30 at 2. Mississippi Deputy Chief Medical Examiner Dr. Eric Barnhart determined Troy died from "complications of LSD toxicity." Doc. #640-13 at 4. Dr. Barnhart testified that her determination was "rather broad [and] intended … to mean that the ingestion of LSD was the precipitating factor that led to the series of events ending in his death." Doc. #645-15 at 6. Dr. Barnhart was unaware of cases where LSD toxicity caused death in either her practice or in the medical literature and admitted that Troy's restraint was among the "complications of LSD." *Id.* at 6, 16. Kelli disputes that LSD can cause death generally and that it killed Troy specifically. Doc. #654 at 23–24. According to Kelli, Troy died from suffering cardiac arrest that was caused by the use of the four-point restraint. *Id.* Defense expert Dr. Gary Vilke, however, contends that excited delirium "directly led to [Troy's] death." Doc. #667-3 at 1.

### i. Applicable Policies and Relevant Standards

*Police Subject Control* by Ron L. Crew is a training manual used in The State of Mississippi Department of Public Safety Law Enforcement Training Academy.[24] *See* Doc. #643-5 at 1–12. The manual instructs that police can legitimately use force for the purposes of defense or control, factoring in the severity of the crime—which influences in the determination of the reasonableness of force, as the government's interest in control and capture increases with a crime's severity. *Id*. at 59. The purpose of defense considers the risk a suspect poses to officers or others, while the purpose of control is implicated where a suspect resists arrest or attempts to flee. *Id*. The manual states that Mississippi police departments "should ensure its officers are properly trained in the use of [restraint] devises." *Id*. at 63. The manual cautions officers on the risk of position asphyxia posed by handcuff restraints: "When a violator has been arrested, and handcuffed in a face-down position, Officers must get the suspect up to at least a 'seated' position as soon as possible. People who remain on their stomachs for varying periods of time will suffocate themselves due to their own body weight." *Id*. at 119.

Kelli submits that the City of Southaven has a policy allowing its officers to utilize four-point restraints and that Southaven police chief William Long acknowledged such a policy exists. Doc. #663 at 2–3.[25] Long testified that beginning in the early 1990s, "back when position asphyxia first came about [and officers] first began to hear of that term," the city determined to stop restraining suspects with two sets of cuffs and to not leave anyone unattended. Doc. #643-4 at 28–29. Moreover, Long testified that the City of Southaven had been aware since the early nineties

---

[24] The Arkansas Law Enforcement Training protocol, under which Baggett was trained, Doc. #643-3 at 8, describes the four-point, prone restraint as "troublesome," Doc. #643-8 at 7. The Arkansas training materials list drug and alcohol intoxication as predisposing factors for positional asphyxia. *Id*. at 2. The Arkansas materials instruct that restrained suspects should be seated upright and forbids transporting suspects in a "hog-tied" or "face down" position. *Id*. at 7–8.

[25] Kelli also contends that The City of Southaven's mayor, Darren Musselwhite, wrote that Troy "was restrained by a legal 4-point restraint tactic." Doc. #281 at 29 (quotation marks omitted).

that four-point restraints create a risk of position asphyxia. Doc. #643-4 at 15, 28–29. Baggett confirms that Southaven officers were taught that suspects who remain on their stomachs for an extended period could suffocate if they are left unattended. Doc. #643-3 at 15–16. Scallorn testified that Southaven officers were trained that the use of four-point restraints was allowed to "gain control" of a suspect. Doc. #643-6 at 60–61. Nevertheless, Southaven denied that its officers were trained that an intoxicated individual should not be placed prone or in a four-point restraint. Doc. #643-11 at 2. Kelli also submits that the City of Southaven has policies permitting patients to be transported in a prone position by its EMS personnel,[26] *see* Doc. #661 at 13, and allowing officers to order a canine attack as soon as a suspect fails to comply with verbal commands regardless of threat posed, Doc. #643-4 at 53–54.

The City of Southaven points to no policy that its employees or agents violated in the arrest, restraint, medical treatment, or transportation of Troy. *See* Doc. #643-4 at 13; Doc. #643-11 at 1–2. Moreover, Southaven admitted that its police officers were not trained that they should avoid restraining intoxicated individuals in a prone position. Doc. #643-11 at 2. As for its Fire and EMS personnel, Southaven "admits that fire and EMS personnel are trained that patients should not be restrained in a hogtied position except in situations where the safety of the patient, other bystanders and fire department/EMS personnel may be at issue." *Id.*

Kelli, citing to the testimony of defendants' expert Dr. Michael David LaRochelle, asserts that BMH-D did not adhere to proper medical procedures by failing to place Troy on his back in soft restraints. Doc. #654 at 6, 8–9. Kelli further asserts that BMH-D incorrectly trained its staff

---

[26] Kelli submits that the National Association of EMS Physicians has issued Model EMS guidelines that "forbid transporting a patient in the prone position,and forbid transporting a patient who has been [placed in a four-point restraint]." Doc. #663 at 5. The guidelines Kelli refers to are a Position Paper in which the National Association of EMS Physicians cautions that "[p]atients should never be transported while … hog-tied, or restrained in a prone position with hands and feet behind the back." Doc. #643-15 at 1 (quotation marks omitted).

that the patient monitoring provisions of 42 CFR 482.13(e) do not apply to patients in police custody. Doc. #654 at 8, 19. Kelli claims BMH-D trains its employees to defer to police on the treatment of an in-custody patient, instructing them not to interfere except where police violate BMH-D policy. *Id*.

BMH-D Security Officer Kendrick DeBerry testified that although BMH-D routinely restrains patients, it only uses soft restraints—which BMH-D stocks—such that BMH-D would have violated its own policy had its employees placed Troy in a shackled restraint. Doc. #653-6 at 11, 13, 39–40. DeBerry testified that to the extent BMH-D places violent patients in a four-point restraint, it would do so by using a soft restraint to secure a patient's arms and legs to bed rails, such that the patient rests on his or her back. *Id*. at 38–39.

Kelli asserts that DeBerry failed to adhere to BMH-D policies which require its security officers to: (1) meet with law enforcement officers accompanying a custodial patient to brief them on BMH-D's forensic policy and review orientation materials; (2) remain with law enforcement officers until the inmate patient is properly secured; and (3) obtain a law enforcement officer's signature concerning BMH-D's confidentiality statement and orientation material regarding procedures for inmate forensic patient handling. Doc. #654 at 6–7; Doc. #654-6 at 50–53, 60–62. Although DeBerry conversed with Southaven police during Troy's visit, he testified that he did not ask Southaven police to remove or change Troy's restraints. Doc. #643-25 at 7–8, 11. Nurse Baker testified that he was surprised that Troy "had not [been] shackled … to the bed. That's what the police usually do with people in custody in those circumstances." Doc. #643-19 at 3.

## II.    Procedural Background

On August 15, 2016, Kelli, in the same capacities as that in her original complaint, filed an amended complaint, naming as defendants the City of Southaven, Todd Baggett, Jeremy Bond,

Tyler Price, Joel Rich, Jason Scallorn, Stacie J. Graham, Mike Mueller, William Painter, Jr., Bruce K. Sebring, Joseph Spence, Richard A. Weatherford (collectively the "Southaven Defendants" if including the City of Southaven, otherwise the individuals are referred to by name or collectively as the "individual Southaven defendants"); John Doe's 1-10; Baptist Memorial Hospital-Desoto ("BMH-D"); Southeastern Emergency Physicians, Inc.; and Lemuel Donja Oliver, M.D. *Id.* In her amended complaint, Kelli asserts numerous state and federal claims against the defendants regarding Troy's death.[27] Doc. #107. On May 31, 2018, Southeastern Emergency Physicians, LLC was terminated as a party, Doc. #505.

### III.    Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L. Ed. 2d 202 (1986). At the summary judgment stage, the court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L. Ed. 2d 105 (2000). Once the moving party shows there is no genuine dispute as to any material fact, the nonmoving party "must come forward with specific facts showing a genuine factual issue for trial." *Harris ex rel. Harris v. Pontotoc Cty. Sch. Dist.*, 635 F.3d 685, 690 (5th Cir. 2011). "[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Turner v. Baylor Richardson Med.*

---

[27] Kelli's 66-page amended complaint contains fourteen counts: civil conspiracy (Count I); 42 U.S.C. § 1983 claims (Counts II-VIII); violation of Tennessee Code § 40-32-101 (Count IX); violation of Mississippi Code §§ 11-7-13 and 11-46-9 (Count X); intentional and negligent infliction of emotional distress (Count XI); "outrage" (Count XII); violation of right of interstate travel and hospital visitation (Count XIII); and medical malpractice (Count XIV).

*Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

## IV.    Discussion

### a.  Count I: Civil Conspiracy

Count I alleges that the City of Southaven, the Hospital defendants, the Police defendants, the Fire/EMS defendants, and John Does 1-10 entered a civil conspiracy to deprive Kelli and Troy of their constitutional rights. Doc. #107 at 35–36. Kelli alleges the defendants "entered into an agreement, expressly or by implication, through their participation in or condoning of the use of excessive force … to engage in conduct that was wrongful, intentional, willful, wanton, and designed to violate the civil and constitutional rights" of Troy and Kelli. *Id*. at 35–36. Furthermore, Kelli claims that the "[d]efendants agreed, both explicitly and tacitly, to use unlawful and deadly force against Troy by keeping him prone and hogtied … throughout his arrest, detention, and stay at the hospital." *Id*. at 36.

All defendants move for summary judgment on this count, arguing that Kelli fails to provide evidence of an agreement to violate Troy's rights. The Southaven defendants submit that "[n]o evidence has been produced concerning communications between the Southaven defendants and any other defendant which would be indicative of a conspiracy ….", Doc. #639 at 13, and that "[Kelli] has offered no factual evidence that the Individual Defendants and/or the hospital defendants conspired to take any action that was in violation of Troy's constitutional rights," Doc. #642 at 22. Oliver submits that the record demonstrates evidence of, at most, parallel conduct: "Even if one indulges the strained assumption that leaving [Troy] in a restrained position was the same behavior as placing him in that position, the allegations and evidence simply establish that … Oliver did not undo the conduct of the police, not that they conspired together to hogtie [Troy]."

Doc. #646 at 13. BMH-D submits that there is no proof that its nursing personnel had any contact with the Southaven police until Troy arrived in the Emergency Room. Doc. #641 at 19. As such, BMH-D argues "it would be impossible for BMH-D to conspire to keep [Troy] prone and restrained throughout his arrest and detention when it had no communication or participation or knowledge of his arrest or detention." *Id*. at 20.

In response to BMH-D, Kelli merely notes that "four tests have been enunciated to determine whether a private person may be held liable for a section 1983 conspiracy to deprive one of Constitutional rights" and also adds that "BMH can be held liable for a civil conspiracy to violate Troy's Fourth Amendment rights." Doc. #654 at 19–20. In response to Oliver's motion for summary judgment, Kelli reiterates that a "private person acts 'under color of state law' when he engages in a conspiracy with state officials to deprive another of federal rights" and that "four tests have been enunciated to determine whether a private person may be held liable for a Sec. 1983 conspiracy to deprive one of Constitutional rights." Doc. #656 at 11. In response to the Southaven defendants, Kelli seeks to "avoid repetition [and] incorporates" her responses to Oliver and BMH-D. Doc. #661 at 30; Doc. #663 at 14.

Neither the amended complaint nor the summary judgment briefs specify whether the conspiracy claim is brought under Mississippi or federal law. The Court will construe Kelli's conspiracy claim as arising under Mississippi law because "the only type of conspiracy actionable under [42 U.S.C.]. § 1985(3) is one motivated by racial animus," which is not alleged in the amended complaint. *Deubert v. Gulf Fed. Savings Bank*, 820 F.2d 754, 757 (5th Cir. 1987).

In Mississippi, a civil conspiracy "is a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." *Gallagher Bassett Servs., Inc. v. Jeffcoat*, 887 So. 2d 777, 786 (Miss. 2004) (alterations omitted). "It is elementary that a

conspiracy requires an agreement between co-conspirators." *Id.* "To establish a civil conspiracy, the plaintiff must prove (1) an agreement between two or more persons, (2) to accomplish an unlawful purpose or a lawful purpose unlawfully, (3) an overt act in furtherance of the conspiracy, (4) and damages to the plaintiff as a proximate result." *Bradley v. Kelley Bros. Contractors*, 117 So. 3d 331, 339 (Miss. Ct. App. 2013). An agreement between the parties must be established "[f]or a civil conspiracy to arise [as] the alleged confederates must be aware of the fraud or wrongful conduct at the beginning of the agreement." *Id.* An agreement "need not extend to all details of the scheme and may be express, implied, or based on evidence of a course of conduct." *Id*.

In response to the defendants' assertions, Kelli has not produced evidence to suggest to this Court that the parties agreed to deprive Troy and Kelli of any constitutional rights. Kelli argues that Dr. Oliver's failure to remove the restraints, and BMH-D's alleged order to keep Troy restrained during treatment, equates a conspiracy. According to *Bell Atlantic v. Twombly*, 550 U.S 544, 557 (2007), conspiracy allegations must raise "a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." In this case, at most, the actions of Dr. Oliver and BMH-D amount to parallel conduct and independent actions taken by each defendant through their own review and judgment of the situation they each particularly faced. Based on these arguments and the facts, Plaintiff cannot maintain a claim for civil conspiracy. As such, the defendants are granted summary judgment as to this claim.

**b. Count II: Excessive Force/Unreasonable Seizure (42 U.S.C. § 1983)**

Count II alleges that the City of Southaven, the Hospital defendants, the Police defendants, the Fire/EMS defendants, and John Does 1-10 used excessive and deadly force on Troy. Doc. #107 at 38–40. Kelli's complaint alleges that the Southaven police department's actions, individually

and collectively, in deploying its canine against Troy, shooting at Troy with a Taser, sitting on Troy's back, placing and maintaining Troy in a four-point restraint, and further restraining Troy with five stretcher straps, constituted excessive force. *Id*. The amended complaint accuses the Fire/EMS and Hospital defendants of acting in concert with the Police defendants to use excessive force against Troy. *Id*. at 40.

### i. Hospital (Private) Defendants

A plaintiff alleging a §1983 claim must show that a defendant acted "under color of state law." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 150 (1970). Acting "under color of state law for § 1983 purposes does not require that the defendant be an officer of the State." *Dennis v. Sparks*, 449 U.S. 24, 27 (1980) (quotation marks omitted). "Although private entities are not generally considered state actors, it is without doubt that the actions of a private citizen can … become the actions of the state for purposes of § 1983." *Meade v. Dillard Dep't Stores*, 275 F.3d 43, 2001 WL 1223752 at *3 (5th Cir. 2001) (alterations and quotation marks omitted). In particular, "a private individual may act under color … when a private person is involved in a conspiracy or participates in joint activity with state actors." *Ballard v. Wall*, 413 F.3d 510, 518 (5th Cir. 2005) (citations omitted). Because Kelli has failed to support her claim of civil conspiracy against private actors BMH-D and Oliver, they are entitled to summary judgment on this count.

### ii. Police and Fire/EMS (Public) Defendants

In response to their motion for summary judgment, Kelli submits that the individual Southaven defendants subjected Troy to excessive force in two respects. First, Kelli argues they acted unreasonably in "using a police dog on an unarmed, nonthreatening[] suspect who was attempting to submit arrest." Doc. #661 at 20. Second, Kelli argues they acted unreasonably in using "a prone hogtie restraint on an intoxicated, agitated suspect with a breathing disorder." *Id*.

The individual Southaven defendant officers argue that they are entitled to qualified immunity and summary judgment on this count as their actions in the restraint and transport of Troy was "objectively reasonable." Doc. #642 at 9–16.

### a) Excessive Force

The Fourth Amendment states, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated …." U.S. Const. amend. IV. "When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014). "The inquiry into whether this right was violated requires a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id*. (quotation marks omitted). To establish a claim of excessive force under the Fourth Amendment a plaintiff must demonstrate "(1) an injury, (2) which resulted directly and only from a use of force that was clearly excessive and (3) the excessiveness of which was clearly unreasonable." *Pratt*, 822 F.3d at 181 (alterations and emphasis omitted).

"Excessive force claims are necessarily fact-intensive," *Id*. (alterations, citations, and quotation marks omitted), and applying the Fourth Amendment reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (U.S. 1989). Reasonableness is an objective inquiry; however, "[t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. (quotation marks omitted.

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." *Id*. (citations and quotation marks omitted).

> b)      Use of Canine

Kelli fails to establish a genuine, material dispute that the Southaven police officers' use of a canine was clearly excessive or unreasonable. To start, Kelli fails to meet her burden of providing clearly established law—which does not discuss the law at a high level of generality—to support her claim. As such, the defendants are entitled to qualified immunity on the claim that the use of a canine constituted excessive force. Moreover, construing the facts in a light most favorable to Kelli, Troy was "not himself" and behaving oddly—disoriented, evasive, intoxicated, and talking to himself. Notably, Kelli admits that Troy was panicking and uncooperative after he exited her vehicle as she tried to drive him home because he was under the influence of hallucinogenic drugs. Citing no case law demonstrating the right she seeks to vindicate was clearly established considering the specific context of the case, Kelli merely remarks about the impropriety of using of the canine—relating that Troy was not violent or aggressive, had not destroyed any property, attempted to submit to arrest, and was neither fleeing nor resisting. Such dearth of legal authority does not allow Kelli to surmount the officers' invocation of qualified immunity.

Faced with Troy's conduct, the Southaven police officers used "measured and ascending actions that corresponded to [Troy's] escalating verbal and physical resistance." *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012). Although Kelli asserts that Troy surrendered immediately, this fact is contradicted by the details of her own testimony, as Kelli concedes that Troy opened the door to Scallorn's vehicle when he was asked to get down on the ground, thus, releasing the canine. Moreover, even if Officer Scallorn intentionally unlocked the back door to

his vehicle, it is uncontested that either (1) Troy opened the canine compartment and released the canine himself; or (2) the Southaven police officers separated the canine from Troy, placed the canine back in his compartment, and tried to calm Troy down, before releasing the canine. Thus, either Troy released the canine himself and the officers reasonably ordered the canine to engage with Troy, or the officers attempted to deescalate the situation, only re-releasing the canine and instructing him to bite Troy after Troy gave flight.

For the above reasons, there is no genuine issue of fact on whether the use of the canine was clearly excessive or unreasonable and the officers are entitled to qualified immunity on this count. *See, e.g., Bailey v. Preston*, 702 F. App'x 210, 214 (5th Cir. 2017) (finding that, based on the circumstances of attempting to apprehend suspect, police were entitled to qualified immunity as their use of force including a stun gun, baton, kicks, punches, and a canine bite was not objectively unreasonable under clearly established law).

c)      Use of Four-Point Restraint

1. *Clearly Established*

Although the Fifth Circuit describes "hog-tying [as] a controversial restraint, [it has] never held that an officer's use of a hog-tie is a per se, unconstitutional use of excessive force." *Pratt*, 822 F.3d at 182. The Fifth Circuit's first of several opinions about four-point restraints, *Gutierrez v. City of San Antonio*, is most squarely implicated by the facts of this case. 139 F.3d 441 (5th Cir. 1998).

Police officers discovered Gutierrez stumbling across an intersection wearing nothing but a pair of trousers. *Id*. at 442. As the officers approached Gutierrez, whom they initially believed was intoxicated, "he began swinging his arms wildly and crawling towards them on his hands and knees." *Id*. at 443. Gutierrez told officers he had been shot, but they could not find any bullet

wounds on him. *Id*. After being handcuffed, Gutierrez told the officers he had "shot some bad coke;" one of the officers testified that Gutierrez was "exhibiting he was high on some type of drugs" and called an ambulance. *Id*. While waiting for the ambulance, Gutierrez was calm; however, when the ambulance arrived Gutierrez grew combative and violent, leading responders to conclude he was experiencing psychological problems and should be transported in a patrol car rather than the ambulance. *Id*. Gutierrez was then placed in a four-point restraint in the rear of a patrol car and left unmonitored by the officers, who rode in the front of the car—although Gutierrez struggled initially, he fell silent ten minutes into the ride and was discovered face-down and without a pulse on arriving at the hospital. *Id*. Although police claim they had positioned Gutierrez on his side, he was prone and on his stomach on arrival at the hospital. *Id*.

Gutierrez's survivors sued the officers, and the trial court denied them qualified immunity and summary judgment on the Fourth Amendment claims. *Id*. at 444. The Fifth Circuit affirmed, reasoning that "there are many material issues of fact in dispute which ultimately impinge upon [the] determination as to whether the officers employed reasonable force or excessive (and deadly) force by the manner in which they seized Gutierrez." *Id*. at 449. The material issues of fact in dispute were whether: (1) the officers knew Gutierrez was on drugs; (2) the officers placed Gutierrez on his side; (3) the department had warned its officers of the dangers of four-point restraints; and (4) Gutierrez posed a threat of death or serious bodily injury to the officers or others. *Id*. at 448–49. As such, the Fifth Circuit issued a "very limited" holding that "hog-tying may present a substantial risk of death or serious bodily harm in a limited set of circumstances—*i.e.*, when a drug-affected person in a state of excited delirium is hog-tied and placed face down in a prone position." *Id*. at 451. Given the material disputes of facts, the Fifth Circuit could not determine that the officers' conduct was objectively reasonable and denied qualified immunity. *Id*.

27

In *Hill v. Carroll County, Mississippi.*, the Fifth Circuit again declined to hold that the "four-point restraint [is] a per se unconstitutionally excessive use of force." 587 F.3d 230, 235 (5th Cir. 2009). The facts in *Hill* share several similarities with those in *Gutierrez*: the decedent violently resisted arrest and was placed face down in the back of a patrol car while in a four-point restraint for a thirty-minute drive to the hospital, where she was discovered dead. *Id*. at 232–33. However, unlike in *Gutierrez*, the decedent was obese and not "under the influence of drugs or excessive alcohol." *Id*. at 233. The Fifth Circuit held that the "deputies cannot be held responsible for the unexpected, albeit tragic result, of their use of necessary force" because, from the perspective of an officer at the scene, they "had no objective basis not to use four-point restraints." *Id*. at 237. In determining there were no material issues of fact in dispute and granting summary judgment, the court cautioned: "This holding should not be read to condemn or condone the use of four-point restraint. We conclude only that Hill did not meet her burden of proof in this case." *Id*.

In *Khan v. Normand*, 683 F.3d 192 (5th Cir. 2012) the Fifth Circuit held that officers who "hog-tie[d] a drug-affected arrestee did not violate a clearly established constitutional right because the restraint was used only briefly and the arresting officers did not know that the arrestee was under the influence of drugs." *Pratt v. Harris Cty., Tex.*, 822 F.3d 174, 183 (5th Cir. 2016). Moreover, "Khan remained under constant supervision, which allowed the officers to remove the handcuffs and administer first aid quickly after he stopped breathing." *Khan*, 683 F.3d. at 195. Most recently, in *Pratt*, the Fifth Circuit granted qualified immunity to officers because "in the factual context of [the] case, the use of the hog-tie restraint was not unconstitutionally excessive, or unreasonable." 822 F.3d at 184. The Fifth Circuit distinguished *Pratt* from *Gutierrez* and *Hill*:

> [U]nlike the arrestee in *Gutierrez*, the officers who hog-tied Pratt were unaware of his use of drugs or alcohol when they hog-tied him, and Pratt does not contend that

28

her [deceased] son volunteered such information. Additionally, unlike the arrestees in *Gutierrez* and *Hill*, neither party contests that Pratt was only restrained for a very brief period of time.

*Id*.

The Southaven defendants attempt to distinguish Fifth Circuit caselaw from the facts of this case: "No Fifth Circuit cases have considered cases where: (1) medical personnel were immediately on the scene after the restraint, (2) the arrestee was transported by ambulance to the hospital and (3) the arrestee died at the hospital sometime later." Doc. #642 at 11. According to the Southaven defendants' reading of *Gutierrez*, the court was chiefly concerned that officers had "placed [Gutierrez] in the back of a police car unattended for a long period of time prior to his death" and merely mentioned "the dangers of a 4-point restraint when used on a drug infected person." *Id*. In response, Kelli asserts that it is undisputed that Southaven police had knowledge of Troy's drug intoxication and yet nevertheless kept him in a four-point restraint for around ninety minutes—roughly sixty minutes more than the "extended period of time" in *Khan*. Doc. #661 at 21–23.

*Gutierrez* is adequate authority at a sufficiently high level of specificity to put Southaven police officers on notice that their conduct was definitively unlawful, as they had knowledge that Troy was under the influence of drugs—which provided an objective basis to avoid, or at least temper, the use of four-point restraints. In contrast to *Khan*, Southaven police officers knew Troy was under the influence of drugs, yet they allowed him to remain in a four-point restraint for approximately ninety minutes—far longer than the approximately thirty minutes of restraint in *Gutierrez* and *Hill*. Distinguishing this case because Southaven police officers monitored Troy does not undercut the notice provided in 1998 by *Gutierrez's* narrow holding that "hog-tying may present a substantial risk of death or serious bodily harm in a limited set of circumstances—*i.e.*, when a drug-affected person in a state of excited delirium is hog-tied and placed face down in a

prone position." As such, arguments pertaining to the monitoring of Troy are properly directed towards the objective reasonableness prong of the qualified immunity analysis.

### 2. *Objectively Reasonable*

Further development of the facts at trial is required before a determination on qualified immunity can be made. As in *Gutierrez*, because of genuine disputes of material facts, the Court cannot determine that the conduct of the Southaven Police Officers was objectively reasonable. Further development of the facts at trial is required before a determination on qualified immunity can be made. Among these factual disputes are: (1) the extent and degree of Troy's resistance against law enforcement; (2) the extent to which Troy posed a threat, to himself or others; (3) whether Troy had committed a crime at the time he was restrained; (4) whether alternative or lesser restraints could have been used, given Troy's behavior; (5) whether it was practicable to alter, adjust, or change Troy's restraints or to turn Troy on his side once restrained; (6) the degree to which Troy was actively monitored and watched by police once restrained; (7) the degree to which Troy, or others, put police on notice that Troy was struggling to breathe in his restraints; and (8) whether it was reasonable to keep Troy in a four-point restraint for ninety minutes. As such, the Court cannot conclude that Baggett, Bond, Price, Rich, and Scallorn—all of whom participated in the four-point restraint of Troy with knowledge of his drug intoxication—acted with objective reasonableness.

### iii. The City of Southaven

The City of Southaven argues that it cannot be liable under § 1983 "on the theory of respondeat superior for the alleged acts or omissions of its employees" because the acts alleged by Kelli are isolated and not "attributable to it through some official action or imprimatur." Doc. #639 at 2; s*ee City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) ("A municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue.

Respondeat superior or vicarious liability will not attach under §1983.") As such, allegations that the City of Southaven allowed excessive force to be used against Troy will be addressed in subsection IV(e) of this memorandum discussing Count V of the Amended Complaint—Unconstitutional Practices/De Facto Policy (42 U.S.C. § 1983).

### iv.    Kelli's Motion for Partial Summary Judgment on Excessive Force

Kelli asks the Court to find that (1) it is a per se constitutional violation to use a four-point restraint on a subject known to be of diminished capacity; and/or (2) under the facts here, placing Troy in four-point, prone restraint for over ninety minutes constituted excessive force in violation of the Fourth Amendment to the United States Constitution. Doc. #644 at 17–18. Kelli also asks the Court to find that Southaven EMS used excessive force by transporting Troy in a prone, four-point restraint. *Id*. at 18. In support of her motion, Kelli makes several factual contentions: (1) Troy was not charged with a commission of a crime and had not committed one; (2) Troy posed no risk to others—at most, Troy would have kicked the officers and there was thus no risk of serious harm; and (3) given the number and size of the police officers compared to Troy, they used excessive force in capturing or controlling Troy, and there is no evidence they attempted to apply a lesser amount of force. *Id*. at 19–20.

The Southaven defendants oppose Kelli's motion as a matter of law, arguing that the Fifth Circuit has declined to impose a rule that using a four-point restraint on an individual in diminished capacity is a per se constitutional violation. Doc. #652 at 4, 6; *see Khan*, 683 F.3d at 200–201 (Garza dissent). Because the Fifth Circuit has declined to adopt such a rule, and there is a genuine dispute about the factual contentions Kelli asserts, she is not entitled to summary judgment.

### c. Count III: Substantive Due Process—Loss of Family Relationship (42 U.S.C. § 1983)

Count III alleges that all the defendants "deprived the Plaintiff of her interest in her family relationship with her husband [and] deprived R.G., a minor child, of his interest in his family relationship with his father … in violation of [the] substantive due process rights [of] the Fourteenth Amendment to the Constitution of the United States." Doc. #107 at 41.

#### i. Hospital (Private) Defendants

As Kelli has failed to support her claim of civil conspiracy against private actors Oliver and BMH-D, for the reasons stated above in section IV(b)(i), they are entitled to summary judgment on this § 1983 count as well.

#### ii. Police and Fire/EMS (Public) Defendants

The Southaven defendants argue they are entitled to qualified immunity because the facts do not establish that they acted with "malicious or outrageous conduct" at any point, so "Plaintiff's substantive due process claim fails as a matter of law." Doc. #642 at 21. However, Kelli argues that summary judgment is not warranted as defendants conduct was "akin to treating Troy as an animal [and] violates the decencies of civilized conduct." Doc. #661 at 29.

Substantive due process is implicated in "the use of extreme force by police officers or other state actors." *Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 868 (5th Cir. 2012) (collecting cases). The standard for substantive due process claims is whether the challenged conduct "shocks the conscience." *See Rochin v. California*, 342 U.S. 165 (1952); *Cty. of Sacramento v. Lewis*, 523 U.S. 833 (1998). Conduct shocks the conscience when it: "violates the decencies of civilized conduct"; "is so brutal and offensive that it does not comport with traditional ideas of fair play and decency"; "interferes with rights implicit in the concept of ordered liberty"; and "is so egregious, so outrageous, that it may fairly be said to shock the contemporary

32

conscience." *Doe ex rel. Magee*, 675 F.3d at 867 (alterations and quotation marks omitted). "The burden to show state conduct that shocks the conscience is extremely high, requiring stunning evidence of arbitrariness and caprice that extends beyond mere violations of state law, even violations resulting from bad faith to something more egregious and more extreme." *J.R. v. Gloria*, 593 F.3d 73, 80 (1st Cir. 2010) (alterations and quotation marks omitted); *see, e.g., Checki v. Webb*, 785 F.2d 534, 538 (5th Cir. 1986) ("police officer use[d] a police vehicle to terrorize a civilian … with malicious abuse of official power"); *Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 797 (8th Cir. 1998) (woman raped by police officer who had stopped her for a traffic violation and then followed her home).

Giving Kelli every benefit of the doubt on the record evidence, she cannot prove as a matter of law that the defendants' conduct towards Troy shocks the conscious. Here, officers responded to a situation involving an intoxicated individual who was concededly not in his right mind yet did not behave in an egregious or extreme manner; rather, they used verbal commands and escalating force including use of a canine, Taser, and restraints in order to detain Troy and provide him with medical treatment. Moreover, Kelli points to no overt, bad-faith conduct on the part of Southaven police or EMS/Fire suggesting that they behaved arbitrarily or capriciously.

To the extent that Kelli alleges misconduct on the part of officers, their attempts to detain Troy were not egregious or outrageous enough to violate decencies of civilized society as she claims. As such, all defendants are entitled to summary judgment on this count. *See Jones v. Houston Indep. Sch. Dist. Bd. of Trs.*, 986 F.Supp.2d 812, 819 (S.D. Tex. 2013) ("In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts").

### iii. The City of Southaven

To establish municipal liability under §1983, a plaintiff must show that (1) an official policy, (2) promulgated by the municipal policy maker, (3) was the moving force behind the violation of the constitutional right. *Piotrowski*, 237 F.3d at 568 (citing *Monell*, 436 U.S. at 694). As Kelli has pointed to no official municipal policy of allowing its employees to commit due process violations, her claim against the City of Southaven arising under Count III fails.

### d. Count IV: Deliberate Indifference to Medical Necessity (42 U.S.C. § 1983)

Count IV is brought against all defendants,[28] alleging they violated the Fourteenth Amendment to the United States Constitution by acting with deliberate indifference to Troy's medical needs by maintaining Troy in a four-point restraint and failing to take actions which Kelli asserts would have spared Troy's life. Doc. #107 at 42–44. Both Kelli and the defendants have moved for summary judgment on Count IV.[29]

---

[28] Kelli accuses the Police defendants of acting with deliberate indifference in each of the following ways: (1) maintaining Troy in a four-point restraint for an extended period of time; (2) failing to perform basic first aid to Troy by maintaining his airway after arrest and during transport; (3) transporting Troy to BMH-D in a routine, non-emergency fashion; (4) maintaining Troy in a four-point restraint "during and after the transport … despite Troy showing signs of hypoxia, including low oxygen saturation, tachycardia, tachypnea, and difficulty breathing"; and (5) failing to monitor Troy's breathing in Emergency Room 9 "despite knowing Troy was experiencing a cardiac arrhythmia and having difficulty breathing." Doc. #107 at 42–43. Kelli accuses the Fire/EMS defendants of acting with deliberate indifference in each of the following ways: (1) maintaining Troy in a four-point restraint for an extended period of time; (2) violating Southaven EMS Standard Operating Procedures; (3) transporting Troy to BMH-D in a routine, non-emergency fashion; (4) maintaining Troy in a four-point restraint "during and after the transport … despite Troy showing signs of hypoxia, including low oxygen saturation, tachycardia, tachypnea, and difficulty breathing"; and (5) failing to (a) perform appropriate heart monitoring and/or pulse oximetry; (b) maintain Troy's airway; (c) provide Troy supplemental oxygen; (d) use appropriate medical restraints; (e) treat Troy for supraventricular tachycardia despite actual knowledge of the condition; and (f) comply with the ACLS protocol. *Id.* at 43.

[29] Although Kelli moved for summary judgment that EMS's treatment and transportation of Troy constituted excessive force, the Southaven defendants note that the "standard for liability for EMS workers is the Fourteenth Amendment deliberate indifference standard." Doc. #652 at 13; *see Pena v. Gibbons*, 637 Fed. App'x. 775, 780–81 (5th Cir. 2015) (holding that medical technicians in emergency room who restrained patient while rendering aid were entitled to qualified immunity as it was not clearly established law that restraining patient while providing medical care constituted a Fourth Amendment seizure).

### i. Hospital (Private) Defendants

As Kelli has failed to support her claim of civil conspiracy against private actors such as Oliver and BMH-D, for the reasons stated above in section IV(b)(i), they are entitled to summary judgment on this § 1983 count as well.

### ii. Police and Fire/EMS (Public) Defendants

The individual Southaven defendants argue that Graham and Weatherford are held to the deliberate indifference standard and should be dismissed as they medically transported and treated Troy in the safest way possible and did not act with deliberate indifference. They further argue that Mike Mueller, Bruce Sebring, William Painter, and Joseph Spence—fire fighters—should also be dismissed as there "was no deliberate indifference" in their minimal interaction with Troy. Doc. #642 at 16–20. Kelli submits that Graham, Mueller, Painter, Sebring, Spence, and Weatherford should be denied summary judgment as they "assisted in placing Troy on the stretcher prior to EMS transport [by] lift[ing] Troy by the shackles, inflicting unnecessary and objectively unreasonable pain on a subdued, restrained patient." Doc. #661 at 28, 30–31. Moreover, Kelli submits that Mueller "had the authority and responsibility to prevent Troy's death, given the[e] affirmative knowledge" provided by McLaughlin's warning. Doc. #661 at 31.

The individual Southaven defendants note that Fire/EMS personnel were on the scene minutes after Troy was restrained, with paramedics actively assessing and treating Troy in an objectively reasonable way that accounted for the threat he posed. Doc. #652 at 13–16.

In her response in opposition to summary judgment, Kelli asserts that Graham is not entitled to summary judgment because her conduct was objectively unreasonable as she "knowingly and admittedly violated her emergency medicine training, national standard operating procedures, and Mississippi SOPs …. despite the fact that she could have repositioned Troy, and despite the fact that he did not threaten her in any way." Doc. #661 at 28.

35

"The Due Process Clause requires the responsible government or governmental agency to provide medical care to persons who have been injured while being apprehended by the police." *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 279 (5th Cir. 2015) (alterations omitted). Deliberate indifference is "an extremely high standard to meet." *United States v. Gonzales*, 436 F.3d 560, 574–75 (5th Cir. 2006). To recover, a "plaintiff must show that an officer acted with subjective knowledge of a substantial risk of serious medical harm, followed by a response of deliberate indifference." *Mason*, 806 F.3d at 279. As such, a plaintiff must demonstrate "that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* (quotation marks omitted). "Negligent or erroneous medical treatment or judgment does not provide a basis for a section 1983 claim" as a plaintiff is not entitled to the best medical treatment available. *Estes v. Rahorst*, No. 2:11-CV-0023, 2013 WL 5422874, at *7 (N.D. Tex. Sept. 27, 2013) (citing *Graves v. Hampton*, 1 F.3d 315, 319 (5th Cir. 1993)).

Wantonness refers to reckless conduct undertaken "without regard to the rights of others." *Smith v. Wade*, 461 U.S. 30, 41 (1983). Courts have defined wantonness as "the conscious failure by one charged with a duty to exercise due care and diligence to prevent an injury after the discovery of the peril, or under circumstances where he is charged with a knowledge of such peril, and being conscious of the inevitable or probable results of such failure." *Id.*

There is no evidence that Graham exhibited a wanton disregard for Troy's medical needs; on the contrary, the evidence developed suggests that Graham medically assessed and treated Troy to the extent possible during his transport to the emergency room. For example, Graham attempted to measure Troy's vital signs and blood pressure, take an EKG reading, and obtain IV access. Doc.

#643-22 at 58–59, 70. Graham also testified that, given the police escort in the ambulance, she was standing beside Troy and able to watch—and assess—his every movement. *Id*. at 26.

"Deliberate indifference exists wholly independent of an optimal standard of care." *Gobert v. Caldwell,* 463 F.3d 339, 349 (5th Cir. 2006). To the extent that Graham violated EMS protocol, she testified that she felt that it was appropriate and important for the safety of all those involved for Troy to remain in four-point restraints. Doc. #643-22 at 69.

Weatherford arrived on scene and performed an initial assessment after Troy was in a four-point restraint; Weatherford then participated in securing Troy to the stretcher and loading him into the ambulance. Doc. #636-8 at 16. Weatherford also requested that Southaven police ride in the ambulance with Troy. *Id*. Graham was not involved in placing Troy in a four-point restraint; rather, she thought it prudent for Troy to remain in such restraints during transport. Doc. #642 at 5. Graham monitored and treated Troy in the ambulance, and then assisted Spence in moving Troy from the ambulance to the decontamination room and then to Emergency Room 9—where medical care was completely handed off to BMH-D.

Spence's involvement entailed: (1) retrieving the stretcher that Troy would be placed on; (2) driving the ambulance to BMH-D; and (3) moving Troy from the ambulance, to the decontamination room, and then to Emergency Room 9—where medical care was handed off to BMH-D. Doc. #642 at 20. Sebring merely assisted in placing Troy on a stretcher and loading him into the ambulance, while Painter assisted in loading the stretcher onto the ambulance and observed Troy in the ambulance. *Id* at 19–20.

Kelli argues that Mueller, the lead firefighter, was warned by McLaughlin that "y'all are going to kill him!" and should have acted to prevent Troy's death after the warning. The extent of Mueller's involvement entailed (1) observing the scene once Troy was already in a four-point

restraint; (2) told McLaughlin, who was filming, that his video did not provide a complete picture of what had occurred; (3) spoke briefly to Kelli; and (4) cleared the scene. *Id*. at 18–19.

The Court finds that Kelli has failed to provide evidence that Graham, Weatherford, Mueller, Sebring, Painter, and Spence acted with a mental state of wantonness; accordingly, each is entitled to summary judgment as to Count IV.

### iii. The City of Southaven

The City of Southaven argues that it cannot be liable under § 1983 "on the theory of respondeat superior for the alleged acts or omissions of its employees" because the acts alleged by Kelli are isolated and not "attributable to it through some official action or imprimatur." Doc. #639 at 2; s*ee City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) ("A municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue. Respondeat superior or vicarious liability will not attach under §1983.") As such, allegations that the City of Southaven allowed excessive force to be used against Troy will be addressed in subsection IV(e) of this memorandum discussing Count V of the Amended Complaint—Unconstitutional Practices/De Facto Policy (42 U.S.C. § 1983).

### iv. Kelli's Motion

Kelli submits she is entitled to her claim that Weatherford acted with excessive force—or deliberate indifference—in providing aid to Troy. Doc. #644 at 29. As evidence, Kelli asserts that Weatherford failed to record his measurement of Troy's blood oxygen saturation through pulse oximetry, which violated EMS protocols. *Id*. Kelli merely adds, "This glaring omission must be construed against the City. Moreover, this critical omission was compounded by the transportation of Mr. Goode in violation of the requirement of supine positioning and the stricture of hogtying and prone position." *Id*. In response, Weatherford contends that Kelli has failed to raise a deliberate indifference claim, as the constitutionality of his actions "is neither guided or governed by [his]

38

subjective beliefs about the constitutionality of his actions or by his adherence to policies of the department under which he operates." Doc. #652 at 15 (citing *Pratt*, 822 F.3d at 183–84). Moreover, Weatherford argues that "Troy was appropriately transported due to his own conduct and for the safety concerns of EMT Graham and others …. Although Troy was hog-tied and prone, he was constantly under medical supervision and being assessed by EMT Graham." *Id*. at 16.

Because Kelli has failed to demonstrate that Weatherford acted with a mental state of wantonness, Weatherford is entitled to summary judgment and accordingly Kelli's motion for summary judgment will be denied.

### e. Count V: Unconstitutional Practices/De Facto Policy (42 U.S.C. § 1983)

Count V alleges that "[t]he acts and omissions of the Defendants were the direct and proximate result of the customs, practices, and/or de facto policies of Defendants John Does 6 through 10 and the City of Southaven." Doc. #107 at 45. "Such customs, practices, or de facto policies include but are not limited to an ongoing pattern of being deliberatively indifferent to the excessive use of force and the use of deadly force against persons such as Troy." *Id*. In Troy's case, such policies permitted Southaven police to use "police dogs, tasers, prone hogtie restraints, transfer in the prone and hogtied position while strapped to stretcher, and other uses of force." *Id*. Furthermore, Kelli alleges that the "City of Southaven and Southaven Fire Department policies and procedures or de facto policies permit its employees to use the methods of restraint used on Troy, including transportation in a prone, hogtied position." Doc. #107 at 45.

The City of Southaven moves for summary judgment claiming that Kelli "cites to no policy statement, ordinance, regulation or decision that was officially adopted and promulgated by Southaven's lawmaking officers that is unconstitutional and was a moving force behind the alleged violations of any of the Plaintiff's rights." Doc. #639 at 4. As support, the City of Southaven asserts

that "[n]either the use of the 4-point restraint or any of the other restraints are unconstitutional …
and the Southaven police department's … permitted use of those escalating levels of restraint does
not create city liability." *Id*. As such, Southaven submits that "there is no proof of anything done
by its policy makers, much less any actions perpetrated with deliberate indifference, resulting in a
violation of the Troy's constitutional rights." *Id*.

In response, Kelli alleges that three unconstitutional practices and polices are implicated in
this case. First, Kelli argues that Southaven's policies on the four-point restraint "give rise to
municipal liability" as such policies "permit[ed] Southaven police officers to hogtie an intoxicated,
agitated, asthmatic suspect in the prone position for an hour and a half." Doc. #663 at 2. According
to Kelli, this policy was in place despite the City of Southaven's awareness "since the 90's that the
hogtie restraint may be fatal." *Id*. at 3. Kelli contends that Southaven's mayor has described Troy's
restraint as legal and notes that, throughout discovery, the City of Southaven maintained "that all
of its police officers acted in compliance with city policies in their actions …." *Id*.

Second, Kelli alleges that the City of Southaven has use of force policies which "permit[]
an officer to use a K-9 attack as soon as that officer judges that a suspect is not complying with
verbal commands, regardless of the threat posed by the suspect or the suspect's attempts to
surrender." *Id*. at 4. Kelli contends that Scallorn, guided by this policy, "intentionally commanded
his K-9 to attack Troy," rather than speaking to Troy to assess his threat, which would have resulted
in lesser use of force. *Id*. at 4. In support, Kelli submits that Troy was not aggressive but rather
submitting to officers—who had not detained Troy or placed him under arrest at the time the canine
was deployed. *Id*. at 3–4.

Third, Kelli alleges that "Southaven has in place a policy that permits Fire/EMS personnel
to disregard the SOPs." *Id*. at 5. Although "Graham openly admitted she violated the Mississippi

SOPs in her treatment of Troy …. Southaven concluded that, despite this admitted violation, Ms. Graham complied with all City policies." *Id*.

"[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). "A municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue. Respondeat superior or vicarious liability will not attach under §1983." *City of Canton, Ohio*, 489 U.S. at 385.

A policymaker is one who "speak[s] with final policymaking authority for the local government actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue."[30] *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). "[W]hether a particular official has final policymaking authority is a question of state law." *Id*. (quotation marks and emphases omitted). Under Mississippi law, "[t]he governing authorities of municipalities shall have the power to make all needful police regulations necessary for the preservation of good order and peace of the municipality and to prevent injury to, destruction of, or interference with public or private property." Miss. Code Ann. § 21-19-15(1). However, "[a] city's governing body may delegate policymaking authority (1) by express statement or formal action or (2) it may, by its conduct or practice, encourage or acknowledge the agent in a policymaking role." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 167 (5th Cir. 2010) (internal quotation marks omitted).

---

[30] "For the purposes of § 1983, an official policy is a policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority. Alternatively, official policy is a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Sanders-Burns v. City Of Plano*, 594 F.3d 366, 380 (5th Cir. 2010)

"The Supreme Court has rejected the principle of a 'de facto' [or presumptive] policymaker." *Gros v. City of Grand Prairie, Tex.*, 181 F.3d 613, 616 n. 2 (5th Cir. 1999) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 131 (1988)). "The burden rests on [the plaintiff] to identify the positive law or evidence of custom demonstrating that [an individual] was a policymaker." *Dallas Police Ass'n. v. City of Dallas*, No. CIV.A. 3:03-CV-0584D, 2004 WL 2331610, at *4 (N.D. Tex. Oct. 15, 2004); *see Macias v. Raul A. (Unknown), Badge No. 153*, 23 F.3d 94, 99 (5th Cir. 1994) (determining claim against municipality "has no arguable basis in fact" on motion to dismiss because plaintiff did not identify policymakers).

Kelli's amended complaint and brief in opposition to summary judgment do not meet her burden of identifying Southaven's policymaker. As summary judgment evidence of policies, Kelli submits (1) Police Chief Long's deposition, which contains no evidence of who the Southaven policymaker is; (2) Scallorn's deposition; (3) Mayor Musselwhite's statements after Troy's death; and (4) assertions made about Southaven policies in its brief in support of summary judgment. Such evidence fails to prove the first element for municipal liability.

To begin, "[i]t is not reasonable to infer based solely on Chief [Long's] status as Chief of Police that he has been delegated final policymaking authority with respect to enforcement of the City's ordinances …." *Dorward v. Ramirez*, No. 3:09-CV-0018-D, 2009 WL 2777880, at *5 (N.D. Tex. Aug. 28, 2009); *see also Dallas Police Ass'n*, 2004 WL 2331610, at *4 (holding in context of summary judgment motion that police chief did not have policymaking authority merely because he possessed discretionary decision-making authority); *Gros v. City Grand Prairie*, 34 Fed. Appx. 150, 2002 WL 494040, at *4 (5th Cir. May 12, 2002) (affirming conclusion that chief of police was not policymaker). Kelli does not assert that Long was a municipal policymaker. Scallorn, as a uniformed officer of the Southaven police department, cannot be a policymaker if

his chief, Long, fails to qualify for the designation. Mayor Musselwhite has never been identified as a policymaker, and citation to his ex post facto comments on Troy's death are grist for a ratification claim—not for proving the existence of an unconstitutional practice or policy. Finally, conclusory remarks that Southaven acknowledges the existence of policies in briefing is insufficient to identify a policymaker. As such, the City of Southaven is entitled to summary judgment on Count V.

### f. Count VI: Supervisory Liability and Ratification (42 U.S.C. § 1983)

In Count VI, Kelli alleges that "Defendants City of Southaven and Defendants John Does 6-10 expressly and tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein, and knew that such conduct was unjustified and would result in violations of constitutional rights." Doc. #107 at 46. As evidence, Kelli cites to numerous statements made by Mayor Musselwhite and Southaven Police Lieutenant Mark Little which she alleges "serve[] as an official ratification of the conduct of the Police and Fire/EMS Defendants." *Id*. at 30–33. However, none of the statements referenced in the amended complaint are included in the summary judgment record.

The City of Southaven moves for summary judgment on this claim but does not brief the issue. Doc. #639; Doc. #642. In response, Kelli advances no argument against summary judgment, and again fails to attach as an exhibit the communications referenced in her amended complaint. As such, Kelli's ratification claim "falls short because she did not attach evidentiary exhibits to her summary judgment responses and there is nothing in the record to support her claims." *Richardson v. D.C. Dep't of Youth Rehab. Servs.*, 271 F. Supp. 3d 113, 118 (D.D.C. 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Kelli's briefing also fails to lay the prerequisites for a section 1983 claim of municipal liability. *See Piotrowski*, 237 F.3d at 578.

Moreover, even assuming Kelli had attached the statements she attributes to the Southaven mayor and spokesman to the record, her claim would fail as she has not presented an "extreme factual situation" required to recover for ratification. *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 848 (5th Cir. 2009); *cf. Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985) (extreme factual situation and ratification where police "poured" gunfire onto a truck and killed innocent occupant ), *with Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998) (refusing to find an extreme factual situation and ratification where officer shot fleeing suspect in the back). Furthermore, "[g]ood faith statements made in defending complaints against municipal employees do not demonstrate ratification," and the statements Kelli alleges Musselwhite made center on defending his police department. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 169 (5th Cir. 2010). Additionally, "[a] policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality." *Id*.

Thus, for the above reasons, the City of Southaven is entitled to summary judgment on Count VI.

### g. Count VII: Supervisory Liability—Failure to Train (42 U.S.C. § 1983)

Count VII alleges that the City of Southaven and John Does 1-6 were deliberately indifferent to Troy's constitutional rights—namely, they "failed to provide adequate training and/or supervision to its police officers regarding the appropriate response to reports of disturbances, treatment and control of individuals such as Troy, use of force, and use of deadly force." Doc. #107 at 47–48.

Both Kelli and the City of Southaven move for summary judgment on this count. Southaven submits its officers were adequately trained and that Kelli's claim fails as a matter of law as she "fails to articulate what necessary training was <u>not</u> provided to the involved officers or

EMT and how any prescribed training resulted in a constitutional deprivation … much less that Southaven was deliberately indifferent in regard to training protocol." Doc. #639 at 6 (emphasis original). In response, Kelli submits that although the City of Southaven has "affirmative knowledge that its officers are using a potentially lethal restraint technique, [it] provides no training on the appropriate use of this technique." Doc. #663 at 6. Moreover, Kelli contends that Southaven "does not train its officers about the need to avoid such restraints on particularly vulnerable individuals, including individuals with respiratory disorders, drug intoxication, or severe agitation …. [Or] on the appropriate handling of a suspect who has been hogtied, such as the need to place such suspects into a recovery position as soon as possible." *Id*. Furthermore, Kelli asserts that the City of Southaven maintains policies permitting "the use of a police dog on an unarmed, non-violent suspect who is attempting to submit to arrest, so long as that suspect has not complied with verbal instructions" and the transport of patients in a prone position. *Id*. at 7.

Kelli's argument for summary judgment is simply that the "[t]he City of Southaven permits officers to hogtie arrestees" and "trains its officers and paramedics to follow Southaven policies, even when those policies conflict with Mississippi State police training and state training applicable to EMS personnel." Doc. #644 at 31. Kelli contends that despite knowing that officers were using four-point restraints and that such technique could be fatal, "Southaven chose not to train officers on how to properly apply a [four-point] restraint, how to prevent injury from that restraint, the danger to intoxicated individuals from that restraint, the danger to individuals with respiratory disorders from that restraint, or the dangers of positional asphyxia caused by that restraint." *Id.* at 31–32. Kelli submits that the State of Arkansas warns that four-point restraints are "troublesome" and that subjects should not be transported in them and that "police departments throughout the United State prohibit [such restraint] altogether and train officers not to use such a

restraint position", *Id*. at 32, yet officers in Southaven received no such training—where Troy's four-point restraint "for an extended period of time was in accordance with the training protocol in place in Southaven." *Id*. Kelli characterizes Long's testimony as a "confession" that no policies were violated in Troy's restraint, which "taint[s] the actions of all officers involved in the arrest, detention, and transportation of Mr. Goode." *Id*. at 18. In response, the City of Southaven counters that its officers were adequately trained, and that Kelli's motion should be denied as "she fails to establish that Southaven was deliberately indifferent to the rights of Troy in its training protocol." Doc. #652 at 19.

To establish the City of Southaven's failure to train, Kelli must show "(1) inadequate training procedures; (2) that inadequate training caused … officers to use excessive force; and (3) the deliberate indifference of municipal policymakers." *Quinn v. Guerrero*, 863 F.3d 353, 365 (5th Cir. 2017) (alterations omitted). "This proof can take the form of either (1) failure to provide adequate training in light of foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violations by its officers." *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029–30 (7th Cir. 2006). "The inadequacy of the training must be closely related to the injury," *Pineda v. City of Houston*, 291 F.3d 325, 332 (5th Cir. 2002) (alterations omitted), and "[d]efects in a particular training program must be specifically alleged," *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005).

In assessing whether a training policy or procedure is inadequate, courts "look to whether the program enables officers to respond properly to the usual and recurring situations with which they must deal." *Hicks-Fields v. Harris Cty., Texas*, 860 F.3d 803, 811 (5th Cir. 2017) (alterations and quotation marks omitted). As "adequately trained officers occasionally make mistakes[] the fact that they do says little about the training program or the legal basis for holding the city liable,"

so a plaintiff "must demonstrate that the highly predictable consequence of not training is that the asserted injury would occur." *Id.*

If Kelli cannot establish a dispute of fact as to deliberate indifference, the other two prongs of the analysis need not be addressed. *Goodman v. Harris Cty, Texas*, 571 F.3d 388, 395 (5th Cir. 2009). "Only where a failure to train reflects a deliberate or conscious choice by a municipality … can a city be liable for such a failure under § 1983." *City of Canton, Ohio*, 489 U.S. at 389 (alteration and quotation marks omitted). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (alterations and quotation marks omitted). "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id*. "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity." *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005).

There is a so-called "single incident exception" to the deliberate indifference standard, which is implicated when, given the duties assigned to specific officers, "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio*, 489 U.S. at 390.

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Id*. The single incident exception "is inherently a narrow one" and the Fifth Circuit has been "reluctant" to expand it. *Estate of Davis ex rel. McCully*, 406 F.3d at 385.

### i. The City of Southaven's Motion

There are genuine questions of material fact such that summary judgment is precluded on this claim. First, Kelli has pointed to what she contends is an inadequate training procedure—namely, that Southaven "does not train its officers about the need to avoid [four-point] restraints on particularly vulnerable individuals, including individuals with … drug intoxication." Doc. #663 at 6. Second, it is unsettled whether the Southaven policy, which permitted the prone-restraint of those intoxicated on drugs so long as they were monitored, was the cause of the allegedly excessive force used on Troy—this is a fact question for the jury. Third, given Southaven's awareness since the early 1990s that placing an agitated, drug-intoxicated suspect in a prone restraint can result in asphyxiation, and that city policymakers ought to know that its police officers will certainly encounter out-of-control, intoxicated individuals who must be restrained, there is a jury question as to whether the City of Southaven was deliberately indifferent.

### ii. Kelli's Motion

For the above reasons, Kelli's motion for summary judgment will also be denied on this Count.

### h. Count VIII: Injunctive Relief—Class Action (42 U.S.C. § 1983)

Count VIII is brought against the Southaven defendants and seeks the certification of two class actions—one for injunctive relief, the other for monetary relief—of all "present and future individuals" placed or transported in a four-point point restraint by the City of Southaven, seeking monetary. Doc. #107 at 48. Federal Rule of Civil Procedure 23(c)(1)(A) provides that a district court must determine "[a]t an early practicable time" whether a case should be certified as a class

action. No motion for class certification has been filed and the plaintiff and the defendants—despite moving for summary judgment on this claim—have not briefed it.

"Although infrequent, dismissals for failure to prosecute of suits denominated as class actions are proper in the federal courts." *Jones v. Caddo Par. Sch. Bd.*, 704 F.2d 206, 214 (5th Cir. 1983). In *Jones*, the Fifth Circuit affirmed that district court's sua sponte dismissal of a putative class action:

> The failure of the plaintiffs and their counsel to affirmatively assert an interest in this action within the prescribed time period, combined with the uncertainty surrounding the "class" aspect of the suit over the preceding six years and the lack of any class certification, warranted the district court's dismissal of the claims of the class for failure to prosecute.

*Id*. Essentially, this case is unsuitable for class certification given the individualized, factually intensive nature of excessive force cases such as this. *See, e.g.,* Fed. R. Civ. P. 23(b)(3) (trial court must "find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy"). Moreover, "[f]rom the outset of this litigation, the status of the private plaintiffs as representatives of a class was uncertain." *Jones*, at 212. As such, this count will be dismissed for want of prosecution.

### i. Count IX: Invasion of Privacy by the Malicious Release of Expunged Records in Violation of T.C.A. § 40-32-101

Count IX alleges that John Doe 1, "who is believed to be one of the Police Defendants or another member of the Southaven Police Department …. released expunged records to reporters working with the Commercial Appeal, a newspaper in Memphis, Tennessee." Doc. #107 at 53.

A footnote in the Southaven defendants' previous memorandum in support of summary judgment read: "By email dated January 17, 2018, Plaintiff's counsel agreed to dismissal of this claim. Accordingly, no further discussion of this claim is required as it should be dismissed by

agreement of the parties." Doc. #423 at 29. The Court notes that the Southaven defendants did not include such footnote in, or attach this email exchange to, their renewed motion for summary judgment. However, the Court also notes that plaintiff did not object to Southaven's representation in their previous memorandum in response. *See* Doc. #464. Neither party moved for summary judgment on this claim. The Court can only assume that this claim has in fact been resolved by the parties.

### j.  Count X & XIV: Wrongful Death Due to Act of Reckless Disregard and Medical Malpractice

Count XIV alleges that Oliver, BMH-D, and the Fire/EMS defendants "failed to meet the standard of care prevailing in Southaven, MS and similar communities" in ten respects, and that these breaches "were the direct and proximate cause of Troy's injury.[31] Oliver, BMH-D, and the Fire/EMS defendants have all moved for summary judgment on this count. Count X alleges that the acts of all the defendants "were the direct and proximate cause, or were a proximate contributing cause" of Troy's injuries, "entitling Plaintiff to recover damages pursuant to Miss. Code Ann. §11-7-13 and Miss. Code Ann. §11-46-9."[32] Doc. #107 at 54. All the defendants have

---

[31] Kelli alleges the following breaches in the standard of care: "a. Failing to perform appropriate heart monitoring and/or pulse oximetry; b. law with arrest and the inflation of charges against Troy if they entered the state of Mississippi and came to Baptist Memorial Hospital-Desoto, thereby depriving Troy of his medical decision-maker and emotional support. Failing to maintain Troy's airway; c. Failing to provide Troy supplemental oxygen; d. Failing to use appropriate medical restraints; e. Failing to appropriate monitor Troy's condition as required by written medical orders; f. Permitting non-medical personnel exclusive custody and control over Troy; g. Failing to treat Troy for supraventricular tachycardia despite actual and constructive knowledge of Troy's condition; h. Failure to treat Troy's respiratory distress despite actual and constructive knowledge of that condition; i. Maintaining Troy in a supine, dangerously constricted position under five-point restraints in violation of their own protocols, policies, and/or standard operating procedures; and, j. Falsely informing Plaintiff and her mother-in-law that Troy's condition was "stable" when he was, in fact, mere minutes from death, and using or conspiring to use communications directed into the state of Tennessee to threaten Kelli and her mother-in-law with arrest and the inflation of charges against Troy if they entered the state of Mississippi and came to Baptist Memorial Hospital-Desoto, thereby depriving Troy of his medical decision-maker and emotional support." Doc. #107 at 61–62.

[32] Kelli accuses the police defendants of acting with reckless disregard for Troy's safety through the lethal use of force including the canine, Taser, and four-point restraint while within the course of scope of their employment as agents and employees of the City of Southaven. Doc. #107 at 54–55. Kelli accuses the fire and EMS defendants of acting in reckless disregard of Troy's safety "by willfully violating their own written Standard Operating Procedures." *Id*. at 55. Kelli accuses the fire and EMS defendants, as well as Oliver and BMH-D's agents and employees, of acting in concert with the Police Defendants to maintain Troy in [restrained,] prone position despite knowing the dangers …

moved for summary judgment on this claim. Defendants also urge that Mississippi's wrongful conduct rule bars all state claims, such as these.

### i. Wrongful Conduct Rule

The wrongful conduct rule stands for the proposition that "no Court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act." *Price v. Purdue Pharma Co.*, 920 So. 2d 479. 484 (Miss. 2006) (alterations omitted). As such, "[i]f a plaintiff cannot open his case without showing that he has broken the law, a court will not aid him …. The principle of public policy is that no court will lend its aid to a party who grounds his action upon an immoral or illegal act." *Western Union Telegraph Co. v. McLaurin*, 66 So. 739, 740 (1914).

"For the rule to apply, the injury must be traceable to the plaintiff's own breach of the law and such breach must be an integral and essential part of the plaintiff's case." § 21:26. Wrongful conduct rule, Mississippi Law of Torts § 21:26 (2d ed.). "At the same time, if the plaintiff is a lawbreaker at the time of his injury, that alone is not enough to bar the plaintiff from recovery." *Price*, 920 So. 2d at 485; *see Meador v. Hotel Grover*, 193 Miss. 392, 9 So.2d 782, 785–86 (1942) (holding that recovery not barred by wrongful conduct rule because decedent was accidentally killed in hotel elevator while riding to patronize prostitute upstairs).

*Price* related to injuries sustained from the plaintiff's ingestion of OxyContin and accordingly plaintiff's suit was precluded because the injury was a proximate result of the plaintiff's commission of an illegal act. For example, the plaintiff in *Price* engaged in many forms of misconduct, namely lying to doctors, purchasing prescriptions off the street, and doctor shopping across jurisdictions. It did not appear that he consumed OxyContin legitimately at any time. The *Price* court thus held that the plaintiff's misconduct was not "merely a condition, but

---

and by acting in concert with the Police Defendants to refuse the interventions clearly indicated by Troy's vital signs and conditions." *Id*. at 55.

instead an integral and essential part of his case and the contributing cause of his alleged injury." While Price's "entire claim is wholly rooted in his own transgressions taking place at the time his alleged injury occurred," Goode's claims are not. *Price*, 920 So. 2d at 485. Kelli's claim, rather than *wholly* rooted in Troy's transgressions, involves the independent actions of defendants for which Troy's actions were a mere condition. Rather, Troy's wrongful conduct should be addressed through a comparative negligence framework. *See Cahn v. Copac, Inc.*, 198 So. 3d 347 (Miss. Ct. App. 2015) (reversing grant of summary judgment and declining to bar medical malpractice and wrongful death action against residential drug and alcohol treatment facility as question of fact existed regarding whether rehabilitation facility had breached standard of care in allowing decedent to gain access to controlled substance).

### i. Wrongful Death

The wrongful death statute, which is predicated on an underlying tort, "encompasses all claims—including survival claims which could have been brought by the decedent, wrongful-death claims, estate claims, and other claims—resulting from a tort which proximately caused a death." *Empire Abrasive Equip. Corp. v. Morgan*, 87 So. 3d 455, 461–62 (Miss. 2012) (quotation marks omitted). The wrongful death statute provides, in pertinent part:

> Whenever the death of any person … shall be caused by any ... negligent act or omission, ... as would, if death had not ensued, have entitled the party injured or damaged thereby to maintain an action and recover damages in respect thereof, ... and such deceased person shall have left [wrongful death beneficiaries] ... , the [defendant] ... that would have been liable if death had not ensued ... shall be liable for damages, notwithstanding the death ....

Miss. Code Ann. § 11–7–13.

Defendant City of Southaven argues that dismissal of the state law claim of wrongful death against it and its deputies is warranted pursuant to § 11-46-9(1)(c), (d), and (m) of the Mississippi Code. These MTCA sections state that:

> (1) A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim:
>
> . . .
>
> > (c) [a]rising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury;
> >
> > (d) [b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee therefore, whether or not the discretion is abused;
> >
> > . . .
> >
> > (m) [o]f any claimant who at the time the claim arises is an inmate of any detention center, jail, workhouse, penal farm, penitentiary or other such institution, regardless of whether such claimant is or is not an inmate of any detention center, jail, workhouse, penal farm, penitentiary or other such institution when the claim is filed;

Miss. Code Ann. § 11–46–9(1)(c), (d), (m).

Defendant City of Southaven argues that the police exemption, § 11–46–9(1)(c), applies in this case because "Troy … was unquestionably engaged in criminal activity during the entire course of his interactions with all Southaven defendants." Specifically, the city contends that Troy had consumed LSD—a schedule I controlled substance—and was arrested for "disorderly conduct, public intoxication, failure to obey a lawful command, and for resisting arrest." Doc. #639 at 9. In response, Kelli disputes that Troy was engaged in criminal activity during his interaction with Southaven defendants. Doc. #663 at 10. Kelli argues that "even if Troy was engaged in the commission of any criminal offenses when he was initially attacked by the police dog, his criminal conduct ended once he was handcuffed and shackled," and once restrained he was no longer able to resist or move and any criminal offenses had ended. *Id*. at 11–12. Kelli argues that the continued use of the four-point restraint against Troy qualifies as "reckless disregard" and precludes immunity under the police exemption. In its reply, the city contends that even if Plaintiff's

argument is accepted, she "still must demonstrate each individual Southaven defendant acted with 'reckless disregard' for Troy's safety" and readopts its qualified immunity arguments. Because this Court has found that further development of the facts at trial is required before a determination on qualified immunity can be made, it cannot at this time render a ruling as to whether the acts or omissions of any of the individual Southaven defendants amounted to reckless disregard. Thus, the Court cannot find that immunity is warranted pursuant to the police exemption.

As to § 11–46–9(1)(d), the discretionary function exemption, Defendant City of Southaven argues that "the actions of the Southaven employees were strictly discretionary in nature" and as such "Southaven is exempt from the waiver of sovereign immunity" and the wrongful death claim is barred. Doc. # 639 at 10–11. In response, Kelli argues that "Southaven exceeded its discretion when it violated Troy's constitutional rights," and that use of such excessive force "is not protected by the discretionary function exemption." Doc. #663 at 12–13. Southaven rebuts that "[n]o blanket rule exists that the discretionary function exemption is inapplicable in an excessive force claim." Doc. #669 at 5–6. Although the Court agrees with Defendants that no blanket rule exists, the District Court for the Southern District of Mississippi has discussed the discretionary function exception to the Federal Torts Claims Act—which this Court finds supportive.

In *Knott v. Donahoe*, the District Court for the Southern District of Mississippi noted that "[i]t is true that decisions related to law enforcement typically are discretionary functions, but the Fifth Circuit 'ha[s] not hesitated to conclude that such action does not fall within the discretionary function … when governmental agents exceed the scope of their authority as designated by statute or the Constitution." No. 3:11–CV–00256–CWR–FKB, 2011 WL 6399920, at *4–6 (S.D. Miss. Dec. 20, 2011). Although the discretionary function exemption is raised in this case at the summary judgment stage, and not in a motion to dismiss as the cases cited by Kelli, there are nonetheless

fact issues as to whether the individual Southaven defendants exceeded their authority so as to preclude this Court from granting immunity under the discretionary function exemption.

Finally, Defendant City of Southaven also argues that the state law claims were barred under the inmate exemption, § 11–46–9(1)(m), because "Troy … was at all relevant times a pre-trial detainee." Doc. #639 at 11. Kelli argues that Troy was neither a pretrial detainee nor an inmate because "[he] was never taken to any jail … [he] was never booked into a detention center and never became an inmate" and "this exemption applies only where a pretrial detainee is an inmate of a detention center or other similar institution." Doc. #663 at 14. The Court agrees with Defendant that the inmate exemption "from the MTCA's waiver of sovereign immunity applies to both pretrial detainees and convicted inmates." Doc. #639 at 11. However, Defendant City of Southaven does not provide this Court with any court opinions that have found the exemption to apply to situations where an individual was arrested but never detained in any institution because medical treatment was being sought at the time of his injury and before any official booking or detention occurred. The Court finds no case law to support Defendant's argument that Troy was in fact a pre-trial detainee under the inmate exemption. Thus, the Court is inclined to find that such exemption does not apply.

The City further argues that, regardless of its sovereign immunity arguments, "[t]he undisputed evidence in this case demonstrates that no act or omission of Southaven or its employees proximately caused or contributed to Troy's … death." Doc. #639 at 13. The City of Southaven emphasizes that the code blue "was called approximately one (1) hour after EMT Graham last provided care to Troy" and that Southaven no longer had "continuing responsibility" over Troy once care was transitioned over to BMH-D. *Id*. at 15–18. Kelli responds by stating that her experts establish that "Defendants' actions of maintaining Troy in a prone, hogtied position

and transporting him in that position in violation of their own policies and procedures ultimately led to his death." Doc. # 663 at 14–15. Additionally, Kelli contends that "[BMH-D] personnel testified … [that] they deferred to the Southaven police officers on the manner of restraint to be used on Troy on [BMH-D] premises." *Id*. The City contends that Kelli has failed to provide "the necessary evidence to demonstrate that any act or omission of Southaven officers or EMS workers engaged in 'lethal, wrongful conduct' which caused or contributed to Troy's death." Doc. #669 at 8.

Because the discussion of whether expert opinions establish a causal link between the parties' acts or omissions and Troy's death is discussed in detail in the next section, (ii) below, the Court will discuss causal link as to Southaven below as well.

### ii.    Medical Malpractice

The Mississippi Supreme Court defines medical malpractice as the "legal fault by a physician or surgeon. The term physician [i]s said to include all persons possessing an M.D. and providing medical … services." *Boyd v. Lynch*, 493 So. 2d 1315, 1318 (Miss. 1986) (citation and quotation marks omitted) (emphasis added). Accordingly, "hospitals are not liable for medical malpractice liability since a hospital is not a person licensed as a physician." *Id*. However, "[a] hospital may also be liable under other legal theories, such as negligence, contract, or expressed warranty" in which the hospital "had a duty to act in accordance with a standard of reasonable care so as to prevent injury to a foreseeable plaintiff." *Id*. at 1318–1319.

As such, BMH-D acknowledges that "as to BMH-D, the underlying tort is medical negligence" rather than medical malpractice. Doc. #641 at 7. Oliver also acknowledges that "the Plaintiff's wrongful death claims are predicated on … medical negligence." Doc. #646 at 19.

Under Mississippi law, for a plaintiff to prove medical negligence, she must prove a duty to conform to a specific standard of conduct, a failure to conform to that standard, and an injury proximately caused by the breach of duty. *Crosthwait v. Southern Health Corp. of Houston, Inc.*, 94 So.3d 1070, 1073 (Miss. 2012). "When proving these elements in a medical malpractice suit, expert testimony must be used. Not only must this expert identify and articulate the requisite standard that was not complied with, the expert must also establish that the failure was the proximate cause, or proximate contributing cause, of the alleged injuries." *Hubbard v. Wansley*, 954 So.2d 951, 957 (Miss. 2007) (citations omitted). "Where a plaintiff fails to present expert testimony as to the applicable standard of care, breach thereof, and proximate causation, summary judgment is mandated." *Crosthwait*, 94 So.3d at 1074.

Kelli has disclosed a standard of care expert, Mark Fowler, M.D., against Oliver and BMH-D, along with three causation experts, Cyril Wecht, M.D., Michael Arnall, M.D., and Parin Parikh, M.D., who were previously qualified by Judge Brown in this action in her gatekeeping function.

According to the deposition of, and reports by, Dr. Fowler, BMH-D and Dr. Oliver breached the standard of care by:

> (1) failing to promptly assess and treat a supraventricular tachycardia[33];
>
> (2) BMH-D personnel, particularly Nurse Baker, failing to properly communicate effectively thereby allowing a supraventricular tachycardia to go untreated[34];
>
> (3) failing to effectively and thoroughly trouble-shoot a low oxygen saturation reading which would have suggested a cause (cardiac dysrhythmia) warranting treatment[35];
>
> (4) failing to promptly assess and effectively treat a patient in a psychotic rage, leaving him hogtied in the prone position for over 40 minutes after arrival[36];

---

[33] Doc. #640-15 at 3; Doc. #645-16 at 12 (Fowler Dep. 70:15–17).

[34] In his deposition, Dr. Fowler stated that this criticism was not directed against Dr. Oliver. Doc. #645-16 at 30 (Fowler Dep. 177:12–178:14).

[35] Doc. #640-15 at 3; Doc. #645-16 at 14 (Fowler Dep. 84:8–18).

[36] Doc. #640-15 at 3; Doc. #645-16 at 17 (Fowler Dep. 96:23–97:8).

(5) failing to take effective measures to relieve the patient's distress by turning him to the supine position, despite the hospital protocol requiring the least restrictive restraint[37];

(6) failing to post a trained medical staff member in the room to observe the patient.[38];

(7) failing to reposition Troy[39];

(8) failing to use ECG and pulse oximetry monitoring[40];

(9) failing to investigate an oxygen saturation rate of 90%[41]; and

(10) failing to provide Troy supplemental oxygen[42].

Plaintiff's Amended Complaint[43] also states that the hospital defendants failed to meet the standard of care prevailing in Southaven, MS, and surrounding communities by:

(1) failing to maintain Troy's airway;

(2) failing to use appropriate medical restraints;

(3) failing to appropriately monitor Troy's condition as required by medical orders;

(4) permitting non-medical personnel exclusive custody and control over Troy;

(5) failing to treat Troy's respiratory distress despite actual and constructive knowledge of the condition; and

(6) falsely informing Plaintiff and her mother-in-law that Troy's condition was "stable" when he was in fact, mere minutes from death, and using or conspiring to use communications directed into the State of Tennessee to threaten Kelli and her mother-in-law with arrest and the inflation of charges against Troy if they entered the state of Mississippi and came to BMH-D, thereby depriving Troy of his medical decision-maker and emotional support.[44]

Oliver and BMH-D both argue that Kelli fails to offer any expert proof regarding causation.

Doc. #641 at 9–12; Doc. #646 at 20–24. In support of their arguments, both defendants rely on Dr.

---

[37] Doc. #640-15 at 3; Doc. #645-16 at 19 (Fowler Dep. 112:16–113:6); Doc. #645-16 at 30 (Fowler Dep. 177:12–178:14).

[38] Doc. #640-15 at 3; Doc. #645-16 at 30 (Fowler Dep. 177:12–178:14).

[39] Doc. 645-16 at 17–18; 31–32 (Fowler Dep. 102–103, 183, 187).

[40] Doc. 645-16 at 33 (Fowler Dep. 196).

[41] Doc. 645-16 at 32 (Fowler Dep. 191).

[42] Doc. 645-16 at 34 (Fowler Dep. 204).

[43] Doc. #107 at 61–62.

[44] Plaintiff's Count XIII: Violation of Plaintiff's Right to Interstate Travel, has been deemed waived. Refer to Section IV(m) of this memorandum.

Fowler's deposition in which he stated that he would not be addressing the issue of causation of Troy's death during his testimony at trial as such issues are outside his purview. Doc. #645-16 at 14 (Fowler Dep. 83:16–17), 22 (Fowler Dep. 129:3–7), 26 (Fowler Dep. 154:14–155:10). These defendants also argue that the experts upon which Kelli relies on for the issue of causation—Dr. Arnall, Dr. Parikh, and Dr. Wecht—fail to establish a link between the alleged deviations from the standard of care and Troy's death. Doc. #641 at 10–11; Doc. #646 at 21–24.

In response, Plaintiff argues that "contrary to the claims made by [BMH-D and Dr. Oliver], Drs. Parikh, Arnall and Wecht have each disclosed opinions and testified that [BMH-D's and Dr. Oliver's] breaches of the standard of care were the proximate cause of Troy Goode's death." Doc. #654 at 13; Doc. #656 at 14.

The Court finds that summary judgment on this issue is not warranted at this time because there exists questions of fact as to whether the medical defendants' failure to remove the four-point restraint and reposition Troy, which ultimately, according to the experts' testimony, precluded the medical defendants from properly treating and assessing Troy—which are listed as, and encompass, many of the listed breaches of the standard of care—caused Troy's death. The defendants argue that the causation experts fail to link the cause of death to any breach by Dr. Oliver, BMH-D, or Southaven, and instead merely discuss the cause and manner of Troy's death in a general sense. However, this Court finds that the opinion of the standard of care expert, the deposition opinions of the cause experts, and the record in general, are sufficient for this court to refrain from granting the defendants summary judgment. Review of the record establishes that Dr. Arnall, Dr. Parikh, and Dr. Wecht each link Troy's death to the prolonged use of the four-point restraint—which according to Dr. Fowler, Dr. Oliver and BMH-D were required to reassess and act to ensure repositioning of the patient and removal of the restraints if needed. Dr. Parikh, a

cardiologist, opined that Troy's positioning should have been reevaluated and that Troy "had a prolonged physiologic instability related to being in the prone [four-point] position that led to his cardiac arrest." Doc. #645-18 at 39 (Parikh Dep. 155–156). Dr. Arnall, a forensic pathologist, during his deposition, stated that the four-point restraint coupled with Troy's struggle against the restraints, contributed to his death, Doc. #645-17 at 15 (Arnall Dep. 53:20–56), and that if Troy's physical condition had been improved, his probability of survival may have improved as well, Doc. #645-17 at 40 (Arnall Dep. 153–154). Dr. Wecht, also a designated causation expert, opined that Troy's death was a result of positional asphyxiation that resulted from a prolonged use of the four-point restraint. Doc. #645-19 at 21, 36. However, the Court also notes that the evidence also establishes that certain acts or omissions by Dr. Oliver, BMH-D, or Southaven EMTs, may in fact have not been unreasonable or outside sound medical judgment—such as the administration of relaxants before treating Troy or removing the restraints. Nonetheless, such matters should be further developed at trial. As such, the Court will deny Dr. Oliver and BMH-D summary judgment on the medical malpractice claim and the wrongful death claim, and the Court will also deny Southaven summary judgment on the wrongful death claim above.

Defendant City of Southaven also moved for summary judgment as to the medical malpractice claim. The City of Southaven argues that "[n]one of the Southaven EMTs in question, principally Medic Weatherford or Paramedic Graham, were a 'physician or surgeon'" and "any 'medical malpractice' claim against Southaven for the alleged acts or omissions of its emergency personnel must be dismissed." Doc. #639 at 21–22. Kelli has waived her claim of medical malpractice against defendant City of Southaven. In her response to The City of Southaven's Renewed Motion for Summary Judgment, Doc. #663, Kelli does not offer an argument against the

defendants' contention that "[n]one of the Southaven EMTs … were a 'physician or surgeon'". As such, the medical malpractice claim is deemed waived as to defendant City of Southaven.

### k. Count XI: Intentional and Negligent Infliction of Emotional Distress

Count XI alleges that Kelli "endured emotional distress and mental anguish at the time of the events leading to the death of Troy and since these events, and will continue to endure emotional distress and mental anguish in the future." Doc. #107 at 56. Namely, Kelli claims "she was present when Defendants commanded a police dog to attack Troy, shot a taser gun at a completely helpless and incapacitated Troy in the back, hogtied him and placed him face down on a stretcher, and denied Plaintiff the right to visit Troy in the hospital." *Id*.

Kelli has waived her claims of intentional and negligent emotional distress. In her responses to BMH-D, Doc. #654, and Oliver, Doc. #656, Kelli does not offer an argument against the defendants' reasons for summary judgment on the infliction of emotional distress claims. Instead, Kelli "concurs that summary judgment should be granted" on infliction of emotion distress claims." Doc. #654 at 24; Doc. #656 at 25. As such, claim XI is deemed waived and defendants are entitled to summary judgment on this count.

### l. Count XII: The Common Law Tort of Outrage

Count XII alleges that the City of Southaven, the Hospital Defendants, the Police Defendants, the Fire/EMS Defendants, and John Does 1-10 committed the tort of outrage as their "overall conduct at all times pertinent to this civil action was so outrageous that it shocks the moral and legal conscience of the community." Doc. #107 at 57. However, the tort of outrage is not a cognizable cause of action because the Mississippi Supreme Court "has recognized outrageous conduct as a tort more commonly known as the intentional infliction of emotional distress." *Donald v. Amoco Prod. Co.*, 735 So. 2d 161, 179 (Miss. 1999). Moreover, Kelli has waived this

61

claim by failing to respond to defendants' arguments for summary judgment. *See* Docs. #654 at 24; #656 at 25. Kelli again "concurs that summary judgment should be granted." As such, defendants are entitled to summary judgment on Count XII of the amended complaint.

### m. Count XIII: Violation of Plaintiff's Right to Interstate Travel

Count XIII alleges that the City of Southaven, the Hospital Defendants, the Police Defendants, the Fire/EMS Defendants, and John Does 1-10 "deprived Kelli of her right to travel freely between the states of Tennessee and Mississippi for the purpose of visiting her husband in the hospital" by threatening her. Doc. #107 at 58. The City of Southaven moved for summary judgment on all claims, Doc. #639 at 1, yet did not discuss grounds for summary judgment on this particular count in their memorandum brief in support, Doc. #639. BMH-D and Dr. Oliver stated, in reference to a previous Court Order, Doc. #633, that the claim had been found to be abandoned and waived. Doc. #641 at 25; Doc. #646 at 18. However, after review of previous orders issued by this Court and the previous court, such statement in the Court's Order, Doc. #633, was an oversight. Reluctantly, Kelli, in her responses, Doc. #656 and Doc. #654, stated that "Plaintiff does not intend to pursue" this claim as the Court has barred any evidence of such claim at trial through Order #633. However, the Plaintiff could have easily produced evidence and arguments of such claims in her responses and could have urged the Court to review its previous order to determine whether such order was correct.

Nevertheless, the Court, to the extent that Kelli has not argued against entry of summary judgment on Count XIII of her Amended Complaint in response to any of the instant motions and has not urged the Court to review and reconsider its previous order and merely stated that she "does not intend to pursue it", this count is deemed waived.

### n. Punitive Damages

#### i. The Southaven Defendants

All defendants have moved for summary judgment on punitive damages. The individual Southaven Defendants argue that "[a]ll Southaven defendants are immune from punitive damages for … state law claims" because the MTCA "prohibits recovery of punitive damages against a governmental entity or employees thereof." Doc. #642 at 23. They further argue that any punitive damages claims brought against the individual Southaven defendants "pursuant to claims of federal constitutional violations are barred by qualified immunity." *Id.* at 24. The City of Southaven argues that it "is absolutely immune from any punitive damages awards for claims arising under federal law … or arising under state law," and that "Plaintiff conceded that summary judgment was appropriate as to the City of Southaven for any punitive damages claim." Doc. #639 at 25–26.

In response to the individual Southaven defendants' punitive damages motion for summary judgment, Kelli "concurs that punitive damages claims are unavailable against the individual Southaven Defendants for state law claims," Doc. #661 at 32, but argues that there is "sufficient factual basis for the imposition of punitive damages against the individual Southaven Defendants for her federal claims," *Id.*. Plaintiff, in her response in opposition to Defendant City of Southaven's motion for summary judgment, did not provide an argument against the city's motion for summary judgment as to punitive damages.

Pursuant to Mississippi Code § 11–46–52(2) "[n]o judgment against a governmental entity or its employees for any act or omission for which immunity is waived under this chapter shall include an award for exemplary or punitive damages." Finding that Plaintiff has not opposed City of Southaven's motion for summary judgment as to punitive damages and that she concurred that

punitive damages are unavailable against the individual Southaven Defendant for her state law claims, the individual Southaven Defendants and the City of Southaven are granted summary judgment on punitive damages as to the state law claims.

Whether punitive damages should be imposed against the individual Southaven Defendants for Plaintiff's federal claims is a matter that depends on whether the individual Southaven Defendants will be granted qualified immunity—a matter this Court has found requires development of the facts at trial before a determination can be made. As such, the Court will deny the individual Southaven Defendants' motion for summary judgment as to punitive damages.

### ii. The Medical Defendants

Dr. Oliver argues that punitive damages are not warranted against him because Kelli cannot "prove[] by clear and convincing evidence, that Dr. Oliver: [(1)] acted with actual malice; [(2)] acted with gross negligence which evidences a willful, wanton or reckless disregard for the safety of others; or [(3)] committed actual fraud." Doc. #646 at 32–34. In response, Kelli argues that "[i]t simply cannot be concluded that Dr. Oliver should not be considered for a punitive damage award" because, among other things, Dr. Oliver took too long to provide Troy with care, indicating a reckless or callous disregard for the rights of an injured person. Doc. #656 at 24–25.

In its motion, BMH-D argues that it is entitled to summary judgment as to punitive damages because (1) Plaintiff's claims against BMH-D "are based upon vicarious liability" and Mississippi law does not allow for punitive damages based upon vicarious liability; and because (2) Kelli cannot show a genuine issue of material fact that the "acts and omissions of [BMH-D] were malicious, reckless, wanton and/or accomplished with a conscious disregard of the rights of [Troy] and [Kelli]." Doc. # 641 at 26–27. Kelli responds by arguing that BMH-D was passive in the face of Troy's plight and did nothing to stop the events and resulted in Troy's death, evidencing

a reckless or callous disregard for the rights of an injured person. Doc. #654 at 21. In reply, BMH-D argues that Kelli concedes that it cannot be liable for punitive damages based on vicarious liability by not addressing this point in her briefing. Doc. #667 at 20.

To the extent that any of Plaintiff's punitive damages claims against BMH-D arise under vicarious liability BMH-D will be granted summary judgment because "punitive damages are not available in Mississippi on the basis of vicarious liability." *Bell v. Coleman*, No. 4:17–CV–47–SA–JMV, 2018 WL 3118614, at *4 (N.D. Miss. June 25, 2018) (citing *Littlejohn v. Werner Enterprises, Inc.*, No. 1:14–CV–44–SA–DAS, 2015 WL 3484651 (N.D. Miss. June 2, 2015). Therefore, BMH-D's motion as to punitive damages is granted in this respect.

However, the Court finds that any further rulings on punitive damages as to Dr. Oliver and BMH-D would be premature at this time. The Court will consider the issue of punitive damages as to these defendants once the case proceeds to trial, if it does proceed to trial, and only after an award of compensatory damages has been made by a jury. *See* Miss. Code Ann. § 11–1–65.

## V.    Conclusion

**IT IS THERFORE ORDERED AND ADJUDGED** that

1.  The City of Southaven's *Motion for Summary Judgment*, Doc. # 636, is **GRANTED in part** and **DENIED in part.**

2.  The individual Southaven Defendants' *Motion for Summary Judgment*, Doc. #637, is **GRANTED in part** and **DENIED in part.**

3.  BMH-D's *Motion for Summary Judgment*, Doc. #640, is **GRANTED in part** and **DENIED in part.**

4. Dr. Oliver's *Motion for Summary Judgment*, Doc. #645, is **GRANTED in part** and **DENIED in part.**

5. Kelli's *Motion for Partial Summary Judgment*, Doc. #643, is **DENIED**.

SO ORDERED, this the 1st day of May 2019.

/s/ **MICHAEL P. MILLS**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF MISSISSIPPI**